ACCEPTED
06-15-00013-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
12/14/2015 2:21:13 PM
DEBBIE AUTREY
CLERK

No. 06-15-00013-CV

**IN THE**
**COURT OF APPEALS**
**SIXTH DISTRICT OF TEXAS**
**TEXARKANA**

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS

12/14/2015 2:21:13 PM

DEBBIE AUTREY
Clerk

_____

**CITY NATIONAL BANK OF SULPHUR SPRINGS,**
**Appellant**

**v.**

**JOHN ALEXANDER SMITH,**
**Appellee**

_____

**On Appeal from the District Court of Hopkins County, Texas**
**62nd Judicial District**
**The Honorable Will Biard Presiding**

_____

**APPELLEE'S BRIEF**

_____

**J. Mark Sudderth**
**Texas Bar No. 19461500**
NOTEBOOM – THE LAW FIRM
669 Airport Freeway, Suite 100
Hurst, Texas 76053
(817) 282-9700
(817) 282-8073 (facsimile)
Sudderth@Noteboom.com

Attorney for Appellee,
John Alexander Smith

**ORAL ARGUMENT REQUESTED**

## REQUEST FOR ORAL ARGUMENT

Appellee John Alexander Smith respectfully requests the opportunity to present oral argument.  TEX. R. APP. P. 39.7.

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

ABBREVIATIONS AND RECORD REFERENCES. . . . . . . . . . . . . . . . . . . . . xii

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      1.     How it Really All Began. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      2.     Who Cares About Probable Cause?. . . . . . . . . . . . . . . . . . . . 4

      3.     Untruths and Consequences. . . . . . . . . . . . . . . . . . . . . . . . . 4

      4.     Misery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      5.     Things Cone Forgot.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      6.     Shame and Degradation.. . . . . . . . . . . . . . . . . . . . . . . . . . 11

      7.     The Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

I.     Response to Appellant's Issue No. 1. . . . . . . . . . . . . . . . . . . . . . . 18

     A.     The Bank is barred and estopped from asserting that it is not a "responsible third party" under Chapter 33 because such assertion is clearly adverse to its position in the trial court that Clark was a "settling person" under Chapter 33, upon which the Bank sought and obtained judgment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

B.     The Bank is barred and estopped from asserting that it is not a "responsible third party" under Chapter 33 because the bank judicially admitted that "the harm for which recovery of damages is sought" from Clark and the Bank was the same by affirmatively and unequivocally pleading that Clark was a "settling person" under Chapter 33, which requires that Clark settled claims with respect to "the harm for which recovery of damages is sought" from the Bank.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C.     The Bank has failed to preserve any error on its alleged statute of limitations defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

     1.     The Bank never secured an order on its improper motion to strike its own designation as a responsible third party, choosing instead to proceed with its limitations defense by motion for summary judgment... . . . . . . . . . . . . . . . . . . . . . 21

     2.     The denial of the Bank's motion for summary judgment preserved no alleged error.. . . . . . . . . . . . . . . . . . . . . . . . . 21

     3.     At trial, the Bank offered no proof to establish its alleged limitations defense and did not request or secure any findings to sustain such affirmative defense; nor did it move for a directed verdict in such regard.. . . . . . . . . . . . . . . . . . . . . . . 22

D.     The trial court had no discretion to grant the Bank's improper motion to strike its own designation as a responsible third party... . . 25

E.     The trial court did not err in entering judgment against the Bank for malicious prosecution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

     1.     The Bank was properly joined and timely sued under Chapter 33 because it was responsible for contributing, in some way, to some portion of Smith's alleged injury or damages.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

a. The damages Smith sought from Clark included all damages recoverable from the Bank in a malicious prosecution suit.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

b. The damages Smith sought from the Clark also included mental anguish and harm to his reputation.. . . . 29

2. Identity of cause of action is not required.. . . . . . . . . . . . . . . 30

3. Smith's claims against Clark and the Bank are not mutually exclusive, and Chapter 33 would apply, regardless.. . . . . . . . . 36

4. Applying the statute as written does not produce an absurd result, and no vested right was curtailed.. . . . . . . . . . . . . . . . 37

5. The statute promotes public policy.. . . . . . . . . . . . . . . . . . . . 39

II. Response to Appellant's Issue No. 2.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

A. Punitive damages recoverable from the Bank in a malicious prosecution case were part of the actual damages Smith's sought against Clark.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

B. Chapter 33 prohibits the reduction of exemplary damages, not their recovery.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

III. Response to Appellant's Issue No. 3.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

A. Sufficient evidence supports the jury's finding that the Bank initiated or procured the prosecution.. . . . . . . . . . . . . . . . . . . . . . . 44

1. The evidence shows that the Bank initiated the prosecution; moreover, the Banks' representative and retained expert each testified and admitted that it did.. . . . . . . . . . . . . . . . . . . . . . 44

2. The evidence shows that the Bank procured the prosecution.. 47

a. Cone knowingly provided false information. . . . . . . . . 48

b.     The Bank was the source of information that caused Smith's prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

B.     Sufficient evidence supports the jury's finding that the Bank lacked probable cause.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

IV.     Response to Appellant's Issue No. 4.. . . . . . . . . . . . . . . . . . . . . . . . 54

Sufficient evidence supports the jury's finding that the Smith sustained some physical pain or mental anguish.. . . . . . . . . . . . . . . . . . . . . . . 54

A.     Physical Pain.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

B.     Mental Anguish.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

PRAYER.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

CERTIFICATE OF COMPLIANCE .. . . . . . . . . . . . . . . . . . . . . . . . . 61

APPENDIX . .. . . . . . . . . . . . . . . . . (Separate Index Located in Front of Materials)

# INDEX OF AUTHORITIES

**<u>Cases</u>**

*Ackerman v. Vordenbaum,*
    403 S.W.2d 362 (Tex. 1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Adams v. Parker Square Bank,*
    610 S.W.2d 250 (Tex.App.–Fort Worth 1980). . . . . . . . . . . . . . . . . . . . 21

*Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.,*
    299 S.W.3d 106 (Tex.2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 41

*Anzaldua v. State,*
    696 S.W.2d 911 (Tex.Crim.App. 1985). . . . . . . . . . . . . . . . . . . . . . . . . 52

*Ardmore, Inc. v. Rex Group, Inc.,*
    377 S.W.3d 45 (Tex.App.–Houston [1st Dist.] 2012). . . . . . . . . . . . . . . . 55

*Baker v. Hughes,*
    12 S.W.3d 1 (Tex. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Browning-Ferris Industries, Inc. v. Lieck,*
    881 S.W.2d 288 (Tex. 1994). . . . . . . . . . . . . . . . . . . . . . 44, 45, 46, 47

*City of Rockwall v. Hughes,*
    246 S.W.3d 621 (Tex. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*City of San Antonio v. Talerico,*
    81 S.W. 518 (1904). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Clark v. Dillard's, Inc.,*
    460 S.W.3d 714 (Tex.App.–Dallas 2015). . . . . . . . . . . . . . . . . . . . . . . 22

*Clear Lake City Water Authority v. Kirby Lake Development, Ltd.,*
    123 S.W.3d 735 (Tex.App.–Houston [14th Dist.] 2008). . . . . . . . . . . . . . 55

*Cosgrove v. Grimes,*
    774 S.W.2d 662 (Tex.1989). . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 41

*Dixon v. SW Bell Tel. Co.,*
     607 S.W.2d 240 (Tex. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Edlund v. Bounds,*
     842 S.W.2d 719 (Tex.App.–Dallas 1992). . . . . . . . . . . . . . . . . . . . . . . . 22

*Elizondo v. Krist*,
     415 S.W.3d 259 (Tex. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 41

*Eslon Thermoplastics v. Dynamic Systems, Inc.,*
     49 S.W.3d 891 (Tex.App.–Austin 2001). . . . . . . . . . . . . . . . . . . . . . . . 33

*ExxonMobil Corp. v. Pagayon*,
     467 S.W.3d 36 (Tex.App.–Houston [14th Dist.] 2015). . . . . . . . . . . . . . 35

*FFP. Operating Ptnrs., L.P. v. Duenez,*
     237 S.W.3d 680 (Tex. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Flack v. Hanke*,
     334 S.W.3d 251 (Tex. App.–San Antonio 2010). . . . . . 25, 26, 27, 38, 40, 43

*French v. Gill,*
     252 S.W.3d 748 (Tex.App.–Texarkana 2008). . . . . . . . . . . . . . . . . . . . . 20

*GAB Business Services, Inc. v. Moore,*
     829 S.W.2d 345 (Tex.App.–Texarkana 1992). . . . . . . . . . . . . . . . . . . . . 59

*Golden Eagle Archery, Inc. v. Jackson*,
     116 S.W.3d 757 (Tex. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Gonzalez v. Grimm,*
     No. 08-13-00326-CV, 2015 WL 4137862
     (Tex.App.–El Paso, July 8, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

*Gray v. Nash*,
     259 S.W.3d 286 (Tex.App.–Fort Worth 2008). . . . . . . . . . . . . . . . . . . . 34

*Greathouse v. McConnell*,
     982 S.W.2d 165 (Tex.App.–Houston [1st Dist.] 1998). . . . . . . . . . . . . . 29

*Heath v. Herron*,
732 S.W.2d 748 (Tex.App.–Houston [14th Dist.] 1987). . . . . . . . . . . . . . . 30

*Hernandez v. Bumbo, Ltd.,*
No. 3:12-CV-1213-M, 2014 WL 924238 (N.D. Tex. March 10, 2014). . . . 36

*Hines v. Commission for Lawyer Discipline*,
28 S.W.3d 697 (Tex.App.–Corpus Christi 2000). . . . . . . . . . . . . . . . . . . 21

*Holy Cross Church of God in Christ v. Wolf,*
44 S.W.3d 562 (Tex. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Houston First Am. Sav. v. Musick,*
650 S.W.2d 764 (Tex. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re: Bexar County,*
224 S.W.3d 182 (Tex. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*In re: Brokers Logistics, Ltd.*,
320 S.W.3d 402 (Tex.App. – El Paso 2010). . . . . . . . . . . . . . . . . . . . 34, 35

*In re: Smith*,
366 S.W.3d 282 (Tex.App.–Dallas 2012). . . . . . . . . . . . . . . . . . . . . . 23, 24

*Ingersoll-Rand Co. v. Valero Energy Corp.,*
997 S.W.2d 203 (Tex. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Isern v. Watson,*
942 S.W.2d 186 (Tex.App.– Beaumont 1997). . . . . . . . . . . . . . . . . . . . . 55

*J.C. Penney Co., Inc. v. Ruth*,
982 S.W.2d 586 (Tex.App.–Texarkana 1998).. . . . . . . . . . . . . . . . . . . 51, 54

*Jay Miller & Sundown, Inc. v. Camp Dresser & McKee, Inc.*,
381 S.W.3d 635 (Tex. App.–San Antonio 2012). . . . . . . . . . . . . . . 25, 26, 27

 *Latham v. Castillo,*
972 S.W.2d 66 (Tex. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 59

*Lexington Ins. Co. v. Strayhorn*,
209 S.W.3d 83 (Tex.2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Litton Indus. Prod., Inc. v. Gammage*,
668 S.W.2d 319 (Tex. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mobil Oil Corp. v. Ellender*,
968 S.W.2d 917 (Tex. 1998). . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

*Parkway Co. v. Woodruff*,
901 S.W.2d 434 (Tex.1995). . . . . . . . . . . . . . . . . . . . . . . . . . 56, 58

*Parsons v. Greenberg,*
No. 02-10-00131-CV, 2012 WL 310505
(Tex.App.–Fort Worth, Feb. 2, 2012). . . . . . . . . . . . . . . . . . . . . . 41

*Patterson & Wallace v. Frazer,*
93 S.W. 146 (Tex.Civ.App.–El Paso 1906).. . . . . . . . . . . . . . . . . . 41

*Patterson & Wallace v. Frazer,*
94 S.W. 324 (Tex. 1906). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Rhodes v. Batilla,*
848 S.W.2d 833 (Tex.App.–Houston [14th Dist.] 1993). . . . . . . . . . . . . . 30

*Richey v. Brookshire Grocery Co.*,
952 S.W.2d 515 (Tex.1997). . . . . . . . . . . . . . . . . . . . . . . . . 51, 54

*Shepherd v. Ledford*,
962 S.W.2d 28 (Tex. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Shoemake v. Fogel, Ltd.,*
826 S.W.2d 933 (Tex. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Taylor v. Alonso, Cersonsky & Garcia, P.C.*,
395 S.W.3d 178 (Tex. App.—Houston [1st Dist.] 2012). . . . . . . . . . . . . . 29

*Tenet Hospitals Ltd. v. Rivera*,
445 S.W.3d 698 (Tex. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Tex. & P. Ry. Co. v. Wood*,
    199 S.W.2d 652 (1947). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Tex. Dep't of Transp. v. City of Sunset Valley*,
    146 S.W.3d 637 (Tex. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Thrift v. Hubbard*,
    974 S.W.2d 70 (Tex.App.–San Antonio 1998). . . . . . . . . . . . . . . . 50, 57, 58

*Tittizer v. Union Gas Corp.*,
    171 S.W.3d 857 (Tex. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Tobin v. Garcia,*
    316 S.W.2d 396 (Tex. 1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Turner v. State*,
    850 S.W.2d 210 (Tex.App.–Texarkana 1993).. . . . . . . . . . . . . . . . . . . 51

*Villarreal v. Wells Fargo Brokerage Svcs., LLC*,
    315 S.W.3d 109 (Tex.App.–Houston [1st Dist.] 2010). . . . . . . . . . . . . . 39

## Statutes and Rule

TEX. CIV. PRAC. & REM. CODE §33.002. . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

TEX. CIV. PRAC. & REM. CODE §33.004. . . . . . . . . 23, 25, 26, 28, 31, 38, 39, 40, 41

TEX. CIV. PRAC. & REM. CODE §33.011. . . . . . . . . . . . . . 18, 20, 27, 28, 31, 32

TEX. CIV. PRAC. & REM. CODE §33.012. . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

TEX. GOV. CODE § 311.011. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

TEX. R. CIV. P. 38(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## Dictionary

Webster's Dictionary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

## ABBREVIATIONS AND RECORD REFERENCES

**Abbreviations**

Plaintiff/Appellee,
John Alexander Smith. . . . . . . . . . . . . . . . . . . . . . . . . . . . "Plaintiff" or "Smith"

Defendant/Appellant,
City National Bank of Sulphur Springs. . . . . . . . . . . . . . "Defendant" or "the Bank"

**Record References**

References to Clerk's Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . "CR:[page #]"

References to Supplemental Clerk's Record. . . . . . . . . . . . . . . . . "SCR:[page #]"

References to Reporter's Record . . . . . . . . . . . . . . . . . . . . . . "[vol#]RR:[page #]"

Plaintiff's Exhibits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . "PX-[exhibit #]"

Defendant's Exhibits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . "DX-[exhibit #]"

## STATEMENT OF THE CASE

This is a malicious prosecution case.[1] Smith filed a Rule 202 petition against the Bank to investigate his malicious prosecution claim,[2] but his attorney neglected to file suit within one year. Smith sued the attorney for malpractice,[3] but the attorney designated the Bank as a responsible third party.[4] Smith joined the Bank as a defendant and settled with the attorney. The case was transferred from Smith County to Hopkins County on the Bank's motion and proceeded to trial, resulting in a verdict against the Bank including actual and exemplary damages.[5] The trial court entered judgment on such verdict, applying a settlement credit as requested by the Bank.[6] The judgment was modified to reduce the amount of pre-judgment interest.[7] The Bank appeals.

---

[1]CR:403

[2]CR:585

[3]CR:12

[4]CR:23

[5]CR:535

[6]CR:582

[7]SCR:5

**Appellee's Brief - Page xiii**

## STATEMENT OF FACTS

    1.    <u>How it Really All Began</u>

Smith obtained a loan from the Bank to purchase a commercial embroidery machine and pledged the machine as collateral. (DX-20) He fell behind on his payments, and in July, 2004, the Bank's vice-president in charge of collections, Jerry Cone, sent Smith a letter threatening to file "Hindering a Secured Creditor with the Sulphur Springs Police Department" if payment arrangements were not made. (3RR:44; PX-6)  When Cone made this threat, he had never spoken to Smith and had no information whatsoever that Smith had done anything improper with any collateral. (3RR:45,76; 4RR:102)

Smith contacted Cone (4RR:126) and agreed to sign a new, consolidated loan with monthly $400 payments. (3RR:47; 4RR:79) Smith executed the new note and security agreement on August 13, granting a security interest in the machine. (DX-41,42)

Smith and Cone agreed that Cone would help Smith sell the machine by taking it to the bank to show customers, and that when it was sold, all the proceeds would be applied to Smith's loan balance. (3RR:45-47; 4RR:81-82; PX-20) With Smith's help, Cone loaded the machine in his vehicle and took it to the bank. (3RR:46-47,171; 4RR:47-48; PX-20)

Smith and Cone agreed that the minimum price Smith would accept for the machine was $9,800. (4RR83,101)[8] Nevertheless, Cone sold the machine for $6,000 without Smith's permission. (3RR:69; 4RR:11-12,13,14,27-28,185-186,192) The buyers financed their purchase with a $500 down payment to the Bank and a $5,500 loan for the balance, which Cone personally handled. (3RR:59-60,127)

When Smith learned of the sale, he demanded Cone credit his loan by his $9,800 asking price, but Cone refused. (4RR:87) Smith had his partner, Lillian Lake, stop payment on the $400 loan payment check she had recently sent. (4RR:86) Cone called Lake, angry and upset, and told her he would get his money one way or another. (4RR:55-56) Cone told Smith he would fix him so he would never again work on a military base or government job. (4RR:89-90) After these discussions, Cone and Smith had no further contact, and the Bank never requested or demanded the return of any other alleged collateral. (3RR:118, 119,125; 4RR:58,59,67,68,90,91,143)

Although he refused Smith's demand to credit the loan by $9,800, Cone understood and believed that Smith's loan had nevertheless been credited by the

_____

[8]Cone claimed it was $7,800. (3RR:68-69)

$6,000 selling price as they had agreed.  (3RR:64-65; PX-20)[9]  Such $6,000 credit

would put Smith fifteen months ahead on his loan payments, giving Smith the

option to wait fifteen months to make his next payment. (3RR:66-67)

Five months later, on February 7, 2005, the Bank filed a lawsuit against

Smith, alleging Smith had defaulted on the loan, that the entire $24,378.54

principal amount was unpaid, and that $30,425.91 was currently due. (PX-14).  On

the same day the lawsuit was filed, the Bank secured an Order Granting Motion for

Substituted Service based on an affidavit of Cone. (PX-15) The affidavit falsely

swore that Cone had attempted to contact Smith at his residence on many

occasions and had been advised many times that Smith was a long-haul truck

driver and was seldom home. (PX-21:p.CNB_00222) Cone admitted that these

statements in the affidavit were false.  (3RR:135-136,137,139).  The Bank's expert

confirmed such constitutes perjury. (4RR:290-291)

The Bank took no action on its lawsuit. (PX-16,17) Instead, three weeks

later, Cone personally filed "hindering a secured creditor" charges against Smith

with the Sulphur Springs Police Department.  (3RR:76; PX-20)[10] Cone initiated

---

[9]Cone did not discover until after his 2009 deposition that no money was actually credited to the loan.  (3RR:64-65)

[10]Cone knew from experience the police would want to see that a civil lawsuit had been attempted. (3RR:133) The Bank never pursued the suit because, he said, "we turned it over to the police department to file the claim." (3RR:140)

such charges on behalf of the Bank. (3RR:77)

2.      Who Cares About Probable Cause?

Cone's purpose in filing the charges was "to get him indicted and charged with the crime." (3RR:112-113) Nevertheless, Cone admitted that when he filed charges, he had no knowledge of any facts or circumstances whatsoever that would lead him to reasonably and honestly believe that any crime had been committed. (3RR:115-116,119)  Smith had never interfered with any efforts to repossess any collateral or even refused to tell the Bank where it was. (3RR:118-119).

Cone specialized in collections and knew and understood that the crime of hindering a secured creditor is not a vehicle to collect a debt, but applies to a situation where someone has destroyed or basically stolen collateral . (3RR:35-36) He knew that a Bank cannot file such charges to collect a debt, as opposed to in a situation where somebody has destroyed collateral. (3RR:36,104-105) Nevertheless, Cone admitted that when he filed the complaint with the police, he knew nothing about Smith destroying, removing, or even hiding any collateral. (3RR:115-116) "I didn't know anything about the collateral."(3RR:119)

3.      Untruths And Consequences

As reflected on the incident and offense reports, (PX-27; PX-28) Cone provided the following documents to the police:

- Two copies of the August, 2004, security agreement. The only collateral specifically identified is the embroidery machine. (PX-21:pp.CNB_00188, CNB_00196)

- Copy of a financing statement dated May, 2001. No collateral is identified, and the loan was no longer outstanding. (PX-21:p.CNB_00216)

- Copy of the Bank's civil petition against Smith. (PX-21:p.CNB_00217)

- Copy of "civil paper," apparently the Bank's Motion for Substituted Service, including the false affidavit of Cone. (PX-21:p.CNB_00220-222)

- Copy of Texas license plate return.

- Copy of the demand letter Cone had sent in July threatening to file criminal charges (before Smith contacted the Bank, signed a new loan, and turned over the machine), and the envelope showing it was returned unclaimed. (PX-21:pp.CNB_00224-225)

No other loan documents were provided. (3RR:88) The only piece of equipment mentioned as collateral was the embroidery machine. (3RR:79-80)

Cone met with Officer Irving. (3RR:79; 4RR:32) Cone was the only bank representative who dealt with the police, and Irving was the only police officer Cone spoke to. (3RR:75; 4RR:33)

The police conducted no investigation beyond talking to Cone and receiving information from him; they had no other source of information and "totally took the word of the Bank." (4RR:33,36) Irving documented what Cone told him in a written narrative. (4RR:39; PX-29) It stated that Smith secured a loan on 8/13/2004 for $24,378.54, that no part of it had been repaid, and that Smith had not contacted

the Bank or returned any property associated with the loan. (PX-29) Cone admitted these statements were false, as Smith had been in contact with the Bank, the embroidery machine had been returned, and payments had been made. (3RR:204)[11]

In addition to providing documents which identified the embroidery machine as the collateral, Cone told Irving that Smith had not contacted the Bank or returned any of the property associated with the loan. (4RR:36) Cone told Irving the machine was the collateral. (4RR:37) Irving wrote exactly what Cone told him and did not add or omit anything. (4RR:39) This was his job and practice, and if Cone had told him the machine was not actually the collateral in question, Irving would have noted that on his narrative. (4RR:38,39)

Cone told the police the missing collateral was worth $23,150. (3RR:81,92) At the time, Cone knew that all the collateral on all of Smith's loans, other than the machine, was worth at most, $14,800. (3RR:100-102). The Bank estimated the embroidery machine was worth approximately $8,000 (3RR:94).[12]

When Cone filed the criminal charges, he believed the $6,000 sales price of the machine had been credited against Smith's loan (3RR:64-65), and knew that

[11]The Bank is thus absolutely incorrect in asserting that "no one disputes that the information in Plaintiff's Exhibit 29 is true."

[12]Adding $8,350 to $14,800 yields the $23,150 value Cone reported. No other collateral was ever pledged by Mr. Smith. (3RR:94-95)

would have put Smith 15 months ahead on his payments. (3RR:66-67). Yet Cone told the authorities that Smith had not contacted the Bank, had made no payments, and had returned no collateral. (PX-29)

Irving forwarded the information and allegations Smith had provided to Lieutenant Stillwagoner, who did not himself speak to Smith. (4RR:33)[13] Stillwagoner put such information in a probable cause affidavit. (PX-25) Based on such information, an arrest warrant was issued for Smith on a charge of hindering a secured creditor (signed by a Justice of the Peace who was the wife of the Bank's vice-president). (4RR:277; PX37,pp.CNB_00300-301)

4.    Misery

Smith was arrested in front of his friend and neighbor while on a fishing trip, after he was stopped in Henderson County for not wearing a seat belt, and was taken to jail. (4RR:104-105) For the first day and a half, Smith was forced to sit in the drunk tank (though he did not drink and was not drunk) before being transferred to a cell with a bunk. (4RR:105) The conditions were bad, including: a one-inch feather mattress, an open shower, no toilet paper, a cup of coffee in the morning with a quarter scoop of egg, half a bologna sandwich for lunch; further,

---

[13] It is not uncommon for a detective to simply rely on what a victim tells an officer. (5RR67-68)

Smith had a fight with another inmate over a bunk. (4RR:106)

Smith suffers from a seizure disorder for which he takes Phenobarbital. (4RR:61) The medication is very important, because without having it at least twice a day he can go into seizures, including grand mal seizures. (4RR:61) While in jail, Smith was without this medication. (4RR:61) He kept asking for it, but they could not give him any. (4RR:105) Without his medication, he is unable to sleep and loses his sense of time and space. (4RR:107) His mind goes into overdrive and he just overloads. (4RR:107)

After several days in the Henderson County jail Smith was transferred to Sulphur Springs, where he spent several more days before finally being released. (4RR:107) When Lake picked him up he was physically very shaky.(4RR:61) He was speaking incoherently, like he had "fuddle brain." He would start to say something then his sentences would become all jumbled. (4RR:62) The first thing he did when he got to the car was take a double dose of his medication. (4RR:61-62)

He was rough, dirty, and smelled. (4RR:61-62) He was also very angry because he knew he had not done what he was accused of. (4RR:62) He felt like he had been dropped down and kicked – and totally wronged. (4RR:62) He was also scared because he did a lot of work on high security military bases, and feared the

effect it would have on his ability to work. (4RR:63)

5.      Things Cone Forgot

When Smith appeared in court for his arraignment, Cone was present in the

courtroom, observed the proceedings, and heard the charges read. (4RR:108-109)

The indictment stated that Smith did:

> sell or dispose of secured property, to-wit: Toyota 860-12 needle embroidery
> machine, with intent to appropriate the proceeds or value of the secured
> property, and at the time of the said sale or disposition, the said defendant
> was a debtor under a security agreement and did not have a right to sell or
> dispose of the secured property, and said proceeds were $20,000 or more but
> less than $100,000... (PX-22)

Over one year later, in May of 2007, the indictment was amended to allege that

Smith:

> having theretofore signed a security agreement (see Exhibit "A") creating a
> security interest in property, namely, Toyota 860-12 needle embroidery
> machine, conceal said property by not allowing a representative of City
> National Bank to retrieve the property or returning the property at the
> request of City National Bank. (PX-36,p.CNB_00263)

Although Cone testified he never had any communications with the D.A.'s

office,[14] the evidence proved he did.  After filing the charges with the police, Cone

received a letter from the D.A. stating they needed to know the value of the items

in question so that proper restitution could be ordered. (3RR:91-92; PX-34) The

---

[14]Cone testified that if he had been in communication with the D.A.'s office, he would have "straightened out this error." (3RR:214)

letter enclosed a "Restitution Form" asking for the amount of "property damages," and the value of "unrecovered property." (PX-35) Cone filled it out and signed it on behalf of the Bank, stating that the Bank's damages totaled $31,925.91 and that the value of the allegedly unrecovered collateral was $23,150. (PX-35)

On cross-examination, Cone admitted sending the form, but claimed he had no other communications with the D.A. and never knew anything about Smith being arrested, jailed, or indicted. (3RR:215-216)  He was then shown a copy of a letter the D.A. had sent to him personally, stating Smith had been indicted and that Cone would be notified of relevant court dates. (PX- 33) Cone conceded he probably did receive the letter, but claimed not to remember.  (3RR:216) Cone admitted the handwritten notes on the bottom of the letter were his. (3RR:216) Cone's notes included several apparent hearing dates, including "2-28-06" (three days after the date of the letter), "pre-trial 6-23-06, 9AM, w/no atty Probably will be reset," and "11-13-06 Tim Rountree w/D.A.'s office." (PX-33) Cone then admitted he could not tell the jury he was not in communication with the D.A.'s office. (3RR:216-217) The Bank's expert confirmed that Tim Rountree was indeed an assistant district attorney (4RR:270) and that Cone's notations obviously indicated he was checking to see what had happened in court that day and finding out when the next setting was. (4RR:272)

6. <u>Shame And Degradation</u>

Smith remained under indictment for over two years until the D.A. dismissed the charges without explanation in 2008. (PX-21,pp.CBB_00256-257) During this time, Smith had to appear in court approximately 18 times. (4RR:109; PX-36,pp.CNB_000270-292)

Having a felony charge hanging over him was extremely distressing. He had to lie to his boss every time he had to take off work to appear in court, as Smith was afraid of being fired if he found out. (4RR:111) When Smith would appear in court, he would be seen by friends and people in town he did business with, who would wonder why he was going to jail. (4RR:111) He was embarrassed and humiliated. (4RR:112)

It was very upsetting to be indicted for something he knew he was innocent of. (4RR:63) He felt like the neighbors were all looking down on him. The people that he had worked for and with now had a different view of him. He had been charged with a felony and branded a crook, a thief. (4RR:63) He was terribly embarrassed around family and friends. (4RR:63) At the time of trial – years after he was originally arrested – Smith still felt humiliated and embarrassed. (4RR:112)

Smith also suffered significantly from his inability to earn a living doing what he most enjoyed, working on government construction projects. Prior to

being arrested, Smith had a security clearance and had done a lot of construction work for the government in different parts of the country. (4RR:64,75) For most of his life he had made a living working in construction. (4RR:74) He particularly liked working on government jobs – "the only one in the world that guarantees pay" – and did so every chance he could. (4RR:74) The government jobs required a security clearance. (4RR:75) As a result of the Bank's allegations, he lost government jobs and was never again able to work on a military base. (4RR:65,66) The loss of his security clearance prevented him from getting a lot of jobs he otherwise would have gotten, which he testified about. (4RR:113,114,115)

Despite the dismissal of the criminal charges, as of the date of trial Smith's arrest still showed up on criminal background checks, hanging over his head and continuing to limit what he could do professionally. (4RR:113) This was very upsetting to him, as it impacted not only his reputation, but his ability to provide for his family. (4RR:66) It was very important to Smith to clear his name. (4RR:69) This had been hanging over him almost a decade. (4RR:117) Even at the time of trial, the Bank was still telling people he was guilty, which angered and insulted him. (4RR:118)

7.     The Litigation

After the criminal charges were dismissed, Smith retained attorney Charles Clark, who filed an "Application for Investigative Depositions" of the Bank under TEX. R. CIV .P. 202  (CR:585) Clark's efforts to schedule pre-suit depositions of the Bank were delayed for months by the Bank's attorney until he finally notified Clark that limitations had expired. (CR:35,39)

Smith sued Clark for negligence. (CR:12) After fifteen months of litigation, Clark filed a motion for leave to designate the Bank as a responsible third party, alleging the Bank "caused or contributed to cause the harm for which the plaintiff in this matter seeks to recover damages from Defendants." (CR:23) No objection was filed; accordingly, the court entered an order granting the motion and designating Bank a responsible third party. (CR:25)

In accordance with TEX. CIV. PRAC. & REM. CODE ["C.P.R.C.] § 33.004(e) (WEST 2008), Smith then joined the Bank as a defendant, alleging malicious prosecution. (CR:27) Smith subsequently settled his claims against Clark for $100,000 and dismissed Clark from the case. (CR:79; CR:74)

The Bank affirmatively pled that Smith had settled with Clark, who was a settling party under Chapter 33, and that the Bank was therefore entitled to an offset and settlement credit. (CR:494,497)

The Bank filed a motion for summary judgment based on the statute of limitations, which was denied. (CR:487) Thereafter, the Bank did not attempt to offer any evidence or obtain any findings at trial in support of such affirmative defense.

The jury returned a unanimous verdict finding the Bank had maliciously prosecuted Smith and assessing damages of $150,000 for "physical pain and mental anguish," $250,000 for "injury to reputation," and $500,000 in "exemplary damages." (CR:535-545)

The trial court entered a judgment which, based on Bank's affirmative pleading and the parties' stipulation (4RR:165), provided that "the amount of damages to be recovered by the Plaintiff should be reduced by $100,000 in accordance with C.P.R.C. § 33.0l2(b)." After such credit, the judgment awarded $800,000, plus $84,542 in prejudgment interest. (CR:582-3)

The Court then granted the Bank's motion to modify the judgment to include only $54,243 in prejudgment interest. (SCR:5)

## SUMMARY OF ARGUMENT

The Bank's argument that it was improperly designated as a responsible third party – because it allegedly did not contribute to "the harm for which recovery of damages was sought" from Clark – is barred because such assertion is clearly adverse to the Bank's request for a settlement credit under Chapter 33, which the trial court granted. Such credit required that Clark settled claims with respect to "the harm for which recovery of damages was sought" from the Bank. Additionally, the Bank's affirmative pleading for such a credit was a judicial admission, which estopps the Bank from arguing the contrary.

Furthermore, the Bank waived its alleged statute of limitations defense by offering no proof and requesting no findings at trial on such affirmative defense. As a matter of law, its motion for summary judgment preserved no error. Moreover, the Bank secured no order on its motion to strike its designation as a responsible party, which the trial court could not have granted in any event as the Bank had been joined as a defendant and was no longer a designated third party.

Regardless, the Bank was properly joined under Chapter 33 because it was alleged to be responsible for contributing, in some way, to some portion of the injuries or damages Smith sought from Clark. Such damages included all underlying damages recoverable from the Bank in a malicious prosecution suit, as

well as additional mental anguish and harm to Smith's reputation as a result of Clark's conduct.

After being properly designated, the Bank was timely joined as the plain language of Chapter 33 clearly permitted. The statute does not apply only to derivative claims or consistent claims as the Bank asserts, and does not produce an absurd result, nor was any vested right curtailed. The statute promotes public policy, as determined by the legislature, and this Court should decline the Bank's request to disregard its unambiguous language

This Court should also reject the Bank's argument that punitive damages must be reversed because Chapter 33 does not apply to punitive damages. Smith did not seek punitive damages from Clark, and Clark did not designate the Bank as being responsible for such a non-existent claim. All damages recoverable from the Bank in a malicious prosecution case were part of the actual damages Smith sought against Clark, but Smith recovered punitive damages against the Bank (which was a defendant, not a third party) under the common law, not Chapter 33. Moreover Chapter 33 prohibits the reduction of exemplary damages, not their recovery.

Turning to the evidence, the jury's finding that the Bank initiated the prosecution was not only sufficiently supported, it was required. The Bank's own attorney elicited clear and specific testimony from the Bank's own expert witness

that the Bank initiated the prosecution for purposes of malicious prosecution. This fact was also confirmed by the testimony of the Bank's vice-president Cone, who filed the charges.

Although not required, the evidence established that the Bank also "procured" the prosecution by providing information to the authorities it knew to be false, thereby causing the prosecution.

The jury's finding that the Bank lacked probable cause was likewise strongly supported by more than sufficient evidence, including Mr. Cone's clear acknowledgment that he had no knowledge of any facts whatsoever that would lead him to reasonably and honestly believe that Smith had committed any crime.

Finally, overwhelming evidence supports the jury's finding that Mr. Smith – who was wrongfully accused of a felony of moral turpitude, arrested, jailed for almost a week without his medication, prosecuted for over two years, stripped of his security clearance, humiliated in front of his friends and neighbors, and forced to fight almost a decade to clear his name – sustained some physical pain or mental anguish.

In short, the trial court did not err and was well within its discretion in entering judgment in Smith's favor, based on the law and the jury's verdict, and must be sustained.

# ARGUMENT

## I.    Response to Appellant's Issue No. 1

**A.    The Bank is barred and estopped from asserting that it is not a "responsible third party" under Chapter 33 because such assertion is clearly adverse to its position in the trial court that Clark was a "settling person" under Chapter 33, upon which the Bank sought and obtained judgment.**

The Bank affirmatively pled for,[15] proved,[16] and obtained judgment awarding,[17] a settlement credit on the grounds that Clark was a "settling person" under Chapter 33.  Chapter 33 defines a "settling person" as a person who has settled with respect to "the harm for which recovery of damages is sought."[18]  Using identical language, Chapter 33 defines a "responsible third party" as a person who contributed to causing in any way "the harm for which recovery of damages is sought."[19]

The Bank was designated as a responsible third party for the same reason Clark is a settling person – the harm for which recovery of damages was sought

---

[15]CR:497, paragraph 10.

[16]RR:165

[17]CR:582

[18]C.P.R.C. 33.011(5)

[19]C.P.R.C. 33.011(6)

from each of them was the same harm (in whole or in part). The Bank's assertion that it did not contribute to the harm for which damages were sought from Clark is directly and irreconcilably in conflict with its affirmative pleading that Clark settled with respect to the harm for which damages were sought from the Bank, and to the Court entering judgment in the Bank's favor based on the Bank's request for a settlement credit on such basis.

A party is estopped from taking a position on appeal that is clearly adverse to its position in the trial court. *See, e.g., Tittizer v. Union Gas Corp*., 171 S.W.3d 857, 863 (Tex. 2005). Having affirmatively obtained a judgment from the trial court, the Bank cannot, on appeal, take a position inconsistent with that part of the judgment. *Litton Indus. Prod., Inc. v. Gammage*, 668 S.W.2d 319, 321-22 (Tex. 1984).

**B.    The Bank is barred and estopped from asserting that it is not a "responsible third party" under Chapter 33 because the Bank judicially admitted that "the harm for which recovery of damages is sought" from Clark and the Bank was the same by affirmatively and unequivocally pleading that Clark was a "settling person" under Chapter 33, which requires that Clark settled claims with respect to "the harm for which recovery of damages is sought" from the Bank.**

The Bank clearly, deliberately, and unequivocally pled that Plaintiff had sued and settled with Clark, who was a settling party under Chapter 33, and that the Bank was entitled to an offset and settlement credit for any and all monies

paid by Clark.[20]   The Bank thus pled that Clark is a person who settled with respect to "the harm for which recovery of damages is sought."[21]

"The facts alleged or admitted in the live pleadings of a party are accepted as true by the court and jury and are binding on the pleader."[22] "Assertions of fact, not pleaded in the alternative, in the live pleadings of a party are regarded as formal judicial admissions.  A judicial admission that is clear and unequivocal has conclusive effect and bars the admitting party from later disputing the admitted fact."[23]

By pleading that Clark was a settling person under Chapter 33, and that the Bank was entitled to a settlement credit under Chapter 33, the Bank has judicially admitted the required Chapter 33 element that Clark settled  with respect to "the harm for which recovery of damages is sought," and is estopped to claim the contrary.[24]

---

[20]CR 497, paragraph 10.  *See also* CR 494, paragraph 5.

[21]C.P.R.C. 33.011(5).

[22]*Houston First Am. Sav. v. Musick,* 650 S.W.2d 764, 769 (Tex. 1983).

[23]*French v. Gill,* 252 S.W.3d 748, 754 (Tex.App.–Texarkana 2008, pet. denied), *quoting, Holy Cross Church of God in Christ v. Wolf,* 44 S.W.3d 562, 568 (Tex. 2001).

[24]*Shepherd v. Ledford*, 962 S.W.2d 28, 33 (Tex. 1998) ("because the defendants judicially admitted facts ... they are estopped from now claiming to the contrary.")

**C. The Bank has failed to preserve any error on its alleged statute of limitations defense.**

**1. The Bank never secured an order on its improper motion to strike its own designation as a responsible third party, choosing instead to proceed with its limitations defense by motion for summary judgment.**

Appellant's Brief refers to the Bank's motion to strike its designation as a responsible third party and to several motions for summary judgment; however, the only such motion the Bank ever secured an order on was its second amended motion for summary judgment. (CR: 487)

**2. The denial of the Bank's motion for summary judgment preserved no alleged error.**

As a matter of law, an order denying a motion for summary judgment is not reviewable after a conventional trial on the merits has been held. *Ackerman v. Vordenbaum,* 403 S.W.2d 362, 365 (Tex. 1966);[25] *See also, e.g., Hines v. Commission for Lawyer Discipline*, 28 S.W.3d 697, 700 (Tex.App.–Corpus Christi 2000, no pet.) ("The general rule is that appellate courts do not have jurisdiction to hear denied motions for summary judgment on appeal."); *Adams v. Parker Square Bank,* 610 S.W.2d 250 (Tex.App.–Fort Worth 1980, no pet.) ("an appeal does not

---

[25] An exception exists where, unlike at bar, both parties file competing motions for summary judgment on the same issue and one is granted. *Ackerman,* 403 S.W.2d at 364, 365 (citing *Tobin v. Garcia,* 316 S.W.2d 396 (Tex. 1958)).

lie from an order overruling a motion for summary judgment."). Therefore, the trial court's order overruling the Bank's motion for summary judgement could not and did not preserve any error.

3. **At trial, the Bank offered no proof to establish its alleged limitations defense and did not request or secure any findings to sustain such affirmative defense; nor did it move for a directed verdict in such regard.**

Because the statute of limitations is an affirmative defense, the Bank had the burden to plead, prove, and secure findings to support the defense. *Clark v. Dillard's, Inc.,* 460 S.W.3d 714, 719 (Tex.App.–Dallas 2015, no pet.); *Edlund v. Bounds,* 842 S.W.2d 719, 728 (Tex.App.–Dallas 1992, writ denied). The Bank failed to do so. Instead, after the trial court denied its summary judgment, the Bank did not attempt to offer any evidence or obtain any findings at trial in support of the defense, either by the submission of jury questions or by motion for directed verdict.[26]

Notably, this is not a case where evidence and jury findings were not required due to the defense being established as a matter of law.[27] Under the

---

[26]The Bank did move for a directed verdict on the statute of limitations with regard to Plaintiff's "unreasonable collection efforts" cause of action, which was granted. 4RR:162-163. A limitations defense was not pursued, however, with regard to the malicious prosecution claim.

[27]An issue which is normally a question of fact can, in some circumstances, be proved so conclusively by the evidence at trial that it becomes a question of law. *See, e.g.,*

posture of this case, in order to establish that Smith's suit was barred by limitations, the Bank would have to prove that it was not responsible for any portion of the damages Smith had alleged against Clark.[28] Such would have entailed evidence and arguments addressing the damages Smith had alleged against Clark – including the loss of the underlying lawsuit recovery, mental anguish, and ongoing damage to Smith's reputation – and whether the Bank was allegedly partially responsible for such alleged damages.

Moreover, although not necessary, the evidence could have also addressed whether or not the Bank contributed to causing Clark to miss the statute of limitations.[29] An illustrative case in this regard is *In re: Smith*, 366 S.W.3d 282 (Tex.App.–Dallas 2012, no pet.) As in the case at bar, the plaintiff in *Smith* sued

---

*Dixon v. SW Bell Tel. Co.,* 607 S.W.2d 240, 242 (Tex. 1980)

[28]C.P.R.C. § 33.004 (*l*) ("A party may move to strike the designation of a responsible third party on the ground that there is no evidence that the designated person is responsible for any portion of the claimant's alleged injury or damage.") This standard is addressed in more depth in Section I-E of this brief, *infra*.

[29]Clark testified in his deposition that his efforts to schedule pre-suit depositions of the Bank were delayed for months by the Bank's attorney until he finally notified Clark that limitations had expired. (CR:35,39) Clark had known the Bank's attorney for 35 years (CR:57) and (unbeknownst to Smith) once served with him as co-counsel for the Bank in defense of another lawsuit filed by a bank customer. [Such testimony appears in the deposition of the Bank's president, Lee Teets, which is not a part of the record in this appeal.] Because this issue was not tried, none of this testimony was introduced at trial and is mentioned solely to illustrate the type of *hypothetical* testimony that *could* have been admitted if the Bank had proceeded with the defense.

his attorney for missing a statute of limitations to file a lawsuit against a tortfeasor – the driver of a vehicle involved in an injury accident. After being sued, the attorney moved for leave to designate the driver as a responsible third party. The plaintiff opposed such motion and the trial court denied it, but the Court of Appeals reversed. Like the Bank in the case at bar, the plaintiff argued that since the driver was not an attorney, she could not have contributed to the attorney's error in missing limitations, thereby losing the right to pursue the car-wreck case, which the plaintiff characterized (apparently without disagreement) as the harm in question. Without addressing whether such characterization was correct, the Court of Appeals held that it was nevertheless improper to deny the motion without giving the movant an opportunity to attempt to show that the driver had indeed somehow contributed to the attorney's error. *Smith,* 366 S.W.3d at 286.[30]

As addressed in detail below, the Bank was properly designated as a responsible third party because it allegedly contributed to causing part of the harm or damages Smith sought to recover from Clark; however, even if the Bank were

_____

[30]The attorney/defendant pled contributory negligence against the plaintiff, claiming to have relied on information provided by the plaintiff when he mistakenly sued the wrong person. *Smith,* 366 S.W.3d at 286, fn.2. The court explained, "If [the attorney/defendant] made a similar allegation against [the driver] – that she somehow tortiously contributed to any error committed by [the attorney/defendant] –the fact that [the driver] is not an attorney would not necessarily mean she could not have tortiously contributed to cause the harm, for which [plaintiff] is suing [the attorney/defendant] ." *Id.* at 286.

correct in asserting it would have to have contributed to Clark's missing limitations, rather than simply contributing to the damages sought, the Bank still never proved that it did not somehow contribute to such error. The Bank made no effort whatsoever to present anything to the jury or trial court in such regard.

In short, although the Bank did plead limitations, it did not prove such defense under the evidence and did not secure any findings to support the defense. Accordingly, the affirmative defense of limitations was waived.

**D.    The trial court had no discretion to grant the Bank's improper motion to strike its own designation as a responsible third party.**

Although the Bank failed to secure an order on its motion to strike, denial of such motion could not have been erroneous as the Bank had no standing and was now a defendant and no longer a designated third party.

If a defendant designates an entity as a responsible third party, an opposing "party" may move to strike that designation [C.P.R.C. § 33.004(f), (g),(*l*) (WEST 2008)], but a responsible third party cannot object to or strike its own designation. *Jay Miller & Sundown, Inc. v. Camp Dresser & McKee, Inc.*, 381 S.W.3d 635, 642 (Tex. App. --San Antonio 2012, no pet.); *Flack v. Hanke*, 334 S.W.3d 251, 261-62 (Tex. App.-San Antonio, 2010 pet. dism'd). Further, once a party has been joined as a defendant, it is a party, not a responsible "third party" subject to being stricken. *Flack*, 334 S.W.3d at 262. Accordingly, a trial court has no discretion to

strike the designation of a responsible third party when the challenge comes from the responsible third party itself. *Flack,* 334 S.W.3d at 263; *See FFP. Operating Ptnrs., L.P. v. Duenez*, 237 S.W.3d 680, 694 (Tex. 2007). Simply stated, "Chapter 33 does not authorize a joined defendant to litigate its previous designation as a responsible third party." *Jay Miller*, 381 S.W.3d at 642, citing, *Flack*, 334 S.W.3d at 261-63.

In this case, Clark filed a motion for leave to designate the Bank as a responsible third party, which the trial court reviewed and granted. The Bank, as an entity which had been designated as a responsible third party but had not yet been sued, simply did not have standing to object or to strike its designation, and did not attempt to do so. The court then granted the designation, and the statute of limitations no longer barred Smith's claims against the Bank, per the express language of the statute.

Once Smith subsequently joined the Bank as a defendant, there was no longer any responsible third party designated. Allowing a recently-joined defendant that was previously a responsible third party to challenge its own designation as a responsible third party would improperly require that party to be simultaneously both a defendant and a responsible third party. *Flack*, 334 S.W.3d at 262. Such a use of the statute "conflicts with its plain wording and renders the

statute unworkable." *Id.*

Accordingly, the Bank was not capable of striking its designation before it was joined as a defendant and, once joined as an actual party, was no longer a "third party" capable of being stricken. As explained in *Jay Miller* and *Flack,* the statute simply provides no mechanism for a responsible third party to challenge its own designation, and a joined defendant lacks standing to collaterally attack that designation. The court thus could not have properly granted the Bank's motion to strike, and its refusal to do so could not constitute error.

**E.    The trial court did not err in entering judgment against the Bank for malicious prosecution.**

**1.    The Bank was properly joined and timely sued under Chapter 33 because it was responsible for contributing, in some way, to some portion of Smith's alleged injury or damages.**

The Bank's argument that it was improperly joined in a legal malpractice case because it did not commit legal malpractice mis-construes the law, and is unsupported by any authority. The clearly-defined test is whether the Bank was responsible for contributing "in any way" to "any portion of [Smith's] alleged injury or damages." C.P.R.C. § 33.011(6) (A "responsible third party" means "any person who is alleged to have caused or contributed to *causing in any way the harm for which recovery of damages is sought*, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or

activity that violates an applicable legal standard, or by any combination of these."); C.P.R.C. § 33.004 (*l*) ("A party may move to strike the designation of a responsible third party on the ground that there is no evidence that the designated person is *responsible for any portion of the claimant's alleged injury or damage*.") (emphasis added).

### a. The damages Smith sought from Clark included all damages recoverable from the Bank in a malicious prosecution suit.

The causes of action Smith asserted against the Bank and attorney Clark were distinct, but the Bank was responsible for the harm giving rise to the damages Smith sought from Clark as a matter of law. When Smith sued Clark for mis-handling his case against the Bank, his primary measure of damages was defined as the money he could prove he would have recovered from the Bank, had Clark not negligently failed to file suit.

When an attorney is sued by a client for mis-handling a case, the plaintiff must prove the "case within the case," that is, he must prove that, but-for the attorney's neglect, he would have prevailed in the underlying lawsuit. Significantly, to prove damages in the malpractice case, he must prove that he would have actually recovered damages in the underlying suit. By definition, a major portion of his damages in the malpractice suit are the damages he would

have recovered in the underlying suit, had the malpractice not occurred (compensatory, punitive, or otherwise).[31]

Accordingly, the harm caused by the Bank – and all damages recoverable from the Bank – is precisely the "harm for which recovery of damages [was] sought" in Smith's suit against Clark.

> **b.     The damages Smith sought from the Clark also included mental anguish and harm to his reputation.**

The damages Smith sought against Clark included not only the loss of his recovery against the Bank, but all other damages resulting from Clark's malpractice, including continuing damage to his reputation and mental anguish. *See, e.g., Cosgrove v. Grimes*, 774 S.W.2d 662, 666 (Tex.1989) (affirming a mental anguish award in legal malpractice case).

Although the criminal charges had been dropped, the Bank had continued to assert that Smith was not innocent.[32]  After everything the Bank had put Smith

---

[31]The Texas Supreme Court has repeatedly explained that, "in a legal-malpractice case damages consist of 'the amount of damages recoverable and collectible ... if the suit had been properly prosecuted.'" *Elizondo v. Krist*, 415 S.W.3d 259, 263 (Tex. 2013) (quoting, *Cosgrove v. Grimes*, 774 S.W.2d 662, 666 (Tex.1989)); *see also Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 112 (Tex.2009).  Court's refer to this method of proving damages as a "suit-within-a-suit." *See, e.g., Taylor v. Alonso, Cersonsky & Garcia, P.C.*, 395 S.W.3d 178, 183 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *Greathouse v. McConnell*, 982 S.W.2d 165, 173 (Tex. App.—Houston [1st Dist.] 1998, pet. denied).

[32]*See, e.g.,* 5RR:125-126; 4RR:232-233,236.

through, the loss of Smith's ability to proceed with a lawsuit to finally clear his name was devastating, and could certainly have caused substantial mental anguish and reputational injury. At the very least, Smith was entitled to allege[33] and attempt to prove such damages against Clark.[34] Had the case against Clark gone to trial rather than settling, Clark could have attempted to prove that all or part of the mental anguish and harm to Smith's reputation alleged to have resulted from his malpractice was caused or contributed to by the conduct of the Bank.

Accordingly, Clark's designation of the Bank as a responsible third party, and Smith's subsequent joinder of the Bank, were entirely proper, even without considering the "case-within-a-case" damages.

### 2. Identity of cause of action is not required.

The Bank's argument that Chapter 33 "does not waive the statute of limitations on claims not asserted in the original case" because the "plain language of the statute only allowed revival of the cause of action originally sued under"

---

[33] Smith's pleadings against Clark, which were not excepted to, broadly and generally pled for all damages. CR:14

[34] Mental anguish damages are not recoverable in a legal malpractice claim alleging "pure economic loss" (anguish caused solely by the loss of economic compensation) but are recoverable where the circumstances of a legal malpractice case otherwise make an award of emotional distress damages appropriate. *See, e.g., Cosgrove*, 774 S.W.2d at 666; *Rhodes v. Batilla,* 848 S.W.2d 833 (Tex.App.–Houston [14th Dist.] 1993, pet. denied); *Heath v. Herron*, 732 S.W.2d 748 (Tex.App.–Houston [14th Dist.] 1987, writ denied).

makes no sense, and is contrary to the statutory language.  Chapter 33 specifically

provides for the joinder of claims that would otherwise be barred by limitations[35]

and thus not "originally sued under."  Moreover, it expressly allows such claims

against "any person"[36] alleged to have contributed to "any portion"[37]  of a

claimant's "injury or damage,"[38] "in any way,"[39] "whether by negligent act or

omission, by [product liability], by other conduct or activity that violates an

applicable legal standard, or by any combination of these."[40]  The plain language of

the statute thus clearly and unambiguously allows the assertion of virtually any

independent cause of action against any party who allegedly contributed to the

"injury" or the "damage."

The Bank's attempt to construe "harm" to somehow mean "cause of action"

is contradicted by numerous references throughout  Chapter 33 which demonstrate

that *"harm"* clearly refers to the injuries which are compensated by an award of

---

[35]C.P.R.C. 33.004(e)

[36]C.P.R.C. 33.011(6)

[37]C.P.R.C. 33.004(*l*)

[38]*Id.*

[39]C.P.R.C. 33.011(6)

[40]*Id.*

damages.[41]   The statute consistently uses "harm" to mean injury, which in this case

was the injury Smith suffered as a result of the Bank's wrongful prosecution.[42]

Such harm is precisely what the jury would have considered and evaluated in

awarding damages had Plaintiff's claims against Clark gone to trial, just as it was

the harm the jury considered and evaluated in assessing damages against the Bank.

Ignoring the plain and unambiguous language of the statute,[43] the Bank

attempts to re-write Chapter 33's definition of a responsible third party to mean a

person who is liable for all or part of the plaintiff's claim or cause of action against

---

[41] *See, e.g.,* C.P.R.C. § 33.011(1)–(1)(A)(". . . 'claimant' includes: the person who was injured, was harmed, or died or whose property was damaged . . ."); § 33.011(1), (1)(B) (". . . 'claimant' includes: . . . any person who is seeking ... recovery of damages for the injury, harm, or death of that person"); § 33.011(4) ("'Percentage of responsibility' means that percentage . . . attributed . . . with respect to causing . . . the personal injury, property damage, death, or other harm for which recovery of damages is sought."); § 33.011(5) ("'Settling person' means a person who has . . . paid or promised to pay money . . . with respect to the personal injury, property damage, death, or other harm for which recovery of damages is sought."); § 33.011(6) ("'Responsible third party' means any person . . . causing in any way the harm for which recovery of damages is sought . . . ."). Substituting "cause of action," "legal theory," or "defendant's conduct" for "harm" in any of these provisions would yield absurd results.

[42] Courts must read a statute as whole, not just isolated portions. *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex.2004)

[43] Court's "look first and foremost to the words of the statute." *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex.2006). A court must construe the statute's words according to their plain and common meaning, unless a contrary intention is apparent from the context or unless such a construction leads to absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex.2008); *see also* TEX. GOV.CODE ANN. § 311.011(a) (Vernon 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage.")

the defendant, as opposed to a person responsible for any part of the plaintiff's alleged injuries or damages. If the legislature had intended to limit responsible third parties to those liable for the plaintiff's cause of action against a defendant it could have done so, using clear and well-understood language such as appears in TEX.R.CIV.P. 38(a), which allows a defendant to join a third party who is liable to the defendant or to the plaintiff "for all or part of the plaintiff's claim against him." Instead, by referring to causing any portion of the "alleged injury or damages," Chapter 33 provides a much broader definition than Rule 38(a).

Moreover, in contrast to the broad language of Chapter 33, Rule 38(a)'s definition allows only derivative claims for contribution and indemnity.[44] Such derivative actions do not accrue for limitations purposes until a plaintiff recovers damages or settles its suit against a defendant.[45] Accordingly, if Chapter 33 were indeed limited to such derivative claims, there would be no need for Section 33.004(d)'s provision authorizing joinder notwithstanding limitations. Such would be meaningless surplusage, which cannot be presumed, since every word of a

---

[44] *See, Eslon Thermoplastics v. Dynamic Systems, Inc.,* 49 S.W.3d 891, 902 (Tex.App.–Austin 2001, no pet.), *citing, Shoemake v. Fogel, Ltd.,* 826 S.W.2d 933, 935 (Tex. 1992).

[45] *City of San Antonio v. Talerico,* 81 S.W. 518, 520 (1904); *see also, Ingersoll-Rand Co. v. Valero Energy Corp.,* 997 S.W.2d 203, 211 (Tex. 1999).

statute must be presumed to have been used for a purpose.[46]

In addition to being contrary to the clear statutory language, the Bank's position is contrary to case law. Citing no supporting authority, the Bank argues this is a case of first impression, but the Bank's position is actually counter to well-established law recognizing that when apportioning responsibility and liability for damages among multiple defendants, no joint conduct or identity of cause of action is required. Instead, liability and comparative causation under independent causes of action is routinely considered.

Significantly, this is true even in cases involving an original tort followed by subsequent professional malpractice. Under Chapter 33's proportionate responsibility scheme, the negligence of an original tortfeasor and a subsequently-malpracticing professional are compared in evaluating causation. An example is *In re: Brokers Logistics, Ltd.*, 320 S.W.3d 402 (Tex.App. – El Paso 2010, no pet.), which was decided under the same (2008) version of Chapter 33 applicable to the case at bar. In *Brokers,* the original defendant in a premises liability case designated a subsequently-treating doctor as a responsible third party. The plaintiff then sued the doctor within sixty days, despite the fact that limitations had otherwise expired. The trial court granted a motion to strike the doctor's

---

[46] *Gray v. Nash*, 259 S.W.3d 286, 291 (Tex.App.-Fort Worth 2008, pet. denied).

designation as a responsible third party, but the court of appeals granted

mandamus, holding that, because "a genuine issue of fact regarding [the doctor's]

responsibility for at least a portion of [the plaintiff's] injury or damages" had been

raised, "[t]he trial court clearly abused its discretion by striking the designation of

[the doctor] as a responsible third party." *Brokers*, 320 S.W.3d at 408.  The

original tortfeasor did not cause the doctor to malpractice, and the doctor did not

cause the original tort, but part of the damages sought from each were the same.

The rule continues to apply under the current version of Chapter 33. *See,*

*e.g., ExxonMobil Corp. v. Pagayon*, 467 S.W.3d 36, 52 (Tex.App.–Houston [14[th]

Dist.] 2015, pet. filed) (trial court in intentional assault case erred in striking the

defendant's designation of a subsequent treating doctor as a responsible third party

where the evidence raised an issue as to whether the doctor was "responsible for at

least a portion of [the plaintiff's] 'alleged injury or damage,' which is all that the

statute requires.")

Nevertheless, citing no authority, the Bank asserts that the 2003 amendments

to Chapter 33 provided "a very limited definition of a proper responsible third

party," limiting it to parties at blame for a "particular cause of action."  Case law

recognizes the opposite is true – that the 2003 amendments actually liberalized and

significantly broadened the definition of a responsible third party:

**The purpose of the 2003 amendments** to the requirements for designating responsible third parties **was to liberalize who may be so designated**, such that the jury may be permitted to consider the extent to which each involved entity is at fault, regardless of the extent to which the plaintiff could actually recover against such an entity.(... **the 2003 amendments "substantially broadened" the meaning of responsible third parties** to eliminate those restrictions and to allow the jury to allocate responsibility among all persons potentially responsible); *Holman*, supra, at 884 (describing the new rule as a **"veritable free-for-all**, with submission of '... unidentified defendants, phantom vehicles, subcontractors ... whose names can't be remembered,' and so forth") (quoting *Tort Reform of 2003: Hearings on Tex. H.B. 4 Before the Senate Comm. on State Affairs*, 78th Leg., R.S. (Apr. 10, 2003), reprinted in 2 Legislative History of Texas H.S. 4: The Medical Malpractice & Tort Reform Act of 2003, at 1304 (2003)).

*Hernandez v. Bumbo, Ltd.,* No. 3:12-CV-1213-M, 2014 WL 924238, \*5 (N.D. Tex.

March 10, 2014) (emphasis added).

3. **Smith's claims against Clark and the Bank are not mutually exclusive, and Chapter 33 would apply, regardless.**

The Bank did not raise its "mutually exclusive" argument in the trial court.

On appeal, the Bank cites no authority for its novel assertion that Chapter 33 does

not waive limitations as to mutually exclusive claims. Instead, numerous scenarios

exist involving mutually exclusive claims where Chapter 33 clearly applies. One

example is where an original defendant and a designated responsible third party,

later joined as a defendant, each assert that the other's conduct was the sole cause

of a plaintiff's injuries – for example, by disputing which of them caused an

accident, or disputing which of two distinct events caused the plaintiff's alleged

damages.  If the Bank's theory were correct, Chapter 33 would not provide for joinder in such "mutually exclusive" cases.

At any rate, Smith's claims against the Bank and Clark are not mutually exclusive.  Smith's entire claim against the Bank was an *element* of his claim against Clark (due to the "case-within-a-case" rule), and Smith's claim against Clark does not contradict or affect his claim against the Bank at all.  There is no inconsistency.

There is nothing "inconsistent" about the fact that – as applied in this case – Chapter 33 allows all parties who are somehow responsible for injuring a plaintiff to be brought into litigation filed against other parties which involves such injuries, notwithstanding the statute of limitations.  This represents a legislative policy, not an inconsistency.

> **4.    The statute does not produce an absurd result, and no vested right was curtailed.**

The Bank argues that reading the statute to permit its joinder produces an "absurd result."  Smith could as easily argue it was an "absurd result" that a Rule 202 petition filed against the Bank did not toll limitations on the identified claims, of which the Bank was fully aware.  But in specific response to the Bank's argument, it would be much more absurd if the law permitted a Bank which had maliciously harmed its customer to shift all of its liability to the attorney

attempting to help the aggrieved customer by allowing – or perhaps even contributing to causing – the statute of limitations to be missed. In short, there is nothing "absurd" about a legislative scheme that permits the party that actually caused damages to be joined and held to account, rather than allowing all responsibility to be permanently shifted onto somebody else.

The Bank's argument it was deprived of some "vested right" to rely on limitations is unsupportable and contrary to law. The Bank relies on *Baker v. Hughes,* 12 S.W.3d 1 (Tex. 2000), which addressed the completely different situation where a statutory amendment took away a limitations defense that had already vested under prior law, thereby violating Article I, Section 16 of the Texas Constitution which prohibits "ex post facto or retroactive laws." *See, Baker,* 12 S.W.3d at 4.[47] Such rule has no application to the case at bar, where no statutory amendment destroyed a pre-existing right.

The precise argument made by the Bank was squarely rejected in *Flack v. Hanke,* 334 S.W.3d 251, 260 (Tex.App.–San Antonio 2010, pet. denied), which held that joinder of claims under Chapter 33.004(e) which would otherwise be

---

[47]The Texas Supreme Court recently noted, "We have only upheld constitutional retroactivity challenges four times. In two of those cases, we upheld retroactivity challenges because amendments to statutes of limitations revived claims the previous statutes barred. [citing *Baker*] *Tenet Hospitals Ltd. v. Rivera*, 445 S.W.3d 698, 708 (Tex. 2014).

barred by limitations cannot violate the rule against retroactive application unless the cause of action arose before the statute was amended in 2003.

The Bank's other cited case is to the same effect. *Villarreal v. Wells Fargo Brokerage Services, LLC*, 315 S.W.3d 109, 123 (Tex.App.–Houston [1st Dist.] 2010, no pet.) (Because "claims were time-barred when the 2003 amendments to Chapter 33 were enacted," section 33.004(e) would not be applied retroactively.)

### 5. The statute promotes public policy.

The Bank urges this Court to question the statute's wisdom and logic and apply a "different construction than as written" in the interest of "public policy." The Court should decline to do so. A court's job is to ascertain the policy and intent of a statute from its language and apply it as written, not to substitute its opinions on matters of public policy.

Furthermore, it is much better public policy to permit a tortfeasor primarily responsible for causing damages to be joined in an ongoing lawsuit, despite limitations, than to allow all of its liability to be permanently shifted onto others. Regardless, this is an area entrusted to the legislature.

An extreme example illustrates that courts properly apply Chapter 33.004(e) as written and permit joinder, even where it is argued that such permits absurd results or violates public policy. In *Flack,* the court applied the "plain meaning" of

the statute to hold that joinder of third parties should have been permitted, despite

the fact they had been "designated as RTPs solely to 'try and wash out their

limitations defense,'" allegedly contrary to "public policy." *Flack,* 334 S.W.3d at

260. 261. Applying the statute as written, the court explained:

> Section 33.004(e) creates the potential to revive otherwise barred claims
> against a designated RTP. This procedure may result in the plaintiff
> collaborating with a defendant to join additional tortfeasors. For example,
> section 33.004(e) allows a plaintiff to sue a defendant with little or no
> liability, and that defendant may then designate the true tortfeasor as an
> RTP. *Id.* The plaintiff subsequently may join the true tortfeasor, avoid a
> limitations defense, and nonsuit the original defendant. *Id.*; *see also* Gregory
> J. Lensing, *Proportionate Responsibility and Contribution Before and After
> the Tort Reform of 2003*, 35 TEX. TECH L.REV. 1125, 1182 (2004) ("A
> plaintiff who misses limitations as to one joint tortfeasor can easily suggest
> to another joint tortfeasor that it should invoke the responsible-third-party
> device-perhaps even offer that tortfeasor some inducement to do so-and then
> enjoy a new sixty-day window of opportunity to sue the responsible third
> party.")

*Flack,* 334 S.W.3d at 256. Despite such "public policy" concerns, court applied

the plain language of the statue and held that the trial court abused its discretion in

dismissing the plaintiff's claims against the third party based on limitations. *Id.* at

263.

## II. Response to Appellant's Issue No. 2

### A. Punitive damages recoverable from the Bank in a malicious prosecution case were part of the actual damages Smith's sought against Clark.

The Bank argues that punitive damages should not be recoverable against the Bank because Smith did not seek punitive damages against Clark, since Chapter 33.004(e) only allows for the joinder of tortfeasors who could be responsible for the damages sought from the original defendant. This argument completely mis-construes the basis of Smith's claims. *All damages* Smith could have recovered from the Bank in a malicious prosecution suit – including punitive damages – represent part of the compensatory damages Smith sought from Clark.[48] Such damages were thus included in the damages which Clark alleged the Bank was responsible for in his designation of the Bank as a responsible third party.

---

[48] Damages in a legal malpractice case include "the amount of damages recoverable and collectible ... if the suit had been properly prosecuted." *Elizondo*, 415 S.W.3d at 263 (citing *Cosgrove*, 774 S.W.2d at 666; *see also*, *Akin,* 299 S.W.3d at 112. This includes exemplary damages. *Patterson & Wallace v. Frazer,* 93 S.W. 146, 148, (Tex.Civ.App.– El Paso 1906) ("[S]he has lost by such negligence of defendants what she would have otherwise collected; and the fact that part of the judgment which might reasonably have been expected to be recovered and collected might have been for exemplary damages would make no difference."), *rev'd o.g.,* 94 S.W. 324, 328 (Tex. 1906) (holding that the trial court's error in instructing the jury regarding what a witness had said was "harmful" because it prevented the jury from considering facts in mitigation of the underlying damages, "especially in the matter of exemplary damages."); *Parsons v. Greenberg,* No. 02-10-00131-CV, 2012 WL 310505, *11, (Tex.App.–Fort Worth, Feb. 2, 2012, pet. denied) (noting that no known case has ever overruled *Patterson's* holding that the loss of underlying punitive damages are recoverable as compensatory damages in a legal malpractice case.)

**B.** **Chapter 33 prohibits the reduction of exemplary damages, not their recovery.**

The Bank next argues that Chapter 33 "does not apply to exemplary damages;" however, rather than supporting the Bank's position, such fact actually highlights why the Bank's preceding argument is incorrect.

Section 33.002(c)(2) states that Chapter 33 "does not apply to ... a claim for exemplary damages included in an action to which this chapter otherwise apples." Thus, a defendant cannot shift or reduce his liability for punitive damages to a third party, nor can a defendant receive a "settlement credit" for settlement payments representing punitive damages. This is the meaning and effect of section 33.002(c)(2). *See, Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 927 (Tex. 1998) ("A defendant cannot receive credit for settlement amounts representing punitive damages [because] '[t]his chapter does not apply to ... a claim for exemplary damages included in an action to which this chapter otherwise applies.'")

Accordingly, if Smith had sought punitive damages against Clark, Clark could not have properly designated the Bank as a responsible third party with respect to such punitive damages claim, and the Bank's first argument would indeed apply. Punitive damages from Clark, based on Clark's own conduct, would not represent compensation for a loss the Bank caused.

This did not occur, however. Smith did not sue Clark for exemplary damages, and the Bank was not designated or joined because it allegedly caused the harm giving rise to a non-existent punitive damage claim against Clark. The Bank was designated because it caused the "actual damages" sought from Clark. Such is expressly permitted, by Chapter 33. Once the Bank had been so-designated, it was proper for Smith to join the Bank as a defendant. At that point, the Bank was no longer a "responsible third party" under Chapter 33 but a defendant in the case. *Flack,* 334 S.W.3d at 262. Nothing prohibited Smith from recovering from the Bank every element of damages the Bank was liable for – certainly all elements representing part of the actual damages alleged against Clark.

Chapter 33's prohibition against using another party's comparative responsibility to reduce a defendant's liability for punitive damages has never been construed to prohibit holding a defendant responsible for its own punitive damages, as the Bank advocates. Instead, punitive damages are routinely awarded in cases which also involve the application of comparative responsibility under Chapter 33; the defendant simply does not receive a reduction on punitive damages. *See, e.g., Mobil Oil Corp.* 968 S.W.2d at 927.[49]

---

[49]Thus, if the Bank had alleged and proved that Smith was negligent and responsible for his own injuries, Smith's negligence would still have reduced his recovery of actual damages against the Bank under 33.012(a), notwithstanding the fact that it would not have reduced his recovery of punitive damages, per 33.002(c)(2).

The Bank was properly designated as a responsible third party because it allegedly caused at least part of the damages Smith sought to recover from Clark. It was then permissibly joined as a defendant. Smith's claims against the Bank arose under common law, not Chapter 33. Chapter 33 allowed for the Bank's joinder in the case, but did not otherwise create or diminish any substantive rights, once the Bank became a defendant.

## III. Response to Appellant's Issue No. 3

### A. Sufficient evidence supports the jury's finding that the Bank initiated or procured the prosecution.

#### 1. The evidence shows that the Bank initiated the prosecution; moreover, the Bank's representative and its retained expert each testified and admitted it did.

"A person initiates a criminal prosecution if he makes a formal charge to law enforcement authorities." *Browning-Ferris Industries, Inc. v. Lieck*, 881 S.W.2d 288, 292 (Tex. 1994). That is exactly what the Bank's vice president Jerry Cone did when he personally "filed hindering a secured creditor" charges against Smith with the Sulphur Springs Police Department. (3RR:76; PX-20) Indeed, Cone testified (then denied) that his purpose in filing the charges was "to get him indicted and charged with the crime." (3RR:112-113) Moreover, Cone acknowledged that he "initiated criminal prosecution" against Smith on behalf of the bank. (3RR:77)

Significantly, the Bank's attorney elicited clear and specific testimony from the Bank's own retained expert witness, former Hopkins County District Attorney Frank Long, that when the Bank filed the complaint with the police department, the Bank "initiated the prosecution" within the meaning of the required element of malicious prosecution. (4RR:234) On cross-examination, Mr. Long confirmed that, consistent with the Texas Court of Criminal Appeals' holding that, "A person initiates a criminal prosecution if he makes a formal charge to law enforcement authorities," that is what Cone did when he filed a complaint with the police in this case. (4RR:254-255)

Smith's expert, Lamar County District Attorney Gary Young, likewise testified, "if a person goes to the police, reports a crime, they have initiated criminal prosecution." (5RR:22)

The Bank did not object to any of this testimony, offer any contrary testimony, or request any sort of instruction or definition from the court regarding initiating the prosecution. The charge did not define "initiate,"[50] which is commonly understood and defined to mean, "to cause or facilitate the beginning

---

[50]"Initiation would not ordinarily need to be defined, as it would be demonstrated by evidence that a defendant filed formal charges against plaintiff." *Browning-Ferris*, 881 S.W.2d at 293.

of."[51]   Under the evidence and the charge, "initiation of prosecution" was clearly established, in addition to being admitted by the Bank's vice president, and though expert testimony offered by and on behalf of the Bank.

Contrary to its own testimony and admissions, the Bank quotes language out of context from an unpublished, unreviewed, El Paso opinion, *Gonzalez v. Grimm*, that "initiating" an action "describes executing the charging instrument which goes before the magistrate who may then issue an arrest warrant."[52]   While *Gonzalez* did quote such language from the Restatement of Torts, the Bank omits the remainder of the citation, where the court went on to also quote the Texas Supreme Court's holding that, "A person initiates a criminal prosecution if he makes a formal charge to law enforcement authorities."[53]

*Gonzalez* did not hold or suggest that "execution of a charging instrument" is required.  *Gonzalez* held that a witness, who had previously reported a man to the police for threatening to misuse her social security number, had not "initiated prosecution" when the D.A. had declined to prosecute him based on her complaint,

---

[51]*See* Webster's Dictionary: http://www.merriam-webster.com/dictionary/initiate

[52]Appellant's Brief p.24, quoting *Gonzalez v. Grimm,* No. 08-13-00326-CV, 2015 WL 4137862, (Tex.App.–El Paso 2015, no pet.)

[53]*Gonzalez,* 2015 WL 4137862 at *5, *quoting Browning-Ferris,* 881 S.W.2d at 292.

but one year later had filed different charges – for criminal assault – based on the factual statements of an investigating police officer and other witnesses (including allegations which the original witness herself actually disputed), without communicating with her at all.[54] Such holding in no way changes the fact, confirmed by the court, that "[a] person initiates a criminal prosecution if he makes a formal charge to law enforcement authorities."[55] As all the witnesses agreed at trial, that is exactly what the Bank did.

2. **The evidence shows that the Bank procured the prosecution**.

Because the Bank initiated Smith's prosecution, evidence of procurement is not required, as a plaintiff asserting malicious prosecution may prove the defendant "*either* 'initiated' *or* 'procured'" criminal proceedings. *Browning-Ferris,* 881 S.W.2d at 293 (emphasis added). Nevertheless, even if Cone had not personally initiated the criminal proceedings by filing hindering a secured creditor charges against Smith with the police, the Bank would still be liable for "procuring" the prosecution, as sufficient evidence supports a finding that the Bank provided information it knew to be false, thereby causing the prosecution, which would not have occurred absent the Bank's actions.

---

[54] *Gonzalez,* 2015 WL 4137862 at *3-*4,*6.

[55] *Gonzalez,* 2015 WL 4137862 at * 5, *quoting, Browning-Ferris,* 881 S.W.2d at 292.

### a.    Cone knowingly provided false information.

When Cone accused Smith of hindering a secured creditor, he was not aware of any facts or circumstances whatsoever that would lead him to believe that Smith had committed such crime. (3RR:45,76,115-116,118-110; 4RR:102)[56]

In addition to groundlessly accusing Smith of committing a crime, Cone gave the police several pieces of important information he knew to be false – information he later repeated and confirmed to the D.A.'s office when they contacted him, including: that Smith had not paid any part of the $24,378.54 loan; that Smith had refused to contact the Bank; that Smith had not returned any part of the collateral associated with the loan; that the value of the unreturned collateral was $23,150; and that the collateral included in particular the Toyota commercial embroidery machine.[57]   He also gave the police his false affidavit claiming he had been unable to contact Smith at his house on multiple occasions, and had been informed he was a long-distance trucker, and gave them an unclaimed demand letter he had sent before the consolidated loan was even executed.[58]

---

[56]Please see the "Facts" section of this brief, *supra,* p. 4

[57]*Supra*, pp. 4-7

[58]*Id. See also supra,* p. 3

The Bank attempts to rely on Cone's self-serving assertions that he told

Officer Irving the truth, did not realize the ramifications of filing a complaint; and

had no contacts with the D.A.'s office after filing the charges, but such assertions

are demonstrably false, and the jury was well within its purview in concluding

otherwise.[59]

### b. The Bank was the source of information that caused Smith's prosecution.

A plaintiff in a malicious prosecution suit need not provide direct evidence

of causation, but may prove his case through "alternative means," including

circumstantial evidence. *In re: Bexar County,* 224 S.W.3d 182, 186 (Tex. 2007).

Nevertheless, as detailed in the "Facts" section of this brief, strong, direct evidence

shows that all of the allegations and information which the police and D.A.'s office

relied upon in arresting, jailing, indicting, and prosecuting Smith were provided

exclusively by Cone, on behalf of the Bank.[60]  There was no independent

investigation, beyond talking to Cone and receiving information from him.[61]

---

[59]*Supra*, pp. 2-3; 4-7;  9-10

[60]*Supra,* pp. 3-7; 9-10

[61]4RR:33,36. *See also* the first page of the D.A. documents (PX-21) which states that most of the file consists of documents the Bank provided. It contains no independently-developed evidence.

The Bank claims that "Officer Russell Sterling [*sic.*] swore out the complaint against Smith based on his investigation and own beliefs," but cites only Officer Stillwagoner's probable cause affidavit, failing to mention that Stillwagoner undisputedly never conducted any independent investigation. (4RR:33,36) The Bank's own expert, former D.A. Frank Long, did not fault the police department for relying on the information Cone provided. (4RR:286) A police officer would reasonably expect and assume that someone reporting that certain property has been destroyed or sold would accurately identify the property. (4RR:289)

As addressed in *Thrift v. Hubbard*, 974 S.W.2d 70 (Tex.App.–San Antonio 1998, pet. denied), even though the decision to prosecute is ultimately made by the District Attorney, evidence that a party intentionally included false and misleading information in his complaint to the police is sufficient to support a finding of procurement.[62]   The evidence in this case is more than sufficient.

**B.    Sufficient evidence supports the jury's finding that the Bank lacked probable cause.**

When asked about the Bank's probable cause to believe that Smith was guilty of the crime the Bank accused him of, Cone acknowledged that he had no knowledge of any facts whatsoever that would lead him to reasonably and honestly

---

[62] *Thrift* cited the defendant's misidentification of certain accounts receivable pledged as collateral on a loan as an example of false information the D.A. had acted upon. *Thrift,* 974 S.W.2d at 78.

believe that any crime had been committed. (3RR:115)

Although there is an initial presumption that the defendant in a malicious prosecution case acted reasonably and in good faith and had probable cause to initiate the proceedings, this presumption disappears once the plaintiff produces evidence that the motives, grounds, beliefs, and evidence upon which the defendant acted did not constitute probable cause. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517, 518 (Tex.1997). The burden then shifts to the defendant to offer proof of probable cause. *Id.* Cone's admission that he knew of no facts whatsoever that would lead him to reasonably and honestly believe that any crime had been committed not only shifted the burden, it established the lack of probable cause as a mater of law.[63]

To overcome the jury's finding, the Bank "must show that [the] evidence could only be interpreted in such a way as to provide it with probable cause to believe that [Smith] was guilty of the offense." *J.C. Penney Co., Inc. v. Ruth*, 982 S.W.2d 586, 589 (Tex.App.–Texarkana 1998, no pet.), *citing, Richey*, 952 S.W.2d at 517. Thus, this Court must "look to see if [the Bank] conclusively proved that a

---

[63]When a litigant admits positive facts, he is conclusively bound by such admissions. "The testimony of a party to a suit and admissions made by him must be construed as binding upon him, and not merely as raising issues of fact." *Turner v. State*, 850 S.W.2d 210, 213 (Tex.App.–Texarkana 1993, no pet.), *quoting, Tex. & P. Ry. Co. v. Wood*, 145 Tex. 534, 199 S.W.2d 655 (1947).

reasonable person would believe that a crime had been committed, given the facts as [the Bank] honestly and reasonably believed them to be before the criminal proceedings were instituted." *Id.* Even aside from Cone's admissions, the Bank has failed to meet this burden.

The "Facts" section of this brief cites clear evidence establishing the Bank lacked probable cause.[64] Moreover, the Bank's own expert, former District Attorney Long, testified that he could not state an opinion that Cone had probable cause to accuse Smith of hindering a secured creditor. (4RR:274)

As Long confirmed, hindering a secured creditor requires more than simply refusing to tell a lender where collateral is located. (4RR:244) The statute does not outlaw refusal by the debtor to reveal the location of property. (4RR:245-246) Not paying on a secured loan does not constitute the crime. (4RR:261) Nor does the law outlaw refusal by a debtor to conceal both himself and the collateral from the lender. (4RR:262) District Attorney Gary Young, agreed: Refusing to reveal the location of collateral or merely refusing to deliver collateral upon demand does not constitute an offence, nor does the debtor's concealment of himself. (5RR:15,16)[65]

---

[64]*Supra,* p. 4

[65]The trial court correctly so charged the jury. CR:538. *See, Anzaldua v. State*, 696 S.W.2d 911, 912-913 (Tex.Crim.App. 1985).

The Bank attempts to prove probable cause based solely on Cone's testimony that, at the time the renewal note was executed, Smith allegedly told Cone that he would return later and tell him where some unidentified other collateral was located, but never did. Smith denied such conversation ever occurred. (4RR:143) The jury was free to believe Smith, rather than Cone.

Moreover, even if the jury believed Cone's testimony, such does not establish probable cause, as a mere refusal by a debtor to reveal the location of collateral does not constitute the crime of hindering a secured creditor.[66] The Bank's attorney attempted to elicit testimony from the Bank's expert that if Cone had indeed asked Smith where other collateral was, and if Smith had indeed told Cone he would come back later and show him but then refused to do so, such could have constituted hindering a secured creditor, but Mr. Long testified it would not. Such would not be a demand to deliver possession of the property, and refusing to reveal its location would not constitute the crime of hindering a secured creditor. (4RR:296,297)

---

[66]Furthermore, Cone claimed this discussion occurred when he renewed Smith's loan, during a pleasant conversation, when Smith supposedly indicated it was in storage somewhere by pointing over his shoulder to the west. (3RR:51) At that time, the loan was being renewed, Smith was cooperating, and there was no demand for payment or return of any collateral. Cone testified he never again spoke to Mr. Smith about such collateral, and did not mention it or ask him about it several weeks later when Smith came up to the Bank to demonstrate the machine to the Stones. (3RR:206-207) He never again asked Smith about it. (3RR:115,125)

The Bank also cites Cone's testimony that his intent in filing charges was not to get Smith indicted, but to get paid.  Although largely irrelevant to the issue of probable cause, Smith would point out that, at one point, Cone admitted that his purpose in filing the charges was "to get him indicted and charged with the crime." (3RR:112-113) Furthermore, Cone knew it was improper to file criminal charges in order to get paid. (3RR:36,104-105)

Because the evidence does not conclusively prove that a reasonable person would believe that a crime had been committed, given the facts as the Bank honestly and reasonably believed them, its point of error must be overruled.[67]

## IV.    <u>Response to Appellant's Issue No. 4</u>

**Sufficient evidence supports the jury's finding that Smith sustained some physical pain or mental anguish.**

As Appellant acknowledges, because the charge submitted physical pain and mental anguish in a single question, the verdict and judgment must be upheld if there is some evidence of just one of those elements.[68]  The record contains sufficient evidence of both elements.

---

[67] *See, J.C. Penney Co.,* 982 S.W.2d at 589; *Richey*, 952 S.W.2d at 517.

[68] *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 771 (Tex. 2003).

## A.    Physical Pain

Although most of Smith's anguish was mental, the evidence shows Smith also suffered some physical pain.  For one thing, he was physically restrained and locked in jail for five days without freedom of movement, forced to sleep on a very uncomfortable mattress, obliged to eat unpalatable food and to use the bathroom with no toilet paper, forced to wear filthy, smelly clothes.  (4RR:106) Significantly, during this time he was denied access to important anti-seizure medication, without which he was unable to sleep or maintain his sense of time and space. (4RR:107)  He became physically very shaky and was speaking incoherently. (4RR:61,62)

Ignoring the evidence, Appellant argues that "Smith recognizes there was no evidence of physical pain" because Smith's counsel stated he was "talking mental anguish" in his closing argument. (5RR:111)  That Smith's counsel chose to talk about mental anguish in argument in no way establishes there was no evidence of physical pain.[69]

---

[69]The Bank does not assert such comments constituted a judicial admission, and could not support such assertion in any event, as counsel's statement that he was "talking mental anguish" was not a "clear, deliberate, and unequivocal admission" that no evidence of physical pain existed.  *See, Clear Lake City Water Authority v. Kirby Lake Development, Ltd.*, 123 S.W.3d 735, 753-754 (Tex.App.–Houston [14th Dist.] 2008, pet. denied); *Ardmore, Inc. v. Rex Group, Inc.*, 377 S.W.3d 45, 62  (Tex.App.–Houston [1st Dist.] 2012, pet. denied); *Isern v. Watson,* 942 S.W.2d 186, 201 (Tex.App.– Beaumont 1997, pet. denied).

The Bank does not appeal the amount of damages awarded. Accordingly, because there was sufficient evidence from which the jury could conclude that Smith experienced some physical pain, the verdict must be affirmed.

## B. Mental Anguish

"An award of mental anguish damages will survive a legal sufficiency challenge when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995) Even absent such evidence, the award will survive if the record nevertheless reveals "any evidence of 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'" *Id.*[70] Considering all that Smith endured, the Bank's assertion that he suffered no compensable mental anguish is absurd. The evidence in such regard was not merely sufficient, it was overwhelming.[71]

---

[70] Courts have typically defined mental anguish as, "more than mere disappointment, anger, resentment or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation." *Parkway,* 901 S.W.2d at 444.

[71] Please refer to the evidence of Smith's mental anguish set forth in the "Facts" section of this brief, *Supra,* pp. 7-9; 11-12.

A closely analogous case addressing mental anguish damages for malicious prosecution is *Thrift v. Hubbard*, 974 S.W.2d 70 (Tex.App.–San Antonio 1998, pet. denied), in which the court affirmed an award of mental anguish based on evidence very similar to, though not as compelling as, that at bar:

Thrift contends that the evidence is insufficient to support the jury's award of damages for emotional distress because the award necessitates an inference of humiliation. We disagree. The evidence reflects that Hubbard **was indicted by a grand jury** of four counts of criminal activity **reflecting negatively on her character**, and that she **remained under indictment for over three years**. Hubbard testified that she had to sit with other criminal defendants who were chained and attended by guards during her **fifteen court appearances**. She further testified that, during these hearings, she endured "glossy eyed" on-lookers "pawing" at her and **asking why she was there**. She spent over three years assisting in her defense and fearing a conviction of unfounded charges. She testified that **it was "terrible."**

Hubbard testified that she discontinued her church activities because she **feared misleading people about her faith if they discovered that she was under indictment.** She also **worried about her business dealings** and **feared applying for certain projects** because she would be compelled to disclose the indictment. Hubbard's criminal attorney testified that she was many times, **"crying, a nervous wreck."** Hubbard's stepdaughter testified that the Hubbards's criminal defense took up "pretty much all of their time and all of their thoughts and everything ... I mean they worked hard to get where they were, and it was all gone, taken away."

Thrift's contention that the award of damages for emotional distress required evidence that Hubbard could not sleep or eat, required medication or psychiatric care, experienced depression, or fell into substance abuse as a result of the charges against her is unfounded. **The evidence in this case supports a finding that Hubbard's daily routine was substantially disrupted by fear and anxiety related to the charges pending against her, not to mention by the emotional strain surrounding her preparation for and attendance at over 15 court proceedings as a**

**criminal defendant**. The jury's award of $150,000 for mental anguish was, therefore, appropriate. Thrift's third point of error is overruled.

*Thrift,* 974 S.W.2d at 81 (emphasis added).

As in *Thrift,* the evidence at bar shows that Smith's "daily routine was substantially disrupted by fear and anxiety related to the charges pending against [him], not to mention by the emotional strain surrounding [his] preparation for and attendance at [18] court proceedings as a criminal defendant." Like Ms. Hubbard, Smith was indicted, felt ashamed, and feared people finding out that he was accused of a crime. Unlike Hubbard, however, Smith was actually arrested and jailed for days, deprived of important medication, and actually did lose the ability to work on certain, projects, as opposed to just fearing that he would.

In addition to being stronger than the evidence held sufficient in *Thrift,* the evidence of Smith's mental anguish is also significantly greater than the evidence held by the Texas Supreme Court to support such award in *Latham v. Castillo,* 972 S.W.2d 66 (Tex. 1998). Like *Thrift, Latham* was decided after *Parkway*, and applied the standards from that case to hold that the evidence was sufficient.

*Latham* involved a DTPA suit against a lawyer by a married couple who claimed they suffered mental anguish when they learned the lawyer had missed the statute of limitations to file a medical malpractice lawsuit over their daughter's death, and had misled them about it. The father testified that when he found out

the lawyer had lied to him, it "made me throw up," made him "sick, nervous, and mad," and "it just hurt me a lot because I trusted in him." *Latham* 972 S.W.2d at 70. The mother simply testified, "my heart was broken. I was devastated, I felt physically ill." *Id.* Citing no other evidence, the Supreme Court held this was "some evidence" that the attorney's conduct caused each of the plaintiffs a "high degree of mental pain and distress," exceeding the evidence of "mere emotions" as referenced in *Parkway. Id.*

Even more so than in *Latham*, the anguish Smith suffered also exceeded "mere emotions," and included great physical discomfort and restraint, the loss of sleep, shakiness, confusion, incoherent speech, "fuddle brain" from lack of medication, the loss of the ability to work in his chosen field, harm to his ability to provide for his family, and the fear and humiliation of being branded a criminal.

"Evidence of what has taken place in a plaintiff's life as a result of a defendant's actions is important in showing mental anguish. [] Jurors are best suited to determine, by referring to their own experiences, whether and to what extent the defendant's conduct caused compensable mental anguish." *GAB Business Services, Inc. v. Moore,* 829 S.W.2d 345, 350 (Tex.App.–Texarkana 1992, no writ). In this case, the evidence strongly supports the jury's verdict. In short, the jury's conclusion that Smith suffered some pain or mental anguish was

well supported by all the evidence, and the trial court did not err in granting judgment on the jury's verdict.

## PRAYER

For the foregoing reasons, Appellee respectfully requests:

1.      that the trial court's judgment be affirmed (except to the extent that the judgment is reversed and rendered, in part, so as to include $84,542.00 in prejudgment interest, as addressed and requested in Smith's Cross-Appeal herein);

2.      that Appellee recover the appellate costs incurred by him herein; and

3.      that Appellee have all other and/or further relief that the law and the nature of this case may require.

Respectfully submitted,

/s/ J. Mark Sudderth
**J. Mark Sudderth**
**Texas Bar No. 19461500**
NOTEBOOM – THE LAW FIRM
669 Airport Freeway, Suite 100
Hurst, Texas  76053
(817) 282-9700
(817) 282-8073 (facsimile)
Sudderth@Noteboom.com

Attorney for Appellee,
John Alexander Smith

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the attached document been served upon all counsel record on the 14th day of December, 2015, via e-service, to the attorneys of record for Cross-Appellee City National Bank of Sulphur Springs as follows:

John R. Mercy
Mercy, Carter, Tidwell, L.L.P.
1724 Galleria Oaks Drive
Texarkana, Texas 75503
E-mail: jmercy@texarkanalawyers.com

Coy Johnson
E-mail: coy@clayjohnsonlaw.com
Clay Johnson
E-mail: clay@clayjohnsonlaw.coim
Johnson Law Firm, P.C.
609 Gilmer Street
Sulphur Springs, Texas 75482

/s/ J. Mark Sudderth
J. Mark Sudderth


## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of TEX. R. APP. P. § 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 13-point for footnotes.

I certify that this brief was prepared with Corel WordPerfect X5, and that, according to that program's word-count function, the sections covered by TEX. R. APP. P. § 9.4(i)(1) contain 14,217 words, thus bringing the brief into compliance with the word-count limitations of that Rule.

/s/ J. Mark Sudderth
J. Mark Sudderth

# APPENDIX

A.    *Ackerman v. Vordenbaum*

B.    *Adams v. Parker Square Bank*

C.    *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*

D.    *Anzaldua v. State*

E.    *Ardmore, Inc. v. Rex Group, Inc.,*

F.    *Baker v. Hughes,*

G.    *Browning-Ferris Industries, Inc. v. Lieck,*

H.    *City of Rockwall v. Hughes,*

I.    *City of San Antonio v. Talerico,*

J.    *Clark v. Dillard's, Inc.,*

K.    *Clear Lake City Water Authority v. Kirby Lake Development, Ltd.,*

L.    *Cosgrove v. Grimes,*

M.    *Dixon v. SW Bell Tel. Co.,*

N.    *Edlund v. Bounds,*

O.    *Elizondo v. Krist,*

P.    *Eslon Thermoplastics v. Dynamic Systems, Inc.,*

Q.    *ExxonMobil Corp. v. Pagayon,*

R.    *FFP. Operating Ptnrs., L.P. v. Duenez,*

S.    *Flack v. Hanke,*

T.      *French v. Gill,*

U.      *GAB Business Services, Inc. v. Moore,*

V.      *Golden Eagle Archery, Inc. v. Jackson*,

W.      *Gonzalez v. Grimm,*

X.      *Gray v. Nash,*

Y.      *Greathouse v. McConnell*,

Z.      *Heath v. Herron*,

AA.     *Hernandez v. Bumbo, Ltd.,*

BB.     *Hines v. Commission for Lawyer Discipline,*

CC.     *Holy Cross Church of God in Christ v. Wolf,*

DD.     *Houston First Am. Sav. v. Musick,*

EE.     *In re: Bexar County,*

FF.     *In re: Brokers Logistics, Ltd.*,

GG.     *In re: Smith*,

HH.     *Ingersoll-Rand Co. v. Valero Energy Corp.,*

II.     *Isern v. Watson,*

JJ.     *J.C. Penney Co., Inc. v. Ruth*,

KK.     *Jay Miller & Sundown, Inc. v. Camp Dresser & McKee, Inc.*,

LL.     *Latham v. Castillo,*

MM.     *Lexington Ins. Co. v. Strayhorn,*

NN. *Litton Indus. Prod., Inc. v. Gammage,*

OO. *Mobil Oil Corp. v. Ellender,*

PP. *Parkway Co. v. Woodruff,*

QQ. *Parsons v. Greenberg,*

RR. *Patterson & Wallace v. Frazer* (App.)

SS. *Patterson & Wallace v. Frazer* (Tex.)

TT. *Rhodes v. Batilla,*

UU. *Richey v. Brookshire Grocery Co.,*

VV. *Shepherd v. Ledford,*

WW. *Shoemake v. Fogel, Ltd.,*

XX. *Taylor v. Alonso, Cersonsky & Garcia, P.C.,*

YY. *Tenet Hospitals Ltd. v. Rivera,*

ZZ. *Tex. & P. Ry. Co. v. Wood,*

AAA. *Tex. Dep't of Transp. v. City of Sunset Valley,*

BBB. *Thrift v. Hubbard,*

CCC. *Tittizer v. Union Gas Corp.,*

DDD. *Tobin v. Garcia,*

EEE. *Turner v. State,*

FFF. *Villarreal v. Wells Fargo Brokerage Svcs., LLC,*

GGG. TEX. CIV. PRAC. & REM. CODE Chapter 33

HHH.  Tᴇx. Gov. Cᴏᴅᴇ § 311.011

III.     Tᴇx. R. Cɪv. P. 38



403 S.W.2d 362
Supreme Court of Texas.

Milton O. ACKERMANN et ux., Petitioners,

v.

Ernestine VORDENBAUM, Respondent.

No. A—11101.  |  May 25, 1966.
|  Rehearing Denied June 22, 1966.

Suit in form of trespass to try title. The Second Twenty-Fifth District Court, Guadalupe County, Paul C. Boethel, J., entered a dismissal and the plaintiff appealed. The San Antonio Court of Civil Appeals of the Fourth Supreme Judicial District, 393 S.W.2d 927, reversed and rendered and error was brought. The Supreme Court, Norvell, J., held that although where amended original petition of plaintiff was defective in the matters pointed out by defendants' motion to strike which related to form rather than substance of petition which was not claimed to have failed to state a cause of action and trial court had not ordered a repleader, the decision of plaintiff not to amend did not render cause subject to dismissal.

Judgment of Court of Civil Appeals reformed, and as so reformed, affirmed.

West Headnotes (3)

**[1]**     **Pretrial Procedure**
    Defects and Objections Ground for Dismissal in General

Where second amended original petition of plaintiff was defective in the matters pointed out by defendants' motion to strike which related to form rather than substance of petition, which was not claimed to have failed to state a cause of action and trial court had not ordered a repleader, the decision of plaintiff not to amend did not render cause subject to dismissal. Rules of Civil Procedure, rules 46, 69, 90.

7 Cases that cite this headnote

**[2]**     **Appeal and Error**
    Nature and Scope of Decision

Generally, order overruling motion for summary judgment is interlocutory in nature and not appealable.

151 Cases that cite this headnote

**[3]**     **Appeal and Error**
    On Appeal from Intermediate Court

Where an order of dismissal was appealed from Court of Civil Appeals and Supreme Court had determined that order of dismissal was improper, a remand and reinstatement of case in trial court's docket was the proper disposition of case rather than the Supreme Court's rendition of a judgment for the plaintiff.

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*362**  Jandt & Jandt, Seguin, for petitioners.

Threlkeld, Saegert & Saegert, Seguin, W. James Kronzer, Houston, for respondent.

**Opinion**

NORVELL, Justice.

Upon an appeal from an order dismissing this cause, the Court of Civil Appeals reversed the judgment of the trial court and rendered judgment for the plaintiff, Ernestine Vordenbaum. The Court of Civil Appeals held that the trial court erred in overruling the plaintiff's motion for summary judgment and rendered judgment for the plaintiff in accordance with Rule 434, Texas **\*363** Rules of Civil Procedure. 393 S.W.2d 927. We affirm.

The plaintiff in the trial court was the appellant in the Court of Civil Appeals and is the respondent here. [1] We will use the trial court designation of the parties.

Two questions are involved, namely, (1) Did the trial court err in dismissing this cause?, and, if that question be answered in the affirmative, (2) Was the Court of Civil Appeals correct in rendering judgment for the plaintiff or should the cause have been remanded for another trial?

The first question presents little difficulty. The action was in trespass to try title in which the grounds of recovery were specifically alleged. The plaintiff alleged that on December 5, 1951, she executed a deed conveying one and one-fifth acre of land out of the G. Malpaz Survey No. 67 in Guadalupe County, Texas to the defendants, Milton O. Ackermann and wife, Emelie Ackermann, in which she reserved a life estate and a vendor's lien, said lien being reserved 'until the above described obligations are fully complied with according to their intent and purpose when this deed shall become absolute'. The consideration for this deed was that the Ackermanns 'take care of and provide the meals for the grantor (Mrs. Vordenbaum) as long as she lives'. These were the obligations referred to in the vendor's lien clause. The plaintiff asserted the agreement to support had not been carried out, but had been abandoned and consequently she was entitled to recover upon the superior legal title retained by her in the deed above mentioned.

Plaintiff's Second Amended Original Petition in the forepart thereof contained a number of exceptions directed against defendants' answer. These exceptions were followed by a repleading of her cause of action. The defendants moved to 'strike from the record the document called the second amended original petition for the reason that the same is not in compliance with Rules 46 and 69 of the Texas Rules of Civil Procedure'. Apparently the motion to strike was heard on May 21, 1964, but the order sustaining the same was not signed by the trial judge until December 14, 1964. It appears that on the same date the order was signed, the defendants made a further motion in which they requested the trial court to dismiss the case for want of prosecution because plaintiff had failed to amend her second amended original petition. The trial court sustained the motion to strike the second amended original petition and then dismissed the case. The order of dismissal was not based upon the theory that the plaintiff had failed to prosecute her case, but on the contrary recites that as 'plaintiff desires to stand on her pleadings and not to replead the same after having a reasonable opportunity to do so, it is further ordered that this cause be and the same is hereby dismissed, * * *.'

[1] Undoubtedly, the second amended original petition was defective in the particulars pointed out by defendants' motion and we do not know why plaintiff did not amend her defective petition. However that may be, the only pleading which was stricken was the second amended original petition and if plaintiff decided not to file another amendment, such decision did not render the cause subject to dismissal. As pointed out by the Court of Civil Appeals, the trial court did not order a

repleader and plaintiff had violated no order of the court. The ground set forth in the motion to strike related to form rather than substance and it was not contended that the petition failed to state a cause of action. We have no true analogy between the action taken here and the now outmoded general demurrer practice (Rule 90), in which a dismissal could be ordered upon a refusal **\*364** to amend after a court had held that the petition stated no cause of action. We hold that the order of dismissal was erroneous and must be reversed.

This brings us to a consideration of the second question, that is, whether an order of rendition or remand constitutes the correct disposition of the case. This largely depends upon whether an appellate court having held that an order of dismissal was improper may then examine a trial court's action in overruling a summary judgment. In Tobin v. Garcia, 159 Tex. 58, 316 S.W.2d 396 (1958), we held that:

> 'If the only order in the trial court is one overruling a motion for summary judgment, then that order is interlocutory and no appeal will lie therefrom. But when, as in this case, both parties file motions for summary judgment and one such motion is granted, then the trial court's judgment becomes final and appealable, and on appeal the Court of Civil Appeals should determine all questions presented. If reversible error is found, the court should render such judgment as the trial court should have rendered, Rule 434, and if the case is brought to this court and the judgment of the Court of Civil Appeals is reversed, we should render such judgment as that court should have rendered. Rules 501 and 505. Rogers v. Royalty Pooling Co. (Tex., 302 S.W.2d 938) is overruled.'

In the Tobin-Garcia case, the appeal was from an order granting a summary judgment based upon the defendants' motion. We held that the order granting such summary judgment was erroneous and that after having made such holding, we were authorized to review the trial court's action in overruling the plaintiff's motion for summary judgment. In the present case, an order of dismissal was appealed from instead of an order granting a motion for summary judgment.

This circumstance squarely raises the question of whether the Tobin-Garcia rule is a comparatively narrow one having application only to that situation wherein both parties have moved for summary judgment, or whether it should be applied broadly as applicable to all cases in which a motion for judgment has been overruled and thereafter an appealable judgment has been rendered. In Gulf, Colorado & Santa Fe Ry. Co. v. McBride, 159 Tex. 442, 322 S.W.2d 492 (1959), the Tobin-Garcia rule was thus broadly stated: 'We held (in Tobin v. Garcia) that where there was a final judgment rendered in a cause, which was appealable (and was appealed), the appellate court could act upon a denied motion for summary judgment, if the point has been properly preserved'. Although in McBride, both sides had filed motions for summary judgment, the Court of Civil Appeals in the present case took the language of McBride as indicating that this Court intended the Tobin-Garcia rule to apply to all cases wherein an appealable judgment (including a dismissal, or judgment rendered at the conclusion of a conventional trial upon the merits), had been entered subsequent to the overruling of a motion for summary judgment. The broader interpretation of the rule would undoubtedly lead to the expeditious disposal of lawsuits in cases where it appears that a litigant whose motion for summary judgment had been overruled was clearly entitled to prevail, and undoubtedly this factor was considered by the Court of Civil Appeals in rendering judgment in the case. However, there are other considerations which must be taken into account in determining whether to adopt a narrow or broad interpretation of the Tobin-Garcia doctrine.

When both sides file motions for summary judgment, each litigant in support of his own motion necessarily takes the position that there is no genuine issue of fact in the case and that he is entitled to judgment as a matter of law. While it does not necessarily follow that when both sides file motions for summary judgment there is no genuine fact issue in the case, it does indicate that the legal controversy is one **\*365** which generally turns upon an interpretation of some rule of law and both sides are prepared to present their respective contentions with reference thereto.

However, when we have a case in which a motion for summary judgment is overruled and thereafter,—perhaps years thereafter, the suit is removed from the trial court docket by dismissal or a judgment following a conventional trial on the merits, a different situation is presented. In such instances a review of the overruled motion for summary judgment could result in judgments which would be patently unjust. Motions

for summary judgment do not always disclose all the pertinent facts relating to a case and the same may be said as to answers and defenses to such motions. Generally, the facts are more fully developed upon a conventional trial than they are by the affidavits and depositions relied upon to support or defeat a motion for summary judgment. It would seem incongruous for a court, upon finding that a judgment following a full and complete conventional trial should be reversed because of the admission of improper evidence, to then review the action of a trial court in overruling a summary judgment, particularly if it appears from the evidence adduced upon the conventional trial that there were genuine issues of fact in the case even though the summary judgment record might not reflect this situation because of an incomplete development of the facts.

 **[2]** In Wright v. Wright, 154 Tex. 138, 274 S.W.2d 670 (1955), this Court pointed out that the general rule was that an order overruling a motion for summary judgment was interlocutory in nature and hence not appealable. In speaking of the practice later sanctioned in Tobin v. Garcia, it was said:

> 'True, where there is an appeal from that part of the court's order which grants summary judgment, it might be convenient to allow the appellate court to review also the part refusing summary judgment and itself to render summary judgment on the latter issue, if it concludes that the trial court ought to have done so. At the same time, since such a practice would be by way of exception to a general rule, any benefits might well be outweighed by the resultant confusion.'

Undoubtedly, the rule of practice adopted by Tobin v. Garcia is an exception to the general rule that an order overruling a motion for summary judgment is not subject to review upon appeal. Compare, Brown v. Aetna Casualty & Surety Co., 135 Tex. 583, 145 S.W.2d 171 (1940). Such rule was recognized in the interest of the prompt disposal of causes and its operation has generally been attended with satisfactory results. However, the rule should not be so broadened as to produce confusion or injustice. Thomas de Quincey once intimated that many a man could trace his downfall to some murder he thought little of at the time. However, our system of practice should not permit the downfall of a cause because of an overruled motion for summary judgment, which in the light of a conventional

trial on the merits appears to have been defectively defended against by insufficient pleadings, depositions or affidavits. Many of the considerations militating against the review of a trial court's action overruling a motion for summary judgment after the case has been tried in the conventional manner before judge or jury are also applicable when the final judgment appealed from is one of dismissal. The safer rule is one restricting the Tobin-Garcia doctrine to its factual situation and that disclosed in Gulf, Colorado & Santa Fe Ry. Co. v. McBride, that is, to cases in which motions for summary judgment have been filed by all of the real parties at interest and the appeal is prosecuted from a judgment granting one or more of them.

**[3]** Accordingly, the judgment of the Court of Civil Appeals is reformed to provide **\*366** for a remand and a reinstatement of the case on the trial court's docket rather than a rendition of a judgment for the plaintiff. As so reformed, the judgment of the Court of Civil Appeals is affirmed.

**All Citations**

403 S.W.2d 362, 15 A.L.R.3d 893

Footnotes

1    The action was instituted by Ernestine Vordenbaum, who is advanced in years. She was joined by her grandson, Wilbur Paul Vordenbaum, as next of kin and temporary guardian, while the suit was pending in the trial court.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# B

610 S.W.2d 250
Court of Civil Appeals of Texas, Fort Worth.

Van E. ADAMS, Appellant,
v.
PARKER SQUARE BANK, Appellee.

No. 18351.  |  Dec. 31, 1980.

The District Court, Wichita County, Calvin Ashley, J., entered summary judgment, and appeal was taken. The Court of Civil Appeals, Massey, C. J., held that appellant could not raise by point of error denial of his motion for summary judgment where appellant did not challenge by point of error granting summary judgment in favor of adverse party.

Appeal dismissed.

West Headnotes (1)

[1]      **Appeal and Error**
          Scope and Effect
          Appellant could not raise by point of error denial of his motion for summary judgment where appellant did not challenge by point of error granting summary judgment in favor of adverse party.

          12 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*250**  James Q. Smith, Wichita Falls, for appellant.

Donald E. Short, Wichita Falls, for appellee.

**OPINION**

MASSEY, Chief Justice.

Van E. Adams sued Parker Square Bank (Bank) which had financed the purchase of a truck for Adams. Adams sued for penalties under the Texas Consumer Credit Code. Both sides moved for summary judgment. The trial court granted

the summary judgment for Bank and denied the summary judgment for Adams. Adams appealed. (See also Ormsby v. Parker Square Bank, 610 S.W.2d 246 (Tex.Civ.App.) handed down this date. Background of the instant Adams appeal is nearly identical.)

We dismiss the appeal.

Strangely the appellant in this case could have but did not appeal from the summary judgment for appellee, but chose instead to limit his appeal to the denial of his own motion for summary judgment.

Of this we could not have been aware until appellant's brief was filed, because up until the time he became committed by his point of error it was to be assumed that his appeal would be predicated upon the action of the trial court in granting judgment for his opponent. (Adams waived all but the single point of error which is identical to the point in the appeal by Ormsby companion hereto.) It is by reference to his brief that we have found absence of any complaint of error by the trial court in having granted summary judgment for his adversary. This fact is evidenced by the point and by the language thereunder to which we have referred to seek to determine whether there was any such complaint of error in the summary judgment which was granted to the defendant bank. Rather than any such complaint we find that appellant Adams has confined himself to point of error and complaint thereunder of no more than the court's failure to grant the motion for summary judgment filed by him.

Could we have known of this at the time the clerk received the transcript in the case it would not have been filed, for an appeal does not lie from an order overruling a motion for summary judgment.

Obviously it is the theory of appellant that because both he and his adversary filed motions for summary judgment, followed by order of the court granting the motion of his adversary and denying his own motion, he can predicate his appeal solely upon the denial and disregard the motion granted. That is not the law.

Until there is successful attack made on appeal of the motion granted, with judgment entered in accord, the question does not exist as to whether the trial court should have granted the motion which was denied. In such a situation this court would lack authority to rule upon the contentions made of impropriety of the denial.

**\*251** It is after having made the holding that the trial court erred in granting a summary judgment that a complainant becomes entitled to have the appellate court review the court's action in overruling his own motion for summary judgment. If it were otherwise his appeal would be no different from the situation where it was only the appellant who had moved for summary judgment and had his motion overruled, and who attempted an appeal from the denial. In such a case it is settled that no appeal shall lie. Wright v. Wright, 154 Tex. 138, 274 S.W.2d 670 (1955).

Since Wright v. Wright a great deal has been written on the question, with the ultimate resolution of that upon which the appellate court has the power to decide, as we understand it, be in accord with what is written in the paragraph next preceding. See Tobin v. Garcia, 159 Tex. 58, 316 S.W.2d 396 (1958), and Ackermann v. Vordenbaum, 403 S.W.2d 362 (Tex.1966), and the authorities referred to in both opinions.

The appeal is dismissed.

**All Citations**

610 S.W.2d 250

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

C

Reversed, rendered, and remanded.

KeyCite Yellow Flag - Negative Treatment

**Disagreed With by**　　Smith v. McLaughlin,　　Va.,　　February 26, 2015

299 S.W.3d 106
Supreme Court of Texas.

AKIN, GUMP, STRAUSS, HAUER
& FELD, L.L.P., Petitioner,

v.

NATIONAL DEVELOPMENT AND
RESEARCH CORPORATION, Respondent.

No. 07–0818.　　|　　Argued Dec. 9,
2008.　　|　　Decided Oct. 30, 2009.
　|　Rehearing Denied Jan. 15, 2010.

**Synopsis**

**Background:** Client, a consulting company, brought legal
malpractice action against law firm that represented it in
litigation against energy company and its affiliates, which
litigation resulted in entry of judgment notwithstanding the
verdict (JNOV) against client due to firm's failure to submit
jury questions to support partial verdict in client's favor. The
68th Judicial District Court, Dallas County, Charles Stokes,
J., entered judgment on jury verdict finding firm negligent
and awarded client damages. Firm appealed. The Court of
Appeals, 232 S.W.3d 883, Bea Ann Smith, J., retired, sitting
by assignment, affirmed as modified. Parties petitioned for
review.

**Holdings:** The Supreme Court, Johnson, J., held that:

[1] evidence was insufficient to support damages award to
client for value of stock at time energy company breached
parties' agreement;

[2] evidence was insufficient to support finding that attorney's
negligence was a cause in fact of client's appellate attorney's
fees and expenses;

[3] evidence was legally sufficient to support award for
separate counsel fees; and

[4] evidence was insufficient to support amount of award for
separate counsel fees.

West Headnotes (20)

**[1]　Attorney and Client**

　⚷　Pleading and evidence

When a former client sues a lawyer for
improperly prosecuting a prior lawsuit, provided
the judgment is not dormant or preempted, the
requirement that client must prove amount of
damages that would have been collectible from
defendant in prior suit is satisfied by proof of the
greater of either (1) the fair market value of the
underlying defendant's net assets that would have
been subject to legal process for satisfaction of
the judgment as of the date the first judgment
was signed or at some point thereafter, or (2)
the amount that would have been paid on the
judgment by the defendant or another, such as a
guarantor or insurer.

5 Cases that cite this headnote

**[2]　Attorney and Client**

　⚷　Elements of malpractice or negligence
action in general

To prevail on a legal malpractice claim, the
plaintiff must prove the defendant owed the
plaintiff a duty, the defendant breached that duty,
the breach proximately caused the plaintiff's
injury, and the plaintiff suffered damages.

26 Cases that cite this headnote

**[3]　Attorney and Client**

　⚷　Conduct of litigation

When the claim for legal malpractice is that
lawyers improperly represented the plaintiff in
another case, the plaintiff must prove and obtain
findings as to the amount of damages that would
have been recoverable and collectible if the other
case had been properly prosecuted.

11 Cases that cite this headnote

**[4]　Attorney and Client**

Pleading and evidence

When the claim for legal malpractice is that lawyers improperly represented the plaintiff in another case, evidence that a defendant in the underlying suit could have satisfied a judgment at times prior to the time a judgment is signed generally will not be relevant to and will not be probative of the judgment's collectibility unless it is also shown that the defendant's ability to satisfy a judgment was not diminished by the passage of time until judgment was signed.

2 Cases that cite this headnote

**[5]** **Attorney and Client**
Pleading and evidence

When the claim for legal malpractice is that lawyers improperly represented the plaintiff in another case, evidence that a judgment in client's favor in the other case would have been collectible on or after the date a judgment was first signed is relevant, since a judgment creditor does not have to wait thirty days past signing of the final judgment to begin procedures for collecting its judgment.

Cases that cite this headnote

**[6]** **Attorney and Client**
Pleading and evidence

When the claim for legal malpractice is that lawyers improperly represented the plaintiff in another case, prejudgment or pre-suit evidence of solvency or other evidence that damages would be collectible from a defendant could be sufficient to support a finding that damages were later collectible, provided the evidence also shows a reasonable probability that the underlying defendant's financial condition did not change during the time before a judgment was signed in a manner that would have adversely affected collectibility.

5 Cases that cite this headnote

**[7]** **Evidence**
Sufficiency to support verdict or finding

Findings based on speculation are not based on legally sufficient evidence.

1 Cases that cite this headnote

**[8]** **Appeal and Error**
Verdict

In reviewing a legal sufficiency challenge to the evidence, the Supreme Court credits evidence that supports the verdict if reasonable jurors could have done so and disregards contrary evidence unless reasonable jurors could not have done so.

15 Cases that cite this headnote

**[9]** **Appeal and Error**
Sufficiency of Evidence in Support

**Appeal and Error**
Total failure of proof

A legal sufficiency challenge will be sustained by the Supreme Court when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.

44 Cases that cite this headnote

**[10]** **Appeal and Error**
Sufficiency of Evidence in Support

Evidence does not exceed a scintilla, as required to sustain a legal sufficiency challenge, if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists.

45 Cases that cite this headnote

**[11]** **Attorney and Client**
Pleading and evidence

Evidence submitted against law firm was insufficient to prove that damages that client would have been awarded in underlying lawsuit against energy company for value of stock, if

its attorney had submitted jury questions to support partial verdict in client's favor, were collectible from company, as required to support award of damages against firm for malpractice; statements admitted to show that company had sufficient assets to pay judgment, such as company's financial statement showing over $47 million in equity, did not represent its financial capabilities or access to any asset listed on statement, or set out which company entities were included in statement, but implied that only the financial condition of four joint ventures were represented, and those joint ventures were not parties to underlying lawsuit.

2 Cases that cite this headnote

**[12]  Attorney and Client**
 Damages and costs

General rule that a party may not recover attorney fees for the litigation in which it is involved unless recovery is authorized by statute or contract does not bar a malpractice plaintiff from claiming damages in the malpractice case for fees it paid its attorney in the underlying suit if it was the defendant attorney's negligence that proximately caused the fees.

47 Cases that cite this headnote

**[13]  Attorney and Client**
 Deductions and forfeitures

Part or all of the fees a client paid to an attorney may be recovered through disgorgement and forfeiture if the attorney breached his or her fiduciary duty to the client.

6 Cases that cite this headnote

**[14]  Negligence**
 Necessity of causation
**Negligence**
 Foreseeability

In a negligence case, proximate cause has two elements: cause in fact and foreseeability.

15 Cases that cite this headnote

**[15]  Negligence**
 "But-for" causation; act without which event would not have occurred
**Negligence**
 Substantial factor

Element of cause in fact, as required to support finding of proximate cause in a negligence case, must be established by proof that (1) the negligent act or omission was a substantial factor in bringing about the harm at issue, and (2) absent the negligent act or omission, the harm would not have occurred.

18 Cases that cite this headnote

**[16]  Negligence**
 In general; degrees of proof

Causation must be proved to support finding of negligence, and conjecture, guess, or speculation will not suffice as that proof.

3 Cases that cite this headnote

**[17]  Attorney and Client**
 Pleading and evidence

In legal malpractice action against law firm, there was legally insufficient evidence to support a finding that attorney's negligence was a cause in fact of client's appellate attorney's fees and expenses in underlying lawsuit, so as to support award of appellate fees as damages against firm; there was no evidence that defendant in underlying suit would not have appealed case if client had obtained a favorable judgment, or that client would not have defended its judgment on appeal if underlying defendant appealed.

11 Cases that cite this headnote

**[18]  Attorney and Client**
 Damages and costs

Evidence was legally sufficient that attorney's failure in underlying lawsuit to request jury instruction on whether opposing party had breached certain agreements was a cause in fact of client's need to retain separate counsel for post-trial proceedings, and thus client could

recover attorney fees and expenses paid to the separate counsel as damages in legal malpractice action; separate counsel were retained to focus on the jury charge in underlying lawsuit and argue to trial court that despite the absence of a jury finding that the opposing party had breached the agreements, the verdict entitled client to specific performance of the agreements.

1 Cases that cite this headnote

[19] **Attorney and Client**

Damages and costs

In legal malpractice action, evidence was legally insufficient to support amount of jury award for separate counsel appellate fees incurred by client, where client's actual fees were less than half amount that jury awarded. Rules App.Proc., Rule 61.2.

5 Cases that cite this headnote

[20] **Appeal and Error**

Rendering Final Judgment

Generally, Supreme Court renders judgment when it sustains a no evidence issue, however, when there is some evidence of damages, but not enough to support the full amount, it is inappropriate to render judgment.

8 Cases that cite this headnote

**Attorneys and Law Firms**

**\*108** Thomas Fenton Allen Jr., Christopher John Scanlan, Carrington, Coleman, Sloman & Blumenthal, L.L.P., Jeffrey S. Levinger, Hankinson Levinger LLP, Dallas, and Corbet F. Bryant Jr., Richardson, for petitioner.

David W. Shuford, Law Office of David W. Shuford, and Michael L. Jones, Henry & Jones LLP, Dallas, for respondent.

**\*109** Mark C. Harwell, Cotham Harwell & Evans, P.C., Houston, Luther H. Soules III, Soules & Wallace, San Antonio, for amicus curiae.

**Opinion**

Justice JOHNSON delivered the opinion of the Court.

[1] When a former client sues a lawyer for improperly prosecuting a prior lawsuit, part of what the plaintiff must prove is the amount of damages that would have been collectible from the defendant in the prior suit. In this legal malpractice case we address the following issues: (1) what evidence is necessary to prove damages would have been collectible in the prior case, and (2) whether a client may recover attorney's fees and expenses paid for representation in the prior case as damages in the malpractice case.

We hold that (1) the amount of damages that would have been collectible in the prior suit is the greater of the amount of a judgment for damages that would have been either paid or collected from the underlying defendant's net assets; and (2) the time at which collectibility is determined is as of or after the time a judgment was first signed in the underlying case. We also hold that attorney's fees and expenses paid for representation in the underlying lawsuit may be recovered as damages to the extent they were proximately caused by the defendant's negligence.

Because there is legally insufficient evidence in this case to support a finding that damages in the underlying suit would have been collectible or that the defendant attorneys' negligence proximately caused the entire amount the jury awarded as damages for attorney's fees and expenses, we reverse the judgment of the court of appeals. Because there is evidence that the attorneys' negligence caused some amount of attorney's fees and expenses in the underlying suit, we remand to the court of appeals for further proceedings.

## I. BACKGROUND

### A. The Underlying Suit

At times relevant to this matter, Panda Energy International Corporation (Panda International) was involved in developing energy-related projects. Its operations were conducted, in part, through several subsidiary corporations and joint ventures. In 1994, National Development and Research Corporation (NDR) entered into a Letter Agreement with Panda Energy Corporation (PEC), one of Panda International's subsidiary corporations, for NDR to assist

PEC in locating and securing energy-related projects in China. NDR's compensation was to be (1) an annual service retainer, (2) stock grants in a Panda subsidiary corporation, and (3) success fees for each transaction that closed. To facilitate the stock grants, NDR and PEC entered into a Shareholders' Agreement with respect to Pan–Sino Energy Development Company, L.L.C. (Pan–Sino), the Panda subsidiary corporation whose shares would be transferred to NDR as part of its compensation. The Shareholders' Agreement required NDR to sell its interest in Pan–Sino to PEC if the Letter Agreement was terminated.

Subsequently, and with NDR's approval, PEC assigned its interest in and obligations under the Letter Agreement to

Panda International, the parent Panda corporation. PEC also sold its Pan–Sino stock to Panda Global Energy Company (Panda Global), another subsidiary of Panda International. [1]

 **\*110**  In the spring of 1997, Panda Global, as the issuing company, closed a $155 million Senior Secured Notes offering (the bonds) from which a project in Luannan County, China (the Luannan project) was funded. NDR assisted with the Luannan project and, pursuant to the Letter Agreement, received 4 1/2% of Pan–Sino's stock. After NDR received its stock in Pan–Sino, and as relevant to this appeal, the corporate structure of the Panda entities and interests was as follows:



Shortly after funding closed on the Luannan project, Panda Global notified NDR that it was terminating the Letter Agreement and exercising its rights under the Shareholders' Agreement to purchase NDR's Pan–Sino stock. NDR disputed Panda Global's authority to take those actions. The dispute resulted in Panda Global filing a declaratory judgment action (the "underlying" or "Panda" suit) in Dallas County against NDR and its President, Robert Tang. NDR and Tang retained Akin Gump to represent them in the suit and agreed to pay the firm an hourly fee and a sliding percentage contingency fee on any recovery they obtained in the suit. NDR and Tang then, through Akin Gump, counterclaimed for declaratory judgment and breach of the Letter Agreement and filed third party claims against Panda International and Pan–Sino. The Panda entities responded by asserting claims

against NDR and Tang for breach of contract, constructive fraud, breach of fiduciary duty, unjust enrichment, and negligence.

The case was tried to a jury in August 1999. The trial court held several post-trial hearings and signed, then modified, four successive judgments, all generally in favor of the Panda entities. Final judgment was signed on February 6, 2001, and provided that (1) Panda Global recover $111,043.50 from NDR and Tang as attorney's fees for obtaining the declaratory judgment; (2) Panda Global and Pan–Sino recover $316,273.50 from NDR as attorney's fees pursuant to the Shareholders' Agreement; (3) contingent attorney's fees be awarded in the event of appeal; and (4) all parties take nothing otherwise. The court of appeals affirmed the judgment. *Nat'l*

*Dev. & Research Corp. v. Panda* **\*111** *Global Energy Co.,* No. 05–00–00820–CV, 2002 WL 1060483 (Tex.App.-Dallas May 29, 2002, pet. denied) (not designated for publication).

### B. The Malpractice Suit

NDR [2] later sued Akin Gump for legal malpractice based on its handling of the Panda suit. NDR asserted, in part, that Akin Gump negligently failed to request jury questions asking whether Panda breached the Letter and Shareholders' Agreements. NDR alleged that because there were no jury findings that the agreements were breached by Panda, the trial court rendered judgment against NDR despite the verdict having been favorable to NDR.

The malpractice jury found Akin Gump's negligence resulted in damages to NDR as follows: (1) $168,667.41 for the judgment paid by NDR in the Panda lawsuit; (2) $427,777.77 that was owed to NDR for the fair market value of its Pan–Sino stock; (3) $109,596.68 for success fees owed to NDR; and (4) $216,590.00 for attorney's fees and expenses paid by NDR in the Panda lawsuit. The trial court rendered judgment in favor of NDR according to the verdict.

Akin Gump did not appeal the negligence finding or damages awarded for the $168,667.41 NDR paid on the Panda judgment. 232 S.W.3d 883, 889. However, it appealed the other damage awards. The court of appeals reversed that part of the judgment awarding attorney's fees and expenses and affirmed the remainder of the judgment. *Id.* at 887.

We granted petitions for review filed by both Akin Gump and NDR. Akin Gump urges that the court of appeals erred in upholding the trial court's judgment for the value of NDR's Pan–Sino stock and success fees because (1) there is legally insufficient evidence to support the jury's finding that a favorable judgment in the Panda suit would have been collectible, (2) there is legally insufficient evidence to support the jury's finding as to the amount NDR was owed for the value of its Pan–Sino stock, and (3) the damages should have been reduced by the amount Akin Gump's contingency fee would have reduced NDR's net recovery.

NDR challenges the court of appeals' determination that attorney's fees it paid for representation in the Panda suit are not recoverable as damages.

We agree with Akin Gump that the evidence is legally insufficient to support the jury's findings that NDR would have collected damages awarded in the Panda suit for the value of NDR's Pan–Sino stock and for success fees. Absent such evidence, there is no evidence Akin Gump's negligence proximately caused those damages to NDR. We do not reach the law firm's issue challenging the evidentiary support for the damages findings or the issue of whether NDR's damages should be reduced by Akin Gump's contingency fee.

We also agree with NDR that it may recover damages for attorney's fees it paid [3] to its attorneys in the underlying suit to the extent the fees were proximately caused by the defendant attorneys' negligence. We conclude the evidence is legally sufficient to support a finding that **\*112** some attorney's fees paid by NDR were proximately caused by Akin Gump's negligence, but the evidence is legally insufficient to support the finding of $216,590.

### II. COLLECTIBILITY OF A JUDGMENT IN THE UNDERLYING SUIT

 **[2]**  **[3]** To prevail on a legal malpractice claim, the plaintiff must prove the defendant owed the plaintiff a duty, the defendant breached that duty, the breach proximately caused the plaintiff's injury, and the plaintiff suffered damages. *Peeler v. Hughes & Luce,* 909 S.W.2d 494, 496 (Tex.1995). ==When the claim is that lawyers improperly represented the plaintiff in another case, the plaintiff must prove and obtain findings as to the amount of damages that would have been recoverable and collectible if the other case had been properly prosecuted.== *Cosgrove v. Grimes,* 774 S.W.2d 662, 666 (Tex.1989). In *Cosgrove,* a lawyer was sued for failing to properly prosecute an automobile collision case. *Id.* at 662. The jury was charged to find the amount of damages the malpractice plaintiff would have "in reasonable probability recovered" and "in reasonable probability collected from [the defendant] *as a result of the collision.*" *Id.* at 665 n. 3 (emphasis added). Addressing the submission, we said, "The two issues should have inquired as to the amount of damages recoverable and collectible [in the prior case] if the suit had been *properly prosecuted.*" *Id.* at 666.

The jury in this case was charged to find the amount of damages that would have been "recovered and collected" in the prior case. In connection with the damages question, the jury was instructed:

> In determining damages, you are instructed to only consider the amount of money NDR actually would have recovered and collected from [Panda Global and Panda International].

*See* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—MALPRACTICE, PREMISES, PRODUCTS PJC 84.3 cmt. (2008). Neither party questions whether the jury instruction was correct. *Cf. Cosgrove,* 774 S.W.2d at 665 n. 3 (instructing jury to find the amount of damages the plaintiff would have collected to a reasonable probability). Because there was no objection to the charge as submitted, we assume, without deciding, that the instruction was correct and measure the evidence by the charge as given. *See Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000).

Akin Gump's argument on the collectibility issue is twofold. First, it asserts the court of appeals erred in considering evidence of collectibility as of the time the Panda suit was filed in 1997, as opposed to evidence of collectibility on or after the date execution could have issued on the final judgment. Second, it contends that if a judgment favorable to NDR had been rendered in the underlying suit for its Pan–Sino stock values and success fees, there is legally insufficient evidence that the judgment would have been collected.

### A. When Must Judgment be Collectible

The Panda case was filed in October 1997 and tried in August 1999. The trial court signed its first judgment on February 25, 2000, and its final judgment on February 6, 2001. In affirming the trial court judgment for NDR, the court of appeals considered evidence of the Panda entities' financial condition at times before any judgment was signed. In doing so, the court cited *Jackson v. Urban, Coolidge, Pennington & Scott,* 516 S.W.2d 948, 949 (Tex.Civ.App.-Houston [1st Dist.] 1974, writ ref'd n.r.e.), for the proposition that the time to be considered in determining whether NDR would have collected on a **\*113** judgment was "on the date the [underlying] case was filed or anytime thereafter." 232 S.W.3d at 895. Akin Gump asserts collectibility can only be proved by evidence of the underlying defendant's financial status as of the time execution could have been issued—thirty days after the final judgment was signed. We agree with Akin Gump's position in part.

NDR, citing Texas Civil Practice and Remedies Code sections 31.002 and 63.001(c), argues that the court of appeals was correct: evidence of collectibility prior to the date the judgment was signed is relevant because some remedies are available to judgment creditors even before a judgment becomes final. Section 31.002, commonly referred to as the "turnover statute," allows a party that has already secured a final judgment to collect the judgment through a separate court proceeding. TEX. CIV. PRAC. & REM. CODEE § 31.002; *see also Schultz v. Fifth Judicial Dist. Court of Appeals at Dallas,* 810 S.W.2d 738, 739 n. 3 (Tex.1991) (stating that the "purpose of the turnover statute is to aid the collection of final money judgments"). Because that section does not address prejudgment remedies, it does not aid NDR here.

Section 63.001 contemplates the availability of prejudgment writs of garnishment. But NDR did not attempt to garnish any Panda assets before judgment nor did it prove that it would have been entitled to do so. Accordingly, Section 63.001 does not make evidence of Panda International's prejudgment financial condition relevant in determining collectibility of a judgment favorable to NDR.

We next address Akin Gump's position that a plaintiff must prove a judgment would have been collectible when the judgment becomes final or at some later time. [4] Texas Rule of Civil Procedure 627 states that unless an exception applies, "the clerk of the court or justice of the peace shall issue the execution upon [a] judgment upon application of the successful party or his attorney after the expiration of thirty days from the time a final judgment is signed." TEX. R. CIV. P. 627. Depending on the particular case's circumstances, however, the thirty-day period may be shortened or extended. *See* TEX. R. CIV. P. 628 (allowing a trial court to issue execution any time before the thirtieth day after the final judgment is signed if the plaintiff shows that the defendant may remove personal property subject to execution out of the county); TEX. R. CIV. P. 627 (extending the period for which a clerk must wait before issuing execution when a motion for new trial or a motion in arrest of judgment is filed). Further, unless the judgment debtor properly supersedes the judgment, the judgment creditor is not precluded from immediately filing an abstract of judgment to aid in seeking satisfaction of its judgment. *See* 5 ROY W. MCDONALD & ELAINE A. GRAFTON CARLSON, TEXAS CIVIL PRACTICE § 31:2 (2d ed. 1999).

**[4]**  **[5]**  In light of the foregoing, we conclude that evidence a defendant in the underlying suit could have satisfied a judgment at times *prior* to the time a judgment is signed generally will not be relevant to and will not be probative of the judgment's collectibility unless, as discussed below, it is also shown that the defendant's ability to satisfy a judgment **\*114** was not diminished by the passage of time until judgment was signed. On the other hand, because a judgment creditor does not have to wait thirty days past signing of the final judgment to begin procedures for collecting its judgment, evidence that the judgment would have been collectible on or after the date a judgment was first signed will be relevant.

**[6]**  **[7]**  Part of the evidence NDR references predates not only signing of a judgment in the Panda suit but the suit itself. We agree that prejudgment or pre-suit evidence of solvency or other evidence that damages would be collectible from a defendant could be sufficient to support a finding that damages were later collectible, provided the evidence also shows a reasonable probability that the underlying defendant's financial condition did not change during the time before a judgment was signed in a manner that would have adversely affected collectibility. Absent such evidence as to the gap time period, however, a factfinder could only speculate as to how events during the period affected the judgment debtor's finances. Findings based on speculation are not based on legally sufficient evidence. *See Leitch v. Hornsby,* 935 S.W.2d 114, 119 (Tex.1996) (noting that proof of causation cannot rest on speculation or conjecture).

### B. Evidence of Collectibility

The court of appeals stated that a legal malpractice plaintiff must prove the underlying defendant was solvent in order to prove collectibility of damages that would have been recovered in the underlying suit. 232 S.W.3d at 895. We agree with the court of appeals, at least in part. Proving the underlying defendant was solvent is one way to prove collectibility when "solvent" means the underlying defendant owned sufficient property subject to legal process to satisfy all outstanding debts and have property remaining to satisfy some or all of the damages the malpractice plaintiff would have recovered. *See* BLACK'S LAW DICTIONARY 434 (8th ed. 2004) (defining a "solvent debtor" as a debtor who owns enough property to satisfy all outstanding debts and against whom a creditor can enforce a judgment). But collectibility may also be shown in other ways. For example,

some judgment debtors might be classified as insolvent because they have a balance sheet showing more debts than assets, or showing liens or pledges that encumber their property, yet there is insurance or a surety that will pay some or all of the judgment. Or an insolvent judgment debtor might have current income, profits, or access to finances that can be diverted to satisfy a judgment. Evidence that damages awarded against the debtor in the underlying suit probably would have been paid, even though the debtor was not solvent, would be probative evidence that the damages were collectible.

Generally, then, the amount that would have been collectible in regard to an underlying judgment—provided the judgment is not dormant or preempted—will be the greater of either (1) the fair market value of the underlying defendant's net assets that would have been subject to legal process for satisfaction of the judgment as of the date the first judgment was signed or at some point thereafter, or (2) the amount that would have been paid on the judgment by the defendant or another, such as a guarantor or insurer. *See* 4 RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 31.17 (2009); *see also James V. Mazuca & Assocs. v. Schumann,* 82 S.W.3d 90, 96 (Tex.App.-San Antonio 2002, pet. denied) (finding collectibility was adequately shown by a letter recognizing the defendant in the underlying suit was insured and the policy would have satisfied a judgment against the defendant). But **\*115** collectibility must be proved; it is not presumed.

We next consider Akin Gump's contention that the evidence was legally insufficient to support the jury's finding that NDR would have collected damages for the value of its Pan–Sino stock and success fees had they been awarded in the Panda suit. In doing so, we note NDR did not claim in the court of appeals that Panda Global was solvent or that damages would have been collectible from it. *See* 232 S.W.3d at 895 (noting that the parties did not dispute that Panda Global was insolvent). Nor does it do so here. Accordingly, our focus will be on whether NDR would have recovered and collected damages from Panda International.

### C. Analysis

**[8]**  **[9]**  **[10]**  In reviewing a legal sufficiency challenge to the evidence, we credit evidence that supports the verdict if reasonable jurors could have done so and disregard contrary evidence unless reasonable jurors could not have done so.

*City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). A legal sufficiency challenge "will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Kroger Tex., Ltd. P'ship v. Suberu,* 216 S.W.3d 788, 793 (Tex.2006) (quoting *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004)).

The jury charge instructed that in determining damages the jury was to consider the amount NDR would have collected from "Panda." "Panda" was defined as Panda International and Panda Global. As previously noted, however, because NDR did not address the collectibility of damages from Panda Global in the court of appeals and does not do so here, our review is for evidence that damages would have been collectible from Panda International.

 **[11]**    NDR generally contends the evidence showing Panda International "owned numerous subsidiaries with hundreds of millions of dollars of assets is evidence that Panda [International], through its ownership of these subsidiaries, had sufficient assets to pay" a judgment. Specifically, NDR points to the following as legally sufficient evidence of collectibility from Panda International: (1) May 2001 "Consolidated Financial Statements" which were attached to a Panda International business records affidavit and showed over $47 million of owner's equity; (2) Panda International owned 100% of the stock of Panda Holdings, Inc. (Panda Holdings) and a May 1999 investor service report showed that Panda Holdings had $70 million on its balance sheet; (3) Tang's testimony that Panda International and Panda Global indirectly owned a portion of the Luannan project as well as several other power projects in the United States, Latin America, and Asia; (4) the value of Pan–Sino stock owned by Panda Global (which was wholly owned by Panda International) would have been over $8 million based on the jury finding as to the value of NDR's 4.5% ownership interest in Pan–Sino; (5) the ability of Panda International and Panda Global to pay NDR $593,000 in success fees in 1997; and (6) the award of attorney's fees to Panda International and  **\*116** Panda Global in the underlying suit as well as their ability to pay their own attorneys to prosecute their claims against

NDR. We will address the evidence as it is categorized by NDR.

First, the consolidated financial statements which NDR refers to as part of Panda International's business records, and as showing "owner's equity," comprise just over one page. The document heading states "Consolidated Financial Statements (JV1–JV4) as of May 2001." The statements (1) do not purport to represent Panda International's financial capabilities or access to any asset shown on the financial statement, and (2) do not expressly set out which Panda entities were included in the statement, but imply that only the financial condition of the four joint ventures is represented. The same group of business records included a one-page balance sheet from Pan–Western, the subsidiary through which Panda International's interest in the joint ventures flowed. [5] Pan–Western owned 87.92% of the joint ventures. The Pan–Western balance sheet, however, showed no owner's equity and indicated that as of May 31, 2001, the Luannan Project had not commenced commercial operations, Pan–Western had not yet received any interest on loans it made to the joint ventures to fund the project, and Pan–Western had paid no interest on the $96.136 million in loans it received from Panda Global, the issuer of the $155 million in bonds that funded the Luannan project.

To the extent the consolidated financial statement referenced the joint ventures, the joint ventures were not parties to the Panda suit, nor did NDR allege that it would have been entitled to collect a judgment from any of them. *See* TEX. BUS. ORGS. CODEE § 21.223 (stating that any affiliate of a corporation shall be under no obligation to the corporation or to its obligees with respect to "any contractual obligation of the corporation or any matter relating to or arising from the obligation" unless "the obligee demonstrates that the ... affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee"). Nor does one corporation's ownership of all or the majority of a second entity affect the second entity's existence as a distinct, separate legal entity. *See BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 798 (Tex.2002); *Lucas v. Tex. Indus., Inc.,* 696 S.W.2d 372, 374 (Tex.1984); *Gentry v. Credit Plan Corp. of Houston,* 528 S.W.2d 571, 573 (Tex.1975); *Bell Oil & Gas Co. v. Allied Chem. Corp.,* 431 S.W.2d 336, 337 (Tex.1968). The consolidated financial statements NDR references are not evidence that a judgment would have been collectible from Panda International as of or after February 2000.

Next, NDR references a report reflecting that Panda Holdings's May 1999 balance sheet showed it had "millions of dollars." To begin with, NDR does not contend that it would have been entitled to collect its damages from Panda Holdings, a separate corporation, and Panda International's ownership of Panda Holdings is not, by itself, evidence that NDR would have collected any amount from Panda International, the parent corporation. *See* TEX. BUS. ORGS. CODEE § 21.223; *BMC Software,* 83 S.W.3d at 798. Further, the report was dated May 14, 1999, which was more than nine months before **\*117** the first judgment was signed on February 25, 2000. And the May 1999 report itself negates its value as evidence a judgment would have been collectible from Panda Holdings, even disregarding the fact Panda Holdings is a separate corporation from Panda International. The document is a third party report disclosing that "Moody's Investors Service has downgraded the bonds of Panda Global Energy from B2 to B3. The rating outlook is negative." The report says that Panda Holdings "has up to $70–million available on its balance sheet *currently,*" but "*there is no certainty as to how much may be available both in the short—and medium-term to supply Panda Global*" (emphasis added). To the extent NDR's argument is that cash held by Panda Holdings implies the corporation was an asset evidencing Panda International's solvency, we disagree with it. The Offering Memorandum for the $155 million bond issue contains financial data for Panda Holdings, including an Unaudited Pro Forma Consolidated Balance Sheet as of December 31, 1996. The balance sheet showed Panda Holdings' liabilities exceeded its assets by $101.5 million. There is no evidence that its financial situation improved even though it sold one of its assets and had $70 million in cash as of May 1999. No evidence shows whether the asset sale was at a loss or profit, how the sale affected the solvency of Panda Holdings itself, whether the cash was committed to and used for other projects or to pay creditors, or other such details. The May 1999 report simply is not evidence that damages would have been collectible from Panda International.

Third, the fact that success fees were paid to NDR in May 1997 is no evidence a judgment in the Panda suit would have been collectible over two years later. There is no evidence of events between the time the success fees were paid and the time judgment was signed except testimony evidencing financial deterioration of the Panda entities and projects.

NDR argues that collectibility is also shown by Panda International's indirect ownership of the Luannan Project and other power projects and Tang's testimony as to Panda

International's ownership of the projects. Tang testified that Panda International indirectly owned multiple projects. But Tang's testimony is no better evidence a judgment would have been collectible from Panda International than the financial statement in Panda International's business records. First, the evidence was uncontroverted that the joint ventures directly owned the Luannan project and there were several corporate entities between the joint ventures and Panda International. Moreover, there was no evidence the judgment was collectible from the joint ventures themselves, and NDR does not contend it would have been. Second, Tang's testimony did not set out any particular owner's equity, cash on hand, current assets, or similar details that would support a conclusion Panda International was solvent or that NDR could have collected any damages from it. Third, testimony from the Panda trial of a Panda International employee with first-hand knowledge of Panda International's affairs was read into evidence. The employee's testimony was that he was "trying to save the company" because the Luannan project "cannot meet its debt, and therefore, we are at risk of foreclosure."

Next, the total value of the Pan–Sino stock based on NDR's ownership interest is not evidence that damages in the Panda suit would have been collectible. The court of appeals relied on the jury finding that NDR's interest in Pan–Sino stock was valued at over $400,000 to conclude that the remaining 94.5% of Pan–Sino stock **\*118** was worth over $8 million. The court attributed that value to Panda International. 232 S.W.3d at 895. But on April 11, 1997, four years prior to the final judgment in the Panda suit, PEC had transferred all the Pan–Sino stock to Panda Global, which NDR does not contend was solvent. The Chairman of the Board and Chief Executive Officer of Panda International testified in the Panda trial that bonds with a face value of over $155 million issued in 1997 to finance the Luannan project were trading at "30 to 40 cents on the dollar" at the time of the Panda trial because the "Chinese markets ha[d] deteriorated dramatically.... Banks ha[d] lost all confidence in this Chinese market." His testimony was introduced as evidence in the malpractice suit. Further, notes accompanying a Balance Sheet for Pan–Western Energy Corporation LLC (Pan–Western) stated that as of May 31, 2001, the Luannan Project had not commenced commercial operations, Pan–Western had not received any interest on loans it made to fund the project, and Pan–Western had not paid any interest on the loans it received from Panda Global, the issuer of the bonds that funded the project. The Bond Offering Memorandum showed that the $155 million bonds were secured not only by the assets of Panda Global,

including the Pan–Sino stock, but by the capital stock of Panda Global itself.[6] The only interest Panda International had in the Pan–Sino stock flowed from Panda Global's status as a subsidiary of Panda International, and any value the Pan–Sino stock had was subsumed in the uncontested insolvent financial status of Panda Global.

NDR asserts that the award of attorney's fees Panda Global incurred in the Panda suit and the fact that Panda International and Panda Global obtained representation in the Panda suit are evidence a judgment against them was collectible. We disagree. First, if judgment in the Panda suit had been in favor of NDR, then Panda Global would not have recovered attorney's fees. Therefore, the fact it recovered fees in the suit has no bearing on whether a judgment *against* Panda Global would have been collectible. *See Cosgrove,* 774 S.W.2d at 666. Second, as to NDR's assertion that a judgment would have been collectible because the Panda parties had sufficient assets to pay attorneys in the underlying lawsuit, NDR offered no evidence of (1) the terms by which the attorneys for the Panda entities were compensated, (2) whether the attorneys were actually paid, (3) the source of any funds used to pay the attorneys, even if they were paid, or (4) if any funds that might have been used to pay the Panda attorneys would have been used to pay NDR's damages.

In sum, none of the evidence NDR cites is legally sufficient to prove collectibility of damages it would have been awarded in the Panda suit for its Pan–Sino stock value and success fees. Accordingly, we need not and do not reach the issues of whether there was evidence to support the jury findings as to the amount of NDR's damages and whether the judgment in favor of NDR should have been reduced by the **\*119** contingency fee Akin Gump would have collected had NDR prevailed in the Panda lawsuit.

### III. ATTORNEY'S FEES AS DAMAGES

In its petition, NDR argues that the court of appeals erred in holding the attorney's fees it paid in the Panda lawsuit are not recoverable. 232 S.W.3d at 897. It says the fees paid to appeal the judgment in Panda's favor are economic damages proximately caused by Akin Gump's negligent failure to properly submit jury questions.[7]

Citing *Turner v. Turner,* 385 S.W.2d 230, 233 (Tex.1964), NDR acknowledges the general rule that a party may not recover attorney's fees for the litigation in which it is involved unless recovery is authorized by statute or contract. It urges adoption of the "tort of another" exception. *See* RESTATEMENT (SECOND) OF TORTS § 914(2) (1977) (allowing a party to recover attorney's fees when that party must, as a result of some tort committed by another, bring or defend an action against a third party). NDR contends that under the exception, it can recover the attorney's fees it had to pay for appealing the Panda judgment.

As to the jury's finding on attorney's fees, Akin Gump asserts (1) NDR is seeking fee disgorgement, which is available only if the attorneys breached a fiduciary duty to NDR, but NDR did not plead or request jury questions on breach of fiduciary duty, *see Burrow v. Arce,* 997 S.W.2d 229, 241–43 (Tex.1999); (2) the "tort of another" exception to the general rule is not implicated by facts such as these where the fees being sought were paid to the defendant attorneys in the underlying suit; (3) NDR did not prove it paid the appellate fees it seeks to recover; and (4) to the extent NDR paid the fees, the fees would have been incurred regardless of the firm's negligence and therefore were not proximately caused by Akin Gump's actions.[8]

We disagree with Akin Gump that attorney's fees paid in an underlying suit can only be recovered through forfeiture for breach of fiduciary duty. For the reasons set out below, we conclude the general rule as to recovery of attorney's fees from an adverse party in litigation does not bar a malpractice plaintiff from claiming damages in the malpractice case for fees it paid its attorneys in the underlying suit. Because the general rule does not apply to NDR's claim, we need not and do not address whether the exception set out in section 914(2) of the Second Restatement should be adopted as Texas law.

### *120 A. The American Rule

It has long been the rule in Texas that attorney's fees paid to prosecute or defend a lawsuit cannot be recovered in that suit absent a statute or contract that allows for their recovery. *See Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 310–11 (Tex.2006) ("Absent a contract or statute, trial courts do not have inherent authority to require a losing party to pay the prevailing party's fees."); *Wm. Cameron & Co. v. Am. Sur. Co. of N.Y.,* 55 S.W.2d 1032, 1035 (Tex. Comm'n App.1932, judgm't adopted) ("It is settled law in this state that, unless provided for by statute or by contract between the parties, attorneys' fees incurred by a party to litigation are not recoverable against his adversary either in an action in tort or

a suit upon a contract."); *Sherrick v. Wyland,* 14 Tex.Civ.App. 299, 37 S.W. 345, 345 (1896) ("It has often been ruled, in this state and elsewhere, that fees of counsel, incurred in prosecuting a suit for or defending against a wrong, are not ordinarily recoverable as actual damages, because they are not considered proximate results of such wrong."). The rule is known as the American Rule. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health and Human Res.,* 532 U.S. 598, 602, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) ("[P]arties are ordinarily required to bear their own attorney's fees—the prevailing party is not entitled to collect from the loser."); *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967).

 **[12]**  The court of appeals in this case concluded that attorney's fees are not recoverable as damages for legal malpractice. 232 S.W.3d at 896–97 (citing *El Dorado Motors, Inc. v. Koch,* 168 S.W.3d 360, 366 (Tex.App.-Dallas 2005, no pet.) (noting that attorney's fees are not recoverable in a legal malpractice suit because attorney's fees expended in prior litigation are recoverable only when provided for by contract or agreement between the parties)). The court of appeals also cited *Martin–Simon v. Womack,* 68 S.W.3d 793, 797–98 (Tex.App.-Houston [14th Dist.] 2001, pet. denied), where it was held that a plaintiff in an interference-with-contract case could not recover attorney's fees as damages when the fees were paid in a prior suit related to enforcement of the contract. That court relied on *Dallas Central Appraisal District v. Seven Investment Co.,* 835 S.W.2d 75, 77 (Tex.1992), and *New Amsterdam Casualty Co. v. Texas Industries, Inc.,* 414 S.W.2d 914, 915 (Tex.1967), for the proposition that attorney's fees are not recoverable unless provided for by statute or contract. But those cases should not be read so broadly.

For example, in *New Amsterdam Casualty Co.,* we considered the appeal of a case in which an unpaid materialman sued a construction contractor and its surety. *New Amsterdam Cas. Co.,* 414 S.W.2d at 914. Judgment was rendered in favor of the materialman for the amount due on the materials plus attorney's fees for prosecuting the suit. *Id.* at 915. The appeal before this Court concerned only the award of attorney's fees. *See id.* The Court reversed the award of attorney's fees and rendered judgment in favor of the surety. *Id.* at 916. In doing so, we "reaffirmed the rule previously recognized as settled law ... that attorney's fees are not recoverable either in an action in tort or a suit upon a contract unless provided by statute or by contract between the parties." *Id.* at 915. Our statement, considered without reference to the facts of the

case, could be read out of context as generally precluding recovery of attorney's fees for prosecuting or defending a suit. It was not intended to extend so far.

 **\*121**  The situation before us does not involve the American Rule that prevails in Texas. NDR does not seek to recover attorney's fees for prosecuting its malpractice suit against Akin Gump. It seeks damages measured by the economic harm it suffered from Akin Gump's breach of its duty of care in prosecuting the Panda suit. Akin Gump does not contend it did not have or did not breach a duty of care. Thus, unless there is some reason not to consider the Panda suit attorney's fees as damages in the malpractice suit, the question becomes an evidentiary one: Does evidence support the jury's finding that $216,590 in attorney's fees and expenses were proximately caused by Akin Gump's negligence?

Akin Gump, in effect, urges us to exclude all the Panda suit attorney's fees from being considered as damages. It says that awarding damages for the fees would be fee forfeiture by another name, and NDR did not plead or obtain findings that Akin Gump breached a duty that would allow fee forfeiture under the holding of *Burrow v. Arce. See Burrow,* 997 S.W.2d at 241–43. We disagree with the proposition.

 **[13]**  If an attorney has breached his or her fiduciary duty to a client, then part or all of the fees the client paid may be recovered through disgorgement and forfeiture. *See id.* at 237. In *Burrow,* we noted our agreement with the following forfeiture rule: "A lawyer engaging in clear and serious violation of duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter." *Id.* at 241–42 (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 49 (Proposed Final Draft No. 1, 1996)). But because attorney's fees in an underlying case may be subject to forfeiture for breach of fiduciary duty, it does not follow that fees and expenses paid to attorneys who negligently try a suit should not be recoverable as compensatory damages in a second suit for malpractice.

In *Burrow,* the plaintiffs were injured in explosions at a Phillips 66 chemical plant. *Burrow,* 997 S.W.2d at 232. The defendant lawyers represented the plaintiffs in a suit for their personal injuries. *Id.* The suit was settled and the plaintiffs received settlement payments. *Id.* They then sued their lawyers for breach of fiduciary duty, fraud, violations of the Deceptive Trade Practices–Consumer Protection Act, negligence, and breach of contract. *Id.* at 232. The trial court granted summary judgment for the defendant attorneys on the

basis that the settlement in the underlying case was fair and reasonable and any misconduct of the lawyers did not cause damages to the plaintiffs. *Id.* at 233.

This Court held that the defendants were not entitled to summary judgment because they did not establish as a matter of law that the plaintiffs suffered no actual damages. *Id.* at 237. As to the breach of fiduciary duty claim, though, we held that a client need not prove actual damages as part of the breach of fiduciary duty claim. *Id.* at 240. We remanded the claim to the trial court for determination of whether the lawyers breached their fiduciary duties and if so, the appropriate amount of fee forfeiture. *Id.* at 246. The question of whether the plaintiffs were precluded from recovering, as damages in a malpractice case, attorney's fees paid to the defendant lawyers in the underlying case was not before the Court in *Burrow.* As we said, "[t]he main purpose of [fee] forfeiture is not to compensate an injured principal, even though it may have that effect. Rather, the central purpose of the equitable remedy of forfeiture is to protect relationships of trust by discouraging agents' disloyalty." *Id.* at 238.

**\*122** A negligence claim, unlike a fee forfeiture claim for breach of fiduciary duty, is about compensating an injured party. *See Douglas v. Delp,* 987 S.W.2d 879, 885 (Tex.1999) ("[W]hen the injuries caused by an attorney's negligence are economic, the plaintiff can be fully recompensed by the recovery of any economic loss. Restoration of the pecuniary interest suffices to return a plaintiff to her prior circumstances."); THOMAS D. MORGAN, LAWYER LAW: COMPARING THE ABA MODEL RULES AND THE ALI RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS 98 (2005) ("A key distinction between fee forfeiture and the malpractice remedy is that the amount forfeited need have no relation to actual damages suffered by the client.") (emphasis omitted); RESTATEMENT (SECOND) OF TORTS § 903 cmt. a (1977) ("When there has been harm only to the pecuniary interests of a person, compensatory damages are designed to place him in a position substantially equivalent in a pecuniary way to that which he would have occupied had no tort been committed.").

We see little difference between damages measured by the amount the malpractice plaintiff would have, but did not, recover and collect in an underlying suit and damages measured by attorney's fees it paid for representation in the underlying suit, if it was the defendant attorney's negligence that proximately caused the fees. In both instances, the

attorney's negligence caused identifiable economic harm to the malpractice plaintiff. The better rule, and the rule we adopt, is that a malpractice plaintiff may recover damages for attorney's fees paid in the underlying case to the extent the fees were proximately caused by the defendant attorney's negligence. *See Alexander v. Turtur & Assocs., Inc.,* 146 S.W.3d 113, 119 (Tex.2004); *Knebel v. Capital Nat'l Bank,* 518 S.W.2d 795, 799 (Tex.1974); 3 RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 21:19 (2009).

### B. Analysis

NDR's position is that it incurred damages by paying attorney's fees to appeal the judgment rendered against it because Akin Gump negligently failed to request inclusion of necessary questions in the jury charge. NDR does not contest its burden to prove that Akin Gump's negligence proximately caused it to pay the fees and expenses it seeks to recover.

**[14] [15] [16]** Proximate cause has two elements: cause in fact and foreseeability. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex.2004). Cause in fact must be established by proof that (1) the negligent act or omission was a substantial factor in bringing about the harm at issue, and (2) absent the negligent act or omission ("but for" the act or omission), the harm would not have occurred. *See id.* at 799. Causation must be proved, and conjecture, guess, or speculation will not suffice as that proof. *Leitch,* 935 S.W.2d at 119; *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995).

### 1. Fees and Expenses Paid to Akin Gump

NDR does not contest the reasoning of the court of appeals that "even a successful litigant may be forced to defend its judgment when the losing party appeals." 232 S.W.3d at 896. Instead, NDR argues that the court of appeals overlooked Texas Civil Practice and Remedies Code section 38.001, which allows a successful litigant on a breach of contract claim to recover its attorney's fees for appeal. It asserts that NDR would not have suffered economic loss by paying appellate attorney's fees because a judgment favorable to NDR would have included provisions that it recover **\*123** appellate attorney's fees from Panda.

 **[17]** First, we agree with the court of appeals. There is no evidence that if NDR had recovered a favorable judgment in the Panda suit, it would not have paid appellate fees to defend the judgment. The evidence does not show that if NDR had obtained a favorable judgment, Panda would not have appealed the case or that NDR would not have defended its judgment on appeal if Panda appealed. Thus, the court of appeals was correct in determining there is legally insufficient evidence to support a finding that Akin Gump's negligence was a cause in fact of the appellate attorney's fees and expenses NDR paid to Akin Gump.

Next, we address NDR's argument that it would have been entitled to recover in the Panda suit for its appellate attorney's fees under Texas Civil Practice and Remedies Code section 38.001. As Akin Gump points out, NDR's position in the malpractice suit was not that it would have recovered and collected a judgment for additional appellate attorney's fees from Panda had Akin Gump properly tried the Panda case. The damages question in the malpractice jury charge asked about, and NDR argued to the jury that it sought recovery for, "[a]ttorney's fees and expenses *paid* by NDR in the *Panda Lawsuit,*" not about what fees and expenses would have been recovered and collected from Panda had Akin Gump properly tried the underlying case.

### 2. Fees for Separate Counsel

 **[18]** The situation is different as to the fees NDR paid the separate, additional counsel who were retained post-trial. Post-trial proceedings focused on whether the jury verdict entitled NDR to specific performance of the Letter and Shareholder Agreements calling for NDR's Pan–Sino stock to be purchased by Panda upon termination of the agreements, or whether NDR waived its claims by failing to request jury questions as to breach of the agreements. NDR at that point retained law Professors William Dorsaneo and Maureen Armour to help Akin Gump convince the trial judge to render judgment favorable to NDR. There was evidence that Professors Dorsaneo and Armour were retained to focus on the jury charge and argue to the trial court that despite the absence of a jury finding that Panda breached the agreements, the verdict supported judgment for NDR. The evidence is legally sufficient to support the jury finding that Akin Gump's negligence was a cause in fact of NDR's retaining the professors and, thus, that the firm's negligence proximately caused NDR to pay the fees and expenses of the professors.

Akin Gump further argues that even if NDR were entitled to recover fees and expenses charged by Dorsaneo and Armour, there was no evidence NDR actually paid them. However, Professor Armour testified NDR paid her several thousand dollars for her work on the case, and Tang testified that Professor Dorsaneo was paid for his work. Thus, there was more than a scintilla of evidence that NDR actually paid attorney's fees and expenses to the professors. *See City of Keller,* 168 S.W.3d at 810.

 **[19]** But although there is some evidence that the fees and expenses of Dorsaneo and Armour were paid, the evidence is undisputed that the total of those payments was less than half the $216,590 awarded by the jury. NDR only argues that it paid Armour $49,500 and Dorsaneo $10,000. Accordingly, although the evidence is legally sufficient to support a finding of some amount, it is legally insufficient to support the entire amount the jury found. **\*124** *Guevara v. Ferrer,* 247 S.W.3d 662, 669–70 (Tex.2007); *see Texarkana Mem'l Hosp., Inc. v. Murdock,* 946 S.W.2d 836, 841 (Tex.1997).

 **[20]** Ordinarily, we render judgment when we sustain a no evidence issue. *Guevara,* 247 S.W.3d at 670; *Murdock,* 946 S.W.2d at 841. However, when there is some evidence of damages, but not enough to support the full amount, it is inappropriate to render judgment. *Guevara,* 247 S.W.3d at 670. In such a situation, we may either remand the case to the court of appeals for a suggestion of remittitur or to the trial court for a new trial. *Id.* Given the state of the evidence in this case, it is appropriate to remand the case to the court of appeals. *See id.* (remanding to the court of appeals to consider suggestion of remittitur rather than remanding for a new trial after determining the evidence was legally insufficient to support all of the damages awarded by the jury). If the court of appeals determines that suggestion of remittitur is not appropriate or is unable to successfully suggest a remittitur, then the part of the case involving liability and attorney's fees and expenses—including those of both Akin Gump and separate counsel—should be remanded for a new trial. *See* TEX. R. APP. P. 61.2.

### IV. CONCLUSION

We reverse the court of appeals' judgment. We render judgment that NDR take nothing on its claims for the fair market value of its stock and success fees owed to it. The claim for attorney's fees and expenses is remanded to the

court of appeals for further proceedings consistent with this opinion.

**All Citations**

299 S.W.3d 106, 53 Tex. Sup. Ct. J. 77

Justice GUZMAN did not participate in the decision.

Footnotes

1       NDR, PEC, and Panda International are Texas corporations. Panda Global and Pan–Sino are Cayman Island corporations. NDR, PEC, Panda International, and Panda Global have their principal offices in Dallas.

2       Tang was initially a party in the suit but was dismissed in the trial court. He is not a party to this appeal.

3       The jury found and NDR argues that the attorney's fees *paid* in the Panda suit are recoverable as damages. We address only that issue and express no opinion as to whether attorney's fees incurred but not paid in an underlying case would be recoverable as damages.

4       To be enforced, an unsatisfied final judgment must not have become dormant and must not be preempted by federal law. *See* TEX. CIV. PRAC. & REM. CODE E § 34.001; 5 ROY W. MCDONALD & ELAINE A. GRAFTON CARLSON, TEXAS CIVIL PRACTICE § 31:3 (2d ed. 1999). Here, however, there is no contention that a judgment in the Panda suit would have been dormant or preempted by federal law.

5       As we begin our analysis of the evidence, it is helpful to review the relationships among the Panda entities. Panda International owned 100% of Panda Holdings, which owned 100% of Panda Global. Panda Global owned 95.5% of Pan–Sino (NDR owned the other 4.5%). Pan–Sino owned 99% of Pan–Western. Pan–Western owned 87.92% of each of the joint ventures, which in turn owned the Luannan facilities.

6       The record shows that Panda Global owned 94.5% of Pan–Sino, which in turn owned 99% of Pan–Western. The 1997 Bond Offering Memorandum stated that the bonds were secured by a pledge of 100% of Panda Global's Capital Stock as well as by

        a security interest in certain assets of [Panda Global] and its Subsidiaries, including a pledge of (i) at least 90% of the Capital Stock of Pan–Sino, (ii) 99% of the Capital Stock of Pan–Western, (iii) the Issuer Note and (iv) the Luannan Facility Notes and the granting of a security interest in certain funds of [Panda Global] and its Subsidiaries maintained by the Senior Secured Notes trustee.

7       In its petition for review, NDR claims that legally sufficient evidence supports the jury finding it paid attorney's fees to Akin Gump for appeal. In its reply brief, NDR argues that it also paid post-trial and appellate attorney's fees to two attorneys who were not members of the firm and the evidence it paid those fees also supports the jury finding. Akin Gump asserts NDR did not timely raise the argument about evidence of fees paid to separate counsel supporting the jury finding. We believe the argument is fairly encompassed within the issue framed by NDR. TEX. R. APP. P. 53.2(f) ("The statement of an issue or point [in a petition for review] will be treated as covering every subsidiary question that is fairly included.").

8       Akin Gump does not assert the collectibility argument in response to NDR's petition seeking attorney's fees based on the actual jury finding awarding attorney's fees. The firm makes the collectibility argument as to attorney's fees only in response to NDR's argument that if Akin Gump had not negligently submitted the underlying case, NDR would have recovered its appellate attorney's fees under Texas Civil Practice and Remedies Code § 38.001.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# D

696 S.W.2d 911
Court of Criminal Appeals of Texas.

Gilbert ANZALDUA, Appellant,
v.
The STATE of Texas, Appellee.

No. 64066. | Sept. 25, 1985.

Defendant was convicted in the County Court at Law No. 2, Bell County, William P. Gibson, J., of hindering a secured creditor, and he appealed. The Court of Criminal Appeals, Onion, P.J., held that information did not adequately charge one element of offense.

Reversed and cause dismissed.

Davis and McCormick, JJ., dissented.

West Headnotes (1)

**[1]** **Secured Transactions**
    Criminal Liability of Debtor

Information charging that defendant "concealed . . . by refusing to return . . ." property in which secured party had interest did not sufficiently allege an element of offense of hindering secured creditor as defined in V.T.C.A., Penal Code § 32.33, namely, that defendant "destroys, removes, conceals, encumbers, transfers or otherwise harms or reduces value of property", and thus did not charge an offense under that section.

8 Cases that cite this headnote

**Attorneys and Law Firms**

**\*911** Glenn H. Williams, Copperas Cove, Frank Newton, Del Rio, Charles O. Grigson, James G. Boyle, Austin, for appellant; H. Clyde Farrell, Austin, of counsel.

Patrick Ridley, Co. Atty., and Pete Hamer, Asst. Co. Atty., Belton, Robert Huttash, State's Atty., Austin, for the State.

Before the court en banc.

**OPINION ON APPELLANT'S
MOTION FOR REHEARING**

ONION, Presiding Judge.

Our opinion on original submission is withdrawn in lieu of the following.

This appeal is from a conviction for hindering a secured creditor under V.T.C.A., Penal Code, § 32.33 (1974). Appellant entered a plea of nolo contendere before the court. His punishment was assessed at 60 days in jail and at a fine of $50.00. Appellant, however, was placed on misdemeanor probation for a period of 12 months and ordered to pay restitution of $165.03.

Among his grounds of error appellant contends the information filed in the County Court at Law No. 2 of Bell County did not allege an offense under § 32.33 of the Penal Code.[1] Appellant urges, as we understand it, that the information is fundamentally defective.

Omitting the formal parts, the information alleged that appellant

> "having signed a security agreement with Arthur Neale Potts creating interest in property, namely One Weed Eater, One Lawnmower, One Bicycle, One Ladder with intent to hinder the enforcement of the security interest, the defendant intentionally *concealed* the above described property *by refusing* to return said property upon demand at a time when a part of the debt secured by the aforesaid security was due and unpaid.[2] (Emphasis added.)

V.T.C.A., Penal Code, § 32.33 (1974), in effect at the time of the alleged offense,[3] provides as follows:

> "(a) For purposes of this section:

"(1) 'Remove' means transport, without the effective consent of the secured party, from the state in which **\*912** the property was located when the security interest or lien attached.

"(2) 'Security interest' means an interest in personal property or fixtures that secures payment or performance of an obligation.

"(b) A person who has signed a security agreement creating a security interest in property or a mortgage or deed of trust creating a lien on property commits an offense if, with intent to hinder enforcement of that interest or lien, he destroys, removes, conceals, encumbers, transfers, or otherwise harms or reduces the value of the property.

"(c) For purposes of this section, a person is presumed to have intended to hinder enforcement of the security interest or lien if, when any part of the debt secured by the security interest or lien was due, he failed:

"(1) to pay the part then due; and

"(2) if the secured party had made demand, to deliver possession of the secured property to the secured party.

"(d) Except as provided in Subsection (e) of this section, an offense under this section is a Class A misdemeanor.

"(e) If the actor removes the property, the offense is a felony of the third degree.

The elements of the offense are

(1) a person

(2) who has signed

(3) a security agreement that created a security interest in property, or

(4) a mortgage or deed of trust creating a lien on property

(5) with intent to hinder enforcement of interest on lien

(6) destroys, removes, conceals, encumbers, transfers or otherwise harms or reduces value of property.

Subsection (b) of the statute sets out two elements of the offense which are (5) and (6) above. The information sufficiently alleges element (5) above. As to element (6), the information alleges appellant "concealed ... by refusing to return...." The information does not allege that appellant hid or secreted the property nor that he withheld the whereabouts of the property. The terms "conceal" or "refuse" are not defined in the statute or by the Penal Code.

V.T.C.A., Penal Code, § 1.05 (Construction of the Code), provides in part:

> "(b) Unless a different construction is required by the context, Sections 2.01, 2.02, 2.04, 2.05, and 3.01 through 3.12 of the Code Construction Act (Article 5429b–2, Vernon's Texas Civil Statutes) apply to the construction of this code."

Section 2.01 of said Article 5429b–2, V.A.C.S., provides:

> "Words and phrases shall be read in context and construed according to rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."

Thus we give to "conceal" and "refuse" their original meaning and common usage. See *Courtemanche v. State,* 507 S.W.2d 545 (Tex.Cr.App.1974). Black's Law Dictionary (1968), defines "conceal" as "to hide, secrete, withhold from the knowledge of others; to withdraw from observation...." Webster's Third International Dictionary (1961) defines "refuse" as "to show or express a positive unwillingness to do or comply with (as something asked, demanded, expected). <mark>The mere refusal to deliver property upon demand does not constitute "concealing."</mark> Further, the intent of § 32.33, supra, is apparently to protect secured property for the benefit of the credit. The clause "otherwise harms or reduces the value of the property" implies that aforementioned acts, destroys, removes, conceals, etc., also harm or reduce such value. Certainly the mere refusal to deliver property generally would not harm or reduce its value.

In the Practice Commentary to § 32.33 (Searcy & Patterson) it is stated in part:

> "This section is derived from Business & Code Secs. 25.0 and 25.02, but is somewhat broader in its choice of verbs. It

is narrower in that *it does not outlaw refusal* by the debtor *to reveal* the location **\*913** of the property (although this may violate Section 32.34); nor does it make the debtor's concealment of himself an offense...." (Emphasis added.)

Accord: Explanatory Comment, § 32.33, Texas Anno. Penal Statutes, Branch's 3rd Ed., Vol. 2, p. 578.

In Attorney General's Opinion H–980 (1977), the Attorney General was asked whether there was concealment under V.T.C.A., Penal Code, § 32.33 (1974), when the debtor refuses to deliver collateral upon demand of a secured party but does not harm or reduce the value of the collateral. The Attorney General answered that concealment under subsection (b) of the statute must entail some further act

beyond mere refusal to deliver citing 53 Tex.Jur.2d, Statutes, § 165 and authorities there cited. The Attorney General concluded that "mere refusal to deliver property to a secured party is not an offense under § 32.33 of the Penal Code."

We conclude that the instant information does not charge an offense under V.T.C.A., Penal Code, § 32.33 (1974). The judgment is reversed and the cause ordered dismissed.

W.C. DAVIS and McCORMICK, JJ., dissent.

**All Citations**

696 S.W.2d 911

Footnotes

1      Appellant complains the court erred in failing to set aside the information pursuant to his motion.
2      Now see the 1979 amendment to § 32.33 (Acts 1979, 66th Leg., p. 501, ch. 232, § 1, eff. Sept. 1, 1979).
3      Now see the 1979 amendment to § 32.33 (Acts 1979, 66th Leg., p. 501, ch. 232, § 1, eff. Sept. 1, 1979).

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**E**

377 S.W.3d 45
Court of Appeals of Texas,
Houston (1st Dist.).

ARDMORE, INC. f/k/a GHX Incorporated
and Star Properties, LLC, Appellants
v.
The REX GROUP, INC. d/b/a T–
3 Support Services, Inc., Appellee.

No. 01–11–00328–CV. | April 19, 2012.

**Synopsis**

**Background:** After lessor asserted that lessee's attempt
to exercise purchase option in lease was ineffective, and
lessee asserted that sublessee's attempt to exercise purchase
option in sublease was ineffective, lessee brought claims for
declaratory relief against lessor and sublessee, and lessor and
sublessee brought counterclaims against lessee, each seeking
an adjudication of which, if any, of the purchase options
were properly exercised. The 125th District Court, Harris
County, Kyle Carter, J., granted lessee's motion for summary
judgment on basis that it had timely exercised its purchase
option under the lease and that the description of the property
subject to the purchase option in the sublease was rendered
unenforceable by the statute of frauds. Lessor and sublessee
appealed, lessee cross-appealed, and appeals were dismissed
for lack of jurisdiction, 2011 WL 486588.

**Holdings:** On appeal after remand, the Court of Appeals,
Laura Carter Higley, J., held that:

[1] sublease, which had a separate exercise date for the
purchase option in the lease than the lease did, did not modify
the lease, and thus lessee timely exercised its purchase option
under the lease;

[2] property to be sold under purchase option in sublease was
sufficiently identified to satisfy statute of frauds;

[3] sublessee was not entitled to summary judgment on its
claim for specific performance of purchase option in sublease;
and

[4] lessor's attorney's statement during closing argument of
bench trial on attorney fees did not preclude trial court from
awarding lessee only $85,000 in attorney fees.

Affirmed in part, reversed in part, and remanded.

West Headnotes (35)

**[1]** **Landlord and Tenant**
 Conditions precedent

**Landlord and Tenant**
 Time

Sublease, which had a separate exercise date
for the purchase option in the lease than the
lease did, did not modify the lease, even
though lessor's required consent to sublease
was expressly conditioned on specific terms of
sublease, and thus lessee timely exercised its
purchase option under the lease, where lease
provided that any sublease entered into by lessee
would not relieve it "of any of its obligations
hereunder," the sublease provided that it was
"subject and subordinate to" the lease, and the
consent to sublease provided that the sublease
"shall not diminish or in any way effect the
obligations of [lessee] to [lessor] under the
Lease" and that the original lessors "executed
this Consent solely to evidence [their] consent to
the Sublease."

Cases that cite this headnote

**[2]** **Landlord and Tenant**
 Time

While lessee's purchase option in lease was
generally a right, the notice requirement and
deadline were obligations that could not be
effected by sublease, where lessor's required
consent to sublease explicitly provided that the
sublease would not "in any way effect" lessee's
obligations in the lease.

Cases that cite this headnote

**[3]** **Landlord and Tenant**
 Construction and Operation of Subleases

Lessor could not assert that the modified
notification date in sublease for the purchase

option in lease was fraudulently induced, rendered the contract unenforceable, or had resulted in a material breach of the contract, where lessor was not party to sublease.

Cases that cite this headnote

**[4]    Contracts**

    Rights Acquired by Third Persons

The general rule is that only the parties to a contract have the right to complain of a breach thereof; and if they are satisfied with the disposition that has been made of it and all claims under it, a third person has no right to insist that it has been broken.

Cases that cite this headnote

**[5]    Frauds, Statute Of**

    Sufficiency in general

For a contract concerning the conveyance of real estate to satisfy the statute of frauds, the writing must furnish within itself, or by reference to some other existing writing, the means or data by which the particular land to be conveyed may be identified with reasonable certainty. V.T.C.A., Bus. & C. § 26.01.

2 Cases that cite this headnote

**[6]    Frauds, Statute Of**

    Nature of Contract in General

The statute of frauds applies to a purchase option in a contract. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[7]    Frauds, Statute Of**

    Questions for jury

Whether a contract falls within the statute of frauds is a question of law. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[8]    Frauds, Statute Of**

    Sufficiency in general

The purpose of a description in a written conveyance is not to identify the land, but to afford a means of identification.

2 Cases that cite this headnote

**[9]    Frauds, Statute Of**

    Purpose

**Frauds, Statute Of**

    Sufficiency in general

While courts apply a strict application of the statute of frauds, they allow for a liberal construction of the words describing the land. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[10]    Frauds, Statute Of**

    Sufficiency in general

A metes-and-bounds description is not required to satisfy the statute of frauds. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[11]    Frauds, Statute Of**

    Sufficiency in general

A plat in a recorded property description is not required to satisfy the statute of frauds. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[12]    Frauds, Statute Of**

    Sufficiency in general

The description of the property does not require conviction beyond all peradventure of doubt to satisfy the statute of frauds. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[13]    Frauds, Statute Of**

    Sufficiency in general

If enough appears in the description of the property so that a party familiar with the locality can identify the premises with reasonable

certainty, it will be sufficient to satisfy the statute of frauds. V.T.C.A., Bus. & C. § 26.01.

1 Cases that cite this headnote

**[14]** **Frauds, Statute Of**
　 Sufficiency in general

Generally, a property can be identified with reasonable certainty, as required to satisfy the statute of frauds, if it identifies the general area of the land and contains information regarding the size, shape, and boundaries. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[15]** **Deeds**
　 Language of instrument

When construing a conveyance, the court does not look at terms in isolation; rather, it must give effect to all parts of the conveyance and construe the document as a whole.

Cases that cite this headnote

**[16]** **Frauds, Statute Of**
　 Sufficiency in general

When a contract includes a map of the property to be conveyed as a part of its description of the property, this is included in the analysis of whether the description satisfies the statute of frauds. V.T.C.A., Bus. & C. § 26.01.

1 Cases that cite this headnote

**[17]** **Frauds, Statute Of**
　 Sufficiency in general

Whether a map is helpful in remedying descriptive defects of the contract so as to satisfy the statute of frauds depends on whether the missing details are shown on the map. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[18]** **Evidence**
　 Contracts of sale

**Frauds, Statute Of**
　 Admissibility of evidence to aid memorandum

Parol evidence cannot be used to supply the essential elements of a contract for the sale of real estate.

Cases that cite this headnote

**[19]** **Evidence**
　 Grounds for admission of extrinsic evidence

**Frauds, Statute Of**
　 Admissibility of evidence to aid memorandum

Parol evidence can be used to explain or clarify the essential terms appearing in a contract for the sale of real estate.

Cases that cite this headnote

**[20]** **Frauds, Statute Of**
　 Sufficiency in general

If it does not sufficiently describe the land to be conveyed, a conveyance of an interest in real property is void and unenforceable under the statute of frauds. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[21]** **Frauds, Statute Of**
　 Sufficiency in general

Property to be sold under purchase option in sublease, which was a portion of property subject to purchase option in lease, was sufficiently identified to satisfy the statute of frauds, where property subject to sale under the sublease could be identified with a metes-and-bounds description, by reference to the property description in the lease, on three out of four of its borders, and the fourth border, a hand-drawn line on a map attached as an exhibit to sublease, could be identified with reasonable certainty given the amount of detail on the map, including designations of buildings on the premises. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[22]** **Evidence**
🔑 Leases

**Frauds, Statute Of**
🔑 Admissibility of evidence to aid memorandum

While testimony by representative of sublessee who prepared exhibit to sublease showing the property subject to purchase option was parol evidence, it could be used to clarify the meaning of the markings on exhibit.

Cases that cite this headnote

**[23]** **Frauds, Statute Of**
🔑 Admissibility of evidence to aid memorandum

Surveyor's affidavit stating that he was able to identify and determine the boundaries of property to be sold under purchase option in sublease, and metes-and-bounds description attached to affidavit, did not function in violation of rule that the information required to satisfy the statute of frauds must be in the document or by reference to some other existing writing, or rule that parol evidence cannot be used to supply the essential requirements to satisfy the statute of frauds, but rather, functioned to show that a party familiar with the locality could identify the premises with reasonable certainty. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[24]** **Frauds, Statute Of**
🔑 Admissibility of evidence to aid memorandum

The information required to satisfy the statute of frauds must be in the document or by reference to some other existing writing. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[25]** **Declaratory Judgment**
🔑 Determination and disposition of cause

Appellate court's reversal of trial court's summary judgment in favor of lessee on

its claims against lessor and sublessee for declaratory relief required reversal of trial court's award of attorney fees in favor of lessee.

Cases that cite this headnote

**[26]** **Judgment**
🔑 Specific performance

Sublessee was not entitled to summary judgment on its claim for specific performance of purchase option in sublease, following appellate court's reversal of trial court's grant of summary judgment to lessee on basis that sublease was rendered unenforceable by the statute of frauds, where sublessee's only summary judgment evidence concerned whether the purchase option was unenforceable under the statute of frauds, and its motion for summary judgment did not present any legal authority for what was required to entitle it to specific performance of the purchase option, nor did it present any evidence to establish that it had done everything required to entitle it to specific performance. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[27]** **Appeal and Error**
🔑 Verdict

In conducting a legal sufficiency review of the evidence, appellate court considers all of the evidence in a light favorable to the verdict and indulges every reasonable inference that supports it.

Cases that cite this headnote

**[28]** **Appeal and Error**
🔑 Sufficiency of Evidence in Support

In conducting a legal sufficiency review of the evidence, appellate court considers evidence favorable to the challenged finding if a reasonable factfinder could consider it, and disregards evidence contrary to the finding unless a reasonable factfinder could not disregard it.

Cases that cite this headnote

**[29]** **Appeal and Error**
  Extent of Review

**Appeal and Error**
  Clearly, plainly, or palpably contrary

In conducting a factual sufficiency review, appellate court considers all of the evidence supporting and contradicting the challenged finding and sets it aside only if the evidence is so weak as to make it clearly wrong and manifestly unjust.

Cases that cite this headnote

**[30]** **Appeal and Error**
  Credibility of witnesses; trial court's superior opportunity

**Appeal and Error**
  Province of trial court

In an appeal of a judgment rendered after a bench trial, appellate court may not invade the fact-finding role of the trial court, who alone determines the credibility of the witnesses, the weight to give their testimony, and whether to accept or reject all or any part of that testimony.

Cases that cite this headnote

**[31]** **Costs**
  Vendor and purchaser; sales

**Evidence**
  By counsel

Lessor's attorney's recognition during closing argument of bench trial on attorney fees, that it would risk appearing hypocritical arguing it should be entitled to $120,000 in attorney fees but that lessee should be entitled to less for work done during the same period, was not a judicial admission and was not excepted from rule that unsworn statements of counsel generally do not constitute evidence, and thus attorney's statement did not preclude the trial court from performing its obligation to determine what were reasonable and necessary attorney fees and awarding lessee only $85,000 in attorney fees.

1 Cases that cite this headnote

**[32]** **Evidence**
  Judicial Admissions

A judicial admission results when a party makes a statement of fact which conclusively disproves a right of recovery or defense he currently asserts.

Cases that cite this headnote

**[33]** **Evidence**
  Judicial Admissions

The elements for establishing that a statement is a judicial admission are (1) the statement must be made in the course of a judicial proceeding; (2) it must be contrary to an essential fact or defense asserted by the party; (3) it must be deliberate, clear, and unequivocal; (4) it cannot be destructive of the opposing party's theory of recovery or defense; and (5) enforcing the statement as a judicial admission would be consistent with public policy.

Cases that cite this headnote

**[34]** **Evidence**
  Judicial admissions in general

The public policy concerning judicial admissions is that it would be unjust to permit a party to recover after he has sworn himself out of court by a clear, unequivocal statement.

Cases that cite this headnote

**[35]** **Trial**
  Statements as to Facts, Comments, and Arguments

Unsworn statements of counsel generally do not constitute evidence.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*48** Ben A. Baring Jr., Paul J. McConnell, De Lange, Hudspeth, McConnell & Tibbets, **\*49** L.L.P., Robert A.

Jones, Craig W. Saunders, Barlow Jones L.L.P., Richard H. Edelman, Houston, TX, for Appellants.

Katherine T. Garber, James M. Kimbell, Strasburger & Price, L.L.P., Thomas W. Paterson, Susman Godfrey, LLP, Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices HIGLEY and BROWN.

## OPINION

LAURA CARTER HIGLEY, Justice.

This appeal concerns whether purchase options in two leases were properly exercised. Appellants, Ardmore, Inc. and Star Properties, LLC, appeal the trial court's grants of summary judgment against them and in favor of appellee, The Rex Group, Inc. In one issue, Star Properties argues that the trial court erred by determining that The Rex Group had timely exercised its option to purchase from Star Properties. In two issues, Ardmore argues that the trial court erred by determining the statute of frauds barred the application of its option to purchase from The Rex Group because (1) the property was identified with reasonable certainty; (2) Ardmore fully performed under the contract; (3) Ardmore partially performed under the contract; and (4) The Rex Group is estopped from asserting the statute of frauds defense. In a cross-appeal, The Rex Group challenges the sufficiency of the evidence to support the trial court's award of attorneys' fees in favor of The Rex Group and against Star Properties.

We affirm, in part, and reverse and remand, in part.

## Background

This lawsuit concerned a dispute over ownership of certain commercial property located in Houston, Texas. There are three parties involved in the suit: Star Properties, the owner of the property; The Rex Group, the lessee of the property; and Ardmore, a sublessee of the property. Both the lease from Star Properties to The Rex Group and the sublease from The Rex Group to Ardmore contain purchase options, exercisable at the end of the lease from Star Properties to The Rex Group. At the end of the lease, The Rex Group attempted to exercise the purchase option in the lease, and Ardmore attempted to exercise the purchase option in the sublease. In turn, Star Properties asserted that The Rex Group's attempt

was ineffective, and The Rex Group asserted that Ardmore's attempt was ineffective. The parties brought this litigation seeking to establish their respective claims to ownership of the property.

The commercial property at issue in this case is located along Ardmore Street in Houston, Texas. In 1991, the property in question was owned by Baker Hughes, Inc. and Combustion Engineering, Inc. Combustion Engineering later conveyed its interest in the property to ABB Prospects, Inc. Baker Hughes, Combustion Engineering, and ABB Prospects will be referred to collectively as the "Original Lessors." The Original Lessors entered into a lease agreement with The Rex Group, Inc. in May 1991. The lease was effective until the end of November 1997. During the term of the lease—provided that proper notice was given—The Rex Group was authorized to purchase the property in question for $2,500,000.

The lease also prevented The Rex Group from assigning or subleasing any portion of the property to non-affiliated parties without obtaining the prior written consent of the landlord. Specifically, the lease provided, in pertinent part,

> **\*50** Except for subleases to affiliates or subsidiaries of Tenant [The Rex Group] for which no consent to sublease shall be required by Landlord [the Original Lessors], Tenant may not sublet all or any portion of the Premises without the prior written consent of Landlord. Landlord shall not unreasonably withhold its required consent to a particular subletting provided [certain enumerated conditions exist]. Tenant shall not be relieved of any of its obligations hereunder by reason of any sublease of all or part of the premises.

The lease was amended by agreement of the parties at least seven times. Among other things, the amendments extended the term of the lease to July 2008, and modified the terms of the purchase option. As modified by the sixth amendment, the purchase option section of the lease provided, in pertinent part,

> A. In consideration of the mutual covenants herein contained, Landlord grants to Tenant the option to purchase the Premises during the Term for $2,500,000 in accordance with this Section. This option to purchase may not be

exercised to be effective at any time or times other than in the month of June, 2008 (the "Effective Month").

....

D. Except as provided in subsection F. below, to exercise such purchase option, Tenant must ... (ii) give Landlord written notice of its intent to purchase at least 90 days prior to the first day of the applicable Effective Month....

The parties agree that, by the terms of these two subsections alone, The Rex Group's deadline to exercise the purchase option was March 3, 2008.

As of 2001, both The Rex Group and Ardmore were subsidiaries of Industrial Holdings Incorporated, and both were operating their businesses in the commercial property subject to the lease. In 2001, Industrial Holdings began negotiations over a merger with T3 Energy Services. One

condition of the merger was that Industrial Holdings would sell Ardmore prior to the merger.

As a result, Industrial Holdings approached Ben Andrews and Dan Ahuero, the executives then in charge of Ardmore, about purchasing Ardmore. Andrews and Ahuero agreed but insisted as part of the sale that they be allowed to remain on the leased premises and, if The Rex Group elected to exercise the purchase option in the lease, that they be allowed to purchase a lesser portion of the property.

To that end, The Rex Group entered into a sublease with Ardmore. The sublease provided that it was "subject and subordinate to" the lease. It also recognized that Ardmore was already subleasing a portion of the property. That portion of the property was defined as the "Premises" in the sublease "as more particularly described on *Exhibit A*." Exhibit A consists of the following image:



**\*51** The sublease gave Ardmore continued use of the Premises along with "the nonexclusive right to use for vehicular and pedestrian access and vehicular parking, any and all driveways, parking areas, pedestrian walkways, and other common or shared areas, including, without limitation, the "Shared Drive" depicted on *Exhibit A*."

The purchase option in the sublease provided, in pertinent part:

> In the event that Sublessor [The Rex Group] elects to exercise the option to purchase the premises covered by the Base Lease (the "Entire

Base Lease Premises") in accordance with the terms of such purchase option contained in Section 27 of the Base Lease (the "Purchase Option"), Sublessor shall give Lessors the required written notice of Sublessor's intent to exercise the Purchase Option (the "Exercise Notice") no later than the thirtieth (30th) day ("Sublessor Exercise Deadline") prior to the last day by which the Purchase Option may be timely exercised pursuant to Section 27.D(ii) of the Base Lease.... Sublessee [Ardmore] shall thereupon

be entitled, contemporaneously with Sublessor's acquisition of the Entire Base Lease Premises, to acquire from Sublessor that portion of the Entire Base Lease Premises ("Option Property") as is depicted on the drawing attached hereto as *Exhibit D* ....

The parties agree that the Ardmore's exercise deadline, as defined in the sublease, was February 2, 2008.

Exhibit D consists of the following image:



 **\*52** Both exhibits were prepared by Andrews on behalf of Ardmore. Andrews testified in his deposition that both exhibits were drafted from the same basic drawing. Andrews acknowledged that there were already markings on the basic drawing he used to create the exhibits. Exhibit A defines the premises to be leased, and Exhibit D defines the premises subject to the purchase option. To that end, Andrews testified, Exhibit A contains a line that "more heavily note [s]" the subleased area. The markings added to Exhibit D show what would be subject to the purchase option.

The Original Lessors consented in writing to the sublease on December 13, 2001. In it, the Original Lessors acknowledged that consent was given and provided that the "Sublease shall not diminish or in any way effect the obligations

of Lessee [The Rex Group] to Lessor [the Original Lessors] under the Lease and Lessee shall remain primarily liable for the performance of its obligations under the Lease notwithstanding the existence of the Sublease." The consent also provided that "Lessee and Sublessee [Ardmore] acknowledge and agree that Lessor has executed this Consent solely to evidence its consent to the Sublease and this Consent shall not in any way create any liabilities, obligations or duties on the part of Lessor." It was signed by representatives for the Original Lessors, The Rex Group, and Ardmore.

In 2003, the Original Lessors sold the property and its lease to Star Properties.

On February 7, 2008, The Rex Group sent Star Properties a written notification of its intent to exercise its purchase option under the lease. On February 15, 2008, Star Properties sent The Rex Group a letter, asserting that The Rex Group had failed to timely exercise its purchase option in accordance with the lease as modified by the sublease.

Following The Rex Group's notification of its intent to exercise the purchase option under the lease, Ardmore elected to exercise its purchase option under the sublease. The Rex Group asserted that Ardmore **\*53** could not enforce the purchase option on the grounds that the description of the property subject to the sublease's purchase option violated the statute of frauds.

The underlying litigation ensued. The Rex Group brought claims against Star Properties and Ardmore. Star Properties and Ardmore each brought counterclaims against The Rex Group. As those claims pertain to this appeal, each of the parties sought an adjudication of which, if any, of the purchase options were properly exercised. All of the parties ultimately brought motions for summary judgment on the issues.

As a part of its summary judgment evidence, Ardmore presented the affidavit of Ernest Roth, a registered professional land surveyor. Roth testified in his affidavit that he was familiar with the locality of the property subject to the sublease's purchase option, that he "was able to identify and determine the boundaries of the Option Property with reference to the description thereof provided in the sublease and Exhibit D thereto," and that the property could be identified with reasonable certainty. He included with his affidavit a metes-and-bounds description of the property subject to the sublease's purchase option based on the property description.

In a series of rulings on the motions, the trial court determined that The Rex Group had timely exercised its purchase option under the lease and that the description of the property subject to the purchase option in the sublease was rendered unenforceable by the statute of frauds.

The parties submitted the issue of attorneys' fees to a bench trial. The trial court ultimately awarded attorneys' fees in favor of The Rex Group and against Ardmore and Star Properties.

Each of the parties appealed.

**Motions for Summary Judgment**

In one issue, Star Properties argues that the trial court erred by determining that The Rex Group had timely exercised its option to purchase from Star Properties. In two issues, Ardmore argues that the trial court erred by determining the statute of frauds barred the application of its option to purchase from The Rex Group because (1) the property was identified with reasonable certainty; (2) Ardmore fully performed under the contract; (3) Ardmore partially performed under the contract; and (4) The Rex Group is estopped from asserting the statute of frauds defense.

**A. Standard of Review**

The summary-judgment movant must conclusively establish its right to judgment as a matter of law. *See MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex.1986). Because summary judgment is a question of law, we review a trial court's summary judgment decision de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex.2009).

To prevail on a "traditional" summary-judgment motion asserted under Rule 166a(c), a movant must prove that there is no genuine issue regarding any material fact and that it is entitled to judgment as a matter of law. *See* TEX.R. CIV. P. 166a(c); *Little v. Tex. Dep't of Criminal Justice,* 148 S.W.3d 374, 381 (Tex.2004). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *See City of Keller v. Wilson,* 168 S.W.3d 802, 816 (Tex.2005).

When a party moves for summary judgment on a claim for which it bears the burden of proof, it must show that it is entitled to prevail on each element of its cause of action. *See* **\*54** *Parker v. Dodge,* 98 S.W.3d 297, 299 (Tex.App.- Houston [1st Dist.] 2003, no pet.). The party meets this burden if it produces evidence that would be sufficient to support an instructed verdict at trial. *Id.*

To determine if there is a fact issue, we review the evidence in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *See Fielding,* 289 S.W.3d at 848 (citing *City of Keller,* 168 S.W.3d at 827). We indulge every reasonable inference and

resolve any doubts in the nonmovant's favor. *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002).

When, as here, the parties file cross-motions for summary judgment on overlapping issues, and the trial court grants one motion and denies the other, we review the summary judgment evidence supporting both motions and "render the judgment that the trial court should have rendered." *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000).

### B. Timeliness of the Notice under the Lease

 **[1]**    Star Properties acknowledges that, under the terms of the lease alone, The Rex Group's deadline to exercise the purchase option was March 3, 2008. It also acknowledges that The Rex Group sent its written notice of its intent to exercise its purchase option under the lease on February 7, 2008. Star Properties maintains that The Rex Group nevertheless failed to timely exercise the purchase option under the lease because the purchase option under the lease was modified by the purchase option under the sublease to Ardmore.

The Rex Group acknowledges that, under the terms of the sublease purchase option, it had agreed with Ardmore that The Rex Group would submit its notice of its intent to exercise the purchase option by February 2, 2008. The Rex Group maintains, however, that Star Properties was not a party to the sublease and, accordingly, cannot use the notice deadline under the sublease as a basis to claim that The Rex Group's notice was untimely.

The trial court determined that the deadline to exercise the purchase option under the lease was March 3, 2008 and that The Rex Group timely exercised its right to purchase the property.

In making its argument, Star Properties relies on the following facts: The lease required consent of the landlord for subleases with entities that were not affiliates or subsidiaries of The Rex Group. Star Properties signed a written consent in the form of a contract, which incorporated the sublease into the consent. The sublease incorporated the lease into the sublease. The consent was expressly conditioned on the specific terms of the sublease, including, Star Properties argues, the February 2 exercise date for the option.

Based on these facts, Star Properties argues, "Because the consent was a formal contract that expressly incorporated the sublease (which, in turn, expressly incorporated the lease) and

was signed by all three ... parties to the lease and sublease, the signing of the consent was tantamount to all three parties also signing the lease and sublease so as to each be mutually bound by the terms of the three agreements that applied to them."

Specific terms from the lease, the sublease, and the consent show that this argument is incorrect. The lease provides that any sublease entered into by The Rex Group will not relieve it "of any of its obligations hereunder by reason of any sublease of all or part of the Premises." The sublease provides that it is "subject and subordinate to" the lease. The consent **\*55** provides that the sublease "shall not diminish or in any way effect the obligations of [The Rex Group] to [then Original Lessors, now Star Properties] under the Lease" and that the Original Lessors "executed this Consent solely to evidence [their] consent to the Sublease." The plain language of each of these contracts establishes that Star Properties was not a party to the sublease and that the sublease did not modify the lease.

 **[2]**    Star Properties argues that the provision in the consent stating that the sublease does not diminish or effect the obligations of The Rex Group should not affect our analysis because the purchase option is a right, not an obligation. The Rex Group counters that, while the purchase option may generally be a right, the notice requirement and deadline are obligations. We agree with The Rex Group. Generally, an option in a contract "is a privilege or right." *Faucette v. Chantos,* 322 S.W.3d 901, 907 (Tex.App.-Houston [14th Dist.] 2010, no pet.). But that right can only be exercised by strictly complying with the obligations set out in the contract. *See id.* at 908; *Mensa–Wilmot v. Smith Int'l, Inc.,* 312 S.W.3d 771, 781 (Tex.App.-Houston [1st Dist.] 2009, no pet.). The consent explicitly provides that the sublease would not "in any way effect" The Rex Group's obligations in the lease. No exception is made for the obligations required to exercise the purchase option.

 **[3]**    Star Properties also argues that allowing the lease and sublease to have separate exercise dates for the purchase option in the lease leads to the conclusion that The Rex Group intended to allow for the breach of the sublease. It further argues that such a conclusion would violate the rules of contract construction because this would mean the sublease was fraudulently induced and, accordingly, invalid. *See Tawes v. Barnes,* 340 S.W.3d 419, 425 (Tex.2011) (holding all provisions of a contract must be given effect so that none is rendered meaningless).

**[4]** Whether the sublease was fraudulently induced, is unenforceable, or allows for an easy breach by The Rex Group is irrelevant to our analysis. "The general rule is that only the parties to a contract have the right to complain of a breach thereof; and if they are satisfied with the disposition that has been made of it and all claims under it, a third person has no right to insist that it has been broken." *Wells v. Dotson,* 261 S.W.3d 275, 284 (Tex.App.-Tyler 2008, no pet.); *see also Allan v. Nersesova,* 307 S.W.3d 564, 571 (Tex.App.-Dallas 2010, no pet.) (holding party must be in privity of contract or beneficiary of contract to have standing to complain about contract). Neither The Rex Group nor Ardmore has asserted that the modified notification date in the sublease was fraudulently induced, rendered the contract unenforceable, or has resulted in a material breach of the contract. Star Properties may not assert this argument on their behalf. *See Wells,* 261 S.W.3d at 284.

We hold that the evidence establishes, as a matter of law, that The Rex Group timely exercised its purchase option under the lease. We overrule Star Properties' sole issue.

### C. Application of the Statute of Frauds to the Purchase Option in the Sublease

In its first issue, Ardmore argues the trial court erred by granting The Rex Group's motion for summary judgment. Both parties' motions for summary judgment focus on whether the statute of frauds bars the application of the purchase option in the sublease and, if it does, **\*56** whether any of the exceptions to the application of the statute of frauds also apply.

**[5]** **[6]** **[7]** Under the applicable statute of frauds, a contract for the sale of real estate is not enforceable unless it, or a memorandum of it, is in writing and signed by the person to be charged with the contract. TEX. BUS. & COM.CODE ANN. § 26.01(a), (b)(4) (Vernon 2009). For a contract concerning the conveyance of real estate to satisfy the statute of frauds, "the writing must furnish within itself, or by reference to some other existing writing, the means or data by which the particular land to be conveyed may be identified with reasonable certainty." *Wilson v. Fisher,* 144 Tex. 53, 188 S.W.2d 150, 152 (1945). This applies to a purchase option in a contract. *See Matney v. Odom,* 147 Tex. 26, 210 S.W.2d 980, 981–82 (1948) (applying statute of frauds analysis to purchase option in contract). Whether a contract falls within the statute of frauds is a question of law. *Iacono v. Lyons,* 16 S.W.3d 92, 94 (Tex.App.-Houston [1st Dist.] 2000, no pet.).

**[8]** **[9]** The purpose of a description in a written conveyance is not to identify the land, but to afford a means of identification. *Jones v. Kelley,* 614 S.W.2d 95, 99–100 (Tex.1981). While we apply a strict application of the statute of frauds, we allow for a liberal construction of the words describing the land. *Gates v. Asher,* 154 Tex. 538, 280 S.W.2d 247, 248 (1955).

**[10]** **[11]** **[12]** A metes-and-bounds description is not required to satisfy the statute of frauds. *Tex. Builders v. Keller,* 928 S.W.2d 479, 481 (Tex.1996). Similarly, a plat in a recorded property description is not required. *Nguyen v. Yovan,* 317 S.W.3d 261, 269 (Tex.App.-Houston [1st Dist.] 2009, pet. denied). Nor does the description of the property require "[c]onviction beyond all peradventure of doubt." *Gates,* 280 S.W.2d at 249; *see also Templeton v. Dreiss,* 961 S.W.2d 645, 659 (Tex.App.-San Antonio 1998, pet. denied) (holding mathematical certainty not required). Instead, only proof within "reasonable certainty" is required. *Gates,* 280 S.W.2d at 249.

**[13]** **[14]** "If enough appears in the description so that a party familiar with the locality can identify the premises with reasonable certainty, it will be sufficient." *Id.* at 248–49. Generally speaking, a property can be identified with reasonable certainty if it identifies the general area of the land and "contains information regarding the size, shape, and boundaries." *Reiland v. Patrick Thomas Props., Inc.,* 213 S.W.3d 431, 437 (Tex.App.-Houston [1st Dist.] 2006, pet. denied); *accord Fears v. Tex. Bank,* 247 S.W.3d 729, 736 (Tex.App.-Texarkana 2008, pet. denied).

**[15]** **[16]** **[17]** "[W]hen construing a conveyance, the court does not look at terms in isolation; rather, it must give effect to all parts of the conveyance and construe the document as a whole." *Plainsman Trading Co. v. Crews,* 898 S.W.2d 786, 789 (Tex.1995). When a contract includes a map of the property to be conveyed as a part of its description of the property, this is included in the analysis of whether the description satisfies the statute of frauds. *Matney,* 210 S.W.2d at 984; *U.S. Enters., Inc. v. Dauley,* 535 S.W.2d 623, 628 (Tex.1976). "Whether a map is helpful in remedying descriptive defects of the contract depends on whether the missing details are shown on the map." *U.S. Enters.,* 535 S.W.2d at 628.

**[18]** **[19]** While parol evidence may be considered under certain circumstances, it cannot be used to supply the "essential elements" of the contract. *Wilson,* 188 S.W.2d at

152. In contrast, it can be used **\*57** to "explain or clarify the essential terms appearing in the" contract. *Id.*

 **[20]**  If it does not sufficiently describe the land to be conveyed, a conveyance of an interest in real property is void and unenforceable under the statute of frauds. *Nguyen,* 317 S.W.3d at 267.

 **[21]**  In order to determine if the purchase option under the sublease is barred by the statute of frauds, we must determine if the property to be sold under the sublease is identified with reasonable certainty. *Wilson,* 188 S.W.2d at 152. We begin by noting that the entire property subject to the lease is described by three metes-and-bounds descriptions. The lease identifies the property subject to the lease as the property "described on Exhibit A" of the lease. Exhibit A of the lease is a metes-and-bounds description of three tracts of land.

The sublease expressly incorporated the lease by reference, and made the lease "a part [of the sublease] for all purposes." Additionally, the purchase option in the sublease expressly recognizes The Rex Group's authority to purchase the premises covered by the lease and defines those premises as the "Entire Base Lease Premises." The sublease then allows Ardmore to purchase a portion of the Entire Base Lease Premises, provided that The Rex Group exercises its right to purchase the Entire Base Lease Premises.

The question we must answer, then, is whether the portion of the Entire Base Lease Premises that was a part of the purchase option in the sublease was sufficiently identified. *See Matney,* 210 S.W.2d at 982 (considering whether portion of larger identified property was sufficiently identified).

The sublease identifies the portion subject to its purchase option as "that portion of the Entire Base Lease Premises ... as is depicted on the drawing attached hereto as *Exhibit D.*" Exhibit D is a map of the premises, including designations of the buildings on the premises at the time of the creation of the sublease. There are three main markings on Exhibit D. It contains an irregular loop around certain buildings on the map. It contains a dashed line that intersects the property from Highway 288 to Ardmore Street. It also contains a solid line that follows the same basic path as the dashed line. On either end of the two lines are two arrows that point in the same direction. Next to one of the arrows is a notation that says "property covered by option."

The Rex Group focuses on the irregular loop and the arrows on the map, arguing that these drawings are too vague to identify the property subject to the sublease's purchase option. Ardmore, in contrast, focuses on the solid line and arrows on the map, arguing this is sufficient to satisfy the statute of frauds. We hold that Ardmore's explanation of the markings on Exhibit D is supported by the record.

Andrews, one of the representatives for Ardmore, prepared Exhibit D to the sublease. In his deposition, Andrews testified that he prepared both Exhibit A and Exhibit D. He further testified that both exhibits were drafted from the same basic drawing. Andrews acknowledged that there were already markings on the basic drawing used to prepare the exhibits. Exhibit A defined the premises to be leased, and Exhibit D defined the premises subject to the purchase option. To that end, Andrews testified, Exhibit A contains a line that "more heavily note[s]" the subleased area. The markings added to Exhibit D showed what would be subject to the purchase option.

This testimony is borne out by a review of the two exhibits. Both exhibits contain the irregular loop and the dashed line. **\*58** Exhibit A adds the heavier line, which follows the basic path of the irregular loop. It also adds some shaded areas with arrows indicating that the shaded areas were a shared drive. In contrast, Exhibit D adds the solid line, which follows the same basic path of the dashed line. It also adds the arrows at the top and bottom of the solid line and the notation "property covered by option."

 **[22]**  While Andrews's testimony is parol evidence, it falls within the exception of when parol evidence can be considered. *See Wilson,* 188 S.W.2d at 152 (holding parol evidence can be used to "explain or clarify the essential terms appearing in the contract"); *see also David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450 (Tex.2008) (per curiam) (holding when contract contains ambiguity, courts can admit extraneous evidence to determine true meaning of contract). [1] Because there were multiple markings on Exhibit D, Andrews's testimony may be used to clarify the meaning of the markings.

We are left, then, with a map of the Entire Base Lease Premises with a line running through the parking lot, midway between two groups of buildings, and notations indicating that the property covered by the purchase option is everything to one side of this line. To put it another way, the property subject to sale under the sublease can be identified with a

metes-and-bounds description—by reference to the property description in the lease, which contains a metes-and-bounds description of the entire premises—on three out of four of its borders. Whether the fourth border—the hand-drawn line running through the premises—can be identified with reasonable certainty determines whether the purchase option under the sublease satisfies the statute of frauds.

The Rex Group argues that the map is too ambiguous to identify the property subject to the sublease's purchase option with reasonable certainty. To support this argument, The Rex Group relies on *U.S. Enters.,* 535 S.W.2d at 623 and *Guenther v. Amer–Tex Constr. Co.,* 534 S.W.2d 396 (Tex.Civ.App.-Austin 1976, no writ).

In *U.S. Enterprises,* the Texas Supreme Court recognized that, when a map is included as a part of a property description, it "becomes a part of the written contract and can aid a defective written description if the map contains enough necessary descriptive information." 535 S.W.2d at 628. In that case, the written description of the land to be sold was 10 tracts of land out of three identified surveys in Wise County, Texas. *Id.* at 625. The 10 tracts were generally identified in the written description. *Id.* The written description also said that the tracts—other than certain identified tracts—were identified on a map marked as Exhibit A. *Id.*

The issue for the court to resolve was whether two of the 10 tracts were properly identified in the contract, including the map. *Id.* at 626–27. It was undisputed that, without the map, the two tracts were not sufficiently identified. *Id.* at 628. The court held that the map did not correct this inadequacy because there was nothing on the map "which supplies any aid as to **\*59** the name or location of" the tracts at issue. *Id.* U.S. Enterprises sought to establish by parol evidence that the two tracts were located on the map, but the court held that—even if this were a proper use of parol evidence—the proffered evidence did not show *where* on the map the two properties were. *Id.* at 629. Accordingly, even if admissible, it was insufficient. *Id.*

In *Guenther,* the only reference to the land to be conveyed was a map. 534 S.W.2d at 396–97. The map referenced two roads, two fences, and a utility line to establish the boundaries of the land. *Id.* One of the fences bordered a park. *Id.* The court recognized that the two roads and the fence bordering the park could likely be found. *Id.* at 398. It held, however, that the type of utility line—such as electric, telephone, or gas—forming one of the borders was not identified. *Id.* Even if

this utility line could be identified, the last border was a fence that was not identified in any way. *Id.* Because there was no indication of the location of the fence, the size of the property or the length of the borders, there was no information to fill in what would be needed to identify this last border either. *See id.*

We find this case to be easily distinguishable from *U.S. Enterprises* and *Guenther.* Unlike *U.S. Enterprises,* the map consists only of the property subject to the lease's purchase option and the portion of that property that is subject to the sublease's purchase option is demarcated. Unlike *Guenther,* three of the four boundaries can be identified with metes-and-bounds descriptions, leaving only one line that is not identified at that level of detail.

We hold that this last line on Exhibit D of the sublease can be identified with reasonable certainty. There is enough detail on the map—including designations of buildings on the premises—to show fairly clearly where this last line falls. While the location of the line is not identified with exact precision, this is not required to satisfy the statute of frauds. *See Gates,* 280 S.W.2d at 249 (holding "[c]onviction beyond all peradventure of doubt" is not required); *Templeton,* 961 S.W.2d at 659 (holding mathematical certainty is not required).

Additionally, as Ardmore points out, the property subject to the sublease's purchase option has been identified by a land surveyor. Roth, the surveyor, testified in his affidavit that he was familiar with the locality of the property subject to the sublease's purchase option, that he "was able to identify and determine the boundaries of the Option Property with reference to the description thereof provided in the sublease and Exhibit D thereto," and that the property could be identified with reasonable certainty. He included with his affidavit a metes-and-bounds description of the property subject to the sublease's purchase option based on the property description.

**[23]** **[24]** The Rex Group argues that Roth's affidavit and attached metes-and-bounds description cannot be considered because after-the-fact parol evidence cannot be used to cure an inadequate description in a contract. It is true that, the information required to satisfy the statute of frauds must be in the document "or by reference to some other *existing* writing." *Wilson,* 188 S.W.2d at 152 (emphasis added). It is also true that parol evidence cannot be used to supply the essential requirements to satisfy the statute of frauds. *Id.* at 57, 188 S.W.2d at 152. Roth's affidavit and attached metes-

and-bounds description do not function in violation of either of these rules, however. Instead, they function to show "that a party familiar with the locality can identify the premises with reasonable certainty." *Gates,* 280 S.W.2d at 248–49; *see also Dixon* **\*60** *v. Amoco Prod. Co.,* 150 S.W.3d 191, 195 (Tex.App.-Tyler 2004, pet. denied) (holding testimony of surveyor can be admitted to show that property can be identified with reasonable certainty); *Foster v. Bullard,* 496 S.W.2d 724, 733 (Tex.Civ.App.-Austin 1973, writ ref'd n.r.e.) (holding parol evidence can be considered to show property can be identified with reasonable certainty).

The Rex Group included evidence of its own surveyor, who asserted in an affidavit that the property subject to the sublease cannot be identified with reasonable certainty. At best, however, this creates a fact issue. We must review the evidence in the light most favorable to Ardmore, crediting favorable evidence if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *See Fielding,* 289 S.W.3d at 848 (citing *City of Keller,* 168 S.W.3d at 827). Additionally, we must indulge every reasonable inference and resolve any doubts in Ardmore's favor. *See Sw. Elec. Power Co. v. Grant,* 73 S.W.3d at 215. The affidavit of The Rex Group's surveyor does not overcome the affidavit of Ardmore's surveyor. As a result, The Rex Group was not entitled to judgment as a matter of law.

In this way, this case is similar to *W. Beach Marina, Ltd. v. Erdeljac,* 94 S.W.3d 248 (Tex.App.-Austin 2002, no pet.). In *West Beach Marina,* the property at issue was identified by "a hand-drawn sketch superimposed on an elevation map that indicates the location of" the relevant property. *Id.* at 265. Both parties presented testimony from a surveyor. *Id.* at 266. During a bench trial, one surveyor asserted he could not identify the property with reasonable certainty, while the other surveyor testified that he could identify it and created a metes-and-bounds description of the property. *Id.* The court of appeals held that the trial court did not err in relying on the other surveyor's testimony and accepting that the property could be identified with reasonable certainty. *Id.*

The same reasoning is applicable here. The property description contained with the sublease is not so vague or ambiguous as to render its boundaries indeterminable. Additionally, the record shows that a surveyor, using the information contained in or referenced by the sublease, was able to identify the property with reasonable certainty. Accordingly, we hold that the trial court erred by determining, as a matter of law, that the property subject to the sublease's

purchase option could not be identified with a reasonable certainty. [2]

**[25]** In the remainder of its first issue, Ardmore argues that, if we reverse the trial court's summary judgment in favor of The Rex Group, we must also reverse the trial court's award of attorneys' fees in favor of The Rex Group. The Rex Group acknowledges this is the law, and we agree. *See Bd. of Med. Exam'rs v. Nzedu,* 228 S.W.3d 264, 276 (Tex.App.-Austin 2007, pet. denied) (holding that reversal of declaratory judgment act claim also requires reversal of award of attorneys' fees for new determination of equitable and just award). Accordingly, we reverse the trial court's award of attorneys' fees in favor of The Rex Group and against Ardmore.

We sustain Ardmore's first issue.

**\*61** **[26]** Ardmore's second issue concerns whether the trial should have granted summary judgment in favor of Ardmore and against The Rex Group.

When a party moves for summary judgment on a claim for which it bears the burden of proof, it must show that it is entitled to prevail on each element of its cause of action. *See Parker,* 98 S.W.3d at 299. When, as here, the parties file cross-motions for summary judgment on overlapping issues, and the trial court grants one motion and denies the other, we review the summary judgment evidence supporting both motions and "render the judgment that the trial court should have rendered." *FM Props.,* 22 S.W.3d at 872.

Ardmore's counter-petition against The Rex Group seeks specific performance of the purchase option, arguing that it had exercised the purchase option and that it "is ready, willing, and able to complete its purchase of the property." Ardmore argued the same thing in its motion for summary judgment. In its prayer, Ardmore asked the court to "enter judgment decreeing specific performance, requiring [The Rex Group] to convey the property described in Exhibit 'D' to the sublease to [Ardmore] in accordance with the terms and conditions of the sublease."

Ardmore's only summary judgment evidence, however, concerned whether the purchase option was unenforceable under the statute of frauds. Its motion for summary judgment did not present any legal authority for what was required to entitle it to specific performance of the purchase option. Nor did it present any evidence to establish that it had done

everything required to entitle it to specific performance. *See* TEX.R. CIV. P. 166a(c) (requiring movant to establish with competent evidence that it is entitled to judgment as a matter of law). Accordingly, we hold that the record does not permit us to render judgment in favor of Ardmore and against The Rex Group.

We overrule Ardmore's second issue.

**Bench Trial on Attorneys' Fees**

In a cross-appeal, The Rex Group challenges the sufficiency of the evidence to support the trial court's award of attorneys' fees in favor of The Rex Group and against Star Properties.

**A. Standard of Review**

 **[27]** **[28]** **[29]** **[30]** In conducting a legal sufficiency review of the evidence, we consider all of the evidence in a light favorable to the verdict and indulge every reasonable inference that supports it. *City of Keller,* 168 S.W.3d at 827. We consider evidence favorable to the finding if a reasonable factfinder could consider it, and disregard evidence contrary to the finding unless a reasonable factfinder could not disregard it. *Id.* at 827. In conducting a factual sufficiency review, we consider all of the evidence supporting and contradicting the challenged finding and set it aside only if the evidence is so weak as to make it clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *see also Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). In an appeal of a judgment rendered after a bench trial, we may "not invade the fact-finding role of the trial court, who alone determines the credibility of the witnesses, the weight to give their testimony, and whether to accept or reject all or any part of that testimony." *Volume Millwork, Inc. v. W. Hous. Airport Corp.,* 218 S.W.3d 722, 730 (Tex.App.-Houston [1st Dist.] 2006, pet. denied).

**B. Analysis**

 **[31]** In the bench trial on the issue of attorneys' fees, The Rex Group presented **\*62** evidence that it had incurred $209,552 in attorneys' fees. It also presented expert testimony concerning whether the fees were reasonable and necessary based on *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 818 (Tex.1997) (quoting Tex. Disciplinary Rules Prof'l 1 Conduct R. 1.04, *reprinted in* TEX. GOV'T

CODE ANN. tit. 2, subtit. G, app. A (Vernon Supp. 2011) (Tex. State Bar R., art. X, § 9)).

During the bench trial, it was established that Star Properties had incurred about $120,000 in attorneys' fees for about 410 hours of work through the time that summary judgment was rendered against it. Star Properties' attorney then acknowledged to the trial court that it was "in no position to deny that [$]120,000 is reasonable in the case."

Ultimately, the trial court awarded $85,000 in attorneys' fees in favor of The Rex Group and against Star Properties. On appeal, The Rex Group argues the trial court abused its discretion by only awarding $85,000 in attorneys' fees based on Star Properties' attorney's statement. Specifically, The Rex Group argues,

> Thus the record contains undisputed evidence that Rex's reasonable and necessary attorneys' fees against Star were at least $120,000. This conclusion in turn triggers a series of subsidiary conclusions: (1) that as a matter of law the evidence contradicts the trial court's implied finding that only an $85,000 fee was reasonable and necessary; (2) that the finding is against the great weight and preponderance of the evidence; and (3) that the trial court abused its discretion in setting the fee at $85,000.

 **[32]** **[33]** **[34]** The Rex Group does not cite to any legal authority to show why the statement made during closing arguments by Star Properties' attorney would constitute evidence or would otherwise be binding on the trial court. Star Properties' attorney's statement does not constitute a judicial admission. "A judicial admission results when a party makes a statement of fact which conclusively disproves a right of recovery or defense he currently asserts." *Seminole Pipeline Co. v. Broad Leaf Partners, Inc.,* 979 S.W.2d 730, 740 (Tex.App.-Houston [14th Dist.] 1998, no pet.). The elements for establishing that a statement is a judicial admission are (1) the statement must be made in the course of a judicial proceeding; (2) it must be contrary to an essential fact or defense asserted by the party; (3) it must be deliberate, clear, and unequivocal; (4) it cannot be destructive of the opposing party's theory of recovery or defense; and (5) enforcing the statement as a judicial admission would be consistent

with public policy. *Kaplan v. Kaplan,* 129 S.W.3d 666, 669 (Tex.App.-Fort Worth 2004, pet. denied). The public policy concerning judicial admissions is that it would be unjust to permit a party to recover after he has sworn himself out of court by a clear, unequivocal statement. *Id.*

Star Properties' attorney's recognition that it would risk appearing hypocritical arguing it should be entitled to $120,000 in attorneys' fees but that The Rex Group should be entitled to less for work done during the same period is not tantamount to a deliberate, clear, and unequivocal admission that $120,000 is inherently reasonable and necessary. *See id.*

 **[35]**  Moreover, unsworn statements of counsel generally do not constitute evidence. *See Banda v. Garcia,* 955 S.W.2d 270, 272 (Tex.1997); *see also Vaughn v. Tex. Emp't Comm'n,* 792 S.W.2d 139, 144 (Tex.App.-Houston [1st Dist.] 1990, no writ) (holding unsworn attorney's statement does not constitute evidence to support award of attorneys' fees). The Rex Group offers no argument as to why Star **\*63**

Properties' attorney's statement should be excepted from this rule. Accordingly, we hold that this statement did not preclude the trial court from performing its obligation to determine what were reasonable and necessary attorneys' fees.

We overrule The Rex Group's sole issue.

### Conclusion

We reverse the trial court's grant of summary judgment in favor of The Rex Group and against Ardmore as well as its award of attorneys' fees in favor of The Rex Group and against Ardmore. We affirm the judgment in all other respects. We remand this case to the trial court for further proceedings.

### All Citations

377 S.W.3d 45

---

Footnotes

1    While The Rex Group argues that the irregular loop formed the property subject to the sublease's purchase option, it presented no evidence that this in any way reflected the intent of the parties. Accordingly, whether this alternative interpretation satisfies the statute of frauds is not before us. *See Travis v. City of Mesquite,* 830 S.W.2d 94, 100 (Tex.1992) (holding appellate courts may only review issues "actually presented to and considered by the trial court"); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 677 (Tex.1979) (holding that trial court may not grant summary judgment on ground not presented by movant in writing).

2    Because we hold that the trial court could not determine as a matter of law that the statute of frauds barred the enforcement of the purchase option in the sublease, we do not reach Ardmore's remaining arguments concerning the application of certain exceptions to the statute of frauds. *See* TEX.R.APP. P. 47.1 (requiring appellate courts to address every issue raised and *necessary* to final disposition of the appeal).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**F**

KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by** Tenet Hospitals Ltd. v. Rivera, Tex., August 22, 2014

12 S.W.3d 1
Supreme Court of Texas.

BAKER HUGHES, INC. and
Envirotech Controls, Inc., Petitioners,
v.
KECO R. & D., INC., Respondent.

No. 98–0520. | Argued Sept. 15,
1999. | Decided Oct. 7, 1999. |
Rehearing Overruled Jan. 6, 2000.

Manufacturer of calibration apparatus sued buyer, alleging misappropriation of trade secrets and breach of contract for violating confidential disclosure agreement. The 165th District Court, Harris County, Elizabeth Ray, J., entered summary judgment for buyer. Manufacturer appealed, and buyer cross-appealed. The Houston Court of Appeals, First District, 982 S.W.2d 25, reversed and remanded. Buyer petitioned for review. The Supreme Court, Hecht, J., held that: (1) application of three-year statute of limitations to revive misappropriation claim violated prohibition against retroactive laws, but (2) genuine issues of material fact precluded summary judgment for buyer on breach of contract claim.

Affirmed in part, reversed in part, and remanded.

West Headnotes (8)

**[1]** **Limitation of Actions**
 Revival of causes of action by amendment or repeal of statute

Application of three-year statute of limitations to revive claim for misappropriation of trade secrets that was barred by two-year statute of limitations violated State Constitution's prohibition against retroactive laws. Vernon's Ann.Texas Const. Art. 1, § 16; V.T.C.A., Civil Practice & Remedies Code § 16.010.

17 Cases that cite this headnote

**[2]** **Limitation of Actions**
 Nature of statutory limitation

Statutes of limitations are procedural.

6 Cases that cite this headnote

**[3]** **Statutes**
 Effect on vested rights
**Statutes**
 Application to pending actions and proceedings

Procedural statutes may apply to suits pending at the time they became effective, but even a procedural statute cannot be given application to a suit pending at the time it becomes effective if to do so would destroy or impair rights which had become vested before the act became effective. Vernon's Ann.Texas Const. Art. 1, § 16.

10 Cases that cite this headnote

**[4]** **Limitation of Actions**
 Retroactive Operation

After a cause has become barred by a statute of limitations, a defendant has a vested right to rely on such statute as a defense, so that a procedural statute that became effective while the cause was pending and that impaired that right would not apply.

19 Cases that cite this headnote

**[5]** **Courts**
 In general; retroactive or prospective operation

As a rule, court decisions apply retroactively.

4 Cases that cite this headnote

**[6]** **Courts**
 In general; retroactive or prospective operation

Exceptions to general rule that court decision applies retroactively are determined mostly by three factors: (1) whether the decision establishes a new principle of law by either overruling clear

past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) whether prospective or retroactive application of the particular rule will further or retard its operation through an examination of the history, purpose, and effect of the rule; and (3) whether retroactive application of the rule could produce substantial inequitable results.

9 Cases that cite this headnote

**[7]** **Judgment**

👈 Contract cases in general

Genuine issues of material fact existed as to whether information about plaintiff's product that defendant disclosed to third party could be classified as trade secret and whether that information was confidential, precluding summary judgment for defendant on claim of breach of contract for violating confidential disclosure agreement.

7 Cases that cite this headnote

**[8]** **Appeal and Error**

👈 Determination of part of controversy

General rule that a denial of summary judgment is interlocutory and not appealable does not apply when a movant seeks summary judgment on multiple grounds and the trial court grants the motion on one or more grounds but denies it, or fails to rule, on one or more other grounds presented in the motion and urged on appeal; this exception does not depend on the number of motions filed, when they were presented to the trial court, or when the trial court ruled.

38 Cases that cite this headnote

**Attorneys and Law Firms**

**\*2** Claudia Wilson Frost, Jacalyn Ann Hollabaugh, David Hricik, Steve Rosenblatt, Houston, for petitioners.

D. Arlon Groves, David Alton Bryant, Jr., Houston, for respondent.

**Opinion**

Justice HECHT delivered the opinion of the Court.

The principal issue we address here is whether a claim for misappropriation of trade secrets that was barred by limitations was revived by the later enactment of section 16.010 of the Texas Civil Practice and Remedies Code, which extended the limitations period from two years to three years and adopted the discovery rule for determining accrual. We hold that for section 16.010 to have such effect would violate the prohibition against retroactive laws in article I, section 16 of the Texas Constitution. Consequently, we reverse in part and affirm in part the judgment of the court of appeals [1] and remand the case to the district court for further proceedings.

**I**

Keco R. & D., Inc., a small, closely-held corporation, manufactured a device that recalibrates industrial pollution gas analyzer systems when the accuracy of their readings drifts. Keco began selling the device, which Keco called a "Texas Ranger," to Tracor Atlas, Inc. in 1987 for incorporation into industrial gas analyzer systems that Tracor manufactured. Baker Hughes, Inc. later bought Tracor and merged it into Envirotech Controls, Inc., a wholly owned Baker Hughes subsidiary. For convenience, we refer to Tracor, Envirotech, and Baker Hughes collectively as "Baker Hughes."

Keco also provided Baker Hughes information concerning the "Texas Ranger" that Keco considered proprietary. To protect that information, Keco had Baker Hughes sign a "Confidential Disclosure Agreement" in December 1989. Reciting that Keco had "developed substantial confidential information data and products," the Agreement provided that as long as Keco continued to sell to Baker Hughes and for three years thereafter, Baker Hughes would not (1) disclose confidential information, data, or processes supplied by Keco, (2) manufacture, in competition with Keco, components of original Keco design, or (3) use Keco's confidential information for the development of competitive component equipment. The Agreement gave Baker Hughes ownership of any test data it developed.

On April 26, 1991, Keco's president and principal, Charles Kimbell, wrote to a Baker Hughes employee and asserted that a paper the employee had presented at an industry trade show

some six months earlier violated the Confidential Disclosure Agreement. The paper purported to discuss Baker Hughes test data concerning calibration of gas analyzer systems, but Kimbell called it "plagiarism" of Keco information. In response, Baker Hughes terminated its relationship with Keco and sought a different supplier for a calibration device to incorporate in its analyzer systems. Also in April 1991, Baker Hughes furnished a Keco competitor, Kin–Tek, with a disassembled "Texas Ranger," the test data it had presented at the trade show, and Keco's promotional literature. Within a month or so, Kin–Tek had developed **\*3** a unit for Baker Hughes's use in place of the "Texas Ranger."

On October 27, 1993, Keco sued Baker Hughes for misappropriation of trade secrets and breach of the Confidential Disclosure Agreement. Baker Hughes moved for summary judgment on the trade secrets claim on the ground that it was barred by the applicable two-year statute of limitations, section 16.003 of the Texas Civil Practice and Remedies Code. About a month later, Baker Hughes filed a second motion for summary judgment on the contract claim on the ground that the evidence established as a matter of law that no breach had occurred. The district court granted the first motion but denied the second one at the same time. Several months later, Baker Hughes then filed a third motion for summary judgment on the ground that it did not breach the Confidential Disclosure Agreement because none of the information it obtained from Keco was a trade secret. The trial court granted this motion. In accordance with its rulings, the court rendered a final judgment that Keco take nothing.

The court of appeals reversed and remanded both of Keco's claims. [2] Concerning limitations, the court held that section 16.010, enacted almost a year after final judgment was rendered, applied to Keco's trade secrets claim. [3] Section 16.010(a) states:

> A person must bring suit for misappropriation of trade secrets not later than three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. [4]

The statute extends the applicable limitations period from two years, which it had been under section 16.003 and adopts the discovery rule for determining the accrual of a claim, something we declined to do in *Computer Associates International, Inc. v. Altai, Inc.* [5] Section 3 of the Act adopting section 16.010 adds:

> (a) This Act applies to all actions:
>
> > (1) commenced on or after the effective date of this Act [May 1, 1997]; or
>
> > (2) pending on that effective date and in which the trial, or any new trial or retrial following motion, appeal, or otherwise, begins on or after that effective date.
>
> (b) In an action commenced before the effective date of this Act, a trial, new trial, or retrial that is in progress on the effective date is governed by the law applicable to the trial, new trial, or retrial immediately before the effective date, and that law is continued in effect for that purpose. [6]

The court of appeals concluded simply that because Keco's action was pending on May 1, 1997, section 16.010 applied, and that the parties' dispute over when Keco knew or should have known of the misappropriation of its trade secrets precluded summary judgment. [7]

Concerning Keco's contract claim, the court held that Baker Hughes had not established that information it obtained from Keco was not a trade secret, so that its third motion for summary judgment should not have been granted. [8] The court refused to consider whether Baker Hughes's second motion for summary judgment should have been granted. [9]

**\*4** We granted Baker Hughes's petition for review. [10] Baker Hughes argues that the court of appeals' application of section 16.010 violates the prohibition against retroactive laws in article I, section 16 of the Texas Constitution, and that Keco's trade secrets claim is barred by limitations. Baker Hughes also argues that it was entitled to summary judgment on Keco's contract claim. We address each argument in turn.

## II

**[1]** This case was pending on May 1, 1997, the effective date of section 16.010, and any trial following this appeal will begin after that date. Thus, section 3(a)(2) of the Act adopting section 16.010 makes the statute applicable to this case.

**[2] [3] [4]** Statutes of limitations are procedural. [11]

The rule is well settled that procedural statutes may apply to suits pending at the time they became effective, but even a procedural statute cannot be given application to a suit pending at the time it becomes effective if to do so would destroy or impair rights which had become vested before the act became effective. In this connection it is the settled law that, after a cause has become barred by the statute of limitation, the defendant has a vested right to rely on such statute as a defense. [12]

To permit barred claims to be revived years later would undermine society's interest in repose, which is one of the principal justifications for statutes of limitations. [13] Thus, we have written that a statute extending the limitations period of a claim already barred by limitations violates the Texas Constitution's prohibition against retroactive laws, which is article I, section 16. [14]

 **[5]**    **[6]**    Keco argues that Baker Hughes had no vested right to its limitations defense because at the time suit was filed, it was an "open question" whether the discovery rule applied to claims for misappropriation of trade secrets. It is true that no reported decision of a Texas court addressed the applicability of the discovery rule to such claims until our opinion in *Computer Associates International, Inc. v. Altai, Inc.,* [15] which issued while the present case was pending in the district court. But whether a party has a vested right to a limitations defense does not depend on whether the law was settled when suit was filed. Our decision in *Computer Associates* did not create new law for trade secrets claims; rather, it recognized what the law was. As a rule, court decisions apply retroactively. [16] Exceptions are determined mostly by three factors:

> (1) whether the decision establishes a new principle of law by either overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) whether prospective or retroactive application of the particular rule will further or retard its operation through an examination of the history, purpose, and effect of the rule; and (3) whether retroactive application **\*5** of the rule could produce substantial inequitable results. [17]

We did not indicate in *Computer Associates* that our decision there should be prospective only, and these factors clearly do not weigh in favor of a prospective application. Although the issue was one of first impression, denying applicability of the

discovery rule was in keeping with this Court's precedents and with the purpose of limitations.

Keco's claims against Baker Hughes accrued, at the latest, in April 1991, when Baker Hughes provided Kin–Tek with information to manufacture a calibrator to compete with Keco's "Texas Ranger." Within a few weeks Kin–Tek began manufacturing the new device. Keco's trade secrets claim, filed well over two years later, was therefore barred by the then-applicable two-year statute of limitations. Baker Hughes's right to a limitations defense vested before section 16.010 was enacted. Section 16.010's divestiture of that right violates article I, section 16 of the Texas Constitution.

Baker Hughes was thus entitled to summary judgment on Keco's trade secrets claim.

### III

 **[7]**    Baker Hughes argues that it is entitled to summary judgment on Keco's contract claim because it established, in its third motion, that no information it received from Keco was a trade secret and, in its second motion, that no breach of the Confidential Disclosure Agreement occurred.

We agree with the court of appeals that factual disputes over whether the information Baker Hughes obtained from Keco can be classified as trade secrets preclude summary judgment. Baker Hughes relied on the affidavit of an expert on pollution analyzers who stated that the information in question was widely known in the industry and therefore could not qualify for trade secret protection. But Keco's president, also an expert in engineering and manufacturing Keco's products, made statements in his affidavit directly counter to Baker Hughes's expert. Because of this conflict in the evidence, Baker Hughes's third motion for summary judgment should have been denied.

 **[8]**    The court of appeals refused to consider whether Baker Hughes's second motion for summary judgment should have been granted, citing the general rule that a denial of summary judgment is interlocutory and not appealable. [18] But as we recognized in *Cincinnati Life Insurance Co. v. Cates,* [19] the rule does not apply when a movant seeks summary judgment on multiple grounds and the trial court grants the motion on one or more grounds but denies it, or fails to rule, on one or more other grounds presented in the motion and urged

on appeal. [20] In *Cates* we held that the appellate court must review all of the summary judgment grounds on which the trial court actually ruled, whether granted or denied, and which are dispositive of the appeal, [21] and may consider any grounds on which the trial court did not rule. [22] The court of appeals refused to follow *Cates* because the second motion was denied months before the third motion was granted. [23] The court of appeals offered no rationale for its position, and we know of none. The rule in *Cates* does not depend **\*6** on the number of motions filed, when they were presented to the trial court, or when the trial court ruled. The court of appeals should have considered whether the district court properly denied Baker Hughes's second motion for summary judgment.

Rather than remand the case to the court of appeals, however, we have examined the grounds of Baker Hughes's second motion ourselves. [24] Baker Hughes argues that the essence of Keco's breach of contract claim is that Baker Hughes provided Keco's confidential information to Kin–Tek, who used it to design and manufacture a product to compete with the "Texas Ranger." Baker Hughes concedes that it obtained information from Keco, and we have concluded that there is evidence to support Keco's claims that that information included trade secrets. Baker Hughes contends that the only information it furnished Kin–Tek, and that Kin–Tek used,

was not confidential, but the Baker Hughes employee who provided the information to Kin–Tek testified that he could not recall exactly what was furnished. Keco's president averred that Kin–Tek could not possibly have designed and built, in a few weeks, a device that Keco had taken four years and spent millions of dollars to develop, unless Kin–Tek had used confidential information that Keco had provided Baker Hughes. As we have noted, Keco's president was an expert involved in the design and manufacture of the "Texas Ranger". On this record, we conclude that questions of fact precluded summary judgment on the grounds raised in Baker Hughes's second motion.

Thus, Baker Hughes was not entitled to summary judgment on Keco's contract claim.

\* \* \* \* \*

Accordingly, the court of appeals' judgment is affirmed in part and reversed in part, and the case is remanded to the district court for further proceedings.

**All Citations**

12 S.W.3d 1, 43 Tex. Sup. Ct. J. 9

Footnotes

1   982 S.W.2d 25.

2   *Id.*

3   *Id.* at 28.

4   TEX. CIV. PRAC. & REM.CODE § 16.010.

5   918 S.W.2d 453, 458 (Tex.1996).

6   Act of Apr. 17, 1997, 75th Leg., R.S., ch. 26, § 3, 1997 Tex. Gen. Laws 68.

7   982 S.W.2d at 28.

8   *Id.* at 28–29.

9   *Id.* at 29.

10  42 Tex. Sup.Ct. J. 420 (Mar. 25, 1999).

11  *Franco v. Allstate Ins. Co.,* 505 S.W.2d 789, 793 (Tex.1974).

12  *Wilson v. Work,* 122 Tex. 545, 62 S.W.2d 490, 490 (1933) (per curiam) (citing *Cathey v. Weaver,* 111 Tex. 515, 242 S.W. 447, 453 (1922)); *see Mellinger v. City of Houston,* 68 Tex. 37, 3 S.W. 249, 255 (1887).

13  *Safeway Stores, Inc. v. Certainteed Corp.,* 710 S.W.2d 544, 545 (Tex.1986).

14  *Mellinger,* 3 S.W. at 251.

15  918 S.W.2d at 458; *see Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 22 F.3d 32, 33 (2d Cir.1994).

16  *State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696, 719(Tex.1996); *Elbaor v. Smith,* 845 S.W.2d 240, 250 (Tex.1992); *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489, 515 (Tex.1992); *Sanchez v. Schindler,* 651 S.W.2d 249, 254 (Tex.1983).

17    *Gandy,* 925 S.W.2d at 719–720 (quoting *Elbaor,* 845 S.W.2d at 250). *See also Carrollton–Farmers Branch,* 826 S.W.2d at 518 (quoting *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971)).

18    *See Novak v. Stevens,* 596 S.W.2d 848, 849 (Tex.1980).

19    927 S.W.2d 623 (Tex.1996).

20    *Id.* at 625, 626.

21    *Id.* at 624.

22    *Id.*

23    982 S.W.2d at 29.

24    *See Coulson & CAE, Inc. v. Lake L.B.J. Mun. Util. Dist.,* 734 S.W.2d 649, 652 (Tex.1987); *Roark v. Allen,* 633 S.W.2d 804, 811 (Tex.1982).

**End of Document**                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

G

KeyCite Yellow Flag - Negative Treatment
**Disagreed With by** Pahle v. Colebrookdale Tp., E.D.Pa., March 26, 2002

881 S.W.2d 288
Supreme Court of Texas.

BROWNING–FERRIS INDUSTRIES,
INC. and James Meszaros, Petitioners,
v.
Kenneth LIECK and Nydia
Hinojosa Lieck, Respondents.

No. D–3616. | Argued Oct. 13,
1993. | Decided June 2, 1994. |
Rehearing Overruled Sept. 8, 1994.

City manager, against whom charges of official misconduct had been dropped, brought action against defendant who had provided information to authorities, alleging malicious prosecution. The 138th District Court, Cameron County, Darrell B. Hester, J., entered jury verdict for city manager, and appeal was taken. The Corpus Christi Court of Appeals, 845 S.W.2d 926, Gilberto Hinojosa, J., affirmed in part and reversed in part, and writ of error was sought. The Supreme Court, Hecht, J., held that, unless person knowingly provides false information, person cannot be held to have "caused" criminal prosecution, as required to establish tort of malicious prosecution, unless person's acts were both necessary and sufficient cause of prosecution.

Reversed and remanded.

Doggett, J., concurred in part and dissented in part.

West Headnotes (2)

**[1]** **Malicious Prosecution**
Instigation of or participation in prosecution
Unless person knowingly provides false information to authorities, person cannot be held to have "caused" criminal prosecution, as required to establish tort of malicious prosecution, unless person's acts were both necessary and sufficient cause of prosecution, i.e., person's actions in course of things brought about prosecution and, but for his actions, prosecution would not have occurred; abrogating Flowers, 314 S.W.2d 373.

89 Cases that cite this headnote

**[2]** **Husband and Wife**
Personal injuries to wife resulting in loss of services or consortium, impairment of earning capacity, or expenses
**Husband and Wife**
Personal injuries to husband
Damages for loss of consortium cannot be awarded for harm to spouse that involves no physical injury.

29 Cases that cite this headnote

**Attorneys and Law Firms**

**\*289** Roger Townsend, Houston, William Powers, Jr., Austin, Lisa Powell, Charles C. Murray, McAllen, for petitioners.

Neil E. Norquest, McAllen, Norton A. Colvin, Jr., Brownsville, Gordon L. Briscoe, Harlingen, for respondents.

**Opinion**

HECHT, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and HIGHTOWER, CORNYN, GAMMAGE, ENOCH, and SPECTOR, Justices, join.

We address three questions in this malicious prosecution action: first, whether the trial court properly instructed the jury concerning the causal connection a plaintiff must prove between defendant's conduct and plaintiff's criminal prosecution to establish liability; second, whether a defendant can ever be liable for making statements to law enforcement officials which he did not actually know were false; and third, whether damages for loss of consortium can be awarded for harm to a spouse that involves no physical injury? For reasons that follow, we answer the first and third questions "no", and the second question "yes". The district court rendered judgment against defendants, which a sharply divided court of appeals, 845 S.W.2d 926, en banc, affirmed with some modifications. 845 S.W.2d at 950. We reverse and remand the case for further proceedings.

## I

A detailed account of the evidence in this case has been made by the court of appeals in assessing the sufficiency of the evidence to support the judgment. As we have not been asked to review the method or standard used in that assessment, we need not recapitulate the entire record. We focus instead on the circumstances directly relevant to the legal issues raised here.

When James Meszaros, an employee of Browning–Ferris Industries, Inc., heard that the Texas Rangers were investigating the purchasing practices of the City of Brownsville, he became concerned that they might question his attempt to make a financial contribution to the reelection campaign of one of the members of the City Commission at a time when BFI was bidding on the City's garbage collection business. Meszaros asked another BFI employee and former Ranger, Dan North, to contact his friends among the Rangers and try to determine the scope of the investigation. North did so, and arranged for Meszaros to meet with two officials involved in the investigation.

At that meeting, Meszaros brought up the subject of the bidding on the City's garbage collection business. BFI had submitted its bid on its standard form contract, which was similar to the ones it, and its competitors, used with other Texas cities. Garbage Management Services also bid on the City's business. The terms of the bids were summarized by Brownsville's City Manager, Kenneth Lieck, distributed to members of the City Commission and to the press, and discussed at several City Commission meetings **\*290** which were open to the public. After the Commission voted to award the business to GMS, Lieck gave GMS' representative, Robert Torres, a slightly modified form of the contract BFI had submitted, and that proposed contract became the basis of the final negotiations between the City and GMS. Meszaros complained to the investigators that the contract Lieck had given Torres was confidential information. North showed the two investigators a statute from which they concluded, after reading it, that Lieck had violated the law.

At the request of various other law enforcement officials, Meszaros and an attorney for BFI provided additional statements and affidavits. Two City Commissioners also told officials that Lieck had given Torres confidential information. Meszaros, by his own admission at trial, never told officials

that the terms of BFI's contract had been made public during the City Commission's consideration of the bids, even though he knew that was true, nor did he tell officials that he believed Lieck had not committed a crime, even though that was his belief. From these admissions it may thus be fairly said that Meszaros withheld from law enforcement officials information which they might well have considered important in deciding whether to prosecute Lieck.

An assistant district attorney reviewed the matter and presented it to the grand jury, which indicted Lieck for giving Torres confidential information, specifically, the contract BFI had submitted to the Brownsville City Commission. The indictment alleged a misdemeanor, although it did not state what statute had been violated. The indictment was dismissed about two months later because the grand jury had been improperly constituted. A second grand jury refused to indict Lieck, and the prosecution was then terminated.

Lieck and his wife Nydia sued BFI and Meszaros for malicious prosecution. The jury rendered a verdict favorable to the Liecks on all issues and found actual damages of $706,500 for Lieck [1] and $250,000 for his wife for loss of consortium, and punitive damages against BFI of $1,500,000. The trial court rendered judgment awarding Lieck his actual damages against BFI and Meszaros, jointly and severally, and his punitive damages against BFI, but rendered judgment non obstante veredicto that Nydia Lieck take nothing. The court of appeals reversed in part, awarding Nydia the consortium damages found by the jury, then modified the punitive damages, apportioning them between Nydia and Kenneth, and otherwise affirmed the judgment. 845 S.W.2d 926.

## II

Before we turn to petitioners' complaints, it is necessary to recognize the important societal interests in tension in the tort of malicious criminal prosecution. A century ago this Court wrote:

> It is important that every citizen should be protected against malicious prosecutions, and it is equally important that crimes should be punished, in order that the law-abiding citizen may be secure in life, liberty, and property. To make the citizen liable to be mulcted in damages for

an honest discharge of duty is to give immunity to crime, and to weaken the restraining power of the criminal law, thereby endangering the security of law-abiding people.

*Sebastian v. Cheney,* 86 Tex. 497, 25 S.W. 691, 694 (1894). The Restatement (Second) of Torts describes these competing interests similarly:

> The first is the interest of society in the efficient enforcement of the criminal law, which requires that private persons who aid in the enforcement of the law should be given an effective protection against the prejudice that is likely to arise from the termination of the prosecution in favor of the accused. The second is the interest that the individual citizen has in being protected against unjustifiable and oppressive litigation of criminal charges, which not only involve pecuniary loss but also distress and loss of reputation.

**\*291** RESTATEMENT (SECOND) OF TORTS ch. 29, intro. note, at 405 (1977) [hereinafter "the RESTATEMENT"]. These interests are balanced by carefully defining the elements of an action for malicious prosecution, and the balance is maintained by strictly adhering to these elements.

It is frequently said that actions for malicious prosecution are not favored in the law. *E.g., Sullivan v. O'Brien,* 85 S.W.2d 1106, 1112 (Tex.Civ.App.—San Antonio 1935, writ ref'd); *Diamond Shamrock Corp. v. Ortiz,* 753 S.W.2d 238, 241 (Tex.App.—Corpus Christi 1988, writ denied); *Parker v. Dallas Hunting & Fishing Club,* 463 S.W.2d 496, 499 (Tex.Civ.App.—Dallas 1971, no writ); *Montgomery Ward & Co. v. Kirkland,* 225 S.W.2d 906, 909 (Tex.Civ.App.—San Antonio 1949, writ ref'd n.r.e.); *Deaton v. Montgomery Ward & Co.,* 159 S.W.2d 969, 972 (Tex.Civ.App.—Beaumont 1942, writ ref'd w.o.m.); *Reed v. Lindley,* 240 S.W. 348, 351 (Tex.Civ.App.—Ft. Worth 1922, no writ); 54 C.J.S. *Malicious Prosecution* § 4, at 524–25 (1987); 52 AM.JUR.2D *Malicious Prosecution* § 5, at 188 (1970). This aphorism is far too vague to serve as an analytical tool. As with any other cause of action, if the elements of malicious prosecution are proved, liability is established. What is distinctive about

malicious prosecution is that there is little room for error in applying the law. Even a small departure from the exact prerequisites for liability may threaten the delicate balance between protecting against wrongful prosecution and encouraging reporting of criminal conduct. It is in this context that we consider the issues raised.

**III**

**A**

Petitioners complain that the trial court erred in refusing to require the jury to find whether Meszaros' actions actually caused the indictment of Lieck. The trial court asked instead:

> Did James R. Meszaros, acting without probable cause and with malice, cause, *or aid or cooperate in causing,* a criminal prosecution to be commenced against Kenneth J. Lieck?

(Emphasis added.) The trial court did not define "cause, or aid or cooperate in causing" in the jury charge. Giving these words their plain meaning, the jury could have concluded that it was enough for Meszaros to have aided or cooperated with law enforcement officials in bringing about Lieck's prosecution. Petitioners argue that this does not satisfy the requirements for liability.

The court of appeals rejected petitioners' argument in a single sentence: "The courts of this State have repeatedly stated that the causation issue submitted in this case is the proper question for malicious prosecution cases." 845 S.W.2d at 943. The court cited four cases in support of this statement. In *Davis v. City of San Antonio,* 752 S.W.2d 518 (Tex.1988), this Court held that there was evidence to support a finding that defendant caused, aided or contributed to a criminal prosecution, but did not consider—because it was not questioned by the parties—whether such a finding was sufficient for liability. In *Bass v. Metzger,* 569 S.W.2d 917, 924 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.), and *Ellis v. Sinton Sav. Ass'n,* 455 S.W.2d 834, 836 (Tex.Civ.App.—Corpus Christi 1970, writ ref'd n.r.e.), the court listed the elements of a malicious prosecution action as including that defendant have caused, or aided or cooperated in causing, plaintiff's prosecution. Neither of these cases considered the causation element specifically; each merely listed the element among the other requirements

to establish liability. *See also Yianitsas v. Mercantile Nat'l Bank,* 410 S.W.2d 848, 850 (Tex.Civ.App.—Dallas 1967, no writ). Finally, *Thomas v. Cisneros,* 596 S.W.2d 313, 316–17 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.), also lists the same elements but later refers to a requirement that defendant's actions have proximately caused plaintiff's prosecution. Thus, none of the cases cited by the court of appeals, or by respondents, specifically considers the element of causation.

The statement of the element as "cause, or aid or cooperate in causing", appears to have originated in *Flowers v. Central Power & Light Co.,* 314 S.W.2d 373, 375 (Tex.Civ.App.— Waco 1958, writ ref'd n.r.e.). That case cites no authority for so broad an element **\*292** of causation. Prior decisions included among the required elements a stricter showing that defendant actually caused the prosecution. *See Davidson v. First State Bank,* 310 S.W.2d 678, 680 (Tex.Civ.App.—El Paso 1958, no writ); *Kirkland,* 225 S.W.2d at 907–08; *Meyer v. Viereck,* 286 S.W. 894, 897 (Tex.Civ.App.—Galveston 1926, writ dism'd w.o.j.); *Reed,* 240 S.W. at 351. Although as noted above several courts of appeals have recited the *Flowers* version of the elements of malicious prosecution, several others have referred to the pre-*Flowers* version of the causation element. *See McHenry v. Tom Thumb Page Drug Stores,* 696 S.W.2d 664, 665 (Tex.App.—Dallas 1985, writ dism'd); *Blanton v. Morgan,* 681 S.W.2d 876, 878 (Tex.App. —El Paso 1984, writ ref'd n.r.e.); *Fisher v. Beach,* 671 S.W.2d 63, 66 (Tex.App.—Dallas 1984, no writ); *Martin v. Trevino,* 578 S.W.2d 763, 766 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.); *Lloyd v. Almeda State Bank,* 346 S.W.2d 947, 951 (Tex.Civ.App.—Waco 1961, writ ref'd n.r.e.).

The RESTATEMENT formulates the causation element as "initiates or procures". RESTATEMENT § 653. [2] A person initiates a criminal prosecution if he makes a formal charge to law enforcement authorities. *Id.* cmt. c. A person procures a criminal prosecution if his actions are enough to cause the prosecution, and but for his actions the prosecution would not have occurred. *Id.* cmts. d, f–h. In other words, procurement requires that a person's actions be both a necessary and a sufficient cause of the criminal prosecution. Thus, a person cannot procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another person, a law enforcement official or the grand jury. *Id.* An exception, which we discuss below, occurs when a person provides information which he knows is false to another to cause a criminal prosecution. *Id.* cmt. g.

The concept of procurement in the RESTATEMENT is essentially the same as the cause-in-fact element of proximate cause. Cause in fact is ordinarily defined as "that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred". 1 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 2.04 (1987). A person procures a criminal prosecution if his actions in the course of things bring it about, and if, but for his actions, the prosecution would not have occurred. Just as there may be more than one proximate cause of an event, a single prosecution may be procured by more than one person. The RESTATEMENT idea of procurement does not, however, include the foreseeability component of proximate cause, which requires that "the act or omission complained of must be such that a person using *ordinary care* would have foreseen that the event, or some similar event, might reasonably result therefrom." *Id.* Foreseeability is not an appropriate requirement for procurement. An ordinary person simply cannot be expected to foresee that his communication with law enforcement officials either will or will not lead to a criminal prosecution. There are too many participants in the process to foresee what the outcome of one person's role in the investigatory process is likely to be.

The RESTATEMENT rule does not subject a person to liability for merely aiding or cooperating in causing a criminal prosecution. We agree that liability should be thus restricted. Were it otherwise, persons only incidentally involved in a criminal investigation might find themselves facing allegations in a civil suit. The prospect of such liability poses too great a disincentive for people to cooperate freely with law enforcement officials. As many Texas courts have already recognized, a person's actions must be the cause in fact of a criminal prosecution before he can be liable for malicious prosecution. The trial court's instruction permitted the jury to find liability under a lesser standard and was therefore in error.

 **\*293** **[1]** The RESTATEMENT concepts of initiation and procurement are better suited to malicious prosecution cases than the more general idea of causation. In such cases in the future, the jury should be asked, not whether the defendant "caused" criminal proceedings, but whether he either "initiated" or "procured" them, depending on the nature of the case. Initiation would not ordinarily need to be defined, as it would be demonstrated by evidence that defendant filed formal charges against plaintiff, but procurement should be defined as follows:

A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides information which he knows is false. A criminal prosecution may be procured by more than one person.

We discuss below the basis for the exception for providing false information.

**B**

Respondents argue that even if the trial court erred in failing to instruct the jury properly on the element of causation, that error was harmless, citing *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n,* 710 S.W.2d 551 (Tex.1986). Petitioners urge us to overrule *Island Recreational* as having been wrongly decided. *See* 34 GUS. M. HODGES & T. RAY GUY, THE JURY CHARGE IN TEXAS CIVIL LITIGATIONN § 34, at 92–94 (Texas Practice 1988). *Island Recreational* considered whether the trial court's failure to instruct the jury on a party's theory was reversible error. In the present case, the trial court affirmatively charged the jury on the wrong standard of causation. We have not extended the holding of *Island Recreational, see Exxon Corp. v. Perez,* 842 S.W.2d 629 (Tex.1992) (per curiam), and we do not do so in this case. We need not consider here whether *Island Recreational* should be overruled.

The trial court rendered judgment against petitioners on a verdict which allowed the jury to find only that Meszaros aided or cooperated in causing Lieck's criminal prosecution. The trial court's failure to limit the jury to the proper standard of causation constitutes reversible error.

**IV**

Petitioners also argue that a person who cooperates with law enforcement authorities by providing them information

should not be liable for malicious prosecution unless he knows the information to be false. Petitioners base their argument on the RESTATEMENT § 653, cmt. g, quoted in *Thomas,* 596 S.W.2d at 317, and policy considerations underlying actions for malicious prosecution and defamation.

Comment g describes the circumstances under which a person may be said to have procured a criminal prosecution by influencing a public prosecutor. The comment states:

A private person who gives to a public official information of another's supposed criminal misconduct, of which the official is ignorant, obviously causes the institution of such subsequent proceedings as the official may begin on his own initiative, but giving the information or even making an accusation of criminal misconduct does not constitute a procurement of the proceedings initiated by the officer if it is left entirely to his discretion to initiate the proceedings or not. When a private person gives to a prosecuting officer information that he believes to be true, and the officer in the exercise of his uncontrolled discretion initiates criminal proceedings based upon that information, the informer is not liable under the rule stated in [§ 653] even though the information proves to be false and his belief was one that a reasonable man would not entertain. The exercise of the officer's discretion makes the initiation of the prosecution his own and protects from liability the person whose information or accusation has led the officer to initiate the proceedings.

If, however, the information is known by the giver to be false, an intelligent exercise **\*294** of the officer's discretion becomes impossible, and a prosecution based upon it is procured by the person giving the false information. In order to charge a private person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false.

Plainly, comment g does not support petitioners' argument. The last sentence states that a person may be liable, not only when he gives information he knows is false to a prosecutor, but also when his conduct is the determining factor in the prosecutor's decision to prosecute. The comment states that a person who provides information which he believes is true but is in fact false is not liable *when* the

prosecutor relies upon his own discretion in deciding whether to prosecute. If the prosecutor does not exercise his own discretion, however, the comment indicates that the provider of information has procured a criminal prosecution whether he knew the information to be false or not.

The comment states that an intelligent exercise of discretion is impossible when a prosecutor is provided false information. This is not literally true in all instances. Prosecutors may well suspect that information they receive is unreliable and decide not to initiate criminal proceedings. What is true is that a person who provides false information cannot complain if a prosecutor acts on it; he cannot be heard to contend that the prosecutor should have known better. Such a person has procured the resulting prosecution, regardless of the actions of the prosecutor, and the causation element for malicious prosecution is satisfied. This rule does not assist the Liecks. The jury found that Meszaros did not make full and fair disclosure to investigating officers. This is not the equivalent of a finding that Meszaros made statements he knew were false.

Petitioners have cited no authority from any other jurisdiction which supports their argument, and we are aware of none. They argue that a person would not be liable for defamation of a public official, like Lieck, without proof that statements made were known to be false, and that the same rule should apply in a malicious prosecution case. Otherwise, they argue, the imposition of civil liability will infringe upon constitutionally guaranteed freedom of speech. We are not persuaded. As we noted above, the conflicting policies underlying malicious prosecution actions must be carefully balanced. The requirements that a person make statements without probable cause and with malice, and the stringent requirement of procurement, are sufficient protection to those cooperating with law enforcement officials.

Accordingly, we conclude that the trial court did not err in refusing to instruct the jury that Meszaros could not be liable for malicious prosecution unless he knew the statements he made to investigators to be false.

## V

 **[2]**    We turn finally to the question whether Nydia Lieck is entitled to damages for loss of consortium when Lieck suffered no physical injury. Although we have never held that damages for loss of spousal consortium cannot be recovered

absent proof of physical injury, the only cases in which we have allowed such damages did involve physical injury. *See Reed Tool Co. v. Copelin,* 610 S.W.2d 736 (Tex.1980); *Whittlesey v. Miller,* 572 S.W.2d 665 (Tex.1978). Moreover, in *Reagan v. Vaughn,* 804 S.W.2d 463, 467 (Tex.1990), we limited recovery of damages for loss of parental consortium to those cases where the parent has sustained "serious, permanent, and disabling" physical injuries. There is no reason to have one rule for parental relationships and another rule for spousal relationships. We are bound by *Reagan* to hold that damages for loss of spousal consortium are not recoverable absent proof of physical injury.

Furthermore, we believe that the conflicting policies underlying malicious prosecution actions require that recovery of damages be limited to the person prosecuted, and should not extend to members of his family. A person who provides information leading to **\*295** the prosecution of another should not face liability for damages other than to the person prosecuted.

Nydia cites decisions by four intermediate appellate courts in other states which have permitted recovery of consortium damages in malicious prosecution cases without proof of physical injury. *See Minion v. Gaylord's Int'l Corp.,* 541 So.2d 209 (La.Ct.App.1989); *Rivers v. Ex–Cell–O Corp.,* 100 Mich.App. 824, 300 N.W.2d 420 (1980); *Zalewski v. Gallagher,* 150 *N.J.Super.* 360, 375 A.2d 1195 (1977); *Dunn v. Alabama Oil & Gas Co.,* 42 Tenn.App. 108, 299 S.W.2d 25 (Tenn.Ct.App.1956). She does not cite a case from any state's highest court, and we are aware of none. We decline to follow these authorities.

Accordingly, we hold that Nydia is not entitled to recover damages for loss of consortium.

\* \* \* \* \* \*

For the reasons explained, we reverse the judgment of the court of appeals, remand Kenneth Lieck's action against BFI and Meszaros to the trial court for further proceedings, and render judgment that Nydia Lieck take nothing.

DOGGETT, J., joins in Parts I–IV only, and notes his dissent to Part V.

GONZALEZ, J., not sitting.

**All Citations**

881 S.W.2d 288

Footnotes

1    The jury found Lieck's damages to be $50,000 for past loss of earning capacity, $0 for future loss of earning capacity, $50,000 for past mental anguish, $100,000 for future mental anguish, $500,000 for injury to reputation, and $6,500 attorney fees to defend the criminal charges.

2    "A private person who initiates or procures the institution of criminal proceedings against another who is not guilty of the offense charged is subject to liability for malicious prosecution if (a) he initiates or procures the proceedings without probable cause and primarily for a purpose other than that of bringing an offender to justice, and (b) the proceedings have terminated in favor of the accused."

     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.



246 S.W.3d 621
Supreme Court of Texas.

CITY OF ROCKWALL, Texas, Petitioner,

v.

Vester T. HUGHES, as Sole Independent Executor of
the Estate of W.W. Caruth, Deceased, Respondent.

No. 05–0126. | Argued Jan. 25,
2006. | Decided Jan. 25, 2008.
| Rehearing Denied April 4, 2008.

**Synopsis**

**Background:** After city proposed to annex land under
"sparsely populated" exemption from three-year annexation
plan, declined landowner's petition to include land in
annexation plan, and refused to arbitrate the dispute,
landowner sought order compelling arbitration. The 382nd
Judicial District Court, Rockwall County, Paul Banner, J.,
granted city's plea to the jurisdiction. Landowner appealed.
The Dallas Court of Appeals, 153 S.W.3d 709, reversed and
remanded. City petitioned for review.

**Holdings:** The Supreme Court, Johnson, J., held that:

[1] statute did not create a substantive private right for
landowner to compel arbitration, and thus landowner lacked
standing, and

[2] landowner could pursue a quo warranto action.

Judgment of Court of Appeals reversed and judgment
rendered.

Willett, J., dissented and filed opinion in which Hecht,
O'Neill, and Brister, JJ., joined.

West Headnotes (17)

**[1]**    **Municipal Corporations**
  🔑 Notice
  A municipality generally must annex land
  pursuant to a plan giving three years' notice of

its intent to annex. V.T.C.A., Local Government
Code § 43.052(c).

1 Cases that cite this headnote

**[2]**    **Municipal Corporations**
  🔑 Notice
  If an area is exempt from the three-year notice
  requirement, then annexation can take place by
  use of abbreviated procedures with less notice
  of a city's intent to annex. V.T.C.A., Local
  Government Code § 43.052(h).

1 Cases that cite this headnote

**[3]**    **Appeal and Error**
  🔑 Cases Triable in Appellate Court
  Statutory construction is a legal question
  Supreme Court reviews de novo.

55 Cases that cite this headnote

**[4]**    **Statutes**
  🔑 Language and intent, will, purpose, or
  policy
  In construing statutes, courts ascertain and give
  effect to the Legislature's intent as expressed by
  the language of the statute.

80 Cases that cite this headnote

**[5]**    **Statutes**
  🔑 Defined terms; definitional provisions
  **Statutes**
  🔑 Technical terms
  In construing statutes, courts use definitions
  prescribed by the Legislature and any technical
  or particular meaning the words have acquired.
  V.T.C.A., Government Code § 311.011(b).

71 Cases that cite this headnote

**[6]**    **Statutes**
  🔑 Relation to plain, literal, or clear meaning;
  ambiguity
  **Statutes**

🔑 Plain Language;  Plain, Ordinary, or Common Meaning

Courts construe a statute's words according to their plain and common meaning, unless a contrary intention is apparent from the context, or unless such a construction leads to absurd results.

248 Cases that cite this headnote

**[7]** **Statutes**

🔑 Plain, literal, or clear meaning;  ambiguity

Courts may consider legislative history in construing a statute that is not ambiguous. V.T.C.A., Government Code § 311.023(3).

4 Cases that cite this headnote

**[8]** **Statutes**

🔑 Absence of Ambiguity;  Application of Clear or Unambiguous Statute or Language

**Statutes**

🔑 Extrinsic Aids to Construction

When a statute's language is clear and unambiguous, it is inappropriate to resort to rules of construction or extrinsic aids to construe the language.

58 Cases that cite this headnote

**[9]** **Alternative Dispute Resolution**

🔑 Nature and form of proceeding

Statute providing that "if the municipality fails to take action on the petition [to include the area in the municipality's annexation plan], the petitioner may request arbitration of the dispute," did not create a substantive private right for landowner to compel arbitration when city took action on landowner's petition by denying it, and thus landowner lacked standing to pursue action to compel arbitration. V.T.C.A., Local Government Code § 43.052(i).

1 Cases that cite this headnote

**[10]** **Quo Warranto**

🔑 Nature and scope of remedy

Quo warranto proceedings are used by the State to protect itself and the good of the public through agents of the State who control the proceedings.

3 Cases that cite this headnote

**[11]** **Quo Warranto**

🔑 Exclusiveness of remedy by quo warranto

**Quo Warranto**

🔑 Exercise of powers by municipality

Unless an annexation is wholly void or the Legislature has expressly granted a private right to challenge the annexation in some manner, a quo warranto proceeding brought by the State is the only proper means of attacking a municipality's annexation in court.

6 Cases that cite this headnote

**[12]** **Alternative Dispute Resolution**

🔑 Remedies and Proceedings for Enforcement in General

Statute providing that "if the municipality fails to take action on the petition [to include the area in the municipality's annexation plan], the petitioner may request arbitration of the dispute," allows arbitration to be requested if the city did not bring the landowner's petition up for consideration, or, if it was brought up for consideration, the city failed to take action on it one way or the other, but not if the city denied the petition and refused to put the land into a three-year plan. V.T.C.A., Local Government Code § 43.052(i).

Cases that cite this headnote

**[13]** **Statutes**

🔑 Plain Language;  Plain, Ordinary, or Common Meaning

Ordinary citizens should be able to rely on the plain language of a statute to mean what it says.

7 Cases that cite this headnote

**[14]** **Constitutional Law**

Inquiry Into Legislative Judgment

Supreme Court's standard for construing statutes is not to measure them for logic.

1 Cases that cite this headnote

**[15]    Alternative Dispute Resolution**

Remedies and Proceedings for Enforcement in General

Subchapter of Local Government Code setting out annexation procedures for areas included in three-year plans provides different methodologies for arbitration in three different situations: (1) disputes about a landowner's petition to include an area in the municipality's annexation plan, (2) disputes during negotiations for services to be provided by the municipality, and (3) disputes about whether the service plan has been fulfilled; disputes arising under each different section and its dispute resolution provision must be construed in its own context. V.T.C.A., Local Government Code §§ 43.052(i), 43.056(*l* ), 43.0564.

Cases that cite this headnote

**[16]    Quo Warranto**

Exercise of powers by municipality

Landowner, whose petition to include property in city's three-year annexation plan was denied by city, could pursue a quo warranto action. V.T.C.A., Local Government Code § 43.052(i).

4 Cases that cite this headnote

**[17]    Constitutional Law**

Judicial rewriting or revision

Changing the meaning of a statute by adding words to it is a legislative function, not a judicial function.

7 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*622**  Terry D. Morgan, Terry Morgan & Associates, P.C., James W. Morris Jr., Goins **\*623**  Underkofler Crawford & Langdon, L.L.P., Dallas, F. Dayton Eckert Jr., Law Offices of F. Dayton Eckart Jr., Garland, Bob E. Shannon, Joseph R. Knight, Alice G. McAfee, Baker Botts LLP, Austin, TX, for Petitioner.

R. Matthew Molash, James A. Baker, Robert H. Mow Jr., Dwight A. Shupe, Matthew R. Miller, Garon R. Horton, Hughes & Luce, L.L.P., Dallas, TX, for Respondent.

Theodore Paul Gorski Jr., City of Fort Worth, Fort Worth, Edwin M. Snyder, City Attorney's Office, Denton, M. Scott Norman Jr., Texas Association of Builders, Scott Houston, Texas Municipal League, Austin, Darrin M. Coker, City Attorney for City of Pearland, Pearland, Brian D. Shannon, Texas Tech University School of Law, Lubbock, L. Stanton Lowry, Boyle & Lowry, LLP, Irving, TX, for Amicus Curiae.

**Opinion**

Justice JOHNSON delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice WAINWRIGHT, Justice MEDINA, and Justice GREEN joined.

 **[1]    [2]**   A municipality generally must annex land pursuant to a plan giving three years' notice of its intent to annex. If an area is exempt from the three-year notice requirement, then annexation can take place by use of abbreviated procedures with less notice of a city's intent to annex.

In this case, a landowner sought inclusion in the City of Rockwall's three-year annexation plan. The City denied the request, claimed the proposed annexation was statutorily exempt from the three-year requirement, and gave notice of intent to annex the landowner's territory under abbreviated procedures. The landowner requested that the City arbitrate the dispute. When the City refused, the landowner sought a court order compelling arbitration. The trial court refused to compel arbitration and dismissed the landowner's case for lack of jurisdiction. The court of appeals held that the City must arbitrate. We reverse the judgment of the court of appeals and affirm the trial court's judgment dismissing the suit.

**I. Background**

## A. Annexation Law

The Texas Constitution confers on cities the power to annex land. TEX. CONST. art. XI, § 5. The Legislature prescribes procedures to be used by cities in conducting annexations. *See* TEX. LOC. GOV'T CODEE ch. 43; [1] *Alexander Oil Co. v. City of Seguin,* 825 S.W.2d 434, 439 (Tex.1991). Statutory annexation procedures require municipalities to prepare annexation plans specifically identifying areas which may be annexed beginning on the third anniversary of the date the plan is adopted or amended (a "three-year plan"). *See* TEX. LOC. GOV'T CODEE § 43.052(c). Subchapter 43C sets out annexation procedures for areas included in such three-year plans. *See id.* §§ 43.051–.057.

Section 43.052(h) lists several types of exemptions from three-year plans. One type of area exempted is a "sparsely-populated" area. *Id.* § 43.052(h)(*l* ). If an area is exempt from inclusion in a three-year plan, annexation occurs according to procedures set out in subchapter 43C–1. *See id.* § 43.061 ("This subchapter applies to an area proposed for annexation that is not required to be included in a municipal annexation plan under Section 43.052."). **\*624** Annexations of section 43.052(h)(*l* ) sparsely-populated areas may be initiated subject to 30 days' notice of the first hearing on the proposed annexation. *Id.* § 43.062(b). Annexations under subchapter 43C–1 procedures generally must be completed within ninety days of the time proceedings are begun. *Id.* § 43.064. Cities are prohibited from using the section 43.052(h)(1) "sparsely populated" exemption to circumvent requirements that annexations be pursuant to a three-year plan. *Id.* § 43.052(i).

The controversy before us primarily involves subsections 43.052(c), (h), and (i) which in pertinent part provide as follows:

(c) A municipality shall prepare an annexation plan that specifically identifies annexations that may occur beginning on the third anniversary of the date the annexation plan is adopted. The municipality may amend the plan to specifically identify annexations that may occur beginning on the third anniversary of the date the plan is amended.

....

(h) This section [43.052] does not apply to an area proposed for annexation if: (1) the area contains fewer than 100

separate tracts of land on which one or more residential dwellings are located on each tract....

(i) A municipality may not circumvent the requirements of this section by proposing to separately annex two or more areas described by Subsection (h)(1) if no reason exists under generally accepted municipal planning principles and practices for separately annexing the areas. If a municipality proposes to separately annex areas in violation of this section, a person residing or owning land in the area may petition the municipality to include the area in the municipality's annexation plan. If the municipality fails to take action on the petition, the petitioner may request arbitration of the dispute. The petitioner must request the appointment of an arbitrator in writing to the municipality. Sections 43.0564(b), (c), and (e) apply to the appointment of an arbitrator and the conduct of an arbitration proceeding under this subsection.

## B. The Controversy

The estate of W.W. Caruth (the Estate) owns 405 acres of land (the Caruth property) within a part of the extraterritorial jurisdiction of the City, a home-rule city. In August 2004, the Estate applied to the City for initial approval of a residential development plan for the Caruth property. After the Estate filed its application, the City initiated annexation procedures pursuant to section 43.052(h)(*l* ) in regard to two areas: one included the Caruth property and another included land not contiguous to the Caruth property. The City sent notices of annexation to affected persons [2] pursuant to subchapter 43C–1 procedures for areas exempted from three-year annexation plans. The Estate objected to the City's attempt to annex using subchapter 43C–1 procedures and petitioned the City to include the Caruth property in the City's three-year annexation plan. The Rockwall City Council adopted a resolution rejecting the Estate's request. The Estate then asserted that the City was circumventing section 43.052(c)'s requirement that annexations be carried out pursuant to a three-year plan and requested arbitration pursuant to section 43.052(i). The City responded by advising the Estate that the proposed annexations were exempt from inclusion in a three-year plan **\*625** and the Estate's "request for arbitration [was] not appropriate."

The Estate filed suit in district court seeking an order compelling arbitration pursuant to section 43.052(i) and a temporary restraining order and temporary injunction

preventing the City from proceeding with annexation pending completion of arbitration, including related appeals, if any. The City responded, in part, by filing a plea to the jurisdiction asserting that the Estate did not have standing because the dispute concerned annexation procedures, the suit was a collateral attack on the annexation ordinances and proceedings and the only way to challenge alleged annexation procedural irregularities was through quo warranto proceedings. In support of its plea to the jurisdiction, the City argued, in part, that section 43.052(i) authorized the Estate to request arbitration if the City did not take action on the Estate's petition to be included in a three-year plan but that the City took action on the petition by denying it. The trial court denied the Estate's applications, granted the City's plea to the jurisdiction and dismissed the action.

The Estate appealed. The court of appeals agreed with the Estate's interpretation of section 43.052(i):

> [W]e read the plain language of the statute to provide that, if the City fails to take action on the petition *to include the area in the [three-year] annexation plan,* the landowner may request arbitration of the dispute.

153 S.W.3d 709, 713–14 (emphasis added). The court of appeals reversed and remanded with instructions that the trial court compel arbitration and enjoin the City from proceeding with annexation pending the outcome of arbitration. *Id.* at 714.

In this Court, the City, supported by amicus curiae, [3] maintains that the court of appeals erred in concluding that section 43.052(i) grants a private right to the Estate to elect, and thereby require, arbitration of the Estate's claim even though the City took action on the Estate's petition by denying it. [4] The Estate, also supported by amicus curiae, [5] claims it has standing because section 43.052(i) grants it a substantive, private right to require the City to arbitrate the Estate's claim.

## II. Standard of Review

 **[3]**   **[4]**   **[5]**   **[6]**   **[7]**   **[8]**   Statutory construction is a legal question we review de novo. In construing statutes, we ascertain and give effect to the Legislature's intent as expressed by the language of the statute. *See State, Texas Parks and Wildlife Dept. v. Shumake,* 199 S.W.3d 279, 284

(Tex.2006). We use definitions prescribed by the Legislature and any technical or particular meaning the words have acquired. TEX. GOV'T CODE § 311.011(b). Otherwise, we construe the statute's words according to their plain and common meaning, *Texas Department of Transportation v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004), unless a contrary intention is apparent ***626** from the context, *Taylor v. Firemen's and Policemen's Civil Service Commission of City of Lubbock,* 616 S.W.2d 187, 189 (Tex.1981), or unless such a construction leads to absurd results. *Univ. of Tex. S.W. Med. Ctr. v. Loutzenhiser,* 140 S.W.3d 351, 356 (Tex.2004); *see also Tex. Dep't of Protective and Regulatory Servs. v. Mega Child Care, Inc.,* 145 S.W.3d 170, 177 (Tex.2004) (noting that when statutory text is unambiguous, courts must adopt the interpretation supported by the statute's plain language unless that interpretation would lead to absurd results). We presume the Legislature intended a just and reasonable result by enacting the statute. TEX. GOV'T CODE § 311.021(3). [6] When a statute's language is clear and unambiguous, it is inappropriate to resort to rules of construction or extrinsic aids to construe the language. *See St. Luke's Episcopal Hosp. v. Agbor,* 952 S.W.2d 503, 505 (Tex.1997); *Ex parte Roloff,* 510 S.W.2d 913, 915 (Tex.1974).

## III. Analysis

 **[9]**   The statutory language on which the issue turns provides: "If the municipality fails to take action on the petition, the petitioner may request arbitration of the dispute...." TEX. LOC. GOV'T CODEE § 43.052(i). The Estate urges that the statute be read differently than the plain language reads. The Estate says that the statute "expressly provides for arbitration between a landowner and a city when the city, upon the petition of a landowner, fails to act *to include the landowner's property in a three year annexation plan.*" (Emphasis added). The Estate asks that we affirm the court of appeals' construction to that effect. We decline to do so.

We first address the City's standing argument. In challenging the Estate's standing, the City cites *Alexander Oil Co. v. City of Seguin,* 825 S.W.2d 434 (Tex.1991), for the proposition that the Estate does not have standing because the validity of the City's annexation can only be challenged by a quo warranto proceeding unless the proposed annexation is wholly void. *See id.* at 436 ("The only proper method for attacking the validity of a city's annexation of territory

is by quo warranto proceeding, unless the annexation is wholly void."). The City reasons that the trial court lacked jurisdiction to hear a suit to compel arbitration because the Estate does not allege that the City has no power to annex the areas in question or that the annexation proceedings are otherwise wholly void, but rather alleges only that the City must annex pursuant to the three-year plan procedures of subchapter 43C as opposed to using the more expedited procedures of subchapter 43C–1.

[10]    [11]    In *Alexander Oil,* the City of Seguin passed an ordinance annexing land owned by Alexander Oil Company. *Id.* at 435. Alexander Oil filed suit alleging that Seguin failed to comply with procedures required by the Municipal Annexation Act [7] such as providing proper notice for hearings, conducting the required hearings, and providing an annexation plan. *Id.* at 436. Seguin responded that because the ordinance annexing Alexander Oil's **\*627** property was not void, a quo warranto [8] proceeding by the State was the only proper way to collaterally attack the ordinance and the case should be dismissed. *Id.* The Court agreed with Seguin that procedural irregularities render ordinances voidable, not void. *Id.* at 439. The Court also noted that the Legislature had not expressly provided a private action to set aside annexations where an annexation ordinance is merely voidable. *Id.* at 437. Thus, *Alexander Oil* affirmed the rule that unless an annexation is wholly void or the Legislature has expressly granted a private right to challenge the annexation in some manner, a quo warranto proceeding brought by the State is the only proper means of attacking a municipality's annexation in court. *Id.*

The Estate does not urge that the City's annexation proceeding is void or that the City lacks power to annex the area in question. Nor does the Estate challenge the authorities. The City cites various cases for its contention that the annexation process in general is procedural. *See Werthmann v. City of Fort Worth,* 121 S.W.3d 803 (Tex.App.-Fort Worth 2003, no pet.); *City of Balch Springs v. Lucas,* 101 S.W.3d 116 (Tex.App.-Dallas 2002, no pet.); *City of San Antonio v. Hardee,* 70 S.W.3d 207 (Tex.App.-San Antonio 2001, no pet.). The Estate says those authorities simply are not applicable because none of them interpret the language of section 43.052(i) which is the issue in this case. The Estate maintains that it has standing because subsequent to *Alexander Oil* the Legislature expressly granted landowners a substantive private right to arbitration by enacting section 43.052(i). It argues that when the Legislature enacted comprehensive changes in 1999 to impose order in

annexation law, the cornerstone of the changes was section 43.052(c)'s requirement that municipalities must prepare annexation plans specifically identifying areas that may be annexed beginning on the third anniversary of the date the plan is adopted or amended. According to the Estate, the exemptions of section 43.052(h) have been used regularly by cities to circumvent the three-year planning requirement. The Estate posits that by enacting section 43.052(i), the Legislature must have intended to protect against such abuse by requiring arbitration if a municipality fails to take action on a landowner's petition to incorporate the land into the city's three-year plan and that any other interpretation of the statute would lead to absurd results. As part of its argument, the Estate references the policy of the State which favors arbitration of disputes and the short time frame necessary to complete arbitration if there are no appeals from the arbitration award. *See Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 268 (Tex.1992). The Estate also argues that it would be illogical for the Legislature to have crafted a detailed statutory framework around the requirement that municipalities enact three-year annexation plans, provide for exemptions to the three-year plan requirement, allow landowners to contest whether a city is circumventing the three-year plan requirement by requesting inclusion in a three-year plan, yet require a city to arbitrate the contest only if the city ignores, or "pocket vetoes," the petition.

[12]    But we are not persuaded that the process and result called for by the plain language of the statute is illogical, much **\*628** less absurd. Subchapters 43C and 43C–1 contain extensive provisions in regard to annexations. Section 43.052(i) is detailed in specifying how and when the landowner may present a complaint to the city. It incorporates by reference part, but not all, of section 43.0564's arbitration procedures. And in the midst of the detailed language, we find that the Legislature specifically addressed when arbitration may be requested: "If the municipality fails to take action on the petition...." In regard to "logic," it seems to us that by crafting language specifying when arbitration of the dispute could be requested, legislators logically would have considered that there are two instances in which a dispute would need to be resolved. The first instance is if the city did not bring the landowner's petition up for consideration, or, if it was brought up for consideration, the city failed to take action on it one way or the other (what the parties refer to in this case as a "pocket veto"). The second instance is if the city denied the petition and refused to put the land into a three-year plan. It follows, logically, that because the statutory language as enacted allows arbitration to be requested only in

the first instance, the Legislature's intent was not to provide for arbitration in the second instance. *See Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540 (Tex.1981) ("It is a rule of statutory construction that every word of a statute must be presumed to have been used for a purpose ... [and] we believe every word excluded from a statute must also be presumed to have been excluded for a purpose.").

 **[13]**    Contrary to the Estate's position, we see benefits from reading the statute's language literally. One significant benefit is that by not reading language into the statute when the legislature did not put it there, we do not risk crossing the line between judicial and legislative powers of government as prescribed by article II of the Texas Constitution. TEX. CONST. art. II, § 1. ("[N]o person, or collection of persons, being of one of these [three governmental] departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."). Another benefit is that by interpreting statutes such as this in a straightforward manner, we build upon the principle that "ordinary citizens [should be] able 'to rely on the plain language of a statute to mean what it says.' " *Fitzgerald v. Advanced Spine Fixation Sys.,* 996 S.W.2d 864, 866 (Tex.1999) (quoting *Addison v. Holly Hill Fruit Prods. Inc.,* 322 U.S. 607, 618, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944)).

As presented in this case, construing the statute's language to mean what it says results in a landowner having the right to request arbitration only if a city refuses to include the area in question in a three-year plan, fails to deny the petition, and fails to otherwise accommodate the landowner. The statute as written, in effect, provides a structured method for landowners to seek redress from cities if landowners believe cities are annexing in violation of section 43.052(c). If a landowner petitions to be included in a three-year plan and the city acts on the petition in a way that is acceptable to the landowner, there is no dispute to be resolved. If the city denies the landowner's petition, then the landowner has notified the city of its specific complaint in writing and pursued and exhausted a legislatively-provided method for seeking redress before asking a State's attorney to disrupt the city's annexation process by filing a quo warranto action. *See* TEX. CIV. PRAC. & REM.CODE § 66.002(c) (quo warranto proceedings may be brought by the attorney general or county or district attorney on his or her own motion or at the request of an individual). And a city has the option of taking no **\*629** action to either grant or deny the landowner's petition and, thereby, effectively agreeing to arbitration of the dispute if the landowner requests arbitration. Under this last scenario, the

arbitration essentially is a dispute resolution process agreed to by the parties. In the event multiple landowners submit petitions, the city might delay acting on the petitions in an attempt to have all the petitioning landowners agree to join in one arbitration to resolve the issue(s). If an agreement cannot be reached to join in one arbitration, the city might choose to either grant or deny each petition. The landowners whose petitions are denied have the option of seeking institution of a quo warranto action in which the claims of all landowners will be resolved, instead of the city and each landowner being involved in individual arbitration proceedings.

The literal language of the statute can be viewed as a legislative attempt to encourage cities and landowners to resolve their conflicts without court action. First, if the statute is interpreted according to its literal language—not mandating arbitration if a landowner's petition is denied—the result is that neither landowners nor cities have lost protections which they had prior to the statute's amendment. Landowners will continue to have the right to seek a quo warranto action to challenge the annexation. Cities will continue to be protected because a disinterested party such as the attorney general or a county or district attorney will review and weigh the strength of landowner claims before cities are subjected to litigation and disruption of their annexation processes. By giving landowners the right to request arbitration if cities delay taking action on their petitions, the Legislature gave landowners leverage to push the processes to conclusion, prevent pocket vetoes of petitions to be included in three-year plans and, if necessary, bolster arguments to state's attorneys in support of quo warranto actions to challenge proposed annexations.

 **[14]**    But in any event, our standard for construing statutes is not to measure them for logic. *See Lee v. City of Houston,* 807 S.W.2d 290, 293 (Tex.1991) ("Our function is not to question the wisdom of the statute; rather, we must apply it as written."). As previously noted, our standard is to construe statutes to effectuate the intent of the Legislature, with the language of the statute as it was enacted to be our guide unless the context or an absurd result requires another construction. *See Fitzgerald,* 996 S.W.2d at 866 (Tex.1999) ("[I]t is a fair assumption that the Legislature tries to say what it means, and therefore the words it chooses should be the surest guide to legislative intent."); *Jones v. Del Andersen & Assocs.,* 539 S.W.2d 348, 350 (Tex.1976) ("[The intention of the Legislature] is to be found in the language of the statute itself ... we cannot give Section 28 the limited construction advocated by Andersen. To do so would require that we

read into the statute words which are not there."). In this instance, the context does not indicate that the plain meaning of the language was not intended. The sentence in question addresses a separate subject from the surrounding language: the circumstances under which a city can be requested to arbitrate. It would not have been inconsistent with the context of the sentence for the Legislature to have provided that a landowner could request arbitration if the municipality failed to act favorably upon the landowner's petition or failed to include the landowner's property in a three-year annexation plan. Clearly, though, there is a difference between the meaning of the statute as it is written and the statute as contended for by the Estate.

**\*630** The dissent agrees as to the standards for interpreting the statute and that "words matter" and "context matters." The dissent, however, says that "the most natural reading" of the statute results from adding words to make it mean something other than what the plain words mean. For the reasons we have set out, we disagree that the proper reading of the statute results from changing the language of the statute.

The dissent also references section 43.056(*l* ), the provision for resolving disputes over whether a municipality has complied with the service plan adopted to provide full municipal services to the area to be annexed, and that section's use of the "[i]f the municipality fails to take action" language. A municipality's service plan must be adopted by the municipality's governing body and is a contractual obligation of the municipality by statute. *See* TEX. LOC. GOV'T CODEE § 43.056(j), (k). Whatever construction is eventually given to the language of section 43.056(*l* )— and we venture none here because there is no controversy before us as to that section—it will be according to statutory construction principles. And that construction, when and if it occurs, must take into consideration the context of the language: section 43.056 addresses controversies regarding whether the municipality is fulfilling its service plan contractual commitment. The controversy presented by the present case and the statutory language of section 43.052(i) do not involve the question of whether a municipality is fulfilling a contractual obligation. The controversy involves a governmental decision of whether to annex territory, and if so, how.

In this regard, we note that sections 43.052(i) and 43.056(*l* ) not only differ in the types of disputes they address, but also in how arbitrations of those disputes are to be conducted. Arbitration under section 43.056(*l* ) must be in accordance

with section 43.0565. Section 43.0565(d) specifies three options available to an arbitrator if the arbitrator finds that the municipality has not complied with its service plan requirements. But that same subsection provides that the municipality has the option of disannexing the area in lieu of complying with its service plan. In other words, even if an arbitration occurs pursuant to section 43.056(*l* ), however it comes about, the municipality retains the right to make its own decision as to annexation or disannexation of the property. That prerogative is expressly not ceded to an arbitrator by the statute.

Section 43.052(i), on the other hand, provides only that sections 43.0564(b), (c), and (e) apply to the arbitration referenced in 43.052(i). Those sections address procedures for selecting an arbitrator, setting a hearing, giving notice of the hearing, and powers of the arbitrator in regard to conducting the arbitration. Section 43.052(i) does not prescribe or incorporate any provisions as to issues to be decided by the arbitrator, how long the arbitration is to take, when the arbitrator is to issue a decision, or whether the parties have a right to appeal the arbitrator's decision—all of which are provided by subsections of 43.0564 but not incorporated by 43.052(i). Nor does section 43.052(i) specify what remedies an arbitrator may impose, as does section 43.0565(d).

**[15]** In sum, subchapter 43C provides different methodologies for arbitration in three different situations: (1) disputes under section 43.052(i), (2) disputes during negotiations for services to be provided by the municipality, *see* section 43.0564, and (3) disputes about whether the service plan has been fulfilled. Disputes arising under each different section and its dispute resolution provision must be construed in its own context. That is what we do as to the **\*631** controversy presented by this case: we construe the language of section 43.052(i) in its context.

**[16]** The dissent also states that under our construction of the statute, if a city rejects the landowner's petition, the landowner has no further recourse. That is incorrect. The statute does not deprive the landowner of the right to a quo warranto action, which is the recourse long available to landowners.

**[17]** If the Legislature desires to amend the statute to add words so that the statute will then say what is contended for by the Estate, we are confident it will do so. However, changing the meaning of the statute by adding words to it, we believe, is a legislative function, not a judicial function. *See*

67 TEX. JUR. 3d *Statutes* § 85 (2003) (noting that it is for the Legislature, not the courts, to remedy deficiencies, if any, in laws).

### V. Conclusion

We decline to read additional language into the statute as the Estate urges us to do. We go no further than the unambiguous language of the statute to interpret it. Section 43.052(i) does not create a substantive private right for a landowner to compel arbitration if a municipality takes action on the landowner's petition by denying it, as the City did. Accordingly, the Estate lacks standing to pursue the suit it filed.

We reverse the judgment of the court of appeals and render judgment dismissing the Estate's suit.

Justice WILLET filed a dissenting opinion, in which Justice HECHT, JUSTICE O'NEILL, and Justice BRISTER joined.

Justice WILLETT, joined by Justice HECHT, Justice O'NEILL, and Justice BRISTER, dissenting.
The Court espouses sound principles of statutory construction but unsoundly applies them. Basically, it takes literalism too literally. Read naturally, section 43.052(i) means this: landowners who request inclusion of their land in a city's annexation plan may arbitrate the city's failure to include it.

The City's position—arbitration is only available if the City *ignores* the petition, not if it *rejects* it—makes little sense. Studied in context, the arbitration-triggering phrase "fails to take action" in section 43.052(i) has a more substantively coherent meaning than "fails to take *any* action"; it necessarily means "fails to take *favorable* action." Landowners are seeking a specific outcome: inclusion in the city's annexation plan. The statute grants arbitration if the property remains excluded, and exclusion persists just as surely through *adverse* action as through *inaction.*

The meaning of "fails to take action" is best revealed by how this phrase is used in another Chapter 43 arbitration provision. Applying today's wooden construction to that provision dictates an illogical result that lays bare the Court's misinterpretation. As discussed more fully below, the Court's literalist interpretation would deny residents of areas annexed

by the City of Houston their statutory right to arbitrate the City's failure to provide municipal services to the annexed area if the City rejects the residents' petition to enforce the service plan. As the Court reads "fails to take action," Houstonians deprived of basic city services will have no private remedy.

Read as a whole, the statutory scheme—in both section 43.052(i) and in section 43.056(*l* )—is straightforward and cannot bear the narrow meaning the Court ascribes to it. The Court's unduly restrictive **\*632** reading is foreclosed by statutory context, and because context matters, I respectfully dissent.

### I. When Searching for Statutory Meaning, Words Matter—And So Does Context

The Court aptly describes, then misapplies, the pertinent ground rules for construing statutory language. Words and phrases must be read "in context and construed according to the rules of grammar and common usage."[1] The import of language, plain or not, must be drawn from the surrounding context, particularly when construing everyday words and phrases that are inordinately context-sensitive.[2] Given the power of context to transform the meaning of language, courts should resist rulings anchored in hyper-technical readings of isolated words or phrases,[3] or forced readings that are exaggerated or, at the other extreme, constrained.[4]

This "context matters" maxim—a cardinal rule not only of statutory construction but "of language itself"[5]—is rooted in common sense,[6] Texas statutory law,[7] and caselaw from both this Court[8] and the United States Supreme Court.[9]

 **\*633** Accordingly, when interpreting the (h)(1) exemption for quick annexation of rural land and the arbitration remedy in subsection (i), we must consult the text and structure of surrounding and related provisions. Doing so yields a clear and forthright interpretation that confirms the statute's natural meaning while giving effect to every part of the statute.

Subsection (i) begins: "A municipality may not circumvent the [three-year plan] requirement[ ] by proposing to separately annex two or more areas described by Subsection (h)(1) if no reason exists under generally accepted municipal planning principles and practices for separately annexing

the areas." This proscriptive language sets the context; lawmakers intended arbitration to curb the overzealous use of expedited, piecemeal annexations under subsection (h)(1) in order to evade the three-year planning requirement.

Ignoring this context, the Court adopts the City's view that "fails to take action" means "fails to take *any* action," in other words, when a city succumbs to bureaucratic inertia and does nothing. But if a city rejects a petition outright, the landowner has no further recourse.[10] This interpretation subverts the Legislature's effort to curb abusive annexation tactics.

The City complains that Hughes's interpretation requires arbitration of all requests, no matter how groundless, but the City's rigid interpretation enables it to deny all requests, no matter how meritorious. The Court's holding will effectively prescribe, not proscribe, the very circumvention that subsection (i), by its terms, was intended to cure.[11]

In context, the phrase "fails to take action" captures not only a city's inaction but also a city's overt denial of favorable action. The word "favorable" is implicit, honors the phrase's (and the overall statute's) common-sense meaning, and gives full effect to the statute's objective: giving landowners a specific and workable remedy against abuse of the (h)(1) exemption. **\*634** In my view, the language cannot fairly be read any other way, and the Court's reading almost certainly undermines the Legislature's intent.

## II. The Court's Strained Reading Invites Absurd Results

The Court acknowledges that any interpretation, literal or not, that produces absurd results should be discarded.[12] In my view, the Court's interpretation works multiple absurdities.

### A. The Undeniable Meaning of "Fails to Take Action" Elsewhere in Chapter 43 Undercuts the Court's Literalist Construction of Subsection (i)

Most disconcerting is that the Court's noncontextual analysis cannot be squared with other parts of Chapter 43, principally section 43.056, which centers on the City of Houston's contractual duty to provide must-have services to areas slated for annexation (*e.g.,* fire and police protection, EMS, road maintenance, solid waste collection, water and wastewater facilities).[13] The Legislature in subsection (*l* ) authorizes

Houston residents and landowners to request arbitration to force compliance with the City's service plan, and, strikingly, it uses the very same "fails to take action" phrase that appears in section 43.052(i). Subsection (*l* ) provides:

> A person residing or owning land in an annexed area ... may enforce a service plan by petitioning the municipality for a change in policy or procedures to ensure compliance with the service plan. If the municipality *fails to take action* with regard to the petition, the petitioner may request arbitration of the dispute....[14]

Under long-settled authority, "fails to take action" must mean the same thing here as it does in section 43.052(i).[15] The multiple parallels at work here—the same phrase enacted the same day in the same bill describing the same proceeding—could not present a more "classic case for application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning."[16]

I venture this prediction: if today's case centered not on subsection (i) but on subsection **\*635** (*l* ) and a Houston resident's request to arbitrate the City's alleged breach of a service plan, the Court would read "fails to take action" exactly as I read it in subsection (i). Studied consistently and contextually, the meaning is self-evident: someone in an annexed area can request arbitration to enforce the service plan if the city grants no relief on the petition.

Applying today's construction of "fails to take action," however, if the City of Houston denied a service-plan enforcement petition, arbitration would be unavailable. This reading runs head-long into subsection (*l* )'s two-step process for enforcing City of Houston service plans: (1) a petition urging the City to comply, then (2) arbitration if the petition produces no compliance. The notion that arbitration is possible only if the City refuses to move a bureaucratic muscle is conceptually untenable. The paramount goal of service-plan enforcement is illusory if the City of Houston can foreclose a service-plan challenge simply by rejecting the petition outright. Such a result would render subsection (*l* ) wholly impotent and allow the concerns that prompted its enactment to thrive unchecked.[17] The landowner is seeking to compel obedience to the service plan—a formal "contractual obligation"[18]—and vital city services will remain unprovided whether the City rejects the petition or

ignores it; granting arbitration only if the City's response is dilatory, but not if it is direct, works an absurd result.

The very next sentence in subsection (*l* ) removes any doubt that the Legislature intended "fails to take action" to mean "fails to take favorable action." It authorizes persons living outside of Houston to apply for a writ of mandamus to prod service-plan compliance from their respective cities.[19] It cannot possibly be the law that every Texan outside the Houston city limits can freely and immediately seek mandamus relief to enforce their cities' service plans while Houstonians deprived of basic services and whose enforcement petitions are rejected must hope exclusively for a State-led quo warranto action. Again, this result defeats the fundamental purpose (and contractual promise) of the service-plan statute, but it is necessitated by the Court's construction of section 43.052(i).

Chapter 43 is most coherent and consistent when "fails to take action" means the same thing in both provisions. The Court, however, cites "context" to reserve the right to interpret subsection (*l* ) differently because "sections 43.052(i) and 43.056(*l* ) not only differ in the types of disputes they address, but also in how arbitrations of those disputes are to be conducted."[20] That is true, but also irrelevant; the decisive "fails to take action" language is word-for-word identical and operates the same way—the triggering phrases are grammatical and structural twins—and there is no principled basis for distinguishing the indistinguishable.[21]

### *636  B. The City Says Arbitration Is Possible "Only Under the Narrowest of Circumstances"—Namely, When a City Volunteers

The City's view, at its core, is that a landowner entitled to *request* arbitration is never entitled to *receive* arbitration. Rather, subsection (i) is "an essentially consensual remedy of limited applicability," something vested in the City's absolute discretion.[22] I disagree that cities are only subjected to arbitration if they choose to be. Section 43.052(i), like the identically worded section 43.056(*l* ), grants an actual remedy, not a "consensual" one and not merely a request for one.

The Court's "consensual remedy" holding endorses a path by which cities may circumvent the legislatively preferred three-year plan: "Just Say No"—deny everything and arbitrate

nothing. Under this view, if a city (for reasons I cannot imagine) wanted to cede some of its planning authority, it would ignore the petition. But if a city wanted to retain unfettered control, it would deny the petition. Given how cities prize and safeguard their municipal annexation authority,[23] no rational city would ever renounce power by ignoring a petition when it could redouble power by denying it. If the Legislature intended only to authorize cities to volunteer for arbitration, then no statute was necessary as home-rule cities already possess "all the powers of the state not inconsistent with the Constitution, the general laws, or the city's charter."[24] A city that wants to arbitrate something does not need a statute granting it permission. Because "the legislature is never presumed to do a useless act,"[25] we must presume that it intended something more than voluntary arbitration.

More revealing, though, is the City's argument that all this sound and fury about arbitration and inclusion in the city's annexation plan signifies nothing because the fast-track nature of (h)(1) annexations will quickly moot the entire dispute. As the City noted at oral argument: "If the **\*637** landowner asks to be included in a three-year plan, the city sits on it, that remedy or rather any consideration of whether it should be in a three-year plan is lost [once the area is annexed]."

The underlying facts illustrate the City's position that all landowner action under subsection (i) is ultimately futile:

- the Estate proposed to the City a high-density housing plan in the City's extraterritorial jurisdiction (ETJ)

- five days later the City directed its staff to begin expeditious (h)(1) annexation (goal: to bring the property within the City limits so it could impose *low*-density development restrictions)

- the Estate then petitioned for inclusion in the City's three-year plan (goal: to delay the (h)(1) annexation so it could vest the property's high-density development plan)

Under the City's position, heads the city wins and tails the landowner loses. The calendar is inexorable. Arbitration is forever a mirage because even if a landowner is theoretically entitled to arbitration, the City's annexation—the very annexation being challenged—zooms along the (h)(1) fast track, thus short-circuiting the dispute.

## C. The City's "Pocket Veto" Analogy Is Facially off the Mark

The City says arbitration is possible in exactly one situation: "when a city refuses to consider or evaluate the request —exercising the proverbial 'pocket veto.' " The pocket-veto analogy is inapposite because a pocket veto, classically understood, quickly yields a definitive outcome: rejection. [26]

Accepting arguendo the City's pocket-veto characterization, the Legislature, unlike the United States Constitution, has failed to define the contours, and the Court avoids addressing these concerns, [27] most notably (1) how much time must elapse before the landowner may request arbitration? and (2) what form of "action" suffices to derail arbitration? [28]

 **\*638** Subsection (i) is open-ended and sets no decision-making deadline by which a city must respond to a landowner's petition. If a city sits idle, a landowner has no way of knowing whether the city has merely failed to open its mail or, alternatively, has in fact reviewed the petition but quietly decided not to grant it. What length of city inaction is sufficient before a landowner may seek arbitration? Meanwhile, as the landowner awaits a formal response, the city continues speedily annexing the targeted property under subsection (h)(1).

Moreover, the Court, while purporting to construe "fails to take action" literally, actually spurns its own literalist method. The Court says arbitration is unavailable because the City's categorical refusal amounts to "action." The word "action," however, encompasses a wide range of activities: reviewing a petition, conducting research, convening a hearing, deliberating, etc. [29] Why are these actions not "action"? The Court implicitly limits the word "action" to mean *dispositive* action—when a city formally denies a petition—but the Court cites nothing to explain why *nondispositive* action fails to qualify. By restricting "action" to a yes-or-no decision, [30] the Court has in fact abandoned literalism by reading the statute to mean "fails to take *final* action," a locution that, notably, lawmakers have used elsewhere in the Local Government Code regarding land use regulation, but not here. [31] The Court thus allows context to inform the meaning of "action," but it does so selectively, picking and choosing when it will permit context to guide its statutory analysis.

## III. The Legislature Enacted a Specific Alternative to Quo Warranto in Cases of Alleged Abuse of Subsection (h)(1)

The Court says landowners are no worse off given the possibility of State-initiated quo warranto intervention. The Court reasons that annexation law is largely procedural and that our 1991 decision in *Alexander Oil Co. v. City of Seguin* declared quo warranto the exclusive mechanism to challenge improperly conducted annexations. [32] The Court's analysis is unconvincing.

The Legislature is presumed to understand extant law when it enacts legislation, [33] and if it intended that quo warranto remain a landowner's sole remedy against post–1999 annexation abuses, it would not have enacted a statute that explicitly grants a private arbitration right. [34] This Court recently held that the "truest manifestation" of what lawmakers intended is what lawmakers enacted—the text they actually voted on—and the intent to supersede *Alexander Oil* is found in a statute that does exactly that. [35]

 **\*639** We decided *Alexander Oil* in 1991 largely on the basis that the Legislature had not yet given private individuals a way to challenge annexations. Eight years later, the Legislature did so, granting landowners a defined arbitration right. [36] The Legislature, we must presume, understood the role of quo warranto in challenging annexation proceedings when it provided for arbitration in subsection (i), but the Legislature's comprehensive overhaul makes no mention of quo warranto, much less retains the exclusivity of such relief. The City insists the Legislature's failure to unequivocally declare that it was superseding *Alexander Oil* indicates it never intended to do so. We have never required such declarations, and *Alexander Oil* overtly disclaims the necessity for any such declaration: quo warranto, we said in that case, is the way to attack annexation irregularities *unless* the Legislature has "acted to expressly provide a private action." [37] The Legislature did precisely that post-*Alexander Oil.* [38]

This 1999 legislative exception to the general quo warranto rule provides a simple yet substantive remedy that is complete unto itself: the landowner petitions for inclusion in the three-year plan, and if the land is not added, the landowner may seek arbitration. Subsection (i) never states or suggests that

quo warranto remains part of the legal landscape or that quo warranto must precede arbitration as an intermediate step.

Finally, the City's reliance on three courts of appeals' decisions construing section 43.052 as strictly procedural, and thus subject only to quo warranto challenge, is misplaced. [39] While those courts held that quo warranto is the sole means to attack a city's alleged violation of 43.052, none of those decisions considered the (h)(1) exemption or interpreted subsection (i), focusing instead on other portions of section 43.052.

The remedy for abuse of the sparsely-populated-area exemption is arbitration, which subsection (i) clearly authorizes.

**IV. Conclusion**

The statute in this case speaks for itself. The Court mutes the statute, however, by **\*640** fixating on four words divorced from the surrounding statutory framework. I agree judges must adhere to the language that lawmakers voted on, but statutes operate as a whole and must be read as a whole, not as a hodgepodge of isolated fragments. The Court's noncontextual reading is incompatible with related provisions (including one *identical* provision) in the same statute. Literalism can sometimes border on trivialism and should not be confused with textualism, which considers both statutory text and statutory *context* to ascribe meaning. Today's decision is literalism gone bad.

Hughes is statutorily entitled to arbitration, and because the Court "fails to take action" to enforce that remedy, I respectfully dissent.

**All Citations**

246 S.W.3d 621, 51 Tex. Sup. Ct. J. 349

Footnotes

1    Further references to Local Government Code provisions will generally be by reference to the chapter, section, or subsection number.

2    Section 43.052(i) refers to "persons residing or owning land in the area." We will refer to such persons as "landowners" for ease of reference.

3    This Court has received briefs in support of the City's position from the Texas Municipal League and the Texas cities of Fate, Fort Worth, Denton, and Pearland.

4    The City also maintains that even if section 43.052(i) grants a right to arbitration, the Estate still lacks standing because section 43.052(i) comprises a procedural part of the annexation process and violations of procedural requirements can only be challenged through quo warranto proceedings. We do not reach the argument and express no opinion on it.

5    This Court has received briefs in support of the Estate from Brian Shannon, Associate Dean and Charles "Tex" Thornton Professor of Law at Texas Tech University and by the Texas Association of Builders.

6    We may also consider legislative history in construing a statute that is not ambiguous. *See* TEX. GOV'T CODE § 311.023(3). In this instance we are at a disadvantage because the language in question was crafted by a conference committee, and legislative history does not provide illumination as to how it was formulated.

7    TEX.REV.CIV. STAT. art 970a §§ 6, 10, *repealed by* Act of May 1, 1987, 70th Leg., R.S., ch. 149, § 49, 1987 Tex. Gen. Laws 1306, *now codified as* TEX. LOC. GOV'T CODEE § § 43.052, .053, .056. Further references are to the Local Government Code.

8    Quo warranto proceedings are used by the State to protect itself and the good of the public through agents of the State who control the proceedings. *See Fuller Springs v. State ex rel. City of Lufkin,* 513 S.W.2d 17, 19 (Tex.1974); *State ex rel. Candler v. Court of Civil Appeals, Fourth Supreme Judicial Dist.,* 123 Tex. 549, 75 S.W.2d 253 (1934); *Staples v. State,* 112 Tex. 61, 245 S.W. 639 (1922).

1    TEX. GOV'T CODE § 311.011(a).

2    *Id.* Some familiar words, depending on how they are used, convey polar opposite meanings. For example, the word "sanction" may indicate approval ("I sanction eating that bowl of ice cream.") or disapproval ("My wife will sanction me for eating that bowl of ice cream."). *See* WEBSTER'S NEW WORLD DICTIONARY & THESAURUS 566 (Michael Agnes, ed., 2d ed.2002). Its meaning—permission or prohibition—turns entirely on context.

3    *Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004) ("We must read the statute as a whole and not just isolated portions.").

4  *Cities of Austin, Dallas, Ft. Worth, & Hereford v. Sw. Bell Tel. Co.,* 92 S.W.3d 434, 442 (Tex.2002).

5  *Deal v. United States,* 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993).

6  As noted above, some words are auto-antonyms that can mean diametrically opposite things depending on the context. The word "fast," for example, can mean "swift" or "firmly fastened." *See* WEBSTER'S, *supra* note 2, at 233. The word "cleave" can mean "to adhere" or "to divide." *See id.* at 112. In my view, the Court's decision today "cleaves" to a myopic approach that "cleaves" literal meaning from plain meaning.

7  *See* TEX. GOV'T CODE § 311.011(a).

8  For example, in *Tooke v. City of Mexia,* 197 S.W.3d 325 (Tex.2006), our sole objective was to define the meaning of "sue and be sued"-type language. Rather than concluding that these simple and apparently unambiguous words have one, definitive meaning, we recognized that "the import of these phrases cannot be ascertained apart from the context in which they occur." *Id.* at 329; *see also, e.g., City of Sunset Valley,* 146 S.W.3d at 642.

9  In *Deal,* the Court identified numerous possible meanings of "conviction" in a bank robbery statute but reasoned that "of course susceptibility of all of these meanings does not render the word 'conviction,' whenever it is used, ambiguous; all but one of the meanings is ordinarily eliminated by context." 508 U.S. at 131–32, 113 S.Ct. 1993.

   The author of *Deal,* Justice Scalia, was determined to drive home this point, as he wrote a dissent two weeks later in *Smith v. United States,* 508 U.S. 223, 241–47, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), which centered on the meaning of "using a firearm" and where Justice Scalia again stressed the importance of giving words their fair meaning:

   To use an instrumentality ordinarily means to use it for its intended purpose. When someone asks, "Do you use a cane?," he is not inquiring whether you have your grandfather's silver-handled walking stick on display in the hall; he wants to know whether you *walk* with a cane. Similarly, to speak of "using a firearm" is to speak of using it for its distinctive purpose, *i.e.,* as a weapon.

   *Id.* at 242, 113 S.Ct. 2050.

   The Court is equally attuned to context in civil cases. In *Textron Lycoming Reciprocating Engine Division v. UAW of America,* 523 U.S. 653, 118 S.Ct. 1626, 140 L.Ed.2d 863 (1998) (construing "suits for violation of contracts"), the Union urged a narrow focus on the meaning of the preposition "for," but the Court refused to turn statutory interpretation into a brain teaser and instead insisted on a natural reading that examined each word in context, not under a microscope. *Id.* at 656–58 ("It is not the meaning of the word 'for' we are seeking here, but the meaning of '[s]uits for violation of contracts.' " (alteration in original)).

10  While this opinion uses the term "landowner" for simplicity, section 43.052(i) makes clear that a petitioner may be either "a person residing or owning land in the area." *Id.*

11  The record suggests that few cities enact three-year municipal annexation plans. In fact, amicus curiae The Texas Municipal League ("TML"), an association of more than 1,070 incorporated cities that advocates municipal interests, notes that many of its member "cities will have a one page plan stating that they do not intend to annex any area for which an annexation plan is required." *See* SCOTT N. HOUSTON, TEX. MUN. LEAGUE, MUNICIPAL ANNEXATION IN TEXAS: "IS IT REALLY THAT COMPLICATED?" 13 (2003, updated Nov. 2004), *available at* htt p://www.tml.org/ legal_ pdf/ANNEXATION111704.pdf. The City of Rockwall's annexation "plan" is a near carbon copy: "[t]he City does not intend to annex any territory that in order to be annexed, is required to be in an annexation plan." City of Rockwall, Tex., Ordinance 99–49 (Dec. 20, 1999). Hughes argues that such "plans" clash with a key objective underlying the Legislature's 1999 rewrite, that annexation decisions should be driven not by circumvention of the three-year planning process but by order, thoughtfulness, and predictability. Judging by the myriad amicus briefs filed by Texas cities, expedited annexations under (h)(1) are so common that (h)(1) is actually the rule. TML's brief admits as much, saying the (h)(1) exception "is routinely used by most home rule cities. Only a handful of cities annex under an annexation plan" at all.

12  *See* 246 S.W.3d 627.

13  The statute defines the service plan as a contract between the city and the annexed area. TEX. LOC. GOV'T CODEE § 43.056(k) ("On approval by the governing body, the service plan is a contractual obligation...."). This contract establishes the method that the city will follow in extending services to the newly annexed area. TEX. LOC. GOV'T CODE E § 43.056(b).

14  TEX. LOC. GOV'T CODEE § 43.056(*l*) (emphasis added). Compare this statute with section 43.052(i): "If the municipality fails to take action on the petition, the petitioner may request arbitration of the dispute." It seems beyond serious dispute that "fails to take action *with regard to* the petition" in subsection (*l*) means exactly the same thing as "fails to take action *on* the petition" in subsection (i).

15  *See Comm'r of Internal Revenue v. Lundy,* 516 U.S. 235, 249–50, 116 S.Ct. 647, 133 L.Ed.2d 611 (1996), *superseded by statute,* Taxpayer Relief Act of 1997, Pub.L. No. 105–34, sec. 1282(a), 111 Stat. 1037 (codified as amended at 26

U.S.C. § 6512); *see also Dallas County Cmty. Coll. Dist. v. Bolton,* 185 S.W.3d 868, 873 (Tex.2005) ("We must interpret a statute according to its terms, giving meaning to the language consistent with other provisions in the statute."); *Paddock v. Siemoneit,* 147 Tex. 571, 218 S.W.2d 428, 435 (Tex.1949) (observing that the same words must be given the same meaning unless context dictates otherwise).

16 *Lundy,* 516 U.S. at 250, 116 S.Ct. 647 (internal quotation marks omitted) (quoting *Sullivan v. Stroop,* 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990)); *see also Paddock,* 218 S.W.2d at 435.

17 *See* HOUSTON, *supra* note 11, at 5–8 (describing the furor surrounding the City of Houston's annexation of suburban Kingwood in 1996, a controversy that fueled the Legislature's 1999 overhaul of Texas annexation law).

18 *See supra* note 13.

19 TEX. LOC. GOV'T CODEE § 43.056(*l*) ("A person residing or owning land in an annexed area ... may enforce a service plan by applying for a writ of mandamus....").

20 246 S.W.3d 630.

21 Besides eviscerating the arbitration provision in section 43.056(*l*) regarding service-plan enforcement, the Court's holding also nullifies parts of section 43.056(i) above and beyond the arbitration provision itself. For example, subsection (i) features a cost-shifting penalty provision whereby arbitrators can sanction landowners if the petition was "groundless or requested in bad faith or for the purposes of harassment." It is inconceivable, however, that any right-minded city would ever submit to city-funded arbitration of *any* petition, much less a baseless one, if it knew that it could dodge arbitration just by denying the petition outright.

22 At oral argument, the City insisted that a valid arbitration request alone cannot trigger arbitration or justify a court order compelling arbitration:

COURT: So does 43.052 give a private landowner any right at any time under any circumstances to sue for an order compelling arbitration?

RESPONSE: No, it doesn't....

COURT: So even when the city fails to act one way or the other, they sit on it for whatever reason, there is still no private right of action to compel arbitration?

RESPONSE: Well, that's correct. We take that position....

23 Cities regard the broad, unilateral power to annex as a matter of municipal life and death: "According to many national authorities, this annexation power is the primary difference between the flourishing cities of Texas and the declining urban areas in other parts of the nation." *See* HOUSTON, *supra* note 11, at 10.

24 *Proctor v. Andrews,* 972 S.W.2d 729, 733 (Tex.1998) (observing that the Legislature may restrict the power of home-rule cities that derive their plenary power directly from the Constitution); *see also* TEX. CONST. Art. XI, § 5.

25 *Hunter v. Fort Worth Capital Corp.,* 620 S.W.2d 547, 551 (Tex.1981); *see also Travis County v. Pelzel & Assocs., Inc.,* 77 S.W.3d 246, 249–50 (Tex.2002), *superseded by statute,* TEX. LOC. GOV'T CODEE § 262.007; *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.,* 966 S.W.2d 482, 485 (Tex.1998).

26 A true pocket veto occurs when the President fails to sign a bill passed by Congress within ten days, if Congress is not in session at the end of those ten days. U.S. CONST. art. I, § 7, cl. 2; *see also The Pocket Veto Case,* 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929). Timing is the critical element. The President can only kill legislation with a pocket veto if Congress adjourns before the ten days expire; if Congress remains in session, and ten days elapse, then the bill automatically becomes law without the President's signature. U.S. CONST. art. I, § 7, cl. 2.

27 246 S.W.3d 628.

28 The City argues that two other Texas statutes use the phrase "fails to take action" to mean "fails to take *any* action" and not overt rejection. *See* TEX. LOC. GOV'T CODEE § 232.096 (authorizing commissioner's courts to approve or disapprove plat decisions of a land planning commission and providing that if the court "fails to take action" within thirty days, the commission's decision becomes final); TEX. OCC.CODE § 262.1025 (authorizing the State Board of Dental Examiners to review rules proposed by an advisory committee and providing that if the board fails to take action on the recommendation within ninety days, it must adopt the recommendation). These two statutes are facially different. In both, one governmental body is reviewing the prior decision or proposal of another governmental body; if the reviewing body "fails to take action" for a specified number of days, the prior decision is ratified by operation of law. The annexation statute, by contrast, lacks this critical "deeming" feature. The City's theory leaves the landowner in perpetual limbo since inaction is never treated as either approval or rejection of the landowner's petition, no matter how much time elapses. Meanwhile, the challenged annexation proceeds unabated. The reason the identical phrase "fails to take action" is interpreted differently in these other statutes is because the surrounding language is different in these other statutes. Again, context controls.

29 According to BLACK'S LAW DICTIONARY, "action" means "[t]he process of doing something; conduct or behavior." BLACK'S LAW DICTIONARY 31 (8th ed.2004).

30 *See, e.g.,* 246 S.W.3d 628 ("[T]he city failed to take action on it one way or the other....").

31 The Legislature, for example, says if a county planning commission "fails to take *final* action" on a completed plat application within sixty days, the applicant may seek mandamus relief "to compel the planning commission to approve or disapprove the plat." TEX. LOC. GOV'T CODE E § 232.096(g) (emphasis added).

32 825 S.W.2d 434, 436–37 (Tex.1991).

33 *In re Pirelli Tire, L.L.C.,* 247 S.W.3d 670 (Tex.2007).

34 Again, "the legislature is never presumed to do a useless act." *Hunter v. Fort Worth Capital Corp.,* 620 S.W.2d 547, 551 (Tex.1981).

35 *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644, 651–52 (Tex.2006).

36 Act of May 31, 1999, 76th Leg., R.S., ch. 1167, § 4, sec. 43.052(i), 1999 Tex. Gen. Laws 4074, 4076–77.

37 *Alexander Oil,* 825 S.W.2d at 437.

38 The Court posits the specter of multiple "individual arbitration proceedings" as another basis for its pro-quo-warranto holding. 246 S.W.3d. 629. To be sure, the City and various amici predict calamitous and "drastic implications" if we interpret the statute to provide a private arbitration right. I concede that landowner-invoked arbitration may well saddle cities with real and nonincidental costs. I also understand the City's fear that developers will (1) target areas within the ETJ for dense, out-of-character projects that clash with the city's overall vision for the area and (2) use arbitration under subsection (i) as a delaying tactic or as negotiating leverage. These arguments, however, are rooted in policy and prudential concerns, which are quintessential legislative judgments, not judicial ones. Burdensome or not, the costs and hassles attending arbitration were, I would conclude, presumed acceptable by the Legislature, and in any event, avoidable if cities scrupulously complied with the statute's three-year annexation plan requirement in lieu of successive fast-track annexations under (h)(1).

39 The City cites *Werthmann v. City of Fort Worth,* 121 S.W.3d 803, 807 (Tex.App.-Fort Worth 2003, no pet.); *City of Balch Springs v. Lucas,* 101 S.W.3d 116, 122 (Tex.App.-Dallas 2002, no pet.); *City of San Antonio v. Hardee,* 70 S.W.3d 207, 212 (Tex.App.-San Antonio 2001, no pet.).

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# I

98 Tex. 151
Supreme Court of Texas.

CITY OF SAN ANTONIO

v.

TALERICO et al.

June 16, 1904.

Error to Court of Civil Appeals of Fourth Supreme Judicial
District.

Action by Willie Talerico against the city of San Antonio, in
which the St. Joseph's Orphan Asylum was impleaded. There
was a judgment of the Court of Civil Appeals (for opinion,
see 78 S. W. 28) affirming a judgment for plaintiff against
defendant city and dismissing the orphan asylum from the
case, and defendant city brings error. Judgment for plaintiff
affirmed, and judgment of dismissal reversed.

West Headnotes (5)

**[1]** **Appeal and Error**
 Incompetent or immaterial evidence

The admission of incompetent testimony to
contradict other incompetent testimony is
harmless.

Cases that cite this headnote

**[2]** **Appeal and Error**
 Necessity

Appellate courts may consider without
assignment of errors, rulings of trial courts which
are fundamental in character, or which determine
a question upon which the very right of the case
depends.

19 Cases that cite this headnote

**[3]** **Appeal and Error**
 Pleadings and rulings thereon

Rulings of trial courts sustaining or overruling
general demurrers to a petition on the ground of
its insufficiency or sufficiency to state a cause of

action are fundamental, and may be reviewed on
appeal without assignments of error, although,
in addition to the general demurrer, there were
special exceptions, which might have been well
taken, and which could only be reviewed under
specific assignments of error.

21 Cases that cite this headnote

**[4]** **Limitation of Actions**
 Indemnity

A person injured by a defect in a sidewalk
caused by a property owner, who was therefore
primarily liable, sued the city, which impleaded
the property owner. Held that, as no cause of
action in favor of the city against the property
owner accrued in favor of the former until it
had suffered damage by the latter's act, i.e. until
recovery against it, the fact that the city did not
file its answer impleading the property owner
until two years after the injury to plaintiff did not
bar the city's action for indemnity.

37 Cases that cite this headnote

**[5]** **Municipal Corporations**
 Parties

In an action against a city for injuries caused by a
defective sidewalk, a pleading, filed by the city,
showing that a property owner caused the defect
without the city's knowledge or consent, made a
case for impleading such property owner as the
party primarily liable.

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*152** **\*\*519** William Aubrey and Chas. C. Cresson, for
plaintiff in error.

**\*153** P. H. Swearingen, H. C. Carter, and Perry J. Lewis, for
defendant in error Talerico.

T. F. Shields, for defendant in error orphan asylum.

## Opinion

*154 WILLIAMS, J.

Willie Talerico, one of the defendants in error, brought this action against the city to recover damages for personal injuries received by him in stepping in a hole which the city had negligently allowed to exist in a sidewalk on one of its streets. The city caused the St. Joseph's Orphan Asylum to be made a party defendant, and sought judgment over against it in case plaintiff recovered. The pleading by which this was done appears to be full and specific in all its allegations. It will be sufficient for the purposes of this opinion to state that such pleading, construed, as it must be, in connection with plaintiff's petition, fully alleged that the dangerous condition of the sidewalk was created by the action of the St. Joseph's Orphan Asylum, and that the injury for which plaintiff sought to recover was caused by its negligence in making the sidewalk with the hole in it, and the bridge by which the hole was hidden from plaintiff, in consequence of which he stepped into it, and that this was done without the knowledge or consent of the city. It also set up ordinances by which it was made the duty of lot owners to keep the sidewalks in front of their property in repair, and subjected such owners to prescribed penalties for not repairing sidewalks within a given time after notice to do so, and also made it unlawful for any person to place obstructions in streets, etc. St. Joseph's Orphan Asylum, to this pleading, answered by general demurrer and 10 further exceptions, styled by the pleader 'special exceptions.' The general demurrer and all special exceptions except the one setting up limitation were sustained, this defendant was dismissed from the case, and plaintiff recovered judgment against the city. Upon appeal the Court of Civil Appeals refused to consider the assignment of error made by the city attacking the ruling in favor of St. Joseph's Orphan Asylum, and affirmed the judgment in favor of plaintiff against the city.

In its application for writ of error the city has assigned many rulings made in the trial between it and plaintiff, and also the action in the court below in favor of St. Joseph's Orphan Asylum. We have examined all of the points urged, and see no reason to disturb the judgment in favor of the plaintiff.

The assignment of error made in the Court of Civil Appeals against the St. Joseph's Orphan Asylum was to the 'sustaining the general demurrer and special exceptions' of that party and dismissing the cause *155 as to it. We may concede that this is too general to require the court to consider any ruling to present which an assignment of error is necessary. But

it is the practice of the appellate courts to consider without assignment rulings of the trial courts which are 'fundamental in character,' or which determine 'a question upon which the very right of the case depends.' Wilson v. Johnson, 94 Tex. 276, 60 S. W. 242. It has always been regarded as proper for the appellate court, before affirming a judgment, to see that the petition states a good cause of action, since nothing short of that will sustain a judgment in favor of a plaintiff. Dean v. Lyons, 47 Tex. 18; Browne v. Johnson, 29 Tex. 40. It is true that this court has said in a number of its opinions that assignments of error specifying the overruling of general and special exceptions, of which there were several, were too general. But we think it may be safely assumed that in such cases the pleadings were regarded as sufficient to sustain the judgments based upon them, and that all that was meant was that the assignments were insufficient to raise any question requiring an assignment. Were it otherwise, those decisions would be in conflict with the practice established by many others. If the overruling a general demurrer going to the foundation of the action will be examined without an assignment, 'it would seem to follow,' as is well said by Mr. Justice Fly in Hall v. Jackson (Tex. Civ. App.) 40 S. W. 47, 'that a judgment sustaining a general demurrer, which is a declaration that no cause of action exists, would be fundamental, and therefore should be considered, although the error is not assigned.' The Court of Civil Appeals were of the opinion that the rule referred to would not apply in this case because there were, in addition to the general demurrer, special exceptions, which may **520 have been properly sustained, and the merits of which would only be examined under specific assignments of error. But the fact, if it existed, that special exceptions to the form and manner of stating the cause of action were well taken, would not sustain a ruling on general demurrer that plaintiff had no cause of action. Everett v. Henry, 67 Tex. 405, 3 S. W. 566; Porter v. Burkett, 65 Tex. 387. We think it clear that the general demurrer was improperly sustained. The pleading showed that St. Joseph's Orphan Asylum was the original and active perpetrator of th wrong for which the city, without participation therein, but only by reason of its passive negligence, was sought to be held responsible. A case was made for impleading the party thus primarily liable. City of San Antonio v. Smith, 94 Tex. 266, 59 S. W. 1109, and authorities cited.

Most of the other exceptions were either mere repetitions of the general demurrer, or reasons assigned, which, if well founded, would have justified sustaining it. What we have said answers most of them. We may remark, however, that the view of the pleading by which it is held to show a cause of action is not based upon the charter and ordinances of the

city. Whether or not, as alleged, they would impose a liability of the character asserted, it is unnecessary to decide. The view taken is based upon the general principles of law laid down in the authorities cited, by which the active wrongdoer may be made to **\*156** indemnify one who has been subjected to, or is sought to be held liable for, damage through his wrong. This is enough to show that the general demurrer was improperly sustained.

St. Joseph's Orphan Asylum, in the Court of Civil Appeals, made a cross-assignment of error upon the overruling of the exception invoking the two-years statute of limitations. The pleadings showed that the injury to plaintiff happened more than two years before the filing of the answer of the city impleading the asylum. The ruling was correct. No limitation against the city ever commenced to run so long as it had no cause of action, and a cause of action could only arise in its favor when it sustained damage from the act of the asylum. According to the strict rules of the common law it could not have brought any other party into this litigation, and could have maintained no independent action, until the suit had terminated by judgment, or it had paid the damages to plaintiff. Hence no limitation would have run against it.

Inhabitants of Veazie v. The Penobscot Railroad Co., 49 Me. 119. It is permitted by our law to bring into the suit against it the party whom it seeks to hold liable as an indemnitor, in order that protection may be given to it by the same judgment that fixes its liability; but this does not make the limitation applicable to the cause of action of the plaintiff control its action over against the indemnitor. In bringing in another party it has no right to delay the suit of the plaintiff, to which such other party is not essential, and it is not at all necessary that the plaintiff's rights should be further involved in the litigation between the two defendants.

The judgment in favor of the plaintiff against the city may be affirmed, and that in favor of St. Joseph's Orphan Asylum may be reversed, and the cause remanded for a trial of the issues between it and the city, without prejudicing the rights of any of the parties. City of San Antonio v. Smith, supra. It is accordingly so ordered.

**All Citations**

98 Tex. 151, 81 S.W. 518

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

J

460 S.W.3d 714
Court of Appeals of Texas,
Dallas.

Stephen W. Clark, Appellant

v.

Dillard's, Inc. and The Campbell
Agency, Inc., Appellees

No. 05–13–01503–CV    |
Opinion Filed March 25, 2015

**Synopsis**
**Background:** Fashion model brought action against department store and modeling agency, alleging claims including misappropriation of likeness and unjust enrichment based on assertion that photographs of model were used without his permission. After jury trial, the 44th Judicial District Court, Dallas County, entered judgment in favor of model as to unjust enrichment claim and entered take-nothing judgment as to other claims. Model appealed.

**Holdings:** The Court of Appeals, Myers, J., held that:

[1] store's use of model's image on packages of underwear was not inherently undiscoverable, and therefore discovery rule did not apply to toll limitations period on model's claim for unjust enrichment;

[2] model did not establish an imminent threat of irreparable injury, as could support grant of injunctive relief; and

[3] model's complaint failed to state claim for unfair competition.

Affirmed in part, reversed in part, and rendered.

West Headnotes (31)

**[1]** **Limitation of Actions**
 Causes of action in general
A cause of action generally accrues, and the statute of limitations begins to run, when facts come into existence that authorize a claimant to seek a judicial remedy.

Cases that cite this headnote

**[2]** **Limitation of Actions**
 Questions for Jury
The date a cause of action accrues is normally a question of law.

Cases that cite this headnote

**[3]** **Implied and Constructive Contracts**
 Unjust enrichment
Unjust enrichment occurs when the defendant has wrongfully secured or passively received a benefit from another that would be unconscionable to retain, and the defendant obtained the benefit from the plaintiff by fraud, duress, or the taking of an undue advantage.

Cases that cite this headnote

**[4]** **Limitation of Actions**
 Contracts;  warranties
Department store's use of fashion model's image on packages of underwear was not inherently undiscoverable, and therefore discovery rule did not apply to toll limitations period on model's claim for unjust enrichment based on use of image, despite argument that model spent large parts of each year outside country and, even when in county, never went to that particular department store; image was used on packaging for products prominently displayed in stores open to the public and thus was readily observable and on public display. Tex. Civ. Prac. & Rem. Code Ann. § 16.003.

Cases that cite this headnote

**[5]** **Limitation of Actions**
 In general;  what constitutes discovery
The discovery rule is a very limited exception to statutes of limitations that defers the accrual of the cause of action until the injury was or could have reasonably been discovered.

Cases that cite this headnote

**[6]     Limitation of Actions**

🔑 In general;  what constitutes discovery

The discovery rule applies to toll the statute of limitations only when the nature of the plaintiff's injury is both inherently undiscoverable and objectively verifiable.

Cases that cite this headnote

**[7]     Limitation of Actions**

🔑 Questions for Jury

Whether the discovery rule applies to toll the statute of limitations in a given context is a question of law.

Cases that cite this headnote

**[8]     Limitation of Actions**

🔑 In general;  what constitutes discovery

An injury being inherently undiscoverable, as could support application of discovery rule to toll limitations period, does not mean that plaintiff failed to discover injury within limitations period; instead, court determines whether an injury is inherently undiscoverable on a categorical basis in which the focus is on the type of injury rather than a particular injury.

Cases that cite this headnote

**[9]     Limitation of Actions**

🔑 In general;  what constitutes discovery

An injury is inherently undiscoverable, as could support application of discovery rule to toll limitations period, if by its nature, it is unlikely to be discovered within the limitations period despite due diligence.

Cases that cite this headnote

**[10]    Limitation of Actions**

🔑 In general;  what constitutes discovery

A wrong or injury is not inherently undiscoverable, as could support application of

discovery rule to toll limitations period, if it generally is capable of detection within the time allotted for bringing such suits.

Cases that cite this headnote

**[11]    Limitation of Actions**

🔑 In general;  what constitutes discovery

**Limitation of Actions**

🔑 Questions for Jury

Whether an injury is inherently undiscoverable, as could support application of discovery rule to toll limitations period, is a legal question decided on a categorical basis rather than case-specific basis.

Cases that cite this headnote

**[12]    Appeal and Error**

🔑 Particular orders or rulings reviewable in general

Trial court's denial of fashion model's motion for summary judgment on claim against department store for misappropriation of likeness was not appealable, where trial court also denied store's motion for summary judgment on claim, and claim was subsequently tried on merits before a jury.

Cases that cite this headnote

**[13]    Injunction**

🔑 Protection of name or likeness

Fashion model did not establish an imminent threat of irreparable injury, as could support grant of injunctive relief in model's action against department store seeking injunction to restrain store's allegedly unauthorized use of model's likeness on packaging of underwear, where store had changed its packaging of the underwear to show a different model's picture.

Cases that cite this headnote

**[14]    Injunction**

🔑 Grounds in general;  multiple factors

To be entitled to an injunction, a plaintiff must plead and prove: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury.

Cases that cite this headnote

**[15]    Injunction**
 Irreparable injury

**Injunction**
 Recovery of damages

An assertedly imminent injury is irreparable, as could support grant of injunction, if the injured party cannot be compensated in damages or if the damages cannot be measured by any certain monetary standard.

Cases that cite this headnote

**[16]    Antitrust and Trade Regulation**
 Particular cases

Fashion model's complaint against department store failed to state claim for unfair competition, in case in which model alleged that store engaged in unauthorized use of model's image on underwear packaging, where complaint did not allege that store's use of image created a likelihood of confusion of the public.

Cases that cite this headnote

**[17]    Antitrust and Trade Regulation**
 Sponsorship, approval, or connection, representations concerning

The tort of unfair competition concerns the use of another's good will with the public to gain a competitive advantage in the market; any practice which may mislead customers into believing that the product of the defendant is endorsed by or somehow connected to the plaintiff falls within the parameters of the tort.

Cases that cite this headnote

**[18]    Antitrust and Trade Regulation**
 Confusion or deception

**Antitrust and Trade Regulation**
 Sponsorship, approval, or connection, representations concerning

**Antitrust and Trade Regulation**
 Passing off or Palming off

Unfair competition is a common law tort that occurs when one business entity "palms off" its products as those of another; the determinative question is whether the tortfeasor's practices are likely to mislead customers into believing that the product emanates from or has been endorsed by the claimant, and the test is likelihood of confusion.

Cases that cite this headnote

**[19]    Declaratory Judgment**
 Pendency of other action

A declaratory judgment is not available to settle legal disputes already pending before the court.

Cases that cite this headnote

**[20]    Declaratory Judgment**
 Pendency of other action

Disputes encompassed by declarations sought by fashion model to determine what rights, if any, of model were transferred, affected, or otherwise released by any agreement among modeling agency, third party contractor, and department store were already before the trial court in model's action alleging misappropriation of his likeness by store, and thus disputes could not be subject of declaratory judgment, where store's defense to model's misappropriation of likeness claim was that it paid for full use of model's image and that contractor told store that it would have the right to reproduce photographs of model at will so long as invoice for photographs was paid.

Cases that cite this headnote

**[21]    Appeal and Error**
 Grounds for Sustaining Decision Not Considered

An appellant must attack every ground on which summary judgment could have been granted in order to obtain a reversal.

Cases that cite this headnote

**[22]** **Appeal and Error**
 Grounds for Sustaining Decision Not Considered

If an appellant fails to challenge one of the grounds for summary judgment, an appellate court may affirm the summary judgment on that ground alone.

1 Cases that cite this headnote

**[23]** **Fraud**
 Fiduciary or confidential relations

A fiduciary relationship is an extraordinary one and will not be created lightly.

Cases that cite this headnote

**[24]** **Fraud**
 Fiduciary or confidential relations

The mere fact that one party to a relationship subjectively trusts the other does not indicate the existence of a fiduciary relationship.

Cases that cite this headnote

**[25]** **Fraud**
 Presumptions and burden of proof

The party claiming a fiduciary duty has the burden of proving that a fiduciary duty exists.

Cases that cite this headnote

**[26]** **Principal and Agent**
 Nature of the relation in general

Agency is a consensual relationship between two parties by which one party acts on behalf of the other subject to the other's control.

Cases that cite this headnote

**[27]** **Principal and Agent**

 Nature of the relation in general

To prove agency, a party must prove the alleged principal has the rights: (1) to assign the agent's task, and (2) to control the means and details of the process by which the agent will accomplish that task.

Cases that cite this headnote

**[28]** **Principal and Agent**
 Contractor

It is primarily the extent of the principal's control over the details of the agent's accomplishing the assigned task that distinguishes an agent from an independent contractor.

Cases that cite this headnote

**[29]** **Appeal and Error**
 Reply briefs

An appellant may not present arguments for the first time in a reply brief.

1 Cases that cite this headnote

**[30]** **Appeal and Error**
 Instructions

Trial court's statement in off-the-record conference, that to the extent to which court's jury charge included instructions or questions which either party had not included in its proposed charge, "the request to excise same is denied" did not constitute a specific objection by fashion model to two jury questions as allegedly internally inconsistent and incorrect as matter of law, as would be required to preserve objection for appeal, in model's action against department store for misappropriation of likeness and unjust enrichment.

Cases that cite this headnote

**[31]** **Evidence**
 Records and decisions in other actions or proceedings

Trial court was not required to take judicial notice of complaint filed in another action, which

fashion model alleged was relevant to issue of punitive damages in model's action against department store alleging misappropriation of likeness and unjust enrichment from store's use of model's image, where jury did not find that model's harm resulted from store's malice and thus never reached the punitive damages stage. Tex. R. Evid. 201(d).

Cases that cite this headnote

**\*717** On Appeal from the 44th Judicial District Court, Dallas County, Texas, Trial Court Cause No. DC–11–12848–B. Eric Moye, Judge.

**Attorneys and Law Firms**

Stephen A. Kennedy, Dallas, TX, for appellants.

Ophelia Camina, Andrew Robertson, Michael James Noordsy, Brian Sheguit, Dallas, TX, for appellees.

Before Justices Bridges, Lang–Miers, and Myers

## OPINION

Opinion by Justice Myers

This case involves claims by a fashion model, Stephen W. Clark, against a department store, Dillard's, Inc., and a modeling agency, The Campbell Agency, Inc. (TCA). Clark sued Dillard's and TCA after pictures of Clark were used without his permission on packages of underwear that were sold in Dillard's stores nationwide. Based on the jury's verdict, the trial court awarded Clark damages of $4,500 against Dillard's for unjust enrichment and ordered that Clark take nothing on his other claims.

Clark brings seven issues on appeal, contending the trial court erred by (1) denying Clark's motion for summary judgment on misappropriation of likeness; (2) granting Dillard's motion for summary judgment on some of Clark's claims against it; (3) granting TCA's motion for summary judgment on all of Clark's claims against it; (4) constructively striking Clark's expert witness; (5) failing to take judicial notice of past pleadings; (6) refusing to consider requiring Dillard's disgorgement of profits as a remedy in this case; and (7) overruling Clark's objections to incorrect and inconsistent

jury questions. Dillard's brings a cross-appeal, contending the trial court erred by granting judgment for Clark because Clark's claims of misappropriation of likeness and unjust enrichment were barred by the statute of limitations.

We reverse the trial court's judgment in part and render judgment that Clark take nothing on his claim against Dillard's for unjust enrichment, and we affirm the trial court's judgment in all other respects.

## BACKGROUND

In 1998, Dillard's hired Mollie McKool Photography, Inc. in Dallas to submit photographs of men modeling underwear from Dillard's house brand, Roundtree & Yorke. McKool contacted TCA to provide a model. Clark was a fashion model and used TCA and other modeling agencies to obtain modeling jobs. TCA contacted Clark about the modeling job, and Clark agreed to do it. McKool paid TCA Clark's standard rate for two days of modeling, and after deducting its commission, TCA paid Clark. The testimony showed it was customary for models in Dallas to be paid a bonus in addition to their standard rate if their picture from the photo shoot was used for product packaging. Clark testified he was not paid anything for further use of the photos and that he did not agree to Dillard's commercial use of the photos for product packaging.

**\*718** Beginning in about 2001 or 2002, Dillard's used photographs showing Clark from the tip of his nose to his waist on its packaging of Roundtree and Yorke men's underwear. In September 2005, Dillard's changed its packaging and used pictures showing Clark from midthigh or waist to the top of his head and showing Clark's entire face. Dillard's used these pictures on the packaging of Roundtree & Yorke underwear from September 2005 to September 2011. Clark testified he never went into a Dillard's store until December 2009 and was unaware of Dillard's use of his image on packaging for Roundtree & Yorke underwear.

In November 2009, while Clark was living in Europe, a friend in the United States told him she had seen his photograph in a Dillard's store on its products. The next month, when Clark traveled to Arkansas, he went to a Dillard's store and saw his image on the packaging of Roundtree and Yorke underwear. He contacted his "mother agency" in New York to investigate. In January 2010, that agency contacted Dillard's. Dillard's asked the agency to provide a contract from the 1998

photo shoot, but Clark no longer had the paperwork. In 2011, Clark contacted Nancy Campbell, the president of TCA, for assistance in pursuing his claim against Dillard's. Campbell told Clark she had shredded all documents from 1998 and that TCA no longer had the vouchers and other documents from the photo shoot. Campbell refused to write to Dillard's, but she agreed to search TCA's premises for any records from the 1998 photo shoot; she found no records.

In September 2011, Dillard's changed its packaging on Roundtree & Yorke underwear, including changing the image on the packaging by using new photographs and a different model. Dillard's paid the model $4,500 for the right to use his image on the packaging for the life of the products.

On October 5, 2011, Clark filed his original petition against Dillard's and TCA for misappropriation of likeness, unjust enrichment, and other claims. Clark later amended his petition, including adding claims against TCA for breach of contract and breach of fiduciary duty. Clark, Dillard's, and TCA each moved for summary judgment. The trial court denied Clark's motion. The court granted Dillard's motion for summary judgment on all of Clark's claims except misappropriation of likeness and unjust enrichment. The court granted TCA's motion as to all of Clark's claims and rendered judgment that Clark take nothing on his claims against TCA.

The court held a jury trial on Clark's claims against Dillard's for misappropriation of likeness and unjust enrichment. The jury found Dillard's misappropriated Clark's likeness and that his damages for the unauthorized use of his image were $9,000. However, the jury also found the misappropriation of his likeness "was excused as a result of a mistake." [1] On Clark's unjust-enrichment claim, the jury found Dillard's was unjustly enriched and that Clark's damages were $4,500. On Clark's assertion of the discovery rule to Dillard's defense of the statute of limitations, the jury found Clark "should ... have discovered the benefits obtained by Dillard's" by December 6, 2009. The court's judgment ordered that Clark take nothing on his misappropriation-of-likeness claim and ordered that Clark recover **\*719** $4,500 from Dillard's, presumably on Clark's unjust-enrichment claim.

### DILLARD'S CROSS–APPEAL

In its cross-appeal, Dillard's contends the trial court erred by not dismissing Clark's misappropriation-of-likeness and unjust-enrichment claims as barred by the statute of limitations. Dillard's moved for directed verdict on the ground of the statute of limitations, and the trial court implicitly denied the motion. Because the trial court rendered a take-nothing judgment on the misappropriation-of-likeness claim and the only relief granted Clark was on his claim for unjust enrichment, we consider the question of the statute of limitations only on the unjust-enrichment claim.

### Standard of Review

Claims of unjust enrichment are governed by the two-year statute of limitations in section 16.003 of the Texas Civil Practice and Remedies Code. *Elledge v. Friberg–Cooper Water Supply Corp.,* 240 S.W.3d 869, 871 (Tex.2007) (per curiam); *see* TEX. CIV. PRAC. & REM.CODE ANN. § 16.003(a) (West Supp.2014). Because the statute of limitations is an affirmative defense, the defendant has the burden to plead, prove, and secure findings to support the defense. *See* TEX.R. CIV. P. 94 (limitations is affirmative defense); *Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 517 (Tex.1988) (affirmative defense of limitations must be proven by asserting party). To prevail on a motion for directed verdict, the movant must prove the grounds asserted as a matter of law. Thus, to prevail on a motion for directed verdict on the ground of limitations, Dillard's had to have (1) proved as a matter of law when the cause of action accrued and (2) negated the discovery rule if it applied and if Clark both pleaded it and presented evidence in support of it. *See Woods,* 769 S.W.2d at 518 & n. 2; *see also Hua Xu v. Lam,* No. 14–13–00730–CV, 2014 WL 5795475, at \*13 (Tex.App.–Houston [14th Dist.] Nov. 6, 2014, no pet.) (mem.op.) (defendant moving for directed verdict on limitations had no burden to negate discovery rule even though discovery rule was pleaded unless plaintiff presented evidence supporting application of discovery rule). In this case, Clark pleaded the discovery rule and presented evidence of when he learned Dillard's used his image.

### Accrual of the Unjust–Enrichment Cause of Action

 [1]   [2]   A cause of action generally accrues, and the statute of limitations begins to run, when facts come into existence that authorize a claimant to seek a judicial remedy. *Schneider Nat'l Carriers, Inc. v. Bates,* 147 S.W.3d 264, 279 (Tex.2004). The date a cause of action accrues is normally a question

of law. *Etan Indus., Inc. v. Lehmann,* 359 S.W.3d 620, 623 (Tex.2011) (per curiam).

Dillard's asserts the evidence established as a matter of law that the unjust-enrichment claim accrued no later than September 2005 when the packaging was changed to use an image showing Clark's entire face. Dillard's argues that because Clark filed his lawsuit in October 2011, more than six years after the accrual of the cause of action, Clark's unjust-enrichment claim was barred by the two-year statute of limitations.

Dillard's General Merchandise Manager, William Shields, testified that the 2005 packaging showing Clark's entire face was first displayed in Dillard's stores in September 2005 and continued to be displayed for sale in the stores until September 2011. Clark argues that Shields's testimony should not have been considered because the trial court erred by overruling Clark's **\*720** objection to Shields's testifying. Clark argued to the trial court that Shields was identified as a fact witness for the first time on November 27, 2012, which he asserted was after the August or September 2012 discovery deadline. [2] The trial court considered the objection at a pretrial hearing. At the hearing, Dillard's asserted that the discovery deadline was January 13, 2013, and that the November 27, 2012 identification of Shields was before the discovery deadline. After considering the parties' arguments and examining the documents they presented to support their positions, the trial court overruled Clark's objection. On appeal, Clark continues to argue that the discovery deadline was in August 2012, but he presents no argument, explanation, or authority as to why the trial court could not have concluded from the documents before it that the discovery deadline was after Dillard's identified Shields as a fact witness. We conclude Clark has not shown that Shields's testimony could not be considered.

Dillard's Vice President for Merchandising, Michael McNiff, testified that the earlier packaging using Clark's image from his nose to his waist was first displayed in stores in "[l]ate 2001, 2002." McNiff later testified that he did not know when Clark's image was first used. In affidavits and his deposition, McNiff stated the earlier packaging may have first been used in 1991 (an impossible date since the photograph was taken in 1998) and 1999.

Clark argues that Dillard's failed to establish as a matter of law the accrual date of Clark's cause of action. Clark appears to argue that because the evidence was conflicting whether the

cause of action accrued in 1999, 2001, 2002, or 2005, Dillard's failed to prove the accrual date as a matter of law. However, to prove the accrual date as a matter of law, Dillard's did not have to prove the exact date on which the cause of action accrued. Instead, Dillard's had only to prove as a matter of law the latest date by which the cause of action accrued. *See Williams v. Wachovia Mortg. Corp.,* 407 S.W.3d 391, 398 (Tex.App.– Dallas 2013, pet. denied) (court need not determine the exact date the cause of action accrued because regardless of the date applied, suit was filed outside the limitations period).

The evidence was uncontroverted that the packaging showing Clark's entire face first went on display in September 2005 and that this packaging replaced the previous packaging that showed Clark's image from his nose to his waist. Therefore, the evidence established Clark's image was first displayed on Roundtree & Yorke underwear packaging no later than September 2005.

[3] Unjust enrichment occurs when the defendant has wrongfully secured or passively received a benefit from another that would be unconscionable to retain, and the defendant obtained the benefit from the plaintiff by fraud, duress, or the taking of an undue advantage. *Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex.1992); *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.,* 300 S.W.3d 348, 367 (Tex.App.–Dallas 2009, pet. denied). On Clark's unjust-enrichment claim, facts came into existence that authorized Clark to seek a judicial remedy when Dillard's first used Clark's image for packaging without having paid Clark for the right to use his image on product packaging. The evidence **\*721** conclusively established that Dillard's initial use of Clark's image without paying him occurred no later than September 2005, which was over six years before Clark filed suit in October 2011. Therefore, unless the discovery rule applies, Clark filed his suit outside the two-year limitations period.

### Discovery Rule

[4] Clark pleaded that the discovery rule delayed commencement of the limitations period until he learned in November or December 2009 that Dillard's used his image, which was less than two years before he filed suit in October 2011. Dillard's contends that the discovery rule does not apply as a matter of law.

**[5] [6] [7]** The purpose of statutes of limitations is to compel the assertion of claims within a reasonable period while the evidence is fresh in the minds of the parties and witnesses. *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex.1996). The discovery rule is "a very limited exception to statutes of limitations," [3] *id.* that "defers the accrual of the cause of action until the injury was or could have reasonably been discovered," *Shell Oil Co. v. Ross,* 356 S.W.3d 924, 929–30 (Tex.2011). "The discovery rule applies 'only when the nature of the plaintiff's injury is both inherently undiscoverable and objectively verifiable.' " *Id.* (quoting *Wagner & Brown, Ltd. v. Horwood,* 58 S.W.3d 732, 734 (Tex.2001)). The supreme court has "restricted the discovery rule to exceptional cases to avoid defeating the purposes behind the limitations statutes." *Via Net v. TIG Ins. Co.,* 211 S.W.3d 310, 313 (Tex.2006) (per curiam). Whether the discovery rule applies to a given context is a question of law. *Velocity Databank, Inc. v. Shell Offshore, Inc.,* 456 S.W.3d 605, 609 (Tex.App.–Houston [1st Dist.] 2014, pet. filed); *Steel v. Rhone Poulenc, Inc.,* 962 S.W.2d 613, 618 (Tex.App.–Houston [1st Dist.] 1997), *aff'd,* 997 S.W.2d 217 (Tex.1999).

**[8] [9] [10] [11]** "Inherently undiscoverable" does not mean that the plaintiff failed to discover the injury within the limitations period. *Wagner & Brown,* 58 S.W.3d at 735. "Instead, we determine whether an injury is inherently undiscoverable on a categorical basis because such an approach 'brings predictability and consistency to the jurisprudence.' " *Id.* (quoting *Apex Towing Co. v. Tolin,* 41 S.W.3d 118, 122 (Tex.2001)). "The focus is on whether a *type* of injury rather than a *particular* injury was discoverable." *Via Net,* 211 S.W.3d at 314. "An injury is inherently undiscoverable if by its nature, it is unlikely to be discovered within the limitations period despite due diligence." *Id.* at 313 (quoting *Wagner & Brown,* 58 S.W.3d at 734–35). The question is whether Clark's injury is "the type of injury that generally is discoverable by the exercise of reasonable diligence." *Wagner & Brown,* 58 S.W.3d at 735 (quoting *HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 886 (Tex.1998)). A wrong or injury is not inherently undiscoverable if it "generally is capable of detection within the time allotted for bringing such suits." *Computer Assocs.,* 918 S.W.2d at 457. Whether an injury is inherently undiscoverable is a legal question "decided on a categorical basis rather than case-specific basis." *Via Net,* 211 S.W.3d at 314.

**\*722** The supreme court has discussed the types of cases in which the wrong and injury to the plaintiff were inherently undiscoverable. *See S.V. v. R.V.,* 933 S.W.2d 1, 6–7 (Tex.1996). The cases where the court concluded the wrong and injury were inherently undiscoverable were ones in which the wrong and the injury were, by their nature, difficult or impossible to detect until circumstances changed. *See id.* (discussing inherently undiscoverable nature of undetectable medical malpractice, latent construction defects, false credit report, and corporate self-dealing). [4] "The common thread in these cases is that when the wrong and injury were unknown to the plaintiff because of their very nature and not because of any fault of the plaintiff, accrual of the cause of action was delayed." *Id.* at 7.

Clark argues he could not have discovered Dillard's use of his image because he spent large parts of each year outside the United States and, even when in this country for brief periods, he never went to a Dillard's store. He states he was never informed that Dillard's intended to use the pictures from the photo shoot for packaging, so he had no reason to research the use of his image by Dillard's. Clark also asserts that fashion models pose for thousands of photos and cannot know which pictures are actually used. He argues that "[t]he sheer volume of a successful international model's body of work would make discovering product packaging exclusive to a chain of U.S. stores in limited areas virtually impossible, even when exercising due diligence and relying on internet searches."

The type of wrong or injury in this case is a company's unjust enrichment by using a model's image without payment on packaging for products prominently displayed in stores open to the public. Unlike the wrongs and injuries to which the supreme court has applied the discovery rule, this type of injury is not by its nature hidden or undetectable but is readily observable and on public display. *See S.V.,* 933 S.W.2d at 6–7 (discussing cases applying the discovery rule). This type of wrong or injury is generally capable of detection within two years by the plaintiff entering the store and seeing the display. The fact that a particular plaintiff might not enter one of the stores where the product is on display within two years of the first display does not make the company's unjust enrichment inherently undiscoverable. *See Via Net,* 211 S.W.3d at 314 (issue is whether a type of injury and not a particular **\*723** injury is discoverable within the limitations period). "[P]ermitting application of the discovery rule exception in these cases would do no more than permit the litigation of stale claims." *Computer Assocs.,* 918 S.W.2d at 457.

We conclude as a matter of law the discovery rule does not apply. Clark's cause of action for unjust enrichment accrued when Dillard's first displayed the Roundtree & Yorke packaging with Clark's image without having paid Clark for the use of his image on product packaging. The evidence conclusively established this first display occurred no later than September 2005. Clark's suit filed in October 2011 was not brought within two years of the accrual of the unjust-enrichment cause of action. We conclude the trial court erred by denying Dillard's motion for directed verdict on Clark's claim for unjust enrichment. We sustain Dillard's cross-point as to unjust enrichment.

### SUMMARY JUDGMENT

 **[12]**   In his first three issues, Clark contends the trial court erred by denying his motion for summary judgment and by granting Dillard's and TCA's motions for summary judgment. The standard for reviewing a traditional summary judgment is well established. *See Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548 (Tex.1985); *McAfee, Inc. v. Agilysys, Inc.,* 316 S.W.3d 820, 825 (Tex.App.–Dallas 2010, no pet.). The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c). In deciding whether a disputed material fact issue exists precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon,* 690 S.W.2d at 548–49; *In re Estate of Berry,* 280 S.W.3d 478, 480 (Tex.App.–Dallas 2009, no pet.). Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *City of Keller v. Wilson,* 168 S.W.3d 802, 824 (Tex.2005). A defendant moving for summary judgment is not required to prove the plaintiff cannot succeed on any conceivable theory; "he is only 'required to meet the plaintiff's case as pleaded.' " *SmithKline Beecham Corp. v. Doe,* 903 S.W.2d 347, 355 (Tex.1995) (quoting *Cook v. Brundidge, Fountain, Elliott & Churchill,* 533 S.W.2d 751, 759 (Tex.1976)); *see Via Net v. TIG Ins. Co.,* 211 S.W.3d 310, 313 (Tex.2006) (per curiam) ("Defendants are not required to guess what unpleaded claims might apply and negate them."). We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp. of Am.,* 12 S.W.3d 172, 175 (Tex.App.–Dallas 2000, pet. denied).

We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. *See* TEX.R. CIV. P. 166a(i); *Flood v. Katz,* 294 S.W.3d 756, 762 (Tex.App.–Dallas 2009, pet. denied). "Thus, we must determine whether the nonmovant produced more than a scintilla of probative evidence to raise a fact issue on the material questions presented." *Flood,* 294 S.W.3d at 762. "More than a scintilla of evidence exists when the evidence 'rises to a level that would enable reasonable and fair-minded persons to differ in their conclusions.' " *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003) (quoting *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997)). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/ Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)).

### Clark's Motion for Summary Judgment

In his first issue, Clark contends the trial court erred by denying his motion for **\*724**  summary judgment on his claim for misappropriation of likeness. A party cannot appeal the denial of a summary judgment unless (a) both sides moved for summary judgment on the same issues and the trial court granted one motion for summary judgment and denied the other, or (b) a statute expressly permits appeal of the denial of the motion for summary judgment. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005); *see, e.g.,* TEX. CIV. PRAC. & REM.CODE ANN.  § 51.014(a)(5), (6), (12) (West 2015). In this case, no statute authorizes an appeal from the denial of Clark's motion for summary judgment. Although both Clark and Dillard's moved for summary judgment on Clark's claim for misappropriation of likeness, the trial court denied both motions, and the claim was tried on the merits before a jury. In this situation, the denial of the motion for summary judgment is not appealable. *See Ackermann v. Vordenbaum,* 403 S.W.2d 362, 365 (Tex.1966); *Moore v. Jet Stream Invs., Ltd.,* 261 S.W.3d 412, 427 (Tex.App.– Texarkana 2008, pet. denied) ("Where a motion for summary judgment is denied by the trial court and the case is tried on its merits, the order denying the summary judgment cannot be reviewed on appeal."); *Anderton v. Schindler,* 154 S.W.3d 928, 931 (Tex.App.–Dallas 2005, no pet.) ("The denial of a motion for summary judgment when followed by a conventional trial on the merits does not finally decide any issue pending before the trial court; the denial of a motion for summary judgment presents nothing for review."). We conclude Clark may not appeal the trial court's order denying

his motion for summary judgment. We overrule Clark's first issue.

### Dillard's Motion for Summary Judgment

In his second issue, Clark contends the trial court erred by granting Dillard's motion for summary judgment on Clark's claims for injunctive relief, unfair business practices, and declaratory relief.

### *Injunctive Relief*

 **[13]** In his original petition, filed in 2011, Clark pleaded for "an injunction precluding Dillard's further unauthorized use of Clark's likeness." Clark asserted that unless Dillard's was restrained from unauthorized use of Clark's likeness, "Clark will continue to suffer irreparable injury for which he has no adequate remedy at law." In his first and second amended petitions (the second amended petition is Clark's live pleading), Clark omitted the allegations supporting an injunction, but his prayer included a request for "judgment enjoining further unauthorized use of Clark's likeness."

 **[14]** **[15]** To be entitled to an injunction, a plaintiff must plead and prove (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002). An injury is irreparable if the injured party cannot be compensated in damages or if the damages cannot be measured by any certain monetary standard. *Id.*

Dillard's moved for summary judgment on the ground that there was no evidence to support one of the elements for injunctive relief, namely, imminent irreparable injury. In its motion for summary judgment, Dillard's presented evidence that in September 2011 it changed its packaging of Roundtree & Yorke underwear and used a different model's picture on the packaging. On appeal, Clark does not identify any evidence that Dillard's past misappropriation of Clark's likeness poses an imminent threat of irreparable injury. We conclude Clark has not shown the trial **\*725** court erred by granting Dillard's motion for summary judgment on Clark's request for injunctive relief.

### *Unfair Business Practices*

 **[16]** Clark alleged that an agreement existed among or between the defendants Dillard's, TCA, and Mollie McKool Photography, Inc.[5] to use Clark's image on product packaging and that this conduct constituted an unfair business practice, depriving him of control of his image for business purposes, preventing him from earning fees to which he was otherwise entitled, and causing him damages. Clark brought this cause of action as an alternative to his claim for misappropriation of likeness.

Dillard's moved for summary judgment on the grounds that (1) there was no such cause of action recognized in Texas[6] and (2) Clark had no evidence that Dillard's conduct (a) was an unfair business practice; (b) deprived Clark of control of his image for business purposes; (c) prevented Clark from benefitting from the use of his image; (d) prevented Clark from earning fees to which he would otherwise have been rightfully entitled; and (e) caused Clark damages.

In his response to the motion for summary judgment and on appeal, Clark asserts that he was damaged not only by Dillard's failure to pay him for the use of his image, but also because he lost the opportunity for "the publicity and exposure that otherwise could have resulted from an advertising campaign lasting over 10 years" "preventing hi[m] from benefitting from the use of that image and thereby preventing him from earning fees to which he would otherwise have been rightfully entitled." However, in his response to Dillard's motion for summary judgment, Clark did not point to any evidence that he would likely have had other fee-earning opportunities that did not arise due to his being unaware of Dillard's use of his image.

 **[17]** **[18]** Concerning Dillard's argument that Texas does not recognize a cause of action for "unfair business practices" as pleaded by Clark, Clark cites no authority that such a claim is viable under Texas law. Clark argues in his reply brief that his "unfair business practices" cause of action is actually a claim for "unfair competition." We disagree. The tort of unfair competition concerns the use of "another's good will with the public to gain a competitive advantage in the market." *Nat'l Bank of Commerce v. Shaklee Corp.,* 503 F.Supp. 533, 541 (W.D.Tex.1980). "[A]ny practice which may mislead customers into believing that the product of the defendant is endorsed by or somehow connected to the

plaintiff falls within the parameters of the tort." *Id.* As another court defined it,

> Unfair competition is a common law tort that occurs when one business entity **\*726** "palms off" its products as those of another. The determinative question is whether the tortfeasor's practices are likely to mislead customers into believing that the product emanates from or has been endorsed by the claimant.... [T]he test is likelihood of confusion.

*Ky. Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 382 (5th Cir.1977) (citations omitted). Clark's pleading of unfair business practices did not allege that Dillard's use of his image created a "likelihood of confusion" of the public. *Id.* Instead, Clark's petition and his response to Dillard's motion for summary judgment asserted that his unawareness of Dillard's use of his image deprived him of the opportunity to obtain other fee-earning modeling assignments arising from Dillard's use of his image for packaging. That is not the tort of unfair competition.

We conclude Clark has not shown the trial court erred by granting Dillard's motion for summary judgment on the claim of unfair business practices.

### *Declaratory Judgment*

 **[19]** **[20]** Clark also asserts the trial court erred by granting Dillard's motion for summary judgment on Clark's claim for declaratory relief. [7] A declaratory judgment is a remedial action that determines the rights of the parties and affords relief from uncertainty with respect to rights, status, and legal relations. TEX. CIV. PRAC. & REM.CODE ANN. § 37.002 (West 2015). "A court of record within its jurisdiction has power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." *Id.* § 37.003(a). However, a declaratory judgment is not available to settle legal disputes already pending before the court. *Hydroscience Techs., Inc. v. Hydroscience, Inc.,* 401 S.W.3d 783, 801 (Tex.App.–Dallas 2013, pet. denied).

Clark pleaded in his original petition that Dillard's misappropriated his likeness by displaying his image prominently on packaging for men's undergarments without Clark's consent. In its first amended answer, Dillard's asserted the defense of payment, alleging it paid for full use of Clark's image because "[p]ayment was made to Mollie McKool photo studio, which in turn paid The Campbell Agency, which in turn paid Plaintiff [Clark]." Subsequently, Dillard's filed a motion to designate Mollie McKool Photography, Inc. as a responsible third party under section 33.004 of the civil practice and remedies code. *See* CIV. PRAC. § 33.004 (West 2015). In the motion, Dillard's stated that McKool sent Dillard's an invoice with the photographs and told Dillard's that it "would have the right to reproduce the photographs at will so long as the invoice was **\*727** paid." [8] Clark then amended his petition and requested a declaratory judgment declaring "what rights, if any, of the Plaintiff were transferred, affected or otherwise released by any agreement among McKool, Dillard's and Campbell." Clark also requested specific declarations that there were no agreements between the parties that transferred the usage rights of Clark's image to Dillard's for product packaging. The record shows that the disputes encompassed by these requested declarations were already before the trial court. Accordingly, we conclude the trial court did not err by granting Dillard's motion for summary judgment on Clark's claim for declaratory judgment.

We conclude Clark has not shown the trial court erred by granting Dillard's motion for summary judgment. We overrule Clark's second issue.

### **TCA's Motion for Summary Judgment**

In his third issue, Clark contends the trial court erred by granting TCA's motion for summary judgment. Clark sued TCA for breach of fiduciary duty and breach of contract for not assisting him when he informed it of Dillard's use of his image.

### *Breach of Contract*

 **[21]** **[22]** TCA moved for summary judgment on Clark's claim for breach of contract on several grounds, including that there was no evidence of a written contract between TCA and Clark and that any oral contract would have violated the statute of frauds. *See* TEX. BUS. & COM.CODE ANN. § 26.01(b)(6) (West 2009). Clark did not respond to this ground in his response to TCA's motion for summary judgment, and he does not argue on appeal that the trial court would

have erred by granting summary judgment on that ground. An appellant must attack every ground on which summary judgment could have been granted in order to obtain a reversal. *See Malooly Bros., Inc. v. Napier,* 461 S.W.2d 119, 121 (Tex.1970); *Trevino & Assocs. Mech., L.P. v. Frost Nat'l Bank,* 400 S.W.3d 139, 144 (Tex.App.–Dallas 2013, no pet.). If an appellant fails to challenge one of the grounds for summary judgment, an appellate court may affirm the summary judgment on that ground alone. *See Trevino & Assocs.,* 400 S.W.3d at 144. Because Clark does not challenge on appeal TCA's ground that there was no written contract and that any oral contract would have violated the statute of frauds, we affirm the trial court's grant of summary judgment on Clark's claim for breach of contract on that ground.

### Breach of Fiduciary Duty

TCA moved for summary judgment on Clark's claim for breach of fiduciary duty on several grounds, including that no fiduciary relationship existed at any time between it and Clark, and that no fiduciary relationship existed between it and Clark when Clark sought its assistance to contact Dillard's in 2011.

Clark first argues that the trial court erred by granting the motion for summary judgment because the motion was based entirely on defensive grounds not disclosed in response to Clark's discovery requests. In support of this argument, Clark cites **\*728** *Hernandez v. Mid–Loop, Inc.,* 170 S.W.3d 138 (Tex.App.–San Antonio 2005, no pet.), and *Chasewood Oaks Condominiums Homeowners Ass'n v. Amatek Holdings, Inc.,* 977 S.W.2d 840 (Tex.App.–Fort Worth 1998, pet. denied). These two cases concerned plaintiffs who, after filing suit, actively frustrated all legitimate attempts by the defendants to define the causes of action and investigate potential defenses. The trial courts in those cases dismissed the plaintiffs' claims, and the appellate courts affirmed. *See Hernandez,* 170 S.W.3d at 144; *Chasewood Oaks,* 977 S.W.2d at 845. Neither of those cases involved a motion for summary judgment filed by a defendant who had failed to disclose its theories of the case. We conclude Clark has not shown the trial court erred by granting the motion for summary judgment due to TCA's failure to supplement its discovery responses with the defensive theories asserted in the motion for summary judgment.

**[23]** **[24]** **[25]** One of TCA's grounds for summary judgment was that no fiduciary relationship existed between

it and Clark. A fiduciary relationship is an extraordinary one and will not be created lightly. *In re Estate of Kuykendall,* 206 S.W.3d 766, 771 (Tex.App.–Texarkana 2006, no pet.). The mere fact that one party to a relationship subjectively trusts the other does not indicate the existence of a fiduciary relationship. *Id.; see also Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 595 (Tex.1992) ("[M]ere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship."). The party claiming a fiduciary duty has the burden of proving that a fiduciary duty exists. *Marathon Oil Co. v. Moye,* 893 S.W.2d 585, 591 (Tex.App.–Dallas 1994, orig. proceeding). Whether a fiduciary duty exists is a question of law. *Id.* A fiduciary relationship may arise as a matter of law in a principal-agent relationship. *McAfee, Inc. v. Agilysys, Inc.,* 316 S.W.3d 820, 829 (Tex.App.–Dallas 2010, no pet.).

**[26]** **[27]** **[28]** Agency is a consensual relationship between two parties "by which one party acts on behalf of the other subject to the other's control." *Suzlon Energy Ltd. v. Trinity Structural Towers, Inc.,* 436 S.W.3d 835, 841 (Tex.App.–Dallas 2014, no pet.) (quoting *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.,* 336 S.W.3d 764, 782–83 (Tex.App.–Houston [1st Dist.] 2011, no pet.)). To prove agency, a party must prove the alleged principal has the rights (1) to assign the agent's task and (2) to control the means and details of the process by which the agent will accomplish that task. *Happy Indus. Corp. v. Am. Specialties, Inc.,* 983 S.W.2d 844, 852 (Tex.App.–Corpus Christi 1998, pet. dism'd w.o.j.); *see Suzlon,* 436 S.W.3d at 841. It is primarily the extent of the principal's control over the details of the agent's accomplishing the assigned task that distinguishes an agent from an independent contractor. *Walker Ins. Servs. v. Bottle Rock Power Corp.,* 108 S.W.3d 538, 549 (Tex.App.–Houston [14th Dist.] 2003, no pet.); *Happy Indus.,* 983 S.W.2d at 852.

Clark pleaded that TCA breached fiduciary duties arising from TCA's position as Clark's agent. TCA asserted in its motion for summary judgment that no principal-agent relationship existed with Clark as a matter of law because Clark did not have control over the means and details of the process by which TCA conducted its representation of him. In his response to the motion for summary judgment and in his brief on appeal, Clark argues that fact issues exist concerning the extent of TCA's duties to him in their relationship, but Clark does not argue that he had control over the means and details of TCA's representation of him. An appellant must attack **\*729** every ground upon which

summary judgment could have been granted in order to obtain a reversal. *See Malooly Bros.,* 461 S.W.2d at 121; *Trevino & Assocs.,* 400 S.W.3d at 144. If an appellant fails to challenge one of the grounds for summary judgment, an appellate court may affirm the summary judgment on that ground alone. *See Trevino & Assocs.,* 400 S.W.3d at 144. Because Clark does not challenge on appeal TCA's ground that it disproved Clark's claim of agency as a matter of law because Clark had no right to control the means and details of the process by which TCA represented him, we affirm the grant of summary judgment on that ground. [9]

 **[29]**  In his reply brief, Clark argues for the first time that his claim of breach of fiduciary duty was not based on a formal relationship created between the parties by contract but was instead based on modeling industry standards that give rise to a special relationship of good faith and fair dealing. An appellant may not present arguments for the first time in a reply brief. *Cebcor Serv. Corp. v. Landscape Design & Constr., Inc.,* 270 S.W.3d 328, 334 (Tex.App.–Dallas 2008, no pet.); *Dall. Cnty. v. Gonzales,* 183 S.W.3d 94, 104 (Tex.App.–Dallas 2006, pet. denied). Moreover, Clark's claim in his petition is clearly one for breach of fiduciary duty based on an alleged principal-agent relationship between Clark and TCA. Clark did not plead a cause of action for breach of a duty of good faith and fair dealing. TCA was not required to move for summary judgment on claims that were not pleaded. *See Via Net v. TIG Ins. Co.,* 211 S.W.3d 310, 313 (Tex.2006) ("Defendants are not required to guess what unpleaded claims might apply and negate them."); *SmithKline Beecham Corp. v. Doe,* 903 S.W.2d 347, 355 (Tex.1995) (defendant need not show that plaintiff cannot succeed on any theory conceivable in order to obtain summary judgment but is only required to "meet the plaintiff's case as pleaded").

We conclude Clark has not shown the trial court erred by granting TCA's motion for summary judgment. We overrule Clark's third issue.

### JURY CHARGE

 **[30]**  In his seventh issue, Clark contends the trial court erred by overruling his objections to questions 3 and 4 of the jury charge. Jury question 3 asked whether Dillard's misappropriation of Clark's likeness was excused because (a) Dillard's paid Clark for the use of his image for packaging; (b) Clark authorized or consented to Dillard's use of his image for packaging; or (c) Clark released Dillard's from the

use of his image for packaging. The jury answered "No" to question 3. Jury question 4 asked if the jury found Dillard's misappropriation was excused by mistake, and the question contained definitions for "mutual mistake" and "unilateral mistake." The jury answered "Yes" to question 4. Clark contends that jury questions 3 and 4 were incorrect as a matter of law and were internally inconsistent.

Dillard's asserts that Clark did not preserve any error because the record does not show Clark presented the objection to the trial court. "Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in **\*730** pleading, is waived unless specifically included in the objection." TEX.R. CIV. P. 274. Clark argues that the following excerpt from the reporter's record shows he objected and that his objection was overruled:

[The Court:] We are off the record.

*(Discussion off the record ensued.)*

*(Recess from 11:30 to 12:45 p.m.)*

The Court: We're back on the record.

I have given to—I discussed with counsel the form of the proposed charge to give to the jury.

To the extent that either Plaintiff or Defendant has requested instructions or questions that are not included with the charge—in my charge, the request to include same is denied, the objection to the failure to include same is overruled.

To the extent that the Court's charge includes instructions and/or questions which either party has not included in its proposed charge, the request to excise same is denied, the objection to the failure to excise same is overruled. Okay?

[Clark's attorney]: Yes, Your Honor.

The Court: I think that covers all the objections to the charge.

We disagree with Clark. This portion of the record does not show that Clark made any objection to jury questions 3 and 4, much less that he asserted they were incorrect as a matter of law and internally inconsistent. Nor does any other part of the record establish that Clark timely objected to jury questions 3 and 4. We conclude Clark has not preserved any error from the trial court's submission of jury questions 3 and 4. We overrule Clark's seventh issue.

### ISSUES ON CLARK'S DAMAGES

In his fourth issue, Clark contends the trial court abused its discretion by constructively striking Dr. Peter Sealey, Clark's expert witness on the damages Clark suffered. In his sixth issue, Clark contends the trial court erred by excluding evidence supporting disgorgement of Dillard's profits from the sale of Roundtree & Yorke underwear with Clark's image on the packaging. Clark's claim for unjust enrichment was barred by the statute of limitations, and Clark has not shown the trial court erred by rendering a take-nothing judgment on the misappropriation-of-likeness claim based on the jury's finding that claim was excused by mistake. Therefore, our resolution of Clark's issues concerning his damages is not necessary to final disposition of this appeal. *See Guerra v. Wal–Mart Stores, Inc.,* 943 S.W.2d 56, 60–61 (Tex.App.–San Antonio 1997, writ denied). Accordingly, we do not address Clark's fourth and sixth issues. *See* TEX.R.APP. P. 47.1.

### JUDICIAL NOTICE

 **[31]**   In his fifth issue, Clark contends the trial court erred by failing to take judicial notice of past pleadings. Specifically, Clark wanted the trial court to take judicial notice of (1) the order granting TCA's motion for summary judgment, (2) the complaint and judicial opinion in the federal case *Henley v. Dillard Department Stores,* [10] and (3) the trial court's finding that McKool was a responsible third party in the case. Rule of evidence 201 states, "A court shall take judicial notice [of adjudicative facts] if requested by a party and supplied with the necessary information." TEX.R. EVID. 201(d).

On July 10, 2013, Clark filed a pretrial motion requesting that the court take judicial **\*731**  notice of the *Henley* complaint, and Clark attached a certified copy of the complaint to the motion. At the pretrial hearing on July 16, 2013, the trial court considered the request for judicial notice of the *Henley*

complaint. Clark's attorney explained, "it really has to do with punitive damages so perhaps it is part of the bifurcation that should be considered then." The trial court stated, "If it's only with regard to the punitive damages we'll jump off that bridge when we get to it." The court's written order regarding the pretrial hearing stated, "Plaintiff's Request for Judicial Notice filed July 10, 2013 is denied." Because the jury did not find that Clark's harm resulted from Dillard's malice, the jury did not reach the punitive damages stage. *See* TEX. CIV. PRAC. & REM. CODE ANN.. § 41.003(a) (West 2015). Therefore, the *Henley* complaint never became relevant. We conclude Clark has not shown the trial court erred by denying this request for judicial notice.

On July 17, 2013, the first day of trial, Clark filed three more requests for judicial notice of (1) the federal district court's opinion in *Henley v. Dillard Department Stores,* (2) the trial court's order granting TCA's motion for summary judgment, and (3) the trial court's order finding McKool a responsible third party. Although Clark states in his brief, "Incredibly, the trial court did not take judicial notice of these documents," Clark does not cite to any place in the record showing the court refused to take judicial notice, and nothing in the record shows the court refused to take judicial notice. We conclude that the record does not support Clark's contention that the trial court did not take judicial notice of these items. We overrule Clark's fifth issue.

### CONCLUSION

We reverse the trial court's judgment awarding Clark damages of $4,500, and we render judgment that Clark take nothing on his claim for unjust enrichment. In all other respects, we affirm the trial court's judgment.

**All Citations**

460 S.W.3d 714

Footnotes

1   Whether mistake excuses a misappropriation of likeness is not properly before us, and we do not address that issue.
2   Clark was inconsistent concerning the date of the discovery deadline. In his written objection to Shields's testifying, he asserted the discovery deadline was September 10, 2012. At the pretrial hearing, he stated the discovery deadline was August 12, 2012, and in his cross-appellee's brief on appeal, he states the discovery deadline was August 15, 2012.
3   Clark states in his cross-appellee's brief, "The presumption is that the discovery rule applies," and cites *Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 518 (Tex.1988). The supreme court stated in *Woods* that the party asserting the

discovery rule bears the burden of pleading, proving, and securing favorable findings on the rule. *Id.* Thus, contrary to Clark's assertion, there is no "presumption ... that the discovery rule applies."

4    The supreme court cited the following cases as illustrative of the types of cases to which the discovery rule applied. (The parenthetical descriptions of the cases are the supreme court's parenthetical descriptions in *S.V.* of these cases.) *Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex.1988) (lawyer's error could not be discovered by client who was ignorant of the law); *Nelson v. Krusen,* 678 S.W.2d 918, 923 (Tex.1984) (malpractice in muscular dystrophy gene screening could not be discovered by parents until child showed symptoms); *Kelley v. Rinkle,* 532 S.W.2d 947, 949 (Tex.1976) (false credit report could not be discovered until credit denied); *Hays v. Hall,* 488 S.W.2d 412, 414 (Tex.1972) ("One who undergoes a vasectomy ... and then after tests is told that he is sterile, cannot know that he is still fertile ... until either his wife becomes pregnant or he is shown to be fertile by further testing."); *Gaddis v. Smith,* 417 S.W.2d 577, 578 (Tex.1967) ("it is often difficult, if not impossible, to discover that a foreign object has been left within the body within the statutory period of limitation"); *Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 580 (Tex.1963) (disinterested directors could not discover certain corporate self-dealing); *Ruebeck v. Hunt,* 142 Tex. 167, 176 S.W.2d 738, 739 (1943) (homeowner could not discover faulty construction of roof); *Hous. Waterworks Co. v. Kennedy,* 70 Tex. 233, 8 S.W. 36, 38 (1888) (cut into plaintiff's building not discoverable until walls cracked). *S.V.,* 933 S.W.2d at 6–7.

5    Clark sued Mollie McKool Photography, Inc. in his second amended petition, but he later nonsuited his claims against it.

6    Dillard's also specially excepted to the pleading, asserting the cause of action was not recognized under Texas law. The appellate record does not show that the trial court ruled on the special exception. Clark does not contend on appeal that the issue should have been resolved by special exception instead of summary judgment. Clark also does not complain on appeal that he lacked opportunity to amend his pleading. *See Chambers v. Huggins,* 709 S.W.2d 219, 223 (Tex.App.– Houston [14th Dist.] 1986, no writ) (special exception should be filed before moving for summary judgment attacking pleadings for failing to state a cause of action to provide nonmovant an opportunity to amend and correct a pleading defect; summary judgment is appropriate when pleadings "fail to set forth any cause of action whatsoever").

7    Dillard's presented two grounds in its motion for summary judgment on Clark's claim for declaratory judgment. Dillard's asserted that the Declaratory Judgment Act "does not allow for the requested declarations." In the alternative, Dillard's asserted that any declarations the trial court made on the issues should support Dillard's position on those issues. The trial court's order on the motion simply "granted" Dillard's motion on the claim for declaratory judgment and did not expressly make any declarations. The final judgment observed that the court had rendered summary judgment in favor of Dillard's on the claims for declaratory judgment, injunctive relief, and unfair business practices, and the judgment ordered that Clark take nothing on those claims. The judgment made no declarations requested by Clark in his petition or by Dillard's in its motion for summary judgment. Therefore, it appears the trial court granted Dillard's motion for summary judgment on the ground that the Declaratory Judgment Act "does not allow for the requested declarations." Clark did not object in the trial court or argue on appeal that this ground was not sufficiently specific; accordingly, we do not address that issue.

8    Clark alleged in his live pleading that he filed a motion to strike the designation of McKool as a responsible third party but that the trial court denied the motion to strike, "apparently finding that disputed facts existed as to whether McKool was responsible for a portion of the injuries or damages claimed by Plaintiff." The trial court's order simply stated that Clark's motion to strike was denied and that Dillard's was granted leave to designate McKool as a responsible third party.

9    Any fact issues concerning the extent of TCA's duties would not be material fact issues on Clark's claim for breach of fiduciary duty unless a principal-agent relationship existed. Clark has not shown the trial court would have erred by determining that no principal-agent relationship existed; therefore, any fact issues concerning the extent of TCA's duties are not material to Clark's claim for breach of fiduciary duty.

10    *See* 46 F.Supp.2d 587 (N.D.Tex.1999).

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.



123 S.W.3d 735
Court of Appeals of Texas,
Houston (14th Dist.).

CLEAR LAKE CITY WATER
AUTHORITY, Appellant/Cross–Appellee,
v.
KIRBY LAKE DEVELOPMENT, LTD.,
Miter Development Company, LLC, Taylor
Lake, Ltd., and University Development,
Inc., Appellees/Cross–Appellants.

No. 14–01–00976–CV. | Dec. 9, 2003.

**Synopsis**

**Background:** Developers, which were not paid by municipal water district for district's use of their water, sewage, and drainage facilities as result of lack of voter approval of bond funds, sued district for, among other things, breach of underlying contracts between district and developers, which provided for, among other things, developers to lease facilities at no charge until district purchased them, and for district to reimburse developers 70 percent of costs of constructing facilities. The 113th District Court, Harris County, Patricia Ann Hancock, J., ultimately awarded actual damages for breach of the four underlying contracts totaling $1,696,171, attorney's fees, pre-and post-judgment interest, and costs to developers, declared that district was obligated, under its contracts with developers, to purchase their facilities, and ordered district to levy, assess, and collect taxes or assessments to pay the judgment. District appealed, and developers cross-appealed from trial court's grant of directed verdict to district on their claim that district's use and control of facilities was a taking in violation of takings clause of state constitution.

**Holdings:** The Court of Appeals, Leslie Brock Yates, J., held that:

[1] three of the contracts unambiguously required district to reimburse developers only with voter-approved bond funds that were legally available and allocated for that purpose and, thus, district's failure to pay developers prior to voter approval of such funds was not breach of underlying contracts;

[2] contract with fourth developer was ambiguous/did not unambiguously require district to reimburse developers only

with voter-approved bond funds that were legally available and allocated for that purpose;

[3] trial court's submission of single broad-form liability question to jury incorporating an invalid theory of recovery was harmful error;

[4] district's counsel's statement during closing argument to the effect that developers provided compensable work to district was not judicial admission of liability in quantum meruit;

[5] trial court's declaratory judgment was not alternative ground upon which to sustain underlying judgment awarding actual damages to developers; and

[6] district's use and control of developer's water, sewer, and drainage facilities did not constitute a taking of developers' property without compensation in violation of takings clause of state constitution.

Affirmed in part, reversed and rendered in part, and reversed and remanded in part.

West Headnotes (30)

**[1]** **Contracts**
⬤ Construing whole contract together

Primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument; to achieve this objective, courts examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.

2 Cases that cite this headnote

**[2]** **Contracts**
⬤ Subject, object, or purpose as affecting construction

Courts construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served.

2 Cases that cite this headnote

**[3]**   **Contracts**
&#x1F511; Existence of ambiguity

**Contracts**
&#x1F511; Ambiguity in general

If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous and it can be construed as a matter of law.

Cases that cite this headnote

**[4]**   **Evidence**
&#x1F511; Grounds for admission of extrinsic evidence

Parol evidence is not admissible for the purpose of creating an ambiguity in context of contract interpretation.

Cases that cite this headnote

**[5]**   **Contracts**
&#x1F511; Existence of ambiguity

For purposes of contract interpretation, if the language of a contract is subject to two or more reasonable interpretations, it is ambiguous.

Cases that cite this headnote

**[6]**   **Contracts**
&#x1F511; Construction as a whole

**Contracts**
&#x1F511; Extrinsic circumstances

**Contracts**
&#x1F511; Ambiguity in general

Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present at the time the contract was executed.

Cases that cite this headnote

**[7]**   **Contracts**
&#x1F511; Construction by Parties

**Evidence**

&#x1F511; Grounds for admission of extrinsic evidence

In context of contract interpretation, only when a contract is first determined to be ambiguous, may the courts consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument.

1 Cases that cite this headnote

**[8]**   **Contracts**
&#x1F511; Existence of ambiguity

For purposes of contract interpretation, an ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; for an ambiguity to exist, both interpretations must be reasonable.

Cases that cite this headnote

**[9]**   **Municipal Corporations**
&#x1F511; Contracts relating to use of sewer system

**Water Law**
&#x1F511; Contracts

Municipal water district's contracts with developers providing for, among other things, developers to lease water and sewer facilities constructed by them to district at no charge until district purchased them, and for district to reimburse developers 70 percent of costs of constructing facilities, unambiguously required district to reimburse developers only with voter-approved bond funds that were legally available and allocated for that purpose and, thus, district's failure to pay developers prior to voter approval of such funds was not breach of underlying contracts; payment provision of contracts unambiguously provided that district's obligation to pay was expressly conditioned upon receipt of voter-approved bond funds.

4 Cases that cite this headnote

**[10]**   **Contracts**
&#x1F511; What are conditions precedent in general

A condition precedent may be either a condition to the formation of a contract or to an obligation to perform an existing agreement.

1 Cases that cite this headnote

**[11] Contracts**
    Nature and scope in general

**Contracts**
    What are conditions precedent in general

"Conditions precedent" to an obligation to perform are those acts or events, which occur subsequently to the making of a contract, that must occur before there is a right to immediate performance and before there is a breach of contractual duty; however, when the intent of the parties is doubtful or when a condition would impose an absurd or impossible result, then the agreement will be interpreted as creating a covenant rather than a condition.

Cases that cite this headnote

**[12] Contracts**
    Nature and scope in general

**Contracts**
    Conditions Precedent in General

Because of their harshness in operation, conditions are not favorites of the law; thus, in construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible.

Cases that cite this headnote

**[13] Municipal Corporations**
    Contracts relating to use of sewer system

**Water Law**
    Contracts

Municipal water district's contract with developer contemplating, among other things, developer to lease water and sewer facilities constructed by it to district at no charge until district purchased them and for district to reimburse developer 70 percent of costs of constructing facilities, did not unambiguously require district to reimburse developers only with voter-approved bond funds that were legally available and allocated for that purpose; contract

acknowledged voter approval of issuance of bonds in certain election, and it was susceptible to two competing interpretations, namely, that developer was to be paid for with voter-approved funds or with other funds specified.

4 Cases that cite this headnote

**[14] Municipal Corporations**
    Construction and operation

**Public Contracts**
    Performance or Breach

Once a governmental entity exercises its discretion to enter into a valid and enforceable contract, it no longer has unfettered "legislative discretion" to decide what its obligations are and how it will perform those obligations.

1 Cases that cite this headnote

**[15] Water Law**
    Contracts

Issue of whether contracts entered into by municipal water district, as governmental entity, are enforceable and whether the district breached them is subject to review by the courts.

Cases that cite this headnote

**[16] Trial**
    Contracts

Trial court's submission of single broad-form liability question to jury was error, in lawsuit for breach of contract, where underlying petition alleged multiple theories of breach of contract.

Cases that cite this headnote

**[17] Appeal and Error**
    Submission of Issues or Questions to Jury

Trial court's submission of single broad-form liability question to jury incorporating an invalid theory of recovery was harmful error, in breach-of-contract proceedings.

Cases that cite this headnote

**[18] Appeal and Error**

   &#128273; Submission of Issues or Questions to Jury

When a single broad-form liability question submitted to jury erroneously commingles valid and invalid liability theories and defendant's objection to said question is timely and specific, such error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding.

Cases that cite this headnote

**[19] Implied and Constructive Contracts**

   &#128273; Work and labor in general; quantum meruit

"Quantum meruit" is an equitable remedy which does not arise out of a contract, but is independent of it.

2 Cases that cite this headnote

**[20] Implied and Constructive Contracts**

   &#128273; Work and labor in general; quantum meruit

To recover under "quantum meruit," a claimant must prove that: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged.

1 Cases that cite this headnote

**[21] Evidence**

   &#128273; Construction

Water district's counsel's statement during closing argument to the effect that developers provided compensable work to district was not judicial admission of liability in quantum meruit, in developers' breach-of-contract lawsuit against district, where it was evident from context of argument that counsel was arguing that quantum meruit was not applicable; statement was not a

clear, deliberate, and unequivocal admission of quantum meruit liability.

Cases that cite this headnote

**[22] Evidence**

   &#128273; Judicial Admissions

A judicial admission must be clear, deliberate, and unequivocal.

Cases that cite this headnote

**[23] Implied and Constructive Contracts**

   &#128273; Contract for Services

Recovery in quantum meruit is generally not available when there is an express contract covering the services or materials furnished.

Cases that cite this headnote

**[24] Declaratory Judgment**

   &#128273; Determination and disposition of cause

Trial court's declaratory judgment, that municipal water district was obligated under its contracts with plaintiffs/developers to purchase their sewer, water, and drainage facilities, which was a constituent part of judgment in favor of developers in their lawsuit against district for breach of contract, was not alternative ground upon which to sustain underlying judgment awarding actual damages to developers for breach of contract upon district's appeal from said judgment; validity of trial court's declaration was wholly dependent on existence of contract liability.

1 Cases that cite this headnote

**[25] Declaratory Judgment**

   &#128273; Scope and extent of relief in general

A declaratory judgment action is not necessarily an action for affirmative relief.

Cases that cite this headnote

**[26] Eminent Domain**

What Constitutes a Taking; Police and Other Powers Distinguished

To recover under a theory that property has been taken by a governmental entity without adequate compensation, a plaintiff must establish the following: (1) that the government entity intentionally performed certain acts; (2) that resulted in the taking of the property; (3) for public use. Vernon's Ann.Texas Const. Art. 1, § 17.

Cases that cite this headnote

**[27]** **Eminent Domain**

Public Use

For purposes of state constitutional provision prohibiting the taking of private property by a governmental entity without adequate compensation, property is taken for a public use only when there results to the public some definite right or use in the undertaking. Vernon's Ann.Texas Const. Art. 1, § 17.

Cases that cite this headnote

**[28]** **Eminent Domain**

Questions for jury

Whether particular facts are enough to constitute a taking in violation of state constitutional provision prohibiting the taking of private property by a governmental entity without adequate compensation is a question of law. Vernon's Ann.Texas Const. Art. 1, § 17.

Cases that cite this headnote

**[29]** **Eminent Domain**

Waters and Water Courses; Flooding

**Eminent Domain**

Drains and sewers

Water district's use and control of developer's water, sewer, and drainage facilities pursuant to underlying contracts with developers did not constitute a taking of developers' property without compensation in violation of takings clause of state constitution, although district failed to compensate developers due to lack of requisite voter approval of bond funds, where

district disputed developers' contention that it was obligated under the subject contracts to pay developers as soon as possible with funds other than voter-approved bond funds; district lacked requisite intent. Vernon's Ann.Texas Const. Art. 1, § 17.

3 Cases that cite this headnote

**[30]** **Eminent Domain**

Government contracts

A governmental entity does not have the requisite intent under constitutional-takings jurisprudence when it withholds property or money from an entity in a contract dispute. Vernon's Ann.Texas Const. Art. 1, § 17.

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*739** Barry Abrams, Houston, for appellants.

Ramon G. Viada, III, Houston, for appellees.

Panel consists of Justice LESLIE BROCK YATES and Justice HUDSON.

**OPINION**

LESLIE BROCK YATES, Justice.

Appellant Clear Lake City Water Authority ("the Authority") appeals a judgment awarding actual damages for breach of four contracts totaling $1,696,171, attorney's fees, pre-and post-judgment interest, and costs in favor of appellees. The judgment also declared that the Authority was obligated, under its contracts with appellees, to purchase appellees' sewer, water, and drainage facilities. Additionally, the Authority board of directors was ordered to levy, assess, and collect taxes or assessments to pay the judgment. For the reasons stated below, we reverse and render the claims of three of the plaintiffs, and reverse and remand the claims of the remaining plaintiff.

### FACTUAL BACKGROUND

The Authority is a conservation and reclamation district created by the Texas Legislature in 1963 to provide water, sewer, and drainage facilities to the Clear **\*740** Lake area. Between 1993 and 1998, the Authority entered into contracts with appellees Kirby Lake Development, Ltd. ("Kirby Lake"), Miter Development Company, LLC ("Miter"), Taylor Lake Ltd. ("Taylor Lake"), and University Development, Inc. ("University"), to pay a portion of the costs incurred in constructing water and sewer facilities on properties appellees developed within the Authority.[1] Under each contract, entitled "Sales Agreement and Lease of Facilities," the developer agreed to lease the facilities to the Authority at no charge until the Authority purchased them, and the Authority agreed to reimburse the developer 70% of the costs of constructing the facilities. All of the contracts except University's contract contained substantially the same payment language.

The contracts contemplated that the primary source of funds for developer reimbursements would be the proceeds from bond sales. In 1989, the voters within the Authority had authorized the sale of $43.6 million in bonds for the purpose of reimbursing developers and paying for the installation and upkeep of the Authority's water, sewer, and drainage system. The Authority subsequently reimbursed University for the facilities constructed in two of the four sections in its development with the proceeds of one of the bond sales. By 1997, however, all of the bonds authorized in 1989 had been sold, so the Authority decided to call another bond election to obtain voter approval for the sale of additional bonds to be used for system needs and to pay for reimbursements to developers, including University and the other appellees.

On March 12, 1998, the Authority voted to call a bond election for May 2, 1998. It also voted to submit its bond proposals in three different propositions. Proposition 1 requested voter authorization for bonds for system needs and current developer reimbursements, including reimbursements to appellees. Propositions 2 and 3 were for future developer reimbursements. The Authority also approved DEV–90, which put into written policy the practice of requiring developers to pay 100% of the construction costs for facilities in their developments up front, and reimbursing them 70% of the costs from voter-approved bond funds.

Gayle Yoder, then a member of the board of directors of the Authority and later its President, became concerned that voters should be given a choice about authorizing bonds for developer reimbursements. She favored separating the bond propositions to distinguish between what she termed the "necessities" of keeping the system running and developer "subsidies." She objected to the inclusion of developer reimbursements in Proposition 1, and publicly took a position against the bond election as structured. Her opinion became the subject of local newspaper articles, and at one point, she distributed a memorandum detailing her opposition in her neighborhood of Taylor Lake Village. The memorandum reflected that it was from "Gayle I. Yoder, Director, Clear Lake City Water Authority."

The May 2 election also included several directors' positions. Two incumbent directors were challenged by Don Johnson and Elliott Cooper, who both ran on an anti-bond platform. They prepared "Vote No Bond$" campaign signs, some of which **\*741** Yoder distributed. The signs also stated "Stop using taxes to subsidize developers" and "CLC Water Authority."[2] Johnson posted a number of signs around the Authority's building.

All the propositions submitted to the voters in the May 2 election failed, and Johnson and Cooper defeated the incumbent directors. Of the three voting precincts in the Authority, the precinct that included Yoder's neighborhood of Taylor Lake Village (where she had distributed her memo to residents) defeated the bonds by the widest margin.

Because Proposition 1 failed and the Authority still required funds for maintenance and expansion of its system, the Authority decided to hold another bond election in October 1998. This time, system needs were separated from developer reimbursements into two propositions. As before, the "Vote No Bond $" signs reappeared around the Authority building and elsewhere, this time prompting a letter from the Authority's counsel requesting they be taken down because they could be read to imply that the Authority was taking a position against the bonds.

Ultimately, Proposition 1, requesting bonds for system needs, passed. However, Proposition 2, requesting bonds for funds to reimburse developers—including appellees—failed. One month later, in November 1998, the Authority changed its DEV–90 policy on reimbursing developers to require developers to pay 100% of the cost of water, sewer, and drainage facilities they install in new subdivisions.

When appellees were not paid for the facilities, they brought suit against the Authority alleging breach of contract, quantum meruit, and an unconstitutional taking based on the Authority's use of the facilities to provide water, sewer, and drainage services to customers in appellees' developments. Appellees also sought a writ of mandamus and a declaratory judgment that the Authority was obligated to fulfill its obligation to purchase the facilities "as soon as possible" with funds on hand or with the issuance of revenue bonds, which would not require voter approval. Appellees pleaded for attorney's fees and costs based on sections 37.009 and 38.001 of the Texas Civil Practice and Remedies Code, and requested a jury trial.

At trial, during questioning from appellees' attorney, Yoder took the position that the revised DEV–90 policy requiring developers to pay 100% of the cost of constructing water, sewer, and drainage facilities within their developments applied to appellees, even though it was not in effect when they signed their contracts, and appellees' agreements call for the Authority to pay 70% of the costs. However, she also stated that the full board had not voted on whether to apply the new policy to appellees. Don Johnson, when asked whether he was opposed to spending any money the Authority has on hand to reimburse appellees, stated that the Authority "has evolved beyond the point of paying any kind of developer subsidies. I think we are past that." Johnson also testified that he thought the Authority could just continue the lease arrangement indefinitely, so it would not have to pay for the facilities and taxpayers would not be charged.

The jury found breach of contract and awarded Kirby Lake $748,675.00, Miter $74,252.00, Taylor Lake $510,000.00, and University $363,244.00.[3] The jury also **\*742** found that appellees were entitled to recover in quantum meruit and awarded the same amount of damages. The issue of attorney's fees was tried to the court. Appellees elected to recover for breach of contract, and the trial court entered judgment for $1,696,171.00 in actual damages, $442,398.56 in prejudgment interest, and $362,014.75 in attorney's fees, plus post-judgment interest and costs. The trial court also declared that the Authority was obligated to purchase the facilities and ordered it to take any and all actions required to purchase them. The trial court further ordered the Authority, pursuant to Texas Water Code section 49.066(b), to levy, assess, and collect taxes or assessments to pay the judgment. The court denied the Authority's post-verdict

motions, including a motion for directed verdict and judgment notwithstanding the verdict. This appeal followed.

### ISSUES ON APPEAL

On appeal, the Authority raises seventeen issues (not including subparts) that can be grouped in the following broad categories: (1) contract construction; (2) charge error; (3) attorney fees; (4) pre- and post-judgment interest; and (5) quantum meruit. By cross-appeal, the appellees contend the trial court erred in granting a directed verdict on their takings claim. Our disposition of the Authority's contract construction and charge error issues make it unnecessary for us to address its remaining issues. We will then take up the appellees' alternative grounds for recovery based on their quantum meruit claim and the trial court's declaratory judgment. Lastly, we will address appellees' cross-point that the trial court erred in granting a directed verdict on their takings claim.

### I. The Authority's Issues

#### A. The Construction of the Contracts

The Authority contends the payment provisions of the contracts were unambiguous and the Authority did not breach those provisions. In response, appellees do not directly address whether the contracts were ambiguous. Instead, they take aim at specific contract language and assert that, as they construe the language, the Authority breached the contracts in several ways. Because the parties' arguments regarding the contract language and the facts are often at cross-purposes, we will incorporate into our discussion as much of the parties' arguments as required to resolve the issues raised.

#### 1. Were the Contracts Unambiguous?

The trial court determined the contracts were ambiguous and instructed the jury to interpret them. However, the trial court did not include special issues asking the jury to interpret specific provisions, so we do not know how the jury interpreted the contracts or on what basis they found breach of contract. The Authority contends the payment provisions of the contracts unambiguously provide that the developers were to be paid only out of legally available and allocated voter-approved bond funds, and while the Authority could use funds from other sources to pay the developers, it was not obligated to do so. In contrast, appellees contend the Authority agreed to pay "as soon as possible"

from any available source, including revenue bonds, which do not require voter approval.[4] The payment provisions of all **\*743** the contracts at issue are similarly worded, with the exception of the University contract, which is discussed separately.

We hold that the Authority is correct with regard to three of the four contracts at issue: the Kirby Lake, Miter, and 1994 Taylor Lake contracts. Accordingly, we reverse and render judgment in favor of the Authority as to those contracts. With regard to the University contract, we find that it is ambiguous. However, as discussed in section I.B. below, charge error requires that University's claims be remanded for new trial.

**(a) *The applicable law***

 **[1]** **[2]** The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *Lenape Res. Corp. v. Tennessee Gas Pipeline Co.,* 925 S.W.2d 565, 574 (Tex.1996); *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). To achieve this objective, we examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Coker,* 650 S.W.2d at 393. We construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served. *Lenape Res.,* 925 S.W.2d at 574.

 **[3]** **[4]** **[5]** If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous and it can be construed as a matter of law. *Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 728 (Tex.2001); *Lenape Res.,* 925 S.W.2d at 574. Parol evidence is not admissible for the purpose of creating an ambiguity. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania, v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995). However, if the language of a contract is subject to two or more reasonable interpretations, it is ambiguous. *Id.; see also Lenape Res.,* 925 S.W.2d at 574.

 **[6]** **[7]** Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present at the time the contract was executed. *Nat'l Union Fire Ins. Co.,* 907 S.W.2d at 520; *see also Coker,* 650 S.W.2d at 394. Only when a contract is first determined to be ambiguous may the courts consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the

instrument. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996).

 **[8]** An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 134 (Tex.1994); *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 727 (Tex.1981). For an ambiguity to exist, both interpretations must be reasonable. *Nat'l Union Fire Ins. Co.,* 907 S.W.2d at 520; *see also Glover v. Nat'l Ins. Underwriters,* 545 S.W.2d 755, 761 (Tex.1977). Thus, the appellate court must decide whether there is more than one reasonable interpretation of the contract such that a fact issue was created concerning the parties' intent. *Columbia Gas Transmission,* 940 S.W.2d at 589.

**(b) *The Kirby Lake, Miter, and 1994 Taylor Lake contracts***

The first two "whereas clauses" of the Kirby Lake, Miter, and 1994 Taylor Lake contracts are identical:

> WHEREAS, the Authority is authorized to provide, among other things, water supply, waste disposal and drainage facilities to the land within its boundaries;
>
> WHEREAS, the Developer is developing land within the Authority and desires **\*744** that water supply, waste disposal, and drainage facilities be provided to such land prior to the time at which the Authority can obtain voter approval and pay for the construction or acquisition of such facilities with the proceeds of its bonds;....

The three contracts also contain substantially the same payment provision:

> **PURCHASE AND ASSIGNMENT.** Subject to other terms and provisions hereof, the Developer agrees to sell and the Authority agrees to purchase all completed portions of the Facilities ... as soon as possible, but not more than 30 days after receipt of bond proceeds legally available and allocated by the Authority for payment therefore, in consideration of the purchase price defined in the following Section. ***It is expressly acknowledged and agreed by the parties hereto, that the Authority has no existing voter authorization to issue any bonds to pay for the cost of the Facilities, and does not anticipate that funds will be available for such costs without a voter approved bond sale for such purchase. The Authority intends to call a bond election in the near future, but is not obligated to***

*do so, and the Authority cannot predict when, if ever, such an election and bond sale will occur, or when, if ever, the Authority will have other funds available and allocated for the purchase of the Facilities. The Authority shall have the right to purchase the Facilities with funds available from a source other than a bond sale for such purpose, but shall have no obligation to do so. The Authority does agree, however, that it shall include in any bond election it does hold subsequent to the effective date of this Agreement bond authorization in an amount sufficient to pay the purchase price of the Facilities. The Authority further agrees that it shall include purchase of the Facilities in any bond issue sold subsequent to any such election.* [5]

 **[9]** We have carefully reviewed the contracts in their entirety, and conclude that the language of the above provisions, as well as the remainder of the contracts, demonstrate that these contracts unambiguously require the Authority to reimburse appellees only with voter-approved bond funds that are legally available and allocated for that purpose. While the Authority obligated itself to purchase the completed facilities "as soon as possible," that requirement did not arise until after the Authority received the proceeds of voter-approved bond funds. That the bond funds were to be voter-approved bond funds, as opposed to other types of bonds or funds, is also evident in the payment provision: "It is expressly acknowledged and agreed by the parties hereto, that the Authority has no existing voter authorization to issue any bonds to pay for the cost of the Facilities, and does not anticipate that funds will be available for such costs without a voter approved bond sale for such purchase." This statement, in the context of the entire provision, and in conjunction with other sections of the contracts, unequivocally indicates that the only funds the Authority was required to use to purchase the facilities was voter-approved bond funds. This conclusion is confirmed by the explicit language that the Authority could, but was not obligated to, use other sources of payment: "The Authority **\*745** shall have the right to purchase the Facilities with funds available from a source other than a bond sale for such purpose, but shall have no obligation to do so." Additionally, there is no obligation on the Authority to ensure that a bond election occurs, or that the voters give their approval: "The Authority cannot predict when, if ever, such an election and bond sale will occur, or when, if ever, the Authority will have other funds available and allocated for the purchase of the Facilities."

 **[10]** **[11]** **[12]** Appellees argue that the payment provision constitutes the Authority's promise to pay for the facilities, and voter approval to sell bonds is not a condition precedent that excuses the Authority's obligation to pay. A condition precedent may be either a condition to the formation of a contract or to an obligation to perform an existing agreement. *Hohenberg Bros. Co. v. George E. Gibbons & Co.,* 537 S.W.2d 1, 3 (Tex.1976). Conditions precedent to an obligation to perform are those acts or events, which occur subsequently to the making of a contract, that must occur before there is a right to immediate performance and before there is a breach of contractual duty. *Id.* However, when the intent of the parties is doubtful or when a condition would impose an absurd or impossible result, then the agreement will be interpreted as creating a covenant rather than a condition. *Id.* Because of their harshness in operation, conditions are not favorites of the law. *Criswell v. European Crossroads Shopping Ctr., Ltd.,* 792 S.W.2d 945, 948 (Tex.1990). Thus, in construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible. *Id.*

We reject appellees' contention that the receipt of voter-approved bond funds is not a condition precedent, because the payment provision of the contracts unambiguously provides that the Authority's obligation to pay is expressly conditioned upon the receipt of voter-approved bond funds. *See McWilliams v. Gilbert,* 715 S.W.2d 761, 763–64 (Tex.App.-Houston [1st Dist.] 1986, no writ) (holding that indemnity agreement unambiguously restricted general partners' reimbursement from partner to designated specific source); *see also City of Seymour v. Municipal Acceptance Corp.,* 96 S.W.2d 814, 816–17 (Tex.Civ.App.-Dallas 1936, writ dism'd by agreement) (holding that contract with city limiting source of payment to net revenues of light plant created a condition precedent to city's liability). To construe the payment provisions another way would be contrary to the plain language of the contracts.

Moreover, the failure of the condition precedent at a given time does not result in a forfeiture, only a delay in payment. Nowhere in the contracts does it provide that the failure to obtain voter approval forfeits appellees' right to receive payment for their facilities. The Authority is not excused from performing its obligation to pay when voters do not, in a particular election, approve the sale of bond funds to pay appellees; its obligation to pay simply does not arise at that time. That it may have appeared highly unlikely, at the time appellees entered to these contracts, that voters

would not approve a bond sale is no reason to rewrite the plain language of the contracts. This conclusion is further supported by the fact that, under the contracts, the Authority was permitted to lease the facilities until such time as it purchased them—a provision that demonstrates the parties contemplated a continuing contractual relationship of an unspecified duration. [6]

**\*746** Appellees contend that even if the receipt of voter-approved bond funds is a condition precedent to payment, the Authority's actions amount to a repudiation of the contracts. Specifically, appellees argue that (1) the trial testimony of Yoder and Johnson amounts to a judicial admission that the Authority has no intention of complying with the contracts, (2) voters authorized bonds to be sold to reimburse University and Kirby Lake, and (3) the Authority had over $5 million in surplus funds from voter-approved bond sales it could have used to pay appellees for their facilities. First, while the statements of Yoder and Johnson may reflect their individual beliefs, appellees cite no authority to support their contention that these statements may be attributed to the Authority, and the jury was charged that action by the Authority requires a vote of at least a quorum of the directors in a public meeting in compliance with the Open Meetings Act. Second, the record shows that the voters approved the sale of bonds for improvements within the Authority's boundaries, not specifically to University and Kirby Lake, as appellees contend. Third, as we have held, while the Authority could use other funds to pay for appellees' facilities, it was not obligated to do so with any funds other than those from a voter-approved bond sale for that purpose; there was no obligation that the Authority use funds from previous bond sales.

### (c) *Appellees' evidence of breach*

Appellees place great emphasis on the following provision in the contracts, which appellees call the "due diligence" requirement:

> **ISSUANCE OF BONDS:** The Authority shall have no obligation to obtain approval from the voters of bonds to finance purchase of the Facilities, but if such voter approval is obtained, the Authority shall sell Authority bonds for the purpose of purchasing the Facilities. The Authority agrees to commence to obtain approval by the [Texas Natural Resource Conservation] Commission of the bonds to finance purchase of the facilities upon the successful passage of a bond election subsequent to the effective date of this Agreement, but subject to the right of the Authority

to reasonably and efficiently integrate any and all other eligible Authority projects in such sale. The Authority agrees to proceed with due diligence to consummate the issuance of such bonds and the acquisition of the Facilities under such circumstances.

According to appellees, the Authority breached its "due diligence" obligation by drawing the public's attention to a misleading distinction between system needs and developer "subsidies," opposing the bond propositions, and separating the propositions for developer reimbursements from the proposition for system needs, which caused the bond elections to fail. Appellees also contend these actions constituted a violation of the Authority's ethical duties. We disagree.

As an initial matter, it is plain that the provision imposes no obligation on the Authority **\*747** to obtain voter approval: "the Authority is not obligated to obtain approval from the voters of bonds to finance the purchase of facilities...." The remainder of the sentence also makes clear that this provision does not apply until such time as voter approval is obtained: "but *if* voter approval is obtained, *then* it shall seek Commission approval of the bonds, and shall proceed with due diligence to consummate the issuance of the bonds and acquisition of the facilities" (emphasis added). The remainder of the paragraph details the Authority's obligations "upon the successful passage of a bond election." We do not interpret this provision to require the Authority to proceed with due diligence to obtain voter approval. Even if the provision could be read as appellees suggest, Yoder's actions, such as distributing memorandums in her neighborhood, publicly opposing the structure of the propositions, and referring to the reimbursements as "subsidies," are not official acts of the Authority. *Webster v. Texas & Pac. Motor Transp. Co.,* 140 Tex. 131, 134–35, 166 S.W.2d 75, 76–77 (1942) (holding that individual members acting separately and not in a public meeting do not bind the board of a governmental entity); *King v. Guerra,* 1 S.W.2d 373, 374 (Tex.Civ.App.-San Antonio 1927, writ ref'd) (same); *see also City of Corpus Christi v. Bayfront Assoc., Ltd.,* 814 S.W.2d 98, 105–06 (Tex.App.-Corpus Christi 1991, writ denied) (inappropriate statements by city council member on city stationery were not binding on city). Appellees cite no contradictory authority.

Appellees also point to the Authority's "official acts" of issuing official newsletters which, appellees contend, signaled the voters to vote against the propositions, and separating the propositions in the October 1998 elections. However, appellees identify nothing in the newsletters that

indicated that the Authority was advising voters to vote against the bond proposition for developer reimbursements. We also find no language in the contracts to support the contention that separating the propositions was a breach of contract. The contracts contain no requirement that the ballot language be structured in any particular way; all that was required was that the developers be included in any subsequent election, and they were. [7]

Appellees similarly argue the "consents and approvals" paragraph that appears in each of the contracts obligated the Authority not to unreasonably withhold its consent or approval to use other available funds to pay appellees. This paragraph, which appears toward the end of the contracts along with other miscellaneous provisions, provides as follows:

> **CONSENTS AND APPROVALS.** Whenever the consent or approval of either party hereto, or of any engineer of [sic] agent therefore, shall be required under the provisions hereof, such consent or approval shall not be unreasonably withheld.

We disagree with appellees' interpretation of this provision. The payment provisions contain no language that the Authority is required to "consent" or give its "approval" to make this provision applicable. [8] **\*748** Moreover, appellees' interpretation conflicts with the express acknowledgment in the contracts that the Authority "shall have the right to purchase the Facilities with funds available from a source other than a bond sale for such purpose, but shall have no obligation to do so." We cannot agree that this general provision trumps the express language of the payment provisions.

Therefore, we hold that the Kirby Lake, Miter, and Taylor Lake contracts unambiguously require the receipt of legally available and allocated voter-approved bond funds as a condition precedent to reimbursement. We further hold that the actions of Yoder and the other Authority board members in connection with the bond elections, the statements of Yoder and Johnson at trial, and the wording of the bond propositions in May and October of 1998 do not constitute a breach of the contracts as a matter of law.

### (d) *The University contract*

 **[13]**    The University contract, however, is different. Unlike the other contracts, the University contract expressly acknowledges, in the first whereas clause, the 1989 bond

election in which the voters approved the issuance of $43.6 million in bonds: [9]

> WHEREAS, the Authority is authorized to provide, among other things, water supply, waste disposal, and drainage facilities to the land within its boundaries and held a bond election on October 14, 1989 at which the voters authorized the issuance of $43.6 million in bonds for those purposes; The second and third whereas clauses provide as follows:

> > WHEREAS, the Authority desires that such facilities be provided prior to the sale of its bonds to pay therefor, because the interim growth of taxable values in the Authority should make such bonds saleable upon better terms and will permit the Authority to meet more easily debt service requirements on such bonds and because timely construction of such facilities will prevent further escalation of construction costs;

> > WHEREAS, the Authority desires that such facilities be provided prior to the sale of its bonds to pay therefor, because the interim growth of taxable values in the Authority should make such bonds **\*749** saleable upon better terms and will permit the Authority to meet more easily debt service requirements on such bonds and because timely construction of such facilities will prevent further escalation of construction costs;

The University contract also contains additional language not found in the payment provisions of the other contracts, which is indicated by added italics:

> **Section 2.01. PURCHASE AND ASSIGNMENT.** Subject to the other terms and provisions hereof, the Developer agrees to sell and the Authority agrees to purchase all completed portions of the Facilities ... as soon as possible, but not more than 30 days after receipt of bond proceeds, *or other funds not required for the payment of operating and maintenance expenses or the payment of debt service on any bonds of the Authority,* legally available and allocated by the Authority for payment therefor, in consideration of the purchase price in the following Section.

This section does not contain the express acknowledgments and "no obligation" language found in the other contracts. Appellees do not address whether the contract is ambiguous, but they interpret this provision to mean that the Authority agreed to purchase the facilities as soon as possible from any available source of funds. We disagree

with appellees' interpretation and find that the University contract is ambiguous.

The first whereas clause of the University contract specifically acknowledges that voters authorized the issuance of $43.6 million in bonds for the purpose of the development of water supply, waste disposal, and drainage facilities on land within the Authority, including the land later purchased by University. In the second and third whereas clauses, the parties acknowledge that the development of the facilities prior to the time the Authority can pay for them with bond proceeds is desired and advantageous to both parties. The bonds referred to in the second and third whereas clauses refer back to the bonds authorized by the voters in the first whereas clause. Therefore, the contract appears to contemplate that University was to be paid with voter-approved bond funds. [10]

Other provisions in the University contract similarly demonstrate that such bond funds were the intended source of payment. In the "Purchase Price" section, the Authority agreed to pay an amount equal to specified costs of the developer, plus interest based on the interest rate "borne by the Authority's bonds issued to reimburse the Developer for these amounts...." In the next section, the Authority agreed to "proceed with due diligence" to obtain the Commission's approval of a bond offering to finance the purchase of University's contemplated facilities. In a separate section, the timing of University's obligation to build street improvements is tied to the Authority's "delivery of its bonds issued to finance the acquisition and construction of the Facilities." Similarly, the developer agrees to provide a letter of credit to cover the cost of street improvements unless the street improvements are completed by the date the Authority advertises "the sale of its bonds issued to finance acquisition and construction of the Facilities."

Moreover, evidence of the circumstances surrounding the execution of the contract support the construction that the facilities **\*750** were to be paid for with voter-approved bond funds. The minutes of the October 14, 1993 board of directors meeting of the Authority reflects that the board approved University's project "to be funded with bond funds." In a follow-up letter to University's principal, George Kawaja, from the Authority's general manager, Wilbert Molbert, Kawaja was informed that the Authority had agreed to participate in the construction costs for the proposed water, sewer, and drainage facilities for the project "in accordance with the Authority's developmental policies." Kawaja also was informed that the Authority's contribution was to be financed "by a future bond sale if adequate bonding

authorization is available (such authorization is presently limited) or would be included in a future bond authorization election that would require voter approval." Kawaja testified that he understood that he was to be paid as described in Molbert's letter.

However, as noted above, the "Purchase and Assignment" section provides that the Authority agrees to pay for the facilities with *either* bond proceeds or "other funds not required for the payment of operating and maintenance expenses or the payment of debt service on any bonds of the Authority." Additionally, in the "Purchase Price" section's provision for the payment of interest, the parties agree to a formula for the calculation of the interest, "*provided, however,* that *if such purchase price* is paid in whole *or in part* from proceeds of bonds of the Authority, such purchase price *or part thereof* shall be subject to the Rules and applicable orders of the Commission, and the Development Policies of the Authority then in effect" (emphasis added). This language further suggests that an alternate, or additional, source of funding was contemplated. Moreover, unlike the other contracts, the University contract does not contain the express language that the Authority may, but is not obligated to, pay for the facilities with funds other than bond funds.

Nevertheless, the extent to which the "other funds" language may apply is unclear. It does not appear to encompass a complete alternative to payment with bond proceeds, because the references to bond funds throughout the contract indicate that such funds were intended to be at least a primary source of funding. Additionally, there is no alternative language for those provisions of the contract that are tied to the issuance or sale of bonds, with the exception of the calculation of interest. Consequently, the University contract is susceptible to two competing interpretations: the facilities are to be paid for with voter-approved bond funds; or, the facilities are to be paid for with either voter-approved bond funds or the "other funds" specified. Therefore, we find that the payment language of the University contract, in contrast to the other contracts discussed above, is ambiguous.

**[14]  [15]**  Having found that the University contract is ambiguous, we must next address the Authority's arguments that any interpretation of the contracts must be harmonized with certain "special considerations" applicable to government contracts, or else the contracts will be rendered void. As an initial matter, the Authority argues that, as a governmental entity, it has legislative discretion to allocate public bond funds for the benefit of the public, and the

courts have no authority to interfere unless the governing body has acted illegally or abused its substantial discretion. *See Barrington v. Cokinos,* 161 Tex. 136, 338 S.W.2d 133, 142–43 (1960); *Inverness Forest Improvement Dist. v. Hardy Street Investors,* 541 S.W.2d 454, 460 (Tex.Civ.App.-Houston [1st Dist.] 1976, writ ref'd n.r.e.). However, once the Authority exercises its discretion to enter into a valid and **\*751** enforceable contract, it no longer has unfettered "legislative discretion" to decide what its obligations are and how it will perform those obligations. Whether the contracts here are enforceable and whether the Authority breached them is subject to review by the courts. *See, e.g., Winograd v. Clear Lake City Water Auth.,* 811 S.W.2d 147 (Tex.App.-Houston [1st Dist.] 1991, writ denied) (affirming judgment against Authority on jury verdict finding breach of contract and denial of due process and equal protection); *Clear Lake City Water Auth. v. Clear Lake Utils. Co.,* 549 S.W.2d 385 (Tex.1977) (construing Authority's obligations under a contract); *see also* TEX. WATER CODE § 49.066(a) ("district may sue and be sued in the courts of this state").

The Authority also contends that the contracts must be construed to allow it to decide whether and how it will pay because the Authority cannot surrender its legislative discretion to decide whether and how to allocate public funds. In essence, the Authority argues a "future board" of the Authority cannot be required to allocate funds for developer reimbursement. In support of this assertion, the Authority cites a single case, *Marco Dev. Corp. v. City of Cedar Falls,* 473 N.W.2d 41 (Iowa 1991). In *Marco Development,* the court refused to enforce the city's agreement to widen a street next to the developer's mall project because it found that the city could not contract for the performance of its governmental functions. *See id.* at 42–43. We find *Marco Development* inapplicable because here the Authority has only agreed to pay for facilities; the fact that the payment is to be "allocated" for that purpose does not, in this circumstance, impermissibly restrict its ability to undertake its governmental functions. Indeed, the Authority is authorized by statute to contract for the joint construction, financing, ownership, and operation of water and drainage facilities, and such contracts may be of unlimited duration. *See* TEX. WATER CODE §§ 49.211, 213(a) & 49.213(c)(4). Nothing in the statutes governing the Authority limits its ability to pay its contractual obligations, and Texas courts have routinely enforced contracts requiring water districts to pay in the future. *See, e.g., Quincy Lee Co. v. Lodal & Bain Eng'rs, Inc.,* 602 S.W.2d 262, 264 (Tex.1980); *Harris County Mun. Util. Dist. No. 48 v. Mitchell,* 915 S.W.2d 859

(Tex.App.-Houston [1st Dist.] 1995, writ denied); *City of Houston v. Moody,* 572 S.W.2d 13 (Tex.Civ.App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.); *Brady v. Hidalgo County Water Control & Improvement Dist. No. 12,* 56 S.W.2d 298 (Tex.Civ.App.-San Antonio 1932), *aff'd,* 127 Tex. 123, 91 S.W.2d 1058 (1936). [11]

The Authority also argues that the Texas Constitution directly limits the power of water districts to incur debt. *See* TEX. CONST. art. XVI, § 59(c). Article XVI, section 59(c) provides in part that "[t]he Legislature **\*752** shall authorize all such indebtedness as may be necessary to provide all improvements and the maintenance thereof requisite to the achievement of the purposes of this amendment." *See id.* The only limitation on that indebtedness is the requirement of voter approval for indebtedness to be paid by taxes. *See id.; Lower Colorado River Auth. v. McCraw,* 125 Tex. 268, 274, 83 S.W.2d 629, 633 (1935); *City of Houston v. Moody,* 572 S.W.2d 13, 15–16 (Tex.Civ.App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.). The Authority cites no case law applying this constitutional provision to invalidate or limit a water district's contract in analogous circumstances.

In summary, we hold that the University contract is ambiguous, and we reject the Authority's arguments that our construction of the contract violates constitutional principles or impermissibly impinges on its governmental or legislative functions. However, as discussed in the next section, we find the trial court erred in submitting a single liability question incorporating an invalid theory of recovery. Accordingly, we reverse the trial court's judgment in favor of University and remand for trial. [12]

**B.** *Casteel* **Charge Error**

The Authority next contends that there is *Casteel* error in the broad-form submission of the breach of contract liability question, because it cannot be determined whether the jury applied an invalid theory to find a breach. For the same reason, the Authority asserts the damages question is defective. Specifically, the Authority contends that the developers alleged three theories of breach of contract in their pleadings, and that all three are invalid: (1) breach of the pay provision, (2) the "prevention doctrine," and (3) the "split format" theory. As to the first of these—breach of the pay provision—we have determined that University's breach of contract claim was properly before the jury. However, we agree with the Authority that the other breach of contract theories were invalid and should not have been considered

by the jury as a basis for breach of contract. Because we cannot determine from the jury's answers the basis for their finding that the Authority failed to comply with its contracts, we find that the error is harmful, and we reverse and remand University's claims for trial.

 [16]   [17]   Here, the trial court submitted a single question on liability under the contracts, which asked the jury the following: "Did the Water Authority fail to comply with the sales agreements, if any, entered into with the respective Plaintiffs?" [13]  Beneath the question was a line for each developer in which the jury was to answer "yes" or "no." At the charge conference, the Authority timely and specifically objected to the question on the grounds now raised. The jury answered "yes" for each appellee, except as to the 1998 Taylor Lake contract.

 [18]   As stated above, the two theories we find invalid are, as referred to by the Authority, the "prevention doctrine" and the "split format" theory. The "prevention doctrine" refers to actions of certain members of the Authority's board during **753 the May and October 1998 bond elections because the developers allege that those actions prevented the passage of the bond proposals that would have authorized the sale of additional bonds to pay them. The "split format theory" refers to the developers' argument that the Authority's decision to split the bond propositions in the October 1998 bond election into one for developer reimbursements and one for water system necessities caused the bond proposition for developer reimbursements to fail. Both were specifically alleged in appellees' petition as bases for breach of contract. As we have already discussed in section I.A.(1)(c) above, we do not find either the prevention doctrine or the split format theory to be a valid basis for breach of contract in this case. Under *Crown Life Insurance Co. v. Casteel,* 22 S.W.3d 378 (Tex.2000), "when a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding." *Id.* at 389. Here, we are unable to determine whether the jury based its conclusion on the actions of Yoder or other board members in opposing the bond propositions for developer reimbursement, or on the Authority's decision to split the bond propositions, or something else. The problem is compounded by the trial court's instruction to the jury to interpret the contracts without specifying which provisions they were to interpret. Therefore, we must conclude that

the error was harmful, and reverse and remand University's claims for new trial.

## II. Appellees' Alternative Grounds for Recovery

### A. Quantum Meruit

 [19]   [20]   Alternatively, appellees argue that they should be allowed to recover on their quantum meruit claim. Quantum meruit is an equitable remedy which does not arise out of a contract, but is independent of it. *Vortt Exploration Co. v. Chevron U.S.A., Inc.,* 787 S.W.2d 942, 944 (Tex.1990). To recover under quantum meruit, a claimant must prove that: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged. *Id.*

 [21]   Appellants first contend that they are entitled to recover on quantum meruit because liability was judicially admitted by the Authority's counsel in closing argument. Appellants point to the statements by the Authority's counsel during his discussion of the jury charge, when he said that the jury question on quantum meruit liability should be answered "yes" and told the jury that, as to whether appellees provided compensable work to the Authority, "Of course. We've never disputed that. This issue isn't whether the private developers did something of value. The issue is when and how they ought to be paid." Appellees also point to the Authority's counsel's arguments to the jury that they should not award more than the 70% figure calculated by appellees' expert, and requesting that the jury award that amount as the reasonable value of the compensable work performed by the plaintiffs. We have reviewed the record and find that the statements of the Authority's counsel do not constitute a judicial admission.

 **754  [22]   A judicial admission must be clear, deliberate, and unequivocal. *Regency Advantage Ltd. P'ship v. Bingo Idea–Watauga, Inc.,* 936 S.W.2d 275, 278 (Tex.1996). During closing argument, the Authority's counsel began his discussion of the jury question on quantum meruit liability by stating that "this one should not be applicable." He went on to argue that whether appellees did something of value was undisputed—what was at issue was whether they had contractually agreed to be paid for that work when the voters approved payment from bond proceeds:

This issue isn't whether the private developers did something of value. The issue is how and when they ought to be paid.

Question three should be answered yes. They were going to be paid 70 percent of their reimbursable expenses out of voter-approved bond funds. That's an easy one. They may still be paid, if, as and when a future election authorizes the use of funds to pay them. And as the Court told you, this is an unlimited duration contract.

The Authority's counsel also addressed the question of quantum meruit damages by arguing that under the contracts, the developers were only going to get reimbursed 70% of the cost of the facilities, and therefore they should not be compensated for the reasonable value of their services in an amount greater than the amount they would have received under the contracts.

We do not find the Authority's statements to be a "clear, deliberate, and unequivocal" admission of quantum meruit liability. It is evident from the context that counsel was arguing that quantum meruit was not applicable, but if the jury was going to answer it in favor of appellees, they should award no more than the amount they agreed to be paid under the contracts. Even if counsel's statement that it was "undisputed" that appellees "did something of value" were construed as an admission, at most it addresses only the first of the four necessary elements of quantum meruit. Therefore, we reject appellees' argument that the Authority judicially admitted liability in quantum meruit.

 [23]    Appellees next argue that they satisfy the elements of quantum meruit because the Authority has accepted the facilities and is using them to provide water and sewer services to customers within its boundaries in accordance with its statutory duties, and it was reasonably notified that appellees expected payment for the facilities. However, recovery in quantum meruit is generally not available when there is an express contract covering the services or materials furnished. *See Vortt,* 787 S.W.2d at 944. In their brief, appellees mention that the existence of an express contract will not defeat a recovery in quantum meruit when the contract is deemed invalid, abandoned, or if it is partially performed without the fault of the party seeking to recover in quantum meruit, citing *W & W Oil Co. v. Capps,* 784 S.W.2d 536, 537–38 (Tex.App.-Tyler 1990, no writ), and *Angroson, Inc. v. Independent Communications, Inc.,* 711 S.W.2d 268, 271–72 (Tex.App.-Dallas 1986, writ ref'd n.r.e.), but they do

not argue that any of these exceptions are applicable to them. In any event, we do not find the stated exceptions applicable to the facts of this case; therefore, we hold that the existence of express contracts prohibits appellees from recovering on the alternative ground of quantum meruit.

### B. Declaratory Judgment

 [24]    [25]    Appellees also argue that the trial court's declaratory judgment is an alternative ground for the judgment which the Authority did not appeal. Appellees refer to that part of the reformed final **\*755** judgment in which the trial court ordered that "Pursuant to Chapter 37 of TEX. CIV. PRAC. & REM CODE, the Clear Lake City Water Authority is obligated under its contract with Plaintiffs to purchase Plaintiffs' sewer, water, and drainage Facilities and its Board of Directors shall take any and all actions required to purchase the Facilities." Appellees contend that the Authority did not raise any challenge in its brief to this declaration, and any complaint about it is therefore waived. They also contend that the Authority judicially admitted what a reasonable price for the facilities would be. For this assertion, appellees again rely on the Authority's counsel's closing remarks about the reasonable value of the compensable work performed by the plaintiffs in his statements to the jury regarding their answer to the quantum meruit damages question discussed above. However, a declaratory judgment action is not necessarily an action for affirmative relief. *See Republic Ins. Co. v. Davis,* 856 S.W.2d 158, 164 (Tex.1993). The relief provided under the Declaratory Judgments Act is remedial only, and it serves only " 'to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations.' " *Id.* (citing TEX. CIV. PRAC. & REM.CODE § 37.002(b)). Here, the Authority has requested that we reverse "the judgment," which subsumes the declaratory judgment, because appellees' contract claims are infirm. The viability of the trial court's declaration is wholly dependent upon the existence of the contract liability the Authority challenges. Because we have found the Authority is not liable under its contracts with appellees, the relief granted pursuant to the Act cannot be sustained. Therefore, we hold that the trial court's declaration does not constitute an alternative ground upon which to sustain the judgment.

### III. Appellees' Cross–Point on Their Takings Claim
 [26]    [27]    [28]    In a single cross-point, appellees contend the trial court erred in granting the Authority's directed verdict on their claim that the Authority's use and control of the facilities constitutes a taking of appellees' property without

compensation in violation of Article I, Section 17 of the Texas Constitution. To recover under a theory that property has been taken by a governmental entity without adequate compensation, a plaintiff must establish the following: (1) that the government entity intentionally performed certain acts; (2) that resulted in the taking of the property; (3) for public use. *Gen. Servs. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 598 (Tex.2001); *Loyd v. ECO Res., Inc.,* 956 S.W.2d 110, 128 (Tex.App.-Houston [14th Dist.] 1997, no writ). Property is taken for a public use only when there results to the public some definite right or use in the undertaking. *Loyd,* 956 S.W.2d at 128. Whether particular facts are enough to constitute a taking is a question of law. *Little–Tex Insulation,* 39 S.W.3d at 598.

 **[29]**   **[30]**   Appellees argue that the evidence was sufficient to submit the claim to the jury, because it showed that the Authority, a governmental entity, took possession of appellees' facilities for public use to provide residents of the district with water, sewer, and drainage services, but has not, and said it will not, pay for the facilities. However, a governmental entity does not have the requisite intent under constitutional-takings jurisprudence when it withholds property or money from an entity in a contract dispute. *See Little–Tex,* 39 S.W.3d at 598–99; *see also Green Int'l, Inc. v. State,* 877 S.W.2d 428, 434 (Tex.App.-Austin 1994, writ dism'd) ("Even if the government were to withhold property or payment it believed to be due the **\*756** other party, the government would still be acting within the color

of right to the extent it had a good faith belief that its actions were justified due to disagreements over payment due or performance under the contract."). Here, the Authority disputed appellees' contention that it was obligated under the contracts to pay appellees for their facilities as soon as possible with any available funds; therefore, it lacks the requisite intent. Accordingly, we overrule appellees' cross-point.

### CONCLUSION

We hold that the Kirby Lake, Miter, and Taylor Lake contracts unambiguously require the receipt of voter-approved bond funds as a condition precedent to payment by the Authority; accordingly, we reverse and render judgment in favor of the Authority against Kirby Lake, Miter, and Taylor Lake. We further hold that University's breach of contract claims are reversed and remanded for a new trial. We further hold that the trial court did not err in granting the Authority's motion for directed verdict on appellees' takings claim.

Former Chief Justice SCOTT BRISTER not participating.

**All Citations**

123 S.W.3d 735

Footnotes

1   Kirby Lake, Miter and University each entered into one contract with the Authority. Taylor Lake entered into two contracts with the Authority, one in 1994 and one in 1998, because the Authority was not immediately able to annex a portion of the property Taylor Lake sought to develop.

2   Apparently, the signs also included a date that was taped over for use in the later bond election held in October 1998.

3   The jury found that the Authority failed to comply with each of the contracts except the 1998 Taylor Lake contract, and did not award damages for that contract. Taylor Lake does not appeal this finding.

4   In addition to revenue bonds, appellees contend that the Authority could pay with surplus funds from the sale of ad valorem tax bonds or cash on hand.

5   The bold and italicized portions are reproduced as they appear in the Kirby Lake and Miter contracts. The provision in the 1994 Taylor Lake contract consists of uniform characters without emphasis. The 1994 Taylor Lake contract also specifies that "The Authority intends to call a bond election in March or May of 1994" instead of "in the near future."

6   The Authority, in addition to arguing that the receipt of voter-approved bond funds is a condition precedent to payment under the contracts, also contended that the language in the payment provision of the contracts that the funds must be "legally available" likewise constituted a condition precedent to payment. Because no funds became "legally available" for payment, the Authority urges, the condition precedent was not fulfilled and there can be no breach of contract. However, we do not find the phrase "legally available" in the context of the payment provisions to constitute a condition precedent. At most, it simply recognizes the manner and mechanism by which the Authority would authorize the expenditures.

7   The Authority also argues, as additional support for its contention that it did not breach the contracts by refusing to combine the bond elections, that the October 1998 election was outside the scope of the Kirby Lake, Miter, and Taylor

Lake contracts because it was only required to include a proposition for developer reimbursements in one election. We express no opinion on the Authority's interpretation of the provision, as appellees make no argument in response and neither party raises this interpretation of the provision as an issue.

8    In contrast, other provisions of the contracts expressly incorporate this provision. For example, section 1.01 of the University contract, dealing with construction of the facilities, provides "[a]ny and all Contracts or change orders to the Contracts shall be subject to approval by the board of Directors of the Authority (the "Board") (which approval shall not be unreasonably withheld)." Likewise, in section 4.01, dealing with the construction of street improvements, the developer agrees to complete and pay for street improvements in the subdivision "as described in the respective plats thereof (as the same may hereafter be amended either without effect to the size or location of such Street Improvements or with the consent of the Authority) in accordance with the plans and specifications therefor approved by the engineers for the Authority, which approval shall not unreasonably be withheld...."

9    Appellees also contend the area that became the subject of the Kirby Lake contract was included in the 1989 bond election, but there is no reference to the bond election in the Kirby Lake contract, which was executed in July of 1997, as there is in the University contract. Moreover, Kirby Lake did not enter into its contract with the Authority until after all the 1989 bond proceeds had been spent or allocated for other purposes. As reflected in the minutes of the public meeting in which the Authority voted to authorize the contract with Kirby Lake, Jack Beard, Kirby Lake's principal, and the Authority stipulated to the following:

> Developer reimbursements are strictly subject to the availability of appropriate bond funds. At this time the Authority and the Developer, Kirby Lake Development, Inc. acknowledge that such funds are not available and that the availability of such funds is subject to voter approval.

10   Sections 1 and 2 of the University development were ultimately included in a 1997 bond sale, and University was paid for those sections out of those proceeds. Sections 3 and 4 were put on the May 1998 ballot, but the proposition failed, and University was not paid for those sections.

11   In connection with this issue, the Authority argues that because the Texas Constitution limits the legislature's discretion to create debt, *see* TEX. CONST. art. III, §§ 44, 49a, 50; art. IV, § 14; art. VIII, § 6, the Authority, as a creation of the legislature, is similarly limited and therefore cannot bind "future boards" of the Authority to allocate funds to pay for the facilities. We are unpersuaded that the constitutional limitations on legislative appropriations is applicable here, and the Authority cites no case law in which these limitations were applied to a water district's contractual obligations. Similarly, the Authority argues that any interpretation of the contract that implies a requirement to appropriate future public funds, when no such requirement clearly and unmistakably appears on the face of the contract, violates the constitutional requirement of separation of powers. Again, we disagree that the contractual agreement to pay a portion of the cost of the facilities in these contracts impinges on the Authority's governmental functions.

12   Because of our disposition of the case, we do not reach the Authority's argument that there was legally and factually insufficient evidence of developer interest, which was part of the damages award.

13   The question also included this instruction: "It is your duty to interpret the meaning of the written agreements of the parties in this case. To interpret each agreement, you must consider, in addition to the language in the agreements, the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties."

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

L

🚩 KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by**    McIntyre v. Commission for Lawyer Discipline,
Tex.App.-Dallas,    March 6, 2008

774 S.W.2d 662
Supreme Court of Texas.

Frank COSGROVE, Petitioner,

v.

Walter GRIMES et al., Respondents.

No. C–8089.    |    June 28, 1989.

Client sued attorneys for negligence, breach of contract, and violation of state Deceptive Trade Practices Act under theory of breach of implied warranty. The 334th District Court, Harris County, Marsha D. Anthony, J., rendered take-nothing judgment as to one attorney after client dropped second attorney from suit and third attorney died, and client appealed. The Court of Appeals, 757 S.W.2d 508, affirmed and client applied for writ of error. The Supreme Court, Spears, J., held that: (1) no subjective good-faith excuse existed for attorney negligence; (2) client was entitled to recover in negligence; and (3) attorney waived objections to damage instructions.

Reversed and rendered.

West Headnotes (8)

**[1]    Attorney and Client**
🔑 Elements of Malpractice or Negligence Action in General

An attorney malpractice action is based on negligence.

53 Cases that cite this headnote

**[2]    Attorney and Client**
🔑 Skill and Care Required

There is no subjective good-faith excuse for attorney negligence, but rather a lawyer is held to the standard of care which would be exercised by a reasonably prudent attorney.

63 Cases that cite this headnote

**[3]    Attorney and Client**
🔑 Nature of Attorney's Duty

In a legal malpractice action, the jury must evaluate the attorney's conduct based on the information the attorney had at the time of the alleged act of negligence.

30 Cases that cite this headnote

**[4]    Attorney and Client**
🔑 Pleading and Evidence

Determination that attorney was negligent in his representation of client in personal injury action and that such negligence adversely affected client was supported by sufficient evidence.

Cases that cite this headnote

**[5]    Attorney and Client**
🔑 Damages and Costs

Proper amount of damages in legal malpratice action for negligent misrepresentation in a personal injury action is amount of damages recoverable and collectible by client from personal injury defendant if suit had been properly prosecuted.

22 Cases that cite this headnote

**[6]    Appeal and Error**
🔑 Instructions

Attorney's failure to distinctly point out any error in damage instructions in legal malpractice action resulted in waiver of issue of whether instructions were proper.

9 Cases that cite this headnote

**[7]    Damages**
🔑 Particular Cases

Plaintiff in legal malpractice action was entitled to recover for mental anguish suffered as a result of attorney's negligence.

58 Cases that cite this headnote

**[8]    Trial**

☞ Particular Actions or Issues

Legal malpractice plaintiff's failure to tender to court a properly worded jury issue on breach of implied warranty under Deceptive Trade Practices Act waived any ground of recovery based on Act. Vernon's Ann.Texas Rules Civ.Proc., Rule 278; V.T.C.A., Bus. & C. § 17.41 et seq.

13 Cases that cite this headnote

**Attorneys and Law Firms**

**\*663** Timothy H. Pletcher, Helm, Pletcher, Hogan, Bowen & Saunders, Houston, for petitioner.

George D. Gordon, Baggett & Gordon, Richard S. Browne, Houston, for respondents.

**OPINION ON MOTION FOR REHEARING**

SPEARS, Justice.

Our opinion and judgment of April 19, 1989 are withdrawn and the following substituted therefor:

The issues in this case concern the applicability of the "good faith" defense in legal malpractice actions. The trial court held that the exception barred client Frank Cosgrove from recovering on his claim. The court of appeals affirmed. 757 S.W.2d 508. We reverse and render judgment for Cosgrove.

In July 1976, Cosgrove was injured when the automobile he was driving was struck from the rear by a car driven by Will Michael Stephens. Timothy Purnell was a passenger in Stephens' car at the time of the accident which occurred on Decker Drive, south of the intersection with Airhart in Baytown, Texas. The Baytown Police Department was called, and an accident report was made by the responding officer.

Soon after the accident, Cosgrove contacted attorney Ed W. Bass, Jr. regarding the accident. Cosgrove executed a power of attorney which designated Bass and Walter Grimes, also an attorney, to represent his interest in the claim. Bass apparently performed no investigation of the circumstances surrounding the case and no lawsuit was filed by Bass. Some time after this initial meeting and before July 1978, Bass notified Cosgrove that he was leaving the state and was turning his automobile collision claim over to Grimes. It is disputed at what point Grimes was notified of the circumstances surrounding the automobile collision. At some time before the statute of limitations ran, however, Grimes filed suit against Purnell.

After the statute of limitations had run, Cosgrove learned that suit had been filed against the wrong person. Grimes, alleging that he had relied on Cosgrove's information, had filed suit against the passenger in the car which struck Cosgrove, rather than Stephens, the car's driver. Cosgrove also discovered that Grimes had alleged the wrong location of the accident.

Based upon errors in the suit filed, Cosgrove sued attorneys Bass and Grimes, and another attorney, Don Hendrix.[1] Cosgrove's malpractice suit alleged negligence, breach of contract, false representations and Deceptive Trade Practices Act ("DTPA") violations under a theory of breach of implied warranty.[2] This suit was consolidated with Cosgrove's personal injury claim.

Eventually, the defendant Hendrix was dropped, and the suit against the remaining defendants proceeded to trial before a jury. Most of the evidence at trial regarding the legal malpractice claim concerned only Grimes. Grimes insisted that he had no knowledge of Cosgrove's cause of action until July 10, 1978, five days before the two-year statute of limitations would run. Grimes testified that on that date he met with Cosgrove and received information concerning the name of the party to sue and the accident's location. Grimes also stated he had not been notified that his name was on the power of attorney executed by Cosgrove, and that he had never been engaged in a partnership with Bass. Cosgrove testified that he contacted and met with Grimes shortly after Bass left the state. Cosgrove said the contact, five days before limitations ran, was actually only a telephone inquiry about the status of the case.

The jury found that Stephens, the driver of the car that hit Cosgrove, had been negligent and that such negligence was a proximate cause of the accident. The jury **\*664** also found that Cosgrove would probably have collected $2,000 from Stephens as damages resulting from the collision.

The jury also found that Grimes had been negligent and that such negligence was a proximate cause of damages to Cosgrove. Further, the jury found that Grimes had failed to use "reasonable and ordinary care and diligence" in prosecuting the suit arising from the automobile collision,

that this failure adversely affected Cosgrove, and that $500.00 would compensate Cosgrove for the mental anguish he suffered as a result of Grimes' representation. No issues were submitted regarding the role of attorney Bass.

Grimes submitted proposed issues which included a good faith defense to a legal malpractice claim. Cosgrove objected to these issues as merely evidentiary, as submitting an inferential rebuttal issue, and as failing to properly submit all elements of any good faith defense, should one exist. The trial court submitted the two issues over Cosgrove's objections. The jury found Grimes had in good faith relied on the information given to him by Cosgrove, and based upon that information, Grimes had acted in Cosgrove's best interest.

Having received favorable jury answers on their submitted issues, both Cosgrove and Grimes moved for judgment on the verdict. Cosgrove later filed a motion to disregard the special issues concerning Grimes' good faith and whether his actions were in Cosgrove's best interest. The trial court denied this motion, and judgment was rendered that Cosgrove take nothing in his suit against the passenger, Purnell, and that he take nothing against Grimes or Bass.

The court of appeals affirmed, holding that the good faith exception to attorney negligence applied when the attorney exercised his best judgment in what he believed was his client's best interests. 757 S.W.2d 508. The court of appeals also ruled that the issue of good faith was defensive, rather than an inferential rebuttal, and thus its submission in this case was proper. Finally, the court held that Cosgrove had not properly submitted issues concerning his DTPA claim, and thus the trial court properly denied him recovery on that cause of action.

In his application for writ of error in this court Cosgrove advances two arguments. First, he contends the good faith exception to attorney negligence should be abolished because it allows attorney conduct to be measured by a lower standard of care than that of other professions. Second, he argues that the jury's answers to the issues submitted establish his right to recover based on negligence and also breach of implied warranty under the DTPA.

**[1]** An attorney malpractice action in Texas is based on negligence. *Fireman's Fund Amer. Ins. Co. v. Patterson & Lamberty, Inc.,* 528 S.W.2d 67 (Tex.Civ.App.—Tyler 1975, writ ref'd n.r.e.); *Patterson & Wallace v. Frazer,* 79 S.W. 1077 (Tex.Civ.App. 1904, no writ), *appeal after remand,* 93

S.W. 146 (Tex.Civ.App.), *rev'd on other grounds,* 100 Tex. 103, 94 S.W. 324 (1906). Some courts have held that if an attorney makes an error in judgment, but acted in good faith and in what the attorney believed was the client's best interest, the attorney is not liable for malpractice. *See e.g., Cook v. Irion,* 409 S.W.2d 475 (Tex.Civ.App.—San Antonio 1966, no writ). In the instant case the jury found that Grimes had acted in good faith in relying on the information Cosgrove allegedly furnished to Grimes, and the trial court rendered judgment for Grimes.

**[2]** **[3]** There is no subjective good faith excuse for attorney negligence. A lawyer in Texas is held to the standard of care which would be exercised by a reasonably prudent attorney. The jury must evaluate his conduct based on the information the attorney has at the time of the alleged act of negligence. In some instances an attorney is required to make tactical or strategic decisions. Ostensibly, the good faith exception was created to protect this unique attorney work product. However, allowing the attorney to assert his subjective good faith, when the acts he pursues are unreasonable as measured by the reasonably competent practiner standard, creates too great a burden for wronged clients to overcome. **\*665** The instruction to the jury should clearly set out the standard for negligence in terms which encompass the attorney's reasonableness in choosing one course of action over another.

If an attorney makes a decision which a reasonably prudent attorney *could* make in the same or similar circumstance, it is not an act of negligence even if the result is undesirable. Attorneys cannot be held strictly liable for all of their clients' unfulfilled expectations. An attorney who makes a reasonable decision in the handling of a case may not be held liable if the decision later proves to be imperfect. The standard is an objective exercise of professional judgment, not the subjective belief that his acts are in good faith. To the extent that some Texas courts have recognized an exception to attorney negligence based on the subjective good faith of the attorney, those cases are disapproved. *E.g., Tijerina v. Wennermark,* 700 S.W.2d 342 (Tex.App.—San Antonio 1985, no writ); *Medrano v. Miller,* 608 S.W.2d 781 (Tex.Civ.App.—San Antonio 1980, writ ref'd n.r.e.); *State v. Baker,* 539 S.W.2d 367 (Tex.Civ.App.—Austin 1976, writ ref'd n.r.e.); *Hicks v. State,* 422 S.W.2d 539 (Tex.Civ.App.—Houston [14th Dist.] 1967, writ ref'd n.r.e.); *Cook v. Irion,* 409 S.W.2d 475 (Tex.Civ.App.—San Antonio 1966, no writ).

Disregarding the jury's findings concerning good faith, we must now determine whether Cosgrove may recover on his

claim of malpractice. An action for negligence is based on four elements. The plaintiff must prove that there is a duty owed to him by the defendant, a breach of that duty, that the breach proximately caused the plaintiff injury and that damages occurred. *McKinley v. Stripling,* 763 S.W.2d 407 (Tex.1989).

 **[4]**    In this case Cosgrove submitted seven special issues regarding his professional malpractice claim against Grimes. [3] The jury found in issue number 5 that Grimes had been negligent in his representation of Cosgrove and in issue number 6 that such negligence adversely affected Cosgrove. There is evidence in the record to support these findings.

 **[5]**    **[6]**    Issues number 7 and 8 inquired about damages Cosgrove would have recovered and collected as a result of the **\*666** collision. The two issues should have inquired as to the amount of damages recoverable and collectible from Stephens *if the suit had been properly prosecuted. See* 3 State Bar of Texas, *Texas Pattern Jury Charges* PJC 85.01 (1982). Although these issues were defectively submitted, Grimes failed to object to them by distinctly pointing out any error. Because Grimes waived the error in the submission, we render judgment that Cosgrove recover $2000 in accordance with the jury's finding on issues number 7 and 8. *See* Tex.R.Civ.P. 274; *see also* 34 G. Hodges & T. Guy, *The Jury Charge in Texas Civil Litigation* § 149, at 271–74 (Texas Practice 2d ed. 1988).

 **[7]**    The jury found in response to issue number 9, that $500 would fairly and reasonably compensate Cosgrove for mental anguish suffered as a result of Grimes' negligence. This issue properly assessed damages incurred by Cosgrove because of Grimes' negligent handling of the first suit. Therefore, Cosgrove is entitled to recover this amount based upon the jury's finding.

 **[8]**    Cosgrove also argues that issue number 5 and issue number 6 embrace a DTPA claim based on breach of an implied warranty. Assuming *arguendo* such a cause of action existed against an attorney under the 1977 version of the DTPA, the issues requested by Cosgrove did not properly place the matter before the jury. At best the language of the submission vaguely alluded to a standard of care, not to an implied warranty. Because the issue did not inquire whether Grimes breached an implied warranty, Cosgrove may not recover on such a claim. Cosgrove's failure to tender a properly worded jury issue to the court for inclusion in the jury charge constituted waiver of any ground of recovery based on the DTPA. Tex.R.Civ.P. 278.

We hold that the trial court erred in submitting issues to the jury concerning Grimes' good faith. Based on the jury's answers to the remaining issues, we reverse the judgment of the court of appeals and render judgment that Cosgrove be awarded $2500.00 as compensation for damages suffered as a result of Grimes' negligent prosecution of Cosgrove's cause of action.

**All Citations**

774 S.W.2d 662

---

Footnotes

1    After the death of Bass, his estate was made a party defendant.

2    The DTPA claim was brought under the 1977 version of that act, thus all references to the DTPA concern the act in effect in 1977.

3    The five special issues relevant here are set out below:
      SPECIAL ISSUE NO. 5
      Do you find that Defendant Walter Grimes failed to exercise reasonable and ordinary care and diligence in applying the skill and knowledge at hand in the prosecution of the lawsuit arising from the July 15, 1976 collision?
      Answer "Yes" or "No."
      ANSWER: <u>Yes</u>
      If your answer to Special Issue No. 5 was "Yes," and only in that event, then answer Special Issue No. 6 below.
      SPECIAL ISSUE NO. 6
      Did such failure adversely affect Frank Cosgrove?
      Answer "Yes" or "No."
      ANSWER: <u>Yes</u>
      SPECIAL ISSUE NO. 7

Find from a preponderance of the evidence what sum of money, if any, if paid now in cash, would fairly and reasonably compensate Frank Cosgrove for his loss, if any, resulting from the occurrence in question?

You are to consider each element of damage separately, so as not to include damages for one element in any other element.

You are instructed that you shall award the sum, if any, that Frank Cosgrove would have in reasonable probability recovered as a result of the July 15, 1976 collision.

Consider the following elements of damage, if any, and none other and answer separately in dollars and cents, if any:

(a) Physical pain and mental anguish in the past; loss of earning capacity in the past; disfigurement in the past and physical impairment in the past.

$2,000.00

(b) Disfigurement and physical impairment that, in reasonable probability, he will suffer in the future.

$ 0

SPECIAL ISSUE NO. 8

Find from a preponderance of the evidence the amount of damages you found in Special Issue No. 7 that Frank Cosgrove would have in reasonable probability collected from WILL MICHAEL STEPHENS as a result of the collision? Answer in dollars and cents, if any.

$2,000.00

SPECIAL ISSUE NO. 9

Find from a preponderance of the evidence what sum of money, if any, if paid now in cash, would fairly and reasonably compensate Frank Cosgrove for the mental anguish he has suffered if any, as a result of the actions of Walter Grimes in connection with his representation of Mr. Cosgrove regarding the July 15, 1976 collision? Answer in dollars and cents, if any.

ANSWER: $500.00

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

M

607 S.W.2d 240
Supreme Court of Texas.

Oleta Gravitt DIXON, Individually
and as Executrix et al., Petitioners,
v.
SOUTHWESTERN BELL
TELEPHONE COMPANY, Respondent.

No. B-8208. | Oct. 22, 1980.
| Rehearing Denied Nov. 19, 1980.

Former employee and executrix of deceased former employee brought action against employer alleging conspiracy, oral and written defamation, invasion of privacy, and economic duress. The 166th District Court, Bexar County, Peter Michael Curry, J., entered judgment in favor of employee and executrix on a jury verdict imposing liability on employer for slander, and employer appealed. The Court of Civil Appeals, Murray, J., 575 S.W.2d 596, reversed and rendered a take nothing judgment against plaintiffs, who petitioned for review. The Supreme Court, Pope, J., held that holding of Court of Civil Appeals that conditional privilege of employer to make inquiries or investigations so as to render statements made by employer or representatives of employer during such investigations conditionally privileged for purposes of slander action existed as matter of law under facts in the case did not conflict with cited cases which held that under those records issue of conditional privilege was question of fact for jury; therefore, Supreme Court had no jurisdiction to review decision of the Court of Civil Appeals.

Application dismissed for want of jurisdiction.

West Headnotes (3)

**[1]** **Courts**
👉 Review by or Certificate to Supreme Court by Court of Civil Appeals of Questions Where Its Decision Conflicts with or Overrules That of Another Court of Civil Appeals or That of the Supreme Court

In slander case wherein justices of Court of Civil Appeals did not disagree, jurisdiction of Supreme Court, if it existed at all, had to rest upon conflict with prior decision of another

Court of Civil Appeals or Supreme Court upon material question of law. Vernon's Ann.Civ.St. arts. 1728, subd. 2, 1821.

1 Cases that cite this headnote

**[2]** **Trial**
👉 Questions of Law or Fact in General

Issue which is normally question of fact can be proved so conclusively by evidence at trial that it becomes question of law rather than question of fact.

5 Cases that cite this headnote

**[3]** **Courts**
👉 Review by or Certificate to Supreme Court by Court of Civil Appeals of Questions Where Its Decision Conflicts with or Overrules That of Another Court of Civil Appeals or That of the Supreme Court

Holding of Court of Civil Appeals that conditional privilege of employer to make inquiries or investigations so as to render statements made by employer or representatives of employer during such investigations conditionally privileged for purposes of slander action existed as matter of law under facts in the case did not conflict with cited cases which held that under those records issue of conditional privilege was question of fact for the jury so as to give Supreme Court jurisdiction to review decision of Court of Civil Appeals. Vernon's Ann.Civ.St. arts. 1728, subds. 1, 2, 1821.

45 Cases that cite this headnote

**Attorneys and Law Firms**

**\*240** Law Offices of Pat Maloney, Pat Maloney and Jack Pasqual, San Antonio, for petitioners.

Green & Kaufman, Hubert W. Green, Groce, Locke & Hebdon, Jack Hebdon, James E. Barden, San Antonio, for respondent.

**Opinion**

POPE, Justice.

This is a slander case. The trial court rendered judgment for Oleta Gravitt Dixon [1] and James H. Ashley, in their suit against Southwestern Bell Telephone Company. The court of civil appeals reversed the judgment and rendered a take-nothing judgment against the plaintiffs, holding that the undisputed facts in the case established Southwestern Bell's defense of conditional privilege to conduct an investigation and that there was no evidence of malice **\*241** which would overcome the privilege. 575 S.W.2d 596. The application is dismissed for want of jurisdiction.

Since the Legislature has limited our jurisdiction of slander cases, we must determine at the outset if we have jurisdiction. Article 1821 [2] provides in part that in all cases of slander, "the judgments of the Courts of Civil Appeals shall be conclusive on the law and facts" and no "writ of error (shall) be allowed thereto from the Supreme Court ...." The only exceptions permitted by this statute are from an appealable judgment "in which the judges of the Courts of Civil Appeals may disagree upon any question of law material to the decision, or in which one of the Courts of Civil Appeals holds differently from a prior decision of another Court of Civil Appeals or of the Supreme Court upon a question of law, as provided for in Subdivisions (1) and (2) of Article 1728."

 **[1]** The justices of the court of civil appeals did not disagree here, and our jurisdiction, if it exists at all, must rest upon a conflict as provided for in Subdivision 2 of Article 1728. [3] We have concluded that the requisite conflict does not exist and that the application for writ of error must be dismissed for want of jurisdiction.

The applicable rules for determining the requisite conflict of decisions under Subdivision 2 of Article 1728 were summarized by this court in John Farrell Lumber Company v. Wood, 400 S.W.2d 307 (Tex.1966), as follows:

"When a conflict of decisions is made the basis of Supreme Court jurisdiction, the conflict must be such that one decision would operate to overrule the other in case they were both decided by the same court. International Harvester Co. v. Stedman, supra (159 Tex. 593, 324 S.W.2d 543). 'An apparent inconsistency in the principles announced, or in the application of recognized principles, is not sufficient. The rulings must be so far upon the same

state of facts that the decision of one case is necessarily conclusive of the decision in the other. In other words, the rulings alleged to be in conflict must be upon the same question, and, unless this is so, there can be no conflict.' Garitty v. Rainey, 112 Tex. 369, 247 S.W. 825, 827. It is essential, moreover, that such conflict appear on the face of the opinions themselves and that the same be specifically pointed out in the application for writ of error. State v. Wynn, supra (157 Tex. 200, 301 S.W.2d 76) ...." (Emphasis added.)

Petitioners, Mrs. Dixon and Ashley, urge that the court of civil appeals misapplied the law of defamation to hold that the defense of conditional privilege is a question of law. They assert that such a holding is in conflict with three prior courts of civil appeals decisions, to wit: Houston Belt & Terminal Ry. Co. v. Wherry, 548 S.W.2d 743 (Tex.Civ.App.-Houston (1st Dist.) 1976, writ ref'd n. r. e.); Stearns v. McManis, 543 S.W.2d 659 (Tex.Civ.App.-Houston (1st Dist.) 1976, writ dism'd w. o. j.); Buck v. Savage, 323 S.W.2d 363 (Tex.Civ.App.-Houston 1959, writ ref'd n. r. e.). We disagree.

Wherry was a libel action wherein the court of civil appeals affirmed a jury verdict for plaintiff. Although the court held that the defendant railroad had waived its defense of conditional privilege, it quoted the rule set forth in Denton Publishing Company v. Boyd, 460 S.W.2d 881 (Tex.1970), as follows:

"Where the facts are undisputed and the language used in the publication is not ambiguous, the question of privilege is ordinarily one of law for the court. ... (citations omitted)

 **\*242** "It is for the jury, however, to resolve any dispute in the evidence as to the circumstances under which the publication was made. ..."

Stearns was a suit for slander wherein the court of civil appeals affirmed a jury verdict for plaintiff after finding, on rehearing, that the evidence summarized there supported the jury finding that defendant acted with malice in making the defamatory statement. The court quoted with approval from 36 Tex.Jur.2d 475 Libel and Slander s 149 which provides in part:

> "In cases involving qualifiedly privileged defamation, although the existence of actual or express malice is not presumed as a matter of law and must be proved, it need

not be proved by direct or extrinsic evidence; its existence is sufficiently shown by evidence of facts and circumstances from which it is reasonably inferable. ..."

In Buck the court of civil appeals reformed and affirmed a plaintiff's judgment for actual and exemplary damages for libel and slander. The court held that the evidence enumerated in its opinion was sufficient to raise the issue of malice and that defendant's conditional privilege was lost by the jury finding of malice. The following rules were recognized by the court:

"A qualified or conditional privilege, as we understand the rule, comprehends bona fide communications, oral or written, upon any subject in which the author or the public has an interest or with respect to which he has a duty to perform to another owing a corresponding duty. Such privilege is termed conditional or qualified because a person availing himself of it must use it in a lawful manner and for a lawful purpose. The effect of the privilege is to justify the communication when it is made without actual malice. ...

"The law, therefore, places the burden on the plaintiff to prove that the defendant in the exercise of a conditional privilege was prompted or partially prompted by malice or a want of good faith. ...

"While actual or express malice must be proved, it need not be proved by direct or extrinsic evidence. Proof of facts and circumstances from which it may be reasonably inferred is sufficient. ..."

**[2]** In the instant case, the court of civil appeals held that, under the facts proved at trial, Southwestern Bell's conditional privilege to make the investigation arose as a matter of law and that there was no evidence of malice or improper motive to cause Southwestern Bell to lose the conditional privilege. It did not hold that under all facts a conditional privilege would

be established as a matter of law. Nor did the courts in the three cases asserted to be in conflict hold that the question of conditional privilege or malice would always be a fact question for the jury. It is fundamental that an issue, which is normally a question of fact, can be proved so conclusively by the evidence at trial that it becomes a question of law, rather than a question of fact. Cf. Texas & N. O. R. Co. v. Burden, 146 Tex. 109, 203 S.W.2d 522 (1947).

Since there was no objection to the New York Times standard of malice which was submitted by the trial court, the court of civil appeals did not find it necessary to determine the proper standard to be applied against a non-media defendant. See: New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); Foster v. Laredo Newspapers, Inc., 541 S.W.2d 809 (Tex.1976); Dun and Bradstreet, Inc. v. O'Neil, 456 S.W.2d 896 (Tex.1970); El Paso Times, Inc. v. Trexler, 447 S.W.2d 403 (Tex.1969); Roegelein Provision Co. v. Mayen, 566 S.W.2d 1 (Tex.Civ.App.-San Antonio 1978, writ ref'd n. r. e.). It held only that there was no evidence to support the jury finding of malice.

**[3]** Without considering the merits of this appeal, we conclude that the holding of the court of civil appeals that conditional privilege of Southwestern Bell exists as a matter of law under the facts in this cause does not conflict with the cited cases which held that under those records the issue of a **\*243** conditional privilege was a question of fact for the jury.

Our order granting the application for writ of error is set aside and the application is dismissed for want of jurisdiction.

GARWOOD, J., not sitting.

**All Citations**

607 S.W.2d 240

---

Footnotes

1    Mrs. Dixon is the surviving widow and Independent Executrix of the Estate of T. O. Gravitt, Deceased.

2    All statutory references are to Texas Revised Civil Statutes Annotated.

3    Subdivision 2 of Article 1728 reads as follows:

"Those in which one of the Courts of Civil Appeals holds differently from a prior decision of another Court of Civil Appeals, or of the Supreme Court upon any question of law material to a decision of the case."

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

N

842 S.W.2d 719
Court of Appeals of Texas,
Dallas.

James A. EDLUND, Appellant,
v.
R.W. BOUNDS, Appellee.

No. 05–90–00085–CV. | Sept. 14,
1992. | Rehearing Denied Oct. 26, 1992.

Payee brought action against maker to enforce promissory note, and maker counterclaimed. The 98th Judicial District Court, Dallas County, Joe Brown, J., entered judgment for payee, and maker appealed. The Court of Appeals, Enoch, C.J., held that: (1) valuable consideration supported note; (2) payee was proper party to enforce note; (3) issue of whether majority shareholder converted note receivables and real estate brokerage franchise was for jury; and (4) payee was entitled to recover 15% of amount of principal and interest owing at time of judgment as attorney fees.

Affirmed in part, modified in part, and reversed and remanded in part.

West Headnotes (38)

**[1]** **Appeal and Error**
 Effect of evidence and inferences therefrom on direction of verdict

In reviewing instructed verdict, appellate court considers all evidence in light most favorable to party against whom verdict was instructed, disregarding all contrary evidence and inferences.

7 Cases that cite this headnote

**[2]** **Trial**
 Sufficiency to present issue of fact
**Trial**
 Insufficiency to support other verdict; conclusive evidence
**Trial**
 Nature and Grounds

Instructed verdict is proper if: specifically indicated defect in opponent's pleading makes it insufficient to support judgment; evidence proves conclusively truth of fact propositions that, under substantive law, establish right of movant, or negate right of his opponent, to judgment; or evidence is insufficient to raise fact issue as to one or more fact propositions that must be established for opponent to be entitled to judgment.

27 Cases that cite this headnote

**[3]** **Trial**
 Insufficiency to support other verdict; conclusive evidence

Instructed verdict is warranted when evidence is such that no other verdict can be rendered and moving party is entitled, as matter of law, to judgment.

5 Cases that cite this headnote

**[4]** **Trial**
 Sufficiency to present issue of fact

It is error for trial court to instruct verdict when material issue is raised by evidence.

6 Cases that cite this headnote

**[5]** **Trial**
 Conflicting evidence

If there is any conflicting evidence of probative value in record, determination of issue is for jury.

4 Cases that cite this headnote

**[6]** **Bills and Notes**
 Nature and essentials in general

Note used to secure purchase of brokerage firm was promissory note as defined by Business and Commerce Code; note was signed by maker and contained unconditional promise to pay $75,000 to order of payee, note contained due date and was clearly designated "promissory note." V.T.C.A., Bus. & C. § 3.104(a, b).

2 Cases that cite this headnote

**[7] Bills and Notes**

 Nature and essentials in general

"Note" is written unconditional promise to pay another certain sum of money at certain time. V.T.C.A., Bus. & C. § 3.104(a, b).

5 Cases that cite this headnote

**[8] Bills and Notes**

 Weight and Sufficiency of Evidence

To collect on note, holder need only establish that there is a note, that he is legal owner and holder of note, that maker signed note, and that certain balance was due and owing on note.

10 Cases that cite this headnote

**[9] Bills and Notes**

 Sufficiency

Valuable consideration supported note; maker agreed to be liable on $75,000 note to payee in return for payee's pledge of real property worth over $150,000 to secure purchase of brokerage firm, maker benefitted by acquisition of firm, and there was detriment to payee in securing purchase of firm with property belonging to corporation in which he was majority shareholder.

Cases that cite this headnote

**[10] Bills and Notes**

 Mistake, fraud, or duress

Maker failed to establish that note was obtained by payee through fraud where maker testified at trial that payee never told him that he would have no responsibility on note.

Cases that cite this headnote

**[11] Evidence**

 Fraud

To establish fraud in the inducement sufficiently to allow exception to parol evidence rule, there must be showing of some type of trickery, deceit, or device employed by payee as well as showing that payee represented to maker that he would not be liable on note.

1 Cases that cite this headnote

**[12] Bills and Notes**

 Parties Plaintiff

Payee was proper party to enforce promissory note used to apportion debt between partners who purchased brokerage firm, although sole consideration for note used to purchase firm was owned by third-party corporation in which payee was majority shareholder; corporation's absence did not prevent existing parties from obtaining complete relief, note was between maker and payee, and corporation was not mentioned on note.

Cases that cite this headnote

**[13] Limitation of Actions**

 Bills and notes

Four-year statute of limitations applicable to actions for debt began running at maturity date of promissory note, notwithstanding maker's ability to prepay.

5 Cases that cite this headnote

**[14] Bills and Notes**

 General rules of construction

Rules of construction governing contracts are applicable to notes, and note must be construed as a whole.

4 Cases that cite this headnote

**[15] Contracts**

 Conflicting clauses in general

When provisions of contract appear to conflict, they should be harmonized if possible to reflect intentions of parties.

7 Cases that cite this headnote

**[16]** **Contracts**
Intention of Parties

**Contracts**
Conflicting clauses in general

Parties to contract intend every clause to have some effects and court will not strike down any portion of contract unless there is irreconcilable conflict.

6 Cases that cite this headnote

**[17]** **Contracts**
Questions for Jury

If written instrument is so worded that it can be given certain or definite legal meaning or interpretation, then it is not ambiguous and court will construe contract as matter of law.

2 Cases that cite this headnote

**[18]** **Bills and Notes**
Time of Maturity

Words "on or before" on promissory notes are well understood to mean, "immediately at or at any time in advance of" period named.

4 Cases that cite this headnote

**[19]** **Limitation of Actions**
Bills and notes

When note is payable at definite time, limitations begins to run at maturity of note.

5 Cases that cite this headnote

**[20]** **Conversion and Civil Theft**
Questions for jury

Issue of whether majority shareholder converted note receivables and real estate brokerage franchise was for jury in counterclaim for conversion brought by minority shareholder where allegedly converted items were identified chattels of which minority shareholder adduced evidence of their value on date of their alleged conversion.

Cases that cite this headnote

**[21]** **Conversion and Civil Theft**
Assertion of ownership or control in general

"Conversion" is wrongful exercise of dominion and control over another's property in denial of or inconsistent with property owner's rights.

12 Cases that cite this headnote

**[22]** **Conversion and Civil Theft**
Measure of damages in general

Measure of damages in conversion action is value of property at time and place of conversion.

4 Cases that cite this headnote

**[23]** **Conversion and Civil Theft**
Money and commercial paper; debt

Action for conversion of money will lie if money can be identified as specific chattel.

12 Cases that cite this headnote

**[24]** **Conversion and Civil Theft**
Money and commercial paper; debt

Action for conversion of money may be brought where money is: delivered for safekeeping; intended to be kept segregated; substantially in form in which it is received or intact fund; and not subject of title claim by keeper.

26 Cases that cite this headnote

**[25]** **Appeal and Error**
Time of bringing suit, limitations, and laches

Majority shareholder failed to preserve issue of whether minority shareholder's conversion claim was barred by limitations where majority shareholder did not obtain trial court's ruling on his limitations defense. Rules App.Proc., Rule 52(a).

1 Cases that cite this headnote

**[26]** **Corporations and Business Organizations**
 Allegations as to interest of or injury to plaintiff

**Corporations and Business Organizations**
 Necessity of allegation of demand and refusal

**Corporations and Business Organizations**
 Allegations of excuse for failure to demand; futility

**Corporations and Business Organizations**
 Derivative or direct action

Derivative suit for conversion could not be brought by counterclaimant on behalf of corporation where counterclaimant failed to establish that he was owed individual duty by plaintiff in any transactions regarding corporation, and counterclaimant's pleadings failed to allege that he was record or beneficial owner of shares at time of alleged conversion and his efforts to have suit brought for corporation by board of directors, or reasons for not making such efforts. V.A.T.S. Bus.Corp.Act, art. 5.14, subd. B(2); Vernon's Ann.Texas Rules Civ.Proc., Rule 42.

2 Cases that cite this headnote

**[27]** **Corporations and Business Organizations**
 Actions by or Against Directors, Officers, or Agents in General

When corporation is fully functional, cause of action for breach of director's fiduciary duties normally belongs to corporation and cannot be brought by shareholder, unless shareholder establishes that he is owed individual duty by corporation, its officers, directors, or majority shareholders.

1 Cases that cite this headnote

**[28]** **Bills and Notes**
 Particular Grounds

**Divorce**
 Property not disposed of by judgment or decree

Former wife of payee had no interest in promissory note and, therefore, maker was not entitled to affirmative defense of offset by assignment in suit on note; note was not disposed of by divorce decree and there was no evidence of judgment determining former wife's ownership interest in note. V.T.C.A., Family Code § 3.91.

1 Cases that cite this headnote

**[29]** **Appeal and Error**
 Contracts in general

Trial court did not err in excluding testimony of witness for maker in suit on promissory note; maker failed to show relevancy of witness' testimony and that its exclusion resulted in improper judgment.

1 Cases that cite this headnote

**[30]** **Appeal and Error**
 Necessity of Setting Forth Evidence Excluded

Error is not shown in exclusion of evidence unless complaining party brings before appellate court record that clearly shows not only what evidence would have been if admitted, but also its relevancy.

Cases that cite this headnote

**[31]** **Bills and Notes**
 Mode and Sufficiency of Payment

Maker of promissory note was not entitled to jury question asking it to determine what amount of note remained unpaid where no evidence was introduced that any payments were made on note or that any credits were applied to note.

Cases that cite this headnote

**[32]** **Bills and Notes**
 Attorney fees

Payee was entitled to 15% of principal and interest owing at time of judgment as attorney fees in action to collect amount owing on promissory note; payee proved his entitlement to attorney fees based on contractual provision as matter of law and maker presented no evidence

on unreasonableness of requested fees, nor did he prove lesser amount that was reasonable under circumstances.

5 Cases that cite this headnote

**[33]** **Appeal and Error**
　　 Interrogatories and special verdicts

**Appeal and Error**
　　 Extent of Review

**Appeal and Error**
　　 Sufficiency of Evidence in Support

**Appeal and Error**
　　 Against Weight of Evidence

In reviewing "matter of law" challenge, appellate court uses two-pronged test: first, court examines record for evidence that supports jury's findings, while ignoring all evidence to contrary; second, if there is no evidence to support fact finder's answer, court will examine entire record to see if contrary proposition was established as matter of law.

1 Cases that cite this headnote

**[34]** **Appeal and Error**
　　 Void or defective appeal or other proceeding

Surety's obligations on supersedeas bond would be discharged in suit to collect amount owing on promissory note since maker's counterclaim was still pending, judgment was not final, and Court of Appeals could not render judgment against surety on bond.

3 Cases that cite this headnote

**[35]** **Appeal and Error**
　　 Nature of obligation

Purpose of supersedeas bond is to secure appellee and abate remedies he would otherwise have for realizing his judgment.

3 Cases that cite this headnote

**[36]** **Appeal and Error**
　　 Nature of obligation

Supersedeas bond is not intended to secure speculative damages or damages that have not been finally determined.

1 Cases that cite this headnote

**[37]** **Execution**
　　 Nature and form

Execution cannot issue on judgment that is not final.

2 Cases that cite this headnote

**[38]** **Judgment**
　　 Final judgment

Judgment for plaintiff that does not dispose of defendant's counterclaim is not final judgment.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*722**  John Alan Goren, Dallas, for appellant.

Will Ford Hartnett, Jack Kent Davenport, Dallas, for appellee.

Before ENOCH, C.J., and BISSETT [1] and ONION [2], JJ.

**OPINION ON REHEARING**

ENOCH, Chief Justice.

We withdraw our opinion of July 3, 1992. This is now the opinion of the court. R.W. Bounds sued James A. Edlund on a promissory note. Edlund answered with a general denial and asserted affirmative defenses and a counterclaim. Edlund now appeals the trial court's judgment rendered in favor of Bounds. Bounds cross-appeals the judgment on the issue of attorney's fees. We affirm in part, modify and affirm in part, and reverse and remand in part.

**FACTUAL BACKGROUND**

Bounds testified that he and Edlund formed the real estate brokerage company, K–John Real Estate, Inc. (K–John) in the

early 1980s. Bounds owned fifty-one percent of the shares. Edlund was president of K–John, ran its day-to-day affairs, and owned forty-nine percent of the shares. In February, 1981, they agreed to purchase the Frances Powell Gallery of Homes for $150,000. The purchase was accomplished with a $150,000 promissory note to Frances Powell in which both Bounds and Edlund were personal guarantors. Frances Powell required security of at least 125% of $150,000, which Bounds satisfied by pledging a 9.7 acre tract of real property located in Plano. The property was owned by R–Co Corporation (R–Co), a corporation in which Bounds owned a majority of the shares. Bounds further testified that since Edlund had no security to pledge, Edlund voluntarily signed a $75,000 note payable to Bounds. In 1982, Edlund informed Bounds that he was leaving K–John and surrendered his stock to him. Bounds agreed to wind up the affairs of K–John. The business was "broke" and owed over $400,000 to various creditors. Per Edlund's request, Bounds told Edlund that he could delay payment of the $75,000 note until after Edlund sold his home. Bounds testified that he never agreed to forgive the $75,000 note. Edlund sold his home, moved to New York, and failed to pay Bounds the $75,000 due him. In the meantime, Bounds sold the Plano property and with the sale proceeds paid Frances Powell $150,000. Bounds filed suit against Edlund on June 23, 1987 to collect on the note. Bounds also mentioned that he was awarded the $75,000 note in his divorce from Suzanne Stringer.

Kent Davenport testified that reasonable and necessary legal expenses for trying this case for Bounds was $20,000, to appeal this case to the court of appeals would cost $7,500, and to file an application for writ of error with the Texas Supreme Court would cost $2,500. If the Supreme Court granted the writ, Bounds would incur an additional $2,500 in fees.

For the defense, Suzanne Stringer testified that she was formerly Bounds's wife. At the time of their divorce, she was unaware of the $75,000 note. She stated that she claimed a one-half interest in this note because she was married to Bounds at the time it was executed. The divorce decree was admitted into evidence. She also stated that she received nothing from Edlund when she assigned her interest in the note to him on January 13, 1988.

Edlund testified that he became acquainted with Bounds when Bounds sold him a **\*723** home. Bounds appeared to be a successful real estate developer and builder. Edlund agreed to go into business with Bounds, and they formed K–John in February, 1981. They invested equal amounts of money in K–John. To expand their business, they agreed to purchase the Frances Powell Gallery of Homes. Edlund would not have signed the note to Bounds had he known that Bounds did not own the Plano property securing the Frances Powell note. In January, 1982, Edlund and Bounds formed Zanz Corporation (Zanz) for franchise transactions. In February, 1982, Bounds and Edlund agreed to close the businesses because they were losing money. They thought that they "could settle out of the relationship on an equal basis," and Edlund "would make up the difference" if they did not break even. Bounds never told Edlund that K–John was over $400,000 in debt. Edlund stated that in addition to the $150,000 Frances Powell debt, K–John owed about $30,000 to $40,000 to various creditors. Bounds told Edlund that K–John expected to collect about $70,000 in income during the winding up period. Edlund testified that their settlement agreement included the forgiveness of the $75,000 note and the distribution of the furniture and over $51,000 to Bounds. Edlund never had any stock in Zanz to surrender. Bounds stated that he left K–John in March, 1982, and left Dallas after he sold his home in August, 1984. In January, 1987, Bounds requested payment of $75,920.09. Edlund believed that the $75,920.09 represented the net difference between amounts collected and debts owed and included interest and a credit on the $75,000 note.

Richard Euting testified that he was president and forty-nine percent owner of R–Co. The remainder of his testimony was excluded by the court as not relevant.

Robert Bounds was called for the defense. He explained that the figures totalling $75,920.09 that he supplied to Edlund in January, 1987, reflected figures Bounds copied from K–John's files. The $75,920.09 represented a settlement offer to prevent a lawsuit. Bounds stated that he never agreed to forgive Edlund's $75,000 note and that Edlund had paid him nothing on the note to date. Bounds was able to elucidate some of the credits and debts received during the winding-up period, but could not explain all of the figures provided to Edlund.

Edlund was recalled and testified that he never told Bounds that he would pay off the note after he sold his house. Bounds never told him that payment of $75,920.09 would prevent a lawsuit.

Bounds called Lawrence Kruger, K–John's accountant, by deposition as a rebuttal witness. Kruger stated that the files he produced were complete records for K–John. He was never

told of any settlement agreement between Bounds and Edlund concerning the $75,000 note. Edlund told Kruger that he would be owed some money during the winding-up period but to write it off on his income tax return. Edlund reported a $36,000 loss.

Edlund urged a motion for instructed verdict which was overruled. Bounds presented a motion for instructed verdict which was granted with respect to Edlund's defenses of fraud in the inducement, limitations, and improper plaintiff, and all of Edlund's counterclaims. The jury determined reasonable and necessary attorney's fees for legal services in the preparation and trial of the cause to be one dollar and found that Bounds did not agree to an accord and satisfaction of the $75,000 note.

## STANDARD OF REVIEW

 **[1]** **[2]** **[3]** **[4]** **[5]** In reviewing an instructed verdict, we consider all of the evidence in the light most favorable to the party against whom the verdict was instructed, disregarding all contrary evidence and inferences. We determine whether there is any evidence of probative force to raise fact issues on the material questions presented. *C & C Partners v. Sun Exploration & Prod. Co.,* 783 S.W.2d 707, 712 (Tex.App.—Dallas 1989, writ denied). An instructed verdict is proper if (1) a specifically indicated defect in the opponent's pleading makes it insufficient to support a judgment; (2) the evidence proves conclusively the truth of fact propositions that, under the substantive **\*724** law, establish the right of the movant, or negate the right of his opponent, to judgment; or (3) the evidence is insufficient to raise a fact issue as to one or more fact propositions that must be established for the opponent to be entitled to judgment. *Fort Worth State School v. Jones,* 756 S.W.2d 445, 446 (Tex.App.–Fort Worth 1988, no writ). An instructed verdict is warranted when the evidence is such that no other verdict can be rendered and the moving party is entitled, as a matter of law, to judgment. *C & C Partners,* 783 S.W.2d at 712. It is error for the trial court to instruct a verdict when a material issue is raised by the evidence. *Graziadei v. D.D.R. Mach. Co.,* 740 S.W.2d 52, 55–56 (Tex.App.–Dallas 1987, writ denied). An instructed verdict is improper when reasonable minds may differ as to the truth of the controlling facts. *Id.* at 56. If there is any conflicting evidence of probative value in the record, determination of the issue is for the jury. *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983).

## PROMISSORY NOTE

 **[6]** In Edlund's first point of error, he contends that the trial court erred by granting Bounds's motion for instructed verdict and in rendering judgment because the evidence proves that the $75,000 note was not a conventional promissory note in which he would be considered the maker and Bounds the payee. Edlund argues that the evidence shows that the note was actually security for the Frances Powell transaction.

 **[7]** The Texas Business and Commerce Code defines a promissory note. It provides that a writing is a negotiable instrument if it (1) is signed by the maker; (2) contains an unconditional promise or order to pay a sum certain; (3) is payable on demand or at a definite time; and (4) is payable to order or to bearer. TEX.BUS. & COM.CODE ANN. § 3.104(a) (Vernon 1968). It further provides that "[a] writing which complies with the requirements of this section is ... (4) a "note" if it is a promise other than a certificate of deposit." TEX.BUS. & COM.CODE ANN. § 3.104(b) (Vernon 1968). In short, a note is a written unconditional promise to pay another a certain sum of money at a certain time. *FDIC v. Eagle Properties, Ltd.,* 664 F.Supp. 1027, 1034 (W.D.Tex.1985).

Here, the $75,000 note was signed by Edlund and contained an unconditional promise to pay $75,000 to the order of Bounds. The note stated that it was "due on or before February 3, 1984." It was clearly designated a "promissory note." *See Clark v. Dedina,* 658 S.W.2d 293, 297 (Tex.App.—Houston [1st Dist.] 1983, writ dism'd). We conclude that the $75,000 note was a promissory note as defined by the Texas Business and Commerce Code and, accordingly, overrule Edlund's first point of error.

## DAMAGES

 **[8]** Edlund argues, in his second point of error, that the judgment is improper because there is no evidence that Bounds suffered any damages. The holder of a note need only establish that there is a note, that he is the legal owner and holder of the note, that the maker signed the note, and that a certain balance was due and owing on the note. *Clark,* 658 S.W.2d at 295. Since Bounds sufficiently established these elements, we overrule Edlund's second point of error.

## CONSIDERATION

 **[9]** In his third point, Edlund asserts that the trial court erred in granting Bounds's motion for instructed verdict and in rendering judgment against him on his affirmative defense that there was no consideration or a failure of consideration to support the $75,000 note. The record reveals that Edlund verified these affirmative defenses. *See* TEX.R.CIV.P. 93. A sworn plea of no consideration places the burden of proof on Edlund to show that there was none. *Clark,* 658 S.W.2d at 297. Our review shows that Edlund failed to meet this burden.

"Valuable consideration for a contract may consist of *either* a benefit to the promisor *or* a detriment to the promisee." **\*725** *Clark,* 658 S.W.2d at 297 (emphasis in original). Here, Edlund agreed to be liable on the $75,000 note to Bounds in return for Bounds's pledge of real property worth over $150,000 to secure the Frances Powell note. The pledge was necessary for K–John to acquire the Frances Powell brokerage firm. As president and shareholder of K–John, Edlund benefitted from the acquisition of the Frances Powell brokerage firm. *See Texas Export Dev. Corp. v. Schleder,* 519 S.W.2d 134, 138 (Tex.Civ.App.—Dallas 1974, no writ). Additionally, there was a detriment to Bounds in securing the Frances Powell note with property belonging to R–Co, a corporation in which he was a majority shareholder. Since Edlund failed to establish his affirmative defense of failure of or want of consideration, we overrule his third point.

## FRAUD

 **[10]** **[11]** In his fourth point, Edlund asserts that the trial court erred in granting Bounds's motion for instructed verdict and rendering judgment against him on his affirmative defense that the note was obtained by Bounds through fraud. To establish fraud in the inducement sufficiently to allow an exception to the parol evidence rule, there must be a showing of some type of trickery, deceit, or device employed by the payee as well as a showing that the payee represented to the maker that he would not be liable. *Clark,* 658 S.W.2d at 296. Edlund testified at trial that Bounds never told him that he would have no responsibility on the $75,000 note. We overrule Edlund's fourth point of error.

## IMPROPER PARTY PLAINTIFF

 **[12]** Edlund's fifth point asserts that the trial court erred in granting Bounds's motion for instructed verdict and rendering judgment on his affirmative defense of improper party plaintiff. The record reveals that Edlund verified the affirmative defense of improper party plaintiff. *See* TEX.R.CIV.P. 93. However, Edlund has failed to prove this affirmative defense.

Edlund argues that R–Co was a necessary party since the sole consideration for the Frances Powell note was an asset owned by R–Co. A party must be joined if (1) his absence prevents granting complete relief to existing parties in the lawsuit, or (2) he claims an interest in the subject matter and his absence in the lawsuit may impair or impede his ability to protect this interest or leave the parties already present in the lawsuit subject to substantial risk of incurring double, multiple, or inconsistent obligations. TEX.R.CIV.P. 39.

Here, R–Co's absence does not prevent the existing parties from obtaining complete relief. The $75,000 note is between Edlund, the maker, and Bounds, the payee. Nowhere on the note is R–Co mentioned. Any claim on the $75,000 note can be adjudicated without R–Co's presence. Additionally, we cannot conclude that R–Co's interests are impaired or that Edlund was subjected to substantial risk of incurring double liability. "Under the provisions of ... Rule 39 it would be rare indeed if there were a person whose presence was so indispensable in the sense that his absence deprives the court of jurisdiction to adjudicate between the parties already joined." *Cooper v. Texas Gulf Ind., Inc.,* 513 S.W.2d 200, 204 (Tex.1974). We overrule Edlund's fifth point.

## STATUTE OF LIMITATIONS

 **[13]** Edlund's sixth and seventh points of error contend that the trial court erred in granting Bounds's motion for instructed verdict and in denying Edlund's motion for judgment n.o.v. and motion for new trial. Edlund argues that the lawsuit was barred by the four-year statute of limitations. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 16.004(a)(3) (Vernon 1986). The instrument consisted of a preprinted form wherein blank lines were completed with typewritten words. The first line of the instrument reads: "$ 75,000.00 Plano, Texas, August 24 A.D. 1981." The second line begins: "Due upon demand after date...." Edlund argues that this language makes the instrument a demand note which matured on the date of execution. *See Loomis v. Republic Nat'l Bank of Dallas,* 653 S.W.2d 75, 77 (Tex.App.—Dallas 1983, writ

ref'd n.r.e.) (limitations begins to run on a **\*726** demand note on the date of making). However, at the lower left-hand corner of the note, the printed word "Due" precedes a blank line. Typed upon the blank line are the words: "On or before February 3, 1984."

 **[14]** **[15]** **[16]** **[17]** It is well established in Texas that the rules of construction governing contracts are applicable to notes, and a note must be construed as a whole. *Amarillo Nat'l Bank v. Dilday,* 693 S.W.2d 38, 41 (Tex.App.—Amarillo 1985, no writ). When the provisions of a contract appear to conflict, they should be harmonized if possible to reflect the intentions of the parties. *Ogden v. Dickinson State Bank,* 662 S.W.2d 330, 332 (Tex.1983). The parties to a contract intend every clause to have some effect and a court will not strike down any portion of the contract unless there is an irreconcilable conflict. *Id.* If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983).

 **[18]** **[19]** We find no ambiguity in the terms of the $75,000 note. The $75,000 was due, at the latest date, on February 3, 1984. Edlund could prepay this amount at his option. *See Fortson v. Burns,* 479 S.W.2d 722, 724 (Tex.Civ.App.—Waco 1972, writ ref'd n.r.e.). The words "on or before" on promissory notes are well understood to mean, "immediately at or at any time in advance of" a period named. *Lovenberg v. Henry,* 104 Tex. 550, 140 S.W. 1079, 1080 (Tex.1911). Upon the passing of the due date of February 3, 1984, the option ceased to prepay and the note became an obligation to pay at all events. *See id.* When a note is payable at a definite time, limitations begins to run at the maturity of the note. *Loomis,* 653 S.W.2d at 77. Here, the note matured on February 3, 1984. As this lawsuit was filed on June 23, 1987, filing occurred within the four-year statute of limitations applicable to actions for debt. We overrule Edlund's sixth and seventh points of error.

## CONVERSION

 **[20]** In his eighth point of error, Edlund asserts that the trial court erred in granting Bounds's motion for instructed verdict and rendering judgment against Edlund on his counterclaims for a constructive trust, damages, or distribution of the net assets of K–John and/or Zanz. Bounds responds that (1) Edlund lacks standing to sue because his claims belong to the corporations; and (2) Edlund adduced no evidence of what assets were purportedly converted, their value, and the date of their conversion. In his motion for rehearing, Bounds also asserts that Edlund's conversion claim is barred by limitations.

On appeal, Edlund argues that he is entitled to an accounting, a constructive trust, and damages for Bounds's "failure to distribute the net assets resulting from the winding up of affairs of K–John and Zanz." However, Edlund's second amended answer and counterclaim states:

> On February 20, 1984, K–John forfeited its charter and was involuntarily dissolved pursuant to Article 7.010(B) of the Texas Corporations Act. At that time, Plaintiff seized control of all assets of K–John and converted them to his personal benefit. Defendant hereby sues Plaintiff for 49% of all assets of K–John, for an accounting of all assets of K–John between March 1982 and the present, and for a constructive trust over all assets which should have been allocated by Plaintiff to Defendant's 49% interest, the value of which Defendant asserts to be in excess of $75,000 before interest.

Similar arguments were made with respect to Zanz. When Bounds asserted his motion for instructed verdict with respect to Edlund's counterclaims, Bounds formulated his arguments based on a conversion claim. Edlund responded to the conversion issues and added: "It would be our position once the assets come out of that corporation, [Bounds] has got to give Mr. Edlund his half, seems obvious."

Allegations contained in the pleadings define the nature and character of a suit. **\*727** *Bobby Smith Brokerage, Inc. v. Bones,* 741 S.W.2d 621, 622 (Tex.App.—Fort Worth 1987, no writ). Here Bounds had the right to assume that the case made by the pleadings was the only case he was called upon to defend. *See id.* Edlund must recover on the basis on which he sued and upon proof of facts stated in his pleadings, and he cannot recover through a right not asserted. *Id.* Therefore, Edlund's request for the remedies of a constructive trust, damages, or distribution stem from a claim of conversion as set forth in his second amended answer and counterclaim.

The record shows that the Secretary of State revoked K–John's right to do business on September 15, 1983, and its charter on February 20, 1984, for failure to file a franchise tax report. The effect of the Secretary of State's forfeiture is summarized as follows:

> The Supreme Court of Texas has held that where the Secretary of State has entered on the record in his office forfeiture of the right of the corporation to do business in this state, the charter of the corporation has not thereby been cancelled nor has the corporation been dissolved. The effect of such a forfeiture is to prohibit the corporation from doing business in the state, and to deny to it the right to sue or defend in any court of the state except in a suit to forfeit its charter. The legal title to the assets remains in the corporation, but the beneficial title to the assets of the corporation is in the stockholders. This being true, and since the right to sue has been denied to the corporation by forfeiture, the stockholders, as beneficial owners of the assets of the corporation, may prosecute or defend such actions in the courts as may be necessary to protect their property rights.

*Regal Constr. Co. v. Hansel,* 596 S.W.2d 150, 153 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) (citing *Humble Oil & Refining Co. v. Blankenburg,* 149 Tex. 498, 235 S.W.2d 891, 894 (Tex.1951)). Since Edlund is one of the beneficial owners of the assets of K–John, Edlund is entitled to pursue his cause of action for conversion against Bounds to protect his property right. *See Regal Constr. Co.,* 596 S.W.2d at 153. Concluding that Edlund is so entitled,

we now address Bounds's assertion that Edlund presented no evidence of what assets were purportedly converted, their value, and the date of the conversion of K–John's assets.

**[21] [22] [23] [24]** Conversion is the wrongful exercise of dominion and control over another's property in denial of or inconsistent with the property owner's rights. *Tripp Village Joint Venture v. MBank Lincoln Centre, N.A.,* 774 S.W.2d 746, 750 (Tex.App.—Dallas 1989, writ denied). The measure of damages is the value of the property at the time and place of the conversion. *Matter of Village Mobile Homes, Inc.,* 947 F.2d 1282, 1283 (5th Cir.1991); *Prewitt v. Branham,* 643 S.W.2d 122, 123 (Tex.1982) (per curiam). An action for the conversion of money will lie if the money can be identified as a specific chattel. *Eckman v. Centennial Sav. Bank,* 757 S.W.2d 392, 398 (Tex.App.—Dallas 1988, writ denied). "When an indebtedness can be discharged by payment of money generally, an action in conversion is inappropriate." *Id.* An action for the conversion of money may be brought where money is (1) delivered for safe keeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by the keeper. *Houston Nat'l Bank v. Biber,* 613 S.W.2d 771, 774–75 (Tex.Civ.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.).

At trial, Bounds testified that he owned fifty-one percent and Edlund owned forty-nine percent of K–John. They began losing money and agreed to dissolve K–John in 1982. Bounds was charged with the duty of closing up the offices, collecting any funds owed to K–John, and paying any debts.

Edlund testified about an exhibit admitted into evidence representing three pages of figures that Bounds presented to Edlund in January, 1987, when Bounds requested payment of $75,920.09. This document reflects a total of $20,433.80 in fees collected and $5,749.55 paid. The figures are itemized with a description of each transaction, and then summarized as follows:

Note—Date Aug. 24, 1981

| | | |
|---|---|---|
| $75,000 @ 10% for 9 mos. | – | 5,626.00 |
| 47,651.54 @ 10% 4 yrs. 9 mos. | | |
| Int. through Feb. 1, 1987 | – | 22,637.55 |
| (397.15 per mo.) | | |
| Prip. | – | 47,657.54 |

**\*728** Additional documents were admitted into evidence to demonstrate that some of K–John's financial obligations were relieved. Another exhibit reflected that K–John received $25,000 on March 18, 1982 from Sanger Suburban Realty, Inc. for the Coit Road office. This figure was not reflected in the document shown to Edlund in January, 1987. Edlund also stated that Elizabeth Carrol Enterprises bought their Plano office on October 31, 1981. Bounds's personal financial statement reflects a $76,800 note receivable from Elizabeth Carrol Enterprises.

Bounds's testimony included the explanation of his June 31, 1982 personal financial statement reflecting an asset of $360,000 for the Gallery of Homes franchise. Bounds stated that the asset was probably left over from K–John. Bounds also testified that a note receivable from Hallmark Gallery of Homes for $10,000 was due to the sale of a K–John office.

Viewing the evidence in the light most favorable to Edlund, the party against whom the verdict was instructed, we find that there is sufficient evidence to raise a fact issue on Edlund's counterclaim for conversion on the note receivables and the Gallery of Homes franchise. These are specifically identified chattels of which Edlund adduced evidence of their value on the date of their conversion. Bounds's personal financial statement reflects Bounds's valuation of the Gallery of Homes franchise. Additionally, the actual sales price of property provides some evidence of fair market value. *See Religious of the Sacred Heart of Texas v. City of Houston,* 836 S.W.2d 606, 616 (Tex.1992). However, any claims involving the conversion of money must fail because they involve alleged indebtedness that can be discharged by the payment of money generally.

 **[25]** We next address Bounds's contention that the conversion claim was barred by limitations. In Bounds's motion for instructed verdict, Bounds asserted that Edlund failed to comply with TEX.R.CIV.P. 42 and TEX.BUS.CORP.ACT ANN. art. 5.14(B)(2) (Vernon 1980). Bounds also contended that there was no evidence of the value of the assets, dates of the conversion, and that Bounds seized the assets. The same arguments were made with respect to Zanz. Bounds did not assert his limitations defense although he did raise the issue in his pleadings. In order to preserve error for appellate review, a party must obtain a ruling upon a timely and specific request, objection, or motion for a ruling.

TEX.R.APP.P. 52(a). Since Bounds did not obtain the trial court's ruling on his limitations defense, he has failed to preserve error. We sustain Edlund's eighth point of error as to K–John.

 **[26]** **[27]** We do not reach the same conclusion regarding Edlund's claim that Bounds converted the assets of Zanz. No evidence was introduced at trial that Zanz's right to do business had been revoked or that its charter was forfeited. We must, therefore, assume that Zanz, unlike K–John, is a fully functional corporation. When a corporation is fully functional, a cause of action for the breach of a director's fiduciary duties normally belongs to the corporation and cannot be brought by a shareholder, unless the shareholder establishes that he is owed an individual duty by the corporation, its officers, directors, or majority shareholders. *Schautteet v. Chester State Bank,* 707 F.Supp. 885, 887 (E.D.Tex.1988). Here, Edlund has failed to establish that he was owed an individual duty by Bounds in any transactions regarding Zanz.

A derivative suit may be brought by Edlund on behalf of Zanz if his pleadings allege (1) that he was a record or beneficial owner of shares at the time of the transaction of which he complains, and (2) specifically his efforts to have suit brought for the corporation by the board of directors, or the reasons for not making such efforts. *See* TEX.R.CIV.P. 42; **\*729** TEX.BUS.CORP.ACT ANN. art. 5.14(B)(2) (Vernon 1980). Since Edlund failed to comply with these derivative suit requirements, we hold that the trial court properly granted Bounds's motion for instructed verdict and rendered judgment against Edlund on his claim for conversion of Zanz's assets.

We sustain Edlund's eighth point of error asserting that the trial court erred in granting Bounds's motion for instructed verdict and rendering judgment against him on his counterclaims for the conversion of nonmonetary assets of K–John. We overrule this point as to Zanz.

### SUPPLEMENTAL TRANSCRIPT

On rehearing, Edlund has requested to supplement the record with his first amended answer and counterclaim to show the date on which he first asserted his conversion counterclaim. This request was in response to Bounds's

contention that the conversion claim is barred by limitations. Due to our disposition of Bounds's limitations argument, we deny Edlund's motion to supplement the record. *See K & S Interests v. Texas Am. Bank/Dallas,* 749 S.W.2d 887, 891–92 (Tex.App.—Dallas 1988, writ denied) (op. on reh'g).

## THE STRINGER ASSIGNMENT

 **[28]**    In his ninth and tenth points, Edlund contends that the trial court erred in granting Bounds's motion for instructed verdict and rendering judgment on his affirmative defense of offset by assignment. Before trial, Edlund obtained an assignment from Bounds's ex-wife, Suzanne Stringer, of any community property interest she may have had in the $75,000 note. If the divorce decree did not partition the note, Edlund argues, then Bounds and Stringer are joint owners of the note. To the contrary, Bounds argues that the divorce decree awards the note to him and, therefore, the trial court acted properly. Bounds cites the court to the following portions of his divorce decree awarding Bounds, as his sole property: "Any and all sums ... related to any profit-sharing plan, retirement plan, pension plan, ... or other benefit program existing by reason of [Bounds's] past, present, or future employment [and] all stocks, bonds, and securities registered in the name of [Bounds]."

Property held or acquired by a spouse during marriage is presumed to be community property. *Southern Title Guar. Co., Inc. v. Prendergast,* 494 S.W.2d 154, 157 (Tex.1973); *see also* TEX.FAM.CODE ANN. § 5.02 (Vernon Supp.1992). As the note in this case was acquired during Bounds's marriage, it is presumed to be community property. It was not disposed of by the divorce decree—the above cited portions of the divorce decree do not apportion the $75,000 note.

Next, we address the validity of the Stringer assignment absent the disposition of the $75,000 note in the divorce decree. Texas common law once provided that when a divorce decree did not dispose of community property, the parties became owners of the property as tenants in common. Each owned an undivided one-half interest in the property. *Thompson v. Thompson,* 500 S.W.2d 203, 207 (Tex.Civ.App.—Dallas 1973, no writ). However, sections 3.90 and 3.91 of the Family Code, added by the Legislature in 1987, now require a different result. [3]

Under section 3.63 of the Family Code, a court shall, in a decree of divorce, order a division of the estate of the parties in a manner that the court deems just and right having due regard for the rights of each party. TEX.FAM.CODE ANN. § 3.63 (Vernon Supp.1992). Should the court not do so, section 3.90 provides, in part: "Property not divided or awarded to a spouse in a final decree of divorce ... may be divided in a suit under this subchapter." [4]   **\*730** TEX.FAM.CODE ANN. § 3.90(a) (Vernon Supp.1992). Section 3.91 provides, in part: "If a final decree of divorce or annulment rendered by a Texas court failed to dispose of property subject to division under Section 3.63 of this code ..., the court shall divide the property in a manner that the court deems just and right." TEX.FAM.CODE ANN. § 3.91(a) (Vernon Supp.1992).

Thus, the "just and right" division rule applies also to property not covered by the final divorce decree. Stringer has no ascertainable interest in the note until there is a division under the "just and right" standard of section 3.63 of the Family Code. A suit filed pursuant to section 3.90 is a prerequisite to determine Stringer's assignable interest in the note. As there is no evidence of a judgment determining Stringer's ownership interest in the note, we cannot assign error to the trial court's judgment against Edlund on his affirmative defense of offset by assignment. We overrule Edlund's ninth and tenth points of error.

## EXCLUDED TESTIMONY

 **[29]**    In his eleventh point of error, Edlund asserts that the trial court erred in excluding the testimony of Richard Euting, a forty-nine percent shareholder of R–Co. In his bill of exceptions, Euting testified that he invested in the R–Co property, but Bounds had not. Bounds was the controlling owner of R–Co. Euting was unaware that Bounds made an unauthorized pledge of the R–Co property as security for the Frances Powell note. Euting would not have agreed to such a pledge. Euting stated that he was also unaware that the property had been sold until he researched the deed records at the courthouse. Euting stated that he would assign Edlund his stock in R–Co "if it would help [Edlund] in his situation." Euting further stated that Bounds offered to transfer the R–Co property to him if he would assume all indebtedness against it. He refused the offer. Bounds objected to the testimony as being irrelevant and likely to confuse the issues before the jury. Edlund's attorney, outside of the jury's presence, said that he just wanted to "disclose to the jury that Mr. Edlund

was fraudulently induced to sign the note and there was no consideration given by Mr. Bounds."

**[30]** Error is not shown in the exclusion of evidence unless the complaining party brings before the appellate court a record that clearly shows not only what the evidence would have been if admitted, but also its relevancy. *Rio Grande Valley Sugar Growers, Inc. v. Campesi,* 580 S.W.2d 850, 861 (Tex.Civ.App.—Corpus Christi), *rev'd on other grounds,* 592 S.W.2d 340 (Tex.1979). Additionally, Edlund has the burden of proving that reversible error occurred by demonstrating that the exclusion of Euting's testimony was reasonably calculated to cause and probably did cause the rendition of an improper judgment. TEX.R.APP.P. 81(b)(1); *Rio Grande Valley Sugar Growers, Inc.,* 580 S.W.2d at 861. We find that Edlund has failed to demonstrate the relevancy of this testimony and failed to show that its exclusion resulted in an improper judgment. We overrule Edlund's eleventh point of error.

### CREDITS AGAINST THE NOTE

**[31]** Edlund's twelfth and thirteenth points of error challenge the trial court's failure to submit a question to the jury asking it to determine what amount of the note remained unpaid. Edlund testified at trial that in their agreement to dissolve K–John, he and Bounds would "settle out of the relationship on an equal basis." Edlund also stated that, although Bounds may not have stated it specifically, he agreed to forgive the $75,000 note as part of the settlement. Edlund further stated:

> The terms of the settlement that we had reached was that [Bounds] was going to stay on and finish up closing the various offices, collect the money; and that based upon how much I was owed and how much he was owed, that it would **\*731** about cover the debts and I was going to take the difference, which I did take, and my accountant took this and I wrote the rest of it off in income tax as a loss. * * * I think it was over forty thousand dollars.

We find that this evidence raised a fact issue as to Edlund's affirmative defense of accord and satisfaction. This issue was properly submitted to the jury. We find nothing in the record to support the submission of a jury question to determine

the amount still unpaid under the note. No evidence was introduced that any payments were made on the note or that any credits were applied to the note. Accordingly, we overrule Edlund's twelfth and thirteenth points of error.

### ATTORNEY'S FEES

**[32]** **[33]** Bounds sets forth three cross points challenging the jury's finding of one dollar as reasonable attorney's fees. Bounds bases his attack on the theories that (1) the jury finding is immaterial, (2) the amount of the fees was proven as a matter of law, and (3) the finding is against the great weight and preponderance of the evidence. In reviewing a "matter of law" challenge, we use a two-pronged test. First, we examine the record for evidence that supports the jury's findings, while ignoring all evidence to the contrary. Second, if there is no evidence to support the factfinder's answer, then we examine the entire record to see if the contrary proposition was established as a matter of law. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989).

The evidence consists of the promissory note itself and the testimony of Bounds's attorney. The relevant portion of the note provides: "It is further expressly agreed that if this note ... is collected ... through other legal proceedings ... to pay the owner or holder of this note fifteen per cent additional on the principal and interest then due hereon as attorney's fees." Bounds's attorney testified about the amount and kind of work done and the reasonableness of the fees he charged Bounds. On cross-examination, Edlund only asked Bounds's attorney how much he had been paid to date and whether that amount related solely to the lawsuit. Since Edlund presented no evidence on the unreasonableness of the requested fees, nor did he prove a lesser amount that was reasonable under the circumstances, he is not entitled to a fee reduction. *F.R. Hernandez Constr. & Supply Co., Inc. v. National Bank of Commerce of Brownsville,* 578 S.W.2d 675, 677 (Tex.1979); *see also Long v. Tascosa Nat'l Bank of Amarillo,* 678 S.W.2d 699, 706 (Tex.App.—Amarillo 1984, no writ).

We hold that Bounds proved his entitlement to attorney's fees based on the contractual provision as a matter of law. We render judgment that Bounds recover fifteen percent of the amount of principal and interest *owing at the time of judgment* as attorney's fees. Bounds is not entitled to recover an additional amount for attorney's fees for appealing the judgment.[5]

## SUPERSEDEAS BOND

**[34]** In his motion for reconsideration, Bounds requests that we enter judgment against the surety on Edlund's supersedeas bond. Edlund responds that judgment should not be entered against the surety because our remand of the counterclaim renders the amount of the surety's liability uncertain. Edlund further argues that it is improper to render judgment against a surety without a final judgment. He asserts that Bounds's judgment against him cannot be final until the trial court disposes of his counterclaim.

**\*732 [35] [36] [37] [38]** When a court of appeals affirms the trial court's judgment, it shall render judgment against the appellant and the sureties on his appeal or supersedeas bond, if any, for such costs as are taxed against him. TEX.R.APP.P. 82. The purpose of a supersedeas bond is to secure the appellee and abate the remedies he would otherwise have for realizing his judgment. *Carter Real Estate & Dev., Inc. v. Builder's Serv. Co.,* 718 S.W.2d 828, 830 (Tex.App.—Austin 1986, no writ). A supersedeas bond is not intended to secure speculative damages or damages that have not been finally determined. *Hughes v. Habitat Apartments,* 828 S.W.2d 794, 795 (Tex.App.—Dallas 1992, n.w.h.). Execution cannot issue on a judgment that is not final. *Id.* A judgment for a plaintiff that does not dispose of a defendant's counterclaim is not a final judgment. *Springwoods Shopping Ctr., Inc. v. University Sav. Ass'n,* 610 S.W.2d 177, 178 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.).

Since in this case Edlund's counterclaim is still pending, the judgment is not final, and we cannot render judgment against the surety on the supersedeas bond. Accordingly, our judgment will reflect that the surety's obligations on the supersedeas bond are discharged.

## DISPOSITION

We affirm the trial court's judgment as to Edlund's liability under the note, his affirmative defenses, and his counterclaim on the conversion of Zanz's assets. We modify the attorney's fees award and we render judgment that Edlund pay, as attorney's fees, fifteen percent of the trial court's award of principal and interest owing at the time of judgment, and affirm that part of the judgment as modified. We reverse the judgment on Edlund's counterclaim for conversion of K–John's assets and remand that portion of the cause for a new trial in accordance with this opinion. We grant Edlund's motion for rehearing and Bounds's motions for rehearing and reconsideration. We deny Edlund's motion to supplement the record. The parties are ordered to bear their own costs incurred by reason of this appeal. The obligations of the supersedeas bond surety, Fidelity and Deposit Company, are ordered discharged.

## All Citations

842 S.W.2d 719

Footnotes

1    The Honorable Gerald T. Bissett, Justice, Court of Appeals, Thirteenth District of Texas at Corpus Christi, Retired, sitting by assignment.

2    The Honorable John F. Onion, Jr., Presiding Judge, Court of Criminal Appeals, Retired, sitting by assignment.

3    The Legislature changed the application of these sections so they apply to decrees of divorce and annulment rendered *before,* on, or after November 1, 1987. Act approved June 14, 1989, 71st Leg., R.S., ch. 371, 1989 Tex.Gen.Laws 1466 (emphasis added).

4    The statute further provides: "(b) The suit may be brought by either former spouse. (c) The suit must be filed before two years after the date on which a former spouse unequivocally repudiates the existence of the ownership interest of and communicates that repudiation to the other spouse." TEX.FAM.CODE ANN. § 3.90(b), (c) (Vernon Supp.1992). We make no finding as to whether the statute of limitations now prevents a suit to determine proper division of the note.

5    Bounds, in his pleadings, relies on the contractual provision for his claim for attorney's fees. He did not plead an entitlement under the statute which allows for attorney's fees in suits on a written contract. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 38.001(8) (Vernon 1986). Thus, Bounds is entitled only to fifteen percent of the amount owing on the note. Additionally, being limited by his pleadings, there was no proper question before the trial court on the issue of Bounds's attorney's fees in case of appeal. Edlund properly objected to the submission of question number one. Subparts (b), (c), and (d) of question number one, requesting findings for reasonable and necessary attorney's fees if the case was appealed, have no basis in the pleadings and should not have been presented to the jury. *See* TEX.R.CIV.P. 278.

**End of Document**                                                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.



415 S.W.3d 259
Supreme Court of Texas.

Jose L. ELIZONDO and
Guillermina Elizondo, Petitioners,

v.

Ronald D. KRIST, The Krist Law Firm, P.C., Kevin
D. Krist, and William T. Wells, Respondents.

No. 11–0438. | Argued Dec. 5,
2012. | Decided Aug. 30, 2013.
| Rehearing Denied Dec. 13, 2013.

**Synopsis**

**Background:** Client and his wife brought action against
their former attorneys for professional negligence, breach
of fiduciary duty, violations of the Deceptive Trade
Practices Act (DTPA), common law fraud, fraudulent
misrepresentations, negligent representations, and fraudulent
inducement. The 129th District Court, Harris County, S.
Grant Dorfman, J., entered judgment in favor of attorneys.
Client and his wife appealed. The Houston Court of Appeals,
338 S.W.3d 17, affirmed. Client and his wife filed petition for
review.

**[Holding:]** The Supreme Court, Don R. Willett, J., held that
summary judgment affidavit of expert for client and his wife
was insufficient to establish legal malpractice damages.

Affirmed.

Boyd, J., dissented, with opinion, in which Lehrmann, J.,
joined.

West Headnotes (9)

**[1]** **Judgment**
    ⚖ Matters of fact or conclusions

    **Judgment**
    ⚖ Attorneys

Conclusory statements in summary judgment
affidavit of expert witness that former attorney
for client who was injured in explosion at oil

refinery had not obtained an adequate settlement
for client and his wife in underlying suit they
had brought against refinery was insufficient to
establish that client and his wife had suffered
damages resulting from former attorney's alleged
malpractice, as expert offered only conclusory
and speculative opinions, and he did not evaluate
what underlying case would have yielded by way
of a judgment if case had gone to trial, nor did he
compare the settlement reached with other actual
settlements obtained in litigation involving the
explosion.

3 Cases that cite this headnote

**[2]** **Attorney and Client**
    ⚖ Damages and costs

In a legal-malpractice case, damages consist
of the amount of damages recoverable and
collectible if the suit had been properly
prosecuted.

2 Cases that cite this headnote

**[3]** **Attorney and Client**
    ⚖ Damages and costs

Legal malpractice damages are the difference
between the result obtained for the client and
the result that would have been obtained with
competent counsel; damages in such cases are
the difference between the result obtained and
the case's "true value," defined as the recovery
that would have been obtained following a trial
in which the client had reasonably competent,
malpractice free counsel.

1 Cases that cite this headnote

**[4]** **Trial**
    ⚖ Expert and other opinion evidence

Bare, baseless opinions will not support a
judgment even if there is no objection to their
admission in evidence.

2 Cases that cite this headnote

**[5]** **Judgment**
    ⚖ Matters of fact or conclusions

A conclusory statement of an expert witness is insufficient to create a question of fact to defeat summary judgment.

9 Cases that cite this headnote

### [6] Evidence

⚷ Necessity and sufficiency

A claim will not stand or fall on the mere ipse dixit of a credentialed witness.

2 Cases that cite this headnote

### [7] Evidence

⚷ Necessity and sufficiency

Expert testimony fails if there is simply too great an analytical gap between the data and the opinion proffered.

2 Cases that cite this headnote

### [8] Appeal and Error

⚷ Judgment

Attempts by former attorneys for client, who was injured in explosion at oil refinery, to limit client's discovery of information about other settlements that had been reached with others injured in explosion, did not estop former attorneys from arguing that summary judgment affidavit of client's expert was insufficient to establish that client had suffered damages resulting from former attorney's alleged malpractice in failing to obtain an adequate settlement for client in client's legal malpractice suit against former attorneys; former attorneys argued within bound of zealous advocacy in contending that the information regarding other settlements reached should not be disclosed even if it might be helpful to client, and client did not take position in trial court that discovery of dollar amount of other settlements in similar cases was needed so their expert could make a valid, nonconclusory determination of adequacy of client's settlement or better describe his analysis.

1 Cases that cite this headnote

### [9] Attorney and Client

⚷ Pleading and evidence

Method available to establish attorney malpractice damages requiring an analysis of settlements made under comparable circumstances requires expert testimony.

Cases that cite this headnote

## Attorneys and Law Firms

**\*260** Andrew D. Kumar, Michael J. Lowenberg, The O'Quinn Law Firm, Brian K. Tully, Jesse R. Pierce & Associates, P.C., Donald B. McFall, Kenneth R. Breitbeil, McFall, Breitbeil & Smith, P.C., Levon G. Hovnatanian, Martin Disiere Jefferson & Wisdom LLP, Houston, TX, for Jose L. Elizondo.

Jane M.N. Webre, Ryan Squires, Stephen E. McConnico, Scott Douglass & McConnico, L.L.P., Austin, TX, for Respondent Kevin Krist.

Jeffrey L. Oldham, Bracewell & Guiliani LLP, Jennifer Rustay, William Fred Hagans, Hagans Burdine Montgomery Rustay, P.C., Warren W. Harris, Bracewell & Giuliani, LLP, Houston, TX, for Respondent Ronald D. Krist.

Diana L. Faust, Cooper & Scully, P.C., Dallas, TX, John Wesley Raley, Raley & Bowick LLP, Kirsten Anne Davenport, Davenport Law Firm PC, Houston, TX, for Respondent William T. Wells.

## Opinion

Justice WILLETT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice GREEN, Justice JOHNSON, Justice GUZMAN, and Justice DEVINE joined.

In this legal-malpractice case, the clients sued their former attorneys, complaining the attorneys had obtained an inadequate settlement. The trial court granted summary judgment for the attorneys, and the court of appeals affirmed. We affirm the court of appeals' judgment.

### I. Background

In March 2005, an explosion occurred at the Texas City refinery of BP Amoco Chemical Company (BP), killing fifteen workers and injuring many others. Approximately

4000 claims were filed against BP, and BP settled them all. A handful of cases proceeded to trial but settled before a verdict.

Jose Elizondo was working for a BP contractor at the plant on the day of the explosion. The blast threw him about twenty feet. He received medical treatment for neck and back injuries. He returned to work a few days later but claimed he continued to suffer from psychological problems. His wife, Guillermina, claimed that she too suffered, from loss of consortium. Jose met with attorney William Wells and signed a power of attorney **\*261** retaining Wells to represent him on "all claims I may have against BP and others" arising from the March 2005 explosion.

Wells sent a demand letter to BP asking for a settlement of $2 million on the Elizondos' claims. The settlement demand was made on behalf of both husband and wife. [1] A few months later, an attorney for BP offered to settle "any and all claims of Jose L. Elizondo and his family members" for $50,000. In an effort to increase the settlement in this and three other cases, Wells associated Ronald Krist, Kevin Krist, and the Krist Law Firm as additional counsel. Ronald and Kevin Krist met with BP, but could not obtain a larger settlement for the Elizondos.

Wells and Kevin Krist met with Jose to discuss the settlement offer. They went through a form release prepared by BP. Jose decided to accept the settlement offer and signed the release in February 2006. The release covers Jose and Guillermina, defining the "RELEASORS" as "JOSE ELIZONDO, GUILLERMINA ELIZONDO, and any of their heirs, executors, agents, trustees, assignees, representatives, attorneys, advisors, administrators, successors and assigns." The release had signature lines for Jose and Guillermina, but only Jose signed it. Guillermina testified that she cannot speak or read English. Jose contends that when he met with his counsel, he asked whether Guillermina needed to sign the agreement and was told it was not necessary.

In August 2007, Jose brought this suit against Wells, Kevin Krist, Ronald Krist, and the Krist Law Firm (the Attorneys). Guillermina was later added as a plaintiff, but all the Attorneys deny ever representing Guillermina. The suit claimed that the Attorneys represented both Elizondos and failed to obtain an adequate settlement on their behalf. The petition asserted claims of professional negligence, breaches of fiduciary duty, and fraud, as well as other claims. It contended that Jose was "sold down the river" so that Ronald Krist could represent BP. After Jose accepted BP's settlement offer, Ronald Krist did represent BP, but he

contends his representation of Jose had ended months earlier. The Elizondos also claimed that because Guillermina did not sign the release her claim was never settled, and the Attorneys should have pursued her claim before it became time-barred.

The Attorneys filed several motions for summary judgment on grounds of no evidence of damages, impermissible "claim splitting," and no attorney-client relationship with Guillermina, as well as other grounds. In response to the motions regarding damages, the Elizondos submitted the expert affidavit of attorney Arturo Gonzalez.

The trial court granted some of the summary-judgment motions, including the motions regarding damages. The court of appeals affirmed, holding that because the Elizondos had not presented more than a scintilla of competent evidence of damages, the trial court did not err in granting summary judgment on this ground. [2]

### **\*262** II. Discussion

#### A. The Gonzalez Affidavit Did Not Raise a Genuine Issue of Material Fact on Malpractice Damages.

[1] The parties disagree on whether the Gonzalez affidavit was sufficient to defeat summary judgment on the issue of malpractice damages. [3] Summary judgment was warranted for the Attorneys if, after adequate time for discovery, they demonstrated that the Elizondos had failed to offer competent summary judgment evidence raising a genuine issue of material fact as to damages. [4]

In his eight-page affidavit, Gonzalez recites his general qualifications and his specific involvement in the BP litigation. He worked for two firms that represented claimants in litigation arising from the plant explosion and was appointed by the 212th district court as plaintiffs' liaison counsel. He attested that these experiences familiarized him with the settlement of many claims. He stated that BP focused on ten criteria in determining the general value of a case for settlement purposes: (1) proximity to ground zero; (2) when injury was reported to a supervisor; (3) corroboration of proximity and reporting of injuries to supervisor or management; (4) age of victim; (5) wage earning capacity and wage loss (present and future); (6) injuries and bio-mechanics of injuries—e.g., nature, extent, and duration; (7) medical treatment received and duration thereof (physical and mental/

PTSD); (8) surgical versus non-surgical interventions; (9) single or married/residual consortium claims; and (10) onsite versus offsite claims. The affidavit describes the basic facts regarding Jose's injuries, family situation, and work history. It then states:

> Based on the factual information provided and reviewed by me, my experience in the BP litigation, my knowledge of general settlement values and in the criteria and protocol relied upon to establish general settlement values in the BP litigation, it is my opinion that for a plaintiffs' attorney acting within the standard of care applicable to the same or similar circumstances, using reasonable due diligence, the Elizondo case would have had a general value, by way of settlement or verdict, in the range of between Two Million ($2,000,000.00) and Three Million ($3,000,000.00) dollars. Guillermina Elizondo's individual claim would represent some part of that value, but Jose's claim would represent the majority of that value. The settlement value of the Elizondo claim is not distinguished as compensatory, non-economic or exemplary in nature, but instead is a single value offered by BP so that BP could avoid a trial or jury verdict.

The affidavit sets out the information reviewed by Gonzalez and details why, in Gonzalez's opinion, the Attorneys failed to exercise due diligence in their representation of the Elizondos. It then states:

> The settlement offer made by BP for the Elizondos' claim was basically for nuisance value. Given the extraordinary circumstances surrounding the BP explosion[ ] claims, a reasonably competent plaintiff's lawyer should have continued to prosecute the claim until a fair and reasonable offer was made by BP. In my opinion, had that been done, the Lawyers would have garnered far

in excess **\*263** of the $50,000 offer which was supposedly the most that BP would ever pay.

It then concludes that, in light of the risk of punitive damages in the BP explosion cases, "these cases were heavily evaluated and settlements obtained were significantly higher as compared to the average personal injury lawsuit in the [S]tate of Texas."

At the outset, the Attorneys contend that the Gonzalez affidavit is defective because a legal-malpractice suit is a "suit within a suit," and proof of malpractice damages requires proof of what the plaintiff would have recovered by way of a judgment after *trial* absent his attorney's negligence. For example, the Attorneys argue in their brief that plaintiffs alleging malpractice damages "must prove that the 'true value' of their case is a collectible recovery, after a trial, that is greater than the actual result they received," and that "[t]o show the existence of malpractice damages, the Elizondos had to show the *true value* of their claims was greater than what they received, *i.e.,* that they would have recovered by way of judgment an amount greater than they did from BP." They contend that Gonzalez only analyzed why the *settlement* was inadequate for various reasons, and he did not discuss what amount the Elizondos would have recovered if the case had proceeded to judgment after a trial. We disagree with this argument.

**[2]**    We have recognized that in a legal-malpractice case damages consist of "the amount of damages recoverable and collectible ... if the suit had been properly prosecuted."[5] In *Keck, Mahin & Cate v. National Union Fire Insurance Co.,* we described damages in such cases as the difference between the result obtained and the case's "true value," defined as the recovery that would have been obtained "following a trial" in which the client had "reasonably competent, malpractice-free" counsel.[6]

**[3]**    These cases recognize that legal-malpractice damages are the difference between the result obtained for the client and the result that would have been obtained with competent counsel. They do not require that damages can only be measured against the result the client would have obtained if the case had been tried to a final judgment.

In this case, it is undisputed that BP, a large, solvent corporation, made the decision to settle every case arising from the plant explosion. Here, where the same defendant

settled thousands of cases, and indeed made the business decision to settle all cases and not try any to a verdict, we see no reason why an expert cannot base his opinion of malpractice damages on a comparison of what similarly situated plaintiffs obtained from the same defendant. This data is perhaps the best evidence of the real-world settlement value of the case. Under Evidence Rule 703, experts may base their testimony on facts or data that are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." [7] That test is met when, in a mass tort litigation involving thousands of similar claimants and arising out of the same event, the expert measures the "true" settlement value of a particular case by persuasively comparing all the circumstances of the case to the settlements obtained in other cases with similar circumstances arising from the event.

**\*264** Nevertheless, the Attorneys argue that the Gonzalez affidavit was conclusory, while the Elizondos maintain that it was sufficiently specific to raise a fact issue on damages.

 **[4]** **[5]** **[6]** **[7]** "Bare, baseless opinions will not support a judgment even if there is no objection to their admission in evidence," [8] and we have "often held that such conclusory testimony cannot support a judgment." [9] "A conclusory statement of an expert witness is insufficient to create a question of fact to defeat summary judgment." [10] Further, "a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." [11] Expert testimony fails if there is "simply too great an analytical gap between the data and the opinion proffered." [12] Courts are not required "to ignore fatal gaps in an expert's analysis or assertions." [13] Stated another way, in a legal-malpractice case, we have observed that even where an attorney-expert was qualified to give expert testimony, his affidavit "cannot simply say, 'Take my word for it, I know: the settlements were fair and reasonable.' " [14] Conversely, in this case, an attorney-expert, however well qualified, cannot defeat summary judgment if there are fatal gaps in his analysis that leave the court to take his word that the settlement was inadequate.

Our decision in *Burrow v. Arce* is instructive. In that case as in today's case, attorneys had settled numerous suits in a mass tort proceeding arising out of a plant explosion. The plaintiffs, former clients of the attorneys, contended that the settlements they received were inadequate for various reasons, including the failure of the attorneys to "fully investigate and assess individual claims." [15] The trial court granted summary judgment for the attorneys on grounds that the settlements were fair and reasonable and therefore the clients had suffered no actual damages and were not entitled to the forfeiture of fees they sought. [16]

We held that the affidavits submitted by the attorneys were conclusory and therefore insufficient to entitle the attorneys to summary judgment. We considered three affidavits. The most detailed affidavit, from retained expert-attorney Malinak, set out numerous criteria that were important in evaluating settlements in the case, including the underlying liability facts, the identity of the employer, the elements of damages available to each plaintiff, and the losses to each plaintiff. [17] The expert then declared that he had evaluated the criteria as to each plaintiff and had concluded that the settlement as to each was reasonable and fair. [18] We held that the affidavit was **\*265** too conclusory to sustain a summary judgment on the element of damages:

> The affidavit says no more than that Malinak, an experienced attorney, has considered the relevant facts and concluded that the Clients' settlements were all fair and reasonable.... Credentials qualify a person to offer opinions, but they do not supply the basis for those opinions. The opinions must have a reasoned basis which the expert, because of his "knowledge, skill, experience, training, or education [,"] is qualified to state. That basis is missing in Malinak's affidavit. He does not explain why the settlements were fair and reasonable for each of the Clients. His affidavit ... is nothing more than a sworn denial of plaintiffs' claims and no more entitles the Attorneys to summary judgment than a lawyer's equally conclusory affidavit stating that the Clients had suffered $10 million damages would entitle them to summary judgment.... [T]he issue is whether Malinak's affidavit states a sufficient basis for his opinions. Malinak might have analyzed the Clients' injuries by type, or related settlement amounts to medical reports and expenses, or compared these settlements to those of similar claims, or provided other information showing a relationship between the plaintiffs' circumstances and the amounts received. He did not do so. The absence of such information did not merely make the affidavit unclear or indirect; it deprived Malinak's opinions of any demonstrable basis. We therefore conclude that summary judgment could not rest on Malinak's affidavit. [19]

The Gonzalez affidavit in today's case is similarly conclusory. Like the Malinak affidavit, the Gonzalez affidavit is from an experienced attorney whose credentials are not the problem. The problem is the lack of a demonstrable and reasoned basis on which to evaluate his opinion that the settlement was inadequate. Like the Malinak affidavit, the Gonzalez affidavit explains in some detail the factors or criteria that should inform a determination of the value of the case. Like the Malinak affidavit, the Gonzalez affidavit confirms that the affiant considered the facts relevant to the case, but it fails to offer specifics on why the value of the case was $2–3 million as opposed to the $50,000 received in settlement. A fatal analytical gap divides the recitation of the facts of the Elizondo case and the declaration of its settlement value.

Gonzalez did not evaluate what the Elizondo case would have yielded by way of a judgment if the case had gone to trial. On the contrary, he based his opinion on what the Attorneys should have obtained in *settlement.* The affidavit makes clear throughout that Gonzalez's opinion of the value of the case stems from his opinion of the settlement the Attorneys should have obtained. As noted above, none of the approximately 4000 claims arising from the BP plant explosion was tried to a verdict. Gonzalez states in the affidavit that through his experience he gained knowledge of the "settlement ranges or case values" in the BP litigation. He then lists the criteria BP used in "determining the general value of a case for settlement purposes." He states his value of the case based on his "knowledge of general settlement values and ... the criteria and protocol relied upon to establish general settlement values." He states that "[t]he settlement offer made by BP ... was basically for nuisance value" and that, given the extraordinary circumstances of the BP plant explosion, "a reasonably competent plaintiff's lawyer should have continued to **\*266** prosecute the claim until a fair and reasonable offer was made by BP." He concludes by stating that the Attorneys could have "greatly enhanced the settlement value of the Elizondo claim" by developing facts supporting exemplary damages. As explained above, we conclude that an analysis of settlements of cases with injuries and circumstances similar to the Elizondo case *might* be sufficient to raise a fact issue as to the inadequacy of the settlement, but Gonzalez did not undertake to compare the Elizondo settlement with other actual settlements obtained in the BP litigation. As in *Burrow,* the expert might have compared this settlement "to those of similar claims, or provided other information showing a relationship between the plaintiffs' circumstances and the amounts received [but he] did not do so." [20] We are simply left to take his word that

the settlement here was inadequate. In this regard, we agree with the court of appeals:

> [A]lthough Gonzalez lists specific criteria he contends BP "focused on" when determining settlement values, he offers no analysis to explain how these factors would be applied to the Elizondos' situation. He also fails to link settlement amounts to specific injuries and circumstances, and provides no comparison of settlement amounts of similar claims. Thus, Gonzalez's affidavit offers only conclusory and speculative opinions. [21]

We conclude, therefore, that the affidavit did not raise a genuine issue of material fact sufficient to defeat summary judgment.

The dissent reasons that the affidavit raised a fact issue on whether competent counsel would have obtained a settlement in excess of $50,000, which Gonzalez characterized as nuisance value. We differ because, for the reasons stated, the affidavit was devoid of a demonstrable basis, whether we consider that portion of the affidavit claiming the case had a settlement value of $2–3 million, or that portion declaring the settlement value was "far in excess of the $50,000" actually received. These assertions are equally conclusory, suffer from the same fatal gap in analysis, and, as in *Burrow,* rely on nothing more than the *ipse dixit* of the expert. We are simply left to take the expert's word as to the adequacy of the settlement, the same defect we recognized in *Burrow.*

### B. Discovery Disputes in the Trial Court Did Not Warrant Denial of the Summary Judgment Motions on Damages.

 **[8]**   The court of appeals dissent noted that at various points in the litigation the Lawyers objected to the discovery of information about other settlements, and this dissent thought it "fundamentally unfair for the Lawyers to thwart discovery as to other settlements and at the same time use the lack of that information to strike Gonzalez's affidavit." [22] It noted that "[t]he Elizondos asked for a court order to allow Gonzalez to reveal specifics from the BP settlements, and the Lawyers opposed the order." [23] On the other hand, the court of appeals majority concluded that the Elizondos did not assign as error on appeal that the trial court erred in denying their request to obtain discovery on or otherwise reveal information regarding settlements in other cases. [24]

On this issue, **\*267** we ultimately are not persuaded by the court of appeals dissent—essentially urging that, because the Lawyers objected to discovery regarding other settlements, the Lawyers should be estopped from prevailing on grounds that the Gonzalez affidavit was inadequate. Nevertheless, we find the issue difficult and discuss it at some length herein.

The settlement agreements in the BP cases contained a confidentiality provision prohibiting disclosure of the details of the settlements to third parties. The Elizondos' expert, Gonzalez, stated in his affidavit that he was bound by this provision. The Attorneys were also bound by this provision. [25] To the extent the Attorneys contended as an initial discovery response that they and others could not disclose information regarding other settlements for contractual reasons, we believe they argued within the bounds of zealous advocacy in contending that the information should not be disclosed even if it might be helpful to the Elizondos.

Further, we can find no place in the record where the Elizondos contended that their expert needed to review and reveal information about other specific settlements in order to prepare a valid expert opinion. The voluminous record before us indicates several pretrial skirmishes where other settlements came up. [26] But the Elizondos point to nothing in the record indicating that, but for objections raised by the Attorneys, Gonzalez would have augmented his affidavit with a more revealing analysis and comparison of other specific settlements obtained in similar cases. On the contrary, he stated in his affidavit that "I am precluded pursuant to the confidentiality provisions from divulging specific settlement amounts related to the monetary payments by BP to specific plaintiffs." Gonzalez did not indicate that he wished to analyze and describe other specific settlements to buttress his opinion but had been thwarted by the objections of the Attorneys.

In addition, the Elizondos did not ask the trial court to defer ruling on the summary judgment motions until they could obtain from the Lawyers or third parties evidence of other settlements. The Elizondos should have made such a request if they thought their expert needed this data. [27] Moreover, they do not even now **\*268** contend that they needed discovery of other settlements so that Gonzalez could provide a comparison of them in opining on the adequacy of the Elizondo settlement. In their principal brief, they argue to us only that the Lawyers' refusal to produce information about other settlements should lead us to hold "that the trial court abused its discretion in striking portions of Gonzalez's

affidavit." As detailed above, [28] even if we consider the entire Gonzalez affidavit, including the portions struck by the trial court, we still conclude that it failed to raise a material issue of fact as to damages.

As noted above, the Elizondos filed a motion, mentioned by the court of appeals majority and dissent, seeking a trial court order allowing Gonzalez to reveal information regarding other settlements under a proposed protective order. [29] But from the record before us the Attorneys were not actually opposing such disclosures. [30] In fact, the motion sought entry of an order allowing Gonzalez to testify in his deposition about other settlements because the Elizondos anticipated that *the Lawyers* would ask about these other settlements. [31] Gonzalez sought a court order because the settlement agreements authorized disclosure of settlement amounts if "required by law or court order."

In several pleadings in our record the Elizondos requested a continuance or more discovery before the trial court ruled on the summary judgment motions. These requests met with some success, in that the trial court agreed not to set a hearing on the summary judgment motions until two weeks after the depositions of the Lawyers were taken. In a motion for continuance filed in April 2008, the Elizondos contended that they needed settlement-related documents pertaining to other BP clients of the Lawyers. However, this pleading disclaimed any need for information regarding the amounts of other settlements, stating that the Elizondos were content with redaction of settlement amounts if that information raised confidentiality concerns [32] and that the Attorneys' **\*269** summary judgment motions on damages were based on a "faulty premise," namely that the "only way of proving damages is by showing that someone else with identical injuries and claims against BP received a larger settlement." A pleading styled "Demonstration of Need for Additional Discovery Prior to Hearing on Defendants' Sixteen Motions for Summary Judgment," also filed in April 2008, stated that the Elizondos needed settlement documents related to other BP clients of the Lawyers, but the stated need was to refute the Lawyers' contention that they did not represent Guillermina, the wife of the plaintiff directly injured in the blast. At least two other pleadings—plaintiffs' April 2008 motion for continuance and a March 2008 motion to compel production of documents—made the same argument. Again, the Demonstration of Need disclaimed any need for discovery of the amounts of the other settlements, stating that "Plaintiffs would not object to limited redactions necessary to comply

with confidentiality provisions, such as dollar amounts....”[33] Another motion for continuance, filed in October 2008 and relating specifically to the summary judgment motions on damages, made no request for additional discovery on settlements in other cases. It contended, on the contrary, that the Gonzalez affidavit was adequate to refute all the Lawyers' arguments in favor of summary judgment on grounds that no evidence had been presented on damages, including the Lawyers' argument that “Plaintiffs cannot identify anyone who obtained a larger settlement for the same claims, much less the amount received, which demonstrates that Plaintiffs cannot prove damages.” It asked for a continuance only if the Court was considering granting summary judgment on grounds that Guillermina had no consortium claim because Jose's injuries were not sufficiently “serious, permanent, and disabling,” grounds unrelated to the alleged inadequacy of the Elizondo settlement that might be revealed by an expert comparison of other BP settlements.

In sum, none of these discovery skirmishes indicate that the Elizondos took the position in the trial court that (1) discovery of the dollar amount of other settlements in similar cases was needed so their expert could make a valid, non-conclusory determination of the adequacy of the Elizondo settlement or better describe his analysis, and (2) consideration of the summary judgment motions on damages should be continued until such discovery was provided. Accordingly, we do not agree with the court of appeals dissent insofar as it would hold that the Lawyers were not entitled to summary judgment because of their attempts to limit discovery regarding other settlements.

### C. The Lay Testimony of the Elizondos Did Not Raise a Genuine Issue of Material Fact on Malpractice Damages.

The Elizondos contend that their own deposition testimony raised fact issues as to damages sufficient to defeat summary judgment. Jose testified about his pain and suffering, and Guillermina testified **\*270** about her loss of consortium. The Elizondos contend that these unliquidated damages are best left to a jury and that summary judgment therefore was not warranted.

**[9]** We agree with the Lawyers that even if the Elizondos presented some evidence of actual damages, this does not mean they raised a material issue of fact as to *malpractice* damages. The two are not the same here, because the

case settled for $50,000. Even if the Elizondos suffered some compensable damages, they suffered as a result of the Attorneys' conduct only if, absent malpractice, they probably would have recovered a settlement for more than $50,000. As explained above, the general measure of damages in a legal-malpractice case is the difference between the amount the plaintiff probably would have recovered in the absence of malpractice, and the amount recovered. While a “suit within a suit” analysis is not required in a case like this one, for the reasons explained, the alternative method available to establish attorney-malpractice damages requires an analysis of settlements made under comparable circumstances. While this alternative method is sometimes available, we conclude that such an analysis requires expert testimony. We have in the past noted that proof of attorney malpractice requires expert testimony, because establishing such negligence requires knowledge beyond that of most laypersons.[34] The same is true of proof of damages under a theory that a settlement was inadequate. The Elizondos' own expert attested that a calculation of a reasonable settlement in this case required an analysis of at least ten factors considered by BP in determining settlement values, a balancing and evaluation of which is surely “beyond the ken of most jurors.”[35] We conclude that even these factors are inadequate if considered in a vacuum without evaluation of settlements of comparable cases. Given the complexity of these factors, we conclude that such an analysis requires expert testimony. It cannot be based solely on the testimony of the claimants, particularly where Jose testified that he did not know the value of his claim, he testified that he had “no idea” of the value of his wife's claim, and both husband and wife testified that they did not know whether anyone had received a larger settlement in a case involving similarly situated claimants.

The Elizondos also argue that summary judgment was not warranted as to Guillermina because she recovered nothing. They argue that Guillermina did not sign the release and therefore still had an unsettled claim, and that she received nothing in the settlement. The parties disagree on whether the Lawyers ever represented Guillermina. But even if Guillermina is correct that the Lawyers represented her and had a duty to obtain a settlement for her, or at least advise her that her claim should be pursued before limitations ran, we cannot agree that she raised a fact issue on damages in light of the Elizondos' own evidence proffered in response to the summary judgment motions. The Elizondos offered proof that (1) William Wells advised BP that he represented Jose and Guillermina and made a settlement demand on behalf of both husband and wife; (2) BP responded with a settlement

offer to settle "all claims of Jose L. Elizondo and his **\*271** family" for $50,000; (3) the settlement offer was accepted, and BP drafted a release to be signed with disbursement of the settlement proceeds, defining the "releasors" to include both Jose and Guillermina; (4) the release had signature lines for both husband and wife; (5) Jose alone met with Wells and Kevin Krist to go over the release; (6) Jose was told that Guillermina (who could not speak or read English) did not need to sign the release; and (7) Jose signed the release and received the settlement proceeds. To prevail under the theory that Guillermina received nothing on her claim of loss of consortium, she would have to prove that her claim survived the release because Jose did not have authority to sign the release and accept the settlement proceeds on behalf of both of them, and that she and her lawyers tricked BP into paying $50,000 to settle both claims and BP remained liable on the loss of consortium claim. She would also have to prove that BP could have been persuaded to pay an additional settlement or a trier of fact could have been persuaded to award additional damages in such unsavory circumstances. We have reviewed the record and conclude that Guillermina failed to proffer evidence, expert or otherwise, upon which a reasonable and fair-minded trier of fact could have found damages for her under such a novel theory. [36]

### III. Conclusion

We affirm the court of appeals' judgment.

Justice BOYD filed a dissenting opinion, in which Justice LEHRMANN joined.

Justice HECHT did not participate in the decision.

Justice BOYD, joined by Justice LEHRMANN, dissenting.
To prove the existence of legal malpractice damages, clients who sue their attorneys must establish that "the result obtained for the client" was less (or lower or worse) than "the result that would have been obtained with competent counsel." *See ante* at 263. The Court holds that Jose and Guillermina Elizondo failed to submit any evidence that could meet that burden, despite their expert's testimony that, in his opinion, the attorneys' breaches of their duties caused the Elizondos to settle their claims "basically for nuisance value," and "a reasonably competent plaintiff's lawyer ... would have garnered far in excess" of that amount. I believe the Court

imposes too strict a standard at this summary judgment stage. Because the expert based his opinion on facts that could support a finding that the Elizondos' claims had substantial merit but were settled as if they had no merit at all, I would hold that the Elizondos created a fact issue on the existence of malpractice damages. I therefore respectfully dissent.

### I.

### Standard of Review

This is an appeal from a summary judgment. We must consider the evidence in the light most favorable to the Elizondos, indulging every reasonable inference and resolving any doubts in their favor. *See City of Keller v. Wilson,* 168 S.W.3d 802, 824 (Tex.2005); *see also Shah v. Moss,* 67 S.W.3d 836, 844 (Tex.2001). The trial court found that the Elizondos submitted no evidence that they incurred any damages **\*272** as a result of the defendants' alleged breaches. At this stage of the case, the Elizondos did not have to prove the amount of their damages; they only had to create a fact issue as to the existence of damages—that is, whether they sustained any damages at all. To do this, they had to "produce some evidence from which a reasonable jury could infer" that they sustained some damages. *See Garcia v. Gomez,* 319 S.W.3d 638, 642 (Tex.2010) (observing that even though there was no evidence of amount of damages, there was evidence that some damages were incurred); *see also Alexander v. Turtur & Assocs., Inc.,* 146 S.W.3d 113, 117 (Tex.2004) (noting that plaintiff must "produce evidence from which a jury may reasonably infer that the attorney's conduct caused the damages alleged") (citing *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 181 (Tex.1995)). If they have done this, we must reverse the trial court's summary judgment.

### II.

### A Qualified Expert Witness

The Elizondos relied primarily on the affidavit of their expert witness, Arturo J. Gonzalez. According to his affidavit, Gonzalez is a Texas lawyer who has specialized in personal injury claims for over twenty years. Following a 2005 explosion at BP Amoco Chemical Company's plant in Texas City, Gonzalez assisted in the representation of over

525 plaintiffs who, like the Elizondos, asserted claims for damages against BP. For most of that time, Gonzalez served as the plaintiffs' court-appointed liaison counsel to facilitate discovery and the exchange of information between the parties. He "was intimately involved on a day to day basis with the settlement process" involving these claims, and participated in numerous settlement conferences with BP's representatives and attorneys. He was "directly responsible" for negotiating and settling three cases, and has personal knowledge of the values for which most of the other claims were settled. The defendants may ultimately dispute Gonzalez's assertions and qualifications and, at trial, would be free to disprove them or otherwise undermine his credibility or the reliability of his opinions. But for purposes of summary judgment, as the Court acknowledges, Gonzalez's affidavit establishes that he is "an experienced attorney whose credentials are not the problem." [1] *Ante* at 265.

### III.

### An Acceptable Method of Proof

We have previously held that a client who was the plaintiff in an underlying case can establish the existence of malpractice damages by proving that the amount the client recovered was less than the amount "that would have been recoverable and collectible if the other case had been properly prosecuted." *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.,* 299 S.W.3d 106, 112 (Tex.2009). Because we have focused on the recoverable and collectible amount of a judgment following trial, courts often refer to this method of proving damages as a "suit-within-a-suit." *See, e.g.,* **\*273** *Taylor v. Alonso, Cersonsky & Garcia, P.C.,* 395 S.W.3d 178, 183 (Tex.App.–Houston [1st Dist.] 2012, no pet.) ("This causation burden in this type of legal malpractice claim has been called the 'suit-within-a-suit' requirement.") (citing *Greathouse v. McConnell,* 982 S.W.2d 165, 173 (Tex.App.–Houston [1st Dist.] 1998, pet. denied)).

Today, the Court holds that a client who was a plaintiff "in a mass tort litigation involving thousands of similar claimants and arising out of the same event" can also establish the existence of malpractice damages by proving that the amount the client received in settlement is lower than the amounts of "the settlements obtained in other cases ... arising from the event." *Ante* at 263. This holding is consistent with the Court's comments in *Burrow v. Arce,* 997 S.W.2d

229, 236 (Tex.1999) (noting that the expert "might have ... compared these settlements to those of similar claims"), and I agree with it. I also agree with the Court's holding that Gonzalez's affidavit was insufficient under this "comparison-of-settlements" method. Gonzalez "did not undertake to compare the Elizondo settlement with other actual settlements obtained in the BP litigation." *Ante* at 266. He did not state the values for which any of the other cases settled, and he did not assert that the Elizondos' claims were comparable to, but settled for less than, any of the other cases. [2]

But the Elizondos did not rely on the comparison-of-settlements method. Instead, they challenged the defendants' "faulty premise" that the "only way of proving damages is by showing that someone else with identical injuries and claims received a larger settlement." *See ante* at 269. I agree with the Elizondos that the suit-within-a-suit and the comparison-of-settlements methods are not the *only* ways to prove the existence of legal malpractice damages. Just as our decisions "do not require that damages can only be measured against the result the client would have obtained if the case had been tried in court to a final judgment," *ante* at 263, they also do not require that damages can only be measured against the result the client would have obtained if the case had settled for the amounts for which similar cases settled. Since malpractice damages are "the difference between the result obtained and the case's 'true value,' " *see ante* at 263, I would hold that any method that provides competent evidence that the case's "true value" was greater than the "results obtained" will suffice to raise a fact issue on the existence of malpractice damages. And I would hold that, by submitting sufficient expert opinion evidence that their claims had merit but were settled as if they had none, the Elizondos satisfied that burden.

### IV.

### Sufficient Expert Opinions

Gonzalez did not utilize the comparison-of-settlements method because confidentiality agreements prohibited him from disclosing the amounts for which other cases settled. Nor did he utilize the suit-within-a-suit method, presumably because BP settled every one of the 2005 explosion claims prior to the entry of any judgment. Instead, after stating his experience and qualifications, explaining the confidentiality of BP's settlement amounts, listing the **\*274** factors that BP considered when determining the settlement value of a

case, stating his opinion of the general settlement value of the Elizondos' claims, listing the sources on which he relied, describing the things that a reasonably diligent attorney would have done to pursue the Elizondos' claims, and listing the specific ways in which the attorney defendants failed to meet that standard, Gonzalez stated his opinions as follows:

> The settlement offer made by BP for the Elizondos' claim *was basically for nuisance value.* Given the extraordinary circumstances surrounding the BP explosions claims, a reasonably competent plaintiff's lawyer should have continued to prosecute the claim *until a fair and reasonable offer was made* by BP. In my opinion, had that been done, the Lawyers would have garnered far in excess of the $50,000 offer[.]

(Emphasis added.) In Gonzalez's opinion, the $50,000 that the Elizondos received to settle their claim was "basically for nuisance value" and not a "fair and reasonable" amount based on the merits of the claim.

Although Gonzalez did not define "nuisance value," its meaning is common knowledge, at least among American litigators and judges: a nuisance value settlement is a settlement of meritless, frivolous, or groundless claims for an amount that is less than the defendant would have to spend to defeat them. *See, e.g., Valores Corp. v. McLane Co.,* 945 S.W.2d 160, 169 (Tex.App.–San Antonio 1997, writ denied) (noting that summary judgment rule was intended to dispose of "groundless actions instituted by plaintiffs seeking to harass defendants into nuisance value settlements") (quoting Roy W. McDonald, *Summary Judgment,* TEX. L.REV. 286, 286 (1952)); *Wolcott v. Trailways Lines, Inc.,* 774 So.2d 1054, 1055 n. 1 (La.App. 2nd Cir.2000) ("The 'nuisance value' of a claim is generally considered to be the cost of defending a claim in which it is doubtful the plaintiff will prevail, but is unwilling to simply dismiss."); *Fletcher v. City of Fort Wayne, Ind.,* 162 F.3d 975, 976 (7th Cir.1998) ("[a] compromise for less than the cost of defense is a good working definition of a nuisance-value settlement"); R. Kozel & D. Rosenberg, *Solving the Nuisance–Value Settlement Problem: Mandatory Summary Judgment,* 90 VA. L.REV. 1849, 1851 (2004) (defining a nuisance-value settlement as "a payoff extracted by a threat to litigate a meritless claim or defense that both parties know the court would readily dismiss

as 'untriable' or otherwise legally untenable on an applicable dispositive motion for merits review"). [3]

**\*275** Reading Gonzalez's affidavit in the light most favorable to the Elizondos, and indulging every reasonable inference in their favor, it is Gonzalez's opinion that the Elizondos were paid as if their claims had no merit, when in fact they had substantial merit. If, in fact, the Elizondos' claims had substantial merit but were settled as if they had no merit, a reasonable jury could at least infer that the Elizondos sustained damages of some amount. Although Gonzalez's opinions could not establish any particular amount of damages, in my view they are sufficient to create a fact issue on the existence of damages.

## V.

### An Adequate Factual Basis

Gonzalez's opinions, however, are not enough. Absent an adequate factual basis, an expert's bare opinion that a claim had merit or that it was settled for nuisance value would be conclusory and, therefore, incapable of creating a fact issue to avoid summary judgment. Gonzalez cannot just expect us to "take his word" for it, *see ante* at 264; he must provide facts to support his opinions. *See, e.g., Jelinek v. Casas,* 328 S.W.3d 526, 536 (Tex.2010) ("We have rejected expert opinions not grounded in a sound evidentiary basis: '[I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection.' " (citation omitted)); *see also Elizondo v. Krist,* 338 S.W.3d 17, 25–28 (Tex.App.–Houston [14th Dist.] 2010) (Christopher, J., dissenting) (discussing Gonzalez affidavit). In my view, Gonzalez's affidavit recites numerous facts that, taken in the light most favorable to the Elizondos, constitute evidence that the Elizondos' claims had merit but were settled for nuisance value, as if they did not.

### A. Facts supporting merit

Gonzalez provided an extensive recitation of facts supporting his conclusion that the Elizondos' claims had merit. First, he listed ten "criteria or factors" that BP "focused on" when determining the value of claims arising out of the 2005 explosion:

- proximity to ground zero of the explosion;

- when injury was reported to a supervisor;

- corroboration of proximity and reporting of injuries to supervisor or management;

- age of the victim;

- wage earning capacity and wage loss (present and future);

- injuries and biomechanics of injuries—e.g., nature, extent, and duration;

- medical treatment received and duration of (physical and mental/PTSD);

- surgical vs. nonsurgical intervention(s);

- single or married/residual consortium claims; and

- onsite vs. offsite claims.

He then listed the facts of the Elizondos' claims that were relevant to these factors:

- On the date of the explosion, Jose was working for a subcontractor at the BP facility. He was 37 years old.

- **\*276** • Jose was approximately 200 to 300 feet from the blowdown stack when the explosion occurred. The force of the explosion blew him a number of feet into a port-a-potty.

- Jose was near Mr. Eamello at the time of the blast.

- Jose sustained injuries to his neck and lower back and suffered such mental anguish and emotional distress that he was considered to have post-traumatic stress disorder.

- Jose was first treated for his neck and back injuries by Dr. Ron Kirkwood and Dr. English of Kirkwood Medical Associates, on March 26, 2005.

- Jose saw Dr. David Winberly at Fondren Orthopedic on April 1, 2005, for complaints of neck and lower back pain, and had a follow-up visit on June 7, 2005 for persistent neck and back pain.

- Jose received physical therapy at TIRR twelve times over the six-week period between April 7 and May 19, 2005.

- Jose was first treated for mental anguish or emotional distress by Dr. Susana Rosin on May 6, 2005. He attended additional therapy sessions on May 20, July 6, and August 3, 2005. His treatment lasted approximately three months.

- Jose is married to Guillermina Elizondo, and they had four children at the time of the explosion. They now have five children.

- Jose earned about $23 per hour at the time of the explosion, and worked about 50 to 60 hours each week.

- Jose missed work as a result of the explosion.

- Jose has not been physically or medically restricted from working, but he was injured in the explosion.

Based on these facts and the "criteria and protocol relied upon to establish general settlement values in the BP litigation," Gonzalez opined that the Elizondo case "would have had a general value, by way of settlement or verdict, in the range of between Two Million ... and Three Million ... dollars," and he later summarized his view by opining that the claims were worth "far in excess" of the $50,000 that BP paid. Whether the facts that Gonzalez recited were sufficient to support his $2–3 million valuation is doubtful (at best), but, in my view, they constitute some evidence that the Elizondos' claims had merit.

**B. Facts supporting nuisance value**

Next, Gonzalez recited facts to support his view that the claims were settled "basically for nuisance value," as if they had no merit. First, he described in some detail what a "plaintiff's attorney using reasonable due diligence" would have done to establish the claims' merit. Specifically, a reasonably diligent attorney would have:

> taken steps that included prosecuting the case to its fullest extent including investigation, prosecution and filing of a lawsuit ..., the taking of depositions or sworn statements of important witnesses, requesting or obtaining and reviewing liability documents, coordinating efforts to develop liability and damages in this matter, interviewing other potential

fact witnesses that can determine the extent and location of the injuries sustained by their client, determining any and all responsible parties, determining all claims that their clients could respectfully (sic) have ..., and addressing and developing facts and issues relevant to establishing the egregious conduct of BP.

He then described specifically how the attorneys failed to do these things: they did **\*277** not file a lawsuit; conduct any investigation into the liability and damages facts; send out any discovery requests; take any depositions; investigate and develop evidence of gross negligence; or investigate and determine how BP valued the explosion claims. Instead, Gonzalez asserted, the attorneys "perform[ed] no work other than to review a demand package prepared by a referring lawyer."

These facts, if true, would certainly support the duty and breach elements of the Elizondos' malpractice claims. But in my view, they also support Gonzalez's opinion that the claims were settled for nuisance value, as if they had no merit. If, in fact, the attorney defendants did nothing to develop the claims and establish their merit, a reasonable jury could infer that the amount BP paid reflected the cost of defense and the claims' lack of merit, and that the amount was lower than BP would have paid for a meritorious claim. Again, although this cannot constitute evidence of any particular amount of damages, in my view it does constitute evidence of the existence of damages.

## VI.

### Distinguishing *Burrow v. Arce*

In rejecting Gonzalez's affidavit, the court of appeals relied heavily on our decision in *Burrow v. Arce,* 997 S.W.2d 229 (Tex.1999), as does this Court. In *Burrow,* the defendants' expert testified by affidavit that he had considered the relevant factors (including the underlying facts, the identity of the defendant, the elements of damages available, and the losses each plaintiff incurred) and concluded based on these factors that each plaintiff was "reasonably and fairly compensated." *Id.* at 235. The Court held that this affidavit was conclusory because the expert "[did] not explain why the settlements were fair and reasonable." *Id.* at 235–36. To do

this, the Court explained, he "might have analyzed the Clients' injuries by type, or related settlement amounts to medical reports and expenses, or compared the settlements to those of similar claims, or provided other information showing a relationship between the plaintiffs' circumstances and the amounts received." *Id.* at 236.

In the present case, the Court concludes that Gonzalez's affidavit is "similarly conclusory" because it "fails to offer specifics on why the value of the case was $2–3 million as opposed to the $50,000 received in settlement." *Ante* at 265. But to avoid summary judgment, Gonzalez did not have to establish that the case was worth $2–3 million as opposed to $50,000; he only had to establish that the case was worth more than $50,000. By providing specifics on why $50,000 reflects the value of a case that had "basically" no merit, and specifics on why the Elizondos' case had merit, I would hold that he has done that.

*Burrow* is distinguishable from this case in all material aspects. In *Burrow,* the defendants sought and obtained a traditional summary judgment—they had the burden to prove the absence of damages as a matter of law. 997 S.W.2d at 234. Here, the Elizondos are defending against a no-evidence summary judgment—they need only raise a question of fact on the existence of damages. More importantly, the expert in *Burrow* provided no facts to support his opinion that the "fair and reasonable" amounts the plaintiffs received were equal to or greater than their true value. Here, by contrast, Gonzalez provided extensive facts to support his conclusion that the Elizondos' settlement was "basically for nuisance value," meaning it did not reflect any merit at all. Because a reasonable jury can infer that a claim that lacks merit is worth less than a claim that has merit, I would hold that Gonzalez's **\*278** testimony was sufficient to defeat summary judgment, and that *Burrow* does not counsel otherwise.

## VII.

### Conclusion

In response to the attorney defendants' motions for summary judgment, the Elizondos' expert testified that, in his opinion, their claims had merit but were settled as if they had no merit, and he did so in an affidavit in which he identified numerous facts that support each of these two propositions. Because I would hold that the expert's affidavit constitutes

competent evidence from which a reasonable jury could infer the existence of damages, I respectfully dissent.

**All Citations**

415 S.W.3d 259, 56 Tex. Sup. Ct. J. 1074

Footnotes

1    The letter begins "Re: Our Clients: Jose Elizondo and spouse Guillermina Elizondo." It states that "Our office represents Jose Elizondo and his wife Guillermina Elizondo" regarding the BP explosion and requests "settlement to the Elizondos" of $2 million. It describes the family life and background of both spouses. It details Jose's physical and psychological injuries. It states that "Mr. Elizondo and his wife have the privilege and responsibility of providing for, nurturing and raising four daughters. The events of March 23rd and following disrupted their family existence and security."

2    338 S.W.3d 17, 24.

3    The trial court struck certain portions of the affidavit after the Attorneys complained that it was conclusory. Unlike the court of appeals, we do not separately analyze this ruling but address whether the affidavit, considered in its entirety, raised a material issue of fact as to damages.

4    *See* TEX.R. CIV. P. 166a(i).

5    *Cosgrove v. Grimes,* 774 S.W.2d 662, 666 (Tex.1989); *see also Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.,* 299 S.W.3d 106, 112 (Tex.2009).

6    20 S.W.3d 692, 703 n. 5 (Tex.2000).

7    TEX.R. EVID. 703.

8    *City of San Antonio v. Pollock,* 284 S.W.3d 809, 816 (Tex.2009).

9    *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 232 (Tex.2004).

10    *McIntyre v. Ramirez,* 109 S.W.3d 741, 749–50 (Tex.2003).

11    *Burrow v. Arce,* 997 S.W.2d 229, 235 (Tex.1999).

12    *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726 (Tex.1998) (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

13    *Volkswagen of Am., Inc. v. Ramirez,* 159 S.W.3d 897, 912 (Tex.2004).

14    *Burrow,* 997 S.W.2d at 236.

15    *Id.* at 232.

16    *Id.* at 233.

17    *Id.* at 235.

18    *Id.*

19    *Id.* at 235–36 (quoting TEX.R. EVID. 702).

20    *Id.* at 236.

21    338 S.W.3d at 21–22.

22    *Id.* at 28 (Christopher, J., concurring and dissenting).

23    *Id.* (footnote omitted).

24    The court of appeals majority noted:

> The Elizondos sought to obtain discovery regarding various documents relating to the BP settlements and, in response, the Lawyers asserted various objections. The Elizondos also asked for a court order under which Gonzalez could reveal specific information regarding the BP settlements, and the Lawyers opposed this motion. But, the Elizondos have not asserted on appeal that the trial court sustained the Lawyers' discovery objections or denied this motion, and the Elizondos have not cited any place in the record in which the trial court made any ruling in this regard. In addition, the Elizondos have not assigned error or presented argument challenging any such ruling by the trial court.

>    *Id.* at 21 n. 2 (majority opinion).

25    The Elizondo release applies to the Elizondos and their attorneys and other agents, and provides: "The parties agree to keep confidential and not to disclose to third parties any of the consideration paid under this Agreement or any of the other terms of this Agreement, except that any party may disclose such portions of the Agreement, and to such limited extent, as may be necessary for obtaining tax or legal advice or as may be required by law or court order."

26 For example, the Elizondos sought from the Lawyers production of settlement documents of other BP explosion clients and sought production of settlement documents from third-party law firms who had represented BP. They also sought the production of any matrix or grid used by BP in valuing claims. The Lawyers raised various objections to these requests.

27 *See* Tex.R. Civ. P. 166a(g) ("Should it appear from the affidavits of a party opposing the [summary judgment] motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."); *Tenneco Inc. v. Enter. Prods. Co.,* 925 S.W.2d 640, 647 (Tex.1996) ("When a party contends that it has not had an adequate opportunity for discovery before a summary judgment hearing, it must file either an affidavit explaining the need for further discovery or a verified motion for continuance.").

28 *See supra* note 3 and Part II.A.

29 *See supra* notes 23–24 and accompanying text. The protective order would have limited disclosure to this lawsuit only.

30 The court of appeals majority and dissent perhaps noted that the Lawyers opposed the motion because the certificate of conference to this motion stated that counsel for the two sides "have been unable to work out any resolution of this motion," and that counsel for Kevin Krist was unavailable and would likely oppose the relief requested.

31 The motion states: "The Lawyer Defendants have made it clear that they intend to inquire of Mr. Gonzalez, or seek documents from him, regarding the specific amounts paid by BP to settle other similar claims ... as referenced by Mr. Gonzalez in his affidavit. Plaintiffs are more than willing for such information to be disclosed, but want to do so in a way that limits disclosure to *this* lawsuit only and for no other use or purpose. Likewise, Mr. Gonzalez has advised that he is willing to disclose such information under a fair protective order."

32 The motion states: "The only apparent confidentiality concern raised by anyone concerns the 'confidential' settlement amounts paid to injured BP claimants, as set out in settlement/release agreements. This concern does not apply to any settlement demand made by a plaintiff's lawyer to BP's defense counsel. To the extent the concern is legitimate in regard to any settlement/release agreement, the Court can permit the producing party to redact any actual settlement amounts and thereby protect confidentiality."

33 The March 2008 motion to compel similarly states that "Plaintiffs are willing to allow Defendants to redact the actual dollar amounts contained in any demands and in any settlement/release agreements signed by their other clients, so Defendants have no basis to object on these purported confidentiality grounds."

34 *See Alexander v. Turtur & Assocs., Inc.,* 146 S.W.3d 113, 119–20 (Tex.2004) (noting that "the wisdom and consequences" of "tactical choices made during litigation are generally matters beyond the ken of most jurors" and that "when the causal link is beyond the jury's common understanding, expert testimony is necessary").

35 *Id.* at 119.

36 *See Goodyear Tire & Rubber Co. v. Mayes,* 236 S.W.3d 754, 755 (Tex.2007) ("An appellate court reviewing a summary judgment must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented.").

1 The Court holds that expert testimony is necessary to establish the existence of damages under the comparison-of-settlements method that it approves today, because the balancing and evaluation of factors necessary to compare different claims and their settlement values is "beyond the ken of most jurors." *Ante* at 270 (quoting *Alexander,* 146 S.W.3d at 119–20). Because I would hold that Gonzalez's affidavit was sufficient, under a different method, to create a fact issue and defeat summary judgment, I need not decide in this case whether expert testimony would be necessary in all such cases.

2 As the Court notes, Gonzalez did not use the "comparison-of-settlements" method because confidentiality agreements prevented him from disclosing the amounts for which the other cases settled. I agree with the Court that, to the extent the Elizondos are now arguing that the attorney defendants thwarted their efforts to compare the values of other settlements, they waived that argument in the court of appeals and in the trial court. *Ante* at 263.

3 *See also Fed. Land Bank of Hous. v. Brooks,* 124 S.W.2d 161, 167 (Tex.Civ.App.–Beaumont 1938) (Combs, J., dissenting) (expressing concern that majority's holding would "give to many an unfounded and unjust claim, 'a nuisance value' which may encourage such claims being asserted merely in the hope of a settlement"), *rev'd,* 135 Tex. 370, 143 S.W.2d 928 (Tex.Com.App.1940); *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 548, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) (characterizing suits brought to "realize upon their nuisance value" as suits "brought not to address real wrongs"); *Owens Corning v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 257 F.3d 484, 495 n. 6 (6th Cir.2001) (explaining that suit's "nuisance value" is "based on the prospective litigation costs required to effect a dismissal of the action"); *Travelers Ins. Co. v. Motorists Mut. Ins. Co.,* 178 N.E.2d 613, 619 (Ohio.Ct.App.1961) ("The fact that insurers agree to defend groundless claims, otherwise within the coverage of their policies, is a recognition that even groundless claims

have a nuisance value subject to defense and settlement."); Robert A. Sachs, *Product Liability Reform and Seller Liability: A Proposal for Change,* 55 BAYLOR L.REV. 1031, 1040 n. 25 (2003) (noting that parties "pay 'nuisance value' to avoid continuing with the defense of a frivolous claim"); Geoffrey P. Miller, *Payment of Expenses in Securities Class Actions: Ethical Dilemmas, Class Counsel, and Congressional Intent,* 22 REV. LITIG. 557, 592 (2003) (characterizing strike suits and "nuisance value" suits as "litigation without substantial merit"); Cym H. Lowell & Jack P. Governale, U.S. INT'L TAX: PRAC. & PROC. ¶ 6.02 (2012) (noting that, under 26 C.F.R § 601.106(f)(2), the IRS will not settle based on "nuisance value," described as "any concession made solely to eliminate the inconvenience or cost of further negotiations or litigation and is unrelated to the merits of the issues").

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**P**

🟨 KeyCite Yellow Flag - Negative Treatment
**Declined to Follow by** Davis v. City of Grapevine, Tex.App.-Fort Worth, March 9, 2006

49 S.W.3d 891
Court of Appeals of Texas,
Austin.

ESLON THERMOPLASTICS; Tokyo
Electron America, Inc. and Tokio Marine
& Fire Insurance Company, Appellants,
v.
DYNAMIC SYSTEMS, INC., Appellee.

No. 03–00–00501–CV. | June 29, 2001. | Rehearing Overruled Aug. 9, 2001.

Corporation and its insurer brought action against water line manufacturer and water line installer for damages which occurred when water line broke at corporation's building. After manufacturer brought action against installer for contribution, installer brought motion for summary judgment against corporation, insurer, and manufacturer, based on a waiver of subrogation clause. The 200th Judicial District Court, Travis County, John K. Dietz, J., granted the motion for summary judgment. Corporation, insurer, and manufacturer appealed. The Court of Appeals, Bea Ann Smith, J., held that: (1) installation of water line was work and thus covered by waiver clause in contract between contractor and corporation; (2) genuine issue of material fact as to whether installation of water line was performed under separate contract between installer and corporation or was subcontract of contract between contractor and corporation, and thus incorporated waiver clause, precluded summary judgment; (3) affidavits that may have been filed to create a fact issue to defeat summary judgment, and one of which did not show personal knowledge of contracts between corporation and installer, were inadmissible; and (4) genuine issue of material fact as to whether manufacturer was entitled to contribution from installer precluded summary judgment.

Reversed and remanded.

West Headnotes (20)

**[1] Subrogation**

⚷ Nature and Theory of Right

"Subrogation" is a doctrine of equity and is the substitution of another person in the place of the creditor, so that the person in whose favor it is applied succeeds to the rights of the creditor in relation to the debt.

Cases that cite this headnote

**[2] Insurance**

⚷ Equitable Subrogation

Generally, an insurer paying a claim under a policy becomes equitably subrogated to any cause of action the insured may have against a third party responsible for the injury.

3 Cases that cite this headnote

**[3] Judgment**

⚷ Presumptions and Burden of Proof

The party moving for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

1 Cases that cite this headnote

**[4] Judgment**

⚷ Presumptions and Burden of Proof

Evidence favorable to the nonmovant will be taken as true in deciding whether there is a disputed material fact issue that would preclude summary judgment.

1 Cases that cite this headnote

**[5] Judgment**

⚷ Presumptions and Burden of Proof

Every reasonable inference must be indulged in favor of the nonmovant for summary judgment and any doubts resolved in its favor.

1 Cases that cite this headnote

**[6] Judgment**

⚷ Presumptions and Burden of Proof

When a defendant moves for summary judgment on an affirmative defense, it must conclusively establish each element of its defense as a matter of law.

1 Cases that cite this headnote

**[7]** **Judgment**

　　 Existence of Defense

A defendant is not entitled to judgment as a matter of law on an affirmative defense if the plaintiff supplies evidence as to any material fact issue relevant to the defense upon which reasonable minds could differ.

2 Cases that cite this headnote

**[8]** **Appeal and Error**

　　 Cases Triable in Appellate Court

Because the propriety of a summary judgment is a question of law, the Court of Appeals reviews the trial court's decision de novo.

3 Cases that cite this headnote

**[9]** **Appeal and Error**

　　 Grounds for Sustaining Decision Not Considered

When the trial court has not stated the grounds for granting a summary judgment motion, the Court of Appeals may affirm the judgment if any of the grounds advanced in the motion has merit.

Cases that cite this headnote

**[10]** **Insurance**

　　 Waiver or Loss of Subrogation Rights

Installer's hookup of water lines was "work," and as such was covered by clause waiving subrogation rights in contract between general contractor and corporation, for purposes of determining whether corporation and insurer could maintain action against installer for damages after water line broke.

2 Cases that cite this headnote

**[11]** **Contracts**

　　 Merger in Subsequent Contract

A subsequent agreement does not supersede a prior agreement if it is not inconsistent with the prior agreement, is made for separate consideration, or is such an agreement as might naturally be made as a separate agreement by parties situated as were the parties to the written agreement

Cases that cite this headnote

**[12]** **Contracts**

　　 Merger in Subsequent Contract

Whether merger occurs, or whether another agreement is simply supplemental and does not contradict an earlier agreement, is determined from the parties' intent.

4 Cases that cite this headnote

**[13]** **Judgment**

　　 Insurance Cases

Genuine issue of material fact as to whether hookup of water line was performed under a separate contract between corporation and water line installer, or under a modified subcontract which incorporated waiver of rights clause contained in main contract between corporation and contractor, precluded summary judgment in corporation's and insurer's action against installer and manufacturer for damages which occurred after water line broke.

Cases that cite this headnote

**[14]** **Judgment**

　　 Personal Knowledge or Belief of Affiant

**Judgment**

　　 Matters of Fact or Conclusions

**Judgment**

　　 Operation and Effect of Affidavit

Affidavits were inadmissible in corporation's and insurer's action against water line installer and manufacturer for damages from broken water line; affidavits may have been filed for the express purpose of creating a fact issue to

defeat summary judgment, affidavits did not show personal knowledge of contracts between corporation and installer, and affidavits were simply legal conclusions.

Cases that cite this headnote

**[15]    Trial**
  Admission of Evidence in General

The exclusion of evidence rests within the sound discretion of the trial court.

Cases that cite this headnote

**[16]    Appeal and Error**
  Abuse of Discretion

The trial court commits an abuse of discretion only when it acts in an unreasonable or arbitrary manner, or acts without reference to any guiding principles.

Cases that cite this headnote

**[17]    Judgment**
  Operation and Effect of Affidavit

An individual cannot file an affidavit to contradict his own deposition testimony without any explanation for the change in the testimony, for the purpose of creating a fact issue to avoid summary judgment; such an affidavit presents no more than a "sham" fact issue.

12 Cases that cite this headnote

**[18]    Affidavits**
  Form and Contents

Affidavits must state facts, not legal conclusions.

Cases that cite this headnote

**[19]    Judgment**
  Particular Cases

Genuine issue of material fact as to whether water line manufacturer was entitled to right of contribution from water line installer precluded summary judgment in action by manufacturer against installer, which arose from action by

corporation and insurer against manufacturer and installer for damages caused when water line broke. V.T.C.A., Civil Practice & Remedies Code § 33.013(b).

Cases that cite this headnote

**[20]    Contribution**
  Nature and Grounds of Obligation

A claim of contribution is derivative of the plaintiff's right to recover from a joint defendant against whom contribution is sought.

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*894**  John William Belk, Sheiness, Scott, Grossman & Cohn, L.L.P., Houston, for Eslon.

Mark Daniel Hopkins, Black & Connolly, L.L.P., Vic Fields, Austin, for Tokyo & Tokio.

David L. Downs, Law Office of David L. Downs, Wallace B. Jefferson, Jacqueline M. Stroh, Crofts, Callaway & Jefferson, P.C., San Antonio, for appellee.

Before Justices KIDD, B.A. SMITH and PURYEAR.

**Opinion**

BEA ANN SMITH, Justice.

 **[1]    [2]**    After a water line broke causing $800,000 in damages to a semiconductor wafer processor and the new building in which it was installed, owner Tokyo Electron America, Inc. (Tokyo Electron) and its property insurer Tokio Marine & Fire Insurance Company (Tokio Marine) [1] sued Dynamic Systems, Inc., which installed the water line, and Eslon Thermoplastics (Eslon), which manufactured the pipe fitting that broke. Eslon, in turn, sued Dynamic Systems for indemnity and contribution. Dynamic Systems was granted summary judgment against Tokyo Electron and Eslon based on a waiver of subrogation clause in the contract between Tokyo Electron and the general contractor, which was incorporated into its contracts with subcontractors. Tokyo Electron and Tokio Marine appeal that judgment, arguing that the water line was installed pursuant to a separate contract between Tokyo Electron and Dynamic Systems, which had no

waiver of subrogation clause. In the event this Court reverses the summary judgment against Tokio, Eslon urges that we reverse the summary judgment on its contribution claim. Because we hold that there is a genuine issue of material fact whether the work occurred under a separate contract, we reverse both summary judgments and remand to the trial court for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

Tokyo Electron manufactures, sells, and services semiconductor equipment. In April 1995, Taisei Construction Corporation agreed to be the design/builder of Tokyo Electron's new corporate facility in Austin. [2] This facility included an on-site training lab to familiarize customers with the operation of Tokyo Electron's Clean Track photoresist processing systems. Taisei hired subcontractors to provide labor and materials on various parts of the project. Dynamic Systems contracted to install the building's plumbing infrastructure. Taisei later asked Dynamic Systems to submit a bid on bringing chilled water lines from the ceiling of the training facility down the wall to a piece of machinery called the Clean Track Mark 8 wafer processor (Mark 8), which is used in the production of semiconductor wafers. Dynamic **\*895** Systems submitted a bid to Taisei in April 1996, and performed the Mark 8 hookup in July 1996.

Tokyo Electron began moving into the new facility during the first weekend of August 1996. On August 3, one of the chilled water lines in the training lab burst, forcefully spraying water that destroyed the Mark 8 and severely damaged parts of the building. Tokyo Electron's investigation concluded that certain pipe fittings manufactured by Eslon were defective or were negligently installed and that this was the cause of the accident that resulted in damages exceeding $800,000.

Taisei's contract with Tokyo Electron included a waiver of all claims for damage arising out of the construction project, allocating such risks to insurers without a right of subrogation. Tokyo Electron was obligated to procure insurance to cover any losses that might occur during construction regardless of blame. Taisei's subcontract with Dynamic Systems expressly incorporated the waiver of claims. Tokyo Electron carried two types of insurance on the building, builder's risk coverage and property insurance. Because the project was substantially complete at the time of the loss, the builder's risk coverage was no longer in effect. Therefore, Tokyo Electron's property insurer, Tokio Marine,

covered the loss on the Mark 8. Tokio Marine now seeks to recover from Dynamic Systems and Eslon.

Tokyo Electron and Tokio Marine (collectively Tokio) sued Dynamic Systems and Eslon [3] for strict liability, negligence, and breach of implied warranties. It was their position that Dynamic Systems connected the chilled water lines to the Mark 8 under a direct contract with Tokyo Electron, which had no waiver of claims for damages and no waiver of subrogation. Dynamic Systems contends that Tokyo Electron and Taisei intended to avoid legal disputes such as this one by allocating all risks of damage growing out of the construction project to insurance, without a right of subrogation. Dynamic Systems insists that it was performing under the subcontract with Taisei when it installed the chilled water lines and connected them to the Mark 8. It relies on the waiver to defeat Tokio Marine's subrogation claims. In the trial court, Dynamic Systems filed a motion for summary judgment based on this clause. The court granted the summary judgment in favor of Dynamic Systems but then granted Tokio's motion for new trial, which asserted newly discovered evidence. Dynamic Systems subsequently filed its second motion for summary judgment against Tokio and a motion for summary judgment against Eslon, based on the derivative claims of contribution and indemnity. The trial court granted both motions in favor of Dynamic Systems.

Tokio and Eslon appeal. Tokio urges that the trial court erroneously granted summary judgment because genuine issues of material fact exist as to whether the hookup was performed as part of Dynamic Systems' subcontract with Taisei or pursuant to a separate contract with Tokyo Electron that did *not* contain or incorporate the waiver. Should this Court reverse the summary judgment against Tokio, Eslon seeks reversal of the summary judgment against Eslon on the issue of contribution.

### STANDARD OF REVIEW

[3] [4] [5] A summary judgment shall be rendered if the evidence properly before the court indicates that "there is no genuine issue as to any material fact and the **\*896** moving party is entitled to judgment as a matter of law." Tex.R. Civ. P. 166a(c); *see also Rodriguez v. Naylor Indus., Inc.,* 763 S.W.2d 411, 413 (Tex.1989). The party moving for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546,

548 (Tex.1985). Evidence favorable to the nonmovant will be taken as true in deciding whether there is a disputed material fact issue that would preclude summary judgment. *Id.* at 548–49. Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *Id.* at 549.

 **[6]**   **[7]**   **[8]**   **[9]**   When a defendant moves for summary judgment on an affirmative defense, as Dynamic Systems does, it must conclusively establish each element of its defense as a matter of law. *See Velsicol Chem. Corp. v. Winograd,* 956 S.W.2d 529, 530 (Tex.1997). A defendant is not entitled to judgment as a matter of law on an affirmative defense if the plaintiff supplies evidence as to any material fact issue relevant to the defense upon which reasonable minds could differ. *Santanna Natural Gas Corp. v. Hamon Operating Co.,* 954 S.W.2d 885, 890 (Tex.App.—Austin 1997, pet. denied) (citing *Kassen v. Hatley,* 887 S.W.2d 4, 9 (Tex.1994)). Because the propriety of a summary judgment is a question of law, we review the trial court's decision *de novo. Id.* When the trial court has not stated the grounds for granting the motion, we may affirm the judgment if any of the grounds advanced in the motion has merit. *See State Farm Fire & Cas. Co. v. S.S.,* 858 S.W.2d 374, 380 (Tex.1993). Eslon concedes that if we affirm this summary judgment in favor of Dynamic Systems, then the trial court correctly granted Dynamic Systems' summary judgment against Eslon. Therefore, we begin by addressing Dynamic Systems' summary judgment against Tokio.

## DISCUSSION

### *Waiver Clause*

### A. Work v. Non–Work

Tokyo Electron and Taisei entered a construction contract that obligated Tokyo Electron, under the part of the agreement entitled "Terms and Conditions," to purchase and maintain property insurance on the work at the site. This insurance was required to include the interests of Tokyo Electron, Taisei, and "their respective contractors and subcontractors." The waiver clause appears in the section entitled "Property Insurance," and provides:

> The Owner and Design/Builder waive all rights against each other and the contractors, subcontractors, agents and employees, each of the other, for damages caused by fire or other perils to the extent covered by

property insurance obtained pursuant to this Paragraph 7.3 or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by the Owner as trustee. The Owner or Design/Builder, as appropriate, shall require from contractors and subcontractors by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated in this Paragraph 7.3. The policies shall be endorsed to include such waivers of subrogation.

Taisei's subcontract with Dynamic Systems incorporated this waiver in article 1, which defines the term "Contract Documents" as "the 'Contract' between [Tokyo Electron] and [Taisei] together with all plans, drawings and specifications including the General Conditions and Special **\*897** Conditions, Addenda, Amendments, and/or instruments of like effect."

Tokio asserts that the waiver does not apply, but even if it does, it only forecloses claims for damage done to the building, not damage to machinery or equipment such as the Mark 8. This argument hinges on the following language in the waiver: "for damages caused by fire or other perils to the extent covered by ... other property insurance *applicable to the Work.*" (Emphasis added.) Tokio posits that the Mark 8 was not part of the "work" performed by Dynamic Systems and cites out-of-state cases that distinguish work and non-work in waiver of subrogation clauses. *See Fidelity & Guar. Ins. Co. v. Craig–Wilkinson, Inc.,* 948 F.Supp. 608, 614 (S.D.Miss.1996) (holding that the waiver did not bar claims for damage to "non-Work property"); *Town of Silverton v. Phoenix Heat Source Sys., Inc.,* 948 P.2d 9, 12 (Colo.Ct.App.1997) (stating that the waiver does not show an intent to exculpate parties for "parts of the building other than the work"); *St. Paul Fire & Marine Ins. Co. v. Freeman–White Assocs., Inc.,* 322 N.C. 77, 366 S.E.2d 480, 484 (1988) (holding that the contract was ambiguous as to whether the plaintiff had waived its claims); *S.S.D.W. Co. v. Brisk Waterproofing Co.,* 76 N.Y.2d 228, 233, 557 N.Y.S.2d 290, 556 N.E.2d 1097 (N.Y.1990) (stating that the contract required the owner of the construction project to acquire insurance for the "Work" and the contractor to provide insurance for property damage it may cause "other than to the Work itself"); *Travelers Ins. Cos. v. Dickey,* 799 P.2d

625, 630 (Okla.1990) (concluding that the "agreement clearly is ineffective to exonerate the contractor from liability for negligently inflicted harm to the owner's interior property").

Dynamic Systems urges that Tokio presents only a minority view that has been rejected by a majority of the states, which originally supported the work/non-work distinction. *See ASIC II Ltd. v. Stonhard, Inc.,* 63 F.Supp.2d 85, 92–93 (D.Me.1999) (rejecting *Craig–Wilkinson* and *Dickey* ); *Lloyd's Underwriters v. Craig & Rush, Inc.,* 26 Cal.App.4th 1194, 32 Cal.Rptr.2d 144, 148 (1994) (rejecting *S.S.D.W.* and *Dickey*); *Employers Mut. Cas. Co. v. A.C.C.T., Inc.,* 580 N.W.2d 490, 494 n. 4 (Minn.1998) (rejecting *Craig–Wilkinson, S.S.D.W.,* and *Dickey*); *Mu Chapter of Sigma Pi Fraternity of United States Inc. v. Northeast Constr. Servs. Inc.,* 273 A.D.2d 579, 709 N.Y.S.2d 677, 680 n. 2 (N.Y.App.Div.2000) (explaining that the waiver in the form contract discussed in *S.S.D.W.* was later revised to overcome the holding in that case).

 **[10]**    Dynamic Systems, however, asserts that we need not address this question of first impression in Texas because connecting the Mark 8 to the water lines was part of the work as defined in this contract. The construction contract states that the "[w]ork comprises the completed construction designed under the Project and includes labor necessary to produce such construction, and materials and *equipment incorporated* or to be incorporated in such construction." (Emphasis added.) We agree that the Mark 8 became equipment incorporated into the construction when it was installed and connected to the chilled lines in the walls of the new facility. We hold that under the contract, hookup of the Mark 8 was work and as such it was covered by the waiver. We overrule Tokio's second issue.

## B. Modified Subcontract v. New Contract

Dynamic Systems argues that the waiver evidenced the parties' intent to allocate all construction risks to their insurers, making insurance the exclusive remedy for **\*898** accidents and damages. *See Richmond Steel, Inc. v. Legal & Gen. Assurance Soc'y,* 821 F.Supp. 793, 800 (D.P.R.1993) ("The purpose of a waiver of subrogation clause in construction contracts is to avoid disruptions and disputes between the parties working on a project.... The clause is also meant to require a party to the contract to provide property insurance for all the parties." (Citations omitted.)); *Chadwick v. CSI, Ltd.,* 137 N.H. 515, 629 A.2d 820, 825–26 (1993). Dynamic Systems urges that Tokyo Electron agreed to purchase sufficient insurance as its only remedy

for damages and waived its right to recover against Dynamic Systems, which defeats Tokio Marine's subrogation claim.

Specifically, Dynamic Systems maintains that the connection was performed under the subcontract between Taisei and Dynamic Systems, which implicates the waiver. The subcontract includes "any supplemental written agreements made and entered into by the parties hereto subsequent to the date of execution of the Subcontract." Dynamic Systems points out that Tokio never produced a separate contract between Tokyo Electron and Dynamic Systems for the hookup, and insists that the Mark 8 work was performed as a supplement to its subcontract with Taisei.

During the performance of the subcontract, Dynamic Systems submitted a bid to Taisei for the work necessary to connect the chilled water lines to the Mark 8. Taisei's project manager authorized and initialed the work in a fax to Dynamic Systems stating, "Please Provide the Air and Vacuum hook up." Dynamic Systems did the work and subsequently billed Taisei for the hookup.

Dynamic Systems contends that this evidence proves that the work was performed as a supplement to its original subcontract with Taisei, citing *Boudreaux Civic Ass'n v. Cox,* 882 S.W.2d 543, 547–48 (Tex.App.—Houston [1st Dist.] 1994, no writ) (treating amendments to deed restrictions as contracts among parties). In *Boudreaux,* the court held that "[a] modification to a contract creates a new contract that includes the new, modified provisions and the unchanged old provisions." *Id.* (citations omitted).

 **[11]**    **[12]**    Alternatively, Dynamic Systems urges that its written bid and Taisei's faxed approval merged with their original subcontract. *See Carr v. Weiss,* 984 S.W.2d 753, 764 (Tex.App.—Amarillo 1999, pet. denied). In *Carr,* the court of appeals explained that the "merger doctrine" refers to the "absorption of one contract into another subsequent contract." *Id.* A subsequent agreement does not supersede a prior agreement if it is not inconsistent with the prior agreement, is made for separate consideration, or is such an agreement as might naturally be made as a separate agreement by parties situated as were the parties to the written agreement *Id.* Whether merger occurs, or whether another agreement is simply supplemental and does not contradict the earlier agreement, is determined from the parties' intent. *Id.*

Tokio counters that it offered ample contravening summary-judgment evidence indicating that Tokyo Electron contracted

directly with Dynamic Systems,[4] thereby creating a fact issue as to whether the work was subject to the waiver. *See Santanna,* 954 S.W.2d at 890. As a result, Tokio urges that Dynamic Systems failed to establish as a matter of law all the elements of its affirmative defense upon which summary judgment rests. *See Velsicol,* 956 S.W.2d at 530.

**\*899** The most persuasive evidence that Dynamic Systems performed the connection services directly for Tokyo Electron, not as a part of the subcontract with Taisei, is found in a letter from Taisei's project manager Richard Aman on July 16, 1996, informing Tokyo Electron that Dynamic Systems "is proceeding on a cost plus basis and also expect[s] to be compensated by [Tokyo Electron]. Please let me know if this is not your understanding. Should you want this to be handled under the construction portion, [Taisei] will submit a change order for this work."[5]

The construction contract between Tokyo Electron and Taisei required written change orders. Article 8 of the contract provided that Tokyo Electron could order additions, deletions, or other revisions, "and the contract sum and contract time shall be adjusted accordingly. Such changes in the Work shall be authorized by Change Order...." A change order, according to the contract, is a written order signed by Tokyo Electron and Taisei authorizing a change in the work. "The contract sum and contract time may be changed only by Change Order."

Tokio emphasizes that there was no change order adjusting the contract sum, time, or work to cover services for the hookup of the Mark 8. If the connection was to come within Dynamic Systems' responsibilities under the subcontract, then Tokio insists that a change order was required to show this as part of the scope of Taisei's work. Tokio maintains that Aman's letter supports this interpretation: Taisei offered to submit a change order if Tokyo Electron wanted the work covered under the construction contract. Aman testified in an oral deposition that Tokyo Electron worked directly with Dynamic Systems to perform this work. As Taisei's project manager, he acknowledged that the connection of the chilled lines to the Mark 8 was not contemplated by the original contract: "In my contract with Tokyo Electron, I do not have the tool hook-up ." Indeed, the hookup is expressly excluded under the original construction contract.

Dynamic Systems first responds that a change order was not necessary because the subcontract between it and Taisei did not require formal change orders but only that changes be in writing. Second, it contends that even if a change order were required, it would not yet have been issued because at the time of the accident Dynamic Systems was still calculating the final bill to be submitted to Taisei. Third, Dynamic Systems asserts that "a written contract not required by law to be in writing, may be modified by a subsequent oral agreement even though it provides it can be modified only by a written agreement." *Robbins v. Warren,* 782 S.W.2d 509, 512 (Tex.App.—Houston [1st Dist.] 1989, no writ).

Tokio's assertion is not that a change order was required between Dynamic Systems and Taisei, but rather that a change order was required between Tokyo Electron **\*900** and Taisei concerning the overall scope of the work. Connection of the Mark 8 was expressly excluded from the original construction contract. To add these services, to be performed by a subcontractor, to the scope of work for which Taisei would eventually bill Tokyo Electron, a change order was required to modify their contract, as Taisei noted. According to Aman's letter of July 16, Dynamic Systems expected to be paid directly by Tokyo Electron for these services. Although Dynamic Systems initially billed Taisei for the hookup, when it was not paid it did subsequently bill Tokyo Electron directly. In *Robbins,* the court held that a question of fact existed as to whether there was a supplemental agreement entered into between the parties. *Id.* On these facts, we cannot say as a matter of law that the construction contract or the subcontract was modified by oral agreement to include the hookup services that failed.

**[13]** In light of this evidence, we cannot say that Dynamic Systems has proved as a matter of law that the hookup was performed under a modified subcontract that included the allocation of risks to insurance and the waiver of subrogation. *See Nixon,* 690 S.W.2d at 548. Indulging every reasonable inference in favor of Tokio, we conclude that there is a material fact issue as to whether the hookup was performed under a separate contract between Tokyo Electron and Dynamic Systems or under a modified subcontract incorporating the waiver. *See id.* at 549. We therefore sustain Tokio's first issue.

### Alternative Grounds

Dynamic Systems also presented a no-evidence motion for summary judgment. *See* Tex.R. Civ. P. 166a(i). The parties dispute whether Dynamic Systems was in a position to bring a no-evidence motion for summary judgment.[6] Assuming this motion was properly raised, we hold that Tokio produced

sufficient competent summary-judgment evidence to defeat a no-evidence motion for summary judgment. Sufficient evidence was raised, as previously discussed, in the form of Aman's letter to Tokyo Electron, his deposition testimony, and the appendix to the construction contract specifically excluding the hookup. We sustain Tokio's fourth point of error.

### *Affidavits*

 **[14]**　Tokio contends that the trial court erred in striking parts of two affidavits as conclusory and not based on personal knowledge. Aman, Taisei's project manager, and Thomas Austin, a member of Tokyo Electron's project team, both provided affidavit testimony that included this common statement, which the court struck:

> The specific fitting, and related plumbing, for actual hook-up of [the Mark 8], **\*901** was selected, designed, and installed by Dynamic Systems, Inc., ... at the request of Tokyo Electron. I am personally aware that the hook-up of the fitting at issue was not done as a change order to the original construction contract.... The tool hook-up was considered a separate contract made directly with TEA and DSI.

The court also struck the following sentence from Austin's affidavit: "I am aware of this fact because I was involved in the approval and processing of DSI invoices covering tool hook-up." Additionally, it struck from Aman's affidavit the sentence: "I am aware of this fact because I attended some of the meetings between DSI and TEA concerning the 'hook-up' of the tools, including the Mark 8."

 **[15]**　**[16]**　The exclusion of evidence rests within the sound discretion of the trial court. *Porter v. Nemir,* 900 S.W.2d 376, 381 (Tex.App.—Austin 1995, no writ). The trial court commits an abuse of discretion only when it acts in an unreasonable or arbitrary manner, or acts without reference to any guiding principles. *Id.*

 **[17]**　Dynamic Systems asserts that the sentences from Aman's affidavit were stricken because they conflicted with his earlier deposition testimony that he had no knowledge of a separate contract between Tokyo Electron and Dynamic Systems. [7] An individual "cannot file an affidavit

to contradict his own deposition testimony without any explanation for the change in the testimony, for the purpose of creating a fact issue to avoid summary judgment." *Farroux v. Denny's Rests., Inc.,* 962 S.W.2d 108, 111 (Tex.App.—Houston [1st Dist.] 1997, no pet.). Such an affidavit presents no more than a "sham" fact issue. *Id.*

Dynamic Systems next argues that the stricken part of Austin's affidavit, which stated he was involved in approving and processing invoices for the hookup, fails to show personal knowledge of contracts between Tokyo Electron and Dynamic Systems. We may not consider statements that offer no basis for purported knowledge about the contracts at issue. *See Morin v. Helfrick,* 930 S.W.2d 733, 738 (Tex.App.—Houston [1st Dist.] 1996, no writ), *overruled on other grounds by Rizkallah v. Conner,* 952 S.W.2d 580 (Tex.App.—Houston [1st Dist.] 1997, no writ).

 **[18]**　Further, Dynamic Systems maintains that these stricken statements are simply legal conclusions, which may not support summary judgment as a matter of law. *See Clement v. City of Plano,* 26 S.W.3d 544, 552 (Tex.App.—Dallas 2000, no pet.). Affidavits must state facts, not legal conclusions. *See id.* For all the reasons advanced by Dynamic Systems, we cannot say the trial court abused its discretion in striking this affidavit testimony. We overrule Tokio's third issue. But as we have held, there is sufficient evidence apart from the stricken affidavits to create a genuine issue of material fact that prevents disposition of this case by summary judgment.

### *Contribution*

 **[19]**　**[20]**　Because we reverse Dynamic Systems' summary judgment against Tokio, we must consider Eslon's argument **\*902** that the trial court erred in granting Dynamic Systems' motion for summary judgment against Eslon on the issue of contribution. A claim of contribution is derivative of the plaintiff's right to recover from a joint defendant against whom contribution is sought. *Shoemake v. Fogel, Ltd.,* 826 S.W.2d 933, 935 (Tex.1992). In other words, Eslon's claim of contribution derives from Tokio's right to recover from Dynamic Systems.

Eslon maintains that on remand Dynamic Systems may be found jointly and severally liable with Eslon for Tokyo Electron's damages, and Eslon then might be called upon to pay a greater amount of the damages than its percentage of responsibility. In such a case, Eslon argues that it would be entitled to a right of contribution, and that right should be determined in the main suit. *See* Tex. Civ. Prac. &

Rem.Code Ann. § 33.013(b) (West 1997) (when a defendant who is jointly and severally liable pays a percentage of damages that is greater than its percentage of responsibility, then that defendant may have a right of contribution for the overpayment); *cf. Casa Ford, Inc. v. Ford Motor Co.,* 951 S.W.2d 865, 874–75 (Tex.App.—Texarkana 1997, pet. denied). Therefore, Eslon asks us to reverse the summary judgment against it so that its claim of contribution can be considered on remand. Eslon concedes that the trial court was correct in granting summary judgment against its claim for indemnity.

Dynamic Systems urges that it is free from liability as a matter of law, thus it is not a "liable defendant" against whom judgment can be entered, and against whom a right of contribution can be sought. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 33.003, .013(b) (West 1997). Because we have reversed the summary judgment against Tokyo Electron, Dynamic Systems cannot say it is free from liability as a matter of law. In this circumstance, Dynamic Systems concedes that "Eslon would be entitled to a remand of its contribution claims to await a determination that Eslon is

jointly and severally liable." We, therefore, sustain Eslon's issue and reverse the summary judgment against Eslon on its contribution claim only and remand that issue for disposition in the trial court.

### CONCLUSION

Tokio produced competent evidence to raise a fact issue that Dynamic Systems' hookup work was performed under a separate contract that did not allocate the risks of damage to insurance and had no waiver of subrogation. The trial court, therefore, erred in granting summary judgment in favor of Dynamic Systems. Because we reverse the summary judgment against Tokio, we also reverse the summary judgment against Eslon on its claim of contribution. We remand this cause to the trial court for further proceedings consistent with this opinion.

### All Citations

49 S.W.3d 891

---

Footnotes

1     Tokio Marine urges that it is the real party in interest entitled to subrogation for the insurance payments made to Tokyo Electron to cover the loss. Subrogation is a doctrine of equity and is the substitution of another person in the place of the creditor, so that the person in whose favor it is applied succeeds to the rights of the creditor in relation to the debt. *Fleetwood v. Med Ctr. Bank,* 786 S.W.2d 550, 553 (Tex.App.—Austin 1990, writ denied). Generally, an insurer paying a claim under a policy becomes equitably subrogated to any cause of action the insured may have against a third party responsible for the injury. *Medina v. Herrera,* 927 S.W.2d 597, 604 (Tex.1996).

2     Taisei Construction Company, in turn, formed a joint venture with Hensel Phelps Construction Company to serve as design/builder and general contractor (collectively Taisei).

3     Eslon, the manufacturer, sued Dynamic Systems for contribution and indemnity. Tokio also sued Liebert Corporation, which was subsequently nonsuited.

4     Tokio refers us to the provision of the construction contract that reserved Tokyo Electron's right to award separate contracts in connection with other work at the site.

5     Tokio also states that it offered additional evidence that raised a fact question that precluded summary judgment, including a March 1996 letter Dynamic Systems sent to Taisei stating that its scope of work did not include the "Process Systems in the Parts and Training Facility," a May 1996 letter from Taisei to Dynamic Systems stating that Dynamic Systems had substantially finished its work under the construction contract (as evidence that the July 1996 hookup was excluded from the construction contract), and the fact that Dynamic Systems did not increase its bonding requirements even though the existing bond only covered the value of the work under the construction contract and subcontract (as evidence that the hookup was not part of either one of these contracts). Tokio also relies on statements in affidavits by Thomas Austin and Richard Aman, which we subsequently hold were appropriately stricken.

6     Tokio maintains that a no-evidence motion for summary judgment may only be brought against a party on a claim on which the nonmovant bears the burden of proof at trial. *See* Tex.R. Civ. P. 166a(i). Waiver is an affirmative defense on which Dynamic Systems bore the burden of proof. *See id.* 94; *In re Epic Holdings, Inc.,* 985 S.W.2d 41, 57 (Tex.1998). Tokio urges that because Dynamic Systems bore this burden, it could not bring a no-evidence motion for summary judgment. Dynamic Systems counters that it did not bring the no-evidence motion based on its own waiver claim; rather, it asserts that it "moved for a no-evidence summary judgment on what is essentially a plea in avoidance offered by [Tokyo

Electron]." Dynamic Systems asserts that Tokyo Electron was attempting to avoid the effect of the waiver by claiming that the work was performed outside of the contracts, and thus, Tokyo Electron "raised a defense to [Dynamic Systems'] defense" to which a no-evidence summary judgment motion was proper. We need not resolve this conflict to hold that the evidence presented raised a fact issue that defeated summary judgment.

7    Aman's deposition testimony is as follows:

Q. But do you know if there was any other different contract? You're not offering testimony today about their [sic] being some other different contract between Tokyo Electron and DSI, are you?

A. Not that I'm aware of. I don't know.

Q. You don't know? You have no personal knowledge?

A. I don't.

---

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

Q

467 S.W.3d 36
Court of Appeals of Texas,
Houston (14th Dist.),
**Houston (14th Dist.)**.

ExxonMobil Corporation, Appellant

v.

Delia Pagayon, Michelle Fulton, Alfredo
G. Pagayon, Michael G. Pagayon, and the
Estate of Alfredo M. Pagayon, Appellees

NO. 14–13–00456–CV | Opinion and
Dissenting Opinion filed April 9, 2015 |
Rehearing En Banc Overruled July 14, 2015

**Synopsis**
**Background:** Decedent's estate brought action against convenience store, seeking to hold it directly liable for negligent supervision of store employee who instigated a violent physical altercation with decedent, who later died allegedly from injuries sustained in the fight. The Probate Court No. 2, Harris County, entered judgment on jury verdict awarding estate approximately $1.35 million in damages. After its motion for new trial was denied, store appealed.

**Holdings:** The Court of Appeals, Tracy Christopher, J., held that:

[1] store had duty to use reasonable care to prevent employee from intentionally harming others;

[2] store breached its duty;

[3] store proximately caused violent altercation between employee and coworker's father;

[4] emergency medical care standard did not apply for purposes of ruling on motion to strike designation of physician as responsible third party;

[5] proportionate responsibility statute applied for purposes of ruling on motion to strike designation;

[6] evidence of physician's medical treatment of decedent was sufficient to defeat motion to strike designation; and

[7] error in striking designation of physician as responsible third party was reversible error.

Reversed and remanded for new trial.

McCally, J., issued dissenting opinion.

West Headnotes (28)

**[1]** **Labor and Employment**
 Scope of Employment
To impute liability to an employer for its employee's tort, the employee's act usually must fall within the course and scope of the employee's general authority and must have been performed in furtherance of the employer's business.

Cases that cite this headnote

**[2]** **Labor and Employment**
 Intentional Acts
Intentional torts are not ordinarily within the scope of a worker's employment, as is necessary to impute liability to an employer for the employee's actions.

Cases that cite this headnote

**[3]** **Labor and Employment**
 Intentional Acts
An employer ordinarily is not vicariously liable for the employee's intentional torts that are motivated by personal animosity.

Cases that cite this headnote

**[4]** **Labor and Employment**
 Negligent training and supervision
Unlike a claim of vicarious liability, a claim of negligent supervision does not depend on a finding that the employee committed the tort while acting in the course and scope of his employment; in particular, an employer can be held liable under a negligent supervision theory for its employee's intentional torts.

Cases that cite this headnote

**[5]** **Labor and Employment**

   Negligent training and supervision

Under a negligent-supervision theory, an employer that breaches the duty to use reasonable care to control an employee so as to prevent him from harming others can be held directly liable for harm that is proximately caused by its employee's intentional conduct that is outside the scope of his employment.

Cases that cite this headnote

**[6]** **Appeal and Error**

   Sufficiency of Evidence in Support

**Appeal and Error**

   Total failure of proof

The appellate court will conclude that the evidence is legally insufficient to support a finding only if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact.

Cases that cite this headnote

**[7]** **Labor and Employment**

   Negligent hiring, retention, and supervision

Whether a duty exists, as element of negligent employee supervision claim, is generally a legal question for the court.

Cases that cite this headnote

**[8]** **Labor and Employment**

   Negligent training and supervision

The duty for an employer to use reasonable care to prevent its employee from harming others can arise if: (1) the employee is on the employer's premises; (2) the employer knows it has the ability to control the employee; and (3) the

employer knows or should know of the necessity and opportunity for exercising such control.

Cases that cite this headnote

**[9]** **Labor and Employment**

   Negligent training and supervision

Evidence was sufficient to establish that convenience store, the employer, knew or should have known of the necessity and opportunity for exercising control over employee, giving rise to duty to use reasonable care to prevent employee from intentionally harming others, in action in which decedent's estate sought to hold store directly liable for negligent supervision of employee who instigated a violent physical altercation with decedent, resulting in injuries or condition that allegedly caused decedent's death; store manager was made aware of employee's threat to harm decedent prior to the altercation, and she had the opportunity to prevent the altercation.

Cases that cite this headnote

**[10]** **Negligence**

   Foreseeability

For a result to be foreseeable, all that is required is that the injury be of such a general character as might reasonably have been anticipated; and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen.

Cases that cite this headnote

**[11]** **Labor and Employment**

   Negligent training and supervision

Convenience store manager's request that an individual relay her message to employee ordering him to avoid the person toward whom he had ill feelings, after learning that employee had threatened physical violence, was not sufficient to satisfy the store's duty to use reasonable care to prevent employee from intentionally harming others, in action in which decedent's estate sought to hold store directly

liable for negligent supervision of employee who instigated a violent physical altercation with decedent, the father of the other employee, resulting in injuries or condition that allegedly caused decedent's death; a relayed message asking the agitated and threatening employee to avoid the other employee did little to prevent employee from harming his coworker's father.

Cases that cite this headnote

**[12]** **Negligence**

    Necessity of causation

**Negligence**

    Foreseeability

Proximate cause consists of the elements of cause-in-fact and foreseeability.

Cases that cite this headnote

**[13]** **Negligence**

    'But-for' causation; act without which event would not have occurred

**Negligence**

    Substantial factor

Cause in fact, an element of proximate cause, is shown by establishing that the negligent act or omission was a substantial factor in bringing about the injury; without the act or omission, harm would not have occurred.

Cases that cite this headnote

**[14]** **Negligence**

    Foreseeability

Foreseeability, an element of proximate cause, means that the actor, as a person of ordinary intelligence, should have anticipated the dangers his negligent act or omission created for others.

Cases that cite this headnote

**[15]** **Negligence**

    Knowledge or notice

Before liability will be imposed, there must be sufficient evidence indicating that the defendant knew or should have known that harm would eventually befall a victim.

Cases that cite this headnote

**[16]** **Labor and Employment**

    Negligent training and supervision

Convenience store proximately caused violent altercation between store employee and coworker's father, in action in which decedent's estate sought to hold store directly liable for negligent supervision of employee who instigated a violent physical altercation with decedent, resulting in injuries or condition that allegedly caused decedent's death; ill feelings between employee and coworker arose from their working relationship, employee threatened coworker with physical violence, and although store's manager was made aware of the threat, she did little to prevent the altercation despite the foreseeability of harm.

Cases that cite this headnote

**[17]** **Negligence**

    Possibility of multiple causes

There can be more than one proximate cause of an event.

Cases that cite this headnote

**[18]** **Parties**

    Effect of striking out parties, and proceedings in cause thereafter

Standard recognized in statute governing health care liability claims involving alleged deficient emergency medical care, requiring the claimant to establish that the health care provider deviated from the standard of care "with wilful and wanton negligence," did not apply to convenience store's response to estate's motion to strike store's designation of emergency room physician, rather than itself, as a third party who was responsible for the injuries or condition resulting in decedent's death, in action in which decedent's estate sought to hold store directly liable for negligent supervision of employee who instigated the violent physical altercation with

decedent that necessitated the emergency room visit; statute applied to ultimate determinations of an emergency medical care provider's liability in health care liability cases, rather than questions of third-party responsibility. Tex. Civ. Prac. & Rem. Code Ann. § 74.153.

Cases that cite this headnote

**[19]    Health**
  Breach of Duty

In determining a physician's standard of care in a health care liability action, the question to be answered is whether the physician undertook a mode or form of treatment which a reasonable and prudent member of the medical profession would not have undertaken under the same or similar circumstances.

Cases that cite this headnote

**[20]    Health**
  Breach of Duty

In determining whether the physician undertook a mode or form of treatment which a reasonable and prudent member of the medical profession would not have undertaken under the same or similar circumstances, the circumstances to be considered include, but are not limited to, the expertise of and means available to the physician-defendant, the health of the patient, and the state of medical knowledge.

Cases that cite this headnote

**[21]    Health**
  Emergency room care in general

Standard recognized in statute governing health care liability claims involving alleged deficient emergency medical care, requiring the claimant to establish that the health care provider deviated from the standard of care "with wilful and wanton negligence," does not change the general acceptable standard of medical care standard; it simply allows one providing emergency medical care to deviate from that standard by a wider margin before becoming liable in damages for

its breach. Tex. Civ. Prac. & Rem. Code Ann. § 74.153.

Cases that cite this headnote

**[22]    Parties**
  Effect of striking out parties, and proceedings in cause thereafter

Proportionate-responsibility statute, which provided the means for comparing the extent of fault as between responsible parties and allowing a defendant to reduce both its own liability and the claimant's recovery, applied to convenience store response to estate's motion to strike store's designation of emergency room physician, rather than itself, as a third party who was responsible for the injuries or condition resulting in decedent's death, in action in which decedent's estate sought to hold store directly liable for negligent supervision of employee who instigated the violent physical altercation with decedent that necessitated the emergency room visit; and thus, store needed to respond to estate's motion to strike by producing evidence sufficient to raise a fact question about whether the emergency room physician contributed to causing decedent's death in a manner encompassed by the statute. Tex. Civ. Prac. & Rem. Code Ann. §§ 33.003(a), 33.012.

Cases that cite this headnote

**[23]    Parties**
  Effect of striking out parties, and proceedings in cause thereafter

Convenience store's response to estate's motion to strike store's designation of emergency room physician as a responsible third party, and evidence in support thereof, was sufficient to raise a fact question about whether physician contributed to causing decedent's death in a manner encompassed by the proportionate-responsibility statute, as was necessary to defeat the motion to strike, in action in which decedent's estate sought to hold store directly liable for negligent supervision of employee who instigated the violent physical altercation with decedent that necessitated the

emergency room visit; store introduced evidence questioning physician's treatment of decedent, indicating it was possible that the treatment, rather than injuries from the fight, caused decedent to develop sepsis, which ultimately led to respiratory and renal failure. Tex. Civ. Prac. & Rem. Code Ann. §§ 33.003(a), 33.004, 33.012.

Cases that cite this headnote

**[24]    Evidence**
　　 Due care and proper conduct in general

A physician from one school of practice may testify about the negligence of a physician of a different school of practice so long as the subject of inquiry is common to and equally recognized and developed in both fields.

Cases that cite this headnote

**[25]    Evidence**
　　 Due care and proper conduct in general

In determining whether a doctor is qualified to testify as a medical expert for determination of standard of care in a health care liability claim, the trial court should not focus on the specialty of the medical expert.

Cases that cite this headnote

**[26]    Appeal and Error**
　　 Prejudicial Effect

Instructional error is generally considered harmful if it relates to a contested, critical issue.

Cases that cite this headnote

**[27]    Appeal and Error**
　　 Prejudice to Rights of Party as Ground of Review

To determine if an error was harmful, the appellate court must examine the entire record.

Cases that cite this headnote

**[28]    Appeal and Error**
　　 Parties

Error in striking convenience store's designation of emergency room physician as a third party who was responsible for decedent's death was reversible error, in action in which decedent's estate sought to hold store directly liable for negligent supervision of employee who instigated the violent physical altercation with decedent that necessitated the emergency room visit preceding decedent's death; proper application of proportionate responsibility statute would have compelled trial court to deny estate's motion to strike store's designation, but by striking the designation of a responsible third party, jury never learned of the emergency room care, including a misdiagnosis, which, according to store and medical expert testimony, could have led to decedent's sepsis and respiratory and renal failure. Tex. Civ. Prac. & Rem. Code Ann. § 33.002(a)(1).

Cases that cite this headnote

**\*40   On Appeal from the Probate Court No. 2, Harris County, Texas, Trial Court Cause Nos. 408,329-401 & 408,329. Michael James Wood, Judge.**

**Attorneys and Law Firms**

Rahfaan (Clive) Markland, Richard P. Hogan, Jr., Houston, TX, for appellant.

Graham Eugene Sutliff, Houston, TX, Matthew Brian Ploeger, Austin, TX, for appellee.

**\*41**   Panel consists of Justices Christopher, McCally, and Wise

**OPINION**

Tracy Christopher, Justice

Alfredo M. Pagayon ("Alfredo") died several weeks after an altercation between himself, his son Alfredo G. Pagayon ("J.R."), and an ExxonMobil Corporation employee at an ExxonMobil service station/convenience store. ExxonMobil challenges the judgment rendered on the jury's verdict in favor of Alfredo's wife, children, and estate (collectively, "the Pagayons") on their claims arising from Alfredo's

death. ExxonMobil asserts that the judgment should be reversed because (1) it had no duty to control its employee under the facts of this case, (2) the evidence is legally and factually insufficient to support a finding that its negligent supervision caused Alfredo's death, (3) issues of causation and comparative fault were not fairly tried because the trial court refused to allow ExxonMobil to present certain evidence and defenses, (4) the evidence is insufficient to support the medical-expenses damages awarded, and (5) a remittitur of Alfredo's widow's non-pecuniary damages should be suggested because her pain and mental anguish were due almost entirely to events that occurred during Alfredo's hospitalization and not to the fight at the convenience store. We conclude that ExxonMobil is not entitled to rendition of a take-nothing judgment on any of the asserted grounds, that is, we conclude that ExxonMobil had a duty to control the employee who injured Alfredo, and there is legally sufficient evidence that its breach of that duty caused Alfredo's death. However, we agree with ExxonMobil that the trial court erred in striking its designation of an emergency-room physician as a responsible third party. We further conclude that the error probably caused the rendition of an improper judgment; thus, without reaching ExxonMobil's remaining issues, we reverse the judgment and remand the case for a new trial.

## I. INTRODUCTION

J.R. Pagayon and Carlos Cabulang were both employed by ExxonMobil as sales associates at a convenience store in the Houston area. Cabulang, J.R., and J.R.'s father Alfredo had known each other prior to the employment. J.R. had conflicts with Cabulang at work and reported those problems not only to his ExxonMobil manager, but also to Alfredo. On July 31, 2011, Alfredo telephoned Cabulang and the two had heated words about the conflict between J.R. and Cabulang.

The next day, Cabulang and J.R. worked together. During that time, Cabulang repeatedly cursed J.R. and said things to him that J.R. described as threats against himself and Alfredo. A co-worker told store manager Roce Asfaw of Cabulang's threats against J.R., but Asfaw simply told the co-worker to tell J.R. to stay away from Cabulang. J.R. did so, but when Alfredo came into the ExxonMobil store to pick up J.R. from work that afternoon, Cabulang left his sales register and started a fight with Alfredo. Cabulang struck Alfredo several times in the head and back, and Alfredo was transported to a hospital for treatment of his injuries. He was

treated in the emergency room by Dr. Hung Hoang Dang until after midnight, then admitted to the hospital. Shortly thereafter, Alfredo was transferred to the intensive-care unit for treatment of his respiratory distress, and Dr. Jaime Clavijo intubated him. An attempt to wean Alfredo from the respirator failed, and he was transferred to a long-term intensive-care facility. On August 24, 2011, Alfredo died. The stated cause of death was cardiac arrhythmia, renal failure, and respiratory **\*42** failure. According to Dr. Clavijo, the organ failure was caused by sepsis, a blood infection. The source of the infection was not definitively identified, and the parties' respective medical experts had differing opinions regarding the most probable source.

The Pagayons sued ExxonMobil, seeking to hold it directly or vicariously liable for Alfredo's injury and death. The Pagayons attributed Alfredo's death solely to the events at the store. ExxonMobil maintained that it was not liable for any harm that Alfredo sustained in the fight, and in any event, his death was caused by negligent medical care. ExxonMobil sought to designate Dr. Dang as a responsible third party, but the Pagayons successfully moved to strike the designation. They also successfully moved to exclude the testimony of ExxonMobil's medical expert, Dr. Jose Gregorio Casar.

The jury failed to find that Cabulang's actions were within the course and scope of his employment; thus, ExxonMobil was not held vicariously liable for its employee's actions. The jury did find, however, that ExxonMobil was directly liable for its negligent supervision of Cabulang, and that this negligence, together with the negligence of both J.R. and Alfredo, proximately caused Alfredo's death. The jury was then asked to apportion liability for the fight among ExxonMobil, J.R., and Alfredo. It attributed seventy-five percent of the responsibility for causing the fight to ExxonMobil, fifteen percent to J.R., and ten percent to Alfredo. Finally, the jury assessed damages of over $1.8 million for the Pagayons' claims. In accordance with the proportionate-responsibility statute, the trial court signed a judgment awarding the Pagayons seventy-five percent of the damages assessed by the jury. The trial court denied ExxonMobil's motion for new trial, and ExxonMobil appealed.

## II. VICARIOUS V. DIRECT LIABILITY

In ExxonMobil's first two issues, it argues that it is entitled to rendition of a take-nothing judgment on the Pagayons' two theories of liability: vicarious liability as Cabulang's

employer (also called "imputed" liability), and direct liability for negligent supervision. The distinction between these two theories is crucial to our analysis, because although the jury failed to find ExxonMobil vicariously liable, many of ExxonMobil's appellate arguments pertain only to that theory of liability rather than to the negligent-supervision theory of liability on which the judgment is based.

[1] [2] [3] To impute liability to an employer for its employee's tort, the employee's act usually must fall within the course and scope of the employee's general authority and must have been performed in furtherance of the employer's business. *See Wrenn v. G.A.T.X. Logistics, Inc.,* 73 S.W.3d 489, 493 (Tex.App.–Fort Worth 2002, no pet.). Intentional torts are not ordinarily within the scope of a worker's employment. *Cowboys Concert Hall–Arlington, Inc. v. Jones,* No. 02–12–00518–CV, 2014 WL 1713472, at *9 (Tex.App.–Fort Worth May 1, 2014, pet. denied) (per curiam, mem. op.). And as ExxonMobil points out, an employer ordinarily is not vicariously liable for the employee's intentional torts that are motivated by personal animosity. *See Wrenn,* 73 S.W.3d at 494 (citing *Tex. & P. Ry. Co. v. Hagenloh,* 151 Tex. 191, 197, 247 S.W.2d 236, 239 (1952)).

[4] Unlike a claim of vicarious liability, a claim of negligent supervision does not depend on a finding that the employee committed the tort while acting in the course and scope of his employment. *See* **\*43** *Soon Phat, L.P. v. Alvarado,* 396 S.W.3d 78, 100 (Tex.App.–Houston [14th Dist.] 2013, pet. denied). In particular, an employer can be held liable under a negligent-supervision theory for its employee's intentional torts.

[5] To illustrate this, we need only look to the test for determining whether the "duty" element of a negligent-supervision claim is satisfied. Where, as here, a claimant seeks to hold an employer liable under a negligent-supervision theory for an employee's actions that were outside the scope of his employment, the Texas Supreme Court has adopted the following test to determine whether the employer had a duty to use reasonable care to control the employee so as to prevent him from harming others:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from *intentionally harming others* or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> (a) the servant

> (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
>
> (ii) is using a chattel of the master, and
>
> (b) the master
>
> (i) knows or has reason to know that he has the ability to control his servant, and
>
> (ii) knows or should know of the necessity and opportunity for exercising such control.

RESTATEMENT (SECOND) OF TORTS § 317 (1965) (emphasis added), adopted in *Kelsey–Seybold Clinic v. Maclay,* 466 S.W.2d 716, 720 (Tex.1971), *superseded by statute on other grounds as stated in Helena Labs. Corp. v. Snyder,* 886 S.W.2d 767, 768 (Tex.1994) (per curiam); *see also Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex.1983) (including this section among other Restatement provisions in which, as a matter of law, a relationship imposes certain duties upon the parties); *accord, Nabors Drilling, U.S.A., Inc. v. Escoto,* 288 S.W.3d 401, 404–05 (Tex.2009). Thus, under a negligent-supervision theory, an employer that breaches this duty can be held directly liable for harm that is proximately caused by its employee's intentional conduct that is outside the scope of his employment.

Because the jury failed to find ExxonMobil liable on a theory of vicarious liability, we do not address ExxonMobil's arguments and authorities that pertain to that theory of liability rather than to the Pagayons' negligent-supervision claim. Specifically, we do not address ExxonMobil's arguments that liability cannot be imputed to it because the altercation was (a) based on intentional conduct or personal animosity, (b) unauthorized, (c) not in the course and scope of Cabulang's employment, or (d) not in the furtherance of ExxonMobil's business. We instead analyze only ExxonMobil's arguments that could require reversal of the judgment on the Pagayons' negligent-supervision claim.

### III. NEGLIGENT SUPERVISION

To prevail on a claim of negligent supervision, the Pagayons were required to prove that (a) ExxonMobil owed Alfredo a duty to supervise its employees, (b) ExxonMobil breached that duty, and (c) the breach proximately caused Alfredo's injuries. *See Knight v. City Streets, L.L.C.,* 167 S.W.3d

580, 584 (Tex.App.–Houston [14th Dist.] 2005, no pet.). In ExxonMobil's first issue, it argues that, as a matter of law, it had no duty to control Cabulang, and in its second issue, it contends that the evidence is legally insufficient to support **\*44** the finding that its actions were a proximate cause of Alfredo's death. ExxonMobil also makes a subsidiary argument that we construe as an assertion that ExxonMobil fulfilled any duty that it owed to the Pagayons, or in other words, that it did not breach its duty.

 **[6]** To analyze the legal sufficiency of the evidence, we review the record in the light most favorable to the challenged finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). Evidence is legally sufficient if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004). We will conclude that the evidence is legally insufficient to support the finding only if (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *City of Keller,* 168 S.W.3d at 810.

### A. ExxonMobil's Duty

 **[7]**     **[8]**     **[9]** In its first issue, ExxonMobil contends that there is no evidence to support the imposition of a duty. Whether a duty exists is generally a legal question for the court. *See Nabors Drilling.,* 288 S.W.3d at 404; *Tex. Home Mgmt., Inc. v. Peavy,* 89 S.W.3d 30, 33 (Tex.2002); *Otis Eng'g Corp.,* 668 S.W.2d at 312. As previously discussed, the duty for an employer to use reasonable care to prevent its employee from harming others can arise if (1) the employee is on the employer's premises, (2) the employer knows it has the ability to control the employee, and (3) the employer "knows or should know of the necessity and opportunity for exercising such control." RESTATEMENT (SECOND) OF TORTS § 317. According to the uncontroverted evidence, Cabulang was on ExxonMobil's premises when he threatened physical violence and when he fought Alfredo, and store manager Roce Asfaw knew that she was authorized to exercise control over him, to reprimand him, send him home, or terminate his employment. Thus, the question of whether ExxonMobil had a duty to use reasonable care to prevent Cabulang from intentionally harming others turns on whether

there is legally sufficient evidence that ExxonMobil knew or should have known "of the necessity and opportunity for exercising such control" over Cabulang. *See id.*

ExxonMobil asserts there is no evidence that it should have known of Cabulang's violent tendencies, thereby implying that it should not have known of the need and opportunity to exercise control over him. But the evidence on this issue is uncontroverted; indeed, it consists largely of admissions by Asfaw.

First, Asfaw's testimony established that ExxonMobil knew or should have known of the need to control Cabulang. Asfaw acknowledged that if she, as the store manager, were alerted to a threat of violence, then she should do something about it, and that failing to do so could pose a threat to others. It is undisputed that before the fight occurred, Asfaw *was* alerted to a threat of violence. Asfaw admits that she left the store before Cabulang arrived to work at around 3:30 p.m. to work a shift that overlapped with J.R.'s, and while she was away, Cabulang's co-worker Jovita Leslie telephoned her and said that Cabulang was threatening "to beat J.R. up" and asking him to go outside to fight. Asfaw agreed that such statements are threatening. **\*45** Nevertheless, she did not tell Cabulang to stop, and she did not investigate the complaint.

Second, Asfaw's testimony established that she had the opportunity to exercise control over Cabulang. She acknowledged that J.R. continued working until around 4:30 p.m., and she admitted that she received the phone call about Cabulang's threats "long before" that time. Asfaw agreed that although she was not physically present at the store when she was told of Cabulang's threats, she still could have sent him home. Indeed, she conceded that, regardless of whether she believed the report of Cabulang's threats, the fight could have been avoided if she had just spoken to him.

This evidence distinguishes the facts of this case from those of the cases ExxonMobil cites in support of its argument that, as a matter of law, it had no duty to exercise reasonable care to prevent Cabulang from intentionally harming others. Here, the employee's manager had advance warning of his current violent tendencies, expressed through his verbal threats of physical violence while working on the employer's premises. There was no such evidence in the cases on which ExxonMobil relies. *See, e.g., Garrett v. Great W. Distrib. Co. of Amarillo,* 129 S.W.3d 797, 804 (Tex.App.– Amarillo 2004, pet. denied) (holding that employer has no duty to prevent employee from fighting unless it reasonably

should have known of that particular employee's propensity for violence; thus, beer-distribution company's executive secretary's knowledge that "fights could occur in a bar" or that two other employees had been involved in such a fight did not make it foreseeable that different employees would do so on a different occasion); *Dailey v. Albertson's, Inc.,* 83 S.W.3d 222, 229 (Tex.App.–El Paso 2002, no pet.) (explaining that a grocery store should not have foreseen its employee's physical assault of a customer where the assault was preceded only by the employee making loud comments about the customer's hair and following the customer from one check-out line to another); *Peek v. Equip. Servs., Inc.,* 906 S.W.2d 529, 532 (Tex.App.–San Antonio 1995, no writ) (holding that an employee's shooting of a customer was unforeseeable because although the employee was "nervous and sweating" on the day of the shooting, he had made no threats and acted "without warning"). In contrast to the holdings of these cases, we conclude that the evidence here establishes, as a matter of law, that ExxonMobil had a duty to exercise reasonable care to control Cabulang so as to prevent him from harming others.

## B. Breach

 **[10]**    **[11]** Although not listed as a distinct issue, ExxonMobil also makes an argument that appears to be directed to the element of breach of duty. ExxonMobil states that although it had no duty, Asfaw nevertheless "did take precautions" by relaying instructions to J.R. to stay away from Cabulang. ExxonMobil implies that this was all that was required. But the duty at issue here was the duty to exercise reasonable care "to control the servant while acting outside the scope of his employment as to prevent *him* from intentionally harming others or from so conducting *himself* as to create an unreasonable risk of bodily harm to them." RESTATEMENT (SECOND) OF TORTS § 317 (emphasis added). The only person who expressed an intention to harm "others" or who is claimed to have posed an unreasonable risk of bodily harm to "others" was Cabulang; thus, ExxonMobil's duty was to exercise reasonable care to control *Cabulang.* Moreover, the duty was owed not just to J.R., but to "others" who were similarly situated—including Alfredo. **\*46** ExxonMobil asserts in its reply brief that it could not have foreseen that Cabulang would assault Alfredo because Asfaw was told only that Cabulang had threatened J.R. This, however, was sufficient, because for a result to be foreseeable, "[a]ll that is required is 'that the injury be of such a general character as might reasonably have been anticipated; and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen.'

" *Motsenbocker v. Wyatt,* 369 S.W.2d 319, 323 (Tex.1963) (quoting *Carey v. Pure Distrib. Corp.,* 133 Tex. 31, 35, 124 S.W.2d 847, 849 (1939)); *see also Mindi M. v. Flagship Hotel, Ltd.,* 439 S.W.3d 551, 557 (Tex.App.–Houston [14th Dist.] 2014, pet. pending) ("An employer is negligent if the employer hires, retains, or supervises an employee whom the employer knows, or by the exercise of reasonable care should have known, is unfit or incompetent, and whose unfitness or incompetence creates an unreasonable risk of harm *to others* because of the employee's job-related duties." (emphasis added)); *Watkins v. Basurto,* No. 14–10–00299–CV, 2011 WL 1414135, at \*4 (Tex.App.–Houston [14th Dist.] Apr. 14, 2011, no pet.) (mem.op.) ("An employer has a general duty to control its employees ..., and to adequately hire, train, and supervise employees to prevent injuries *to third parties* that are reasonably foreseeable." (emphasis added) (citations omitted)). As the facts of this case illustrate, relaying a message to one potential victim—J.R.—to "stay away" from Cabulang did not prevent Cabulang from harming someone else who was similarly situated. [1]

## C. Proximate Cause

 **[12]**    **[13]**    **[14]**    **[15]**    **[16]** In its second issue, ExxonMobil asks us to reverse and render a take-nothing judgment because the evidence is legally insufficient to support the jury's finding that ExxonMobil's negligent supervision proximately caused Alfredo's death. Proximate cause consists of the elements of cause-in-fact and foreseeability. *See Doe v. Boys Clubs of Greater Dall., Inc.,* 907 S.W.2d 472, 477 (Tex.1995). Cause-in-fact is shown by establishing that the negligent act or omission was a substantial factor in bringing about the injury; without the act or omission, harm would not have occurred. *See Transcontinental Ins. Co. v. Crump,* 330 S.W.3d 211, 221–23 (Tex.2010); *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992). Foreseeability means that the actor, as a person of ordinary intelligence, should have anticipated the dangers his negligent act or omission created for others. *See D. Hous., Inc. v. Love,* 92 S.W.3d 450, 454 (Tex.2002). Thus, "before liability will be imposed, there must be sufficient evidence indicating that the defendant knew or should have known that harm would eventually befall a victim." *Greater Hous. Transp. Co. v. Phillips,* 801 S.W.2d 523, 526 (Tex.1990).

 **[17]** As the jury here was instructed, there can be more than one proximate cause of an event. *Del Lago Partners, Inc. v. Smith,* 307 S.W.3d 762, 774 (Tex.2010). ExxonMobil does not contend otherwise. It instead implies that, as a matter

of law, other events proximately caused the fight, and that the existence of these other causes negates the jury's finding that ExxonMobil's negligence was "a proximate cause" of the fight or of Alfredo's death. Specifically, ExxonMobil urges that its negligence cannot be a proximate cause of either event because, as a matter of law, (1) intentional conduct caused the **\*47** fight rather than any act or omission by ExxonMobil; and (2) the store "merely provided the location for this assault to occur," so that Exxon Mobil was not the legal cause of this "personal-animus incident." Stated in terms of the standard of review, ExxonMobil contends that "the evidence establishes conclusively the opposite of the vital fact." *See City of Keller,* 168 S.W.3d at 810.

These arguments are variations of ExxonMobil's assertion that it cannot be liable under a negligent-supervision theory if its employee acted intentionally and from personal animus. As previously explained, however, this is incorrect as a matter of law. The question of whether Cabulang's behavior was an intentional tort motivated by personal animus is relevant to the determination of whether he acted in the course and scope of his employment or in the furtherance of ExxonMobil's business. Those are elements necessary to establish vicarious liability, but not to establish ExxonMobil's direct liability under a negligent-supervision theory. As previously discussed, it is precisely because Asfaw was told that Cabulang made threats of violence while he was on the premises working that ExxonMobil had a duty to exercise reasonable care "to prevent him from *intentionally harming others* or from so conducting himself as to create an unreasonable risk of bodily harm to them." RESTATEMENT (SECOND) OF TORTS § 317 (emphasis added). Thus, even if Cabulang's conduct were intentional and motivated by personal animus, these would not be grounds on which to reverse the judgment on the Pagayons' negligent-supervision claim. *Cf. CoTemp, Inc. v. Hous. W. Corp.,* 222 S.W.3d 487, 492 (Tex.App.–Houston [14th Dist.] 2007, no pet.) (plurality op.) ("Under the tort of negligent hiring, supervision, or retention, an employer who negligently hires an incompetent or unfit individual may be directly liable to a third party whose injury was proximately caused by the employee's negligent or *intentional* act." (emphasis added)). [2]

ExxonMobil also contends that its conduct was "too attenuated" from the fight to have proximately caused it, because the store was "just the location for an inevitable wrestling match," which occurred there "only because events and people coincided by chance inside the store." But the only evidence on these subjects is at odds with ExxonMobil's

assertions. First, there is no evidence that the altercation was inevitable. Asfaw instead testified that if she had sent Cabulang home or simply spoken to him, then the altercation would not have occurred. Cabulang additionally testified that if he had just let J.R. and Alfredo walk out of the store, then there would have been no fight. Second, it was not a coincidence that the participants in the altercation were all inside the store; it instead was foreseeable to ExxonMobil, because it scheduled Cabulang and J.R. to work overlapping shifts, and it did not send Cabulang home after being informed that Cabulang was threatening J.R. It was foreseeable to ExxonMobil that a person "similarly situated" to J.R.—his father—would come to the store that afternoon, because Asfaw knew that Alfredo provided J.R.'s transportation. And it was foreseeable that J.R. and Alfredo would be in the store with Cabulang because Asfaw knew both that J.R. customarily waited inside the store for his father—a practice that **\*48** she permitted—and that Alfredo customarily came inside the store when he arrived to drive J.R. home. The day of the altercation was no exception to this pattern: J.R. called his father when he finished working, and twelve minutes after he changed out of his uniform, Alfredo entered the store to pick him up. [3]

In sum, the store was the location where ExxonMobil's duty to supervise its employees arose, and the evidence supports the jury's finding that ExxonMobil's negligence in supervising Cabulang was a proximate cause of the altercation, as described in more detail above. We thus reject ExxonMobil's argument that the store was "merely the location" of the fight and that its conduct was too attenuated to have been a proximate cause of Alfredo's death. We overrule this issue. [4]

### IV. DESIGNATION OF RESPONSIBLE THIRD PARTIES

In its third issue, ExxonMobil argues that the trial court erred by striking its designation of emergency-room physician Dr. Dang as a responsible third party. [5] The resolution of this issue turns on the interpretation and application of the proportionate-responsibility statute found in Chapter 33 of the Texas Civil Practice and Remedies Code and the health-care-liability statute found in Chapter 74 of the same code. We review the trial court's ruling de novo. *See Flack v. Hanke, 334* S.W.3d 251, 261 (Tex.App.–San Antonio 2010, pet. denied) (sub.op.).

## A. Chapter 74's "Standard of Proof" v. Chapter 33's "Responsibility"

The parties principally join issue on the legal question of whether, to survive a motion to strike the designation of an emergency-room physician as a responsible third party, the designating defendant is required to produce evidence of simple negligence, or instead must produce evidence of "wilful and wanton" negligence. Under Chapter 74 of the Texas Civil Practice and Remedies Code governing health-care-liability claims, "the claimant bringing the suit" for damages arising from allegedly deficient emergency medical care cannot establish liability absent proof that the physician or health-care provider deviated from the standard of care "with wilful and wanton negligence." *See* TEX. CIV. PRAC. & REM. CODE § 74.153 (West 2011). The parties dispute whether this is the correct standard to apply when measuring the sufficiency of ExxonMobil's response to a motion to strike its designation of an emergency-room physician as a responsible third party.

The Pagayons argue that the following provision from Chapter 74 applies:

### Standard of Proof in Cases Involving Emergency Medical Care

**\*49** In a suit *involving a health care liability claim against a physician* or health care provider for injury to or death of a patient arising out of the provision of emergency medical care in a hospital emergency department ..., *the claimant bringing the suit* may prove that the treatment or lack of treatment by the physician or health care provider *departed from accepted standards of medical care* or health care only if the claimant shows by a preponderance of the evidence that the physician or health care provider, *with wilful and wanton negligence,* deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances.

*Id.* (emphasis added). Citing this provision, the Pagayons moved to strike ExxonMobil's designation of Dr. Dang as a responsible third party solely on the ground that there was no evidence that Dr. Dang deviated from the standard of care "with wilful and wanton negligence."

ExxonMobil responded that the provisions of Chapter 74 should not affect the application of responsible-third-party practice because Chapter 74 is designed to apply to health-care-liability claims in which damages are sought directly from the physician or health-care provider. *See id.* § 74.001(2), (13) (West Supp. 2014) (defining "claimant" as "a person, including a decedent's estate, seeking or who has sought recovery of damages in a health care liability claim," and defining a "health care liability claim" as "a cause of action against a health care provider or physician for ... claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury or death of a claimant"). In contrast, the proportionate-responsibility statute concerns "responsibility," not "liability," so that a person can be wholly or partially "responsible" for the harm at issue without being "liable" for the damages assessed as compensation for that harm. *Compare id.* § 33.011(3) (West 2015) (" 'Liable defendant' means a defendant *against whom a judgment can be entered* for at least a portion of the damages awarded to the claimant." (emphasis added)) *with id.* § 33.011(6) (" 'Responsible third party' means any person *who is alleged* to have caused or contributed to causing in any way the harm for which recovery of damages is sought ...." (emphasis added)). To determine that a person is "responsible," the factfinder need find only that the person "caus[ed] or contribut[ed] to cause *in any way* the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these." *Id.* § 33.003 (emphasis added).

## B. Chapter 74's "Standard of Proof" of Liability is Inapplicable

**[18]** **[19]** **[20]** We agree with ExxonMobil that section 74.153 does not apply to the designation of Dr. Dang as a responsible third party. Since *Hood v. Phillips,* the Texas Supreme Court's seminal case defining a physician's standard of care, a single standard of care has applied to physicians: the question to be answered is whether the physician undertook "a mode or form of treatment which a reasonable and prudent member of the medical profession would not have undertaken under the same or similar circumstances." 554 S.W.2d 160, 165 (Tex.1977). In answering that question, "[t]he circumstances to be considered include, but are not limited to, the expertise of and means available to the physician-defendant, **\*50** the health of the patient, and the state of medical knowledge." *Id.*

**[21]** Section 74.153 of the Civil Practice & Remedies Code does not purport to change this *standard of care* ; it instead provides the *standard of proof* that is required to establish liability for harm to a patient arising from the provision of emergency medical care, because with limited exceptions, one "who in good faith administers emergency care is not liable in civil damages for an act performed during the emergency unless the act is wilfully or wantonly negligent." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.151(a) (West Supp. 2014); *see also Benish v. Grottie,* 281 S.W.3d 184, 191 (Tex.App.–Fort Worth 2009, pet. denied) ("Section 74.153's statutorily created *standard of proof* and the applicable *medical standards of care* are not the same thing."); *Baylor Med. Ctr. at Waxahachie v. Wallace,* 278 S.W.3d 552, 556 (Tex.App.–Dallas 2009, no pet.) (same); *Bosch v. Wilbarger Gen. Hosp.,* 223 S.W.3d 460, 464 (Tex.App.–Amarillo 2006, pet. denied) (same). Thus, when a claimant seeks to recover damages for harm caused by allegedly deficient emergency medical care, the legislature has heightened the standard of proof required to establish the health-care provider's liability. *See Bosch,* 223 S.W.3d at 464 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.153). Stated differently, Chapter 74 does not change the "acceptable standard of medical care"; it simply allows one providing emergency medical care to deviate from that standard by a wider margin before becoming liable in damages for its breach. But as discussed further below, even if an emergency-room physician has not deviated from the standard of care sufficiently to make him "liable" for damages, he nevertheless may have deviated from it sufficiently to make him "responsible."

### C. Chapter 33's Definition of "Responsibility" Applies

**[22]** In contrast to section 74.153, the proportionate-responsibility statute does not address the standard of proof for a claimant to hold a defendant liable for damages. It instead provides a means for comparing the extent of fault, providing the means for a defendant to reduce both its own liability and the claimant's recovery. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.012 (West 2015) (reducing the amount of a claimant's recovery); *id.* § 33.013 (reducing the amount of a liable defendant's liability). Because the statute evidences the legislature's intent that the factfinder determine the "percentage of responsibility," its plain language requires the factfinder to compare the conduct of those who allegedly violated a legal standard—even if the plaintiff could not hold all of them liable for the resulting harm. *See In re Transit Mix Concrete & Materials Co.,* No. 12–13–00364–CV, 2014 WL 1922724, at *2–3 (Tex.App.–Tyler 2014,

orig. proceeding) (mem.op.) (agreeing that a motion to strike the designation of a responsible third party may be defeated without evidence of an "actionable act or omission" to "establish liability"; the designating party need only produce more than a scintilla of evidence that the third party is "responsible" for the claimant's injury or damage, as that term is used in the proportionate-responsibility statute (internal quotation marks omitted)). We may not ignore such specific statutory language even where its application may render a plaintiff less than whole. *See, e.g., Galbraith Eng'g Consultants, Inc. v. Pochucha,* 290 S.W.3d 863, 868–69 (Tex.2009) (noting that the proportionate-liability statute is "apparently unconcerned with the substantive defenses of responsible third parties" that place them beyond the reach of the plaintiff).

**\*51** Accordingly, we agree with ExxonMobil that for purposes of its response to the Pagayons' motion to strike, it was not required to raise a fact issue regarding whether Dr. Dang, "with wilful and wanton negligence," violated the standard of care. On the other hand, we disagree with ExxonMobil that it needed only to raise a fact issue on whether Dr. Dang "caused or contributed to cause" Alfredo's death; that is, we disagree that *causation* is the sole question under Chapter 33. As the discussion above demonstrates, ExxonMobil needed to respond to the Pagayons' motion to strike by producing evidence sufficient to raise a fact question about whether Dr. Dang contributed to causing Alfredo's death in a manner encompassed by the proportionate-responsibility statute, such as by (1) negligent act or omission, (2) any defective or unreasonably dangerous product, (3) other conduct or activity that violates an applicable legal standard, or (4) any combination of these. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a).

### D. Sufficiency of the Evidence

**[23]** Under the proportionate-responsibility statute, a motion to strike the designation of a responsible third party is warranted only if "there is no evidence that the designated person is responsible for any portion of the claimant's alleged injury or damage." *See id.* § 33.004(*l* ). When measured by the correct standard, ExxonMobil produced sufficient evidence to defeat the Pagayons' motion to strike.

In its response, ExxonMobil asserted that in the opinion of its expert Dr. Casar, Dr. Dang breached the standard of care in three interconnected ways.

First, Dr. Casar contends that Dr. Dang misread a chest x-ray that was taken shortly after Alfredo arrived in the emergency room. Alfredo was born without a left lung, but according to Dr. Casar, Dr. Dang misinterpreted the chest x-ray showing this defect and instead diagnosed Alfredo with a hemothorax on that side, meaning that Dr. Dang believed that blood was collecting in the space between Alfredo's chest wall and his left lung. Dr. Casar stated in his report that the x-ray revealed three signs that could be "clearly viewed on the chest x-ray" and that were "inconsistent with the diagnosis of hemothorax." Dr. Casar additionally stated that if Alfredo had been bleeding into his chest cavity, his blood pressure would have dropped, but instead, his blood pressure was elevated.

Second, Dr. Dang failed to order a CT scan of Alfredo's chest before attempting to insert a chest tube to drain the hemothorax that he believed existed. Regarding the failure to timely secure a CT scan of Alfredo's chest, Dr. Casar stated in his report only that "any prudent physician would have ordered a CT scan in order to acquire more information in regards to the chest x-ray," and that when the scan was actually performed, it revealed that Alfredo was born without a left lung and had a large hematoma from the unsuccessful attempt to place a chest tube.

Third, Dr. Casar opined that Dr. Dang breached the standard of care by attempting to insert a chest tube to drain the hemothorax. Dr. Casar stated that after the failed attempts to insert a chest tube, Alfredo was given ten milligrams of morphine for his resulting complaints of pain. Dr. Casar explained that a patient who is missing a lung and has pulmonary hypertension is "extremely sensitive to the depressing effects of narcotics and it comes as no surprise that the patient developed progressive respiratory failure that required intubation and mechanical ventilation." According to Dr. Casar, "This was a direct result of giving the patient narcotics to control the chest wall pain caused by **\*52** the attempted insertion of a chest tube that should ha[ve] not been placed to begin with." He further stated that Alfredo developed multiple organ failures, most likely as a result of uncontrolled sepsis. He opined that although the source of the sepsis was not clear from the cultures obtained, the most likely source was an infected chest-wall hematoma that was directly caused by the attempted chest-tube placement. In Dr. Casar's opinion, Dr. Dang's acts and omissions began a chain of medical complications that ultimately led to Alfredo's death. [6]

This evidence is sufficient to raise a question of fact as to whether Dr. Dang is responsible for at least a portion of the Pagayons' "alleged injury or damage," which is all that the statute requires. *See id.*

Although our dissenting colleague would conclude that the trial court did not err in granting the motion to strike because Dr. Casar was not familiar with the standard of care for an emergency-room physician, that is a conclusion concerning Dr. Casar's qualifications. *See Roberts v. Williamson,* 111 S.W.3d 113, 121–22 (Tex.2003). But on appeal, no one has challenged Dr. Casar's qualifications to offer an expert opinion on the applicable standard of care—nor, so far as we can tell, did anyone do so in the trial court. Thus, any objection to his qualifications to render an expert opinion on the subject has been neither preserved nor presented. *See Croft v. State,* 148 S.W.3d 533, 544 (Tex.App.–Houston [14th Dist.] 2004, no pet.).

**[24]** **[25]** Moreover, the dissent applies the wrong test. Whether Dr. Casar is qualified to testify on the causes and effects of a person's injuries would be measured by Texas Rule of Evidence 702. *See Roberts,* 111 S.W.3d at 121–22. The question to be answered is whether the party offering the expert's testimony has established that the witness "has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Broders v. Heise,* 924 S.W.2d 148, 153 (Tex.1996) (quoting TEX. R. EVID. 702). A physician from one school of practice may testify about the negligence of a physician of a different school of practice "so long as the 'subject of inquiry is common to and equally recognized and developed' in both fields." *Id.* at 152 (quoting *Hart v. Van Zandt,* 399 S.W.2d 791, 797 (Tex.1965)). Thus, in determining whether a doctor is qualified to testify on the specific issue before it, the trial court "should not focus on the specialty of the medical expert." *Tenet Hosps. Ltd. v. Love,* 347 S.W.3d 743, 750 (Tex.App.–El Paso 2011, no pet.) (citing *Roberts,* 111 S.W.3d at 122). And here, Dr. Casar testified repeatedly—and without contradiction—that the standard of care for reading a chest x-ray is the same regardless of the physician's school of practice.

**\*53** In rejecting Dr. Casar's opinion on the ground that he was not familiar with the standard of care for an emergency-room physician, the dissent follows the approach that we rejected in *Blan v. Ali.* In that health-care-liability case, the defendant physicians did not dispute that the opposing expert

was "qualified by training and experience to offer expert testimony regarding the diagnosis, care and treatment of a neurological condition"; they simply argued that the opposing expert "does not know the standard of care as applied to emergency room physicians." 7 S.W.3d 741, 746 (Tex.App.–Houston [14th Dist.] 1999, no pet.). But as we explained in *Blan,* that argument "ignores the plain language of the statute, which focuses *not* on the defendant doctor's area of expertise, *but on the condition involved in the claim.*" *Id.* (emphasis in original) (quoting the predecessor to TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a) (West 2011)). [7] The expert in *Blan* attested "that the standard of care he describes applies to *any* physician treating a patient suffering from a stroke and lupus, regardless of the physician's area of expertise." *Id.* (emphasis in original). Although in *Blan* we discussed the application of provisions in the health-care-liability statute concerning expert qualifications to testify regarding "the standards applicable to the 'illness, injury, or condition *involved in the claim,*' " [8] the inquiry is the same under Texas Rule of Evidence 702, that is, whether the expert is qualified to testify "regarding the specific issue before the court." *See Broders,* 924 S.W.2d at 153 (concluding that the trial court properly excluded expert testimony where the proponent failed to establish that the physician was qualified to opine "on cause in fact"); *see also Roberts,* 111 S.W.3d at 122 (concluding that the proponent established that a physician from a different school of practice "had experience and expertise regarding the specific causes and effects" of the decedent's injuries). And here, there is no issue before us regarding Dr. Casar's qualifications to opine that Dr. Dang breached the standard of care and proximately caused Alfredo's death through his misreading of the chest x-ray and his resultant attempts to treat Alfredo for a hemothorax he did not have.

In sum, we conclude the evidence is sufficient to raise a question of fact as to whether Dr. Dang caused or contributed to causing "in any way the harm for which recovery of damages is sought, whether by negligent act or omission ..., by other conduct or activity that violates an applicable legal standard, or by any combination of these." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a). We accordingly sustain this issue.

## *54 E. Harm Analysis

[26] [27] [28] Although we conclude that the trial court erred in striking ExxonMobil's designation of Dr. Dang as a responsible third party, the error is not reversible unless it probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case on appeal. *See* TEX. R. APP. P. 44.1 (a). By striking the designation of Dr. Dang as a responsible third party, the trial court removed Dr. Dang from the list of persons whose percentage of responsibility could be submitted to the jury. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a). [9] Thus, the result is analogous to charge error, which "is generally considered harmful if it relates to a contested, critical issue." *See Thota v. Young,* 366 S.W.3d 678, 687 (Tex.2012). To determine if the error was harmful, we must examine the entire record. *See Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749, 756 & n. 25 (Tex.1998) (citing *Lorusso v. Members Mut. Ins. Co.,* 603 S.W.2d 818, 821–22 (Tex.1980) and *Patterson Dental Co. v. Dunn,* 592 S.W.2d 914, 921 (Tex.1979)); *Heritage Gulf Coast Props., Ltd. v. Sandalwood Apartments, Inc.,* 416 S.W.3d 642, 655 (Tex.App.–Houston [14th Dist.] 2013, no pet.).

Here, the extent to which Dr. Dang was responsible for "causing or contributing to cause in any way the harm for which recovery of damages is sought" [10] was such a "contested, critical issue." Medical records reflect that the Houston Fire Department evaluated Alfredo at the scene at 5:06 p.m. Responders were told that Alfredo had been punched in the face and the back. He was alert, and complained of swelling in his cheek and pain in his neck. He also had difficulty breathing. Alfredo was transported to the hospital's emergency room, arriving at 5:34 p.m. In medical records prepared at that time, the only complaints listed were "assault—punched on the left side of head and on the back." Alfredo also continued to be described as alert and oriented. He complained of pain in his face and lower back, but when CT scans of his brain and lumbar spine were performed later that evening, neither showed any injuries. No one contends that Cabulang struck Alfredo in the chest; that Alfredo fell on his chest; or that Alfredo's chest was injured in the fight.

But as Dr. Casar would have testified, something else happened in the emergency room. When Alfredo's vital signs were checked upon his arrival, it was discovered that he had no breath sounds from the lower left side of his chest, and he had an oxygen saturation of just 75%. [11] Dr. Dang ordered a chest x-ray, which was performed at 6:08 p.m. The radiologist, Dr. *55 Luis DeSantos, read the x-ray and commented that the "left hemithorax is completely opaque and there is displacement of the mediastinum toward the right side suggesting the presence of a large amount of fluid in

the left hemithorax with displacement of the mediastinum." Dr. Dang reviewed the x-ray and concluded that Alfredo had a hemothorax. Although this conclusion was consistent with Dr. DeSantos's observations, it was Dr. Dang who actually diagnosed Alfredo as having a hemothorax.

It is undisputed, however, that this diagnosis was wrong. Alfredo did not have a hemothorax; he was born without a left lung. Dr. Casar would have testified that Dr. Dang breached the standard of care by misreading the x-ray in that he failed to note the signs that Alfredo did not have a hemothorax and had only one lung. Even Dr. Clavijo, the Pagayons' testifying medical expert, wrote in his own consultation notes, "Chest x-ray showed absence of left lung."

According to Dr. Casar, Alfredo's medical complications and eventual death arose from Dr. Dang's misreading of the chest x-ray and his resultant efforts to treat a condition that Alfredo did not have (a hemothorax), while failing to take into consideration the condition that Alfredo did have (a missing lung). [12] The evidence of Dr. Dang's actions and their consequences is as follows:

Dr. Dang stated in his notes that Alfredo was given morphine for the attempted insertion of a chest tube to drain the excess fluid that Dr. Dang believed was collecting in Alfredo's chest. Alfredo was given the first dose of four milligrams of morphine at 6:42 p.m., four minutes before Dr. Dang's first attempt to insert a chest tube. He attempted to insert a chest tube at 6:46 p.m. and again at around 6:52 p.m. After these attempts, Alfredo's primary complaint of pain no longer concerned his face or back, and he instead complained of pain at the site where Dr. Dang had attempted to insert the chest tube. Dr. Dang responded with more morphine. Sixteen minutes after Dr. Dang's second attempt to insert a chest tube, Alfredo was given four more milligrams of morphine, and twenty minutes after that, Alfredo was given a further six milligrams of morphine. Thus, in connection with his attempt to insert a chest tube, Dr. Dang caused Alfredo to be given a total of fourteen milligrams of morphine in the space of forty-six minutes. Dr. Casar would have testified that when a dose of about eight milligrams is given to someone with only one lung, it can be expected that the patient will stop breathing. He stated that although Alfredo was given a medication to reverse the effects of morphine and "for a little bit he **\*56** became more responsive," [13] his condition continued to deteriorate, and he had to be placed on a respirator. At 12:20 a.m. on August 2, 2011, Dr. Dang wrote in Alfredo's progress notes, "Discuss [with] Dr. Fisher about events in E.R. Agrees to

admit observation for pain controll [sic]." But here, too, the testimony of the Pagayons' expert Dr. Clavijo is consistent with Dr. Casar's proffered testimony rather than with Dr. Dang's notes. Dr. Clavijo testified that Alfredo was admitted to the hospital from the emergency room for observation and for somnolence, because Alfredo "was just entirely ... lethargic."

Alfredo was admitted "to the floor" of the hospital, but shortly after his arrival, he suffered acute respiratory failure and was transferred to the intensive-care unit where Dr. Clavijo intubated him at 8:20 a.m. Dr. Clavijo testified that Alfredo was intubated because he was hypoventilating, meaning that his body could not get rid of carbon dioxide. Dr. Clavijo testified that hypoventilating "causes somnolence and lethargy and, subsequently, complete respiratory failure," but he identified no injuries that Alfredo received in the fight that could have caused hypoventilation. He further testified that Alfredo was never able to be weaned off of intubation, and that continuing intubation was a problem because this leaves tubes in the patient's body that can cause infection and further complications—including, in Alfredo's case, "a sepsis-type of infection." According to Dr. Clavijo, Alfredo's respiratory failure also caused his other systems to shut down. Dr. Casar, Dr. Clavijo, and Alfredo's death certificate all identify respiratory failure as one of the causes of Alfredo's death.

Finally, Dr. Clavijo agreed that "the trauma ... that occurred on August 1, at Exxon, it kind of set off *a chain of events* that caused this respiratory failure that then caused [Alfredo's] renal failure and that eventually resulted in his death." (emphasis added). The "trauma" sustained "at Exxon" was not identified, and the jury did not hear the evidence that the events in this chain included Dr. Dang's alleged negligence in misreading Alfredo's chest x-ray, failing to observe that Alfredo had only one lung, attempting to insert a chest tube, and administering morphine in doses high enough to cause respiratory failure. Jurors also did not hear Dr. Casar's testimony that the injuries Alfredo received in the fight did not cause his death, and that Alfredo's death instead was caused by Dr. Dang's negligence. And because the question of Dr. Dang's responsibility was removed from the case by the trial court's striking of the designation, the jury was unable to consider this hotly contested issue.

The Pagayons contend that even if Dr. Dang made errors that increased the harm to Alfredo or led to his death, Exxon would still bear the liability for the doctor's negligence under

the "original tortfeasor rule." *See, e.g., Cannon v. Pearson,* 383 S.W.2d 565, 567 (Tex.1964) ("It has long been an accepted and established in this State that one who wrongfully injures another is liable in damages for the consequences of negligent treatment by a doctor or surgeon selected by the injured person in good faith and with ordinary care."); *Galvan v. Fedder,* 678 S.W.2d 596, 598 (Tex.App.–Houston [14th Dist.] 1984, no writ) (same). But as the Texas Supreme Court **\*57** recently pointed out, the legislature "has overhauled Texas's system for apportioning fault in negligence cases" over the past four decades, enacting a comparative-negligence statute, which was replaced by a comparative-responsibility statute, and which has since been modified to become our current proportionate-responsibility statute. *See Nabors Well Servs., Ltd. v. Romero,* 456 S.W.3d 553, 555, 559 (Tex.2015). By its terms, the proportionate-responsibility statute applies to "any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought." TEX. CIV. PRAC. & REM. CODE ANN. § 33.002(a)(1) (West 2015). The Pagayons asserted causes of action based on tort, and the jury determined ExxonMobil's percentage of responsibility; thus, the proportionate-responsibility statute governs the determination of responsibility in this case.[14]

For the reasons we have described, we conclude that ExxonMobil was harmed by the trial court's erroneous application of the statute in striking the designation of Dr. Dang as a responsible third party.

We sustain this portion of ExxonMobil's third issue. Because we conclude that this error requires us to reverse the judgment and remand the case for a new trial, we do not reach ExxonMobil's remaining issues.

## V. CONCLUSION

Although the evidence is legally sufficient to support the jury's liability finding against ExxonMobil under a negligent-supervision theory, we conclude that the trial court erred in striking the designation of Dr. Dang as a responsible third party, and that this error harmed ExxonMobil. Thus, without reaching ExxonMobil's remaining issues, we reverse the judgment and remand the case for a new trial consistent with this opinion.

(McCally, J., dissenting).

Sharon McCally Justice, dissenting.

I agree with the Majority's determination that for purposes of its response to the Pagayons' motion to strike, ExxonMobil was not required to raise a fact issue regarding whether Dr. Dang, with willful and wanton negligence, violated the standard of care. I disagree, however, with the Majority's conclusion that ExxonMobil raised a fact issue concerning Dr. Dang's alleged negligence in providing emergency care to Alfredo. Because I would instead conclude that the trial court did not err in striking Dr. Dang's designation, I respectfully dissent.

Though the trial court did not articulate its basis for striking the designation of Dr. Dang in its order, there are two independent reasons that the decision is not error. The trial court would not have erred in concluding that the medical opinion ExxonMobil offered to raise a fact issue on Dr. Dang's alleged departure from the standard of care was not probative opinion testimony in that (1) the "expert" disclaimed knowledge of the applicable standard of care and (2) the physician's "expert opinion" was based upon assumed facts that varied from the actual, underlying facts.

### 1. The basis for the "expert opinion" that Dr. Dang fell below the standard of care

**\*58** The medical record relied upon by Dr. Casar reflects that Alfredo arrived at the hospital's emergency room via EMS at 17:58.[1] The record also shows injury to the left back and decreased breath sounds on the lower left side. The radiology report also relied upon by Dr. Casar confirms that Dr. Dang immediately ordered a chest x-ray due to chest pain, and the x-ray was performed at 18:08. The radiologist, Dr. Luis DeSantos, read the x-ray at 18:10 and provided a diagnosis of "[c]omplete opacification of the left hemithorax" and commented that the "left hemithorax is completely opaque and there is displacement of the mediastinum toward the right side suggesting the presence of a large amount of fluid in the left hemithorax with displacement of the mediatinum." At 18:46 the emergency room records show "chest tube insertion because of hemothorax."[2] In fact, Alfredo had no left lung and the x-ray was misread. According to Dr. Casar, Dr. Dang fell below "the standard of care" when, faced with what, in Dr. Casar's opinion was, an unusual x-ray, Dr. Dang failed to wait for a CT scan before deciding to attempt insertion of a chest tube. Dr. Casar stated that "[a]fter

the CT Scan was obtained, it became clear that the patient had a congenital absence of the left lung."

### 2. The "expert" disclaims knowledge of the standard of care

Problematic to the above evidence is Dr. Casar's testimony that he is not familiar with the standard protocol for emergency room physicians when they believe they are confronted with a hemothorax and his assumption about the timely availability of diagnostic tools in the emergency room. First, Dr. Casar's field of expertise is critical care medicine, which he concedes has a different standard of care than emergency room medicine. Standing alone, the fact that Dr. Casar's expertise is in a different area is not fatal if Dr. Casar demonstrates knowledge of the area at issue. *See* Tex. R. Evid. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."); *cf. Blan v. Ali,* 7 S.W.3d 741, 745–46 (Tex.App.–Houston [14th Dist.] 1999, no pet.). But Dr. Casar repeatedly testified that he does not know the standard of care for an emergency room physician. Although Dr. Casar testified that, in his opinion, the standard of care for reading an x-ray is the same despite the diagnostic setting, he also stated that he was not familiar with the standard of care for an emergency room physician. When Dr. Casar admitted that he does not know the standard for an emergency room physician, he caused his own opinion that the standards are the same to be completely without foundation. In other words, if he does not know what the emergency standard is, he cannot know that the emergency standard is the same as the non-emergency standard.

Where the treatment criticized is provided as part of emergency care, the expert should demonstrate familiarity with that standard of care, not simply guess that the setting for care does not matter. **\*59** *Cf. Ly v. Austin,* No. 03–05–00516–CV, 2007 WL 2010757, at \*5 (Tex.App.–Austin July 13, 2007, no pet.) (mem. op) (holding that when the specific issue before the court is "the standard of care applicable to neurologists providing emergency care immediately following a stroke," testimony from an expert in caring for stroke patients in rehabilitative setting is insufficient). Thus, in my view, Dr. Casar must know the applicable standard of care—in this case, what a reasonably prudent emergency room physician would have done in the

same or similar circumstances—to support the designation of Dr. Dang as a responsible third party.

In short, Dr. Casar admitted he has neither the expertise nor the knowledge of reading x-rays or making critical decisions in an emergency room setting. Thus, I would conclude that the trial court did not err in determining that Dr. Casar lacked the requisite knowledge, skill, experience, training, or education to opine on the emergency care provided to Alfredo. *See* Tex.R. Evid. 702; *cf. Ehrlich v. Miles,* 144 S.W.3d 620, 625 (Tex.App.–Fort Worth 2004, pet. denied) ("A medical expert who is not of the same school of medicine, however, is competent to testify if he has practical knowledge of *what is usually and customarily done by a practitioner under circumstances similar to those confronting* the [allegedly negligent physician]." (emphasis added)).

The majority urges that, notwithstanding Dr. Casar's admission that he is not familiar with the applicable standard, we may not affirm on this basis because the Pagayon's did not object to Dr. Casar's qualifications. I disagree factually and legally. Counsel for the Pagayons consistently and persistently pointed out Dr. Casar's lack of qualification before the trial court:

> Q. Certainly, an emergency room physician's practice is very different from your practice as a critical care doctor, correct?
>
> ...
>
> A. It is different, yes.
>
> ...
>
> Q. You don't practice in the ER, correct?
>
> A. I practice in ICU.
>
> Q. Okay.
>
> A. Not in the ER.
>
> Q. So you don't know what the standard protocol is for emergency room physicians when they believe they have a hemothorax is, do you?
>
> A. I don't know what their standard is.
>
> ...
>
> Q. But—but for the emergency room. You don't know the emergency room standard—you're—you're basing your

understanding of the ICU standard with the ER standard, fair?

A. Fair.

Q. That's not necessarily fair to the doctors is it? Because you agree with me that an ICU setting is different from emergency room setting, fair?

...

A. It is different, yes.

Q. And so, sitting here today, you don't know what the standard protocol is for an emergency room physician?

A. I don't—I don't know what the standard of care is for an emergency room physician.

...

Q. Again, you're not familiar with the standard of care in the emergency room?

...

A. I'm not sure if—what the standard of care for the emergency room, but I would be surprised if it's any different.

**\*60** Q. But I just want to make sure.

You're not qualified to testify on the standard of care in an emergency room?

...

A. I don't know what the standard of care in the emergency room is.

Thus, in my view, the Pagayons placed Dr. Casar's qualification at issue. Here, we are not faced with an alleged error on the admissibility of Dr. Casar's opinion. The trial court did not exclude the evidence. Instead, as the Texas Supreme Court has recently pointed out, the question is whether the expert's opinion is any evidence at all. *Cf. Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch,* 443 S.W.3d 820, 832–33 (Tex.2014) ("[I]f no basis for the opinion is offered, or the basis offered provides no support, the [expert] opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." (internal quotation and citation omitted)).

Further, the nature of the opinion Dr. Casar proffers is, in the words of our opinion in *Blan v. Ali,* "peculiar to the field" of emergency medicine about which he knows nothing. 7 S.W.3d 741, 746 (Tex.App.–Houston [14th Dist.] 1999, no pet.). As noted above, Alfredo was admitted to the emergency room at 5:58 p.m. Dr. Dang testified that he "was very concerned about [Alfredo]'s medical condition and believed that if [he] did not take immediate medical action, [Alfredo]'s health could have been placed in serious jeopardy." Dr. Dang performed a physical examination and obtained a chest x-ray at approximately 6:08 p.m., which, as noted above, revealed complete opacification of the left hemithorax. Dr. Dang's interpretation of the chest x-ray was confirmed by Dr. DeSantos. Further, as Dr. Dang testified,

> Based on, among other things, the x-ray, Mr. Pagayon's medical condition, and *his need for emergency care,* I made the decision to place a chest tube to drain what I believed to be a hemothorax in his left lung.... *Based on the circumstances and the emergency situation,* I made the determination that there was not time to perform a CAT scan prior to placing the chest tube. In my training and experience when dealing with what one believes to be a hemothorax, the same must be addressed as soon as possible.

(emphasis added). Thus, according to Dr. Dang—and acknowledged by Dr. Casar—Dr. Dang was providing emergency medical care when he attempted the chest tube insertion. Dr. Casar's admission that he does not know the standard of care for emergency room physicians is "determinative." *See id.*

### 3. The "expert opinion" ' rests on misperceived facts

Second, Dr. Casar repeatedly displayed his unfamiliarity with the facts of Alfredo's care in his deposition testimony. *Cf. Houston Unlimited, Inc. Metal Processing,* 443 S.W.3d at 822 ("If an expert's opinion is unreliable because it is 'based on assumed facts that vary from the actual facts,' the opinion 'is not probative evidence.' " (quoting *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499–500 (Tex.1995)). If the factual assertions or assumptions underlying an expert's opinion are contrary to the facts, opinion testimony founded on those

assumptions is not competent evidence. *Cf. id.* at 833. Here, Dr. Casar's opinion was based on assumptions contrary to proven facts in several respects. [3]

**\*61** For example, Dr. Casar was mistaken about the time and dosages of morphine provided to Alfredo: Dr. Casar initially stated that the morphine was still in Alfredo's system when he was intubated, but when confronted with Alfredo's medical records that established the contrary, Dr. Casar acknowledged that morphine was "probably not" still in Alfredo's system when he was later intubated in the ICU. Dr. Casar also testified that Alfredo's respiratory rate was 32 breaths per minute, an elevated rate, when he was admitted to the ICU. But when confronted with Alfredo's records, Dr. Casar stated that the record showed Alfredo's breath rate was 24 breaths per minute. Further, he testified that there was a note in Alfredo's medical records that Afredo could be released that "afternoon" from the emergency room. [4] Yet, the doctor was unable to find this note when given an opportunity to search through the records. Finally, Dr. Casar's criticism of Dr. Dang's failure to wait for a CT scan to confirm his hemothorax diagnosis emanated from his belief that "in the emergency room, you can get a CAT scan in 15 minutes." But the following exchange occurred during Dr. Casar's deposition:

Q. You also testified he had a CT scan less than an hour after ... after the chest tube.

    Remember that?

A. Yes.

Q. That's not the case, is it, Doctor?

A. I said I don't remember exactly the time line.

Q. In fact, let me show you what's ... previously been marked as Exhibit No. 37.

A. Okay.

Q. And he didn't have a CT scan until 8:53 that night, more than two hours—

A. Two hours. Well, that's terrible.

Q. More than two hours, correct?

A. That's terrible.

Q. And more than three hours after his initial ... consult, right?

A. Yeah. So, you see—uh-huh.

Q. You can't wait three hours for a CAT scan, can you doc?

A. Well, they waited and nothing happened.

Q. If you can get a CAT scan at the snap of a finger, as you claim you can—

A. Yeah. You should be able to here.

Q. Took two hours here?

A. Right.

Q. And they ordered one immediately, and it took two hours?

A. That's not good. That's not good. That's not what it [sic] should happen in an emergency room.

\* \* \*

Q. Would you like to correct your testimony wherein you stated he received a **\*62** CAT scan 30 minutes after his chest tube?

    A. Yes.

In summary, Dr. Casar did not indicate that he was familiar with the facts of Alfredo's care. Instead, the record before the trial court indicates that he based his conclusions on either improper recollections of the facts or assumptions. *See id.*; *cf. Jelinek v. Casas,* 328 S.W.3d 526, 539 (Tex.2010) (holding that the basis for an expert's opinion must be linked to the facts).

### *4. Conclusion*

I would conclude, after considering Dr. Casar's testimony as a whole, that Dr. Casar's opinions do not raise a fact question regarding whether Dr. Dang failed to act as a reasonably prudent physician under the same or similar circumstances. Although Exxon Mobil offered Dr. Casar's opinion on emergency room treatment in an emergency situation, Dr. Casar did not undertake to analyze Dr. Dang's conduct in the context of the circumstances of emergency care. As such, Dr. Casar's statements that he does not know the emergency room standard of care is determinative. *Cf. Ehrlich,* 144 S.W.3d at 625; *Blan,* 7 S.W.3d at 746 (noting

that expert's admission that he was unfamiliar with the emergency room and cardiology standards of care would be "persuasive, if not determinative *if* [he] were purporting to offer expert medical opinions in matters peculiar to the fields of cardiology or emergency medicine"). Dr. Casar's testimony completely misses the mark regarding whether Dr. Dang's care of Alfredo fell below the standard of care for a reasonably prudent physician in an emergency room setting. Indeed, Dr. Casar's testimony demonstrated he was unfamiliar with the actual facts surrounding Alfredo's medical care. *Cf. Houston Unlimited, Inc. Metal Processing,* 443 S.W.3d at 832–33; *Jelinek,* 328 S.W.3d at 539. Thus, I would conclude that Dr. Casar's opinion is no evidence of Dr. Dang's responsibility for Alfredo's death.

In sum, I agree with the Majority that ExxonMobil did not need to bring forth evidence that Dr. Dang willfully and wantonly departed from the standard of care. But ExxonMobil nonetheless needed to bring forth some probative evidence that Dr. Dang departed from the applicable standard of care. Because ExxonMobil failed to do so, I would conclude that the trial court did not err in striking the designation of Dr. Dang. Because the Majority concludes otherwise, I respectfully dissent.

**All Citations**

467 S.W.3d 36

Footnotes

1 ExxonMobil does not argue that J.R. and his father were not "similarly situated."

2 This is not the only problem with ExxonMobil's argument. In addition, it appears to be contrary to the position it maintained at trial, where it argued that Cabulang did not cause the fight, but instead acted only in self-defense. Whether Cabulang caused the fight was a disputed question of fact. Moreover, the jury found that ExxonMobil, J.R., and Alfredo acted negligently, but it was not asked to find that anyone acted intentionally.

3 Although ExxonMobil points out that its written "policies prohibit loitering inside the store," there is no evidence that J.R. did so.

4 Having rejected ExxonMobil's arguments that it cannot be the proximate cause of Alfredo's death because (a) "intentional conduct" caused the fight, and (b) the store was merely the location of the fight, we do not reach its remaining argument under this heading, i.e., that "[a]ny reliance on the foreseeability of medical negligence cannot overcome these problems with causation."

5 The parties sometimes refer to the trial court's ruling as a denial of ExxonMobil's motion to designate Dr. Dang as a responsible third party, and sometimes refer to it as a grant of the Pagayons' motion to strike the designation. Our record contains only an order granting the Pagayons' motion to strike the designation of Dr. Dang as a responsible third party.

6 We acknowledge that "if evidence presents 'other plausible causes of the injury or condition that could be negated, the [proponent of the testimony] must offer evidence excluding those causes with reasonable certainty.' " *See Crump,* 330 S.W.3d at 218 (quoting *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 720 (Tex.1997) (alterations in original)). But, in determining whether the trial court erred in striking the designation of Dr. Dang as a responsible third party, we must consider the evidence before it at the time of that ruling. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.004(*l* ). At this point in the proceedings, the trial court was not presented with evidence about other possible sources of sepsis; it was simply presented with Dr. Casar's opinion that even though cultures did not clarify the source of the sepsis, the chest-wall hematoma from the failed chest-tube insertion was the most likely cause.

7 Tellingly, this statute is entitled, "Qualifications of Expert Witness in Suit Against Physician," and provides as follows:

(a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

(emphasis added).

8 *Id.* at 746 (quoting Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 2, sec. 14.01(a)(2), 1995 TEX. GEN. LAWS 985, 988, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 TEX. GEN. LAWS 847, 884).

9   Having removed that issue from the jury's consideration, the trial court also excluded evidence relevant to that determination.

10  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a).

11  There are many inconsistencies in the medical records. To cite a few examples, Dr. Dang's handwritten notes identify Alfredo himself as the person from whom Dr. Dang obtained Alfredo's medical history; other records identify the family as the historian. Dr. DeSantos stated on the radiology report that Alfredo was referred for a chest x-ray due to chest pain, but this was not listed among Alfredo's complaints. Although Dr. Clavijo was not present when Alfredo arrived at the hospital, he wrote that Alfredo was confused and disoriented at that time; however, before Dr. Dang administered fourteen milligrams of morphine as discussed *infra*, Alfredo was consistently described as alert and oriented by those who evaluated him at ExxonMobil and by the emergency-room personnel. Our description of the evidence is intended only to show our reasons for concluding that the extent of Dr. Dang's responsibility, if any, for causing or contributing to Alfredo's death was a contested, critical issue.

12  Even if a chest CT scan were needed to properly diagnose Alfredo's true condition and rule out a hemothorax, evidence supports Dr. Casar's opinion that Dr. Dang had time to have the scan performed. Dr. DeSantos made his comments on the chest x-ray at approximately 6:10 p.m., and Dr. Dang did not administer the first dose of morphine in preparation for the chest tube until 6:42 p.m.—a time lapse of thirty-two minutes. Medical records also show that Dr. Dang finally ordered a chest CT scan at 8:31 p.m., and that it was completed at 8:53 p.m.—a time lapse of just twenty-two minutes. Thus, the record supports the conclusion that if Dr. Dang had ordered a chest CT scan after seeing the unusual chest x-ray, the extra procedure would not have delayed the insertion of the chest tube if the CT scan had confirmed his diagnosis of a hemothorax. We note, however, that it is unclear what role the chest CT scan played in Dr. Dang's treatment of Alfredo. Although other doctors state in their notes that the CT scan "confirmed" that Alfredo had only one lung, the CT scan is not mentioned in Dr. Dang's narrative. He instead wrote, "Wife arrive to ER many hours later and I was informed that patient was born w/o one lung, but they are not sure which side."

13  At 11:30 p.m., Dr. Dang wrote that Alfredo was asleep and was given Narcan, a drug which, as Dr. Casar explained in his deposition, was intended to reverse the effects of morphine. After writing that Narcan was given, Dr. Dang wrote "patient continues to be drowsy $\rightarrow$ more alert now." The time of this entry was also stated to be 11:30 p.m. (or as written in the records, 2330 pm).

14  Although the statute contains a few exceptions to its broad application, the Pagayons do not contend that any of the enumerated exceptions applies. *See id.* § 33.002(c) (providing that Chapter 33 does not apply to actions for workers' compensation benefits, claims for exemplary damages, or claims arising from the manufacture of methamphetamine).

1   The entirety of Alfredo's medical records were not included as part of the motion-to-strike record. Only a two page "Emergency Provider Record" and the "Diagnostic Radiography" report are provided as the basis for Dr. Casar's opinion.

2   According to Dr. Casar, the thorax is the space between the waist and the neck; a hemothorax is a thorax full of blood, which means that something is bleeding inside, and it is a condition that may be life-threatening if not treated promptly.

3   The "facts" as proven at the time of the motion to strike did not include Alfredo's entire medical records. Instead, these "facts" included Dr. Casar's deposition testimony and a few pages from Alfredo's records. Thus, although the Majority notes several facts from Alfredo's medical records in its harm analysis, those facts were not part of the record when the trial court implicitly determined that Dr. Casar's opinion testimony failed to raise a fact issue regarding Dr. Dang's purported responsibility. In other words, the Majority has reviewed the trial court's alleged error based upon a record that was not before the trial court at the time it made the challenged ruling. Moreover, the facts the Majority draws from the expanded record are facts neither articulated, nor apparently known, by Dr. Casar at the time he supplied the deposition testimony ExxonMobil presented to the trial court.

4   As noted above, Alfredo was admitted to the emergency room at 17:58, which is 5:58 p.m. Thus, it does not appear that Alfredo was in the emergency room in the "afternoon."

---

**End of Document**                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

R

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** Williams v. McCollister, S.D.Tex., September 22, 2009

237 S.W.3d 680
Supreme Court of Texas.

F.F.P. OPERATING PARTNERS, L.P.,
d/b/a Mr. Cut Rate # 602, Petitioner,
v.
Xavier DUENEZ and Wife Irene Duenez,
As Next Friends of Carlos Duenez and
Pablo Duenez, Minors, Respondents.

No. 02–0381. | Argued Nov.
30, 2005. | Decided May 11, 2007.

**Synopsis**
**Background:** Motorists injured in collision with intoxicated driver brought action under the Dram Shop Act against owner of a convenience store which had provided alcoholic beverages to driver. The County Court at Law No. 1, Calhoun County, Alex R. Hernandez, J., severed store owner's cross-action against driver, and rendered judgment on jury verdict awarding motorists $35 million. Store owner appealed. The Corpus Christi-Edinburg Court of Appeals, 69 S.W.3d 800, affirmed. Review was granted.

**Holdings:** On denial of rehearing, the Supreme Court, Wainwright, J., held that:

[1] Proportionate Responsibility Act applies to all claims under Dram Shop Act, including third-party claims, and

[2] store owner's cross-action against driver was not severable.

Reversed and remanded.

Jefferson, C.J., and O'Neill, J., dissented and filed opinions.

West Headnotes (16)

**[1]** **Appeal and Error**

Cases Triable in Appellate Court

**Statutes**

Plain Language; Plain, Ordinary, or Common Meaning

Statutory construction is a legal question that Supreme Court reviews de novo, ascertaining and giving effect to the legislature's intent as expressed by the plain and common meaning of the statute's words.

61 Cases that cite this headnote

**[2]** **Intoxicating Liquors**

Proximate cause of injury

**Intoxicating Liquors**

Presumptions and burden of proof

If a plaintiff meets the onerous burden of proof imposed by the Dram Shop Act, then the provider of alcoholic beverages is liable for damages proximately caused by its employees or patrons. V.T.C.A., Alcoholic Beverage Code § 2.02.

4 Cases that cite this headnote

**[3]** **Intoxicating Liquors**

Statutory provisions

In the Dram Shop Act, the Legislature created a duty, not recognized at common law, on alcohol providers and increased the potential liability of providers as a means of deterring providers from serving obviously intoxicated individuals. V.T.C.A., Alcoholic Beverage Code §§ 2.02, 2.03.

3 Cases that cite this headnote

**[4]** **Intoxicating Liquors**

Nature of remedy

**Intoxicating Liquors**

Contributory act or negligence

Section of Dram Shop Act setting forth the exclusivity of statutory remedy against an alcohol provider for damages caused by an intoxicated patron does not make an alcohol provider responsible, without regard to fault, for 100% of the damages caused by an intoxicated

patron. V.T.C.A., Alcoholic Beverage Code § 2.03.

1 Cases that cite this headnote

**[5]** **Labor and Employment**
 Nature of liability in general

**Principal and Agent**
 Rights and liabilities of principal

Generally, the doctrine of "vicarious liability," or respondeat superior, makes a principal liable for the conduct of his employee or agent.

12 Cases that cite this headnote

**[6]** **Principal and Agent**
 Rights and liabilities of principal

Vicarious liability is based on the principal's control or right to control the agent's actions undertaken to further the principal's objectives.

6 Cases that cite this headnote

**[7]** **Negligence**
 Control over object

Basis for imposing liability on the owner of the thing entrusted to another, under theory of negligent entrustment, is that ownership of the thing gives the right of control over its use.

1 Cases that cite this headnote

**[8]** **Intoxicating Liquors**
 Contributory act or negligence

**Intoxicating Liquors**
 Persons Liable

Apportionment of responsibility, under Proportionate Responsibility Act, applies to all claims under Dram Shop Act, including third-party claims; neither the purpose nor the language of Dram Shop Act makes a dram shop automatically responsible for all of the damages caused by an intoxicated patron, regardless of a jury's determination of the dram shop's proportion of responsibility, and imposing vicarious liability in dram-shop cases would conflict with Proportionate Responsibility Act.

V.T.C.A., Alcoholic Beverage Code §§ 2.02, 2.03; V.T.C.A., Civil Practice & Remedies Code §§ 33.002, 33.003(a), 33.013; § 33.001(a)(2003).

15 Cases that cite this headnote

**[9]** **Constitutional Law**
 Inquiry Into Legislative Judgment

**Constitutional Law**
 Policy

**Statutes**
 Intent

Supreme Court's role is not to second-guess the policy choices that inform statutes or to weigh the effectiveness of their results; rather, Court's task is to interpret those statutes in a manner that effectuates the legislature's intent.

4 Cases that cite this headnote

**[10]** **Statutes**
 Prior construction

Legislature must be regarded as intending statutes, when repeatedly reenacted, to be given that interpretation which has been settled by the courts.

Cases that cite this headnote

**[11]** **Action**
 Severance of actions

**Contribution**
 Automobile cases

**Indemnity**
 Nature of obligation

Convenience store owner's claim against intoxicated driver who purchased beer and then had automobile accident was not an indemnification claim that could be properly severed from injured motorist's and passenger's action against store owner under Dram Shop Act; store owner's claim was one of contribution for proportionate share of damages for which driver was responsible. V.T.C.A., Alcoholic Beverage Code §§ 2.02, 2.03; V.T.C.A., Civil Practice & Remedies Code §§ 33.002, 33.003; Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

4 Cases that cite this headnote

**[12]** **Appeal and Error**

🔑 Allowance of remedy and matters of procedure in general

Supreme Court will not reverse a trial court's order severing a claim unless the trial court abused its discretion. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

2 Cases that cite this headnote

**[13]** **Action**

🔑 Severance of actions

A claim is properly severable if (1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

22 Cases that cite this headnote

**[14]** **Action**

🔑 Severance of actions

Avoiding prejudice, doing justice, and increasing convenience are the controlling reasons to allow severance of a claim. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

23 Cases that cite this headnote

**[15]** **Intoxicating Liquors**

🔑 Persons Liable

Dram Shop Act does not make a provider of alcoholic beverages vicariously liable to a third party for the conduct of an intoxicated patron; provider's liability arises from the actions of its employees and agents, and not through the actions of patron. V.T.C.A., Alcoholic Beverage Code §§ 2.02, 2.03.

7 Cases that cite this headnote

**[16]** **Appeal and Error**

🔑 Abuse of discretion

A trial court's failure to correctly apply the law is an abuse of discretion.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*681** Oscar H. Villarreal, Villarreal Moreno & Ruiz, San Antonio, Gregory J. Lensing, Cowles Thompson, Dallas, Arthur C. Reyna Jr., San Antonio, Glen Garey, Austin, James E. Rensimer, Markle & Ramos, **\*682** Houston, TX, Victor E. Schwartz, Emily J. Laird, Manuel Lopez, Shook, Hardy & Bacon L.L.P., Washington, DC, Edward J. Murphy, Beirne, Maynard & Parsons, L.L.P., Houston, E. Lee Parsley, E. Lee Parsley, P.C., Austin, Grant E. Adami III, Adami Goldman & Shuffield, San Antonio, TX, for Amicus Curiae.

Russell H. McMains, Law Offices of Russell H. McMains, Corpus Christi, Reagan W. Simpson, King & Spalding LLP, Houston, Mike A. Hatchell, Locke Liddell & Sapp, LLP, Austin, TX, for Petitioner.

David Roberts, Wanda Roberts, Garner, Roberts & Roberts, L.L.P., Port Lavaca, Christa Brown, Austin, Cynthia T. Sheppard, Attorney At Law, Cuero, David C. Griffin, John W. Griffin Jr., Houston, Marek & Griffin, L.L.P., Victoria, TX, for Respondent.

**Opinion**

Justice WAINWRIGHT delivered the opinion of the Court, in which Justice HECHT, Justice BRISTER, Justice MEDINA, Justice GREEN, Justice JOHNSON and Justice WILLETT joined.

On December 12, 2002, we granted this petition for review, and on September 3, 2004, the Court issued an opinion. On April 8, 2005, we granted the petitioner's motion for rehearing, reargued the case, and issued an opinion on November 3, 2006. Today we deny the respondents' motion for rehearing. We withdraw our opinion of November 3, 2006 and substitute the following in its place.

We are asked to revisit our holding in *Smith v. Sewell* that the proportionate responsibility scheme of chapter 33 of the Texas Civil Practice and Remedies Code requires

an apportionment of responsibility under chapter 2 of the Alcoholic Beverage Code. 858 S.W.2d 350 (Tex.1993). We decline the invitation to reverse *Sewell* and instead affirm its holding that the language of the proportionate responsibility statute includes claims under the Dram Shop Act. Neither the purpose nor the language of the Act makes a dram shop automatically responsible for all of the damages caused by an intoxicated patron, regardless of a jury's determination of the dram shop's proportion of responsibility. Instead, pursuant to Chapter 33, a dram shop is responsible for its proportionate share of the damages as determined by a jury. Accordingly, we reverse the court of appeals' judgment and remand the case for a new trial.

### I. Factual and Procedural Background

After spending the day cutting firewood while consuming a case and a half of beer, Roberto Ruiz drove his truck to a Mr. Cut Rate convenience store owned by F.F.P. Operating Partners, L.P. and purchased a twelve-pack of beer. The store's assistant manager, Carol Solis, sold the beer to Ruiz. Ruiz then climbed into his truck, opened a can of beer, and put the open beer can between his legs. There was conflicting testimony about whether Ruiz actually drank any of the beer that he purchased at Mr. Cut Rate.

Ruiz then drove onto a nearby highway and swerved into oncoming traffic several times. Two cars dodged his truck to avoid a collision. As he crossed a bridge approximately a mile and a half from the Mr. Cut Rate convenience store, Ruiz swerved across the center line, hitting the Duenezes' car head-on. All five members of the Duenez family suffered injuries.

Ruiz was arrested at the accident scene for drunk driving. He pled guilty to intoxication assault and was sentenced to prison. The Duenezes brought a civil suit against F.F.P., Ruiz, Solis, Nu–Way Beverage Company, and the owner of the land where Ruiz had spent the afternoon cutting firewood and drinking. F.F.P. filed a cross-action against Ruiz, naming him as a **\*683** responsible third-party and a contribution defendant. The Duenezes thereafter nonsuited all defendants except F.F.P.

At the pretrial conference, the Duenezes obtained a partial summary judgment that chapter 33 of the Texas Civil Practice and Remedies Code, the proportionate responsibility statute, did not apply to this case. The trial court then severed F.F.P.'s cross-action against Ruiz, leaving F.F.P. as the only defendant

for trial. F.F.P.'s severed action against Ruiz remains pending in the trial court.

The Duenezes' claim against F.F.P. proceeded to trial. At the charge conference, the trial court refused to submit questions for determination of Ruiz's negligence. The court also failed to submit questions on the proportionate responsibility of Ruiz and F.F.P.

The jury found that when the alcohol was sold to Ruiz, it was "apparent to the seller that he was obviously intoxicated to the extent that he presented a clear danger to himself and others," and that Ruiz's intoxication was a proximate cause of the collision. The jury returned a $35 million verdict against F.F.P., upon which the trial court rendered judgment.

The court of appeals affirmed the trial court's judgment, holding:

> [I]n third-party actions under the Dram Shop Act in which there are no allegations of negligence on the part of the plaintiffs, a provider is vicariously liable for the damages caused by an intoxicated person, and such a provider is not entitled to offset its liability by that of the intoxicated person.

69 S.W.3d 800, 805. In reaching that conclusion, the court distinguished our decision in *Sewell,* in which we held that the comparative responsibility statute applied to dram-shop causes of action. *Id.* The court of appeals concluded that *Sewell's* holding was limited to first-party actions in which the intoxicated patron is suing for his own injuries and is inapplicable when the plaintiff is an innocent third party injured by an intoxicated patron. *Id.* at 805–06. The court also held that the trial court did not abuse its discretion in severing F.F.P.'s contribution claim against Ruiz, concluding that because F.F.P.'s statutory liability was vicarious and not direct, F.F.P. had an indemnity claim rather than a contribution claim against Ruiz. *Id.* at 807–08.

We granted F.F.P.'s petition for review. While the petition was pending, Xavier, Irene, and Ashley Duenez settled their claims against F.F.P. Only the claims of Pablo and Carlos Duenez against F.F.P. remain before the Court.

## II. Statutory Interpretation

**[1]** Statutory construction is a legal question that we review de novo, ascertaining and giving effect to the Legislature's intent as expressed by the plain and common meaning of the statute's words. *Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004).

## A. The Dram Shop Act

**[2]** **[3]** The Legislature enacted the Dram Shop Act to "deter providers of alcoholic beverages from serving alcoholic beverages to obviously intoxicated individuals who may potentially inflict serious injury on themselves and on innocent members of the general public." *Sewell,* 858 S.W.2d at 356. Section 2.02 of the Alcoholic Beverage Code sets forth the scope and elements of this action:

(a) This chapter does not affect the right of any person to bring a common law cause of action against any individual whose consumption of an alcoholic beverage allegedly resulted in causing the person bringing the suit to suffer personal injury or property damage.

(b) Providing, selling, or serving an alcoholic beverage may be made the basis **\*684** of a statutory cause of action under this chapter and may be made the basis of a revocation proceeding under section 6.01(b) of this code upon proof that:

(1) at the time the provision occurred it was apparent to the provider that the individual being sold, served, or provided with an alcoholic beverage was *obviously intoxicated* to the extent that he presented a *clear danger* to himself and others; and

(2) the intoxication of the recipient of the alcoholic beverage was a proximate cause of the damages suffered.

TEX. ALCO. BEV.CODEE § 2.02 (emphasis added).[1] If a plaintiff meets the "onerous burden of proof" imposed by the Dram Shop Act, then the provider is liable for damages proximately caused by its employees or patrons. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 314 (Tex.1987); *see also* TEX. ALCO. BEV.CODEE § 2.03.[2] In the Dram Shop Act, the Legislature created a duty, not recognized at common law, on alcohol providers and increased the potential liability of providers as a means of deterring providers from serving

obviously intoxicated individuals. Historically, the "rule of non-liability" held that an alcohol provider owed no duty to third persons for injuries caused by the provision of alcohol. *Sewell,* 858 S.W.2d at 352; *Poole,* 732 S.W.2d at 310; *see also* Joel Smith, Annotation, *Common–Law Right of Action for Damages Sustained by Plaintiff in Consequence of Sale of Gift of Intoxicating Liquor or Habit–Forming Drug to Another,* 97 A.L.R.3d 528 (1980). Providers also were generally able to avoid liability because the consumption of alcohol, rather than its provision, was considered the sole proximate cause of injury to the patron and third persons. *Poole,* 732 S.W.2d at 309. Finally, even if the sale was a proximate cause of intoxication, injury was considered to be an unforeseeable result of the patron's intoxication. *Id.* The common law effectively precluded dram shops from incurring liability when their intoxicated patrons caused injury to third parties. *Id.; see also Mata v. Schoch,* 337 B.R. 135, 136 (Bankr.S.D.Tex.2005).

Relying on "modern analysis," in 1987 the Court in *Poole* discarded the "absolute rule of no liability" and imposed a duty on a dram shop not to serve alcoholic beverages to a person it knows or should know is intoxicated. *Poole,* 732 S.W.2d at 310. For the first time, the Court held that a provider of alcohol is negligent as a matter of law when he knowingly sells an alcoholic beverage to an intoxicated person, and the Court relaxed the standards for proving proximate cause and foreseeability. *Id.* at 313–14. The claimant was still required to prove that the dram shop's conduct was the proximate cause of his or her injury to recover. *Id.* at 313.

The Legislature acted to address the problem of providers' excessive provision of alcohol to patrons. A week after this Court issued *Poole,* the Dram Shop Act became effective and narrowed potential liability from *Poole* in several ways. *See id.* First, it made the Act the exclusive **\*685** means of pursuing a dram shop for damages for intoxication. TEX. ALCO. BEV.CODEE § 2.03.[3] Second, as an element of liability, the patron must be *"obviously* intoxicated," not just intoxicated, when the dram shop serves him alcohol. *Id.* § 2.02 (emphasis added).[4] Third, under Chapter 2, "the intoxication of the recipient must be a proximate cause of the damages." *Sewell,* 858 S.W.2d at 355 (citing TEX. ALCO. BEV.CODEE § 2.02(b)).

The common foundation of both CHIEF JUSTICE JEFFERSON'S and JUSTICE O'NEILL'S dissents is the contention that the Legislature abolished the element of proximate cause for a third party to recover from a dram shop

and replaced it with "a form of vicarious liability," as CHIEF JUSTICE JEFFERSON labels it, or "imputed liability," as JUSTICE O'NEILL terms it. The dissenters contend that once the dram shop provides alcohol to an obviously intoxicated patron, it becomes responsible for all subsequent injuries caused by the patron's intoxication. This assumption forms the basis of their conclusions that submitting a proportionate liability question to the jury does not change the dram shop's joint and several liability for all of the damages. For example, even if the patron consumed none of the alcohol purchased from the dram shop, the dissenters would hold the provider liable for all the injuries caused by the patron to third parties. The statutes do not support their approaches, which would nullify the effect of the expansive language in the proportionate responsibility statute.

The dissenters contend that the failure to read vicarious or imputed liability into the Act undermines the legislative purpose. On the contrary, the Act accomplishes the objective of deterring the sale of alcohol to obviously intoxicated persons in several ways. The Act provides a previously foreclosed remedy against sellers of alcohol. And unlike the prior common law, dram shops now owe a duty to patrons and injured third parties under specified circumstances and can be subject to civil liability for the damages they proximately cause. *Compare Poole,* 732 S.W.2d at 309 *with Sewell,* 858 S.W.2d at 355. The Legislature also deterred irresponsible conduct by providing that a dram shop's alcohol license is subject to revocation for violating the Act. TEX. ALCO. BEV.CODEE § 2.02(b). [5]

JUSTICE O'NEILL finds the imposition of imputed liability on providers in a single phrase in Section 2.03 of the Act, set out in italics: "The *liability of providers under this chapter for the actions of their customers, members, or guests who are or become intoxicated* is in lieu of common law or other statutory law warranties and duties of providers of alcoholic beverages." 237 S.W.3d at 704; TEX. ALCO. BEV.CODEE § 2.03. [6] Although JUSTICE O'NEILL states that Chapter 33 applies, she nevertheless concludes that "the dram shop is liable to injured third parties for both its own actions and for its patron's share of responsibility." 237 S.W.3d at 709. She borrows support for this position from section 7 of the Restatement of Torts: a party to whom liability is imputed and who is also independently liable "is responsible for the share of the verdict assigned to [the party whose liability is imputed] and is also responsible for the share of the verdict assigned **\*686** to its own negligence." *Id.* at 710; *see also* RESTATEMENT (THIRD) OF TORTS:

APPORTIONMENT OF LIABILITY § 7 cmt. j (2000) (stating that "[t]he employer is responsible for the share of the verdict assigned to the employee and is also responsible for the share of the verdict assigned to its own negligence"). The common law has been supplanted by statute and Section 7 is not the law on this issue in Texas. The Proportionate Responsibility Act and the Dram Shop Act govern this issue.

[4] JUSTICE O'NEILL insists that the Legislature intended the phrase "the liability of providers under this chapter for the actions of their customers," to mean that providers under this chapter *are liable* for the actions of their customers. 237 S.W.3d at 710; TEX. ALCO. BEV.CODEE § 2.03. [7] The statute can mean this only if words not in the text are inserted. Read as written, in context, Section 2.03 simply means that the Dram Shop Act provides the exclusive remedy against an alcohol provider for damages caused by an intoxicated patron at least 18 years of age—i.e., common law remedies are no longer available. *See Borneman v. Steak & Ale of Tex., Inc.,* 22 S.W.3d 411, 412 (Tex.2000). We do not read Section 2.03 to say that a provider of alcohol is responsible, without regard to fault, for one hundred percent of the damages caused by an intoxicated patron.

[5] [6] [7] CHIEF JUSTICE JEFFERSON seeks to support his position with an analogy to reasoning in vicarious liability theory for negligent entrustment cases. 237 S.W.3d at 697. Generally in Texas, the doctrine of vicarious liability, or respondeat superior, makes a principal liable for the conduct of his employee or agent. *See Baptist Mem. Hosp. Sys. v. Sampson,* 969 S.W.2d 945, 947 (Tex.1998). This liability is based on the principal's control or right to control the agent's actions undertaken to further the principal's objectives. *See Wingfoot v. Alvarado,* 111 S.W.3d 134, 136 (Tex.2003); PROSSER & KEETON ON THE LAW OF TORTS, § 69–70 (W. Page Keeton et al. eds., 5th ed.1984). Should an innocent third party suffer injury at the hands of the agent or employee, the theory is that the enterprise itself, not only the agent, should be held accountable. *See Wingfoot,* 111 S.W.3d at 146; KEETON ET AL., § 69; *see also* RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY § 13 (2000). Here, the patron is not the agent or employee of the dram shop, the provider has no control or right to control the patron, and the patron's actions causing the accident are not in furtherance of the provider's business. The analogy to negligent entrustment, a form of vicarious liability, suffers from similar deficiencies. As the late Dean Prosser explained, the basis for imposing liability on the owner of the thing entrusted to another is that ownership of the thing gives the

right of control over its use. KEETON ET AL., § 73; *see Schneider v. Esperanza Transmission Co.,* 744 S.W.2d 595, 596 (Tex.1987) (proving negligence by a theory of negligent entrustment requires establishment of ownership). Hence, an owner may have to answer in damages for negligently exercising her control by entrusting an item to a person who the owner knew or should have known would act in a reckless or incompetent manner. *Schneider,* 744 S.W.2d at 596. Because there is no ownership by the dram shop of the object used by a patron to cause the accident, the vicarious liability doctrine does not support—and the Dram Shop Act does not create—the indemnification scheme proposed by JUSTICE O'NEILL or the vicarious liability scheme that CHIEF **\*687** JUSTICE JEFFERSON would create. Their positions expand the theory of vicarious liability beyond its traditional boundaries.

### B. Chapter 33

Chapter 33 of the Texas Civil Practice and Remedies Code governs the apportionment of responsibility in cases within its scope. The 1995 version of the proportionate responsibility scheme applies to this case because the collision that injured the Duenezes occurred in July 1997. At that time, section 33.013 of the Civil Practice and Remedies Code provided, with certain exceptions, that a defendant was liable only for the percentage of responsibility found by the trier of fact, unless the percentage of responsibility exceeded fifty percent. TEX. CIV. PRAC. & REM.CODE § 33.013.[8] If a defendant's percentage of responsibility exceeded fifty percent, that defendant was jointly and severally liable for all of the claimant's recoverable damages. *Id.*

Section 33.003 provided that the factfinder was to compare a defendant's responsibility with the responsibility of the claimant, other defendants, and any responsible third party joined by a defendant. TEX. CIV. PRAC. & REM.CODE § 33.003.[9] The statute required the trier of fact to apportion responsibility

> with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these....
> *Id.* § 33.003(a).

Chapter 33 applied to a broad range of cases, including "any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought" and actions brought under the Texas Deceptive Trade Practices–Consumer Protection Act. *Id.* §§ 33.002(a),[10] (h).[11] Section 33.002(c) expressly excluded from its coverage actions to collect workers' compensation benefits, actions against an employer for exemplary damages arising out of the death of an employee, and claims for exemplary damages included in an action to which this chapter otherwise applies.[12] **\*688** Section 33.002(b) excluded application of Chapter 33 to actions for damages caused by a list of intentional criminal acts committed in concert with another person by imposing joint and several liability.[13] Chapter 33 does not specifically exclude the Dram Shop Act.

### C. *Smith v. Sewell*

This Court addressed the applicability of Chapter 33 to the Dram Shop Act in *Smith v. Sewell,* 858 S.W.2d 350 (Tex.1993). When *Sewell* was decided, Chapter 33 provided that it applied "[i]n an action to recover damages for negligence ... or an action for products liability grounded in negligence." TEX. CIV. PRAC. & REM.CODE § 33.001(a).[14] The Court held that the essential elements of a dram-shop action replicated those of a negligence claim, hence Chapter 33 applied to the Act. *Sewell,* 858 S.W.2d at 355–56.

In *Sewell,* the plaintiff became intoxicated at a bar. *Id.* at 351. On his way home, he lost control of his car and was severely injured in a one-car accident. He sued the bar. This Court explicitly recognized that a cause of action against a provider of alcohol is a direct action for the wrongful conduct of the provider: "[L]iability under [the Dram Shop Act] is premised on the conduct of the provider of the alcoholic beverages—not the conduct of the recipient or a third party." *Id.* at 355. The Court reasoned this is true "regardless of whether the intoxicated individual injures himself or a third party." *Id.* The Court then examined the comparative responsibility scheme and its exclusions and concluded that a cause of action against a provider of alcohol was not excluded from the Comparative Responsibility Act, and therefore, the comparative responsibility scheme applied. *Id.* at 356. The Court identified the Legislature's intent, expressed under Chapter 33, as "requir[ing] the trier of fact to determine the

percentage of responsibility attributable to *each* of the parties involved in causing the injury." *Id.* (emphasis added). Under the combined effect of both statutes, an intoxicated person "will be entitled to recover damages only if his percentage of responsibility is found to be less than or equal to 50 percent," and any recovery must be reduced by the percentage of the intoxicated individual's responsibility. *Id.* The Court recognized that this interpretation of the statutes ensured a consistent and equitable approach to dram-shop liability, whether the case involved first or third person liability. *Id.*

In this case, the court of appeals held that *Sewell* did not apply to third-party Dram Shop claims like this one. 69 S.W.3d at 805. The court interpreted *Sewell* as limiting an intoxicated patron's recovery against a provider according to the intoxicated person's percentage of responsibility but not imposing similar limitations when a third party seeks recovery against a provider for damages caused by an intoxicated patron's actions. *Id.* Instead, the court of appeals concluded that a provider is vicariously liable for the damages caused by an intoxicated employee or patron in third party actions in which there are no allegations of negligence of the third party. **\*689** *Id.* The court reasoned that this interpretation is consistent with the Dram Shop Act because the Act imposes liability on the provider for the actions of the intoxicated person, "just as an employer is liable for the damages caused by an employee in the course and scope of the employment." *Id.* at 806 (citations omitted). Thus, the court concluded, "a division of liability would be meaningless: the vicariously liable party is liable for the other party's actions, as though those actions were its own." *Id.*

This is contrary to our opinion in *Sewell,* and rebutted by the deterrent effects of the Act, discussed above. This Court has interpreted the Dram Shop Act to create liability based "on the conduct of the provider of the alcoholic beverages —not the conduct of the recipient or a third party." *Sewell,* 858 S.W.2d at 355. The conduct for which the provider may be held liable is the same conduct "whether the intoxicated individual injures himself or a third party." *Id.* Thus, the premise of the court of appeals' vicarious liability holding —that the provider's liability stems from the conduct of the intoxicated individual instead of the provider's own conduct—runs contrary to both the Dram Shop Act and our interpretation of the Act in *Sewell. Compare Sewell,* 858 S.W.2d at 355, *with* 69 S.W.3d at 806.

The dissents likewise recognize significant problems with their approaches in light of this precedent. They approach the problem of *Sewell* differently. CHIEF JUSTICE JEFFERSON argues that *Sewell* was wrongly decided but nevertheless would keep the holding intact as to first-party claims and create a different rule for third-party claims. 237 S.W.3d at 701. Similarly, JUSTICE O'NEILL would limit *Sewell's* holding to first-party claims thereby distinguishing it from the instant case. 237 S.W.3d at 706. Nothing in the statute supports a different rule in this regard for first versus thirdparty claims. In fact, the statute anticipates the existence of both types of claims by describing the "person bringing the suit" broadly and referring to the danger created by the intoxicated person as impacting "himself and others." TEX. ALCO. BEV.CODEE § 2.02. [15] Contrary to CHIEF JUSTICE JEFFERSON'S dissent, nothing in the Dram Shop Act prevents a provider from "lessen[ing] or escap[ing] liability altogether" if a jury determined that the intoxicated patron was completely responsible for the damages and injuries suffered by a third-party. *See* 237 S.W.3d at 701– 02. Refusing to apply *Sewell's* rule of law to cases in which a third party is injured as a result of an intoxicated person's actions is contrary to the language of the Dram Shop Act, to the premise of *Sewell,* and to the purpose of the Dram Shop Act: the provider's liability stems from its own conduct. *See Borneman,* 22 S.W.3d at 413 (correctly holding that a jury question that was inconsistent with the language of the Dram Shop Act for establishing liability was erroneous).

### D. Legislative Intent

**[8]** Our review is confined to identifying the expressed legislative intent and applying it. Even if this Court were to agree with the court of appeals that holding a provider vicariously liable for a patron's intoxication may be a legitimate public policy, we would still be constrained to faithfully apply the Legislature's statutory proportionate responsibility scheme. Imposing vicarious liability in dram-shop cases conflicts with the Proportionate Responsibility Act. The court of appeals suggested that the Legislature did not intend for an innocent third party to bear the risk **\*690** of an intoxicated patron's insolvency. But, by enacting Chapter 33, the Legislature made the policy decision that an innocent third party, suing the intoxicated patron and the dram shop, could be burdened with the risk of a joint tortfeasor's insolvency. A tortfeasor who was found less than fifty-one percent responsible does not have to pay the entire amount of damages, only his or her proportionate share. TEX. CIV. PRAC. & REM.CODE §§ 33.013(a), (b)(1). [16]

**[9]** We recognize that there may be a greater incentive to avoid conduct that leads to responsibility for higher damages than to avoid conduct that leads to responsibility for lower damages. Accordingly, a statute that makes providers liable for all the damages caused by an intoxicated patron could be a greater deterrent to serving that patron. That may influence the drafting of a statute, but it says little about how to interpret the words of the Dram Shop and Proportionate Responsibility Acts. The statutes only hold providers responsible for their own conduct causing injury. This is consistent with a fundamental tenet of tort law that an entity's liability arises from its own injury-causing conduct. Under the dissenters' positions, the provider would be responsible for all the damages caused by an inebriated patron even if he never drank any of the product purchased from the provider. The same would occur if an inebriated patron drank a bit of the dram shop's alcohol but evidence established that it did not contribute any further to the deterioration of the patron's ability to drive safely. We recognize some of the alternatives the Legislature considered as it drafted the statutes; however, we do not pick and choose among policy options on which the Legislature has spoken. "Our role ... is not to second-guess the policy choices that inform our statutes or to weigh the effectiveness of their results; rather, our task is to interpret those statutes in a manner that effectuates the Legislature's intent." *McIntyre v. Ramirez,* 109 S.W.3d 741, 748 (Tex.2003). Upon a finding of liability, the statutes make dram shops responsible for the proportionate share of the injuries their conduct caused.

The broad coverage of the proportionate responsibility statute to tort claims is persuasive. The Chapter 33 proportionate responsibility scheme includes exceptions for certain torts, but claims against providers of alcohol are not among those exceptions. *See, e.g.,* TEX. CIV. PRAC. & REM.CODE §§ 33.002(b), [17] (c). [18] For example, the Legislature carved out exceptions for a host of criminal acts, declaring that there should be joint and several liability instead of proportionate responsibility, but only if there was specific intent to do harm to others and the defendant acted in concert with another. *Id.* § 33.002. [19] The list of crimes is numerous and broad in scope, ranging from capital murder to fraudulent destruction of a writing, and also includes theft when "the punishment level ... is a felony of the third degree or higher." TEX. CIV. PRAC. & REM. CODE § 33.002(b) (13). [20] Section 33.002(c) expressly **\*691** excluded from its coverage actions to collect workers' compensation benefits, actions against an employer for exemplary damages arising out of the death of an employee, and claims for exemplary damages included in an action to which this chapter otherwise applies. [21] When the Legislature has chosen to impose joint and several liability rather than proportionate liability, it has clearly said so.

The Legislature created a strict liability cause of action against a person who manufactures methamphetamine for injuries, damages, or death arising from the manufacture or exposure to the manufacturing process of that drug. TEX. CIV. PRAC. & REM.CODE §§ 99.002–.003. The Legislature declared that a person who manufactures methamphetamine and is found liable for any amount of damages arising from the manufacture is jointly liable with any other defendant for the entire amount of damages arising from the manufacture. *Id.* § 99.004. In both the statute that created the cause of action against such manufacturers and in amendments to the Proportionate Responsibility Act, the Legislature specifically said that the proportionate responsibility scheme "does not apply in an action for damages arising from the manufacture of methamphetamine." *Id.* § 99.005; *see also id.* § 33.002(c) (3). The Legislature did not carve out an exclusion for alcohol providers in either the Proportionate Responsibility Act or the Dram Shop Act.

Both dissents struggle to conclude that an injured third party may recover his damages entirely from the alcohol provider under the Dram Shop Act. CHIEF JUSTICE JEFFERSON argues that the Act creates "a form of vicarious liability," while JUSTICE O'NEILL allows a jury to apportion liability but ultimately holds the provider liable for the full amount of damages, regardless of the jury's determination. The stated public policy behind the Alcoholic Beverage Code, including the Dram Shop Act, is "the protection of the welfare, health, peace, temperance, and safety of the people of the state." TEX. ALCO. BEV.CODEE § 1.03. More specifically, the Dram Shop Act codifies the exclusive action against an alcohol provider for injuries or damages resulting from the intoxication of a patron. *Id.* § 2.02. The legislative intent to protect the public and provide a potential remedy against an alcohol provider does not equate to a guarantee of recovery against a provider by an injured party. The Act simply supplants in a single codified action all prior common law theories that previously could have been employed by the injured party (either a third party or the intoxicated patron himself) against a provider. *See id.* § 2.03. While the dissents' positions might express sound public policy, we are constrained to conclude that neither correctly applies the Legislature's statutory proportionate responsibility scheme.

Both read more into the Dram Shop Act than the words chosen by the Legislature can bear.

At the time of the Duenezes' injuries, the proportionate responsibility scheme imposed joint and several liability on those who caused toxic tort injuries and those who released hazardous substances into the environment if their responsibility was equal to or greater than fifty percent. TEX. CIV. PRAC. & REM.CODE § 33.013(c). [22] In such cases, liability was not limited by proportionate responsibility. In 2003, the Legislature revisited that exclusion and repealed it in its entirety. [23] Now, defendants **\*692** found liable for these tortious acts are subject to the general proportionate responsibility scheme. The Legislature seemed intent on creating a general scheme of proportionate responsibility for tort claims, subject to specific statutory exclusions.

 **[10]** Finally, our controlling interpretation of that statutory scheme has remained in place since our 1993 decision in *Smith v. Sewell.* 858 S.W.2d at 356 (holding that "[a]pplication of the principles of comparative responsibility to causes of action brought under [the Dram Shop Act] establishes a consistent and equitable approach to the issue of 'dramshop liability' generally, and first party 'dramshop liability' specifically"). In the thirteen years since *Sewell* was decided, the Legislature has amended the Dram Shop Act and has extensively amended the proportionate responsibility statutes, but it has never excluded a cause of action against a provider of alcohol from comparative or proportionate responsibility. We presume that the Legislature knew of our holding in *Sewell* and that by subsequently re-enacting the Proportionate Responsibility Act and the Dram Shop Act, it accepted this Court's construction of those statutes. " 'The Legislature must be regarded as intending statutes, when repeatedly reenacted, as in the case here, to be given that interpretation which has been settled by the courts.' " *Wich v. Fleming,* 652 S.W.2d 353, 355 (Tex.1983) (quoting *Marmon v. Mustang Aviation, Inc.,* 430 S.W.2d 182, 187 (Tex.1968)); *Coastal Indus. Water Auth. v. Trinity Portland Cement Div., Gen. Portland Cement Co.,* 563 S.W.2d 916, 918 (Tex.1978).

Given the many instances in which the Legislature has (1) expressly said that certain causes of action are excluded from the Proportionate Responsibility Act, which would otherwise limit liability commensurate with proportionate responsibility, and (2) has expressly tailored special joint and several liability provisions for some causes of action, the phrase in Section 2.03 cannot reasonably be read to require

vicarious liability and joint and several liability in lieu of proportionate liability for alcohol providers.

The dissenters suggest that the Court's opinion exonerates dram shops from liability. They draw a stark distinction between excusing a dram shop from liability for its conduct that violates the Act, which they assert to be the Court's opinion, and making the provider liable for all the injuries caused by an inebriated patron, which is the dissenters' position. For several reasons, our interpretation does not excuse dram shops from liability for their conduct. First, it is simply inaccurate to describe the Court's holding as allowing dram shops to escape liability. The central issue in this case is the apportionment of damages among liable parties. Dram shops are liable if they provide alcoholic beverages to an individual that is obviously intoxicated to the extent that he presents a clear danger to himself and others, and the intoxication of the patron was a proximate cause of the injuries. TEX. ALCO. BEV.CODEE § 2.02(b). These requirements were promulgated by the passage of the Act in 1987. In this case, we hold that dram shops are responsible for the proportion of damages they cause or contribute to cause, as set forth in the Proportionate Responsibility Act. TEX. CIV. PRAC. & REM.CODE § 33.003. [24] Second, we follow the Legislature's guidance in the language of the statute, **\*693** as explained above. Third, it is not true that juries will always assign most of the responsibility for injury, as between a provider and an inebriated patron, to the patron. Juries have found the dram shop equally or more responsible than the patron for injuries proximately caused by the intoxication of the patron. *See, e.g., I–Gotcha, Inc. v. McInnis,* 903 S.W.2d 829, 837 (Tex.App.Fort Worth 1995, writ denied) (jury found that the dram shop proximately caused fifty-one percent of the injuries); *Venetoulias v. O'Brien,* 909 S.W.2d 236, 239 (Tex.App.-Houston [14th Dist.] 1995, writ dism'd by agr.) (trial court found that the patron proximately caused thirty-three percent of the injuries and the dram shop thirty-three percent). Unlike CHIEF JUSTICE JEFFERSON's position, which would take the question of apportioning responsibility away from the jury, we leave this determination to the fact-finder imbued with "constitutional authority to weigh conflicting evidence." *See Volkswagen of Am., Inc. v. Ramirez,* 159 S.W.3d 897, 913–14 (Tex.2004) (Jefferson, C.J., dissenting).

### III. Severance

**[11]** The trial court severed F.F.P.'s cross-claim against Ruiz and then tried the case with F.F.P. as the only defendant. The court of appeals affirmed the trial court's severance order, concluding that because F.F.P. was vicariously liable for Ruiz's conduct, F.F.P.'s right of recovery, if any, was through an indemnification action only. 69 S.W.3d at 807. The court of appeals held that any indemnity claim F.F.P. might have against Ruiz would not accrue until F.F.P.'s liability to the Duenezes' was "fixed and certain." *Id.* at 807–08. By this reasoning, F.F.P.'s claim for indemnification against Ruiz would not become actionable until an adverse judgment was taken. *Id.* The court rejected F.F.P.'s request to include Ruiz as a responsible third party under Chapter 33, reasoning that F.F.P.'s vicarious liability puts F.F.P. in the same position as Ruiz would have been. *Id.* at 808. Because Ruiz's actions are imputed to F.F.P., the court continued, Ruiz is not a responsible third party who may be included in a proportionate responsibility question. *Id.*

**[12]** **[13]** **[14]** Rule 41 of the Texas Rules of Civil Procedure provides that "[a]ny claim against a party may be severed and proceeded with separately." We will not reverse a trial court's order severing a claim unless the trial court abused its discretion. *Guar. Fed. Sav. Bank v. Horseshoe Op. Co.,* 793 S.W.2d 652, 658 (Tex.1990).

> A claim is properly severable if (1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues.

*Id.* We have explained that avoiding prejudice, doing justice, and increasing convenience are the controlling reasons to allow a severance. *See id.*

**[15]** As already explained, the Dram Shop Act does not make a provider vicariously liable for the conduct of an intoxicated patron. F.F.P.'s liability arises from the actions of its employees and agents—not through the actions of Ruiz. *See Sewell,* 858 S.W.2d at 355. Thus, F.F.P.'s claim against Ruiz is not one for indemnification that could be properly severed; it is one of contribution for Ruiz's proportionate share of the damages for which he is responsible. F.F.P.'s claim against Ruiz is "interwoven with the remaining action": it involves the same facts and issues to be litigated in the

Duenezes' action against F.F.P. In fact, to succeed in a claim against F.F.P., the Duenezes had to prove that Ruiz was obviously intoxicated and that his conduct proximately caused damages—the same facts and issues that **\*694** would be litigated in a separate suit by F.F.P. against Ruiz. The trial court abused its discretion in severing F.F.P.'s claim against Ruiz.

**[16]** Chapter 33 requires "[t]he trier of fact, as to each cause of action asserted, [to] determine the percentage of responsibility ... for [each claimant, defendant, settling person, and responsible third party who has been joined under Section 33.004] with respect to each person's causing or contributing cause in any way the harm for which recovery of damages is sought...." TEX. CIV. PRAC. & REM.CODE § 33.003. This statutory mandate is not discretionary; failing to correctly apply the law is an abuse of discretion. *In re Kuntz,* 124 S.W.3d 179, 181 (Tex.2003). Therefore, F.F.P. was entitled to a charge that included a question to allow the trier of fact in a single trial to determine Ruiz's proportionate share of responsibility. The trial court's severance constituted reversible error.

## IV. Conclusion

The trial court abused its discretion by severing F.F.P.'s claim against Ruiz, proceeding to trial with F.F.P. as the only defendant, and refusing to submit jury questions for determination of Ruiz's negligence and proportion of responsibility. We reverse the court of appeals judgment and remand the case to the trial court for a new trial.

Chief Justice JEFFERSON filed a dissenting opinion.

Justice O'NEILL filed a dissenting opinion.

Chief Justice JEFFERSON, dissenting.

If a bar sells liquor to a person so "obviously intoxicated" that he is "a clear danger to himself and others," to what extent does the sale "proximately cause" the harm that person inflicts when he gets behind the wheel? The Legislature has answered that it does not matter. If the bar sells to a drunk, it must pay damages when the drunk's intoxication (not the provider's sale) causes the sort of trauma at the heart of this case. The Legislature plainly believes that deterring such a sale is sound public policy. By imposing potentially

crippling financial penalties on those who ignore its dictates, the statute has the salutary effect of enlisting providers in the state's campaign against drunk driving. Under the Court's construction, however, the bar may *avoid* liability precisely *because* its patron was so "obviously intoxicated" and such a "clear danger" that the sale could not have proximately caused carnage on a Texas road. The dram shop thus has a perverse incentive to establish at trial that its customer was in such a drunken state that selling him "one for the road" could not have contributed to the harm his intoxication later caused. I cannot agree that the Legislature intended as a defense to liability proof that the dram shop completed a sale that the statute quite sensibly forbids.

The Court relies heavily on our opinion in *Sewell,* but as I demonstrate below, the Court's reliance on that case only perpetuates our prior error in interpreting the Dram Shop Act. *See Smith v. Sewell,* 858 S.W.2d 350, 356 (Tex.1993). I would hold, contrary to *Sewell,* that the Legislature has imposed a form of vicarious liability on a dram shop for the acts of its intoxicated customer. Because the shop's conduct is statutorily irrelevant in relation to the plaintiff's injury, there is no legitimate basis for comparing its responsibility with that of the intoxicated person.

## I

### Vicarious Liability and the Dram Shop Act

The question here is whether and, if so, how chapter 33's proportionate responsibility scheme applies to claims based on the **\*695** Dram Shop Act. Our separate writings in this case demonstrate that the statutes are not easily harmonized. *See also Fid. & Guar. Ins. Underwriters Inc. v. Wells Fargo Bank,* No. H–04–2833, 2006 U.S. Dist. LEXIS 23545, at \*17, 2006 WL 870683, at \*5 (S.D.Tex. Mar. 31, 2006) (noting that "courts and commentators alike have recognized the difficulty in reconciling the language of the Proportionate Responsibility Statute with certain causes of actions, including vicarious and/or derivative liability actions"). This is not the first time we have struggled to reconcile chapter 33 with another statute's terms. *See, e.g., Southwest Bank v. Info. Support Concepts, Inc.,* 149 S.W.3d 104, 111 (Tex.2004) (concluding that, even assuming a UCC conversion claim is a tort, "the Legislature did not intend to upset the UCC's carefully balanced liability provisions by applying Chapter 33 to a UCC-based conversion claim" and "[t]o hold otherwise would ignore the UCC itself and thwart

its underlying purpose"). Nor have we been the only court to recognize exceptions to the statute's apportionment scheme. *See, e.g., Fid. & Guar. Ins. Underwriters,* 2006 U.S. Dist. LEXIS 23545, at \*18, 2006 WL 870683, at \*5 ("Although the language of the statute itself indicates a clear legislative preference for apportionment of responsibility in all tort actions, it is equally clear that an apportionment scheme is not proper in certain cases."); *Rosell v. Cent. W. Motor Stages, Inc.,* 89 S.W.3d 643, 656–57 (Tex.App.-Dallas 2002, pet. denied).

The Court and JUSTICE O'NEILL would submit both the provider and the intoxicated person in the apportionment question, the Court employing it to reduce the dram shop's liability and JUSTICE O'NEILL to facilitate the shop's contribution action against the intoxicated tortfeasor. While I concede that *Sewell* supports a comparative submission of the provider and the intoxicated person, such a submission is inconsistent both with the provider's essentially vicarious liability and chapter 33's mandate to apportion liability only among those causing the harm at issue. The Court holds that dram shop liability cannot be vicarious, reiterating our holding in *Sewell* that such liability is based on the provider's own conduct. JUSTICE O'NEILL writes that liability is both direct and vicarious, as it includes the provider's wrongful sale and imputes to the provider the harm caused by the drunk's intoxication. I disagree with those interpretations. To give effect to each statute, we must acknowledge that the Dram Shop Act imposes a form of vicarious liability.

Both the Dram Shop Act and chapter 33 support such an interpretation. While liability under the Dram Shop Act is premised on the provider's sale, the requisite causal link focuses solely on the drunk's actions. Once alcohol is provided to a person so "obviously intoxicated to the extent that he presented a clear danger to himself and others," the provider's role is complete. *See* TEX. ALCO. BEV.CODEE § 2.02(b)(1). From that point forward, any harm caused by the intoxicated person is imputed to the provider; indeed, for purposes of the Dram Shop Act, the provider virtually becomes the drunk. Hence, the only causation required under the statute focuses on the intoxicated person's, not the dram shop's, actions. *Id.* § (b)(2) (requiring proof that "the *intoxication* of the recipient of the alcoholic beverage was a proximate cause of the damages suffered") (emphasis added).

F.F.P. concedes that, under the Dram Shop Act, the provider's actions need not be a cause-infact of the harm.[1] Earlier **\*696** versions of the act included such an element, but

the Legislature deleted it before the statute was enacted. *Compare* Tex.C.S.H.B. 1652, 70th Leg., R.S. (1987) (Dram Shop Act claim requires proof that "the provider was the last known contributor to the intoxication of the recipient; and that the recipient consumed no alcoholic beverage subsequent to that served by the last contributor") *with* TEX. ALCO. BEV.CODEE § 2.02(b) (containing no such requirement). Instead, unlike other states,[2] the Texas statute imposes liability even absent causation relating to the provision of alcohol.[3] If the dram shop's conduct need not be a substantial factor in bringing about the injury, then it cannot be said to have caused or contributed to the accident. *See Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex.1995).

That Texas omitted such a requirement is significant. Chapter 33 requires apportionment among claimants, defendants, settling persons, and responsible third parties, but not all such persons are submitted in the apportionment question. *See* TEX. CIV. PRAC. & REM.CODE § 33.003. Instead, chapter 33 imposes an important limitation on the allocation of responsibility: *Only those persons who "caus[ed] or contribut[ed] to cause in any way the harm for which recovery of damages is sought"* must be included in apportioning responsibility for that harm.[4] *Id.* §§ 33.003, **\*697** 33.011(4) (emphasis added); William D. Underwood & Michael D. Morrison, *Apportioning Responsibility in Cases Involving Claims of Vicarious, Derivative, or Statutory Liability for Harm Directly Caused by Another,* 55 BAYLOR L.REV. 617, 638 (2003) (hereinafter "*Apportioning Responsibility*") ("[U]nder section 33.003, the jury apportions responsibility among only those persons whose *conduct caused or contributed to cause the plaintiff's injury.*") (footnote omitted). This restriction is "especially significant" in cases involving claims against persons whose liability is vicarious:

A person whose liability was purely vicarious had not personally engaged in "conduct or activity" that had "caused or contributed to cause" the harm. Liability was based instead entirely on the relationship between the person whose tortious conduct proximately caused the harm and the person who was vicariously responsible. Thus, rather than allocating responsibility among persons directly liable and persons vicariously liable, whatever responsibility existed for persons directly liable was simply passed on to persons vicariously liable. The vicariously liable defendant essentially stepped into the shoes of the

tortfeasor who was directly responsible and assumed that person's responsibility to the claimant.

*Id.* at 628–29 (footnote omitted). Because the inquiry involves the harm for which recovery of damages is sought, "it is obvious that it concerns only the primary conduct of the active participants in the event, accident, or physical episode giving rise to the injuries complained of by the claimant, and the causational role of that primary conduct in the episode." Carl David Adams, *The "Tort" of Civil Conspiracy in Texas,* 54 BAYLOR L.REV. 305, 315 (2002); Gregory J. Lensing, *Proportionate Responsibility and Contribution Before and After the Tort Reform of 2003,* 35 TEX. TECH L.REV. 1125, 1184–86 (2004) (noting that "[i]t is problematic to assign the jury the task of apportioning responsibility between the intoxicated person and the dram shop when the dram shop's statutory liability is not necessarily based on true responsibility for the accident, in the sense of causing the accident, at all").

Courts applying chapter 33's apportionment scheme in negligent entrustment cases—a variant of vicarious liability—have used similar reasoning to conclude that an entrustor should not be included in the apportionment question. In *Rosell v. Central West Motor Stages, Inc.,* the Rosells, plaintiffs in a wrongful death and survival action, contended that the trial court erred by refusing to submit Central West, employer of the allegedly negligent bus-driver and owner of the vehicle that struck and killed their son, in the jury's apportionment question. The court of appeals disagreed:

The Rosells contend that Central West should be included because it was a producing or contributing cause of the injuries to Chad. Although negligent entrustment and negligent hiring are considered independent acts of negligence, these causes are not actionable unless a third party commits a tort. In that respect, these causes are similar to the respondeat superior theory of recovery where, unless the employee commits a tort in the scope of employment, the employer has no responsibility. In reviewing the application of section 33.003 **\*698** to responsibility, we observe that, while the statute on its face requires all defendants to be included in the apportionment question, it would not be proper for an employer to be included along with the driver if its only responsibility was that of respondeat superior. Section 33.003 has not been used to require both a driver and employer to be submitted in the apportionment question in that situation.

Similarly, the causes of action for negligent entrustment and hiring are a means to make a defendant liable for the negligence of another. Once negligent hiring or

entrustment is established, the owner/employer is liable for the acts of the driver, and the degree of negligence of the owner/employer is of no consequence. Thus, because Rieve's negligence would be passed on, it was proper to apportion fault among those directly involved in the accident.

*Rosell,* 89 S.W.3d at 656–57 (citations and footnote omitted).

Even before chapter 33's 1995 amendments, courts engaged in similar analysis to conclude that the entrustor should not be included in an apportionment question. In *Loom Craft Carpet Mills, Inc. v. Gorrell,* the court of appeals noted that:

> Negligent entrustment liability is derivative in nature. While entrusting is a separate act of negligence, and in that sense not imputed, it is still derivative in that one may be extremely negligent in entrusting and yet have no liability until the driver causes an injury. If the owner is negligent, his liability for the acts of the driver is established, and the degree of negligence of the owner would be of no consequence. When the driver's wrong is established, then by negligent entrustment, liability for such wrong is passed on to the owner. We believe the better rule is to apportion fault only among those directly involved in the accident, and to hold the entrustor liable for the percentage of fault apportioned to the driver.

*Loom Craft,* 823 S.W.2d 431, 432 & n. 7 (Tex.App.-Texarkana 1992, no pet.) (declining to follow cases from other jurisdictions in which fault was apportioned to the entrustor); *see also Wyndham Hotel Co. v. Self,* 893 S.W.2d 630, 640 (Tex.App.-Corpus Christi 1994, writ denied); *Rodgers v. McFarland,* 402 S.W.2d 208, 210 (Tex.App.-El Paso 1966, writ ref'd n.r.e.) (noting that, in a negligent entrustment case, "[t]he proximate cause of the accident or the occurrence is the negligence of the driver and not that of the owner").

More recently, the Fort Worth Court of Appeals grappled with the proper submission of a negligent entrustment claim. *Bedford v. Moore,* 166 S.W.3d 454 (Tex.App.-Fort Worth

2005, no pet.). Based in part on this Court's now-withdrawn opinion in this case, the court concluded that the entrustor should be submitted in the apportionment question. The court then held, however, that failure to submit the entrustor was not reversible error:

> There were only two people involved in the accident. Therefore, the submission of the acts of "other parties" whose actions preceded the actions of [the driver] at the time of the accident could only have contributed to her actions at the accident scene, that is, to her forty percent negligence. In other words, because there were only two parties involved in the incident, the jury has decided how those actions at the time of the accident should be apportioned as far as responsibility is concerned. What led up to those actions at the time of the accident does not change those actions at the accident scene but can only be subparts of those respective responsibilities. [The entrustors] did not cause [the plaintiff] to cross the highway **\*699** or [the driver] to strike that truck. Therefore ... we conclude that it was harmless error to omit them from those questions.

*Bedford,* 166 S.W.3d at 464.[5] This passage captures the proper submission in a vicarious liability case: If, in fact, the entrustor's share of responsibility is merely a "subpart" of the entrustee's share, then the entrustor should not be submitted separately. Only the entrustee should be submitted, and his or her negligence would then be imputed to the entrustor as a matter of law.

Under similar reasoning, even after chapter 33's 1995 amendments, the provider should not be included in the apportionment question. The Dram Shop Act is "intended to deter providers of alcoholic beverages from serving alcoholic beverages to obviously intoxicated individuals who may potentially inflict serious injury on themselves and on innocent members of the general public." *Sewell,* 858 S.W.2d at 356. The Court's holding runs counter to that policy. As commentators recognize:

If a person whose conduct creates a foreseeable risk of misconduct by another (in other words, a person whose liability is derivative) can largely escape responsibility simply because the very event which made his own conduct wrongful in the first place actually occurs, then the incentive to take precautions against the risk is substantially reduced. This concern is especially great when the foreseeable event is a crime of violence given the likelihood that a jury, when asked to apportion responsibility between a person who commits a crime of violence and a person whose conduct simply involved facilitating that crime through negligence, might be expected to apportion most of the responsibility to the person who actually committed the crime. Allocating responsibility in cases of vicarious or derivative liability would not only be bad policy, but has not traditionally been how Texas courts have interpreted and applied the allocation of responsibility provisions in Chapter 33. Moreover, nothing in the language or the legislative history of the 1995 tort reform revisions to the allocation of responsibility provisions of Chapter 33 either requires or justifies departure from the traditional rule that juries are not asked to allocate responsibility between persons who are directly liable and persons whose liability is either derivative or vicarious.

*Apportioning Responsibility,* 55 BAYLOR L.REV. at 624–25 (footnotes omitted). Thus, "given that causation is imputed to the provider in an action under the [Dram Shop] Act, section 33.003 neither contemplates or permits the apportionment of responsibility between the intoxicated patron and the provider in an action brought by an injured third party." *Id.* at 642. This approach is supported by the Restatement, which provides that "[a] person whose liability is imputed based on the tortious acts of another is liable for the entire share of comparative responsibility assigned to the other, regardless of whether joint and several liability or several liability is

the governing rule for independent tortfeasors who cause an indivisible injury." RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITYYY § 13 (2000).

The Court concludes that it is improper to analogize dram shop claims to other vicarious liability situations, because those situations typically rely on a right of control **\*700** or an employer/employee relationship, which may be absent in a drop shop situation. In this case, however, the Legislature chose to impose vicarious liability for Dram Shop Act claims and consciously opted to omit control as a prerequisite. That the justification for doing so may not comport with the rationale for common-law vicarious liability is beside the point.

The Court reasons that, because the Dram Shop Act was not among the explicit exceptions to proportionate liability set forth in chapter 33, it must be included. This is not necessarily so. As we recognized in *Southwest Bank,* if another statute enacts a comparative responsibility scheme, chapter 33 will not govern a claim brought under the other statute, notwithstanding that the other statute is not among chapter 33's enumerated exceptions. *See Southwest Bank,* 149 S.W.3d at 111. Nor did the Legislature exclude negligent entrustment or respondeat superior claims from the reach of chapter 33. Applying the Court's logic, by omitting those actions the Legislature intended that employers or entrustors be submitted in an apportionment question even though their liability is purely vicarious. More likely, the Legislature never envisioned that a court would include in the apportionment question persons whose only liability was vicarious.

The Court's decision to include the provider in the apportionment question would first necessitate an inquiry otherwise unnecessary under the Dram Shop Act: whether the provider's conduct caused or contributed to cause the plaintiff's injuries. *Apportioning Responsibility,* 55 BAYLOR L.REV. at 638.

> If the jury's answer was no, then under the express language of section 33.003, the jury could not consider the provider in apportioning responsibility. Since no responsibility could be apportioned to the provider, one possible result would be that the provider would not be liable for any of the plaintiff's damages. This result would have the effect of rewriting the Dram Shop Act to read into the Act

a causation requirement that simply is not there. *The provider would always escape all responsibility unless the jury found a causal connection between the provider's conduct and the plaintiff's injury. That result obviously would be wrong.*

*Id.* (footnote omitted) (emphasis added). The Legislature meant to make providers liable *whether or not* their conduct played a causative role in subsequent harm. The Court's holding eviscerates that policy choice and requires that the Duenezes prove not only that Ruiz consumed F.F.P.'s alcohol, but also that his consumption so aggravated the danger he posed pre-sale that the sale (and not just his prior intoxicated condition) "caused" the ultimate harm. But the statute does not require that the patron consume the alcohol, that the sale aggravate the patron's prior intoxication, or that the provider play any role in causing or contributing to the accident. Ironically, under the Court's interpretation, the provider now has an incentive to establish that its patron was so drunk at the time of sale that its conduct could not, as a matter of law, have contributed to the harm the patron ultimately caused. As a result, the very instrument that the Legislature employed to deter drunk driving (liability for serving a drunk) becomes a means to escape responsibility entirely.

Joining the intoxicated person as a responsible third party does not change this result. *See* TEX. CIV. PRAC. & REM.CODE § 33.011. As commentators have noted:

> By adding the [responsible third party language] to section 33.003, the Texas legislature clearly intended to change existing law regarding the apportionment **\*701** of responsibility among tortfeasors with direct liability. But there is absolutely no indication in either the legislative history or the text of the amended apportionment of responsibility provisions of Chapter 33 that the legislature intended to now permit apportionment of responsibility among directly liable tortfeasors and those whose liability was only derivative or vicarious.

*Apportioning Responsibility,* 55 BAYLOR L.REV. at 631. Whatever percentage of responsibility is attributed to the drunk should be imputed to the provider, who may then seek indemnity from the intoxicated person. *Cf. Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, 819–20 (Tex.1984).

## II

### *Sewell* **and Third–Party Actions**

If I were writing on a clean slate, my analysis could end here. But in *Smith v. Sewell,* we determined that "[chapter 33] is applicable to Chapter 2 causes of action" and held that "an intoxicated person suing a provider of alcoholic beverages for his own injuries under Chapter 2 will be entitled to recover damages only if his percentage of responsibility is found to be less than or equal to 50 percent." *Sewell,* 858 S.W.2d at 356. Although our holding was not limited to first-party claims *(i.e.* a drunk suing a dram shop), our reasoning arguably supports such a limitation:

> Chapter 2 is intended to deter providers of alcoholic beverages from serving alcoholic beverages to obviously intoxicated individuals who may potentially inflict serious injury on themselves and on innocent members of the general public. But when it is the intoxicated individual who is injured due to his own intoxication, it is particularly appropriate that his conduct in contributing to his injury should be considered in assessing the amount of recovery, if any, to which he is entitled. Application of the principles of comparative responsibility to causes of action brought under Chapter 2 establishes a consistent and equitable approach to the issue of "dramshop liability" generally, and first party "dramshop liability" specifically. This approach provides an effective solution to a difficult and controversial issue.

*Id.*

Even if limited to first-party claims, however, *Sewell* presents another, more difficult, problem. In *Sewell,* we held—incorrectly, in my opinion—that a provider should

be included in the apportionment question because its conduct violated an applicable legal standard. *Sewell,* 858 S.W.2d at 356 (quoting "percentage of responsibility" definition and holding that "[b]ecause Chapter 2 clearly establishes a legal standard and creates a cause of action for conduct violative of that legal standard, the definition of 'percentage of responsibility' provides additional support for our determination that the Comparative Responsibility Act is applicable to Chapter 2 causes of action"). Implicitly, therefore, we held that the provider in a dram shop case must have "caused or contributed to cause" the harm for which recovery of damages was sought. For the reasons set forth above, that simply need not be the case. While *Sewell* remains workable for first-party claims, as apportionment between the drunk and the provider approximates what would occur in an indemnity action, [6] *Sewell's* reasoning breaks down when applied to third-party dram shop actions. Submitting both the drunk and the provider as parties who **\*702** "caused or contributed to cause" the harm, rather than imputing the drunk's actions to the provider, would allow the provider to lessen or escape liability altogether.

Thus, for example, a jury could determine that a provider's "percentage of responsibility" is zero—a not unlikely scenario given that the provider's actions are compared with a person so obviously intoxicated he posed a danger to himself and others—notwithstanding that the drunk's intoxication proximately caused the harm. This contravenes the purpose as well as the text of the Dram Shop Act, which imposes liability even absent causation relating to the provision of alcohol, and is unnecessary to a proper application of chapter 33. *See* TEX. ALCO. BEV.CODEE § 1.03 (requiring that the Dram Shop Act be liberally construed to accomplish its purpose of protecting the welfare, health, and safety of the people). "To paraphrase Dean Prosser, it simply cannot be the law that a defendant can be relieved of the consequences of his wrongful conduct by the occurrence of the very risk which made his conduct negligent in the first instance." *Apportioning Responsibility,* 55 BAYLOR L.REV. at 650.

In *Sewell,* we were faced with a person suing a dram shop for damages he suffered in a one-car accident due to his own intoxication. Although *Sewell* correctly held that chapter 33 applies to first-party Dram Shop Act claims, its holding regarding the submission of the provider in the apportionment question cannot apply to third-party claims, and its reasoning for that submission does not comport with the statute's terms. Thus, I would limit *Sewell* to first-party claims and overrule

its holding that the provider is properly included within those persons who caused the harm.

### III

### Conclusion

The Legislature, confronting a serious question of public health, enacted a strong deterrent to curb the plague of drunk driving in Texas. If a provider sells to a drunk, it must answer in damages for the injury its patron's intoxication visits upon an innocent person, even if the sale is not itself the proximate cause. The policy reflects a concern not only for the victim. It is a comprehensive approach designed to discourage the sale of liquor to a person whose intoxication poses an obvious danger to the public. Faced with the specter of catastrophic financial loss, a provider is more likely to intervene (for selfish interests, and to the public good) by closely monitoring a customer's alcohol intake, by refusing to serve more liquor to an obviously drunk person and, where appropriate, by offering to arrange alternative transportation or by alerting law enforcement. At a minimum, the provider has a direct incentive to enroll its employees in training that emphasizes how to recognize the debilitating effects of excessive alcohol consumption and offers methods to avoid its devastating consequences. *See* TEX. AL CO. BEV.CODE § 106.14(a). Considerations like these justify the Legislature's intentional omission of a proximate cause element with respect to the provider's sale. The Court's insertion of that defense, contrary to the statute's terms, seriously undermines an important deterrent.

In an appeal to cozening hope, the Court offers that a jury will not *always* assign most of the responsibility to a provider's patron. 237 S.W.3d at 705. The Duenezes will take cold comfort in that pronouncement. The record shows that Ruiz—already so intoxicated that he was a clear danger to others before F.F.P. completed the sale—drank, at most, one more beer in 1.5 miles of highway driving **\*703** afterwards. Under the legal sufficiency standards announced in *City of Keller v. Wilson,* 168 S.W.3d 802 (Tex.2005), that evidence will never support a finding that F.F.P. caused the accident. The Court's remand for a new trial is, in reality, a decree of rendition.

I would affirm the court of appeals' judgment. [7] *See* TEX.R.APP. P. 60.2(a).

Justice O'NEILL, dissenting.

The proportionate-responsibility statute directs its application to all tort-based causes of action. TEX. CIV. PRAC. & REM.CODE § 33.002. At the same time, the Dram Shop Act directs that alcohol providers who serve customers so obviously intoxicated that they present a clear danger to themselves and others are liable "for the actions of their [intoxicated] customers...." TEX. ALCO. BEV.CODEE § 2.03.[1] Over two years ago, this Court issued an opinion giving effect to both statutes; when a customer who has been served in violation of the Dram Shop Act injures an innocent third party, the intoxicated customer's percentage of responsibility must be apportioned so that the provider may seek reimbursement from the customer, but the innocent third party may recover from the provider "for the actions of [its] customer[ ]." TEX. ALCO. BEV.CODEE § 2.03. Unlike today's decision, our holding honored both the statutory-apportionment directive and the Dram Shop Act's derivative-liability component. Rather than reiterate the original opinion's exhaustive analysis here, I attach the Court's decision as an appendix to this dissent. A few additional points, though, are worthy of note.

First, between the time the Court issued its original decision in this case and the date rehearing was granted, more than seven months passed and three members of the former majority left the Court. F.F.P.'s motion for rehearing raised no new issues; every point was thoroughly considered by the Court in its prior decision. While F.F.P.'s motion for rehearing was pending, the Legislature convened without taking any action to alter this Court's original interpretation. Nevertheless, the Court withdrew the prior opinion, reached the opposite result, and accomplished judicially what the Legislature itself declined to do.

More substantively, while the Court parrots the statutory construction rule favoring interpretations that harmonize different statutes, it makes no effort whatsoever to reconcile the Dram Shop Act's specific language with the more general proportionate-responsibility statute, giving effect only to the latter. The Court reasons that **\*704** holding the dram shop liable for the actions of its intoxicated customer could, in some cases, impose joint and several liability on the dram shop if the jury found it less than fifty-one percent responsible, which would be contrary to Chapter 33's provisions. *See* 237 S.W.3d at 690 (citing TEX. CIV. PRAC. & REM.CODE § 33.013(a), (b)(1)). I believe this is precisely

what the Legislature intended if a provider serves alcohol in violation of the Dram Shop Act. To avoid this potential result, the Court simply ignores the Dram Shop Act's derivative-liability component, *i.e.,* the provider's liability "for the actions of [its] customers." TEX. ALCO. BEV.CODEE § 2.03. By ignoring the very language that imbues the Dram Shop Act with deterrent effect, the Court undermines the legislative policy underlying the entire Alcoholic Beverage Code, which is to "protect[ ] the welfare, health, peace, temperance, and safety of the people of the state," and to "liberally construe [the Code] to accomplish this purpose." TEX. ALCO. BEV.CODEE § 1.03. The Dram Shop Act's derivative-liability component, designed to deter providers from selling alcohol to obviously intoxicated and clearly dangerous persons, can and should be reconciled with the proportionate-responsibility statute rather than selectively ignored.

To support its selective view, the Court today finds arguments convincing that the prior Court did not. Specifically, the Court interprets section 2.03 of the Dram Shop Act to signal nothing more than the exclusivity of the statutory remedy, marginalizing the specific language used. But as the prior Court noted:

> [i]f that had been the statutory purpose, [the statute] would have simply said:
>
>> The liability of providers under this chapter is in lieu of common law or other statutory law warranties and duties of providers of alcoholic beverages.
>
> Instead, section 2.03 clearly says:
>
>> [t]he liability of providers under this chapter *for the actions of their customers, members, or guests who are or become intoxicated* is in lieu of common law or other statutory law warranties and duties of providers of alcoholic beverages.
>
> TEX. ALCO. BEV.CODEE § 2.03 (emphasis added).

237 S.W.3d at 690. The Court today also picks up the prior dissents' refrain that the Legislature specifically carved out exceptions to the proportionate-responsibility scheme for a number of criminal acts, like the manufacture of methamphetamine, yet did not make exceptions for alcohol providers. But the Dram Shop Act, with its express derivative-liability component, came out of the same legislative session that enacted comparative responsibility; being by its own terms a limited exception to comparative responsibility, there

was no need to create a separate one. Act of June 1, 1987, 70th Leg., R.S., ch. 303, § 3, 1987 Tex. Gen. Laws 1673, 1674 (amended 2003) (current version at TEX. ALCO. BEV.CODEE § 2.03); Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.06, 1987 Tex. Gen. Laws 37, 41 (amended 2003) (current version at TEX. CIV. PRAC. & REM.CODE § 33.003).

In sum, the disagreement in this case is, and has always been, over what the Legislature meant in the Dram Shop Act when it referred to *"the liability of providers under this chapter for the actions of their customers ... who are or become intoxicated."* TEX. ALCO. BEV.CODEE § 2.03. Over two years ago, the Court considered this language significant and straightforward, and afforded the Legislature deference in choosing it. F.F.P. raised no new arguments on rehearing, and the Legislature proposed no new legislation in light of our prior interpretation. Today the Court usurps the legislative function and dilutes the deterrent protections the Dram Shop **\*705** Act was designed to afford. For the reasons expressed in the original Court's opinion, I would affirm the court of appeals' judgment.

### APPENDIX

IN THE SUPREME COURT OF TEXAS

F.F.P. OPERATING PARTNERS, L.P., D/B/A MR. CUT RATE # 602, PETITIONER,

v.

XAVIER DUENEZ AND WIFE, IRENE DUENEZ, AS NEXT FRIENDS OF CARLOS DUENEZ AND PABLO DUENEZ, MINORS, RESPONDENTS

ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

Argued on March 5, 2003

JUSTICE O'NEILL delivered the opinion of the Court, in which CHIEF JUSTICE PHILLIPS, JUSTICE JEFFERSON, JUSTICE SCHNEIDER, and JUSTICE SMITH joined.

JUSTICE OWEN filed a dissenting opinion, in which JUSTICE HECHT, JUSTICE WAINWRIGHT, and JUSTICE BRISTER joined.

The plaintiffs in this dram-shop case were injured when their car was struck head-on by an intoxicated driver who had purchased alcohol from a convenience store that the defendant owned. The trial court refused to submit the intoxicated driver's percentage of responsibility to the jury for apportionment, as we required in *Smith v. Sewell,* 858 S.W.2d 350, 356 (Tex.1993) when the intoxicated driver sued his provider for his own injuries. Instead, the trial court severed the provider's cross-action against the driver and rendered judgment on the jury's verdict against the provider. The court of appeals affirmed, holding that the proportionate responsibility statute does not apply when the injured plaintiff is an innocent third party. 69 S.W.3d 800. We hold that the proportionate responsibility statute applies to all Dram Shop Act claims, including the type at issue here. We conclude, however, that the judgment was correct because the provider is responsible to the innocent third-party plaintiffs for its own liability and that of its intoxicated patron, from whom it seeks recovery in the cross-action. We also conclude that, although the trial court should have submitted the intoxicated patron's percentage of responsibility to the jury for apportionment, its order severing the provider's cross-action against the intoxicated driver did not amount to reversible error. Finally, we hold that the trial court did not err in refusing to submit an instruction on sole proximate cause to the jury. Accordingly, we affirm the court of appeals' judgment, although on different grounds.

### I

After consuming a case-and-a-half of beer, Roberto Ruiz drove his truck to a Mr. Cut Rate convenience store owned by F.F.P. Operating Partners, L.P., and purchased a twelve-pack of beer. The store's assistant manager, Carol Solis, sold the beer to Ruiz. Ruiz then got into his truck, opened a can of beer, and put the open beer can between his legs.[2]

Ruiz then drove onto a nearby highway, and several times swerved into oncoming traffic. Two cars had to dodge his truck to avoid a collision. As he crossed a bridge less than a mile from the convenience store, Ruiz swerved across the center line and hit the Dueñezes' car head-on. At the time of the collision, Ruiz had lowered his head below his truck's dashboard as he tried to reach beneath his seat to retrieve a compact disc.

**\*706** All five members of the Dueñez family suffered some injury. Nine-year-old Ashley was the most seriously hurt. She suffered a traumatic brain injury, and will require round-the-clock care for the rest of her life. Xavier Dueñez, a

corrections officer, also suffered some degree of permanent brain damage.

Ruiz was arrested at the accident scene for drunk driving. He pleaded guilty to intoxication assault and was sentenced to prison. The Dueñezes initially sued F.F.P., Ruiz, Solis, Nu–Way Beverage Company, and the owner of the land where Ruiz had spent the afternoon cutting firewood and drinking. F.F.P. named Ruiz a responsible third party and filed a cross-action against him. F.F.P. named no other persons or entities as responsible for the accident. The Dueñezes thereafter nonsuited all defendants except F.F.P.

At the pretrial conference, the Dueñezes obtained a partial summary judgment that Texas Civil Practice and Remedies Code Chapter 33's proportionate responsibility provisions did not apply to this type of case. The trial court then severed F.F.P.'s cross-action against Ruiz, leaving F.F.P. as the only defendant for trial. The severed action remains pending in the trial court.

At trial, F.F.P. requested a jury instruction that "if an act or omission of any person not a party to the suit was the 'sole proximate cause' of an occurrence, then no act or omission of any other person could have been a proximate cause." The trial court refused to give the instruction. The trial court also overruled F.F.P.'s objections that the jury charge omitted: (1) any question submitting Ruiz's negligence as a responsible third party; and (2) any comparative responsibility question asking the jury to determine what percentage of negligence causing the occurrence in question was attributable to Ruiz and what percentage was attributable to F.F.P.

The jury found, as required to impose dram-shop liability, that when the alcohol was sold to Ruiz, it was "apparent to the seller that he was obviously intoxicated to the extent that he presented a clear danger to himself and others," and that Ruiz's intoxication was a proximate cause of the collision. *See* TEX. ALCO. BEV.CODEE § 2.02(b). The jury returned a $35 million verdict against F.F.P., upon which the trial court rendered judgment.

The court of appeals affirmed the trial court's judgment, holding:

> [I]n third-party actions under the Dram Shop Act in which there are no allegations of negligence on the part of the plaintiffs, a provider is vicariously liable for the damages caused by

an intoxicated person, and such a provider is not entitled to offset its liability by that of the intoxicated person.

69 S.W.3d at 805. In reaching that conclusion, the court distinguished our decision in *Sewell,* 858 S.W.2d at 356, in which we held that the comparative responsibility statute applied to dram-shop causes of action. 69 S.W.3d at 805. The court of appeals concluded that *Sewell's* holding was limited to first-party actions, in which the intoxicated patron is suing for his own injuries, and did not apply when the plaintiff is an innocent third party injured by an intoxicated patron. *Id.* The court also held that the trial court did not abuse its discretion in severing F.F.P.'s cross-action against Ruiz, concluding that F.F.P.'s statutory liability was vicarious and not direct so that any rights F.F.P. had against Ruiz did not accrue until its own liability became fixed. *Id.* at 807.

Finally, the court rejected F.F.P.'s argument that the trial court should have submitted an instruction on sole proximate cause. *Id.* at 808–09. We granted **\*707** F.F.P.'s petition for review to consider Chapter 33's application and related issues.[3]

## II

In enacting the Dram Shop Act, the Legislature sought to "deter providers of alcoholic beverages from serving alcoholic beverages to obviously intoxicated individuals who may potentially inflict serious injury on themselves and on innocent members of the general public." *Sewell,* 858 S.W.2d at 356. A plaintiff seeking to impose liability on a provider under the Act must shoulder what we have called "an onerous burden of proof," *El Chico Corp. v. Poole,* 732 S.W.2d 306, 314 (Tex.1987), approaching the common-law gross negligence standard. *See Steak & Ale of Tex., Inc. v. Borneman,* 62 S.W.3d 898, 909 (Tex.App.-Fort Worth 2001, no pet.). The Act requires a plaintiff to prove that, when the alcohol was provided, the recipient "was obviously intoxicated to the extent that he presented a clear danger to himself and others," and the recipient's intoxication was a proximate cause of the damages suffered. TEX. ALCO. BEV.CODEE § 2.02(b) (emphasis added). If the plaintiff can meet this burden, the Act nevertheless affords providers a relatively simple safe-harbor. Section 106.14(a)[4] shields a provider from liability for its employee's actions if the provider establishes that it required the employee to attend a training course approved by the Texas Alcoholic Beverage

Commission, the employee actually attended the course, and the provider did not encourage the employee to violate the Alcoholic Beverage Code. Act of May 21, 1987, 70th Leg., R.S., ch. 582, § 3, 1987 Tex. Gen. Laws 2298, 2299 (amended 2003) (current version at TEX. ALCO. BEV.CODEE § 106.16(a)); *see D. Houston, Inc. v. Love,* 92 S.W.3d 450, 453 (Tex.2002). If the plaintiff meets the burden of proof that the Dram Shop Act imposes, and the provider is unable to establish a server-training defense, then the provider is liable "for the actions of [its] customer[ ]." Act of June 1, 1987, 70th Leg., R.S., ch. 303, § 3, 1987 Tex. Gen. Laws 1673, 1674 (amended 2003) (current version at TEX. ALCO. BEV.CODEE § 2.03).

Chapter 33 of the Texas Civil Practice and Remedies Code governs the apportionment of responsibility and applies to "any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought." Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.05, 1987 Tex. Gen. Laws 37, 41 (amended 2003) (current version at TEX. CIV. PRAC. & REM.CODE § 33.002). Section 33.003 provides that the trier of fact shall apportion responsibility "with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought." Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.06, 1987 Tex. Gen. Laws 37, 41 (amended 2003) (current version at TEX.ALCO.BEV.CODE § 33.003). Chapter 33 expressly excludes certain types of cases from its coverage, such as workers' compensation cases, *id.* § 33.002(c)(1), but it **\*708** does not exclude actions brought under the Dram Shop Act.

It is clear from Chapter 33's language that the Legislature intended all causes of action based on tort, unless expressly excluded, to be subject to apportionment. The statute was similarly plain when we decided in *Sewell,* 858 S.W.2d at 356, that Chapter 33 applied to claims brought under the Dram Shop Act. When *Sewell* was decided, Chapter 33 provided that it applied "[i]n an action to recover damages for negligence ... or an action for products liability grounded in negligence." Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.04, 1987 Tex. Gen. Laws 37, 40 (amended 1995) (current version at TEX. CIV. PRAC. & REM.CODE § 33.001(a)). We concluded that the statute applied because the essential elements of a dram-shop action replicated those of a negligence claim. *Sewell,* 858 S.W.2d at 355–56. Since *Sewell,* the Legislature has amended Chapter 33's applicability provision to encompass "any cause of action based on tort." TEX. CIV. PRAC. & REM.CODE § 33.002.

If anything, that change indicates the Legislature intended a broader application, since the term would include non-negligent tortious conduct.

The court of appeals held that *Sewell* did not apply in cases like this one because the Dram Shop Act imposes vicarious liability on F.F.P. for Ruiz's actions; thus, as between F.F.P. and the Dueñezes, there is nothing to apportion. 69 S.W.3d at 806. The court noted that vicarious liability is "problematic" in first-party suits because allowing an intoxicated patron to impose vicarious liability on a provider without regard to the patron's own conduct would be "unpalatable." *Id.* It was a desire to avoid this result, the court of appeals reasoned, that fueled our *Sewell* analysis, as evidenced by our statement that the decision was based on "the limited circumstances present in this cause...." *Sewell,* 858 S.W.2d at 356.

It is true, though hardly remarkable, that we based our holding in *Sewell* on the facts presented, and those facts presented a first-party claim. But our holding was more broadly stated: "[T]he Comparative Responsibility Act—Chapter 33 of the Texas Civil Practice and Remedies Code—*is applicable to Chapter 2 [dram shop] causes of action.*" *Id.* at 351 (emphasis added). Nowhere did we create an exception for third-party claims. The statute's plain language leaves no doubt that Chapter 33 applies to all claims brought under the Dram Shop Act. Moreover, the nature of the liability that the Dram Shop Act imposes on a provider does not render the proportionate responsibility statute meaningless, nor does Chapter 33's application undermine the Dram Shop Act's effect.

Causation under the Dram Shop Act is tied to the patron's intoxication rather than the provider's conduct. *See Borneman v. Steak & Ale of Tex., Inc.,* 22 S.W.3d 411, 413 (Tex.2000). Because the Act imposes liability on providers "for the actions of their customers" regardless of whether the provider's conduct actually caused the injuries suffered, the court of appeals in this case concluded that the provider's liability is purely vicarious. 69 S.W.3d at 805–06. Under the court's analysis, the provider and the intoxicated patron are one and the same, like the employer and employee in a case founded upon the doctrine of *respondeat superior. Id.*

It is true that, if a provider's liability under the Dram Shop Act were purely vicarious, as the court of appeals held, there would be nothing for the jury to apportion between F.F.P. and the Dueñezes in this case. But the Act has a direct liability component that the court of appeals wholly ignored.

Unlike true vicarious **\*709** liability, in which one party's actionable conduct is imputed to another, a dram shop's liability stems in part from its own wrongful conduct. *See Sewell,* 858 S.W.2d at 355; KEETON ET AL., PROSSER & KEETON ON TORTS § 69, at 499 (5th ed.1984). In order to impose liability under the Act, the factfinder must conclude that the provider made alcohol available to an obviously intoxicated patron whose intoxication caused the plaintiff harm. TEX. ALCO.BEV.CODE § 2.02(b). As we said in *Sewell,* "liability under [the Dram Shop Act] is premised on the conduct of the provider of the alcoholic beverages—not the conduct of the recipient or a third party." 858 S.W.2d at 355. Accordingly, the dram shop's liability is based on its own wrongful or dangerous conduct even though the statutorily required causal link focuses on the patron's intoxication. TEX. ALCO.BEV.CODE § 2.02(b).

That a provider's liability under the Dram Shop Act has a derivative component does not make it antithetical to proportionate responsibility. Under Chapter 33, the trier of fact must apportion the percentage of responsibility attributable to each of the persons who "caus[ed] or contribut[ed] to cause in any way" the harm suffered. TEX. CIV. PRAC. & REM.CODE § 33.003. Although the Act ties causation to the intoxicated patron's actions, certainly dram-shop liability was fashioned on the notion that providing alcohol to one who is obviously intoxicated to the extent that the public is clearly endangered "contributes [in some] way" to harm that the intoxication causes. *Id.; see Sewell,* 858 S.W.2d at 356.

The Dueñezes contend that allowing F.F.P. to avoid its statutory liability by shifting responsibility onto its intoxicated customer will undermine the legislative policy choice to deter the sale of alcohol to obviously intoxicated persons and the Legislature's "recogni[tion] that providers of alcoholic beverages owe a duty to those who may be injured due to the consumption of those alcoholic beverages." *Sewell,* 858 S.W.2d at 354. We agree that the Legislature did not intend for an innocent third party to bear the risk of an intoxicated patron's insolvency when a provider has breached the duty that the Act imposes. But applying Chapter 33 to a dram-shop liability scheme that partially imputes causation does not thwart the Legislature's purpose. As one commentator has noted:

> Comparative negligence, in and of itself, has not changed these basic principles [of imputed negligence]. When negligence is apportioned in

the presence of vicarious liability, the master bears the burden of his servant's negligence. If the master has been partially at fault, the percentage of negligence attributed to the servant is added to the percentage attributed to the master.

SCHWARTZ, COMPARATIVE NEGLIGENCE § 16.1 (2d ed.1986) (emphasis added) (citations omitted). Thus, while the dram shop is entitled to seek recovery from an intoxicated patron to the extent causation is imputed, rather than direct, the dram shop is liable to injured third parties for both its own actions and for its patron's share of responsibility.

This construct comports with the rule stated in section 13 of the Restatement of Apportionment of Liability that "[a] person whose liability is imputed based on the tortious acts of another is liable for the entire share of comparative responsibility assigned to the other...." RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY § 13 (2000). While section 13 refers to the situation in which a party is held vicariously liable solely on the basis of another's conduct, the Restatement makes clear that a party to whom liability is imputed and who is also independently liable "is responsible **\*710** for the share of the verdict assigned to [the party whose liability is imputed] and is also responsible for the share of the verdict assigned to its own negligence." *Id.* § 7 cmt. j (2000).

We conclude that, when the factfinder determines that a provider has violated the Dram Shop Act and its patron's intoxication has caused a third party harm, responsibility must be apportioned between the dram shop and the intoxicated patron, as well as the injured third party if there is evidence of contributory negligence. The resulting judgment should aggregate the dram shop's and driver's liability so that the plaintiff fully recovers from the provider without assuming the risk of the driver's insolvency. The dram shop may then recover from the driver based upon the percentages of responsibility that the jury assessed between them.

In reaching this conclusion, we pay heed to the principle that courts should, if possible, construe statutes to harmonize with each other. *La Sara Grain Co. v. First Nat'l Bank of Mercedes,* 673 S.W.2d 558, 565 (Tex.1984) (citing *State v. Standard Oil Co.,* 130 Tex. 313, 107 S.W.2d 550 (Tex.1937)). In enacting the Dram Shop Act, the Legislature sought to protect innocent members of the public from the dangers intoxicated individuals pose by placing some responsibility for injury on

those who sell alcoholic beverages. *Sewell,* 858 S.W.2d at 356. That is why the Act speaks in terms of "[t]he liability of providers under this chapter for the actions of their customers, members, or guests who are or become intoxicated...." TEX. ALCO. BEV.CODEE § 2.03. As the Iowa Supreme Court has postulated, juries in dram shop cases are likely to assign most, if not all, of the responsibility for third parties' injuries to the intoxicated patron. *See Slager v. HWA Corp.,* 435 N.W.2d 349, 357 (Iowa 1989). If the provider who serves a clearly intoxicated patron does not bear responsibility for injuries caused by the patron's intoxication, the remedy the Legislature provided in the Dram Shop Act would be meaningless, at least to the extent the intoxicated patron proves to be insolvent, hardly a result that the Legislature likely contemplated in substituting dram-shop liability for otherwise available common-law remedies.

Moreover, the Legislature has directed that, in construing statutes, we must consider the object sought to be obtained and the consequences of a particular construction. CODE CONSTRUCTION ACT, TEX. GOV'T CODE §§ 311.023(1), (5); *see* TEX. ALCO. BEV.CODE § 1.02 (expressly incorporating the Code Construction Act). The Legislature has further instructed courts to liberally construe the Alcoholic Beverage Code so that the safety and welfare of our citizens are protected. TEX. ALCO. BEV.CODE § 1.03. Rather than undermine the Legislature's purpose in enacting the Dram Shop Act, we give effect to both it and the Proportionate Responsibility Act.

In contrast, the dissent gives no weight to section 2.03(a) of the Dram Shop Act, concluding it "means only that a cause of action for damages caused by an intoxicated patron is the exclusive remedy against an alcohol provider." (OWEN, J., dissenting). But if that had been the statutory purpose, section 2.03(a) would have simply said:

> The liability of providers under this chapter is in lieu of common law or other statutory law warranties and duties of providers of alcoholic beverages.

Instead, subsection (a) clearly says:

> [t]he liability of providers under this chapter *for the actions of their employees, customers, members, or guests who are or become intoxicated* is in lieu of common law or other

statutory law warranties **\*711** and duties of providers of alcoholic beverages.

TEX. ALCO. BEV.CODEE § 2.03(a) (emphasis added). The dissent's construction of the statute violates the fundamental rule that we are to give effect to "every sentence, clause, and word of a statute so that no part thereof [will] be rendered superfluous." *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 29 (Tex.2003) (quoting *Spence v. Fenchler,* 107 Tex. 443, 180 S.W. 597, 601 (1915)).

Finally, the dissent's discussion of the Legislature's imposition of strict liability on illegal methamphetamine manufacturers and other criminal actors improperly presumes that we are similarly exempting alcohol providers from the proportionate responsibility scheme. Clearly we are not. Instead, we apply that scheme consistent with the Dram Shop Act's language and purpose. Our interpretation gives effect to both the Dram Shop Act's express language and the statutory proportionate responsibility scheme. Even the dissent acknowledges that our decision "may express sound public policy." (OWEN, J., dissenting). That is exactly the public policy we believe the Legislature chose when it crafted section 2.03(a).

We conclude that the court of appeals erred in holding that the proportionate responsibility statute does not apply to third-party actions under the Dram Shop Act. The judgment is correct, though, because F.F.P. is responsible to the Dueñezes for its own liability and that of Ruiz, from whom F.F.P. may recover to the extent of his imputed liability. We must now decide whether the trial court erred in severing F.F.P.'s claim against Ruiz.

### III

The trial court severed F.F.P.'s claim against Ruiz and proceeded to trial with F.F.P. as the only defendant. The court of appeals affirmed the trial court's severance order, concluding that a vicariously liable party's right of recovery against a tortfeasor is through indemnity, which does not become actionable until an adverse judgment is taken. 69 S.W.3d at 807–08. Because the court considered F.F.P.'s liability vicarious in nature, it also held that Ruiz did not meet Chapter 33's definition of a responsible third party for apportionment purposes. *Id.*

As already explained, F.F.P.'s dram-shop liability is not purely vicarious; therefore the trial court should have submitted Ruiz's percentage of responsibility to the jury for apportionment under Chapter 33. But because F.F.P. is responsible to the Dueñezes for its own percentage of liability and that of Ruiz, and because there is nothing that would prevent a jury from fairly apportioning responsibility between F.F.P. and Ruiz in the severed action, the trial court's severance order did not constitute reversible error.

## IV

Finally, F.F.P. contends the trial court erred in refusing to instruct the jury on sole proximate cause. F.F.P. bases its claimed entitlement to that instruction on evidence that Ruiz was reaching under the seat for a compact disc when the accident occurred, and it was this inattention rather than Ruiz's intoxication that caused the accident. The Dueñezes respond that the instruction F.F.P. requested did not preserve this argument. We agree.

F.F.P.'s requested instruction stated: "if an act or omission of any person not a party to the suit was the 'sole proximate cause' of an occurrence, then no act or omission of any other person could have been a proximate cause." The proposed submission merely instructs that if a non-party's action was the sole proximate cause of the Dueñezes' injury, then no other **\*712** person's action could be a proximate cause. The instruction thus asks the jury to compare the actions of two different people rather than distinguish between the same person's intoxication and inattention. The requested instruction would not have focused the jury's attention on the act that F.F.P. contends was the sole proximate cause of the Dueñezes' injuries; thus, the trial court did not err in refusing to submit it. *See Hyundai Motor Co. v. Rodriguez,* 995 S.W.2d 661, 665–66 (Tex.2002).

## V

For the foregoing reasons, the court of appeals' judgment is affirmed.

**All Citations**

237 S.W.3d 680, 50 Tex. Sup. Ct. J. 764

Footnotes

1    The Legislature has amended much of the code applicable to this case. For clarity, the text references the codified version of the statutes applicable to the case as current law with the full citation appearing in footnotes. Citations without clarifying footnotes refer to the version in effect on the date of this opinion.
     Act of June 1, 1987, 70th Leg., R.S., ch. 303, § 3, 1987 Tex. Gen. Laws 1673, 1674, *amended by* Act of June 17, 2005, 79th Leg., R.S., ch. 643, § 1, 2005 Tex. Gen. Laws 1617, 1617 (current version at TEX. ALCO. BEV.CODEE § 2.02).

2    Act of June 1, 1987, 70th Leg., R.S., ch. 303, § 3, 1987 Tex. Gen. Laws 1673, 1674, *amended by* Act of June 20, 2003, 78th Leg., R.S., ch. 456, § 1, 2003 Tex. Gen. Laws 1698, 1698–99 (current version at TEX. ALCO. BEV.CODE E § 2.03(a)).

3    Act of June 1, 1987, 70th Leg., R.S., ch. 303, § 3, 1987 Tex. Gen. Laws 1673, 1674 (amended 2003).

4    Act of June 1, 1987, 70th Leg., R.S., ch. 303, § 3, 1987 Tex. Gen. Laws 1673, 1674 (amended 2005).

5    Act of June 1, 1987, 70th Leg., R.S., ch. 303, § 3, 1987 Tex. Gen. Laws 1673, 1674 (amended 2005).

6    Act of June 1, 1987, 70th Leg., R.S., ch. 303, § 3, 1987 Tex. Gen. Laws 1673, 1674 (amended 2003).

7    Act of June 1, 1987, 70th Leg., R.S., ch. 303, § 3, 1987 Tex. Gen. Laws 1673, 1674 (amended 2003).

8    Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3271, *amended by* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.09, 1987 Tex. Gen. Laws 37, 42, *amended by* Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971, 974, *amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 4.07, 4.10(5), 2003 Tex. Gen. Laws 847, 858–59 (current version at TEX. CIV. PRAC. & REM.CODE § 33.013).

9    Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.06, 1987 Tex. Gen. Laws 37, 41, *amended by* Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971, 972, *amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4.02, 2003 Tex. Gen. Laws 847, 855 (current version at TEX. CIV. PRAC. & REM.CODE § 33.003).

10   Act of June 3, 1987, 70th Leg., 1st C. S., ch. 2, § 2.05, 1987 Tex. Gen. Laws 37, 41, *amended by* Act of May 29, 1989, 71st Leg., R.S., ch. 380, § 4, 1989 Tex. Gen. Laws 1490,1492, *amended by* Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971,971–72, *amended by* Act of May 21, 2001, 77th Leg., R.S., ch. 643, § 2, 2001 Tex. Gen.

Laws 1208, 1208–09, *amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4, 2003 Tex. Gen. Laws 847, 858–59 (current version at TEX. CIV. PRAC. & REM.CODE § 33.002).

Act of June 3, 1987, 70th Leg., 1st C. S., ch. 2, § 2.05, 1987 Tex. Gen. Laws 37, 41 (amended 1989, 1995, 2001, repealed 2003).

Act of June 3, 1987, 70th Leg., 1st C. S., ch. 2, § 2.05, 1987 Tex. Gen. Laws 37, 41 (amended 1989, 1995, 2001, 2003).

Act of June 3, 1987, 70th Leg., 1st C. S., ch. 2, § 2.05, 1987 Tex. Gen. Laws 37, 41 (amended 1989, 1995, 2001, repealed 2003).

Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3271, *amended by* Act of June 3, 1987, 70th Leg. 1st C.S., ch. 2, § 2.04, 1987 Tex. Gen. Laws 37, 40, *amended by* Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971, 971 (current version at TEX. CIV. PRAC. & REM.CODE § 33.002). Section 33.001 grounded the applicability of the statute in negligence. However, Section 33.002, added to the code in 1987, is specifically devoted to the applicability of the chapter and is rooted in torts, giving the current law a broader application than that at the time of *Sewell.*

Act of June 1, 1987, 70th Leg., R.S., ch. 303, § 3, 1987 Tex. Gen. Laws 1673, 1674 (amended 2005).

Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3271 (amended 1987, 1995, 2003).

Act of June 3, 1987, 70th Leg., 1st C. S., ch. 2, § 2.05, 1987 Tex. Gen. Laws 37, 41 (amended 1989, 1995, 2001, repealed 2003).

Act of June 3, 1987, 70th Leg., 1st C. S., ch. 2, § 2.05, 1987 Tex. Gen. Laws 37, 41 (amended 1989, 1995, 2001, 2003).

Act of June 3, 1987, 70th Leg., 1st C. S., ch. 2, § 2.05, 1987 Tex. Gen. Laws 37, 41 (amended 1989, 1995, 2001, 2003).

Act of June 3, 1987, 70th Leg., 1st C. S., ch. 2, § 2.05, 1987 Tex. Gen. Laws 37, 41 (amended 1989, 1995, 2001, repealed 2003).

Act of June 3, 1987, 70th Leg., 1st C. S., ch. 2, § 2.05, 1987 Tex. Gen. Laws 37, 41 (amended 1989, 1995, 2001, 2003).

Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3271 (amended 1987, 1995, 2003).

Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4.10(5), 2003 Tex. Gen. Laws 847, 859.

Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.06, 1987 Tex. Gen. Laws 37, 41, *amended by* Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971, 972, *amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4.02, 2003 Tex. Gen. Laws 847, 855 (current version at TEX. CIV. PRAC. & REM.CODE § 33.003).

F.F.P.'s reply brief asserts, correctly, that "[u]nder [the statutory] elements, the dram shop plaintiffs need not prove that 'but for' the alcohol seller's conduct, the harm would not have occurred—presumably because it will always be hard to prove that any injury occurred because of any particular sale of alcoholic beverage."

Some states require that the dram shop's provision of alcohol cause the harm. *See, e.g.,* ARK.CODE § 16–126–104 (2006) (requiring jury in dram shop case to determine "whether or not the *sale* constitutes a proximate cause of any subsequent injury to other persons") (emphasis added); GA.CODE § 51–1–40 (2000) ("[A] person who ... knowingly sells, furnishes, or serves alcoholic beverages to a person who is in a state of noticeable intoxication, knowing that such person will soon be driving a motor vehicle, may become liable for injury or damage caused by or resulting from the intoxication of such minor or person *when the sale, furnishing, or serving is the proximate cause of such injury or damage.*") (emphasis added); MICH. COMP. LAWS § 436.1801 (2001) ("[A]n individual who suffers damage or who is personally injured by a minor or visibly intoxicated person by reason of the unlawful selling, giving, or furnishing of alcoholic liquor to the minor or visibly intoxicated person, *if the unlawful sale is proven to be a proximate cause of the damage, injury, or death,* or the spouse, child, parent, or guardian of that individual, shall have a right of action in his or her name against the person *who by selling, giving, or furnishing the alcoholic liquor has caused or contributed to the intoxication of the person or who has caused or contributed to the damage, injury, or death*") (emphasis added); TENN.CODE § 57–10–102 (2002)(imposing liability if a jury finds, "beyond a reasonable doubt that the *sale* by such person of the alcoholic beverage or beer *was the proximate cause of the personal injury or death sustained* and that such person ... [s]old the alcoholic beverage or beer to an obviously intoxicated person and such person *caused the personal injury or death as the direct result of the consumption of the alcoholic beverage or beer so sold*") (emphasis added).

This may seem punitive, as it risks imposing liability without fault, but the Legislature also provides a relatively cost-free safe harbor: the trained server defense. As the Court's original opinion noted, section 106.14(a) provides that "the actions of an employee shall not be attributable to the employer if" the provider establishes that it required the employee to attend a training course approved by the Texas Alcoholic Beverage Commission, the employee actually attended the course, and the provider did not encourage the employee to violate the Alcoholic Beverage Code. Act of May 21, 1987, 70th Leg., R.S., ch. 582, § 3, 1987 Tex. Gen. Laws 2298, 2299 (amended 2003) (current version at TEX. ALCO. BEV.CODE E § 106.14(a)).

4    This is consistent with *Borneman v. Steak & Ale of Texas, Inc.,* 22 S.W.3d 411, 412–13 (Tex.2000), a dram shop case in which we held that it was error to submit a jury question asking whether the conduct of an alcohol provider was a proximate cause of the occurrence in question. After the Court issued its November 3, 2006 opinion, the Duenezes moved for rehearing, asserting that the Court's latest interpretation of the statute directly conflicts with *Borneman.* A comparative submission, which the Court now requires in this case, presupposes that the provider's conduct is in issue. In this respect, the Court's current holding certainly undermines, if not overrules, *Borneman.*

5    On the failure-to-submit issue, Chief Justice Cayce concurred in the result only, as he felt that the sixty-percent responsibility the jury placed on the plaintiff barred her recovery as a matter of law, rendering harmless any error in failing to submit the employer's negligence. *Bedford,* 166 S.W.3d at 456 (Cayce, C.J., concurring).

6    *See B & B Auto Supply, Sand Pit, & Trucking Co. v. Cent. Freight Lines, Inc.,* 603 S.W.2d 814, 817 (Tex.1980) (recognizing common law right to indemnity when a party's liability is vicarious).

7    F.F.P. also contends the trial court erred in refusing to instruct the jury on sole proximate cause. F.F.P. bases its claimed entitlement to that instruction on evidence that Ruiz was reaching under the seat for a compact disc when the accident occurred, and it was this inattention, rather than Ruiz's intoxication, that caused the accident. The court of appeals held that Ruiz's carelessness was indistinguishable from his intoxication and, therefore, the trial court did not abuse its discretion in refusing to give the requested instruction. 69 S.W.3d at 809. In this Court's original opinion, the Court concluded that, as "[t]he instruction ... ask[ed] the jury to compare the actions of two different people rather than distinguish between the same person's intoxication and inattention[,][t]he requested instruction would not have focused the jury's attention on the act that F.F.P. contends was the sole proximate cause of the Duenezes' injuries; thus, the trial court did not err in refusing to submit it." I agree with both the court of appeals and the Court's original opinion on this point.

1    The Dram Shop Act has since been amended in a manner that does not affect my analysis. All citations in this dissent refer to the version applicable to the present case. Act of June 1, 1987, 70th Leg., R.S., ch. 303, § 3, 1987 Tex. Gen. Laws 1673, 1674 (amended 2003) (current version at TEX. ALCO. BEV.CODEE § 2.03).

2    There was conflicting testimony about whether Ruiz actually drank any of the beer that he purchased at Mr. Cut Rate.

3    In addition to briefing from the parties, we received briefs from several amici, including the Saltgrass Steakhouse Private Club, Inc., Waco Texas Management, Inc., on behalf of Cactus Canyon, Texas Restaurant Association, Texas Petroleum Marketers and Convenience Store Association, and Mothers Against Drunk Driving.

4    Although this provision has since been amended, in this opinion, we refer to the version of the statute that governs these proceedings. We treat other code provisions that have been amended similarly.

---

       © 2015 Thomson Reuters. No claim to original U.S. Government Works.

S

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Hernandez v. Bumbo (Pty.) Ltd., N.D.Tex., March 10, 2014

334 S.W.3d 251
Court of Appeals of Texas,
San Antonio.

Lawrence T. FLACK, Appellant,
v.
Dan H. HANKE and the Hanke Group, P.C.,
f/k/a Hanke, Green and Stein, Cox Smith
Matthews Incorporated, f/k/a Cox & Smith
and f/k/a Matthews & Branscomb; John
D. Fisch; Mary Potter; Langley & Banack
Incorporated a/k/a Langley & Banack, Inc.;
Steven R. Brook; and David S. Gragg, Appellees.

No. 04–08–00177–CV. | Oct. 13, 2010.

**Synopsis**

**Background:** Client brought action against financial advisor to recover for negligent advice regarding creation of employee stock ownership plan (ESOP) which borrowed money and purchased client's stock in corporation that later went into bankruptcy. In a settlement agreement, advisor designated law firms and attorneys in connection with ESOP, loans to ESOP, and bankruptcy as responsible third parties (RTP), even though statute of limitations had run against them. Advisor was then dropped from the suit, and the RTPs were joined as defendants. The 166th Judicial District Court, Bexar County, Lori Massey, J., granted summary judgment in favor of firms and attorneys based on limitations. Client appealed.

**Holdings:** On motions for rehearing, the Court of Appeals, Rebecca Simmons, J., held that:

[1] advisor as settling party was also a "defendant" authorized by statute to designate responsible third parties (RTP);

[2] firms and attorneys designated as RTPs waived any objection;

[3] joining firms and attorneys as defendants after expiration of statute of limitations did not involve retroactive application of RTP statute;

[4] trial court had no discretion to deny on "public policy" grounds the designation of law firms and attorneys as RTPs; and

[5] as a matter of first impression, law firm could not use status as defendant to strike former designation as RTP.

Reversed and remanded; motions denied.

West Headnotes (12)

**[1]** **Attorney and Client**
⚭ In general; limitations

The statute of limitations on professional negligence claims against lawyers is two years. V.T.C.A., Civil Practice & Remedies Code § 16.003(a).

Cases that cite this headnote

**[2]** **Limitation of Actions**
⚭ Intervention or bringing in new parties

Settling party was also a "defendant" authorized by statute to designate responsible third parties (RTP), for purposes of avoiding limitations defense of law firms and attorneys in client's suit arising from advice and a bankruptcy which related to an unsuccessful employee stock ownership plan (ESOP); nothing in RTP statute precluded a party from being both a defendant and a settling person, client had neither filed, nor taken, a nonsuit against settling party, and he was thus still a defendant at the time he designated the RTPs. V.T.C.A., Civil Practice & Remedies Code §§ 33.004(a), 33.011(2, 5, 6).

2 Cases that cite this headnote

**[3]** **Parties**
⚭ Necessity, Mode, and Time of Objection

Law firm and attorneys designated as responsible third parties (RTPs) waived any objection that the motion to designate them as RTPs did not meet the pleading requirements implicit in

the statute, by failing to object as provided in RTP statute, in client's suit arising from advice in a bankruptcy which related to an unsuccessful employee stock ownership plan (ESOP). V.T.C.A., Civil Practice & Remedies Code § 33.004(f).

1 Cases that cite this headnote

**[4]    Appeal and Error**
　　　 Nature of error or defect in general

Plaintiff preserved challenge to summary judgment for defendants on ground that joinder as defendants after expiration of statute of limitations was unconstitutional application of statute permitting joinder of person designated as responsible third party (RTP), even though statute of limitations had run; plaintiff's brief stated the two issues raised in the summary judgment motions as (1) the case was filed after limitations ran and (2) application of the RTP statute would violate constitutional prohibition against retroactive laws, and Court of Appeals was required to broadly construe the issues to encompass core question of constitutionality of retroactive application. V.T.C.A., Civil Practice & Remedies Code § 33.004(e).

2 Cases that cite this headnote

**[5]    Appeal and Error**
　　　 Form and requisites in general

An appellate court is required to construe a party's brief liberally. Rules App.Proc., Rule 38.9.

1 Cases that cite this headnote

**[6]    Limitation of Actions**
　　　 Retroactive Operation

Client's claims against law firms and attorneys for negligence in connection with sale of client's stock to employee stock ownership plan (ESOP), his purchase of loans to ESOP, and corporation's bankruptcy arose after effective date of statute permitting joinder of person designated as responsible third party (RTP), even though statute of limitations had run, and,

thus, joining firms and attorneys as defendants after expiration of statute of limitations did not involve retroactive application of RTP statute. V.T.C.A., Civil Practice & Remedies Code § 33.004(e).

1 Cases that cite this headnote

**[7]    Limitation of Actions**
　　　 Intervention or bringing in new parties

Trial court had no discretion to deny, on "public policy" grounds, the designation of law firms and attorneys as responsible third parties (RTPs) under the RTP statute, although it appeared they were designated as RTPs solely to defeat their limitations defense; the settling party who designated them as such was also a defendant, such that his designations were proper under the statute. V.T.C.A., Civil Practice & Remedies Code § 33.004(e).

3 Cases that cite this headnote

**[8]    Appeal and Error**
　　　 Parties

Defendants failed to preserve argument that the trial court properly granted motion to strike designation as responsible third parties, where co-defendants filed only motion to strike the designation. Rules App.Proc., Rule 33.1(a); V.T.C.A., Civil Practice & Remedies Code § 33.004(e).

5 Cases that cite this headnote

**[9]    Appeal and Error**
　　　 Cases Triable in Appellate Court

Whether the proof establishes as a matter of law that there is no genuine issue of fact regarding the responsible third parties' (RTP) responsibility for the claimant's injury is a question of law reviewed de novo. V.T.C.A., Civil Practice & Remedies Code § 33.004(*l* ).

1 Cases that cite this headnote

**[10]    Statutes**
　　　 Superfluousness

**Statutes**

👉 Absent terms; silence; omissions

Courts read every word, phrase, and expression in a statute as if it were deliberately chosen, and presume the words excluded from the statute are done so purposefully.

Cases that cite this headnote

[11]  **Parties**

👉 Bringing in New Parties

An entity cannot be both a defendant and a responsible third party (RTP) designated under the RTP statute at the same time. V.T.C.A., Civil Practice & Remedies Code § 33.004(*l* ).

9 Cases that cite this headnote

[12]  **Judgment**

👉 Existence of defense

**Parties**

👉 Necessity, mode, and time of objection

Law firm's claim, that there was no evidence of its responsibility for a client's claimed monetary loss as a lender due to failure to maximize collateral in his former company's bankruptcy, was not properly asserted by contesting its designation as a responsible third party (RTP) by the client's financial advisor, who was then dismissed from the suit, but could be asserted by law firm and attorneys in their status as joined defendants, who then lost their RTP status, by a no-evidence motion for summary judgment, thereby requiring client to present some evidence of law firm's responsibility; firm could not use status as party to strike former designation as RTP. V.T.C.A., Civil Practice & Remedies Code §§ 33.004(a, *l* ), 33.011; Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*254** Charles H. Portz, III, Portz & Portz, Houston, TX, for Appellant.

Casey L. Dobson, Jane M.N. Webre, Paige Arnette Amstutz, Scott, Douglass & McConnico, L.L.P., Austin, TX, Laura A. Cavaretta, Bridget A. Douglass, Lewin Plunkett, Plunkett & Gibson, Inc., George H. Spencer, Jr., Kathryn A. Stephens, Clemens & Spencer, P.C., San Antonio, TX, for Appellee.

Sitting: KAREN ANGELINI, Justice, REBECCA SIMMONS, Justice, STEVEN C. HILBIG, Justice.

**OPINION**

Opinion by: REBECCA SIMMONS, Justice.

The following motions are denied: (1) Appellees John D. Fisch and Mary M. Potter's Motion for Rehearing; (2) Appellees John D. Fisch and Mary M. Potter's Motion for En Banc Reconsideration; (3) Langley & Banack, Incorporated a/k/a Langley & Banack, Inc., Steven R. Brook and David S. Gragg's Motion for Rehearing; (4) Langley & Banack, Incorporated a/k/a Langley & Banack, Inc., Steven R. Brook and David S. Gragg's Motion for Rehearing En Banc; and (5) Motion for Rehearing of Cox Smith Matthews Incorporated. This court's opinion and judgment dated May 27, 2009, are withdrawn, and this opinion and judgment are substituted. We substitute this opinion to clarify our analysis and to address the argument relating to the alleged retroactive application of the 2003 amendments to section 33.004(e).

This appeal stems from a summary judgment in favor of, and an order striking the designation of, Steven R. Brook, David S. Gragg, and Langley & Banack, Incorporated a/k/a Langley & Banack, Inc. and Cox Smith Matthews Incorporated f/k/a Cox & Smith and f/k/a Matthews & Branscomb, John D. Fisch and Mary M. Potter as responsible third parties. Appellant Lawrence T. Flack asserts the trial court erred in granting: (1) summary judgment in favor of the appellees, and (2) Langley & Banack's motion to strike its designation as a responsible third party. We reverse the judgment of the trial court and remand this matter for further proceedings consistent with this opinion.

**FACTUAL BACKGROUND**

Appellant Flack hired Dan H. Hanke and the Hanke Group, P.C., f/k/a Hanke, Green, and Stein (collectively Hanke) to create an employee stock ownership plan (ESOP) in Flack Interiors and to sell Flack's stock in the business to the ESOP.

The stock plan subsequently purchased Flack's stock with loans from Frost National Bank, but Flack Interior's poor financial performance quickly caused Frost to demand that the loans be restructured. In April of 2000, Flack purchased the restructured loans from Frost and became the business's primary lender.

Upon the advice of Hanke, Flack then hired Langley & Banack, Incorporated, along with attorneys Steven R. Brook and David S. Gragg, (collectively Langley & Banack) to represent Flack in connection with Flack Interior's 2004–2005 bankruptcy proceeding. On February 7, 2005, the bankruptcy court approved a settlement agreement resolving Flack's claims regarding his financial dealings with the ESOP. A few months later, Flack sued Hanke for negligent advice regarding the creation of the ESOP and the restructuring of the loans. More than two years later, Flack joined Langley & Banack in the suit. Flack asserted that he suffered a monetary loss due to Langley & Banack's failure to maximize collateral in the bankruptcy.

 **\*255**  In June 2004, on Hanke's advice, Flack hired Cox Smith Matthews Incorporated f/k/a Cox & Smith and f/k/a Matthews & Branscomb, including attorneys John D. Fisch and Mary M. Potter, (collectively Cox Smith) for advice regarding Flack's sale of the business, the ESOP, and the loans. More than two years following the initial suit against Hanke, Flack also joined Cox Smith in the lawsuit.

### PROCEDURAL HISTORY

Flack filed suit against Hanke on July 26, 2005, alleging breach of fiduciary duties, negligence, and violation of the Texas Deceptive Trade Practices Act in connection with the sale of his stock in Flack Interiors, Inc. and certain real property. In July 2007, Flack reached a settlement agreement with Hanke which required Hanke to agree to a new trial setting and to designate both Langley & Banack and Cox Smith (jointly Appellees) as responsible third parties (RTPs). In short, through the settlement agreement, Flack and Hanke agreed: (1) to amend the scheduling order because the deadline to add new parties had passed; (2) Hanke would file a designation of RTPs and secure an agreed order granting the designation; (3) Flack would file a motion to join the RTPs as defendants and secure an order granting the joinder; and (4) the parties would file a motion to dismiss Hanke and secure an order of dismissal. Moreover, each step was to be completed in accordance with a timeline provided in the

settlement documents. Attached to the agreement were the necessary pleadings to effectuate the settlement, signed by the parties, and ready to be filed in keeping with the timetable.

In accordance with the settlement agreement, on July 27, 2007, Hanke filed Defendants' Motion for Leave to Designate Responsible Third Parties pursuant to Texas Civil Practice and Remedies Code section 33.004. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.004 (West 2008). The trial court granted the motion and approved the designation pursuant to an agreed order. Shortly thereafter, Flack and Hanke filed an Agreed Motion to Add Third Parties, also signed by the trial court, joining each of the Appellees as defendants. On August 1, 2007, the trial court signed an agreed order dismissing Flack's claims against Hanke pursuant to a previously executed compromise and settlement agreement between the parties. The following day, Flack filed Plaintiff's Second Amended Original Petition asserting claims of negligence and breaches of fiduciary duty against the Appellees.

Each of the Appellees subsequently filed a general denial and affirmative defenses including a limitations defense. Additionally, all of the Appellees filed traditional motions for partial summary judgment based on limitations, and Langley & Banack filed a motion to strike its designation as a responsible third party. On February 21, 2008, the trial court considered and granted summary judgment in favor of Appellees based on limitations and granted Langley & Banack's motion to strike. The trial court entered final judgment on February 22, 2008. To understand Flack's objections to the trial court's judgment, a brief review of section 33.004 of the Civil Practice and Remedies Code is necessary.

### TEXAS CIVIL AND PRACTICE REMEDIES CODE CHAPTER 33

In 2003, the Texas Legislature revised the Texas Civil Practice and Remedies Code to change from a joinder procedure to a designation procedure for inclusion of responsible third parties in the apportionment of responsibility. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 4.02–.04, secs. 33.003–.004, 2003 Tex. Gen. Laws **\*256** 847, 855–56 (codified at TEX. CIV. PRAC. & REM.CODE ANN. §§ 33.003–.004) (West 2008). The 2003 amendments to section 33.004 significantly changed the procedures for apportioning responsibility to third parties. *See*

TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(a), (h) (West 2008).

After the 2003 amendments became effective, the defendant need only file a motion for leave to designate an RTP sixty days prior to trial and, absent objection by another party, the trial court must grant leave to designate the RTP. TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(a), (f) (West 2008). The granting of leave to designate an RTP does not, absent joinder as a defendant, impose liability on the RTP and may not be used in other proceedings on the basis of res judicata or collateral estoppel. *Id.* § 33.004(i). Additionally, the statute allows parties who could never have been sued, as well as unknown parties, to be designated as RTPs. *Id.* § 33.004(i), (j), (k). The statute further provides that joinder is not prohibited "even though such joinder would otherwise be barred by limitations, if the claimant seeks to join that person not later than 60 days after that person is designated as a responsible third party." *Id.* § 33.004(e).

Although generally regarded as a defense-oriented statute, plaintiffs benefit from Section 33.004's erosion of the limitations defense. *See id.* § 33.004(e). Section 33.004(e) creates the potential to revive otherwise barred claims against a designated RTP. This procedure may result in the plaintiff collaborating with a defendant to join additional tortfeasors. For example, section 33.004(e) allows a plaintiff to sue a defendant with little or no liability, and that defendant may then designate the true tortfeasor as an RTP. *Id.* The plaintiff subsequently may join the true tortfeasor, avoid a limitations defense, and nonsuit the original defendant. *Id.; see also* Gregory J. Lensing, *Proportionate Responsibility and Contribution Before and After the Tort Reform of 2003,* 35 TEX. TECH L.REV. 1125, 1182 (2004) ("A plaintiff who misses limitations as to one joint tortfeasor can easily suggest to another joint tortfeasor that it should invoke the responsible-third-party device—perhaps even offer that tortfeasor some inducement to do so—and then enjoy a new sixty-day window of opportunity to sue the responsible third party.").

Finally, although Chapter 33 provides for the liberal designation of RTPs, the chapter allows a party to challenge the sufficiency of the evidence supporting the designation of an RTP. The trial court must grant a party's motion to strike the designation of an RTP unless the defendant produces sufficient evidence to raise a genuine issue of fact as to the RTP's responsibility. TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(*l*) (West 2008).

## MOTIONS FOR SUMMARY JUDGMENT

All of the Appellees filed traditional motions for summary judgment urging the two-year statute of limitations barred Flack's recovery. In response to Flack's assertion that section 33.004(e) defeated their limitations defense, Appellees urged they were improperly joined.

### A. Standard of Review

The standard of review for a traditional summary judgment is well established: (1) the movant must show "that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law; (2)[i]n deciding whether there is a disputed material fact issue precluding summary judgment," the court must take "evidence favorable to the non-movant ... as true"; and (3) the court must indulge every reasonable inference in favor of the non-movant and resolve any doubts in the non- **\*257** movant's favor. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). If the defendant meets this burden, the plaintiff must then raise a genuine issue of material fact on each challenged element. *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995). Additionally, a "defendant moving for summary judgment on an affirmative defense has the burden to conclusively establish that defense." *Long Distance Int'l, Inc. v. Telefonos de Mex., S.A. de C.V.,* 49 S.W.3d 347, 350–51 (Tex.2001).

### B. Grounds for Summary Judgment

 **[1]**    The motions for summary judgment were all based, in part, on the affirmative defense of limitations. Appellees assert that Flack's claims of negligence are barred by the two-year statute of limitations because the claims were filed approximately three years after the day the cause of action accrued. [1] "The statute of limitations on professional negligence claims against lawyers is two years." *Murphy v. Gruber,* 241 S.W.3d 689, 693 (Tex.App.-Dallas 2007, pet. denied); *accord* TEX. CIV. PRAC. & REM.CODE ANN. § 16.003(a) (West 2002); *Parsons v. Turley,* 109 S.W.3d 804, 807 (Tex.App.-Dallas 2003, pet. denied). Therefore, Appellees argue that Flack, as the non-movant, was required to bring forth evidence raising a fact issue as to whether the statute of limitations should apply. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.003(a) (West 2002); *Gonzalez v. City of Harlingen,* 814 S.W.2d 109, 112 (Tex.App.-Corpus Christi 1991, writ denied). Flack responds that section

33.004(e) of the Civil Practice and Remedies Code defeats Appellees' limitations claim. We agree.

### 1. Timeliness

The claims against Appellees were timely filed in accordance with section 33.004(e) of the Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(e) (West 2008). Section 33.004(e) provides:

> If a person is designated under this section as a responsible third party, a claimant is not barred by limitations from seeking to join that person, even though such joinder would otherwise be barred by limitations, if the claimant seeks to join that person not later than 60 days after that person is designated as a responsible third party.

*Id.* Here, the claims were timely because Appellees were joined as defendants within sixty days of Hanke's designation of Appellees as responsible third parties.

### 2. Settling Persons

 **[2]**     Appellees argue that their limitations defense is not defeated by section 33.004(e) because Hanke was a settling party and not a defendant; therefore, his designation of RTPs was improper. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(a) (West 2008). Flack counters that a plain reading of the statute does not preclude such a designation and joinder. Section 33.011 provides:

(2) "Defendant" includes any person from whom, at the time of the submission of the case to the trier of fact, a claimant seeks recovery of damages.

....

(5) "Settling person" means a person who has, at any time, paid or promised to pay money or anything of monetary value to a claimant in consideration of potential liability with respect to the personal injury, property damage, death,  **\*258**  or other harm for which recovery of damages is sought.

(6) "Responsible third party" means any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought,

whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these.

*Id.* § 33.011(2), (5), (6); *see also In re Unitec Elevator Servs. Co.,* 178 S.W.3d 53, 58 (Tex.App.-Houston [1st Dist.] 2005, no pet.). Flack contends the foregoing definitions are not mutually exclusive.

#### a. Agreement to Designate RTPs

There is no question that Hanke's designation of Appellees as RTPs, and ultimately their joinder by Flack, was clearly part of the settlement agreement between Flack and Hanke. The case was set for trial on November 5, 2007, and the trial court granted the Agreed Motion for Leave to Designate Responsible Third Party pursuant to an Agreed Order on July 27, 2007, well before the sixty-day requirement of section 33.004(a). *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(a) (West 2008). Absent an objection by any party to the suit, the trial court was required to grant the request. *Id.* By granting a motion for leave to designate a person as an RTP, the person is designated as a responsible third party without further action by the trial court or any party. *Id.* § 33.004(h); *Tex. Dep't of Pub. Safety v. Boswell,* No. 13–06–327–CV, 2007 WL 2471447, at *3 n. 3 (Tex.App.-Corpus Christi Aug. 31, 2007, no pet.) (mem. op.).

Hanke designated Appellees as RTPs after Flack's claims against each of the Appellees would have been barred by limitations. After a *defendant* designates an RTP, section 33.004(e) allows the plaintiff to join the RTPs, regardless of limitations. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(e) (West 2008); *id.* § 16.003(a) (West 2002) (establishing a two-year limitations period for various causes of action). We must, therefore, determine whether Hanke was a defendant when the RTP designation was made.

#### b. Effect of Settlement on Hanke's Status in the Suit

Flack and Hanke signed the settlement agreement on July 23, 2007, four days before the trial court's order designating RTPs. Based on the signed settlement agreement, at the time of the designation, Hanke was clearly a settling person under section 33.011. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.011 (West 2008). Nothing in Chapter 33, however,

precludes a party from being both a defendant and a settling person, and Appellees have not provided any authority to the contrary. *See* TEX. CIV. PRAC. & REM.CODE ANN. ch. 33 (West 2008); *Kimbrell v. Molinet,* 288 S.W.3d 464, 467–68 (Tex.App.-San Antonio 2008, pet. granted) (mem. op.) (Simmons, J., concurring). As such, because Flack had neither filed, nor taken, a nonsuit against Hanke, Hanke was both a settling person and a defendant under section 33.011. Hanke was still a defendant at the time Appellees were designated as RTPs, and summary judgment cannot be sustained based on limitations. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.004 (West 2008).

### 3. Pleading Requirements within Section 33.004

 **[3]**    Appellees Fisch and Potter next argue that Hanke's motion to designate RTPs did not meet the pleading requirements implicit in the statute. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(f) (West **\*259** 2008).[2] No party, however, filed an objection in accordance with section 33.004(f). *See id.* ("A court shall grant leave to designate the named person as a responsible third party unless another party files an objection to the motion for leave on or before the 15th day after the date the motion is served."). Absent a timely objection, Fisch and Potter waived any objection to Hanke's motion for leave to designate RTPs. Thus, the trial court's grant of summary judgment in favor of Fisch and Potter cannot be sustained based on insufficient pleading.

### 4. Unconstitutional Retroactive Application of Section 33.004(e)

 **[4]**    As Appellees point out, it well-settled law that the non-movant is required to negate on appeal any grounds upon which the trial court could have rendered judgment. *See Malooly Bros., Inc. v. Napier,* 461 S.W.2d 119, 121 (Tex.1970); *Villanueva v. Gonzalez,* 123 S.W.3d 461, 464 (Tex.App.-San Antonio 2003, no pet.). Absent such action by the non-movant, an appellate court will affirm the summary judgment if any one of the theories advanced is meritorious. *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989). We therefore must address whether in his original briefing Flack failed to address the summary judgment ground relating to the unconstitutionality of the retroactive application of section 33.004(e). More specifically, the summary judgment argument that any claims that Flack may have had against Fisch and Potter were already barred by the statute of limitations before the 2003 amendments took effect.

 **[5]**    An appellate court is required to construe a party's brief liberally. TEX.R.APP. P. 38.9; *see also Perry v. Cohen,* 272 S.W.3d 585, 587 (Tex.2008); *Ditta v. Conte,* 298 S.W.3d 187, 189–90 (Tex.2009) (construing petitioner's brief liberally to contain argument that it did not expressly contain because it contained similar and related arguments). Instead of using the term "retroactive constitutionality" as the Appellees do, Flack couches the argument in terms of "applicability." Flack argues the Appellees were properly joined as defendants under section 33.004(e). Moreover, at the beginning of Flack's brief, he sets out the two issues raised in the summary judgment motions as (1) the case was filed after limitations ran; and (2) "application of Texas Civil Practice & Remedies Code § 33.004(e) to this case would violate the Texas Constitutional prohibition against retroactive laws." Flack further argues "the Court should have in all things denied Defendant's Motion for Summary Judgment." "In order to see that 'a just, fair[,] and equitable adjudication of the rights of the litigants' is obtained," this court is mandated to broadly construe Flack's issues to "encompass the core question" of whether a retroactive constitutional violation occurred. *See Ditta,* 298 S.W.3d at 190 (internal citations omitted). Accordingly, we conclude, after reviewing Flack's entire brief, the argument is preserved for appellate review.

 **[6]**    Substantively, Appellees contend that section 33.004(e) is an unconstitutional application of an extended limitations period in this case because their dealings with Flack were concluded before the statute was implemented and, thus, extending the statute of limitation in this case would be an impermissible retroactive application. **\*260** *See Baker Hughes, Inc. v. Keco R. & D., Inc.,* 12 S.W.3d 1, 4 (Tex.1999), (reaffirming "settled law" that, "after a cause has become barred by the statute of limitation, the defendant has a vested right to rely on such statute as a defense.") (citing *Wilson v. Work,* 122 Tex. 545, 62 S.W.2d 490, 490 (1933)). On appeal, Appellees suggest that all of their dealings with Flack were concluded in the 1990s, and any limitations period would have run prior to the enactment of the 2003 amendments to Chapter 33. *See also Mann v. Jack Roach Bissonnet, Inc.,* 623 S.W.2d 716, 718–19 (Tex.Civ.App.-Houston [1st Dist.] 1981, no writ) (holding that legislature cannot extend limitations period for claims that are already time-barred). Yet, in their motions for summary judgment, the Appellees concede that their dealings with Flack continued until as late as June of 2004, when the bankruptcy was filed. There is no other date relied upon in their motion for summary judgment. *See In re A.D.,* 73 S.W.3d 244, 247–49 (Tex.2002) (holding that statute would be an unconstitutional, retroactive law if it destroyed

a vested right by eliminating a matured statute-of-limitations defense, but concluding that statute in question did not do so). Accordingly, because *Appellees'* pleadings before the trial court support that Flack's claims arose after the enactment of the 2003 amendments to Chapter 33, we conclude that the trial court erred in granting the motion for summary judgment based on retroactive application. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.004 (West 2008).

### 5. *Public Policy*

**[7]** Appellees additionally argue that they were designated as RTPs solely to "try and wash out their limitations defense."[3] Although this appears to be true, the statute does not specifically preclude such designations based on the intent of the designator. *See id.* § 33.004. Appellees further assert their designations as RTPs were unrelated to the purpose of section 33.004 and were nothing more than an attempt to manipulate the process and circumvent statutory limitations. More specifically, Cox Smith points out that Flack's and Hanke's settlement did not resolve the litigation, but actually promoted a brand new suit against the lawyers. *See Elbaor v. Smith,* 845 S.W.2d 240, 250 (Tex.1992) ("[W]e do not favor settlement arrangements that skew the trial process, mislead the jury, promote unethical collusion among nominal adversaries, and create the likelihood that a less culpable defendant will be hit with the full judgment."). However, because Hanke was both a settling party and a defendant in Flack's lawsuit, the designations were proper under Chapter 33. Thus, the trial court had no discretion to deny the designation of Appellees as responsible third parties under the statute.

Accordingly, because section 33.004 provides that a properly designated responsible third party may be joined regardless of limitations, the trial court erred in granting the motions for partial summary judgment based on limitations. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.004 (West 2008).

### MOTION TO STRIKE DESIGNATION OF RESPONSIBLE THIRD PARTIES

**[8]** In addition to its motion for summary judgment, the trial court also granted Langley & Banack's Motion to Strike Responsible Third Parties.[4] Langley & **\*261** Banack claim that it was not a proper RTP because it was not responsible for a portion of the injury or damage resulting from Hanke's poor advice. Furthermore, the statute requires "a defendant

[to] produce[ ] sufficient evidence to raise a genuine issue of fact regarding the designated person's responsibility," *Id.,* and Hanke was no longer in the case to present evidence. Thus, Langley & Banack contend that under section 33.004(*l* ), the motion to strike was properly granted because there was no evidence produced that Langley & Banack was responsible for a portion of Flack's alleged injury or damage.

Flack responds that Langley & Banack's motion to strike became moot when Langley & Banack was joined as a defendant and lost its status as an RTP. Once Langley & Banack was joined in the suit, it could only contest its status as a defendant—not its prior designation as an RTP.

### A. Standard of Review

**[9]** According to section 33.004(*l* ), the movant has the burden to show there is no genuine issue of material fact regarding the designated person's responsibility for the claimant's injury. Whether the proof establishes as a matter of law that there is no genuine issue of fact is a question of law reviewed de novo. *See Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005) (citing *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003)) (reviewing a summary judgment de novo); *see also Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004) ( "[W]hether undisputed evidence of jurisdictional facts establishes ... jurisdiction is ... a question of law.").

### B. Analysis

**[10]** This is a case of first impression. The parties have cited no authority for their arguments, and our search has likewise yielded no results. We, therefore, turn to the plain meaning of the statute. *Fireman's Fund County Mut. Ins. Co. v. Hidi,* 13 S.W.3d 767, 768–69 (Tex.2000). In construing the statute, we look to the plain meaning of the words used in the statute in our "attempt to give effect to the Legislature's intent." *Id.* Moreover, "[w]e read every word, phrase, and expression in a statute as if it were deliberately chosen, and presume the words excluded from the statute are done so purposefully." *USA Waste Servs. of Houston, Inc. v. Strayhorn,* 150 S.W.3d 491, 494 (Tex.App.-Austin 2004, pet. denied); *see also Cities of Austin, Dallas, Fort Worth, & Hereford v. Sw. Bell Tel. Co.,* 92 S.W.3d 434, 442 (Tex.2002) (reiterating that an appellate court begins with the words used by the Legislature).

Section 33.004(*l* ) provides:

After adequate time for discovery, a party may move to strike the designation of a responsible third party on the ground that there is no evidence that the designated person is responsible for any portion of the claimant's alleged injury or damage. The court shall grant the motion to strike unless a defendant produces sufficient evidence to raise a genuine issue of fact regarding the designated person's responsibility for the claimant's injury or damage.

TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(*l* ). The statute anticipates that a party may move to strike the designation of an RTP. Generally, the party moving **\*262** to strike would be the plaintiff seeking to remove an RTP from before the jury when there is no evidence the particular RTP bore any responsibility for the plaintiff's injury. [5] In response, the defendant typically would be the party seeking to retain the RTP in the jury charge to diminish his potential liability and perhaps eliminate any joint and several liability. Thus, to retain the RTP, the statute provides the "defendant" must produce sufficient evidence to raise a fact issue regarding the RTP's responsibility to the claimant. Notably absent from section 33.004 is any method for the RTP to object to its own designation. According to the statute, only a party may object to the designation and move to strike the designation. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(f), (g), (*l* ) (West 2008). [6] With this general construct in mind, we review the parties' differing interpretations of the statute.

 **[11]**   At the time Langley & Banack filed its motion to strike itself as an RTP, it was a defendant in the lawsuit and therefore a party. But Langley & Banack was no longer an RTP, and thus, no longer subject to being stricken under section 33.004(*l* ). *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(*l* ). Langley & Banack cannot use its status as a defendant to strike its former designation as an RTP. Such a theory would require Langley & Banack to define itself as both a defendant and an RTP at the same time. This interpretation of the statute conflicts with its plain wording and renders the statute unworkable. *See Cities of Austin, Dallas,* 92 S.W.3d at 442. As Langley & Banack points out, in response to a motion to strike, the statute requires a defendant to produce sufficient evidence to raise a genuine issue of fact. *See* TEX. CIV. PRAC. & REM.CODE ANN.

§ 33.004(*l* ). Certainly, the defendant in this case would not be Hanke because he no longer was a defendant when the motion to strike was filed. It would be illogical to assume Langley & Banack, as a defendant, would raise an issue against the motion it filed. Such an interpretation would permit defendants to re-litigate their designation of RTPs— which the statute does not permit.

 **[12]**   There are other procedures available for a defendant such as Langley & Banack to assert that there is no evidence that it "is responsible for any portion of the claimant's alleged injury or damage" and thereby obtain a dismissal from the suit. *See id.* The trial court may grant a no-evidence summary judgment under Rule 166a(i) when there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX.R. CIV. P. 166a(i). The similarity in language between section 33.004(*l* ) and a no-evidence summary judgment is not coincidental. *See* Elaine A. Carlson, *Tort Reform: Redefining the Role of the Court and the Jury,* 47 S. TEX. L.REV. 245, 263 (2005); Gregory J. Lensing, *Proportionate Responsibility and Contribution Before and After the Tort Reform of 2003,* 35 TEX. TECH. L.REV. 1125, 1182 (2004). As a defendant, Langley & Banack's claim that **\*263** there is no evidence of its responsibility is not properly asserted by contesting its designation as an RTP, but may be asserted by a no-evidence motion for summary judgment thereby requiring Flack to present some evidence of Langley & Banack's responsibility. *See* TEX.R. CIV. P. 166a(i).

Accordingly, because Langley & Banack was no longer a designated RTP, but was instead a party to the lawsuit, the trial court had no discretion but to deny Langley & Banack's motion to strike its designation as a responsible third party.

#### CONCLUSION

The motion to designate responsible third parties was timely filed by Hanke without objection. Nothing in Chapter 33 of the Texas Civil Practice and Remedies Code prevents a party from being both a defendant and a settling person. Thus, Hanke's designation of Appellees as responsible third parties was in accordance with section 33.004. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 33.004(a); 33.011 (West 2008). Because Appellees were properly designated RTPs, Flack was not barred by limitations from joining Appellees as defendants and the trial court erred in granting Appellees' motions for partial summary judgment based on limitations.

Additionally, because Langley & Banack was no longer an RTP under section 33.004, but was a defendant, the trial court erred in granting Langley & Banack's Motion to Strike Responsible Third Parties.

We, therefore, reverse the judgment of the trial court and remand this matter for proceedings consistent with this opinion.

**All Citations**

334 S.W.3d 251

Footnotes

1　Appellees further argued that Flack and Hanke were perpetrating a fraud upon the court.

2　Fisch and Potter contend that sections 33.004(g)(1) and (2) imply a pleading requirement because the trial court may refuse to grant leave to designate an RTP if the "defendant failed to plead sufficient facts concerning the alleged responsibility of the person." However, we note section 33.004(g) is predicated on "an objection to the motion for leave [being] timely filed." TEX. CIV. PRAC. & REM.CODE ANN. § 33.004 (West 2008).

3　This argument is contained in Langley & Banack's motion for summary judgment that was adopted by the other appellees.

4　Although Appellees Cox Smith and Appellees Fisch and Potter argue the trial court properly granted the motion to strike, only Langley & Banack filed a motion to strike in the trial court. Therefore, any issue raised or briefed by Cox Smith or Fisch and Potter relating to the motion to strike *their* designation as responsible third parties was not preserved for appeal. *See* TEX.R.APP. P. 33.1(a) ("[T]he record must show that ... the complaint was made to the trial court by a timely request, objection, or motion....").

5　This is the only means available to a plaintiff to remove an objectionable RTP. Procedures such as summary judgment are unavailable because the RTP is not a party to the suit. Notably, the plaintiff would seek to dismiss an RTP because asking the jury to determine the RTP's percentage of responsibility potentially diminishes the named defendant's percentage of fault.

6　The RTP has limited rights regarding its designation presumably because the designation or finding of fault against the RTP does not, absent joinder as a defendant, impose liability or responsibility on the RTP and may not be used in other proceedings. TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(i).

**End of Document**　　© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**T**

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** In re NETtel Corp., Inc., Bankr.D.Dist.Col.,
September 21, 2011

252 S.W.3d 748
Court of Appeals of Texas,
Texarkana.

Michael A. FRENCH and Wife,
Misti Michelle French, Appellants
v.
Brian James GILL and Giuseppe V. Riccio
d/b/a Tigers Trucking Company, Appellees.

No. 06–07–00076–CV. | Submitted
April 2, 2008. | Decided April 16, 2008.

**Synopsis**
**Background:** After plaintiffs' second amended complaint in
federal suit arising from automobile accident was stricken,
plaintiffs sued defendants in state court for negligence arising
from automobile accident. The 402nd Judicial District Court,
Wood County, G. Timothy Boswell, J., granted defendants'
motion for summary judgment on limitations grounds, and
plaintiffs appealed. The Court of Appeals, 206 S.W.3d 737,
reversed and remanded. On remand, the 402nd Judicial
District Court, Wood County, entered summary judgment in
favor of defendants, and plaintiffs again appealed.

**[Holding:]** The Court of Appeals, Moseley, J., held that the
amended complaint in the federal diversity action did not
invoke statutory tolling provision.

Affirmed.

West Headnotes (10)

**[1]** **Limitation of Actions**
　　 Failure of action for want of jurisdiction
　　The statute tolling the limitations period if
　　plaintiff filed a previous suit in a different court
　　that is dismissed for lack of jurisdiction does
　　not apply if the initial filing was done with
　　intentional disregard of proper jurisdiction; if the

record establishes intentional disregard and that
jurisdiction did not lie in the tribunal in which
the proceeding was originally filed, the original
lawsuit did not, as a matter of law, serve to toll
limitations. V.T.C.A., Civil Practice & Remedies
Code § 16.064.

2 Cases that cite this headnote

**[2]** **Judgment**
　　 Particular defenses
　　When the movant seeks summary judgment
　　based on the expiration of limitations, the
　　movant must conclusively prove the bar
　　of limitations. Vernon's Ann.Texas Rules
　　Civ.Proc., Rule 166a(c).

Cases that cite this headnote

**[3]** **Appeal and Error**
　　 Extent of Review Dependent on Nature of
　　Decision Appealed from
　　When a movant seeks summary judgment based
　　on the expiration of limitations, the question on
　　appeal is not whether the summary judgment
　　proof raises a fact issue with reference to the
　　essential elements of the plaintiff's cause of
　　action, but whether the summary judgment proof
　　establishes the movant is entitled to judgment as
　　a matter of law.

12 Cases that cite this headnote

**[4]** **Judgment**
　　 Particular defenses
　　On a motion for summary judgment based on the
　　statute of limitations, if the nonmovant asserts
　　that the statute has been tolled, it becomes
　　the movant's burden to conclusively negate the
　　tolling provision's application before summary
　　judgment may be awarded. V.T.C.A., Civil
　　Practice & Remedies Code § 16.064.

2 Cases that cite this headnote

**[5]** **Evidence**
　　 Pleadings

Assertions of fact not plead in the alternative in the live pleadings of a party are regarded as formal judicial admissions.

Cases that cite this headnote

**[6]    Evidence**
  Judicial admissions in general

A judicial admission that is clear and unequivocal has conclusive effect and bars the admitting party from later disputing the admitted fact.

Cases that cite this headnote

**[7]    Evidence**
  Pleadings

The statement in an amended pleading in a federal diversity action seeking to add additional defendants, that diversity would be destroyed by doing so, was not a judicial admission, in determining whether later state action was barred by limitations; statement was not a factual statement, but was a legal statement or conclusion based on stated facts.

Cases that cite this headnote

**[8]    Judgment**
  Sufficiency of pleading
**Judgment**
  Documentary evidence or official record

Although pleadings generally do not constitute summary judgment proof, if a plaintiff's pleadings contain judicial admissions negating a cause of action, summary judgment may properly be granted on the basis of the pleadings.

1 Cases that cite this headnote

**[9]    Limitation of Actions**
  Failure of action for want of jurisdiction

One way to prove the intentional disregard of proper jurisdiction in the initial filing of a lawsuit, which will prevent the tolling of the statute of limitations, is by looking at the face of

the pleadings filed in the first lawsuit. V.T.C.A., Civil Practice & Remedies Code § 16.064.

Cases that cite this headnote

**[10]    Limitation of Actions**
  Failure of action for want of jurisdiction

Plaintiffs' filing of an amended complaint seeking to add nondiverse parties as defendants in a federal diversity action, indicated intentional disregard of proper jurisdiction which prevented tolling of the statute of limitations in state negligence action based on the same underlying automobile accident; amended complaint on its face established federal court's lack of jurisdiction, and counsel's belief that the federal court might retain jurisdiction had it chosen to did not show he had a mistaken understanding of the facts. V.T.C.A., Civil Practice & Remedies Code § 16.064.

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*749**  John R. Mercy, Mercy\*Carter\*Tidwell, LLP, Texarkana, Richard G. Danner, Jr., Dallas, John W. Alexander, Winnsboro, for Appellants.

Gregory S. Porter, Charles H. Clark, Clark, Lea & Porter, Tyler, for Appellees.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

## OPINION

Opinion by Justice MOSELEY.

This appeal involves a summary judgment granted against Michael A. and Misti Michelle French in a suit brought by them against Brian James Gill and Guiseppe V. Riccio, doing business as Tigers Trucking Company. The same suit and very closely-related questions were previously appealed by the Frenches to this Court; a summary judgment rendered against them was reversed and remanded for further proceedings. [1]

The controlling issue in both of these appeals is the impact of limitations on the claim of the Frenches against Gill and Riccio.

## I. Factual and Procedural Background

The claims of the Frenches arose as the result of a motor-vehicle collision which occurred January 29, 2002. Initially, the Frenches filed suit in March 2003 in federal court against several defendants (not including Gill or Riccio), all of whom were citizens of states other than Texas. *See* 28 U.S.C.A. § 1332(a) (West 2006) (granting **\*750** federal jurisdiction in cases where complete diversity of citizenship exists).

On January 14, 2004, the Frenches filed an amended pleading in the pending federal court action, seeking permission to join Gill and Riccio (Texas residents); an order was then entered on January 28, 2004, which permitted the filing of that amendment to the pleadings. However, the federal court reconsidered that order and withdrew its consent for the joinder of Gill and Riccio by order entered on March 4, 2004. Suit was then filed by the Frenches against Gill and Riccio in the district court of Wood County, Texas, on April 29, 2004.

## II. The Rule on Limitations

On January 29, 2004 (between the date the Frenches had been granted leave to include Gill and Riccio in the federal lawsuit and the date of the entry of the order which withdrew that permission), the two-year anniversary of the collision occurred. The two-year anniversary of the collision is significant; after then, this kind of tort claim would be barred under Texas's two-year statute of limitations. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.003(a) (Vernon Supp.2007).

## A. Tolling Exception to the Rule

Although recovery on most tort actions would be barred after the expiration of two years, an exception to that rule provides that a tolling of the statute of limitations takes place if a party has filed a previous suit in a different court and that action was dismissed because of lack of jurisdiction, provided that the party refiled the suit in a court of proper jurisdiction within sixty days after such dismissal. TEX. CIV. PRAC. & REM.CODE ANN. § 16.064 (Vernon 1997); *Clary Corp. v. Smith,* 949 S.W.2d 452, 461 (Tex.App.-Fort Worth 1997, writ denied). The cases also note that the statute is to be liberally construed to effectuate its objective—relief from penalty of limitation bar to one who has mistakenly brought his action

in the wrong court. TEX. CIV. PRAC. & REM.CODE ANN. § 16.064; *Clary Corp.,* 949 S.W.2d at 461. The Frenches maintain that because they had filed their claim in federal court within two years of the collision, this tolling of the statute of limitations occurred.

## B. The Exception to the Exception

 **[1]** However, Gill and Riccio contest the application of that tolling statute by pointing out an exception to that exception. The tolling provision of Section 16.064 of the Texas Civil Practice and Remedies Code does not apply if the initial filing was done with intentional disregard of proper jurisdiction. *Parker v. Cumming,* 216 S.W.3d 905, 909–10 (Tex.App.-Eastland 2007, pet. denied). Under that exception, if the record establishes intentional disregard and that jurisdiction did not lie in the tribunal in which the proceeding was originally filed, the original lawsuit did not, as a matter of law, serve to toll limitations. Therefore, Gill and Riccio maintain, if those conditions exist, and under these facts, the Frenches would be time-barred from maintaining their action in state court. *See* TEX.R. CIV. P. 166a; *see also Parker,* 216 S.W.3d at 908.

## III. What is the Difference Between This Case and the First One?

In the first judgment and appeal, appellees/defendants argued before the trial court and here that collateral estoppel or the full faith and credit clause ended the action. Gill and Riccio had convinced the trial court at the first summary judgment hearing to find that rulings by the federal court (which included a statement that "The additional Defendants that the Plaintiffs wish to add are not indispensable and were clearly added solely for the purposes of defeating diversity jurisdiction") conclusively proved that the savings clause of **\*751** Section 16.064 of the Texas Civil Practice and Remedies Code did not toll limitations. We found to the contrary and reversed the summary judgment granted Gill and Riccio.

In the present appeal, the sole issue is one that we mentioned in our previous opinion in this case but could not then address: Whether the Frenches' statements in their federal pleading seeking to add Gill and Riccio preclude the Frenches from seeking to apply the exception to the limitations statute in the state lawsuit. In other words, when they filed their pleadings in federal court, did they plead themselves right out of court?

Another motion for summary judgment was filed by Gill and Riccio and this motion was granted. The validity of that summary judgment is now before us.

## IV. Standard of Review

Summary judgment is proper when the movant establishes that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671 (Tex.1979); *Baubles & Beads v. Louis Vuitton, S.A.,* 766 S.W.2d 377 (Tex.App.-Texarkana 1989, no writ). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant and indulge in every reasonable inference and resolve any doubts in the nonmovant's favor. *Limestone Prods. Distrib., Inc. v. McNamara,* 71 S.W.3d 308, 311 (Tex.2002); *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999).

 **[2]**    **[3]**    **[4]**    When the movant seeks summary judgment based on the expiration of limitations, the movant must conclusively prove the bar of limitations. *Jennings v. Burgess,* 917 S.W.2d 790, 793 (Tex.1996). The question on appeal is not whether the summary judgment proof raises a fact issue with reference to the essential elements of the plaintiff's cause of action, but whether the summary judgment proof establishes the movant is entitled to judgment as a matter of law. *Gonzalez v. Mission Am. Ins. Co.,* 795 S.W.2d 734, 736 (Tex.1990). Because the movant bears the burden of proof, all conflicts in the evidence are disregarded, evidence favorable to the nonmovant is taken as true, and all doubts as to the genuine issues of material fact are resolved in favor of the nonmovant. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546 (Tex.1985). If the nonmovant asserts that the statute of limitations has been tolled, it becomes the movant's burden to "conclusively negate the tolling provision's application" before summary judgment may be awarded. *Allen v. Intercapital Lodge Ltd. P'ship,* 66 S.W.3d 351, 353 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

### A. Basis Upon Which This Summary Judgment Rests

Gill and Riccio's motion for summary judgment specifically states that they are entitled to summary judgment based on limitations because the time had run on the Frenches' lawsuit and that due to the statements contained in the Frenches' pleadings in the federal suit, the statutory tolling provision did not apply.

### B. Summary Judgment Evidence

Gill and Riccio attached a number of documents as summary judgment evidence, but rely largely on the federal pleading: "Plaintiffs' Second Amended Original Complaint."

That document was filed by the Frenches in federal court January 28, 2004. In relevant part, it reads as follows:

> 6. **There will no longer be diversity of citizenship** between the parties to this [federal] civil action with the joinder of Defendants, Brian James Gill and Giuseppe V. Riccio, d/b/a Tigers Trucking Co. The amount in controversy, exclusive **\*752** of interest and costs, exceeds SEVENTY–FIVE THOUSAND AND NO/100 DOLLARS ($75,000.00). Jurisdiction will no longer exist pursuant to 28 U.S.C. § 1392 and the Plaintiffs request that this proceeding be transferred to the State District Court in Wood County, Texas.

Another piece of Gill and Riccio's summary judgment evidence is the federal district court's "Order Striking Plaintiffs' Second Amended Complaint." In relevant part, that document includes the following language:

On January 14, 2004, the Plaintiffs filed a motion for leave to file their second amended complaint. The Court inadvertently granted said motion before the Defendants in the case had adequate time to file their response. The Court's *Order* (Docket No. 24) allowed the Plaintiffs leave to add Brian James Gill and Giuseppe V. Riccio d/b/a Tigers Trucking Co. as Defendants in this matter.

On January 30, 2004, the Defendants filed the instant motion to strike the Plaintiffs' second amended complaint, noting that they [Defendants] were not afforded an opportunity to respond. Because the Court ruled on the Plaintiffs' motion before the expiration of the Defendants' deadline to respond, the Court will reconsider the Defendants' motion to strike as if it were their original response to the Plaintiff's motion for leave to amend.

After reconsidering the Plaintiffs' motion for leave to amend and the Defendants['] motion to strike, it is clear to the Court that the former should be denied. The

additional Defendants that the Plaintiffs wish to add are not indispensable and were clearly added solely for the purposes of defeating diversity jurisdiction. Further, there has already been extensive discovery in this case: the Plaintiffs and Defendant Omang have served and responded to interrogatories and requests for production; Defendant Omang has served depositions on written questions to 17 of the Plaintiffs' healthcare providers, all of which have been answered; Defendant Omang has served a deposition on written questions to the Plaintiffs' former employer and has filed discovery pleadings regarding same with the Court; the Plaintiffs and Omang have made not only their Initial Disclosures, but also their Expert Disclosures, including production of all expert reports and other materials.

As an equitable matter, the Plaintiffs chose to seek damages from Omang and Mr. Henderson. They also chose to pursue their claims in this Federal Court. To justify their 10–month–long delay in adding these nondiverse, dispensable parties to their lawsuit, the Plaintiffs claim they just now discovered that they need to join Mr. Gill and his employer, Giuseppe V. Riccio d/b/a Tigers Trucking Co. However, the Plaintiffs and their counsel have known of Mr. Gill, and all other witnesses to the accident, since January 30, 2002. In the subsequent two-year period, the Plaintiffs and their counsel made no effort to contact Mr. Gill or his employer, much less join them in this case. Meanwhile, Defendant Omang has expended a significant amount of time and resources in discovery for this case and in preparing its defense to this case.

Finally, the Plaintiffs have not shown that they will be prejudiced or how they will be denied an adequate judgment or an adequate remedy of their claims if Mr. Gill and his employer are not joined as Defendants. Accordingly, the Court will now vacate its previous order granting the Plaintiffs leave to amend.

## C. The Frenches' Response to the Motion for Summary Judgment

**\*753** As its primary summary judgment evidence, counsel for the Frenches filed his own affidavit in which he stated in relevant part as follows:

12. "As I stated during the oral argument on the MSJ prior to the appeal in this case, I did not add Gill and Riccio to defeat jurisdiction. In fact, I had only recently learned of

their involvement and needed to file suit against them to toll the statute of limitations and preserve Plaintiffs' rights."

13. "Further, the case against Gill and Riccio was based on the same nucleus of operative facts as the one against Henderson and Omang and I sought to avoid piecemeal litigation of this matter. Filing it in federal court, whether it defeated jurisdiction or not, was to keep the case as one."

14. "Moreover, I did not add Gill and Riccio to defeat federal jurisdiction. I chose to file this case initially in federal court as there was diversity of the initial parties. I would not seek to intentionally disregard the proper jurisdiction in a case I filed in federal court."

15. "Initially, I thought that if jurisdiction was defeated, that the entire case would be transferred to Wood County. I was relying upon the *Freeport–McMoRan, Inc. v. KN Energy* case and thought that the federal court might have been able to retain jurisdiction had it wanted to, but that the decision would be up to the federal court. In the event the federal trial court decided it did not want to retain jurisdiction, I requested a transfer to state court."

16. "Indeed, in Plaintiffs' Rejoinder to Defendants' Reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment, Plaintiffs argued that diversity was not defeated as it was determined at the time of filing a lawsuit, based on the same interpretation of *Freeport–McMoran, Inc. v. K N Energy, Inc.,* 498 U.S. 426, 111 S.Ct. 858, 860 [112 L.Ed.2d 951] (1991). My interpretation was not an unreasonable one. Even the treatise *O'Connor's Federal Rules * Civil Trials (2003)* states, relying upon *Freeport–McMoran* that 'Diversity is determined as of the date the action is commenced.' See page 83, a copy of which is attached hereto as Exhibit A–5.["]

17. "I did not, in any event, purposely ignore jurisdiction by filing in federal court. That is where the case was pending originally and since the second set of Defendants to be added were involved in the same accident, it only made sense to add them to the lawsuit existing at the time, whether that meant the case would remain in federal court or be transferred to state court."

18. "I requested a transfer to state court in the event the federal court determined that jurisdiction was no longer appropriate in federal court. This was to conserve judicial resources and keep the case, which had already been on file for 10 months and for which most of the discovery was completed."

19. "Defendants make the following statement in their Motion for Summary Judgment at page 2 which is patently false and without basis in fact: 'Clearly, Plaintiffs added Mr. Gill and Mr. Riccio to destroy diversity jurisdiction.' Defendants do not cite to any evidence to support this statement. Further, as explained above, this is illogical since Plaintiffs were the ones who chose to file in the federal court to begin with. It does not make sense that some 10 months later, well into the lawsuit, that Plaintiffs would then seek to destroy the jurisdiction they chose."

....

21. "Judge Steger's comment, which was *dicta,* that Plaintiff's addition of Mr. Gill and Mr. Riccio was 'for the purposes **\*754** of defeating diversity jurisdiction,' was not based on any findings of fact. No testimony was taken and there was no basis upon which to make this comment. As demonstrated above, this is illogical."

**D. The Frenches' Argument**

The Frenches argue that the language that they chose to use in their motions to the federal court did not conclusively show that they intentionally disregarded proper jurisdiction when they filed the first lawsuit. As previously discussed, under that exception to the application of the tolling statute, if the record affirmatively establishes that jurisdiction did not lie in the tribunal in which the proceeding was originally filed, the original lawsuit did not, as a matter of law, serve to toll limitations. Therefore, the Frenches were time-barred from recovering from Gill and Riccio in state court.

There are three separate aspects to the Frenches' argument:

1) The pleadings in the federal case cannot be classified as "judicial admissions"; thus, the pleadings are not conclusive proof that the Frenches were aware of the impact of what they were doing. As a result, summary judgment was therefore improper.

2) There is "reliable authority" to support the Frenches' counsel's belief that diversity would not be destroyed by adding the two nondiverse parties.

3) The Frenches provided summary judgment evidence in which their counsel stated that they did not intentionally file the case in the wrong court in an effort to destroy jurisdiction.

**1. Was There a Judicial Admission?**

 **[5]**   **[6]**   **[7]**   Initially, we will look at whether the document itself constitutes a judicial admission. The general language involving judicial admissions states that:

> Assertions of fact, not plead in the alternative, in the live pleadings of a party are regarded as formal judicial admissions. A judicial admission that is clear and unequivocal has conclusive effect and bars the admitting party from later disputing the admitted fact.

*Holy Cross Church of God in Christ v. Wolf,* 44 S.W.3d 562, 568 (Tex.2001) (citations omitted).

 **[8]**   In a more typical scenario, courts acknowledge that although pleadings generally do not constitute summary judgment proof, if a plaintiff's pleadings contain judicial admissions negating a cause of action, summary judgment may properly be granted on the basis of the pleadings. *Commercial Structures & Interiors, Inc. v. Liberty Educ. Ministries, Inc.,* 192 S.W.3d 827, 835 (Tex.App.-Fort Worth 2006, no pet.); *see Brooks v. Ctr. for Healthcare Servs.,* 981 S.W.2d 279, 283 (Tex.App.-San Antonio 1998, no pet.).

All of those situations, however, explain the use of pleadings by a party in the suit in which they were filed. This situation is, however, different. The pleading is not from this case. It is not being used to prove or disprove the cause of action based on the Frenches' allegations or statements of fact about the cause of action. It is used by the Frenches to prove that there was a prior case in which the new defendants had been sued; thus, when those defendants were dropped, the tolling provision allowed the Frenches to bring suit in state court. It is then used by Gill and Riccio as proof that the Frenches knew that their addition of Gill and Riccio as new defendants would destroy diversity and nevertheless added them in; therefore, the exception to the tolling provision applies, and the Frenches' state lawsuit is untimely brought.

As Gill and Riccio point out, a number of facts were pled by the Frenches in the **\*755** federal complaint, including the names and citizenship of the defendants. Based on those factual statements, the Frenches then stated that no diversity of citizenship would continue to exist between the parties and asked the federal court to transfer the proceeding to state district court.

The statement that diversity would be destroyed is not a factual statement. Rather, it is a legal statement or conclusion based on stated facts. As such, it does not fit within the definition of a judicial admission.

The Frenches' counsel goes further to maintain that the statement in federal court pleadings could not possibly be a judicial admission because it is not a live pleading (in this lawsuit). That aspect of his argument is not persuasive. The facts stated in the pleading are not contested and were not part of alternative pleadings. The fact that the federal lawsuit is no longer being pursued is not a reason to conclude that the facts stated have no further usefulness to prove the Frenches' intent and knowledge when causing them to be filed.

 **[9]**    In applying this particular statute, as pointed out by Gill and Riccio, one primary way to prove intentional disregard is by looking at the face of the pleadings filed in the first lawsuit. *See Gordon v. Staudt,* No. 03–02–00768–CV, 2004 WL 314965, at *3, 2004 Tex.App. LEXIS 1685, at *9 (Tex.App.-Austin Feb. 20, 2004, pet. denied); *Parker,* 216 S.W.3d at 910; *Williamson v. John Deere Co.,* 708 S.W.2d 38, 39–40 (Tex.App.-Tyler 1986, no writ) (all using the pleadings from the prior lawsuits to determine limitations—and the application of the exceptions—under this section).

Accordingly, although it does appear that the pleading did make certain formal judicial admissions of fact, the part upon which Gill and Riccio rely is not an admission of fact; it is, rather, a statement of the application of the law to those facts.

It is very clear, however, that the pleading is a statement by the Frenches' counsel reflecting his understanding that his action in including Gill and Riccio as defendants would destroy diversity; the case thereafter lacking diversity of parties, the jurisdiction of the federal court to hear the suit would be destroyed. [2]

Although the statement is not a "fact" as to actual jurisdictional authority, it may well be a "fact" as to whether the Frenches filed their action against Gill and Riccio in federal court with intentional disregard of its jurisdiction to hear the case.

**E. Determining Intent**
 **[10]**    Even though the pleading filed by the Frenches in federal court is not a judicial admission, it nonetheless

provides summary judgment evidence of much more than simply the date of its filing. The question before us is whether the Frenches' counsel's unequivocal and clear statement that adding the new players would defeat jurisdiction conclusively shows that he made the filing with intentional disregard of the proper jurisdiction.

On its face, it does. The filing of the petition which included nondiverse parties clearly sets out the facts defeating diversity and then correctly states the legal impact of those facts. It then goes on to, based on the termination of the court's  **\*756**  jurisdiction, request the federal court to transfer the proceeding to state court.

The Frenches argue that because they have provided summary judgment evidence by their counsel's affidavit, they have sufficiently explained the motive for filing in federal court to enable them to avoid summary judgment. Looking at counsel's affidavit critically, it states that he did not intend to add the additional parties in an effort to defeat jurisdiction; rather, that he did so to toll limitations and that he had thought that if jurisdiction was defeated, the federal court could nonetheless either transfer the case to state court or retain jurisdiction. He states repeatedly in multiple paragraphs that he did not ignore jurisdiction.

The Frenches' counsel's affidavit does not directly address the dispositive issue. It answers another and different question: whether he had the intention to defeat jurisdiction. Counsel's affidavit states that he did not intend to defeat jurisdiction.

The question here is not whether he intended to defeat jurisdiction but whether he filed in conscious disregard of proper jurisdiction. Those are different propositions. Although these arguments bear some real similarity, they do not intersect.

The Frenches' counsel's affidavit also stated that he had believed that the federal court might have been able to retain jurisdiction over the entirety had it chosen to do so. That was a mistake in an understanding of the law, not a mistake of fact. As pointed out by the Eastland court in *Parker,* the issue focused on the question of whether the record showed that claimant had made "a good faith mistake" by initially filing in a (federal) court without jurisdiction over the claim. [3] The court found that the claimant had not acted in good faith (recognizing that the party's factual complaint, if taken as true, affirmatively established that the other tribunal had no jurisdiction) and that it was not necessary for the defendants

to prove that Parker "consciously appreciated this because her knowledge of the law is imputed." *Parker,* 216 S.W.3d at 910. The court concluded that absent some evidence of accident or mistake of fact, the filing of a suit with a pleading which, on its face, establishes the court's lack of jurisdiction does not invoke the tolling provision.

In its analysis, the *Parker* court recognized that Parker's construction of the section that he claimed provided jurisdiction was incorrect, and that whether Parker was conscious of this was immaterial, due to the fact that all persons are presumed to know the law and are charged with knowledge of statutory provisions.[4] *Id.* at 911; *Virtual Healthcare Servs., Ltd. v. Laborde,* 193 S.W.3d 636, 644 (Tex.App.-Eastland 2006, no pet.). All are presumed to know the law. *Redmon v. Griffith,* 202 S.W.3d 225, 238 (Tex.App.-Tyler 2006, pet. denied).[5]

In this case, the Frenches' counsel argues that he misunderstood the import of the law, and that a question of fact exists as to whether he simply made a mistake or intended to defeat the jurisdiction of the **\*757** federal court. We conclude that this is a distinction without a difference. He is charged with knowledge of the law, and there is no suggestion that there were any mistaken understandings of fact (such as the residence of the parties or the situs in which an event occurred) that could support any suggestion of mistaken application of that law. The only evidence on point thus shows that his filing was made in intentional disregard of the jurisdiction of the federal court. Because there was intentional disregard of the jurisdiction, the tolling does not occur and limitations barred the prosecution of the lawsuit.

We affirm the judgment of the trial court.

**All Citations**

252 S.W.3d 748

Footnotes

1   *French v. Gill,* 206 S.W.3d 737 (Tex.App.-Texarkana 2006, no pet.).

2   Gill and Riccio point out that the Frenches never argued to the trial court that the pleading could not be considered as summary judgment proof and also points to our opinion in the earlier appeal, in which we also pointed out that the Frenches had offered the documents for the summary judgment proceedings, and declining to "reward the Frenches for complaining the trial court erred by considering the very evidence they originally offered and certified as authentic." *French,* 206 S.W.3d at 741.

3   *Parker,* 216 S.W.3d at 910.

4   *N. Laramie Land Co. v. Hoffman,* 268 U.S. 276, 283, 45 S.Ct. 491, 69 L.Ed. 953 (1925); *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 n. 3 (Tex.1990).

5   It is a maxim that all persons are presumed to know the law. *Greater Houston Transp. Co.,* 801 S.W.2d at 528 n. 3 (citing *E.H. Stafford Mfg. Co. v. Wichita Sch. Supply Co.,* 118 Tex. 650, 23 S.W.2d 695, 697 (1930)). A parallel maxim is that ignorance of the law is no excuse. *Cherokee Water Co. v. Forderhause,* 727 S.W.2d 605, 615 (Tex.App.-Texarkana 1987), *rev'd on other grounds,* 741 S.W.2d 377 (Tex.1987); *Goss v. Bobby D. Assocs.,* 94 S.W.3d 65, 69 (Tex.App.-Tyler 2002, no pet.).

---

**End of Document**     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# U

KeyCite Yellow Flag - Negative Treatment
**Declined to Follow by** Foster v. Teacher Retirement System, Tex.App.-Austin, December 23, 2008

829 S.W.2d 345
Court of Appeals of Texas,
Texarkana.

GAB BUSINESS SERVICES, INC., Appellant,

v.

Sherry MOORE, Appellee.

No. 6–91–103–CV. | April 14, 1992.

Workers' compensation claimant brought action against city employer, risk pool through which city insured itself, and workers' compensation insurer, alleging insurance bad faith and deceptive trade practices in connection with denial of her claim. The 71st Judicial District Court, Harrison County, Bonnie Leggat, J., granted judgment non obstante veredicto in favor of city and risk pool, but entered judgment against insurer. Insurer appealed. The Court of Appeals, Grant, J., held that: (1) evidence was sufficient to support jury's finding that insurer failed to act fairly and in good faith by failing to provide claimant weekly workers' compensation benefits; (2) evidence was sufficient to support jury's finding that insurer engaged in unfair or deceptive act or practice; (3) evidence was sufficient to support award of $25,000 for mental anguish; (4) insurer was not entitled to governmental immunity from liability; and (5) trial court properly excluded defendant's former employee's deposition testimony.

Affirmed.

West Headnotes (22)

**[1]** **Appeal and Error**
   Extent of Review

**Appeal and Error**
   Clear or palpable weight or preponderance

When considering insufficiency of evidence point, Court of Appeals must consider and weigh all evidence and should set aside verdict only if it is so contrary to overwhelming weight of evidence as to be clearly wrong.

Cases that cite this headnote

**[2]** **Workers' Compensation**
   Unfair Practices; Bad Faith; Penalties

Workers' compensation carriers have duty to deal fairly and in good faith with injured employees.

1 Cases that cite this headnote

**[3]** **Workers' Compensation**
   Reasonable cause to dispute or deny

**Workers' Compensation**
   Delay

Workers' compensation claimant who asserts that carrier has breached duty of good faith and fair dealing must establish absence of reasonable basis for denying or delaying payment of claim and that carrier knew or should have known that there was no reasonable basis for denying or delaying payment of claim.

4 Cases that cite this headnote

**[4]** **Workers' Compensation**
   Rights as Between Employers, Insurers, and Employees

Evidence was sufficient to support finding that there was no reasonable basis for workers' compensation carrier to deny claim and that carrier knew or should have known that there was no reasonable basis to deny claim, even though claimant's back injury upon which claim was based occurred while claimant was at home putting on her pants six months after work injury, where carrier had several medical reports indicating that claimant's back problems resulted from the initial on-the-job injury.

Cases that cite this headnote

**[5]** **Antitrust and Trade Regulation**
   Insurance

Workers' compensation insurer's lack of good faith in processing claim is unfair or deceptive act and can be basis of cause of action under

Deceptive Trade Practices Act. V.T.C.A., Bus. & C. § 17.41 et seq.

2 Cases that cite this headnote

**[6]** **Antitrust and Trade Regulation**
Weight and sufficiency

Evidence was sufficient to support finding that workers' compensation insurer engaged in unfair or deceptive act or practice, where even after insurer received medical reports indicating that claimant's back injury was caused by her on-the-job fall, insurer refused to reconsider its position denying benefits, offer reasonable settlement amount, or begin weekly benefit payments. V.T.C.A., Bus. & C. § 17.41 et seq.

Cases that cite this headnote

**[7]** **Trial**
Noting disposition of requests

When requested jury instruction is submitted in writing and trial judge refuses it, trial judge shall write "refused" on requested instruction and sign or initial it; such endorsed, refused instruction serves as bill of exceptions. Vernon's Ann.Texas Rules Civ.Proc., Rule 276.

1 Cases that cite this headnote

**[8]** **Appeal and Error**
Instructions
**Appeal and Error**
Decisions Not Otherwise Reviewable

Contention that trial court erred in refusing to submit requested jury instruction was not preserved for review, where record did not include requested instruction marked and endorsed as "refused" by trial judge and there was no formal bill of exceptions. Vernon's Ann.Texas Rules Civ.Proc., Rule 276.

1 Cases that cite this headnote

**[9]** **Damages**
Nature of Injury or Threat in General
**Damages**

Humiliation, insults, and indignities in general

In order to establish "mental anguish," plaintiff must show more than mere worry, anxiety, vexation, embarrassment, or anger; mental anguish includes mental sensation of pain resulting from such painful emotions as grief, severe disappointment, wounded pride, shame, despair, and public humiliation.

4 Cases that cite this headnote

**[10]** **Damages**
Workers' compensation
**Damages**
Particular cases

Evidence that, as result of workers' compensation insurer's improper refusal to pay benefits, claimant changed residences two or three times, accepted charity from church food bank on two occasions, sold personal property and was planning to pawn her wedding ring, accepted $600 loan from neighbor, and was on verge of nervous breakdown, was sufficient to support jury's award of $25,000 for mental anguish damages against insurer.

Cases that cite this headnote

**[11]** **Damages**
Mental suffering and emotional distress

Evidence of what has taken place in plaintiff's life as result of defendant's actions is important in showing mental anguish.

1 Cases that cite this headnote

**[12]** **Damages**
Mental suffering and emotional distress

Jurors are best suited to determine, by referring to their own experiences, whether and to what extent defendant's conduct caused compensable mental anguish.

7 Cases that cite this headnote

**[13]** **Municipal Corporations**

☛ Application of principle of agency to municipalities

Workers' compensation insurer which handled workers' compensation claims against city was independent contractor acting on its own authority when it denied claimant's claim, and was not agent of city as might entitle insurer to governmental immunity, where insurer paid all claims of less than certain amount without notifying city and claim was within that amount which was not beyond insurer's authority to pay without notifying city.

5 Cases that cite this headnote

**[14]  Judges**

☛ Liabilities for official acts

Under official immunity doctrine, state employee who gathers facts and acts on them is clothed with quasi-judicial status and enjoys immunity from personal liability as long as employee acts in good faith within scope of his or her authority.

Cases that cite this headnote

**[15]  States**

☛ Appointment or employment and tenure of agents and employees in general

Workers' compensation insurer, which handled workers' compensation claims against city, was not protected by official immunity doctrine, where insurer was not state employee but was private company which contracted to provide specific services to city and insurer did not act in good faith in denying claim for benefits.

3 Cases that cite this headnote

**[16]  Judges**

☛ Liabilities for official acts

In some cases, state employee with quasi-judicial status is not entitled to official immunity.

Cases that cite this headnote

**[17]  Municipal Corporations**

☛ Governmental powers in general

Workers' compensation insurer, which handled workers' compensation claims against city, was not performing uniquely governmental duties, as might give rise to official immunity, but rather was acting as would adjuster for private insurance company in denying claim for benefits.

5 Cases that cite this headnote

**[18]  Witnesses**

☛ Leading questions

Ordinarily, leading questions should be permitted on cross-examination; however, use of leading questions may be denied when cross-examination is of friendly witness, as in cross-examination of party by his own counsel after party was called by opponent. Rules of Civ.Evid., Rule 611(c).

Cases that cite this headnote

**[19]  Pretrial Procedure**

☛ Admissibility in general

Trial court properly excluded defendant's former employee's deposition testimony, which consisted of responses to leading questions asked on cross-examination by defendant's counsel; although witness was no longer working for defendant, she could still be characterized as friendly witness to defense. Rules of Civ.Evid., Rule 611(c).

Cases that cite this headnote

**[20]  Witnesses**

☛ In general;  right to use

"Leading questions" are questions that suggest desired answer, framed so that "yes" or "no" answer will enable witness to merely echo words of counsel.

4 Cases that cite this headnote

**[21]  Witnesses**

☛ In general;  right to use

"Leading question" is one which instructs witness how to answer or puts words into witness' mouth to be echoed back.

4 Cases that cite this headnote

**[22]** **Appeal and Error**
👉 Discovery and depositions

Any error in trial court's exclusion of deposition testimony which had been elicited by leading questions on cross-examination of friendly witness, was harmless, where questions inquired whether witness, who was claims adjuster for workers' compensation insurer, had access to certain medical records in handling claimant's claim, which records claimant had already established were in insurer's files when insurer denied claim; excluded testimony was merely cumulative of what already had been presented to jury.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*347** W. David Carter, Barry Bryant, Smith, Stroud, McClerkin, Dunn, Nutter, Texarkana, Ark., for appellant.

Jim Ammerman, II, Marshall, for appellee.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

**OPINION**

GRANT, Justice.

GAB Business Services appeals from a judgment in favor of Sherry Moore for insurance bad faith and deceptive trade practices.

GAB contends there was insufficient evidence to support the jury's findings that GAB failed to act fairly and in good faith in handling Sherry Moore's workers' compensation claim, that GAB engaged in an unfair or deceptive act or practice, and that Moore suffered out-of-pocket expenses or mental anguish damages. GAB also contends the trial court erred in refusing to submit GAB's requested jury instructions,

in denying GAB's motion for instructed verdict based on sovereign immunity and the Texas Tort Claims Act, and in refusing to allow a deposition excerpt into evidence.

GAB is an insurance adjuster specializing in workers' compensation claims. GAB contracted to handle all workers' compensation claims brought against any of the 850 cities that insure themselves through the Texas Municipal League Intergovernmental **\*348** Risk Pool (the "Risk Pool"). Marshall, Texas, is one of those cities.

On January 20, 1987, Sherry Moore, an employee of the City of Marshall, slipped and fell at work while carrying a bulky container of mail. Moore's injuries required medical treatment and physical therapy. GAB authorized payment of the medical expenses for this treatment and therapy.

Moore continued to work full time, taking an hour every few days for physical therapy. Then, on July 26, 1987, while she was at home putting on a pair of pants, Moore experienced severe lower back pain and had to be taken to Marshall Memorial Hospital. The hospital stay lasted two weeks. By October 6, 1987, Moore had missed over 190 hours of work, and the City of Marshall ceased to pay her.

Moore requested weekly workers' compensation benefits. GAB denied weekly benefits on the theory that Moore's lower back injury was not connected to her on-the-job fall but was caused solely by the strain she incurred while putting on her pants at home. Moore's numerous requests for weekly benefits were unavailing.

The Industrial Accident Board awarded Moore $5,484.63 for her on-the-job injury. Moore appealed, and in July of 1988, a bench trial was held. The judge found that Moore's back problem was a result of her on-the-job injury and that Moore was totally and permanently incapacitated.

In November of 1988, Moore filed this suit, alleging that the City of Marshall, the Risk Pool, and GAB failed to act in good faith and violated portions of the Insurance Code and the Deceptive Trade Practices Act in handling her claim. A jury trial was held, and the jury found in favor of Moore. The trial court granted the City's and the Risk Pool's motion for judgment non obstante veredicto, finding no evidence that those defendants violated their duty of good faith, and entered judgment only against GAB for $25,000 in actual damages, $75,000 in exemplary damages, and forty percent attorney's fees. GAB appeals from that judgment.

**[1]** GAB first contends that there was insufficient evidence to support the jury's finding that GAB failed to act fairly and in good faith in providing Moore weekly workers' compensation benefits. When considering an insufficiency of the evidence point, this Court must consider and weigh all of the evidence and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

**[2]** **[3]** Workers' compensation carriers have a duty to deal fairly and in good faith with injured employees. *Aranda v. Insurance Co. of North America,* 748 S.W.2d 210, 212–13 (Tex.1988). A claimant who asserts that a carrier has breached its duty of good faith and fair dealing must establish (1) the absence of a reasonable basis for denying or delaying payment of the claim, and (2) that the carrier knew or should have known that there was no reasonable basis for denying or delaying payment of the claim. *Aranda,* 748 S.W.2d at 213.

**[4]** Patricia Strobel, the GAB employee who handled the case, testified that the medical reports in GAB's file indicated that Moore's on-the-job accident had injured her shoulder, elbow, and wrist. Strobel and her supervisor, Mike Bratcher, both testified that GAB was willing to pay any expenses related to Moore's shoulder, elbow, and wrist. But they took the position that Moore's back problem was caused by a separate, intervening accident which happened at home and therefore was not compensable.

The initial report of injury filed by the City, however, indicated that Moore suffered injury to her left shoulder, left leg, *and the left side of her back.* Moreover, GAB had medical reports indicating that Moore was having back problems in the Spring of 1987, after her on-the-job injury but before the alleged intervening incident on July 26, 1987. GAB had a hospital report dated March 26, 1987 indicating that Dr. Douglas Duncan had ordered a CT-scan of Moore's lumbar spine. GAB also had a **\*349** report from Dr. David Adams dated March 26, 1987, stating, "This 38–year–old lady gives a history of falling at work two months ago injuring her left upper extremity *and low back.* She complains of paresthesia of her left hand with frequent nocturnal hand pain. *She also complains of severe low back pain radiating into the left lower extremity.*" (Emphasis added.) GAB had a medical history from Dr. Jorge Martinez indicating that Moore's back had been injured by the January fall.

GAB filed a statement of controversion on October 30, 1987, listing its reasons for denying the claim. According to the statement, GAB's investigation did not indicate that Moore's disability was due to her January injury.

On November 12, Dr. Bob Herrin, who had been treating Moore's back, wrote GAB stating, "It is my opinion that Mrs. Moore's problems with her back originated on January 20, 1987, as a result of her fall." A few days later, GAB was forwarded a report from the physical therapy department of Marshall Memorial Hospital indicating that the therapy Dr. Duncan had prescribed in March included therapy to the left arm, shoulder, neck, and *lower back.* GAB also received an employer's supplemental injury report indicating that, as of October 6, 1987, Moore was off the job as a result of her January injury.

Despite this additional documentation, GAB refused to reconsider its statement of controversion and would not begin weekly benefits. Ken Hargrove, who had worked as a claims adjuster for twenty years, testified that he would have started benefits in this situation and that GAB unreasonably delayed payment.

Two witnesses testified that Sherry Moore's husband, William Moore, told them that Moore's back pain was due to her putting on her pants at home. There was testimony, however, that it is not uncommon for a person to incur an injury and then later, while performing some ordinary task, feel the effects of that injury.

There was sufficient evidence for the jury to find that there was no reasonable basis to deny Moore's claim and that GAB knew or should have known that there was no reasonable basis to deny the claim. The point of error is overruled.

**[5]** GAB next contends there was insufficient evidence to support the jury's finding that GAB engaged in any unfair or deceptive act or practice. An insurer's lack of good faith in processing a claim is an unfair or deceptive act and can be the basis of a cause of action under the Deceptive Trade Practices Act, TEX.BUS. & COM.CODE ANN. § 17.41, et seq. (Vernon 1987 & Supp.1992). *Vail v. Texas Farm Bureau Mut. Ins. Co.,* 754 S.W.2d 129, 135 (Tex.1988); *Allied General Agency, Inc. v. Moody,* 788 S.W.2d 601, 604 (Tex.App.—Dallas 1990, writ denied).

**[6]** The evidence shows that even after GAB received medical reports indicating that Moore's back injury was

caused by her on-the-job fall, GAB refused to reconsider its position, offer a reasonable settlement amount, or begin weekly benefit payments. There was sufficient evidence for the jury to find that GAB engaged in an unfair or deceptive act or practice. The point is overruled.

 [7]    [8]    GAB next urges that the trial court erred in refusing to submit GAB's requested jury instructions. When a requested instruction is submitted in writing and the trial judge refuses it, the judge shall write "refused" on it and sign or initial it. Such an endorsed, refused instruction serves as a bill of exceptions. TEX.R.CIV.P. 276. Nowhere in the record is there a sheet so marked and endorsed, nor is there a formal bill of exceptions. We therefore conclude that GAB did not comply with Rule 276 and did not preserve error. *Templeton v. Unigard Sec. Ins. Co.,* 550 S.W.2d 267, 269 (Tex.1976); *Moffett v. Goodyear Tire & Rubber Co.,* 652 S.W.2d 609, 612 (Tex.App.—Austin 1983, writ ref'd n.r.e.); *Breithaupt v. Navarro County,* 675 S.W.2d 335, 339 (Tex.App.—Waco 1984, writ ref'd n.r.e.).

 [9]    GAB next contends that there was insufficient evidence to support the jury's finding that Moore suffered any out-of- **\*350** pocket expenses or mental damages. In order to establish mental anguish, a plaintiff must show more than mere worry, anxiety, vexation, embarrassment, or anger. *Town East Ford Sales, Inc. v. Gray,* 730 S.W.2d 796 (Tex.App.—Dallas 1987, no writ). Mental anguish includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, wounded pride, shame, despair, and public humiliation. *Trevino v. Southwestern Bell Telephone Co.,* 582 S.W.2d 582, 584 (Tex.Civ.App.—Corpus Christi 1979, no writ).

 [10]    Ireba Hartsell, Moore's Sunday school teacher and personal friend, visited with Moore during the time she was unable to work. Hartsell testified that the Moores had to change residences two or three times during this period; that the Moores had to accept charity from the church food bank on at least two occasions; that Moore told her that Moore had sold personal property and was going to pawn her wedding ring; and that Moore had had to accept a $600 loan from a neighbor.

Hartsell testified that during the time that Sherry Moore was unable to work, William Moore was also disabled by a back injury. Hartsell testified that Sherry Moore was on the verge of a nervous breakdown: very upset, worried, and scared. "She was disturbed to the extent that it was, I believe, having

an effect on her health because she couldn't provide for her family." Ken Hargrove testified that Moore came into his office on more than one occasion and cried because of the family's financial difficulties.

 [11]    [12]    Evidence of what has taken place in a plaintiff's life as a result of a defendant's actions is important in showing mental anguish. *National Union Fire Ins. v. Dominguez,* 793 S.W.2d 66, 73 (Tex.App.—El Paso 1990, writ denied). Jurors are best suited to determine, by referring to their own experiences, whether and to what extent the defendant's conduct caused compensable mental anguish. *St. Elizabeth Hosp. v. Garrard,* 730 S.W.2d 649, 654 (Tex.1987). There was sufficient evidence to support the jury's award of $25,000 for mental anguish damages. The point is overruled.

GAB next contends that it should have been granted a directed verdict because it was the agent of a governmental entity and therefore entitled to governmental immunity.

 [13]    First, the evidence does not clearly establish that GAB was an agent of the Texas Municipal League Intergovernmental Risk Pool. Leigh Goodwin, an employee of the Risk Pool, testified that GAB paid all claims of less than a certain amount without notifying the Risk Pool. If GAB estimated that liability on a claim would be more than $15,000, GAB would notify the Risk Pool, which would then determine whether to extend a settlement offer to the injured worker. Goodwin testified, however, that, based on the information she was provided, the instant claim was not beyond GAB's $15,000 authority. The evidence shows that GAB was an independent contractor acting on its own authority.

 [14]    [15]    Second, GAB does not come within the protective ambit of the official immunity doctrine. Under that doctrine, a state employee who gathers facts and acts on them is clothed with quasi-judicial status and enjoys immunity from personal liability as long as he or she acts in good faith within the scope of his or her authority. *Austin v. Hale,* 711 S.W.2d 64, 66 (Tex.App.—Waco 1986, no writ); *Augustine By Augustine v. Nusom,* 671 S.W.2d 112, 115 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). GAB was not a state employee but a private company that contracted to provide specific services to the Risk Pool. More importantly, the jury found that GAB did not act in good faith.

 [16]    [17]    In some cases, even a state employee with quasi-judicial status is not entitled to official immunity. *Armendarez*

*v. Tarrant County Hospital Dist.,* 781 S.W.2d 301, 306 (Tex.App.—Fort Worth 1989, writ denied). The *Armendarez* court held that a medical doctor is not entitled to immunity if the doctor's duties are neither uniquely governmental in purpose or different from the duties of a doctor in private **\*351** practice. In the present case, GAB was not performing uniquely governmental duties; it was acting just as an adjuster for a private insurance company would. We are not persuaded that GAB is entitled to official or governmental immunity. The trial court committed no error in refusing to grant a directed verdict on the basis of governmental immunity.

GAB also contended that the Texas Tort Claims Act, TEX.CIV.PRAC. & REM.CODE § 101.001, et seq. (Vernon 1986 & Supp.1991), does not allow recovery of the type Moore sought. GAB was not entitled to immunity, however, so the extent to which the Tort Claims Act allows recovery is irrelevant. These points are overruled.

GAB next contends that the trial court erred in refusing to allow an excerpt from Patricia Strobel's deposition to be read to the jury. The excerpt contains questions that were objected to as leading. The court sustained this objection.

 **[18]**    The portion of the deposition in which these questions appear is clearly marked "cross-examination." Ordinarily, leading questions should be permitted on cross-examination. TEX.R.CIV.EVID. 611(c). The purpose of the qualification "ordinarily" is to furnish a basis for denying the use of leading questions when the cross-examination is of a friendly witness, for example, the cross-examination of a party by his own counsel after the party was called by the opponent. TEX.R.CIV.EVID. 611(c) (Notes and comments).

 **[19]**    The deponent, Patricia Strobel, was an employee of GAB, whose counsel was asking the questions. When this

deposition was taken, Strobel was no longer working for GAB, but she could still be characterized as a friendly witness. Rule 611(c) gives the trial judge discretion to limit the use of leading questions in cross-examining a friendly witness.

 **[20]**    **[21]**    Leading questions are questions that suggest the desired answer. *Implement Dealers Mutual Ins. Co. v. Castleberry,* 368 S.W.2d 249, 253 (Tex.Civ.App.—Beaumont 1963, writ ref'd n.r.e.). The questions Moore objected to as leading called for yes or no answers. [1] A question framed so that a yes or no answer will enable the witness to merely echo the words of counsel is leading. *Texas Employers' Ins. Ass'n v. Hughey,* 266 S.W.2d 456, 458 (Tex.Civ.App.—Fort Worth 1954, writ ref'd n.r.e.). A leading question is one which instructs the witness how to answer or puts words into the witness' mouth to be echoed back. *Myers v. State,* 781 S.W.2d 730, 733 (Tex.App.—Fort Worth 1989, pet. ref'd).

 **[22]**    The trial judge did not err by keeping out these questions and answers. Moreover, even if it had been error, it would not have been harmful. The questions inquired whether Strobel had access to certain medical records in handling Moore's claim. Moore had already shown, as part of her prima facie case, that GAB had these records in its files when it denied her claim. The excluded testimony was merely cumulative of what had already been presented to the jury. The point is overruled.

The judgment of the trial court is affirmed.

**All Citations**

829 S.W.2d 345

---

Footnotes

1    Q. Did you have the benefit of Dr. Duncan's report of March 26, 1987, where he indicated he wanted to run a CAT scan of Ms. Moore's low back, and if it was negative, he was going to proceed as though her injury was a mild ligamentous type strain?
       A. Yes, sir.
       ....
     Q. Did you also have the benefit of Dr. Duncan's report of April the 14th, 1987, where he reported that Ms. Moore's CAT scan was negative and the EMG or the nerve conduction study performed by Dr. Adams was also negative?
     ....
     A. Yes, sir.
     Q. Did you have, in considering Ms. Moore's claim, the report of Dr. Duncan dated 6–3–87 where he makes no mention of any back problem?

A. Yes, sir.

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.



116 S.W.3d 757
Supreme Court of Texas.

GOLDEN EAGLE ARCHERY, INC.

v.

Ronald JACKSON.

No. 01–0007.  |  Argued Oct. 16,
2002.  |  Decided Sept. 11, 2003.

In a products liability action against the manufacturer of compound bow, the user moved for a new trial alleging juror misconduct. The 136th Judicial District Court, Jefferson County, entered judgment and denied motion for new trial. User appealed. The Court of Appeals, Stover, J., 974 S.W.2d 952, reversed and remanded. Review was granted. The Supreme Court, Gonzales, J., 24 S.W.3d 362, reversed and remanded. On remand, the Court of Appeals, 29 S.W.3d 925, reversed and remanded. Manufacturer filed a petition for review. The Supreme Court, Owen, J., held, as an issue of first impression, that: (1) a jury may consider "physical impairment" as a factor loss of enjoyment of life; (2) when only one category of damages is challenged on the basis that the award in that category was zero or was too low, a court should consider only whether the evidence unique to that category is so against the great weight and preponderance of the evidence; and (3) when the jury's failure to find greater damages in more than one overlapping category is challenged, the court of appeals should first determine if the evidence unique to each category is factually sufficient and, if it is not, the court of appeals should then consider all the overlapping evidence.

Reversed and remanded.

O'Neill, J., filed a concurring opinion, in which Schneider, J., joined.

West Headnotes (20)

**[1]** **Appeal and Error**
　　 Review of Questions of Fact

Although the Supreme Court does not have jurisdiction to conduct a factual sufficiency review, it does have jurisdiction to determine whether a court of appeals has applied the correct standard in conducting a factual sufficiency review.

11 Cases that cite this headnote

**[2]** **Appeal and Error**
　　 Conclusiveness in General

In conducting a factual sufficiency review, a court must not merely substitute its judgment for that of the jury.

65 Cases that cite this headnote

**[3]** **Appeal and Error**
　　 Province of Jury

The jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony.

244 Cases that cite this headnote

**[4]** **Appeal and Error**
　　 Sufficiency of Evidence in Support

Before a court can properly conduct a factual sufficiency review, it must first have a clear understanding of the evidence that is pertinent to its inquiry.

9 Cases that cite this headnote

**[5]** **Appeal and Error**
　　 Sufficiency of Evidence in Support

The starting point of factual sufficiency review generally is the charge and instructions to the jury.

14 Cases that cite this headnote

**[6]** **Damages**
　　 Elements of Compensation in General

When someone suffers personal injuries, the damages fall within two broad categories-economic and non-economic damages: traditionally, "economic damages" are those that compensate an injured party for lost wages, lost earning capacity, and medical expenses, whereas "non-economic damages"

include compensation for pain, suffering, mental anguish, and disfigurement.

28 Cases that cite this headnote

**[7]** **Damages**
 Mental Suffering and Emotional Distress

"Hedonic damages" are a type of non-economic damages and compensate for loss of enjoyment of life.

15 Cases that cite this headnote

**[8]** **Appeal and Error**
 Instructions Understood or Followed

Unless the record demonstrates otherwise, an appellate court must presume that the jury followed its instructions on damages.

23 Cases that cite this headnote

**[9]** **Appeal and Error**
 Amount of Recovery

In conducting its factual sufficiency review, the court of appeals should presume that the jury did not award damages for any element more than once, unless the record demonstrates otherwise.

8 Cases that cite this headnote

**[10]** **Damages**
 Nature of Injury or Threat in General

The pangs of separation from family during hospitalization may be taken into account as a part of the injured person's mental suffering.

Cases that cite this headnote

**[11]** **Damages**
 Discretion as to Amount of Damages

**Damages**
 Discretion as to Amount of Damages

**Damages**
 Discretion as to Amount of Damages

**Damages**
 Questions for Jury

Whether to award damages and how much is uniquely within the factfinder's discretion.

2 Cases that cite this headnote

**[12]** **Damages**
 Mental Suffering and Emotional Distress

**Damages**
 Instructions Authorizing Double Recovery

**Damages**
 Physical Suffering and Inconvenience Resulting from Injuries

If "physical impairment" is defined for a jury, the jury may consider as a factor loss of enjoyment of life, although the jury should be instructed that the effect of any physical impairment must be substantial and extend beyond any pain, suffering, mental anguish, lost wages or diminished earning capacity and that a claimant should not be compensated more than once for the same elements of loss or injury.

40 Cases that cite this headnote

**[13]** **Appeal and Error**
 Mistake, Passion or Prejudice; Shocking Conscience or Sense of Justice

When only one category of damages is challenged on the basis that the award in that category was zero or was too low, a court should consider only whether the evidence unique to that category is so against the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias even if the evidence also relates to another category of damages.

74 Cases that cite this headnote

**[14]** **Appeal and Error**
 Inadequate Verdict

When the jury's failure to find greater damages in more than one overlapping category is challenged, the court of appeals should first determine if the evidence unique to each category is factually sufficient; if it is not, the court of appeals should then consider all the overlapping evidence, together with the evidence

unique to each category, to determine if the total amount awarded in the overlapping categories is factually sufficient.

23 Cases that cite this headnote

**[15]** **Appeal and Error**

🔑 Amount of Recovery

A court of appeals should confine its review to evidence, if any, that is unique to the challenged category of damages.

4 Cases that cite this headnote

**[16]** **New Trial**

🔑 Inadequate Damages

**New Trial**

🔑 Inadequate Damages

If the jury's failure to award damages or the amount of damages awarded is so against the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias, then a new trial would be required.

59 Cases that cite this headnote

**[17]** **Appeal and Error**

🔑 Inadequate Verdict

Courts should not conclude that a jury's failure to award any damages for physical impairment is against the great weight and preponderance of the evidence simply because there is objective evidence of an injury.

13 Cases that cite this headnote

**[18]** **Damages**

🔑 Nature and Theory of Compensation

A tort victim should be fully and fairly compensated, but double recovery should be avoided.

1 Cases that cite this headnote

**[19]** **Appeal and Error**

🔑 Form and Requisites

Court of appeals was required to detail the evidence that supported the jury's failure to award to bow user any damages in products liability action for physical impairment other than loss of vision or state in what regard the contrary evidence greatly outweighed the evidence in support of the verdict.

7 Cases that cite this headnote

**[20]** **Appeal and Error**

🔑 Submission of Issues or Questions to Jury

Trial court's error, if any, in submitting both "physical impairment of loss of vision" and "physical impairment other than loss of vision" as separate items of damage was not reversible error, absent any explanation by bow manufacturer of how it was harmed by the submission, particularly in light of the jury's award of "$0" for physical impairment other than loss of vision in the products liability action.

9 Cases that cite this headnote

**Attorneys and Law Firms**

**\*759** Jacqueline M. Stroh, Crofts & Callaway, P.C., San Antonio, Lipscomb Norvell, Jr., Benckenstein Norvell & Nathan, Beaumont, for petitioner.

John Cash Smith, Bush, Lewis & Roebuck, George Barron, Orange, David W. Holman, Holman & keeling, P.C., Houston, for respondent.

**Opinion**

Justice OWEN delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice ENOCH, Justice SMITH, and Justice WAINWRIGHT joined.

In this case, we resolve how courts of appeals are to conduct a factual sufficiency review when 1) a jury is permitted to award damages for elements that somewhat overlap, 2) the jury is instructed not to duplicate an award for any particular loss, and 3) the jury awards no damages or **\*760** damages that are allegedly inadequate for an element that could overlap with another.

Because the court of appeals in this case did not properly apply the standard of review set forth in *Pool v. Ford Motor Co.,*[1] and because this Court has never before articulated the standard for factual sufficiency review when evidence pertains to more than one category of damages, we reverse the court of appeals' judgment[2] and remand this case to that court for another factual sufficiency review.

## I

This is the second time that this case has been before our Court. In our prior decision,[3] we considered alleged juror misconduct and whether Texas Rule of Civil Procedure 327(b) and Texas Rule of Evidence 606(b), limiting proof of juror misconduct, are constitutional. We held that there was no competent evidence of juror misconduct and that Rules 327(b) and 606(b) neither deprive litigants of a fair trial under the Texas Constitution nor fail to afford litigants due process.[4] We remanded the case to the court of appeals to consider issues it had not reached.[5] On remand, the court of appeals held that the jury's failure to award any damages for a category of physical impairment was so against the great weight and preponderance of the evidence that the zero damages award was manifestly unjust and required a new trial.[6] Our focus is on that issue.

Ronald Jackson received a compound hunting bow manufactured by Golden Eagle Archery as a gift from his wife. When she presented it to him, he attempted to demonstrate how it is used. The bow went out of control, and the metal rod that separated the bow string from the cables struck Jackson in the eye. He bled profusely, required emergency treatment at one hospital, was transferred to another hospital for additional treatment, and spent ten days there. He suffered broken bones around the orbit of his eye, some loss of vision, a ruptured sinus, and a broken nose. Upon discharge he was instructed to limit activities to avoid straining or lifting. About a month later, he underwent surgery to repair the orbital fractures and other reconstructive surgery and was hospitalized an additional three days. Jackson was unable to work for about two months after the date of the accident with the bow. He returned to work thereafter, but has some permanent impairment to his eye and vision, and some disfigurement.

Jackson sued Golden Eagle, alleging that the bow was defectively designed and marketed. The jury failed to find a design defect, but found that Golden Eagle did not give adequate warnings of the product's danger. A single damage question was submitted in which the jury was permitted to award damages in six separate categories. They awarded $25,393.10 for medical care, $2,500 for physical pain and mental anguish, $2,500 for "physical impairment of loss of vision," $0 for "physical impairment other than the loss of vision," $1,500 for disfigurement, and $4,600 for loss of earnings in the past.

The trial court rendered judgment on the verdict in favor of Jackson, and Jackson appealed. As we have already described **\*761** above, the court of appeals reversed the trial court's judgment after concluding that two of our rules of procedure were unconstitutional. We reversed the court of appeals and remanded other, unresolved issues to that court. Following that remand, the court of appeals considered Jackson's contention that he was entitled to a new trial because the jury's failure to award any damages for "physical impairment other than loss of vision" was against the great weight and preponderance of the evidence. Jackson also contended that the jury's awards for physical pain and mental anguish, physical impairment because of loss of vision, and disfigurement were inadequate and required a new trial. The court of appeals agreed with Jackson regarding the award of no damages for physical impairment other than loss of vision. It remanded the case for a new trial and therefore did not reach Jackson's other issues on appeal.

Golden Eagle filed a petition for review in our Court. We granted that petition to consider the proper standard to be applied in conducting a factual sufficiency review of a jury's failure to award any damages for physical impairment.

## II

 **[1]**   **[2]**   **[3]**   Although this Court does not have jurisdiction to conduct a factual sufficiency review, we do have jurisdiction to determine whether a court of appeals has applied the correct standard in conducting a factual sufficiency review.[7] It is a familiar principle that in conducting a factual sufficiency review, a court must not merely substitute its judgment for that of the jury.[8] It is an equally familiar principle that the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony.[9]

We held in *Pool v. Ford Motor Co.* that in order for this Court to conduct a meaningful review of whether a court of appeals has correctly applied the factual sufficiency standard, courts of appeals "should, in their opinions, detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias." [10] Pointedly, we added, "[f]urther, those courts, in their opinions, should state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict. It is only in this way that we will be able to determine if the requirements of *In re King's Estate* have been satisfied." [11] We held in *In re King's Estate* that a court of appeals must

consider and weigh all of the evidence in the case and to set aside the verdict and remand the cause for a new trial, if it thus concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust—this, regardless of whether the record contains some "evidence of probative force" in support of the verdict.... The evidence supporting the verdict is to be

weighed along with the **\*762** other evidence in the case, including that which is contrary to the verdict. [12]

 **[4]** **[5]** Before a court can properly conduct a factual sufficiency review, it must first have a clear understanding of the evidence that is pertinent to its inquiry. The starting point generally is the charge and instructions to the jury. In this case the jury was instructed and answered as follows:

What sum of money, if paid now in cash, would fairly and reasonably compensate Ronald Jackson for his damages, if any, that resulted from the injury in question?

Consider the elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element. Do not include interest on any amount of damages you find.

Do not reduce the amounts, if any, in your answers because of the negligence, if any, of Ronald Jackson.

Answer in dollars and cents for damages, if any, that were sustained in the past and that in reasonable probability will be sustained in the future, unless otherwise instructed.

Answer:

| | |
|---|---|
| a. Medical care | $25,393.10 |
| b. Physical pain and mental anguish | $ 2,500.00 |
| c. Physical impairment of loss of vision | $ 2,500.00 |
| d. Physical impairment other than loss of vision | $ 0 |
| e. Disfigurement | $ 1,500.00 |
| f. Loss of earnings in the past | $ 4,600.00 |

The only definition that was given regarding this question was a definition of "injury" that said: " 'Injury' means damage or harm to the physical structure of the body and such diseases or infection as naturally result therefrom, or the incitement, acceleration, or aggravation of any disease, infirmity, or condition, previously or subsequently existing, by reason of such damage or harm." "Physical impairment" was not defined, nor were any of the other listed categories of damages.

Jackson does not challenge the jury's findings regarding medical care and loss of past earnings. The jury awarded the full amounts he requested in those categories. It is the non-economic damages that are at issue. The court of appeals addressed only the jury's failure to award damages for "Physical impairment other than loss of vision." The court of appeals concluded that the failure to award damages in this category was against the great weight and preponderance of the evidence because "Jackson sustained multiple fractures to his face; four of the seven bones that make up the orbit

of the eye were fractured.... [H]e sustained a ruptured sinus and a broken nose.... [H]e remained [in the hospital] for ten days.... Thirty-seven days elapsed from the date of the accident ... until the injuries to his face were repaired," and he had headaches up until the time of trial. [13]

Jackson's arguments in this Court focus more directly on the "loss of enjoyment of life" he suffered while hospitalized and recuperating. Specifically, Jackson's brief says:

> The injury to [Jackson's] orbital area, nose and sinuses resulted in his hospitalization for ten days immediately following the accident and then for another three days for surgery to repair the broken orbital bones, nose and ruptured sinus. These objective injuries did not allow [Jackson] to enjoy any of his normal life activities during the time of his **\*763** hospitalizations. Moreover, the pain medication prescribed for Jackson kept him "zombied out" most of the time between the first and second hospitalizations. The normal life activities impaired by these injuries include enjoyment of home life activity with family, socializing with friends such as he was doing when he was injured, enjoying the bow which he had looked forward to having and the bow hunting season which he was wanting to do and had brought on the desire for the bow in the first place.... The disability of [Jackson] was obvious form [sic] the injuries themselves and did not require Jackson to produce evidence to show the tasks that he could not do during the periods of his hospitalizations and the time in between the hospital stays.... A person that is hospitalized with traumatic injuries cannot engage (at least for the time of hospitalization) in his or her normal life activities outside of work and consequently suffers loss of physical impairment [sic]. [14]

In reviewing the record evidence, the court of appeals generally focused on physical injuries while Jackson focuses on what are sometimes called "hedonic damages." [15] Our first inquiry is to determine whether the evidence recounted by the court of appeals and relied upon by Jackson pertains to "physical impairment other than loss of vision," to some other category of damage that was submitted to the jury, or both. For the reasons we consider below, we conclude that this evidence pertains to more than one of the categories that were submitted, particularly in light of the fact that neither "physical impairment" nor any of the other damage elements were defined. Our second inquiry is how a factual sufficiency review should be conducted given that overlapping elements of damages were submitted and the jury was instructed not to award damages for the same loss more than once.

## III

 **[6]** **[7]** When someone suffers personal injuries, the damages fall within two broad categories—economic and non-economic damages. Traditionally, economic damages are those that compensate an injured party for lost wages, lost earning capacity, and medical expenses. Non-economic damages include compensation for pain, suffering, mental anguish, and disfigurement. "Hedonic" damages are another type of non-economic damages and compensate for loss of enjoyment of life. [16]

This Court has never considered the historical origins of the term "physical impairment" or its parameters in any detail. **\*764** But Texas courts, including this one, have long recognized that "physical impairment" or similar concepts could encompass both economic and non-economic damages. [17] Early Texas decisions seemed to recognize that while an injured party was entitled to a full recovery, care should be taken to prevent a double recovery when instructions are given to a jury. Courts of appeals have been conscious of these concerns. In *Robinson v. Minick,* the court observed, "[t]he intermediate appellate courts have shown extreme caution in reviewing claims for physical impairment because of justified concern to prevent a double recovery." [18] That same court lamented, "[o]ur review of this difficult area of the law is hampered by the absence of supreme court authority." [19]

The only guidance our Court has given since our early decisions was in *Estrada v. Dillon.* [20] There we considered

whether a court of appeals had properly conducted a factual sufficiency review of evidence of damages due to physical impairment.[21] The jury had awarded damages for past physical pain and mental anguish, past loss of earnings, and past medical care. The jury did not award any damages for future physical pain and mental anguish, future medical care, future loss of earning capacity, past or future physical impairment, or past or future disfigurement.[22] The court of appeals reversed the trial court's judgment and remanded the case, concluding that the failure to award any damages for past physical impairment required a new trial.[23] The court of appeals did not reach the plaintiffs' contention that the failure to award damages for other elements also required reversal.[24] We found no error in the factual sufficiency review, but we did hold that the court of appeals erred in remanding for a new trial solely on damages.[25] We did not analyze in any detail the history of physical impairment, but instead focused on whether a jury must award damages for past physical impairment if there was objective evidence of an injury.[26] We "assumed" that the defendants' definition of physical impairment was correct. We said: "Assuming that [the defendants] are correct that evidence of physical impairment must focus on restriction of activities caused by the injury, the court of appeals' analysis in this case is not inconsistent with that focus. The court of appeals did not hold that proof of objective injury alone establishes physical impairment."[27] Today, we examine more carefully what evidence relates to physical impairment, the potential for double recovery, **\*765** and how a factual sufficiency review should be conducted.

The courts of appeals have recognized that physical impairment can encompass economic as well as non-economic damages.[28] A number of those courts have attempted to separate physical impairment from economic damages by defining physical impairment to exclude any impediment to earning capacity and also to separate physical impairment from the non-economic damages of pain and suffering. Over the last thirty years, a number of courts of appeals have said,[29] as the court of appeals in the case before us today said, that "[t]o recover damages for physical impairment, a plaintiff must prove 'that the effect of his physical impairment extends beyond any impediment to his earning capacity and beyond any pain and suffering to the extent that it produces a separate and distinct loss that is substantial and for which he should be compensated.' "[30]

The genesis of this definition of "physical impairment" is not entirely clear. And the courts of appeals have not been entirely congruent in applying that term to particular facts. Most of the Texas cases that have addressed physical impairment have concluded either explicitly or implicitly that the injury must be permanent and affect physical activities.[31] There are **\*766** some decisions, though, that seem to have concluded that temporary injuries can give rise to physical impairment.[32] In *Estrada v. Dillon,* this Court seems to have agreed with a court of appeals that evidence of temporary injuries could amount to evidence against the great weight and preponderance when a jury failed to award any damages for past physical impairment.[33]

The courts of appeals are in far greater disagreement, however, on whether "physical impairment" encompasses hedonic damages, that is, the "loss of enjoyment of life." There are three possibilities. Loss of enjoyment of life could be encompassed entirely by "physical impairment," not encompassed in that term at all, or spill across physical impairment as well as other categories of damage. Other than this Court's early, tangential ruminations in *International & G.N. Railway Co. v. Butcher,*[34] mentioned above, we have never decided whether loss of enjoyment of life can be an element of recovery.

A very early court of appeals' decision, *Locke v. International & G.N. R. Co.,* indicated there could be no recovery for loss of enjoyment of life.[35] It held that there was no error in excluding testimony about "loss of capacity for 'the enjoyment of pleasures of life' " because the concept was "too vague to furnish any information upon a definite subject upon which damages would arise or be allowed."[36] We have found no other court of appeals decision in Texas that ascribes to this view.

Subsequently, a court of appeals recognized that the inability to have a normal life is compensable. In *Dr. Pepper Bottling* **\*767** *Co. v. Rainboldt,*[37] a delivery truck struck a young girl. The defendant argued on appeal that the trial court allowed a double recovery because "physical pain and anguish are involved in bodily impairment."[38] The court of appeals rejected that argument, pointing out that the trial court had defined bodily impairment as "the loss or injury of a member."[39] The court explained that there was, of course, pain incident to such a loss, but that it was separate.[40] The court continued:

To illustrate, a man might lose his leg; that would be a bodily impairment. In connection with the loss of the leg, he might suffer at the same time pain and anguish. The wound might heal and the pain and anguish disappear, but the bodily impairment, to wit, the loss of the leg, would remain. The evidence [in *Dr. Pepper*] supports the element of bodily impairment. Her bladder is permanently injured. She will not be able to bear children. Her injuries are permanent. [41]

Under this reasoning, recovery for loss of a member could include the mental anguish for the loss of bodily functions, separate and apart from the pain and anguish experienced during recuperation, and could also include the loss of the ability to have, nurture, and enjoy children.

Other Texas courts of appeals' opinions that have considered loss of enjoyment of life have agreed on at least two things. First, a factfinder should be free to compensate an injured party who is physically impaired to the extent that party may no longer engage in or enjoy activities that he or she was able to do before the injury. Second, Texas courts of appeals have uniformly held that loss of enjoyment of life is not a separate category of damage, [42] which is in accord with a number of other jurisdictions. [43] Beyond this, the courts of appeals' decisions diverge.

 **\*768** The Texarkana court of appeals said in *Missouri Pacific Railroad Co. v. Lane* that "[l]oss of enjoyment of life may not be claimed as a separate element of damages, but may be treated as a factor in determining the damages in general or those for pain and suffering." [44] It reiterated this view in *Fibreboard Corp. v. Pool.* [45] The Corpus Christi court of appeals in *Spohn Hospital v. Mayer* seemed to agree with *Lane* and *Fibreboard,* concluding that "[e]vidence of a loss of enjoyment of life may be considered in determining damages in general or for pain and suffering." [46] However, the Tyler court of appeals' analyses do not agree entirely with the Texarkana and Corpus Christi courts. In *Brookshire Brothers, Inc. v. Wagnon,* the Tyler court suggested that "certainly the loss of enjoyment of life, which encompasses the loss of the injured party's former lifestyle, may be considered when determining mental anguish damages." [47] In *Wal–Mart Stores, Inc. v. Holland,* that court said that "physical impairment, sometimes termed loss of enjoyment of life, encompasses the loss of the injured party's former lifestyle." [48] The Fourteenth District court of appeals in

Houston seems to have agreed with the latter view of the Tyler court, holding that "[p]hysical impairment, sometimes called loss of enjoyment of life, encompasses the loss of the injured party's former lifestyle." [49] A dissenting opinion in the San Antonio court of appeals contended that loss of enjoyment of life should be categorized as part of mental anguish damages. [50] Thus, loss of enjoyment of life has variously been categorized as an element of pain and suffering, mental anguish, or physical impairment.

The divergence of views is understandable. Courts across the country have struggled with whether loss of enjoyment of life is compensable at all, and if so, whether it is part of pain and suffering, mental anguish, or physical impairment, or is a separate, independent category of damages. [51] And, as indicated above, there **\*769** is a logical nexus between loss of enjoyment of life and each of the categories of non-economic damages recognized in Texas—pain, suffering, mental anguish, disfigurement, and physical impairment.

The widely disparate views of courts in Texas and across the country lead us to conclude that in the case before us today, the court of appeals should not have applied the definition of "physical impairment" so frequently quoted by Texas courts of appeals in considering the factual sufficiency of the evidence. [52] The court of appeals said, "[t]o recover damages for physical impairment, a plaintiff must prove 'that the effect of his physical impairment extends beyond any impediment to his earning capacity and beyond any pain and suffering to the extent that it produces a separate and distinct loss that is substantial and for which he should be compensated.' " [53]

 **\*770** First, that definition does not fully eliminate the overlap among physical impairment, pain, suffering, mental anguish, and disfigurement. Nor does it give adequate guidance about whether the impairment must be the result of a permanent injury. Second, and more importantly, that definition was not given to the *jury* in this case. If courts across the country can rationally conclude that loss of enjoyment of life can be part of pain and suffering or mental anguish or disfigurement or physical impairment, then so can a jury. The jury in this case could have compensated Jackson for loss of enjoyment of life as part of physical pain and mental anguish, or disfigurement, or divided compensation in some manner between the two categories. The jury charge permitted the jury to make its own determination of how to categorize and compensate the losses suffered by Jackson.

The jury submission in this case comports with a practice suggested by some courts of appeals. Instead of defining damage categories for juries in such a way that they do not overlap, which we recognize may not be feasible for some damage elements, some courts of appeals have concluded that to avoid double awards of damages, particularly when physical impairment is submitted, juries should be directly instructed not to award overlapping damages. [54] The decision in *French v. Grigsby* [55] approved such an instruction in affirming the trial court's judgment awarding damages for physical impairment:

> In answering this special issue you shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss, that is, do not compensate twice for the same loss, if any. [56]

This type of instruction informs the jury that it is not to make a duplicative award of damages. In this regard, we note that the trial court in the case before us today followed the State Bar of Texas Pattern Jury Charge to some extent, [57] which uses language different from the instruction in *French.* The trial court's charge said: "Consider the elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element." The instruction in *French* is clearer.

Given that some of the categories of damages submitted to the jury in this case were not defined and therefore were not cleanly and clearly segregated from one another, the question, then, is how should the court of appeals review the factual sufficiency of the evidence supporting the jury's award for physical impairment. It is to that question that we now turn.

### IV

The charge in this case permitted the jury to award separate amounts of damages **\*771** in six different categories. The standard of review to determine factual sufficiency of the evidence that we set forth today differs from the standard of review that is applied when the jury is asked to award a single amount of damages, but is told that it may consider various elements in arriving at that amount. [58] In the latter circumstance, we have held that a challenge must address all the elements that could have been considered by the jury in making its total, single-amount award. [59] "If there is just one element that is supported by the evidence, the damages award will be affirmed if it is supported by the evidence." [60]

[8] [9] In the case before us, the jury had six blanks to fill and was instructed not to award damages for the same element more than once. Unless the record demonstrates otherwise, an appellate court must presume that the jury followed these instructions. [61] In conducting its factual sufficiency review, the court of appeals should presume that the jury did not award damages to Jackson for any element more than once, unless the record demonstrates otherwise. Accordingly, in reviewing the evidence, the court of appeals should consider whether the jury could reasonably have compensated Jackson for a particular loss that might be "physical impairment other than loss of vision" under another category of damages. If the jury could have done so, then the failure to award damages for that particular loss would not be against the great weight and preponderance of the evidence.

The court of appeals should first consider what evidence is unique to "physical impairment other than loss of vision." In this regard, the bone fractures, ruptured sinus, and broken nose sustained by Jackson are the typical type of physical injury for which a jury could reasonably compensate an injured party through an award for physical pain and mental anguish. Evidence of Jackson's headaches could also logically fall either within "physical impairment other than loss of vision," for which the jury awarded no damages, or within past and future physical pain and mental anguish, for which the jury did award damages.

[10] [11] The evidence regarding Jackson's hospital confinements and his alleged loss of enjoyment of life for the two months he was recuperating present a more complex question. A number of decisions in other jurisdictions indicate that loss of enjoyment of life results from permanent rather than temporary injuries, [62] **\*772** although a few decisions indicate otherwise. [63] Particularly in light of the availability of damages in other categories, such as pain, suffering, and mental anguish to compensate for a temporary inability to enjoy life's activities, a jury could reasonably conclude that hedonic damages should be awarded only for permanent injuries. To the extent that our decision in *Estrada v. Dillon* [64] could be read to hold otherwise, we did not focus on that specific issue, as we now have done. As the Supreme Court of Michigan has observed, "the pangs of separation from family during hospitalization may be taken into account as a part of the injured person's mental suffering." [65] The Supreme

Court of Alaska has also categorized "a substantial amount of time convalescing in the hospital" as evidence of pain and suffering. [66] But whether to award damages and how much is uniquely within the factfinder's discretion.

 [12]   We are persuaded that in the proper case, when the evidence supports such a submission, loss of enjoyment of life fits best among the factors a factfinder may consider in assessing damages for physical impairment. Indeed, if other elements such as pain, suffering, mental anguish, and disfigurement are submitted, there is little left for which to compensate under the category of physical impairment other than loss of enjoyment of life. Accordingly, if "physical impairment" is defined for a jury, it would be appropriate to advise the jury that it may consider as a factor loss of enjoyment of life. But the jury should be instructed that the effect of any physical impairment must be substantial and extend beyond any pain, suffering, mental anguish, lost wages or diminished earning capacity and that a claimant should not be compensated more than once for the same elements of loss or injury.

 **\*773** **[13]** **[14]** **[15]** **[16]**   In the case before us today, no definition of "physical impairment" was given or requested. Without any definition to guide it, the jury could have concluded that Jackson's temporary injuries resulted in compensable loss of enjoyment of life. However, the jury could reasonably have decided to compensate Jackson for the time he spent hospitalized and recuperating, during which he was unable to enjoy recreational activities, under the category of physical pain and mental anguish. Or, the jury could have decided that Jackson should not recover any hedonic damages for his temporary injuries. If a court of appeals were to base its decision on the sufficiency of the evidence to support the jury's failure to award damages for one category of damages (or its failure to award larger damages) on evidence that the jury could have credited in making an award for other damage elements, then the court of appeals would be substituting its judgment for that of the jury in evaluating in which category, if any, the injured party should have been compensated. A court of appeals should therefore confine its review to evidence, if any, that is unique to the challenged category. If the jury's failure to award damages or the amount of damages awarded is so against the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias, then a new trial would be required.

If only one category of the jury's award is challenged, and the award in that category is not against the great weight and preponderance of the evidence unique to it, the court's inquiry should end there. A court should not consider losses or injuries for which the jury could have compensated the injured party under a different category unless a factual sufficiency challenge is made to all overlapping categories of damages. Otherwise, an injured party could receive an adequate award for all injuries and losses sustained when a jury chooses to compensate for injuries or losses in the categories of pain, suffering or mental anguish, rather than physical impairment, and the injured party would still get a new trial by challenging only the jury's award under physical impairment.

In this case, Jackson has challenged the factual sufficiency of the jury's failure to award larger damages in the categories of physical pain and mental anguish, physical impairment of loss of vision, and disfigurement, as well as the award of no damages for "physical impairment other than loss of vision." The court of appeals should conduct a review of each of these categories, considering the evidence unique to each category. If, after considering evidence unique to a category, the court concludes that the jury's failure to award larger damages for that category is against the great weight and preponderance of the evidence, it should then consider all the overlapping evidence, together with the evidence unique to each other category to determine if the total amount awarded in the overlapping categories is factually sufficient. This takes into account all the evidence regarding damages in categories that overlap, but does not credit that evidence more than once in evaluating the amount awarded by the jury.

The necessary corollary to these principles is that in reviewing a challenge that an award for a category is excessive because there is factually insufficient evidence to support it, a court of appeals should consider all the evidence that bears on that category of damages, even if the evidence also relates to another category of damages. To do otherwise would mean that evidence that reasonably could have supported the jury's award would not be considered, which would be improper. If more than one award in overlapping categories is challenged as excessive, the court **\*774** of appeals should consider all the evidence that relates to the total amount awarded in all overlapping categories to determine if the total amount awarded was excessive. This likewise gives full effect to all the evidence without crediting any of the evidence more than once.

Golden Eagle contends that the court of appeals concluded that the jury was required to award damages for "physical impairment other than loss of vision" solely on the basis that there was objective evidence of physical injury. In this regard the court of appeals said that it found the decision in *Robinson v. Minick* [67] "instructive." [68] The injured party in *Robinson* had facial fractures, surgery, and spent a month in the hospital. The court in *Robinson* held that "when we apply settled law that requires a jury to award something for every element of damage proven, to the undisputed, objective evidence of severe physical impairment in the past, we cannot escape the conclusion that the jury's finding of $0 is against the great weight and preponderance of the evidence." [69] Similarly, the court of appeals in this case held that "[t]here is nothing subjective or conflicting about the evidence of the broken bones around [Jackson's] eye, the broken nose, or ruptured sinus" and that these "injuries are demonstrative of impairment beyond pain and suffering, loss of earning capacity, and loss of vision." [70]

 **[17]**    In keeping with the principles that a court may not substitute its judgment for that of the jury and that the jury is the sole judge of the weight and credibility of testimony, courts should not conclude that a jury's failure to award any damages for physical impairment is against the great weight and preponderance of the evidence simply because there is objective evidence of an injury. The courts of appeals in *Landacre v. Armstrong Building Maintenance Co.* [71] and *Platt v. Fregia* [72] both concluded that a jury's failure to award damages for physical impairment was not against the great weight and preponderance of the evidence even though the plaintiffs in those cases had some permanent functional loss of a part of their body. In *Landacre,* the plaintiff had a frozen shoulder and her normal range of motion decreased to 50%. In *Platt,* the plaintiff lost 30% function in his knee. The jury in each case had awarded amounts in other categories of non-economic damages. The court in *Landacre* concluded that "[t]he determination that the appellant has not and will not suffer physical impairment apart from that already compensated for is uniquely within the jury's province." [73]

Similarly, in *Pilkington v. Kornell,* the court of appeals concluded that when a jury is presented with conflicting evidence about the existence and severity of a physical injury and associated pain, the jury "could believe all or any part of the testimony **\*775** of any witness and disregard all or any part of the testimony of any witness." [74] The court upheld a

jury's failure to award any damages for pain and suffering. [75] This does not mean, however, that a verdict awarding no damages for pain and suffering should be upheld on appeal if there is objective, undisputed evidence of a significant injury and the jury could not have compensated the injured party in some other category of damages.

In *Monroe v. Grider,* [76] the court of appeals properly drew a distinction between a jury's failure to award damages for pain and suffering when there was objective, undisputed evidence of injury and the jury's failure to award damages for mental anguish. In that case, the trial court had submitted physical pain and mental anguish in one issue. The jury failed to award any damages in that category, although the plaintiff had a fractured wrist and a sprained muscle in her groin that "temporarily prevented her from working and fully enjoying recreational activities." [77] The court of appeals held, "[u]ncontroverted evidence of an objective injury does not always require mental anguish damages," but the jury could not ignore uncontroverted evidence of injury in denying any recovery for past physical pain. [78]

To summarize the factual sufficiency standard of review that we adopt today, when only one category of damages is challenged on the basis that the award in that category was zero or was too low, a court should consider only whether the evidence unique to that category is so against the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. When, as in this case, the jury's failure to find greater damages in more than one overlapping category is challenged, the court of appeals should first determine if the evidence unique to each category is factually sufficient. If it is not, the court of appeals should then consider all the overlapping evidence, together with the evidence unique to each category, to determine if the total amount awarded in the overlapping categories is factually sufficient.

 **[18]**    This standard of review gives due regard to a jury's choice of whether and how to categorize and compensate for specific losses or injuries that could reasonably fall into more than one category of damages. It also advances the principles that a tort victim should be fully and fairly compensated, but that a double recovery should be avoided.

 **[19]**    Additionally, in reviewing a jury's failure to award any damages, courts of appeals should apply the principles articulated in *Pool v. Ford Motor Co.* [79] In this case, the

court of appeals did not detail the evidence that supported the jury's failure to award any damages for physical impairment other than loss of vision or state in what regard the contrary evidence greatly **\*776** outweighed the evidence in support of the verdict, as our decision in *Pool* requires.

### V

 **[20]** Finally, we consider Golden Eagle's contention that the trial court erred in submitting both "physical impairment of loss of vision" and "physical impairment other than loss of vision" as separate items of damage. Golden Eagle argues that submitting these elements violated Texas Rule of Civil Procedure 277. We need not decide whether Golden Eagle preserved this complaint for appeal because we conclude that there was no reversible error in the submission.

Rule 277 provides that "[i]n all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions." [80] Although the trial court granulated physical impairment into two separate categories, Golden Eagle did not explain how it was harmed by this submission, particularly in light of the jury's award of "$0" for physical impairment other than loss of vision.

We reverse the judgment of the court of appeals and remand this case to that court for further proceedings.

Justice O'NEILL filed a concurring opinion, in which Justice SCHNEIDER joined.

Justice JEFFERSON did not participate in the decision.

Justice O'NEILL filed a concurring opinion, in which Justice SCHNEIDER joined.

If I were directed to conduct a factual sufficiency review of the evidence in this case under the standard the Court articulates today, I wouldn't have a clue. The question this case presents is simple and straightforward: did the court of appeals follow the review standard we articulated in *Pool v. Ford Motor Company,* 715 S.W.2d 629 (Tex.1986), in reviewing the jury's award of zero damages for Jackson's physical impairment other than loss of vision? Clearly it did not, applying instead the so-called "zero damages" rule. That rule is inconsistent with *Pool,* and we should take this opportunity to clearly say so. I would reverse the court of

appeals' judgment and remand the case for consideration of the evidence under the well-established *Pool* standard. Because the Court fashions a confusing and unnecessary review standard that will be difficult, if not impossible, to apply, I concur in the judgment only.

In *Pool v. Ford Motor Company,* we said that courts of appeals should, when reversing on insufficiency grounds,

> detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias. Further, those courts, in their opinions, should state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict.

715 S.W.2d at 635. Courts of appeals may not reverse on the mere conclusion that the evidence preponderates toward an affirmative answer but may reverse only after a detailing of evidence under *Pool* indicates that the great weight of that evidence supports an affirmative answer. *Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988).

Some courts of appeals, though, have applied a different rule when a jury finds **\*777** liability but fails to award damages. Although the so-called "zero damages" rule has various iterations, it generally provides that, once a jury has found an injury and some resulting damage, the failure to compensate for intangible damage elements such as pain and suffering is necessarily against the great weight and preponderance of the evidence. *See* W. Wendall Hall, *Standards of Review in Texas,* 29 St. Mary's L.J. 351, 465–66 (1998); Raul A. Gonzalez & Rob Gilbreath, *Appellate Review of a Jury's Finding of "Zero Damages,"* 54 Tex. B.J. 418 (1991). When strictly applying the "zero damages" rule, a reviewing court does not consider and weigh all of the evidence in the case (both that which tends to support the jury's finding and that which does not), state in what regard the contrary evidence greatly outweighs the evidence that supports the verdict, or explain why the jury's finding shocks the conscience or clearly demonstrates bias, as *Pool* requires. Because the "zero damages" rule is inconsistent with the *Pool* review standard, we should take this opportunity to expressly disavow it.

In this case, although the court of appeals recited the *Pool* standard, it actually conducted an evidentiary review that more closely resembles the "zero damages" rule. From the existence of the injury itself, which necessitated hospitalization and surgery, the court of appeals concluded that Jackson suffered compensable physical impairment other than loss of vision and that the jury's finding to the contrary was so against the great weight and preponderance of the evidence as to be manifestly unjust. There are several problems with the court of appeals' approach. First, the court began its analysis by examining the record for evidence *against* the jury's finding, citing Jackson's facial fractures, hospitalization and frequent headaches as some evidence of impairment other than loss of vision. It then failed to recite all of the evidence that *supports* the jury's finding. Jackson himself testified that he recovered well from his eye injury, and that he received an excellent result from his surgery. There was evidence that Jackson's headaches had lessened over time. At Jackson's request, his doctor released him to return to work approximately two months after the injury, and he continued to work five days a week as he had before. Jackson was able to perform tasks around the home after his injury, and he continued to go hunting, although not as frequently. The court of appeals recounted some of this evidence, but failed to articulate in what regard the contrary evidence so greatly outweighed the evidence supporting the jury's verdict as to shock the conscience or be manifestly unjust. *See Pool,* 715 S.W.2d at 635.

More importantly, though, in order to recover, Jackson had to demonstrate that his physical impairment other than loss of vision produced a distinct loss that was substantial and should be compensated. *See Estrada v. Dillon,* 44 S.W.3d 558, 562 (Tex.2001) (citing *Landacre v. Armstrong Bldg. Maint. Co.,* 725 S.W.2d 323, 325 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e.)) (applying rule that to recover for physical impairment a plaintiff must prove that the effect of the physical impairment extends beyond any impediment to earning capacity or pain and suffering to the extent that it produces a substantial separate and distinct loss); *Platt v. Fregia,* 597 S.W.2d 495, 495–96 (Tex.Civ.App.-Beaumont 1980, writ ref'd n.r.e.) (concluding that the jury was not required to award physical impairment damages where plaintiff suffered severe knee injury, but surgery produced good results, plaintiff was soon able to resume almost everything he could do before the injury, and he had a 30% functional loss). The **\*778** charge in this case

allowed the jury to award separate damages for medical care, physical pain and mental anguish, physical impairment of loss of vision, physical impairment other than loss of vision, disfigurement, and loss of earnings in the past. The jury was instructed to consider each damage element separately and not to include damages for one element in any other. We must presume that the jury followed the court's instruction. *See In re J.F.C.,* 96 S.W.3d 256, 298 (Tex.2002) (Hankinson, J., dissenting). Accordingly, to reverse based on the jury's finding of zero damages for Jackson's alleged physical impairment other than loss of vision, the court of appeals was required to detail the evidence that would show Jackson suffered a distinct physical impairment loss that did not overlap the other damage elements the jury found. Further, that evidence must demonstrate a distinct loss so substantial and compelling that, when weighed against the contrary evidence, the jury's failure to compensate it is manifestly unjust, shocks the conscience, or clearly demonstrates bias. The court of appeals summarily concluded that Jackson's facial fractures, hospitalization, and headaches "are demonstrative of impairment beyond pain and suffering, loss of earning capacity, and loss of vision," but it does not explain how they resulted in any impairment beyond the damages elements for which Jackson was compensated or why the jury's contrary finding was manifestly unjust. I would reverse and remand the case to the court of appeals with instructions to conduct a proper factual sufficiency review under the standard we articulated in *Pool.*

Rather than applying the relatively straightforward *Pool* standard, the Court wanders through the origins of physical impairment as a distinct damage element (something neither party felt compelled to discuss), ruminates on whether impairment damages should be awarded for other than permanent injuries (again, neither party raised the issue), and contemplates which damage element best encompasses the concept of hedonic damages (nary a word from the parties). Because the Court's writing consists primarily of dicta, and the factual sufficiency review standard it "adopt[s] today" is confusing at best and completely unnecessary, I concur in the judgment only.

**All Citations**

116 S.W.3d 757, Prod.Liab.Rep. (CCH) P 16,745, 46 Tex. Sup. Ct. J. 1133

Footnotes

1    715 S.W.2d 629, 635 (Tex.1986).

2    29 S.W.3d 925.

3    *Golden Eagle Archery, Inc. v. Jackson,* 24 S.W.3d 362, 364 (Tex.2000).

4    *Id.* at 375.

5    *Id.*

6    29 S.W.3d at 929.

7    *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634–35 (Tex.1986); *see also Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988) (plurality opinion); *Id.* at 145 (Phillips, C.J., concurring); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

8    *Pool,* 715 S.W.2d at 635.

9    *Jones v. Tarrant Util. Co.,* 638 S.W.2d 862, 866 (Tex.1982).

10   *Pool,* 715 S.W.2d at 635.

11   *Id.*

12   244 S.W.2d at 661.

13   29 S.W.3d at 929.

14   Ronald Jackson's Brief on the Merits at 11–12, 13, 18 (record citations omitted).

15   The purported origin of the term "Hedonic damages" is discussed in *Loth v. Truck–A–Way Corp.,* 60 Cal.App.4th 757, 70 Cal.Rptr.2d 571, 573 n. 1 (1998).

16   *See Peek v. Equip. Serv. Co. of San Antonio,* 779 S.W.2d 802, 803 (Tex.1989); *see also Mo. Pac. R.R. Co. v. Handley,* 341 S.W.2d 203, 205 (Tex.Civ.App.-San Antonio 1960, no writ) (concluding that damages for "mental anguish, severe and continued pain and suffering, disfigurement, embarrassment and inability to live a normal life" were not excessive when the plaintiff's fingers had been amputated and he was unable to grip anything or hunt and fish as he had in the past); *but see Ramos v. Kuzas,* 65 Ohio St.3d 42, 600 N.E.2d 241, 243 (1992) (holding that " '[h]edonic losses' include the inability to perform the plaintiff's usual specific activities which had given pleasure to this particular plaintiff, such as playing golf, dancing, bowling, playing musical instruments, and engaging in specific outdoor sports," which must be distinguished from "[b]asic losses" or "disability losses" that "include the inability to perform the basic mechanical body movements of walking, climbing stairs, feeding oneself, and driving a car").

17   *See Houston Transit Co. v. Felder,* 146 Tex. 428, 208 S.W.2d 880, 883–84 (1948); *Int'l & G.N. Ry. Co. v. Butcher,* 98 Tex. 462, 84 S.W. 1052, 1053 (1905); *Int'l–Great N. R.R. Co. v. King,* 41 S.W.2d 234, 236 (Tex. Comm'n App.1931, holding approved); *see also Dupont v. Preston,* 9 P.3d 1193, 1197 (Colo.Ct.App.2000) (physical impairment can result in pecuniary or nonpecuniary harm).

18   755 S.W.2d 890, 893 (Tex.App.-Houston [1st Dist.] 1988, writ denied); *see also Rosenboom Mach. & Tool, Inc. v. Machala,* 995 S.W.2d 817, 825 (Tex.App.-Houston [1st Dist.] 1999, pet. denied).

19   755 S.W.2d at 893.

20   44 S.W.3d 558 (Tex.2001).

21   *Id.* at 561.

22   *Id.* at 560.

23   *Estrada v. Dillon,* 23 S.W.3d 422, 427–28 (Tex.App.-Amarillo 2000), *rev'd in part,* 44 S.W.3d 558 (Tex.2001).

24   *Id.* at 427.

25   *Estrada,* 44 S.W.3d at 562 (citing TEX.R. APP. P. 44.1(b)).

26   *Id.* at 561.

27   *Id.*

28   *See, e.g., Green v. Baldree,* 497 S.W.2d 342, 350 (Tex.Civ.App.-Houston [14th Dist.] 1973, no writ) (observing "[i]t would not be proper in every personal injury case to instruct the jury that it might consider loss of earning capacity, pain and physical impairment as separate elements of plaintiff's damage," but concluding that "in almost all of such cases, if not all of them, the defendant would be entitled, on request, to have the court submit a special instruction that would be calculated to prevent the jury from allowing a double recovery"); *Santa Rosa Med. Ctr. v. Robinson,* 560 S.W.2d 751, 760 (Tex.Civ.App.-San Antonio 1977, no writ) (reviewing charge that included physical pain and mental anguish, loss of earnings, and physical impairment, concluding that "[t]here is clearly a possibility of some overlapping and blending in the issues as submitted," but finding no reversible error); *Mikell v. La Beth,* 344 S.W.2d 702, 709 (Tex.Civ.App.-Houston 1961, writ ref'd n.r.e.) (concluding that when physical impairment and diminished capacity to work and earn money were

both submitted, "there was no necessary duplication of elements of damage.... But if we are mistaken in this, we are of the opinion that appellants' [point of error] nevertheless must be overruled because the objection made to the issue in the Trial Court did not specifically point out that there was any duplication in the elements of damage as submitted.").

29 *Blankenship v. Mirick,* 984 S.W.2d 771, 777 (Tex.App.-Waco 1999, pet. denied); *Peter v. Ogden Ground Servs., Inc.,* 915 S.W.2d 648, 650 (Tex.App.-Houston [14th Dist.] 1996, no writ); *Sharm, Inc. v. Martinez,* 900 S.W.2d 777, 784 (Tex.App.-Corpus Christi 1995, judgm't vacated); *Pipgras v. Hart,* 832 S.W.2d 360, 366 (Tex.App.-Fort Worth 1992, writ denied); *Lawson–Avila Constr., Inc. v. Stoutamire,* 791 S.W.2d 584, 599 (Tex.App.-San Antonio 1990, writ denied); *Tri–State Motor Transit Co. v. Nicar,* 765 S.W.2d 486, 493 (Tex.App.-Houston [14th Dist.] 1989, no writ); *Robinson v. Minick,* 755 S.W.2d 890, 893 (Tex.App.-Houston [1st Dist.] 1988, writ denied); *S. Pac. Transp. Co. v. Harlow,* 729 S.W.2d 946, 950 (Tex.App.-Corpus Christi 1987), *writ dism'd, improvidently granted,* 745 S.W.2d 320 (Tex.1988); *Landacre v. Armstrong Bldg. Maint. Co.,* 725 S.W.2d 323, 324 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e.); *Baker Marine Corp. v. Herrera,* 704 S.W.2d 58, 62 (Tex.App.-Corpus Christi 1985, writ ref'd n.r.e.); *Allen v. Whisenhunt,* 603 S.W.2d 242, 244 (Tex.Civ.App.-Houston [14th Dist.] 1980, writ dism'd); *Browning v. Paiz,* 586 S.W.2d 670, 675 (Tex.Civ.App.-Corpus Christi 1979, writ ref'd n.r.e.); *French v. Grigsby,* 567 S.W.2d 604, 607 (Tex.Civ.App.-Beaumont), *writ ref'd n.r.e.,* 571 S.W.2d 867 (Tex.1978); *Santa Rosa Med. Ctr.,* 560 S.W.2d at 760; *Green,* 497 S.W.2d at 350.

30 29 S.W.3d at 928 (quoting *Blankenship,* 984 S.W.2d at 777).

31 *See Rosenboom Mach. & Tool, Inc. v. Machala,* 995 S.W.2d 817, 826–28 (Tex.App.-Houston [1st Dist.] 1999, pet. denied); *Blankenship,* 984 S.W.2d at 778 (concluding that evidence that plaintiff could no longer do aerobic exercises, she did not walk as well, her knees gave out, and her physician said likelihood of developing arthritis was much higher was sufficient to support award for physical impairment); *Peter,* 915 S.W.2d at 650; *Lawson–Avila Constr., Inc.,* 791 S.W.2d at 600 (noting that physician testified that 27–year–old plaintiff would have to restrict his activities for the rest of his life and his condition would become worse over time); *Tri–State Motor Transit Co.,* 765 S.W.2d at 493 (concluding that evidence of loss of ability to enjoy recreational sports supported award); *S. Pac. Transp. Co.,* 729 S.W.2d at 950–51; *Allen,* 603 S.W.2d at 244 (observing that plaintiff could no longer engage in manual labor as an employee or for his own benefit, mow a lawn, or play basketball); *Platt v. Fregia,* 597 S.W.2d 495, 495–96 (Tex.Civ.App.-Beaumont 1980, writ ref'd n.r.e.); *Browning,* 586 S.W.2d at 675 (observing that physician testified that condition of plaintiff's leg was permanent and the prognosis was poor, perhaps requiring amputation); *French,* 567 S.W.2d at 607–08; *Santa Rosa Med. Ctr.,* 560 S.W.2d at 760 (concluding that evidence of partial paralysis, spasticity, difficulty focusing both eyes, slurring of words, and inability to perform any of the usual tasks of a working man supported award for physical impairment); *Charles T. Picton Lumber Co. v. Redden,* 452 S.W.2d 713, 723 (Tex.Civ.App.-Corpus Christi 1970, writ ref'd n.r.e.) (noting that plaintiff, a paraplegic, was permanently injured and would require braces, crutches, or a wheel chair); *Dr. Pepper Bottling Co. v. Rainboldt,* 66 S.W.2d 496, 501 (Tex.Civ.App.-Waco 1933), *rev'd on other grounds, Schroeder v. Rainboldt,* 128 Tex. 269, 97 S.W.2d 679 (1936) (plaintiff's bladder was permanently injured and she would be unable to have children); *see also Mo. Pac. R.R. Co. v. Handley,* 341 S.W.2d 203, 205 (Tex.Civ.App.-San Antonio 1960, no writ).

32 *See, e.g., Schindler Elevator Corp. v. Anderson,* 78 S.W.3d 392, 412–13 (Tex.App.-Houston [14th Dist.] 2001, judgm't vacated) (holding that temporary injuries supported award for past physical impairment, but that permanent injuries supported award for future physical impairment).

33 44 S.W.3d 558, 561–62 (Tex.2001).

34 98 Tex. 462, 84 S.W. 1052 (1905).

35 25 Tex.Civ.App. 145, 60 S.W. 314, 316 (1901).

36 *Id.*

37 66 S.W.2d at 497.

38 *Id.* at 501.

39 *Id.*

40 *Id.*

41 *Id.*

42 *See, e.g., Mo. Pac. R.R. Co. v. Lane,* 720 S.W.2d 830, 834 (Tex.App.-Texarkana 1986, writ denied); *Spohn Hosp. v. Mayer,* 72 S.W.3d 52, 67 (Tex.App.-Corpus Christi 2001), *rev'd on other grounds,* 104 S.W.3d 878 (Tex.2003); *Brookshire Bros., Inc. v. Wagnon,* 979 S.W.2d 343, 353 (Tex.App.-Tyler 1998, pet. denied).

43 *Akers v. Kelley Co.,* 173 Cal.App.3d 633, 219 Cal.Rptr. 513, 526 (1985); *Loth v. Truck–A–Way Corp.,* 60 Cal.App.4th 757, 70 Cal.Rptr.2d 571, 575 (1998); *Knight v. Lord,* 271 Ill.App.3d 581, 207 Ill.Dec. 917, 648 N.E.2d 617, 623 (1995); *Sena v. N.M. State Police,* 119 N.M. 471, 892 P.2d 604, 610–11 (Ct.App.1995) (noting that loss of enjoyment of life is a

factor to be considered in relation to other elements of damage such as disability, pain, suffering, and mental anguish); *Jones v. Chicago Osteopathic Hosp.,* 316 Ill.App.3d 1121, 250 Ill.Dec. 326, 738 N.E.2d 542, 554–55 (2000); *Frito–Lay, Inc. v. Cloud,* 569 N.E.2d 983, 989 (Ind.Ct.App.1991); *Poyzer v. McGraw,* 360 N.W.2d 748, 753 (Iowa 1985); *Gregory v. Carey,* 246 Kan. 504, 791 P.2d 1329, 1336 (1990); *Adams v. Miller,* 908 S.W.2d 112, 116 (Ky.1995) (holding that hedonic value of life "is already recoverable in the recognized category of mental suffering"); *Anunti v. Payette,* 268 N.W.2d 52, 55 (Minn.1978); *Anderson v. Neb. Dep't of Soc. Servs.,* 253 Neb. 813, 572 N.W.2d 362, 367 (1998) (holding that loss of enjoyment of life may properly be considered as it relates to pain and suffering and to disability, but it is improper to treat it as a separate category of nonpecuniary damages); *Bennett v. Lembo,* 145 N.H. 276, 761 A.2d 494, 498 (2000); *Wilt v. Buracker,* 191 W.Va. 39, 443 S.E.2d 196, 207 (1993); *but see Ogden v. J.M. Steel Erecting, Inc.,* 201 Ariz. 32, 31 P.3d 806, 813 (Ct.App.2001); *Preston v. Dupont,* 35 P.3d 433, 441 (Colo.2001); *Montalvo v. Lapez,* 77 Hawai'i 282, 884 P.2d 345, 364 (1994); *Curtis v. Porter,* 784 A.2d 18, 26 (Me.2001); *Kan. City S. Ry. Co. v. Johnson,* 798 So.2d 374, 380–81 (Miss.2001); *Moscatello v. Univ. of Med. and Dentistry,* 342 N.J.Super. 351, 776 A.2d 874, 881 (2001); *Boan v. Blackwell,* 343 S.C. 498, 541 S.E.2d 242, 244 (2001); *Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694, 715 (Tenn.Ct.App.1999); *Kirk v. Wash. State Univ.,* 109 Wash.2d 448, 746 P.2d 285, 292–93 (1987); *Mariner v. Marsden,* 610 P.2d 6, 12 (Wyo.1980).

44    720 S.W.2d at 834.

45    813 S.W.2d 658, 674 (Tex.App.-Texarkana 1991, writ denied) (stating that loss of enjoyment of life "may be treated as a factor in determining damages in general or for pain and suffering").

46    72 S.W.3d at 67.

47    979 S.W.2d at 353.

48    956 S.W.2d 590, 599 (Tex.App.-Tyler 1997), *rev'd on other grounds,* 1 S.W.3d 91 (Tex.1999) (reversing award of attorney's fees).

49    *Schindler Elevator Corp. v. Anderson,* 78 S.W.3d 392, 412 (Tex.App.-Houston [14th Dist.] 2001, judgm't vacated).

50    *Santa Rosa Med. Ctr. v. Robinson,* 560 S.W.2d 751, 762 (Tex.Civ.App.-San Antonio 1977, no writ) (Cadena, C.J., dissenting).

51    *See generally Boan v. Blackwell,* 343 S.C. 498, 541 S.E.2d 242, 244–45 (2001) (holding that, when supported by the evidence, a jury shall be charged that the injured person is entitled to recover damages for loss of enjoyment of life); *Kan. City S. Ry. Co., Inc. v. Johnson,* 798 So.2d 374, 380 (Miss.2001) (holding that "loss of enjoyment of life should be fully compensated and should be considered on its own merits as a separate element of damages, not as a part of one's pain and suffering"); *Ogden v. J.M. Steel Erecting, Inc.,* 201 Ariz. 32, 31 P.3d 806, 813 (Ct.App.2001) (holding that a "separate charge on hedonic damages will minimize the risk that a jury will under- or over-compensate an injured person for her noneconomic losses"); *Jones v. Chicago Osteopathic Hosp.,* 316 Ill.App.3d 1121, 250 Ill.Dec. 326, 738 N.E.2d 542, 554 (2000) (stating that " 'loss of normal life' has almost universally been interpreted as a component of disability which compensates for a change in the plaintiff's lifestyle"); *Knepper v. Robin,* 745 So.2d 1248, 1257 (La.Ct.App.1999) (holding that trial court erred in "depriv[ing] the jurors of the opportunity to consider the distinctions between loss of enjoyment of life and the general damages of pain and suffering"); *Loth v. Truck–A–Way Corp.,* 60 Cal.App.4th 757, 70 Cal.Rptr.2d 571, 575 (1998) (surveying decisions and holding that "[l]oss of enjoyment of life, however, is only one component of a general damage award for pain and suffering [but] is not calculated as a separate award"); *Smallwood v. Bradford,* 352 Md. 8, 720 A.2d 586, 592–95 (1998) (examining authorities, concluding that loss of enjoyment of life was not recoverable when decedent was almost instantly killed in a car crash); *Adams v. Miller,* 908 S.W.2d 112, 116 (Ky.1995) (holding that hedonic value of life "is already recoverable in the recognized category of mental suffering"); *Knight v. Lord,* 271 Ill.App.3d 581, 207 Ill.Dec. 917, 648 N.E.2d 617, 623 (1995) (noting that loss of enjoyment of life is a component of disability damages, but the term "loss of a normal life" is less likely to be misunderstood than "disability"); *Fantozzi v. Sandusky Cement Prods. Co.,* 64 Ohio St.3d 601, 597 N.E.2d 474, 481–87 (1992) (surveying decisions regarding loss of enjoyment of life and holding that "permitting a separate interrogatory and jury finding on this damage, would help the jury understand exactly what claimed damages it is addressing"); *Eyoma v. Falco,* 247 N.J.Super. 435, 589 A.2d 653, 658 (1991) (holding that loss of enjoyment of life is a separate and distinct item of damages); *Frito–Lay, Inc. v. Cloud,* 569 N.E.2d 983, 989 (Ind.Ct.App.1991) (holding it "is error to instruct the jury on the loss of quality and enjoyment of life as an element of damages separate from other elements of damage, such as pain and suffering or permanency of injury"); *Gregory v. Carey,* 246 Kan. 504, 791 P.2d 1329, 1335–36 (1990) (discussing the various decisions that have considered loss of enjoyment of life and concluding that it is "inextricably included within the more traditional areas of damages for disability and pain and suffering"); *Nussbaum v. Gibstein,* 73 N.Y.2d 912, 539 N.Y.S.2d 289, 536 N.E.2d 618, 619 (1989) (holding that "loss of enjoyment of life is not a separate element of damages deserving a distinct award but is, instead, only a factor to be considered by the jury in assessing damages for conscious pain and suffering"); *McDougald v. Garber,* 73

N.Y.2d 246, 538 N.Y.S.2d 937, 536 N.E.2d 372, 376–77 (1989) (surveying authorities and holding that loss of enjoyment of life is a permissible factor in assessing pain and suffering, but no purpose would be served by having the jury make separate awards); *see generally* Hermes, *Loss of Enjoyment of Life–Duplication of Damages Versus Full Compensation,* 63 N.D. L.REV. 561 (1987); Annotation, *Loss of Enjoyment of Life as Distinct Element or Factor in Awarding Damages for Bodily Injury,* 34 A.L.R.4TH 293 (1984); Cramer, Comment, *Loss of Enjoyment of Life as a Separate Element of Damages,* 12 PAC. L.J. 965 (1981).

52    *See, e.g., Green v. Baldree,* 497 S.W.2d 342, 350 (Tex.Civ.App.-Houston [14th Dist.] 1973, no writ) (holding that "[t]he plaintiff must sustain the burden of proving that the effect of his physical impairment extends beyond any impediment to his earning capacity and beyond any pain and suffering to the extent that it produces a separate and distinct loss that is substantial and for which he should be compensated").

53    29 S.W.3d at 928 (quoting *Blankenship v. Mirick,* 984 S.W.2d 771, 777 (Tex.App.-Waco 1999, pet. denied)).

54    *See, e.g., Rosenboom Mach. & Tool, Inc. v. Machala,* 995 S.W.2d 817, 825 (Tex.App.-Houston [1st Dist.] 1999, pet. denied); *Green,* 497 S.W.2d at 350 (commenting that when physical impairment is submitted as a separate element, "the defendant would be entitled, on request, to have the court submit a special instruction that would be calculated to prevent the jury from allowing a double recovery"); *see also Robinson v. Minick,* 755 S.W.2d 890, 894–95 (Tex.App.-Houston [1st Dist.] 1988, writ denied) (stating that limiting instruction might have prevented jury from considering past physical impairment in making its award for other elements).

55    567 S.W.2d 604 (Tex.Civ.App.-Beaumont), *writ ref'd n.r.e.,* 571 S.W.2d 867 (Tex.1978).

56    *Id.* at 608.

57    TEXAS PATTERN JURY CHARGES PJC 8.2 (2000 ed.).

58    *See, e.g., Thomas v. Oldham,* 895 S.W.2d 352, 360 (Tex.1995); *Price v. Short,* 931 S.W.2d 677, 688 (Tex.App.-Dallas 1996, no writ); *Greater Houston Transp., Inc. v. Zrubeck,* 850 S.W.2d 579, 589 (Tex.App.-Corpus Christi 1993, writ denied).

59    *See Price,* 931 S.W.2d at 688.

60    *Greater Houston Transp., Inc.,* 850 S.W.2d at 589.

61    *See Gillette Motor Transp. Co. v. Whitfield,* 145 Tex. 571, 200 S.W.2d 624, 626 (Tex.1947); *see also In re K.R.,* 63 S.W.3d 796, 800–01 (Tex.2001); *Turner, Collie, & Braden, Inc. v. Brookhollow, Inc.,* 642 S.W.2d 160, 167 (Tex.1982); *Daugherty v. S. Pac. Transp. Co.,* 772 S.W.2d 81, 83 (Tex.1989).

62    *Kan. City S. Ry. Co. v. Johnson,* 798 So.2d 374, 381 (Miss.2001) (distinguishing loss of enjoyment of life from pain and suffering, noting that "[a] permanent injury differs from pain and suffering in that it is an injury from which the plaintiff cannot completely recover"); *Ogden v. J.M. Steel Erecting, Inc.,* 201 Ariz. 32, 31 P.3d 806, 813 (Ct.App.2001) (defining loss of enjoyment of life as "damages [that] compensate the individual not only for the subjective knowledge that one can no longer enjoy all of life's pursuits, but also for the objective loss of the ability to engage in these activities"); *Bennett v. Lembo,* 145 N.H. 276, 761 A.2d 494, 498 (N.H.2000) (holding that damages for loss of enjoyment of life are a component of permanent impairment); *Sena v. N.M. State Police,* 119 N.M. 471, 892 P.2d 604, 611 (Ct.App.1995) (holding that "New Mexico permits proof of nonpecuniary damages resulting from the loss of enjoyment of life in tort actions involving permanent injuries"); *Laing v. Am. Honda Motor Co., Inc.,* 628 So.2d 196, 204 (La.Ct.App.1993) (finding evidence sufficient to support award for hedonic damages when, seven years after the accident, plaintiff could not feed himself or enjoy writing or cooking, and required assistance to perform basic tasks); *Wilt v. Buracker,* 191 W.Va. 39, 443 S.E.2d 196, 200 (1993) (stating that "damages for the loss of enjoyment of life are a valid element of recovery when a plaintiff has suffered a permanent injury") (emphasis omitted); *Fantozzi v. Sandusky Cement Prods. Co.,* 64 Ohio St.3d 601, 597 N.E.2d 474, 486–87 (1992) (holding that a jury should be instructed that it may award damages for an inability to perform usual activities of life or usual activities that give pleasure if it finds a permanent disability); *Eyoma v. Falco,* 247 N.J.Super. 435, 589 A.2d 653, 662 (1991) (holding that loss of enjoyment of life is an element of the permanent injury a plaintiff has suffered); *Kirk v. Wash. State Univ.,* 109 Wash.2d 448, 746 P.2d 285, 292–93 (1987) (holding that trial court did not err in allowing jury to consider loss of enjoyment of life when injury to plaintiff's elbow was permanent and she could not become a professional dancer); *Gowdy v. United States,* 271 F.Supp. 733, 751 (W.D.Mich.1967) (noting in reviewing evidence of loss of enjoyment of life that the plaintiff's impairment was permanent).

63    *Smith v. City of Evanston,* 260 Ill.App.3d 925, 197 Ill.Dec. 810, 631 N.E.2d 1269, 1279 (1994) (noting that "loss of a normal life" should be "defined as plaintiff's 'diminished ability to enjoy life that the plaintiff has experienced,' which should include plaintiff's temporary or permanent inability to pursue the pleasurable aspects of life, such as recreation or hobbies") (citation omitted).

64    44 S.W.3d 558 (Tex.2001).

65    *Berger v. Weber,* 411 Mich. 1, 303 N.W.2d 424, 436 (1981).

66    *Am. Nat'l Watermattress Corp. v. Manville,* 642 P.2d 1330, 1341 (Alaska 1982).

67    755 S.W.2d 890 (Tex.App.-Houston [1st Dist.] 1988, writ denied).

68    29 S.W.3d at 929.

69    755 S.W.2d at 894.

70    29 S.W.3d at 929.

71    725 S.W.2d 323, 325 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e.).

72    597 S.W.2d 495, 495–96 (Tex.Civ.App.-Beaumont 1980, writ ref'd n.r.e.).

73    725 S.W.2d at 325; *see also Platt,* 597 S.W.2d at 495–96 (holding that jury was not required to award damages for physical impairment in addition to damages for past physical and mental anguish even though plaintiff severely injured his knee, surgery was required, and there was a 30% functional loss).

74    822 S.W.2d 223, 230 (Tex.App.-Dallas 1991, writ denied).

75    *Id.* at 231; *see also Waltrip v. Bilbon Corp.,* 38 S.W.3d 873, 881–82 (Tex.App.-Beaumont 2001, pet. denied) (holding that $100 award for past physical pain and mental anguish was not against great weight and preponderance of the evidence); *Srite v. Owens–Ill., Inc.,* 870 S.W.2d 556, 563 (Tex.App.-Houston [1st Dist.] 1993), *rev'd on other grounds, Owens–Ill., Inc. v. Estate of Burt,* 897 S.W.2d 765 (Tex.1995) (reversing only on pre-judgment interest).

76    884 S.W.2d 811, 820 (Tex.App.-Dallas 1994, writ denied).

77    *Id.* at 819.

78    *Id.* at 820.

79    715 S.W.2d 629, 635 (Tex.1986).

80    TEX.R. CIV. P. 277.

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.



2015 WL 4137862
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL RELEASED,
IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Court of Appeals of Texas,
El Paso.

Gary Gonzalez, Appellant,
v.
Ione Grimm, Appellee.

No. 08–13–00326–CV  |  July 8, 2015

**Synopsis**
**Background:** After parent of schoolchild was charged with
harassment regarding parent's phone call to school principal,
parent brought action against principal for malicious criminal
prosecution. The 171st District Court, El Paso County,
Yvonne Rangel, J., awarded summary judgment to principal
but declined to award attorney fees. Parent and principal
appealed. The Court of Appeals, Guadalupe Rivera, J., 353
S.W.3d 270, reversed and remanded. AFter remand, the 171st
District Court, El Paso County, Yvonne Rangel, J., granted
principal's motion for directed verdict, and parent appealed.

**[Holding:]** The Court of Appeals, Ann Crawford McClure,
C.J., held that parent did not establish malicious prosecution
claim against principal.

Affirmed.

West Headnotes (6)

**[1]** **Malicious Prosecution**
 Nature and elements of malicious
prosecution in general

Elements of malicious prosecution are: (1)
commencement of a criminal prosecution against
the plaintiff; (2) the defendant's initiation or
procurement of that prosecution; (3) termination

of the prosecution in the plaintiff's favor; (4)
the plaintiff's innocence; (5) lack of probable
cause to initiate or procure the prosecution; (6)
malice in filing the charge; and (7) damage to the
plaintiff.

Cases that cite this headnote

**[2]** **Malicious Prosecution**
 Instigation of or participation in prosecution

**Malicious Prosecution**
 Institution or continuation of prosecution

Malicious prosecution plaintiff must prove that
the defendant either initiated or procured the
prosecution as an element of the claim, and
initiating the action describes executing the
charging instrument which goes before the
magistrate, who then may issue an arrest warrant.

Cases that cite this headnote

**[3]** **Malicious Prosecution**
 Instigation of or participation in prosecution

Defendant can be liable for malicious
prosecution for procuring the prosecution, and
person procures a criminal prosecution if his
actions are enough to cause the prosecution, and
but for his actions the prosecution would not
have occurred.

Cases that cite this headnote

**[4]** **Malicious Prosecution**
 Instigation of or participation in prosecution

Merely aiding or cooperating with the authorities
cannot "cause" a criminal prosecution for
purposes of malicious prosecution claim, nor
does a person procure a criminal prosecution
when the decision whether to prosecute is left
to the discretion of another person, such as law
enforcement or a grand jury.

Cases that cite this headnote

**[5]** **Malicious Prosecution**
 Instigation of or participation in prosecution

Even if the decision is ultimately left to law enforcement, when a person knowingly provides false information which causes a criminal prosecution, they have effectively procured the prosecution and may be liable for malicious prosecution.

Cases that cite this headnote

**[6]** **Malicious Prosecution**

&#128273; Instigation of or participation in prosecution

**Malicious Prosecution**

&#128273; Institution or continuation of prosecution

Parent, who was charged with harassment regarding parent's phone call to school principal, did not establish malicious prosecution claim against principal; prosecutor initiated charge and not the principal, the claim that principal was threatened with bodily injury was itself false, but it did not come from principal, and even if principal provided false information, there was no indication that the claimed false information procured the prosecution.

Cases that cite this headnote

Appeal from 171st District Court of El Paso County, Texas (TC # 2008–3874). Yvonne Rangel, Judge.

**Attorneys and Law Firms**

Mark Berry, El Paso, TX, for Appellant.

Albert Armendariz Jr., Law Offices of Dunbar, Armendariz, Hegeman & Holguin, P.L.L.C., El Paso, TX, for Appellee.

Before McClure, C.J., Rodriguez, J., and Perez, Judge

*OPINION*

ANN CRAWFORD McCLURE, Chief Justice

**\*1** This is an appeal from a directed verdict. Gary Gonzalez sued Ione Grimm for malicious prosecution. At the time of events in question, Grimm was a middle school principal and Gonzalez was the father of two students at the school. The malicious prosecution claim arose out of Gonzalez' arrest on a charge of criminal harassment, which was later dismissed at the request of the State's prosecutor. After the charge was dismissed, Gonzalez sued Grimm who initially prevailed on a motion for summary judgment, premised on an affirmative defense under the Education Code. That summary judgment was reversed on appeal. *Gonzalez v. Grimm,* 353 S.W.3d 270 (Tex.App.–El Paso 2011, no pet.). Following remand, the case proceeded to trial and at the conclusion of Gonzalez' case in chief, the trial court granted a directed verdict, the propriety of which is the only issue before us.

*Standard of Review*

A directed verdict is properly granted when there is "no evidence" to support a material issue in the case. *Prudential Insurance Company of America v. Financial Review Services, Inc.,* 29 S.W.3d 74, 77 (Tex.2000). A trial record contains "no evidence" when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005).

In reviewing a directed verdict, we examine the evidence in the light most favorable to the person suffering the adverse judgment. *S.V. v. R.V.,* 933 S.W.2d 1, 8 (Tex.1996). But evidence cannot be taken out of context in a way that makes it seem to support a material issue when in fact it never did. *City of Keller,* 168 S.W.3d at 812. Nor do we consider the evidence "in isolated bits and pieces divorced from its surroundings; it must be viewed in its proper context with other evidence." *AutoZone, Inc. v. Reyes,* 272 S.W.3d 588, 592 (Tex.2008). Evidence is legally sufficient if it rises to a level that would enable a reasonable and fair-minded jury to make the finding. *City of Keller,* 168 S.W.3d at 810. Evidence that is "so weak as to do no more than create a mere surmise or suspicion" of a fact is not legally sufficient. *Kroger Tex. Ltd. P'ship v. Suberu,* 216 S.W.3d 788, 793 (Tex.2006), *quoting Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004). With these standards in mind, we turn to the facts presented prior to the directed verdict.

*Factual Summary*

Gonzalez' case was presented through four witnesses: Ione Grimm; Victor Araiza (the school district's police chief); Gonzalez; and his wife. The admitted exhibits included the court's file from the underlying criminal case, and the investigation file from the police. We recite only those matters from the testimony and exhibits that bear on the issues before us and the background necessary to put them in context.

**\*2** Ione Grimm started with the El Paso Independent School District (EPISD) as a principal at Wiggs Middle School in 2000. Following a run-in with an EPISD board member's wife, she was transferred to an administrative position for several years. By 2004, she was assigned to Magoffin Middle School as its principal.

Her tenure at Magoffin Middle School was not without some conflict. Five sets of parents had issues with her and Grimm believed that Gonzalez led the group. By January 2006, this group of parents had filed a complaint against Grimm with the EPISD. Part of the dispute related to the PTA chapter at the school. Gonzalez also complained about an incident with his daughter. The EPISD Board ruled in Grimm's favor in February 2006.

The genesis of this lawsuit is a telephone call that occurred on March 8, 2006. Grimm contends that Gonzalez called the school and left a message for her that morning, and that the two talked later that day. Gonzalez claims he never left a message for Grimm, and that he called the school to talk to his daughter's teacher, but instead the call was routed into Grimm's office. Gonzalez and Grimm sharply dispute what was said in the conversation.

Grimm maintains the phone call started with Gonzalez requesting that the school hold his daughter back a year. Grimm did not think that was a good idea, as the daughter was passing all her classes. Gonzalez was upset with this decision and then told Grimm she was going to be "real unhappy" because he had something that belonged to her and that he had gotten it from the EPISD. He explained that he had her Social Security number and then asked her "how it made me feel" and "do you know what I could do with this?" Grimm interpreted this as a threat. Gonzalez then supposedly explained that another parent had gotten Grimm's un-redacted personnel file from the EPISD through an open records request and that person had given him a copy. Gonzalez then solicited Grimm's participation in a suit against

the EPISD where they both could make money. At that point, she claims to have hung up on him.

Conversely, Gonzalez denied ever talking to Grimm about holding his daughter back, as that is a decision made by a specific committee at the school. Instead, Grimm wanted to talk about his complaint to the District about her. While he agreed there was a discussion about his possession of her personnel file and Social Security number, he mentioned it only so she could pursue an action against the school district. He denied any intent to participate in such a lawsuit himself. He also denied making any threats to harm to Grimm through use of her Social Security number, including the statement "do you know what I could do with this?"

Following the phone call, Grimm consulted her husband, her personal attorney, and an EPISD Associate Superintendent, all of whom recommended that she file a report with the police. She then reported the matter to the EPISD campus police[1] who took her statement on March 14, 2006. She signed and initialed the written statement which repeated the substance of her version of the March 8 phone conversation set out above. Grimm also sent a letter to the EPISD superintendent regarding the phone call and requested that the EPISD look into the possible release of her un-redacted personnel file. On March 28, 2006 she completed a second statement for the EPISD police department. It repeated the substance of her version of theconversation and then concluded by stating: "I am afraid of Gary Gonzalez and I do believe that he will use any method within his power to cause me harm. I do want to prosecute Gary Gonzalez for being in possession of my identifying numbers and threatening me with using those numbers." Several EPISD officers participated in the investigation, the last being Officer Lionel Calanche. He had passed away by the time of trial. Only Victor Araiza, Chief of EPISD Police, testified at trial about the handling of the investigation. Generally, when an allegation is brought to his department, it is investigated and if the complaining witness desires prosecution, the department proceeds further. In some instances, the department might pursue prosecution even if the complaining witness wanted to drop the matter. After the investigation was completed, the investigating officers, and their supervisor, would discuss the matter and determine what charges might be appropriate and how to pursue them. In some cases, the officers might decide to immediately take a probable cause affidavit to a judge to secure an arrest. In other cases, they may refer the matter to the district attorney's office through a "non-arrest" complaint.

The district attorney would then decide whether and how to proceed further.

**\*3** In this particular case, based on the March 28, 2006 written statement from Grimm, the EPISD police believed that Gonzalez may have violated TEX. PEN. CODE ANN.. § 32.51 (West Supp.2014) which is entitled "Fraudulent Use or Possession of Identifying Information." [2] Thatcharge was presented to the district attorney's office which declined to prosecute the matter. The district attorney instead asked that the EPISD police investigate the case under a possible charge of criminal harassment. TEX. PEN. CODE ANN.. § 42.07. [3] Based on this direction, Officer Calanche resumed the investigation.

At the same time the EPISD police department was handling its initial investigation, Grimm was encountering more problems at work. On March 24, 2006 the new EPISD superintendent had posted an agenda item to reassign Grimm to a different school. [4] The next day he told her it was a mistake and that he wanted more time to investigate the unauthorized release of her personal information. On May 1, 2006, she was informed that the district wanted to put her on a "growth plan" which is apparently a euphemism for a poor performance report in the EPISD system. In June 2006, the EPISD Board demoted her to an assistant principal position at Hornedo Middle School. Grimm soon thereafter filed a federal lawsuit against the EPISD claiming the demotion and growth plan constituted retaliation for her complaint about the unauthorized release of her personal information to Gonzalez. Gonzalez countered in this trial that Grimm's true motive in making the allegations against him was to set up a retaliation claim to protect her position at Magoffin Middle School.

**\*4** On February 2, 2007, Grimm was contacted by Officer Calanche of the EPISD police department. Calanche explained that the district was examining "cold cases" and he was following up on the Gonzalez complaint and wanted to meet with her. Under the department's policy, an officer should check again with the complaining witness to be sure that he or she still wanted to pursue a charge, and if not, the case would likely be dropped. No new statement was taken from Grimm at the February 2007 meeting. A note in Officer Calanche's file following the meeting recites that she "will appear for court, if necessary." The file note reflects that the case was being presented to the district attorney's office.

Following their meeting, Officer Calanche executed a Complaint and a Complaint Affidavit, which along with his file was sent to the district attorney's office. The Complaint, sworn to by Officer Calanche, alleges three violations of TEX. PEN. CODE ANN.. § 42.07, the criminal harassment statute. Paragraph A alleged that Gonzalez with the intent to "harass, annoy, alarm, abuse, torment, and embarrass Ione Grimm threaten Ione Grimm by telephone, in a manner likely to alarm Ione Grimm, to wit: *commit a felony* against Ione Grimm." [Emphasis added]. Paragraph B alleged that, with the same intent, Gonzalez caused Grimm's phone to ring repeatedly. Paragraph C alleged that, with the same intent, Gonzalez made repeated telephone communications in a manner to harass, annoy, alarm, abuse, torment or embarrass Grimm.

The supporting Complaint Affidavit, also sworn to by Officer Calanche, alleged that Gonzalez committed criminal harassment "by threatening by telephone in manner reasonably likely to alarm the person receiving the threat, *to inflict bodily injury* on the person or to commit a felony against the person." [Emphasis added]. The factual basis for the allegation is stated in a separate paragraph:

Affiant [Officer Calanche] is aware of defendants conduct and constant harassments during the months of February And March of 2006 by means of EPISD Case reports 06–44288 and numerous witness statements. On March 8, 2006 at 11:59 a.m. at 4931 Hercules, El Paso, Tx. The Principal at Magoffin Middle School and defendant spoke via the school business telephone. Defendant had initiated the phone contact and asked to speak to the Principal. Defendant in a threatening manner in conversation informed the Principal of obtaining her Social Security number and alarmed the Principal by asking, 'HOW DOES THAT MAKE YOU FEEL? YOU KNOW WHAT I CAN DO WITH IT DON'T YOU?' Defendant was able to provide the Principal with the correct SS # belonging to the Principal. The Principal felt harassed, annoyed, alarmed, abused, tormented, and or embarrassed by defendant's comments. Affiant does believe this to be true and correct to the best of his knowledge.

Contrary to the Complaint Affidavit, Grimm testified that she did not believe that Gonzalez ever threatened her with bodily injury, and as importantly, she never made that claim to Officer Calanche. Chief Araiza agreed that the department's investigation file does not contain any supporting information for a threat of bodily injury, as sworn to by Officer Calanche. Grimm denied knowing that Calanche was going to initiate charges against Gonzalez following their meeting, and she

denied seeing his complaint paperwork before he filed it with the district attorney's office.

The Complaint, the Complaint Affidavit, and various witness statements were forwarded to the district attorney's office that then had the discretion to pursue or not pursue the charge. The district attorney's office did not contact Grimm during that process. On February 21, 2007, Assistant District Attorney Manny Arambula executed and filed an "Information"[5] repeating the same three paragraphs as were in Calanche's Complaint form. On March 1, 2007, a capias for Gonzalez' arrest was issued and several months later he turned himself in. The charges were later dropped based on prosecutorial discretion.

**\*5** At the conclusion of Gonzalez' case, the trial court granted Grimm's motion for directed verdict and entered a final judgment in her favor. Raising three issues on appeal, Gonzalez challenges that ruling. Issue One questions whether Gonzalez was required to prove that Grimm made false statements to the police. Issue Two contends there is evidence to support the element of malice and Issue Three generally contends he presented evidence of each element of his malicious prosecution claim.

### *Malicious Prosecution*

 **[1]** The elements of malicious prosecution are: (1) commencement of a criminal prosecution against the plaintiff; (2) the defendant's initiation or procurement of that prosecution; (3) termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) lack of probable cause to initiate or procure the prosecution; (6) malice in filing the charge; and (7) damage to the plaintiff. *Suberu,* 216 S.W.3d at 793 n. 3; *Richey v. Brookshire Grocery Co.,* 952 S.W.2d 515, 517 (Tex.1997).

We are reminded by the Texas Supreme Court to strictly apply these elements as they reflect a delicate balance of societal values. *Browning–Ferris Industries, Inc. v. Lieck,* 881 S.W.2d 288, 291 (Tex.1994)("Even a small departure from the exact prerequisites for liability may threaten the delicate balance between protecting against wrongful prosecution and encouraging reporting of criminal conduct."). Citizens must be encouraged and free to report possible crimes to the authorities. *Id., citingSebastian v. Cheney,* 86 Tex. 497, 25 S.W. 691, 694 (1894) and RESTATEMENT (SECOND) OF TORTS ch. 29, intro. note, at 405 (1977). At the same time,

the consequences of arrest and prosecution for an offense are considerable, and every citizen should be protected from a prosecution based on false claims arising from some malicious intent. *Id.*

There is no dispute below that Gonzalez was charged for an offense that was terminated in his favor. Grimm does not challenge that he suffered some damages. The relevant issues focus on whether Grimm initiated or procured the criminal charge, whether Gonzalez was innocent of the charge, whether there was probable cause to make the charge, and whether the charge was brought with malice. We find the element of initiation or procurement, which embodies a causation element, to be determinative and begin our discussion there.

 **[2]** A plaintiff must prove that the defendant either *initiated* or *procured* the prosecution as an element of the claim. RESTATEMENT (SECOND) OF TORTS, § 653(a)(1977). *Initiating* the action describes executing the charging instrument which goes before the magistrate, who then may issue an arrest warrant. *Id.*§ 653(a) cmt.c ("Criminal proceedings are initiated by making a charge before a public official or body in such form as to require the official or body to determine whether process shall or shall not be issued against the accused."); *see alsoLieck,* 881 S.W.2d at 292. ("A person initiates a criminal prosecution if he makes a formal charge to law enforcement authorities.").

 **[3]** **[4]** **[5]** A defendant can also be liable for *procuring* the prosecution. *Lieck,* 881 S.W.2d at 292. A person procures a criminal prosecution "if his actions are enough to cause the prosecution, and but for his actions the prosecution would not have occurred." *Id.* Merely aiding or cooperating with the authorities cannot "cause" a criminal prosecution. *Id.* Nor does a person "procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another person" such as law enforcement or a grand jury. *Id.* But even if the decision is ultimately left to law enforcement, when a person knowingly provides false information which causes a criminal prosecution, they have effectively procured the prosecution and may be liable. *Id.* at 292, 294 ("What is true is that a person who provides false information cannot complain if a prosecutor acts on it").[6]

 **\*6** The Texas Supreme Court expanded on this false information exception in *King v. Graham,* 126 S.W.3d 75 (Tex.2003). As *King* is controlling of the outcome here, we revisit its facts. The plaintiffs in *King* were hunting guides

who agreed to secure for the defendants hunting rights and reserve a certain number of animals to be hunted. *Id.* at 76. The defendants were promoters who would arrange the hunts for paying hunters. *Id.* The defendants advanced money to the plaintiffs for that purpose and then the defendants began soliciting, apparently unsuccessfully, hunters for the venture. *Id.* As hunting season approached, the defendants believed the plaintiffs had not fulfilled their end of the deal and contacted the sheriff's office claiming the plaintiffs committed theft and criminal fraud. *Id.* at 77. The sheriff's office investigated the matter and referred it to a prosecutor, who in turn submitted the case to a grand jury which indicted the plaintiffs. *Id.*

The criminal case soon unraveled. While the defendants claimed to the authorities that they had booked several hunters, that turned out to be false. *Id.* The claim that the plaintiffs had not reserved any animals was also false. *Id.* Ultimately the district attorney dismissed the charges and the plaintiff hunting guides filed suit for malicious prosecution, prevailing against some defendants before a jury and the court of appeals. The Texas Supreme Court reversed and rendered. *Id.* at 76. While noting the false information exception from *Lieck,* the court held proving that false information was given to authorities is "necessary" but it is not "sufficient." *Id.* Instead, the plaintiff has the burden of proving that the decision to prosecute "would not have been made but for the false information supplied by the defendant." *Id.* at 78. In *King,* the prosecutor testified, but was never asked whether the specific pieces of false information which the plaintiffs had alleged influenced his decision to take the case to the grand jury. *Id.* Because the plaintiffs failed to meet this burden, the court rendered judgment in the defendants' favor.

Several years later the court discussed a malicious prosecution plaintiff's burden in *In re Bexar County Criminal Dist. Attorney's Office,* 224 S.W.3d 182 (Tex.2007). There, a malicious prosecution plaintiff subpoenaed several assistant district attorneys to solicit testimony as to how the charging decision was made in that case. *Id.* at 184. The district attorneys sought to quash the subpoena, contending any testimony they might give would be privileged. *Id.* The court of appeals concluded that *King* necessitated the district attorney's testimony because the plaintiff had to show any false information was important to the charging decision. *Id.* at 185. The Texas Supreme Court disagreed, noting the plaintiffs need for the testimony did not outweigh the importance of the privilege. *Id.* at 187–88. Moreover, the court suggested a malicious prosecution plaintiff might prove their case through circumstantial evidence, testimony from

the defendant, or from expert testimony on prosecutorial decision-making. *Id.* at 189. The court never suggested, however, that the decision making process of the district attorney was not a necessary component of the plaintiff's case.

### *Analysis*

**[6]** Gonzalez had the burden to prove that Grimm either initiated or procured the criminal prosecution. The court in *Lieck* chose not to provide a jury instruction defining the term "initiate" because ordinarily that would be apparent from the formal charging instruments. 881 S.W.2d at 293. In other words, it is usually a question of law. As the record here reflects, Officer Calanche executed the Complaint and Complaint affidavit, and the district attorney's office executed the Information which led to the capias. The Information is a formal charging instrument in Texas. "An 'information' is a written statement filed and presented in behalf of the State by the district or county attorney, charging the defendant with an offense which may by law be so prosecuted." TEX. CODE CRIM. PROC. ANN. art. 21.20 (West 2009). Thus, Grimm did not "initiate" the charge, the State's prosecutor did. *Lermon v. Minyard Food Stores, Inc.,* No. 05–13–00034–CV, 2014 WL 6466840 *5 (Tex.App.–Dallas, Nov. 19, 2014, pet.denied)(mem.op.)(voluntary statement made by defendant was not a "formal charge" nor did it actually operate to initiate the criminal prosecution when detective presented his own probable cause affidavit to a magistrate).[7]

**\*7** Gonzalez was therefore left with proving that Grimm *procured* the charge by showing she provided false information that led to the filing of the information. The false information Gonzalez focuses upon is contested statements such as "do you know what I could do with this" which imply some improper use of the Social Security number. But in this case, Officer Calanche executed a Complaint and Complaint Affidavit that made three specific allegations, one of which stated Grimm was threatened with bodily injury. Grimm testified she never made such a claim, and there is no evidence in the record that she did. Stated otherwise, Officer Calanche included allegations in the complaint paperwork that Grimm never made, and the claim that she was threatened with bodily injury was itself false, but it did not come from Grimm. Whether the district attorney filed the information based on Calanche's false information, or that alleged to be from Grimm, is unknowable without testimony from the district attorney, its file, or some other indication as to how the actual decision to proceed with the charge was made.

Gonzalez had neither the district attorney's testimony, nor the district attorney's file. On the facts in this case, the lack of any such testimony is fatal to his claim.

The plaintiffs in *King* argued that a jury could infer causation from the falsity of the information itself. 126 S.W.3d at 79. And the court suggests such an inference might be drawn when the only information the official relied on was the false information. *Id.* But just like in *King,* the prosecutor here had much more information before him than just the defendant's statement. For instance, Officer Calanche's Complaint affidavit references events over a two month period, supported by statements from multiple witnesses, which were forwarded to the district attorney's office. Those statements included claims by another principal, a PTA vice president, and a teacher who described confrontations with Gonzalez.[8] The charging decision made by the district attorney's office involved more than simply looking at Grimm's version of the March 8, 2006, phone call. Without some evidence that Grimm's version of the March 8 phone call formed the basis of the district attorney's decision, Gonzalez simply lacks any evidence of causation.[9]

Grimm urges that we could also affirm the judgment below based upon her having probable cause (as a matter of law) to believe that Gonzalez committed Fraudulent Use or Possession of Identifying Information (the charge the district attorney initially declined). She also believes the record shows that Gonzalez is guilty of that charge as a matter of law. She contends that she was privileged as a matter of law to report a crime because she did so an employee of a school

district in the course and scope of her employment. But all of these contentions in one way or another turn on whether Gonzalez in fact threatened Grimm in the March 8 phone call. If he never threatened her, there was no crime to report, no probable cause to make a complaint, and no crime of which to be guilty. The threat arose from the words "do you know what I could do with" in the context of the other things said in the call. Because the witnesses disputed what was said in that phone call, as well as the other surrounding contextual facts, these issues would have all been appropriate for the jury to decide.

**\*8** In summary, we overrule Issue One which contends there was no need for proof of a false statement. Because there was no evidence that Grimm initiated the prosecution, and the ultimate decision was left to the district attorney's office, the only means to prove Grimm procured the prosecution was to prove she knowingly provided false information. But even assuming she did provide false information, there was no evidence that the claimed false information procured the prosecution, and we accordingly overrule Appellant's third issue (claiming there is some evidence of each element of the claim). The second issue regarding evidence of Grimm's malice is moot. We affirm the judgment below.

Perez, Judge, sitting by assignment

**All Citations**

--- S.W.3d ----, 2015 WL 4137862

Footnotes

1    The EPISD police are certified peace officers in Texas. *See*TEX. EDUC. CODE ANN. § 37.081(b)(2)(West Supp. 2014)(school board may commission peace officers who "may enforce all laws, including municipal ordinances, county ordinances and state laws").

2    Section 32.51 provides in pertinent part:
(a) In this section:
(1) 'Identifying information' means information that alone or in conjunction with other information identifies a person, including a person's:
...
(E) social security number or other government-issued identification number.
...
(b) A person commits an offense if the person, with the intent to harm or defraud another, obtains, possesses, transfers, or uses an item of:
(1) identifying information of another person without the other person's consent;
...
(c) An offense under this section is:
(1) a state jail felony if the number of items obtained, possessed, transferred, or used is less than five.

3     Section 42.07 titled, "Harassment" provides in pertinent part:

(a) A person commits an offense if, with intent to harass, annoy, alarm, abuse, torment, or embarrass another, the person:

...

(2) threatens, in a manner reasonably likely to alarm the person receiving the threat, to inflict bodily injury on the person or to commit a felony against the person, a member of the person's family or household, or the person's property;

...

(4) causes the telephone of another to ring repeatedly or makes repeated telephone communications anonymously or in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another;

...

(c) An offense under this section is a Class B misdemeanor, except that the offense is a Class A misdemeanor if the actor has previously been convicted under this section.

4     In February of 2006, the district hired a new superintendent, Lorenzo Garcia. Grimm believed that the new superintendent and Gonzalez knew each other and that Gonzalez took advantage of that relationship to work against her. For instance, Grimm claims that Gonzalez had a picture of Garcia on his cell phone and would flash it and claim he had a personal relationship with Garcia that would help him get rid of Grimm.

5     "An 'information' is a written statement filed and presented in behalf of the State by the district or county attorney, charging the defendant with an offense which may by law be so prosecuted."TEX. CODE CRIM. PROC. ANN. art. 21.20 (West 2009). "The primary pleading in a criminal action on the part of the State is the indictment or information."TEX. CODE CRIM. PROC. ANN. art. 27.01 (West 2006).

6     The Lieck court provides this instruction for the jury:

A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides information which he knows is false. A criminal prosecution may be procured by more than one person.

*Id.* at 293.

7     Gonzalez cites a number of cases in support his contention that Grimm initiated the charge. We have previously discussed Lieck and King, and neither supports the claim that simply signing a witness statement is the same as initiating a formal charge. The four other cases cited by Gonzalez are all inapposite. *All American Telephone, Inc. v. USLD Communications, Inc.,* 291 S.W.3d 518, 534 (Tex.App.–Fort Worth 2009, pet. denied)("Appellants do not assert that appellees initiated Nowik's and Thibodeaux's prosecutions by filing a formal complaint."); *Tranum v. Broadway,* 283 S.W.3d 403, 416 (Tex.App.–Waco 2008, pet. denied)(court affirmed on evidence that defendant procured the prosecution by presenting false evidence, not by initiating the charge); *Ogg v. Dillard's, Inc.,* 239 S.W.3d 409, 422 (Tex.App.–Dallas 2007, pet. denied)(holding defendant did not initiate or procure prosecution, rather the State did); *Thrift v. Hubbard,* 974 S.W.2d 70, 77-78 (Tex.App.–San Antonio 1998, pet. denied) (court did not need to reach question of whether sworn complaint was equivalent of formal charging document because there was ample proof of false information given to authorities which led to arrest).

8     At time of Grimm's first report about the March 8 phone call, the EPISD police already were already investigating Gonzalez, based on staff concerns that he was aggressive, rude, and abrasive, which some perceived as threatening conduct. Some of the witnesses stated that Gonzalez never threatened them. None claimed that Gonzalez ever physically threatened them, and of most of his statements were related to threats of filing lawsuits, getting people fired, or filing grievances with the EPISD.

9     The Austin Court of Appeals in *Bennett v. Grant,* 460 S.W.3d 220 (Tex.App.–Austin March 20, 2015, no pet. hist.) recently held that a plaintiff could also overcome a prosecutor's role in the decision making process by showing that "a defendant's conduct was the determining factor in the prosecutor's decision to prosecute."*Id.* at 233. Without endorsing this holding, we note that the facts in *Grant* are unique and far different than those here. In *Grant*, the defendant shopped the prosecution to four different counties, and when no one would pursue the matter, he was apparently instrumental in having a special prosecutor appointed who did pursue the case. *Id.* at 229–32. In any event, the special prosecutor testified that he relied on the false information provided by the defendant, which provided some evidence for the false information exception described in *Lieck. Id.* at 233–36.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.



259 S.W.3d 286
Court of Appeals of Texas,
Fort Worth.

Brenda GRAY, Appellant

v.

Maria Gloria NASH, Appellee.

No. 2–07–351–CV.  |  June 19, 2008.

**Synopsis**
**Background:** Life insurance company filed an interpleader action to determine who was entitled to a portion of life insurance proceeds. The 17th District Court, Tarrant County, Fred W. Davis, J., granted wife's motion for summary judgment and denied ex-wife's motion for summary judgment. Ex-wife appealed.

**Holdings:** The Court of Appeals, Anne Gardner, J., held that:

[1] statute governing the applicability of a pre-divorce decree designation of an ex-spouse as the beneficiary under a life insurance policy did not apply to invalidate insured's designation of ex-wife as the beneficiary of $60,000 of insured's life insurance proceeds;

[2] ex-wife had a continuing insurable interest in insured's life at the time of his death;

[3] termination of insured's child support obligation did not override insured's designation of his ex-wife as the beneficiary of $60,000 in life insurance proceeds; and

[4] ex-wife was not entitled to recover from wife $1,500 in costs the trial court awarded life insurance company.

Reversed and rendered.

West Headnotes (13)

**[1]  Insurance**
    Divorce or Separation; Agreements and Settlements

Ex-wife of insured was entitled to disputed life insurance policy proceeds; ex-wife was the designated beneficiary to $60,000 of the life insurance proceeds. V.T.C.A., Insurance Code § 1103.102(a).

1 Cases that cite this headnote

**[2]  Insurance**
    Policies considered as contracts
**Insurance**
    Application of rules of contract construction

An insurance policy is a contract, and it is governed by the same rules of construction applicable to all contracts.

1 Cases that cite this headnote

**[3]  Contracts**
    Language of contract

When interpreting a contract the court's primary goal is to give effect to the written expression of the parties' intent.

1 Cases that cite this headnote

**[4]  Insurance**
    Effect on prior designation of beneficiary

Statute governing the applicability of a pre-divorce decree designation of an ex-spouse as the beneficiary under a life insurance policy did not apply to invalidate insured's designation of ex-wife as the beneficiary of $60,000 of insured's life insurance proceeds; statute provided that only divorce decrees and annulments nullified the beneficiary designations, insured named ex-wife as a beneficiary after they divorced, and order modifying insured's parent child relationship did not trigger statute, as argued by insured's wife. V.T.C.A., Family Code § 9.301(a).

Cases that cite this headnote

**[5]  Statutes**
    Plain Language; Plain, Ordinary, or Common Meaning

**Statutes**

👉 Language

When construing a statute, the Court of Appeals begins with the statute's plain language because the court assumes that the legislature tried to say what it meant and, thus, that its words are the surest guide to its intent.

2 Cases that cite this headnote

**[6] Statutes**

👉 Statute as a Whole; Relation of Parts to Whole and to One Another

In ascertaining legislative intent, for the purpose of statutory construction, the Court of Appeals does not confine its review to isolated statutory words, phrases, or clauses, but it instead examines the entire act.

3 Cases that cite this headnote

**[7] Insurance**

👉 Spouses and former spouses

Insured's ex-wife had a continuing insurable interest in insured's life at the time of his death, for the purpose of proceeding to determine beneficiary to life insurance proceeds, where insured applied for the life insurance policy on his own life and designated ex-wife as a beneficiary. V.T.C.A., Insurance Code §§ 1103.053, 1103.054.

1 Cases that cite this headnote

**[8] Insurance**

👉 Effect on prior designation of beneficiary

The termination of insured's child support obligation did not override insured's designation of his ex-wife as the beneficiary of $60,000 in life insurance proceeds; insured named ex-wife individually, and not as trustee for child, as the beneficiary under the policy, and insured never changed the beneficiary designation, even after his support obligation terminated.

Cases that cite this headnote

**[9] Appeal and Error**

👉 Insufficient discussion of objections

Insured's wife waived her appellate argument that alleged the doctrines of unjust enrichment and estoppel precluded ex-wife form recovering any life insurance proceeds, where wife failed to cite any authority in support of her argument. Rules App.Proc., Rules 38.1(h), 38.2(a)(1).

5 Cases that cite this headnote

**[10] Appeal and Error**

👉 Insufficient discussion of objections

An argument may be waived if inadequately briefed.

14 Cases that cite this headnote

**[11] Interpleader**

👉 Costs and fees

Ex-wife was not entitled to recover from wife $1,500 in costs the trial court awarded life insurance company, even though ex-wife was the prevailing party in the litigation; ex-wife specifically agreed that insurance company was entitled to recover its reasonable attorney fees, costs and expenses paid out of the interpleaded funds.

Cases that cite this headnote

**[12] Interpleader**

👉 Costs and fees

A party interpleading funds may be entitled to have his attorney's fees deducted from the funds.

Cases that cite this headnote

**[13] Interpleader**

👉 Costs and fees

Generally, the ultimate burden between rival claimants should fall on the party whose unsuccessful claim rendered the interpleader necessary.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*288** Moses, Palmer & Howell, LLP and Shayne D. Moses, David A. Palmer and Brandon J. Edmundson, Fort Worth, for Appellant.

Thorne & Skinner and Michael L. Skinner, Grand Prairie, for Appellee.

Panel B: LIVINGSTON, HOLMAN, and GARDNER, JJ.

## OPINION

ANNE GARDNER, Justice.

This is a life insurance case. The question before the court is whether a disputed portion of the policy's death benefit is payable to Appellant Brenda Gray—the insured's ex-wife and the policy's designated beneficiary—or to Appellee Maria Gloria Nash ("Gloria")—the insured's wife at the time of his death. We reverse the trial court's summary judgment in favor of Gloria and render judgment in favor of Brenda.

## Background

The following facts are not in dispute. The decedent, Brent Nash, and Brenda were divorced in 1997. The divorce decree required Brent, as "additional child support," to purchase a life insurance policy with a death benefit of at least $60,000 and naming Brenda as irrevocable beneficiary as trustee for the benefit of Brent and Brenda's daughter, Amanda.

In July 1997, Brent purchased a life insurance policy from Pan–American Life Insurance Co. with a death benefit of $500,000 and designated Amanda as the beneficiary.

Brent married Gloria in 1998. In June 1998, Brent submitted a change of beneficiary form to Pan–American. The new beneficiary designation states that "$60,000.00 shall be paid to [Brenda]. The balance of the net proceeds, if any, shall be paid to [Gloria], wife." It is undisputed that Brent never again changed the beneficiary designation thereafter.

In July 2001, the divorce court issued its "Order in Suit to Modify Parent–Child Relationship and Motion for Enforcement," appointing Brent to serve as Amanda's primary joint managing conservator. The divorce court found that Brent was "current in all child support and medical

support payment obligations" and ordered that Brent's child support obligation was terminated.

Brent died on October 14, 2006, in a motor vehicle accident. Gloria submitted his death certificate and a claim for payment of the full $500,000 death benefit to Pan–American in December 2006. Pan– **\*289** American filed an interpleader action and deposited $60,460.27 (the proceeds plus interest) into the trial court's registry. Pan–American paid the rest of the death benefit to Gloria. By agreement of the parties, the trial court dismissed Pan–American from the suit and awarded it costs of $1,500 out of the funds in the registry.

Brenda and Gloria filed traditional cross-motions for summary judgment. The trial court denied Brenda's motion and granted Gloria's and awarded Gloria the $58,960.27 remaining in the court's registry. Brenda filed this appeal.

## Standard of Review

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979). We review summary judgments de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005); *Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 318 (Tex.2002). When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions presented. *Valence Operating Co.,* 164 S.W.3d at 661. The reviewing court should render the judgment that the trial court should have rendered. *Id.*

## Discussion

Brenda argues that she is entitled to the disputed policy proceeds because she is the policy's designated beneficiary. Gloria argues that she is entitled to the proceeds because the divorce court's July 2001 order appointing Brent as Amanda's primary joint managing conservator was the equivalent of a divorce decree and terminated Brenda's rights to the policy proceeds under family code section 9.301(a); Brenda had no insurable interest in Brent's life; family code section

154.015(f) imposes a constructive trust on the proceeds as excess child support payments; and failure of consideration, unjust enrichment, and estoppel preclude Brenda from collecting the proceeds.

**1. Under the express terms of the policy, Brenda is entitled to the disputed proceeds as the policy's designated beneficiary.** [1]

 [1]   [2]   [3]   An insurance policy is a contract, and it is governed by the same rules of construction applicable to all contracts. *Balandran v. Safeco Ins. Co.,* 972 S.W.2d 738, 740–41 (Tex.1998). The court's primary goal is to give effect to the written expression of the parties' intent. *Id.* at 741.

In this case, the insurance contract provides as follows:

> We will pay the life insurance proceeds upon proof the Insured died prior to the Expiration Date. The proceeds will be paid to the Beneficiary.
>
>  ....
>
> You may change any Beneficiary at any time during the Insured's lifetime unless otherwise provided in the previous designation. The new designation must be made by a signed notice in satisfactory form to our Home Office. The change **\*290** will take effect on the date the notice was signed subject to any action taken by us before recording the change.

It is undisputed that Brenda was the designated beneficiary of $60,000 of the policy proceeds at the time of Brent's death. Thus, under its contract of insurance, Pan–American was obligated to pay $60,000 to Brenda upon Brent's death.

The Texas Insurance Code compels the same result. Insurance code section 1103.102, captioned "Payment to Designated Beneficiary," mandates that a life insurance company must pay a policy's death benefit to the policy's designated beneficiary:

> Except as provided by Subsection (b) or (c), if an individual obtains a policy insuring the individual's life, designates in writing a beneficiary to receive the proceeds of the policy, and files the written designation with the company, the company shall pay the proceeds that become due on the death of the insured to the designated beneficiary.

TEX. INS.CODE. ANN. § 1103.102(a) (Vernon 2007). Subsection (b) provides that the insurer is not required to pay the proceeds of the policy to a designated beneficiary under subsection (a) if the company receives notice of an adverse claim to the proceeds from a person who has a bona fide legal claim to all or part of the proceeds. *Id.* § 1103.102(b). [2] Thus, but for notice of Gloria's adverse claim to the proceeds, section 1103.102 obliged Pan–American to pay the policy proceeds to Brenda.

We therefore hold that under the express terms of the insurance contract, Brenda is entitled to the disputed proceeds.

**2. Family code section 9.301.**

 [4]   Gloria argues that notwithstanding the plain language of the policy and insurance code section 1103.102, Brenda is not entitled to the proceeds by virtue of family code section 9.301(a). That section, captioned "Pre–Decree Designation of Ex–Spouse as Beneficiary of Life Insurance," provides in relevant part as follows:

> (a) If a decree of divorce or annulment is rendered after an insured has designated the insured's spouse as a beneficiary under a life insurance policy in force at the time of rendition, a provision in the policy in favor of the insured's former spouse is not effective unless:
>
> > (1) the decree designates the insured's former spouse as the beneficiary;
> >
> > (2) the insured redesignates the former spouse as the beneficiary after rendition of the decree; or
> >
> > (3) the former spouse is designated to receive the proceeds in trust for, on behalf of, or for the benefit of a child or a dependent of either former spouse.
>
> (b) If a designation is not effective under Subsection (a), the proceeds of the policy are payable to the named alternative beneficiary or, if there is not a named alternative beneficiary, to the estate of the insured.

TEX. FAM.CODE ANN. § 9.301 (Vernon 2006). Gloria contends that the divorce court's July 2001 order appointing Brent as Amanda's primary managing conservator was the equivalent of a divorce decree, thus triggering section

9.301 and nullifying Brent's 1998 designation of Brenda as beneficiary, and that the difference between **\*291** "a decree of divorce or annulment" and an order modifying the parent-child relationship is merely a matter of semantics.

 **[5]**   **[6]**   When construing a statute, our goal is to ascertain and give effect to the legislature's intent as expressed by the plain and common meaning of the statute's words. TEX. GOV'T CODE ANN. § 312.002 (Vernon 2005); *F.F.P. Operating Partners, L.P. v. Duenez,* 237 S.W.3d 680, 683 (Tex.2007); *Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004). We begin with the statute's plain language because we assume that the legislature tried to say what it meant and, thus, that its words are the surest guide to its intent. *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 865–66 (Tex.1999). In ascertaining legislative intent, we do not confine our review to isolated statutory words, phrases, or clauses, but we instead examine the entire act. *Meritor Auto., Inc. v. Ruan Leasing Co.,* 44 S.W.3d 86, 90 (Tex.2001); *Rodgers v. Comm'n for Lawyer Discipline,* 151 S.W.3d 602, 614 (Tex.App.-Fort Worth 2004, pet. denied). It is a well-settled rule of statutory construction that every word of a statute must be presumed to have been used for a purpose. *See Quick v. City of Austin,* 7 S.W.3d 109, 123 (Tex.1998); *Laidlaw Waste Sys., Inc. v. City of Wilmer,* 904 S.W.2d 656, 659 (Tex.1995). Likewise, every word excluded from a statute must also be presumed to have been excluded for a purpose. *Quick,* 7 S.W.3d at 123; *Laidlaw Waste Sys., Inc.,* 904 S.W.2d at 659.

The legislature specified that only divorce decrees and annulments nullify beneficiary designations; we must presume that it included those instruments, and excluded others, like orders modifying the parent-child relationship, for a purpose. *See* TEX. FAM.CODE ANN. § 9.301(a); *Quick,* 7 S.W.3d at 123; *Laidlaw Waste Sys., Inc.,* 904 S.W.2d at 659. Moreover, the legislature limited section 9.301's nullifying effect to designations made before the decree or annulment, at a time when the insured and the designated beneficiary are still married—a circumstance not present in this case.

Because the unambiguous language of section 9.301 limits its application to life insurance policies issued before a trial court renders a decree of divorce or an annulment, we hold that it does not apply in this case and does not nullify Brent's designation of Brenda as beneficiary of the disputed proceeds.

**3. Insurable interest.**

 **[7]**   Gloria next argues that Brenda did not have an insurable interest in Brent's life at the time of his death. In a closely-related argument, she contends that public policy prohibits Brenda from collecting the policy proceeds. We recently addressed a similar question in *Allen v. United of Omaha Life Insurance Co.,* 236 S.W.3d 315, 322–23 (Tex.App.-Fort Worth 2007, pet. denied). In *Allen,* the question was whether a limited partnership had a continuing insurable interest in the life of its former CEO after his association with the partnership ended. *Id.* at 319. We noted that under the common law, the designated beneficiary of a life insurance policy must have an insurable interest in the insured's life when the policy is issued and when the insured dies. *Id.* at 322 (citing *Torrez v. Winn–Dixie Stores, Inc.,* 118 S.W.3d 817, 820 (Tex.App.-Fort Worth 2003, pet dism'd)). Two policies drive the common law rule: A practice that encourages one to take another's life should be prohibited, and no one should be permitted to wager on the life of another. *Id.* (citing *Torrez,* 118 S.W.3d at 820).

While the insurable-interest rule is still followed by Texas courts, the legislature **\*292** has enlarged the class of persons deemed to have an insurable interest. *Id.* Under the insurance code, an individual may apply for a life insurance policy on the individual's own life and designate as beneficiary any individual. TEX. INS.CODE ANN. § 1103.054 (Vernon 2007); *Allen,* 236 S.W.3d at 323. Insurance code section 1103.053 further provides that a beneficiary of a life insurance policy who is designated in accordance with section 1103.054 has, at all times after the designation, an insurable interest in the life of the individual who is insured under the policy. TEX. INS.CODE ANN. § 1103.053; *Allen,* 236 S.W.3d at 323. Thus, the legislature has conferred an insurable interest on those persons named by an insured as beneficiaries in a policy on the insured's own life. *Allen,* 236 S.W.3d at 323.

The cases cited by Gloria for the proposition that a beneficiary must have a continuing insurable interest independent of the beneficiary designation predate insurance code sections 1103.053 and 1103.054 and their predecessor. *See* TEX. INS.CODE ANN. §§ 1103.053, .054 (effective June 1, 2003); Act of April 30, 1953, 53rd Leg., R.S., ch. 113, § 1, 1953 Tex. Gen. Laws 400, *repealed by* Act of May 22, 2001, 77 Leg., R.S., ch. 1419, § 31(a), 2001 Tex. Gen. Laws 4208; *Cheeves v. Anders,* 87 Tex. 287, 28 S.W. 274, 275 (Tex.1894); *McBride v. Clayton,* 140 Tex. 71, 166 S.W.2d 125, 128–29 (Tex. Comm'n App.1942); *Drane v. Jefferson Standard Life Ins. Co.,* 139 Tex. 101, 161 S.W.2d 1057, 1059 (Tex. Comm'n App.1942); *Whiteselle v. Nw. Mut. Life Ins.*

*Co.,* 221 S.W. 575, 576 (Tex. Comm'n App.1920), *overruled in part on other grounds by Womack v. Womack,* 141 Tex. 299, 172 S.W.2d 307, 308 (Tex.1943). Gloria also cites *Torrez* as fundamentally indistinguishable from this case. But in *Torrez,* the insured's employer—not the insured himself—took out a policy on the insured's life. *Torrez,* 118 S.W.3d at 819. Thus, unlike this case, *Torrez* did not implicate the continuing-insurable-interest provisions of insurance code sections 1103.053 and 1103.054.

In *Allen,* we held that because the CEO, himself, applied for the life insurance policy on his own life and designated the partnership as the beneficiary, the partnership had, at the policy's inception and at all times thereafter, an insurable interest in the CEO's life, even after the CEO's relationship with the partnership ended. *Allen,* 236 S.W.3d at 323. Likewise, in this case, Brent, himself, applied for the life insurance policy on his own life and designated Brenda as a beneficiary. Thus, we hold that Brenda had a continuing insurable interest in Brent's life.

### 4. Effect of termination of Brent's child support obligation.

 **[8]**  Gloria next argues that because the life insurance policy was security for Brent's child support obligation under the 1997 divorce decree, and the 2001 order modifying the parent-child relationship terminated his child support obligation, the sole reason for designating Brenda as beneficiary was extinguished. Gloria further argues that allowing Brenda to collect the disputed proceeds is tantamount to an excess child support payment, which Brenda would merely hold in constructive trust for Brent's estate. *See* TEX. FAM.CODE ANN. § 154.015(f) (Vernon 2007) ("If money paid to the obligee for the benefit of the child exceeds the amount of the unpaid child support obligation remaining at the time of the obligor's death, the obligee shall hold the excess amount as constructive trustee for the benefit of the deceased obligor's estate until the obligee delivers the excess amount to the legal representative of the deceased obligor's estate.").

 **\*293**  Implicit in Gloria's arguments are the notions that the only reason Brent designated Brenda as beneficiary was to comply with the divorce decree—a notion which Gloria calls an undisputed fact—and that he did not intend Brenda to receive any portion of the policy proceeds after the 2001 modification order. But Brenda *does* dispute these assertions, and the record is silent as to why Brent (1) designated Brenda as beneficiary in her individual capacity rather than "as

trustee for the benefit of the child" as ordered by the divorce decree and (2) never undesignated Brenda as beneficiary after the 2001 modification order terminated his child support obligation. There is no evidence in the record that Brent obtained life insurance coverage solely to comply with the divorce decree, and the only evidence of his intent regarding the disputed proceeds is his unconditional and unambiguous designation of Brenda as beneficiary. Therefore, the record does not support Gloria's argument that the policy proceeds are solely a form of child support, excess or otherwise.

Nor do the foreign cases Gloria cites support her argument that a beneficiary designation in favor of a former spouse is ineffective when the insured's child support obligation ends. In *Caracansi v. Caracansi,* the Connecticut court of appeals held that a divorce court erred by ordering a father to maintain a life insurance policy for the benefit of his children after they reached the age of majority because the insurance policy served solely as a means to secure payment of the father's child support obligations. 4 Conn.App. 645, 496 A.2d 225, 227–28 (1985). Likewise, in *H.P.A. v. S.C.A.,* the Supreme Court of Alaska held that a divorce court could not order a father to maintain a life insurance policy for the benefit of his children past their ages of majority. 704 P.2d 205, 211 (Alaska 1985). In *Equitable Life Assurance Society v. Flaherty,* a federal district court in Alabama held that when a father failed to obtain a divorce-court-ordered $10,000 life insurance policy for the benefit of his minor child as security for child support payments, his ex-wife was entitled to recover $10,000 for the benefit of the child from the only policy the father had at the time of his death, even though it named his second wife as beneficiary. 568 F.Supp. 610, 616 (D.C.Ala.1983). In *In re Marriage of Weidner,* the Iowa supreme court held that a divorce court had the power to order a father to maintain an existing life insurance policy for the benefit of his minor children. 338 N.W.2d 351, 360 (Iowa 1983). [3]

Thus, all of the cases Gloria cites support a divorce court's power to order a parent to maintain life insurance for the benefit of the parent's minor children, and some of the cases recognize such insurance as security for the parent's support obligation. To this extent, they are consistent with Texas law. *See* TEX. FAM.CODE ANN. § 154.006(a) (recognizing trial court's authority to order that child support payments continue after obligor's death); *Miles v. Peacock,* 229 S.W.3d 384, 389 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (recognizing trial court's authority to order parent to maintain life insurance for benefit of minor children); *Niskar v. Niskar,* 136 S.W.3d

749, 759 (Tex.App.-Dallas 2004, no pet.) (same); *Grayson v. Grayson,* 103 S.W.3d 559, 563 (Tex.App.-San Antonio 2003, no pet.) (same). But none of the cases hold that termination of a child support obligation during the child's minority overrides a life insurance policy's **\*294** beneficiary designation in favor of the insured's former spouse.

Finding no support for Gloria's argument in the record or the law, we hold that the termination of Brent's child support obligation in 2001 does not override his designation of Brenda, individually, as beneficiary of the disputed proceeds or result in an excess child support payment.

### 5. Gloria's remaining arguments.

 [9]  Gloria—without citation to any authority—argues (1) that failure of consideration and the doctrine of unjust enrichment preclude Brenda's recovery of the policy proceeds because the divorce decree was a contract between Brent and Brenda and Brenda failed to hold up her end of the bargain by serving as Amanda's primary managing conservator after 2001; (2) that Brenda is estopped from claiming the policy proceeds because she agreed in the divorce decree that Brent was obligated to fund the life insurance policy only so long as he was obligated to pay child support; and (3) that even if Brenda is entitled to the disputed proceeds, Gloria is entitled to at least one-half of the value of the policy premiums because Brent paid them with community property.

 [10]  An appellate brief must contain appropriate citations to authorities. TEX.R.APP. P. 38.1(h), 38.2(a)(1). An argument may be waived if inadequately briefed. *Fredonia State Bank v. Gen. Am. Life Ins. Co.,* 881 S.W.2d 279, 284 (Tex.1994). Because Gloria cites no authority whatsoever in support of these arguments, we hold that she has waived them.

### 6. Allocation of costs awarded to Pan–American.

 [11]   [12]   [13]  Brenda argues that she is entitled to recover from Gloria the $1,500 in costs the trial court awarded to Pan–American out of the disputed proceeds. A party interpleading funds may be entitled to have his attorney's fees deducted from the funds. *Foreman v. Graham,* 693 S.W.2d 774, 778 (Tex.App.-Fort Worth 1985, writ ref'd n.r.e.). Generally, the ultimate burden between rival claimants should fall on the party whose unsuccessful claim rendered the interpleader necessary. *Id.* (citing *Monarch Tile Sales v. Frost Nat'l Bank,* 496 S.W.2d 254, 255–56 (Tex.Civ.App.-San Antonio 1973, no writ); *Givens v. Girard Life Ins. Co.,* 480 S.W.2d 421, 430 (Tex.Civ.App.-Dallas 1972, writ ref'd n.r.e.) (op. on reh'g)). But in this case, Brenda and Gloria specifically agreed in the "Joint Stipulations and Motion for Dismissal with Prejudice Regarding [Pan–American]" that "[a]s a disinterested stakeholder, Pan–American is entitled to recover its reasonable attorney[']s fees, costs, and expenses, paid out of the interpleaded funds ... in the amount of $1,500.00." Because Brenda agreed to pay Pan–American's fees and costs out of the interpleaded funds, we hold that the trial court did not err by so ordering.

### Conclusion

We sustain Brenda's sole issue. We reverse the trial court's judgment and render judgment in favor of Brenda for the remaining policy proceeds on deposit in the trial court's registry.

### All Citations

259 S.W.3d 286

Footnotes

1    Gloria does not argue otherwise; instead, she argues that other factors preclude Brenda's entitlement to the proceeds. Thus, we may curtail our analysis of this threshold issue.

2    Subsection (c) involves private placement contracts and is not relevant to this case. *See id.* § 1103.102(c).

3    Gloria cites *Weidner* for the proposition that an order to maintain life insurance may be invalid to the extent that the amount of insurance required exceeds the insured's alimony or child support obligation. The case does not support or even discuss that proposition.

**End of Document**   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Y

KeyCite Yellow Flag - Negative Treatment

**Superseded by Statute as Stated in** Lemery v. Ford Motor Co., S.D.Tex., November 19, 2002

982 S.W.2d 165
Court of Appeals of Texas,
Houston (1st Dist.).

Carolyn GREATHOUSE, Individually and
as Independent Executor of the Estate of
Clyde R. Greathouse, Deceased, Appellant,

v.

Gary L. McCONNELL, Appellee.

No. 01–97–00324–CV. | July 30, 1998.

Action was brought for legal malpractice in representation of client and his estate. Suit was transferred to the Probate Court and County Court at Law No. 3, Brazoria County, James Blackstock, J., which granted attorney's motion for summary judgment. Client's executor appealed. The Court of Appeals, Wilson, J., held that: (1) transfer of suit was authorized, and (2) executor failed to create genuine issues of material fact regarding whether client could have prevailed in underlying litigation but for attorney's conduct.

Affirmed.

West Headnotes (10)

**[1]    Courts**
        Acts and proceedings without jurisdiction

When a trial court acts without subject matter jurisdiction by exceeding the limits of its statutory authority, any orders entered by the court are void, and not merely voidable.

4 Cases that cite this headnote

**[2]    Courts**
        Jurisdiction of Cause of Action
**Courts**
        Presumptions and Burden of Proof as to Jurisdiction
**Courts**

        Waiver of Objections

Subject matter jurisdiction is essential to the authority of a court to decide a case; it is never presumed and cannot be waived.

1 Cases that cite this headnote

**[3]    Courts**
        Causes which may be transferred

Statutory probate court had authority to transfer legal malpractice claim from the district court to itself, where client's estate administration was pending before probate court, and legal malpractice action was brought by executor of client's estate in her capacity as such. V.A.T.S. Probate Code, §§ 5A(b), 5B.

6 Cases that cite this headnote

**[4]    Courts**
        Causes which may be transferred

Statutory probate court may properly transfer to itself any case brought by or against a personal representative of an estate, regardless of whether the claim meets the definition of "appertaining to or incident to" an estate. V.A.T.S. Probate Code, §§ 5A(b), 5B.

4 Cases that cite this headnote

**[5]    Judgment**
        Motion or Other Application

A defendant is not entitled to a summary judgment on the entire case unless the defendant files a summary judgment that addresses, and then conclusively demonstrates, that the plaintiff is not entitled to recover on any theory of liability alleged.

Cases that cite this headnote

**[6]    Judgment**
        Attorneys, cases involving

Claims against attorney for breach of fiduciary duty, breach of the duty of good faith and fair dealing, fraud, Deceptive Trade Practices Act (DTPA) violations, breach of contract,

and breach of express and implied warranties were essentially duplicative of legal malpractice claim, and therefore, attorney could obtain summary judgment on entire case by disproving, as matter of law, one element of legal malpractice claim. V.T.C.A., Bus. & C. §§ 17.41–17.63.

38 Cases that cite this headnote

**[7]** **Attorney and Client**
 Elements of malpractice or negligence action in general

Generally, to recover on a claim of legal malpractice, a plaintiff must prove: (1) the attorney owed the plaintiff a duty; (2) the attorney breached that duty; (3) the breach proximately caused the plaintiff's injuries; and (4) damages occurred.

30 Cases that cite this headnote

**[8]** **Attorney and Client**
 Pleading and evidence

When a legal malpractice case arises from prior litigation, the plaintiff has the burden to prove that, "but for" the attorney's breach of duty, he or she would have prevailed on the underlying cause of action and would have been entitled to judgment.

28 Cases that cite this headnote

**[9]** **Judgment**
 Attorneys, cases involving

Executor of client's estate failed to create genuine issues of material fact as to whether client could have prevailed in underlying suit to recover deficiency judgment but for attorney's failure to raise commercial reasonableness of the sale of the collateral and usury as affirmative defenses, as would preclude summary judgment on legal malpractice claim.

Cases that cite this headnote

**[10]** **Appeal and Error**
 To verdict, findings, or judgment

By failing to make reference to issue in her appellate brief, executor of client's estate waived any complaint concerning propriety of summary judgment on legal malpractice claim relating to attorney's duty to raise the affirmative defense of interest beyond the contractual term, in underlying suit to recover deficiency judgment.

5 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*166** Timothy Ferguson, Cheryl A. Schultz, Beaumont, for appellant.

Gary L. McConnell, Lynn J. Klement, Angleton, for appellee.

Before SCHNEIDER, C.J., and WILSON and SMITH, [*] JJ.

### OPINION

WILSON, Justice.

The case involves a legal malpractice action originally brought by the appellants, Carolyn Greathouse in her individual capacity and as representative of her husband's estate (Greathouse), in state district court. The case was later transferred to a statutory probate court which granted a summary judgment on the merits of the dispute in favor of the appellee, Gary McConnell. Greathouse appealed to this Court challenging both the transfer and the granting of summary judgment. We affirm.

### Facts

Greathouse's current claims against McConnell arise out of his representation of Greathouse's deceased husband, Clyde R. Greathouse (Clyde), and Forrest Allen & Associates, Inc. (Forrest Allen), an insurance agency formerly owned by Clyde, in a suit (the "underlying suit") brought against them by Charter National Bank–Southwest (Charter) to recover a deficiency judgment on a $250,000 loan Charter made to the Forrest Allen agency. Pursuant to the terms of that loan, the Forrest Allen agency was pledged as collateral and Clyde agreed to act as guarantor. After Charter declined to renew the note, Clyde informed Charter that he was abandoning the

Forrest Allen agency. Charter than took control of the agency and sold it to another insurance agency in Corpus Christi. Charter subsequently sought to recover a deficiency judgment from Forrest Allen as maker and from Clyde as guarantor on the note.

After Clyde's death, Greathouse was appointed independent executrix of his estate and, on June 3, 1986, Clyde's will was admitted to probate in the statutory Probate Court and County Court at Law Number 3 of Brazoria County (the probate court). The administration of Clyde's estate is still pending, and no final distribution or accounting has been made.

Because Clyde died during the pendency of the underlying suit, Greathouse, in her capacity as independent executrix of Clyde's estate, was substituted as a party in place of Clyde. On August 24, 1989, the trial court entered a judgment in the underlying suit against Forrest Allen and against Clyde's estate for an amount in excess of $250,000.

On August 11, 1993, Greathouse, in her individual capacity, instituted the current action (the "legal malpractice suit") against McConnell in the 149th District Court of **\*167** Brazoria County (the district court) alleging legal malpractice and violations of the Deceptive Trade Practices Act (DTPA), TEX.BUS. & COM.CODE ANN. § 17.41–.63 (Vernon 1987 & Supp.1998), stemming from McConnell's representation of Clyde and Clyde's estate in the underlying suit. In an amended petition filed on May 3, 1995, Greathouse sued McConnell in her capacity as independent executrix of Clyde's estate as well as in her individual capacity, and added allegations of breach of contract and fraud. On November 22, 1995, McConnell filed a motion in the probate court asking the court to transfer the legal malpractice suit from the district court to itself and to consolidate that action with Clyde's estate administration pending in the probate court. McConnell alleged that section 5B of the Probate Code authorized the probate court to transfer the legal malpractice suit from the district court to itself because the legal malpractice suit was appertaining to or incident to Clyde's estate. Greathouse filed a motion opposing the transfer claiming that the legal malpractice suit was not appertaining to or incident to the estate administration, and, therefore, transfer pursuant to section 5B was inappropriate. The probate court granted McConnell's motion.

After the legal malpractice suit was transferred, McConnell filed a motion for summary judgment which the probate court granted on December 6, 1996 without stating the grounds. In two points of error, Greathouse alleges that (1) the probate

court lacked subject matter jurisdiction to transfer the legal malpractice suit from the district court to itself, and (2) even if the transfer was proper, the trial court erred in granting summary judgment to McConnell.

**Transfer Pursuant to Section 5B of the Probate Code**

**[1]** **[2]** In her first point of error, Greathouse alleges the probate court lacked statutory authority to transfer the legal malpractice claim from the district court to itself, and, therefore, the order granting the transfer and all subsequent rulings by the probate court are void. When a trial court acts without subject matter jurisdiction by exceeding the limits of its statutory authority, any orders entered by the court are void, and not merely voidable. *See Qwest Microwave, Inc. v. Bedard,* 756 S.W.2d 426, 437 (Tex.App.–Dallas 1988, orig. proceeding). Subject matter jurisdiction is essential to the authority of a court to decide a case; it is never presumed and cannot be waived. *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 443–44 (Tex.1993).

**1. The Probate Code**

The provisions of the Probate Code at issue in this appeal are section 5B and subsections (b) through (e) of section 5A. Section 5B of the Probate Code, entitled "Transfer of Proceeding," permits the judge of a statutory probate court to transfer from another court an action appertaining to or incident to an estate pending in the probate court. Specifically, section 5B provides:

> A judge of a statutory probate court on the motion of a party to the action or on the motion of a person interested in an estate, may transfer to his court from a district, county, or statutory court a cause of action *appertaining to or incident to an estate* pending in the statutory probate court and may consolidate the transferred cause of action with the other proceedings in the statutory probate court relating to that estate.

TEX.PROB.CODE ANN. § 5B (Vernon Supp.1998) (emphasis added).

Subsections (b) through (e) of section 5A, entitled "Matters Appertaining and Incident to an Estate and Other Probate

Court Jurisdiction," set forth the subject matter jurisdiction of statutory probate courts. Those sections, as they existed in 1995, provided, in pertinent part:

> (b) In proceedings in the statutory probate courts and district courts, the phrases "appertaining to estates" and "incident to an estate" in this Code include the probate of wills, the issuance of letters testamentary and of administration, and the determination of heirship, and also include, but are not limited to, all claims by or against an estate, all actions for trial of title to land and for the enforcement of liens thereon, all actions for trial of the right of property, **\*168** all actions to construe wills, the interpretation and administration of testamentary settlement, partition, and distribution of estates of deceased persons.... In situations where the jurisdiction of a statutory probate court is concurrent with that of a district court, any cause of action appertaining to estates or incident to an estate shall be brought in a statutory probate court rather than in the district court.

> (c) A statutory probate court has concurrent jurisdiction with the district court in all actions: (1) by or against a person in the person's capacity as a personal representative....

> (d) A statutory probate court may exercise the pendent and ancillary jurisdiction necessary to promote judicial efficiency and economy.

> (e) Subsections (c) and (d) apply whether or not the matter is appertaining to or incident to an estate.

Act of May 30, 1993, 73rd Leg., R.S., ch. 957, § 6, 1993 Tex.Gen.Laws 4081, 4162 (amended 1997) (current version at TEX.PROB.CODE ANN. § 5A(b) (Vernon Supp.1998)); TEX.PROB.CODE ANN. § 5A(c)–(e) (Vernon Supp.1998).

### 2. Legislative and Decisional Law History

To answer whether the probate court was authorized under the Probate Code to transfer the district court case to itself, a review of the case law and legislative amendments relevant to these sections is necessary. In *Seay v. Hall,* the Texas Supreme Court, interpreting an earlier version of Section 5A(b), held that a statutory probate court did not have jurisdiction over a wrongful death and survival action filed in that court by the representative of a decedent's estate. 677 S.W.2d 19, 23 (Tex.1984). The court stated that the "appertaining to an estate and incident to an estate" language of section 5A(b) was designed to limit probate court

jurisdiction to matters in which the *controlling issue* was the settlement, partition, or distribution of an estate, and that wrongful death actions did not fall within this definition. *Seay,* 677 S.W.2d at 23. *Seay* did not involve an interpretation of the transfer statute, section 5B, but addressed only whether the plaintiff's claims could be filed in the probate court in the first instance pursuant to the jurisdictional requirements of section 5A(b).

In 1985, the Legislature responded to *Seay* by amending the Probate Code to broaden statutory probate court jurisdiction. *Palmer v. Coble Wall Trust Co., Inc.,* 851 S.W.2d 178, 181 (Tex.1992). The 1985 amendment added a sentence to the end of section 5A(b) which provided that "in actions by or against a personal representative, the statutory probate courts have concurrent jurisdiction with the district court." *Palmer,* 851 S.W.2d at 181. The purpose of the amendment was to legislatively overrule the result in *Seay* by insuring that personal representatives could bring wrongful death or survival actions on behalf of others in the statutory probate courts. *See Palmer,* 851 S.W.2d at 181.

However, after the 1985 amendment many courts continued to apply the "controlling issue" test set out in *Seay* in determining whether a claim was "appertaining to or incident to an estate," which had the effect of denying statutory probate courts jurisdiction over wrongful death and survival actions because the "controlling issue" in such actions was not the settlement, partition, and distribution of an estate. *See Palmer,* 851 S.W.2d at 181. To further clarify the issue, in 1989 the Legislature again amended section 5A to give probate courts jurisdiction over claims by or against personal representatives "whether or not the matter is appertaining to or incident to an estate." *Palmer,* 851 S.W.2d at 182. [1]

In 1992, the supreme court in *Palmer* addressed the effect of the 1985 and 1989 amendments to section 5A, and the continuing validity of the "controlling issue" test in determining probate court jurisdiction under that section. *Palmer,* 851 S.W.2d at 178. The court stated that to apply the "controlling issue" test in the context of the 1985 amendment, as some courts continued to do, **\*169** would deny probate courts jurisdiction over wrongful death and survival actions, in direct contravention of the purpose of the amendment. *Palmer,* 851 S.W.2d at 181–82. Furthermore, the court stated the 1989 amendment, which gave probate courts jurisdiction over claims by or against personal representatives whether or not the matter was "appertaining to or incident to an estate," had dispensed altogether with the need to determine whether

the "controlling issue" test applied in suits involving personal representatives. *Palmer,* 851 S.W.2d at 182. However, the court stated that the need for an ascertainable meaning of "appertaining to or incident to an estate" still existed in certain circumstances. *Id.* The court went on to confirm its earlier reasoning in *Seay* that, under section 5A, a suit is "appertaining to or incident to an estate" when the controlling issue is the settlement, partition, or distribution of an estate insofar as it does not apply to suits by or against a personal representative. *Palmer,* 851 S.W.2d at 182. As in *Seay, Palmer* addressed only a probate court's concurrent jurisdiction over wrongful death and survival actions, but did not involve a transfer under section 5B of the Probate Code.

### 3. The Present Dispute

 [3]    As previously stated, McConnell moved to transfer the legal malpractice suit from the district court to the probate court pursuant to section 5B of the Probate Code. The trial court granted McConnell's request, specifically finding that the legal malpractice claim was "appertaining to or incident to" Clyde's pending estate administration. On appeal, the only issue contested by the parties is whether the legal malpractice claim was "appertaining to or incident to" a pending estate administration, as required by section 5B. *See Henry v. LaGrone,* 842 S.W.2d 324, 326 (Tex.App.—Amarillo 1992, orig. proceeding) (holding that transfer under section 5B requires showing that (1) court ordering transfer is a statutory probate court, (2) an estate is pending in that court, (3) a separate case is pending in a district, county, or statutory court, and (4) *that case involves claims that are appertaining to or incident to the estate pending in the statutory probate court* ). On appeal, McConnell argues that, because the definition of "appertaining to or incident to an estate" found in section 5A(b) includes "all claims by or against an estate," Greathouse's legal malpractice claim brought in her capacity as the personal representative of Clyde's estate was a claim "appertaining to or incident to an estate," and, therefore, transfer pursuant to section 5B was proper. According to McConnell, whether the legal malpractice claim is one "appertaining to or incident to an estate" under section 5B should not be judged by the "controlling issue" test because, as the supreme court stated in *Palmer,* that test is not applicable when the claim is brought by or against a personal representative. *See Palmer,* 851 S.W.2d at 182.

Greathouse points out two cases which she claims support her position. *See In re Ford Motor Co.,* 965 S.W.2d 571, 575 (Tex.App.—Houston [14th Dist.] 1997, orig. proceeding);

*D.B. Entertainment, Inc. v. Windle,* 927 S.W.2d 283, 288 (Tex.App.—Fort Worth 1996, orig. proceeding). In *D.B. Entertainment,* the defendants in a wrongful death and survival action pending in a district court sought mandamus relief after a statutory probate court transferred the district court case to itself pursuant to section 608 of the Probate Code to be consolidated with guardianship proceedings pending in the probate court. TEX.PROB.CODE ANN. § 608 (Vernon Supp.1998); *D.B. Entertainment,* 927 S.W.2d at 284–85. Sections 607 and 608 of the Probate Code, which apply to guardianships, are almost identical to sections 5A and 5B respectively. TEX.PROB.CODE ANN. §§ 607, 608 (Vernon Supp.1998). Because of the similarity in the statutes, the Fort Worth Court examined sections 5A and 5B and the case law construing those sections to determine if the section 608 transfer was appropriate. The court held that the wrongful death and survivorship action at issue in that case was not a cause of action "appertaining to or incident to" a guardianship estate, and, therefore, the transfer was not authorized by section 608. The court noted that the "controlling issue" test, used to determine what claims were "appertaining to or incident to" an estate, was still good law in certain circumstances, **\*170** as was the *Seay* court's determination that wrongful death actions do meet that standard. *D.B. Entertainment,* 927 S.W.2d at 286. The court also noted that, despite the fact that statutory probate courts were unquestionably given *concurrent jurisdiction* over claims by or against personal representatives by adding to section 5A the language "whether or not the [claim by or against a representative] is appertaining to or incident to an estate," this language does not appear in section 5B, which controls the *transfer* of actions. *D.B. Entertainment,* 927 S.W.2d at 287–88. The court concluded that (1) because nothing in section 608 authorizes the *transfer* of actions by or against a person in their capacity as a guardian, regardless of whether the matter is "appertaining to or incident to" a guardianship estate, and because (2) a wrongful death action was not "appertaining to or incident to" an estate under the "controlling issue" test, the probate court had no statutory authority to transfer the action to itself under section 608. *D.B. Entertainment,* 927 S.W.2d at 287.

In *Ford,* the defendants in a wrongful death and survival action pending in a district court sought mandamus relief after a statutory probate court transferred that case to itself pursuant to section 5B after finding that the wrongful death action was "appertaining to or incident to" an estate action pending in the probate court. *Ford,* 965 S.W.2d at 572–73. The Fourteenth Court relied on *D.B. Entertainment,*

finding its reasoning equally applicable to the facts in *Ford,* 965 S.W.2d at 574. The court went on to note that *D.B. Entertainment* was not inconsistent with *Palmer. Ford,* 965 S.W.2d at 574. According to the Fourteenth Court, although in *Palmer* the supreme court acknowledged that the subsequent amendments to section 5A dispensed with the need to determine by use of the "controlling issue" test whether a claim is "appertaining to or incident to an estate" in suits involving a personal representative, *Palmer* did recognize the continued validity of that test in certain circumstances. *Ford,* 965 S.W.2d at 574. The Fourteenth Court held that, as implicitly recognized in *D.B. Entertainment,* a *transfer* is such a circumstance because there is nothing in section 5B that authorizes the transfer of an action by or against a personal representative, regardless of whether the action is "appertaining to or incident to" an estate. *Ford,* 965 S.W.2d at 574. The court concluded that, although the relators in that case argued that section 5B cannot be applied without looking to section 5A, section 5A is a jurisdictional statute that determines the court where a suit may be filed. *Ford,* 965 S.W.2d at 575. Unlike section 5B, the court stated, section 5A does not govern transfers, and courts need only look to section 5A to ascertain the definition of the phrase "appertaining to or incident to" an estate. *Ford,* 965 S.W.2d 575.

Based on our reading of the plain language of sections 5A and 5B, and upon the nature of the underlying cause of action at issue in this case, we decline to follow the holdings in *Ford* and *D.B. Entertainment.* At the outset, we note that, unlike *Seay, Ford,* and *D.B. Entertainment,* this case involves the transfer of a legal malpractice claim and not wrongful death and survivorship claims. Key to the holdings in both *Ford* and *D.B. Entertainment* was the fact that, according to that portion of the *Seay* opinion which is still good law, wrongful death and survivorship claims are not causes of action appertaining to or incident to an estate. *Ford,* 965 S.W.2d at 575; *D.B. Entertainment,* 927 S.W.2d at 287. No cases have extended this per se rule to other causes of action.

Notwithstanding the fact that in this case we are not faced with a wrongful death or survivorship claim, we disagree with the conclusion reached by the courts in *Ford* and *D.B. Entertainment* that, because section 5A is a "jurisdiction" statute and section 5B is a "transfer" statute, the two statutes should not be read together. *See Ford,* 965 S.W.2d at 575; *D.B. Entertainment,* 927 S.W.2d at 287–88. In both *Ford* and *D.B. Entertainment,* the courts noted that, although section 5A grants to the probate courts *concurrent jurisdiction* over

all actions by or against a personal representative *whether or not the matter is appertaining to or incident to an estate,* section 5B contains no language allowing the court to *transfer* any action *whether or not the matter is appertaining to or incident to an estate. See* **\*171** *Ford,* 965 S.W.2d at 575; *D.B. Entertainment,* 927 S.W.2d at 287–88. The courts concluded that, due to the absence of this language in section 5B, a probate court may only transfer causes of action which are appertaining to or incident to an estate, regardless of whether the action was brought by a personal representative. *See Ford,* 965 S.W.2d at 575; *D.B. Entertainment,* 927 S.W.2d at 287–88.

**[4]** However, we find no reason to draw such a distinction between sections 5A and 5B. In unambiguous terms, the legislature amended section 5A in 1989 to grant probate courts concurrent jurisdiction over *all* actions brought by or against a personal representative, whether or not those claims standing alone would meet the definition of "appertaining to or incident to" an estate. *See Palmer,* 851 S.W.2d at 182. While similar language was not added to section 5B, we believe the broad grant of jurisdiction found in section 5A requires that the two sections be read together. We do not believe the legislature intended to grant the probate courts *concurrent jurisdiction* over such claims in one section and then restrict the *transfer* of those claims in another. As the supreme court stated in *Palmer,* the 1989 amendments "dispensed with the need to make this inquiry [whether an action was appertaining to or incident to an estate] in suits involving a personal representative" under section 5A. *Palmer,* 851 S.W.2d at 182. We find this reasoning applies equally to section 5B. Therefore, we hold that a statutory probate court may properly transfer to itself any case brought by or against a personal representative of an estate, regardless of whether the claim meets the definition of "appertaining to or incident to" an estate. Accordingly, because Greathouse brought her legal malpractice claim in her capacity as independent executrix of Clyde's estate, and because Clyde's estate administration was pending before the probate court, the court had jurisdiction to transfer the legal malpractice suit to itself.

We overrule Greathouse's first point of error.

### Propriety of Summary Judgment

Because we have held that the probate court properly transferred Greathouse's legal malpractice claim to itself,

we now address Greathouse's second point of error which challenges the trial court's granting of summary judgment in favor of McConnell.

### 1. Standard of Review

A defendant, as the movant, is entitled to prevail on a motion for summary judgment if the defendant can establish with competent summary judgment proof that, as a matter of law, there is no genuine issue of fact as to one or more of the essential elements of the plaintiff's cause of action. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 679 (Tex.1979). The standard for appellate review of a summary judgment is well established:

>   (1) the movant has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law;
>
>   (2) in deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant must be taken as true; and
>
>   (3) every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor.

*Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). On appeal, we will affirm a summary judgment if any of the theories advanced in the motion is meritorious. *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 626 (Tex.1996).

### 2. Nature of Action

 [5]  [6]  Before determining if any of the grounds asserted by McConnell supported the trial court's grant of summary judgment, we must first address the precise nature of the claims Greathouse has alleged against McConnell. A defendant is not entitled to a summary judgment on the entire case unless the defendant files a summary judgment that addresses, and then conclusively demonstrates, that the plaintiff is not entitled to recover on any theory of liability alleged. **\*172** *Klein v. Reynolds, Cunningham, Peterson & Cordell,* 923 S.W.2d 45, 48–49 (Tex.App.—Houston [1st Dist.] 1995, no writ). Greathouse's petition contained allegations of legal malpractice (professional negligence), breach of fiduciary duty, breach of the duty of good faith and fair dealing, fraud, DTPA violations, breach of contract, and breach of express and implied warranties. McConnell contends that Greathouse should not be allowed to "fracture"

what is essentially a legal malpractice claim into several causes of action. We agree.

Although Greathouse did allege multiple causes of action, they were all essentially "means to an end" to achieve one complaint of legal malpractice. *See Klein,* 923 S.W.2d at 49. A cause of action arising out of bad legal advice or improper representation is legal malpractice. *Sullivan v. Bickel & Brewer,* 943 S.W.2d 477, 481 (Tex.App.—Dallas 1995, writ denied). Although Greathouse alleged separate and distinct causes of action, the crux of each of those claims was that McConnell did not provide adequate legal representation to Greathouse. Greathouse's petition separately alleges negligence, breach of fiduciary duty, and breach of the duty of good faith and fair dealing; however, each of those allegations are followed by identical paragraphs detailing how McConnell breached these duties to Greathouse. Under her DTPA subheading, Greathouse alleged that McConnell (1) falsely represented that his legal services were of a competent quality, when they were not, (2) represented that the attorney-client relationship between them conferred certain rights, remedies or obligations that it did not have, (3) engaged in an unconscionable course of conduct that took advantage of Greathouse's lack of knowledge and experience such that there existed a gross disparity between the value of legal services received and the consideration paid to McConnell for those services, because McConnell's legal services were of no value. Under her breach of contract subheading, Greathouse alleged that (1) McConnell made express and implied warranties to Greathouse that McConnell would provide good and competent legal services, and McConnell breached those warranties by failing to, among other things, handle the lawsuit as a reasonably prudent attorney would have.[2] As to Greathouse's allegations of fraud, she does not provide any specific allegations separate from those alleged misrepresentations which, according to Greathouse, violated the DTPA. We hold that these claims amounted to nothing more than allegations of legal malpractice, and, therefore, McConnell could have obtained summary judgment on the entire case by disproving, as a matter of law, one element of Greathouse's legal malpractice cause of action.

### 3. Legal Malpractice Cause of Action

 [7]  [8]  Generally, to recover on a claim of legal malpractice, a plaintiff must prove: (1) the attorney owed the plaintiff a duty; (2) the attorney breached that duty; (3) the breach proximately caused the plaintiff's injuries; and

(4) damages occurred. *Farah v. Mafrige & Kormanik, P.C.,* 927 S.W.2d 663, 670 (Tex.App.—Houston [1st Dist.] 1996, no writ). When a legal malpractice case arises from prior litigation, <mark>the plaintiff has the burden to prove that, "but for" the attorney's breach of duty, he or she would have prevailed on the underlying cause of action and would have been entitled to judgment.</mark> *Jackson v. Urban, Coolidge, Pennington & Scott,* 516 S.W.2d 948, 949 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.); **\*173** *Schlager v. Clements,* 939 S.W.2d 183, 186–87 (Tex.App.—Houston [14th Dist.] 1996, writ denied). <mark>This aspect of the plaintiff's burden is commonly referred to as the "suit within a suit" requirement.</mark> *See id.*

### 4. Failure to Raise Affirmative Defenses

 **[9]**    Although Greathouse's pleadings alleged several breaches of the applicable standard of care, the crux of her claim was that McConnell did not raise affirmative defenses in the underlying suit which a reasonable attorney would have raised. Specifically, Greathouse alleged that McConnell should have raised the following affirmative defenses: (1) the commercial reasonableness of the sale of the collateral securing the note in the underlying case; (2) usury; and (3) interest beyond the contractual term of the note. In his motion for summary judgment, McConnell attempted to disprove the "suit within a suit" element of Greathouse's legal malpractice cause of action by showing that, even if he would have raised those affirmative defenses, Greathouse would not have prevailed in the underlying litigation. Therefore, if McConnell was successful in proving as a matter of law that raising these defenses would not have resulted in a favorable outcome for Greathouse, McConnell was entitled to summary judgment on Greathouse's legal malpractice claim.

### a. Commercial Reasonableness

In his motion for summary judgment, McConnell attempted to show that the sale of the collateral securing the note, the Forrest Allen agency, was conducted in a commercially reasonable manner, and, therefore, raising commercial reasonableness as a defense would not have resulted in a successful outcome for Greathouse in the underlying suit.

Section 9.504 of the Business and Commerce Code requires that, before the holder of a note can obtain a deficiency judgment against the maker, or in this case a guarantor, it must show the sale was made in a commercially reasonable manner. *See* TEX.BUS. & COM.CODE ANN. § 9.504 (Vernon 1991). In support of his claim that the sale was made

in a commercially reasonable manner, McConnell attached the affidavit of Winston Davis, the president of Charter Bank at the time Charter brought suit against Clyde and Forrest Allen. In his affidavit, Davis outlined the events surrounding the sale of the Forrest Allen agency, including (1) the notice given to the parties, (2) Davis's efforts to solicit bids from insurance agents in Corpus Christi, and (3) the sale of the agency to the only bidder, Courtesy Insurance Agency, for $100,000. [3] McConnell refers us to several cases in which affidavits similar to Davis's were found sufficient to prove, as a matter of law, that a sale of collateral was commercially reasonable pursuant to section 9.504. *See Wilson v. General Motors Acceptance Corp.,* 897 S.W.2d 818, 822 (Tex.App.—Houston [1st Dist.] 1994, no writ); *Folkes v. Del Rio Bank & Trust Co.,* 747 S.W.2d 443, 446 (Tex.App.—San Antonio 1988, no writ). We hold that Davis's affidavit contains sufficient information to establish, as a matter of law, that the sale was conducted in a commercially reasonable manner.

In her response to McConnell's motion for summary judgment, Greathouse objected to Davis's affidavit on the ground that it contained **\*174** legal conclusions and was therefore not competent summary judgment proof. Greathouse also attached the affidavit of Denice Smith, an attorney, which Greathouse claimed raised fact issues concerning McConnell's culpability for failing to plead and prove the affirmative defense of commercial reasonableness.

However, neither Greathouse's objections to McConnell's summary judgment proof nor her own summary judgment evidence addressed the element of her cause of action which McConnell sought to disprove, namely, the "suit within a suit" requirement. As previously stated, McConnell proved, as a matter of law, that the sale of Clyde's insurance company was conducted in a commercially reasonable manner. Therefore, *even if* McConnell would have pleaded and proved the affirmative defense of commercial reasonableness, Greathouse would not have been successful in the underlying action because the sale was commercially reasonable. Greathouse objected to those portions of Davis's affidavit in which he stated "Charter gave reasonable notice of a private sale of the collateral to Forrest Allen and the Greathouses," and "Charter subsequently sold the collateral in a commercially reasonable manner, including the method, manner, time, place and terms." However, in addition to these statements, Davis provided a detailed summary of the *facts* surrounding the loan transaction and the subsequent sale of the collateral. As in *Wilson* and *Folkes,* these facts allowed McConnell to prove the commercial reasonableness

of the sale as a matter of law, notwithstanding any conclusory statements contained in the affidavit.

The affidavit of Denice Smith, attached as summary judgment evidence to Greathouse's response, also misses the mark. In her affidavit, Smith stated it was her expert opinion that a reasonably prudent attorney would have raised the affirmative defense of commercial reasonableness, and that by failing to do so, McConnell breached the standard of care owed to Greathouse. However, in her affidavit Smith did not attempt to dispute the *facts* surrounding the sale of the underlying collateral as described in Davis's affidavit, nor did she explain why the sale was not conducted in a commercially reasonable manner. Smith merely attempted to establish that McConnell breached a duty owed to Greathouse, but did not address the question whether Greathouse would have prevailed in the underlying suit but for McConnell's negligence. Therefore, as to the affirmative defense of commercial reasonableness, Greathouse failed to raise a fact issue concerning the "suit within a suit" element of her legal malpractice cause of action.

### b. Usury
Greathouse also alleged in her pleadings that McConnell should have raised the affirmative defense of usury. In his motion for summary judgment, McConnell argued (1) the note and Clyde's guarantee, which were attached as summary judgment evidence, make clear that Clyde was liable for the interest which accrued on the note, and (2) even if Charter had charged usurious interest to Forrest Allen and sought to recover that interest from Clyde, the defense of usury was not available to Clyde because he was only a guarantor on the note.

It is well settled that usury is a defense personal to the debtor, one that a guarantor may not interpose. *Arndt v. National Supply Co.,* 633 S.W.2d 919, 925 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.). Because Clyde was a guarantor on the note, McConnell could not have raised this defense on Clyde's behalf, and, therefore, his failure to do so could not have affected the outcome of the underlying suit.

In her response to McConnell's motion, Greathouse did not specifically mention McConnell's failure to raise usury as a defense, nor did she specifically address McConnell's summary judgment arguments on this issue. However, in her response to McConnell's motion and in her appellate brief Greathouse makes the general statement that Smith's affidavit raised fact issues precluding summary judgment. Therefore,

we will review Smith's affidavit to determine if it raised a fact issue concerning McConnell's usury arguments.

As she did in connection with the affirmative defense of commercial reasonableness, Smith states in her affidavit that McConnell, **\*175** by failing to raise the affirmative defense of usury, failed to act as a reasonable and prudent attorney would have. However, in his motion for summary judgment McConnell sought to negate the "suit within a suit" element of Greathouse's legal malpractice action by proving that the affirmative defense of usury was not available to Clyde, and, therefore, Greathouse would not have prevailed in the underlying suit even if McConnell would have raised that defense. Merely stating that McConnell, by failing to raise usury as a defense, breached a duty of care to Greathouse does not counter McConnell's summary judgment argument that the defense was not available in the first instance. Therefore, as to the affirmative defense of usury, Greathouse did not raise a fact issue concerning the "suit within a suit" element of her legal malpractice cause of action.

### c. Interest Beyond the Contractual Term
 **[10]** Finally, Greathouse alleged McConnell was negligent by not raising interest beyond the contractual term as an affirmative defense. In his motion for summary judgment, McConnell argued that the loan documents clearly show Clyde was liable for the interest accruing on the note until final payment, and that his death had no effect on his obligation because his liability for that interest was created prior to his death. However, Greathouse makes no mention of interest beyond the contractual term in her appellate brief. Although Greathouse does make the general assertion that Smith's affidavit raises fact issues precluding summary judgment, we find no reference to the affirmative defense of interest beyond the contractual term in Smith's affidavit. We are not authorized to reverse a judgment in the absence of properly assigned error, and thus cannot address contentions which Greathouse either failed to raise or chose to abandon. *See Houston Mercantile Exch. Corp. v. Dailey Petroleum Corp.,* 930 S.W.2d 242, 249 (Tex.App.—Houston [14th Dist.] 1996, no writ). Therefore, Greathouse has waived any complaint concerning the propriety of summary judgment relating to McConnell's duty to raise the affirmative defense of interest beyond the contractual term.

### 7. Conclusion
Because McConnell proved, as a matter of law, that raising the affirmative defenses of (1) commercial reasonableness

and (2) usury in the underlying suit would not have resulted in a successful outcome for Greathouse, and because Greathouse waived any argument concerning the affirmative defense of interest beyond the contractual term, we overrule Greathouse's second point of error and affirm the judgment of the trial court.

**All Citations**

982 S.W.2d 165

Footnotes

*   The Honorable Jackson B. Smith, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1   The 1989 amendment to section 5A was the last legislative change relevant to this appeal. An amendment in 1993 had no bearing on the issues in this case, and an amendment in 1997 became effective after the conclusion of the trial court proceedings.

2   In *Jampole v. Matthews,* we recognized a cause of action for breach of contract independent of a legal malpractice claim. 857 S.W.2d 57, 62 (Tex.App.—Houston [1st Dist.] 1993, writ denied). That case, however, limited this distinction to actions against attorneys for excessive legal fees:

> We distinguish ... between an action for negligent legal malpractice and one for fraud allegedly committed by an attorney relating to the establishing and charging of fees for services. Similarly, we distinguish between an action for negligent legal malpractice and one for breach of contract relating to excessive fees for services.

> *Id.* However, this case does not involve a dispute over the amount of attorney's fees which McConnell charged Greathouse. Rather, Greathouse alleges only that, by not taking certain actions during the course of his representation, McConnell did not provide the services for which Greathouse contracted, *i.e.,* the services that a reasonably prudent attorney would have provided. Therefore, the facts of this case do not give rise to the *Jampole* exception. *See id.*

3   Davis's affidavit began by detailing the terms of the loan transaction, specifically, that Charter loaned $253,308.19 to Forrest Allen, Clyde's insurance agency, and that the loan was guaranteed by Clyde and was secured by all rights, title and interest in the insurance expirations, commissions, accounts receivable, furniture, and fixtures belonging to Forrest Allen. Davis then explained that Forrest Allen and Clyde were notified that the loan would not be renewed at maturity, and that upon maturity, Charter demanded full payment of all sums owed to Charter. According to Davis, a representative of Greathouse informed Charter that the Greathouses were abandoning the insurance agency. Davis then traveled to Corpus Christi to inspect Charter's collateral, and sent a Charter employee to watch over the collateral pending sale. Charter then gave notice of a private sale to Forrest Allen and Greathouse, a copy of which was attached to the affidavit. Davis then contacted a number of insurance agents in Corpus Christi to solicit bids for the agency. Davis received only one offer in the amount of $100,000 from Courtesy Insurance Agency, and on May 9, 1985, Charter sold the agency to Courtesy for that amount. Davis concluded that, based on his background and experience, Charter gave reasonable notice of the sale to Forrest Allen and Greathouse, and the subsequent sale of the collateral was conducted in a commercially reasonable manner.

Z

732 S.W.2d 748
Court of Appeals of Texas,
Houston (14th Dist.).

Bob HEATH, Appellant,
v.
Glen Earl HERRON, Appellee.

No. A14–86–517–CV. | June 11,
1987. | Rehearing Denied July 7, 1987.

In legal malpractice suit alleging negligence and violations of Texas Deceptive Trade Practices Act, the 133rd District Court, Harris County, David Hittner, J., entered judgment against attorney, who appealed. The Court of Appeals, J. Curtiss Brown, Chief Justice, held that: (1) client's introduction of trial pleadings and judgment from underlying partnership suit did not act as collateral or judicial estoppel on that issue in malpractice suit, and settlement of partnership suit did not bar client from bringing legal malpractice suit under election doctrine; (2) attorney had duty to file verified denial of partnership or failure of consideration, under circumstances of case; (3) evidence was legally and factually sufficient to support jury's answers to special issues finding attorney's omissions to be negligent conduct proximately causing damage to client; (4) emotional distress damages should not have been awarded, absent egregious or extraordinary circumstances; and (5) attorney's announcement of "ready" in open court at commencement of partnership suit was not false representation giving rise to cause of action under Deceptive Trade Practices Act.

Affirmed in part, reversed and rendered in part.

West Headnotes (10)

**[1]** **Evidence**
 Conclusiveness of Evidence on Party Introducing It

Client's introduction of trial pleadings from underlying partnership suit did not act as judicial admission in legal malpractice suit of truth of matters contained therein; party was not conclusively bound by introduction of opponent's pleadings and could disprove any facts in document introduced.

Cases that cite this headnote

**[2]** **Judgment**
 Persons Not Parties or Privies

**Judgment**
 Scope and Extent of Estoppel in General

Collateral estoppel did not bar relitigation of issue of existence of partnership in partner's subsequent legal malpractice suit; facts concerning that issue were not fully and fairly litigated in underlying lawsuit, in absence of failure to verify denial of partnership, and parties to present action were not cast as adversaries in former action.

Cases that cite this headnote

**[3]** **Election of Remedies**
 Nature and Grounds in General

Election doctrine may constitute bar to relief when one successfully exercises informed choice between two or more remedies, rights, or states of facts which are so inconsistent as to constitute manifest injustice.

1 Cases that cite this headnote

**[4]** **Election of Remedies**
 Acts Constituting Election

Client's decision to settle lawsuit did not act as bar to later malpractice suit against his attorney under election doctrine, in view of client's testimony that attorney told him his case was lost and that he should probably settle and that he was relying on his attorney to make legal decision on what course to pursue.

1 Cases that cite this headnote

**[5]** **Torts**
 Duty and Breach Thereof in General

In order to establish tort liability, plaintiff must initially prove existence and breach of duty owed to him by defendant.

Cases that cite this headnote

**[6]** **Attorney and Client**

🔑 Conduct of Litigation

For purposes of legal malpractice suit, attorney had duty to file verified denial of partnership and failure of consideration in partnership suit, and failure to do so deprived client of viable defense notwithstanding that other party's pleadings in that suit did not allege partnership or make failure of consideration an issue; failure to deny partnership status resulted in admission of partnership's existence and was result of oversight rather than mere error in judgment. Vernon's Ann.Texas Rules Civ.Proc., Rule 93.

3 Cases that cite this headnote

**[7]** **Attorney and Client**

🔑 Pleading and Evidence

Evidence was legally and factually sufficient to support jury's answers to special issues, finding numerous omissions by attorney in his representation of client in partnership suit to be negligent conduct that was proximate cause of damage to client.

1 Cases that cite this headnote

**[8]** **Attorney and Client**

🔑 Conduct of Litigation

In order to support malpractice recovery against attorney representing defendant in civil suit, it is necessary to establish that client had meritorious defense to that suit; "meritorious defense" is one that, if proved, would cause different result upon retrial of case.

11 Cases that cite this headnote

**[9]** **Damages**

🔑 Mental Suffering and Emotional Distress

Emotional distress damages should not be awarded in legal malpractice cases, at least in absence of egregious or extraordinary circumstances.

5 Cases that cite this headnote

**[10]** **Antitrust and Trade Regulation**

🔑 Legal Professionals; Attorney and Client

Attorney's announcement of "ready" in open court at commencement of suit was not false representation to client concerning characteristics and quality of legal services giving rise to cause of action under Deceptive Trade Practices Act. V.T.C.A., Bus. & C. § 17.46(a, b).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*749** Robert Heath, Houston, for appellant.

J.L. Culpepper, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and ROBERTSON and CANNON, JJ.

## OPINION

J. CURTISS BROWN, Chief Justice.

This is an appeal from a judgment entered against appellant (Heath or appellant) in a legal malpractice suit brought by appellee (Herron or appellee) alleging negligence and violations of the Texas Deceptive Trade Practices Act. We affirm the trial court's judgment except as to the award of damages and attorney's fees under the DTPA claim and those damages awarded for mental anguish under the negligence claim.

Appellee retained appellant to represent him as sole defense counsel in a suit filed by Neil Beene, who sought a dissolution and accounting of monies and property under partnerships and other business relationships with appellee (hereafter the Beene/Herron suit). In particular, Beene alleged that in 1977 he and appellee entered into a written partnership agreement whereby each was to share an interest in the Jerry Dominy, Trustee, tract of land. Beene's petition further alleged that in 1978 he and appellee entered into an oral agreement of partnership whereby Beene was to pay appellee one-half of all profits received by Beene for the construction of the Houston Northwest Professional Building in return for one-half of appellee's ownership interest in the building.

Appellant, on behalf of appellee, filed an answer denying "that there was ever any **\*750** agreement finally consumated [sic] between the Plaintiff and Defendant concerning any 1977 written partnership agreement" and denying "that any oral agreement was entered into in 1978" between Plaintiff and Defendant concerning the Houston Northwest Professional Building. This answer was not verified.

Trial proceeded before a jury. At the conclusion of the presentation of Beene's evidence, Beene moved for an "instructed verdict" requesting that all testimony offered by appellee contradicting the existence of partnerships be stricken from the record as appellee had failed to verify his answer as required by Tex.R.Civ.P. 93(f). The motion further requested the trial court to instruct the jury to return a verdict that established Beene and appellee as partners in the Houston Northwest Professional Building, the Jerry Dominy tract and two other properties located in Limestone County. Understanding that the trial court was inclined to grant the motion, appellee decided to settle with Beene. The settlement, approved by the court, resulted in a judgment dissolving the alleged partnerships and awarding $250,000.00 to Beene from funds held in escrow pending trial deposited by Sumed, Inc., the management company for the alleged partnership in the Northwest Professional Building. The final judgment further awarded to Beene several parcels of land in which he claimed an interest.

Appellee complied with the settlement agreement, then filed his legal malpractice suit against appellant alleging negligence and violations of the DTPA (hereafter the Herron/Heath or malpractice suit). Trial was to the jury, which answered special issues favorably to appellee on both claims. Judgment was entered awarding appellee $298,308.58 in actual damages, $2,000.00 under the DTPA claim, $25,000.00 in attorney's fees, and pre- and postjudgment interest. It is from this judgment that appellant appeals.

 **[1]** **[2]** **[3]** **[4]** Appellant brings 74 points of error. In points of error 1, 2, 5 and 17 appellant contends the trial court erred in failing to grant his Motion for Directed Verdict because, as a matter of law, appellee's introduction into evidence of the trial pleadings and judgment from the Beene/Herron suit act as collateral or judicial estoppel on the issue of partnership in the Herron/Heath suit. Appellant further contends that the settlement of the Beene/Herron suit bars appellee from bringing suit against appellant for legal malpractice according to the election doctrine.

We find these pleas in bar inapplicable. Appellee's introduction into evidence of the trial pleadings from the Beene/Herron suit does not act as a judicial admission of the truth of the matters contained therein; a party is not conclusively bound by the introduction of his opponent's pleadings and may disprove any facts in a document he introduced. *Pope v. Darcey,* 667 S.W.2d 270, 274 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). Nor does collateral estoppel bar relitigation of the issue of the existence of a partnership between Beene and appellee. The facts concerning this issue were not fully and fairly litigated in the Beene/Herron lawsuit since appellant failed to verify a denial of partnership; nor were appellant and appellee cast as adversaries in that action. *See Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, 818 (Tex.1984).

The election doctrine may constitute a bar to relief when (1) one successfully exercises an informed choice (2) between two or more remedies, rights or states of facts (3) which are so inconsistent as to (4) constitute manifest injustice. *Bocanegra v. Aetna Life Insurance Co.,* 605 S.W.2d 848, 851 (Tex.1980). Contrary to appellant's assertion otherwise, appellee denied throughout both trials that a partnership existed as to the Jerry Dominy tract and the Northwest Professional Building. Nor is this court convinced that appellee made his decision to settle with a full and clear understanding of the problem, facts and remedies essential to the exercise of an intelligent choice. Appellee testified that appellant told him that his case was lost because of appellant's pleading mistake and that, while they could try the case and hope for **\*751** different results on appeal, Beene was ready to settle and that was probably what appellee should do. Appellee further testified that he did not understand the legal significance of what appellant was telling him and was relying on appellant to make the legal decision on what course to pursue. Under these circumstances appellee's decision to settle does not act as a bar to the later malpractice suit. Points of error 1, 2, 5 and 17 are overruled.

In points of error 6–9 and 28 appellant contends the trial court erred in failing to grant his Motions for Directed Verdict and New Trial because appellant had no duty to plead and have appellee verify a denial of partnership or failure of consideration.

 **[5]** **[6]** In order to establish tort liability, a plaintiff must initially prove the existence and breach of a duty owed to him by the defendant. *Otis Engineering Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex.1983). Appellant argues that as

appellee's attorney in the Beene/Herron lawsuit he had no duty to file a verified denial of partnership or failure of consideration with appellee's trial pleading because Beene's pleadings did not allege partnership nor was failure of consideration made an issue by Beene. Appellant further contends that no verified denial was required as a matter of law because there is no statutory or case authority in this state mandating that certain steps be taken in preparing a defense.

The two main issues in the Beene/Herron suit are contained within paragraphs V and VI of Beene's second amended petition. Paragraph V states that:

> In 1977, Plaintiff and Defendant, GLEN EARL HERRON, entered into a written partnership agreement whereby each party was to share a one-half (½) undivided interest in a ten per cent (10%) interest in the JERRY DOMINY, TRUSTEE, tract of land. A copy of this written partnership agreement is attached as Exhibit "D" and included herein for all purposes verbatim.

Paragraph VI states that:

> In 1978, Plaintiff and Defendant, GLEN EARL HERRON entered into an oral agreement of partnership whereby Plaintiff was to pay said Defendant one-half (½) of all profits received by Plaintiff for the construction of a building known as Houston Northwest Professional Building, in return for one-half (½) of Defendant, GLEN EARL HERRON'S twenty per cent (20%) ownership interest in the building.

Tex.R.Civ.P. 93 (Vernon 1979) provides that "A pleading setting up any of the following matters, unless the truth of such matters appear of record, shall be verified by affidavit.... (f) A denial of partnership as alleged in any pleading as to any party to the suit."

Appellant insists that these pleadings do not require a verified denial because the nature of the relationship between Beene and appellee was not the controlling issue, particularly as appellee acknowledged the existence of some partnerships with Beene, while Beene in other parts of his pleading labelled his business relationships with appellee as "joint ventures." Thus, appellant argues, the "truth of such matters appear of record" and need not be verified under Rule 93.

Appellant further contends that the true issues raised by Beene's petition had to do with whether certain agreements between the two were carried out, not the identity of the relationship between the two; therefore he should have been allowed to defend appellee's case without addressing the partnership issue.

We are not persuaded by appellant's "no duty" argument. A lawyer is required under the Texas Code of Professional Responsibility to represent a client competently, and this includes a mandate that the lawyer shall not handle a legal matter without adequate preparation under the circumstances. Under the pleadings in effect at the time of trial, Beene clearly alleged the existence of a partnership with appellee in paragraphs V and VI concerning the Jerry Dominy tract and the Northwest Professional Building. Equally clear from appellee's testimony is that he maintained throughout the Beene/Herron suit and the malpractice suit that no such partnership existed. The failure by appellant to file the **\*752** verified denial required by Rule 93 deprived appellee of a viable defense in the Beene/Herron suit, since the failure to deny partnership status by a verified denial results in an admission of the existence of a partnership which cannot be controverted at trial. *Washburn v. Krenek,* 684 S.W.2d 187, 191 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). Nor was appellant's omission a mere error in judgment for which he would not be held liable since he admitted in testimony that he would have filed a verified denial had he thought of it.

We therefore hold that appellant had a duty under the circumstances to file a verified denial of partnership and failure of consideration on behalf of appellee in the Beene/Herron suit. Points of error 6–9 and 28 are overruled.

 **[7]**  In points of error 4, 10, 11, 19, 20, 30, 32–47, 55 and 56, appellant challenges the factual and legal sufficiency of the evidence to support the jury's answers to Special Issue Nos. 2, 3 and 4. In these issues the jury found numerous omissions by appellant in his representation of appellee in the Beene/Herron suit to be negligent conduct and that such negligence was a proximate cause of damage to appellee. These omissions included the failures to file verified denials denying partnership and failure of consideration, to properly

prepare appellee's defense for trial, to properly represent appellee during trial, to properly counsel and advise appellee concerning his defense, and to properly counsel and warn appellee concerning the risks of loss involved in the Beene/Herron trial.

Appellant's briefing obligations do not end with a statement of his points of error. He has the further burden to show that the record supports his contentions and to point out the place in the record where the matters upon which he relies are shown. *Perez v. Baker Packers,* 694 S.W.2d 138, 142 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). Appellant's few references to the record do not meet this burden. We also note that nowhere in his voluminous brief does appellant cite the applicable standards of review for these points of error.

When reviewing legal sufficiency points of error, this court must consider only the evidence and the inferences tending to support the findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). In considering factual insufficiency points of error, we are required to consider and weigh all of the evidence. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

A review of the evidence shows these points to be without merit even with proper briefing by appellant. With respect to Special Issue No. 2 concerning whether appellant failed to do certain acts on behalf of appellee in the Beene/Herron suit, it is uncontested that appellant failed to file a verified denial of partnership and failure of consideration. Concerning the failures to properly prepare appellee's defense, to properly represent appellee during the trial and to properly counsel appellee concerning his defense and the risks of loss involved, the record reflects that appellant submitted to Beene no interrogatories, requests for admission nor production of documents, did not depose any witnesses or Beene, did not attend two depositions taken by Beene, sought no records from anyone but appellee and did not prepare what records he did obtain in admissible form. During trial appellant did not seek a trial amendment even after the trial court indicated it would sustain Beene's motion to exclude all testimony on the partnership issue because of the failure to file a verified denial. Appellee testified that at no time did appellant consult with him on his trial strategy or advise him on the merits of his suit. Appellant testified that the reason he did not file a verified denial was because he did not think to do it, that it was an oversight, and that he probably would have done it had he thought to do so. Appellee testified that appellant told him

he might well have a malpractice case against him for failing to verify the denial.

The jury found these omissions to be negligent conduct in answers to Special **\*753** Issue No. 3. David Lueders, an attorney called by appellee as an expert witness in the malpractice case, testified that the organization of facts was essential to the preparation of appellee's defense in the Beene/Herron suit and that appellant did not conduct the pretrial discovery that he should have. Lueders further testified that appellant should have advised appellee of the state of the evidence and how the law would affect the issues, and should have evaluated the probable outcome of the trial so that appellee could properly evaluate the risks of loss involved. Finally, Lueders testified that appellant's failure to verify the denials was negligent and that appellee was not properly represented. Appellant raised no objection to this testimony nor did he object to Lueders' qualifications as an expert witness. Concerning the proximate cause issue in Special Issue No. 4, the record indicates that no settlement negotiations were undertaken prior to the indication by the trial court that appellee would not be permitted to present evidence on the issue of partnership. In addition, Vernon Hankins, Beene's counsel, testified at the malpractice trial that appellant's failure to file a verified denial effectively destroyed appellee's trial strategy and his basis for strength in negotiating a settlement.

The jury had before it sufficient evidence to answer the contested issues affirmatively. Points of error 4, 10, 11, 19, 20, 30, 32–42, 55 and 56 are overruled.

In points of error 12, 18 and 29 appellant asserts that the jury's answer to Special Issue No. 1 should have been disregarded because the issue of whether appellee had a meritorious defense in the Beene/Herron suit is immaterial in deciding whether appellant's acts were negligent and the proximate cause of injury to appellee. In related points of error 21, 48, 70 and 72 appellant contends the evidence does not support an award of damages under a negligence theory.

 **[8]**  In order to support a malpractice recovery against an attorney, it is necessary that the client establish that he had a meritorious defense to the suit filed by Beene. *Rice v. Forestier,* 415 S.W.2d 711, 713 (Tex.Civ.App.—San Antonio 1967, writ ref'd n.r.e.). A meritorious defense is one that, if proved, would cause a different result upon retrial of the case. *Martin v. Allman,* 668 S.W.2d 795, 797 (Tex.App.—Dallas 1984, no writ).

While we agree with appellant that appellee had the burden of proving what would have happened in the Beene/Herron suit had special issues been submitted and answered, and that the proper measure of damages would have been the difference between the value of the settlement handled properly and improperly, appellant did not object to the submission of Special Issue No. 1, nor did he submit issues on the correct measure of damages. While appellant did submit instructions to be included with Special Issue No. 9 concerning the proper measure of damages, his request was not made separate from his objections to the court's charge as required by Tex.R.Civ.P. 273. *See Woods v. Crane Carrier Co.,* 693 S.W.2d 377, 379 (Tex.1985). Points of error 12, 18, 21, 29, 48, 70 and 72 are overruled.

 **[9]**　In point of error 49 appellant contends the trial court erred in failing to grant his Motion to Reform the Judgment on grounds that the evidence is legally insufficient to support the jury's award of $10,000.00 for mental anguish. Appellee concedes that no Texas court to date has awarded mental anguish damages in a legal malpractice suit, but suggests this court do so by comparing legal malpractice to medical malpractice. Appellee further cites recent cases in which the Texas Supreme Court has eliminated the requirement of a physical manifestation of injury to recover for mental anguish. *See St. Elizabeth Hospital v. Garrard,* 730 S.W.2d 649 (Tex.1987); *Moore v. Lillebo,* 722 S.W.2d 683 (Tex.1986). We choose to decline appellee's offer and hold that emotional distress damages should not be awarded in legal malpractice cases at least in the absence of egregious or extraordinary circumstances. *See Gautam v. De Luca,* 215 N.J.Super. 388, 521 A.2d 1343 (1987). Appellant's point of error 49 is sustained.

 **\*754**　**[10]**　In points of error 22, 52 and 68 appellant contends the trial court erred in entering judgment for appellee on the DTPA claim because appellee failed to prove a cause of action under the DTPA as a matter of law. We agree. The jury found in Special Issue No. 10 that appellant represented to appellee that he was adequately prepared for trial in the Beene/Herron lawsuit when appellant was not adequately prepared.

Appellee contends that appellant's announcement of "ready" in open court at the commencement of the Beene/Herron suit was a false representation to appellee that the characteristics and quality of his legal services were such that appellee's defense was prepared and appellant was competent to begin trial, and that this misrepresentation gave rise to a cause of action under sections 17.46(a) and (b) of the DTPA. We are aware that legal services are actionable under the DTPA. *See, e.g., DeBakey v. Staggs,* 612 S.W.2d 924 (Tex.1981). We are not willing, however, to go so far as to say that an announcement of "ready" in open court with later adverse results constitutes the basis for a DTPA claim. As appellee's DTPA cause of action fails as a matter of law, the trial court erred in entering judgment based on this claim and in awarding attorney's fees. We sustain points of error 22, 52 and 68.

We affirm the trial court's judgment except as to the award to appellee of $10,000.00 in damages for mental anguish, $2,000.00 in DTPA damages, and attorney's fees. As to these we reverse and render judgment that appellee take nothing. All other points are overruled. The trial court's judgment is affirmed in part and reversed and rendered in part.

**All Citations**

732 S.W.2d 748

---

AA

2014 WL 924238
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

Candido HERNANDEZ, Sr. and Waikiki
Hernandez, Individually and as Next Friends
and Guardians of C.H., a Minor, Plaintiffs,
v.
BUMBO (PTY.) LTD. and Bumbo
International Trust f/k/a Jonibach
Management Trust, Defendants.

No. 3:12–cv–1213–M. | Signed March 10, 2014.

**Attorneys and Law Firms**

M. Ross Cunningham, Elizabeth Mitchell Cunningham, Rose Walker LLP, Dallas, TX, for Plaintiffs.

Tarush R. Anand, Brown Sims, Houston, TX, for Defendants.

### *MEMORANDUM OPINION & ORDER*

BARBARA M.G. LYNN, District Judge.

 **\*1** Before the Court is the Motion of Defendants Bumbo (Pty.) Ltd. and Bumbo International Trust (collectively "Bumbo") for Leave to Designate Waikiki Hernandez a Responsible Third Party with respect to the claims of the minor Plaintiff, C.H. [Docket Entry # 42]. For the reasons stated below, the Motion is **GRANTED.**

### I. BACKGROUND

In this products liability action, Defendants have moved under Section 33.004 of the Texas Civil Practice and Remedies Code ("CPRC") for leave to designate Waikiki Hernandez as a responsible third party with respect to the claims of her minor son and Plaintiff, C.H. Defendants claim that Mrs. Hernandez's use of the Bumbo Seat on a raised surface was an improper use of the product, and contrary to the warnings that accompanied the product. Defendants seek to designate Mrs. Hernandez as a responsible third party so that the jury may determine whether, and to what extent, she shares in the responsibility for C.H.'s fall and injuries. In

response, Plaintiffs contend that the Motion should be denied because (1) the applicable statute of limitations has expired; (2) the doctrine of parental immunity bars Mrs. Hernandez being designated as a responsible third party; and (3) Mrs. Hernandez cannot be designated a responsible third party because she is already a party to this lawsuit.

### II. LEGAL STANDARD

Chapter 33 of the CPRC applies to all common law torts and statutory torts that do not have a separate and conflicting fault-allocation scheme. Tex. Civ. Prac. & Rem.Code § 33.002; *JCW Elec., Inc. v. Garza,* 257 S.W.3d 701, 704–07 (Tex.2008). The statute applies to federal diversity cases under the Erie Doctrine, as it is state substantive law that does not conflict with Rule 14 of the Federal Rules of Civil Procedure, the closest federal procedural counterpart. *Nationwide Lloyds Ins. Co. v. Norcold, Inc.,* Nos. 09–0113 & 09–0114, 2009 WL 3381523, at \*2 n. 1 (W.D.Tex. Oct.19, 2009); *Harris Constr. Co. v. GG–Bridgeland, LP,* No. 07–3468, 2009 WL 2486030, at \*1 n. 1 (S.D.Tex. Aug.10, 2009).

Chapter 33 provides that "[a] defendant may seek to designate a person as a responsible third party by filing a motion for leave to designate that person as a responsible third party."Tex. Civ. Prac. & Rem.Code § 33.004(a). Under Chapter 33, a defendant may liberally designate responsible third parties, including parties not subject to the court's jurisdiction, unknown parties, and parties immune from suit. *Id.* § 33.004(j); *In re Unitec Elevator Servs. Co.,* 178 S.W.3d 53, 58 n. 5 (Tex.App.-Houston [1st Dist.] 2005, no pet.). If the court provides leave to designate a responsible third party, and there is evidence sufficient to submit a jury question regarding the party's conduct, the trier of fact determines the percentage of responsibility "by any combination" of claimants, defendants, settling persons, and designated responsible third parties. Tex. Civ. Prac. & Rem.Code § 33.003; *Dhaliwal v. Vanguard Pharm. Mach., Inc.,* No. 08–2452, 2010 WL 231755, at \*1 (S.D.Tex. Jan.20, 2010).

 **\*2** Once a defendant has moved for leave to designate a responsible third party, a plaintiff may object in a timely fashion. Tex. Civ. Prac. & Rem.Code § 33.004(f). Once the plaintiff objects, the court must grant leave to designate the person as a responsible third party "unless the objecting party establishes: (1) the defendant did not plead sufficient facts concerning the alleged responsibility of the person to

satisfy the pleading requirement of the Texas Rules of Civil Procedure; and (2) after having been granted leave to replead, the defendant [still] failed to plead sufficient facts."*Id.* § 33.004(g).

## III. ANALYSIS

### A. Defendants' Motion Is Not Untimely Under Section 33.004(d) of the CPRC

Plaintiffs maintain that the statute of limitations on Mrs. Hernandez's individual bystander cause of action expired on November 24, 2013, and argue that Defendants' motion, which was filed on November 25, 2013, is therefore time-barred under Section 33.004(d). The full text of Section 33.004(d) states:

> A defendant may not designate a person as a responsible third party *with respect to a claimant's cause of action* after the applicable limitations period on the cause of action has expired with respect to the responsible third party *if the defendant has failed to comply with its obligations, if any, to timely disclose that the person may be designated as a responsible third party under the Texas Rules of Civil Procedure.*

*Id.* § 33.004(d) (emphasis added).

Plaintiffs, as an initial matter, have not alleged that Defendants have failed to comply with any obligations to "disclose" that Mrs. Hernandez may be designated as a responsible third party. Furthermore, the relevant limitations period in Section 33.004(d) is specific to the "claimant's cause of action." *Id.* Here, Defendants' motion is limited to the claims of Mrs. Hernandez's minor son and Plaintiff, C.H, and does not concern Mrs. Hernandez's individual bystander claim. Plaintiffs do not allege that the statute of limitations for C.H.'s claims has expired.

However, even if Mrs. Hernandez's bystander claim were relevant to the analysis, Defendants' motion would still be timely, because November 24, 2013 was a Sunday. The CPRC provides that "[i]f the last day of a limitations period under any statute of limitations falls on a Saturday, Sunday, or holiday, the period for filing suit is extended to include the next day...."Tex. Civ. Prac. & Rem.Code § 16.072. Since

Defendants' Motion was filed on Monday, November 25, 2013, the Motion would be timely even if it were limited to Mrs. Hernandez's bystander claim.

### B. Mrs. Hernandez's Designation as a Responsible Third Party Is Not Precluded by the Doctrine of Parental Immunity.

Plaintiffs also allege that the doctrine of parental immunity prohibits the designation of Mrs. Hernandez as a responsible third party to the claims of C.H. under Chapter 33 of the CPRC. Although Plaintiffs are correct that the parental immunity doctrine applies generally under Texas law, Plaintiffs' cited authority does not concern parental immunity in the context of responsible third party designations made after the 2003 amendments to Chapter 33.

**\*3** Previously, Chapter 33 required that the person designated be someone who could be held liable—*i.e.,* someone not immune from suit by the plaintiff.*Fisher v. Halliburton,* Nos. 05–1731 & 06–1971, 2009 WL 1098457, at \*4 (S.D.Tex. Apr.23, 2009), *rev'd on other grounds,*667 F.3d 602, 621–22 (5th Cir.2012). However, in 2003, the Texas Legislature "significantly liberalized who could be designated as a responsible third party," and since then, the statute has allowed defendants to designate "parties [who are] not subject to the court's jurisdiction, *immune from suit* or who are unknown."*Nationwide Lloyds,* 2009 WL 3381523, at \*2 (quotation omitted) (emphasis added); *see also Galbraith Eng'g Consultants, Inc. v. Pochucha,* 290 S.W.3d 863, 868 n. 6 (Tex.2009) ("The 2003 amendments substantially broadened the meaning of the term 'responsible third party' ... regardless of whether ... there is some other impediment to the imposition of liability on them, such as a statutory immunity.") (quoting 19 Dorsaneo, *Texas Litigation Guide* § 291.03[2][b][i] ).

Under Chapter 33 as it now exists, traditional immunity defenses under Texas law, including parental immunity, do not prevent responsible third party designations. *See Fisher v. Halliburton,* 667 F.3d 602, 621–22 (5th Cir.2012) ("Even parties 'who ... are immune from liability to the claimant' can be designated responsible third parties under the statute."); *In re Unitec,* 178 S.W.3d at 58 n. 5 ("a responsible third party may include persons ... who are immune from liability to the claimant"); David W. Holman, *Responsible Third Parties,* 46 S. Tex. L.Rev. 869, 885 (2005) (noting that a "claimant's parents whom the claimant cannot sue because of parental immunity" may now be submitted as a responsible third party after the 2003 amendments). Therefore, the doctrine

of parental immunity does not preclude Mrs. Hernandez's designation as a responsible third party under Chapter 33 of the CPRC.

## C. Despite Being A Party to the Case, Mrs. Hernandez May Be Designated as a Responsible Third Party with Respect to the Claims of the Minor, C.H.

Plaintiffs allege that because Mrs. Hernandez is already a party to the lawsuit, Defendants cannot designate her as a responsible third party. Defendants assert that while Mrs. Hernandez is a party to this lawsuit through her individual bystander claim, she is not a party to the claims of the minor Plaintiff C.H., for which Defendants seek to designate her a responsible third party, because she is merely bringing those claims as the next friend and guardian of C.H. Nevertheless, Chapter 33 still classifies Mrs. Hernandez as a "claimant" with respect to C.H.'s claims, because its definition of "claimant" encompasses both "the person who was injured" and "any person who is seeking ... recovery of damages for the injury ... of that person." Tex. Civ. Prac. & Rem.Code § 33.011(1). There is, however, little authority as to whether a claimant, particularly a guardian bringing a claim on behalf of a minor plaintiff, may nonetheless be designated a responsible third party.

 **\*4** Plaintiffs rely on *Flack v. Hanke,* 334 S.W.3d 251, 254 (Tex.App.-San Antonio 2010, pet. denied). In *Flack,* defendant Hanke designated two law firms-Langley & Banack and Cox Smith-as responsible third parties under Chapter 33. *Id.* at 255. Shortly thereafter, plaintiff Flack and defendant Hanke jointly moved to add the two law firms as defendants. *Id.* After granting that motion, the trial court signed an agreed order dismissing Hanke, leaving the two law firms as the only remaining defendants in the case. *Id.* Langley & Banack then moved to strike its previous designation as a responsible third party by Hanke. *Id.* The trial court granted the motion, but the appellate court overturned this decision on the grounds that allowing Langley & Banack, which was then a defendant, to strike the prior designation of it as a responsible third party, would contradict the plain meaning of Section 33.004(*l* ):

> After adequate time for discovery, a party may move to strike the designation of a responsible third party on the ground that there is no evidence that the designated person is responsible for any portion of the claimant's alleged injury or

damage. The court shall grant the motion to strike unless a defendant produces sufficient evidence to raise a genuine issue of fact regarding the designated person's responsibility for the claimant's injury or damage.

*Id.* at 262. The appellate court emphasized that this provision lacks any mechanism for a responsible third party to challenge its designation. *Flack,* 334 S.W.3d at 262. The appellate court held that Langley & Banack could not strike itself as a responsible third party because under Chapter 33, the only entity that could possibly respond to such a motion is "a defendant produc[ing] sufficient evidence" as to the designated person's responsibility. *Id.* The court reasoned that with Hanke, the defendant who designated Langley & Banack, dismissed from the case, "[i]t would be illogical to assume Langley & Banack, as a defendant, would raise an issue against" its own motion and that "such an interpretation would permit defendants to re-litigate their designation of [responsible third parties]—which the statute does not permit." *Id.* at 262. Here, however, Defendants are not attempting to contest designation of them as responsible third parties. Instead, they are attempting to designate Mrs. Hernandez as a responsible third party, and she would not, as Langley & Banack were, be placed on both sides of a single motion in contravention of the statute. Therefore, the concerns expressed in *Flack* are not at issue here.

The parties also each cite to unpublished orders in support of their positions. Plaintiffs cite to an order in *Ferrell v. Bumbo (Pty.) Ltd.,* in which the court denied a similar motion to designate the parents of a minor plaintiff as responsible third parties on the basis that Chapter 33 "clearly distinguishes between 'claimants' and 'responsible third part[ies]' " and that plaintiffs were "first parties, having brought the case in the first place." No. A–11–CA–467–SS (W.D.Tex. Feb. 21.2012) (quoting Tex. Civ. Prac. & Rem.Code §§ 33.004(a)(1), (4)). Defendants respond that in a similar case, *Blythe v. Bumbo Int'l Trust,* No. 6:12–CV–00036 (S.D.Tex. Nov. 5, 2013), the court granted the defendants' motion to designate the minor plaintiff's mother as a responsible third party, despite the fact that she was a plaintiff in the case. [1] Defendants also note two other instances in which federal courts in Texas have granted motions to designate parents bringing claims on behalf of minor children as responsible third parties, even though the parents were also asserting claims individually; however, these motions were unopposed. *See Stanley v. Target Corp.,*

No. H–07–03680 (S.D. Tex. June 3, 2008); *Mix v. Target Corp.,* No. 3:09–cv00382–PRM (W.D.Tex. Aug. 2, 2010).

**\*5** The differences between the pre- and post–2003 amendment versions of the CPRC are instructive in deciding this issue. Before 2003, the CPRC restricted designations of responsible parties to persons "to whom all of the following apply: (1) the court in which the action was filed could exercise jurisdiction over the person; (2) the person could have been, but was not, sued by the claimant; and (3) the person is or may be liable to the plaintiff for all or part of the damages claimed against the named defendant or defendants."*In re Unitec,* 178 S.W.3d at 58 n. 5. In its current form, however, the CPRC lacks such restrictions and explicitly defines a responsible third party as "any person" alleged to have caused or contributed to harm. Tex. Civ. Prac. & Rem.Code. §§ 33.004(a), 33.011(6).

The purpose of the 2003 amendments to the requirements for designating responsible third parties was to liberalize who may be so designated, such that the jury may be permitted to consider the extent to which each involved entity is at fault, regardless of the extent to which the plaintiff could actually recover against such an entity. *Fisher v. Halliburton,* 2009 WL 1098457, at \*3 (describing "the legislature's expansive intentions" with regard to Chapter 33); *Galbraith,* 290 S.W.3d at 868 n. 6 (noting that while the 1995 proportionate responsibility legislation contained several limitations on responsible third party designations, the 2003 amendments "substantially broadened" the meaning of responsible third parties to eliminate those restrictions and to allow the jury to allocate responsibility among all persons potentially responsible); Holman, *supra,* at 884 (describing the new rule as a "veritable free-for-all, with submission of '... unidentified defendants, phantom vehicles, subcontractors ... whose names can't be remembered,' and so forth") (quoting *Tort Reform of 2003: Hearings on Tex. H.B. 4 Before the Senate Comm. on State Affairs,* 78th Leg., R.S. (Apr. 10, 2003), *reprinted in* 2 Legislative History of Texas H.S. 4: The Medical Malpractice & Tort Reform Act of 2003, at 1304 (2003)).

Accordingly, in furtherance of this goal, courts should permit the designation of responsible third parties where those parties' alleged fault could not otherwise be considered. Here, Mrs. Hernandez's assertion of parental immunity

would preclude Defendants from asserting any claim for contribution against her, thereby making a claim by Defendants against her legally untenable. *See Salinas v. Kristensen,* No. 13–08–00110–CV, 2009 WL 4263107, at \*2 (Tex.App.-Corpus Christi 2009, no pet.)("[W]here the parental immunity doctrine bars legal action by a child against his parents, that child's recovery from other defendants is not reduced by his parents' percentage of negligence.") (quotation omitted). Since Mrs. Hernandez's assertion of parental immunity would prevent a jury from considering the extent of her liability in the contributory negligence context, allowing Mrs. Hernandez to be designated as a responsible third party would not be "superfluous," as Plaintiffs claim. Rather, it would facilitate the goals behind the 2003 amendments to the CPRC, by allowing pursuit of the only mechanism by which such alleged fault could be considered. *See Galbraith,* 290 S.W.3d at 868 n. 6 (concluding that "[t]he thrust of the statute is that the jury should allocate responsibility among *all persons* who are responsible") (emphasis added) (quoting 19 Dorsaneo, *Texas Litigation Guide* § 291.03[2][b][i] ).

**\*6** In *Ferrell,* the parents of the minor plaintiff were also plaintiffs and were not asserting parental immunity, and the court there underscored the fact that the defendants' motion to designate was redundant because the trier of fact was already required to consider the degree of responsibility attributed to the parents. No. A–11–CA–467–SS (W.D.Tex. Feb. 21, 2012). In contrast, in this case if the Court were to deny Defendants' Motion, the trier of fact will have no other means of apportioning the alleged fault of Mrs. Hernandez for C.H.'s injuries, thereby frustrating the goals of the 2003 amendments to the CPRC.

Therefore, because (1) Defendants' motion was timely; (2) Mrs. Hernandez's designation is not precluded by parental immunity; and (3) her designation as a responsible third party would be consistent with the aims of the 2003 amendments to the CPRC, the Court **GRANTS** Defendants' motion and designates Waikiki Hernandez as a responsible third party.

**SO ORDERED.**

**All Citations**

Slip Copy, 2014 WL 924238, Prod.Liab.Rep. (CCH) P 19,346

Footnotes

1     The court in *Blythe* apparently did not sign an order, but instead, ruled on the record, and no transcript has been furnished to the Court. However, Mrs. Hernandez's counsel also represented the plaintiffs in *Blythe,* and Plaintiffs do not dispute Defendants' account of the ruling.

**End of Document**                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**BB**

28 S.W.3d 697
Court of Appeals of Texas,
Corpus Christi.

Zerrie L. HINES, Appellant,
v.
THE COMMISSION FOR
LAWYER DISCIPLINE, Appellee.

No. 13–99–233–CV.   |   Aug. 17, 2000.

Commission for Lawyer Discipline initiated disciplinary action against attorney for alleged violations of rules of professional conduct in representation of client in child support enforcement proceeding. The 127th District Court, Harris County, Dean R. Keith, J., entered judgment against attorney. On appeal, the Court of Appeals, Hinojosa, J., held that: (1) appellate court did not have jurisdiction to review trial court's denial of attorney's no evidence motion for summary judgment, and (2) evidence was sufficient to find that attorney failed to keep client reasonably informed about status of her case, failed to explain matter to extent reasonably necessary to permit client to make informed decisions regarding representation of her case, and failed to take steps to extent reasonably practicable to protect client's interests upon termination of attorney's representation.

Affirmed.

West Headnotes (10)

**[1]**    **Appeal and Error**
    Determining Action and Preventing Judgment
Generally, appellate courts do not have jurisdiction to hear denied motions for summary judgment on appeal.

11 Cases that cite this headnote

**[2]**    **Appeal and Error**
    Determining Action and Preventing Judgment
Appellate court did not have jurisdiction to review trial court's denial of attorney's no evidence motion for summary judgment

pursuant to amended summary judgment rule. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a comment.

12 Cases that cite this headnote

**[3]**    **Appeal and Error**
    Verdict
In reviewing the legal sufficiency of the evidence, appellate court must consider all of the record evidence in a light most favorable to the party in whose favor the verdict has been rendered, and indulge in that party's favor every reasonable inference deducible from the evidence.

7 Cases that cite this headnote

**[4]**    **Appeal and Error**
    Total Failure of Proof
Legal sufficiency point must and may only be sustained by the appellate court when the record discloses: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; and (4) the evidence established conclusively the opposite of the vital fact; if there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails.

23 Cases that cite this headnote

**[5]**    **Evidence**
    Sufficiency to Support Verdict or Finding
When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is not more than a scintilla and, in legal effect, is no evidence.

13 Cases that cite this headnote

**[6]**    **Evidence**
    Sufficiency to Support Verdict or Finding

Test for the application of no evidence/scintilla rule is that if reasonable minds cannot differ from the conclusion, then the evidence offered to support the existence of a vital fact lacks probative force, and it will be held to be the legal equivalent of no evidence.

10 Cases that cite this headnote

**[7]** **Appeal and Error**
 Ⓞ— On Conflicting Evidence
**Appeal and Error**
 Ⓞ— Credibility and Number of Witnesses
**Appeal and Error**
 Ⓞ— Clearly, Plainly, or Palpably Contrary

In reviewing the factual sufficiency of the evidence, appellate court will consider, weigh and examine all of the evidence which supports or undermines the finding of the trier of fact, keeping in mind that it is the fact finder's role, not appellate court's, to judge the credibility of the evidence, to assign the weight to be given to testimony, and to resolve inconsistencies within or conflicts among the witnesses' testimony, and court will then set aside the verdict only when it finds that the evidence standing alone is too weak to support the finding or that the finding is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong.

Cases that cite this headnote

**[8]** **Appeal and Error**
 Ⓞ— Implied Findings in General

It is implied that the trial court made all the necessary findings to support its judgment.

Cases that cite this headnote

**[9]** **Appeal and Error**
 Ⓞ— Reasons for Decision

Judgment of the trial court must be affirmed if it can be upheld on any legal theory supported by the evidence.

1 Cases that cite this headnote

**[10]** **Attorney and Client**
 Ⓞ— Weight and Sufficiency

Evidence was sufficient to find that attorney failed to keep client reasonably informed about status of her case, failed to explain matter to extent reasonably necessary to permit client to make informed decisions regarding representation of her case, and failed to take steps to extent reasonably practicable to protect client's interests upon termination of attorney's representation, though there was no written contract between attorney and client, and he was never paid for appellate representation, given that attorney did accept money to represent client, and failed to file necessary amendment to client's pleadings to keep case from being dismissed, failed to inform her of her options after adverse ruling dismissed case so that she could make an informed decision, and thereafter failed to promptly comply with reasonable requests from client for information after he stopped representing her. V.T.C.A., Government Code Title 2, Subtitle G App. A–1, Disciplinary Procedure Rule 1.03, 1.03(b), 1.15(d).

1 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*699** Joseph Rutherford Willie, Houston, for appellant.

Luis Andres Paredes, Office of General Counsel, State Bar of Texas, Houston, Linda Acevedo, Asst. Disciplinary Counsel, Austin, for appellee.

Before Justices HINOJOSA, CHAVEZ, and RODRIGUEZ.

**O P I N I O N**

Opinion by Justice HINOJOSA.

This is an attorney discipline case. Appellee, the Commission for Lawyer Discipline (the "Commission"), initiated a disciplinary action against appellant, Zerrie L. Hines, and the case was tried in the 127th District Court of Harris County. The trial court: (1) found that appellant had violated

Texas Disciplinary Rules of Professional Conduct 1.03(a), [1] 1.03(b), [2] and 1.15(d), [3] (2) ordered that he be given a public reprimand, and (3) ordered him to pay $1,000 in attorney's fees. By two issues, appellant contends: (1) the trial court erred in denying his "no evidence" motion for summary judgment, and (2) the evidence is factually and legally insufficient to support the trial court's judgment. We affirm.

Appellant agreed to handle a child support enforcement hearing for Nancy A. Hennessy when Hennessy's attorney, Alicia Johnson, moved to Fort Worth. Johnson arranged for appellant to handle the hearing, and Hennessy paid appellant $500 for his services. Appellant met with Hennessy, her husband, and her son to discuss the case. At the time the hearing was scheduled, Hennessy's ex-husband did not appear and could not be located, and the hearing was reset. At the next hearing, appellant continued representing Hennessy. At the conclusion of the hearing, the judge dismissed the case because Hennessy's pleadings were not proper.

The record reflects that Hennessy was very upset. Appellant told Hennessy only that she had a right to appeal. He did not **\*700** file new pleadings. After the hearing, appellant failed to maintain contact with Hennessy. Hennessy tried many times to contact appellant, but appellant made no effort to reply until after Hennessy filed a grievance against him. By then, it was too late to file an appeal.

The Commission determined that appellant was culpable for his actions, and appellant elected to have the complaint heard in a district court of Harris County, without a jury. TEX.R. DISCIPLINARY P. 2.14, *reprinted in* TEX. GOVT.CODE ANN., tit. 2, subtit. G app. A–1 (Vernon 1998). The Commission filed a disciplinary petition, TEX.R. DISCIPLINARY P. 3.01, and the supreme court appointed Judge Dean R. Keith to hear the case. TEX.R. DISCIPLINARY P. 3.02. Appellant filed a "no evidence" motion for summary judgment under Texas Rule of Civil Procedure 166a(i), but the trial court denied the motion. After a trial on the merits, the trial court found that appellant had violated Texas Disciplinary Rules of Professional Conduct 1.03(a), 1.03(b), and 1.15(d). The trial court entered judgment against appellant, ordered that he be given a public reprimand, and ordered him to pay $1,000 in attorney's fees. This appeal ensued. TEX.R. DISCIPLINARY P. 3.16.

### 1. *Summary Judgment*

**[1]** In his first issue, appellant complains the trial court erred in denying his no evidence motion for summary judgment. The general rule is that appellate courts do not have jurisdiction to hear denied motions for summary judgment on appeal. *Ackermann v. Vordenbaum,* 403 S.W.2d 362, 365 (Tex.1966); *Highlands MGMT. Co. v. First Interstate Bank of Tex., N.A.,* 956 S.W.2d 749, 752 (Tex.App.—Houston [14th Dist.] 1997, pet. denied). Appellant contends there should be an exception to this general rule because the federal courts allow review of a denial of a no evidence motion for summary judgment after a trial on the merits, [4] and the Texas no evidence motion for summary judgment was modeled after the federal rule.

**[2]** The Texas Supreme Court order approving the amendment to Rule 166a of the Texas Rules of Civil Procedure which authorized the no evidence motion for summary judgment provides in relevant part:

> The comment appended to these changes, unlike other notes and comments in the rules, is intended to inform the construction and application of the rule.

Order in Misc. Docket No. 97–9139, dated August 15, 1997, published in 60 TEX. B.J. 872 (Oct.1997). The comment appended to the changes states in relevant part:

> The denial of a [no evidence motion for summary judgment under Texas Rule of Civil Procedure 166a(i) ] is no more reviewable by appeal or mandamus than denial of a [motion for summary judgment under Texas Rule of Civil Procedure 166a(c) ].

TEX.R. CIV. P. 166a cmt. to 1997 change. Following this guidance from the supreme court, we conclude we have no jurisdiction to review the trial court's denial of appellant's no evidence motion for summary judgment. We overrule appellant's first issue.

### 2. *Sufficiency of the Evidence*

In his second issue, appellant contends the evidence is factually and legally insufficient to support the verdict of the trial court.

**\*701** **[3]** **[4]** **[5]** **[6]** When we review the legal sufficiency of the evidence, we must consider all of the record evidence in a light most favorable to the party in whose favor the verdict has been rendered, and indulge in that party's favor every reasonable inference deducible from the evidence. *Formosa Plastics v. Presidio Engineers,* 960 S.W.2d 41, 48 (Tex.1998). A legal sufficiency point must and may only be sustained when the record discloses: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; and (4) the evidence established conclusively the opposite of the vital fact. *Juliette Fowler Homes, Inc. v. Welch Assoc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990). If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is not more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/ Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). The test for the application of this no evidence/scintilla rule is: if reasonable minds cannot differ from the conclusion, then the evidence offered to support the existence of a vital fact lacks probative force, and it will be held to be the legal equivalent of no evidence. *Id.*

**[7]** When we review the factual sufficiency of the evidence, we consider, weigh and examine all of the evidence which supports or undermines the finding of the trier of fact. *Plas– Tex, Inc. v. United States Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). We review the evidence, keeping in mind that it is the fact finder's role, not ours, to judge the credibility of the evidence, to assign the weight to be given to testimony, and to resolve inconsistencies within or conflicts among the witnesses' testimony. *Corpus Christi Teachers Credit Union v. Hernandez,* 814 S.W.2d 195, 197 (Tex.App.—San Antonio 1991, no writ). We then set aside the verdict only when we find that the evidence standing alone is too weak to support the finding or that the finding is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *Garza,* 395 S.W.2d at 823.

**[8]** **[9]** Appellant did not request findings of fact and conclusions of law, and none were made by the trial court. In the absence of findings of fact and conclusions of law, we must presume that the trial court made all necessary findings to support its judgment. *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990); *In re W.E.R.,* 669 S.W.2d 716, 717 (Tex.1984). It is implied that the trial court made all the necessary findings to support its judgment. *Roberson v. Robinson,* 768 S.W.2d 280, 281 (Tex.1989); *Buchanan v. Byrd,* 519 S.W.2d 841, 842 (Tex.1975). The judgment of the trial court must be affirmed if it can be upheld on any legal theory supported by the evidence. *In re W.E.R.,* 669 S.W.2d at 717.

**[10]** Appellant argues the evidence shows that: (1) the only written contract was between Hennessy and Johnson, (2) Hennessy never paid for appellate representation, (3) Johnson remained Hennessy's attorney of record, and (4) the Commission failed to present any evidence of an adverse judgment against Hennessy. However, none of this evidence negates the implied findings by the trial court necessary to support a violation of rules 1.03(a), 1.03(b), or 1.15(d). *See Roberson,* 768 S.W.2d at 281.

Appellant accepted money to represent Hennessy. He did not file the necessary amendment to Hennessy's pleadings to keep Hennessy's case from being dismissed. He failed to inform Hennessy of her options after the adverse ruling so that she could make an informed decision. He did not promptly comply with reasonable **\*702** requests for information and failed to protect her interests after he stopped representing her. If appellant believed that his representation had terminated or that Johnson was going to further advise Hennessy, he could easily have made that clear to her, either orally or in writing. He did neither.

We hold the evidence is legally and factually sufficient to support the trial court's finding that appellant violated Texas Disciplinary Rules of Professional Conduct 1.03(a), 1.03(b), and 1.15(d). We overrule appellant's second issue.

We affirm the judgment of the trial court.

**All Citations**

28 S.W.3d 697

Footnotes

1  "A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." TEX. DISCIPLINARY R. PROF'L CONDUCT 1.03(a), *reprinted in* TEX. GOVT.CODE ANN ., tit. 2, subtit. G app. A (Vernon 1998) (TEX. STATE BAR R . art. X, § 9).

2  "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." TEX. DISCIPLINARY R. PROF'L CONDUCT 1.03(b).

3  "Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payments of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law only if such retention will not prejudice the client in the subject matter of the representation." TEX. DISCIPLINARY R. PROF'L CONDUCT 1.15(d).

4  *See e.g. Dickinson v. Auto Center Mfg. Co.,* 733 F.2d 1092, 1102 (5th Cir.1983) ("Under the final appealability rule, a party may obtain review of prejudicial adverse interlocutory rulings upon his appeal from adverse final judgment, at which time the interlocutory rulings (nonreviewable until then) are regarded as merged into the final judgment terminating the action."); *Kamen v. Kemper Fin. Servs.,* 908 F.2d 1338, 1341 (7th Cir.1990).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

CC

36 Cases that cite this headnote

📁 KeyCite Yellow Flag - Negative Treatment
**Distinguished by** Barnes v. LPP Mortg., Ltd., Tex.App.-Dallas, July 12, 2011

**44 S.W.3d 562**
Supreme Court of Texas.

HOLY CROSS CHURCH OF
GOD IN CHRIST, Petitioner,

v.

Johnny WOLF, Respondent.

No. 00–0250. | Argued Dec. 6, 2000. | Decided April 12, 2001. | Rehearing Overruled June 21, 2001.

The maker of a promissory note brought action against holder for a declaratory judgment that foreclosure sale was void as barred by the statute of limitations. The District Court entered summary judgment in favor of maker. Holder appealed. The Tyler Court of Appeals reversed and remanded. On review, the Supreme Court, Baker, J., held that: (1) a predecessor of the holder could accelerate the debt by a clear and unequivocal notice of intent to accelerate and notice of acceleration without taking affirmative steps toward foreclosure, disapproving *Swoboda v. Wilshire Credit Corp.,* 975 S.W.2d 770; *Shepler v. Kubena,* 563 S.W.2d 382; *National Debenture Corp. v. Smith,* 132 S.W.2d 429; (2) holder's cause of action accrued, and four-year statute of limitations began to run, when the predecessor accelerated the debt; and (3) as a matter of first impression, federal six-year statute of limitations for suit by the Federal Deposit Insurance Corporation (FDIC) did not apply.

Reversed and rendered.

West Headnotes (15)

**[1]** **Appeal and Error**
🔑 Rendering Final Judgment

When both sides move for summary judgment and the trial court grants one motion, but denies the other, the reviewing court should review both sides' summary judgment evidence, determine all questions presented, and render the judgment that the trial court should have rendered.

**[2]** **Judgment**
🔑 Bar of statute of limitations

A party moving for summary judgment on limitations grounds must prove when the cause of action accrued.

31 Cases that cite this headnote

**[3]** **Limitation of Actions**
🔑 Bills and notes

If a promissory note or deed of trust secured by real property contains an optional acceleration clause, default does not ipso facto start the statute of limitations running on the note; rather, the action accrues only when the holder actually exercises its option to accelerate.

51 Cases that cite this headnote

**[4]** **Bills and Notes**
🔑 Maturity on nonpayment of installment of interest or principal

Effective acceleration of a debt evidenced by a promissory note requires two clear and unequivocal acts: (1) notice of intent to accelerate, and (2) notice of acceleration.

51 Cases that cite this headnote

**[5]** **Bills and Notes**
🔑 Maturity on nonpayment of installment of interest or principal

Even when the holder of a promissory note has accelerated the note upon default, the holder can abandon acceleration if the holder continues to accept payments without exacting any remedies available to it upon declared maturity.

37 Cases that cite this headnote

**[6]** **Mortgages**
🔑 Time to sue, limitations and laches

**Mortgages**
🔑 Time to foreclose

Promissory note holder's cause of action accrued, and four-year statute of limitations began to run, when predecessor gave a clear and unequivocal notice of intent to accelerate and notice of acceleration, even though the predecessor took no affirmative steps toward foreclosure. V.T.C.A., Civil Practice & Remedies Code § 16.035(b).

31 Cases that cite this headnote

**[7]** **Limitation of Actions**
 Questions for Jury

The issue of when a cause of action accrues is a question of law, not fact.

20 Cases that cite this headnote

**[8]** **Stipulations**
 Matters which may be subject of stipulation

While accrual of a cause of action is a legal question, whether a holder has accelerated a promissory note is a fact question to which parties may agree by stipulation.

10 Cases that cite this headnote

**[9]** **Evidence**
 Judicial admissions in general

A judicial admission that is clear and unequivocal has conclusive effect and bars the admitting party from later disputing the admitted fact.

52 Cases that cite this headnote

**[10]** **Evidence**
 Construction

Promissory note holder's agreement that predecessor had accelerated note and that the statute of limitations began to run on that date amounted to a judicial admission of the acceleration date in a response to a summary judgment motion and in a counter-motion for summary judgment. V.T.C.A., Civil Practice & Remedies Code § 16.035(b).

24 Cases that cite this headnote

**[11]** **Mortgages**
 Change in time or mode of payment

The holder of a promissory note secured by real property could accelerate the debt without taking affirmative steps toward foreclosure; rather, it could accelerate the debt by a clear and unequivocal notice of intent to accelerate and notice of acceleration without following the posting and notice procedures for foreclosure; disapproving *Swoboda v. Wilshire Credit Corp.,* 975 S.W.2d 770; *Shepler v. Kubena,* 563 S.W.2d 382; *National Debenture Corp. v. Smith,* 132 S.W.2d 429. V.T.C.A., Property Code § 51.002.

37 Cases that cite this headnote

**[12]** **Banks and Banking**
 Actions

The federal six-year statute of limitations for suit by the Federal Deposit Insurance Corporation (FDIC) did not apply to the claim by the holder of promissory note sold by the FDIC, since the cause of action on the accelerated debt accrued after the sale; even though the maker was in default while the FDIC held the note, it did not accelerate the debt. Federal Deposit Insurance Act, § 2[11](d)(14), 12 U.S.C.A. § 1821(d)(14).

6 Cases that cite this headnote

**[13]** **Banks and Banking**
 Actions

The Federal Deposit Insurance Corporation's (FDIC) successors do not receive the benefit of the FDIC's six-year limitations period if the cause of action does not accrue until after the note leaves the FDIC's hands. Federal Deposit Insurance Act, § 2[11](d)(14), 12 U.S.C.A. § 1821(d)(14).

5 Cases that cite this headnote

**[14]** **Banks and Banking**
 Actions

The federal six-year statute of limitations for suit by the Federal Deposit Insurance Corporation (FDIC) has no significance independent of a claim to which it applies; it attaches only to an accrued claim, not to a performing promissory note. Federal Deposit Insurance Act, § 2[11](d)(14), 12 U.S.C.A. § 1821(d)(14).

1 Cases that cite this headnote

**[15]** **Banks and Banking**
👉 Powers, functions and dealings in general

**Banks and Banking**
👉 Actions

The federal six-year statute of limitations for suit by the Federal Deposit Insurance Corporation (FDIC) does not attach to the bundle of rights passed to subsequent assignees unless the express terms of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) actually trigger the right. Federal Deposit Insurance Act, § 2[11](d)(14), 12 U.S.C.A. § 1821(d)(14).

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*564** Susan Lea Hays, Shawn Preston Ricardo, Jeffrey Michael Goldfarb, Akin Gump Strauss Hauer & Feld, Dallas, for petitioner.

William Bret, III, Given & Bret, Dallas, for respondent.

**Opinion**

Justice BAKER delivered the opinion of the Court.

We decide two issues in this case: (1) whether a noteholder must take affirmative steps towards foreclosure, in addition to serving a debtor with notice of acceleration, to effectively accelerate a note secured by real property and thereby trigger limitations; and (2) whether the Texas four-year or the federal six-year statute of limitation applies to the noteholder's claim in this case.

Holy Cross Church of God in Christ sued Johnny Wolf seeking a declaratory judgment that the Texas four-year

limitations statute barred Wolf's foreclosure of the Church's property. The trial court granted the Church summary judgment on that ground. The court of appeals held that an optional acceleration clause cannot be effectively exercised without the noteholder's taking specific affirmative steps towards foreclosure. Because the Church did not present summary-judgment evidence that Wolf's predecessor had taken these affirmative steps, the court of appeals reversed the summary judgment, **\*565** concluding that the Church did not carry its burden of proving conclusively when Wolf's cause of action accrued. For this reason, the court did not reach the question of whether the four-year or six-year statute of limitations applied.

We hold that, absent evidence of abandonment or a contrary agreement between the parties, a clear and unequivocal notice of intent to accelerate and a notice of acceleration is enough to conclusively establish acceleration and therefore accrual. Thus, we conclude the Church did conclusively prove when the Church's note was accelerated, and consequently, when Wolf's cause of action accrued. We also conclude that the Texas four-year limitations period applies here. We hold that the FDIC's six-year limitations period only enures to a subsequent noteholder's benefit if a claim accrues on the note before the FDIC transfers the note. Accordingly, we reverse the court of appeals' judgment and render judgment for the Church.

## I. BACKGROUND

In June 1987, Holy Cross Church executed a $140,000, twenty-year promissory note payable to Wynnewood Bank and secured by a deed of trust on its South Dallas church property. Wynnewood Bank failed and Continental Bank succeeded it. Continental Bank also eventually failed and the Federal Deposit Insurance Corporation (FDIC) became its receiver and holder of the Church's note. While the FDIC held the Church's note, the Church could not make its $1,640.20 monthly payment but paid $500 a month to show good faith. The FDIC and the Church agreed to settle the note for $75,000. The Church was unable to pay this amount on the due date. However, even though the Church remained in default, the FDIC did not accelerate the note. The FDIC then sold the note to Mortgage Investment Trust Corporation (MITC).

On July 15, 1994, MITC sent the Church a notice of default and intent to accelerate. On August 15, and again

on September 8, MITC sent the Church letters indicating it had accelerated the note. Both letters specified dates for nonjudicial foreclosure sales. But MITC never actually foreclosed and the Church did not resume payments. On August 1, 1995, MITC sold the note to Great Plains Capital Corporation. Finally, on February 2, 1998, Great Plains sold the note to Johnny Wolf.

On February 23, 1998, Wolf's attorney sent the Church a letter informing it that Wolf now owned the note and that the note was in default. On July 29, Wolf's attorney sent another letter stating that the "maturity of the aforesaid note has occurred and full payment of the balance of same is now due and owing." On September 11, Wolf's attorney sent a notice of foreclosure on the promissory note explaining a foreclosure sale was scheduled for October 6. On the sale date, a trial court granted the Church a temporary injunction to prevent the sale. Nevertheless, the trustee held the sale and Wolf purchased the property.

The Church sued Wolf for a declaratory judgment that the foreclosure sale was void because limitations barred Wolf's foreclosure. The Church also pleaded wrongful foreclosure, unjust enrichment, and constructive trust but later nonsuited these claims without prejudice. The parties then agreed to a temporary injunction. Subsequently, the Church moved for summary judgment, arguing that MITC's August 15, 1994, demand and acceleration triggered the limitations period on Wolf's claim. Thus, the Church argued, limitations had run on August 15, 1998, almost two months before the foreclosure sale.

**\*566** In response, Wolf agreed that limitations began to run on August 15, 1994. However, he argued that because the FDIC had once owned the note, the six-year limitations period afforded federal receivers applied rather than the Texas four-year period. He filed a cross-motion for summary judgment, contending that limitations did not bar the foreclosure because the federal statute applied. He also argued the Church lacked standing to sue, but he abandons that argument here. *See* TEX.R.APP. P. 74(f). The trial court granted the Church's summary-judgment motion on limitations grounds, declared the Church's obligations under the deed and note time-barred, declared the sale void, and ordered the Church vested with fee simple title to the property.

Wolf appealed, arguing that the six-year federal limitations period governed his claim. The court of appeals did not reach the limitations issue. Instead, the court concluded that a fact question existed about when Wolf's claim accrued. Thus, it held that the trial court erroneously granted the Church's motion and reversed and remanded the claims. 49 S.W.3d at ——, 1999 WL 33256589.

## II. APPLICABLE LAW

### A. SUMMARY JUDGMENT
### —STANDARD OF REVIEW

 **[1]** **[2]** A party moving for summary judgment must conclusively prove all elements of its cause of action or defense as a matter of law. TEX.R. CIV. P. 166a(c); *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999); *Walker v. Harris,* 924 S.W.2d 375, 377 (Tex.1996). When both sides move for summary judgment and the trial court grants one motion but denies the other, the reviewing court should review both sides' summary judgment evidence, determine all questions presented, and render the judgment that the trial court should have rendered. *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000). A party moving for summary judgment on limitations grounds must prove when the cause of action accrued. *Burns v. Thomas,* 786 S.W.2d 266, 267 (Tex.1990).

### B. ACCRUAL

By statute, if a series of notes or obligations or a note or obligation payable in installments is secured by a lien on real property, limitations does not begin to run until the maturity date of the last note, obligation, or installment. TEX. CIV. PRAC. & REM.CODE § 16.035(e); *Swedlund v. Banner,* 970 S.W.2d 107, 111 (Tex.App.—Corpus Christi 1998, pet. denied). Section 16.035 modifies the general rule that a claim accrues and limitations begins to run on each installment when it becomes due. *See Palmer v. Palmer,* 831 S.W.2d 479, 481–82 (Tex.App.—Texarkana 1992, no writ).

 **[3]** **[4]** **[5]** If a note or deed of trust secured by real property contains an optional acceleration clause, default does not ipso facto start limitations running on the note. Rather, the action accrues only when the holder actually exercises its option to accelerate. *Hammann v. H.J. McMullen & Co.,* 122 Tex. 476, 62 S.W.2d 59, 61 (1933); *Curtis v. Speck,* 130 S.W.2d 348, 351 (Tex.Civ.App.—Galveston 1939, writ ref'd). Effective acceleration requires two acts: (1) notice

of intent to accelerate, and (2) notice of acceleration. *See Shumway v. Horizon Credit Corp.,* 801 S.W.2d 890, 892 (Tex.1991); *Ogden v. Gibraltar Sav. Ass'n,* 640 S.W.2d 232, 233 (Tex.1982). Both notices must be "clear and unequivocal." *Shumway,* 801 S.W.2d at 893. Even when a noteholder has accelerated a note upon default, the holder can abandon acceleration if the holder continues to accept payments **\*567** without exacting any remedies available to it upon declared maturity. *City Nat'l Bank v. Pope,* 260 S.W. 903, 905 (Tex.Civ.App.—San Antonio 1924, no writ); *see also San Antonio Real Estate, Bldg. & Loan Ass'n v. Stewart,* 94 Tex. 441, 61 S.W. 386, 388 (1901) (explaining that the parties' agreement or actions can "have the effect of obviating the default and restoring the contract to its original condition as if it had not been broken"); *Denbina v. City of Hurst,* 516 S.W.2d 460, 463 (Tex.Civ.App.—Tyler 1974, no writ) (explaining that an option to accelerate may be withdrawn or revoked after it is exercised by the noteholder, effectively restoring the note's original maturity date).

Federal law provides a different scheme for determining accrual of foreclosure actions brought by the FDIC. The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) provides that limitations on FDIC claims begins to run on the later of (1) the date the FDIC is appointed receiver, or (2) the date the cause of action accrues. 12 U.S.C. § 1821(d)(14)(B).

### C. LIMITATIONS

Under state law, a sale of real property under a power of sale in a mortgage or deed of trust that creates a real-property lien must be made not later than four years after the day the cause of action accrues. TEX. CIV. PRAC. & REM.CODE § 16.035(b); *McLemore v. Pacific Southwest Bank,* 872 S.W.2d 286, 292 (Tex.App.—Texarkana 1994, writ dism'd by agr.). When this four-year period expires, the real-property lien and the power of sale to enforce the lien become void. TEX. CIV. PRAC. & REM.CODE § 16.035(d). This four-year limitations period can be suspended by filing a written agreement in the county clerk's office where the real property is located. TEX. CIV. PRAC. & REM.CODE § 16.036.

Federal law provides a different limitations period for FDIC foreclosure actions. FIRREA provides that when the FDIC brings a contract action as a conservator or receiver, the statute of limitations is the longer of (1) the 6 year period beginning on the date the claim accrues, or (2) the statute

of limitations under state law. 12 U.S.C. § 1821(d)(14)(A)(i). While FIRREA's express terms only grant this six-year limitations period to the FDIC, we have held that the FDIC's successors in interest are entitled to the benefit of this longer period when the claim had already accrued before the FDIC received the note. *Jackson v. Thweatt,* 883 S.W.2d 171, 174 (Tex.1994).

### III. ANALYSIS

The court of appeals did not reach the limitations issue because it concluded that the Church had not conclusively established the date Wolf's claim accrued. Accordingly, we consider that question first.

### A. ACCRUAL

**[6]** Under its terms, the Church's note would mature in June 2007, the month the last installment was due. *See* TEX. CIV. PRAC. & REM.CODE § 16.035(e). The Church claims, and Wolf agreed, that MITC's August 15, 1994, letter accelerated this maturity date. The parties also agreed that, upon this acceleration, any cause of action for unpaid amounts accrued, thereby triggering limitations under both state and federal law.

**[7]** The court of appeals correctly noted that when a cause of action accrues is a question of law, not fact. *See Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990). It then concluded that the parties' agreement about the acceleration and accrual date was an impermissible attempt **\*568** to stipulate to a legal question. The court explained that it was incumbent upon the Church to prove the actual accrual date rather than rely on the parties' agreement. Because it determined that the Church had not carried this burden, the court of appeals reversed the trial court's summary judgment for the Church and remanded the case for further proceedings. 49 S.W.3d at ——, 1999 WL 33256589.

The Church argues that the court of appeals violated Rule 166a(c) by reversing summary judgment on grounds other than those presented in the trial court. *See* TEX.R. CIV. P. 166a(c); *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993). The Church also argues that the court of appeals erred in holding that it did not present summary-judgment evidence conclusively establishing that

the note was accelerated on August 15, 1994, and that limitations began running on that date.

Wolf responds by arguing that the trial court's recognition during the summary-judgment hearing that "everybody seems to agree" on the accrual date establishes that the issue was before the trial court and thus the court of appeals could review it. He also contends that the court of appeals correctly held that the Church did not establish the accrual date, and that, in fact, the record shows that MITC's attempted August 1994 acceleration was ineffective or abandoned.

[8] We disagree with the court of appeals' analysis and hold that the parties' agreement about the acceleration date and the summary-judgment evidence each provide independent bases for the trial court to find the Church had conclusively established an accrual date. While accrual is a legal question, whether a holder has accelerated a note is a fact question to which parties may, and in this case did, agree. *See, e.g., McLemore,* 872 S.W.2d at 291 (treating whether "note was accelerated, and when" as fact question); *Texas Airfinance Corp. v. Lesikar,* 777 S.W.2d 559, 563 (Tex.App.—Houston [14th Dist.] 1989, no writ) (treating whether promissory note had been accelerated as fact question).

[9] [10] "Assertions of fact, not plead in the alternative, in the live pleadings of a party are regarded as formal judicial admissions." *Houston First Am. Sav. v. Musick,* 650 S.W.2d 764, 767 (Tex.1983). A judicial admission that is clear and unequivocal has conclusive effect and bars the admitting party from later disputing the admitted fact. *Gevinson v. Manhattan Constr. Co.,* 449 S.W.2d 458, 467 (Tex.1969). Here, Wolf's summary-judgment response and counter-motion for summary judgment states: "Defendant accepts Plaintiff's argument that the note was accelerated by the [sic] MITC on August 15, 1994, and that the statute of limitations began to run on that date." And at the summary-judgment hearing and in his court of appeals' brief Wolf consistently agreed that MITC accelerated the Church's note on August 15, 1994. Wolf's agreement amounted to a judicial admission of the acceleration date. Once Wolf's judicial admission established the acceleration date, the trial court could apply the law to conclude as a matter of law that accrual occurred upon this acceleration and that limitations then began running.

[11] And, even without Wolf's admission, the summary-judgment evidence conclusively establishes an August 15, 1994, accrual. The Church's summary-judgment evidence

included: (1) a copy of the deed of trust containing optional acceleration and power of sale clauses in favor of the original mortgagee and its successors and assigns; (2) documents tracing the note's ownership from Wynnewood bank to each **\*569** successor, including MITC and Wolf; and (3) a July 15, 1994, notice of intent to accelerate and an August 15, 1994, notice of acceleration signed by MITC's attorneys.

The court of appeals held that this evidence was not enough to establish effective acceleration, or, in the alternative, that MITC had abandoned acceleration:

> MITC was required to serve the Church with written notice of the sale, post written notice at the courthouse door for twenty-one days, and file a copy of the notice with the county clerk. There is no evidence in the record that MITC posted the property for sale or filed the notice with the county clerk. There is nothing in the record stating that MITC actually conducted a foreclosure sale. Accordingly, based on the record before us, it appears that, although the Church was in default and MITC served the Church with notice of a sale, MITC did not comply with the contractual or statutory conditions necessary to exercise its option to accelerate the note as declared. Apparently, MITC abandoned the note acceleration.

49 S.W.3d at ——, 1999 WL 33256589 (citations omitted). We disagree.

## 1. ACCELERATION

In holding that MITC's acceleration was ineffective, the court of appeals concluded that an optional acceleration clause cannot be exercised without actually taking steps towards foreclosing on the property. It relied on section 51.002 of the Texas Property Code and *Swoboda v. Wilshire Credit Corp.,* 975 S.W.2d 770 (Tex.App.—Corpus Christi 1998, pet. denied).

Section 51.002 establishes the procedures for conducting a foreclosure sale. The court of appeals held that MITC could

not have accelerated the Church's note without following section 51.002's posting and notice procedures. In other words, the court held that the cause of action on the Church's note could not have accrued absent compliance with section 51.002. However, section 51.002 has nothing to do with accrual or limitations; it only governs the procedures noteholders must follow *if* they choose to exercise their power of sale. Rather, section 16.035 of the Texas Civil Practice and Remedies Code governs accrual, and it provides that a cause of action accrues and limitations begins to run from an installment note's maturity date.

*Swoboda* holds that:

> Exercise of the right of acceleration requires the mortgagee to make a clear, positive, and unequivocal declaration in some manner of the exercise thereof, *followed by* affirmative action towards enforcing the declared intention.... [A] declaration alone does not amount to an election to accelerate without accompanying enforcement action, *i.e.,* steps to execute foreclosure on the real property.

975 S.W.2d at 776 (citations omitted). Several other cases have likewise required affirmative steps towards foreclosure to accelerate a note secured by real property. *E.g., Shepler v. Kubena,* 563 S.W.2d 382, 385 (Tex.Civ.App.—Austin 1978, no writ) ("Intention to mature the note may be evidence[d] by declarations, which alone do not amount to an election, unless followed by affirmative action toward enforcing the declared intention."); *National Debenture Corp. v. Smith,* 132 S.W.2d 429, 431 (Tex.Civ.App.—Galveston 1939, writ dism'd judgm't cor.) ("[D]eclaration alone does not amount to an election to accelerate the maturity; ... to be effective as such, it must be followed by affirmative action toward enforcing the declared intention."); *cf. Joy Corp. v. Nob Hill N. Props., Ltd.,* 543 S.W.2d 691, 694–95 (Tex.Civ.App.—Tyler 1976, no writ) (holding acceleration may be accomplished by *either* declaring **\*570** entire debt due *or* taking some other unequivocal action indicating debt is accelerated).

We disapprove of *Swoboda* and this line of cases to the extent they can be read to require affirmative action towards foreclosure to trigger acceleration of a note secured by real property when the parties' agreement does not require

such action. To hold, as the court of appeals did here, that acceleration does not occur and thus an action does not accrue until a foreclosure posting or sale takes place would, in essence, mean the foreclosure posting or sale would be the triggering event bringing about the right to hold a foreclosure sale. This result is nonsensical.

### 2. ABANDONMENT

The court of appeals alternatively held that MITC abandoned its attempted acceleration. However, as the court of appeals noted, it "is undisputed that the Church did not pay the balance or any portion thereof, or resume making regular payments or in any way change its position." 49 S.W.3d at ——, 1999 WL 33256589. And Wolf has not argued that MITC or its successors had otherwise expressed an intent to abandon acceleration. Thus, abandonment is not implicated in this case.

Both MITC's notice of intent to accelerate and its notice of acceleration were "clear and unequivocal." *See Shumway,* 801 S.W.2d at 893. Because there is no evidence of abandonment, these notices established MITC's acceleration. Accordingly, we conclude that the Church presented conclusive evidence that MITC accelerated the Church's note on August 15, 1994. The trial court correctly held that any cause of action on the note accrued on that date and that limitations then began to run. Thus, the court of appeals erred in holding that a fact issue existed about when MITC's action accrued.

### B. LIMITATIONS

 **[12]**　Wolf foreclosed on the Church's property on October 6, 1998. Because Wolf's action accrued August 15, 1994, we must decide whether the state four-year or federal six-year statute of limitations governs his right to foreclose.

Wolf urges us to hold that, as a FDIC successor, he is entitled to FIRREA's six-year limitations period. *See Jackson,* 883 S.W.2d at 178 (applying six-year FIRREA limitations period to FDIC successor in interest where cause of action accrued before FDIC received the note). He recognizes that two federal courts have refused to extend FIRREA's limitations to FDIC successors when the notes were not in default until after the notes left the FDIC's hands. *See Beckley Capital Ltd. P'ship v. DiGeronimo,* 184 F.3d 52, 58 (1st Cir.1999)

( "[T]he assignee does not get this benefit where an obligation is transferred by the FDIC before it is in default."); *Cadle Co. v. 1007 Joint Venture,* 82 F.3d 102, 105 (5th Cir.1996) ("We agree with Joint Venture that an assignee of the FDIC can invoke FIRREA's six-year period of limitations only if the note at issue was in default either before the FDIC acquired it or while the FDIC owned it."). However, he argues that because the Church's note *was* in default while in the FDIC's hands, he should receive the benefit of the six-year limitations period.

Conversely, the Church argues that the state four-year limitations period applies in this case. It contends that the relevant question is not whether the note was in default while the FDIC held it, but whether a cause of action had accrued before the FDIC transferred the note to a subsequent holder, thereby triggering limitations. It reasons that applying FIRREA's **\*571** limitations period when a cause of action does not accrue until *after* the FDIC transfers the note does nothing to further FIRREA's policies.

### 1. FIRREA

FIRREA's relevant section provides:

(14) Statute of limitations for actions brought by conservator or receiver.

(A) In general

Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be—

(i) In the case of any contract claim, the longer of—

(I) the 6–year period beginning on the date the claim accrues; or

(II) the period applicable under State law;

....

(B) Determination of the date on which a claim accrues

For purposes of subparagraph (A), the date on which the statute of limitations begins to run on any claim described in such subparagraph shall be the later of—

(i) the date of the appointment of the Corporation as conservator or receiver; or

(ii) the date on which the cause of action accrues.

12 U.S.C. § 1821(d)(14). FIRREA does not expressly extend the benefit of this expanded limitations period to the FDIC's successors in interest. However, most jurisdictions have recognized, based on different theories, that the FDIC's successors do enjoy the benefit of the six-year period in some circumstances. *See, e.g., UMLIC–Nine Corp. v. Lipan Springs Dev. Corp.,* 168 F.3d 1173, 1177 n. 3 (10th Cir.1999); *United States v. Thornburg,* 82 F.3d 886, 891–92 (9th Cir.1996); *FDIC v. Bledsoe,* 989 F.2d 805, 810 (5th Cir.1993); *Tivoli Ventures, Inc. v. Bumann,* 870 P.2d 1244, 1246 (Colo.1994); *Cadle Co. II, Inc. v. Lewis,* 254 Kan. 158, 864 P.2d 718, 724 (1993); *N.S.Q. Assocs. v. Beychok,* 659 So.2d 729, 734 (La.1995); *Investment Co. of the Southwest v. Reese,* 117 N.M. 655, 875 P.2d 1086, 1095 (1994); *Union Recovery Ltd. P'ship v. Horton,* 252 Va. 418, 477 S.E.2d 521, 524 (1996). And we so held in *Jackson v. Thweatt,* the case upon which Wolf relies. 883 S.W.2d at 178.

**[13]** The question we did not answer in *Jackson,* however, is the one presented here—whether the FDIC's successors enjoy the benefit of the six-year limitations period when a cause of action on the note has not accrued before the FDIC assigns the note to a subsequent holder. We agree with the Church that the policy justifications we cited for extending limitations in *Jackson* do not apply here. Thus, we join the two federal courts that have considered this issue and hold that the FDIC's successors do not receive the benefit of the FDIC's six-year limitations period if the cause of action does not accrue until after the note leaves the FDIC's hands.

### 2. *JACKSON V. THWEATT*

In *Jackson,* we considered two conflicting court of appeals opinions about whether FIRREA's six-year limitations period applies to the FDIC's successors in interest. 883 S.W.2d at 172–74. In both cases the noteholders' claims had accrued before the FDIC became the receiver of the noteholders. *Jackson,* 883 S.W.2d at 172–74. We recognized that 18 U.S.C. § 1821(d)(14) expressly confers the six-year limitations only on actions the FDIC brings. *Jackson,* 883 S.W.2d at 174. However, based on the common law maxim **\*572** that "[a]n assignee stands in the shoes of his assignor," we held that the FDIC's successors also have the benefit of the

FDIC's longer limitations period. *Jackson,* 883 S.W.2d at 174. Any other holding, we explained, would diminish the note's market value in the hands of the FDIC, thereby hindering the purpose behind the longer limitations period:

> To hold that assignees are relegated to the state statute of limitations would serve only to shrink the private market for the assets of failed banks. It would require the FDIC to hold onto and prosecute all notes for which the state statute of limitations has expired because such obligations would be worthless to anyone else. This runs contrary to the policy of allowing the FDIC to rid the federal system of failed bank assets. The FDIC can only make full use of the market in discharging its statutory responsibilities if the market purchasers have the same rights to pursue actions against recalcitrant debtors as does the FDIC.

*Jackson,* 883 S.W.2d at 174 (quoting *Fall v. Keasler,* 1991 WL 340182, at *4 (N.D.Cal. Dec. 18, 1991)).

While we have never considered whether the result we reached in *Jackson* would compel extending FIRREA's limitations if the cause of action accrued after the note left the FDIC's hands, two federal circuit courts have declined to extend limitations in such a situation. *See DiGeronimo,* 184 F.3d at 58; *Cadle Co.,* 82 F.3d at 105.

### 3. *CADLE COMPANY V. 1007 JOINT VENTURE*

In *Cadle Company,* the Fifth Circuit first considered whether FIRREA's six-year limitations period enured to the benefit of a FDIC successor when the note was not in default until *after* the FDIC transferred it. 82 F.3d at 104–05. It held "that an assignee of the FDIC can invoke FIRREA's six-year period of limitations only if the note at issue was in default either before the FDIC acquired it or while the FDIC owned it." *Cadle Co.,* 82 F.3d at 105. While the court spoke in terms of "default" rather than "accrual," its analysis treated the concepts as synonymous:

> FIRREA's six-year period of limitations has no significance independent of a claim to which it

applies; it attaches only to an accrued claim, not to a performing note.... The six-year period is not triggered by the FDIC's appointment as receiver; rather, it becomes relevant only upon the accrual of a cause of action, at which time it identifies the starting date for the six-year period. Until there is a default, there is no claim....

*Cadle Co.,* 82 F.3d at 105. The court recognized the policies behind extending the six-year period to transferees, but noted that this "reasoning loses force with a note performing when the FDIC transfers it; because such a note is not in default, it has value to a prospective transferee and no limitation period is running." *Cadle Co.,* 82 F.3d at 106. Thus, it distinguished these facts from its previous cases holding that the six-year period applies to the FDIC's successors in interest. *See, e.g., Bledsoe,* 989 F.2d at 810–11.

### 4. *BECKLEY CAPITAL LIMITED PARTNERSHIP V. DIGERONIMO*

In *DiGeronimo,* the First Circuit considered whether FIRREA's six-year limitations period applied to expand a state statute of limitations requiring that suit be brought against an estate within one year after a decedent's death. 184 F.3d at 55. DiGeronimo guaranteed a note that was in default while the FDIC held it. *DiGeronimo,* 184 F.3d at 54. The FDIC later sold the note to Beckley Capital and DiGeronimo died a month later. *DiGeronimo,* 184 F.3d at 58. Because the note was already in default when the FDIC transferred the note, DiGeronimo was already subject to **\*573** suit as guarantor while the FDIC held the note. Despite this, the court refused to extend the statute of limitations:

> [T]he one-year New Hampshire statute [for bringing suit against an estate] had not begun to run at the time of the transfer because Beckley acquired the note and the guaranty in June 1994 and DiGeronimo did not die until July 1994. Accordingly, Beckley had the same one-year period to sue as any other person (apart from the FDIC) who happened to have a claim against a New Hampshire decedent. And because Beckley acquired the guaranty before this period even began

to run, its position is closely analogous to the assignee in *Cadle* that acquired its note prior to the default. Put differently, there is no reason why a special statute of limitations is needed in this case to make the obligation marketable to a purchaser, and absent such a reason, the policy behind state statutes of limitation—vivid in this case—ought to be respected.

*DiGeronimo,* 184 F.3d at 58. The court expressly "adopt[ed] the principle in *Cadle* that the assignee does not get this benefit where an obligation is transferred by the FDIC *before* it is in default." *DiGeronimo,* 184 F.3d at 58 (emphasis added). And, as the *Cadle* court had done, the First Circuit discussed default and accrual as synonymous concepts.

## 5. ANALYSIS

In response to the huge number of bank failures in 1987 and 1988, FIRREA was enacted to "strengthen the enforcement power of [f]ederal regulators of depository institutions." Boteler, *Comment: Protecting the American Taxpayers: Assigning the FDIC's Six Year Statute of Limitations to Third Party Purchasers,* 24 TEX. TECH L.REV. 1169, 1169–71 (1993). The six-year limitations period was created because "once the FDIC is appointed receiver, it needs extra time to review all of the assets and liabilities it has just acquired, before it can go forward with any litigation by which to recover on defaulted promissory notes." Boteler, *supra* at 1078.

Two justifications are generally cited to support extending FIRREA's six-year period to FDIC's successors in interest even though FIRREA is silent about assignees. First, absent such an exception, the FDIC would be forced to prosecute all notes where state limitations has already run. *See, e.g., Bosque Asset Corp. v. Greenberg,* 19 S.W.3d 514, 521 (Tex.App.—Eastland 2000, pet. denied) ("[T]he federal policy of insuring a market for the assets of failed depositories militates strongly in favor of extending the federal statute of limitations to all subsequent assignees of the FDIC."); *see also Tivoli Ventures, Inc.,* 870 P.2d at 1250 ("Requiring the FDIC to prosecute each outstanding loan would ... unduly delay the transfer and sale of the insolvent bank's assets."). Interpreting FIRREA to require the FDIC to prosecute all notes where the state statute of limitations had run would

be contrary to the policies behind FIRREA's enactment. *See generally Jackson,* 883 S.W.2d at 174.

The second justification cited for extending FIRREA's limitations period to its successors is the premise that "[a]n assignee stands in the shoes of his assignor." *General Fin. Servs., Inc. v. Practice Place, Inc.,* 897 S.W.2d 516, 520 (Tex.App.—Fort Worth 1995, no writ). This maxim supports the notion that the FDIC's right to an extended limitations period is part of the bundle of rights that transfers to its subsequent assignees. *See, e.g., Bledsoe,* 989 F.2d at 810. *But see WAMCO, III, Ltd. v. First Piedmont Mortgage Corp.,* 856 F.Supp. 1076, 1087–88 (E.D.Va.1994) (holding common law assignment theories do not support extending FIRREA limitations to assignees). We cited both justifications for our holding in *Jackson.* 883 S.W.2d at 174.

 **\*574** However, while these policies justify extending the six-year limitations period when a cause of action has accrued before the FDIC transfers the note, we agree with the First Circuit that "[n]o reason exists to extend this special benefit beyond the point where it serves the federal policy; and it does not do so here." *DiGeronimo,* 184 F.3d at 57. When a cause of action has not accrued before the FDIC transfers the note, a transferee has the same four years under section 16.035(b) of the Texas Civil Practice and Remedies Code to sue as any other person. Accordingly, refusal to extend limitations in this situation does not significantly impact the FDIC's notes' marketability.

 **[14]** **[15]** Moreover, even though an assignee generally "stands in the shoes of his assignor," *Bledsoe,* 989 F.2d at 810, the Fifth Circuit aptly explained why that concept would not apply here, where a claim has not accrued and thus the FDIC's right to a six-year limitations period is never triggered. "FIRREA's six-year period of limitations has no significance independent of a claim to which it applies; it attaches only to an accrued claim, not to a performing note." *Cadle Co.,* 82 F.3d at 105. We agree. Absent application of FIRREA's statute of limitations, a noteholder's right to sue is limited by section 16.035(b). The six-year provision does not "attach" to the bundle of rights passed to subsequent assignees unless FIRREA's express terms actually trigger the right.

Wolf recognizes that the *Cadle* and *DiGeronimo* courts refused to extend FIRREA's limitations when the notes were not in default until after the FDIC transferred the notes. However, he argues that their reasoning cannot apply here because it is undisputed that the Church's note *was*

in default in the FDIC's hands. We disagree. While *Cadle* and *Beckley* do use the term "default" as the triggering event for determining whether FIRREA's limitations period is extended, it is clear from their reasoning that these courts rely on the default date only to the extent that *it was synonymous* with the accrual date in those cases. However, under Texas law we look to the accrual date as the event to determine if limitations had been triggered while the FDIC held the note. Because the evidence reflects that accrual occurred after the FDIC transferred the note, we hold that Texas' four-year statute of limitations applies to bar Wolf's foreclosure. *See* TEX. CIV. PRAC. & REM.CODE § 16.035(b).

## IV. CONCLUSION

The parties here agreed about the date the note was accelerated and the summary judgment evidence conclusively established the note's acceleration date. The court of appeals erred in holding that an optional acceleration clause cannot be effectively exercised without specific affirmative steps towards foreclosure. Rather, absent evidence of abandonment or a contrary agreement between the parties, a clear and unequivocal notice of intent to accelerate and a notice of acceleration is enough to conclusively establish acceleration. Therefore, the trial court correctly concluded that the Church's evidence conclusively established the date its note was accelerated and thus the date Wolf's cause of action accrued. And, because we further conclude that the cause of action accrued after the FDIC had assigned the note, we also hold that the Texas four-year statute of limitation applicable to foreclosure actions governs this case. Accordingly, we reverse the court of appeals' judgment and render judgment for the Church.

Justice HANKINSON did not participate in this decision.

**All Citations**

44 S.W.3d 562, 44 Tex. Sup. Ct. J. 605

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# DD

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** Hughes Wood Products, Inc. v. Wagner, Tex., May 25, 2000

650 S.W.2d 764
Supreme Court of Texas.

HOUSTON FIRST AMERICAN
SAVINGS, et al., Petitioners,
v.
Vann MUSICK and C.C. Divine, et al., Respondents.

No. C–1370. | April 20, 1983.
| Rehearing Denied June 15, 1983.

Action was instituted in trespass to try title. The District Court No. 164, Harris County, Solito, J., rendered judgment non obstante veredicto in favor of plaintiff, and defendants appealed. The Houston Court of Civil Appeals, Fourteenth Supreme Judicial District, Murphy, J., reversed and remanded, and plaintiff brought error. The Supreme Court, Ray, J., held that: (1) trust deed on which plaintiff based its claim to property was invalid when trustee failed to give notice of sale as required by law, and (2) plaintiff was, however, entitled to rely on doctrine of after-acquired title with respect to remaining defendants.

Judgment of the Court of Appeals reversed, judgment rendered that plaintiff take nothing from one defendant, and judgment of trial court as to remaining defendants affirmed.

West Headnotes (17)

[1] **Evidence**
Admissibility in Same Proceedings

Assertions of fact, not pled in alternative, in live pleadings of a party are regarded as formal judicial admissions.

80 Cases that cite this headnote

[2] **Evidence**
Conclusiveness and Effect

Any fact admitted is conclusively established in case without introduction of pleadings or presentation of other evidence.

33 Cases that cite this headnote

[3] **Evidence**
Judicial Admissions in General

Act of defendant in admitting as a fact that individual bought note and deed of trust in name of corporation which named substitute trustee under whose deed plaintiff claimed was to be regarded as a formal judicial admission and, hence, conclusively established in trespass to try title action that corporation had bought the deed of trust.

5 Cases that cite this headnote

[4] **Evidence**
Private Contracts and Other Writings

Recitals contained in deed by which substitute trustee conveyed property were prima facie evidence that terms of trust were fulfilled, but gave rise only to a presumption of validity and related only to matters of evidence, and thus did not conclusively establish that foreclosure sale under which plaintiff claimed property conformed to conditions set out in deed.

13 Cases that cite this headnote

[5] **Mortgages**
Notice of Sale

Substitute trustee's deed was invalid where substitute trustee was not appointed until within 21 days of sale, with result that notice of sale was not given for 21 days prior to sale as required by deed of trust and statute. Vernon's Ann.Texas Civ.St. art. 3810.

14 Cases that cite this headnote

[6] **Mortgages**
Power as Authority for Sale in General

Maker of a deed of trust with power of sale may condition exercise of power upon such conditions as he may prescribe and, since that power admits of no substitution and no equivalent, trustee must strictly adhere to terms of power.

6 Cases that cite this headnote

7 Cases that cite this headnote

**[7]** **Mortgages**

    Necessity

Compliance with notice condition contained in deed of trust and as prescribed by law is a prerequisite to right of trustee to make sale.

20 Cases that cite this headnote

**[8]** **Evidence**

    Pleadings

Language in answer and cross petition referring to "purported" appointment of substitute trustee on certain date was not so clear and unequivocal as to rise to a judicial admission that substitute trustee was appointed on that date, particularly where answer included plea of not guilty on general denial.

5 Cases that cite this headnote

**[9]** **Evidence**

    Admissibility in Same Proceedings

Allegations in answer which includes a general denial are not a waiver of the general denial and may not be used by plaintiff as admissions.

Cases that cite this headnote

**[10]** **Evidence**

    Pleadings

Assuming that answer in trespass to try title case admitted that substitute trustee, under whose deed plaintiff claimed, was appointed on certain date, plaintiff nonetheless waived its right to rely on admission, where plaintiff's only objection to special issue regarding appointment of substitute trustee was that there was no evidence raising such an issue and that it was irrelevant, and objection did not indicate that it was relying on defendant's pleadings as a judicial admission, and where plaintiff's own chain of title established that substitute trustee was not appointed on date claimed by plaintiff.

**[11]** **Evidence**

    Pleadings

Facts alleged or admitted in live pleadings of a party are accepted as true by court and jury and are binding on pleader.

27 Cases that cite this headnote

**[12]** **Trial**

    Effect of Failure to Object or Except

Party relying on his opponent's pleadings as judicial admissions of fact must protect his record by objecting to introduction of evidence contrary to that admission of fact and by objecting to submission of any issue bearing on fact admitted.

35 Cases that cite this headnote

**[13]** **Estoppel**

    By Deed

Although substitute trustee's deed was invalid as between grantee of the trustee's deed and grantor of deed of trust, where it did give appearance of good title in grantee, grantor would be estopped to assert the invalidity of the trustee's sale with respect to a subsequent bona fide purchaser of the property.

3 Cases that cite this headnote

**[14]** **Mortgages**

    Grantees or Mortgagees of Purchasers

Although invalid trustee's deed gave appearance of good title, party claiming under the grantee was not a bona fide purchaser or bona fide mortgagee, and thus had no better title than its grantor, where it was aware of litigation at time it acquired its interest and notice of lis pendens had been filed.

12 Cases that cite this headnote

**[15]** **Appeal and Error**

To Sustain Judgment Appealed From

Where trial court's judgment non obstante veredicto was exactly the judgment requested by plaintiff, it was unnecessary for plaintiff to file cross points on defendant's appeal in order to advance arguments supporting the trial court's judgment.

4 Cases that cite this headnote

**[16]  Estoppel**
 Actual Transfer of Title by Operation of Law

When one conveys land by warranty of title, or in such a manner as to be estopped to dispute title of his grantee, a title subsequently acquired to that land will pass eo instante to his warrantee, binding both warrantor and his heirs and subsequent purchasers from either.

8 Cases that cite this headnote

**[17]  Mortgages**
 Conveyance to Purchaser

Plaintiff was entitled to rely on doctrine of after-acquired title with respect to certain tract of land, though deed to its ancestor in title was executed, individually, by one of three trustees while property was held under deed of trust requiring signature of two trustees, where, subsequently, all three trustees conveyed the property to a person who, through mesne conveyance, conveyed the property to the grantor of the first deed.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*765** Anderson, Brown, Orn & Jones, Nelson Jones, Houston, for petitioners.

Heath & Associates, Robert A. Heath, Gladys R. Goffney, Houston, for respondents.

**Opinion**

RAY, Justice.

This is a trespass to try title case. Houston First American Savings Association, successor to American Savings & Loan Association of Houston, filed suit in 1966 to recover possession of 618.7 acres in Harris **\*766** County. Named as defendants were Vann Musick,[1] who claims an undivided # interest in the 618.7 acres, and C.C. Divine,[2] who claimed a specific 27 acres. The trial court rendered judgment non obstante veredicto in favor of Houston First American Savings (American). The court of appeals reversed the judgment of the trial court and remanded the cause with instructions to render judgment for Vann Musick and C.C. Divine consistent with the jury's verdict.[3]

We reverse the judgment of the court of appeals and render judgment that American take nothing from defendant Vann Musick and that the judgment of the trial court be affirmed in all other respects. American's claims against the respective defendants are unrelated and will be discussed separately.

### I. American v. Vann Musick

In 1951, W.O. Bartle conveyed the 618.7 acres in controversy to Ted and Levoy Musick, the brothers of Vann Musick. In 1952 Ted Musick and Levoy, joined by his wife Mary Ann Musick, conveyed an undivided # interest in the property to Vann Musick. On March 14, 1961, Vann Musick, joined by her brothers, executed a deed of trust covering the 618.7 acres to secure a note of the same date payable to Theodore Lucas, trustee of the J.B. Lucas Trust. This note was subsequently purchased by TWI Development Company, a corporation wholly owned by Levoy Musick and his wife. Thereafter, TWI appointed B.J. Brown, substitute trustee, to replace the trustee originally named in the deed of trust. At the trustee's sale held on July 2, 1963, Brown, as substitute trustee, conveyed the 618.7 acres to TWI. In June 1964, TWI conveyed the land to Harry Holmes, Jr. and W.M. Wheless, Sr., reserving an option to repurchase. Four months after this conveyance Levoy Musick died. Under the terms of his will, Mary Ann Musick became owner of all TWI stock and the repurchase option. Subsequently, TWI agreed to a plan for exercising its repurchase option. Pursuant to this plan, TWI repurchased the land and conveyed the 618.7 acres to Meyer Jacobson and T.S. Kent who used the land as collateral to

secure a loan from American. On December 18, 1964, three transactions occurred:

1) TWI exercised its option and Holmes and Wheless executed a warranty deed to TWI;

2) Mary Ann Musick, as president of TWI conveyed the land to Kent and Jacobson by general warranty deed;

3) Kent and Jacobson executed a deed of trust to Ralph B. Lee as trustee for the benefit of American.

The deed of trust secured a loan of $150,000 from American to Kent and Jacobson. No payments were ever made on the promissory note. At a trustee's sale held on February 6, 1966, the property was sold to American for $25,000.

American initiated its trespass to try title action in 1966, naming as defendants several members of the Musick family who were already litigating their respective rights in the property. American's lawsuit and the Musick family litigation were consolidated in 1968. Thereafter, American's claims against Vann Musick and C.C. Divine were severed and a separate trial ordered. Before this case was tried, a separate trial was held between American, Levoy Musick, Mary Ann Musick, TWI and others who claimed an interest in the 618.7-acre tract. As between the parties to that suit, this Court rendered judgment for American. *American Savings and Loan Ass'n of Houston v. Musick,* 531 S.W.2d 581 (Tex.1975).

In January, 1980, American's trespass to try title claim against Vann Musick and C.C. Divine came to trial. At the close of **\*767** evidence American moved for an instructed verdict. The trial court denied American's motion and submitted twenty-four special issues requested by Vann Musick. All of the jury's answers to these issues favored Vann Musick. Vann Musick thereafter moved for judgment on the verdict. American filed an opposing motion for judgment non obstante veredicto. The trial court granted American's motion, finding that the jury's verdict was not supported by the pleadings or evidence and was immaterial.

The court of appeals reversed the judgment of the trial court and remanded the cause for entry of judgment on the jury's verdict. Although the court of appeals found evidence to support the verdict, the court did not specifically discuss the evidence or address which issue or issues served to defeat American's title.

American argues that the court of appeals has erred in remanding the cause for entry of judgment on the jury's verdict, because the special issues are immaterial and unsupported by the pleadings and evidence. American submits that the trial court correctly rendered judgment in its favor because it established superior title out of a common source.

American's claim of superior title depends upon the foreclosure of a deed of trust signed by Vann Musick and her brothers on March 14, 1961. This deed of trust was given to secure a note payable to Theodore Lucas, Trustee of the J.B. Lucas Trust. This deed of trust granted the trustee the power to sell the property at the request of the holder or payee of the note in the event of default. The deed of trust further set forth the conditions of the Trustee's power of sale which included, among others, that notice of the sale be posted in three public places in Harris County for at least twenty-one days prior to the sale. The deed of trust also contained the customary provisions authorizing the trustee, or a duly appointed substitute trustee, to recite in the trustee's deed the facts concerning the sale, and that such recitals should be prima facie evidence of the truth of the facts recited.

**[1] [2] [3]** In order to connect this deed of trust to a substitute trustee's deed which purported to convey the 618.7-acre tract to TWI, American introduced in evidence a document entitled "Appointment of Substitute Trustee." This document recited that TWI was the owner and holder of the note and deed of trust, dated March 14, 1961. Although there was no other evidence in the record confirming that TWI bought the note and deed of trust from the J.B. Lucas Trust, none was necessary. Vann Musick admitted as a fact that Levoy Musick "bought the note and deed of trust in the name of TWI Development Company, a corporation" in a pleading which she entitled "Cross-Plaintiff's First Amended Petition." Assertions of fact, not pled in the alternative, in the live pleadings of a party are regarded as formal judicial admissions. Any fact admitted is conclusively established in the case without the introduction of the pleadings or presentation of other evidence. *Kirk v. Head,* 137 Tex. 44, 152 S.W.2d 726 (1941); 1A R. Ray, *Texas Law of Evidence,* § 1144 (Texas Practice 3d ed. 1980).

American next introduced in evidence the deed by which the substitute trustee conveyed the property to TWI. This deed recited compliance with all conditions of the deed of trust. American argues that the recitals in the substitute trustee's deed establish that the foreclosure sale at which TWI acquired

the property conformed to the conditions set out in the deed of trust.

 **[4]**    While we agree that these recitals are prima facie evidence that the terms of the trust were fulfilled, we note that the recitals in a trustee's deed only give rise to a presumption of validity and relate only to matters of evidence. *Slaughter v. Qualls,* 139 Tex. 340, 162 S.W.2d 671, 676 (1942). The presumption of the validity of the sale is not conclusive and may be rebutted. *Hart v. Eason,* 159 Tex. 375, 321 S.W.2d 574, 575 (1959). Although Vann Musick admitted in her "cross-claim" that TWI purchased the note and deed of trust and **\*768** thereby conceded TWI's authority to appoint a substitute trustee, Vann Musick nevertheless did rebut the presumption that the substitute trustee complied with the conditions contained in the deed of trust.

 **[5]**    The "Appointment of Substitute Trustee" recites that B.J. Brown was appointed substitute trustee on May 21, 1963. The appointment, however, refers to the volume and page where the deed of trust is recorded. Since the deed of trust was not recorded until June 17, 1963, the volume and page could not have been known on May 21, 1963. The jury found that B.J. Brown was not appointed substitute trustee until some time after June 17, 1963. Since Brown sold the property to TWI on July 2, 1963, it is apparent that notice of the sale was not given for twenty-one days prior to sale as required by the deed of trust and Article 3810. [4]

 **[6]**    **[7]**    The maker of a deed of trust with power of sale may condition the exercise of the power upon such conditions as he may prescribe. *Slaughter v. Qualls, supra.* The trustee must strictly adhere to the terms of the power for the power "admits of no substitution and no equivalent." *Michael v. Crawford,* 108 Tex. 352, 193 S.W. 1070 (1917). In *Fuller v. O'Neal,* 69 Tex. 349, 6 S.W. 181 (1887) we wrote:

> The course marked out for the trustee to pursue must be strictly followed by him: for the method of enforcing the collection through such deeds is a harsh one. The grantor of the power is entitled to have his directions obeyed; to have the proper notice of sale given; to have it to take place at the time and place, and by the person appointed by him.

Compliance with the notice condition contained in the deed of trust and as prescribed by law is a prerequisite to the right of

the trustee to make the sale. *Goode v. Davis,* 135 S.W.2d 285, 292 (Tex.Civ.App.—Fort Worth 1939, writ dism'd judgmt cor.); *Childs v. Hill,* 20 Tex.Civ.App. 162, 49 S.W. 652 (Tex.Civ.App.1898, no writ).

 **[8]**    **[9]**    **[10]**    American argues, however, that the jury finding that the substitute trustee was not appointed by TWI until sometime after June 17, 1963 is immaterial because Vann Musick admitted in her pleadings that the appointment of the substitute trustee was made on May 21, 1963. In "Cross-Plaintiff's First Amended Petition," Vann Musick alleged:

> "On the 21st day of May, 1963, conspiring with B.J. Brown and Pat Towery, a purported appointment of Substitute Trustee was executed by A.R. Morris, as president attested by Pat Towery, Secretary of the TWI Development Company."

In her amended answer she alleged:

> "The TWI Development Company obtained title to the 618.7 acres in question by an invalid substitute trustee sale from B.J. Brown who was appointed trustee by A.R. Morris purported president of TWI Development Company on the 21st day of May, 1963."

Assuming for the sake of argument that Vann Musick's pleadings do admit as fact that TWI appointed the substitute trustee on May 21, 1963, [5] American has nevertheless waived its right to rely on the admission. **\*769** American's only objection to the special issue regarding the appointment of B.J. Brown as substitute trustee was "there is no evidence which raises such an issue and it is irrelevant." American's objection did not indicate that it was relying on Vann Musick's pleadings as a judicial admission. Furthermore, American's own chain of title, and hence its own evidence, establishes that B.J. Brown was not appointed substitute trustee on May 21, 1963. Although the "Appointment of Substitute Trustee" recites that the appointment was executed on May 21, 1963, when this instrument is considered together with the deed of trust to which it refers by volume and page, it is evident that the May 21 date is erroneous.

[11] [12] <mark>The facts alleged or admitted in the live pleadings of a party are accepted as true by the court and jury and are binding on the pleader.</mark> 1A R. Ray, *Texas Law of Evidence,* § 1127 (Texas Practice 3d ed. 1980). The party relying on his opponent's pleadings as judicial admissions of fact, however, must protect his record by objecting to the introduction of evidence contrary to that admission of fact and by objecting to the submission of any issue bearing on the fact admitted. *Starks v. City of Houston,* 448 S.W.2d 698 (Tex.Civ.App. —Houston [1st Dist.] 1969, writ ref'd n.r.e.); *Restelle v. Williford,* 364 S.W.2d 444 (Tex.Civ.App.—Beaumont 1963, writ ref'd n.r.e.); *Dallas Transit Co. v. Young,* 370 S.W.2d 6 (Tex.Civ.App.—Dallas 1963, writ ref'd n.r.e.).

[13] [14] Although the substitute trustee's deed was invalid as between TWI and Vann Musick, it did give the appearance of good title in TWI. Were American a bona fide purchaser of the property, Vann Musick would be estopped to assert the invalidity of the trustee's sale. *Slaughter v. Qualls,* 162 S.W.2d at 675. The jury, however, found that American was neither a bona fide purchaser, nor a bona fide mortgagee. Both terms were defined as requiring the purchaser or mortgagee to acquire its interest in the property in good faith, for value and without notice of the claim or interest of a third party. *Houston Oil Co. of Texas v. Hayden,* 104 Tex. 175, 135 S.W. 1149 (1911). There is evidence in the record from which the jury could reasonably have concluded that American was aware of the Musick family litigation at the time it acquired its interest in the 618.7-acre tract. This land was the subject of a lawsuit filed in May, 1962. Vann Musick, Ted Musick, Levoy Musick, TWI and other members of the Musick family were all parties to the litigation. In 1963, a notice of lis pendens was filed in the lis pendens records of Harris County. American did not take its deed of trust on the property until December, 1964, and did not foreclose on the property until 1966.

In summary, we hold that the substitute trustee's deed conveying the property to TWI is invalid because the trustee failed to give the notice required by law and by the terms of the deed of trust. We further hold that American is not a bona fide purchaser and, hence, has no better title than its grantor. *See Hartel v. Dishman,* 135 Tex. 600, 145 S.W.2d 865 (1940).

### II. *American v. C.C. Divine*

C.C. Divine claimed a specific 27 acres out of the 618.7-acre tract. Levoy Musick is the common source of title. American's title is identical to that traced above with respect to its claim against Vann Musick.

On December 13, 1961, Levoy and his wife conveyed the 27 acres to C.C. Divine. On October 25, 1962, C.C. Divine and H.G. Divine placed certain property in trust. The corpus of the trust included the 27 acres in controversy. The purpose of the trust was to serve as security for the posting **\*770** of bail bonds. The trust required the signatures of at least two trustees for a valid conveyance of property from the trust. C.C. Divine, H.G. Divine and A. Divine were named trustees. On July 27, 1963, C.C. Divine, individually, executed a general warranty deed conveying the 27 acres to Levoy Musick and his wife. The other two trustees did not join in this conveyance.

On September 5, 1963, all three trustees conveyed the 27 acres to Fred Divine who, on March 19, 1964, conveyed the property to W.E. Whitter and G.D. Peyton. On June 15, 1965, Whitter and Peyton, by general warranty deed, conveyed the 27 acres to C.C. Divine.

Over the objections of American, C.C. Divine was permitted to testify that he did not intend to convey the 27 acres by his warranty deed of July 27, 1963. The jury apparently believed Divine's testimony, because all special issues were answered in Divine's favor. The trial court, however, disregarded the jury's verdict and rendered judgment for American.

The court of appeals reversed the judgment of the trial court and remanded the cause for entry of judgment on the verdict. The court of appeals concluded that there was evidence to support the jury verdict and that American had waived any error by failing to file cross-points.

American argues that it was not required to file cross-points in the court of appeals. American further argues that under the doctrine of after-acquired title, the title conveyed to C.C. Divine by Whitter and Peyton on June 15, 1965, flowed immediately into Levoy Musick and wife, and their assigns because of Divine's general warranty deed dated July 27, 1963.

[15] We agree with both arguments. In *Jackson v. Ewton,* 411 S.W.2d 715, 717 (Tex.1967) we explained that "cross-points" are used to preserve error committed by the trial court and "are the means by which an appellee may bring forward complaints of some ruling or action of the trial court which the appellee alleges constituted error as to him." The judgment non obstante veredicto rendered by the trial court

is exactly the judgment requested by American. In fact, the trial court judgment incorporates by reference American's entire motion for judgment non obstante veredicto. Hence, it was unnecessary for American to file cross-points, because American had no complaint with the judgment of the trial court.

 **[16]** **[17]** The court of appeals' erroneous "cross-point" holding apparently caused the court to conclude that American had waived its argument under the doctrine of after-acquired title. We hold that American is entitled to rely on the doctrine. The rule is that "when one conveys land by warranty of title, or in such a manner as to be estopped to dispute the title of his grantee, a title subsequently acquired to

that land will pass eo instante to his warrantee, binding both the warrantor and his heirs and subsequent purchasers from either." *Caswell v. Llano Oil Co.,* 120 Tex. 139, 36 S.W.2d 208, 211 (Tex.Comm'n App.1931, opinion adopted), citing *Baldwin v. Root,* 90 Tex. 546, 40 S.W. 3, 6 (1897).

The judgment of the court of appeals is reversed. We render judgment that American take nothing from Vann Musick. The judgment of the trial court is affirmed in all other respects.

### All Citations

650 S.W.2d 764

---

Footnotes

1    Vann Musick has conveyed a part of her interest in the 618.7 acres to her attorney, Bob Heath.

2    C.C. Divine is deceased.

3    The court of appeals decision is unpublished. Tex.R.Civ.P. 452.

4    Tex.Rev.Civ.Stat.Ann. art. 3810 (1966) provided in part:

> " * * * Notice of such proposed sale shall be given by posting written notice thereof for three consecutive weeks prior to the day of sale in three public places in said county or counties, one of which shall be made at the courthouse door of the county in which such sale is to be made, and if such real estate be in more than one county, one at the courthouse door of each county in which said real estate may be situated, or the owner of such real estate may, upon written application, cause the same to be sold as provided in said deed of trust or contract lien. * * * "

5    We doubt that Vann Musick judicially admitted as fact that TWI appointed B.J. Brown substitute trustee on May 21, 1963. Both the answer and cross-petition use "purported" which is synonymous with "rumored." We do not view the sentence from either the cross-petition or answer as being so clear and unequivocal as to rise to a judicial admission. *American Savings and Loan Ass'n of Houston v. Musick, supra,* at 589. Furthermore, the answer includes a plea of not guilty and a general denial. Allegations in a defendant's answer which includes a general denial are not a waiver of the general denial and may not be used by the plaintiff as admissions. *Climatic Air Distributors v. Climatic Air Sales, Inc.,* 162 Tex. 237, 345 S.W.2d 702 (1961); *Hynes v. Packard,* 92 Tex. 44, 45 S.W. 562, 564 (1898).

---

**End of Document**                                            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

EE

In re Bexar County Criminal Dist. Attorney's Office, 224 S.W.3d 182 (2007)

50 Tex. Sup. Ct. J. 733

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** In re Hays County Criminal Dist. Attorney's Office, Tex.App.-Austin, October 1, 2010

224 S.W.3d 182
Supreme Court of Texas.

IN RE BEXAR COUNTY CRIMINAL
DISTRICT ATTORNEY'S OFFICE, Relator.

No. 05–0613. | Argued Sept. 28, 2006. | Decided May 4, 2007. | Rehearing Denied June 29, 2007.

**Synopsis**
**Background:** Former criminal defendant brought malicious prosecution action against complainants, following county's dismissal of criminal terroristic threat charges against defendant, and issued subpoenas for testimony of county assistant district attorney, former assistant district attorney, and investigator. District attorney's office moved to quash the subpoenas based on discovery privilege. The 408th Judicial District Court, Bexar County, Karen H. Pozza, J., granted the motion. Former defendant petitioned for writ of mandamus. The San Antonio Court of Appeals, 179 S.W.3d 47, conditionally granted a writ. District attorney's office and complainant petitioned for writ of mandamus.

**Holdings:** The Supreme Court, Don R. Willett, J., held that:

[1] district attorney's office did not waive attorney work-product protection, and

[2] assuming testimony sought by former criminal defendant was non-core attorney work product, former criminal defendant did not have substantial need for the testimony.

Writ conditionally granted.

Don R. Willett, J., filed a concurring opinion.

Phil Johnson, J., filed a dissenting opinion, in which Jefferson, C.J., and Medina, J., joined.

**West Headnotes (13)**

**[1]** **Mandamus**
 Remedy by Appeal or Writ of Error
**Mandamus**
 Matters of discretion
The Supreme Court grants mandamus relief when the trial court has abused its discretion and a party has no adequate appellate remedy.

9 Cases that cite this headnote

**[2]** **Mandamus**
 Matters of discretion
For purposes of the "abuse of discretion" prong for mandamus relief, a lower court has no discretion in determining what the law is, even when the law is unsettled.

2 Cases that cite this headnote

**[3]** **Mandamus**
 Modification or vacation of judgment or order

Appeal is inadequate, as element for mandamus relief, when a court erroneously orders disclosure of privileged information.

7 Cases that cite this headnote

**[4]** **Malicious Prosecution**
 Instigation of or participation in prosecution
**Malicious Prosecution**
 Presumptions and burden of proof

To recover for malicious prosecution when the decision to prosecute is within another's discretion, the plaintiff has the burden of proving causation, i.e., that the decision would not have been made but for the false information supplied by the defendant.

5 Cases that cite this headnote

**[5]** **Pretrial Procedure**
 Work-product privilege

In re Bexar County Criminal Dist. Attorney's Office, 224 S.W.3d 182 (2007)

50 Tex. Sup. Ct. J. 733

The primary purpose of the attorney work-product rule is to shelter the mental processes, conclusions, and legal theories of the attorney, providing a privileged area within which the lawyer can analyze and prepare his or her case. Vernon's Ann.Texas Rules Civ.Proc., Rule 192.5(a)(1).

7 Cases that cite this headnote

**[6]** **Pretrial Procedure**

Work product privilege; trial preparation materials

Attorney work-product protection continues indefinitely beyond the litigation for which the materials were originally prepared. Vernon's Ann.Texas Rules Civ.Proc., Rule 192.5(a)(1).

1 Cases that cite this headnote

**[7]** **Pretrial Procedure**

Work-product privilege

**Pretrial Procedure**

Work product privilege; trial preparation materials

Attorney work-product protection covers more than just documents: it extends to an attorney's mental impressions, opinions, conclusions, and legal theories, as well as the selection and ordering of documents. Vernon's Ann.Texas Rules Civ.Proc., Rule 192.5(a)(1), (b)(1).

2 Cases that cite this headnote

**[8]** **Pretrial Procedure**

Work-product privilege

Attorney work-product protection is broader than the attorney-client privilege, because it includes all communications made in preparation for trial, including an attorney's interviews with parties and non-party witnesses. Vernon's Ann.Texas Rules Civ.Proc., Rule 192.5(a)(1, 2); Rules of Evid., Rule 503.

2 Cases that cite this headnote

**[9]** **Witnesses**

Subpoena duces tecum

While disclosure pursuant to subpoena duces tecum, by county district attorney's office to plaintiff in malicious prosecution action against complainant, of documents from prosecution file, regarding conversations made in course of criminal investigation, information learned during investigation, and district attorney's decision to drop the criminal prosecution, waived attorney work-product protection as to those documents, such selective disclosure did not waive attorney work-product protection as to trial testimony from staff of district attorney's office, interpreting, explaining, or otherwise elaborating on matters contained in file. Vernon's Ann.Texas Rules Civ.Proc., Rule 192.5(a)(1), (b)(1); Rules of Evid., Rule 511(1).

2 Cases that cite this headnote

**[10]** **Witnesses**

Judges, Jurors, and Judicial Officers, as Witnesses as to Proceedings by or Before Them

Assuming that trial testimony sought, by plaintiff in malicious prosecution action against complainant, from staff of county district attorney's office was non-core attorney work product, as would be discoverable upon showing of substantial need and undue hardship, plaintiff did not have substantial need; the live testimony sought by plaintiff would merely improve plaintiff's chances of showing, but was not essential to showing, causation, i.e., that decision by district attorney's office to prosecute would not have been made but for false information supplied by complainant. Vernon's Ann.Texas Rules Civ.Proc., Rule 192.5(b)(2).

8 Cases that cite this headnote

**[11]** **Witnesses**

Judges, Jurors, and Judicial Officers, as Witnesses as to Proceedings by or Before Them

Assuming that trial testimony sought, by plaintiff in malicious prosecution action against complainant, from staff of county district attorney's office was non-core attorney work product, as would be discoverable upon showing

In re Bexar County Criminal Dist. Attorney's Office, 224 S.W.3d 182 (2007)

50 Tex. Sup. Ct. J. 733

of substantial need and undue hardship, plaintiff did not show inability to obtain, without undue hardship, the substantial equivalent of such testimony by other means; while malicious prosecution claim required proof of causation, i.e., that decision by district attorney's office to prosecute would not have been made but for false information supplied by complainant, district attorney's office had produced for plaintiff the office's prosecution file, which was the substantial equivalent of the testimony sought by plaintiff. Vernon's Ann.Texas Rules Civ.Proc., Rule 192.5(b)(2).

10 Cases that cite this headnote

**[12]    Evidence**
   👉 Making of statement fact in issue

Any false statements made by complainant to county district attorney's office would not constitute hearsay, in former criminal defendant's malicious prosecution action against complainant, if offered for their effect on the listener rather than for the truth of the matter asserted. Rules of Evid., Rule 801(d).

8 Cases that cite this headnote

**[13]    Pretrial Procedure**
   👉 Work-product privilege

The attorney work-product rule strikes a sensible balance, recognizing that a lawyer's thoughts are his own and that a party cannot invade every nook and cranny of a lawyer's case preparation, particularly when the essence of what the party seeks has already been revealed to him or is readily available. Vernon's Ann.Texas Rules Civ.Proc., Rule 192.5.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*184**  Susan Dolan Reed, Criminal District Attorney, Clarkson F. Brown, Assistant Criminal District Attorney, Thomas W. Gendry, Claudia Damy Brown, Gendry & Spargue, P.C., San Antonio, for Relator.

Robert W. Wilson, Mark A. Sanchez, Christopher John Gale, Law Offices of Gale, Wilson & Sa#nchez, P.L.L.C., San Antonio, for Real Party In Interest.

**Opinion**

Justice WILLETT delivered the opinion of the Court, in which Justice HECHT, Justice O'NEILL, Justice WAINWRIGHT, and Justice BRISTER joined.

This case presents an issue of first impression: whether the work-product privilege protects prosecutors from testifying in a malicious prosecution suit when they have already released the prosecution file. Relator Bexar County Criminal District Attorney's Office ("DA" or "DA's Office") provided its prosecution file to real party in interest David Crudup, who had sued relator Cynthia Blank for malicious prosecution. Crudup subpoenaed DA representatives to testify, but the trial court granted the DA's Motion to Quash and For Protective Order. The court of appeals disagreed and ordered the trial court to withdraw its order. [1] The DA's Office and Blank now seek mandamus relief in this Court, and given the record and circumstances presented, we conditionally grant it.

## I. Factual and Procedural Background

David Crudup and his wife were feuding neighbors of Cynthia Blank and her teenage son Travis. The Crudups and the Blanks complained repeatedly about each other to the Bexar County Sheriff's Office regarding such incivilities as barking dogs, obscenities yelled, cut cable lines, strewn grass clippings, trash left in a yard, rocks thrown at a fence, water sprayed on cars and grass, and a sprinkler that ran too long and created a puddle. Each time, the responding officer would talk to both sides and prepare an incident report.

On one occasion, Travis Blank alleged that Crudup threatened to kill him. Following this complaint, the DA charged Crudup with making terroristic threats. [2] During their investigation, members of the DA's Office interviewed Blank on several occasions. The DA's prosecution file contains sheriff's department reports, typed internal memos, letters written by Blank, and handwritten notes from interviews and telephone calls prepared by the DA's office. One set of notes detailed a series of calls between Blank and Assistant DA Robert McCabe. The file indicates that Blank refused to testify or to allow Travis to testify at trial, despite McCabe's warnings

In re Bexar County Criminal Dist. Attorney's Office, 224 S.W.3d 182 (2007)

50 Tex. Sup. Ct. J. 733

that the DA's Office would drop the charges against Crudup if they did not testify.

The DA's Office indeed dropped the charges, and Crudup sued the Blanks for malicious prosecution. The DA's Office complied with a subpoena *duces tecum* and turned over its prosecution file to Crudup for use in the civil case. Crudup subpoenaed McCabe, another assistant DA, and a DA investigator to testify at trial. The DA's Office and the three subpoenaed individuals filed a Motion to Quash and For Protective Order, arguing that the work-product privilege precluded the testimony **\*185** Crudup sought. Crudup's response attached no evidentiary support other than the previously produced prosecution file. Crudup insisted the DA testimony was not work product, and in any event the DA had waived any privilege claim by disclosing the prosecution file. The trial court conducted a brief non-evidentiary hearing and granted the DA's motion from the bench. At the hearing, Crudup's counsel complained, without elaboration, that the court had "damaged my case" and "severely limited and handicapped my case." Crudup filed a motion for reconsideration, attaching a transcript of the hearing and arguing that he needed the testimony from the DA personnel "to fully develop" his case and to prove the elements of malicious prosecution. The motion also attached notes from the prosecution file written by McCabe, and purporting to "state the reasons" and "describe the reason" the criminal case was dismissed. The trial court entered a written order again granting the DA's motion and effectively denying the motion for reconsideration.

The court of appeals granted Crudup mandamus relief and directed the trial court to withdraw its order. The court of appeals concluded that under *King v. Graham*[3] Crudup must prove that Blank's provision of false information was the determining factor in the DA's decision to bring the criminal prosecution, and that "[u]nder these circumstances the work-product privilege does not operate as a blanket privilege covering all decisions made by the DA's office."[4] The DA now seeks mandamus relief in this Court.

## II. Discussion

### A. Standard of Review

[1]  [2]  [3]  We grant mandamus relief when the trial court has abused its discretion and a party has no adequate

appellate remedy.[5] As to the first prong, a lower court has no discretion in determining what the law is, even when the law is unsettled.[6] As to the second, we have repeatedly held that appeal is inadequate when a court erroneously orders disclosure of privileged information.[7]

### B. The *King* Decision Does Not Mandate DA Testimony

[4]  Causation is an indispensable element of this malicious prosecution case. As we explained in *King,* "to recover for malicious prosecution when the decision to prosecute is within another's discretion, the plaintiff has the burden of proving that that decision would not have been made but for the false information supplied by the defendant."[8] So Crudup must prove not only that the Blanks furnished false information, but also that this false information caused Crudup to be prosecuted.[9]

In *King,* Kerr County district attorney Sutton testified in the malicious prosecution case brought by plaintiffs Graham and **\*186** Wren.[10] In rendering judgment for defendants, we wrote, "Graham and Wren offered no evidence whatever—*as by opinion from Sutton, for example*—that the decision to prosecute was based on any information supplied by King that Graham and Wren assert was false."[11] The *King* decision and our review of the *King* record do not reveal whether Sutton testified voluntarily or pursuant to a subpoena.

Crudup argues that "[a] necessary element for a malicious prosecution is the testimony of the District Attorney's office," and insists that this Court "has ruled that the testimony of the District Attorney's office is necessary to prove an element of malicious prosecution." This is assuredly wrong; nothing in *King* suggests that plaintiffs must provide direct evidence of causation or that prosecutors can be subpoenaed to provide live testimony regarding causation or anything else. In *King,* the district attorney did testify, and as this Court weighed but-for causation in that case, we noted that his testimony nowhere opined "that the decision to prosecute was based on any information supplied by [the defendant] that [plaintiffs] assert was false."[12] We summarized what the district attorney did and did not say and mentioned his testimony as merely one way causation could have been proved in that case. Our reference to the district attorney's testimony in *King,* however, did not announce a blanket privilege waiver or authorize plaintiffs to subpoena

In re Bexar County Criminal Dist. Attorney's Office, 224 S.W.3d 182 (2007)

50 Tex. Sup. Ct. J. 733

prosecutors to testify whenever plaintiffs wish to bolster the causation element of their malicious prosecution lawsuit.

### C. Crudup Cannot Overcome the DA's Testimonial Privilege

**[5]   [6]   [7]   [8]**   The United States Supreme Court first recognized the work-product doctrine 60 years ago in *Hickman v. Taylor,* [13] and our state discovery rules protect those materials prepared by or at the request of an attorney in anticipation of litigation. [14] As we have explained, "The primary purpose of the work product rule is to shelter the mental processes, conclusions, and legal theories of the attorney, providing a privileged area within which the lawyer can analyze and prepare his or her case." [15] The privilege continues indefinitely beyond the litigation for which the materials were originally prepared. [16] Moreover, the privilege covers more than just documents: it extends to an attorney's mental impressions, opinions, conclusions, and legal theories, [17] as well as the selection and ordering of documents. [18] The work product privilege is broader than the attorney-client privilege [19] because it includes all communications made in preparation for trial, including an attorney's interviews with parties and non-party witnesses. [20]

**\*187**   In the pending case, all of the DA's Office's work in connection with the criminal proceeding against Crudup, and relevant to the decision to bring criminal charges against him, constitutes work product, namely "material prepared or mental impressions developed in anticipation of litigation or for trial" or communications "made in anticipation of litigation or for trial ... among a party's representatives" under Rule 192.5(a). The totality of the DA's work on the Crudup matter, as evidenced by the prosecution file, consisted of the preparation of a criminal charge against Crudup and the criminal litigation that followed. The trial court record indicates that Crudup was not interested in eliciting general factual testimony from DA witnesses regarding how the DA's Office receives, processes, and investigates criminal complaints. Crudup only subpoenaed DA employees who had been directly involved with his criminal case to testify in the civil case. He informed the district court, in his response to the Motion to Quash and For Protective Order, that he was interested in their testimony because "[t]he DA's office had numerous conversations with Defendant Cindy and because of these conversations they are fact witnesses to

the statements made by Defendant Cindy." He stated in his motion for reconsideration that he needed the testimony in order to "present evidence of the conduct of the Defendants before the criminal case was initiated" and also "to present evidence of the conduct of the Defendants during the course of the criminal proceedings, especially as to the reason of the dismissal of the criminal case." In his briefing to this Court, he stresses that without DA testimony, he cannot prove the specific elements of malicious prosecution.

**[9]**   For purposes of his civil case, conversations made in the course of the criminal investigation, information learned during that investigation, and the DA's decision to drop the case all constitute work product as defined above, and while producing the prosecution file unquestionably waived protection of the documents themselves, that selective disclosure does not oblige DA staff to provide deposition and trial testimony interpreting, explaining, or otherwise elaborating on matters contained in the file. The dissent notes that Crudup may well want to quiz DA staff about various matters unrelated to the specifics of the prosecution against him: "testimony as to general procedures such as procedures of the DA's office for intake of criminal complaints, processing of those complaints, whether investigation is made into the facts of cases before criminal proceedings are instituted, and whether contacts are typically made with complaining witnesses before criminal proceedings are begun, during the proceedings, or after the proceedings are completed." 224 S.W.3d at 193. Crudup, however, has never expressed the slightest interest in such general matters, which might well be fair game; the record and his briefs to this Court show him focused solely on eliciting DA testimony regarding the specific events surrounding his criminal case and insisting that without such case-specific details, "he will not be able to prove every element of malicious prosecution."

Rule 192.5(b)(1) distinguishes everyday work product from "core work product" and makes clear that the latter—defined as "the attorney's or the attorney's representative's mental impressions, opinions, conclusions, or legal theories"—is inviolate and flatly "not discoverable," subject to narrow exceptions that are inapplicable here. [21] Core work product is sacrosanct **\*188** and its protection impermeable. Assuming *arguendo* that the testimony Crudup seeks is non-core work product, which seems doubtful, Crudup still bears a heavy burden: he must show that he "has substantial need" for the testimony in the preparation of his case and that he "is unable without undue hardship to obtain the substantial equivalent of the material by other means." [22]

In re Bexar County Criminal Dist. Attorney's Office, 224 S.W.3d 182 (2007)

50 Tex. Sup. Ct. J. 733

The court of appeals said it granted mandamus relief because "the DA's office has failed to meet its burden of showing any basis to quash the subpoenas." [23] This misses the mark. In the record, briefing, and oral argument, Crudup continued to demonstrate his intention to interrogate the DAs about case-specific details. Such testimony would unquestionably require the disclosure of DA work product, which, at a minimum, places the burden on Crudup to show a "substantial need" for the testimony and the inability to obtain its substantial equivalent by other means without "undue hardship."

[10] Addressing the first prong, "substantial need," Crudup contends that he "will not be able to prove an element of his case" (namely, causation) without testimony from the prosecutors. To be sure, granting Crudup access to live DA testimony might improve his chances in court, but improving a civil litigant's odds of winning is not enough. Substantial need is not merely substantial desire. Prosecutors could win more convictions absent the Fifth Amendment, or the priest-penitent privilege, or the marital privilege, but we safeguard these privileges and others because they advance a greater societal good. Like every litigant, Crudup wants to strengthen his lawsuit, understandably so, but that cannot trump a settled privilege and justify a wide-ranging excavation of prosecutorial decision-making.

[11] [12] [13] The second prong is inability to obtain the substantial equivalent of the requested material. As stated above, Crudup cannot win his malicious prosecution suit without showing that false information supplied by the Blanks to the DA's Office caused the DA to prosecute. [24] The DA's Office, however, has already provided Crudup with the substantial equivalent of testimony: it has, pursuant to a subpoena *duces tecum,* turned over its entire prosecution file, which contains notes related to the investigation, sheriff's department complaint reports, Travis Blank's affidavit to the sheriff's department detailing Crudup's alleged threat, and McCabe's log of conversations with Cynthia Blank that ultimately prompted him to dismiss the criminal charges. Many if not all of these documents might come into evidence either through a non-hearsay use or as an **\*189** exception to hearsay. [25] Any false statements made by the Blanks to the DA, for example, would not constitute hearsay if offered for their effect on the listener rather than for the truth of the matter asserted. [26] And Crudup has already taken a deposition on written questions of the DA's custodian

of records in order to establish that the prosecution file contains records of a regularly conducted activity under Rule 803(6). Crudup is not required to produce live testimony from a prosecutor, and he might well be able to prove his case through alternative means, including (1) circumstantial evidence, (2) trial testimony and pretrial discovery from the Blanks, and (3) expert testimony on prosecutorial decision-making and whether the file suggests the DA would not have charged Crudup but for the allegedly false information. Rule 192.5 strikes a sensible balance, recognizing that a lawyer's thoughts are his own and that a party cannot invade every nook and cranny of a lawyer's case preparation, particularly when the "essence" of what the party seeks has already been revealed to him or is readily available. [27] Indeed, while insisting he needs live testimony to prove Blank's malice, Crudup's brief concedes that the prosecution file contains all the evidence he needs: "The notes of District Attorney McCabe clearly indicate the malice of Cynthia Blank."

Understandably, Crudup desires live testimony to fortify his case, but Rule 192.5(b)(2) is not nearly so permissive. Even assuming the testimony sought is non-core work product, Crudup's burden of showing causation in his malicious prosecution suit is insufficient to constitute "substantial need." Nor has Crudup shown an inability to obtain the substantial equivalent of the testimony sought without "undue hardship." If anything, when it comes to affecting Crudup's burdens at trial, the DA's disclosure of its prosecution file did more to alleviate than to aggravate.

### D. The DA Has Not Consented to Testify by Producing the File

Crudup alternatively argues that the DA waived the privilege under Texas Rule of Evidence 511(1) and cannot resist testifying. Again, we disagree. Rule 511(1) provides that a person waives a privilege against disclosure if he "voluntarily discloses or consents to disclosure of any significant part of the privileged matter...." Although the DA's Office turned over its prosecution file without objection, which waived the work-product privilege as to the file's contents, the record is devoid of any indication that by doing so the DA likewise enlisted its current and former personnel to testify in Crudup's malicious prosecution suit regarding their case materials and related impressions and communications. The DA's waiver here is limited, not limitless, and agreeing to produce a prosecution file does not in itself require the DA to produce

its personnel so that their mental processes and related case preparation may be further probed.

We therefore hold on this record, given the protected nature of what Crudup intends to elicit, that the DA's selective disclosure of the prosecution file, while waiving the privilege as to the documents themselves, does not waive the DA's testimonial work-product privilege regarding the prosecutor's mental processes; nor did the DA's file disclosure itself give rise to a **\*190** "substantial need" or "undue hardship" sufficient to overcome the privilege that protects non-core work product.

### III. Conclusion

<mark>Direct prosecutor testimony is not required to prove causation and malice in malicious prosecution suits.</mark> Nor, on this record, did the DA's Office waive its work-product privilege against testifying by producing the prosecution file. Given the nature of what Crudup seeks and his inability to show both "substantial need" and "undue hardship" under Rule 192.5(b)(2), he cannot force DA personnel to discuss their mental processes or other case-related communications and preparation, even if the subpoenaed testimony relates to documents already produced.

We conditionally grant the petition for writ of mandamus and direct the court of appeals to vacate its writ of mandamus and to reinstate the trial court order quashing the subpoenas and issuing a protective order.[28] The writ will issue only if the court of appeals fails to comply.

Justice WILLETT delivered a concurring opinion.

Justice JOHNSON delivered a dissenting opinion, in which Chief Justice JEFFERSON and Justice MEDINA joined.

Justice GREEN did not participate in the decision.

Justice WILLETT, concurring.

Privileges, to be effective, must be predictable; an uncertain privilege, or one subject to widely varying applications, is barely better than no privilege at all.

The United States Supreme Court declared a generation ago, "Although the work-product doctrine most frequently is asserted as a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital."[1] In my view, mandating testimony from DA personnel on these facts would impose an unwarranted burden on our State's finite prosecutorial resources and impede the vigorous deployment of such resources.

When interpreting the rules of procedure and evidence, courts must always be mindful of the mandates of Rule of Civil Procedure 1 and Rule of Evidence 102. The former declares this paramount objective: "to obtain a just, fair, equitable and impartial adjudication ... with as great expedition and dispatch and at the least expense both to the litigants and to the state as may be practicable." The latter states a similar overarching purpose: "to secure ... elimination of unjustifiable expense and delay." These two policy pronouncements, both adopted by this Court, govern construction of the rules and require the promotion of fair and efficient proceedings. And both rules necessarily inform our analysis of whether Texas law permits private plaintiffs to force DA testimony in cases like this.

The DA's Office's brief advances various practical reasons for its view that "turning every prosecutor's office into civil litigants' private investigators and witnesses on the public's dime is not sound public policy." One argument is that allowing malicious prosecution plaintiffs to commandeer DA personnel to testify under a Rule 511 waiver theory would actually cause plaintiffs more problems than it would cure. I agree with the DA's Office that granting **\*191** Crudup's demand for live testimony would, if anything, *exacerbate* evidentiary challenges for future malicious prosecution plaintiffs. District attorneys are chiefly focused on their criminal caseloads—"the primary duty of all prosecuting attorneys ... [is] to see that justice is done"[2]—not on being taxpayer-funded witnesses and investigators in private damages suits. If selective production of a case file effected a sweeping subject-matter waiver that forfeited the testimonial privilege and obliged DAs to endure civil depositions, hearings, and trials while their criminal caseloads languished, prosecutors would simply forswear cooperation altogether and never disclose anything. Plaintiffs like Crudup would then be forced to prove "substantial need" and "undue hardship" for each individual document in the prosecutor's file, a laborious practice that would succeed only in wasting time and expense for the bench and bar alike.

The Court properly limited the scope of the work-product waiver resulting from the DA's disclosure to the documents

In re Bexar County Criminal Dist. Attorney's Office, 224 S.W.3d 182 (2007)

50 Tex. Sup. Ct. J. 733

themselves, not to live testimony concerning the thoughts and communications underlying each document's contents.

I write separately only to make these practical points, which while unnecessary to our holding today, are nonetheless compelling.

Justice JOHNSON, joined by Chief Justice JEFFERSON and Justice MEDINA, dissenting.

The trial court quashed trial subpoenas and granted a protective order shortly before trial was scheduled to start in a malicious prosecution case, effectively excluding all testimony from current and former employees of the Bexar County Criminal District Attorney's office who participated in prosecuting the underlying criminal case. The trial court's action was based on an unsworn "Motion to Quash Trial Subpoenas and For Protective Order" filed by the DA's office and argued by the parties without testimony or evidence. I agree with the court of appeals that based on this record the trial court abused its discretion in quashing the subpoenas.

The Bexar County District Attorney's office filed its unsworn motion in late February 2005 in a malicious prosecution suit filed by David and Annette Crudup. The motion related that DA investigator Al Larry, assistant DA Sylvia Cavazos, and former assistant DA Robert McCabe had been served with subpoenas on behalf of the Crudups to give trial testimony in early March in the 166th District Court in San Antonio. The motion stated that "The [DA's] Office objects, on its behalf and on behalf of these individuals, to their required appearance and testimony based on the work product privilege." By its motion the DA's office claimed that testimony based on the individuals' work or by reference to the DA's records should be found privileged; that the mental impressions, opinions, conclusions, legal theories and strategies of an attorney and the attorney's employees which were "prepared in anticipation of litigation or for trial" were privileged; and that the DA's entire litigation file was privileged.[1] The motion requested that the subpoenas be quashed **\*192** and a protective order granted. The motion did not mention that the DA's litigation case file had been produced in August 2003 in response to a subpoena *duces tecum* or that an assistant DA had given a deposition on written questions at that time to prove the file as a business record. Nor did the motion claim that (1) the file had been involuntarily or mistakenly disclosed; (2) testimony of the subpoenaed witnesses would not be relevant to the civil suit or that the witnesses did not possess knowledge of facts

relevant to the suit; (3) there had been other instances of DA employees or attorneys having been subpoenaed to give testimony in malicious prosecution cases and that testifying in such suits was becoming burdensome; or (4) the witnesses' attendance at court in this particular suit would disrupt the work of the DA's office.[2] McCabe, who no longer worked for the DA, did not urge that his attendance at court would work a hardship or that he needed some accommodation as to the time or date of his attending court.

The Crudups' response asserted, in part, that (1) the subpoenaed individuals were fact witnesses based on their having had conversations with real party in interest Cindy Blank and testimony about such conversations was not privileged; (2) even if some documents in the DA's file might ordinarily be privileged work product, not all documents in the file would be privileged as work product; and (3) the DA's entire file had already been produced in response to a subpoena *duces tecum,* had been on file in the civil case for over a year, and any privilege which might otherwise exist as to the contents of the file was waived. A copy of the DA's case file and the written deposition questions and answers proving it up were attached to the response. Following a hearing at which no evidence was introduced, the trial court quashed the subpoenas.

The DA's argument relies to a significant degree on our opinion in *State ex rel. Curry v. Walker,* 873 S.W.2d 379 (Tex.1994). The DA cites *Walker* in support of its position that the work-product privilege exempts its entire litigation case file from discovery. In *Walker* a subpoena *duces tecum* was issued for:

> Any and all records, books, papers, documents written memoranda [sic], handwritten notes, photographs and videotapes, including but not limited to the entire file(s) in your possession or under your custody or control, indictments, arrest records, investigation, punishment evidence, forensics, internal correspondence and memos regarding the arrest and subsequent conviction of [NAME OF DEFENDANT] on September 27, 1993.

*Id.* at 380.

In re Bexar County Criminal Dist. Attorney's Office, 224 S.W.3d 182 (2007)

50 Tex. Sup. Ct. J. 733

Before the file was produced in *Walker* the DA moved to quash the subpoena and for a protective order. The trial court examined the DA's files *in camera,* directed that certain documents comprising work product be withheld and directed production of the remaining documents, including police reports, court documents, photographs, etc. We conditionally granted a writ directing the trial court to rescind that part of its order denying the DA's motion to quash. In doing so, we stated:

> In effect, this requires the District Attorney to produce his entire litigation file, except for documents involving direct communications. This order is too broad. In *National Union Fire Insurance* **\*193** *Co. v. Valdez,* 863 S.W.2d 458, 460 (Tex.1993, orig. proceeding), we stated that "[a]n attorney's litigation file goes to the heart of the privileged work area guaranteed by the work product exemption. The organization of the file, as well as the decision as to what to include in it, necessarily reveals the attorney's thought processes concerning the prosecution or defense of the case."

*Id.* The DA's reliance on *Walker* is misplaced. [3]

First, in the case before us the file was produced over a year before the DA filed the motion to quash. The subpoena *duces tecum* pursuant to which the Bexar County DA's office produced its file in 2003 required the production of all records relating to, and the case file for, the prosecution of David Crudup. The testimony of the assistant DA in response to the subpoena was that all the requested records had been produced. To the extent that the DA's work product was disclosed by documents, notes, trial preparatory memoranda, organization of the case file or in any other way by the file, the privilege was waived long before the DA's motion was filed in February 2005. *See* TEX.R. EVID. 511(1); *Axelson, Inc. v. McIlhany,* 798 S.W.2d 550, 554 (Tex.1990).

Second, the objects of the DA's motion to quash were witnesses. The work product privilege precludes testimony or discovery as to types of information; it does not make persons privileged from testifying. Witnesses are not the same as documents. Documents have fixed contents that can be analyzed to determine whether the documents and their contents are privileged. But the full knowledge of a witness as to facts and matters relevant to claims made in a lawsuit can hardly ever be known, and the testimony of a witness is not fixed until after the witness has completed testifying. It is only while witnesses are testifying or after they have testified that the admissibility or privileged nature of their testimony can

be determined. Witnesses occasionally are instructed, upon timely and proper motion, not to answer certain questions because the questions seek testimony as to matters which are privileged or are otherwise inadmissible. But if the questions are rephrased the witnesses then may sometimes be allowed to answer. Lawyers may be instructed not to ask witnesses about certain matters, such as privileged work product, but that does not preclude lawyers from asking, and witnesses from testifying about, other matters. [4] For example, testimony as to general procedures such as procedures of the DA's office for intake of criminal complaints, processing of those complaints, whether investigation is made into the facts of cases before criminal proceedings are instituted, and whether contacts are typically made with complaining witnesses before criminal proceedings are begun, during the proceedings, or after the proceedings are completed would not be work product as to the Crudup prosecution. Yet such testimony was encompassed by the DA's motion and is precluded by the trial court's order.

There is no rule that gives an attorney or an attorney's employees a privilege **\*194** from being called to testify. Texas Rule of Evidence 501 provides that:

> Except as otherwise provided by Constitution, by statute, by these rules, or by other rules prescribed pursuant to statutory authority, no person has a privilege to:
>
> (1) refuse to be a witness;
>
> (2) refuse to disclose any matter;
>
> (3) refuse to produce any object or writing; or
>
> (4) prevent another from being a witness or disclosing any matter or producing any object or writing.

Privileges are addressed in Article V of the Texas Rules of Evidence. The DA's office does not cite a provision of Article V, any rule, or a Constitutional or statutory provision which allows its attorneys and employees to be completely exempted from attending court or testifying as to facts or relevant matters within their knowledge. The DA cites an exemption only for testimony as to one area: work product. The work product privilege in our rules of civil procedure allows the DA employees to be protected from testifying as to the subject matter of their work product and that protection continues past termination of the criminal case and applies in a situation such as that before us. *Owens–Corning Fiberglas Corp. v. Caldwell,* 818 S.W.2d 749, 751–52 (Tex.1991). However, the privilege is not a general exemption from being

**In re Bexar County Criminal Dist. Attorney's Office, 224 S.W.3d 182 (2007)**

50 Tex. Sup. Ct. J. 733

called as a witness. It is limited and as relevant here extends to (1) material prepared or mental impressions developed in anticipation of litigation or for trial by or for a party or a party's representatives, including the party's attorneys, consultants, employees, or agents; or (2) communications made in anticipation of litigation or for trial between a party and the party's representatives or among a party's representatives, including the party's attorneys, consultants, employees, or agents. *See* TEX.R. CIV. P. 192.5(a). The privilege does not extend to protecting facts the attorney or the attorney's representatives may acquire. *Owens–Corning Fiberglas Corp.,* 818 S.W.2d at 750 and n. 2; *Axelson,* 798 S.W.2d at 554.

In *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), cited by the Court, the United States Supreme Court addressed the question of whether either written witness statements in possession of, or oral witness statements made to, an attorney in the case at bar had to be produced to opposing parties in response to a pretrial discovery request. The witness statements being discussed were not made by a non-client witness to an attorney in another case, as is the situation with the Crudups, nor were the witness statements asserted to be evidence in another proceeding. They were witness statements taken by an attorney as part of trial preparation in the case in which the discovery was sought. In addressing disclosure of any such oral witness statements, the *Hickman* Court noted that:

> Such testimony could not qualify as evidence; and to use it for impeachment or corroborative purposes would make the attorney much less an officer of the court and much more an ordinary witness.... Denial of production of this nature does not mean that any material, non-privileged facts can be hidden from the petitioner in this case.

*Id.* at 513, 67 S.Ct. 385. In a concurring opinion, Justice Jackson noted that the question of depriving a litigant of *evidence* was not involved:

> It seems clear and long has been recognized that discovery should provide a party access to anything that is evidence in his case. It seems equally clear that discovery should not nullify the privilege of confidential

communication between attorney and client. But those principles **\*195** give us no real assistance here because what is being sought is neither evidence nor is it a privileged communication between attorney and client.

*Id.* at 515–16, 67 S.Ct. 385 (Jackson, J., concurring) (citation omitted). As to statements signed or written by witnesses, "Such statements are not evidence for the defendant.... Nor should I think they ordinarily could be evidence for the plaintiff." *Id.* at 519, 67 S.Ct. 385.

In *United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), the Supreme Court addressed the work-product privilege as to an investigator's report when the investigator was called as a witness in the criminal trial. The Court held that under the circumstances the privilege was waived. *Id.* at 239–40, 95 S.Ct. 2160. Justice White, in a concurring opinion joined by then-Justice Rehnquist, questioned the Court's reaching the "waiver" issue before determining what protection the report had in the first instance. Justice White opined that the work-product doctrine of *Hickman* could not be

> extended wholesale from its historic role as a limitation on the nonevidentiary material which may be the subject of pretrial discovery to an unprecedented role as a limitation on the trial judge's power to compel production of evidentiary matter at trial....

> [T]he work-product doctrine of *Hickman v. Taylor, supra,* has been viewed almost exclusively as a limitation on the ability of a party to obtain pretrial discovery. It has not been viewed as a "limitation on the broad discretion as to evidentiary questions at trial."

*Id.* at 242–43, 95 S.Ct. 2160 (White, J., concurring). As to the work-product privilege and trial evidence Justice White continued:

> Indeed, even in the pretrial discovery area in which the work-product rule does apply, work-product notions have been thought insufficient to prevent discovery of *evidentiary and impeachment* material. In *Hickman v. Taylor,* 329 U.S. at 511, 67 S.Ct. 385, the Court stated: "... Where relevant and nonprivileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had...." Pursuant to this language, the lower courts have ordered evidence to be turned over pretrial even

In re Bexar County Criminal Dist. Attorney's Office, 224 S.W.3d 182 (2007)

50 Tex. Sup. Ct. J. 733

when it came into being as a result of the adversary's efforts in preparation for trial ...

Accordingly, it would appear that with one exception to be discussed below, the work-product notions of *Hickman v. Taylor, supra,* impose no restrictions on the trial judge's ordering production of evidentiary matter at trial; that these notions apply in only a very limited way, if at all, to a party's efforts to obtain evidence pretrial pursuant to discovery devices....

*Id.* at 249–51, 95 S.Ct. 2160 (emphasis in original). Justice White then referenced an example of such a disclosable fact: "A member of a defense team [who] witnesses an out-of-court statement of someone who later testifies at trial in a contradictory fashion becomes at that moment a witness to a relevant and admissible event...." *Id.* at 250, 95 S.Ct. 2160. Although Justice White was addressing whether notes of the defense team member concerning the witness's statement should be disclosed in the trial for which the notes were prepared, a matter on which Texas and federal procedure might differ, the substance of his example applies to the situation before us. Attorneys and members of an attorney's trial-preparation team may in some circumstances be fact witnesses to matters and events.

 **\*196** Furthermore, to the extent a work product privilege exists, it can be waived. *Nobles,* 422 U.S. at 239, 95 S.Ct. 2160. Texas rules and practice are in accord. If a privilege applies, it is waived if the "person or a predecessor of the person while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter unless such disclosure is itself privileged." TEX.R. EVID. 511(1); *see Axelson,* 798 S.W.2d at 554.

In disputes such as this, the burden of proceeding and producing evidence must be on one of the parties. The trial court effectively placed the burden on the Crudups to show why the DA's attorneys and employees should be required to testify and what information or facts would be elicited from them. That is different from the placement of the burden by Texas Rule of Evidence 501 and our prior cases. We have previously required the party resisting testifying or having its employees testify to shoulder the burden of properly asserting a privilege and showing that it applied to the testimony in question. *See Huie v. DeShazo,* 922 S.W.2d 920, 926 (Tex.1996) (orig. proceeding); *Peeples v. Honorable Fourth Supreme Judicial Dist.,* 701 S.W.2d 635, 637 (Tex.1985) (orig. proceeding); *Giffin v. Smith,* 688 S.W.2d 112, 114 (Tex.1985) (orig. proceeding). *See also* TEX.R. CIV. P. 199.6

(providing that a party seeking to avoid having a witness give deposition testimony on the basis of privilege is required to provide evidence to support the claim of privilege in the form of testimony or affidavits served before hearing on the privilege claim). The quashed subpoenas in this case were not discovery inquiries requesting the DA's office to disclose specific information to which the motion for protective order was directed. They were trial subpoenas which would require the witnesses to testify generally. At a minimum the trial court should have required the DA's office to show what particular knowledge and information possessed by its employees was work product for which the privilege had not been waived. It then could have limited the Crudups' inquiries pending further development of a record. Because this record is clear that the DA did not make any such showing, the DA's employees were not entitled by law or rule to refuse to be witnesses and testify, even if some testimony as to their knowledge, information, and mental processes was later properly excluded upon objection. TEX.R. EVID. 501(1), (2); 511(1). Nor was the DA's office entitled to prevent its employees from being witnesses and testifying absent such showing. TEX.R. EVID. 501(4).

The Court concludes that conversations between the DA's office and Blank during the course of the criminal charge investigation were work product. But Blank was a non-party to the criminal proceeding and was not an employee of the state. The DA's office did not offer any proof that more conversations between Blank and DA employees took place than were memorialized by the DA's file. Apart from information disclosed by notes in the DA's file, for which the privilege had been waived by disclosure, the content of statements made by Blank to the DA's employees, if any, might be work product. *See* TEX.R. CIV. P. 192.3(h). But even in the absence of a record showing there were more conversations between Blank and the employees than are disclosed in the DA's file and assuming there were, statements made by the DA's employees to Blank arguably, if not conclusively, were not privileged. The DA's office did not show that any conversations between its employees and Blank not memorialized in its litigation file included work product, that is, either (1) material prepared by the DA's office or its employees for, or mental impressions of its **\*197** employees developed in anticipation of, the criminal trial; or (2) communications made in preparation for the criminal trial between a party and the party's representatives. *See* TEX.R. CIV. P. 192.5(a). If the DA's employee's statements to Blank did not include work product, the statements were not privileged to start with. If the statements to Blank disclosed

In re Bexar County Criminal Dist. Attorney's Office, 224 S.W.3d 182 (2007)

50 Tex. Sup. Ct. J. 733

work product, the privilege as to the material disclosed was presumptively waived and the DA would have had the burden to prove or show why the conversations did not effect a waiver of privilege as to the disclosed matters. *See* TEX.R. EVID. 511(1); *Jordan v. Court of Appeals for Fourth Supreme Judicial Dist.,* 701 S.W.2d 644, 648–49 (Tex.1985) (orig. proceeding); *see also Axelson,* 798 S.W.2d at 553–54 ("Since there was evidence that the investigation [which was being claimed as privileged work product] was disclosed to the FBI, IRS, and the *Wall Street Journal,* the court of appeals properly held that these privileges had been waived."); *Nat'l Union Fire Ins. Co. v. Hoffman,* 746 S.W.2d 305, 311 (Tex.App.-Dallas 1988) (orig. proceeding). And, to the extent that documents memorializing the conversations had been produced and the privilege as to their contents thereby waived, the DA's employees had no privilege to refuse to testify about them. *See* TEX.R. EVID. 501; *Hoffman,* 746 S.W.2d at 311 (holding that attorneys who authored letter to client which had been disclosed could be examined about the letter despite claim of attorney-client privilege).

Because the Crudups' response raised the question of disclosure of the DA's work product both by disclosure of the DA's litigation file and by its employees' conversations with Blank, the question of waiver of privilege was raised and the DA had the burden of proving that no waiver occurred. *See Jordan,* 701 S.W.2d at 648–49. Even though the Crudups did not have the burden to proceed, given the state of the record, their response to the motion specifically set out some reasons the DA's motion should be denied. As noted above, those reasons included assertions that (1) the subpoenaed witnesses were fact witnesses because they had conversations with real party in interest Cindy Blank and testimony about those conversations was not privileged; and (2) prior production of the DA's file waived any privilege as to contents of the file. The Crudups provided support for their response: a copy of the DA's file. The file contains, among other matters, a report from investigator Larry and notes documenting progress of the prosecution and conversations between Blank and assistant DAs handling the case. At least one of the conversations took place after the criminal proceeding was dismissed. As previously noted, the DA was representing the State in the criminal proceeding against David Crudup; Blank was neither a party to the proceeding nor an employee of the state; and the DA did not prove any reason that the content of its employees' conversations with such a non-party witness was privileged work product. If the DA's employees disclosed work product to Blank in the conversations or by disclosure of the file and if either disclosure was significant, then waiver

may have occurred as to more of the DA's work product than just the amount disclosed. *See* TEX.R. EVID. 511(1). Intuitively, one could speculate that there remained some of the DA's work product for which the privilege had not been waived. But speculation is not sufficient: proof is required.

In their motion for reconsideration of the trial court's order, the Crudups attached and quoted individual notes from the DA's file setting out the contents of a conversation between Blank and the assistant DA handling the prosecution. They **\*198** again urged that the contents of notes reflecting conversations were a proper subject of testimony from the subpoenaed witnesses. The DA's office still did not attempt to show authority for or offer evidence to support its employees being exempt from giving testimony as to contents of the notes. The trial court denied the Crudups' motion to reconsider.

The quashing of subpoenas by the trial court on this record turned the procedure for protecting privileged work product upside down. Instead of the DA having to show why its employees who had knowledge of relevant matters should be protected from testifying, the Crudups' attorney had to try to preserve his clients' right to call witnesses by disclosing *his* work product in pleadings and argument in the trial court and setting out testimony he wanted to elicit from the subpoenaed employees. He has had to continue that course through two appellate court proceedings.

Unlike the situation in *Walker* where the district attorney challenged an overly broad subpoena and court order, here it was the DA's office that made an overly broad request seeking an order from the trial court permitting witnesses to refuse to give testimony. *See* TEX. R. EVID. 501; *Walker,* 873 S.W.2d at 380. If the DA's office had sought only to preclude testimony as to work product, the privileged nature of the subject matter might not have required much, if any, proof. The trial court could have entered a protective order precluding the Crudups' attorney from inquiring into certain matters pending further orders of the court. Then as the trial proceeded the court would have had the benefit of at least some record on which to base its decision as to both the existence of privilege as to the subject matter and whether waiver of the privilege as to the specific testimony sought had occurred. When the DA's office ended its pretrial presentation in the trial court without providing proof that all of the testimony the subpoenaed witnesses could give would be work product for which the privilege had not been waived, however, that should have been the end of the matter as to

In re Bexar County Criminal Dist. Attorney's Office, 224 S.W.3d 182 (2007)

50 Tex. Sup. Ct. J. 733

the motion to quash. There was no evidence to support the trial court's order which effectively granted a privilege to the DA's employees and attorneys from testifying at all, and the motion should have been denied. *See* TEX.R. EVID. 501. The motion should have been denied also because the question of waiver of the privilege by disclosure was raised and there was not evidence that waiver had not occurred. *See* TEX.R. EVID. 511(1).

A quote from the United States Supreme Court which we have previously referenced is applicable here:

> "Proper presentation of a client's case demands that (the attorney) assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference."

*Nat'l Union Fire Ins. Co. v. Valdez,* 863 S.W.2d 458, 461 (Tex.1993) (quoting *Hickman,* 329 U.S. at 511, 67 S.Ct. 385). Much evidence can be presented in different ways. For example, records of events can be read or witnesses can be called to testify as to the matters covered by the records; witnesses can be called live or by reading depositions; or several witnesses can be called to present evidence (hopefully non-repetitiously) which could be presented by one witness when the impact of calling multiple witnesses will be greater in the trial lawyer's judgment than using only one witness to tell the story. Decisions about how evidence will be presented at trial so as to maximize the client's chances of prevailing are among the most **\*199** important a trial lawyer must make. In this case the trial court's order unduly interfered with the Crudups' attorney's trial preparation and forecloses certain choices as to how his client's case can be presented at trial. Among other problems it creates, the trial court's order (1) impairs the Crudups' attorney's ability to determine how best to present the Crudups' case to the jury because he cannot count on having the subpoenaed witnesses (or any other witness from the DA's office) available to testify; (2) forecloses the Crudups' attorney from using live testimony to present and explain matters disclosed by the DA's file such as the dates of contact with Blank, the substance of conversations with her and both the existence and substance of reports from police officers and investigators; and (3) keeps the Crudups' attorney from asking DA employees to interpret notes they made in the case file, or even whether records of all conversations with complaining witnesses were made.

The Crudups' counsel has maintained that he planned to prove that the complaint made by the Blanks to the DA was false and that the DA would not have filed the criminal proceedings absent the false complaint. Maybe he can; maybe he can't. But counsel was entitled to formulate and pursue trial strategy without having it limited by a preemptive exclusion of certain witnesses with knowledge of relevant matters or having to disclose his strategy and justify it in pretrial and appellate proceedings simply because the DA's office filed a motion such as the one it filed.

I would deny the relief sought by the DA's office. *See State v. Biggers,* 360 S.W.2d 516, 517 (Tex.1962).

**All Citations**

224 S.W.3d 182, 50 Tex. Sup. Ct. J. 733

Footnotes

1     179 S.W.3d 47, 51.

2     This crime ranges from a Class B misdemeanor to a state jail felony depending upon the circumstances of the threat. *See* TEX. PENAL CODE § 22.07.

3     126 S.W.3d 75 (Tex.2003) (per curiam).

4     179 S.W.3d at 50.

5     *In re Prudential Ins. Co.,* 148 S.W.3d 124, 135–36 (Tex.2004) (orig. proceeding); *Walker v. Packer,* 827 S.W.2d 833, 839–40 (Tex.1992) (orig. proceeding).

6     *Prudential,* 148 S.W.3d at 135 (citing *Huie v. DeShazo,* 922 S.W.2d 920, 927–28 (Tex.1996)).

7     *In re Ford Motor Co.,* 211 S.W.3d 295, 298 (Tex.2006) (per curiam) (orig. proceeding); *In re Bass,* 113 S.W.3d 735, 745 (Tex.2003) (orig. proceeding).

8     126 S.W.3d at 78.

9     *See id.* at 76; *see also Browning–Ferris Indus., Inc. v. Lieck,* 881 S.W.2d 288, 292–93 (Tex.1994) (citing RESTATEMENT (SECOND) OF TORTS § 653 cmt. g (1977)).

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

10    126 S.W.3d at 78–79.

11    *Id.* at 78 (emphasis added).

12    *Id.*

13    329 U.S. 495, 509, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

14    TEX.R. CIV. P. 192.5(a)(1).

15    *Owens–Corning Fiberglas Corp. v. Caldwell,* 818 S.W.2d 749, 750 (Tex.1991) (orig. proceeding) (citing *Axelson, Inc. v. McIlhany,* 798 S.W.2d 550, 554 (Tex.1990)).

16    *Id.* at 751–52.

17    TEX.R. CIV. P. 192.5(b)(1).

18    *Nat'l Union Fire Ins. Co. v. Valdez,* 863 S.W.2d 458, 460 (Tex.1993) (orig. proceeding) (citing *Hickman,* 329 U.S. at 511, 67 S.Ct. 385).

19    *See* TEX.R. EVID. 503.

20    *See* TEX.R. CIV. P. 192.5(a)(1)-(2); *Hickman,* 329 U.S. at 512–13, 67 S.Ct. 385.

21    Rule 192.5(c) provides exceptions to the work-product privilege for:
      (1) information discoverable under Rule 192.3 concerning experts, trial witnesses, witness statements, and contentions; (2) trial exhibits ordered disclosed under Rule 166 or Rule 190.4; (3) the name, address, and telephone number of any potential party or any person with knowledge of relevant facts; (4) any photograph or electronic image of underlying facts (e.g., a photograph of the accident scene) or a photograph or electronic image of any sort that a party intends to offer into evidence; and (5) any work product created under circumstances within an exception to the attorney-client privilege in Rule 503(d) of the Rules of Evidence.
      A "witness statement" under Rule 192.3(h) includes signed witness statements and recorded statements, but does not include "[n]otes taken during a conversation or interview with a witness."

22    TEX.R. CIV. P. 192.5(b)(2).

23    179 S.W.3d at 51.

24    *See King,* 126 S.W.3d at 78.

25    *See* TEX.R. EVID. 801(e)(2) (admission by party-opponent); *id.* 803(6) (records of regularly conducted activity); *id.* 803(8)(A), (C) (public records and reports).

26    *See id.* 801(d).

27    *See Hickman,* 329 U.S. at 509, 67 S.Ct. 385.

28    *See* TEX.R.APP. P. 52.8(c).

1    *United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).

2    TEX.CODE CRIM. PROC. art. 2.01.

1    The DA's motion arguably sought protection for the contents of its case file. The trial court's order granted the motion without specifying whether the material in the DA's case file was going to be excluded from evidence as work product or whether the court only quashed the trial subpoenas. The DA disclaims any issue as to the documents which were produced and asserts that the only issue is whether the subpoenas were properly quashed.

2    The motion was signed by an Assistant Civil Division DA whose address was listed as 300 Dolorosa in San Antonio. The record gives the address of the Bexar County Courthouse as 100 Dolorosa—apparently a short distance from the DA's office.

3    Even though *Walker* dealt with discovery matters and the case before us deals with trial testimony, neither party contends that the principles to be applied in determining privilege and waiver are different in the different settings. Both parties rely on cases involving discovery matters.

4    *See* TEX.R. CIV. P. 199.5(d)-(g) and 199.6 as to conduct of oral depositions and assertion of privilege from testifying.

---

**End of Document**          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

FF

KeyCite Yellow Flag - Negative Treatment
Distinguished by In re Transit Mix Concrete & Materials Co.,
Tex.App.-Tyler, May 14, 2014

320 S.W.3d 402
Court of Appeals of Texas,
El Paso.

In re: BROKERS LOGISTICS, LTD. (f/
k/a Brokers Logistics, Inc.) and Brokers
Logistics Genpar, L.L.C. (General Partner
of Brokers Logistics, Ltd.), Relators.

No. 08–09–00086–CV. | May 19,
2010. | Rehearing Overruled July 7, 2010.

**Synopsis**
**Background:** Worker who was injured while making
delivery on premises in course and scope of his employment
filed suit against premises owners, seeking to recover for his
injuries. Owners filed motion for leave to designate physician
as a responsible third party, alleging that physician's
negligence in treating worker's knee injuries caused worker's
injuries, which motion was granted. Thereafter, worker filed
motion to strike the designation of physician as a responsible
third party. The 34th District Court, El Paso County, William
E. Moody, J., granted motion. Owners filed petition for writ
of mandamus, challenging this ruling.

**Holdings:** The Court of Appeals, Ann Crawford McClure, J.,
held that:

[1] owners produced sufficient evidence to raise a genuine
issue of fact regarding physician's responsibility for at least a
portion of worker's injuries or damages, and

[2] owners had no adequate remedy by appeal.

Petition conditionally granted.

West Headnotes (8)

[1] **Mandamus**
 Remedy by Appeal or Writ of Error

**Mandamus**
 Matters of discretion

To be entitled to mandamus relief, a relator must
show the trial court clearly abused its discretion
and he must demonstrate that he has no adequate
remedy by appeal.

1 Cases that cite this headnote

[2] **Antitrust and Trade Regulation**
 Parties

**Negligence**
 Nature of conduct to which doctrine
applies; what constitutes "fault"

Under statute governing the designation of
a responsible third party for purposes of
apportioning responsibility in tort and deceptive
trade practice actions, which permits party to
move to strike designation of a responsible third
party on the ground that there is no evidence
that the designated person is responsible for
any portion of the claimant's alleged injury or
damages, the legislature did not intend for a
responsible third party designation to be struck
on any ground other than the one contained in
the statute. V.T.C.A., Civil Practice & Remedies
Code § 33.004(*l* ).

9 Cases that cite this headnote

[3] **Damages**
 Aggravation of previous injury, disease, or
disability

Premises owners produced sufficient evidence to
raise a genuine issue of fact regarding physician's
responsibility for at least a portion of worker's
injuries or damages, arising out of worker being
injured on premises while making a delivery
in course and scope of his employment, such
that trial court was not justified in striking
the designation of physician as a responsible
third party in worker's suit against owners, in
which owners alleged that physician's negligence
in treating worker's injuries caused workers'
damages; owners' expert report stated that
physician's treatment of worker's knee injury
was excessive, unnecessary, and more likely
than not contributed to a rapid chondrolysis of

the articular surfaces of the knee resulting in a total knee replacement, and expert also believed that the steroidal treatments possibly resulted in immune compromise and may have led to post-operative infection. V.T.C.A., Civil Practice & Remedies Code § 33.004(*l* ).

1 Cases that cite this headnote

**[4]    Mandamus**
　🔑 Modification or vacation of judgment or order

Premises owners, on whose premises worker was injured while making a delivery in the course and scope of his employment, had no adequate remedy by appeal with respect to trial court's erroneous order striking designation of physician as a responsible third party in worker's suit against owners, in which owners alleged that physician's negligence in treating worker's injuries caused workers' damages, and, thus, mandamus relief, compelling trial court to set aside order, was appropriate; denial of owners' right to designate physician as responsible third party would skew proceedings, potentially affect outcome of case, and compromise presentation of owners' defense in ways unlikely to be apparent in appellate record. V.T.C.A., Civil Practice & Remedies Code § 33.004(*l* ).

9 Cases that cite this headnote

**[5]    Mandamus**
　🔑 Remedy by Appeal or Writ of Error

The adequacy of an appellate remedy must be determined by balancing the benefits of mandamus review against the detriments; in evaluating benefits and detriments, the appellate court considers whether mandamus will preserve important substantive and procedural rights from impairment or loss.

1 Cases that cite this headnote

**[6]    Mandamus**
　🔑 Remedy by Appeal or Writ of Error

In determining adequacy of an appellate remedy for mandamus purposes, the appellate court

considers whether mandamus review will allow the appellate court to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments.

Cases that cite this headnote

**[7]    Mandamus**
　🔑 Remedy by Appeal or Writ of Error

In determining adequacy of an appellate remedy for mandamus purposes, appellate court must consider whether mandamus will spare litigants and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings.

Cases that cite this headnote

**[8]    Mandamus**
　🔑 Remedy by Appeal or Writ of Error

Where a trial court's error will cause a waste of judicial resources, an appellate court may properly consider that factor in determining the adequacy of an appeal to remedy the error in question for mandamus purposes.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*404**  Steven L. Hughes, Mounce, Green, Myers, Safi, Paxson & Galatzan, El Paso, TX, for Relator.

John P. Mobbs, Attorney at Law, El Paso, TX, for Real Party in Interest.

Before CHEW, C.J., McCLURE, J., and ANTCLIFF, Judge.

*OPINION ON PETITION FOR WRIT OF MANDAMUS*

ANN CRAWFORD McCLURE, Justice.

Relators seek a writ of mandamus against the Honorable William E. Moody, Presiding Judge of the 34th District Court of El Paso County, Texas, to compel him to set aside an order striking the designation of Dr. Randy J. Pollet as a responsible third party. We conditionally grant relief.

## FACTUAL SUMMARY

The real party in interest, Rafael Martinez, filed suit against Relators alleging he was injured on the premises while making a delivery in the course and scope of his employment with Aeroground. Relators filed a motion for leave to designate Randy Pollet, M.D. as a responsible third party under Section 33.004 of the Civil Practice and Remedies Code, alleging that Dr. Pollet's negligence in treating Martinez's injuries caused Martinez's damages. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 33.004(a)(Vernon 2008). Relators based their designation on an expert report prepared by William Blair, M.D. The trial court granted the motion and designated Dr. Pollet as a responsible third party. As permitted by Section 33.004, Martinez amended his petition within sixty days of the designation to include a negligence claim against Dr. Pollet. [1] When Martinez did not file an expert report and *curriculum vitae* within 120 days after filing his claims against Dr. Pollet, Dr. Pollet filed a motion to dismiss pursuant to Section 74.351(b) of the Civil Practice and Remedies Code. Dr. Pollet also filed a motion for summary judgment on the ground that the two-year statute of limitations had expired. During this same time period, Martinez filed a motion to strike the designation of Dr. Pollet on the ground that Relators had not produced sufficient evidence to raise a genuine issue of fact regarding Dr. Pollet's responsibility for Martinez's injuries or damages. Initially, the trial court took Dr. Pollet's motion to dismiss and Martinez's motion to strike the designation under advisement pending discovery. Dr. Pollet challenged the trial court's failure to rule by filing a writ of mandamus and we conditionally granted relief on September 25, 2008. *See In re Randy J. Pollet, M.D.,* 281 S.W.3d 532 (Tex.App.-El Paso 2008, orig. proceeding).

On January 6, 2009, the trial court conducted a hearing on Dr. Pollet's motion to quash the deposition of Dr. Blair. During this hearing, the trial court expressed a number of concerns about the responsible third party designation being unfair to Dr. **\*405** Pollet. First, Dr. Pollet's insurance carrier could take the position it did not have a duty to defend, and if the jury found Dr. Pollet was 90 percent responsible, then Dr. Pollet would have a judgment against him for medical malpractice and the insurance company could raise Dr. Pollet's premiums. Second, Dr. Pollet's medical license could be at risk in the event there was a judgment against him. A few days after this hearing, Martinez filed another motion to strike the designation because "there is no liability or responsibility of Dr. Randy J. Pollet under the Health Care Liability Act." Echoing what Judge Moody had stated at the previous hearing, Martinez also alleged that permitting Relators to hold Dr. Pollet liable "would subject Dr. Pollet to potential licensure issues without being able to defend himself against his accuser, Dr. Blair." At the conclusion of a hearing held on February 12, 2009, Judge Moody orally granted Dr. Pollet's motion to dismiss Martinez's suit against him. [2] Following entry of a written order dismissing Martinez's suit against Dr. Pollet and severing that portion of the case into a new cause number, Martinez filed notice of appeal. The trial court also granted Martinez's motion to strike the designation of Dr. Pollet without specifying the basis for the ruling. Relators filed a mandamus petition to challenge the trial court's order striking the designation. This mandamus proceeding does not concern the dismissal of Martinez's claims against Dr. Pollet. [3]

## RESPONSIBLE THIRD PARTY DESIGNATION

In their sole issue, Relators contend that the trial court abused its discretion by striking the designation of Dr. Pollet as a responsible third party. Because Judge Moody did not specify the basis for his ruling, Relators must show that the ruling cannot be upheld on any ground asserted by Martinez in his motion to strike the designation.

 **[1]**    To be entitled to mandamus relief, a relator must meet two requirements. First, it must show the trial court clearly abused its discretion. *In re Prudential Insurance Company of America,* 148 S.W.3d 124, 135 (Tex.2004). Second, the relator must demonstrate it has no adequate remedy by appeal. *Id.* at 136.

A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *In re Ford Motor Company,* 165 S.W.3d 315, 317 (Tex.2005). When reviewing the trial court's decision for an abuse of discretion, the reviewing court may not substitute its judgment for that of the trial court with respect to resolution of factual issues or matters committed to the trial court's discretion. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex.1985); *see Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992). Review of the trial court's determination of the legal principles controlling its ruling is much less deferential. *Walker,* 827 S.W.2d at 840. A trial court has no discretion in determining what the law is or applying the law to the facts, even when the law is unsettled.

*In re Prudential,* 148 S.W.3d at 135. A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Walker,* 827 S.W.2d at 840.

### *Clear Abuse of Discretion*

Chapter 33 sets forth the statutory scheme for the apportionment of responsibility **\*406** in tort and deceptive trade practice actions. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 33.003. Section 33.004(a) of the Civil Practice and Remedies Code provides:

> A defendant may seek to designate a person as a responsible third party by filing a motion for leave to designate that person as a responsible third party. The motion must be filed on or before the 60th day before the trial date unless the court finds good cause to allow the motion to be filed at a later date.

TEX.CIV.PRAC. & REM.CODE ANN. § 33.004(a). A court is required to grant leave to designate the named person as a responsible third party unless another party files an objection on or before the 15th day after the date the motion is served. TEX.CIV.PRAC. & REM.CODE ANN. § 33.004(f). If an objection is timely filed, the court shall grant leave to designate unless the objecting party establishes: (1) the defendant did not plead sufficient facts concerning the alleged responsibility of the person to satisfy the pleading requirement of the Texas Rules of Civil Procedure; and (2) after having been granted leave to replead, the defendant failed to plead sufficient facts. TEX.CIV.PRAC. & REM.CODE ANN. § 33.004(g). By granting a motion for leave to designate a person as a responsible third party, the person named in the motion is designated as a responsible third party for purposes of the Proportionate Responsibility Chapter of the Civil Practice and Remedies Code without further action by the court or any party. TEX.CIV.PRAC. & REM.CODE ANN. § 33.004(h).

After adequate time for discovery, a party may move to strike the designation of a responsible third party on the ground that there is no evidence that the designated person is responsible for any portion of the claimant's alleged injury or damages. TEX.CIV.PRAC. & REM.CODE ANN. § 33.004(*l* ). The court is required to grant the motion to strike unless a defendant produces sufficient evidence to raise a genuine issue of fact regarding the designated person's responsibility for the claimant's injury or damages. *Id.*

The mandamus record reflects that Martinez filed an untimely objection to Relators' motion for leave to designate Dr. Pollet as a responsible third party.[4] Thus, the trial court complied with the mandate of Section 33.004(f) by entering an order which designated Dr. Pollet as responsible third party. Once Dr. Pollet was designated as a responsible third party, the only statutory ground for striking the designation is that "there is no evidence that the designated person is responsible for any portion of the claimant's alleged injury or damage." TEX.CIV.PRAC. & REM.CODE ANN. § 33.004(*l* ). Martinez asserted non-statutory grounds in his motion to strike the designation and the trial court certainly expressed concern at various hearings about the potential negative and unfair consequences of permitting the designation to stand. The first issue we must address is whether the statutory ground for striking a designation is the only permissible ground. When construing a statute, we begin with its language. *State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006). Our primary objective is to determine the Legislature's intent which, when possible, we discern from the plain meaning of the words chosen. *Id.; City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 25 (Tex.2003). If the statute is clear and unambiguous, we must apply its words according to their common meaning without resort to rules of construction or extrinsic aids. **\*407** *Shumake,* 199 S.W.3d at 284; *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 865–66 (Tex.1999). We may consider other matters in ascertaining legislative intent, including the objective of the law, its history, and the consequences of a particular construction. *See* TEX. GOVT.CODE ANN. § 311.023(1), (3), (5)(Vernon 2005); *Shumake,* 199 S.W.3d at 284. It is a well-settled rule of statutory construction that every word of a statute must be presumed to have been used for a purpose, and those excluded must be presumed to have been excluded for a purpose. *See Quick v. City of Austin,* 7 S.W.3d 109, 123 (Tex.1998). Because statutory construction is a question of law, we review it *de novo. Shumake,* 199 S.W.3d at 284.

 **[2]**　Section 33.004(*l* ) articulates a single ground for striking a designation of a responsible third party. If the Legislature had intended to authorize trial courts to strike designations on any other ground it could have easily indicated that intent in the statute. It did not. The trial court clearly believed it was unfair to permit the case to proceed against Dr. Pollet given that the court had dismissed Martinez's suit against him.[5]

There is nothing in Section 33.004 that suggests a designation can be struck if the plaintiff's suit against the responsible third party is dismissed for some reason. To the contrary, Section 33.004 permits a claimant to sue a designated responsible third party but it does not require that the claimant do so for the designation to stand. We conclude that the plain language of Section 33.004(*l* ) reflects that the Legislature did not intend for a responsible third party designation to be struck on any ground other than the one contained in the statute.

 **[3]**    We now consider whether the trial court's ruling can be upheld on the statutory ground. If Relators failed to produce sufficient evidence to raise a genuine issue of fact regarding Dr. Pollet's responsibility for the claimant's injury or damages, Section 33.004(*l* ) would have required the trial court to strike the designation. On the other hand, if Relators produced evidence raising a genuine issue of fact on that issue, the trial court clearly abused its discretion by striking the designation.

Relators claim to have offered sufficient evidence to raise an issue of fact regarding Dr. Pollet's responsibility for any portion of Martinez's injury or damages. Dr. Blair's expert report described how Dr. Pollet treated Martinez's knee injury with multiple steroidal injections over a two month period along with steroidal phonophoretic treatments during physical therapy. Dr. Blair expressed grave concern over the number of steroidal treatments given in this time-frame and he believed it was more likely than not that the injections and other steroidal treatments played a significant role in the degeneration of the articular cartilage subsequently requiring a total knee replacement. The report states that Dr. Pollet's treatment of Martinez's knee injury was excessive, unnecessary, and more likely than not contributed to a rapid chondrolysis of the articular surfaces of the knee resulting in a total knee replacement. He also believed that the steroidal treatments possibly resulted **\*408** in immune compromise and may have led to post-operative infection. Relators provided another report by Dr. Blair in which he concluded that: (1) the medical documentation indicates that clinical protocols initiated by Dr. Pollet resulted in a severe compromise of Martinez's left lower leg resulting in a total knee arthroplasty, which became infected and resulted in multiple surgeries and an unknown long-term prognosis; (2) Dr. Pollet deviated from the acceptable standard of medical care established by the clinical literature and the standardized guidelines for acceptable patient care published by the American Academy of Orthopaedic Surgeons; and (3) based upon Dr. Blair's analysis of the medical records and the clinical literature, Dr. Pollet's treatment of Martinez fell below the acceptable standard of care.

We conclude that Relators produced sufficient evidence to raise a genuine issue of fact regarding Dr. Pollet's responsibility for at least a portion of Martinez's injury or damages. The trial court clearly abused its discretion by striking the designation of Dr. Pollet as a responsible third party. The only remaining issue is whether Relators have an adequate remedy by appeal.

### *Inadequate Remedy by Appeal*

 **[4]**     **[5]**    The adequacy of an appellate remedy must be determined by balancing the benefits of mandamus review against the detriments. *In re Team Rocket, L.P.,* 256 S.W.3d 257, 262 (Tex.2008), *citing Prudential Insurance Company of America,* 148 S.W.3d 124, 136 (Tex.2004). In evaluating benefits and detriments, we consider whether mandamus will preserve important substantive and procedural rights from impairment or loss. *Id.* We have already determined that Relators presented sufficient evidence to raise a genuine issue of fact regarding Dr. Pollet's responsibility for at least a portion Martinez's injury or damages. Under these circumstances, Relators have a statutory right to demand that the trier of fact determine Dr. Pollet's percentage of responsibility for Martinez's injuries or damages. Mandamus review would preserve this valuable right.

 **[6]**    In addition to impairment of rights, we consider whether mandamus review will "allow the appellate courts to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments." *In re Team Rocket,* 256 S.W.3d at 262, *quoting Prudential,* 148 S.W.3d at 136. The trial court's ruling certainly could be reviewed on appeal in the event Relators suffer an adverse judgment, but Relators would be required to prove that the court's error caused the rendition of an improper judgment in order to obtain a reversal. *See* TEX. R. APP. P. 44.1(a)(1). The denial of Relators' right to designate Dr. Pollet as a responsible third party would skew the proceedings, potentially affect the outcome of the litigation, and compromise the presentation of Relators' defense in ways unlikely to be apparent in the appellate record. *See In re Arthur Andersen, L.L.P.,* 121 S.W.3d 471, 486 (Tex.App.-Houston [14th Dist.] 2003, orig. proceeding). Thus, it is possible Relators would be unable to obtain relief on direct appeal from the trial court's clearly erroneous ruling. [6] *Id.*

**\*409** **[7]** **[8]** Finally, we must also consider whether mandamus will spare litigants and the public "the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings." *In re Team Rocket,* 256 S.W.3d at 262, *quoting Prudential,* 148 S.W.3d at 136. It is beyond dispute that there will be a substantial waste of the litigants' time and money if they to proceed to trial without the error being corrected, proceed through the appellate process only to have the judgment reversed, and then retry the entire case with Dr. Pollet as a designated responsible third party. The additional expense and effort of preparing for and participating in those trials does not, standing alone, justify the issuance of a writ of mandamus. *See Walker,* 827 S.W.2d at 842 (remedy by appeal not inadequate merely because it may involve more delay or cost than mandamus). Where, however, a trial court's error will cause a waste of judicial resources, an appellate court may properly consider that factor in determining the adequacy of an appeal to remedy the error in question. *See id.* at 843. The potential waste of resources, when combined with the possibility that Relators may not be able to successfully prosecute an appeal, supports our conclusion that Relators do not have an adequate remedy at law. Accordingly, we sustain the sole issue presented in the mandamus petition and conditionally grant mandamus relief. The writ will issue only if the trial court fails to withdraw its order striking the designation.

**All Citations**

320 S.W.3d 402

Footnotes

1    If a person is designated under Section 33.004 as a responsible third party, a claimant is not barred by limitations from seeking to join that person provided that the claimant joins the person not later than sixty days following the designation. TEX. CIV. PRAC. & REM. CODE ANN. . § 33.004(e).

2    The trial court did not sign a written order until May 8, 2009.

3    Because the issues in this mandamus proceeding are distinct from the issues in the direct appeal, we denied Martinez's motion to consolidate the cases.

4    Relators served the motion for leave on June 6, 2006 and Martinez did not file his objection until July 10,2006.

5    Many of the trial court's concerns regarding the negative consequences of a judgment finding Dr. Pollet responsible for Martinez's injuries or damages are unfounded. Section 33.004(i) expressly provides that: "The filing or granting of a motion for leave to designate a person as a responsible third party or a finding of fault against the person: (1) does not by itself impose liability on the person; and (2) may not be used in any other proceeding, on the basis of res judicata, collateral estoppel, or any other legal theory, to impose liability on the person." TEX.CIV.PRAC. & REM.CODE ANN. § 33.004(i).

6    We are aware that the Fourteenth Court of Appeals has more recently denied mandamus relief in a case where the trial court refused to allow a party to designate a responsible third party within sixty days of the trial date because it found appeal was an adequate remedy. *See In re Investment Capital Corporation,* No. 14–09–00105–CV, 2009 WL 310899 (Tex.App.-Houston [14th Dist.] Feb. 4, 2009, orig. proceeding). In that case, a party attempted to designate a former defendant, SCI Funeral, as a responsible third party after the trial court had granted summary judgment in favor of SCI Funeral and dismissed it from the case. A party seeking to file the designation must show good cause for filing the motion inside of the sixty day time period. TEX.CIV.PRAC. & REM.CODE ANN. § 33.004(a). The court of appeals did not address whether the trial court clearly abused its discretion but instead found that mandamus relief was unavailable because the facts were relatively straightforward and the error could be corrected through the regular appellate process. Our case is distinguishable because it does not concern the good cause issue as Dr. Pollet had been properly designated as a responsible third party when the trial court struck the designation for a non-statutory reason. Further, we have concluded that Relators might not be able to have the error corrected on direct appeal because it is possible the appellate record would not show how the trial court's ruling caused the rendition of an improper judgment.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

GG

366 S.W.3d 282
Court of Appeals of Texas,
Dallas.

In re Houston M. SMITH and the Law
Offices of Houston Smith, P.C., Relators.

No. 05–11–01657–CV.  |  March 30, 2012.

**Synopsis**
**Background:** Client filed action against attorney and his law firm for legal malpractice after those defendants failed to timely sue motorist allegedly at fault in accident giving rise to underlying personal injury action. Defendants motioned for leave to designate that motorist as a responsible third party. Following a hearing, the 192nd Judicial District Court, Dallas County, Craig Smith, J., denied motion without affording defendants an opportunity to replead. Defendants petitioned for writ of mandamus.

**Holdings:** The Court of Appeals, Fitzgerald, J., held that:

[1] the trial judge does not have the discretion in tort action to deny, on basis of futility, a motion for leave to designate a responsible third party without first giving the movant an opportunity to replead;

[2] client failed, in response to defendants' motion, to shift any burden to defendants to request an opportunity to replead the facts;

[3] trial judge was statutorily required to give defendants an opportunity to replead before denying their motion, regardless of whether defendants made a specific request for time to replead; and

[4] for purposes of determining availability of mandamus relief, appeal is ordinarily an inadequate remedy when a trial judge erroneously denies a motion in tort action for leave to designate a responsible third party without granting leave to replead.

Petition conditionally granted.

Murphy, J., filed a dissenting opinion.

West Headnotes (7)

**[1]** **Attorney and Client**
⚷ In general;  limitations
Legal malpractice is a tort, such that chapter of civil practices and remedies code relating to proportionate responsibility in a tort action applied in legal malpractice action in which trial court denied defendants' motion to designate a responsible third party without giving defendants an opportunity to replead. V.T.C.A., Civil Practice & Remedies Code §§ 33.002(a)(1), 33.004.

1 Cases that cite this headnote

**[2]** **Parties**
⚷ Application and proceedings thereon
Allowing defendants in legal malpractice action an opportunity to replead the facts prior to denying their motion to designate a responsible third party, i.e., the allegedly negligent motorist whom defendants failed to timely sue in underlying personal injury action, would not necessarily be futile, even though motorist was not an attorney; plaintiff did not negate every set of facts that might show the motorist could have contributed to cause harm at issue in malpractice action, namely, the loss of plaintiff's negligence claim against motorist. V.T.C.A., Civil Practice & Remedies Code § 33.004.

1 Cases that cite this headnote

**[3]** **Parties**
⚷ Application and proceedings thereon
The trial judge does not have the discretion in tort action to deny, on basis of futility, a motion for leave to designate a responsible third party without first giving the movant an opportunity to replead. V.T.C.A., Civil Practice & Remedies Code § 33.004(a, f, g).

3 Cases that cite this headnote

**[4]** **Parties**

🔑 Application and proceedings thereon

Plaintiff in legal malpractice action failed, in responding to defendant's motion for leave to designate a responsible third party, namely, the allegedly negligent motorist whom defendants had failed to timely sue in underlying personal injury action, to shift any burden to defendants to request an opportunity to replead the facts; plaintiff made bare assertion, buried in a footnote, that defendants could not merely "contend" that motorist caused or contributed to damages at issue in malpractice action, and that defendants had failed to plead any specific facts explaining how motorist could have committed legal malpractice upon plaintiff. V.T.C.A., Civil Practice & Remedies Code § 33.004(g).

Cases that cite this headnote

**[5]** **Parties**
🔑 Application and proceedings thereon

Trial judge was statutorily required to give defendants in legal malpractice action an opportunity to replead before denying their motion to designate a responsible third party, regardless of whether defendants made a specific request for time to replead; plaintiff, in objecting to motion, made no showing that defendants were given leave to replead, as would be necessary before trial judge could have discretion to deny motion for leave to designate. V.T.C.A., Civil Practice & Remedies Code § 33.004(f), (g)(2).

1 Cases that cite this headnote

**[6]** **Mandamus**
🔑 Modification or vacation of judgment or order

For purposes of determining availability of mandamus relief, appeal is ordinarily an inadequate remedy when a trial judge erroneously denies a motion in tort action for leave to designate a responsible third party without granting leave to replead. V.T.C.A., Civil Practice & Remedies Code § 33.004.

4 Cases that cite this headnote

**[7]** **Courts**
🔑 Number of judges concurring in opinion, and opinion by divided court

Absent an intervening change in the law by the legislature, a higher court, or the Court of Appeals sitting en banc, three-judge panel of Court of Appeals was obliged was follow a prior panel decision of the Court of Appeals, holding in mandamus action that appeal is ordinarily an inadequate remedy when a trial judge erroneously denies a motion for leave to designate a responsible third party without granting leave to replead. V.T.C.A., Civil Practice & Remedies Code § 33.004.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*284** Michael A. Yanof, Alison H. Moore, Jason R. Jobe, Thompson, Coe, Cousins, & Iron, L.L.P., Dallas TX, for Relators.

Daniel J. Sheehan, Jr., Michael Patrick McShan, John M. Phalen, Jr., Daniel Sheehan & Associates, L.L.P., Dallas TX, for Real Party in Interest.

Before Justices BRIDGES, FITZGERALD, and MURPHY.

## OPINION

Opinion by Justice FITZGERALD.

Relators filed this mandamus proceeding after the trial judge signed an order denying their motion for leave to designate a responsible third party. We conclude the trial judge abused his discretion in doing so without granting leave to replead and relators have no adequate remedy by appeal. We therefore conditionally grant mandamus relief.

## I. BACKGROUND

Real party in interest Melvia Lewis sued relators for legal malpractice. Lewis alleges the following facts. He was injured in an auto accident when the vehicle in which he was riding

was rear-ended by a vehicle driven by Edith Winfrey. Lewis hired relators Houston M. Smith and his law firm, The Law Offices of Houston Smith, P.C., to represent him. Relators then erroneously sued Mary Winfrey, the mother of Edith Winfrey. Although Mary Winfrey owned the car that her daughter was driving, she was not in the car at the time of the accident. Relators amended Lewis's petition within limitations to add Kristi McDowell, the driver of the vehicle Lewis was a passenger in, as a defendant, but they never joined Edith Winfrey as a defendant. After limitations ran, Mary Winfrey filed a motion for summary judgment on the ground that she was not in the car at the time of the accident, and relators nonsuited Lewis's claims against Mary Winfrey. Lewis eventually settled with McDowell. Lewis sued relators for negligently investigating his case, failing to sue Edith Winfrey in a timely fashion, and failing to obtain sufficient compensation for Lewis's injuries and medical needs.

Relators moved for leave to designate Edith Winfrey as a responsible third party. In their motion, they alleged that Edith Winfrey was the driver of the vehicle involved in the auto accident and that she negligently caused or contributed to cause Lewis's injuries and damages. Lewis filed a response in opposition, in which he argued that Chapter 33 of the Texas Civil Practice and Remedies Code did not apply at all and that Edith Winfrey could not be a responsible third party because she did not cause or contribute to cause the harm for which Lewis was suing relators. After a hearing, the trial judge signed an order denying relators' motion for leave to designate Edith Winfrey as a responsible third party without affording relators an opportunity to replead.

## II. ANALYSIS

### A. Abuse of discretion

We agree with relators that the trial judge lacked the discretion to deny their **\*285** motion for leave without first granting them leave to replead. Our recent decision in *In re Oncor Electric Delivery Co. LLC,* 355 S.W.3d 304 (Tex.App.-Dallas 2011, orig. proceeding), is controlling. Under section 33.004 of the civil practice and remedies code, a trial judge may not deny a motion for leave to designate a responsible third party without first giving the movant leave to replead the facts concerning the alleged responsibility of the alleged responsible third party. *Id.* at 306 (construing TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(a), (f), and (g)). [1] In *In re Oncor*, as in this case, the trial judge denied a motion for leave to designate a responsible third

party without giving the movant an opportunity to replead. *See id.* We held that this was an abuse of discretion that could not be adequately addressed by appeal. *Id.* Accordingly, we conditionally granted mandamus relief, directing the trial judge to vacate the order denying the motion for leave and to render a new order either granting the movant leave to replead or granting the motion for leave to designate. *Id.* Thus, it appears that relators are entitled to the same relief in this case.

Lewis raises several arguments in opposition to relators' petition, and we consider each in turn.

### 1. The applicability of Chapter 33

 **[1]** Lewis argues that Chapter 33 of the civil practice and remedies code does not apply to this case at all. We disagree. Chapter 33 applies to "any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought." TEX. CIV. PRAC. & REM.CODE ANN. § 33.002(a)(1) (West 2008). Lewis is suing relators—defendants—for legal malpractice, which is a tort. *See Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex.1988) ("A cause of action for legal malpractice is in the nature of a tort...."). Thus, Chapter 33 applies.

### 2. Waiver and futility

Lewis also asserts that relators are not entitled to mandamus relief because they did not ask the trial judge for an opportunity to replead. Factually, the mandamus record does not show a specific request by relators for an opportunity to replead. There is no reporter's record, and relators assert without contradiction that no testimony was taken and the hearing was not transcribed by a court reporter. In their motion for leave to designate a responsible third party, relators prayed that Edith Winfrey be designated a responsible third party and "for such other and further relief to which Defendants may be justly entitled." Lewis also contends that it would be futile for us to require the trial judge to grant relators an opportunity to replead.

We reject Lewis's arguments for the following reasons.

### a. Lewis did not demonstrate futility

 **[2]** Lewis argues that relators were not entitled to an opportunity to replead because affording that opportunity would have been futile. Lewis contends that, because Edith Winfrey was not an attorney, there is no set of facts that

relators **\*286** could plead that would make her a proper responsible third party in this legal-malpractice case. We disagree.

One of Lewis's claims against relators is that relators negligently investigated Lewis's personal-injury case, thereby leading them to sue the wrong defendant and to fail to sue the actual tortfeasor, Edith Winfrey, within limitations. Lewis has not negated every set of facts that may show that non-attorneys could have contributed to cause the resulting harm, that being the loss of Lewis's negligence claim against Edith Winfrey. We note that relators have pleaded the affirmative defense of contributory negligence against Lewis himself. [2] If relators made a similar allegation against Edith Winfrey —that she somehow tortiously contributed to any error committed by the relators—the fact that Edith Winfrey is not an attorney would not necessarily mean she could not have tortiously contributed to cause the harm for which Lewis is suing relators. At this early stage in the proceedings, we cannot accept Lewis's contention that it would necessarily be futile to grant relators an opportunity to replead.

 **[3]** Moreover, section 33.004 does not contain a futility exception to its rule that the movant must be given an opportunity to replead. Thus, the trial judge does not have the discretion to deny a motion for leave to designate a responsible third party without first giving the movant an opportunity to replead. *See In re Oncor Elec. Delivery Co.,* 355 S.W.3d at 306.

#### b. Lewis's objection in the trial court was insufficient

 **[4]** We also reject Lewis's argument that relators waived the right to replead. As the party opposing a motion for leave to designate a responsible third party, Lewis bore the burden of establishing two elements: (1) that relators did not plead sufficient facts concerning Edith Winfrey's responsibility to satisfy the general pleading requirements of the rules of civil procedure, and (2) that relators still failed to plead sufficient facts after having been granted leave to replead. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(g). In the text of Lewis's written response to relators' motion for leave to designate, he asserted three principal arguments: (1) that Chapter 33 did not apply at all, (2) that Edith Winfrey was not a proper responsible third party because the damages Lewis sought from relators were different from his auto-accident damages, and (3) that relators could not use Chapter 33 to avoid their own responsibility by reviving limitations against Edith Winfrey. None of these arguments addressed

the sufficiency of relators' pleadings. Rather, Lewis referred to the pleading standard of section 33.004(g) only in a footnote in his response, in which he stated:

> Defendants cannot merely "contend" that Edith Winfrey caused or contributed to "Plaintiff's alleged injuries and damages." They must plead specific facts concerning her alleged responsibility. TRCP [sic] § 33.004(g). Defendants have failed to meet this burden because they have failed to plead *any* specific facts explaining how Edith Winfrey could have committed legal malpractice upon Lewis.

This bare assertion, buried in a footnote, was not sufficient to satisfy Lewis's burden under section 33.004(g)(1) to establish that relators failed to meet their pleading burden. *See* TEX.R.APP. P. 33.1(a)(1)(A) (stating that party must state the grounds for **\*287** the ruling it sought from the trial court "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context"); *Odom v. Clark,* 215 S.W.3d 571, 574 (Tex.App.-Tyler 2007, pet. denied) (stating that purpose of Rule 33.1(a) is "to ensure that the trial court has had the opportunity to rule on matters for which parties later seek appellate review"); *see also Lincoln v. Clark Freight Lines, Inc.,* 285 S.W.3d 79, 84–85 n. 4 (Tex.App.-Houston [1st Dist.] 2009, no pet.) (argument raised only by bare assertion in footnote in appellate brief was waived); *cf. Bever Props., L.L.C. v. Jerry Huffman Custom Builder, L.L.C.,* 355 S.W.3d 878, 888 (Tex.App.-Dallas 2011, no pet.) (if no-evidence motion for summary judgment fails to identify and challenge specific elements, it is fundamentally defective and cannot support a judgment).

Because Lewis's response and objection to the motion for leave to designate was insufficient under section 33.004(g), the response could not and did not shift any burden to relators to request leave to replead.

#### c. Relators bore no burden to request leave to replead

 **[5]** We also reject Lewis's waiver argument because it is not consistent with the statutory scheme allocating burdens between the parties. If the movant seeking to designate a responsible third party timely files a motion for leave to designate, the trial court "shall grant leave to designate the

named person as a responsible third party unless another party files an objection to the motion for leave on or before the 15th day after the date the motion is served." TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(f). Under the Code Construction Act, the word "shall" "imposes a duty" unless context necessarily requires a different meaning or express statutory text provides otherwise. TEX. GOV'T CODE ANN. § 311.016(2) (West 2005); *see also Albertson's, Inc. v. Sinclair,* 984 S.W.2d 958, 961 (Tex.1999) ("We generally construe the word 'shall' as mandatory, unless legislative intent suggests otherwise."). So a trial judge must grant the motion for leave to designate if no timely objection is filed. TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(f). Moreover, and of particular relevance to this original proceeding, section 33.004(g) provides that the trial judge must grant the motion even if a timely objection is filed unless the objecting party carries the burden of establishing two matters. The statute provides:

> (g) If an objection to the motion for leave is timely filed, the court shall grant leave to designate the person as a responsible third party unless the objecting party establishes:
>
> (1) the defendant did not plead sufficient facts concerning the alleged responsibility of the person to satisfy the pleading requirement of the Texas Rules of Civil Procedure; and
>
> (2) after having been granted leave to replead, the defendant failed to plead sufficient facts concerning the alleged responsibility of the person to satisfy the pleading requirements of the Texas Rules of Civil Procedure.

*Id.* § 33.004(g). Thus, under section 33.004(g)(2), Lewis bore the burden of showing that relators were given leave to replead before the trial judge could have discretion to deny relators' motion for leave to designate. The record contains no indication that Lewis made that showing, nor any indication that the trial judge gave relators an opportunity to replead. During oral argument in this Court, Lewis admitted that he had not met his burden **\*288** on this element. [3] Because Lewis did not carry his burden, the trial judge's only options were to grant relators' motion for leave to designate or to defer ruling while giving relators an opportunity to replead. The judge abused his discretion by denying the motion for leave to designate outright, regardless of whether relators specifically asked for an opportunity to replead.

Our conclusion that relators did not bear the burden of seeking leave to replead is reinforced by our opinion in *In re Oncor.* That opinion contains no indication that the relator made a separate request for an opportunity to replead, but rather states only that the relator "moved to designate [a plaintiff] as a responsible third party." *In re Oncor Elec. Delivery Co.,* 355 S.W.3d at 305. Nevertheless, we construed the statute to preclude the trial judge from denying a motion to designate without granting the movant a chance to replead. *See id.* at 306 ("The statute requires the trial judge to grant relator leave to replead the facts concerning the alleged responsibility of [the responsible third party] before denying its motion for leave to designate him a responsible third party."). We then granted mandamus relief, requiring the trial judge either to grant leave to replead or to grant the motion to designate a responsible third party. *Id.* It would be inconsistent with *In re Oncor* to deny relators relief in this case because they did not specifically request leave to replead. We conclude that the trial judge was statutorily required to give relators an opportunity to replead before denying their motion, regardless of whether they made a specific request for time to replead. [4]

In sum, the relief relators wanted was leave to designate a responsible third party, and by filing a timely motion for that leave, they satisfied the threshold burden the statute placed on them. Their motion shifted the burden onto Lewis to establish that relators had been given an opportunity to replead before the trial judge could have any discretion to deny relators' motion. The only options lawfully available to the trial judge were to grant relators' motion for leave to designate or to grant relators an opportunity to replead. Accordingly, we conclude that relators were not required to ask for leave to replead in order to preserve error.

## B. No adequate remedy by appeal

**[6]** **[7]** In our opinion in *In re Oncor*, we concluded, "An improper denial of leave to designate a responsible third party may not be adequately addressed by appeal," and we granted mandamus relief. [5] *In re* **\*289** *Oncor Elec. Delivery Co.,* 355 S.W.3d at 306. Thus, we conclude that *In re Oncor* stands for the proposition that appeal is ordinarily an inadequate remedy when a trial judge erroneously denies a motion for leave to designate a responsible third party without granting leave to replead. *See id.* The instant case is thus indistinguishable from *In re Oncor*, and we are obliged to follow it. *See MobileVision Imaging Servs., L.L.C. v. LifeCare Hosps. of N. Tex., L.P.,* 260 S.W.3d 561, 566

(Tex.App.-Dallas 2008, no pet.) ("We may not overrule a prior panel decision of this Court absent an intervening change in the law by the legislature, a higher court, or this Court sitting en banc.").

Relators have shown that they have no adequate remedy by appeal, and thus they are entitled to mandamus relief.

### III. CONCLUSION

We express no opinion as to whether relators satisfied their pleading burden under section 33.004(g)(1). We hold only that the trial judge abused his discretion by denying relators' motion for leave to designate a responsible third party without granting them an opportunity to replead. *See In re Oncor Elec. Delivery Co.,* 355 S.W.3d at 306.

Accordingly, we conditionally grant relators' petition for writ of mandamus. The writ will issue only if the trial judge fails to vacate his October 27, 2011 "Order Denying Defendants' Motion for Leave to Designate Edith Winfrey as a Responsible Third Party" and to render a new order either granting relators leave to replead facts supporting the designation or granting the motion for leave to designate.

MURPHY, J. dissenting.

Dissenting Opinion By Justice MURPHY.
A prerequisite to presenting a complaint for appellate review is a timely request, objection, or motion that states the grounds for the ruling that the complaining party sought from the trial court. TEX.R.APP. P. 33.1(a)(1)(A). This Court has cited or quoted this mandate repeatedly to emphasize that the trial court must have the opportunity to rule on an issue or to correct an erroneous ruling before we can review the issue on appeal, much less mandamus a trial court for a clear abuse of discretion. Yet we are conditionally granting mandamus to require the trial court to allow relators the opportunity to replead facts relating to their motion to designate a responsible third party (RTP) when relators never asked the trial court for that opportunity and stated at oral argument that there is "no need to replead." I respectfully dissent.

The only chapter 33 arguments before the trial court related to the merits of whether the driver of the vehicle in Melvia

Lewis's underlying personal injury lawsuit could be an RTP in his subsequent malpractice lawsuit against his former attorneys. For the first time in their petition **\*290** for writ of mandamus, relators claim the trial court abused its discretion by not allowing them the opportunity to replead facts; yet the facts related to the RTP designation were not disputed. The parties' dispute is a legal issue. And while I agree that counsel for real party in interest agreed at oral argument that relators are entitled to replead, I would conclude they did not preserve that right for purposes of their petition for writ of mandamus and that they have an adequate remedy at law. Relators can file a motion with the trial court seeking reconsideration on the basis urged to this Court or ask for leave to amend. Relators could have already repleaded at the trial court and re-addressed the merits of their substantive arguments as to the capacity of the driver in the underlying personal injury lawsuit to be an RTP in this subsequent legal malpractice lawsuit.

The majority relies on our recent decision in *In re Oncor Electric Delivery Co. LLC,* 355 S.W.3d 304 (Tex.App.-Dallas 2011, orig. proceeding), as controlling authority for the proposition that the trial court was required on its own motion to allow relators leave to amend their petition under chapter 33. The opinion in that case, as noted by the majority, is silent as to whether there was a request for leave to replead. Notwithstanding that silence, which often is used to distinguish cases, the majority assumes there was no request to replead in *Oncor* by concluding it "would be inconsistent with *Oncor* to deny relators relief in this case because they did not specifically request leave to replead." Chapter 33 no doubt contains mandatory language. Yet we have found waiver or lack of preservation in similar circumstances.

For example, an opposing party must have the opportunity to amend a summary judgment affidavit in response to an objection to the form. *See* TEX.R. CIV. P. 166a(f); *Hewitt v. Biscaro,* 353 S.W.3d 304, 307–08 (Tex.App.-Dallas 2011, no pet.). The trial court is required to give a party that opportunity to amend. TEX.R. CIV. P. 166a(f). For purposes of appeal, however, that right is waived if the proponent of the evidence fails to request a continuance or "otherwise assert its right to amend." *Brown v. Wong,* No. 05–99–00706–CV, 2000 WL 433973, at *3 (Tex.App.-Dallas Apr. 24, 2000, pet. denied) (not designated for publication) (citing *Eckmann v. Des Rosiers,* 940 S.W.2d 394, 400 (Tex.App.-Austin 1997, no writ)). Similarly, when a trial court sustains special exceptions, the court "must give the pleader an opportunity to amend the pleading"—the trial court has no discretion.

*Friesenhahn v. Ryan,* 960 S.W.2d 656, 658 (Tex.1998). The complaining party must, however, prove "the opportunity to replead was requested and denied to preserve the error for review." *Parker v. Barefield,* 206 S.W.3d 119, 120 (Tex.2006) (per curiam); *Cadle Co. v. Jenkins,* 266 S.W.3d 4, 7 n. 5 (Tex.App.-Dallas 2008, no pet.).

It is incumbent on counsel, when possible, to allow trial judges and opposing parties the opportunity to consider new arguments before raising those for the first time in a petition for writ of mandamus or on appeal. Similarly, we are empowered as an appellate court to address only those issues preserved for review. *See* TEX.R.APP. P. 33.1. Accordingly, I respectfully dissent from the majority's decision to grant mandamus.

**All Citations**

366 S.W.3d 282

Footnotes

1    We said the same in a previous mandamus opinion arising from the same litigation: "A trial court that is presented with a motion for leave to designate a responsible third party and an objection to the motion, as the trial court was here, may either grant the motion or, should the objection to the motion be sustained, grant leave to replead sufficient facts to allege the person's responsibility." *In re Oncor Elec. Delivery Co. LLC,* No. 05–11–00188–CV, 2011 WL 989071, at *1 (Tex.App.-Dallas Mar. 22, 2011, orig. proceeding) (mem. op.).

2    At oral argument, relators stated that they relied on information provided by Lewis when they sued Mary Winfrey.

3    Based on Lewis's concession during oral argument, the dissent argues that relators could have already repleaded in the trial court. We disagree. After oral argument, we asked the parties to advise us whether they had reached agreement during argument that we should dismiss this original proceeding so that relators could replead in the trial court. Lewis responded that no agreement was reached and that remand to the trial court to allow relators to replead was inappropriate because relators did not seek such relief in the trial court or in this Court. Thus, it appears that Lewis would oppose any attempt to replead by relators.

4    The dissent argues that relators bore the burden of seeking leave to replead in order to preserve error. The dissent relies on cases involving formally defective summary-judgment evidence and special exceptions to deficient pleadings. These cases are distinguishable. Under the unique scheme set forth in section 33.004, an opportunity to replead is an element that must be proved by the party objecting to the motion for leave to designate a responsible third party. It would be inconsistent with this statutory scheme to place any burden on the movant to request leave to replead.

5    Courts of appeals have disagreed about whether a party that is aggrieved by a trial judge's erroneous ruling on a responsible-third-party issue has an adequate remedy by appeal. Some courts have granted mandamus relief. *E.g., In re Brokers Logistics, Ltd.,* 320 S.W.3d 402, 408 (Tex.App.-El Paso 2010, orig. proceeding); *In re Arthur Andersen LLP,* 121 S.W.3d 471, 485–86 (Tex.App.-Houston [14th Dist.] 2003, orig. proceeding [mand. denied] ). Others have denied mandamus relief, holding that appeal is ordinarily an adequate remedy for such errors. *E.g., In re Inv. Capital Corp.,* No. 14–09–00105–CV, 2009 WL 310899, at *2 (Tex. App.-Houston [14th Dist.] Feb. 4, 2009, orig. proceeding) (mem. op.); *In re Unitec Elevator Servs. Co.,* 178 S.W.3d 53, 63–64 (Tex. App.-Houston [1st Dist.] 2005, orig. proceeding); *In re Martin,* 147 S.W.3d 453, 459–60 (Tex.App.-Beaumont 2004, orig. proceeding, pet. denied).

**End of Document**      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# HH

997 S.W.2d 203
Supreme Court of Texas.

INGERSOLL–RAND COMPANY, et al., Petitioners,

v.

VALERO ENERGY CORPORATION,
et al., Respondents.

No. 97–1168. | Argued Oct. 21,
1998. | Decided June 24, 1999. |
Opinion On Rehearing Aug. 26, 1999.
| Rehearing Overruled Sept. 23, 1999.

Refinery owner sued contractor and subcontractor for
damages arising out of construction project. The 117th
District Court, Nueces County, Robert M. Blackmon, J.,
granted defendants motions' for summary judgment asserting
that indemnity provision barred owner's claim. Owner
appealed. The Corpus Christi Court of Appeals, 866 S.W.2d
252, affirmed. Defendants sought attorney fees and costs
incurred in defending against owner's claims. The District
Court granted summary judgment for owner, and defendants
appealed. The Court of Appeals, affirmed. Petition for review
was filed. The Supreme Court, Enoch, J., held that: (1)
indemnity claims for attorney fees against owner were not
compulsory counterclaims at time of initial action; (2) res
judicata doctrine did not bar indemnity claims for attorney
fees against owner after entry of take nothing judgment
against owner; (3) subcontractor's claim for attorney fees
under indemnity clause did not accrue until date on which
trial court signed take nothing judgment; (4) contractor's
indemnity claim for attorney fees accrued, despite any
anticipatory breach, when contractor made demand for
indemnity and owner refused to perform; and, on rehearing,
(5) refinery owner's amended petition asserting breach of
contract claim in order to attack validity of indemnity
agreement was barred by doctrine of res judicata.

Judgment of the Court of Appeal reversed and case remanded.

West Headnotes (14)

**[1]** **Judgment**
 Nature and requisites of former recovery as
bar in general
**Judgment**

 Matters which might have been litigated

Res judicata prevents parties and their privies
from relitigating a cause of action that has
been finally adjudicated by a competent tribunal,
as well as claims or defenses that, through
diligence, should have been litigated in the prior
suit but were not.

24 Cases that cite this headnote

**[2]** **Judgment**
 Splitting Cause of Action

Res judicata doctrine is intended to prevent
causes of action from being split, thus curbing
vexatious litigation and promoting judicial
economy.

10 Cases that cite this headnote

**[3]** **Judgment**
 Matters for defense in former action as
cause of action in second

Res judicata does not bar a former defendant
who asserted no affirmative claim for relief in
an earlier action from stating a claim in a later
action that could have been filed as a cross-claim
or counterclaim in the earlier action, unless the
claim was compulsory in the earlier action.

15 Cases that cite this headnote

**[4]** **Set–Off and Counterclaim**
 Effect of failure to assert or claim;
compulsory counterclaim

Counterclaim is compulsory only if: (1) it is
within the jurisdiction of the court; (2) it is not
at the time of filing the answer the subject of
a pending action; (3) the claim is mature and
owned by the defendant at the time of filing the
answer; (4) it arose out of the same transaction
or occurrence that is the subject matter of the
opposing party's claim; (5) it is against an
opposing party in the same capacity; and (6) it
does not require the presence of third parties
over whom the court cannot acquire jurisdiction.
Vernon's Ann.Texas Rules Civ.Proc., Rule 97(a,
d).

31 Cases that cite this headnote

**[5]** **Set–Off and Counterclaim**

&#x1F5DD; Effect of failure to assert or claim; compulsory counterclaim

Claim is mature, for purposes of determining whether it is compulsory counterclaim, when it has accrued.

12 Cases that cite this headnote

**[6]** **Indemnity**

&#x1F5DD; Accrual of liability

Broad language that holds an indemnitee "harmless" against "all claims" and "liabilities" evidences an agreement to indemnify against liability and thus entitles the indemnitee to recover when the liability becomes fixed and certain, as by rendition of a judgment, whether or not the indemnitee has yet suffered actual damages, as by payment of a judgment.

25 Cases that cite this headnote

**[7]** **Set–Off and Counterclaim**

&#x1F5DD; Effect of failure to assert or claim; compulsory counterclaim

Subcontractor's liabilities from refinery owner's suit against subcontractor did not become fixed and certain until date of judgment that owner take nothing, and thus, subcontractor's claim against owner for attorney fees under indemnification clause was not mature until that date and did not have to be asserted as compulsory counterclaim at time of initial suit. Vernon's Ann.Texas Rules Civ.Proc., Rule 97(a, d).

12 Cases that cite this headnote

**[8]** **Judgment**

&#x1F5DD; Matters for defense in former action as cause of action in second

Doctrine of res judicata did not preclude subcontractor from pursuing indemnity claim for attorney fees against refinery owner after entry of judgment in owner's initial action against subcontractor, in light of fact that subcontractor

was only a defendant in initial action and made no affirmative claims, and its claim against owner for attorney fees under indemnity clause was thus permissive rather than compulsory in relation to owner's initial action.

3 Cases that cite this headnote

**[9]** **Limitation of Actions**

&#x1F5DD; Indemnity

Indemnity claim does not accrue until all of the potential liabilities of the indemnitee become fixed and certain by judgment, and recovery for attorney fees component of potential liabilities need not be pursued before and separate from remaining components.

24 Cases that cite this headnote

**[10]** **Limitation of Actions**

&#x1F5DD; Indemnity

Subcontractor's claim for attorney fees against refinery owner under indemnity clause did not accrue for purposes of statute of limitations until date on which trial court signed summary judgment that refinery owner take nothing in its action against subcontractor. V.T.C.A., Civil Practice & Remedies Code § 16.004(a)(3).

10 Cases that cite this headnote

**[11]** **Limitation of Actions**

&#x1F5DD; Breach of contract in general

Limitations may begin to run upon a promisor's anticipatory repudiation, but only if the repudiation is adopted by the nonrepudiating party.

8 Cases that cite this headnote

**[12]** **Contracts**

&#x1F5DD; Renunciation

Effect of an anticipatory repudiation is to give the nonrepudiating party the option of treating the repudiation as a breach or ignoring the repudiation and awaiting the agreed upon time of performance.

9 Cases that cite this headnote

**[13]**    **Limitation of Actions**
 Demand for performance of contract

Contractor's indemnity claim against refinery owner for attorney fees accrued and statute of limitations began to run when contractor made demand for indemnity and owner refused to perform, even assuming owner's initial petition against contractor acted as unequivocal anticipatory repudiation, given that contractor was entitled to ignore any anticipatory repudiation, await time of performance, and sue after actual breach of indemnity clause when owner refused to pay.

14 Cases that cite this headnote

**[14]**    **Judgment**
 Contracts in general

Refinery owner's amended petition asserting breach of contract claim to attack validity of indemnity agreement was barred by doctrine of res judicata, where amended petition was attempt to recast owner's prior tort challenge to indemnity agreement, upon which adverse judgment already had been rendered, as contract claim. Restatement (Second) of Judgments §§ 24, 25(1).

13 Cases that cite this headnote

**Attorneys and Law Firms**

**\*204** John B. Shely, Houston, Audrey Mullert Vicknair, Roberta Shellum Dohse, Corpus Christi, Dimitri Zgourides, Kendall M. Gray, Joseph A. Katarincic, Houston, Paul W. Nye, Harvey Ferguson, Jr., Corpus Christi, for Petitioners.

**\*205** Thomas H. Watkins, C.A. Davis, Austin, Gilberto Hinojosa, Brownsville, James K. McClendon, Elizabeth G. Bloch, Austin, for Respondents.

Justice ENOCH delivered the opinion for a unanimous Court.

Valero [1] sued Kellogg [2] and Ingersoll–Rand [3] for damages caused by malfunctioning equipment. Kellogg and Ingersoll–Rand installed the equipment during an expansion of Valero's oil refinery. Kellogg was the general contractor on the expansion, and Ingersoll–Rand was one of Kellogg's subcontractors. Both Kellogg and Ingersoll–Rand defended by asserting that certain indemnification and hold-harmless provisions in the Valero–Kellogg contract applied. The trial court concluded that the contract's indemnification provisions were enforceable and granted interlocutory summary judgment for Kellogg and Ingersoll–Rand. The court then severed that part of the case, so that Valero could appeal the summary judgment. The court of appeals affirmed, and that judgment is now final. [4]

During that appeal, the trial court abated the remaining claims. After the abatement was lifted, Kellogg and Ingersoll–Rand moved for summary judgment, seeking attorney's fees under the indemnity provisions upheld in *Valero I.* Valero filed its own motion for summary judgment, asserting that Kellogg's and Ingersoll–Rand's claims for attorney's fees were compulsory counterclaims barred by *res judicata* and by the statute of limitations. The trial court granted Valero summary judgment. The court of appeals affirmed. [5]

The pivotal question in this case is when does an indemnitee's contractual claim for indemnification mature for purposes of the compulsory counterclaim rule. We adhere to the longstanding rule that a claim based on a contract that provides indemnification from liability does not accrue until the indemnitee's liability becomes fixed and certain. Applying this rule, we conclude that Kellogg's and Ingersoll–Rand's indemnity claims did not accrue until the trial court's rendition of summary judgment in *Valero I.* Accordingly, neither *res judicata* nor limitations bar Kellogg's and Ingersoll–Rand's claims. We reverse the court of appeals' judgment and remand to the trial court for further proceedings.

### *Valero I*

Valero sued Kellogg in 1986 over mechanical malfunctions allegedly resulting from Kellogg's flawed installation of refinery equipment. Valero pleaded fraudulent misrepresentation, breach of contract, violations of the Texas Deceptive Trade Practices Act, [6] breach of implied and express warranties, products liability, negligence, gross negligence, and intentional misconduct. Valero added

Ingersoll–Rand as a defendant in 1989, after a piece of equipment supplied by Ingersoll–Rand exploded. The suit eventually came to include a host of cross-claims, counterclaims, and third-party claims not at issue here.

Kellogg and Ingersoll–Rand answered Valero's petition, asserting that the contract's indemnity provision barred Valero's **\*206** claims. Both relied on the following contract provision:

> 6.8 OWNER [Valero] shall release, defend, indemnify and hold harmless CONTRACTOR [Kellogg], its subcontractors [Ingersoll–Rand] and affiliates and their employees performing services under this Agreement against all claims, liabilities, loss or expense, including legal fees and court costs in connection therewith, arising out of or in connection with this Agreement or the Work to be performed hereunder, including losses attributable to CONTRACTOR'S negligence, to the extent CONTRACTOR is not compensated by insurance carried under this ARTICLE....

Valero replied that the contract's indemnity provision was unenforceable as against public policy. On this issue, each side filed competing motions for summary judgment.

The trial court granted Kellogg's and Ingersoll–Rand's motions for summary judgment, denied Valero's motion, and rendered judgment that Valero take nothing on its claims against Kellogg and Ingersoll–Rand. That matter was severed, and the remaining issues were abated pending appeal. Valero appealed, and the court of appeals affirmed the trial court's judgment on June 30, 1993.[7] This Court denied Valero's application for writ of error on April 20, 1994, and overruled its motion for rehearing of the application on June 2, 1994. That judgment is final.

### *Valero II*

One of the remaining abated claims was Kellogg's counterclaim for attorney's fees and costs incurred in defending against Valero. Kellogg filed the counterclaim

between the time summary judgment was entered and the time the severance order was entered, but more than five years after Valero first sued Kellogg. After the trial court dissolved the abatement, Ingersoll–Rand initiated its own counterclaim against Valero for attorney's fees and costs. This claim was raised more than five years after Valero added Ingersoll–Rand as a defendant.

Kellogg and Ingersoll–Rand filed a joint motion for summary judgment asserting that the contract's indemnity provision, held enforceable in *Valero I,* entitled each to attorney's fees, court costs, and litigation expenses incurred in *Valero I.* Valero responded with a motion for summary judgment, asserting two affirmative defenses: (1) Kellogg and Ingersoll–Rand's counterclaims were compulsory, had not been asserted in *Valero I,* and were therefore precluded by *res judicata;* and (2) the four-year statute of limitations for breach of contract barred the claims.[8]

Without specifying grounds, the trial court granted Valero's motion for summary judgment, and denied Kellogg and Ingersoll–Rand's motion. The court of appeals affirmed, holding that Ingersoll–Rand's counterclaim was compulsory and barred by *res judicata,* and Kellogg's claim was barred by limitations.[9] Kellogg and Ingersoll–Rand each petitioned for review.

Because resolution of the issues we consider in Ingersoll–Rand's appeal disposes of issues presented by Kellogg's appeal, we consider Ingersoll–Rand's appeal first.

### Ingersoll–Rand's Appeal

The court of appeals held that Ingersoll–Rand's claim for attorney's fees was a compulsory counterclaim that Ingersoll–Rand should have brought in *Valero I;* and, therefore, *res judicata* barred the claim in *Valero II.* We disagree.

**[1] [2] [3]** *Res judicata* prevents parties and their privies from relitigating a cause of action that has been finally adjudicated by a competent tribunal.[10] Also precluded **\*207** are claims or defenses that, through diligence, should have been litigated in the prior suit but were not.[11] The doctrine is intended to prevent causes of action from being split, thus curbing vexatious litigation and promoting judicial economy.[12] *Res judicata,* however, does not bar a former defendant who asserted no affirmative claim for relief in

an earlier action from stating a claim in a later action that could have been filed as a cross-claim or counterclaim in the earlier action, unless the claim was compulsory in the earlier action. [13] Here, the court of appeals concluded that Ingersoll–Rand's claim was compulsory.

 **[4]** But a counterclaim is compulsory only if: (1) it is within the jurisdiction of the court; (2) it is not at the time of filing the answer the subject of a pending action; (3) the claim is mature and owned by the defendant at the time of filing the answer; (4) it arose out of the same transaction or occurrence that is the subject matter of the opposing party's claim; (5) it is against an opposing party in the same capacity; and (6) it does not require the presence of third parties over whom the court cannot acquire jurisdiction. [14] A claim having all of these elements must be asserted in the initial action and cannot be asserted in later actions. [15]

To meet its summary judgment burden on the affirmative defense that Ingersoll–Rand's claim was compulsory and barred by *res judicata,* Valero had to prove that Ingersoll–Rand's counterclaim satisfied each element above. Ingersoll–Rand asserts that its indemnity claim for attorney's fees was not compulsory because the claim could not have become mature before the trial court's rendition of summary judgment in *Valero I.*

 **[5]** **[6]** A claim is mature when it has accrued. [16] To determine the correct accrual date of an indemnity claim we look to the contract's indemnity provision. There are two types of indemnity agreements, those that indemnify against liabilities and those that indemnify against damages. [17] Broad language, like that in this contract, that holds the indemnitee "harmless" against "all claims" and "liabilities" evidences an agreement to indemnify against liability. [18] Such provisions entitle the indemnitee to recover when the liability becomes fixed and certain, as by rendition of a judgment, whether or not the indemnitee has yet suffered actual damages, as by payment of a judgment. [19]

 **\*208** Valero's suit presented the rather anomalous situation of an indemnitor (Valero) acting concurrently as the plaintiff seeking damages from the indemnitee (Ingersoll–Rand). The more common scenario for an indemnification dispute involves three separate and distinct parties: plaintiff (party one), indemnitee (party two), and indemnitor (party three). Despite the unusual factual setting here, we find no persuasive reason not to apply the longstanding rule that a claim under

a liability indemnification clause does not accrue, and thus is not mature, until the indemnitee's liability to the party seeking damages becomes fixed and certain. [20]

 **[7]** When Ingersoll–Rand was added as a defendant in *Valero I,* it was entirely conceivable that Ingersoll–Rand might sustain extensive liabilities because of Valero's claims for damages. And Ingersoll–Rand, presumably, would have sought indemnification for all such liabilities under the contract's indemnity provision. Any claim Ingersoll–Rand could have asserted, however, could not have accrued until all of Ingersoll–Rand's potential liabilities to Valero became fixed and certain by rendition of a judgment.

In *Valero I,* the trial court rendered summary judgment for Ingersoll–Rand that Valero take nothing on its claims for damages. That judgment was signed on October 25, 1991. Ingersoll–Rand's liabilities became fixed and certain at zero for Valero's tort, DTPA, and contract damages plus the total amount of attorney's fees and costs incurred in defending against Valero when summary judgment was rendered in *Valero I.* [21] Because Valero demonstrated no time earlier than the date of judgment in *Valero I* by which Ingersoll–Rand's liabilities became fixed and certain, the third element of the compulsory counterclaim rule—maturity of the claim—was not satisfied.

Our reasoning is bolstered by commentary on the analogous federal rule. The Texas compulsory counterclaim rule is based on Rule 13 of the Federal Rules of Civil Procedure. [22] In commenting on Federal Rule 13(a)'s condition that a claim must be mature in order to be compulsory, Professors Wright and Miller state:

> This exception to the compulsory counterclaim requirement necessarily encompasses a claim that depends upon the outcome of some other lawsuit and thus does not come into existence until the action upon which it is based has terminated. For example, ... *a claim for contribution cannot be compulsory in the action whose judgment is the subject of the contribution suit.* [23]

Likewise, an indemnity claim cannot be compulsory in the action whose judgment is the subject of the indemnity suit. In a suit for either contribution or indemnity the injury upon which suit might be based does not arise until some liability is established. In this case, as in a contribution claim against a joint tortfeasor, liability could not have been established until judgment was rendered.

The court of appeals relied heavily on *Getty Oil v. Insurance Company of North America* [24] in reaching a different conclusion. In *Getty* we stated:

> **\*209** The contingent nature of these claims, however, does not preclude the operation of res judicata. We held in *Barr* [*v. Resolution Trust Corp.*] that "[a] subsequent suit will be barred if it arises out of the same subject matter of a previous suit and which, through the exercise of diligence, could have been litigated in a prior suit." 837 S.W.2d at 631. Getty could have asserted its present claims in the [previous] suit, with their resolution being contingent on the plaintiffs' claims. [25]

In all respects, we stand by *Getty.* But *Getty's* language cannot be applied without considering the case's factual context.

In *Getty* we held that an indemnitee (Getty) was barred by *res judicata* from maintaining a claim against an indemnitor (NL Industries), because Getty had sought the same relief under a different theory in an earlier suit. In the earlier wrongful death suit Getty and NL were co-defendants, and Getty chose to file a permissive cross-claim against NL based on indemnification language in their contract. By taking this action Getty put itself in the same position, for purposes of *res judicata,* as a plaintiff filing a cause of action for damages. We specifically held this to be so in *Getty.* [26] As the plaintiff for *res judicata* purposes, Getty was subject to the general rule of *res judicata* that any cause of action that arises out of the same subject matter should, if practicable, be litigated in the same lawsuit. [27] In the second suit, Getty was the actual plaintiff. Its claim again involved asserting indemnity provisions as the basis for damages. Because Getty could have asserted those claims in the earlier action but did not, *res judicata* barred the claims.

 [8] We face a different situation here. In relation to Valero, Ingersoll–Rand was a defendant only and made no affirmative claims for relief in *Valero I.* Ingersoll–Rand, like Getty, could have stated a permissive claim against Valero, but it did not. This fact is significant because of the rule we pointed out earlier: the doctrine of *res judicata* does not bar claims against the plaintiff from an earlier suit by a defendant from the earlier suit, unless the later claims were compulsory in the earlier suit. Because Ingersoll–Rand, unlike Getty, made no affirmative claims in the first suit, *res judicata* does not bar Ingersoll–Rand's later claims unless they were compulsory. But, as we explained earlier, the compulsory counterclaim

elements were not met by Ingersoll–Rand's potential claims in *Valero I.* Thus, Ingersoll–Rand's claims in *Valero II* are not barred.

As the court of appeals points out, and as we said in *Getty,* we have held that an indemnitee may bring a claim against an indemnitor before the judgment is assigned against the indemnitee. [28] That is indeed what Getty did. We allow such claims to be brought, in the interest of judicial economy, as an exception to the accrual rule for indemnity claims. [29] Such claims are contingent on accrual. But we have never held that an indemnitee must state such claims in the initial suit to preserve them. As we specifically noted in *Getty,* such claims are permissive. [30] None of the cases we cited in *Getty,* for the **\*210** proposition that an indemnitee may file a claim for indemnification before judgment is rendered, stand for the proposition that contingent indemnity claims must be brought in the initial action. Rather, the cases cited in *Getty* hold that it is merely permissive for such claims to be brought before judgment in the initial action. [31]

The fact that attorney's fees and costs were the only liabilities for which Ingersoll–Rand was eventually entitled to seek indemnity does not change our conclusion. It is true that a counterclaim for attorney's fees will in most cases be compulsory. [32] We do not dispute the legal basis of such a statement because a claim for attorney's fees will generally satisfy the elements of the compulsory counterclaim rule. However, an indemnity claim based on an agreement to indemnify against liabilities has different characteristics than a simple claim for attorney's fees. The attorney's fees are certain to be incurred as soon as an attorney is retained, while liabilities covered by an indemnity agreement in any given case may never be incurred depending on the outcome of the case. This difference is significant.

Consider *Fidelity Mutual Life Insurance Company v. Kaminsky,* [33] another case upon which the court of appeals relied. In *Kaminsky* the court concluded that a contractual claim for attorney's fees, even though contingent on the outcome of the suit, was mature and compulsory. [34] The contractual provision on which Dr. Kaminsky relied established his contractual right to attorney's fees contingent on the result of the suit, but it did not indemnify him against other liabilities generally. It was not an indemnification agreement. Thus, the general rule that a cause of action accrues when facts come into existence that authorize the

claimant to seek a judicial remedy applied in *Kaminsky*. [35] Dr. Kaminsky's claim for attorney's fees accrued when he first incurred fees.

 **[9]** As we have explained, a specific accrual rule applies to claims for indemnification: an indemnity claim does not accrue until all of the potential liabilities of the indemnitee become fixed and certain. This specific rule is consistent with the general accrual rule. The facts that entitle an indemnitee to seek indemnification through suit come into existence when the indemnitee's liabilities become fixed and certain by judgment.

While attorney's fees will almost always be a component of an indemnitee's total liabilities, we decline to hold that recovery for the attorney's fees component of an indemnitee's potential liability must be pursued before and separate from the remaining components. An indemnification claim does not accrue until all of the indemnitee's liabilities become fixed and certain.

Because we resolve Valero's *res judicata* claim by applying the compulsory counterclaim rule, we need not consider Ingersoll–Rand's assertion that Valero waived, by Rule 11 agreement, [36] the right to assert *res judicata.*

 **[10]** Valero also asserted in its motion for summary judgment that the four-year statute of limitations for contract claims barred Ingersoll–Rand's claims for attorney's fees. [37] To prevail on the limitations affirmative defense, Valero had the burden of conclusively proving when the cause of action accrued. [38] Ingersoll–Rand's claim **\*211** did not accrue until October 25, 1991, the date that the trial court signed summary judgment in *Valero I.* [39] Because Ingersoll–Rand filed its claim for attorney's fees on September 16, 1994, less than four years after the trial court's judgment, the four-year statute of limitations does not bar Ingersoll–Rand's claim.

### Kellogg's Appeal

Our conclusions above largely dispose of Valero's claims against Kellogg. Like Ingersoll–Rand, Kellogg's claim for attorney's fees did not accrue until summary judgment was rendered in *Valero I.* Consequently, Kellogg's claim was not compulsory. In any event, Kellogg filed its claim one month before severance in the original action while summary judgment was still interlocutory. As such, the claim was

properly preserved through the severance order for later adjudication, and *res judicata* does not bar it.

As to Valero's statute of limitations defense, limitations could not have began to run before Kellogg's indemnity claim became fixed and certain. Like Ingersoll–Rand, Kellogg's claim did not become fixed and certain until judgment was signed in *Valero I.* Kellogg filed its claim on November 20, 1991, less than a month after summary judgment was signed in *Valero I,* and well within the four-year limitations period.

 **[11]** **[12]** **[13]** The court of appeals, however, held that limitations began to run on Kellogg's indemnification claim when Valero filed suit on July 11, 1986, because Valero's suit acted as a repudiation of the contract's indemnity provision. It is true that limitations may begin to run upon a promisor's anticipatory repudiation, but only if the repudiation is adopted by the nonrepudiating party. [40] Valero contends that its petition in *Valero I* was an unequivocal repudiation of its duty to indemnify. However, the effect of such an anticipatory repudiation is to give the nonrepudiating party the option of treating the repudiation as a breach or ignoring the repudiation and awaiting the agreed upon time of performance. [41] Thus, even if Valero's petition acted as an unequivocal repudiation, an issue we do not decide, Kellogg was still entitled to await the time of performance and sue only after an actual breach of the indemnity clause. Valero did not breach its agreement to indemnify Kellogg until Kellogg made a demand for indemnity, and Valero refused to perform. It was only at this time that the statute of limitations began to run.

The record reveals that Kellogg made its demand for attorney's fees on November 20, 1991, and filed its claims for attorney's fees on the same day. Thus, even if Valero repudiated the contract, Kellogg still satisfied the statute of limitations.

### Conclusion

Kellogg and Ingersoll–Rand's claims for attorney's fees were not compulsory counterclaims and are not barred by *res judicata.* Further, the claims were filed within the applicable limitations period. Accordingly, we reverse the court of appeals' judgment and remand to the trial **\*212** court for further proceedings consistent with this opinion.

Justice OWEN did not participate in the decision.

### ON REHEARING

 **[14]**    Like Kellogg, which filed its claim for attorney's fees in *Valero I* after judgment was rendered but before severance was granted, Valero filed an amended petition. Unlike Kellogg, which for the first time asserted a claim for affirmative relief, Valero repackaged its original tort claim upon which the adverse judgment had been rendered as a contract claim. Valero urged in the court of appeals by conditional cross-point that if *res judicata* did not bar Kellogg's claim, then likewise, *res judicata* would not bar its breach of contract claim. The court of appeals, because of its disposition of the appeal, did not consider Valero's cross-point. [1] But because we are reversing and remanding this case to the trial court, Valero, on motion for rehearing, reminds us of its cross-point and we consider it now. [2]

Valero's cross-point has no merit. Valero's late-filed amended petition circumvents the trial court's adverse ruling in *Valero I.* In *Valero I,* Valero attacked the validity of the indemnity agreement. By its late-filed amended petition, Valero recast its attack on the indemnity provision as a breach of contract claim, which is classic claim-splitting. This, Valero cannot do. [3] The subject of the judgment in *Valero I* was Valero's liability under the indemnity provision; it cannot escape the effect of that judgment through a late-filed amended petition, whether there was a severance order or not. The trial court properly concluded that Valero's "new" breach of contract claim is barred by *res judicata.*

Our opinion and judgment of June 24, 1999 remain unchanged.

### All Citations

997 S.W.2d 203, 42 Tex. Sup. Ct. J. 818

---

Footnotes

1    Valero Energy Corp. appears individually and as parent corporation of Valero Refining & Marketing Co. Valero Refining & Marketing Co. (formerly known as Saber Energy, Inc.) appears individually and as parent corporation of Valero Refining Co. Valero Refining Co. (formerly known as Saber Refining Co.) appears individually. We refer to these respondents as "Valero."

2    We refer to petitioners, M.W. Kellogg Co., M.W. Constructors, Inc., M.W. Kellogg Constructors, Inc., Kellogg Rust Synfuels, Inc., and Henley/MWK Holdings, Inc., as "Kellogg."

3    We refer to petitioners, Ingersoll–Rand Co., and Dresser–Rand Co., as "Ingersoll–Rand."

4    *See Valero Energy Corp. v. Kellogg Constr. Co.,* 866 S.W.2d 252 (Tex.App.—Corpus Christi 1993, writ denied) ("*Valero I* ").

5    *See* 953 S.W.2d 861 ("*Valero II* ").

6    *See* TEX. BUS. & COM.CODE § 17.46.

7    *See Valero I,* 866 S.W.2d 252.

8    *See* TEX. CIV. PRAC. & REM.CODE § 16.004(a)(3).

9    953 S.W.2d at 866, 868.

10    *See Getty Oil Co. v. Insurance Co. of N. Am.,* 845 S.W.2d 794, 798 (Tex.1992) (citing *Barr v. Resolution Trust Corp.,* 837 S.W.2d 627, 630 (Tex.1992)), *cert denied,* 510 U.S. 820, 114 S.Ct. 76, 126 L.Ed.2d 45 (1993); *Gracia v. RC Cola–7–Up Bottling Co.,* 667 S.W.2d 517, 519 (Tex.1984); *Texas Water Rights Comm'n v. Crow Iron Works,* 582 S.W.2d 768, 771–72 (Tex.1979).

11    *See Barr,* 837 S.W.2d at 629.

12    *See id.; Jeanes v. Henderson,* 688 S.W.2d 100, 103 (Tex.1985).

13    *See* TEX.R. CIV. P. 97(a); *Valley Forge Ins. Co. v. Ryan,* 824 S.W.2d 236, 238–39 (Tex.App.—Fort Worth 1992, no writ); *Lesbrookton, Inc. v. Jackson,* 796 S.W.2d 276, 281 (Tex.App.—Amarillo 1990, writ denied); *Swiss Ave. Bank v. Slivka,* 724 S.W.2d 394, 396 (Tex.App.—Dallas 1986, no writ).

14    *See* TEX.R. CIV. P. 97(a) & (d); *Wyatt v. Shaw Plumbing Co.,* 760 S.W.2d 245, 247 (Tex.1988); *see also Denbina v. City of Hurst,* 516 S.W.2d 460, 463 (Tex.Civ.App.—Tyler 1974, no writ) ("Under Sections (a) and (d) of [Rule 97] a party is not required to file a counterclaim unless the claim is mature at the time the answer is due.") (citing McDonald, *Texas Civil Practice,* § 7.49, p. 285 (1970)).

15  *See Wyatt,* 760 S.W.2d at 247.

16  *See, e.g., Ryan,* 824 S.W.2d at 239; *Stille v. Colborn,* 740 S.W.2d 42, 44 (Tex.App.—San Antonio 1987, writ denied); *Gray v. Kirkland,* 550 S.W.2d 410, 411 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.).

17  *See Tubb v. Bartlett,* 862 S.W.2d 740, 750 (Tex.App.—El Paso 1993, writ denied); *Russell v. Lemons,* 205 S.W.2d 629, 631 (Tex.Civ.App.—Amarillo 1947, writ ref'd n.r.e.).

18  *See, e.g., Tubb,* 862 S.W.2d at 750; *Bernard v. L.S.S. Corp.,* 532 S.W.2d 409, 410 (Tex.Civ.App.—Austin 1976, writ ref'd n.r.e.).

19  *See Tubb,* 862 S.W.2d at 750; *Russell,* 205 S.W.2d at 631.

20  *See Humana Hosp. Corp. v. American Med. Sys., Inc.,* 785 S.W.2d 144, 145 (Tex.1990)*; Pope v. Hays,* 19 Tex. 375, 379–80 (1857)*; Tubb,* 862 S.W.2d at 750*; Holland v. Fidelity & Deposit Co.,* 623 S.W.2d 469, 470 (Tex.App.—Corpus Christi 1981, no writ)*; Pate v. Tellepsen Constr. Co.,* 596 S.W.2d 548, 552 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.)*; Bernard,* 532 S.W.2d at 410*; Texas Auto Servs., Inc. v. Kemp,* 478 S.W.2d 646, 648 (Tex.Civ.App.—Austin 1972, no writ); *Russell,* 205 S.W.2d at 631.

21  *See, e.g., Pope,* 19 Tex. at 379; *Tubb,* 862 S.W.2d at 750*; Kemp,* 478 S.W.2d at 648; *Russell,* 205 S.W.2d at 631*.*

22  *See* TEX.R. CIV. P. 97, Notes and Comments.

23  6 Charles Alan Wright and Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1411, at 82–84 (2d ed.1990) (footnotes omitted) (emphasis added).

24  845 S.W.2d 794 (Tex.1992).

25  *Id.* at 799.

26  *See id.* at 800 ("The cross-claimant [Getty] becomes a plaintiff for *res judicata* purposes, and is required to assert all claims against the cross-defendant arising from the subject matter of the original cross-claim.").

27  *See Barr,* 837 S.W.2d at 630.

28  *See Getty,* 845 S.W.2d at 799 (citing *Gulf, Colo. & Santa Fe Ry. Co. v. McBride,* 159 Tex. 442, 322 S.W.2d 492, 495 (1958); *Mitchell's, Inc. v. Friedman,* 157 Tex. 424, 303 S.W.2d 775, 779 (1957); *K & S Oil Well Serv., Inc. v. Cabot Corp.,* 491 S.W.2d 733, 739 (Tex.Civ.App.—Corpus Christi 1973, writ ref'd n.r.e.)).

29  *See id.* ("Forcing the indemnity suit to wait for judgment in the liability suit 'would contravene the policy of the courts to encourage settlements and to minimize litigation.' ") (citation omitted).

30  *See id.*

31  *See id.*

32  *See, e.g., Fidelity Mut. Life Ins. Co. v. Kaminsky,* 820 S.W.2d 878, 882 (Tex.App.—Texarkana 1991, writ denied).

33  *Id.*

34  *Id.*

35  *See Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d 826, 828 (Tex.1990).

36  *See* TEX.R. CIV. P. 11.

37  *See* TEX. CIV. PRAC. & REM.CODE § 16.004(a)(3).

38  *See KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999); *Burns v. Thomas,* 786 S.W.2d 266, 267 (Tex.1990); *Willis v. Maverick,* 760 S.W.2d 642, 646 (Tex.1988).

39  *See City of San Antonio v. Talerico,* 98 Tex. 151, 81 S.W. 518, 520 (1904); *Koonce v. Quaker Safety Prod. & Mfg. Co.,* 798 F.2d 700, 706–13 (5th Cir.1986) (discussing application of Texas law); *see also* Maurice T. Brunner, Annotation, *When Statute of Limitations Commences to Run Against Claim for Contribution or Indemnity Based on Tort,* 57 A.L.R.3d 867, 875–76 (1974).

40  *See Hubble v. Lone Star Contracting Corp.,* 883 S.W.2d 379, 382 (Tex.App.—Fort Worth 1994, writ denied).

41  *See Murray v. Crest Constr., Inc.,* 900 S.W.2d 342, 344 (Tex.1995)*; Greenwall Theatrical Circuit Co. v. Markowitz,* 97 Tex. 479, 79 S.W. 1069, 1071 (1904); *America's Favorite Chicken Co. v. Samaras,* 929 S.W.2d 617, 626 (Tex.App.—San Antonio 1996, writ denied).

1  *See* 953 S.W.2d at 869.

2  *See* TEX.R.APP. P. 53.4.

3  *See* RESTATEMENT (SECOND) OF JUDGMENTS §§ 24, 25(1); *Barr v. Resolution Trust Corp.,* 837 S.W.2d 627, 629–31 (Tex.1992).

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---



KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Reliance Steel & Aluminum Co. v. Sevcik, Tex., September 26, 2008

942 S.W.2d 186
Court of Appeals of Texas,
Beaumont.

Reuben A. ISERN, M.D., Appellant,
v.
Helen WATSON and Rix Watson, Appellees.

No. 09–95–344 CV. | Submitted
Dec. 5, 1996. | Decided March 20, 1997.

Patient brought medical malpractice against physician to recover for amputation of leg, after physician's alleged negligence in failing to properly diagnose and treat patient, or to seek consultation from specialist. Following remand, 782 S.W.2d 546, the 60th District Court, Jefferson County, Gary Sanderson, J., entered judgment for patient, reduced award by patient's contributory negligence, and awarded patient $3,091,495.43. Physician appealed and patient cross-appealed. The Court of Appeals, Ron Carr, J. (Assigned), held that: (1) jury's findings were not in conflict; (2) patient's expert was entitled to testify that physician was negligent; (3) whether physician was negligent in failing to perform test on patient was question for jury; (4) expert testimony supported damage award of $5,500 in future medical expenses; (5) patient's testimony supported damage award of $200,000 for future physical pain or mental anguish; (6) patient's reference to insurance during closing argument did not warrant grant of mistrial; (7) total damage award was not excessive; and (8) whether patient was contributorily negligent was question for jury.

Affirmed.

West Headnotes (25)

**[1] Trial**
🔑 Form in General

Submission of jury question that encompasses more than one independent ground of liability in same question, known as "broad-form

submission," is not mandatory. Vernon's Ann.Texas Rules Civ.Proc., Rule 277.

2 Cases that cite this headnote

**[2] Appeal and Error**
🔑 Nature of Error or Defect

**Appeal and Error**
🔑 Necessity of Timely Objection

Physician waived any alleged error as to conflict in jury findings in malpractice action, where physician failed to object to receipt of verdict or at time that any of jury's findings were in conflict before discharge of jury.

3 Cases that cite this headnote

**[3] Trial**
🔑 Failure to Answer Interrogatories or Make Findings

Affirmative finding as to one question on verdict form which will sustain judgment can never conflict with unanswered question.

1 Cases that cite this headnote

**[4] Health**
🔑 Verdict and Findings

Negative finding of jury question regarding physician's alleged negligence in failure to obtain arteriogram, and affirmative finding of question as to whether physician was negligent in failing to hospitalize patient for further diagnosis, tests, or medical evaluation did not create conflict of jury answers in malpractice action; questions did not involve same subject matter, but rather related to two different negligence claims.

Cases that cite this headnote

**[5] Health**
🔑 Verdict and Findings

Jury's affirmative answer to question regarding alleged negligence in physician's failure to hospitalize patient and jury's refusal to find that physician was negligent in failing to have patient's injury evaluated by cardiovascular

specialists were not in conflict in malpractice action.

Cases that cite this headnote

**[6]** **Courts**
 Trial or Evidence, Rulings Relating To

Determination in medical malpractice action that fact issue existed as to whether physician was negligent in failing to use doppler instrument, and in failing to hospitalize patient for further observation and further testing, was law of case on retrial.

Cases that cite this headnote

**[7]** **Evidence**
 Matters Directly in Issue

Physician who testified as expert for patient in medical malpractice action was provided with proper legal definition of negligence, and thus was entitled to testify that defendant physician was negligent.

2 Cases that cite this headnote

**[8]** **Evidence**
 Due Care and Proper Conduct

Medical expert evidence that is based on reasonable medical probability, other than ultimate issue evidence, will support jury finding in malpractice action.

1 Cases that cite this headnote

**[9]** **Health**
 Questions of Law or Fact and Directed Verdicts

Whether physician was negligent in failing to perform test on 270–pound patient who hurt her leg when she fell down was question for jury in patient's medical malpractice action.

1 Cases that cite this headnote

**[10]** **Evidence**
 Damages

Damage award of $5,500 in future medical expenses to patient whose leg was amputated as result of physician's negligence was supported by expert testimony that patient would be confined to wheelchair for life, that she would be deprived of normal exercise and activities which could cause future problems, and she would require "future follow-up."

Cases that cite this headnote

**[11]** **Damages**
 Particular Cases

**Health**
 Amount

Damage award of $200,000 for future physical pain or mental anguish to patient whose leg was amputated as result of physician's negligence was supported by testimony of patient as to her ongoing pain and inability to do things she formerly did, that she and her husband no longer had normal sex life, and fact that patient had 20 years of life expectancy.

Cases that cite this headnote

**[12]** **Damages**
 Particular Cases

Pure mental anguish associated with loss of leg will support $200,000 damage award.

Cases that cite this headnote

**[13]** **Husband and Wife**
 Personal Injuries to Wife Resulting in Loss of Services or Consortium, Impairment of Earning Capacity, or Expenses

**Husband and Wife**
 Personal Injuries to Husband

Loss of services of spouse as homemaker, loss of marital rights, and loss of society and companionship do not all constitute loss of consortium, but rather provide separate bases for recovery of damages by spouse for harm to other spouse.

Cases that cite this headnote

**[14] Trial**
 In General; Duty of Court

Patient's reference to insurance during closing argument of medical malpractice action did not cause rendition of improper verdict, and thus did not warrant grant of mistrial; at most reference was casual or inadvertent reference to insurance coverage and at least as having different connotations. Rules App.Proc., Rule 81(b)(1).

1 Cases that cite this headnote

**[15] Appeal and Error**
 Requests and Failure to Give Instructions

**Appeal and Error**
 Necessity of Timely Objection

Physician waived any error of objectionable argument from patient's reference to insurance in closing argument of malpractice action, where physician failed to timely object and request instruction that jury disregard argument.

Cases that cite this headnote

**[16] Appeal and Error**
 Arguments and Conduct of Counsel

**Appeal and Error**
 At Trial or Hearing

**Appeal and Error**
 Error Committed or Invited by Party Complaining

**Appeal and Error**
 Arguments and Conduct of Counsel

To establish reversible error in jury argument, appellant must prove argument was not invited or provoked, was preserved by proper trial predicate such as objection, motion to instruct, or motion for mistrial, that error was not curable by instruction, prompt withdrawal of statement, or reprimand from court, and that argument constituted reversible harmful error.

1 Cases that cite this headnote

**[17] Appeal and Error**

 Arguments and Conduct of Counsel

In determining whether improper argument caused improper verdict, appellate court must examine argument in light of whole case, beginning with voir dire and ending with closing argument, looking at length of argument, whether it was repeated or abandoned, whether there was cumulative error, and probable effect of argument on material finding.

Cases that cite this headnote

**[18] Appeal and Error**
 Reference to Insurance or Other Indemnity

Complaining party must establish that mere injection of word "insurance" in argument actually caused improper verdict to warrant mistrial or reversal; in absence of clear showing that any reference to insurance resulted in any harm or prejudice, refusal to declare mistrial is not error.

1 Cases that cite this headnote

**[19] Interest**
 Constitutional and Statutory Provisions

Tort Reform Act which required prejudgment interest on future damages applied to medical malpractice action even though action was commenced prior to effective date, since action proceeded to retrial following appeal. Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6.

Cases that cite this headnote

**[20] Interest**
 Prejudgment Interest in General

There exists no necessity to segregate past and future damages to award prejudgment interest on future damages.

Cases that cite this headnote

**[21] Constitutional Law**
 Tort or Financial Liabilities

**Interest**
 Torts; Wrongful Death

Prejudgment interest in tort cases does not violate defendant's constitutional due process safeguards. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[22]** **Health**
 Amount

Damage award in excess of $3.1 million was not excessive in medical malpractice action in which patient suffered amputation of leg as result of physician's negligence.

Cases that cite this headnote

**[23]** **Evidence**
 Construction

Counsel for physician who was defendant in medical malpractice action did not make judicial admission that patient was not contributorily negligent when, during closing argument, he stated, "you haven't heard me claim anything about [patient] being negligent during this trial or offer any evidence on that. That's up to you to --."

2 Cases that cite this headnote

**[24]** **Evidence**
 Due Care and Proper Conduct

Jury was not bound by testimony of expert witnesses as to whether patient was contributorily negligent in medical malpractice action against physician.

1 Cases that cite this headnote

**[25]** **Health**
 Questions of Law or Fact and Directed Verdicts

Whether patient was contributorily negligent in failing to return to emergency room or see other physician was question for jury in patient's medical malpractice action in which patient alleged that physician was negligent, and that negligence caused amputation of her leg.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*189** Denice Smith, Houston, Jo Ben Whittenburg, Orgain, Bell & Tucker, Beaumont, for appellant.

John H. Holloway, Houston, for appellee.

Before BURGESS, STOVER and CARR, JJ.

## OPINION

CARR, Justice [1].

This is a medical malpractice case which arises out of appellees Helen and Rix Watson's claim that appellant, Dr. Reuben A. Isern, was negligent in failing to properly diagnose and treat Mrs. Watson, or to seek a consultation from a specialist, during her visit to a hospital emergency room after a fall. The Watsons claimed at trial that the alleged acts or omissions of Dr. Isern caused Mrs. Watson's leg to be later amputated at the knee.

This appeal is from a retrial of this case and is the second time the case has been appealed to this Court. In the first trial, the jury awarded zero damages to the Watsons and the trial judge rendered judgment that the Watsons take nothing. *Watson v. Isern,* 782 S.W.2d 546 (Tex.App.—Beaumont 1989, writ denied) (Brookshire, J., writing).

In the second trial, the jury found that Dr. Isern was negligent in failing to hospitalize Mrs. Watson for further evaluation and negligent in failing to do a "Doppler" exam to assure that there was no major damage to a blood vessel. The jury awarded Mrs. Watson $1,432,600 and Mr. Watson $9,000 in damages. With reduction of the damages by 35% for contributory negligence, the trial court rendered judgment for damages, with prejudgment interest, in the amount of $3,091,495.43, plus post-judgment interest and cost.

Dr. Isern has appealed asserting eight points of error. The Watsons, in five cross-points, have appealed the jury's 35% apportionate finding that Mrs. Watson was negligent in failing to return to the emergency room or seek other medical care prior to seeing another doctor on Tuesday, following her injury on Saturday. We affirm.

*Evidence*

On May 1, 1982, Mrs. Watson fell and injured her right leg. She weighed 270 pounds at the time. She arrived at the emergency room of a Beaumont hospital at 11:50 p.m. where Dr. Isern saw her. She complained of pain in the right knee, lower leg and ankle.

After X-raying her and finding that the leg was not broken, but finding that there was some damage to the knee joint area, Dr. Isern discharged Mrs. Watson. She was to remain in bed for two or three days, applying ice packs to the knee. Tylenol pain medication was prescribed.

The hospital records reflect her discharge at 1:50 a.m. Sunday morning; it took her family about 30 to 40 minutes to get her into a car to go home. The Tylenol prescription was filled early Sunday morning and she took it for pain, kept the ice packs on her leg as instructed, and remained in bed except to be helped to the bathroom by her family.

Mr. Watson talked with Dr. Isern or his office early Monday morning, and while Mrs. Watson could not detail the two-sided telephone conversation, it was her understanding she was to continue with the prescribed treatment by Dr. Isern.

On Tuesday morning, Mrs. Watson called her orthopedic doctor, Dr. Shorkey. He was unavailable, so she went to see his partner, Dr. Alfred Bessell. Dr. Bessell referred Mrs. Watson across the street to St. Elizabeth Hospital. At St. Elizabeth, she was seen by a vascular surgeon, Dr. Gordon. He referred her to John Sealy Hospital in Galveston where she arrived on the evening of Tuesday, May 4, 1982.

Mrs. Watson spent almost a month at John Sealy. After several procedures on her leg, the Galveston doctors finally removed it, because **\*190** of lack of proper blood supply due to a ruptured popliteal artery.

At trial, the Watsons contended that Mrs. Watson's ruptured popliteal artery was a result of the fall on the night of May 1, 1982, before she came to see Dr. Isern and that Dr. Isern was negligent in his examination, his diagnosis and treatment of Mrs. Watson, and that it resulted in the loss of her leg.

Medical experts testified that when a popliteal artery is severed, as Mrs. Watson's was found to be at the time of her hospitalization at John Sealy, the blood supply is cut off

below the knee, and there is a window of 6–8 hours from the severance within which surgery must be performed to save the leg.

Dr. John Mayo, a board certified emergency room physician who has been in charge of the Baptist Hospital ER since 1987 or 1988, and who worked with both Dr. Isern and Nurse Lannelle (Hussey) Wilson at the Baptist Hospital ER at the time of Mrs. Watson's ER visit, testified that in his medical opinion, Dr. Isern treated Mrs. Watson correctly; and, in his medical opinion, based on reasonable medical probability, Mrs. Watson did not have a ruptured popliteal artery when Dr. Isern treated her in the ER. Part of the basis for his opinion was that a patient with a ruptured popliteal artery would have an elevated pulse of at least 120, and Mrs. Watson's was 103; that she would not have had a pulse in her foot, while Dr. Isern's medical records noted she did have a foot pulse; and, that her knee would have been gangrenous by the time she was operated on at John Sealy on Wednesday, five days after her Saturday fall and a gangrenous leg is not reflected in the Sealy operative report of her first surgery.

Mrs. Watson's subsequent treating physician, Dr. Bessell testified that there is no way to tell how long the severed popliteal artery findings had been present. He could only say that the injury had been present several hours. If Mrs. Watson had a twisting fall with dislocation a day or even two days after she left Dr. Isern's care in the ER, that would be consistent with what he and Dr. Gordon found.

Dr. Mayo further testified that in his opinion, Dr. Isern's chart of his physical exam revealed that he gave Mrs. Watson an appropriate exam, and that Dr. Isern's recommendations of bed rest, elevating the knee, and ice packs were appropriate for Dr. Isern's diagnosis.

Dr. Barbee, also a board certified emergency room physician, testified on Dr. Isern's behalf, that based upon his review of the medical records in the case and his personal knowledge, training and experience as an emergency room physician, in his opinion Dr. Isern treated Mrs. Watson properly, did a proper examination of Mrs. Watson, and made proper records in the case. Dr. Barbee further testified that had Mrs. Watson been injured to the extent she claimed, it would have been very apparent to Dr. Isern that Saturday night. Instead, Dr. Barbee raised the issue of another possible fall.

Additional factual details of this case will be stated in connection with the points to which they pertain.

### Appellant's Appeal

Dr. Isern's first point of error contends that the trial court erred in submitting jury question one [2] because (1) it was not submitted broad-form in violation of the TEX.R.CIV.P. 277, and (2) resulted in conflicting jury findings.

### Standard of Review

The standard of review for error in the court's charge is abuse of discretion. *Texas Dept. of Human Services v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990). An abuse of discretion occurs when the trial court acts without reference to guiding principles. *Id.*

Where error in the charge has occurred which caused the jury's finding to be in conflict, a legal question is presented for the appellate court. *Bender v. Southern Pacific Transportation Co.,* 600 S.W.2d 257, 260 (Tex.1980), the Supreme Court explained the test for determining whether jury findings conflict:

> **\*191** A court may not strike down jury answers on the ground of conflict if there is any reasonable basis upon which they may be reconciled.... We do not determine whether the findings may reasonably be viewed as conflicting; to the contrary, the question is whether there is any reasonably possible basis upon which they may be reconciled.

### Broad–Form Submission

 **[1]** TEX.R.CIV.P. 277 does not support appellant's argument that the practice of submitting a jury question that encompasses more than one independent ground of liability in the same question, known as "broad-form submission", is mandatory in Texas or that our trial courts have "no discretion" in submission of the charge. Rule 277 specifically directs that a broad-form submission be given only "whenever feasible".

Also contrary to appellant's "mandatory" argument is the holding by our Texas Supreme Court in *H.E. Butt Grocery Co. v. Warner,* 845 S.W.2d 258, 260 (Tex.1992):

> Because Warner tendered a proper broad-form question with appropriate instructions, the trial court should have granted her request. However, its failure to do so was not harmful error. TEX.R.APP.P. 81(b)(1). Although submitted in granulated form, the jury questions contained the proper elements of a premises liability action. Because the charge fairly submitted to the jury the disputed issues of fact and because the charge incorporated a correct legal standard for the jury to apply, we hold that the trial court's refusal to submit Warner's tendered question and instructions did not amount to harmful error.

We find that the trial court did not abuse its discretion is submitting jury question one and it did not amount to harmful error.

### Conflicting Jury Findings

 **[2]** First, we note that Dr. Isern did not object to receipt of the verdict or make any objection at the time that any of the jury's findings were in conflict before discharge of the jury, thereby "waiving" any alleged error as to any conflict in the jury findings. *See Ciba–Geigy Corp. v. Stephens,* 871 S.W.2d 317, 324 (Tex.App.—Eastland 1994, writ denied); *Durkay v. Madco Oil Co.,* 862 S.W.2d 14, 23 (Tex.App.—Corpus Christi 1993, writ denied); *Greater Houston Transp. Co. v. Zrubeck,* 850 S.W.2d 579, 586 (Tex.App.—Corpus Christi 1993, writ denied); *Roling v. Alamo Group (USA), Inc.,* 840 S.W.2d 107, 109 (Tex.App.—Eastland 1992, writ denied).

In any event, no conflict can exist between affirmative and negative answers concerning two different claims of negligence. *See Robertson Transport Co. v. Hunt,* 345 S.W.2d 293, 296 (Tex.Civ.App.—San Antonio 1961, no writ). A "No" answer to a special issue simply means that a party having the burden of proof failed to convince the jury as to such liability issue. *Herbert v. Herbert,* 774 S.W.2d 1 (Tex.App.—Fort Worth 1988, writ denied).

In order for conflicting findings to destroy each other, one finding must be such as would warrant a judgment for one of the parties, and the other finding would warrant a judgment for the other party. *Grice v. Hennessy,* 327 S.W.2d 629, 633 (Tex.Civ.App.—San Antonio 1959, no writ); *Woodard v. Tatum,* 277 S.W.2d 943, 945 (Tex.Civ.App.—Waco 1955, no writ). In addition, the existence of a claimed irreconcilable conflict between certain findings becomes immaterial if there "remains at least one finding supporting the judgment which is not in conflict with any other," *Gilcrease v. Hartford Acc. & Indem. Co.,* 252 S.W.2d 715 (Tex.Civ.App.—El Paso 1952, no writ).

Also, to present a conflict the jury findings must concern the "same subject matter." *Phipps v. City of Waco,* 551 S.W.2d 140 (Tex.Civ.App.—Waco 1977, writ ref'd n.r.e.); *Turner v. Victoria County Elec. Co-op. Co.,* 428 S.W.2d 484 (Tex.Civ.App.—Waco 1968, no writ). When testing an alleged conflict, specific findings control over general or ambiguous findings and if a conflict is apparent, the court will disregard general or ambiguous findings to resolve it. *Winn v. Ridgewood Dev. Co.,* 691 S.W.2d 832 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.).

Any apparent conflict in a jury's verdict should be reconciled if it can be done reasonably in light of the pleadings, the evidence, **\*192** the answers to other issues and the verdict as a whole. In making such determination, the court must consider the entire charge and all of the verdict. *Cox v. Huffman,* 159 Tex. 298, 319 S.W.2d 295 (1958); *Little Rock Furniture Mfg. Co. v. Dunn,* 148 Tex. 197, 222 S.W.2d 985 (1949).

**[3]** With the foregoing in mind, Dr. Isern first complains about the partial verdict. He asserts the jury's affirmative finding to Question 1(6)(a) that Dr. Isern failed to exercise ordinary care in failing to admit Mrs. Watson to the hospital for further diagnosis, tests, or medical evaluation conflicts with the jury's failure to reach a verdict to Question 1(5)(a) as to whether Dr. Isern was negligent in failing to perform the necessary physical examination of Mrs. Watson's right leg to diagnose or evaluate the nature and extent of possible vascular injuries or damages to ligaments of the knee. Doctor Isern asserts a second conflict between Question 1(3) and 1(5), claiming that the failure of the jury to answer question 1(5) conflicts with the jury's affirmative answer under question 1(3) that he was negligent in failing to use a Doppler instrument to "diagnose or evaluate the vascular system of

Mrs. Watson's injured right leg." We hold that an affirmative finding which will sustain a judgment can never conflict with an "unanswered" question. *See Stalder v. Bowen,* 373 S.W.2d 824 (Tex.Civ.App.—Dallas 1963, writ ref'd n.r.e.).

**[4]** Doctor Isern next argues a conflict between a negative finding and an affirmative finding. He asserts a conflict between the negative finding of Question 1(4), regarding negligence in failure to obtain an arteriogram, and the affirmative finding of Question 1(6), that Dr. Isern was negligent in failing to hospitalize Mrs. Watson for "further diagnosis, tests or medical evaluation in view of the possible injuries she may have suffered ... as a result of the fall on May 1, 1982." However, it is clear that the two questioned findings do not involve the same subject matter—but rather two different negligence claims, i.e., one asking about the failure to obtain an "immediate arteriogram" and the other as to whether appellant was negligent in failing to hospitalize Mrs. Watson for further diagnosis, tests or medical evaluation.

**[5]** The next alleged conflict is asserted on the basis that the failure to hospitalize affirmative finding to Question 1(6) conflicts with the jury's refusal to find in Question 1(1) that Dr. Isern was negligent in failing to have Mrs. Watson's injury evaluated by cardiovascular specialists. We find the findings are not in conflict. *See Robertson,* 345 S.W.2d at 296; *Herbert,* 774 S.W.2d at 3. For the reasons stated, appellant's first point of error is denied.

Appellant's second point of error argues the negligence/ proximate cause liability findings against Dr. Isern on the basis of no evidence and insufficient evidence that Dr. Isern was negligent (1) in failing to hospitalize Mrs. Watson or (2) in not performing a Doppler exam under the circumstances to ensure that Mrs. Watson did not have a ruptured popliteal artery.

### *Evidence Standards Review*

When addressing a no evidence point, we must consider only the evidence and inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Lewelling v. Lewelling,* 796 S.W.2d 164, 166 (Tex.1990); *Alm v. Aluminum Co. of America,* 717 S.W.2d 588, 593 (Tex.1986); *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985); *White v. Sullins,* 917 S.W.2d 158 (Tex.App.— Beaumont 1996, writ denied). Where there is no evidence to support the jury's verdict, and the appellant has filed

a motion for judgment n.o.v. as here, the case must be reversed and rendered, and the plaintiff takes nothing. *Id.* When reviewing an insufficient evidence point, however, we consider and weigh all the evidence; and we set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Dyson v. Olin Corp.,* 692 S.W.2d 456, 457 (Tex.1985); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). If we sustain a factual insufficiency point, we must "clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance of the evidence as to be manifestly unjust." *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996), quoting **\*193** *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). If we find factually insufficient evidence to support a jury's verdict, we must remand for a new trial. *Id.*

### *Law of the Case*

 **[6]**  This Court held in *Watson,* 782 S.W.2d at 553–555, that the evidence of Dr. Ivey and Dr. Wolma, the same evidence offered on retrial, raised a fact issue as to Dr. Isern's negligence in failing to use the doppler instrument, and in failing to hospitalize Mrs. Watson for further observation and further testing; and, that the failure to submit the above two issues was error, and required reversal. Such holdings constitute the "law of the case" to be applied on appeal following a second trial. The law of the case doctrine applies where the appellate court holds that there was evidence raising a fact issue for the jury, and in a second trial the jury returned a verdict for the plaintiffs on almost identical evidence. *Lincoln National Life Insurance Co. v. Roosth,* 306 F.2d 110 (5th Cir.1962), *cert. denied,* 372 U.S. 912, 83 S.Ct. 726, 9 L.Ed.2d 720 (1963); *Consolidated Casualty Ins. v. Smith,* 309 S.W.2d 80 (Tex.Civ.App.—Houston 1958, writ ref'd n.r.e.); *Bingham v. Kimbrell,* 285 S.W.2d 312 (Tex.Civ.App.—Austin 1955, writ ref'd n.r.e.).

We deny appellant's second point of error based upon the "law of the case doctrine". However, in the interest of justice we will address the conflicting evidence presented by both sides at retrial.

### *Competence of Medical Expert Testimony*

It is well-established that the plaintiff must offer medical expert testimony to prove a medical malpractice case against a physician because Texas law considers medical negligence cases to involve scientific, technical, specialized and complicated knowledge, skills and standards that are difficult or impossible for a jury to evaluate without the guidance of medical expert testimony. *See Hood v. Phillips,* 554 S.W.2d 160, 165–66 (Tex.1977); *Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1965).

In 1987, the Texas Supreme Court abandoned the prior "ultimate issue rule" which prevented experts in Texas cases from expressing an opinion on mixed law-fact issues prior to the adoption of TEX.R.CIV.EVID. 704. *See* Danell L. Keith, *Medical Expert Testimony in Texas Medical Malpractice Cases,* 43 Baylor L.Rev. 1,17 (1991). In other words, experts, may now testify as to whether a defendant's conduct constituted "negligence," "gross negligence," "proximate cause," or the like. *See Louder v. DeLeon,* 754 S.W.2d 148–49 (Tex.1988); *Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 365 (Tex.1987). *See also* TEX.R.CIV.EVID. 704.

However, this new era of freedom allowing experts to testify on the ultimate issue is not without bounds. The Supreme Court has said that:

> Fairness and efficiency dictate that an expert may state an opinion on a mixed question of law and fact *as long as the opinion is confined to the relevant issues and is based on proper legal concepts.*

*Louder,* 754 S.W.2d at 148–49, quoting *Birchfield,* 747 S.W.2d at 365 (emphasis supplied).

Accordingly, before a testifying expert's opinion can be rendered, a predicate must be laid showing that the expert is familiar with the proper legal definition in question. *E–Z Mart Stores, Inc. v. Terry,* 794 S.W.2d 63, 65 (Tex.App.—Texarkana 1990, writ denied).

 **[7]**  With the foregoing in mind, appellant first argues that only Dr. Davies and Dr. Sibley testified to "the ultimate issue, i.e.", that Dr. Isern was "negligent and/or grossly negligent", and because such testimony by both witnesses was not based on proper legal concept in that neither was given a proper legal definition of the "terms", and, there is no evidence that either was knowledgeable about such legal terms, there is no competent expert medical evidence to support the jury findings against Dr. Isern of negligence or proximate cause.

[8]   We reject appellant's argument for two reasons. First, our review of the record reflects that while Dr. Sibley did testify as to negligence he was provided with a proper legal definition of that term and appellant's **\*194** lack of legal concepts [3] argument so far as Dr. Sibley is concerned is without merit. Second, the "ultimate issue rule" is permissive and not mandatory and we find no authority to the contrary. We hold medical expert evidence that is based on reasonable medical probability, other than, "the ultimate issue" evidence, will support a jury finding.

### *"Doppler"* [4] *Liability Evidence*

[9]   Doctor Isern testified that he performed a thorough physical exam, and that he felt Mrs. Watson's pulses in the foot. He further testified where the foot pulses are felt, a "Doppler" exam is not necessary.

Doctor George Sibley testified that a "Doppler exam" was mandatory in Mrs. Watson's case because of her weight and because it was an easy test to do.

Doctor Sibley stated he was an Orthopedic Surgeon in 1986. He further testified that a total transection or disruption of the popliteal artery is unusual; that there are tests like a "Doppler" or an arteriogram, but that a physical examination should be sufficient; that you might check a pulse in the ankle if you have a question about circulation as to whether the pulse is present or faint. Doctor Sibley opined that an absent pulse is the sort of finding that would lead a doctor to use a "Doppler."

Doctor Fred Wolma, a teaching Galveston Cardiovascular Surgeon, opined that at the time of her injury [fall] Mrs. Watson most likely sustained an injury to the popliteal artery; that at the time of Mrs. Watson's surgery it appeared her artery had been totally "torn apart, disruptured, transected"; and, that with that type of damage one would not be able to feel a pulse in her foot.

Doctor Al Davies, an Associate Professor at Baylor Medical School, admitted that there would have been no need for a "Doppler" exam if the patient's distal pulses were good; that a "Doppler" exam is only used if there is some question as to the patient's pulses; and, that failure to do one of two things would fall below the standard of care of the profession, either to examine Mrs. Watson's other leg or perform a Doppler, not both.

Doctor Martin Ivey, a treating Orthopedic Surgeon at John Sealy Hospital, when asked if a Doppler instrument would be "a better thing to utilize to test the sufficiency of a popliteal artery than merely feeling it with your hand", answered, "Well, I've always had difficulty, personally, feeling a popliteal artery directly in the back of the knee because of the other structures and fatty tissue. I think a Doppler is helpful in some cases to detect pulses in the foot area."

Lastly, Dr. Bessell testified that a Doppler is not a more reliable tool if a pulse in the foot is palpable; that a Doppler is only more reliable if the pulse is not palpable; and that a physician might now use a Doppler for injuries, but back in 1982 in all reasonable medical probability a physician would not have. Dr. Bessell further testified that in all reasonable medical probability, if Mrs. Watson's popliteal artery had been ruptured, Dr. Isern would not have been able to feel the pedal pulse.

### *Evidence of Failure to Hospitalize*

Mrs. Watson testified that Dr. Isern did not tell her of the possibility of damage to the blood vessels, which might require the leg to be amputated if surgery was not done; that a Doppler exam was available to test the blood supply to her leg; that an arteriogram may be necessary; or tell her of any other risk which would directly or by inference advise her she stood a risk of amputation of her leg if her injury was not properly diagnosed and treated.

Dr. Isern testified that based upon the history of the patient's fall that he did consider "she could have disrupted the ligaments of the knee or that she could have suffered a rupture or damage to the popliteal artery or **\*195** an artery or vein in the leg or any nerve in the leg." Based upon the findings of a ruptured popliteal artery and disruption of the cruciate and lateral ligaments in the surgery at Galveston, Dr. Isern admitted the facts reveal that when he saw her she had the "ultimate risk of losing her leg." Doctor Isern also admitted, based upon the assumption that the injury to Mrs. Watson's popliteal artery occurred at about 11:00 p.m. Saturday, that when he discharged her from the emergency room at approximately 2:00 a.m. Sunday, three hours of the "golden time" to repair the damage has already passed, which involved a loss of one-half of the "ideal six-hour" safety zone necessary to save the leg from amputation. Based upon a hypothetical "assumption" of facts favorable to Mrs.

Watson's version of her injury and medical evaluation, Dr. Isern admits he would not have discharged her from the hospital based upon such facts or circumstances, and that he would have been alerted to the possibility of a ruptured popliteal artery. He also admits he knew that the overall statistical literature reflects that 21 to 25% of dislocation of the knee injuries will cause a rupture of the artery and that, using the patient's history of dislocation of her knee, coolness of the leg, and feeling of ants crawling on the leg, the symptoms are those of "probably a popliteal artery rupture."

Doctor Sibley testified that the "golden time" to repair a ruptured popliteal artery in order to prevent a loss of the leg is probably six hours and that "Beyond that time the chance of saving the leg is fairly remote; and if you get ten hours ... in an adult I don't think you can save a usable leg." Dr. Sibley testified that discharging the patient with the advice to go home and put an ice pack on the knee, stay off her feet and elevate the leg on a pillow, and to take Tylenol for pain is not appropriate treatment and involved an entire want of care for the patient. Doctor Sibley further testified it was negligence for Dr. Isern to discharge Mrs. Watson to go home with the statement that she was to stay off her foot, put ice packs on the leg, and to take Tylenol; and, based upon the legal definitions of negligence and proximate cause, Dr. Isern's malpractice was a proximate cause of the amputation of Mrs. Watson's leg.

Doctor Ivey testified that the "time frame" of 6 to 8 hours is "usually held as a standard" for repair of a popliteal artery in order to have a possibility of salvaging the leg; that the probability of amputation is caused by delay in repair of the popliteal artery within the 6–8 hour time frame after a traumatic injury because of "damage to the muscles and nerves, loss of their blood supply, and death of those structures"; that based upon a hypothetical question, the damage found at surgery was, with a reasonable medical probability, related to the fall described by Mrs. Watson on the Saturday night before she was seen by Dr. Isern; that there was a reasonable medical possibility that her leg could have been saved if she had undergone surgery within 6 hours after her injury; and, sending a patient home based upon such a history and findings would not be proper medical practice.

Dr. Wolma testified that based upon the condition of the leg at surgery, "there's no question that four to six hours would be essential to reestablish the circulation to that limb in order to save it"; that with a loss of blood supply, there is marked damage to the nerves and muscles that is irreparable, and based upon the history and examination that the injury

described by Mrs. Watson is the "most likely time" of the rupture of the artery; and that based upon a reasonable medical probability, her leg would probably have been saved if surgery had been performed within six hours following her fall. Based upon a hypothetical question, Dr. Wolma testified that immediate hospitalization and immediate surgery is the proper treatment for a ruptured popliteal artery, and that a patient should be advised of these facts.

Doctor Bessell opined that Mrs. Watson had suffered a "severe injury"; that if Mrs. Watson's vascular injury had been timely diagnosed, in all probability if the surgery had been done within 6–8 hours time the leg could have been saved; and, that based upon the signs and symptoms reflected by the testimony of Mrs. Watson and the ER records, the emergency room standard of care required the patient to be admitted to the hospital and further watched and evaluated.

 **\*196** As reflected by the record, each side vigorously presented evidence in support of their respective positions and at the time the evidence was conflicting, which is within the province of the fact finder to resolve. After reviewing the entire record, we find that there is some evidence and sufficient evidence to support the jury finding regarding negligence by failure to use a "Doppler" and failure to hospitalize. Accordingly, we will not substitute our judgment for that of the jury. Appellant's second point of error is denied.

Appellant's third point of error makes a no evidence attack on the jury's award of (1) $200,000.00 for future pain and suffering and (2) $5,500.00 for future medical.

### *Future Medical*

A jury may award future medical expenses based on the nature of the injuries, medical care rendered prior to trial, and plaintiff's condition at trial. *Harvey v. Culpepper,* 801 S.W.2d 596 (Tex.App.—Corpus Christi 1990, no writ); *North Houston Pole Line Corp. v. McAllister,* 667 S.W.2d 829 (Tex.App.—Houston [14th Dist.] 1983, no writ).

 **[10]** Our record reflects expert testimony that Mrs. Watson will be confined to a wheelchair for life, that she will be deprived of normal exercise and activities which could cause future problems, and she will require "future follow-up." Although Mrs. Watson testified that she was not currently receiving any medical treatment for her leg amputation, she has had various medical treatments and problems since her

injury and being confined to a wheelchair has its risks for future injury.

We find there is some evidence to support the jury's award of $5,500.00 in future medical.

### *Future Pain and Mental Anguish*

 **[11]**  Appellant's third point of error also attacks the jury's award of $200,000 to Mrs. Watson on the complaint that there is no evidence that Mrs. Watson would, in reasonable medical probability, suffer any future physical pain or mental anguish as a result of the loss of her leg.

In addressing future damages, the law entrusts to the jury's good sense what future damages would be fair and reasonable. There is no need for expert speculation because doctors do not have a crystal ball to guide them in deciding future pain and mental anguish.

Mrs. Watson was 56 years old at time of trial, and she testified that prior to her injury that she had been a "happy person" and content, with no problems with her life or family; she was able to work and do the things she wanted to do; she still has the feeling that her leg is still there, although she tries to ignore it, and has the mental awareness of "feeling of pain and discomfort in her leg"; that she continues to suffer quite a bit, and mentally she suffers because she cannot do the things for her grandchildren she should be able to do; that she cannot go places without being pushed in her wheelchair, and has problems getting in and out of a car, which she says, "it's just a misery to me"; that she experiences severe pain or discomfort from the leg that was amputated as an everyday thing; and, that she has mental anguish about dying and having to go before God without a leg, because everything in Heaven is perfect: "So, me with one leg and I would have to face God like this, that's hard on me."

Mr. Watson testified that his wife has been affected pretty badly by the loss of her leg; that it "hurts her to her heart" that she cannot do things she wants to do, including being with her grandchildren; and, that she sometimes says that she is "happy but just don't feel right," and that she is "just not like other persons with a leg." They had a normal sexual life before she lost her leg, but now they do not, and it bothers his wife; and, the loss of her leg has effected her mentally and she is "depressed" and seems "anxious and worried about her problems and the loss of her leg."

The undisputed facts are that Mrs. Watson's life has been totally altered by the amputation of her leg, and she is confined for her remaining lifetime to a wheelchair.

Life expectancy is entrusted to the "common sense of a jury," and in this case it is **\*197** reasonable that Mrs. Watson may live at least another 20 years. Using 20 years as her life expectancy, the jury allocated $10,000 a year for physical pain and mental anguish.

### *The Above Evidence*

We find there is some evidence to defeat appellant's "no evidence" attack on the jury's award of $200,000.00 for future physical pain and future mental anguish.

 **[12]**  It must also be kept in mind that the award was for both future physical pain and future mental anguish. The pure mental anguish associated with the loss of her leg will support a $200,000.00 award. *See Pipgras v. Hart,* 832 S.W.2d 360 (Tex.App.—Fort Worth 1992, writ denied); *Pentes Design, Inc. v. Perez,* 840 S.W.2d 75 (Tex.App. —Corpus Christi 1992, writ denied); *Hicks v. Ricardo,* 834 S.W.2d 587 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Gulf States Utilities Co. v. Dryden,* 735 S.W.2d 263 (Tex.App.—Beaumont 1987, no writ). Appellant's third point of error is denied.

Appellant's fourth point of error claims the trial court erred in allowing (1) impermissible elements of damages in the charge and judgment and (2) triple recovery for Rix Watson.

 **[13]**  In Question 5 the jury awarded Mr. Watson $3,000 for each of the following three (3) separate elements of damages, a total of $9,000 for past and future losses: (1) loss of services of his wife as a housewife; (2) loss of marital rights; and (3) loss of society and companionship.

Appellant's trial objection: to Question 5(1) was that Mr. Watson was entitled to "loss of household services," but not "loss of services," and that there was no definition of loss of services; to Question 5(2) that Mr. Watson is not entitled to "loss of marital rights," but only for "loss of consortium" and that the question permits the jury to speculate as to what damages are to be awarded; and to Question 5(3) that there was no definition of the term "loss of society and

companionship" and it would allow the jury to speculate upon an improper element of damage.

Appellant's fourth point of error claims that Question 5(1) through (3) damages are impermissible because such elements of damages "do not exist under Texas Law." Appellant admits that the husband is entitled to recover for loss of material rights or "consortium," *see Whittlesey v. Miller,* 572 S.W.2d 665 (Tex.1978); and is silent as to any authority regarding "loss of society and companionship."

Without citing any authority, appellant also argues that all three damage elements are all one and the same recoverable loss, i.e., loss of consortium, thus Mr. Watson was allowed a "triple recovery." We also find no authority to support appellant's argument and thus reject same by concluding that the trial court did not err in rendering judgment for the damages to Mr. Watson. Appellant's fourth point of error is denied.

### *Jury Argument*

 **[14]**    Appellant's fifth point of error complains of the trial court's refusal to grant a mistrial based on a claimed incurable jury argument which injected insurance into the case.

During closing arguments, appellant's counsel addressed the jury as follows:

> Now, she didn't walk in there with a little sign board hanging around her neck, 'I tripped and I have a ruptured popliteal artery.' She didn't know anything about popliteal arteries. He did. She didn't have the sign around her neck, but he had the knowledge to put it there. He could have hung a sign around her neck and said, 'Take this lady in a wheelchair right now and do an arteriogram. Before I let her go, I want to make sure that she doesn't lose her leg because we have already lost three hours.' *Did you ever think about insurance? We all buy insurance to protect our homes and our property.* You've heard the term since you were a little kid, 'to insure.' (sic ensure) *One of the other words used is 'to assure,'* assure that something won't happen. Don't you think that this man owed her that obligation? She walked out of there, she was going to lose her leg. She was going to lose her leg, and all he had to do was do a Doppler exam. It would have taken him, **\*198** what, ten minutes at the most ... [emphasis added]

We first reject appellees' argument that in the context of the jury argument made the use of the word "insurance' is solely synonymous with "ensure" and "assure", i.e., that Dr. Isern could have assured that Mrs. Watson would not suffer an amputation by his doing a simple, non-evasive "Doppler" exam. Rather we would characterize the use of the term "insurance" at most as a casual or inadvertent reference to insurance coverage and at least as having different connotations.

We also reject appellant's argument that the injection of insurance in a personal injury trial is always reversible error. The "presumed harmful error" no longer exists under Texas law, being replaced by the "harmless error" rule which requires the complaining party to show the error caused an improper verdict. TEX.R.APP.P. 81(b)(1).

 **[15]**    Appellant did move for a mistrial after closing of the jury argument based upon a claim that plaintiff "injected insurance into the case intentionally." However, appellant "waived" any error of objectionable argument by failing to timely object and requesting an instruction that the jury disregard the argument. *Ramirez v. Acker,* 134 Tex. 647, 138 S.W.2d 1054 (1940); *Jenkins v. Chapman,* 636 S.W.2d 238 (Tex.App.—Texarkana 1982, writ dism'd); *Travis v. Vandergriff,* 384 S.W.2d 936 (Tex.Civ.App.—Waco 1964, writ ref'd n.r.e.); *Maxwell v. Maxwell,* 204 S.W.2d 32 (Tex.Civ.App.—Amarillo 1947, writ ref'd n.r.e.); *Shaw v. Porter,* 190 S.W.2d 396 (Tex.Civ.App.—Fort Worth 1945, writ ref'd w.m.). An objection is required because the opposing party has the "right to know" of any claimed error so that he can explain or withdraw it. In fact, upon insisting that the mere word insurance was prejudicial, the trial court could have cured any error by an instruction that insurance had nothing to do with the case to be decided and was to be disregarded. *See Patranella v. Scott,* 370 S.W.2d 922 (Tex.Civ.App.—Waco 1963, no writ).

Instances in which jury argument results in incurable harm are rare. *Strahan v. Davis,* 872 S.W.2d 828, 836 (Tex.App.—Waco 1994, writ denied). Not every casual mention of the word 'insure' requires either a mistrial or new trial.  *Id; Dennis v. Hulse,* 362 S.W.2d 308 (Tex.1962); *Trice Contract Carpets & Furniture Co. v. Gilson,* 329 S.W.2d 476, 483 (Tex.Civ.App.—Houston 1959, writ ref'd n.r.e.).

 **[16]**    To establish reversible error in jury argument, appellant must prove (1) the argument was not invited or provoked, (2) was preserved by proper trial predicate such as an objection,

motion to instruct, or motion for mistrial, (3) that the error was not curable by instruction, prompt withdrawal of the statement, or reprimand from the court, and (4) that the argument constituted "reversible harmful error." *Wells v. HCA Health Services of Texas, Inc.,* 806 S.W.2d 850, 854 (Tex.App.—Fort Worth 1990, writ denied).

 **[17]**    *Haryanto v. Saeed,* 860 S.W.2d 913 (Tex.App.—Houston [14th Dist.] 1993, writ denied), holds that where the complaining party complains of incurable harm he must show that the alleged improper argument causing harm was greater than the "probability that the verdict was based upon proper proceedings and evidence." In making that determination, an appellate court must examine the argument in light of the whole case, beginning with voir dire and ending with closing argument. The court must look at the length of the argument, whether it was repeated or abandoned; whether there was cumulative error, and the probable effect of the argument on a material finding. *Id.* at 919.

 **[18]**    Moreover, it is essential that the complaining party establish that the mere injection of the word "insurance" actually caused an improper verdict. *Tripp v. Bloodworth,* 374 S.W.2d 713, 717 (Tex.Civ.App.—Eastland 1964, writ ref'd n.r.e.).

In the absence of a clear showing that any reference to insurance resulted in any harm or prejudice, refusal to declare a mistrial is not error. *Red Ball Motor Freight, Inc. v. Cordova,* 332 S.W.2d 753 (Tex.Civ.App.—Beaumont 1960, writ ref'd n.r.e.); *Southwestern Freight Lines v. McConnell,* 269 S.W.2d 427, 430–31 (Tex.Civ.App.—El Paso 1954, writ ref'd n.r.e.). Mere mention of insurance **\*199** before a jury does not result in an automatic mistrial or reversal. The complaining party has an obligation to prove that it was prejudicial and reasonably calculated to create an improper verdict.   TEX.R.CIV. EVID. 411; *Beall v. Ditmore,* 867 S.W.2d 791 (Tex.App.—El Paso 1993, writ denied).

In summary, we find the questioned jury argument was at most only a casual and incidental reference to insurance which while we do not condone, does not rise to the level of error; that in any event, error, if any, could have been corrected and was waived by appellant's failure to object and request an instruction to disregard; and in the light of the whole case we cannot say that such jury argument error amounted to such a denial of rights of appellant as was reasonably calculated to cause and primarily did cause rendition of an improper judgment in this case,

TEX.R.APP.P. 81(b)(1). For the reasons stated, appellant's fifth point of error is rejected.

### *Prejudgment Interest on Future Damages*

Appellant's sixth point of error contends the trial court erred in awarding prejudgment interest on the future damages awarded the Watsons.

 **[19]**    Appellant argues that *Cavnar v. Quality Control Parking,* 696 S.W.2d 549 (Tex.1985), controls the prejudgment interest award in this case because the suit filed in September 1983, asserts an injury in 1982, a time prior to the Tort Reform Act which added section 6 to article 5069–1.05 to require prejudgment interest on future damages.[5] However, article 5069–1.05 applies to actions commenced after September 1, 1987, or "*to new trials or retrials following an appeal in the action commenced before the effective date.*" *Id.; Owens–Illinois, Inc. v. Estate of Burt,* 897 S.W.2d 765, 768 (Tex.1995). This case is such a retrial following such an appeal.

 **[20]**    Appellant also argues that because Mr. Watson's past and future damages were not segregated, he is not entitled to prejudgment interest. However, since enactment of the prejudgment interest statute, there exists no necessity to segregate past and future damages. *Missouri Pacific R. Co. v. Lemon,* 861 S.W.2d 501 (Tex.App.—Houston [14th Dist.] 1993, writ dism'd by agr.) as suggested by appellant does not control this case. *Wal–Mart Stores, Inc. v. Berry,* 833 S.W.2d 587, 597 (Tex.App.—Texarkana 1992, writ denied), held that the "clear language of the statute mandates awarding prejudgment interest to the full amount of judgments, whether or not damages are segregated." The court cites *C.T.W. v. B.C.G.,* 809 S.W.2d 788, 795 (Tex.App.—Beaumont 1991, no writ), for its statement that our courts recognize that the statute makes no distinction between past and future damages, and that presumptively, the Legislature was aware of *Cavnar* when it enacted the new statute.

In *C & H Nationwide v. Thompson,* 903 S.W.2d 315 (Tex.1994), the Supreme Court specifically held that the Legislature did not intend to segregate past and future damages in the award of prejudgment interest, and held that the statute modified *Cavnar* as to allow prejudgment interest on future damages.

[21]   Lastly, appellant incorrectly asserts that *Nationwide* holds that prejudgment interest in tort cases violates a defendant's Constitutional "due process" of law safeguards. To the contrary, the opinion holds that prejudgment interest does not violate a defendant's due process of law safeguards since it meets the "rational relative test."

Appellant's sixth point of error is overruled.

### *Cumulative Error*

Failing to have found reversible error in appellant's points of error one through six, we reject appellant's "cumulative error" argument in his seventh point of error.

### *Remittitur for Excessive Damages*

[22]   Appellant's final point of error argues that the jury award to Mrs. Watson for the loss of her limb is excessive because when pre-judgment interest is added, a judgment in excess of $3.1 million in this case "shocks the conscience." Appellant cites no **\*200** authority and we know of none which supports such an argument for a remittitur based upon "prejudgment interest" [6] , which is allowed by statute.

An "abuse of discretion" test covers remittitur. *Texaco, Inc. v. Pennzoil, Co.,* 729 S.W.2d 768 (Tex.App.—Houston [1st Dist.] 1987, writ ref. n.r.e.), *certiorari dismissed,* 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988). TEX.R.APP.P. 85 does provide for a suggested "remittitur" by the Court of Appeals. However, we should not disturb the jury's award of damages "unless it is irrational or so excessive as to shock the conscience of the court." *Clark v. Smith,* 494 S.W.2d 192, 198 (Tex.Civ.App.—Dallas 1973, writ ref'd n.r.e.).

Based upon Mrs. Watson's permanent injuries there is nothing to suggest a "run-away jury" or that the damages award was due to passion, prejudice, bias or improper jury deliberations. Where the record does not show the jury was influenced by passion and prejudice in awarding damages, the Court is without power to require a remittitur. *Bluebonnet Exp., Inc. v. Foreman,* 431 S.W.2d 45 (Tex.Civ.App.—Houston [14th Dist.] 1968, no writ); *Pioneer Bus Co. v. Ward,* 422 S.W.2d 550 (Tex.Civ.App.—Houston [14th Dist.] 1967, no writ); *Texarkana Bus Co. v. Carter,* 301 S.W.2d 300 (Tex.Civ.App.—Texarkana 1957, writ ref'd n.r.e.).

Appellant's eighth point of error remittitur argument is rejected.

### *Appellees' Cross Appeal*

In Question 2(3)(a)(b) the jury found that Mrs. Watson was negligent in "failing to return to the emergency room at Baptist Hospital or to contact a physician before May 4, 1982, when she saw Dr. Bessell" and that such negligence was proximate cause of injury. [7] The jury answered the apportionment portion of Question 3 by finding Mrs. Watson's negligence was 35% in causing the amputation of her right leg and that Dr. Isern's negligence was 65% of the cause.

The trial court denied the Watson's motion to disregard the contributory findings and reduced the total damages of $1,432,600 awarded to Mrs. Watson and $9,000 awarded to Mr. Watson by 35% in entering judgment against Dr. Isern. The court denied the Watson's motion for new trial asserting she should be awarded full damages based upon no evidence, legally insufficient evidence, judicial admission of defendant, and great weight points.

In five cross-points of error, appellees contend that the trial court erred in submitting contributory negligence issues to the jury; in refusing to disregard the jury's contributory negligence findings; and, in disregarding the judgment damage award of 35% because such actions by the trial court are contrary to the judicial admissions of Dr. Isern, unsupported by legally sufficient evidence, and are so contrary to the great weight and preponderance of the evidence as to be manifestly wrong and unjust.

### *Judicial Admission*

[23]   Formal declarations in open court by a party's attorney constitute judicial admissions, and include facts asserted by pleading. *Rosse v. Northern Pump Co.,* 353 S.W.2d 287 (Tex.Civ.App.—Austin 1962, writ ref'd n.r.e.). Therefore, where submission of an issue is not supported by evidence or is contrary to judicial admissions in trial of the case, the jury's findings on such issues are not binding on either the trial court or appellate court. *Thweatt v. Ocean Acc. & Guarantee Corp.,* 62 S.W.2d 250 (Tex.Civ.App.—El Paso 1933, writ ref'd). The effect of a judicial admission is to waive proof of matters admitted in favor of an opposing

party, and the admitting party is bound by the admission. *Turner v. State,* 850 S.W.2d 210, 213 (Tex.App.—Texarkana 1993); *Markwardt v. Harrell,* 430 S.W.2d 1 (Tex.Civ.App.—Eastland 1968, writ ref'd n.r.e.); *Jones v. Underwood & Weld* **\*201** *Co., Inc.,* 406 S.W.2d 491 (Tex.Civ.App.—Beaumont 1966, no writ).

During closing jury argument, defense counsel addressed the jury as follows:

> MR. WHITTENBURG: I'm not going to talk to you about No. 2. I—you haven't heard me claim anything about Mrs. Watson being negligent during this trial or offer any evidence on that. That's up to you to—
>
> MR. HOLLOWAY: Your Honor, if that's true, then I ask that that issue be withdrawn from the Court's charge if he's not making that claim. He has pled it, and he has claimed it.
>
> MR. WHITTENBURG: I have not claimed it, your Honor. It's raised by the evidence, but I haven't claimed that.
>
> THE COURT: All right. That's denied.

The Watson's argue the trial court should have disregarded the jury's contributory negligence and apportionment findings because defense counsel's declaration amounted to a judicial admission regarding these issues. We find that the questioned jury argument does not rise to the level of a judicial admission.

### *Contributory Negligence*

**[24]** Because Mrs. Watson is an "ordinary person," her conduct may be evaluated by the jury without the need for medical or expert testimony. She is held to the standard of ordinary care, i.e., that care of a person of reasonable prudence under the same or similar circumstances. *Colvin v. Red Steel Co.,* 682 S.W.2d 243, 245 (Tex.1984); *Great Atlantic & Pacific Tea Co. v. Evans,* 142 Tex. 1, 175 S.W.2d 249, 250–51 (1943). The trier of fact may take into consideration the "common experience of mankind," to determine the care and diligence an ordinary prudent person would use to prevent injuries under the circumstances. *Id.* at 251, 175 S.W.2d 249. The testimony of the Watson experts that she was not contributorily negligent is merely some evidence that she was not negligent, and the jury was not bound by that testimony.

**[25]** In addition, each side vigorously presented evidence in support of the proposition that she was or was not herself negligent. The record reflects a number of instances of conflicting testimony which required resolution of credibility issues. These are decisions within the province of the fact finder.

After reviewing the entire record, we find that there is some evidence to support the finding of contributory negligence. Accordingly, we will not substitute our judgment for that of the jury. Appellees' cross-points are denied.

Judgment is AFFIRMED.

**All Citations**

942 S.W.2d 186

### Footnotes

1 The Honorable Ron Carr, sitting by assignment pursuant to Tex.Gov't Code Ann. § 74.003(b) (Vernon 1988).

2 Jury question one with the jury answers is attached to this opinion as Exhibit A.

3 Appellant's brief mentions that Dr. Sibley was allowed to testify that "Dr. Isern was guilty of malpractice" over his "inflammatory testimony" objection. No admission of evidence point of error or argument is made. Accordingly, we do not address that issue.

4 A "Doppler" is an instrument used to amplify pulse signals within a blood vessel.

5 . TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 6 (Vernon Supp.1997).

6 We note " prejudgment interest" in this case covers fifteen (15) years since date of injury.

7 The jury refused to find under Questions 2(1) and 2(2) that Mrs. Watson was negligent in failing to give an accurate statement as to how she was injured or in failing to accurately state what her complaints or symptoms were at the time of her fall or when seen in the Baptist Hospital, and refused to find proximate cause.

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

JJ

KeyCite Yellow Flag - Negative Treatment
**Distinguished by**    Airgas-Southwest, Inc. v. IWS Gas and Supply of
Texas, Ltd.,    Tex.App.-Hous. (1 Dist.),    August 30, 2012

982 S.W.2d 586
Court of Appeals of Texas,
Texarkana.

J.C. PENNEY COMPANY, INC., Appellant,

v.

Kristen Ashley RUTH, Appellee.

No. 06–98–00105–CV.   |   Submitted
Nov. 3, 1998.   |   Decided Nov. 25, 1998.

Customer brought action against department store for false arrest and malicious prosecution. The 136th Judicial District Court, Jefferson County, Milton Shuffield, J., entered judgment on jury verdict in favor of customer. Department store appealed. The Court of Appeals, Grant, J., held that: (1) department store did not have probable cause to prosecute customer for shoplifting, and (2) there was sufficient evidence that department store acted with malice when it prosecuted customer, as would support finding of malicious prosecution.

Affirmed.

West Headnotes (12)

**[1]**    **Malicious Prosecution**
       Nature and Elements of Malicious
Prosecution in General

To prevail on a claim of malicious prosecution, a plaintiff must establish the following: (1) commencement of a criminal prosecution against the plaintiff; (2) causation (initiation or procurement) of the action by the defendant; (3) termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) the absence of probable cause for the proceedings; (6) malice in filing the charge; and (7) damage to the plaintiff.

1 Cases that cite this headnote

**[2]**    **Malicious Prosecution**
       Grounds in General

Department store did not have probable cause to prosecute customer for shoplifting, as required to defeat customer's malicious prosecution claim, where customer did not have stolen item in her bag or on her person, the security guard did not see customer steal item, item was recovered from bag of customer's companion, security guard stated that he did not believe that customer had stolen item, and only evidence that department store had was an acknowledgment that customer claimed she signed only because security guard indicated that he would not allow her to call her mother until she signed the document.

1 Cases that cite this headnote

**[3]**    **Malicious Prosecution**
       Presumptions and Burden of Proof

There is an initial presumption that the defendant in a malicious prosecution case acted reasonably and in good faith and had probable cause to initiate the proceedings.

Cases that cite this headnote

**[4]**    **Malicious Prosecution**
       Presumptions and Burden of Proof

The presumption that the defendant in a malicious prosecution case acted reasonably and in good faith and had probable cause to initiate the proceedings disappears once the plaintiff produces evidence that the motives, grounds, beliefs, and evidence upon which the defendant acted did not constitute probable cause, and the burden then shifts to the defendant to offer proof of probable cause.

Cases that cite this headnote

**[5]**    **Malicious Prosecution**
       Probable Cause

If the facts underlying the decision to prosecute are not disputed, whether probable cause existed to prosecute is a question of law to be decided by the trial court in malicious prosecution action.

Cases that cite this headnote

**[6] Malicious Prosecution**

　　Belief in Guilt of Accused

Probable cause to prosecute, precluding malicious prosecution claim, is defined as the existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts within the knowledge of the complainant, that the person charged was guilty of the crime for which he was prosecuted.

Cases that cite this headnote

**[7] Malicious Prosecution**

　　Belief in Guilt of Accused

The determination of probable cause to prosecute, precluding malicious prosecution claim, asks whether a reasonable person would believe that a crime had been committed, given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted.

Cases that cite this headnote

**[8] Malicious Prosecution**

　　Grounds in General

In a malicious prosecution case based on a criminal complaint, the complainant's failure to make a further investigation into the suspect's state of mind does not constitute lack of probable cause if all objective elements of a crime reasonably appear to have been completed.

Cases that cite this headnote

**[9] Malicious Prosecution**

　　Belief in Guilt of Accused

In order to prevail on malicious prosecution claim, defendant must show that the evidence could only be interpreted in such a way as to provide it with probable cause to believe that plaintiff was guilty of the offense.

Cases that cite this headnote

**[10] Torts**

　　Intent or Malice

**Torts**

　　Weight and Sufficiency

Malice is defined as ill will, evil motive, or gross indifference or reckless disregard of the rights of others, and may be established by direct or circumstantial evidence.

2 Cases that cite this headnote

**[11] Torts**

　　Intent or Malice

In order to show malice, a plaintiff is not required to prove that the defendant acted with personal spite but instead that the defendant committed wrongful acts in reckless disregard of another's rights and with indifference as to whether that party would be injured.

3 Cases that cite this headnote

**[12] Malicious Prosecution**

　　Acts and Conduct Evidence of Malice

There was sufficient evidence that department store acted with malice when it prosecuted customer, as would support malicious prosecution claim, in light of the fact that, security guard who detained customer testified that he did not believe that she stole anything, agents of department store stated by deposition that the real reason for having customer sign acknowledgment admitting the theft was to avoid civil liability, and after failing to show for trial on its first prosecution of case, store filed a second complaint against customer two months after she initiated her civil suit.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*587** Michael Ray McGown, Law Office of Michael R. McGown, Beaumont, for appellant.

W. Don Bush, Beaumont, for appellee.

Before CORNELIUS, C.J., and GRANT and ROSS, JJ.

**OPINION**

GRANT, Justice.

Kristen Ruth sued J.C. Penney Company, claiming false arrest and malicious prosecution. Ruth prevailed at trial, and a jury awarded her $20,000 in actual damages, $5,000 in attorney's fees, and $50,000 in exemplary damages. J.C. Penney appeals from the denial of its motion for instructed verdict and the denial of its motion for judgment notwithstanding the verdict on Ruth's malicious prosecution claim.

J.C. Penney raises several points of error concerning two factual issues. J.C. Penney contends that Ruth presented no evidence that J.C. Penney's agents acted either with malice or without probable cause. J.C. Penney contends that, in the absence of such evidence, the court erred by denying its motion for an instructed verdict or, alternatively, erred by submitting jury question 2 to the jury or, alternatively, erred by overruling J.C. Penney's motion for j.n.o.v.

The evidence shows that Kristen Ruth, age 17, and Cori Cates, age 17, went shopping at a J.C. Penney store. They were carrying bags from other stores containing purchases made by Cates that evening. Cates picked up a pair of pantyhose and took them with her to the lingerie department, where she obtained and tried on a brassiere in a dressing room. She asked Ruth to join her in the dressing room to see if she thought the brassiere would be appropriate to wear under a prom dress. Ruth brought the bags and the pantyhose into the dressing area and stayed there briefly. While there, an announcement was made that the store was closing. When they left the dressing room, Ruth was carrying her own purse, and Cates was carrying everything else. Cates went to the counter and paid for the bra (about $43 to $45), but did not pay for the pantyhose, (valued at $5.50) which were inside one of the other bags.

After they left the store, they were stopped by security, who searched the bags carried by Cates and found the pantyhose. Cates explained that because of their hurry she had forgotten the pantyhose. Both girls were then taken to a security office and **\*588** questioned for about forty minutes before the police were called. Both girls signed what J.C. Penney describes as an "acknowledgment" form. Ruth

testified that the officers told her if she signed the form she would be permitted to go home and call her mother. Cates also testified that the officers told her and Ruth that they must sign the form before they could leave and that it was not an admission of guilt. The officers neither confirmed nor denied this allegation. They also testified that they had been trained to inform the alleged shoplifters that the form was for their own protection as well, because it would ensure that no additional items would be added to the allegedly stolen items listed on the form. The "acknowledgment," despite its name, constituted a confession of the crime of theft of the pantyhose. On that same date, Cates also signed another document entitled "Texas–Civil Demand Notice," agreeing that she had confessed to theft of merchandise and stating that she understood that she might receive a letter seeking recovery of civil monetary damages.

When the police arrived, they took both girls to jail, where Cates was shortly released, but where Ruth remained until her mother arrived at about 4:00 a.m.

J.C. Penney filed a criminal charge against Ruth in municipal court, but the charge was dismissed because J.C. Penney failed to appear for trial. After Ruth filed this lawsuit, J.C. Penney refiled the same criminal charge, but when called for trial, J.C. Penney failed to appear a second time, so the charges were dismissed again. Ruth filed suit against J.C. Penney for false arrest and for malicious prosecution. The jury found for her on both grounds. The trial court denied J.C. Penney's motion for a directed verdict, but later granted a motion for j.n.o.v. on the false arrest cause of action.

J.C. Penney has raised several points of error involving whether there was any evidence that its agents acted with malice or had probable cause to prosecute Ruth.

**[1]** To prevail on a claim of malicious prosecution, a plaintiff must establish the following:

(1) commencement of a criminal prosecution against the plaintiff; (2) causation (initiation or procurement) of the action by the defendant; (3) termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) the absence of probable cause for the proceedings; (6) malice in filing the charge; and (7) damage to the plaintiff. *Richey v. Brookshire Grocery Co.,* 952 S.W.2d 515, 517 (Tex.1997); *Metzger v. Sebek,* 892 S.W.2d 20, 41–42, 42 n. 10 (Tex.App. —Houston [1st Dist.] 1994, writ denied).

**[2]** Malicious prosecution does not present a question of whether J.C. Penney had probable cause to stop Ruth and question or arrest her. That issue is a part of the false arrest claim on which J.C. Penney obtained a j.n.o.v. The question is whether J.C. Penney had probable cause to *prosecute* Ruth. Thus, J.C. Penney contends that there is no evidence that it had no probable cause to initiate the proceedings or that it had any malice in filing the charge.

**[3]** **[4]** **[5]** We first review the record for any evidence of probable cause. There is an initial presumption that the defendant in a malicious prosecution case acted reasonably and in good faith and had probable cause to initiate the proceedings. *Richey,* 952 S.W.2d at 517; *Metzger,* 892 S.W.2d at 42. The presumption disappears once the plaintiff produces evidence that the motives, grounds, beliefs, and evidence upon which the defendant acted did not constitute probable cause. *Richey,* 952 S.W.2d at 518. The burden then shifts to the defendant to offer proof of probable cause. *Id.* If the facts underlying the decision to prosecute are not disputed, whether probable cause existed is a question of law to be decided by the trial court. *Id.; Burrows v. Neiman–Marcus Group, Inc.,* 976 S.W.2d 784 (Tex.App.—Houston [1st Dist.] 1998, n.w.h.).

**[6]** **[7]** Probable cause is defined as the existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor [complainant], that the person charged was guilty of the crime for which he was prosecuted. *Richey,* 952 S.W.2d at 517. The probable-cause determination asks **\*589** whether a reasonable person would believe that a crime had been committed, given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted. *Id.*

**[8]** In a malicious prosecution case based on a criminal complaint, the complainant's failure to make a further investigation into the suspect's state of mind does not constitute lack of probable cause if all objective elements of a crime reasonably appear to have been completed. *See Thomas v. Cisneros,* 596 S.W.2d 313, 317–18 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.); *Carswell v. Southwestern Bell Tel. Co.,* 449 S.W.2d 805, 817 (Tex.Civ.App.—Houston [1st Dist.] 1969, no writ).

In this case, the security guard watched Ruth and Cates leave the store and had probable cause to believe that one of them was leaving without paying for an item. At that point, Ruth was wearing relatively tight-fitting clothing and was carrying only a purse, while Cates was carrying multiple bags and her own purse, but this did not negate the possibility that Ruth had the item or that there had been collusion between the two. Thus, the trial court concluded that there was undisputed evidence adequately justifying a stop and arrest, and rendered a j.n.o.v. as to the false arrest claim.

When the security guard searched the bags, however, he found that Cates had the item inside one of her bags. Ruth did not have the bag containing the pantyhose, and the guard did not see Ruth hide the item. It is clear from the evidence that the bags and their contents belonged to Cates. There was no evidence of Ruth's involvement except that Ruth signed a document entitled "acknowledgment," stating that she admitted that she took "from the possession of the Company, without making payment, without the permission of the Company, the following property of the Company: 1 pantyhose."

Ruth testified that she signed the document only because they would not let her call her mother unless she signed it, and that the security guard told her that she was not admitting guilt by so doing. Cates signed this same form document and another document acknowledging that she had confessed to theft and acknowledging that she might receive a letter requiring restitution to the company.

**[9]** In order for J.C. Penney to prevail, it must show that this evidence could **only** be interpreted in such a way as to provide it with probable cause to believe that Ruth was guilty of the offense. In this review, we look to see if J.C. Penney conclusively proved that a reasonable person would believe that a crime had been committed, given the facts as J.C. Penney honestly and reasonably believed them to be before the criminal proceedings were instituted. *Richey,* 952 S.W.2d at 517. In this case, J.C. Penney could reasonably rely on Ruth's signing of the acknowledgment that admitted participation in the theft.

However, that evidence does not stand alone. The security guard who instituted the prosecution on behalf of J.C. Penney testified that even at the time of the arrest he did not believe that Ruth had stolen anything. Further, the objective evidence shows only that Ruth took all the packages into the dressing room, that the pantyhose were not visible while they were both in the dressing room, and that the pantyhose were was ultimately found in Cate's possession. In that situation, even though J.C. Penney might reasonably believe that Ruth had

participated in the theft because of her admission, the jury had before it evidence that the "acknowledgment" was obtained only through a form of mental coercion, based upon the girls' testimony that they were not permitted to contact their parents until they signed the form. In addition, the guard stated that he had been instructed to inform detainees that the "acknowledgment" was in part for their own protection—because it ensured that no J.C. Penney employee would later add more allegedly stolen items to the list on the form.

Further, the security guard testified that he did not believe that Ruth stole anything and that he was only sure that one of the girls had the pantyhose. He testified that Cates had picked up the pantyhose, that she was carrying the bags, and that the pantyhose were found in one of Cates's bags. As shown by the undisputed evidence, when **\*590** they were stopped, the pantyhose were in Cates's possession. As an employee of J.C. Penney, the security guard's knowledge was necessarily imputed to J.C. Penney. In addition, Cates signed the second "Texas–Civil Demand Notice" form discussed earlier in which she agreed that she had admitted to stealing the item.

Even if we disregarded these factors, however, the evidence also shows that the prosecution was re-instituted against Ruth only—after it had been dismissed—but that Cates (the possessor of the stolen merchandise) was not prosecuted for her alleged crime. This is also some evidence from which a jury might conclude that the prosecution was not brought because J.C. Penney believed that Ruth was guilty of the offense, but for some other reason. Thus, this no-evidence contention fails.

 **[10]**    **[11]**    **[12]**    J.C. Penney also contends that the evidence conclusively shows that it did not act with malice. Malice is defined as ill will, evil motive, or gross indifference or reckless disregard of the rights of others, and may be established by direct or circumstantial evidence. *Apache Corp. v. McLean,* 857 S.W.2d 683, 690 (Tex.App.—Houston [14th Dist.] 1993, no writ); *see Fisher v. Beach,* 671 S.W.2d 63, 67 (Tex.App.—Dallas 1984, no writ); *Dahl v. Akin,* 645 S.W.2d 506, 515 (Tex.App.—Amarillo 1982), *aff'd,* 661 S.W.2d 917 (Tex.1983). A plaintiff is not required to prove that the defendant acted with personal spite but instead that the defendant committed wrongful acts in reckless disregard of another's rights and with indifference as to whether that party would be injured. *Reed v. Lindley,* 240 S.W. 348, 351

(Tex.Civ.App.—Fort Worth 1922, no writ). Further, Texas courts have long held that the jury may infer malice from the proof of lack of probable cause. *Biering v. First Nat'l Bank,* 69 Tex. 599, 7 S.W. 90, 92 (1888); *Apache Corp.,* 857 S.W.2d at 690; *Diamond Shamrock Corp. v. Ortiz,* 753 S.W.2d 238, 241 (Tex.App.—Corpus Christi 1988, writ denied).

We have previously discussed the evidence of probable cause, or the lack thereof. In addition, the guard testified that he had told Ruth and Cates that signing the form was for their protection, but other agents of J.C. Penney stated by deposition that the real reason for having the girls sign the acknowledgment was to avoid civil liability. Indeed, as previously noted, the security guard, acting on behalf of J.C. Penney, testified that he did not believe that Ruth stole anything.

The timing of the second prosecution also raises serious questions about the purpose of the prosecution. On March 22, 1995, the first prosecution ended when the complainant failed to show for trial, and the State moved for a dismissal. Ruth filed suit against J.C. Penney on June 2, 1995. Two months later, J.C. Penney filed another complaint against Ruth, on August 23, 1995, but J.C. Penney again failed to appear at trial, and the prosecution was dismissed for a second time. Further, the prosecution against Cates, the individual who actually possessed the property, had been dismissed also but was not refiled.

It would be possible for a jury to draw the conclusion that the only reason the second complaint was filed was an effort to improve the company's legal position in Ruth's civil suit, rather than the proper purpose of bringing an offender to justice.

Based upon these factors, we conclude that there is some evidence that the jury could have taken as proof of malice. Accordingly, the trial court did not err by denying the motion for a directed verdict and the motion for j.n.o.v. Because of our conclusion on this issue, we need not address the conditional cross-point of error raised by Ruth.

The judgment is affirmed.

## All Citations

982 S.W.2d 586

# KK

381 S.W.3d 635
Court of Appeals of Texas,
San Antonio.

JAY MILLER & SUNDOWN, INC. d/b/a Sundown
Construction, Appellant and Cross–Appellee,

v.

CAMP DRESSER & McKEE, INC. d/b/
a CDM, Appellee and Cross–Appellant.

No. 04–11–00056–CV.  |  Aug. 15, 2012.

**Synopsis**
**Background:** General contractor on project to replace and improve parts of city's water distribution system brought action against city for breach of contract, violation of the Prompt Payment Act, and property damage due to negligence in operation or use of water pumping equipment. Contractor brought cross-claim against engineering firm that designed project and provided related services, claiming tortious interference with contract, negligent misrepresentation, and fraud. The 83rd Judicial District Court, Val Verde County, Carl Pendergrass, J., entered partial summary judgment in favor of firm. Contractor appealed.

**[Holding:]** The Court of Appeals, Steven C. Hilbig, J., held that statute that required dismissal of action arising out of the provision of professional services by an engineering firm, if an affidavit of merit was not filed with the complaint, did not apply.

Reversed.

West Headnotes (5)

**[1]** **Judgment**
 👉 Particular defenses

As a defendant moving for summary judgment on the affirmative defense of the statute of limitations, engineering firm had the burden to conclusively establish the defense.

1 Cases that cite this headnote

**[2]** **Appeal and Error**
 👉 Cases Triable in Appellate Court

Court of Appeals reviews summary judgments and issues of statutory construction de novo.

Cases that cite this headnote

**[3]** **Statutes**
 👉 Plain Language;  Plain, Ordinary, or Common Meaning

**Statutes**
 👉 Relation to plain, literal, or clear meaning;  ambiguity

The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results.

Cases that cite this headnote

**[4]** **Torts**
 👉 Constitutional, statutory, and local regulation

**Torts**
 👉 Grounds and conditions precedent

Section of Civil Practice & Remedies Code that required dismissal with prejudice of action arising out of the provision of professional services by an engineering firm, if an affidavit of merit was not filed with the complaint, did not apply to general contractor's tortious interference claim against engineering firm that designed city's water distribution system; the legislative enactment that imposed the certificate requirement on firms did not have the effect of making the certificate of merit requirement applicable to causes of action which accrued before the effective date of the amendment. V.T.C.A., Civil Practice & Remedies Code § 150.001.

1 Cases that cite this headnote

**[5]** **Action**
 👉 Proceedings constituting commencement

An action is filed or commenced when the original petition is filed.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*636** Bryan L. Kost, John C. Dulske, Law Offices of Dulske & Florino, P.C., Jason Speights, Speights Law Firm, L.L.P., San Antonio, TX, for Appellant.

Gregory P. Sapire, K & L Gates, LLP, Austin, TX, for Appellee.

Sitting: CATHERINE STONE, Chief Justice, SANDEE BRYAN MARION, Justice, STEVEN C. HILBIG, Justice.

## OPINION

Opinion by: STEVEN C. HILBIG, Justice.

Jay Miller & Sundown, Inc. ("Sundown") appeals the summary judgment granted in favor of Camp Dresser & McKee Inc. ("CDM") on the ground that Sundown's claim for tortious interference with contract was barred by the statute of limitations. Sundown argues that the statute of limitations was not available to CDM as a defense because CDM was properly joined in the action as a responsible third party pursuant to chapter 33 of the Texas Civil Practice and Remedies Code. CDM contends that Sundown misinterprets and misapplies Chapter 33. CDM argues alternatively in a cross-point that the trial court erred in denying its motion to dismiss the suit pursuant to section 150.002 of the Civil Practice and Remedies Code because Sundown did not file a certificate of **\*637** merit. We hold the trial court erred in granting the summary judgment and that under the law applicable to Sundown's claim, no certificate of merit was required. We therefore reverse the trial court's judgment and remand for further proceedings.

## BACKGROUND

CDM is an engineering firm that contracted with the City of Del Rio to provide design and construction administrative services for a project to replace and improve parts of the City's water distribution system. CDM designed the project, managed the bidding process, and provided construction administrative services after construction began. In April 2003, the City contracted with Sundown to be the general contractor on the project. The contract required Sundown to construct water lines throughout the city, install a booster pump station, and construct an elevated storage tank. Sundown began work in June 2003, and the contract required the project be substantially complete within 365 days and be complete for final payment by July 8, 2004. The contract contained a liquidated damages clause and a provision that if the City, the project engineer or others performing work for the City or for whom the City was responsible, delayed, disrupted, or interfered with the performance or progress of the work, then Sundown was entitled to an equitable adjustment in the contract price, the contract times, or both. CDM was not a party to the contract between Sundown and the City, and Sundown did not have a separate contract with CDM. The City terminated CDM's contract at the end of 2004. Because of numerous delays, the project was not finally complete until January 2005.

Sundown sued the City in February 2007 for breach of contract and violation of the Prompt Payment Act. Sundown alleged the City, through its employees and agents, delayed, disrupted, and interfered with performance of the work, resulting in additional work, expense, and overhead and significantly delaying the completion date. Sundown sought unpaid sums due under the contract, including change orders and additional work, delay damages, interest, and attorney's fees. In October 2009, Sundown amended its petition to add a claim under the Texas Tort Claims Act for property damage caused by the City's negligent operation or use of water pumping equipment. Sundown alleged the City's improper operation of the water pumps that supplied pressure to water lines caused some lines to burst, causing flooding of the project site and damage to Sundown's work and property. Sundown further alleged that had the City not improperly interfered with and delayed the work, Sundown would have progressed beyond the site of the flooding when the pipes burst and its damages would have been less.

The City amended its answer, pleading that to the extent Sundown's negligence allegations against the City were found to be true, CDM was a responsible third party within the meaning of section 33.011(6) of the Texas Civil Practice and Remedies Code. At the same time, the City filed an unopposed motion for leave to designate CDM a responsible third party pursuant to section 33.004 of the Civil Practice and Remedies Code. The trial court signed an order granting the motion. [1] In December 2009 and within sixty **\*638** days of the designation, Sundown filed an amended petition,

joining CDM as a defendant, and alleging causes of action against CDM for tortious interference with contract, negligent misrepresentation, and fraud.

Sundown later settled with and nonsuited the City. CDM filed a motion to dismiss, alleging Sundown had not filed a certificate of merit as required by chapter 150 of the Civil Practice and Remedies Code. CDM also filed a motion for summary judgment on the ground that Sundown's causes of action were barred by the statute of limitations. The trial court heard arguments on the motions and took them under advisement. At the next hearing in the case, the trial court orally rendered its rulings granting summary judgment on the tortious interference claim, denying summary judgment on the fraud and negligent misrepresentation claims, and denying CDM's motion to dismiss. On the same day, Sundown filed its fourth amended petition, naming CDM as the sole defendant and dropping the fraud and negligence claims. The court then signed a final judgment.

Sundown appeals the summary judgment. CDM argues in a cross-point that the trial court should have dismissed the suit for failure to file a certificate of merit.

### STATUTE OF LIMITATIONS

The parties agree the statute of limitations on Sundown's tortious interference claim is two years and that Sundown joined CDM as a defendant more than two years after CDM's last involvement in the project. CDM's motion for summary judgment asserted the claim is barred by limitations. Sundown contends the trial court erred in granting the motion because former section 33.004(e) [2] of the Texas Civil Practice and Remedies Code authorizes it to pursue the claim even though it would otherwise be barred by limitations.

### *Applicable law and standard of review*

 **[1]**    **[2]**    **[3]**    As a defendant moving for summary judgment on the affirmative defense of limitations, CDM had the burden to conclusively establish the defense. *See Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999). We review summary judgments and issues of statutory construction *de novo. Molinet v. Kimbrell,* 356 S.W.3d 407, 411 (Tex.2011); *Carreras v. Marroquin,* 339 S.W.3d 68, 71 (Tex.2011). The court's "primary objective in construing statutes is to give effect to the Legislature's intent." *Molinet,* 356 S.W.3d at 411 (citing *Galbraith Eng'g Consultants, Inc.*

*v. Pochucha,* 290 S.W.3d 863, 867 (Tex.2009)). "The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." *Id.*

Chapter 33 of the Civil Practice and Remedies Code is the "complex statutory scheme for the comparative apportionment of responsibility among parties in most tort actions in Texas." *Galbraith Eng'g,* 290 S.W.3d at 868. Among other things, it allows a tort defendant to designate as a responsible third party a person who has not been sued by the plaintiff, but who is alleged to have caused in any way the **\*639** harm for which the plaintiff seeks damages. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(a) (West Supp.2011), § 33.011(6) (West 2008). When such designation is made, subsection 33.004(e) authorizes the plaintiff to join the person as a defendant and, if joinder is sought within sixty days of the designation, limitations cannot be raised as a bar. *See Galbraith Eng'g,* 290 S.W.3d at 865. The relevant statutory sections state:

§ 33.011 Definitions

In this chapter:

(1) "Claimant" means a person seeking recovery of damages, including a plaintiff, counterclaimant, cross-claimant, or third-party plaintiff....

(2) "Defendant" includes any person from whom, at the time of the submission of the case to the trier of fact, a claimant seeks recovery of damages.

...

(6) "Responsible third party" means any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these. The term "responsible third party" does not include a seller eligible for indemnity under Section 82.002.

TEX. CIV. PRAC. & REM.CODE § 33.011 (West.2008).

§ 33.004 Designation of Responsible Third Party

(a) A defendant may seek to designate a person as a responsible third party by filing a motion for leave to designate that person as a responsible third party. The

motion must be filed on or before the 60th day before the trial date unless the court finds good cause to allow the motion to be filed at a later date.

...

(e) [repealed] If a person is designated under this section as a responsible third party, a claimant is not barred by limitations from seeking to join that person, even though such joinder would otherwise be barred by limitations, if the claimant seeks to join that person not later than 60 days after that person is designated as a responsible third party.

(f) A court shall grant leave to designate the named person as a responsible third party unless another party files an objection to the motion for leave on or before the 15th day after the date the motion is served.

*Id.* § 33.004 (West 2008; West Supp.2011). [3]

### Discussion

Sundown argues the trial court erred in granting summary judgment. Sundown contends that because all the statutory procedural steps for designating and joining a responsible third party were precisely followed in this case, CDM's limitations defense is defeated by section 33.004(e). We agree.

Sundown's tort claim against the City alleged the City's operation or use of motor-driven water pumps caused water lines to rupture, flooding areas in which Sundown was working. Sundown alleged the flooding damaged its property, including construction work it had already performed and later had to repair. Sundown additionally alleged:

> Had the overall PROJECT schedule not been delayed ..., Sundown would have progress[ed] beyond those areas ultimately **\*640** impacted by the flooding before the flooding occurred. Consequently, the delays caused by DEL RIO, by and through their [sic] employees, agents and other individuals for whom DEL RIO is responsible, also contributed to the amount of property damage incurred by Sundown as a result of the flooding.

After Sundown added this tort claim against the City, the City timely designated CDM a responsible third party for the

tort damages sought against it, both in its pleadings and by timely filing a motion to designate. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.004(a). The City's pleadings asserted that CDM was a responsible third party within the meaning of section 33.011(6) of the Texas Civil Practice and Remedies Code because CDM's tortious conduct caused the harm for which Sundown sought to recover damages from the City. The trial court granted the unopposed motion for leave to designate CDM a responsible third party. *See id.* § 33.004(f). Within sixty days of the designation, Sundown joined CDM as a defendant in the suit. *See id.* § 33.004(e).

The third amended petition listed numerous acts and omissions of CDM that Sundown alleged delayed, disrupted, and interfered with Sundown's contract with the City. Sundown generally alleged CDM's acts and omissions caused the project to be significantly delayed and that Sundown incurred actual damages and loss as a result. The petition alleged the delays and interruptions increased Sundown's costs and expenses and damaged its relationship with the City. The petition also alleged that the delays and interruptions caused Sundown to be working in the area flooded when the water lines burst, causing damage to both Sundown's personal property and to the work. Sundown prayed broadly for recovery against CDM for its actual damages, consequential damages, incidental damages, compensatory damages, interest, fees, and costs.

The City's pleadings asserted CDM's tortious conduct caused or contributed to the property damage for which Sundown sought to recover against the City in its tort claim. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.011(6)(definition of "responsible third party"). The City complied with the statutory requirements for designating CDM a responsible third party, and the court properly granted leave to so designate CDM. *See id.* § 33.004(f) (court "shall" grant leave absent timely objection by a party). Pursuant to section 33.004(e), Sundown was therefore "not barred by limitations" from joining CDM as a party defendant "even though such joinder would otherwise be barred by limitations." *Id.* § 33.004(e); *see Flack v. Hanke,* 334 S.W.3d 251, 258–63 (Tex.App.-San Antonio 2010, pet. denied).

In response, CDM asserts that, construing Chapter 33 as a whole, subsection 33.004(e) "cannot revive a limitations-barred tort claim unless the harm for which the plaintiff seeks recovery of damages against the responsible third party is the same harm for which the plaintiff seeks recovery of damages against the original, designating defendant." CDM argues

section 33.004(e) does not apply in this case and the trial court properly granted summary judgment on its limitations defense because (1) Sundown does not allege CDM caused or contributed to the property damage that was the basis of Sundown's tort claim against the City; (2) CDM was not a legal cause of the property damages Sundown sought to recover against the City; and (3) it would "lead to an absurd result by making CDM a joint tortfeasor with [the City] for tort damages that Sundown did not seek to recover against [the City]." We address each of these arguments in turn.

 **\*641** CDM first argues the tortious interference claim is barred by limitations "because the harm for which Sundown seeks recovery of damages against CDM is not the same harm for which Sundown sought recovery of damages against Del Rio." Initially, we note that CDM's argument focuses entirely on the substance of the allegations in Sundown's pleading against CDM—the claimant's allegations against the joined defendant (the former responsible third party). However, as the statute is written, whether the statute of limitations is waived is not dependent on the substance of the claimant's allegations against the joined defendant. Section 33.004(e) provides that limitations does not bar the joinder if (1) the person was designated under section 33.004 as a responsible third party and (2) joinder was sought within sixty days of the designation. Those two conditions were indisputably met in this case. Under a plain reading of the statute, no further inquiry is necessary to conclude that the statute of limitations may not be raised as a bar to Sundown's tortious interference with contract claim. *See Flack,* 334 S.W.3d at 258–60.

Nevertheless, we also disagree with CDM's contention that Sundown did not allege "acts or omissions that caused or contributed to causing the property damage forming the basis of Sundown's claim against Del Rio under the Texas Tort Claims Act." Against the City, Sundown sought to recover for the damage to its property, including the cost to repair the work in progress at the site of the flooding. Both the City and Sundown alleged that CDM's conduct in delaying progress of the work caused or contributed to the damage caused by the flooding. Sundown's petition joining CDM and Sundown's third amended petition, filed while the City remained a defendant in the case, clearly alleged that CDM's tortious conduct contributed to causing the harm for which Sundown sued the City in tort. And, contrary to CDM's assertion that Sundown sought only economic damages from it, Sundown's pleadings seeking "actual," "consequential," "incidental," and "compensatory" damages are broad enough to encompass property damage.

In its post-submission brief, CDM argues for the first time that we should review the summary judgment in light of the allegations made in Sundown's fourth amended petition. We disagree. First, as discussed above, whether section 33.004(e) abrogates a limitations defense depends on whether a responsible third party was properly designated and timely joined; it does not depend on the substance of the allegations in a subsequent petition against the joined defendant. Second, the record clearly establishes the summary judgment was based on Sundown's third amended petition. The third amended petition was its live pleading when the motion for summary judgment was filed, when it was heard by the trial court, and when the motion was taken under submission. When the case was next called for hearing over a month later, the court announced it was ready to rule on the pending motions, including the motion for summary judgment. The trial judge noted he had just received the fourth amended petition, which had been filed earlier in the day, but stated he had not reviewed the amended petition in reaching its decision. Finally, our conclusion would not be different were we to consider the fourth amended petition. Because the fourth amended petition was filed after the City was dismissed as a defendant, it does not contain allegations relating to the tort claim against the City and therefore does not expressly allege that CDM's conduct contributed to the harm caused by the City's tort. The fourth amended petition alleges the numerous acts of interference and delay by **\*642** CDM that caused harm and damage to Sundown and prays broadly for actual damages, which could reasonably include the property damages Sundown previously sought against the City.

CDM argues in its post-submission brief that the summary judgment should be affirmed because Sundown's allegations of delay are "too attenuated to have 'caused or contributed in any way to the harm for which' Sundown sought damages against Del Rio," and as a matter of law could not be a legal cause of Sundown's injuries. However, CDM did not move for summary judgment on the ground there was no evidence it proximately caused any of Sundown's damages. Rather, it moved for and obtained summary judgment on an affirmative defense of limitations. Moreover, CDM is essentially contending that section 33.004(e) does not apply because it should not have been designated a responsible third party. In *Flack v. Hanke,* this court held that Chapter 33 does not authorize a joined defendant to litigate its previous designation as a responsible third party. 334 S.W.3d at 261–63.

In its final argument, CDM contends that Sundown's interpretation of Chapter 33 would lead to an absurd result "by making CDM a joint tortfeasor with Del Rio for tort damages that Sundown did not seek to recover against Del Rio." CDM contends Sundown should not be allowed to use section 33.004(e) to revive the tortious interference claim because the tort allegedly caused economic losses substantially beyond contributing to the harm caused by the City's tort, losses which were completely unrelated to the flooding and which Sundown could not have recovered in a tort claim against the City. However, nothing in Chapter 33 requires the original defendant and the joined responsible third party be joint tortfeasors with respect to all the damages sought in order for section 33.004(e) to apply. We have previously recognized that, although Chapter 33 is generally considered a defense-oriented statute, the revival of limitations provision in section 33.004(e) provides a benefit to plaintiffs that may be subject to manipulation:

> Section 33.004(e) creates the potential to revive otherwise barred claims against a designated RTP. This procedure may result in the plaintiff collaborating with a defendant to join additional tortfeasors. For example, section 33.004(e) allows a plaintiff to sue a defendant with little or no liability, and that defendant may then designate the true tortfeasor as an RTP. The plaintiff subsequently may join the true tortfeasor, avoid a limitations defense, and nonsuit the original defendant.

*Flack,* 334 S.W.3d at 256 (citation omitted). In *Flack,* we rejected appellant's public policy argument that limitations should not be revived because "their designation as responsible parties was "unrelated to the purpose of section 33.004 and ... nothing more than an attempt to manipulate the process and circumvent statutory limitations." *Id.* at 260. Instead, we applied the plain language of the statute and held that "[b]ecause section 33.004 provides that a properly designated responsible third party may be joined regardless of limitations, the trial court erred in granting the motion [ ] for summary judgment based on limitations." *Flack,* at 260; *see also Villarreal v. Wells Fargo Brokerage Servs., LLC,* 315 S.W.3d 109, 122 (Tex.App.-Houston [1st Dist.] 2010, no pet.) (rejecting public policy argument against reviving barred claim and applying plain language of statute). Likewise, because CDM was properly designated a responsible third

party and Sundown timely joined CDM as a defendant, the trial court erred by granting summary judgment based on the statute of limitations. Whether the **\*643** purpose or language of Chapter 33 limits in any way the damages that Sundown can recover against CDM does not bear on whether the cause of action is barred by limitations and is not an issue before us.

## CERTIFICATE OF MERIT

CDM cross-appeals the trial court's order denying its motion to dismiss pursuant to chapter 150 of the Civil Practice & Remedies Code. That chapter requires the trial court dismiss with prejudice a suit arising out of the provision of professional services by an engineering firm if an affidavit certifying the merit of the complaint is not filed with the complaint. TEX. CIV. PRAC. & REM.CODE ANN. §§ 150.001(1), 150.002(a), (d) (West 2011). Sundown did not file a certificate of merit, but contends its claim against CDM is governed by a prior version of Chapter 150, under which no certificate of merit was required in a tortious interference with contract suit against a corporation.

We review a ruling on a motion to dismiss under section 150.002 for abuse of discretion. *Kniestedt v. S.W. Sound & Electronics, Inc.,* 281 S.W.3d 452, 454 (Tex.App.-San Antonio 2007, no pet.). However, construction of the statutory language is a question of law we review using the *de novo* standard. *Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 437 (Tex.2009); *JNY, L.P. v. Raba–Kistner Consultants, Inc.,* 311 S.W.3d 584, 585 (Tex.App.-El Paso 2010, no pet).

When Chapter 150 was enacted in 2003, it applied only to a claim of professional negligence against a "design professional," which was defined as "a registered architect or licensed professional engineer." Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 20.01, 2003 Tex. Gen. Laws 847, 896 (amended 2005 and 2009) (current version at TEX. CIV. PRAC. & REM.CODE ANN. §§ 150.001–.002) ("2003 Act"). The 2003 Act was subsequently construed as applying only to claims against *individual* architects and engineers, and not to claims against architectural or engineering corporations or firms. *Raba–Kistner,* 311 S.W.3d at 588; *J.E. Saenz & Assocs. v. Munoz,* No. 13–10–00139–CV, 2011 WL 193113, at \*3 (Tex. App.-Corpus Christi–Edinburg Jan. 13, 2011, no pet.).

The Legislature amended Chapter 150 twice in 2005. The first 2005 amendment changed some of the wording of the statute and added registered professional land surveyors to its scope. *See* Act of May 12, 2005, 79th Leg., R.S., ch. 189, 2005 Tex. Gen. Laws 348 (amended 2009) (current version at TEX. CIV. PRAC. & REM.CODE ANN. §§ 150.001–.002). This amendment took effect immediately on the governor's signature May 27, 2005. *Id.*

The second 2005 amendment was passed without reference to the changes made by the earlier 2005 amendment. *See* Act of May 18, 2005, 79th Leg., R.S., ch. 208, 2005 Tex. Gen. Laws. 369 (amended 2009) (current version at TEX. CIV. PRAC. & REM.CODE ANN. §§ 150.001–.002) ("the second 2005 Act"). The second 2005 Act changed the definition of "design professional" to mean:

> a licensed architect, licensed professional engineer, or any firm in which such licensed professional practices, including but not limited to a corporation, professional corporation, limited liability corporation, partnership, limited liability partnership, sole proprietorship, joint venture, or any other business entity.

*Id.* ch. 208, § 2. This amendment also made Chapter 150 apply "[i]n any action or arbitration proceeding for damages arising out of the provision of professional services by a design professional." *Id.* The changes to Chapter 150 made by the second 2005 Act applied "only to a cause of action that accrues on or after the effective date of this Act." *Id.* ch. 208, § 4. The **\*644** Legislature further provided that "[a]n action that accrued before the effective date of this Act is governed by the law applicable to the action immediately before the effective date of this Act, and that law is continued in effect for that purpose." *Id.* The second 2005 Act became effective September 1, 2005. *Id.* ch. 208, § 5. Thus, the second 2005 Act, which made the certificate of merit requirement applicable to suits against firms, applied only to causes of action that accrued on or after September 1, 2005. It is undisputed that Sundown's tortious interference claim against CDM accrued before December 31, 2004, before the effective date of the second 2005 Act.

In 2009, the Legislature reenacted Chapter 150 to harmonize the two 2005 amendments. Act of May 29, 2009, 81st Leg., ch. 789, 2009 Tex. Gen. Laws 1991 ("2009 Act"). *See Raba–*

*Kistner,* 311 S.W.3d at 586–87 (discussing amendments and legislative history). The 2009 Act also added registered landscape architects to its scope, detail regarding the qualifications of the expert, and a new subsection specifying the required contents of the certificate of merit affidavit. *Id.* The 2009 Act was effective September 1, 2009, and section 3 of the Act stated:

> The change in law made by this Act applies only to an action or arbitration filed or commenced on or after the effective date of this Act. An action or arbitration filed or commenced before the effective date of this Act is governed by the law in effect immediately before the effective date of this Act, and that law is continued in effect for that purpose.

*Id.* ch. 789 §§ 3, 4.

CDM argues that the current 2009 version of Chapter 150 applies to Sundown's tortious interference claim because, although Sundown's suit against the City was filed before September 1, 2009, CDM was not joined as a defendant until December 2009. CDM argues the action against it therefore was not "filed or commenced" until after the effective date of the 2009 Act. As Chapter 150 is currently written, a certificate of merit must be filed in a tort suit against an engineering firm. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 150.001–.002 (West 2011). Sundown responds that the trial court correctly denied the motion to dismiss because this suit, filed before the 2009 Act, is governed by an earlier version of Chapter 150.

 **[4]** We agree with Sundown that the certificate of merit requirement does not apply to its claims against CDM in this case. By its terms, the enabling provision in the 2009 Act governs only the applicability of the "change in law" made by that Act. The controlling question in this case is whether the change to section 150.001 made by the second 2005 Act that made Chapter 150 applicable to suits against firms, applies. That provision of the law was not changed by the 2009 Act. The legislative enactment that imposed the certificate requirement on suits against firms expressly excluded causes of action such as Sundown's against CDM that accrued before September 1, 2005. Act of May 18, 2005, 79th Leg., R.S., ch. 208, § 4, 2005 Tex. Gen. Laws. 369, 370. We hold the 2009 amendments did not have the effect of making the certificate of merit requirement applicable to causes of action against

firms that accrued before the effective date of the second 2005 Act. The trial court therefore did not abuse its discretion by denying CDM's motion to dismiss. [4]

**\*645 CONCLUSION**

 **[5]**   We hold the trial court erred in granting summary judgment for CDM on statute of limitations grounds. We further hold CDM was not required to file a certificate of merit

affidavit, and the trial court did not abuse its discretion in order denying CDM's motion to dismiss under Chapter 150 of the Texas Civil Practice and Remedies Code. We therefore reverse the trial court's judgment and remand the cause to the trial court for further proceedings.

**All Citations**

381 S.W.3d 635

Footnotes

1    CDM complains in its brief that it had no notice of the City's designation or motion and no opportunity to object to them. CDM suggests this lack of notice violated its right to due process. However, CDM did not raise this complaint or seek a ruling on it in the trial court. Accordingly, these issues are not before us.

2    In 2011, section 33.004 was amended to delete subsection (e) and to add a new subsection (d). Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971, 972, *amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, art. 4, 2003 Tex. Gen. Laws 847, 855, *amended by* Act of May 25, 2011, 82nd Leg., R.S., ch. 203, §§ 5.01–5.02, 2011 Tex. Sess. Law Serv. ch. 203 (West) (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 33.004 (West Supp.2011)). The parties agree that former section 33.004(e) applies in this case. All references to section 33.004(e) are to the now-repealed subsection.

3    *See* note 2, *supra.*

4    We also agree with Sundown and the Austin Court of Appeals that, as used in section 4 of 2009 Act, "an action" is "filed or commenced" when the original petition is filed. *See S & P Consulting Eng'rs, PLLC v. Baker,* 334 S.W.3d 390, 395–398 (Tex.App.-Austin 2011, no pet.) (holding that, "for purpose of the effective date of the 2009 version of section 150.002, an action commences when the original petition is filed. For this purpose, the action does not recommence with the filing of an amended petition even if that petition names a new defendant for the first time"); *but see Nangia v. Taylor,* 338 S.W.3d 768, 770–71 (Tex.App.-Beaumont 2011, no pet.) (holding 2009 Act applies to claim against engineer joined in suit in 2010, even though suit was filed in 2008).

**End of Document**                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# LL

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Kemp v. Jensen, Tex.App.-Eastland, December 2, 2010

972 S.W.2d 66
Supreme Court of Texas.

B. Mills LATHAM, Law Offices of B. Mills
Latham, P.C., and Latham and Moss, Petitioners,
v.
Ernest M. CASTILLO and Audona A. Castillo,
individually and as representatives of the
Estate of Kay Castillo, deceased, Respondents.

No. 96–0986. | Argued April 23,
1997. | Decided June 23, 1998. |
Rehearing Overruled Aug. 25, 1998.

Clients sued attorney who failed to timely file medical malpractice action claiming violation of Deceptive Trade Practices-Consumer Protection Act (DTPA), breach of contract, and fraudulent misrepresentation. The trial court granted directed verdict for attorney. Clients appealed. The Corpus Christy Court of Appeals, reversed and remanded. Attorney filed application for writ of error. The Supreme Court, Spector, J., held that: (1) whether attorney engaged in unconscionable conduct actionable under DTPA by affirmatively misrepresenting to clients that he had filed their medical malpractice claim when in fact he had not, and whether that conduct caused clients to suffer mental anguish were questions for jury, and (2) evidence did not support fraudulent misrepresentation or breach of contract claims.

Court of Appeals' judgment affirmed in part and reversed in part.

Owen, J., filed concurring and dissenting opinion in which Gonzalez, Hecht, and Enoch, JJ., joined.

West Headnotes (9)

**[1]** **Antitrust and Trade Regulation**
In general; unfairness

Unconscionability under unfair advantage test of the Deceptive Trade Practices-Consumer Protection Act requires that resulting unfairness

must be glaringly noticeable, flagrant, complete and unmitigated. V.T.C.A., Bus. & C. § 17.45(5)(A).

7 Cases that cite this headnote

**[2]** **Antitrust and Trade Regulation**
Legal professionals; attorney and client

Attorneys can be found to have engaged in unconscionable conduct under Deceptive Trade Practices-Consumer Protection Act (DTPA) by the way they represent their clients. V.T.C.A., Bus. & C. §§ 17.45, 17.50(a)(3).

13 Cases that cite this headnote

**[3]** **Antitrust and Trade Regulation**
Questions of law or fact

Whether attorney engaged in unconscionable conduct actionable under Deceptive Trade Practices-Consumer Protection Act (DTPA) by affirmatively misrepresenting to clients that he had filed their medical malpractice claim when in fact he had not, and whether that conduct caused clients to suffer mental anguish were questions for jury in clients' DTPA action against attorney. V.T.C.A., Bus. & C. §§ 17.45, 17.50(a)(3).

32 Cases that cite this headnote

**[4]** **Antitrust and Trade Regulation**
Purpose and construction in general

Legislative intent in enacting the Deceptive Trade Practices-Consumer Protection Act (DTPA) was to provide plaintiffs a remedy where the common law fails. V.T.C.A., Bus. & C. § 17.44.

3 Cases that cite this headnote

**[5]** **Antitrust and Trade Regulation**
Legal professionals; attorney and client

Clients would not be required to prove they would have won underlying medical malpractice action to recover on Deceptive Trade Practices-Consumer Protection Act (DTPA) claim against attorney based on attorney's affirmative misrepresentation that he had filed

their medical malpractice claim when in fact he had not. V.T.C.A., Bus. & C. § 17.50(a)(3).

24 Cases that cite this headnote

**[6]** **Damages**
  Nature of Injury or Threat in General

Mental anguish damages are recoverable under Deceptive Trade Practices-Consumer Protection Act (DTPA) without first proving economic injury. V.T.C.A., Bus. & C. § 17.50(a).

39 Cases that cite this headnote

**[7]** **Fraud**
  Difference between actual and represented value

**Fraud**
  Difference between value and price paid

Fraudulent misrepresentation plaintiff may recover either the "out of pocket damages," difference between the value of that which was parted with and the value of which was received, or the "benefit of the bargain damages," difference between the value represented and the value actually received, whichever is greater.

10 Cases that cite this headnote

**[8]** **Attorney and Client**
  Pleading and evidence

Clients, who did not plead or prove either out of pocket or benefit of the bargain damages, could not prevail on fraudulent misrepresentation claim against attorney who affirmatively misrepresented to clients that he had filed their medical malpractice claim when in fact he had not.

6 Cases that cite this headnote

**[9]** **Damages**
  Particular cases

Mental anguish damages were not recoverable under a breach of contract cause of action.

34 Cases that cite this headnote

**Attorneys and Law Firms**

**\*67** Deborah R. Sunderman, Corpus Christi, Gaston M. Broyles, Jr., Dallas, for Petitioners.

John Gano, Stephen M. Gano, Houston, Errlinda M. Castillo, Corpus Christi, for Respondents.

**Opinion**

SPECTOR, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, Baker, Abbott and Hankinson, Justices, join.

In this case, we consider whether an attorney's affirmative misrepresentations to his clients that cause the clients to lose their day in court can constitute unconscionable action under the Deceptive Trade Practices–Consumer Protection Act. The court of appeals answered in the affirmative. We affirm the court of appeals' remand of the DTPA claim, and we reverse and render judgment that the Castillos take nothing on their remaining claims.

**I.**

On January 3, 1986, Audona Castillo prematurely gave birth to twin daughters, Kay and Sara, at Taft Hospital. Born with birth defects, the girls were immediately transferred to Driscoll Foundation Children's Hospital where both underwent surgery. Sara died approximately one week later. The Castillos then filed a medical malpractice suit against Driscoll Hospital on Sara's behalf and received a $6,000,000 default judgment. Later, their attorney, Rene Rodriguez, settled the case for $70,000.

Kay Castillo, the surviving twin, died on February 14, 1988. In December 1989, the Castillos hired B. Mills Latham to file a legal malpractice claim against Rodriguez for settling the default judgment and to pursue a medical malpractice claim against Driscoll Hospital for Kay's death. While Latham settled the legal malpractice claim against Rodriguez for $400,000, the statute of limitations ran on the Castillos' medical malpractice claim on February 14, 1990 without suit being filed. The Castillos then sued Latham for legal malpractice because Latham failed to file the medical malpractice action for Kay's death within the two-year statute of limitations. The Castillos also sued Latham

for unconscionable action under the DTPA because Latham affirmatively represented to them that he had filed and was actively prosecuting the medical malpractice claim. Finally, the Castillos alleged that Latham wrongfully misrepresented himself, breached the contract of employment, and was negligent.

After the Castillos presented their case to a jury, the trial court granted a directed verdict for Latham that the Castillos take nothing. The court of appeals reversed and remanded, holding that the Castillos had presented some evidence to prevent a directed verdict on their DTPA claim. The court of appeals also remanded the "remaining theories of recovery"—fraudulent misrepresentation and breach of contract—without discussion. The court of appeals affirmed the directed verdict on the negligence claim, however, because the Castillos did not present evidence that but for Latham's negligence, **\*68** the medical malpractice suit would have been successful. [1].

The central question before us is whether the Castillos have presented some evidence to support each element of their DTPA cause of action. We hold that they have done so.

**II.**

The trial court granted a directed verdict against the Castillos on all claims. Accordingly, we must view the evidence in the light most favorable to them and indulge every reasonable inference in their favor. *Harbin v. Seale,* 461 S.W.2d 591, 592 (Tex.1970). If reasonable minds could differ on controlling facts, the trial court errs in refusing to submit the issues to the jury. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978). We consider the DTPA claim first. [2]

**A.**

 **[1]** The Castillos alleged Latham's conduct constituted an "unconscionable action or course of action" that violated the DTPA. TEX. BUS. & COM.CODE § 17.50(a)(3). Under section 17.45, "unconscionable action or course of action" means "an act or practice which, to a person's detriment: (A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or (B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration." *Id.* § 17.45(5). The Castillos have relied only

on subsection (A) in asserting that Latham's actions were unconscionable. To be actionable under subsection (A), the resulting unfairness must be "glaringly noticeable, flagrant, complete and unmitigated." *Chastain v. Koonce,* 700 S.W.2d 579, 584 (Tex.1985).

The Legislature's stated public policy in enacting the DTPA is to "protect consumers against false, misleading, and deceptive business practices [and] unconscionable actions." TEX. BUS. & COM.CODE § 17.44. To achieve that goal, the Legislature has mandated that the Act shall be "liberally construed and applied." *Id.* Therefore, we must view Latham's actions with this legislative directive in mind.

 **[2]** Attorneys can be found to have engaged in unconscionable conduct by the way they represent their clients. *See, e.g., DeBakey v. Staggs,* 605 S.W.2d 631, 633 (Tex.Civ.App.—Houston [1st Dist.] 1980), *writ ref'd n.r.e. per curiam,* 612 S.W.2d 924 (Tex.1981) (finding an attorney unconscionably took advantage of a client to a grossly unfair degree when the attorney knowingly failed to obtain in a timely manner a name change for the client's minor child). The Castillos assert that Latham acted unconscionably in representing that he was actively prosecuting their medical malpractice claim for Kay's death when in fact he was not.

 **[3]** The Castillos depended on Latham to file suit against the hospital for Kay's death. As Mrs. Castillo testified, "You trust in a professional because they know more than you." The record reveals, and Latham's attorney conceded at oral argument before this Court, that there is some evidence that Latham told the Castillos he had filed the medical malpractice claim when in fact he had not. Although he affirmatively represented to them that he was actively pursuing the claim, Latham never did file the suit and limitations ran. As a result, the Castillos lost the opportunity to prosecute their claim against the hospital for Kay's death.

 **\*69** Viewing Latham's actions in the light we must, his actions are similar to the attorney's conduct in *DeBakey.* Latham took advantage of the trust the Castillos placed in him as an attorney. Therefore, the Castillos have presented some evidence that they were taken advantage of to a grossly unfair degree.

Latham argues, however, that the Castillos' DTPA claim is essentially a dressed-up legal malpractice claim. Therefore, he asserts, the Castillos must prove that they would have won the medical malpractice case for Kay's death in order to

recover. Because they did not present any evidence on this, Latham argues, the Castillos cannot recover. We disagree.

 **[4]**   **[5]**   The legislative intent in enacting the DTPA was to provide plaintiffs a remedy where the common law fails. *See Woo v. Great Southwestern Acceptance Corp.,* 565 S.W.2d 290, 298 (Tex.Civ.App.—Waco 1978, writ ref'd n.r.e.). Section 17.43 states that the remedies provided by the Act "are *in addition* to any other procedures or remedies provided for in any other law." TEX. BUS. & COM.CODE § 17.43 (emphasis added). Moreover, the Legislature mandates that the DTPA is to be "liberally construed and applied to promote its underlying purposes." *Id.* § 17.44. Recasting the Castillos' DTPA claim as merely a legal malpractice claim would subvert the Legislature's clear purpose in enacting the DTPA—to deter deceptive business practices.

If the Castillos had only alleged that Latham negligently failed to timely file their claim, their claim would properly be one for legal malpractice. However, the Castillos alleged and presented some evidence that Latham affirmatively misrepresented to them that he had filed and was actively prosecuting their claim. It is the difference between negligent conduct and deceptive conduct. To recast this claim as one for legal malpractice is to ignore this distinction. The Legislature enacted the DTPA to curtail this type of deceptive conduct. Thus, the DTPA does not require and the Castillos need not prove the "suit within a suit" element when suing an attorney under the DTPA. The Castillos have presented some evidence of unconscionable action.

It is not enough that the Castillos merely prove an unconscionable action or course of action by Latham, however. Latham's unconscionable action must have been the producing cause of actual damages. TEX. BUS. & COM.CODE § 17.50(a). Latham argues that the Castillos cannot recover mental anguish damages under the DTPA without first proving an economic injury. We disagree.

 **[6]**   Section 17.50(a) of the DTPA, as it appeared when this suit was filed, indicated that "[a] consumer may maintain an action where any of the following constitute a producing cause of *actual damages.*" TEX. BUS. & COM.CODE § 17.50(a) (emphasis added).[3] We have stated that the term "actual damages," as used in the DTPA, means those recoverable at common law. *Brown v. American Transfer & Storage Co.,* 601 S.W.2d 931, 939 (Tex.1980). It is axiomatic that mental anguish damages *are* actual damages recoverable at common law for "some common law torts ...,

and by analogy for knowing violations of certain statutes such as the Deceptive Trade Practices Act." *City of Tyler v. Likes,* 962 S.W.2d 489, 495 (Tex.1997) (citations omitted). Therefore, the Castillos do not have to first prove that they have suffered economic damages in order to recover mental anguish damages. The Castillos have satisfied their burden on the damages element of a DTPA cause of action if they have presented some evidence of mental anguish.

In *Parkway Co. v. Woodruff,* 901 S.W.2d 434 (Tex.1995), we established the evidentiary requirements for recovery of mental anguish damages. To survive a legal sufficiency challenge, plaintiffs must present "direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily **\*70** routine." *Id.* at 444. If there is no direct evidence, the Court will apply "traditional 'no evidence' standards to determine whether the record reveals any evidence of 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger' to support any award of damages." *Id.* (citation omitted).

The plaintiffs in *Parkway* alleged that they were "hot," "very disturbed," "not pleased," and "upset." *Id.* at 445. We held that these allegations were "mere emotions" that did not rise to a compensable level. *Id.; see also Saenz v. Fidelity & Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex.1996) (holding that plaintiff's allegations that she "worried ... a lot" did not rise to a compensable level under *Parkway* ); *Republic Ins. Co. v. Stoker,* 903 S.W.2d 338, 342 (Tex.1995) (Spector, J., concurring) (stating that plaintiff's allegations that she was "very upset" by the offending conduct did not rise to the level of any evidence of compensable mental anguish required under *Parkway* ). In each of these cases, the plaintiffs' evidence of mental anguish amounted to "mere emotions." The mental anguish testimony in this record, however, exceeds that in *Parkway, Saenz,* and *Stoker.*

For example, at trial Ernest Castillo testified that because Latham told them he had filed the medical malpractice suit when in fact he had not:

   A Well, it made me throw up.

   Q Made you sick?

   A Sick, nervous, mad.

   Q Tell the jury how you felt about that, what it did to you.

A It just—it just hurt me a lot because I trusted in him and I—and if I had known, I would have looked for more lawyers. And he promised me he was going [to] do it, and I trusted him to do it. Because of what they had done to my daughters, I would have never stopped; what the doctors done, I would have never stopped.

Audona Castillo testified at trial:

A I—my heart was broken. I was devastated, I felt physically ill.

In sum, there is some evidence that Latham's conduct caused the Castillos a "high degree of mental pain and distress" that a jury could consider. We are confident that the trial judge will instruct the jury to differentiate between the mental anguish the Castillos suffered because of their daughters' deaths, which is not compensable in this suit, and that they may have suffered because of Latham's actions, for which the Castillos may be compensated.

The Castillos have presented some evidence of each element of their DTPA cause of action and the trial court erred in directing a verdict against them on the DTPA claim. We therefore remand this claim to the trial court for a new trial.

### B.

The Castillos also complained in the court of appeals that the trial court erred in granting a directed verdict on their fraudulent misrepresentation and breach of contract claims. The court of appeals sustained these points of error without discussion and remanded them to the trial court. The court of appeals erred by not discussing issues necessary to final disposition of the appeal. *See* TEX.R.APP. P. 47.1. Upon our consideration of these issues, we find no evidence to support these claims.

 **[7]** **[8]** Under common law, two measures of damages are available for fraudulent misrepresentation: (1) the "out of pocket" measure, which is the "difference between the value of that which was parted with and the value of that which was received"; and (2) the "benefit of the bargain" measure, which is the difference between the value represented and the value actually received. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 49 (Tex.1998); *W.O. Bankston Nissan, Inc. v. Walters,* 754 S.W.2d 127, 128 (Tex.1988) (citing *Leyendecker & Assocs., Inc. v. Wechter,*

683 S.W.2d 369, 373 (Tex.1984)). A plaintiff may recover either the out of pocket or the benefit of the bargain damages, whichever is greater. *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 817 (Tex.1997). The Castillos have not pleaded or proved either of these types of damages.

 **\*71** The Castillos presented no evidence of the amount they expected to recover on the medical malpractice claim for Kay's death but for Latham's actions. *See Cosgrove v. Grimes,* 774 S.W.2d 662, 665–66 (Tex.1989). Accordingly, they presented no evidence to support benefit of the bargain damages. The Castillos also did not demonstrate any out of pocket expenses paid to Latham. Therefore, the Castillos have not presented any evidence of recoverable common-law fraudulent misrepresentation damages, and the trial court correctly granted a directed verdict on this claim.

### C.

 **[9]** Finally, the Castillos have alleged a breach of contract claim against Latham for his failure to prosecute the medical malpractice claim for Kay's death. However, because the only damages alleged, mental anguish, are not recoverable under a breach of contract cause of action, this claim also fails. *See Stewart Title Guar. Co. v. Aiello,* 941 S.W.2d 68, 72 (Tex.1997).

### III.

We hold that the Castillos have presented some evidence to support each element of their DTPA cause of action. Therefore, we affirm the court of appeals' remand of the DTPA cause of action. We nevertheless reverse and render judgment that the Castillos take nothing on their fraudulent misrepresentation and breach of contract claims.

OWEN, Justice, joined by GONZALEZ, HECHT and ENOCH, Justices, concurring in part and dissenting in part. The unconscionability section of the DTPA is not a catchall provision or an open-ended supplement to the laundry list of specifically enumerated violations. Unconscionability is something more than a misrepresentation. The statute requires that the act or practice take advantage of the consumer "to a grossly unfair degree." Until now this Court has equated unconscionability with grossly unfair,

flagrant, and unmitigated conduct. It is not grossly unfair or unmitigated conduct when an attorney fails to pursue a meritless suit, even if the attorney represents to the client that suit had been filed when it had not. While such conduct is not to be condoned and would subject the attorney to disciplinary proceedings, it is not unconscionable within the meaning of the DTPA. Nor is there any evidence that the Castillos suffered actual damages as a result of Latham's conduct. Even assuming that mental anguish damages, standing alone, would suffice under the DTPA prior to its amendment in 1995 in a case such as this, there is no evidence that the Castillos' mental anguish was referable to Latham's misrepresentation as distinguished from the mental anguish they suffered from the deaths of their daughters and the fact that they blamed the hospital but had no proof that it was responsible. Accordingly, I dissent from that part of the Court's judgment that remands the unconscionability claims. I concur in Parts I, II B, and II C of the Court's opinion.

## I

We indicated in *Willis v. Maverick,* 760 S.W.2d 642, 647 (Tex.1988), that an attorney may be liable under the DTPA for unconscionable conduct, citing *DeBakey v. Staggs,* 612 S.W.2d 924 (Tex.1981). However, we did not define in *Willis* or *DeBakey* what "unconscionable" meant in the context of a suit against an attorney for professional malfeasance. And in *DeBakey,* we reserved for future determination the "standard of care by which a legal malpractice claim is to be determined" in a DTPA case. 612 S.W.2d at 925.

The Court today places heavy reliance not on our decision in *DeBakey,* but on that of the court of appeals in *DeBakey,* even though we expressly called into question the precedential value of the court of appeals' determination that the attorney's misfeasance rose to the level of unconscionability. *See id.* The holding today is contrary to prior decisions of this Court that have more narrowly defined what is meant by "unconscionable action" within the meaning of the DTPA.

We had the opportunity in *Chastain v. Koonce,* 700 S.W.2d 579, 583 (Tex.1985), to consider what section 17.45(5) of the DTPA means when it says that an act or practice must "take[ ] advantage ... to a grossly unfair degree" to be unconscionable. In **\*72** *Chastain,* a jury had found that false statements and threats made by sellers of land to purchasers and to residents in the area were unconscionable. The court of appeals reversed, finding no evidence of unconscionable conduct. We

agreed and held that evidence that a defendant "simply ... took unfair advantage" is not enough. *Id.* at 582. The resulting unfairness must be "grossly unfair," which means "glaringly noticeable, flagrant, complete and unmitigated." *Id.* at 584.

In its decision in this case, the Court seems to equate "unconscionability" with "deception" when it says that Latham's misrepresentation "is the difference between negligent conduct and deceptive conduct." 972 S.W.2d at 69. But if every misrepresentation and deceptive act could also constitute an unconscionable act, then the laundry list violations in section 17.46(b), which include numerous specific representations and deceptive acts, would be redundant. *See* TEX. BUS. & COM.CODE § 17.46(b)(1)-(25).

More than a decade ago, we held that not every misrepresentation of fact, even an intentional one, constitutes unconscionable conduct. *See Chastain,* 700 S.W.2d at 582–83. We explained that "[a]lthough knowledge and intent may make an act unconscionable, there must be some other means of distinction as well." *Id.* at 582. The test is whether the consumer was taken advantage of to a grossly unfair degree. *Id.* "This should be determined by examining the entire transaction and not by inquiring whether the defendant intended to take advantage of the consumer or acted with knowledge or conscious indifference." *Id.* at 583. The misrepresentation in this case cannot be distinguished from those in *Chastain,* which we held were not unconscionable under the DTPA.

The transaction between the Castillos and Latham did not take advantage of the Castillos and was not grossly unfair. Latham certainly gained no advantage. There is no evidence that he was ever paid a fee or that the Castillos agreed to pay a fee other than one contingent on the success of the suit against the hospital. And how were the Castillos disadvantaged if their claims against the hospital had no merit? While Latham's conduct was wrong and unethical, it is not actionable under section 17.45(5) of the DTPA because it is not grossly unfair to represent that a suit that has no merit has been filed when it has not.

## II

As alluded above, the Castillos have failed to offer any evidence that they were harmed by their attorney's misrepresentation. Harm is a prerequisite to recovery under

the DTPA. The pre–1995 version of the DTPA, under which the Castillos sued, required a consumer to demonstrate that the unconscionable act was "a producing cause of actual damages." [1] The definition of "unconscionable" also embodies a requirement that a loss result from the conduct: " 'Unconscionable action or course of action' means an act or practice which, to a person's *detriment* ... takes advantage ... to a grossly unfair degree." Former TEX. BUS. & COM.CODE § 17.45(5) (emphasis added). [2] There is no evidence of actual damages in this case. There is no evidence that, had the suit been timely filed as Latham represented that it had, the Castillos would have recovered. **\*73** The Castillos offered no evidence that their claims against the hospital had any merit at all. To the contrary, the Castillos testified that they had consulted numerous lawyers before they met with Latham and had been turned down by all of them. One of the attorneys they attempted to hire advised them in writing that the case had no merit.

The Castillos contend that the loss of a "day in court" was enough, and the Court implicitly accepts this argument when it observes that the Castillos "lost the opportunity to prosecute their claim against the hospital for Kay's death." 972 S.W.2d at 68. The ability to have one's claim heard is a valuable right in our system of justice, but it does not follow that liability and damages should be imposed in every case in which a party is deprived of the opportunity to present a claim. If there is no evidence that a claim had merit, failing to file a suit on that claim does not fall within the types of conduct that the Legislature intended to reach under the DTPA. Even when there is a tangible, measurable loss, not all improper conduct falls within the ambit of the DTPA. For example, we have long recognized that "mere breach of contract, without more, does not constitute a 'false, misleading or deceptive act.' " *Ashford Dev., Inc. v. USLife Real Estate Servs. Corp.,* 661 S.W.2d 933, 935 (Tex.1983); *see also Crawford v. Ace Sign, Inc.,* 917 S.W.2d 12, 14 (Tex.1996) (holding misrepresentation that ad would be placed in yellow pages was mere breach of contract and not actionable under the DTPA).

The "day-in-court" argument fails for an even more fundamental reason. The Castillos had the opportunity to prove in their suit against Latham that the hospital had committed professional malpractice or had otherwise breached a duty to Kay that resulted in injury to her and ultimately in her death. They had their day in court.

The Court's failure to require the Castillos to prove that they lost a *meritorious* claim because of Latham's representation is also at odds with overarching Legislative policy as expressed in other statutes. It seems incongruous to me that the Legislature intended to authorize the recovery of damages and potential treble damages under the DTPA for failing to file a suit that had no merit, even if the attorney falsely stated that suit had been filed. Legislative policy discourages the filing of meritless suits, particularly medical malpractice suits. For example, the Legislature requires a plaintiff asserting a medical malpractice claim to come forward within 180 days after suit is filed with an expert's report that sets forth the standard of care, how that standard was breached, and causation. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01. The statute directs that the suit must be dismissed if a report is not filed, and the plaintiff is obligated to pay the other side's attorney's fees and court costs. *See id.* § 13.01(e). Although this statute was enacted after the events in this case took place and would not have been applied to the Castillos' suit against the hospital, it demonstrates that the Legislature demands that there be some merit to a medical malpractice claim before it can be asserted. There is no indication that the Castillos' claims against the hospital had any merit at all. Yet, the Court would allow the recovery of damages from Latham when the suit he failed to file bordered on frivolous.

### III

Lacking any evidence of actual damages, the Court concludes that mental anguish damages alone will support a recovery under the pre–1995 version of the DTPA and that there is some evidence of compensable mental anguish damages. I agree with the Court that actual damages within the meaning of the DTPA means those available at common law. *See* 972 S.W.2d at 69; *see also Brown v. American Transfer & Storage Co.,* 601 S.W.2d 931, 939 (Tex.), *cert. denied,* 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980). But the mental anguish that the Castillos unquestionably suffered was not caused by Latham's misrepresentation, and accordingly, I would not reach the issue of whether, in this type of case, the Castillos could recover mental anguish for Latham's conduct absent a showing of actual damages. When the Castillos' testimony is considered in context, it can be seen that their mental anguish stemmed from the unfortunate deaths of their daughters and the Castillos' desire to **\*74** hold the hospital accountable, not from Latham's misrepresentation.

The Court has blurred the distinct line between the modicum of anguish the Castillos suffered over what Latham said and did, which is not compensable under our decision in *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995), and the mental anguish damages caused by the deaths of their daughters that unquestionably would be recoverable in a suit against one who had caused those deaths or in a suit against one who, through legal malpractice, prevented the Castillos from recovering for their anguish. The emotions aroused by Latham's misrepresentation are of a wholly different character from the mental anguish caused by the loss of their twins. We held in *Parkway:*

> When a challenge is made to the sufficiency of the evidence to go to the jury or to support the jury's finding, ... [t]he reviewing court must distinguish between shades and degrees of emotion. These distinctions are critical under our substantive law because evidence of lesser reactions cannot support an award of mental anguish damages.

> Under this admittedly nebulous definition and the traditional standard of review, it is nevertheless clear that an award of mental anguish damages will survive a legal sufficiency challenge when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine.

*Id.* at 444.

Latham's misrepresentation did not result in "a substantial disruption in the plaintiffs' daily routine." *Id.* Nor did the Castillos offer evidence of the "nature, duration, and severity of their anguish" from Latham's misrepresentation as required by *Parkway. Id.* We held in *Parkway* that testimony by the plaintiffs that the flooding of their home changed their lives, that the husband would become very quiet when he came home, and that he was very disturbed over the flooding did not surmount the evidentiary hurdle for legally sufficient proof of mental anguish damages. *Id.* at 445.

When the record in this case is consulted, it is beyond dispute that the only mental anguish that meets the *Parkway* standard was not caused by Latham. It was caused by the deaths of the Castillos' daughters and the nonexistence of any evidence that the hospital was responsible. Ernest Castillo testified:

> Q When he told you that it was your fault, in effect, that the statute of limitations had gone by, how did that make you feel? What effect did that have on you?

A Well, it made me throw up.

Q Made you sick?

A Sick, nervous, mad.

Q Tell the jury how you felt about that, what it did to you.

A [I]t just hurt me a lot because I trusted in him and I—and if I had known, I would have looked for more lawyers. And he promised me he was going [to] do it, and I trusted him to do it. Because [of] what they had done to my daughters, I would have never stopped; what the doctors done, I would have never stopped.

\* \* \*

Q Did it make you nervous?

> A Made me nervous that I couldn't get my hands on Driscoll [Hospital]. He let them go, and they did do a lot of damage to my girls.

\* \* \*

A I love my kids so much. What those doctors done, they shouldn't have done, and [Latham] knew it. I had told him, and he said he knew it, too. He said, "I'll help you, Ernest, I will help you," and I trusted him to help me, and he let it go.

> Q. Did it break your heart?

> A. Yes, sir. I lost two daughters.

Audona Castillo testified:

> Q How did this make you feel, that is, what effect did this information have on you?

> **\*75** A I—my heart was broken. I was devastated, I felt physically ill. After—excuse me. After running around so many months in pursuit of a lawyer and trying to beat the statute of limitations and having confided in this man and him having promised me that he could handle it. And my daughter's death, and her disabilities, and the pain she suffered by being blind and—and all the other damages, the seizures, and her very short life of two years; and then he tells me that I don't have anything to hold

on to. And it's not as if he could bring her back, but I needed some justice, at least, and I still feel the same way.

The Castillos were distraught because they wanted a court to determine that the hospital was responsible for the pain, suffering, and deaths of their children. But if Latham had filed suit, there is no evidence that a court would have found the hospital responsible or even that there was a fact question for the jury. There was no evidence that the Castillos' desire to establish the hospital's culpability and to require it to respond in damages for negligence would have been satisfied. Further, even assuming that all the Castillos wanted was to prove that the hospital was at fault rather than to recover damages from the hospital, the Castillos had the opportunity in this suit against Latham to present the same case against the hospital that they would have presented had Latham filed suit. The Castillos have not shown that Latham's failure to file suit prevented them from vindicating their position that the hospital was to blame for their daughters' deaths.

In construing the DTPA to allow recovery for Latham's improper conduct, the Court has ignored well-established principles of law and the record in this case and has failed to effectuate the intent of the Legislature.

\* \* \* \* \*

I agree with the Court that because the Castillos failed to prove any proper measure of damages under their claims for breach of contract and fraud, the court of appeals erred in remanding those claims. But I would hold that the trial court did not err in directing a verdict against the Castillos on all of their claims, including unconscionability, and accordingly, I would reverse the judgment of the court of appeals and render judgment that the Castillos take nothing.

## All Citations

972 S.W.2d 66

Footnotes

1   The Castillos have not appealed the court of appeals' disposition of the negligence cause of action and therefore, it is not before this Court.

2   The Legislature amended the DTPA in 1995. Act of May 19, 1995, 74th Leg., R.S., ch. 414, 1995 Tex. Gen. Laws 2988. Unless otherwise noted, all DTPA references will be to the pre-amendment provisions applicable when this suit was filed.
    Under the amendments effective September 1, 1995, lawyers may not be sued under the DTPA unless they engage in one of the following acts: (1) an express misrepresentation of a material fact that cannot be characterized as advice, judgment, or opinion; (2) a failure to disclose; (3) an unconscionable action or course of action that cannot be characterized as advice, judgment, or opinion; or (4) breach of an express warranty that cannot be characterized as advice, judgment, or opinion. TEX. BUS. & COM.CODE § 17.49(c).

3   In 1995, the Legislature amended section 17.50(a) to provide that "[a] consumer may maintain an action where any of the following constitute a producing cause of economic damages *or damages for mental anguish:* ... (3) any unconscionable action or course of action by any person." Act of May 19, 1995, 74th Leg., R.S., ch. 414, § 5, 1995 Tex. Gen. Laws 2988, 2992 (codified at TEX. BUS. & COM.CODE § 17.50(a)(3)).

1   Act of May 16, 1979, 66th Leg., R.S., ch. 603, § 4, 1979 Tex. Gen. Laws 1327, 1329 (amended 1995) (current version at TEX. BUS. & COM.CODE § 17.50(a)(1)(3)).
    The DTPA was amended in 1995 and now provides:
    (a) A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish:
    \* \* \*
       (3) any unconscionable act or course of action by any person[.]
    \* \* \*
    (b) In a suit filed under this section, each consumer who prevails may obtain:
       (1) the amount of economic damages found by the trier of fact. If the trier of fact finds that the conduct of the defendant was committed knowingly, the consumer may also recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of economic damages....
    TEX. BUS. & COM.CODE § 17.50.

2   Act of May 10, 1977, 65th Leg., R.S., ch. 216, § 1, 1977 Tex. Gen. Laws 600, 600 (amended 1995).

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

MM

209 S.W.3d 83
Supreme Court of Texas.

LEXINGTON INSURANCE COMPANY, Landmark
Insurance Company, and American International
Specialty Lines Insurance Company, Petitioners,

v.

Carole Keeton STRAYHORN, Comptroller of Public
Accounts of the State of Texas, and Greg Abbott,
Attorney General of the State of Texas, Respondents.

No. 04–0429.  |  Argued Sept. 28,
2005.  |  Opinion Delivered Dec. 1, 2006.

**Synopsis**
**Background:** Eligible surplus lines insurers brought
declaratory judgment action against Comptroller of Public
Accounts and Attorney General seeking refund of
unauthorized insurance premium tax. The 250th Judicial
District Court, Charles F. Campbell, J., entered summary
judgment in favor of insurers. Comptroller and Attorney
General appealed. The Austin Court of Appeals, Bea Ann
Smith, J., 128 S.W.3d 772, reversed and remanded. Insurers
petitioned for review.

**[Holding:]** The Supreme Court, Scott Brister, J., held that
unauthorized insurance premium tax could be collected from
eligible surplus lines insurers on policies that were not placed
through licensed surplus lines agents.

Judgment of Court of Appeals affirmed and remanded.

West Headnotes (4)

**[1]**  **Statutes**
  Language
In any case of statutory construction, court looks
first and foremost to the words of the statute.

88 Cases that cite this headnote

**[2]**  **Insurance**
  Surplus Lines

If a policy is procured from an eligible
surplus lines carrier without a licensed surplus
lines agent, the premium tax applicable to
unauthorized insurance policies may be collected
from the insurer. V.A.T.S. Insurance Code, art.
1.14-1, § 11(a) (Repealed).

5 Cases that cite this headnote

**[3]**  **Insurance**
  Preemption;  Application of State or Federal
Law
  **States**
  Insurance
Insurance regulation and taxation is generally
a state rather than federal matter. Insurance
Regulation Act, § 2(a), 15 U.S.C.A. § 1012(a).

Cases that cite this headnote

**[4]**  **Insurance**
  Surplus Lines
The only two conditions a surplus lines
carrier must confirm to avoid the unauthorized
insurance premium tax are its own eligibility
and issuance through a licensed agent. V.A.T.S.
Insurance Code, art. 1.14-1, § 11(a) (Repealed).

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*83** Cynthia Hollingsworth, Curtis L. Frisbie Jr., Randy D.
Gordon, Samuel Eugene Joyner Jr., Gardere Wynne Sewell
LLP, Dallas, Jeremy C. Martin, Irving, Anthony Icenogle,
Joseph C. Boggins, De Leon Boggins & Icenogle, Austin,
Chester J. Makowski, Royston Rayzor Vickery & Williams,
L.L.P., Houston, for Petitioners.

William E. Storie, Office of Atty. Gen. of Texas–Taxation,
Greg Abbott, Atty. Gen. of Texas, Barry Ross McBee,
Edward D. Burbach, Esteban H. Rodriguez, Office of Atty.
Gen., Austin, for Respondents.

Craig T. Enoch, Alexander J. Gonzales, Alejandro Sin
Valdes, David Fowler Johnson, Winstead Sechrest & Minick

P.C., Austin, for Amicus Curiae, American Insurance Association.

 **\*84**  Melvin L. Burner, Long Burner Parks & DeLargy, P.C., Austin, for Amicus Curiae, Scottsdale Insurance Company.

Alene Ross Levy, Haynes & Boone, L.L.P., Houston, for Amicus Curiae, Varco International, Inc.

John Smithee, Templeton Smithee Hayes Heinrich & Russell, L.L.P., Amarillo, for Amicus Curiae, John Smithee.

James W. Paulsen, Houston, for Amicus Curiae, Yorkshire Ins. Co., Ltd.

**Opinion**

Justice BRISTER delivered the opinion of the Court.

The Comptroller [1] assessed almost $7 million in premium taxes against Lexington Insurance Company, Landmark Insurance Company, and American International Specialty Lines Insurance Company (collectively, "the insurers") for policies issued in the early 1990s. [2] After the insurers proved that most of their policies were procured through surplus lines agents licensed in Texas, the Comptroller dropped 70 percent of her claim, [3] recognizing that in such cases the agent rather than the carrier was liable for the taxes. But because the insurers could not prove the same as to the rest of their policies, they paid almost $2 million in premium taxes under protest and sought a refund.

We agree with the insurers that the Texas Insurance Code distinguishes between eligible surplus lines carriers and other unlicensed insurers, and often treats the two quite differently. But we agree with the Comptroller that when it comes to collecting premium taxes, the Code treats the two the same if a surplus policy is not placed through a licensed agent. Accordingly, we affirm the court of appeals' judgment remanding the case to the trial court.

**I**

Texas law imposes a variety of taxes on insurance premiums. [4] Generally those taxes are imposed on and paid by insurers licensed to do business in Texas. [5] But premium taxes are assessed even if there is no licensed insurer (as with surplus lines policies) to prevent giving policies by unlicensed insurers an unfair advantage. Thus, the

Insurance Code imposes a 4.85 percent premium tax on both unauthorized insurance and surplus lines policies. [6] Here, because Lexington was not authorized to issue insurance in Texas other than as an eligible surplus lines carrier, its policies were subject to the 4.85 percent tax.

 **\*85**  This suit is about who should pay that tax. On policies issued by unauthorized insurers, the *insurer* must pay the tax, and the insured must pay it if the insurer does not. [7] By contrast, on surplus lines policies, the surplus lines *agent* must pay the tax after collecting it from the insureds; [8] insurers are not liable for the tax. Thus, we must decide whether these policies should be treated as surplus lines insurance (in which case the insurers are not liable) or unauthorized insurance (in which case they are).

The Insurance Code provides that only licensed agents may issue surplus lines policies, [9] and requires that such policies bear the agent's name and address. [10] In a 1998 audit of records for the years 1992–95, the Comptroller could not confirm whether licensed surplus lines agents placed many of the insurers' policies or paid taxes on them. Accordingly, the Comptroller treated the policies as unauthorized insurance and assessed the insurers almost $7 million in past-due premium taxes.

Although the insurers argued they had no statutory obligation to file or maintain records of those transactions, they nevertheless tried to gather information showing that their policies were in fact placed through licensed surplus lines agents, who either paid or should have paid the taxes. These efforts were largely successful, but because some agents were deceased, unavailable, uncooperative, or unhelpful, the insurers were unable to identify licensed agents who should have paid $1,973,352 in taxes. After administrative hearings and requests for redetermination, the insurers paid the taxes under protest and filed declaratory judgment actions seeking refunds of the taxes, interest, and additional penalties.

The insurers moved for summary judgment on the ground that eligible surplus lines insurers cannot be liable for these premium taxes, whether or not a licensed agent was used. The trial court granted their motions, but the Third Court of Appeals reversed and remanded for further proceedings. [11]

**II**

**A**

 **[1]** We begin with the premium tax on unauthorized insurance—the one the Comptroller seeks to collect. As in any case of statutory construction, we look first and foremost to the words of the statute. [12]

Throughout the tax years here, the Insurance Code required unauthorized insurers to pay a tax on premiums, with certain exceptions:

> *Except as to premiums on insurance procured by a licensed surplus lines agent from an eligible surplus lines insurer* as defined in Article 1.14–2 and premiums on independently procured insurance on which a tax has been paid pursuant to this Article or Article 1.14–2, *every unauthorized insurer shall pay* to the comptroller, on a form prescribed **\*86** by the comptroller, before March 1 next succeeding the calendar year in which the insurance was so effectuated, continued or renewed or another date as prescribed by the comptroller a premium receipts tax of 4.85 percent of gross premiums charged for such insurance on subjects resident, located or to be performed in this state. [13]

While the full passage is somewhat cumbersome, the introductory exception is not—surplus lines premiums are carved out if two conditions are met: (1) the insurance is procured by a licensed surplus lines agent (2) from an eligible surplus lines insurer. The insurers' argument that eligible surplus lines carriers are always exempted from this tax would effectively remove the first of these conditions. As the statutory exception contains two conditions, we are not at liberty to disregard one of them.

The insurers' primary argument is that this provision requires only that "every unauthorized insurer" must pay the premium tax, a class it asserts does not include eligible surplus lines insurers. We disagree. First, the insurers' argument would render the introductory exception superfluous—if eligible surplus lines carriers can never be "unauthorized insurers," there would be no need for an exception carving them out. We must presume that the entire statute—including the introductory exception—was intended to be effective. [14]

Moreover, we concluded ten years ago in *Mid–American Indemnity Insurance Co. v. King* that "the general term 'unauthorized insurers' *does* include eligible surplus lines

insurers." [15] Because "legislative history makes plain that the term 'unauthorized' refers to insurers who are unlicensed," we held that eligible surplus lines insurers would be included "because by definition [they] are unlicensed." [16] While we noted several distinctions between eligible surplus lines insurers and "ordinary unauthorized insurers," [17] that holding constrains us from adopting the insurers' construction today.

The insurers point to the separate premium tax provision in the surplus lines statute (imposed on insureds and paid by agents), and argue that the specific statute applicable to surplus lines policies should prevail over the general statute applicable to all unauthorized carriers. [18] But that rule of construction applies only when overlapping statutes cannot be reconciled; [19] we believe these statutes can. **\*87** Here, one statute imposes a tax on insureds for surplus lines premiums; the other imposes a tax on insurers for unauthorized premiums *except when procured by a licensed agent from an eligible surplus lines carrier.* Because a licensed agent and eligible carrier are prerequisites for *all* surplus lines policies, [20] these two statutes can be reconciled by applying the former when both conditions are met, and the latter when one or both conditions are not.

 **[2]** We have recognized that the Legislature has amended these statutes several times "to clarify the distinction between eligible surplus lines insurers and unauthorized insurers." [21] But that does not mean the Legislature intended to make the two categories mutually exclusive, or to exclude the former from treatment as the latter in all cases. [22] Accordingly, we agree with the Comptroller that the words of the unauthorized insurance statute appear to make its premium tax collectible from an eligible surplus lines carrier if the policy was not procured through a licensed surplus agent.

**B**

In construing these statutes, we may also consider the purposes of the Insurance Code. [23] Both the surplus lines and unauthorized insurance statutes include among their purposes "protecting the premium tax revenues of this state." [24] These and other purposes of these statutes would be frustrated if we were to treat all policies by eligible carriers as surplus lines, whether procured through a licensed agent or not.

The surplus lines statute relies heavily on licensed surplus lines agents. It is the agent who determines and certifies that coverage is unavailable from authorized insurers, thus justifying surplus lines placement. [25] An agent must make sure that a carrier meets eligibility requirements, and must make a reasonable effort **\*88** to ascertain the carrier's soundness. [26] It is the agent's duty to issue and deliver the policy, file it with the State, and notify insureds of any material changes. [27] The agent keeps a record of all transactions, and makes an annual report to the State. [28] Indeed, the State's effort to protect the public interest in this area is almost entirely dependent on monitoring licensed surplus lines agents. [29]

The surplus lines premium tax is similarly dependent on the involvement of a licensed agent. Agents must compute the premium taxes (by allocating premiums to Texas risks), collect them from insureds, hold them in trust, and report and render them to the State. [30] Agents are guilty of theft if the taxes are not timely paid. [31] If (as the insurers argue) the tax cannot be collected from eligible insurers when no licensed agent participated, it is hard to see how it will be collected at all.

 **[3]**    This cannot simply be written off as a procedural defect in the Insurance Code. Because insurance regulation and taxation is generally a state rather than federal matter, [32] states have long tried to make sure that insurers are not only reliable but reachable—that local agents and records exist so that local regulations and taxes can be enforced. [33] By definition, surplus lines insurers are not located in Texas, and have not applied for permission to do business here. By requiring that surplus lines insurance must be placed through a licensed Texas surplus lines agent, [34] the Code prescribes a condition vital to the State's regulatory jurisdiction.

When policies are procured through *both* a licensed agent and an eligible surplus lines carrier, state policy is fulfilled by requiring the agent to collect the tax and pay the State. When policies are procured through *neither* a licensed agent nor an eligible carrier, the policy is met by requiring the insurer to pay the tax. But when a policy is procured through an eligible carrier *but not* through a licensed agent, exempting the insurer may result in *no one* paying the tax—indeed, the State may never even know the policy was written. Adopting the insurers' interpretation would leave a hole in the State's insurance regulation and taxation plan.

## C

Finally, in construing statutes we may also consider the consequences of a particular construction. [35] Here, the insurers and several amici argue that treating surplus lines policies as unauthorized insurance will unfairly punish insurers for **\*89** omissions by third parties, and impose penalties that could destroy an important part of the Texas insurance market.

We recognize that whether a surplus lines policy complies with the Code is largely out of a surplus carrier's hands. Surplus lines policies are initiated by insureds or local agents when they cannot procure coverage from Texas-licensed insurers. Agents are responsible for getting their own licenses, as well as properly placing, reporting, and keeping records of all transactions. [36] Agents are responsible for paying the premium tax after collecting it from insureds. [37] As a result, surplus lines carriers often will not know whether insurance was available from a licensed insurer, whether the policy was properly reported, whether proper records were kept, or whether the premium tax was paid.

We also recognize that the consequences of treating a policy as unauthorized insurance can be severe. Anyone who assists in procuring unauthorized insurance is individually liable for unpaid claims under the policy. [38] Violations of the surplus lines statute may result in administrative penalties up to $25,000, [39] but violations of the unauthorized insurance statute are punishable by felony conviction and fines up to $10,000 *per day.* [40] An unauthorized insurer cannot enforce its policies, [41] while an eligible surplus line carrier may do so except in cases of a material and intentional Code violations. [42] Unauthorized insurers cannot even defend themselves in Texas without filing a bond, while eligible surplus lines insurers can. [43]

But we do not agree that these difficult fair notice, due process, and business impact problems are implicated by our decision today. For tax purposes, eligible surplus lines carriers that fail to use a licensed agent are treated like unauthorized insurers only because of the two explicit conditions in the unauthorized insurance premium tax statute. [44] A similar exception with the same conditions does not appear in most other parts of the unauthorized insurance

statute, including the separate penalty provisions that punish violations of each statute. Without any indication from the Legislature that any particular violations of the surplus lines statute would make the unauthorized insurance penalties apply, it is hard to see why violations of each statute would not be limited to the separate penalties that each prescribes.

 **[4]** Additionally, our holding today is limited to the two conditions stated in the particular exception before us (i.e., eligible carrier and licensed agent). As this provision states that it applies except when those two conditions are met, it clearly does *not* apply if they are. While many other violations of the surplus lines statute might occur beyond an eligible carriers' knowledge or control, the only two it must **\*90** confirm to avoid the unauthorized insurance premium tax are its own eligibility and issuance through a licensed agent. [45]

Finally, we note that the Legislature amended the Insurance Code in 2003 to make clear that eligible surplus lines carriers must pay the 4.85 percent premium tax on unauthorized insurers unless an agent paid the tax. [46] The parties of course disagree whether this was a clarification or change in the Code. [47] But in either event, we must reject the argument that the Legislature could never have intended the Insurance Code to mean what the Comptroller says it does, [48] because the Legislature has now made clear that this is precisely its current intent.

\* \* \*

Accordingly, we agree with the Comptroller that if a policy is procured from an eligible surplus lines carrier without a licensed surplus lines agent, the premium tax applicable to unauthorized insurance policies may be collected from the insurer. We affirm the court of appeals' judgment and remand to the trial court for further proceedings consistent with this opinion.

Chief Justice JEFFERSON did not participate in the decision.

**All Citations**

209 S.W.3d 83, 50 Tex. Sup. Ct. J. 181

Footnotes

1  Suit was filed against both the Comptroller of Public Accounts of the State of Texas, Carole Keeton Strayhorn, and the Attorney General of the State of Texas, Greg Abbott, but as their interests do not diverge, we refer to them jointly as the "Comptroller."

2  The Comptroller initially assessed taxes, interest and an additional penalty against Lexington, Landmark, and American International, in the amounts of $6,303,394.91, $171,300.83, and $362,975.97, respectively.

3  The taxes and penalties against Lexington, Landmark, and American International were reduced to $1,596,196.63, $36,174.92, $340,980.31, respectively.

4  *See generally* TEX. INS.CODE §§ 221–226.

5  *See, e.g., id.* § 221.002(a) (imposing 1.6 percent gross premiums tax on property and casualty insurers), § 222.003 (imposing up to 1.75 percent gross premiums tax on life, health, and accident insurers), § 223.003 (imposing 1.35 percent gross premiums tax on title insurers).

6  *See id.* §§ 226.003, 225.004 (formerly codified at TEX. INS. CODE art. 1.14–1, § 11(a) (repealed 1999), 1.14–2, § 12(a) (repealed 2003)). The Texas Insurance Code was recently recodified. When a cited provision has not materially changed from that in effect during the time relevant to this dispute, citation will be to the current Code with the former provision noted parenthetically.

7  *See id.* §§ 225.002–.003, 226.005(c) (formerly art. 1.14–1, § 11(a)).

8  *See id.* §§ 225.004, 225.006, 225.010 (formerly art. 1.14–2, § 12).

9  *See id.* § 981.020 (formerly art. 1.14–2, § 3).

10  *See id.* § 981.101(c) (formerly art. 1.14–2, § 7(a)).

11  *Strayhorn v. Lexington Ins. Co.,* 128 S.W.3d 772 (Tex.App.-Austin 2004).

12  *See PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 83 (Tex.2004).

13  TEX.INS.CODE art. 1.14–1, § 11(a) (repealed 1999) (emphasis added). Before the 1993 amendment, the same section provided that "every unauthorized insurer" shall pay the premium tax "[e]xcept as to premiums on lawfully procured surplus lines insurance." *See* Act of Apr. 27, 1967, 60th Leg., R.S., ch. 185, § 1, 1967 Tex. Gen. Laws 400, 401–14,

*amended by* Act of May 27, 1993, 73d Leg., R.S., ch. 999, § 6, 1993 Tex. Gen. Laws 4373, 4375, *repealed by* Act of Apr. 30, 1999, 76th Leg., R.S., ch 101, § 5, 1999 Tex. Gen. Laws 486, 538.

14 *See* TEX. GOV'T CODE § 311.021(1).

15 22 S.W.3d 321, 326 (Tex.1995) (emphasis added).

16 *Id.*

17 *Id.* at 323.

18 *See* TEX. GOV'T CODE § 311.026(b) (providing that if a "conflict between the general provision and the special or local provision is irreconcilable, the special or local provision prevails as an exception to the general provision"); *Sultan v. Mathew,* 178 S.W.3d 747, 751 (Tex.2005).

19 *See* TEX. GOV'T CODE § 311.026(a) ("If a general provision conflicts with a special or local provision, the provisions shall be construed, if possible, so that effect is given to both.").

20 *See* TEX. INS.CODE §§ 981.002(3), 981.004(a) (formerly art. 1.14–2, § 3(a)).

21 *Mid–American Indem. Ins. Co. v. King,* 22 S.W.3d 321, 325 (Tex.1995). Beginning in 1951, the Insurance Code referred to both unauthorized and surplus lines carriers as "unauthorized insurers" and addressed them in one article. *See* Act of June 7, 1951, 52d Leg., R.S., ch. 491, § 1, 1951 Tex. Gen. Laws 868, 1085–89, *repealed by* Act of Apr. 27, 1967, 60th Leg., R.S., ch. 185, § 2, 1967 Tex. Gen. Laws 400, 408. In 1967, the two were separated into different articles of the Insurance Code, *See* Act of Apr. 27, 1967, 60th Leg., R.S., ch. 185, § 1, 1967 Tex. Gen. Laws 400, 401–14, *repealed by* Act of Apr. 30, 1999, 76th Leg., R.S., ch. 101, § 5, 1999 Tex. Gen. Laws 486, 538; Act of Apr. 27, 1967, 60th Leg., R.S., ch. 185, § 2, 1967 Tex. Gen. Laws 400, 409, *repealed by* Act of May 22, 2001, 77th Leg., R.S., ch. 1419, § 31(b)(1), 2001 Tex. Gen. Laws 3658, 4208, but a surplus lines insurer was still defined as "an *unauthorized* insurer in which an insurance coverage is placed or may be placed under this Article." TEX. INS.CODE art. 1.14–2, § 2(b)(as added by Act of Apr. 27, 1967, 60th Leg., R.S., ch. 185, § 2, 1967 Tex. Gen. Laws 400, 409) (repealed 2001)(emphasis added). In 1993, the Legislature changed "unauthorized insurer" in this definition to "unlicensed insurer." TEX. INS.CODE art. 1.14–2, § 2(b)(as added by Act of 1993, 73rd Leg., R.S., ch. 999, § 9, 1993 Tex. Gen. Laws 4373, 4377) (repealed 2001).

22 *See Mid–American,* 22 S.W.3d at 326.

23 *See* TEX. GOV'T CODE § 311.023 ("In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the: (1) object sought to be attained ..."); *PPG Indus., Inc. v. JMB/ Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 84 (Tex.2004).

24 TEX. INS.CODE §§ 101.001(b), 981.001(b) (formerly art. 1.14–1, § 1, art. 1.14–2, § 1).

25 *See id.* § 981.216 (formerly art. 1.14–2, §§ 5, 6).

26 *See id.* § 981.211 (formerly art. 1.14–2, § 8(a)-(b)).

27 *See id.* §§ 981.103–.105, 981.213, & 981.216 (formerly art. 1.14–2, § 6(b), (c), & (e)).

28 *See id.* §§ 981.215, 981.216 (formerly art. 1.14–2, §§ 15, 16).

29 *See id.* § 981.004 (formerly art. 1.14–2, § 3(a)).

30 *See id.* §§ 225.006–.010 (formerly art. 1.14–2, § 12(a)-(b)).

31 *See id.* § 225.013 (formerly art. 1.14–2, § 12(b)).

32 *See* 15 U.S.C. § 1012(a) ("The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.").

33 *See, e.g., Paul v. Virginia,* 75 U.S. (8 Wall) 168, 170, 19 L.Ed. 357 (1868) (holding constitutional a state statute prohibiting out-of-state insurers from issuing in-state policies without obtaining a license and posting bond).

34 *See* TEX. INS.CODE § 981.001(c) (formerly art. 1.14–2, § 3(a)(1), (3)).

35 *See* TEX. GOV'T CODE § 311.023(5).

36 *See* TEX. INS.CODE §§ 981.103–.105, 981.202–.203, 981.211, 981.213, & 981.216 (formerly art. 1.14–2, §§ 4, 5, 6(c), 7, 8, 12, 15, 15A, & 16).

37 *See id.* §§ 225.006–.010 (formerly art. 1.14–2, § 12).

38 *See id.* § 101.201 (formerly art. 1.14–2, § 8).

39 *See id.* §§ 981.006, 82.052, & 84.021–.022 (formerly art. 1.14–2, § 17).

40 *See id.* §§ 101.105, 101.106 (formerly art. 1.14–1, §§ 3(d) & 13).

41 *See id.* § 101.201 (formerly art. 1.14–1, § 8).

42 *See id.* § 981.005 (formerly art. 1.14–2, § 9(a)).

43 *See id.* §§ 101.352–.354 (formerly art. 1.36, § 11(a), (d)).

44    *See id.* former art. 1.14–1, § 11(a).

45    Licensed surplus lines agents may accept applications from other agents and share commissions with them. *See id.* § 981.212 (formerly art. 1.14–2, § 14).

46    *See id.* § 226.003 (assessing tax on premiums of all insurers—authorized, unauthorized, and eligible surplus lines— and then excluding premiums on insurance procured from authorized insurers and from eligible surplus lines insurers through a licensed agent).

47    *See, e.g., In re C.O.S.,* 988 S.W.2d 760, 764 (Tex.1999) (holding that legislature's intent merely to clarify rather than change existing law does not mean original legislature had the same understanding).

48    *Cf. Bridgestone/Firestone, Inc. v. Glyn–Jones,* 878 S.W.2d 132, 135 (Tex.1994) (Hecht, J., concurring) ("The real principle at work here is this: in some circumstances, words, no matter how plain, will not be construed to cause a result the Legislature almost certainly could not have intended.")

---

**End of Document**                             © 2015 Thomson Reuters. No claim to original U.S. Government Works.

NN

 KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by** Hooks v. Samson Lone Star, Limited Partnership, Tex., January 30, 2015

668 S.W.2d 319
Supreme Court of Texas.

LITTON INDUSTRIAL
PRODUCTS, INC. et al., Petitioners,
v.
Earnest GAMMAGE, Respondent.

No. C–2003. | Jan. 11, 1984.

Action was brought on basis of negligence, strict liability, and for deceptive trade practices to recover for injuries sustained by plaintiff, a diesel mechanic, when he fell backwards due to failure of ratchet adapter tool manufactured by one of the defendants. The District Court, Harris County, Wm. N. Blanton, J., entered judgment in favor of plaintiff, and defendants appealed. The Houston Court of Civil Appeals, 14th Supreme Judicial District, Miller, J., affirmed, 644 S.W.2d 170, and defendants brought error. The Supreme Court, Pope, C.J., held that: (1) defendants did not, by filing motion for entry of judgment on verdict for actual damages found by jury, waive their right to complain about trial court's trebling the jury's damages award; (2) defendants could not reserve right to complain about judgment itself, after filing motion that trial court render judgment for actual damages found by jury, by accompanying the motion with brief in which they took back what they urged in motion; (3) defendants did not, by failing to file motion for new trial, waive right to argue on appeal that there was no evidence or insufficient evidence to support finding that they had violated Deceptive Trade Practices Act; and (4) there was no more than a scintilla of evidence that defendants did any act or practice after effective date of Deceptive Trade Practices Act; thus, award of treble damages under the Act was error.

Affirmed in part, reversed in part.

West Headnotes (11)

**[1]** **Appeal and Error**
 Judgment

In personal injury action brought against company which manufactured defective ratchet adapter, the company, which had moved at trial that judgment for amount of actual damages found by jury be rendered against it, could not on appeal take a position inconsistent with that part of judgment.

15 Cases that cite this headnote

**[2]** **Appeal and Error**
 Judgment

Defendant company in products liability suit could not complain on appeal either that findings in support of actual damages had no support in evidence or that evidence was factually insufficient, where company had previously filed motion that trial court render judgment on verdict for the actual damages found by jury.

11 Cases that cite this headnote

**[3]** **Appeal and Error**
 Judgment

In personal injury action brought against company which manufactured defective ratchet adapter, the company, which had filed motion that trial court render judgment on verdict for actual damages found by jury, could not attack jury findings concerning company's negligence and its manufacture of a defective product.

4 Cases that cite this headnote

**[4]** **Appeal and Error**
 Judgment

In personal injury action brought against company which manufactured defective ratchet adapter, the company did not, by filing motion urging trial court to render judgment on verdict for actual damages found by jury, waive its right to complain about trial court's action, grounded upon the Deceptive Trade Practices Act, in trebling the jury's award. V.T.C.A., Bus. & C. § 17.41 et seq.

11 Cases that cite this headnote

**[5] Appeal and Error**
🔑 Judgment

Defendant company could not reserve right to complain about judgment after filing motion urging trial court to render judgment for actual damages found by jury, by accompanying motion with brief in which it took back what it urged in motion.

15 Cases that cite this headnote

**[6] Appeal and Error**
🔑 Proceedings Included in General

Trial briefs and memoranda of authorities should not be included in transcript on appeal. Vernon's Ann.Texas Rules Civ.Proc., Rule 376–a(a).

1 Cases that cite this headnote

**[7] Appeal and Error**
🔑 Review of Sufficiency of Evidence to Sustain Verdict, Findings, or Judgment

In personal injury action brought against company which manufactured defective ratchet adapter, the company, which failed to file motion for new trial, did not waive right to argue on appeal that there was no evidence that it had violated Deceptive Trade Practices Act. Vernon's Ann.Texas Rules Civ.Proc., Rule 324; V.T.C.A., Bus. & C. § 17.41 et seq.

13 Cases that cite this headnote

**[8] Antitrust and Trade Regulation**
🔑 Retroactive Operation

Date of sale of tool is not determinative as to whether manufacturing company did any act or practice after effective date of Deceptive Trade Practices Act. V.T.C.A., Bus. & C. § 17.63.

1 Cases that cite this headnote

**[9] Antitrust and Trade Regulation**
🔑 Weight and Sufficiency

While circumstantial evidence may be considered in determining whether manufacturing company did any act or practice after effective date of Deceptive Trade Practices Act, there must be more than scintilla of evidence. V.T.C.A., Bus. & C. § 17.63.

1 Cases that cite this headnote

**[10] Evidence**
🔑 Grounds

When circumstances are consistent with either of two facts and nothing shows that one is more probable than the other, neither fact can be inferred.

50 Cases that cite this headnote

**[11] Antitrust and Trade Regulation**
🔑 Retroactive Operation

In personal injury action brought against company which manufactured defective ratchet adapter, there was no more than a scintilla of evidence supporting deemed finding that manufacturing company did any act or practice after, rather than before, effective date of Deceptive Trade Practices Act; thus, award of treble damages pursuant to Deceptive Trade Practices Act was error. V.T.C.A., Bus. & C. § 17.41 et seq.

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*321** A.J. Watkins, Butler, Binion, Rice, Cook & Knapp, Eugene A. Cook and Louis H. Salinas, Jr., Fletcher Etheridge, Houston, for petitioners.

Young, Cook, Pfeifer and Hampton, Russell L. Cook, Jr., and Phillip A. Pfeifer, Houston, for respondent.

**Opinion**

POPE, Chief Justice.

Earnest Gammage sued and obtained a judgment against Litton Industrial Products, Inc. (Litton) upon a jury verdict of defendant's strict liability, negligence, and breach of warranty. The judgment was for $705,852 actual damages which the trial court trebled, pursuant to the terms of the

Deceptive Trade Practice Act as it was first enacted in 1973. The court of appeals affirmed the judgment of the trial court. 644 S.W.2d 170. We granted the application for writ of error to review the holding of the court of appeals that Litton Industries had waived its right to complain that there was no evidence and insufficient evidence that it did any act or practice that violated the Deceptive Trade Practice Act after its effective date. We reverse the judgment of the court of appeals in part and render judgment for actual damages only.

Earnest Gammage, a diesel mechanic, asked his employer, Waukesha-Pearce Industries, Inc., to buy for him a ¾-inch ratchet adapter. As was the practice, Waukesha purchased the tool and charged it to Gammage. Gammage and the other employees furnished their own hand tools. That Litton manufactured the ratchet adapter is not disputed. Gammage was putting the tool under load by pulling it toward himself when it failed, causing him to fall backwards resulting in extensive personal injuries. The evidence was that the pawl, a component of the adapter, had a chipped tooth, which caused it to fail when Gammage put it under load.

The jury made the following findings: the tool was defectively manufactured which was a producing cause of the occurrence in question; the tool was unfit for ordinary purposes for which such tools are used; the unfitness was a producing cause of the occurrence; Litton failed to warn Gammage that the ratchet adapter would slip, which was negligence and a proximate cause; Gammage was not contributorily negligent; and the actual damages to Gammage were $705,852. Upon the basis of those findings, Litton moved that judgment for the amount of actual damages found by the jury be rendered against it. The trial court did not, however, grant that motion. It instead rendered judgment for three times that amount.

Litton urged on its appeal to the court of appeals that plaintiff Gammage could not recover treble damages for an occurrence that preceded the effective date of the Deceptive Trade Practices Act, May 21, 1973, and that there was no evidence and insufficient evidence that showed the date of the occurrence. The court of appeals ruled that Litton had waived its points by its own motion that the trial court render judgment for the actual damages and also by failing to file a motion for new trial. This court granted the application for writ of error to review the holding that Litton had waived its points, and we conclude that it did not.

 **[1]**    **[2]**    **[3]**    By filing its motion that the trial court render judgment on the verdict for  **\*322**  the actual damages found

by the jury, Litton could not, on appeal, take a position inconsistent with that part of the judgment. *Miner-Dederick Construction Corporation v. Mid-County Rental Service, Inc.,* 603 S.W.2d 193 (Tex.1980). Litton could not complain either that the findings in support of the actual damages had no support in the evidence or that the evidence was factually insufficient. Likewise, the jury findings concerning Litton's negligence and its manufacture of a defective product could not be attacked under our decision in *Miner-Dederick, supra.*

 **[4]**    Litton has not attacked on appeal the judgment for actual damages. Litton's motion was not for a judgment grounded upon the Deceptive Trade Practices Act; it was, in fact, made to avoid the treble damages allowed by that law. Litton has at all times during trial and appeal taken the stance that this is not a suit for damages under the Deceptive Trade Practices Act. Its motion for judgment was consistent with, rather than inconsistent with that posture. Litton did not waive its right to complain about the trial court's trebling the damages.

 **[5]**    **[6]**    We disapprove, however, Litton's argument that it reserved the right to complain about the judgment, because it accompanied its motion for judgment with a brief in which it took back what it urged in its motion. Litton's trial brief that accompanied its motion reserved the right to "challenge any adverse judgment based upon the verdict." We disapprove a practice by which a party, by motion, induces the trial court on the one hand to render a judgment, but reserves in a brief the right for the movant to attack the judgment if the court grants the motion. Litton could not have it both ways. The briefs that Litton filed in the trial court were brought forward in the transcript. This violates the provision of Rule 376–a(a), Tex.R.Civ.P., that says trial briefs and memoranda of authorities shall not be included in the transcript. We arrive at our decision in this case, however, that Litton did not waive its right to complain about the treble damages, because the motion itself excluded a judgment for treble damages.

The court of appeals also erred in its holding that Litton waived its points that there was no evidence or insufficient evidence that the act or practice occurred after May 21, 1973, the date the Deceptive Trade Practices Act became effective. That court held that Litton's failure to file a motion for new trial urging these points amounted to a waiver. This case was tried in March 1981, shortly after this court had promulgated a revised Rule 324, Tex.R.Civ.P., relating to motions for new trial.

Prior to January 1978, Rule 324 had an express provision that a motion for new trial was not required in a non-jury case or in a case where the appeal was based on some error of the trial court arising after its action on the motion for new trial. It was settled under that rule that, in a non-jury case, one could raise for the first time on appeal complaints that attacked factual sufficiency of the evidence to support the trial court's expressed or implied findings of fact. *Boswell v. Handley,* 397 S.W.2d 213 (Tex.1965). There was at that time an additional Rule 325 that required a motion for new trial to complain about motions for continuance, change of venue, or other preliminary motions.

Effective January 1, 1978, Rule 325 was repealed and Rule 324 was amended to provide:

> A motion for new trial shall not be a prerequisite to the right to complain on appeal, in any jury or non-jury case. A motion for new trial may be filed by any party, however, and the omission of a point in such motion shall not preclude the right to make the complaint on appeal. Notwithstanding the foregoing, it shall be necessary to file a motion for new trial in order to present a complaint which has not otherwise been ruled upon. A complaint that one or more of a jury's findings have insufficient support in the evidence or are against the overwhelming preponderance of the evidence as a matter of fact may be presented for the first time on appeal.

 **\*323**  Courts of appeals and the bar had trouble with the fourth sentence of Rule 324, quoted above. *Brock v. Brock,* 586 S.W.2d 927 (Tex.Civ.App.—El Paso 1979, no writ), construed the rule to excuse a motion for new trial urging no evidence or insufficient evidence in jury cases but not in non-jury cases. The third sentence of the above quoted rule, according to *Brock,* required a motion for new trial if the complaint had not otherwise been ruled upon. It held that "no evidence" points could be ruled upon in a trial court by an order on a motion for instructed verdict, an objection to the submission of a fact issue to the jury, a motion for judgment notwithstanding the verdict, or a motion to disregard the jury's answer. The court held that since none of those steps are available for a ruling in a non-jury case, a motion for new trial was required so the trial court would have the chance

to rule. The court then held that the fourth sentence of Rule 324, *supra,* that excused a motion for new trial predicate, was expressly limited to jury cases. It concluded that in a non-jury case, the revised rule required a motion for new trial as a predicate for a complaint on appeal about no evidence, insufficient evidence, or that the finding was against the overwhelming weight of the evidence. The holding was that a motion for new trial was required as a predicate for complaint about no evidence in a non-jury case even though none had been required before the rule was amended.

 **[7]**   *Brown v. Brown,* 590 S.W.2d 808 (Tex.Civ.App.—Eastland 1979, no writ), recognized the logic of the court in *Brock,* but concluded that in a non-jury case, neither an attack upon the legal or factual sufficiency of the evidence required a motion for new trial as a predicate to an attack on appeal of the legal or factual sufficiency of the evidence. This court resolved this conflict by disapproving *Brock v. Brock, supra,* and holding that the intent of Rule 324 was to eliminate the requirement for motions for new trial in either a non-jury or a jury case. *Howell v. Coca-Cola Bottling Company of Lubbock, Inc.,* 599 S.W.2d 801 (Tex.1980). We hold, therefore, that at the time this case was tried, *Howell v. Coca-Cola,* had clearly held that a motion for new trial was not required for Litton to urge that there was no evidence that it had violated the Deceptive Trade Practices Act.

Rule 324 has again been amended, effective April 1, 1984. [1] The prior version of the rule created problems including the complaint that an appeal on points complaining  **\*324**  of errors that the trial court had not previously had an opportunity to rule upon was resurrecting the rejected fundamental error rule.

 **[8]**   **[9]**   We also hold that there was no evidence that Litton did any act or practice after May 21, 1973, the effective date of the Act. Tex.Bus. & Comm.Code Ann. § 17.63 (Vernon Supp.1982–83). Plaintiff Gammage did not allege the date of or any particular act or practice that Litton did to violate the Act. He also failed to request an issue fixing the date of the claimed act or practice, so the trial court deemed a finding in support of its judgment for treble damages. *See* Rule 279, Tex.R.Civ.P. The date of sale of the tool is not determinative. *Stagner v. Friendswood Development Company, Inc.,* 620 S.W.2d 103 (Tex.1981); *Woods v. Littleton,* 554 S.W.2d 662, 666 (Tex.1977). While circumstantial evidence may be considered, *Darryl v. Ford Motor Co.,* 440 S.W.2d 630 (Tex.1969), there must be more than a scintilla of evidence. *Joske v. Irvine,* 91 Tex. 574, 44 S.W. 1059 (1898).

Richard C. Langdon, Director of Quality Control for a Litton affiliate, testified by deposition under the adverse witness rule that he had been working for Litton and its affiliate for twenty-three years. He said that the company manufactured the ratchet adapter in batches of two to three hundred at a time and that during the period around 1973, there were about 1,150 sales a year. He answered in the negative whether he could tell from an examination of the tool when it was manufactured and said that it was "possible that it could have been manufactured at any time before June 12, 1974, back to the time they were originally put into production." The tool had been produced since 1970.

There was some proof that Gammage's employer billed Gammage for $20.14 for the new tool after it received the shipment on November 8, 1973. Plaintiff Gammage was uncertain about dates. He said he thought he ordered the ratchet at the end of 1973 but did not actually pick it up until sometime in 1974. There was no proof of the source from which his employer acquired the tool. The witness Langdon explained that Litton would sell the tools to a warehouse distributor who in turn would sell to a jobber who would sell to the mechanic.

**[10]** **[11]** We have in this case meager circumstantial evidence giving rise to inferences which are equally consistent with the proposition that Litton's act or conduct occurred before May 21, 1973, or after that date. When circumstances are consistent with either of the two facts and nothing shows that one is more probable than the other, neither fact can be inferred. *Texas Sling Co. v. Emanuel,* 431 S.W.2d 538 (Tex.1968); *Continental Cas. Co. v. Fountain,* 257 S.W.2d 338 (Tex.Civ.App.—Dallas 1953, writ ref'd). We conclude that there was no more than a scintilla of evidence supporting the deemed finding that Litton did an act or practice after rather than before May 21, 1973. *Warren Petroleum Corp. v. Martin,* 153 Tex. 465, 271 S.W.2d 410 (Tex.1954).

We affirm those parts of the judgments below that rendered judgment for Gammage in the sum of $705,852. We reverse those parts of the judgments that trebled the damages, and we render judgment that plaintiff take nothing by way of treble damages.

**All Citations**

668 S.W.2d 319

Footnotes

1    Rule 324. Prerequisites of Appeal
    (a) Motion for New Trial Not Required. A point in a motion for new trial is not a prerequisite to a complaint on appeal in either a jury or a nonjury case, except as provided in subdivision (b).
    (b) Motion for New Trial Required. A point in a motion for new trial is a prerequisite to the following complaints on appeal:
        (1) A complaint on which evidence must be heard such as one of jury misconduct or newly discovered evidence or failure to set aside a judgment by default;
        (2) A complaint of factual insufficiency of the evidence to support a jury finding;
        (3) A complaint that a jury finding is against the overwhelming weight of the evidence;
        (4) A complaint of inadequacy or excessiveness of the damages found by the jury; or
        (5) Incurable jury argument if not otherwise ruled on by the trial court.
    (c) Judgment Notwithstanding Findings; Cross-Points.
    When judgment is rendered non obstante veredicto or notwithstanding the findings of a jury on one or more special issues, the appellee may bring forward by cross-point contained in his brief filed in the Court of Appeals any ground which would have vitiated the verdict or would have prevented an affirmance of the judgment had one been rendered by the trial court in harmony with the verdict, including although not limited to the ground that one or more of the jury's findings have insufficient support in the evidence or are against the overwhelming preponderance of the evidence as a matter of fact, and the ground that the verdict and judgment based thereon should be set aside because of improper argument of counsel.
    The failure to bring forward by cross-points such grounds as would vitiate the verdict shall be deemed a waiver thereof; provided, however, that if a cross-point is upon a ground which requires the taking of evidence in addition to that adduced upon the trial of the cause, it is not necessary that the evidentiary hearing be held until after the appellate court determines that the cause be remanded to consider such a cross-point.

**End of Document**                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

oo

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Diamond Shamrock Refining Co., L.P. v. Hall, Tex., July 8, 2005

968 S.W.2d 917
Supreme Court of Texas.

MOBIL OIL CORPORATION, Petitioner,

v.

Anna Mae ELLENDER, Individually, and as
Representative of the Estate of Eli Arnold
Ellender, Deceased, James G. Ellender,
Dwain A. Ellender, Ricky Ellender, W. Craig
Ellender, Arnold Kent Ellender, Jr., and
Florence Faye Ellender Hoyt, Respondents.

No. 96–1299. | Argued March
4, 1998. | Decided May 8, 1998.

Surviving family members and administrator of estate of contractor who died of leukemia brought action against chemical company, alleging that exposure to benzene at company's facility caused contractor's death. The 58th District Court, Jefferson County, Michael J. Bradford, J., entered judgment on jury verdict awarding $622,888.97 in compensatory damages and $6,000,000 in punitive or exemplary damages, and applied punitive damages "cap" to reduce award. Chemical company appealed. The Beaumont Court of Appeals, 934 S.W.2d 439, affirmed in part and reversed in part. Chemical company petitioned for writ of error. The Supreme Court, Baker, J., held that: (1) there was legally sufficient evidence of gross negligence; (2) court of appeals should not have recalculated cap on punitive damages when that issue was not appealed; (3) chemical company met its burden of proving amount of family members' settlement with other defendants, as basis for credit; and (4) family members had burden to show what portion of settlement was non-creditable punitive damages.

Affirmed in part, reversed in part, and remanded with instructions.

West Headnotes (22)

**[1]** **Negligence**
🔑 Gross negligence

Gross negligence includes two elements: (1) viewed objectively from the actor's standpoint, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

64 Cases that cite this headnote

**[2]** **Negligence**
🔑 Gross negligence

Evidence of simple negligence is not enough to prove either the objective or subjective elements of gross negligence.

3 Cases that cite this headnote

**[3]** **Negligence**
🔑 Gross negligence

"Extreme risk" element of gross negligence is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff.

34 Cases that cite this headnote

**[4]** **Negligence**
🔑 Gross negligence

Actual awareness of risk, as element of gross negligence, means that the defendant knew about the peril, but its acts or omissions demonstrated that it did not care.

19 Cases that cite this headnote

**[5]** **Negligence**
🔑 Direct or circumstantial evidence in general
**Negligence**
🔑 Heightened degrees of negligence

Circumstantial evidence is sufficient to prove either objective or subjective element of gross negligence.

9 Cases that cite this headnote

**[6]** **Corporations and Business Organizations**
👉 Exemplary damages

A corporation may be liable in punitive damages for gross negligence only if the corporation itself commits gross negligence.

10 Cases that cite this headnote

**[7]** **Corporations and Business Organizations**
👉 Exemplary damages

A corporation is liable for punitive damages if it authorizes or ratifies an agent's gross negligence or if it is grossly negligent in hiring an unfit agent.

17 Cases that cite this headnote

**[8]** **Corporations and Business Organizations**
👉 Exemplary damages

A corporation is liable for punitive damages if it commits gross negligence through the actions or inactions of a vice principal, which encompasses: (a) corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom the master has confided the management of the whole or a department or a division of the business.

20 Cases that cite this headnote

**[9]** **Corporations and Business Organizations**
👉 Exemplary damages

In determining whether acts are directly attributable to the corporation, the reviewing court does not simply judge individual elements or facts; instead, the court should review all the surrounding facts and circumstances to determine whether the corporation itself is grossly negligent.

5 Cases that cite this headnote

**[10]** **Corporations and Business Organizations**
👉 Exemplary damages

Whether corporation's acts can be attributed to the corporation itself, and thereby constitute corporate gross negligence, is determined by reasonable inferences the factfinder can draw from what the corporation did or failed to do and the facts existing at relevant times that contributed to a plaintiff's alleged damages.

5 Cases that cite this headnote

**[11]** **Negligence**
👉 Gross negligence

An appellate court must sustain a gross negligence finding if legally sufficient evidence shows both that the complained of act or omission was likely to result in serious harm and that the defendant was consciously indifferent to the risk of harm.

7 Cases that cite this headnote

**[12]** **Appeal and Error**
👉 Findings and conclusions

If there is no legally sufficient evidence of either gross negligence's objective or subjective elements, appellate court must reverse a gross negligence finding.

6 Cases that cite this headnote

**[13]** **Appeal and Error**
👉 Total failure of proof

In evaluating legal sufficiency of evidence, appellate court determines whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.

9 Cases that cite this headnote

**[14]** **Negligence**
👉 Premises Liability

There was legally sufficient evidence that chemical company's conduct in failing to warn contract workers about benzene exposure or protect them from it, viewed objectively from chemical company's point of view when contractor worked at its facility, involved an

extreme degree of risk to contract workers, as element of gross negligence, in light of evidence of widespread knowledge that benzene was dangerous and presented risk of leukemia, of extent of contractor's exposure, and of chemical company's failure to take sufficient precautions.

14 Cases that cite this headnote

**[15]    Negligence**
　　🗝 Heightened degrees of negligence

There was legally sufficient evidence that chemical company vice principals had actual awareness of extreme risk benzene exposure involved, but nevertheless proceeded in conscious indifference to rights, safety or welfare of contract workers, as element of gross negligence, in light of evidence that chemical company had warning and monitoring policy for its own workers, but chose to disregard that policy when dealing with contract workers.

43 Cases that cite this headnote

**[16]    Appeal and Error**
　　🗝 Form and requisites

Court of appeals properly reviewed factual sufficiency of punitive damages award, in suit against chemical company by contractor's estate and family members for gross negligence in allowing contractor's exposure to benzene, even if court did not accurately state proper punitive damages review throughout its opinion, where it provided abbreviated version of detailed review of all relevant evidence undertaken in its review of gross negligence finding, it applied relevant punitive damages factors, and it explained why evidence supported the punitive damages award.

7 Cases that cite this headnote

**[17]    Appeal and Error**
　　🗝 Form and requisites

When conducting factual sufficiency review of punitive damages award amount, court of appeals must detail all relevant evidence in its opinion, and must explain why evidence does or does not support punitive damages amount

considering five factors: (1) nature of the wrong; (2) character of conduct involved; (3) degree of culpability of wrongdoer; (4) situation and sensibilities of parties concerned; and (5) extent to which such conduct offends public sense of justice and propriety.

4 Cases that cite this headnote

**[18]    Appeal and Error**
　　🗝 Modification as to Amount of Recovery

Court of appeals could not include actual damages awarded to contract workers' estate in its punitive damages recalculation, in suit by estate and family members against chemical company for failure to protect contract worker from benzene exposure, where family members did not appeal trial court's exclusion of estate's actual damages in its calculation of punitive damages cap. V.T.C.A., Civil Practice & Remedies Code § 41.007.

Cases that cite this headnote

**[19]    Appeal and Error**
　　🗝 Power to modify judgment or order

A court of appeals cannot modify a judgment without a point of error asking it to do so.

1 Cases that cite this headnote

**[20]    Damages**
　　🗝 Reparation by wrongdoer
**Damages**
　　🗝 Weight and Sufficiency

By placing uncontested settlement amount in record, nonsettling defendant met its burden of proof on settlement amount, and was entitled to credit against damages, though it did not present judicial admission, stipulation, judicial notice, or properly admitted documents or testimony to establish amount, where nonsettling defendant informed trial court of settlement amount when plaintiffs announced settlement in open court, and plaintiffs did not contest settlement amount. V.T.C.A., Civil Practice & Remedies Code § 33.002(a).

38 Cases that cite this headnote

**[21]** **Damages**

👉 Reparation by wrongdoer

To limit a nonsettling defendant's dollar-for-dollar settlement credit to amount of settlement representing actual damages, plaintiff must tender a valid settlement agreement allocating between actual and punitive damages to trial court before judgment; otherwise, nonsettling party is entitled to a credit equaling entire settlement amount. V.T.C.A., Civil Practice & Remedies Code § 33.002(a), (c)(2).

45 Cases that cite this headnote

**[22]** **Evidence**

👉 Nature and Extent of Liability

Because requiring settling plaintiffs to tender valid settlement agreement allocating between actual and punitive damages, in order to limit credit against damages payable by nonsettling defendant, was a new rule, plaintiffs in present case, and in any case in which a settlement was reached before effective date of decision announcing rule, would be permitted to prove allocation through extrinsic evidence.

30 Cases that cite this headnote

**Attorneys and Law Firms**

**\*919** Lori Meghan Gallagher, Houston, Michael L. Baker, Beaumont, Mark L. Carlton, Fairfax, VA, Laura B. Rowe, Elizabeth A. Wiley, Mariann Sears, Houston, for Petitioner.

Paul F. Ferguson, Darren Brown, Beaumont, Stephen D. Susman, Charles R. Eskridge, Houston, James A. Holmes, Dallas, J. Keith Hyde, Beaumont, Otto D. Hewitt, III, Alvin, Mark C. Hall, Lubbock, for Respondents.

**Opinion**

BAKER, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, GONZALEZ, HECHT, ENOCH, SPECTOR, ABBOTT, and HANKINSON, Justices, join.

In this appeal, Mobil Oil Corporation asserts that the court of appeals erred by: (1) affirming the punitive damages awarded against Mobil because there is legally insufficient evidence of gross negligence and malice; (2) improperly reviewing the factual sufficiency of the punitive damages award; (3) recalculating the punitive damages award to include an extra $91,555.58; and (4) denying Mobil a $500,000 settlement credit. We hold that: (1) there is legally sufficient evidence of gross negligence to support Mobil's liability for punitive damages; (2) the court of appeals properly reviewed the factual sufficiency of the punitive damages award; (3) the court of appeals improperly added $91,555.58 to the punitive damages amount; and (4) the court of appeals improperly denied Mobil's request for a settlement credit.

Therefore, we affirm the court of appeals' judgment that there is legally sufficient evidence of Mobil's gross negligence and we **\*920** affirm the court of appeals' factual sufficiency review of the punitive damages award. We reverse the court of appeals' erroneous $91,555.58 award in extra punitive damages and its denial of a settlement credit. We remand to the trial court and instruct the trial court to provide the Ellenders an opportunity to prove whether there was any allocation between actual and punitive damages in the settlement agreement. We further instruct the trial court to allow a settlement credit consistent with this opinion, to recalculate punitive damages, excluding the estate's actual damages, and to recalculate prejudgment interest.

## I. BACKGROUND

Eli Ellender worked periodically as an independent contractor millwright at Mobil's Beaumont refinery and chemical plants between 1963 and 1977. As a millwright, Ellender repaired, serviced, and cleaned pumps, product lines, and other equipment. While working at Mobil, Ellender was exposed to benzene. He was diagnosed with acute myelogenous leukemia and died in 1989. Ellender's surviving family, individually and on behalf of his estate, sued Mobil and other defendants, alleging that exposure to benzene caused Ellender's leukemia and subsequent death. Specifically, the Ellenders alleged that Mobil was negligent, grossly negligent, and malicious in: (1) failing to warn Ellender about his exposure to benzene on Mobil's premises and the risks associated with it, and (2) failing to protect Ellender from those risks. Just before trial, all defendants, except Mobil, agreed to settle. Before the trial court submitted the case to the jury, Mobil elected a dollar-for-dollar settlement credit. *See*

TEX. CIV. PRAC. & REM.CODE § 33.014. The jury found that Mobil's conduct was grossly negligent and malicious and awarded the Ellenders $622,888.97 in compensatory damages and $6,000,000 in punitive damages.

After the jury verdict, the Ellenders and the settling defendants executed a settlement agreement. The Ellenders received $500,000 in exchange for releasing all claims for actual and punitive damages against the settling defendants. The agreement did not allocate the settlement amount between actual and punitive damages. Mobil opposed the Ellenders' motion for judgment, arguing that the proposed judgment did not reduce the actual damages award by the $500,000 settlement amount.

The trial court rendered judgment on the jury's verdict. The trial court denied Mobil a settlement credit, finding that Mobil did not prove its right to a settlement credit. Mobil moved to modify the judgment, filed a verified copy of the settlement agreement, and again requested the settlement credit. The trial court again refused to credit Mobil with the settlement amount.

The court of appeals affirmed the trial court's denial of settlement credit, holding that Mobil had not met its burden to prove the settlement amount. The court of appeals did not reach the Ellenders' second argument that Mobil's failure to prove the allocation between actual and punitive damages was an additional reason to deny a settlement credit. The court of appeals also affirmed the gross negligence and malice findings and the punitive damages award. However, the court of appeals held that the trial court erroneously added prejudgment interest to actual damages before applying the statutory punitive damages cap.[1] The court of appeals recalculated punitive damages and modified the trial court's judgment accordingly. In its recalculation, the court of appeals sua sponte included the estate's actual damages of $22,888.97 in the total actual damages amount, so that it equaled $622,888.97. Therefore, when the court of appeals reapplied the statutory cap by multiplying $622,888.97 by four, the punitive damages awarded totaled $2,491,555.88. This amount was $91,555.88 ($22,888.97 x 4) over what the punitive damages would have been had the court of appeals not included the estate's actual damages.

**\*921  II. LEGAL SUFFICIENCY —GROSS NEGLIGENCE**

Mobil first argues that there is legally insufficient evidence to support the jury's findings that Mobil's conduct was grossly negligent and malicious. The jury's answer to the punitive damages question was conditioned on a finding of gross negligence or of gross negligence *and* malice. The jury found both and awarded punitive damages. We conclude that there is legally sufficient evidence of gross negligence to uphold the punitive damages award against Mobil. Because Mobil relies solely on its gross negligence arguments to support its malice arguments, and because the gross negligence finding alone will support the punitive damages award in this case, we need not consider Mobil's argument that no evidence supports the jury's malice finding.

### A. APPLICABLE LAW

#### 1. Gross Negligence

[1] [2] [3] [4] [5]  Gross negligence includes two elements: (1) viewed objectively from the actor's standpoint, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others. *See Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 (Tex.1994).[2] Evidence of simple negligence is not enough to prove either the objective or subjective elements of gross negligence. *See Universal Servs. Co. v. Ung,* 904 S.W.2d 638, 641 (Tex.1995); *Moriel,* 879 S.W.2d at 22–23. Under the first element, "extreme risk" is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff. *See Ung,* 904 S.W.2d at 641; *Moriel,* 879 S.W.2d at 22. Under the second element, actual awareness means that the defendant knew about the peril, but its acts or omissions demonstrated that it did not care. *See Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 326 (Tex.1993). Circumstantial evidence is sufficient to prove either element of gross negligence. *See Moriel,* 879 S.W.2d at 22–23; *Wal–Mart Stores,* 868 S.W.2d at 327.

#### 2. Punitive Damages—Corporate Liability

[6] [7]  A corporation may be liable in punitive damages for gross negligence only if the corporation itself commits

gross negligence. *See Fort Worth Elevators, Co. v. Russell,* 123 Tex. 128, 70 S.W.2d 397, 406 (1934), *overruled on other grounds by Wright v. Gifford–Hill & Co.,* 725 S.W.2d 712 (Tex.1987). Because a corporation can "act only through agents of some character," *Fort Worth Elevators,* 70 S.W.2d at 402, this Court has developed tests for distinguishing between acts that are solely attributable to agents or employees and acts that are directly attributable to the corporation. *See Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387 (Tex.1997). A corporation is liable for punitive damages if it authorizes or ratifies an agent's gross negligence or if it is grossly negligent in hiring an unfit agent. *See King v. McGuff,* 149 Tex. 432, 234 S.W.2d 403, 405 (1950) (adopting the RESTATEMENT OF TORTS section 909); *Purvis v. Prattco, Inc.,* 595 S.W.2d 103, 104 (Tex.1980) (citing the RESTATEMENT (SECOND) OF TORTS section 909, **\*922** which is unchanged from the original RESTATEMENT OF TORTS section 909).

 **[8]** A corporation is also liable if it commits gross negligence through the actions or inactions of a vice principal. *See Hammerly Oaks,* 958 S.W.2d at 389. "Vice principal" encompasses: (a) corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom the master has confided the management of the whole or a department or a division of the business. *See Hammerly Oaks,* 958 S.W.2d at 391.

 **[9]** **[10]** In determining whether acts are directly attributable to the corporation, the reviewing court does not simply judge individual elements or facts. Instead, the court should review all the surrounding facts and circumstances to determine whether the corporation itself is grossly negligent. *See McPhearson v. Sullivan,* 463 S.W.2d 174, 176 (Tex.1971). Whether the corporation's acts can be attributed to the corporation itself, and thereby constitute corporate gross negligence, is determined by reasonable inferences the factfinder can draw from what the corporation did or failed to do and the facts existing at relevant times that contributed to a plaintiff's alleged damages. *See Bowman v. Puckett,* 144 Tex. 125, 188 S.W.2d 571, 574 (1945).

### 3. Standard of Review

 **[11]** **[12]** **[13]** An appellate court must sustain a gross negligence finding if legally sufficient evidence shows both

that the complained of act or omission was likely to result in serious harm and that the defendant was consciously indifferent to the risk of harm. *See Moriel,* 879 S.W.2d at 22, 24. If there is no legally sufficient evidence of either gross negligence's objective or subjective elements, this Court must reverse a gross negligence finding. *See Ung,* 904 S.W.2d at 642 (reversing the court of appeals' judgment and rendering judgment that plaintiffs take nothing because there was no evidence of gross negligence's objective element). In evaluating legal sufficiency, we determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *See Moriel,* 879 S.W.2d at 25 (*citing* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX. L.REV. 515, 522, 523 (1991)).

### B. ANALYSIS

#### 1. Gross Negligence—Objective Element

 **[14]** Mobil asserts that there is legally insufficient evidence of an extreme risk to Ellender of serious injury from benzene exposure at Mobil's facilities. Mobil argues that the trial court and the court of appeals improperly relied on evidence of Mobil's conduct and the resultant risks arising after Ellender worked at Mobil. We conclude that legally sufficient evidence shows that, viewed objectively from Mobil's standpoint when Ellender worked at Mobil, Mobil did not warn contract workers about benzene exposure or protect them from it and this failure involved an extreme degree of risk to those workers.

There is evidence that, from Mobil's viewpoint during the period Ellender worked at Mobil in the 1960s and 1970s, the extreme degree of risk associated with benzene exposure was common knowledge in the petrochemical industry. As early as 1926, the National Safety Council reported that "[t]he most characteristic pathological effect of [benzene] is perhaps its destructive influence upon the cells of the blood and the blood forming organs." Mobil stipulated NSC membership dating back to 1922. In 1948, the American Petroleum Institute reported that benzene could cause leukemia and that the only absolutely safe concentration for benzene was zero. The API report also warned that a person should avoid all contact with benzene if possible, but that if the hands must contact the solvent, then a person should use neoprene gloves or

protective creams. Mobil stipulated API membership dating back to 1919.

Dr. R.J. Potts, Mobil's medical director for the Western region (including Beaumont) from 1960 to 1983, testified that he believed Mobil had knowledge of benzene hazards in the 1950s. The record shows other petrochemical companies had knowledge of benzene **\*923** hazards. For example, Conoco's 1953 Employee Safety Manual included information from the 1948 API report and warned that the only safe level of benzene exposure was zero. Conoco also warned that workers should use air masks in case of benzene leaks and neoprene gloves in case of hand contact. In 1948, Exxon noted a definite correlation between benzene and cancer. A 1943 report to Shell warned that prolonged exposure to low concentrations of benzene may be very dangerous.

There is evidence that Ellender's benzene exposure was dangerously high. Mobil's own benzene samples, taken at the olefins and aromatic plant where Ellender periodically worked in the 1960s and 1970s, showed dangerous levels of benzene exposure between 1976 and 1978. These levels were many times more than levels the Occupational Safety and Health Administration considered dangerous in 1977. Roy Gatlin, one of Ellender's co-workers, testified that on many occasions he and Ellender steam-cleaned equipment containing benzene and inhaled benzene. Gatlin and other co-workers also testified that workers used benzene, furnished by Mobil, to wash their tools and hands as often as daily. Russell Witzke, an industrial hygienist at Mobil from 1973 to 1976 admitted that benzene was always being spilled on the ground when piping equipment was connected and disconnected.

Dr. Eula Bingham, a toxicologist specializing in environmental occupational health, reviewed testimony about Ellender's exposure to benzene and described it as "substantial." Dr. John M. Dement, a industrial hygienist and epidemiologist, reviewed the same testimony and described Ellender's exposure as "significant lifetime exposure that would have put him at increased risk for leukemia."

Mobil counters that because there is no evidence that *a vice principal's conduct* involved an extreme degree of risk to contract workers like Ellender, Mobil cannot be liable for gross negligence. However, in reviewing all the facts and circumstances, we conclude that there is evidence that Mobil's own acts and omissions involved an extreme degree of risk to contract workers like Ellender.

David B. Dunham, a Mobil industrial hygienist, testified that although Mobil monitored its employees, it had an "unwritten practice or policy" not to monitor contract workers and that when he attempted to monitor contract workers, he was told not to. Ellender's co-workers testified that they never saw any signs warning them of benzene hazards at Mobil and that Mobil did not monitor them for exposure or provide them with protective gear when they worked around benzene. Moreover, Mobil did not include any reference to benzene or other chemicals in its 1967 pamphlet entitled "Mobil Safety and Security Regulations for Contract Workers." Dr. Josh Esslinger, a former medical consultant for Mobil in Beaumont, testified that he knew workers washed their hands in benzene and that such a practice indicated that workers were not adequately warned of benzene hazards. Dr. Dement testified that Mobil's industrial hygiene program was poor and practically nonexistent for contractors. This is evidence from which the jury could reasonably infer that Mobil had a company policy of not monitoring contract workers for benzene exposure, not warning them of the dangers of such exposure, and not providing them with protective gear and that this policy involved an extreme degree of risk to those workers. *See generally McPhearson,* 463 S.W.2d at 174. Thus, there is evidence that acts and omissions of Mobil itself involved an extreme degree of risk to contract workers like Ellender.

Relying on *Ung,* Mobil argues that it is not grossly negligent for not taking all the precautions it could have. *See Ung,* 904 S.W.2d at 641–42. Specifically, Mobil claims that it complied with the industrial standards for benzene exposure that existed when Ellender worked at Mobil and that Mobil took steps to protect employees and contract workers from benzene exposure. Mobil essentially argues that the Court should overturn the jury's gross negligence finding because there is evidence that Mobil's conduct was not grossly negligent.

Mobil's argument is flawed. As this Court made clear in *Burk Royalty* and *Moriel,* the fact that a defendant exercises some care **\*924** does not insulate the defendant from gross negligence liability. *See Moriel,* 879 S.W.2d at 20 (discussing cases before *Burk Royalty* that erroneously focused on "entire want of care" part of the gross negligence definition in reasoning that "some care" defeated a gross negligence finding; *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 921–922 (Tex.1981). Therefore, Mobil's reference to evidence of some care does not affect our legal sufficiency review of the jury's gross negligence finding.

We conclude that there is legally sufficient evidence that Mobil's conduct, viewed objectively from Mobil's point of view when Ellender worked at Mobil, involved an extreme degree of risk to contract workers like Ellender.

### 2. Gross Negligence—Subjective Element

 **[15]**    Mobil also asserts that there is legally insufficient evidence of gross negligence's subjective element. Mobil argues that the court of appeals erred in relying on evidence of general knowledge of some benzene exposure risks to affirm the finding of actual awareness of an extreme risk. Mobil further argues that there is no evidence that a Mobil vice principal knew of an extreme risk to contract workers. We conclude that there is legally sufficient evidence that Mobil vice principals had actual awareness of the extreme risk benzene exposure involves, but nevertheless proceeded in conscious indifference to the rights, safety or welfare of Ellender and other contract workers.

Dr. Potts, Mobil's regional medical director from 1960 to 1983, testified that even before he became medical director he knew that benzene caused, among other diseases, aplastic anemia. He knew that washing hands and tools in benzene was hazardous. He further testified that he and Dr. Stewart, a physician working directly under him at the Beaumont refinery, implemented a plan "to see that noxious agents [including benzene] were not being used in a manner that was deleterious to employee health." Dr. Esslinger testified that Mobil had a policy to conduct blood and urine tests on its own employees for benzene exposure and that he carried out that policy.

Dunham testified that Mobil had a fleet of industrial hygiene monitors who monitored employees for benzene, among other chemicals, and who sent their results to Mobil's corporate medical director. Some of these samples, including one sample of a Mobil maintenance mechanic doing work identical to the work Ellender periodically did, showed excessive levels of benzene exposure. Further, in 1969, Mobil's Employee Relations Division established "a medical and industrial hygiene program designed to protect the health of those employees who handle benzene and benzene related products." The program directed Mobil doctors, hygienists, and other personnel to monitor employees for benzene exposure, to furnish them benzene protective gear, and to instruct employees on proper benzene handling. The program recognized that long-term benzene inhalation is the most likely source of benzene intoxication and that continuous exposure to benzene affects the formation of red-blood cells in bone marrow. This circumstantial evidence is legally sufficient evidence that Mobil vice principals knew that not providing protective gear, not monitoring and not warning workers about benzene exposure was an extreme risk to contract workers, like Ellender, who routinely came into contact with benzene at Mobil.

Furthermore, there is probative evidence that despite this knowledge, Mobil proceeded in conscious indifference to the rights, safety or welfare of contract workers like Ellender. Contrary to Mobil's policy of warning, monitoring, and protecting its employees, Mobil did not warn, monitor, or protect contract workers from benzene exposure. Dunham admitted that personal monitoring and medical surveillance are the only sure ways to assess a worker's exposure to benzene. Yet, Dunham testified that Mobil had an "unwritten practice or policy" not to monitor contract workers and that when he attempted to monitor contract workers, he was told not to. Ellender's co-workers testified that they were not warned about benzene hazards or provided benzene protective equipment and that Mobil actually furnished benzene for workers to wash their tools. Dr. Dement testified that Mobil's failure to inform workers **\*925** about benzene exposure reflected Mobil's conscious disregard for worker safety. Evidence that Mobil had a policy of monitoring and protecting its own employees but chose not to do the same for contract workers provides additional facts and circumstances for the jury to infer that Mobil knew the risks of benzene exposure yet proceeded with conscious indifference toward the rights, safety or welfare of contract workers vis-a-vis that risk.

Because there is legally sufficient evidence that Mobil was grossly negligent, we affirm the jury's finding of gross negligence against Mobil.

### III. FACTUAL SUFFICIENCY REVIEW —PUNITIVE DAMAGES AWARD

 **[16]**    Mobil argues that the court of appeals did not properly review the factual sufficiency of the punitive damages award. Specifically, Mobil argues that the court did not properly detail all the evidence in light of the *Kraus* [3] factors. We disagree.

**[17]** When conducting a factual sufficiency review of a punitive damages award amount, irrespective of whether the court of appeals ultimately affirms or reverses the award, the court must detail all relevant evidence in its opinion. *See Ellis County State Bank v. Keever,* 915 S.W.2d 478, 479 (Tex.1995)(remanding to the court of appeals to detail all the evidence instead of just the evidence supporting the punitive damages award); *Moriel,* 879 S.W.2d at 31. The court of appeals must explain why the evidence does or does not support the punitive damages amount considering five factors: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety. *See Keever,* 915 S.W.2d at 479; *Kraus,* 616 S.W.2d at 910*; see also* TEX. CIV. PRAC. & REM.CODE §§ 41.011 and 41.013 (requiring courts of appeals, in reviewing evidence of punitive damages amounts, to consider the evidence or lack of evidence with specificity in light of the *Kraus* factors).

The court of appeals misdefined factual sufficiency review of punitive damages awards as detailing "the evidence *supportive of the punitive damage award under Kraus* " and "the evidence relating to why the evidence supports such award." 934 S.W.2d at 458 (emphasis added). Nevertheless, the court of appeals recognized its duty to review "the evidence supportive of an affirmative finding of gross negligence and apply such evidence, *along with any other evidence,* in determining whether or not the exemplary damages awarded [were] reasonable." 934 S.W.2d at 456 (emphasis added).

Further, while the court of appeals may not have accurately stated the proper punitive damages review throughout its opinion, it complied with the *Kraus, Moriel,* and *Keever* requirements. Although the court of appeals' *Kraus* analysis seems to restate only the evidence supporting the punitive damage award, the court of appeals painstakingly detailed *all* relevant evidence in its exhaustive review of the gross negligence finding. Therefore, its *Kraus* analysis is simply an abbreviated version of its gross negligence review of all the evidence. The court of appeals stated:

> Explaining "why" the evidence either does or does not support the punitive damages requires revisiting gross negligence evidence on a *factual sufficiency standard.* In compliance, we consider relevant evidence through

the guidelines enumerated in *Kraus.* The only feasible means of doing so is though a *restatement of the evidence supportive of gross negligence.* It shall also become necessary to restate such evidence yet a third time under the discussion of 'why.'

934 S.W.2d at 457 (emphasis added). Finally, the court of appeals properly applied the *Kraus* factors and explained why the evidence supported the punitive damages award. Accordingly, we conclude that the court of appeals' factual sufficiency review of the punitive damages award, despite the **\*926** court's occasional misleading language, was proper.

## IV. PUNITIVE DAMAGES AWARD—RECALCULATION

**[18]** **[19]** Mobil also argues that the court of appeals erred by including, sua sponte, the estate's actual damages in its punitive damages calculation, thereby adding $91,555.58 to the punitive damages award. We agree. A court of appeals cannot modify a judgment without a point of error asking it to do so. *See Texas Nat'l Bank v. Karnes,* 717 S.W.2d 901, 903 (Tex.1986)(holding that the court of appeals erred in modifying the judgment to include attorneys fees when the trial court's refusal to grant attorneys fees was not the subject of a point of error).

Here, the jury charge asked the jury to apportion the punitive damages award, if any, between the individual plaintiffs, excluding Eli Ellender's estate. Accordingly, the trial court's judgment excluded the estate's actual damages award in its punitive damages calculation. The Ellenders did not complain about the trial court's punitive damages calculation.

The court of appeals recalculated punitive damages to exclude prejudgment interest. For no apparent reason, the court's recalculation included the estate's actual damages and thus, resulted in $91,555.58 more punitive damages than the trial court's award. Because the Ellenders did not appeal the trial court's exclusion of the estate in its punitive damages calculation, the court of appeals erred in including the estate's actual damages in its punitive damages recalculation. *See Karnes,* 717 S.W.2d at 903.

## V. SETTLEMENT CREDIT—BURDEN OF PROOF

Lastly, Mobil argues that the court of appeals erred in affirming the trial court's refusal to grant Mobil a $500,000 settlement credit. The court of appeals held that Mobil did not meet its burden to prove the settlement amount. The Ellenders argue that even if Mobil did prove the settlement amount, Mobil's failure to allocate the settlement amount between actual and punitive damages is an additional reason to affirm the denial of settlement credit. We disagree with both the court of appeals' holding and the Ellenders' allocation argument.

### A. SETTLEMENT AMOUNT

 [20]    Chapter 33 of the Texas Civil Practice and Remedies Code governs settlement credit in this case. *See* TEX. CIV. PRAC. & REM.CODE § 33.002(a) ("[T]his chapter applies to any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought."). Section 33.012(b) provides:

> If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a credit equal to one of the following, as elected in accordance with Section 33.014:
>
> (1) the sum of the dollar amounts of all settlements; or
>
> (2) a dollar amount equal to the sum of the following percentages of damages found by the trier of fact:
>
>> (A) 5 percent of those damages up to $200,000;
>>
>> (B) 10 percent of those damages from $200,001 to 400,000;
>>
>> (C) 15 percent of those damages from $400,001 to 500,000;
>>
>> (D) 20 percent of those damages greater than $500,000.

TEX. CIV. PRAC. & REM.CODE § 33.012(b). When there is a settlement covering some or all of the damages awarded in the judgment, section 33.012 requires the trial court to reduce the judgment accordingly. *See* TEX. CIV. PRAC. &

REM.CODE § 32.012(b). The only question left is by what amount the trial court should reduce the judgment.

Section 33.014 provides:

> If a claimant has settled with one or more persons, an election must be made as to which dollar credit is to be applied under Section 33.012(b). This election shall be made by any defendant filing a written election before the issues of the action are submitted to the trier of fact and, when  **\*927**  made, shall be binding on all defendants. If no defendant makes this election or if conflicting elections are made, all defendants are considered to have elected Subdivision (2) of Section 33.012(b).

TEX. CIV. PRAC. & REM.CODE § 33.014. Thus, for a dollar-for-dollar settlement credit, Chapter 33 requires a written dollar-for-dollar credit election before the case is submitted to the factfinder. *See* TEX. CIV. PRAC. & REM CODE § 33.014. Because the statute is silent on which party has the burden to prove the settlement amount, we refer to the common law. *See First Title Co. v. Garrett,* 860 S.W.2d 74, 78 (Tex.1993)(relying on common law principles for settlement credit determination because Chapter 32 of the Civil Practice and Remedies Code does not consider settlement credit).

At common law, a defendant seeking a settlement credit has the burden of proving its right to such a credit. *See First Title,* 860 S.W.2d at 78. This burden includes proving the settlement credit amount. A party can meet this burden by placing the settlement agreement or some evidence of the settlement amount in the record. *See First Title,* 860 S.W.2d at 79. If a party fails to meet this burden, the party is not entitled to a dollar-for-dollar credit and the trial court is limited to using section 32.012(b)(2) to reduce the judgment.

Here, the court of appeals held that Mobil did not meet its burden to prove the settlement amount because Mobil did not prove the amount by a judicial admission, a stipulation, judicial notice, or properly admitted documents or testimony. However, neither Chapter 33 nor existing case law demands such proof. For a dollar-for-dollar settlement credit, Chapter 33 requires only a written election before the case is submitted to the factfinder. *See TEX. CIV. PRAC. & REM.CODE §*

*33.014. And, First Title* requires only that the record show, in the settlement agreement or otherwise, the settlement credit amount. *See First Title,* 860 S.W.2d at 74.

The record here shows that Mobil first informed the trial court of the $500,000 settlement amount when the Ellenders' attorneys announced the settlement in open court during trial. Later, Mobil's written opposition to the Ellenders' motion for judgment included the settlement amount. The Ellenders did not contest the $500,000 settlement amount. Thus, we conclude that by placing the uncontested settlement amount in the record, Mobil met its burden of proof on the settlement amount.

### B. ALLOCATION OF SETTLEMENT AMOUNT

 [21]    The court of appeals did not consider the Ellenders' argument that Mobil was obligated to allocate between actual and punitive damages in the settlement amount. We have the option to consider the Ellenders' allocation argument to determine if it will support the court of appeals' judgment denying Mobil a settlement credit or to remand the issue to the court of appeals. *See First Baptist Church v. Bexar County Appraisal Review Bd.,* 833 S.W.2d 108, 111 (Tex.1992). To serve judicial economy, we choose to consider the allocation argument.

A defendant cannot receive credit for settlement amounts representing punitive damages. *See* TEX. CIV. PRAC. & REM.CODE § 33.002(c)(2) ("This chapter does not apply to ... a claim for exemplary damages included in an action to which this chapter otherwise applies."); *see also Hill v. Budget Fin. & Thrift Co.,* 383 S.W.2d 79, 81 (Tex.Civ.App.— Dallas 1964, no writ) (holding that a defendant cannot receive credit for settlement amounts representing punitive damages, which are not common damages but are individual in nature); *Howard v. General Cable Corp.,* 674 F.2d 351, 358 (5 th Cir.1983) (citing *Hill,* 383 S.W.2d at 79); *Paschall v. Peevey,* 813 S.W.2d 710, 712 (Tex.App.—Austin 1991, writ denied) (citing *Hill,* 383 S.W.2d at 79). Chapter 33 does not specify which party has the burden of proving the allocation between actual and punitive damages in a settlement amount. Again, common law provides the general rule.

In *Hill,* the court of appeals held that the party seeking the settlement credit has the burden to prove the allocation of the settlement amount between actual and punitive damages. *See Hill,* 383 S.W.2d at 81–82. In *Hill,* the

settlement agreement itself allocated between actual and punitive damages. *See Hill,* 383 S.W.2d at 81. When the nonsettling **\*928** defendant claimed a credit equaling the entire settlement amount, the court of appeals held that the settlement agreement was conclusive proof of the proper allocation. *See Hill,* 383 S.W.2d at 83. Therefore, the court limited the defendant's settlement credit to that part of the settlement amount expressly representing actual damages. *See Hill,* 383 S.W.2d at 83.

In *Texas Gen. Petroleum Corp. v. Leyh,* 52 F.3d 1330, 1340 (5 th Cir.1995), the court placed the burden on plaintiffs to show that a settlement does not involve a double recovery. *See also United States Indus. v. Touche Ross & Co.,* 854 F.2d 1223, 1262 (10 th Cir.1988). Plaintiffs can meet this burden by offering into evidence a written settlement agreement specifically allocating damages to each cause of action. *See Leyh,* 52 F.3d at 1340 (reasoning that a plaintiff that is a party to the settlement agreement is in a better position than a nonsettling defendant to allocate damages in the settlement). While *Leyh* is not directly on point, it is analogous. In cases involving allocation between actual and punitive damages, settling plaintiffs are in a better position than nonsettling defendants to insure that the settlement award is allocated between actual and punitive damages.

Here, unlike in *Hill,* the settlement agreement released the Ellenders' actual and punitive damages claims without allocating between them. Without an allocation, Mobil, who was not a party to the settlement, had almost no ability to prove which part of the settlement amount represented actual damages. Nonsettling parties should not be penalized for events over which they have no control. *See Sisters of Charity of the Incarnate Word v. Dunsmoor,* 832 S.W.2d 112, 117 (Tex.App.—Austin 1992, writ denied) (holding that prejudgment interest is based on the amount of the judgment, not the total amount of damages awarded by the jury, because nonsettling defendants have no control over settlement negotiations and should not be forced to pay prejudgment interest on settling defendants' parts of a damages award). When the settlement agreement does not allocate between actual and punitive damages, requiring a nonsettling party to prove the agreement's allocation before receiving a settlement credit not only unfairly penalizes the nonsettling party but also allows settling parties to abrogate the one satisfaction rule. *See Hess Oil Virgin Islands Corp. v. UOP, Inc.,* 861 F.2d 1197, 1208 (10 th Cir.1988); *United States Indus.,* 854 F.2d at 1262. Settling parties could prevent nonsettling parties from receiving settlement

credit by refusing to allocate between actual and punitive damages in settlement agreements. *See United States Indus.,* 854 F.2d at 1262. The better rule is to require a settling party to tender to the trial court, before judgment, a settlement agreement allocating between actual and punitive damages as a condition precedent to limiting dollar-for-dollar settlement credits to settlement amounts representing actual damages. *Accord Howard,* 674 F.2d at 351 (holding that the defendant was entitled to a credit equaling the full amount of the settlement when the plaintiff conceded that the agreement did not indicate whether it covered punitive damages).

Therefore, we hold that to limit a nonsettling party's dollar-for-dollar settlement credit to an amount representing actual damages, the settling party must tender a valid settlement agreement allocating between actual and punitive damages to the trial court before judgment.[4] Otherwise, the nonsettling party is entitled to a credit equaling the entire settlement amount.

 **[22]**  Because we announce a new proposition of law today, we remand this action to the trial court to allow the Ellenders an opportunity to prove what allocation between actual and punitive damages, if any, was agreed to when they settled with the other defendants. The issue is not what the parties **\*929** would have agreed to, but what if anything they did agree to. The trial court should allow the Ellenders to prove allocation through extrinsic evidence. Furthermore, our holding limiting plaintiffs' ability to prove allocation to that which is expressly stated in a valid settlement agreement applies to all cases in which a valid settlement agreement is reached on or after May 8, 1998, and to all other cases currently in the judicial process in which the issue has been preserved. For valid settlements agreements reached before May 8, 1998, plaintiffs can prove through extrinsic evidence whether, when the settlement was reached, the parties allocated between actual and punitive damages.

### VI. CONCLUSION

We affirm the court of appeals' holding that there is legally sufficient evidence to support the trial court's judgment against Mobil for gross negligence. We affirm the court of appeals' factual sufficiency review of the punitive damages award. We reverse the court of appeals' erroneous $91,555.58 award in extra punitive damages, and its denial of settlement credit. In the interest of justice, we remand the case to the trial court and instruct the court to afford the Ellenders an opportunity to prove whether there was any allocation between actual and punitive damages in the settlement agreement. We further instruct the trial court to grant a settlement credit in accordance with this opinion, to recalculate punitive damages, excluding the estate's actual damages, and to recalculate prejudgment interest.

OWEN, Justice, did not participate in the decision.

**All Citations**

968 S.W.2d 917, 41 Tex. Sup. Ct. J. 763

Footnotes

1    *See* former TEX. CIV. PRAC. & REM.CODE § 41.007, Act of June 3, 1987, 70 th Leg., 1 st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 94, *amended and renumbered by* Act of April 6, 1995, 74 th Leg., ch. 19, § 1, 1995 Tex. Gen. Laws 108.

2    In 1995, after this case was tried, the Legislature substituted malice for gross negligence as the prerequisite for punitive damages in cases like this one. However, the Legislature also redefined "malice" as:

    (A) a specific intent by the defendant to cause substantial injury to the claimant [or]

   (B) an act or omission

      (i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

      (ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

   *See* TEX. CIV. PRAC. & REM.CODE § 41.001(7). The malice definition in section 41.001(7)(B) mirrors this Court's definition of gross negligence in*Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 (Tex.1994). Therefore, this opinion's legal sufficiency review of gross negligence is relevant to legal sufficiency review of malice as redefined by section 41.001(7)(B).

3    *See Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981).

4        Notably, this Court has held that Texas Rule of Civil Procedure 11 applies to settlement agreements. *See Padilla v. LaFrance,* 907 S.W.2d 454 (Tex.1995); *Kennedy v. Hyde,* 682 S.W.2d 525 (Tex.1984). Accordingly, the plaintiff may either offer a written and signed settlement agreement into the record, or the agreement may be made in open court and entered of record. *See* TEX.R. CIV. P. 11. An allocation completed in either form is enough to meet the plaintiff's burden of proof.

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# PP

KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by** Excel Corp. v. Reyes, Tex.App.-Amarillo, October 17, 2000

901 S.W.2d 434
Supreme Court of Texas.

The PARKWAY COMPANY, Parkway Company of Texas, Inc. and Sugar Creek Corporation, Petitioners,

v.

Ray WOODRUFF and Constance Woodruff Presley, Mickelson & Klein, Inc., and Vansickle, Mickelson & Klein, Inc., Respondents.

No. D–4185. | Argued Sept. 21, 1994. | Decided June 15, 1995. | Rehearing Overruled July 21, 1995.

Homeowners brought action against developer for damages in connection with flooding of their home caused by developer's allegedly negligent activities resulting in diversion of surface water across their property. The 268th District Court, Fort Bend County, Brady G. Elliott, J., rendered judgment for homeowners against developer, and developer appealed. The Houston First Judicial District Court of Appeals, 857 S.W.2d 903, affirmed as reformed. On application for writ of error, the Supreme Court, Cornyn, J., held that: (1) there was no implied warranty that developer's postsale development services would be performed in good and workmanlike manner, so as to support claim under Deceptive Trade Practices-Consumer Protection Act (DTPA); (2) developer did not act unconscionably, so as to violate DTPA; (3) allowing award of both cost of repairs and of diminution in value of home improperly gave homeowners double recovery; and (4) evidence did not demonstrate compensable "mental anguish" of homeowners.

Modified and affirmed as reformed.

Gammage, J., filed dissenting opinion.

West Headnotes (13)

**[1]** **Antitrust and Trade Regulation**
 Warranties and Service Contracts

Warranties actionable under Deceptive Trade Practices-Consumer Protection Act (DTPA), both express and implied, must be recognized by common law or created by statute. V.T.C.A., Bus. & C. § 17.50(a)(2).

32 Cases that cite this headnote

**[2]** **Contracts**
 Services

Implied service warranty is common law creation.

17 Cases that cite this headnote

**[3]** **Antitrust and Trade Regulation**
 Other particular subjects

No implied warranty to perform future development services would be imposed in connection with real estate developer's sale of lot to homebuilder, as no services were included in sales transaction; developer's use of phrase "planned community" to describe development could fairly be construed as representation as to form of common interest ownership, not implied promise to provide future development services, and scale model of development did not represent implied promise to never adversely affect lot, which was flooded allegedly because of developer's negligence. V.T.C.A., Bus. & C. § 17.50(a)(2).

20 Cases that cite this headnote

**[4]** **Antitrust and Trade Regulation**
 Housing sales

Real estate developer did not act "unconscionably" in connection with development activities allegedly responsible for flooding of lot owners' home, thus barring imposition of liability under Deceptive Trade Practices-Consumer Protection Act (DTPA) on unconscionability theory; homeowners advanced no theory as to how developer's alleged advantage in exclusively controlling drainage on adjacent lots was exploited at time of sale to homebuilder, and there was no evidence that developer, at time of sale, did anything to cause

gross disparity between value of home and what owners paid for it. V.T.C.A., Bus. & C. § 17.45(5).

16 Cases that cite this headnote

**[5]** **Antitrust and Trade Regulation**
 In general; unfairness

"Unconscionability," for purposes of Deceptive Trade Practices-Consumer Protection Act (DTPA), requires that seller take advantage of special skills and training at time of sale. V.T.C.A., Bus. & C. § 17.45(5).

9 Cases that cite this headnote

**[6]** **Antitrust and Trade Regulation**
 Completion of transaction

For purposes of determining "unconscionability" under Deceptive Trade Practices-Consumer Protection Act (DTPA), time for evaluating disparity between value received and consideration paid is time of sale. V.T.C.A., Bus. & C. § 17.45(5).

2 Cases that cite this headnote

**[7]** **Damages**
 Nature and theory of compensation

Homeowners bringing action in connection with flooding of their home received improper double recovery when they were allowed award of both costs of repairs and diminution in value of home, as diminution was calculated assuming that no repairs had been made.

15 Cases that cite this headnote

**[8]** **Damages**
 Nature and theory of compensation

Law does not permit double recovery.

9 Cases that cite this headnote

**[9]** **Damages**
 Construction and operation

When prevailing party fails to elect between alternative measures of damages, court should render judgment affording greatest recovery.

3 Cases that cite this headnote

**[10]** **Damages**
 Nature and theory of compensation

Damages for diminution in value and for cost of repairs are not always duplicative; diminution in value does not duplicate cost to repairs if diminution is calculated based on comparison of original value of property and value after repairs are made.

8 Cases that cite this headnote

**[11]** **Damages**
 Mental suffering and emotional distress

Award of mental anguish damages will survive legal sufficiency challenge when plaintiffs have introduced direct evidence of nature, duration and severity of their mental anguish, thus establishing substantial disruption in their daily routine; such evidence, whether in form of plaintiffs' own testimony, that of third parties or that of experts, is more likely to provide fact finder with adequate details to assess mental anguish claims, and absence of such evidence justifies close judicial scrutiny of other evidence offered on that element of damages.

260 Cases that cite this headnote

**[12]** **Appeal and Error**
 Particular Cases and Items

When claimants fail to present direct evidence of nature, duration or severity of their anguish, Supreme Court applies traditional "no evidence" standard to determine whether record reveals any evidence of high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment or anger to support any award of damages.

297 Cases that cite this headnote

**[13]** **Damages**

👈 Mental suffering and emotional distress

Evidence did not demonstrate that homeowners suffered compensable "mental anguish" in connection with flooding of their home; homeowners' statements, "I was hot," "It was just upsetting," and "I was just upset" showed anger, frustration or vexation, but did not support conclusion that those emotions rose to compensable level.

145 Cases that cite this headnote

**Attorneys and Law Firms**

**\*436** Randall D. Wilkins, Edward J. Hennessy, Houston, for petitioners.

Amy Dunn Taylor, Linda Foreman Clark, Michael T. Powell, Houston, for respondents.

**Opinion**

Justice CORNYN delivered the opinion of the Court, joined by Chief Justice PHILLIPS, Justice GONZALEZ, Justice HIGHTOWER, Justice HECHT, Justice ENOCH, Justice SPECTOR and Justice OWEN.

We decide in this case whether a real estate development company violated the Texas Deceptive Trade Practices—Consumer Protection Act (DTPA), TEX.BUS. & COM.CODE § 17.41–.63, when it sold a vacant lot in a master-planned community and years later negligently caused a home built on that lot to be flooded. The homeowners argue that the developer breached an implied warranty that its future development services would be performed in a good and workmanlike manner and that it acted unconscionably. Because we reject both of these theories of DTPA liability in this case, we reform the judgment of the court of appeals to delete any award of damages based on the DTPA. We also

conclude that the homeowners received a double recovery for their property damage, and delete the duplicative part of the award. We affirm the remainder of the judgment for negligence-based damages, which were not challenged by the developer, and for out-of-pocket expenses. Finally, we agree with those parts of the court of appeals' opinion that find no evidence to support the mental anguish damages awarded and that affirm the directed verdict rendered on Parkway's claims against its engineers.

## I. Facts

The Sugar Creek Corporation and its successor-in-interest, the Parkway Company (collectively, Parkway), created a real estate development known as Sugar Creek on the south side of Houston. Parkway prepared the land for homebuilding by platting, surveying, regrading, building roads, and dealing with local regulatory and utility authorities. The Sugar Creek community was developed over a period of years, and included plans for retail and recreational areas.

In 1977 Harrington Homes purchased the lot at issue, in section 24 of the development, and built a house on it. After Harrington Homes sold it to the original occupants, the house was resold and occupied by another homeowner before Ray and Constance Woodruff bought it and moved in during April 1981.

In 1983 Parkway began to develop Sugar Creek section 34, which lies immediately to the east of the Woodruffs' lot and the Kaneb tract, a large commercial tract that lies to the north of the Woodruffs' lot and the rest of section 24. During the course of its work in early 1983, Parkway began constructing a wall along the line dividing section 34 from the Kaneb tract and section 24.

**\*437**



Ray Woodruff, who holds an engineering degree, advised Parkway by letter on February 3, 1983, that the wall might alter drainage patterns on his lot. Six days later, during a heavy rainstorm, the Woodruffs observed that regrading activities on section 34 had diverted runoff from the Kaneb tract onto their land.

After investigation, Parkway's engineers proposed a new drainage system, but Mr. Woodruff objected to the proposal because it called for the construction of an earthen berm across the back of his lot. Instead Woodruff installed another type of drainage system. Parkway offered to pay for Mr. Woodruff's drainage system on the condition that the Woodruffs release Parkway from any future liability. The Woodruffs objected to the release, however, and covered the construction costs themselves. Parkway finished the wall in July 1983.

When Hurricane Alicia struck the Texas coast on August 18, 1983, run-off from the Kaneb tract flooded the Woodruffs' sun room. The house flooded again in 1986, 1987, and 1989. As a result, the house suffered a cracked foundation and other structural damage.

The Woodruffs filed suit in 1984 for negligence, gross negligence, nuisance, trespass, and Water Code violations. They also alleged that Parkway was liable under the DTPA for: (1) unconscionable conduct; (2) false, misleading, or deceptive acts or practices; and (3) the knowing breach of an implied warranty to perform "development services" in "a good and workmanlike manner." Parkway, in turn, filed third-party claims against its engineers, the owners of the Kaneb tract, and Harrington Homes. The Woodruffs later amended their petition to sue directly these additional parties.

At trial, the district court granted a directed verdict in favor of Harrington Homes and Parkway's engineers. On the remaining claims, a jury found that Parkway was negligent but that the owners of the Kaneb tract were not. The jury also found that Parkway violated the Water Code, that it knowingly breached an implied warranty, and that it acted unconscionably. The jury declined, however, to find that Parkway was grossly negligent, that it engaged in any false, misleading, or deceptive acts or practices, or that it intentionally caused a trespass of the Woodruffs' property. The court rendered **\*438** judgment for actual damages of $220,000, including $120,000 for diminution in value and $100,000 for repairs to the Woodruffs' house. Based on the

DTPA findings, the trial court also rendered judgment for the Woodruffs for "additional" damages, a percentage-based award of attorney's fees, and mental anguish damages.

The court of appeals affirmed most of the trial court's judgment, but deleted any damages for mental anguish, and added $14,000 in out-of-pocket expenses claimed by the Woodruffs. 857 S.W.2d 903.

## II. DTPA Violations

The Woodruffs allege that Parkway violated the DTPA by breaching an implied warranty to perform future development services in a good and workmanlike manner, or alternatively, by committing an unconscionable act. Assuming that the Woodruffs are consumers under the DTPA,[1] we analyze each basis for DTPA recovery.

### A. Implied Warranty

[1] [2] The DTPA prohibits the breach of an express or implied warranty, *see* TEX.BUS. & COM.CODE § 17.50(a)(2), but it does not create warranties. The warranties, both express and implied, actionable under the DTPA must be recognized by the common law or created by statute. *See La Sara Grain Co. v. First Nat'l Bank,* 673 S.W.2d 558, 565 (Tex.1984). Unlike the implied warranties imposed on certain sales transactions under the Uniform Commercial Code,[2] the implied service warranty is a common law creation. *See Melody Home Mfg. Co. v. Barnes,* 741 S.W.2d 349, 353 (Tex.1987) ("An implied warranty arises by operation of law when public policy so mandates."). Before it was adopted by the court of appeals, the implied warranty to perform future development services was unknown to Texas jurisprudence. The question presented for our decision, then, is whether such an implied warranty[3] should be recognized under the facts of this case.

The judicial recognition of implied warranties in service transactions in Texas has had a short and somewhat uneven history.[4] Until 1987 this Court had never recognized a cause of action for breach of an implied warranty relating to services. In *Dennis v. Allison,* 698 S.W.2d 94 (Tex.1985), we declined to recognize an implied warranty in connection with medical services when a patient was sexually assaulted and beaten by her psychiatrist. The Court considered whether

judicial recognition of an implied warranty was justified in light of existing remedies available to the patient. In denying recovery under an implied warranty theory, the Court concluded: "It is not necessary to impose an implied warranty theory as a matter of public policy because the plaintiff patient has adequate remedies to redress wrongs committed during treatment." *Id.* at 96.

**\*439** Two years later, in *Melody Home,* this Court first recognized a limited implied warranty relating to services. Without retreating from its holding in *Dennis v. Allison,* the Court recognized "an implied warranty to repair or modify existing tangible goods or property in a good and workmanlike manner." 741 S.W.2d at 354.

At least two principles from *Dennis* and *Melody Home* apply in this case. First, an implied warranty will not be judicially imposed unless there is a demonstrated need for it. Second, the *Melody Home* implied warranty extends only to services provided to remedy defects existing at the time of the relevant consumer transaction.[5]

[3] These preliminary issues aside, we view the issue presented here to be whether consumers who are injured by substandard services can recover under an implied warranty theory when they neither sought nor acquired the services about which they complain. The requirement that a consumer urging an implied warranty for services seek or acquire that specific service flows from the historical definition of a warranty:

> A warranty is an express or implied statement of something *with respect to the article sold,* which the seller undertakes shall be part of a contract of sale; and though part of the contract, yet collateral to the express object of it.

ARTHUR BIDDLE, A TREATISE ON THE LAW OF WARRANTIES IN THE SALE OF CHATTELS 1 (Philadelphia, Kay & Brother 1884) (emphasis added).[6] Therefore, to determine whether an implied warranty to provide future development services should be extended to the Woodruffs, we must first identify an underlying transaction upon which an implied warranty might be imposed. The parties identify three possible underlying transactions: the sale of the lot from Parkway to the homebuilder, the purchase of the home by the Woodruffs, and

the regrading and drainage work performed by Parkway in 1983.

Of these three options, we find the last one the least persuasive. In the 1983 negotiations, no contract was formed, and no goods or services were sold. The second alternative, the Woodruffs' purchase of the home in 1981, is also problematic. Parkway was not involved at all in this transaction and did not sell any goods or offer or agree to perform any particular services in connection with the sale. That leaves the initial sale of the lot by Parkway to the homebuilder as the only remaining transaction upon which a service-related implied warranty could be imposed. The Woodruffs' claim hinges on whether any services were conveyed or promised as a part of this transaction. The sale clearly conveyed goods, [7] but our focus is on whether the sale had a service element as well.

We find no reasonable basis under these facts for concluding that Parkway impliedly agreed to perform future development services for the Woodruffs' benefit. The court of appeals pointed to Parkway's claim that Sugar Creek was a "master planned community" as evidence of an implied promise to provide these services. The court reasoned that this term

> certainly suggests to a potential purchaser that each aspect of the development would be undertaken with concern for the rest of the development, that the subdivision would not be built piecemeal, and that the construction of one section would not, as happened here, be allowed to adversely affect another section. The concept of "master planning" also implies provision of continued competent development including flood control, drainage, management, and maintenance services.

857 S.W.2d at 911.

In reaching this conclusion, the court of appeals equated the use of the term "master **\*440** planned community" with an implied promise to never "adversely affect" any homeowner in the community. We do not believe that these terms should be given such an expansive meaning. "Master planned community" and "planned community" are terms of art, specifying a particular form of common

ownership. [8] In the Sugar Creek development, Parkway established a homeowners' association to maintain common area improvements, imposed similar deed restrictions on all homes within the development, and created the formal development plan required for a planned unit development. These features distinguished Sugar Creek as a "planned community," as the term is used in the real estate industry. Parkway's use of the term to describe its development can be fairly construed as a representation about the form of common interest ownership, not an implied promise to provide future development services of the type at issue here.

The only other evidence relied on by the Woodruffs to support their implied warranty claim is a scale model of the development displayed in Parkway's information center. We recognize that models can create *express* warranties about the qualities of goods sold: when a model is displayed prior to sale, the goods delivered must conform to the model. TEX.BUS. & COM.CODE § 2.313(a)(3). But the Woodruffs' argument confuses a statutorily created *express* warranty with a judicially-created *implied* warranty. The testimony about Parkway's model was to the effect that it was intended to show "where everything was eventually going to be within the community." Neither our past holdings nor sound logic support the conclusion that such a model represents an implied promise to never adversely affect the Woodruffs' property.

Accordingly, we hold that no implied warranty to perform future development services should be imposed in this case. Because no services were included in the transaction, no service-related warranty was breached. Moreover, the Woodruffs have not met their burden under *Dennis v. Allison* to show why damages for negligence do not provide an "adequate remed[y] to redress wrongs committed," *see* 698 S.W.2d at 96, and thus have not demonstrated a compelling case for recognition of an implied warranty under these circumstances. To the extent the judgment relied on this breach of warranty theory, it cannot stand.

### B. Unconscionability

**[4]** The Woodruffs also contend that Parkway violated the DTPA by acting unconscionably. The DTPA defines an "unconscionable action or course of action" as one which:

A. takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or

B. results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

TEX.BUS. & COM.CODE § 17.45(5). The Woodruffs did not specify whether they sought to show unconscionability under Part A or B of this definition, and both parts were included in the jury charge. Although the jury found that Parkway committed an unconscionable act, the court of appeals did not address unconscionability because it affirmed the trial court's DTPA judgment on the theory of implied warranty, which we have rejected. Because unconscionability is an alternative theory of DTPA liability upon which the court of appeals judgment might be affirmed, we must address it. Parkway challenges the legal sufficiency of the evidence under both definitions.

 **[5]**    Under Part A, the Woodruffs argue that Parkway's exclusive control over the **\*441** drainage on the adjacent lots deprived them of the "ability or capacity" to protect their own interests. The Woodruffs overlook the fact that unconscionability requires that the seller take advantage of special skills and training *at the time of the sale. See Chastain v. Koonce,* 700 S.W.2d 579, 584 (Tex.1985) (rejecting allegations of unfairness based on events occurring one year after the sale). The Woodruffs advance no theory as to how this advantage was exploited at the time of the sale of the property from Parkway to the homebuilder, and there is no evidence that would support such a finding.

 **[6]**    Under Part B, the Woodruffs argue that the flooding created a gross disparity between the value of their home and what they paid for it. Again, the time for evaluating the disparity in value is the time of sale. Diminution in value caused by later events cannot support a claim of unconscionability. As there is no evidence that Parkway did anything to cause a gross disparity in value at the time of sale, the Woodruffs' claim under this definition of unconscionability also fails.

### C.

Because we conclude that the Woodruffs cannot recover under the DTPA, we reform the judgment to delete

any remedy predicated on the DTPA. This includes the discretionary award of damages for a knowing violation of the DTPA and the award of attorney's fees. In the absence of recovery under the DTPA, there is no basis for the recovery of attorney's fees in this case.[9] *See First City Bank v. Guex,* 677 S.W.2d 25, 30 (Tex.1984).

### III. Double Recovery

 **[7]**    Parkway also alleges that the judgment gives the Woodruffs a double recovery for the damages to their home. Parkway claims that the court of appeals erred by allowing an award of both the cost of repairs *and* the diminution in the value of the home, because the diminution was calculated assuming that no repairs had been made. We agree.

 **[8]**    **[9]**    Texas law does not permit double recovery. *Southern Co. Mut. Ins. Co. v. First Bank & Trust,* 750 S.W.2d 170, 173–74 (Tex.1988). When the prevailing party fails to elect between alternative measures of damages, the court should render the judgment affording the greatest recovery. *See, e.g., Kish v. Van Note,* 692 S.W.2d 463, 468 (Tex.1985) (rendering judgment for each separate element of damages in order to give the plaintiffs complete compensation for their losses).

 **[10]**    Damages for diminution in value and damages for cost of repairs are not always duplicative. Diminution in value does not duplicate the cost of repairs if the diminution is calculated based on a comparison of the original value of the property and the value *after repairs are made. See Ludt v. McCollum,* 762 S.W.2d 575, 576 (Tex.1988). As the court of appeals recounted, however, the Woodruffs' appraiser calculated the diminution in value by comparing the original value of the house to the value of the *unrepaired* house:

> The Woodruffs' expert appraiser testified that he had done two appraisals of market value as of September 19, 1983, *one assuming the flooding, and attendant damages of a cracked slab, had occurred* and one assuming it had not. The house was worth $240,000 before it flooded and *without being subject to flooding. After it flooded and with the damages cause[d] by the flooding,* it was worth $120,000.

857 S.W.2d at 913 (emphasis added). The Woodruffs also sought, and the jury awarded, $100,000 for the cost to repair the slab of the house. The Woodruffs were required to choose between the diminution in market value of the house *and* the cost of repair; they cannot recover both. Accordingly, we reduce the judgment for actual damages by $100,000.

### *442 IV. Mental Anguish

The Woodruffs challenge the court of appeals' deletion of their award for mental anguish based on legal insufficiency. The court of appeals concluded that "the evidence simply does not demonstrate mental anguish as that term is defined by law." 857 S.W.2d at 916. We agree with the court of appeals.

At the outset, we emphasize the limited nature of our present inquiry: we are focusing only on the type of evidence required to support an award of mental anguish damages in cases in which recovery is allowed. Nonetheless, we find it helpful to begin with a historical overview of mental anguish damages before addressing the legal sufficiency of the Woodruffs' evidence of their mental anguish.

The history of mental anguish damages in Anglo–American jurisprudence is convoluted and complex. Mental anguish claims have long been distrusted by the common law, and an early general rule developed that mental anguish damages were not recoverable. *See Lynch v. Knight,* 11 Eng.Rep. 854, 863 (H.L.1961). The inherently subjective nature of mental anguish and the concomitant potential for false claims were two of the most commonly cited reasons for skepticism about such claims. *See, e.g., Battalla v. State,* 10 N.Y.2d 237, 219 N.Y.S.2d 34, 37–39, 176 N.E.2d 729, 731–32 (1961); *Knaub v. Gotwalt,* 422 Pa. 267, 220 A.2d 646, 647 (1966). Exceptions to the general rule gradually emerged, falling into roughly two categories. Recovery for mental anguish was permitted when the mental suffering was: (1) accompanied by a physical injury resulting from a physical impact, or (2) produced by a particularly upsetting or disturbing event.

Once the threshold requirements of physical injury and impact or of particularly disturbing events were met, recovery of mental anguish damages was not hard to justify. Mental suffering could be inferred from the fact of physical injury. The Missouri Supreme Court, for example, justified this inference by reasoning that "the mind is as much a part of

the body as the bones and muscles, and an injury to the body included the whole, and its effects were not separable." *Connell v. Western Union Tel. Co.,* 116 Mo. 34, 22 S.W. 345, 349 (1893).

Similarly, once particularly disturbing events were proved by reference to objective phenomena or conditions, the law generally allowed the claimant's mental suffering to be presumed to flow from such events. *See* Nancy Levit, *Ethereal Torts,* 61 GEO.WASH.L.REV. 136, 142 (1992) (noting that recovery for mental anguish "depended on proof of an independent tort"). The oldest examples of this category of cases are those involving assault, slander, and other intentional torts. *See, e.g., I. de S. v. W. de S.,* Y.B. 22 Edw. III, fo. 99, pl. 60 (1348) (allowing tavern-keeper to recover when the defendant threw a hatchet at the tavern-keeper's wife).

Although limiting mental anguish damages to cases with either physical impact or disturbing events avoided many evidentiary problems, the limitations were admittedly arbitrary: some claimants with relatively minor mental anguish recovered, while others who might have suffered significant anguish were precluded from any recovery. As a result, many of these limitations were first relaxed and later abandoned. The requirement of a physical impact was relaxed, and recovery for mental anguish was permitted so long as the anguish manifested itself physically. *See* James G. Curenton, *The Twilight Zone of Danger: Negligent Infliction of Emotional Distress as an Actionable Tort,* 15 CUMB.L.REV. 519, 522 n. 23 (1985) (listing 39 jurisdictions that abandoned the physical impact rule between 1890 and 1983). *But see Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, ——, 114 S.Ct. 2396, 2406, 129 L.Ed.2d 427 (1994) (noting that at least five states continue to adhere to the physical impact test). Abandonment of the physical impact requirement led the way to recovery for mental injuries suffered by bystanders in the "zone of danger," *see id.* (noting that 14 states have expanded recovery for mental anguish to this point and no further); and even to specified parties beyond this zone. *See, e.g., Dillon v. Legg,* 68 Cal.2d 728, 69 Cal.Rptr. 72, 80, 441 P.2d 912, 920 (1968) (allowing recovery for mental anguish by a witness to the injury of a close relative). In **\*443** recent years, several states have eliminated the physical manifestation requirement altogether. *See, e.g., Schultz v. Barberton Glass Co.,* 4 Ohio St.3d 131, 447 N.E.2d 109, 112 (1983); *Johnson v. Ruark Obstetrics & Gyn. Assocs.,* 327 N.C. 283, 395 S.E.2d 85, 97 (1990).

Over time, the disturbing events exception also yielded to pressure to provide compensation in more routine cases. Courts took cognizance of mental anguish injuries not only in cases of malicious intentional wrongs, but also in cases involving violations of statutes. *See, e.g., Johnson v. Alaska State Dep't of Fish & Game,* 836 P.2d 896, 915 (Alaska 1991) (allowing recovery of mental anguish damages caused by violation of a discrimination statute). *But cf. Gallagher v. Bituminous Fire & Marine Ins. Co.,* 303 Md. 201, 492 A.2d 1280, 1284 (1985) (refusing to permit recovery of mental anguish damages caused by the intentional violation of a statute when the statute merely required the payment of money). Some jurisdictions came to recognize a distinct legal duty to avoid even the negligent infliction of emotional harm itself. *See, e.g., Taylor v. Baptist Med. Ctr., Inc.,* 400 So.2d 369 (Ala.1981); *Montinieri v. Southern New Eng. Tel. Co.,* 175 Conn. 337, 398 A.2d 1180 (1978); *Rodrigues v. State,* 52 Haw. 283, 472 P.2d 509 (1970); *Gammon v. Osteopathic Hosp. of Maine, Inc.,* 534 A.2d 1282 (Me.1987); *Johnson v. Supersave Markets, Inc.,* 211 Mont. 465, 686 P.2d 209 (1984); *Bass v. Nooney Co.,* 646 S.W.2d 765 (Mo.1983); *Johnson v. Ruark Obstetrics & Gyn. Assocs.,* 327 N.C. 283, 395 S.E.2d 85 (1990); *Schultz v. Barberton Glass Co.,* 4 Ohio St.3d 131, 447 N.E.2d 109 (1983).

Texas law has generally followed the same ad hoc pattern of development. We initially allowed mental anguish damages only in cases in which there was a physical injury. *See Hill v. Kimball,* 76 Tex. 210, 13 S.W. 59, 59 (1890) ("Probably an action will not lie when there is no injury except the suffering of the fright itself...."). At the turn of the century, we allowed recovery for mental anguish unaccompanied by physical impact injury, provided the mental anguish had a physical manifestation. *See Hill,* 13 S.W. at 59; *Gulf, C. & S.F. Ry. Co. v. Hayter,* 93 Tex. 239, 54 S.W. 944, 945 (1900). We eased the physical impact rule even further when we adopted the bystander rule from *Dillon v. Legg* in *Freeman v. City of Pasadena,* 744 S.W.2d 923, 923–24 (Tex.1988).

Texas courts have also struggled to distinguish between the disturbing events that justify mental anguish damages and those that do not. Unwilling to confine mental anguish damages to intentional torts, our courts have allowed mental anguish damages for such things as failing to deliver a telegraph relating to death or last illness, *see Stuart v. Western Union Tel. Co.,* 66 Tex. 580, 18 S.W. 351, 353 (1885); sending a passenger to the wrong destination, *see Texas & Pac. Ry. Co. v. Armstrong,* 93 Tex. 31, 51 S.W. 835, 836 (1899); and mishandling a corpse. *See Pat H. Foley & Co. v.*

*Wyatt,* 442 S.W.2d 904, 907 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.).

The physical manifestation requirement was first excused under exceptional circumstances, and then abandoned completely in 1987. *See St. Elizabeth Hosp. v. Garrard,* 730 S.W.2d 649, 654 (Tex.1987), *overruled on other grounds, Boyles v. Kerr,* 855 S.W.2d 593 (Tex.1993). Similarly, the types of culpable conduct for which mental anguish damages were allowed expanded to include more commonplace misconduct, such as knowing misrepresentations in a consumer transaction. *See Luna v. North Star Dodge Sales, Inc.,* 667 S.W.2d 115 (Tex.1984).

As mental anguish damages have became more readily available, members of this Court have voiced concerns about the potential for over-compensation and even double recovery. *See Moore v. Lillebo,* 722 S.W.2d 683, 688–692 (Tex.1986) (Spears, J., joined by Gonzalez, J., dissenting) (arguing that elimination of physical manifestation requirement for recovery of mental anguish damages would allow damages for non-compensable sorrow, anger, worry, and fear, and in a wrongful death case, would duplicate those damages already allowed for loss of companionship and society); *see also Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 368–69 (Tex.1987) (disallowing recovery for "shock and emotional trauma" as duplicative **\*444** of award for mental anguish). Genuineness of a claim of mental anguish has never been the solitary basis for judicial concerns about this species of recovery. Rather, the variability and thus unpredictability of such awards, due to the broad discretion routinely afforded juries when awarding mental anguish damages, helps to explain some of the artificial constraints historically placed on the recovery of such damages. The early requirements for establishing the recoverability of mental anguish damages served primarily as proxies for direct evidence of mental injury. When, for example, evidence of a physical manifestation of a mental injury was required, evidence tended to be directed at proving the manifestation, rather than proving the amount of actual anguish. Similarly, when recovery of mental anguish damages was limited to cases of especially culpable conduct, the focus of the evidence tended to be on the nature of the malfeasance, rather than on the extent of anguish. *See, e.g., Texas & Pac. Ry. Co. v. Armstrong,* 93 Tex. 31, 51 S.W. 835 (1899) (devoting a significant portion of the opinion to the details of the railroad's mistaken issuance of a ticket to the wrong destination, but only a single sentence to the passenger's reaction).

The erosion of these proxies as a substitute for proof of mental anguish has created a vacuum of sorts, in which the only guidance given by trial courts to juries is a confounding definition of mental anguish, of which the following is typical:

> The term "mental anguish" implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation.

*Trevino v. Southwestern Bell Tel. Co.,* 582 S.W.2d 582, 584 (Tex.Civ.App.—Corpus Christi 1979, no writ). This definition requires a jury to distinguish between disappointment and severe disappointment, between embarrassment and wounded pride, between anger and indignation. It is little wonder that courts and juries have found this and similar definitions of mental anguish "somewhat unwieldy." *Sanchez v. Guerrero,* 885 S.W.2d 487, 494 (Tex.Civ.App.—El Paso 1994, no writ).

When a challenge is made to the sufficiency of the evidence to go to the jury or to support the jury's finding, the same type of problem persists. The reviewing court must distinguish between shades and degrees of emotion. These distinctions are critical under our substantive law because evidence of lesser reactions cannot support an award of mental anguish damages.

[11] Under this admittedly nebulous definition and the traditional standard of review, it is nevertheless clear that an award of mental anguish damages will survive a legal sufficiency challenge when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine. Such evidence, whether in the form of the claimants' own testimony, that of third parties, or that of experts, is more likely to provide the fact finder with adequate details to assess mental anguish claims. Although we stop short of requiring this type of evidence in all cases in which mental anguish damages are sought, the absence of this type of evidence, particularly when it can be readily supplied

or procured by the plaintiff, justifies close judicial scrutiny of other evidence offered on this element of damages.

[12] [13] When claimants fail to present direct evidence of the nature, duration, or severity of their anguish, we apply traditional "no evidence" standards to determine whether the record reveals any evidence of "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger" to support any award of damages. *See J.B. Custom Design & Bldg. v. Clawson,* 794 S.W.2d 38, 43 (Tex.App.—Houston [1st Dist.] 1990, no writ). In applying this standard to the record before us, we conclude that the jurors here were left to speculate about the existence of compensable mental anguish in this case.

**\*445** Only two passages of the testimony directly addressed the Woodruffs' mental state. Ray Woodruff testified:

> I was hot. I was very disturbed about that, and called him and said, "I would like to sell you a house. I think you have just flooded my property, I think you have messed up my house." I begged the guy not to.

Constance Woodruff made the following statements in one passage of her testimony (which is reprinted in full in the court of appeals' opinion):

> [I]t's just not pleasant walking around on cement floors.
>
> ....
>
> Well, [our life] changed. It just—I don't know, it's a hard feeling to describe, unless you go through it. It was just upsetting, Ray would come home and he would become very quiet. He was—I guess we both were. It caused some friction between us because I wanted to just get it done and get over with and things couldn't move as quickly as I wanted them to.
>
> ....
>
> Afraid? I wasn't afraid. I guess I was—I was just upset that it changed our life style. We were all very happy, and since I lived at home quite—well, most of the time, it meant a lot to me. I'm a very private person, and I really maybe depended upon my house a little more than other people.

These statements show that the Woodruffs felt anger, frustration, or vexation, but they do not support the conclusion that these emotions rose to a compensable level. For the most part, the quoted testimony does nothing but cite the existence

of "mere emotions": "I was hot," "It was just upsetting," and "I was just upset." It does not support the conclusion that the Woodruffs suffered compensable mental anguish.

Not only is the record devoid of direct evidence of the nature, duration, or severity of the Woodruffs' mental anguish, there is also no circumstantial evidence other than the fact of the flooding itself to support any award of mental anguish. As we have noted, historically, some types of disturbing or shocking injuries have been found sufficient to support an inference that the injury was accompanied by mental anguish. As a general matter, though, qualifying events have demonstrated a threat to one's physical safety or reputation or involved the death of, or serious injury to, a family member. While the flooding of the Woodruffs' home certainly disrupted their lives temporarily, under our substantive law this type of disruption will not support an inference that compensable mental anguish occurred. [10] Evidence of Parkway's negligence and the resulting property damage cannot alone support the mental anguish damages.

We therefore affirm the court of appeals' holding that the evidence of mental anguish damages was legally insufficient.

### V. Conclusion

The judgment of the court of appeals is hereby modified to delete any recovery under the DTPA, for attorney's fees, and for the double recovery of damages, and as reformed the court of appeals' judgment is affirmed. Regarding Parkway's point of error challenging the directed verdict on its claims against the engineers, we agree with the court of appeals' that there was no expert testimony of the applicable standard of care or any basis for finding a breach of that standard. 857 S.W.2d at 919. Accordingly, we affirm the court of appeals' judgment for the engineers.

Justice GAMMAGE, dissenting.

I dissent to that part of the majority opinion which refuses to recognize an implied **\*446** warranty cause of action in this case. I agree that the Woodruffs were awarded a double recovery when they received both the cost of repairs and the diminution in value of the home which was calculated assuming no repairs were made. I also agree that the Woodruffs presented insufficient evidence to support an award for mental anguish damages. I do not agree with the

majority, however, that the Woodruffs do not have a cause of action under the DTPA.

The majority maintains that the Woodruffs do not have a cause of action under the DTPA based upon either implied warranty or unconscionability theories. I believe the Woodruffs do present facts giving rise to a cause of action for Parkway's breach of an implied service warranty.

As the majority notes, this Court has recognized an implied warranty "to *repair or modify* existing tangible goods or property in a good and workmanlike manner" in *Melody Home Mfg. Co. v. Barnes,* 741 S.W.2d 349, 354 (Tex.1987) (emphasis added). The court of appeals correctly held that the applicability of an implied warranty is not negated because the Woodruffs did not purchase their home from the builder. An implied warranty of good and workmanlike construction from a builder/vendor extends to the remote purchaser. *Gupta v. Ritter Homes, Inc.,* 646 S.W.2d 168 (Tex.1983); *see also Nobility Homes of Texas, Inc. v. Shivers,* 557 S.W.2d 77, 78 (Tex.1977).

The majority concludes, however, that Parkway did not impliedly agree to perform future development services "for the Woodruffs' benefit." But the issue is not whether Parkway agreed to provide development services *for the Woodruffs' benefit;* it is whether Parkway impliedly agreed to conduct its future development in a manner not *detrimental* to the Woodruffs and consistent with the scheme of the master-planned community. When the Woodruffs purchased their house, they contracted not only for a house but also for a master-planned community—a developed neighborhood. They were forced to rely on Parkway for its expertise on the technical aspects of building a housing development, including its skills in providing adequate drainage for all lots, because the Woodruffs lacked the knowledge and ability to do so themselves.

As the court of appeals notes, "a homebuyer/consumer cannot, by reasonable examination, discern or anticipate irresponsible or defective subdivision development activities." 857 S.W.2d 903, 911. It is reasonable for a consumer to expect that when he or she buys into a housing community under development the developer will conduct its future development activities without affirmatively damaging their property. Certainly no reasonable homebuyer would purchase a house with the expectation that the neighborhood's developer would take affirmative action to damage the buyer's property. A developer or builder selling property in a

development community may not be impliedly warranting for future development services, but equity demands that he does warrant to not in the future violate the development's master plan in such a way as to interfere with purchasers' reasonably anticipated use and enjoyment of their property.

Service provided in a good and workmanlike manner means "that quality of work performed by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work." *Melody Home,* 741 S.W.2d at 354. As this Court pointed out in *Melody Home,* "a service provider is in a much better position to prevent loss than is the consumer of the service.... [A] consumer should be able to rely upon the expertise of the service provider." *Id.* at 353. In this case, Parkway, as the developer, was in the better position to

ensure that its construction on lots adjoining the Woodruffs' would not result in property damage to other lots and homes in the area. As a professional developer, Parkway impliedly warranted that it would competently furnish development services. By intentionally flooding developed lots and homes, Parkway breached the implied warranty to repair or modify existing property in a good or workmanlike manner.

I would find Parkway liable under the DTPA for breach of the implied warranty to repair or modify existing property in a good **\*447** and workmanlike manner. This cause should be remanded for trial under alternative theories of negligence and DTPA. I respectfully dissent.

## All Citations

901 S.W.2d 434, 38 Tex. Sup. Ct. J. 828

## Footnotes

1 Parkway argues that the Woodruffs are not consumers under the DTPA. *See generally* TEX.BUS. & COM.CODE § 17.45(4) (defining "consumer"); *see also Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 539 (Tex.1981) (summarizing judicial interpretations of this definition). Because we conclude that Parkway did not violate the DTPA, we do not address the issue of consumer status. *See Delaney Realty, Inc. v. Ozuna,* 593 S.W.2d 797 (Tex.Civ.App.—El Paso), *writ ref'd n.r.e. per curiam,* 600 S.W.2d 780, 782 (Tex.1980).

2 Chapter 2 of the Texas Business and Commerce Code establishes three implied warranties in sales transactions: (1) the warranty of title, TEX.BUS. & COM.CODE, § 2.312; (2) the warranty of merchantability, TEX.BUS. & COM.CODE, § 2.314; and (3) the warranty of fitness for a particular purpose, TEX.BUS. & COM.CODE § 2.315. None of these warranties applies to a strictly service transaction.

3 "Warranty" was defined in the charge as an implied promise that services sold or offered for sale by Sugar Creek to the Woodruffs would be performed in a good and workmanlike manner.

4 Traditionally, commentators rejected the idea that warranties applied to services at all. *See, e.g.,* BARKLEY CLARK & CHRISTOPHER SMITH, THE LAW OF PRODUCT WARRANTIES at 2–16 (1984) (characterizing the implied warranty of workmanlike performance as "merely another label for negligence"). The advent of enhanced remedies in consumer protection statutes like the DTPA has provided an incentive to characterize what have previously been regarded as simple negligence actions into breach of implied warranty claims actionable under the DTPA.

5 In *Archibald v. Act III Arabians,* 755 S.W.2d 84, 85 (Tex.1988), the Court considered whether "horse training services fall within the scope of the implied warranty enunciated in *Melody Home.*" A divided court answered that question in the affirmative, characterizing horse training as the modification of an existing tangible good, and viewing the case as fitting squarely within its decision in *Melody Home. Id.* at 86.

6 Biddle wrote his treatise before service-related warranties were recognized, but the same reasoning applies to them.

7 The DTPA includes land in its definition of goods. *See* TEX.BUS. & COM.CODE § 17.45(1).

8 Master planned communities are typically residential developments zoned as planned unit developments with a homeowners' association to maintain common area improvements and to enforce other covenants and restrictions after the initial development stage. *See* Wayne S. Hyatt & Jo Anne P. Stubblefield, *The Identity Crisis of Community Associations: In Search of the Appropriate Analogy,* 27 REAL PROP.PROB. & TRUST J. 589, 641–45 (1993). The owners of the individual units hold title to the unit, but the association holds title to the common amenities. *See* UNIF.COMMON INTEREST OWNERSHIP ACT, prefatory note, 7 U.L.A. 231 (1982). Membership in the association is mandatory for all owners of individual units. *Id.*

9 Although the Woodruffs have established their entitlement to actual damages under theories of negligence and Water Code violations, neither of these theories confers a right to recover attorney's fees.

10      Although the jurors apparently concluded that the flooding was an event from which mental anguish may be inferred, this conclusion is at odds with the very definition of mental anguish. Homes flood with such frequency—from leaky roofs, clogged toilets, and bursting pipes—that flooding cannot be said to be beyond the vicissitudes of daily life. Had the Woodruffs presented additional evidence, for example, that the flooding jeopardized their personal safety, our conclusion today would likely be different. In the absence of such evidence, the jury's verdict is necessarily based on sympathy or the juror's personal experiences, considerations which are not permitted under Texas law. *See Callejo v. Brazos Elec. Power Co-op.,* 755 S.W.2d 73, 75 (Tex.1988); *see also* TEX.R.CIV.P. 226a (approved instructions) pt. II, para. 7 & pt. III, para. 1.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

QQ

2012 WL 310505
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

MEMORANDUM OPINION
Court of Appeals of Texas,
Fort Worth.

Roger K. PARSONS, Appellant

v.

Robert M. GREENBERG; Legal Services P.C.,
Robert M. Greenberg, Attorney; Robert E.
Motsenbocker; Shafer, Davis, O'Leary & Stoker, Inc.
f/k/a Shafer, Davis, McCollum, Ashley, O'Leary &
Stoker, Inc.; E.I. Du Pont de nemours and company;
and ConocoPhillips f/k/a Conoco, Inc., Appellees.

No. 02–10–00131–CV.    |    Feb. 2, 2012.
|    Rehearing Overruled April 19, 2012.    |
Reconsideration En Banc Overruled April 19, 2012.

From the 17th District Court of Tarrant County, Melody
Wilkinson, Judge.

Attorneys and Law Firms

Christopher Nygaard, Plano, TX, for appellant.

Jim Ross, Jim Ross & Associates, P.C., Plano, TX, Joseph
W. Spence, M. Keith Ogle, Monika T. Cooper, Shannon,
Gracey, Ratliff & Miller, L.L.P., Fort Worth, TX, Steven D.
Sanfelippo, Martin E. Rose, Tammy H. Cole, Rose Walker,
L.L.P., Dallas, TX, for appellees.

PANEL: WALKER, McCOY, and GABRIEL, JJ.

MEMORANDUM OPINION [1]

LEE GABRIEL, Justice.

**\*1** This appeal arises from a legal malpractice suit by
Appellant Roger K. Parsons against Appellees Robert M.
Greenberg; Legal Services P.C.; Robert M. Greenberg,
Attorney (collectively, Greenberg); Robert E. Motsenbocker;
Shafer, Davis, O'Leary & Stoker, Inc. f/k/a Shafer, Davis,
McCollum, Ashley, O'Leary & Stoker, Inc. (collectively,
Motsenbocker); E.I. du Pont de Nemours and Company

(DuPont); and ConocoPhillips f/k/a Conoco, Inc. (Conoco).
We will affirm the trial court's judgment.

Background Facts

In November 1991, Parsons retained Windle Turley and
Windle Turley, P.C. (collectively, Turley) to represent him
in wrongful death and survival actions in connection with
the death of his wife (the DuPont litigation). A jury
returned a verdict for Parsons, awarding him $4.75 million in
damages and also awarding punitive damages. The trial court
granted judgment notwithstanding the verdict on the punitive
damages but signed a $4.75 million judgment for Parsons.

In July 1996, Parsons retained Robert Greenberg to sue
Turley for legal malpractice (the Turley litigation) relating to
Turley's representation of him in the DuPont litigation. Later,
Parsons also hired Motsenbocker at Greenberg's suggestion.
Turley moved for summary judgment on limitations grounds
because Turley was not served with citation prior to the
expiration of the statute of limitations. The trial court granted
summary judgment for Turley, and the Dallas Court of
Appeals affirmed the summary judgment. *See Parsons v.
Turley,* 109 S.W.3d 804, 808–10 (Tex.App.-Dallas 2003, pet.
denied).

While Parsons appealed the summary judgment, he
retained a new attorney, Kevin Queenan, and filed the
instant suit against Greenberg and Motsenbocker for their
representation in the Turley litigation. Parsons alleged claims
of misrepresentation and fraud, breach of fiduciary duty,
negligence, gross negligence, and violations of the Deceptive
Trade Practices Act against the attorneys. Greenberg and
Motsenbocker filed motions for summary judgment on all
but the legal malpractice claims. The trial court granted the
motions.

Queenan later withdrew as Parsons's counsel, and Parsons
continued pro se, adding Conoco and DuPont as defendants in
his third amended petition. Parsons alleged claims for unjust
enrichment and conspiracy to defraud against Conoco and
DuPont, sought the imposition of a constructive trust against
them, and sought a declaration that Conoco and DuPont were
vicariously liable for the fraudulent acts of Greenberg and
Motsenbocker.

Conoco and DuPont specially excepted to Parsons's fourth
amended petition, and the trial court ordered Parsons to

replead his claims against Conoco and DuPont. After Parsons filed his fifth amended petition, Conoco and DuPont specially excepted again and moved to dismiss. The trial court granted Conoco and DuPont's special exceptions and dismissed the claims against them.

Parsons proceeded to trial on the claims of legal malpractice against Greenberg and Motsenbocker. The jury found that Greenberg had been negligent in handling the Turley litigation, that Motsenbocker had not been negligent, and it awarded Parsons $0 in damages. Parsons appealed.

## Discussion

### I. The claims against Greenberg and Motsenbocker

### A. Sufficiency of the evidence

 **\*2**  In his first issue, Parsons argues that two of the jury's findings are against the great weight and preponderance of the evidence. When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986) (op. on reh'g); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). When the party with the burden of proof appeals from a failure to find, the party must show that the failure to find is against the great weight and preponderance of the credible evidence. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001); *Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646, 651 (Tex.1988).

### 1. The jury's finding that Motsenbocker was not negligent

In the first subpart of his first issue, Parsons claims that Motsenbocker was negligent under three theories and that the jury's finding that he was not negligent was against the great weight and preponderance of the evidence. [2]

### a. Lost punitives and statute of limitations deadlines

Parsons argues that Motsenbocker was negligent in pursuing damages against Turley when he either knew or should have known that they were not available and that Motsenbocker

was negligent in not arguing that the limitations period should have been calculated from a later date, thus making service of citation on Turley timely.

In his brief, Parsons does not direct us to, nor have we found, any evidence presented at trial that Motsenbocker knew or should have known that lost punitives were not available in a legal malpractice case, or that he pursued them despite this knowledge. An appellate court is not required to search the appellate record, with no guidance from the briefing party, to determine if the record supports the party's argument. [3] *Hall v. Stephenson,* 919 S.W.2d 454, 466–67 (Tex.App.-Fort Worth 1996, writ denied). The only evidence that Parsons does point to pertains to Motsenbocker's general responsibility to research Parsons's claims. This is not evidence that lost punitives were not available, that Motsenbocker pursued them regardless of their unavailability, or that he was negligent in pursuing them.

Likewise, Parsons does not direct us to, nor have we found, any evidence presented at trial that Motsenbocker should have argued in the Turley litigation that the limitations period should have been calculated from a later date. Parsons cites only to a bench conference in the reporter's record that makes no mention of the statute of limitations or any deadlines, and to two briefs written by Motsenbocker and Greenberg that do not address a second accrual date. This is not evidence that there was another way to calculate the limitations period or that Motsenbocker was negligent in failing to argue for it. Parsons's own testimony at trial referred to the 1996 date as the correct start of the limitations period for his claims against Turley. He testified,

 **\*3**  And what Ms. Reggio says in her memorandum— and I'll show you hopefully after lunch here—is that there is a two-year statute of limitations on legal malpractice claims that begin to run—it is—the starting time is the date that mandate issued in the—in the appeal of *Parsons v. DuPont.* So that was back in 1996, July the 18th, 1996.

So two years from that date—or between that time, between 19—July the 18th, 1996, and July the 18th, 1998, is when you have to file a lawsuit; otherwise, your case will be thrown out for reasons of not timely perfecting your claims against—against the party, in this case Mr. Turley and his law firm.

Parsons later mentions that an opinion in the Turley litigation from the Fifth Circuit Court of Appeals noted that there was a second, later appeal in the underlying DuPont litigation

that possibly could have tolled the limitations period, but there was no evidence presented that Motsenbocker should have argued for it or that he was negligent in failing to do so. Thus, the jury's finding that Motsenbocker was not negligent under these theories is not against the great weight and preponderance of the evidence.

### b. Failure to serve citation

Parsons argues that, as his attorney, Motsenbocker was negligent in failing to serve Turley with citation. The parties do not dispute that Parsons and Motsenbocker had an attorney-client relationship; they disagree as to the duties that that relationship imposed upon Motsenbocker. A plaintiff in a legal malpractice suit must prove that (1) the attorney owed the plaintiff a duty, (2) the attorney breached that duty, (3) the breach proximately caused the plaintiff's injuries, and (4) damages occurred. *Peeler v. Hughes & Luce,* 909 S.W.2d 494, 496 (Tex.1995); *Stancu v. Stalcup,* 127 S.W.3d 429, 432 (Tex.App.-Dallas 2004, no pet.). Parsons argues that Motsenbocker did not present evidence affirmatively showing that he had declined the duty of overseeing timely service of citation. We are mindful that it was first Parsons's burden to present evidence that Motsenbocker owed Parsons that duty. *See Peeler,* 909 S.W.2d at 496.

Parsons's expert Michael Quinn testified at trial that Motsenbocker did not use due diligence in having citation issued and service achieved on Turley. Then when asked whether he knew if Greenberg was the one who made the decision to delay service, Quinn testified that he did not know but that it would not surprise him. Motsenbocker's expert Roland Johnson testified that Motsenbocker was not negligent in "the role that he had at the time of filing of the lawsuit."Johnson explained, "When multiple people work on things, people have different roles."At the time of filing the original petition, Johnson believed that Motsenbocker's role did not include making sure that citation was served.

Parsons argues that Johnson's testimony was not evidence because it conflicts with the undisputed facts. But contrary to Parsons's assertion, the evidence at trial was not that Greenberg was "completely dependent on Motsenbocker when it c[a]me[ ] to pre-trial procedure."Greenberg testified that he was "not ... very good" at legal writing and research and so solicited the help of others in drafting petitions and other motions practice. But neither Greenberg nor any other witness ever testified that Greenberg and Motsenbocker had agreed that Motsenbocker alone would be responsible for all pre-trial procedures.[4] In fact, when asked whether Parsons had any knowledge that Motsenbocker had made an agreement to withhold service of citation to Turley, Parsons responded, "No. I have no evidence of that, no."

**\*4** The undisputed evidence is that Greenberg filed the petition and delayed service of citation, a practice he had done "lot[s] of times." Motsenbocker was never tasked with issuing or serving the citation, and his name was not on the petition. Parsons did not plead or argue any sort of vicarious liability that Motsenbocker might have had for Greenberg's actions. *See* Tex. Disciplinary Rules Prof'l Conduct R. 5.01 cmt. 1, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A, art. 10 § 9 (West Supp.2011) (noting the "general principle that a lawyer is not vicariously subjected to discipline for the misconduct of another person"); *see also* Tex. Disciplinary Rules Prof'l Conduct R. 7.01 cmt. 1 (noting that the prohibition against naming a law firm "in any manner suggesting such an ongoing professional relationship" because it would "create the false impression that the lawyers named have assumed a joint professional responsibility for clients' legal affairs"). He presented no evidence that when two or more lawyers take on representation of a client, each lawyer is responsible for overseeing the other's work. *See Dear v. Scottsdale Ins. Co.,* 947 S.W.2d 908, 918 (Tex.App.-Dallas 1997, writ denied) (noting that one of the law firms representing the plaintiff did not participate in or control the prosecution of his counterclaims when another law firm was hired to prosecute those claims and maintained exclusive control over them). As Motsenbocker explained,

> If you enter—if you're asked to become co-counsel in a case that's already under progress, by two other very fine lawyers, and they ask you to do a specific task, that does not impose, in my opinion, a duty on me to go look at all of the work those lawyers have done for two years to find out if they might have made a mistake. I did what I was asked to do and I did it with reasonable prudence and [Parsons was] satisfied with the results of my work.

Both sides presented expert witnesses to support their positions, and the jury was free to give each expert's testimony the weight it felt was appropriate. *See Sears, Roebuck &*

*Co. v. Black,* 708 S.W.2d 925, 927 (Tex.App.-Eastland 1986, no writ) (noting that the jury was free to believe one expert's testimony and to reject that of another when both sides presented expert witnesses). Johnson testified that he had reviewed documents and "satisfied [himself] about the particular activity of Mr. Motsenbocker, as it related to the filing and the service issues in this lawsuit that we're here today about."Parsons's expert Quinn testified that he had not reviewed documents or testimony that described Motsenbocker's role in the Turley litigation other than the testimony presented at trial before he took the stand. Quinn stated he only heard portions of Parsons's testimony. He acknowledged that other than the trial testimony that he heard, he had no basis for rendering an opinion as to Motsenbocker's alleged negligence. The jury was free to believe Johnson's testimony and disbelieve Quinn's. Its determination that Motsenbocker was not negligent in his duties to Parsons is not against the great weight and preponderance of the evidence.

**2. The jury's finding of $0 damages**

 **\*5** In the second subpart of his first issue, Parsons claims that the jury's finding that he suffered zero damages was against the great weight and preponderance of the evidence. "[A] malpractice plaintiff may recover damages for attorney's fees paid in the underlying case to the extent the fees were proximately caused by the defendant attorney's negligence."*Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.,* 299 S.W.3d 106, 122 (Tex.2009). Parsons was therefore required to prove what amount he paid to Greenberg and Motsenbocker that he would not have had to pay but for Greenberg's negligence. "Causation must be proved, and conjecture, guess, or speculation will not suffice as that proof."*Id.*

Parsons's evidence at trial on damages consisted of bills from various entities and checks that he wrote throughout the course of the Turley litigation. Parsons did not present evidence as to which bills were proximately caused by Greenberg's negligence, or conversely, what bills he would have had to pay regardless of any negligence. *See id.*(citing Thomas D. Morgan, *Lawyer Law: Comparing the ABA Model Rules and the ALI Restatement (Third) of the Law Governing Lawyers* 98 (2005) (distinguishing malpractice from fee forfeiture and noting that the "key distinction" is that a fee forfeited "need have no relation to actual damages suffered by the client")). He argues that even if the evidence were unclear as to precisely how much damage Parsons actually suffered, the jury "could have arrived at a number of plausible damages awards" and thus, the award of zero damages is illogical. But

even if the jury could have sifted through eight years of bills and determined which tasks were related to defending against the summary judgment motion on failure to diligently serve citation, Parsons would still fail to meet his burden under *Akin, Gump.*

In *Akin, Gump,* the plaintiff NDR sued its attorneys for failing to request certain jury instructions in the underlying trial against Panda. 299 S.W.3d at 111.The supreme court held that NDR could not recoup any of the attorneys' fees it paid to Akin Gump in appealing its loss at trial because it did not present evidence that it would not have otherwise had to pay *some* appellate fees. *Id.* at 123.It said,

> There is no evidence that if NDR had recovered a favorable judgment in the Panda suit, it would not have paid appellate fees to defend the judgment. The evidence does not show that if NDR had obtained a favorable judgment, Panda would not have appealed the case or that NDR would not have defended its judgment on appeal if Panda appealed.

*Id.* Under the reasoning of *Akin, Gump,* Parsons could only have met his burden by presenting evidence that if Greenberg had diligently served Turley and the case had proceeded, there would have been no other appeal in the case for which Parsons would have paid attorneys' fees. It is not enough to show that Parsons would not have had to pay attorneys' fees for the appeal of the summary judgment based on lack of diligence in serving citation. And while we agree with Parsons that it is a difficult burden to bear, it is nonetheless the burden that Parsons had to meet and he did not meet it.

 **\*6** Because there was no evidence of the amount of damages proximately caused by Greenberg's negligence, the jury's award of $0 damages is not against the great weight and preponderance of the evidence. We overrule Parson's first issue. [5]

**B. Procedural errors**

In his second issue, Parsons argues that the trial court committed three procedural errors that prejudiced the jury against Parsons.

### 1. The trial court did not err by allowing evidence of Parsons's conspiracy theories to be admitted.

The morning of voir dire, Parsons filed a supplemental motion in limine, which is not in the record, seeking to exclude all references to any conspiracy theories Parsons might have had. The defendants objected that the motion was untimely, and the trial court declined to hear it.

Five hours later, during voir dire, Lisa Blue [6] asked the jurors,

Roger Parsons with an S, has anyone ever Googled Mr. Roger Parsons? Anybody ever Googled him? Is there anybody on the jury, just raise your hand quickly, now, this is confusing, George Bush, the father, ... how many of you think George Bush, the father, did a good job, raise your hand?

Parsons objected, saying, "I would like to object, Your Honor. May we approach and discuss this?"A bench conference was held off the record after which Blue returned to voir dire.

Parsons argues that Blue's line of questioning during voir dire was prejudicial. Normally, to preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. Tex.R.App. P. 33.1(a); *see also*Tex.R. Evid. 103(a)(1). If a party fails to do this, error is not preserved, and the complaint is waived. *Bushell v. Dean,* 803 S.W.2d 711, 712 (Tex.1991) (op. on reh'g). Parsons argues that he preserved his complaint because the grounds for his objection were apparent from the context. *See*Tex.R. Evid. 103(a)(1). However, it is not clear from the record what Parsons's objection was, whether he argued that the question was prejudicial, or whether he objected on some other grounds. The questions to which Parsons objected did not include any references to conspiracy theories, and later when Blue did mention Parsons's belief in a conspiracy, Parsons did not object. The same information also came in at trial when Motsenbocker questioned Parsons regarding conspiracy theories and George H.W. Bush. Parsons objected but stated no basis for his objection, and it was overruled.

Parsons argues that he did not have to renew his objections under rule 103(a)(1) of the rules of evidence. *See*Tex.R. Evid. 103(a)(1).Rule 103(a)(1) states, in part, "When the court hears objections to offered evidence out of the presence of the jury and rules that such evidence be admitted, such objections shall be deemed to apply to such evidence when it is admitted before the jury without the necessity of repeating those objections."*Id.* However, as stated above, there is no ruling on the record. Therefore, Parsons has not preserved this complaint for our review.

### 2. The trial court did not err in its instructions to Parsons regarding admission of evidence.

**\*7** Parsons argues that the trial court "[a]ctively obscure[red]" evidentiary issues, "played 'hide the ball,' " and allowed opposing counsel to "bully" Parsons by not providing Parsons with more guidance in his attempts to admit evidence. Numerous times during trial, opposing counsel objected to Parsons's offers of evidence on the grounds that the evidence lacked foundation. In most instances, the trial court asked Parsons if he would like to continue in attempting to establish a foundation for admission. The trial court admitted some of Parsons's evidence over objections but excluded other evidence.

Parsons's argument on appeal contains no authority supporting his contention that the trial court's instructions and rulings were improper; thus, it is inadequately briefed. *See*Tex.R.App. P. 38.1(i) (requiring an appellant's brief to contain clear and concise arguments "with appropriate citations to authorities"); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.,* 881 S.W.2d 279, 284–85 (Tex.1994) (discussing the "long-standing rule" that a point may be waived due to inadequate briefing). We also note that it is not the court's responsibility to school a pro se litigant in legal terminology and procedure. [7] *See, e.g., Rymer v. Lewis,* 206 S.W.3d 732, 736 (Tex.App.-Dallas 2006, no pet.)(noting that public policy demands that a trial judge act with absolute impartiality and not act as an advocate for any party). Parsons elected to represent himself, and he was bound to the same standards as licensed attorneys. *See Cheng v. Wang,* 315 S.W.3d 668, 672 (Tex.App.-Dallas 2010, no pet.)(noting that pro se litigant's difficulties with the technicalities of a trial do not constitute grounds for reversal) (citing *Mansfield State Bank v. Cohn,* 573 S.W.2d 181, 184–85 (Tex.1978) ("There cannot be two sets of procedural rules, one for litigants with counsel and the other for litigants representing themselves.")).

### 3. The trial court did not err by submitting the question on damages to the jury.

Parsons argues that the jury charge regarding damages was worded such that it "proximately caused" the jury to award zero damages. Parsons did not object to the question before

the charge was read to the jury, as required by the rules of civil procedure. *See*Tex.R. Civ. P. 272. During the charge conference, the only reference Parsons made to Question 3 was

> Regarding Question 3, I've—I would like to have an additional Question 4 that similarly worded, but instead of regarding the damages—I mean, the amounts paid by Roger Parsons would be the amounts lost by Roger Parsons by the loss of the legal action that the defendants were hired to handle named *Parsons v. Turley.*Those are my objections, Your Honor.

Parsons's statement does not appear to be an objection to Question 3 at all, much less the same objection that he now attempts to make on appeal. *See Banda v. Garcia,* 955 S.W.2d 270, 272 (Tex.1997) (noting that the complaint on appeal must be the same as that presented in the trial court). Parsons argues that he objected to Question 3 in his motion for new trial. This is not sufficient to preserve error without an objection during the charge conference. *See Kirkpatrick v. Mem'l Hosp. of Garland,* 862 S.W.2d 762, 769 (Tex.App.-Dallas 1993, writ denied) ("Objections to the charge in a motion for a new trial are untimely and preserve nothing for review."). Because Parsons did not timely object, he has waived his objection. *See*Tex.R. Civ. P. 272; Tex.R.App. P. 33.1. We overrule Parsons's second issue.

### C. The August 11, 2008 order

**\*8** In his third issue, Parsons argues that the trial court issued an order sua sponte that incorrectly limited Parsons's recovery to a regurgitation of fees paid to Greenberg and Motsenbocker.

We first note that the August 11, 2008 order was not sua sponte but an order on the defendants' motion to exclude expert testimony. In May 2008, Motsenbocker filed a motion (joined by Greenberg) for partial summary judgment on Parsons's claim for lost punitive damages (that is, the punitive damages Parsons alleged he would have recovered from Turley but for Greenberg and Motsenbocker's negligence). Motsenbocker argued that lost punitive damages in a legal malpractice action were barred as a matter of law. The trial court granted Motsenbocker's motion, and because Parsons would not be allowed to seek lost punitives at trial, Motsenbocker (joined by Greenberg) then moved to

exclude Parsons's proposed expert testimony on matters pertaining to lost punitives. The August 11, 2008 order granted Motsenbocker's motion stating,

> On July 11, 2008, the Court heard [Motsenbocker's] "Motion to Exclude Testimony of Plaintiff's Designated Experts".... [T]he Court hereby finds and orders as follows:

> By Order entered June 6, 2008, the Court has previously granted [Motsenbocker's] Motion for Partial Summary Judgment and has ordered that Plaintiff take nothing on his claims for lost punitive damages. Based upon that ruling, the Court finds that the only alleged damages the Plaintiff is entitled to recover in this case are the attorneys['] fees and expenses that he paid to the Defendants and all other expenses Plaintiff paid to others, including, but not limited to, expert witness fees and investigator fees and expenses in pursuing his claims against Windle Turley. Based upon the Court's rulings, insofar as the proffered testimony of Plaintiff's proposed experts are not relevant to Plaintiff's claims against these Defendants, such testimony should be excluded at the trial of the case.

> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the testimony of [Parsons's proposed experts on lost punitive damages], all as set forth in their reports offered into evidence in this hearing, be excluded from the trial of this case in their entirety.

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that any testimony of Michael Quinn relating to his opinion as to any breaches of duty of Windle Turley constituting negligence, gross negligence, breaches of fiduciary duties, or other matters related to the DuPont or Conoco litigation, and the amount of compensatory damages or punitive damages that could have been awarded in the DuPont and/or Conoco litigation is hereby excluded in the trial of this case.

Parsons argues on appeal that the August 11, 2008 order was overbroad and incorrectly limited his recovery to the fees he paid the attorneys because he had other live causes of action at the time of the order, including a claim for gross negligence, for which other damages are recoverable. Parsons received a copy of the proposed order at the hearing and asked for "a couple of days to respond" to the proposed wording. There is nothing in the record showing that, in the month between the hearing and the date the trial judge signed the order, Parsons ever objected to the language as overbroad, nor is there any evidence that Parsons made an objection to the

trial court after the order was signed. Because Parsons never made an objection to the trial court, he has waived the issue on appeal. [8] *See*Tex.R.App. P. 33.1(a); *Bushell,* 803 S.W.2d at 712.

 **\*9**  Even if he had preserved the error, two partial summary judgments ordered that Parsons take nothing on his other, non-negligence claims prior to trial. Because we will uphold those summary judgments, Parsons has suffered no harm by the limiting of his recovery in the August 11, 2008 order. *See*Tex.R.App. P. 44.1(a) (noting that the appellate court may not reverse a judgment unless the error caused harm to the appellant); *Romero v. KPH Consolidation, Inc.,* 166 S.W.3d 212, 225 (Tex.2005). Parsons's argument that the August 11, 2008 order erroneously prevented the trial judge from considering evidence on damages related to Parsons's gross negligence and fraud claims when she ruled on the defendant's motion for summary judgment was also never presented to the trial court and thus was waived. *See Bushell,* 803 S.W.2d at 712.Further, none of the parties argued in their motions for summary judgment that Parsons's claims should be dismissed because Parsons could not present evidence of damages beyond the fees he paid. Thus, it could not have been the ground on which summary judgment was granted. *See State Farm Lloyds v. Page,* 315 S.W.3d 525, 532 (Tex.2010) (noting that a court cannot grant summary judgment on grounds not presented in the motion); *Timpte Indus., Inc. v. Gish,* 286 S.W.3d 306, 310 (Tex.2009). In fact, in the hearing on the attorneys' motions for summary judgment, Parsons stated,

> We don't have a ruling that this is a legal malpractice case. We've had a ruling that the Motsenbocker defendants and Greenberg defendants have joined in [a] motion for summary judgment as to damages as to what— whether I can collect punitive damages in this case, lost punitive damages. And all the Court said is, [”]No, you can't.[”]

In his reply brief on appeal, Parsons also appears to make a due process argument. Parsons did not make this argument to the trial court (or in his opening brief on appeal). As a rule, a claim, including a constitutional claim, must have been asserted in the trial court in order to be raised on appeal.*Dreyer v. Greene,* 871 S.W.2d 697, 698 (Tex.1993) (citing *Wood v. Wood,* 159 Tex. 350, 320 S.W.2d 807, 813

(1959)). Parsons's constitutional argument is not properly before us and we will not address it. *See id.*(refusing to address constitutional arguments not asserted in the trial court). We overrule Parsons's third issue.

**D. Partial summary judgments**

In Parsons's fourth through seventh issues, he complains of partial summary judgments dismissing his claims against Greenberg and Motsenbocker for fraud, unjust enrichment, breach of fiduciary duty, and gross negligence. We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim,* 315 S.W.3d 860, 862 (Tex.2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex.2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker,* 249 S.W.3d 392, 399 (Tex.2008). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez,* 315 S.W.3d 494, 508 (Tex.2010); *see*Tex.R. Civ. P. 166a(b), (c). When a party moves for summary judgment on both no-evidence and traditional grounds, we will first review the trial court's judgment under the no-evidence standard. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex.2004). If the appellant failed to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether the appellees' summary judgment proof satisfied the less stringent rule 166a(c) burden. *Id.*

**1. Fraud**

 **\*10**  In his fourth issue, Parsons argues that the trial court erred by granting summary judgment for Motsenbocker and Greenberg on Parsons's claim for fraud. The only theory of fraud that Parsons argues on appeal is that the attorneys researched and prepared a claim against Turley for fraud on the court but never filed it. Motsenbocker argues that this specific theory of fraud was not alleged in the live pleading at the time of the summary judgment. We cannot determine whether the theory was or was not pleaded in Parsons's fourth amended petition because the petition does not appear in the record before us. However, we do not need to supplement the record with the relevant pleading because even if Parsons pleaded this theory, he failed to produce any evidence that the

attorneys committed fraud by failing to file the fraud-on-the-court claim against Turley.

To prevail on his fraud claim, Parsons must prove that: (1) Greenberg and Motsenbocker made a material representation that was false; (2) they knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) they intended to induce Parsons to act upon the representation; and (4) Parsons actually and justifiably relied upon the representation and thereby suffered injury. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex.2001). To support his claim, Parsons points to his affidavit, which stated that Greenberg and Motsenbocker told him that there was enough evidence to support a fraud-on-the-court claim against Turley and that the attorneys never filed the claim. This is not evidence that the attorneys never intended to file the claim or that they told Parsons they would file the claim with no intention to do so.[9] Because Parsons did not produce evidence on every element of his fraud claim, the trial court did not err by granting summary judgment in favor of Greenberg and Motsenbocker on the fraud claim. *See Frost Nat'l Bank,* 315 S.W.3d at 508. We overrule Parsons's fourth issue.

**2. Unjust enrichment**

On appeal, Parsons's argument regarding the dismissal of his claim of unjust enrichment contains no authority and thus, it is inadequately briefed. *See* Tex.R.App. P. 38.1(i) (requiring an appellant's brief to contain clear and concise arguments "with appropriate citations to authorities"); *see also Fredonia State Bank,* 881 S.W.2d at 284–85 (discussing the "long-standing rule" that a point may be waived due to inadequate briefing). Further, Parsons asserted in the trial court that he did not sue Greenberg and Motsenbocker for unjust enrichment. We overrule Parsons's fifth issue.

**3. Breach of fiduciary duty**

In his sixth issue, Parsons argues that the trial court erred by granting summary judgment in favor of the attorneys on his claim for breach of fiduciary duty.

> The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant, (2) a breach by the defendant of his fiduciary duty to the plaintiff, and (3) an injury to the

> plaintiff or benefit to the defendant as a result of the defendant's breach."

**\*11** *Lindley v. McKnight,* 349 S.W.3d 113, 124 (Tex.App.-Fort Worth 2011, no pet.)(quoting *Lundy v. Masson,* 260 S.W.3d 482, 501 (Tex.App.-Houston [14th Dist.] 2008, pet. denied)).

Parsons claims that it was a breach of fiduciary duty for the attorneys (1) to bill Parsons for work on his fraud-on-the-court claim when they had no intention of filing it; and (2) to handle the appeals of the dismissal of the Turley litigation themselves "without telling Parsons that their error was the reason for the dismissal" and when reversal of the dismissal "was more likely with another attorney." First, as we stated above, there is no evidence that the attorneys never intended to file the fraud-on-the-court claim. Second, Parsons cites to no evidence that supports his contention that the attorneys never told Parsons the reason for the dismissal or that reversal would be "more likely" with different appellate counsel. He argues without support that the attorneys "insisted" on handling the appeals in the Turley litigation. This is not evidence that the attorneys breached any fiduciary duty to Parsons that they may have had. We overrule Parsons's sixth issue.

**4. Gross negligence**

In his seventh issue, Parsons argues that the attorneys committed gross negligence by pursuing a claim against Turley for lost punitive damages without conducting the proper research. The factor that "lifts ordinary negligence into *gross* negligence is the mental attitude of the defendant...." *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex.1981). That is, Parsons was required to demonstrate that Greenberg and Motsenbocker were "consciously, i.e., knowingly, indifferent to his rights, welfare and safety." *Id.*

As evidence of Greenberg and Motsenbocker's failure to properly research the claim, Parsons points to the fact that the attorneys successfully defended against a claim for lost punitives when Parsons asserted it against them in the present case. That the state of the law in 2008—when the attorneys moved for partial summary judgment on Parsons's claim for lost punitive damages—was such that the attorneys argued that lost punitives were barred as a matter of law does nothing to demonstrate that the law was so in 1998, when the attorneys filed the Turley litigation. Further, as Parsons noted in the trial court, Texas law had at one point provided for the recovery of punitive damages as compensatory damages

in a legal malpractice case. *See Patterson & Wallace v. Frazer,* 93 S.W. 146, 148 (San Antonio 1906), *rev'd on other grounds,*100 Tex. 103, 94 S.W. 324 (1906). Parsons also noted in the trial court that he had found no case explicitly overruling *Patterson.*Nor have we. Greenberg and Motsenbocker made a policy argument in their defense with which the trial court agreed. That is not evidence that Greenberg and Motsenbocker knew ten years earlier that pursuing lost punitive damages was a worthless endeavor. Parsons cites to no other evidence except for a paragraph from one of his affidavits which was objected to and excluded by the trial court. Parsons did not complain of the exclusion on appeal. Thus, Parsons has presented no evidence to support his claim of gross negligence. We overrule Parsons's seventh issue.

**\*12** Because we hold there is no evidence to support Parsons's claims of fraud, unjust enrichment, breach of fiduciary duty, or gross negligence, we do not reach his argument that the claims were not impermissible fracturing of his legal malpractice claim. *See Ridgway,* 135 S.W.3d at 600 (noting that there is no need to analyze summary judgment arguments under the traditional summary judgment burden of proof if the appellant failed to produce more than a scintilla of evidence under the no-evidence summary judgment burden); *see also*Tex.R.App. P. 47.1.

## II. The motion to disqualify

Parsons's argument on his eighth issue—that it was error for the trial court to refuse to hear his motion to disqualify a judge after he retired—is comprised of two sentences, with no cites to supporting authority, other than to rule of civil procedure 18b and rule of appellate procedure 16, with no explanation of how these rules apply to the issue here. [10] An inadequately briefed issue may be waived on appeal. *Hall,* 919 S.W.2d at 467;*see also Fredonia State Bank,* 881 S.W.2d at 284–85.Parsons has waived this issue on appeal, and we overrule his eighth issue.

## III. The claims against DuPont and Conoco

### A. Partial summary judgment

Parsons presents his ninth issue as a complaint that the trial court erred by granting partial summary judgment in favor of Greenberg and Motsenbocker on the issue that lost punitives are not recoverable against a legal malpractice defendant. However, his argument on this issue does not attempt to demonstrate why the summary judgment was in

error, claiming only that because Parsons was not allowed to seek lost punitives against Greenberg and Motsenbocker, DuPont and Conoco unjustly benefitted somehow. Parsons's argument on appeal is entirely without citation to authority, is inadequately briefed, and is thus waived. *Fredonia State Bank,* 881 S.W.2d at 284–85.We overrule Parsons's ninth issue.

### B. Special exceptions

In Parsons's tenth issue, he argues that the trial court erroneously granted Conoco and DuPont's special exceptions and erred by granting their motion to dismiss. Special exceptions may be used to challenge the sufficiency of a pleading. *Friesenhahn v. Ryan,* 960 S.W.2d 656, 658 (Tex.1998). A special exception must point out a particular pleading and "intelligibly and with particularity the defect, omission, obscurity, duplicity, generality, or other insufficiency in the allegations in the pleading excepted to."Tex.R. Civ. P. 91. When the trial court sustains special exceptions, it must give the pleader an opportunity to amend the pleading. *Friesenhahn,* 960 S.W.2d at 658.If a party refuses to amend, or the amended pleading fails to state a cause of action, then summary judgment may be granted. *Id.* We review a trial court's decision to sustain special exceptions under an abuse of discretion standard. *Mowbray v. Avery,* 76 S.W.3d 663, 678 (Tex.App.-Corpus Christi 2002, pet. denied).

**\*13** In his third amended petition, Parsons added claims against DuPont and Conoco. Parsons alleged that DuPont and Conoco were unjustly enriched by Greenberg and Motsenbocker's alleged fraud and breach of fiduciary duty to Parsons, and he sought the imposition of a constructive trust over funds that "should have been rightfully paid" to him had Greenberg and Motsenbocker filed a fraud-upon-the-court cause of action. DuPont and Conoco specially excepted, arguing that (1) unjust enrichment is not an independent cause of action, and (2) Parsons did not identify the funds that would be subject to a constructive trust. The trial court sustained the special exceptions and granted Parsons leave to file a fifth amended petition to replead his claims against DuPont and Conoco. [11]

Parsons filed his amended petition, [12] which included new allegations that unjust enrichment is an independent cause of action; that DuPont and Conoco were unjustly enriched by Greenberg and Motsenbocker's actions as well as the actions of "such other entity or person(s) that [Parsons] may

demonstrate at trial"; and identified the *res* of the constructive trust as DuPont and Conoco's insurance policy. DuPont and Conoco specially excepted again, arguing that Parsons's new allegations still did not state a cause of action against them. After a hearing on the motion, the trial court granted the special exceptions and dismissed Parsons's causes of actions against DuPont and Conoco. The trial court's order also stated that the claims against DuPont and Conoco for unjust enrichment and constructive trust were not ripe.

On appeal, Parsons does not address the dismissal grounds that his claims against DuPont and Conoco were not ripe. Because he has not attacked ripeness, we affirm the dismissal on that ground. *See Gross v. Carroll,* 339 S.W.3d 718, 723 (Tex.App.-Houston [1st Dist.] 2011, no pet.)(affirming dismissal of plaintiff's claims because he failed to challenge

all grounds on which the dismissal could have been based); *Britton v. Texas Dep't of Criminal Justice,* 95 S.W.3d 676, 681 (Tex.App.-Houston [1st Dist.] 2002, no pet.)(affirming granting of a plea to the jurisdiction because the plaintiff did not attack all grounds supporting the grant). We overrule Parsons's tenth issue.

### Conclusion

Having overruled all of Parsons's issues on appeal, we affirm the judgment of the trial court.

### All Citations

Not Reported in S.W.3d, 2012 WL 310505

### Footnotes

1    *See*Tex.R.App. P. 47.4.

2    Parsons argues that Greenberg is also negligent under these theories, but because Parsons does not appeal the jury's finding that Greenberg was negligent, we do not address Parsons's arguments pertaining to Greenberg's actions.

3    This case includes a reporter's record spanning forty-one volumes and a clerk's record of fifty-nine volumes.

4    If the evidence had shown such an agreement, it would have disproven any finding of negligence against Greenberg.

5    Parsons also appears to argue that the trial court erred by entering judgment for Greenberg and Motsenbocker consistent with the jury's findings because the trial court was aware of information outside the record that, according to Parsons, demonstrated negligence by the attorneys. To the extent that Parsons argues that the trial court should have considered information not in evidence, we overrule that argument. *See Pool,* 715 S.W.2d at 635 (noting that the appellate court reviews a factual sufficiency challenge based on the evidence in the record); *see also K–Mart No. 4195 v. Judge,* 515 S.W.2d 148, 155 (Tex.Civ.App.-Beaumont 1974, writ dism'd) ("[I]t would seem most inappropriate for the court to consider evidence outside its own record notwithstanding prior precedent supports such practice.").

6    Blue represented Greenberg for the purposes of voir dire. Blue, as the executrix of the estate of Frederick M. Baron, and Baron & Budd, P.C. were also defendants in this case. The trial court granted summary judgment for them, which was upheld on appeal. *See Parsons v. Baron,* No. 02–09–00380–CV, 2011 WL 3546617, at *1 (Tex.App.-Fort Worth Aug. 11, 2011, no pet. hist.) (mem.op.).

7    We further note that Parsons appeared to understand what it means to "lay the foundation" for the admission of evidence, as shown in this exchange during trial,

     MR. PARSONS: Okay. Thank you. Your Honor, I offer Plaintiff's Exhibit No. 31 as—

     MR. ROSS: Objection, lacks foundation.

     THE COURT: Mr. Parsons, would you like to lay a foundation for this exhibit?

     MR. PARSONS: Yes, ma'am. I thought I had just done that in the trial.

     ....

     MR. ROSS: Your Honor, we'd like to withdraw our objection. I have no objection to this document coming in.

     THE COURT: Thank you, Mr. Ross. Hearing no objection to Plaintiff's Exhibit No. 31, that exhibit is admitted into evidence at this time.

8    We also note that contrary to his position on appeal, in the hearing on Parsons's motion for leave of court to amend his petition for the sixth time, Parsons argued that Greenberg and Motsenbocker misinterpreted the August 11, 2008 order and stated that the order "was limited to really saying that you could not recover punitive damages in a legal malpractice case."

9    Parsons argues that the trial court erroneously struck two paragraphs from one of his affidavits. Parsons's first complaint, that the trial court erroneously struck a description of hiring an investigator, is immaterial because it is not evidence that

the attorneys never intended to file the claim. Parsons's second complaint, that the trial court erroneously struck an entire paragraph when only some of it was speculative, is devoid of any citation to authority and thus, inadequately briefed. *See*Tex.R.App. P. 38.1(i); *see also Fredonia State Bank,* 881 S.W.2d at 284–85.

10   We further note that neither the motion nor the order was found in the record before us.

11   There is presumably a fourth amended petition but it does not appear in the record before us.

12   The fifth amended petition also does not appear in the record except as an exhibit to DuPont and Conoco's special exceptions and motion to dismiss.

---

**End of Document**                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# RR

KeyCite Yellow Flag - Negative Treatment

**Declined to Follow by** Ferguson v. Lieff, Cabraser, Heimann & Bernstein, Cal., June 9, 2003

100 Tex. 103
Supreme Court of Texas.

PATTERSON & WALLACE

v.

FRAZER.

June 21, 1906.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

Action by Ella Frazer against Patterson & Wallace. Judgment for plaintiff, affirmed by Court of Civil Appeals (93 S. W. 146). Defendants bring error. Reversed and remanded.

West Headnotes (3)

**[1]     Attorney and Client**

 Trial and Judgment

Refusal of the instruction, in an action by a client against her attorneys for allowing an action begun by them for her to be dismissed for want of a bond for costs, that, "in order for plaintiff to recover in this case on account of negligence or ignorance of defendants, you must believe that such negligence or ignorance on defendant's part was gross ignorance or gross negligence," is not error; there being nothing in such charge to assist the jury in determining whether defendants had been guilty of such negligence as would render them responsible, and a charge clearly and explicitly stating the standard by which the jury should determine the liability of defendants as attorneys at law having been given.

7 Cases that cite this headnote

**[2]     Libel and Slander**

 Variance

There is a substantial agreement between the allegation of the petition for slander that M. said

of E.F., an unmarried woman, "the F. girls need not be talking about H. for at any time they want to it can be proved that the child born in S. is not Mrs. D.'s child, but E.F. is its mother," and proof that M. said "the F. girls need not trouble or talk about H.'s affairs, and that the people said that E.F. was the mother of a child Mrs. D. was raising in A."; the gist of the slander being that E.F., an unmarried woman, had given birth to a child.

1 Cases that cite this headnote

**[3]     Libel and Slander**

 Damages

For the court, in an action for slander, where the testimony was that M. said of plaintiff, an unmarried woman, that "the people said" she was the mother of a certain child, to state in the charge on actual and exemplary damages that the undisputed testimony showed that M. said that it "could be proved at any time" that plaintiff had given birth to a child, was error, as the jury may have thereby been led to have exercised their discretion against defendant in the matter of damages, especially exemplary damages.

2 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*103   \*\*325** Beall & Kemp, Maury Kemp, and Denman, Franklin & McGown, for plaintiffs in error.

S. P. Weisiger and Seymour Thurmond, for defendant in error.

**Opinion**

BROWN, J.

For the purposes of this opinion the following statement of the case will be sufficient: On or about the 1st day of February, 1901, Ella Frazer employed a firm of lawyers, Patterson & Wallact, composed of the plaintiffs in error, who were practicing as partners in the city of El Paso, to institute in the district court of Reeves county a suit in her name against John Moore and Ellen Moore, husband and wife, for damages on

account of these slanderous words, spoken by Ellen Moore of and concerning the said Ella Frazer, to wit: 'The Frazer girls need not be talking about Marie Howard (or Stone), for at any time they want to it can be proven that the child born in San Antonio is not Mrs. Durrell's child; but Ella Frazer is its mother.' The language was alleged to have been uttered by the said Ellen Moore on the-day of May, 1900. The plaintiffs in error accepted the employment, and Miss Frazer paid them a cash fee of $250, which was to compensate them for all of their services as attorneys in the said case through all of the courts to which it might be carried. Patterson & Wallace instituted the suit in Reeves county in favor of Ella Frazer against John and Ellen Moore by filing a petition which contained all the necessary and appropriate allegations to present to the court the case of the said plaintiff, and in the petition is was sought **\*104** to recover of the Moores the sum of $5,000, actual damages, and $5,000, exemplary damages, charged to have been occasioned to the said Ella Frazer by the slanderous words uttered by Mrs. Moore. Service was had in due time upon the defendants, and, upon a motion filed by the clerk of the said district court, the judge of the court entered an order during the first term of 1900 requiring the said plaintiff to give bond for cost of the said suit on or before the first day of the nest term as required by law. Patterson & Wallace had notice of this rule entered by the judge for the bond for cost, and assured Miss Frazer that they would attend to the matter and see that the bond was filed. Ella Frazer called frequently upon the attorneys for instructions about giving the bond, and from time to time wrote to them, urging the matter upon their attention. It is unnecessary to state the facts in full upon this subject, but it is sufficient to say that she was unusually diligent with regard to the matter, and the evidence justifies the finding that the attorneys were negligent in failing to attend to the filing of the bond. At the September term in the year 1900 the district court convened, and, no bond having been given, on the second day of the term, when the docket was called, the clerk of the court and the defendant John Moore called the court's attention to the requirement to give bond, and the fact that none had been given, whereupon the judge entered an order dismissing the case. Patterson & Wallace were not present in court at the time, but afterwards made a motion to have the case reinstated, which was overruled by the court, which ruling was affirmed by the Court of Civil Appeals. Miss Ella Frazer's cause of action against the Moores was barred by the statute of limitations, and she brought this suit in the district court of El Paso county against Patterson & Wallace to recover of them the damages sustained by her by reason of the dismissal of her suit through their negligence.

It is unnecessary for the disposal of this case, as we view it, to state the pleadings or evidence more explicitly than we have done, except that in her petition against the defendants Ella Frazer presented her cause of action with proper and necessary allegations, alleging the charge as made in the original petition. Proof of the words spoken by Mrs. Moore was made by Mrs. Shertz that 'Mrs. Moore said that the Frazer girls need not trouble or talk about Marie Stone's affairs, and that the people said that Ella Frazer was the mother of a child Mrs. Durrell was raising in Alpine, Tex.' Mrs. Shertz Stated this matter several times with slight variation in the language, but containing substantially the same matter in each statement. It is unnecessary for us to discuss the many questions which are presented by the application for writ of error, and we shall confine ourselves in this opinion to three of the errors assigned in this court.

The objection that the proof which was made of the slanderous words charged to have been uttered by Mrs. Moore varied from the allegations of the petition is not well taken. The gist of the slander spoken by Mrs. Moore of Miss Frazer was that the latter, being an unmarried woman, had given birth to a child. The words proved embodied fully that charge, and the other words proved did not modify or qualify the slanderous charge. Courts have justly been very liberal in permitting the proof of words spoken which constitute slander, for the reason that **\*105** it is almost impossible to reproduce by witnesses the exact words used. A substantial agreement between the allegation and the proof is all that the law requires. Newell on Slander & Def. p. 804, § 50; Id. p. 808 (2), 'Variance Immaterial.'

Plaintiffs in error requested the court to give to the jury the following charge: 'In order for the plaintiff to recover in thes case **\*\*326** on account of negligence or ignorance of the defendants, you must believe that such negligence or ignorance on defendants' part were gross negligence or gross ignorance.' This charge would have given the jury no assistance in determining whether the defendants had been guilty of such negligence as would render them responsible to the plaintiff for the loss of her case. The district court gave to the jury a charge which very clearly and explicitly stated the standard by which they would determine the liability of the defendants as attorneys at law. There was no error in refusing the charge requested by the defendants below.

The application assigns as error the giving of the following instruction by the court: 'You are instructed that the said language uttered by Mrs. Ellen Moore concerning the

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

plaintiff, Ella Frazer, in the month of May, 1900, to Mrs. Louis Shertz, in substance, as follows: 'That the Frazer girls need not talk about Marie Stone's affairs, for at any time they want to it can be proven that the child born in San Antonio is not Mrs. Durrell's child, but Ella Frazer's'-was slanderous in law, and the undisputed evidence showing that such language was uttered by Mrs. Moore, you are instructed would have entitled the plaintiff, Ella Frazer, to have recovered against Mrs. Moore and John Moore, her husband, in damates in such an amount as may be shown from the evidence she had sustained, if any, by reason of the utterance of said slanderous language by Mrs. Moore on the occasion above named, and if said slanderous language was uttered maliciously by Mrs. Moore and actual damages in any sum had been found in favor of the said plaintiff, Ella Frazer, then in the discretion of the court or jury assessing such damages Ella Frazer could have recovered also such sum in exemplary damages as would have constituted an adequate punishment to Mrs. Moore for the utterance of such slanderous language.' This charge, in effect, informs the jury that the undisputed evidence establishes that Mrs. Moore uttered to Mrs. Shertz this language: 'That the Frazer girls need not talk about Marie Stone's affairs, for at any time they want to it can be proven that the child born in San Antonio is not Mrs. Durrell's child, but Ella Frazer's.' The record shows that Mrs. Shertz, the only witness who testified to the language used, said upon the stand: 'Mrs. Moore said that the Frazer girls need not trouble or talk about Marie Stone's affairs, and that people said that Ella Frazer was the mother of a child Mrs. Durrell was raising in Alpine, Tex.' It is plain that the court did not correctly state the testimony of the witness, and the question is, does it appear that the variance between the charge and the testimony is so immaterial that it did not mislead the jury to the injury of the defendants. Hudson v. Morriss, 55 Tex. 610.

The effect of the charge of the court is to construe for the jury the testimony of Mrs. Shertz as establishing the language used in the charge, which is the same as that alleged in the petition. The principal difference **\*106** between the language stated in the charge and that to which Mrs. Shertz testified is that the charge makes it an undisputed fact that Mrs. Moore said that the fact that Ella Frazer had given birth to a child 'could be proved at any time,' which necessarily implies that she, Mrs. Moore, claimed to know the fact to be true, and that she knew of the witnesses who could establish the truth of her statement. The testimony of Mrs. Shertz in this particular is to the effect that 'people said that Ella Frazer was the mother of the child.' In other words, the one presents a case in which a statement is made as upon Mrs. Moore's own knowledge and

responsibility, while in the testimony of the witness the case is presented as being stated as a matter of rumor among the people; that is, the witness testified that Mrs. Moore purported to be repeating that which she had heard. It is true that in either case the gist of the charge is that Ella Frazer had given birth to a child, and, whether spoken as of her own knowledge or as a repetition of a common report, was slanderous and would give a right of action. The injury to the defendants lies, in this; that under the testimony as it was actually given the jury might, in mitigation of damages, have taken into consideration the fact that the slanderous words were repeated, and not originated by Mrs. Moore. Marker v. Dunn, 68 Iowa, 720, 28 N. W. 38; Galloway v. Courtney, 10 Rich. Law (S. C.) 418; McKinnis v. Freeman, 38 Iowa, 364; Evans v. Smith, 5 T. B. Mon. (Ky.) 364, 17 Am. Dec. 74; Calloway v. Middleton, 2 A. K. Marsh. (Ky.) 372, 12 Am. Dec. 406. In Calloway v. Middleton, treating of a similiar question, the court expressed the rule of law applicable to this case in this language: 'But malice is the gist of the action of slander, and the degree of responsibility of one who publishes slanderous words must be proportioned to the malignity of the motives with which he is actuated in making the publication. Whatever, therefore, tends to diminish the malignity of the person who utters a slander, though not evidence of its truth, must lessen the degree of his responsibility; and, most indisputably, one who only gives currency to a report already in existence cannot be guilty of the same degree of malignity as one who is the prime author or original fabricator of the slander.'

The charge excluded testimony which the jury might have considered in mitigation of damages, and placed the case before them as being a slander originated and published by Mrs. Moore, which deprived the defendants of the benefit that they might have derived from the exercise of discretion by the jury in assessing a smaller amount against **\*\*327** Mrs. Moore, especially in the matter of exemplary damages. It appears to us that there could be no reasonable doubt that the jury may have been led by charge of the court to consider the case in the harshest light that could have been presented against Mrs. Moore. The defendants were entitled to stand just where Mrs. Moore would have stood in the trial of the suit against her, and to have before the jury every fact that tended to lessen the damages.

We are of opinion that the giving of the charge above quoted constituted such error against the plaintiffs in error as requires that this court shall reverse the judgment and remand the cause; and it is accordingly so ordered.

94 S.W. 324

## All Citations

100 Tex. 103, 94 S.W. 324

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

SS

KeyCite Red Flag - Severe Negative Treatment

**Reversed by** Patterson & Wallace v. Frazer, Tex., June 21, 1906

93 S.W. 146
Court of Civil Appeals of Texas.

PATTERSON & WALLACE

v.

FRAZER. [*]

Jan. 31, 1906. | Rehearing
Denied Feb. 28, 1906.

Appeal from District Court, El Paso County; J. M. Goggin,
Judge.

Action by Ella Frazer against Patterson & Wallace. From a
judgment in favor of plaintiff, defendants appeal. Affirmed.

West Headnotes (13)

**[1]** **Trial**
 Construction and Operation

In an action against an attorney for negligence
whereby plaintiff lost a right of action for
slander, the petition did not claim exemplary
damages as against defendant, and the verdict
was a certain sum for "actual damages" and
another sum for "exemplary damages." Held,
that the verdict was not erroneous, on the theory
that it awarded exemplary damages against
defendant; it appearing from the pleadings and
evidence and instructions that it must have been
intended to indicate the amount of the actual
and exemplary damages that plaintiff would have
recovered in her action for slander.

2 Cases that cite this headnote

**[2]** **Appeal and Error**
 Instructions in General

A party cannot complain of an instruction which
is the same, or to the same effect, as one asked
by him.

Cases that cite this headnote

**[3]** **Appeal and Error**
 Instructions Understood or Followed

It is presumed that the jury followed instructions.

1 Cases that cite this headnote

**[4]** **Attorney and Client**
 In General; Limitations

In an action against an attorney for negligence
whereby plaintiff lost a right of action for
slander, the damages were not too remote to
support the action, even though a part of the
judgment which might reasonably have been
expected to be recovered might have been for
exemplary damages.

2 Cases that cite this headnote

**[5]** **Attorney and Client**
 Pleading and Evidence

In an action against an attorney for negligence
whereby plaintiff lost a right of action for
slander, the petition alleged that plaintiff might
reasonably have recovered $5,000 actual and
$5,000 exemplary damages, and concluded with
a prayer for $10,000, which it was alleged she
was entitled to and "might reasonably have
expected and would have recovered," had her
action not been lost. *Held,* that the petition
did not claim exemplary damages as against
defendant.

3 Cases that cite this headnote

**[6]** **Attorney and Client**
 Trial and Judgment

In an action against an attorney for negligence
in failing to attend to the filing of a cost bond,
whereby plaintiff's cause was dismissed and her
right of action lost, the court instructed that
contributory negligence means some negligent
act or omission on the part of the plaintiff which,
concurring or co-operating with some negligent
act on the part of defendant, is the proximate
cause of the injury. *Held,* that there was no error,

on the ground that, if plaintiff was guilty of contributory negligence, it must necessarily have been the proximate cause of the dismissal; the court having stated in another instruction that, if plaintiff was guilty of negligence in failing to file a bond herself, she could not recover.

1 Cases that cite this headnote

**[7]** **Husband and Wife**
 Torts

Community property is subject to a judgment founded on the wife's torts, even though it includes exemplary damages.

1 Cases that cite this headnote

**[8]** **Libel and Slander**
 Implied

Where words are actionable per se, the law presumes malice.

Cases that cite this headnote

**[9]** **Libel and Slander**
 Want of Chastity or Sexual Crimes in General

Words imputing unchastity are actionable per se.

Cases that cite this headnote

**[10]** **Libel and Slander**
 Rumors, Other Publications, and Reputation of Person Defamed

The fact that a slanderous statement was a rumor repeated by defendant was no justification.

1 Cases that cite this headnote

**[11]** **Libel and Slander**
 Variance

In an action for slander, it is not necessary to prove the exact words used as alleged, but proof of the use of words substantially the same in meaning as those charged is sufficient.

1 Cases that cite this headnote

**[12]** **Libel and Slander**
 Publication

In an action for slander, it was proper to admit testimony of plaintiff that a person told her that defendant had uttered the words alleged where the jury were instructed that they could only consider the testimony as showing that plaintiff had been informed of the utterance of the words.

3 Cases that cite this headnote

**[13]** **Libel and Slander**
 Exemplary

A husband is liable for exemplary as well as actual damages for slanderous words uttered by the wife.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*147** Beall & Kemp and Maury Kemp, for appellant. S. P. Weisiger and A. Seymour Thurmond, for appellee.

**Opinion**

NEILL, J.

This is the second appeal from a judgment in favor of appellee in this case. The opinion of this court on the first appeal will be found in 79 S. W. 1077, and in 9 Tex. Ct. Rep. 1004, where will be found a full statement of the nature of the action, which need not be repeated. In the opinion referred to many of the questions of law presented here were, after thorough and mature consideration, disposed of; and since, upon reconsidering them on this appeal, our opinion on none has undergone any change, we will, in this opinion, without discussing such questions, simply state the conclusions we then reached. The judgment now appealed from is for $2,100, of which $1,050 are actual, and $1,050 exemplary, damages.

**Conclusions of Fact.**

The evidence in the transcript of the record is reasonably sufficient to warrant the following conclusions: On or about February 1, 1901, the appellee, Ella Frazer, an unmarried woman, employed appellants, C. B. Patterson and George

E. Wallace, composing the firm of Patterson & Wallace, attorneys at law, to institute and prosecute in the district court of Reeves county, Tex., a suit in her name and for her benefit against John Moore and his wife, Ellen, for the sum of $10,000 damages occasioned appellee for slanderous language uttered and published of and concerning her by Ellen Moore, the wife of John, on the ------ day of May and June 19, 1900, she (plaintiff) paying them (defendants) a cash fee of $250, for which they agreed to institute and prosecute to final termination such suit. That suit, on plaintiff's cause of action against John Moore and wife, which she employed defendants as attorneys at law to institute and prosecute, was on February 18, 1901, in pursuance of their contract of employment, instituted by defendants by filing in the district court of Reeves county, Tex., an original petition for plaintiff against Moore and wife for $10,000 damages by reason of the alleged slanderous language uttered by Mrs. Moore of and concerning plaintiff, upon which said suit was based, it being as follows: "The Frazer girls need not be talking about Marie Howard, for at any time they want to it can be proven that the child born in San Antonio is not Mrs. Durrell's child, but Ella Frazer is its mother." The undisputed evidence shows that such language was uttered in the presence and hearing of one Mrs. Shertz by Mrs. Moore in May, 1900, of and concerning appellee, Ella Frazer, an unmarried woman. Such language was false, was maliciously uttered, and imputed that appellee had been guilty of the offense of fornication. That after said suit had been instituted against Moore and wife, appellants represented to appellee and induced her to believe that it was unnecessary for her to file a cost bond in the case, and afterwards promised her that they would attend to filing the cost bond when it became necessary; appellee being ready and able to make such bond. Appellants, after a rule for costs had been entered against appellee, negligently failed to attend to having such bond filed in time, and by reason of such negligence and their representations to appellee, she having failed **\*148** to make and file said bond, her cause was dismissed under the rule for costs; the appellants having negligently failed to appear before the court when the order of dismissal was made. After said cause was dismissed by the court for want of a cost bond, appellants negligently failed to present a proper motion to the court containing the necessary and proper allegations to have said cause reinstated, and made no effort on said motion to show that appellee had a meritorious cause of action against Moore and wife. Upon the dismissal of said case, appellee's cause of action for damages against the defendants therein, being barred by the statute of limitation, was by reason of said negligence of appellants lost to appellee; said negligence being the proximate cause of

said loss. That had appellee's cause of action not been lost by the negligence of appellants as aforestated, and had her suit embracing said cause of action been managed and prosecuted by them with that degree of care, diligence, knowledge, and skill a practicing lawyer of ordinary skill, prudence, and knowledge of the law would have exercised in cases of like character under like circumstances, ==the appellee would have recovered== in said suit against Moore and wife, and collected from them, a judgment for $1,050 actual and $1,050 ==exemplary damages, which s==ums, amounting in the aggregate to $2,100 ==she has lost by the negligence of appellants, which proximately caused such loss and damage to her.==

### Conclusions of Law.

The first assignment of error claims that the damages sought to be recovered in this suit are too remote to support an action, and for this reason appellants' special exception to appellee's petition based upon this ground should have been sustained. In passing upon a phase of the case involving this question on the prior appeal, it was said: "In an action for tort, the injured party is entitled to recover such damages as will compensate him for the injury received, so far as it might reasonably have been expected to flow from the circumstances, such as, according to common experience and the usual course of events, might have been reasonably anticipated. He who is responsible for a negligent act must answer for all injurious results which flow therefrom by ordinary, natural sequence, without the interruption of any other negligent act or overpowering force. The damage is not too remote, if, according to the usual experience of mankind, the result was to be expected, If, therefore, plaintiff had a cause of action against Moore and wife for slander, which is a question of fact, for which suit was pending, the loss of her action would inevitably follow from the negligence of her counsel causing the dismissal of her suit, when barred by limitations, and, after its dismissal, in so negligently preparing and presenting a motion to reinstate the suit as would not authorize the court to grant it. If, then, were it not for such negligence, it can be ==reasonably shown that she would have recovered judgment and collected anything on it, she has lost by such negligence of defendants what she would have otherwise collected; and the fact that a part of the judgment which might reasonably have been expected to be recovered and collected might have been for exemplary damages would make no difference. It is known that judgments for damages, actual and exemplary, are recovered and collected for slander, and it will not do to say that attorneys at law are not liable to their clients for==

negligence in managing such cases, because of the difficulty a jury may have in arriving at the damages occasioned by such negligence, for this would absolve them from all liability for negligence in such cases." See Lynch v. Munson (Tex. Civ. App.) 61 S. W. 141; T. & W. Tel. Co. v. Mackenzie (Tex. Civ. App.) 81 S. W. 582; Fraser v. Mining Co., 9 Tex. Civ. App. 210, 28 S. W. 714; Joske v. Pleasants, 15 Tex. Civ. App. 433, 39 S. W. 586; McLane v. Maurer, 66 S. W. 693. To deny an injured party the right to recover actual damages in cases of this character, because they are of a nature that cannot be certainly measured, would be to enable the defendants to profit by and speculate upon their own wrongs. Allison v. Chandler, 11 Mich. 555; Gilbert v. Kennedy, 22 Mich. 129. That the cases in which damages have been recovered against attorneys for negligently failing to prosecute suits of their clients are generally where the cause of action was a liquidated demand does not limit the right of the client's recovery of damages on account of the attorney's negligence to such cases. The law cannot, when holding all others liable for damages proximately caused by their negligence (though difficult of ascertainment), justly exempt attorneys from the operation of the rule by which it measures the damages consequent on the wrongs of others. This also disposes of the twentieth assignment of error, which complains of the court's refusal to give a special charge, requested by appellants, to the effect that the damages sued for are too remote, speculative, and conjectural to be recovered.

It is urged by the second assignment of error that the alleged defamatory language is not actionable per se, and, for that reason, the court should have sustained appellant's special exception to appellee's petition, no special damages flowing from such language to plaintiff having been alleged. The same point was insisted upon on the prior appeal and decided adversely to appellants. This decision was expressly based upon the causes of Zeliff v. Jennings, 61 Tex. 467, and King v. Sassaman (Tex. Civ. App.) 54 S. W. 304, 64 S. W. 937, which we observed, broke away from the common law-the rule of decision in this state. In the case of Hatcher v. Range (Tex. Sup.) 81 S. W. 239, the question whether language **\*149** orally uttered imputing the want of chastity to an unmarried female is actionable per se being involved, the Court of Appeals of the Second District, being unable to adopt the view expressed in the case of King v. Sassaman, followed by us in our former opinion, that the decision in Zeliff v. Jennings changed the common-law rule, certified the question to the Supreme Court, and it was answered: "That, under the law as it now exists in this state, words spoken or written, which 'falsely and maliciously, or falsely and wantonly' impute to a female want of chastity, are actionable without showing

special damages arising therefrom." This answer we take as settling the question raised by this assignment.

It is further contended by appellants that their special exception challenging the sufficiency of the petition to entitle appellee to recover exemplary damage against them should have been sustained. As we read the petition, exemplary damages are not alleged nor sought against the defendants in this case. The petition in this case charges that, had it not been for the alleged negligence of defendants, she might have reasonably recovered from Moore and wife $5,000 actual and $5,000 exemplary damages, and concludes with a prayer for $10,000 which she says "she was entitled to, and might reasonably have expected, and would have recovered against John Moore and wife," had her action, which was lost by defendants' negligence, been conducted properly. This demonstrates that the petition was not obnoxious to the exception. But in disposing of the assignment our attention was brought to the form of the verdict, which, after stating the style and number of the case, is in these words: "We, the jury in the above-styled case, find for the plaintiff as follows: $1,050 actual damages and $1,050 exemplary damages; total $2,100." This verdict is against the appellants in this case, for it could have been against nobody else. Half of it is for exemplary damages. While no objection was urged to it in the court below, nor in this court, it would seem, unless a construction can be given it from the record different from its apparent meaning, that, as to the exemplary damages, it cannot support the judgment. For an error more egregious than a verdict for exemplary damages against a defendant, when no such damages are alleged or prayed for by the plaintiff, can hardly be conceived. It is evident, however, from the pleadings of the parties, the evidence adduced upon the trial, the charge of the court, and the whole record before us, that it was intended to indicate by the verdict the amount of actual and exemplary damages appellee would have recovered against Moore and wife, had their cause of action not been lost by appellants' negligence, and find in favor of plaintiff the aggregate amount of such damages. This we think was the construction placed upon the verdict by the trial judge, as well as counsel for the parties; and relieves it of any error that could be noticed by this court, in the absence of any objection on the part of appellants.

The following testimony of the appellee was introduced in evidence, over the objection of appellants that it was incompetent and hearsay: "Mrs. Shertz came and told me what Mrs. Moore said about me. Mrs. Shertz said Mrs. Moore said: 'The Frazer girls need not be talking about Marie Howard, for at any time they want to, it can be proven that the

child born in San Antonio is not Mrs. Durrell's child, but Ella Frazer is its mother'-which child is my sister's child, who was married and lives in Alpine. I was not married." When this testimony was offered in evidence plaintiff's counsel stated to the court and jury that it was not offered to prove the utterance of slanderous words, but to show that plaintiff had been informed that they had been uttered. In admitting the testimony, the court instructed the jury that it was admitted only for the purpose stated by appellee's counsel, and that they must not consider it for any other purpose whatsoever. It could as well be contended, that when a man has been shot at, he cannot prove the bullet hit him as to say that when defamatory words against a woman's character have been let loose by a malicious tongue, she cannot prove that she was stricken and wounded by them. Conscious of her innocence, the plaintiff might have been happy, had she nothing known of the vicious assault upon her character. But, when known, her peace and tranquility of mind, her content and happiness, were gone, and she felt that she had become "a fixed figure for the time of scorn to point its slow unmoving finger at." Such are the wounds which a known slander inflicts. If not allowed to prove the slander was known, the wounds could not be shown. We think that the testimony was admissible as evidence to show that appellee suffered from the defamation. As the court expressly charged the jury in writing to disregard the testimony, the admission of which is complained of in the fifth assignment of error, it must be presumed, in the absence of anything to the contrary, that the jury obeyed the instruction, and were not influenced in their verdict by the admission of such testimony.

The testimony complained of in the sixth, seventh, and eighth assignments is not obnoxious to the objections urged by appellants to its admission in evidence. In proving the slanderous utterances upon which an action of slander is based, it is only required to show that the words spoken were substantially as alleged. Zeliff v. Jennings, 61 Tex. 465; Townshend on Slander, 364, 365. In Newell on Slander and Libel, 804, it is said: "In an action for slander the plaintiff need not prove all the words in the declaration, unless it takes all of them to constitute her cause of action; nor will the proof of additional **\*150** words defeat his right of recovery, unless they so qualify the meaning as to remove the slander; but he must prove enough of the words laid to amount to the substance of the charge, and this must be done by proof of the identical words laid." While the evidence complained of shows that more was said than alleged, yet, as the identical words laid were proven, and the additional words do not so qualify their meaning as to remove the slander, there was no variance in the language alleged and that proven. See,

also, Wigmore on Evidence, § 2097; Hume v. Arrasmith, 4 Am. Dec. 626; Logan v. Steele, 4 Am. Dec. 659; Desmond v. Brown, 4 Am. Rep. 194. As is observed by counsel for appellee in their brief: "The gravamen of the slander set out in appellee's petition was that the appellee, being an unmarried woman, was the mother of a child. * * * The testimony objected to substantially met the allegations in the petition, and was not subject to the objection urged. The fact that Mrs. Moore said, 'the people said that Ella Frazer was the mother of the child,' could make no difference. 'One who publishes a defamatory statement made by another cannot justify by proving that the other made the statement. By publishing it, he becomes responsible for his own act in so doing, and, if he seeks to justify, he must prove the truth of the charge published.'" Dement v. Houston Printing Co. (Tex. Civ. App.) 37 S. W. 986; Branstetter v. Dorrough, 81 Ind. 530; Holmes v. Jones (N. Y.) 41 N. E. 409, 49 Am. St. Rep. 646.

In the case of Nicholson v. Rust (Ky.) 52 S. W. 933, which is a case very similar to the one that the appellee had against Moore and wife, the defamatory words being, "One of Mrs. Nicholson's twins had twins, so I heard," which were spoken of a young unmarried woman, the Court of Appeals of Kentucky, after holding it actionable per se to impute want of chastity to a female, without allegation or proof of special damages, said: "Nor is it any justification for a repetition of the slander that it had been reported in the neighborhood, or that appellant, at the time he communicated the slander, gave the party to whom he related it the name of the person from whom he learned said report, or that he informed him at the time that he did not believe said report to be true; and it cannot be relied on by way of justification that he did not intend to charge appellant with the offense of fornication. This court, in the case of Parker v. McQueen, 8 B. Mon. 18, says: 'The fact that the defendant had heard from another the charge which he himself afterwards circulates and gives credit to does not repel the implication of malice arising from the falsehood and unnecessary publication of the charge by him. It may, in the estimation of the jury, mitigate the damages, but cannot, of itself, operate as a bar to the action' (referring to Williams v. Greenwade, 3 Dana, 432). This same doctrine was announced by Judge Cooley, in the great leading case of Burt v. McBain, reported in 29 Mich. 260; and Mr. Newell, in his work on Defamation, Slander, and Libel (pages 354, 355), says: 'It will afford no justification in any action for oral slander that the defamatory matter had been previously published by a third person, or that the defendant, at the time of his publication, disclosed the name of that third person, and believed all of the statements to be true.' In Kelley v. Dillon, 5 Ind. 426, the court said: 'Let it be understood that a bare rumor is sufficient

to justify the retailing of slander, and character would be at the mercy of the artful and designing, as such defenses could be manufactured before hand to suit any emergency.' Odgers, Lib. & Sland. p. 100, says: 'Every repetition of a slander is a willful publication of it, rendering the speaker liable to an action. Tale bearers are as bad as tale makers.'" In cases of slander, where there is a denial that the slanderous statement was uttered, the issue on such denial of uttering the statement is not whether the libelous statement is true, but whether the statement was really made. The making of the statement is the principal fact in issue. Testimony by one that heard the statement uttered is not hearsay, but original evidence of the fact in dispute. It is evidence within the personal knowledge of the witness, and has nothing to do with the hearsay rule. Elliott, Ev. § 323. The Court of Civil Appeals, in the case of Frazer v. Moore, 67 S. W. 427, in which the sufficiency of the application made by these appellants to require the trial court to set aside the judgment of dismissal was in question, having held that the motion was insufficient, it was not error for the court to instruct the jury, as is complained of in the eleventh assignment of error, that such motion was insufficient to require the judge to set aside said judgment of dismissal, and then charge the jury that it was for them to determine from the evidence whether or not the defendants Patterson & Wallace were guilty of negligence in not presenting said motion with other or additional allegations, or in not supporting said motion with evidence.

The twelfth assignment of error complains that the court erred in defining contributory negligence as follows: "By contributory negligence is meant some negligent act or omission on the part of plaintiff, which, concurring or co-operating with some negligent act or omission on the part of the defendants, is the proximate cause of the loss or injury complained of." The objection urged being that, under the facts and circumstances of the case, if the plaintiff was guilty of negligence, which contributed to the failure to file a proper cost bond, such negligence must necessarily have been the proximate cause of the dismissal of her suit. The definition is abstractly correct: and if it were error to apply it to the issue as to whether appellee **\*151** was negligent in failing to make and file a cost bond in her suit against Moore and wife, the court was guilty of no such error. For by the thirteenth paragraph of its charge the jury were instructed as follows: "If you believe from the evidence that the plaintiff was guilty of negligence in failing to make up and file a good and sufficent cost bond herself in the district court in her case against John Moore and wife before the dismissal of her suit, then, and in that event, your verdict should be for the defendants." Thus it is seen, as to this issue, "proximate cause" was ignored,

and the plaintiff's negligence, if found by the jury, was made an absolute bar to her recovery. In submitting another phase of the issue of contributory negligence, in a charge given at appellants' request "proximate cause" was likewise eliminated from the issue, and the jury were instructed to find for defendants if plaintiff was guilty of such negligence. But if the charge upon this issue had been subject to the objection urged, appellants would be in no attitude to complain of it; for special charge No. 7, which was given at their request, and relates to the same issue, instructs the jury in event they should find that plaintiff was negligent in failing to see that a good and sufficient cost bond was filed in said case and such negligence on her part was the direct and proximate cause of said suit being dismissed to find for the defendants. It is thus seen that the special charge requested by defendants themselves embodies the very objection that they urge and which the main charge in its application to the issue is free from. If error, such error was invited by appellants, and the court, in accepting the invitation, did not extend it beyond its express terms. Our conclusions of fact and what we have said in disposing of previous assignments dispose of the thirteenth assignment of error adversely to appellants.

The twelfth paragraph of the charge does not, as is contended under the fourteenth assignment of error, assume as a matter of law that the facts, or any of them, submitted by that paragraph constitute negligence. But the question as to whether such matters, or any of them, if proven, constitute negligence is expressly submitted to the finding of the jury. If correct, in our former opinion on the former appeal, it was not error to submit the question to the jury as to whether exemplary damages could have been recovered against Moore and wife in the suit brought by appellee against them, and to instruct the jury if such damages would have been recovered, to the extent of such recovery, appellants, if negligent, etc., would be liable. As has been shown, the words of Mrs. Moore spoken of and concerning appellee were actionable per se, because, if false, the law imputes malice; for such words are drops of venom from a malicious tongue, which can only come from a depraved heart, bent on blighting the character of a pure and innocent woman. No other proof of malice than such words carry with them need be shown.

As is said in Zeliff v. Jennings, supra, "a husband is liable for his wife's acts, when liable at all, to the same extent as if she alone were answerable." That a husband is liable for his wife's torts, as well as she, is too well settled to admit of discussion, or require citation of authorities. For slander, she is liable for exemplary, as well as actual, damages; and the husband being liable to the same extent as if she alone were answerable, he

is likewise liable for exemplary damages. Besides, it is to be presumed, in the absence of evidence to the contrary, that the assets that Moore and wife had on hand, out of which the judgment which would have been obtained against them, had it not been for appellants' negligence, could have been satisfied, was community property and, as such, would have been subject to a judgment founded on the wife's torts, even though it carried exemplary damages. The difficulty of trying two cases in one involved in this case, is more apparent than real. For the jury trying the case had only to put itself in the place of a jury in the Frazer-Moore Case, and determine what would have been its verdict, in order to ascertain what would probably have been the verdict had such case been tried. What would have been its verdict is a safe criterion in determining what would have been the verdict of another jury in such case. Having in this manner determined what such verdict would have been, they would, then, only have to ascertain what amount could have been collected on a judgment entered on such verdict, and then find for plaintiff such amount; for

such was her damages for which appellants, if negligent, were liable.

What we have said, in connection with our former opinion, we believe, disposes of all the questions raised by the assignments of error, and brings us to an affirmance of the judgment. In affirming it, it is needless to say what would have been the findings of this court had the facts been presented to us in the first instance. Suffice it to say that, in our opinion, there is evidence tending to support the findings of the jury, which places it beyond our power to invade its province. And yet, it is not without regret that it becomes our duty to affirm a judgment, on grounds of negligence, against attorneys known by the court to be competent, diligent, and faithful in the discharge of their duties to their clients.

Affirmed.

**All Citations**

93 S.W. 146

Footnotes

\*       Writ of error granted by Supreme Court.

**End of Document**                                           © 2015 Thomson Reuters. No claim to original U.S. Government Works.

TT

848 S.W.2d 833
Court of Appeals of Texas,
Houston (14th Dist.).

Christopher D. RHODES, Appellant,

v.

Ione A. BATILLA, Appellee.

No. A14–92–00154–CV. | Feb. 18,
1993. | Rehearing Denied March 18, 1993.

Client brought legal malpractice suit against tax attorney. The 334th District Court, Harris County, Russell T. Lloyd, J., entered judgment on jury verdict awarding client actual and exemplary damages, and attorney appealed. The Court of Appeals, Sears, J., held that: (1) acts of attorney hired by client to defend her against tax assessment were sufficient to be negligence on part of attorney; (2) award of $125,000 in exemplary damages was not excessive; and (3) client's response to attorney's interrogatories revealed that client had personal knowledge of facts relevant to lawsuit, and thus, her testimony was not required to be excluded on grounds that she was not properly identified as fact witness in interrogatories.

Affirmed.

West Headnotes (34)

**[1]** **Attorney and Client**
Trial and judgment

Generally, determination of negligence, causation and damages in legal malpractice action are questions of fact for jury.

1 Cases that cite this headnote

**[2]** **Attorney and Client**
Trial and judgment

After jury makes its factual determinations in legal malpractice suit, court then determines legal question of whether facts found by jury are professional misconduct; if trial court determines that facts constitute professional misconduct, then it enters judgment in favor of plaintiff.

1 Cases that cite this headnote

**[3]** **Attorney and Client**
Acts and omissions of attorney in general

Acts of attorney hired by client to defend her against tax assessment, in signing form which consented to assessment of responsible person tax against her even though client had instructed him to show Internal Revenue Service (IRS) that she was not responsible person, advising client to get "paper divorce" to thwart IRS collection attempts, and neglecting to discuss consent form with client were sufficient to be negligence on part of attorney; additionally, even after he signed consent form, attorney never told client about consenting to assessment, and attorney terminated relationship with client leaving her in ignorance of status of her case and without taking any steps to protect her interest.

Cases that cite this headnote

**[4]** **Attorney and Client**
Trial and judgment

Additional instructions tying issues in legal malpractice suit to proper prosecution of case by attorney were not warranted, where client did not suffer damages because attorney failed to properly prosecute case, but instead claimed damage because attorney failed to defend case, he advised getting a "paper divorce," and he secretly consented to assessment of tax against her; instructions submitted to jury satisfied four elements of duty, breach of duty, proximate cause, and damages. Vernon's Ann.Texas Rules Civ.Proc., Rule 277.

Cases that cite this headnote

**[5]** **Attorney and Client**
Pleading and evidence

Evidence was sufficient to support jury's finding that negligent conduct by attorney, who represented her in connection with responsible person tax assessed by the Internal Revenue Service (IRS), caused client's damage; evidence indicated that attorney signed form consenting

to assessment without telling client, advised client to get "paper divorce" to thwart collection attempts, and terminated relationship without taking any steps to protect her interest.

Cases that cite this headnote

**[6]** **Attorney and Client**
Acts and omissions of attorney in general

Failure of client to appeal final assessment of responsible person tax by the Internal Revenue Service (IRS) did not preclude her from establishing malpractice by attorney, who signed form consenting to assessment on client's behalf without client's knowledge, despite defendant's contention that client should be compelled to exhaust administrative or judicial remedies; no administrative agency within IRS or elsewhere should have considered malpractice claim prior to filing suit in trial court.

Cases that cite this headnote

**[7]** **Administrative Law and Procedure**
Exhaustion of administrative remedies

Generally, exhaustion of remedies doctrine is utilized to prevent plaintiff from litigating issue in court which should have been first considered by administrative agency.

Cases that cite this headnote

**[8]** **Attorney and Client**
Acts and omissions of attorney in general

Attorney, who according to his own testimony was tax expert, was properly held to standard of care which should be exercised by reasonably prudent tax attorney.

2 Cases that cite this headnote

**[9]** **Attorney and Client**
Skill and care required

Generally, standard of care for attorney is that which would be exercised by reasonably prudent attorney, based on information attorney had at time of alleged act of negligence.

1 Cases that cite this headnote

**[10]** **Attorney and Client**
Trial and judgment

Jury instructions describing defendant attorney as "tax attorney" and client as "layman" were not abuse of discretion, in legal malpractice suit; attorney held himself out as tax attorney, and client was layperson.

Cases that cite this headnote

**[11]** **Attorney and Client**
Damages and costs

Facts of malpractice by attorney, who signed consent to responsible person assessment without knowledge of client and who advised her to obtain "paper divorce," offended public sense of justice and propriety sufficient to support award of exemplary damages, and award of $125,000 was not excessive, in light of actual damages award of $125,500.

Cases that cite this headnote

**[12]** **Damages**
Grounds for Exemplary Damages

Factors to consider when reviewing exemplary damages are: nature of wrong; character of conduct involved; degree of culpability of wrongdoers; situation and sensibilities of parties concerned; and extent to which conduct offends public sense of justice and propriety.

Cases that cite this headnote

**[13]** **Damages**
Actual damage or compensatory damages; relationship and ratio

Amount of exemplary damages awarded must be reasonably proportioned to amount of actual damages awarded.

Cases that cite this headnote

**[14]** **Attorney and Client**

Damages and costs

Evidence of attorney's net worth was factually sufficient to support jury's award of exemplary damages of $125,000, in malpractice suit; attorney testified about rental property from which he received income, acreage he owned, office furniture and equipment, accounts receivable, and sporting equipment, but claimed that none of items had much value and that law practice had zero value.

Cases that cite this headnote

**[15] Attorney and Client**

Pleading and evidence

Evidence of attorney's conscious indifference in investigating and presenting facts to Internal Revenue Service (IRS), which claimed client was liable for responsible person tax, in failing to investigate or correct misleading information he sent to IRS, in failing to recognize effects of signing form consenting to assessment, and in terminating his relationship with client without informing her of status of case was sufficient to support finding of "gross negligence" on attorney's part, as required for awarding exemplary damages.

1 Cases that cite this headnote

**[16] Damages**

Mental suffering and emotional distress

Client, who testified that she suffered severe emotional distress relating to mishandling of her federal responsible person tax defense, dissolution of marriage, and negative affects on her credit by federal tax lien after attorney consented to assessment without knowledge of client, presented sufficient evidence to support award of damages for emotional distress.

Cases that cite this headnote

**[17] Damages**

Mental Suffering and Emotional Distress

In certain circumstances award of emotional distress damages in legal malpractice case is appropriate.

2 Cases that cite this headnote

**[18] Attorney and Client**

Trial and judgment

First attorney's requested "new and independent cause" instruction, based on client's hiring new attorney, was not supported by evidence, which indicated that second attorney represented her for period of only three or four months in connection with federal tax matter, that tax debt had already been assessed against client due to first attorney's execution of consent to assessment, and that second attorney succeeded in having stopped collection activities.

Cases that cite this headnote

**[19] Negligence**

In general; foreseeability of other cause

"New and independent cause" is separate or independent act that destroys causal connection between defendant's negligence and plaintiff's injury, thereby becoming immediate cause of such injury.

1 Cases that cite this headnote

**[20] Negligence**

Proximate Cause

In order for trial court to submit instruction on new and independent cause, there must be some evidence that independent act, rather than defendant's negligence, was responsible for plaintiff's injuries; additionally, trial court does not err in refusing such instruction where act alleged to be new and independent cause is dependent on defendant's negligent act.

Cases that cite this headnote

**[21] Appeal and Error**

Exclusion of evidence

Tax attorney was precluded from complaining upon appeal in malpractice suit about trial court's exclusion of evidence of client's motion for enforcement and clarification, filed by client's husband about a year after divorce, where

attorney never offered to trial court for admission into evidence.

Cases that cite this headnote

**[22] Trial**
🔑 Cumulative evidence in general

Trial court, which admitted client's divorce decree as evidence that she did get her divorce in malpractice suit against attorney who had represented her in tax matter, could refuse to admit into evidence divorce petition or motion for temporary restraining order by husband, as cumulative of evidence elicited in attorney's cross-examination of client; attorney was allowed to establish that petition alleged that grounds for divorce were cruel treatment by husband and that she knew that papers had to be filed in order to obtain divorce.

Cases that cite this headnote

**[23] Privileged Communications and Confidentiality**
🔑 Impeachment or rehabilitation of witnesses

**Privileged Communications and Confidentiality**
🔑 Waiver of privilege

Trial court could allow client, who had presented evidence of her divorce in malpractice suit brought by her against tax attorney, to assert attorney-client privilege as to communications with divorce attorney; client did not put in issue any advice given her by her divorce attorney, and tax attorney was allowed to extensively attack client's credibility regarding her divorce on cross-examination without delving into privileged matters. Rules of Civ.Evid., Rule 503; Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 3.

Cases that cite this headnote

**[24] Appeal and Error**
🔑 Objections to evidence and witnesses

Claims by defendant attorney in malpractice suit that testimony of client's witness should have been excluded on grounds that it was

more prejudicial than probative and because client did not sufficiently state in her answers to interrogatories facts about which witness had knowledge, were not preserved for appeal; attorney objected to testimony on basis that it was hearsay, extraneous, and irrelevant. Rules of Civ.Evid., Rules 402, 403, 802.

3 Cases that cite this headnote

**[25] Evidence**
🔑 Acts and Statements Accompanying or Connected with Transaction or Event

Testimony by client's codefendant in Internal Revenue Service (IRS) collection action on responsible person tax regarding circumstances of meeting with attorney and circumstances of client's filling out forms IRS official gave her at meeting was part of res gestae and not hearsay, and was admissible, in malpractice suit brought against attorney. Rules of Civ.Evid., Rule 402.

Cases that cite this headnote

**[26] Pretrial Procedure**
🔑 Sufficiency; option to produce business records

Client's response to attorney's interrogatories in malpractice suit revealed that client had personal knowledge of facts relevant to lawsuit, and thus, her testimony was not required to be excluded on grounds that she was not properly identified as fact witness in interrogatories.

Cases that cite this headnote

**[27] Pretrial Procedure**
🔑 Identity and location of witnesses and others

**Pretrial Procedure**
🔑 Time, place, and mode of inspection; copying, photographing, and testing

Client, who produced names and addresses of two witnesses and documents complained of by defendant attorney more than 30 days before trial and several days before discovery deadline, was entitled to have documents and witnesses' testimony admitted, despite attorney's contention

that such evidence should have been excluded as discovery sanction.

Cases that cite this headnote

**[28]     Pretrial Procedure**
 Request, notice, or motion and response or objection

Defendant in attorney malpractice suit specifically waived any objection to production of document, by stating at trial that he did not believe he complained to plaintiff that she failed to timely produce documents in question.

Cases that cite this headnote

**[29]     Pretrial Procedure**
 Request, notice, or motion and response or objection

Client was under no duty to produce personal income tax returns, where attorney never requested returns in any request for production, in legal malpractice suit.

Cases that cite this headnote

**[30]     Appeal and Error**
 Particular cases

Client's letter to Internal Revenue Service (IRS) requesting abatement, which was produced four days before trial of malpractice suit against tax attorney, was admitted only for purpose of showing that client had tried to help herself and was cumulative of other evidence establishing such point, and thus, admission of such evidence was harmless, even though letter was produced only four days before trial and well after discovery deadline. Rules App.Proc., Rule 81(b)(1).

1 Cases that cite this headnote

**[31]     Pretrial Procedure**
 Request, notice, or motion and response or objection

Client, who produced to attorney's counsel loan rejection notice within 48 hours of receipt, satisfied duty to supplement discovery by

producing document as soon as it came into her possession, and thus, notice was not required to be excluded, in legal malpractice suit.

Cases that cite this headnote

**[32]     Appeal and Error**
 Discovery and depositions
**Pretrial Procedure**
 Dismissal or default judgment

Determination of good cause for admission of late produced evidence is within sound discretion of trial court and can only be set aside if that discretion is abused.

Cases that cite this headnote

**[33]     Interest**
 Torts;  wrongful death

Trial court's determination that prejudgment interest on award in malpractice suit against tax attorney should accrue from April 25, 1988, was supported by evidence; evidence indicated that by that date client had paid attorney $500 retainer fee, had learned that attorney had sent Internal Revenue Service (IRS) incorrect information, had obtained "paper divorce" on advice of attorney, and had retained new counsel to salvage her case, and that attorney had agreed to tax assessment against client without client's knowledge.

2 Cases that cite this headnote

**[34]     Attorney and Client**
 Damages and costs

Attorney in legal malpractice suit failed to show that deposition copy was not a cost incurred by client pursuant to civil rule, and thus, cost of deposition copy was required to be paid by attorney, as the losing party in malpractice suit. Vernon's Ann.Texas Rules Civ.Proc., Rules 131, 133, 140.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*837** W. Stephen Rodgers, Charles Escher, Houston, for appellant.

David A. Furlow, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and SEARS and ELLIS, JJ.

## OPINION

SEARS, Justice.

Ione A. Batilla (Batilla), appellee, brought suit for legal malpractice against Christopher D. Rhodes, appellant. Trial was to a jury which found gross negligence in appellant's handling of Batilla's tax defense from the Internal Revenue Service (IRS). Judgment was entered on the verdict in favor of Batilla, awarding her $125,500 in actual, and $125,000 in exemplary, damages. Appellant raises 22 points of error. We affirm.

Batilla's tax liability arose in connection with her employment at Randolph Office Furniture (ROF). Batilla was employed by ROF in January 1980 and left the company in December 1984. While she was with ROF she was employed as controller. She did the company books, worked with a company called ADP to issue payroll checks, and oversaw the purchasing department. Batilla, however, had no authority to sign company checks, even on the payroll account, without the owner's approval. In 1984 and 1985, the company was having financial trouble and eventually went into Chapter 7 bankruptcy. During this time period, the owner, George Randolph (Randolph), refused to approve any checks to pay the company's FICA payroll taxes. At first, ADP would automatically send the payroll taxes to the IRS. However, after two of these drafts bounced, ADP notified Randolph it would not handle the payroll taxes and would not be responsible for non-payment of these taxes. Thereafter, on the advice of the company attorney, Batilla had someone witness her tender of checks for the taxes to Randolph for his signature. Randolph would either refuse to sign the checks or tear them up. As a result, the ROF payroll taxes were not paid.

In January 1986, Batilla received a call from Mr. Bean with the IRS regarding ROF's unpaid FICA taxes for 1984 and the first quarter of 1985. Mr. Bean wanted to determine if Batilla was a "responsible person" for purposes of assessing a 100% penalty against her, i.e., essentially collecting the unpaid company taxes from her. Batilla called her CPA, Jim Orick (Orick), and told him about the call from the IRS. Orick officed in the same building as appellant, and he referred Batilla to appellant for advice. Orick indicated to Batilla that appellant was a tax expert and could represent her. On January 27, 1986, Batilla called appellant, told him that Orick had referred her, and asked if appellant could help her. Batilla testified appellant assured her he could help. She told appellant of the phone call from Mr. Bean and that the IRS had requested a personal interview. Appellant told Batilla to "go down and talk to Mr. Bean and then come and see him after [she] spoke with Mr. Bean." She testified appellant further advised her "he would call Mr. Bean" and he indicated that "everything would be all right." Further testimony shows appellant told her there would be a $500 retainer fee and "that he would help" her. They set an appointment for early February to meet in person. The same day as this initial telephone consultation, January 27, 1986, appellant filled out a time-slip charging one-half hour to Batilla's account for "several telephone conferences with client [and] [t]elephone call to Mr. Beene of IRS." On January 28, 1986, appellant filled out a time-slip for Batilla's account reflecting one hour for "[p]reparation of Power of Attorney and letter to Mr. Beene." At trial, however, appellant testified he really was not retained to represent Batilla, and did not know "whether [he] actually transcribed" the letter.

**\*838** A couple of days after Batilla received the call from the IRS, Larry Owens (Owens), a past president of ROF, also received a call from Mr. Bean about the unpaid taxes. Batilla and Owens agreed to meet and go see the IRS agent together on February 6, 1986. Owens testified he did not want "to go to the IRS without professional help," and he asked his long-time friend Joe Hart (Hart), a CPA, to go with him. When they got to the IRS building, Hart told them they would have to sign a power of attorney before he could go into the meeting with them. Owens and Batilla signed a power of attorney on the trunk of the car. Hart went in with them and the meeting was a very unpleasant experience. Mr. Bean was "intimidating and rather rough," and treated them as guilty until proven innocent. He refused to let them leave the office until they filled out and signed a Form 4180. Batilla testified that Mr. Bean explained that this form "was not an admission of guilty, but just that [they] had showed up for the meeting." However, Mr. Bean told Batilla if she did not fill out the form he would assess all of the penalty against her. They were not allowed to take the documents with them, get professional help in filling them out, or make any phone calls

to get assistance. Further, they were not allowed to talk to each other while filling them out. Batilla was extremely upset, nervous, "scared to death," and crying during this process.

On February 13, 1986, Batilla and Owens met appellant. Batilla took a copy of her Form 4180 with her to the meeting. She went over it with appellant explaining that in the stress of the moment she had made some mistakes on the form. The most glaring mistake was that she claimed employment at ROF for 1985, while in reality she was not employed there during 1985. She and Owens gave appellant the facts and explained that neither one was a "person responsible" for the payment of ROF's payroll taxes. They provided him with the names, addresses and phone numbers of witnesses who could verify these facts. They discussed the various company bank accounts and they specified on which accounts Batilla and Owens could and could not sign. Batilla explained to appellant that the unpaid FICA taxes came out of the operating account and that she never had signature power on that account. She further told appellant how Randolph would refuse to sign, or would tear-up, the checks to the IRS for the payroll taxes. Appellant, however, testified he did not reduce these facts to writing in order to follow up and investigate, even though this information was vital to Batilla's defense. In fact, appellant took absolutely no notes of this or any other conversation with Batilla, and stated at trial that he did not think it was important to take notes in order to get the facts straight.

At this initial meeting, appellant told them he was a "tax specialist." That he had extensive experience with 100 percent penalty cases and that he was an expert in that area. He explained that his hourly rate was $125 an hour, and had Batilla and Owens each sign a power of attorney. He told Batilla that she had a defendable case. He further indicated she would win, but the case might have to go to trial and that would cost $7,000 to $10,000. Batilla told him at that time she did not have the money to go to court and she wanted him to present the facts to the IRS so they would know she was not a "person responsible" for the taxes. Appellant told both Batilla and Owens he would keep them informed and send them copies of any letters he wrote.

Appellant filled out time-slips that same day, charging .4 of an hour to Batilla for "[p]reparation of Form 2848," and 1.5 hours for "[c]onference with client." Batilla and Owens were subsequently each sent a bill for the $500 retainer fee, which they both paid to appellant. In May 1986, Batilla received a letter from the IRS indicating that efforts to collect the taxes

from Randolph had not resulted in payment. The letter went on to state the IRS proposed to assess all of the penalty against Batilla, and if she agreed to the assessment she was to sign the attached Form 2751. Batilla called appellant and told him she "was not going to sign anything." She informed appellant "he needed to call them up and **\*839** take care of it and give them the facts that he had not given them." Appellant indicated that he would take care of it.

Appellant's time-slips indicate no further activity until June 6, 1986 when he charged Batilla 1.3 hours for "[p]reparation of Letter of Protest [and] [r]eview of notice received regarding 100% penalty," and 2.0 hours for "[p]reparation of protest [and] [r]eview of files for L'Lani corporation." When Batilla got a copy of the protest letter which appellant sent to the IRS, she immediately called appellant to tell him the information in the letter was incorrect and that he needed to give them the true facts. Appellant told her he would take care of it. However, appellant never corrected any of the facts in the protest letter, and testified at trial he was not concerned that the letter contained totally inaccurate information "because it was to the best of [his] knowledge at that time."

In 1986, appellant also gave Batilla advice on protecting her family from tax liability. Mr. Bean had told Batilla he would garnish her wages and her husband's wages. In response, appellant told Batilla the only way she could prevent the IRS from taking her money was to get a "paper divorce," give her assets to her husband, and put any equity that she had in a trust fund for her son. Batilla followed this advice even though her husband was against the idea. Due to the stress of the tax problems and her husband's unhappiness over the divorce, their "paper divorce" became a real divorce.

After the protest letter was sent, appellant's time-slips reflect no further activity on behalf of Batilla until January 20, 1987. In 1987, appellant had several telephone conferences with IRS representatives, met with Larry Fagen (Fagen) of the IRS, talked to Batilla once, talked to Owens at least twice, spent a maximum of three hours researching the law, and sent a letter to Fagen. At the meeting with Fagen, appellant was requested to bring "facts, arguments, and legal authority" to support Batilla's position. Any statements appellant brought to the meeting were to be "in affidavit form or signed under penalty of perjury." However, appellant presented an argument to Fagen at the meeting unsupported by any facts or legal authority. He took no case authority with him to the meeting, and he failed to obtain affidavits from Batilla or any of the witnesses, therefore he had no statement of facts to present to

the IRS. The obvious result was that the meeting was of zero value to Batilla. If the true facts had been given to the IRS, it would have been apparent Batilla had zero liability.

Appellant's time-slips also indicate he had a telephone conference in 1987 with a "witness;" however, none of the witnesses had ever heard from or spoken to appellant. On June 18, 1987, Fagen sent appellant a letter indicating he had tried to contact appellant and follow up on this matter on March 27, 1987, April 8, 1987, April 27, 1987, and May 20, 1987, but all of these attempts had failed. A copy of this letter from Fagen was also sent to Batilla. She was extremely upset when she received the letter, and immediately called appellant. Batilla was concerned that the IRS still did not know the truth of the matter, i.e., Batilla was *not* a "responsible person" and in fact had no authority to issue checks for payroll deductions. Appellant told her he previously had several conversations with Fagen and that he would submit further information to Fagen. On June 25, 1987, appellant sent Fagen a letter indicating he had received the letter of June 18, 1987 and would be submitting further information by July 8, 1987. Appellant took no action, and never gave the IRS the correct facts. Obviously, the IRS assumed Batilla was a "responsible person" for the ROF taxes, and initiated collection procedures.

Sometime in 1987, appellant signed the same Form 2751 that Batilla told him she would not sign, and in doing so appellant agreed to the assessment of the 100% penalty against Batilla. This form was executed without her knowledge or consent. When he signed the form, he drew a line across the bottom and put an asterisk to the right of the line. Then across the middle of the form next to another asterisk he wrote "[t]axpayer retains the option of filing claim and suit for refund." Appellant **\*840** never obtained Batilla's consent, never informed her he had signed this form on her behalf, and never sent her a copy of the signed form.

On November 27, 1987, the IRS sent Batilla a letter stating the case was closed "on the basis agreed upon" and the file was to be sent to the service center for account adjustment and interest computation. Batilla frantically tried to contact appellant. After several phone calls, she finally tracked him down in December 1987. She told him about the letter from the IRS, and appellant told her he had done "everything he could" for her. He stated the case was closed, there was nothing else he could do for her, and she would have to get another attorney. Batilla asked if appellant had sent her copies of everything in his files, and he assured her she had copies of

all documents and correspondence in the file. He still failed to inform Batilla he had agreed to 100% assessment of the taxes against her.

In February 1988, Batilla received a bill from the IRS for $32,124.31 in unpaid FICA taxes for ROF. Batilla went to the IRS in an attempt to clear up the mistake. She was advised to write out the facts of her case and get affidavits from people with personal knowledge of the events. On March 29, 1988, Batilla prepared a letter stating the facts of her case, supported by five affidavits. In early April 1988, Batilla presented her letter and affidavits to the collection officer, Mr. Amdexter (Amdexter), who refused to listen to anything she had to say. He told her he could seize any asset she had to satisfy the debt.

Batilla was subsequently referred to Ben Stevens (Stevens), and she retained him in April 1988 to represent her in this tax matter. In late April 1988, Stevens discovered that appellant had signed the Form 2751, and agreed to the assessment of the 100% penalty against Batilla. Stevens immediately informed her of the agreement. On May 11, 1988, the IRS filed a Federal Tax Lien against Batilla. She began payment on the tax lien. In January 1989, Batilla retained Mary Heafner to represent her in this malpractice action against appellant.

In points of error one and two, appellant complains the trial court erred in not making a ruling regarding any "legal errors" he committed, and in rendering judgment for Batilla. He alleges the trial court should not have submitted questions to the jury about his conduct generally, because an evaluation of his acts or omissions as "legal errors" should have been made by the court as a matter of law. Appellant also contends that because his acts or omissions are in uncertain areas of law, they cannot be negligence.

 **[1]** **[2]** Generally, the determination of negligence, causation and damages in a legal malpractice action are questions of fact for the jury. *Millhouse v. Wiesenthal,* 775 S.W.2d 626, 627 & n. 2 (Tex.1989). In the professional misconduct case cited by appellant, the court made it clear the jury is to determine these factual issues. *Hebisen v. State,* 615 S.W.2d 866, 867–68 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ). After the jury makes its factual determinations, the court then determines the legal question of "whether such facts found by the jury constitute professional misconduct." *Id.* at 868 (citing *Howell v. Texas,* 559 S.W.2d 432 (Tex.Civ.App.—Tyler 1977, writ ref'd n.r.e.)). If the trial court determines the facts constitute

professional misconduct, it then enters judgment in favor of the plaintiff. *See id.* at 867–68.

 **[3]**    Appellant opines that the effect of signing the Form 2751 is uncertain and requires numerous judgment calls, however, this fact does not prevent the jury from finding him negligent in his handling of the case. The fact of the matter is that Rhodes was hired to *defend* Batilla against the tax assessment, and instead he signed a form against her interest which *consented* to the assessment of the tax against her. He signed this form in contravention of his client's instructions that he show the IRS she was not a person responsible for the payment of the tax. Rhodes failed to go to the IRS meeting with the facts and affidavits which would have relieved Batilla of all  **\*841**  liability. In fact he presented incorrect information to the IRS. He advised Batilla to get a "paper divorce" to thwart IRS collection attempts, something a first year law student would have known better than to do. Further, Rhodes failed to appreciate the consequences of signing a Form 2751 before he executed the form. He neglected to discuss this form with Batilla or get her consent before he signed it on her behalf. Additionally, even after he signed the form, Rhodes never told Batilla about consenting to the assessment. Finally, Rhodes terminated his attorney-client relationship with Batilla leaving her in ignorance of the status of her case and without taking any steps to protect her interests. These acts are sufficient to constitute negligence on the part of Rhodes. *See Montfort v. Jeter,* 567 S.W.2d 498 (Tex.1978); *Intercoastal Warehouse Corp. v. Clear Lake Nat'l Bank,* 795 S.W.2d 294, 295 (Tex.App.—Houston [14th Dist.] 1990, writ dism'd w.o.j.); *Southwestern Bell Tel. Co. v. Vidrine,* 610 S.W.2d 803, 805 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.); Beck, *Legal Malpractice in Texas,* 43A BAYLOR L.REV. 1, 21, 51 (1991) (citing *Smith v. Lewis,* 13 Cal.3d 349, 118 Cal.Rptr. 621, 627, 530 P.2d 589, 595 (1975)). We overrule appellant's points of error one and two.

 **[4]**    In point of error three, appellant contends the trial court erred in overruling his objections to the jury charge because it did not contain the controlling questions or instructions necessary to support a recovery for Batilla. Appellant attempts to add questions which Batilla should have asked the jury in order to be entitled to a recovery. He relies heavily on the issues set out in *Cosgrove v. Grimes,* which, unlike this case, was an attorney malpractice case brought by a plaintiff whose lawsuit had not been properly prosecuted.

The Texas Supreme Court in *Cosgrove* stated that "[a]n attorney malpractice action in Texas is based on negligence." *Cosgrove v. Grimes,* 774 S.W.2d 662, 664 (Tex.1989). There are four elements which must be established by the plaintiff in a negligence action: 1) "that there is a duty owed to [her] by the defendant," 2) "a breach of that duty," 3) "that the breach proximately caused the plaintiff injury" and 4) "that damages occurred." *Id.* at 665 (citing *McKinley v. Stripling,* 763 S.W.2d 407 (Tex.1989)).

Under Texas' broad form submission rule, the definitions, instructions, and questions submitted to the jury in this case satisfy the four elements of negligence. *See* TEX.R.CIV.P. 277. The jury found Rhodes to be negligent and that his negligent conduct proximately caused Batilla $125,500 in actual damages. The jury further found Rhodes to be grossly negligent and awarded Batilla $125,000 in exemplary damages.

There was no need for additional questions tieing the issues to the "proper prosecution of the suit," as appellant contends. The Court in *Cosgrove* stated the damages issues in that case should have been asked in terms of "what would the plaintiff's damages have been if the suit had been properly prosecuted?" In this case, Batilla did not suffer damages because of Rhodes' failure to properly prosecute the case, instead she incurred damages because of his failure to defend the case, his advice on getting a "paper divorce," and his secretly consenting to the assessment of the tax against her. Thus, her damages questions were properly tied to the underlying case by determining *Iwhat damages Batilla incurred as a result of Rhodes' negligent conduct, for example, his failure to properly defend the case.* We overrule appellant's point of error three.

 **[5]**    In points of error four and five, appellant complains the trial court erred in overruling his motion for directed verdict, motion for judgment non obstante veredicto and motion for new trial. He alleges the evidence was legally and factually insufficient to establish that a different result would have been obtained with the IRS "but for" his acts or omissions, and that he proximately caused Batilla damage.

Appellant's allegation that the evidence is legally insufficient is a "no evidence" complaint. In reviewing a no evidence complaint we must consider only the evidence and inferences which tend to support  **\*842**  the jury's findings, and disregard all contrary evidence and inferences. *Best v. Ryan Auto Group, Inc.,* 786 S.W.2d 670, 671 (Tex.1990). After such

a review, if we find any evidence of probative force to support these findings, then the findings must be upheld. *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.,* 774 S.W.2d 666, 668 (Tex.1989). *See Southern States Transp., Inc. v. State,* 774 S.W.2d 639, 640 (Tex.1989). When there is a challenge to the factual sufficiency of the evidence, we must review all of the evidence and determine if the weight of the record supports the jury's findings that Rhodes' negligence proximately caused Batilla damages. *Plas–Tex, Inc. v. United States Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989); *In re King's Estate,* 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951). The jury is the sole judge of the credibility of the witnesses and the evidence, and is entitled to resolve any conflicts or inconsistencies in the evidence. *See Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792 (1951); *M.J. Sheridan & Son Co. v. Seminole Pipeline Co.,* 731 S.W.2d 620 (Tex.App.—Houston [1st Dist.] 1987, no writ).

Based on the facts and evidence already discussed in this opinion, there is ample evidence, both legally and factually, to support the jury's finding that Rhodes' negligent conduct caused Batilla damage. We overrule appellant's points of error four and five.

 **[6]**    In point of error six, appellant complains the trial court erred in rendering judgment for Batilla because she had not exhausted her administrative or judicial remedies prior to bringing this action. Appellant cites the United States Supreme Court describing the doctrine of exhaustion of administrative remedies as "the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938).

 **[7]**    Although we agree with appellant's definition of the exhaustion of remedies doctrine, we cannot agree that the doctrine bars Batilla from prosecuting this suit. The United States Supreme Court has generally treated the exhaustion of remedies doctrine "as a jurisprudential doctrine [which does not bar absolutely a court's jurisdiction to hear a case,] and has evaluat[ed] the specific circumstances of the particular case to determine whether the [doctrine] should be applied." *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton TRI Indus.,* 727 F.2d 1204, 1208 (D.C.Cir.1984) (citing *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969)). As a general rule, the exhaustion of remedies doctrine is utilized to prevent a plaintiff from litigating an issue in court which should have first been considered by an administrative agency. *See, e.g., Weinberger v. Salfi,* 422 U.S. 749, 766, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975); *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969); *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938); *Gulf Oil Corp. v. United States Dep't of Energy,* 663 F.2d 296 (D.C.Cir.1981). We know of no administrative agency within the IRS or elsewhere which should have considered Batilla's malpractice claim prior to her filing suit in the trial court.

Further, there was no requirement that Batilla appeal the final assessment by the IRS in order to establish the open and obvious malpractice committed by appellant. We overrule appellant's point of error six.

 **[8]**    In points of error seven and eight, appellant contends the trial court erred in its submission of his case to the jury. He argues submitting the case under the standard applicable to a "tax attorney" is improper because to do so suggests his conduct should be reviewed differently than that of "the reasonably prudent attorney." Additionally, appellant alleges the instructions to the jury describing Batilla as a "layman" and him as a "tax attorney" emphasized Batilla's contentions and amounted to an improper comment on the weight **\*843** of the evidence, resulting in reversible error.

 **[9]**    As a general rule the standard of care for an attorney being sued for malpractice is set out as follows:

> A lawyer in Texas is held to the standard of care which would be exercised by a reasonably prudent attorney, based on the information the attorney has at the time of the alleged act of negligence.

*Cosgrove,* 774 S.W.2d at 664; *Dyer v. Shafer, Gilliland, Davis, McCollum & Ashley, Inc.,* 779 S.W.2d 474, 477 (Tex.App.—El Paso 1989, writ denied). In other areas of professional malpractice, such as medical malpractice, a practitioner "who holds himself out as a specialist is generally expected to possess a higher degree of skill and learning than a general practitioner." *King v. Flamm,* 442 S.W.2d 679, 681 (Tex.1969). Other jurisdictions have applied this standard to attorneys and have held that an attorney who holds himself out as a specialist or expert in a field is held to the standard of the reasonably prudent expert attorney in that field. *See Rodriguez v. Horton,* 95 N.M. 356, 359, 622

P.2d 261, 264 (App.1980); *Wright v. Williams,* 47 Cal.App.3d 802, 121 Cal.Rptr. 194 (Ct.App.1975). *See also* Beck, *Legal Malpractice in Texas,* 43A BAYLOR L.REV. 1, 70 (1991) (citing *Smith v. Lewis,* 13 Cal.3d 349, 118 Cal.Rptr. 621, 627, 530 P.2d 589, 595 (1975)).

We see no reason why this standard of care for one who holds himself out as an expert or specialist should not apply to appellant. According to his own testimony, appellant is a "tax expert." Batilla testified he held himself out to her as a tax specialist who was familiar with 100% penalty cases, and that he would have no troubling taking care of her case. Thus, appellant was properly held to the standard of care which would be exercised by a reasonably prudent tax attorney.

 **[10]** As to the jury instructions which described appellant as a "tax attorney," and Batilla as a "layman," we find no abuse of discretion in the trial court's use of these terms. We agree with appellant that in most legal malpractice cases the plaintiff will be a layperson. However, the fact of the matter is appellant held himself out as a tax attorney, and Batilla was a layman. We do not find the use of these terms to be an improper comment on the weight of the evidence. We overrule appellant's points of error seven and eight.

 **[11]** In points of error nine, ten, and eleven, appellant complains the trial court erred in awarding $125,000 in exemplary damages. He alleges the amount of exemplary damages found by the jury is excessive and there is insufficient evidence of his "net worth" on which to base the award. Appellant also contends there is no evidence or insufficient evidence of "gross negligence" upon which to base the award of exemplary damages.

 **[12]** **[13]** The factors to consider when reviewing exemplary damages are set out in *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981). These five factors "are (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety." *Id.* Further, the amount of exemplary damages awarded must be reasonably proportioned to the amount of actual damages awarded. *Id.* at 910.

Based on the facts discussed earlier in this opinion, we find the nature of the wrong, the character of appellant's conduct, the degree of culpability of appellant, the situation and sensibilities of appellant and Batilla, and the extent to

which appellant's conduct offends the public sense of justice and propriety sufficient to support this award of exemplary damages. Additionally, the amount of exemplary damages awarded was $125,000 and the amount of actual damages awarded was $125,500, a ratio of approximately one to one. The award of exemplary damages was not excessive in this case.

 **[14]** As to appellant's complaint of factually insufficient evidence to show his net worth, we will review all of the evidence and determine if the weight of the record **\*844** supports the jury's award of exemplary damages based upon the evidence of his net worth. *See Plas–Tex, Inc.,* 772 S.W.2d at 445.

Batilla entered into evidence a two page listing of real property held in the name of Christopher Rhodes, either individually, or jointly with other persons, including an office building, rental property, and personal residences. Appellant testified about rental property, from which he received income. He also testified he owned acreage, office furniture and equipment, accounts receivables, three boats, vehicles, residential furnishings, and guns and other sporting equipment. Further, he testified, that in his opinion, none of these items had much value and that his law practice had zero value.

The jury was free to believe or disbelieve appellant's opinion as to the value of his assets. *See Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792 (1951); *M.J. Sheridan & Son Co. v. Seminole Pipeline Co.,* 731 S.W.2d 620 (Tex.App.—Houston [1st Dist.] 1987, no writ). Based on a review of all of the evidence, there is sufficient evidence of appellant's net worth for the jury to have awarded $125,000 in exemplary damages.

 **[15]** Finally, we address appellant's complaint of no evidence or factually insufficient evidence to establish his "gross negligence." The standards of review for no evidence and factually insufficient evidence are set out above under points of error four and five.

The factor which "lifts ordinary negligence into *gross* negligence is the mental attitude of the defendant...." *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex.1981). In order for appellant to be found grossly negligent, Batilla must have shown "that [he] was consciously, i.e., knowingly, indifferent to h[er] rights, welfare and safety." *Id.* Appellant's conduct can be either active or passive in nature, which means

a finding of gross negligence can be based on either his acts or omissions. *Id.*

The record is replete with evidence sufficient to support the jury's finding of gross negligence on the part of appellant. His conscious indifference in investigating and presenting facts to the IRS, in failing to return phone calls from the IRS, in failing to investigate or correct the false and misleading information he sent to the IRS, in failing to research or present any facts, affidavits, or legal authority favorable to his client in his meeting with the IRS, in failing to recognize the effects of signing the Form 2751 before signing it, in signing the form agreeing to the assessment of the tax against his client in direct contravention to the purpose for which he had been retained, in doing so without his client's knowledge or consent, and in terminating his relationship with his client without even informing her of the status of her case, are sufficient to support a finding of gross negligence on appellant's part. We overrule appellant's points of error nine, ten, and eleven.

 **[16]**    In point of error twelve, appellant complains the trial court erred in entering judgment for "emotional distress" damages because the award is excessive and should not have been submitted in the absence of extraordinary or egregious circumstances.

 **[17]**    In certain circumstances the award of emotional distress damages in a legal malpractice case is appropriate. *See Cosgrove v. Grimes,* 774 S.W.2d 662 (Tex.1989); *Heath v. Herron,* 732 S.W.2d 748 (Tex.App.—Houston [14th Dist.] 1987, writ denied). We believe the facts of this case meet the test of extraordinary or egregious circumstances.

Batilla testified she suffered severe emotional distress relating to the mishandling of her tax defense, the dissolution of her marriage, and the negative affect on her credit by the Federal Tax Lien filed after the tax assessment was agreed to by appellant. She testified about her inability to deal with relationships, both personal and professional, about her weight loss, her inability to sleep, spastic stomach, sporadic colon ulcers, fear, and nervousness. Batilla told the jury about her loss of credit, the destruction of her banking relationships, the emotional trauma of her divorce and  **\*845** the accompanying property loss, and the pain of trying to help her son understand the divorce and where his father had gone. Other witnesses also testified about Batilla's severe weight loss, nervousness and inability to function. We do not find the award of damages for emotional distress to be improper or excessive. We overrule appellant's point of error twelve.

 **[18]**    In point of error thirteen, appellant complains the trial court erred in not submitting his requested instruction on "new and independent cause" to the jury. Appellant contends Batilla's new attorney, Stevens, was the source of this new and independent cause. He alleges that Stevens represented Batilla from April 1988 until the time of trial in August 1991. During this time period appellant argues Stevens led Batilla to believe she owed the IRS $32,124.31 when in reality the debt was already paid in full.

 **[19]**    **[20]**    A "new and independent cause" is a separate or independent act that destroys the causal connection between a defendant's negligence and a plaintiff's injury, thereby becoming the immediate cause of such injury. *Tarry Warehouse & Storage Co. v. Duvall,* 131 Tex. 466, 115 S.W.2d 401, 405 (1938); *Allied Bank West Loop, N.A. v. C.B.D. & Assocs., Inc.,* 728 S.W.2d 49, 55 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). In order for a trial court to submit an instruction on new and independent cause, "[t]here must be some evidence that the independent act, rather than the defendant's negligence, was responsible for the plaintiff's injury." *Allied Bank West Loop, N.A.,* 728 S.W.2d at 55 (citing *Goldstein Hat Mfg. Co. v. Cowen,* 136 S.W.2d 867, 873 (Tex.Civ.App.—Dallas 1939, writ dism'd judgmt cor.)). Additionally, a trial court does not err in refusing a new and independent cause instruction "where the act alleged to be a new and independent cause is dependent on the defendant's negligent act." *Id.* (citing *McAllen Kentucky Fried Chicken No. 1, Inc. v. Leal,* 627 S.W.2d 480, 483 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.)).

There is no evidence to support appellant's contention that Stevens represented Batilla from April 1988 until August 1991. Both Batilla and Stevens testified that Stevens represented her for a period of approximately three or four months, from April 1988 until July 1988. Stevens further testified his only subsequent contact with Batilla had been through his involvement in this lawsuit as an expert witness. When Stevens first represented Batilla, the tax debt had already been assessed against her on February 15, 1988 due to appellant's execution of the Form 2751. Although Batilla was unaware that appellant had agreed to the IRS' claim, she was aware the IRS was going to execute on her property to collect on the debt. Once he was retained on the case, Stevens got the collection activities against Batilla stopped, and worked out an installment plan with the IRS for payment of the tax debt.

Further, there is no evidence to support appellant's contention that the tax debt was paid off for the period from April 1988 to August 1991, and certainly no evidence to support his contention that the debt was paid off during the period of Stevens' representation. The record is devoid of evidence establishing when the majority of the tax debt was paid or who paid it off. The only evidence in the record is Batilla's testimony that on August 12, 1991 she paid the final $69 owing on the account in order to zero out the balance. This pay-off of the remaining debt was subsequent to the period of Stevens' representation. During the period of Stevens' representation, the collection efforts by the IRS were ongoing, and Batilla was still receiving phone calls from Amdexter regarding the tax debt. Even after Stevens' representation had ceased, there is evidence that the debt was still owing since the IRS sent Batilla a letter dated October 10, 1988, notifying her they were seizing $664.01 of her 1987 tax refund to be applied to the ROF tax debt. Additionally, there was evidence that, pursuant to the Form 2751 signed by appellant, the IRS filed a Federal Tax Lien against Batilla which was outstanding for the period from May 2, 1988 until August 1991. This tax lien adversely affected her **\*846** credit and contributed to her mental and emotional distress. We find no evidence to support the submission of a new and independent cause instruction to the jury. Appellant's point of error thirteen is overruled.

In points of error fourteen and fifteen, appellant complains about the admission and exclusion of certain evidence regarding Batilla's divorce. He alleges the trial court erred in excluding Batilla's divorce papers which were put in issue by her testimony, and claims this exclusion of evidence resulted in harmful error. Additionally, appellant contends the trial court erred by allowing Batilla to claim an attorney-client privilege regarding advice from her divorce attorney, while at the same time allowing her to testify about the reasons for, and affects of, her divorce.

 **[21]**   The divorce papers appellant is complaining about are Batilla's petition for divorce, a motion for temporary restraining order and temporary orders as to custody and support of Batilla's son, and a motion for enforcement and clarification filed by Batilla's husband approximately a year after the divorce. Appellant is precluded from complaining on appeal about the motion for enforcement and clarification because he never offered it to the trial court for admission into evidence.

 **[22]**   As to the other two documents, appellant attempted to offer them into evidence during his cross-examination of

Batilla. At trial, Batilla testified she got a divorce because of Rhodes' advice to protect her family from the IRS's collection efforts. The trial court admitted Batilla's divorce decree as evidence that she did indeed get a divorce. Although the trial court refused to allow either the divorce petition or the motion for temporary restraining order into evidence, it did allow appellant to question Batilla extensively regarding these documents. The trial court did not abuse its discretion in refusing to admit these two documents into evidence as they were cumulative of the evidence elicited in appellant's cross-examination of Batilla. *See Mottu v. Navistar Int'l Transp. Corp.,* 804 S.W.2d 144, 147 (Tex.App.—Houston [14th Dist.] 1990, writ denied).

Appellant was allowed to establish that the petition alleged the grounds for divorce were cruel treatment by her husband, and that her divorce attorney talked to her about the divorce in order to draft and file the petition. Appellant was also able to establish that the petition indicated she needed protection from her husband, and that she got a temporary restraining order entered protecting her from her husband. Finally, he was able to establish that she knew these papers had to be, and were, filed in order to get a divorce, although she alleged she had not seen these documents and was not aware of their contents. This is exactly the relevant information appellant claims in his brief the jury could have gotten from having the documents entered into evidence. Thus, error, if any, was harmless. TEX.R.APP.P. 81(b)(1).

 **[23]**   Appellant also complains the trial court erred by allowing Batilla to claim an attorney-client privilege regarding any advice given by her divorce attorney. Generally, attorney-client communications are protected from discovery by the attorney-client privilege. TEX.R.CIV.EVID. 503; TEX.R.CIV.P. 166b(3). Batilla did not put in issue any advice given her by her divorce attorney. Additionally, appellant was allowed to extensively attack Batilla's credibility regarding her divorce on cross-examination without delving into privileged matters. *See* TEX.R.APP.P. 81(b)(1). Thus, the trial court did not abuse its discretion by allowing Batilla to assert the attorney-client privilege as to communications with her divorce attorney. We overrule appellant's points of error fourteen and fifteen.

 **[24]**   In points of error sixteen and seventeen, appellant complains the trial court erred in admitting Owens' testimony. He alleges that Owens was not properly identified in Batilla's answers to interrogatories. Appellant also contends Owens

should not have been allowed to testify about his own separate, extraneous dealings with Batilla and the IRS.

 **\*847** Appellant asked in interrogatory number 10 for the identity of persons with knowledge of relevant facts and the substance of their testimony. Batilla's answer in pertinent part was "Larry Owens (Also met with Defendant)." At trial appellant objected to Owens being called as a witness because he had not been properly identified since Batilla did not provide sufficient information about him in her interrogatory answer.

Owens was identified by Batilla as a witness. His address and phone number were easily ascertained from appellant's own business records since he was one of appellant's own clients. Also, Batilla filed a number of supplemental responses to interrogatories and requests for production prior to trial, including an affidavit by Owens stating his address, phone number and the facts surrounding Batilla's employment and duties at ROF.

At trial, appellant objected to Owens' testimony on the basis it was hearsay, extraneous, and irrelevant. *See* TEX.R.CIV.EVID. 402, 802. In his brief, however, appellant also argues the trial court should have excluded this evidence under TEX.R.CIV.EVID. 403, and because Batilla did not sufficiently state in her answers to interrogatories the facts about which Owens had knowledge. Appellant never raised either objection at trial; therefore, they are not preserved for appeal.

 **[25]** According to appellant's own attorney, Batilla and Owens were co-debtors or co-defendants in the IRS's collection action on the ROF taxes. The evidence is uncontroverted they went together to the IRS to meet with Mr. Bean. Owens was an eye-witness to the entire event. Additionally, it is uncontroverted Owens and Batilla went together to the meeting with appellant. Appellant's representation of Batilla, or the inadequacy thereof, on the ROF tax debt is what this suit is all about. Thus, this evidence is not about some extraneous event, but is the crux of the cause of action for legal malpractice.

This evidence was also relevant to show the circumstances surrounding Batilla's filling out the forms Mr. Bean gave her at the meeting, and to show the circumstances surrounding Batilla's initial meeting with appellant. *See* TEX.R.CIV.EVID. 402. Further, some of the testimony complained of by appellant was offered to rebut his testimony

about what information Owens and Batilla gave him at their initial meeting, and how well he used or followed up on that information.

We hold the trial court properly found the evidence was part of the res gestae and was not hearsay. *See* TEX.R.CIV.EVID. 803. BLACK'S LAW DICTIONARY 1173 (5th ed. 1979). We overrule appellant's points of error sixteen and seventeen.

In point of error eighteen, appellant complains that Batilla's testimony should have been excluded because she was not properly identified as a fact witness in her answers to interrogatories.

 **[26]** Appellant claims that party status does not constitute good cause for nondisclosure of a witness in answers to interrogatories. He cites us to *Smith v. Southwest Feed Yard, Ltd.,* 811 S.W.2d 717 (Tex.App.—Amarillo 1991, writ pending). The *Smith* case was reversed and remanded by the Texas Supreme Court in a published opinion dated June 24, 1992, a week before we heard this case on submission. *See Smith v. Southwest Feed Yards,* 835 S.W.2d 89 (Tex.1992). The Texas Supreme Court created a limited exception under which a party may be allowed to testify despite the fact he failed to identify himself as a witness in answers to interrogatories. *Id.* at 90–91.

The *Smith* opinion stresses that "[a] party cannot disregard procedural rules and still insist upon an *absolute* right to testify in all circumstances." *Id.* at 90 (emphasis added). However, "[t]he importance attached to a party's ability to testify in his or her own behalf [does] constitute[ ] an additional factor [which] the trial court must consider in making its good cause determination." *Id.* The Supreme Court goes on to state that "[i]n determining whether 'good cause' exists to permit his testimony, the substance of [a party's] entire response should be considered, not just **\*848** his incomplete reply to a single query." *Id.* at 91.

After a review of the facts and circumstances of this case, we find the trial court was correct in overruling appellant's objection to Batilla's testifying. This is a legal malpractice case, and the importance of Batilla being able to testify as to the circumstances of appellant's representation weighs heavily in her favor. Further, a review of her entire response to appellant's interrogatories reveals Batilla had personal knowledge of facts relevant to this lawsuit. *See id.* Batilla answered interrogatories as follows:

3. During meeting in Defendant's office on February 13, 1986, Defendant told me he was a tax specialist. On approximately June 28, 1986, I received a copy of a letter from Defendant to Lawrence M. Fagen of the IRS in which Defendant's letterhead reads "Board Certified Tax Attorney."

4. On approximately May 16, 1986, I called Defendant on the telephone and stressed that I would not be signing any forms which caused me to incur unnecessary tax liability. Despite that fact, Defendant signed Form 2751 where by I incurred unnecessary tax liability.

11. IRS has set up a payment schedule. Have called my home several times. The IRS withheld my 1987 tax refund and applied it to the penalty I incurred because of Defendant's actions. The IRS has filed a personal tax lien against me. The IRS has contacted my banker and informed him of the action they have against me.

These answers, and several others, in Batilla's 21 original answers to appellant's interrogatories, show that she had unique knowledge of relevant facts. We overrule appellant's point of error eighteen.

 **[27]**   In point of error nineteen, appellant complains the trial court erred in admitting numerous items of evidence, and in allowing two witnesses, John Mingus (Mingus) and Elsie Ford (Ford), to testify. He states he served interrogatories and requests for production on April 3, 1990, and did not receive the documents or witnesses' names until shortly before trial.

This case went to trial on August 26, 1991. On July 24, 1991, Batilla supplemented her responses to appellant's interrogatories and requests for production. In that supplement, she provided the names and addresses of both Mingus and Ford, and produced the notice from the IRS seizing her 1984 tax refund. These names, and one of documents complained of by appellant, were produced more than 30 days before trial and several days before the July 30, 1991 discovery deadline. The trial court did not err in admitting this document and the witnesses' testimony.

Appellant also complains specifically about the admission of Batilla's W–2 form, her 1985 income tax return, her decree of divorce, her letter to the IRS requesting abatement, and her loan rejection notice. He alleges he was not served with any of these documents until August 21, 1991, less than a week before trial.

 **[28]**   Appellant has not preserved any complaint for appeal based upon a failure to timely provide the W–2 form. In the trial court appellant did not object based on failure to timely produce, and in fact stated: "I don't believe I complained that you did not give that to me." Appellant specifically waived any objection to the production of this document and there was no error in its admission.

 **[29]**   Appellant never requested Batilla's personal income taxes in any request for production. Thus, she was under no duty to produce the documents. Additionally, the trial court only admitted the tax return for the limited purpose of showing that if Rhodes had used the return in representing Batilla before the IRS, it would have shown she did not receive income from ROF in 1985, was not a ROF employee for that year, and therefore, could not have been a "person responsible" for paying the taxes for that year. The trial court did not err in admitting Batilla's personal tax return.

The record contains excerpts from Batilla's oral deposition indicating that the divorce decree was produced on July 26, 1991 **\*849**  in response to a request for documents. This is at least thirty days before trial and is prior the July 30, 1991 discovery deadline. The trial court did not err in admitting the divorce decree into evidence.

 **[30]**   The next item on the list is Batilla's letter to the IRS requesting abatement. This letter was produced on August 21, 1991, four days before trial and well after the deadline for discovery. The trial court admitted the letter only for the limited purpose of showing that Batilla did take steps to try and help herself with the IRS. There was other testimony establishing that she requested an abatement, requested affidavits from co-workers at ROF in order to prove she was not responsible for the taxes, and met with the IRS to convey this information to Amdexter. Thus, the admission of this document for the purpose of showing she had tried to help herself was cumulative of other evidence establishing that same point, and as such was harmless. *See Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989); *Richardson v. Green,* 677 S.W.2d 497, 501 (Tex.1984). *See also* TEX.R.APP.P. 81(b)(1).

 **[31]**    **[32]**   Finally, as to Batilla's loan rejection notice, Batilla's counsel explained to the trial court that she could not have produced the document any sooner, since it was dated August 12, 1991. She produced it to appellant's counsel within 48 hours of receipt. Determination of good cause for

the admission of late produced evidence is within the sound discretion of the trial court and can only be set aside if that discretion is abused. *Morrow v. H.E.B., Inc.,* 714 S.W.2d 297, 297–98 (Tex.1986). Logic dictates that a document cannot be produced until after it is received. Batilla's counsel satisfied the duty to supplement as soon as it came into her possession. The trial court did not abuse its discretion, and we overrule appellant's point of error nineteen.

In point of error twenty, appellant contends this Court should reverse the trial court's judgment based on the cumulative effect of all errors. Having found no error, appellant's point of error twenty is overruled.

 **[33]**  In point of error twenty-one, appellant complains the trial court erred in awarding pre-judgment interest to Batilla because the evidence did not establish with reasonable certainty when such interest should begin to accrue. Appellant contends the April 25, 1988 date set by the trial court from which pre-judgment interest was to accrue was not proper.

By April 25, 1988, Batilla had already paid appellant the $500 retainer fee, learned appellant had sent the IRS incorrect information, obtained her divorce, appellant had agreed to the tax assessment against her, the IRS had seized a $664 tax refund, and Batilla had retained new counsel to salvage her

case with the IRS. The trial court did not err in ordering pre-judgment interest to begin accruing on April 25, 1988. We overrule point of error twenty-one.

In point of error twenty-two, appellant complains the trial court erred in allowing Batilla to include as costs of court her cost for copies of two depositions.

 **[34]**  The Rules of Civil Procedure mandate that a "successful party to a suit shall recover of his adversary *all* costs incurred therein, except where otherwise provided." TEX.R.CIV.P. 131 (emphasis added). Additionally, the trial court has the discretion to allocate costs in response to motions by the parties. TEX.R.CIV.P. 133. The rules also provide that "[n]o fee for a copy of a paper not required by law or these rules shall be taxed in the bill of costs." TEX.R.CIV.P. 140. Appellant has failed to show that the deposition copy was not a cost incurred under rule 131, and thus, required to be paid by the losing party. We overrule appellant's point of error twenty-two.

The judgment of the trial court is affirmed.

**All Citations**

848 S.W.2d 833

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

UU

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Kroger Texas Ltd. Partnership v. Suberu, Tex.App.-Dallas, August 18, 2003

952 S.W.2d 515
Supreme Court of Texas.

Kelley RICHEY, Petitioner,

v.

BROOKSHIRE GROCERY CO. d/
b/a Super 1 Food Store, Respondent.

No. 95–0692. | Argued Oct. 22,
1996. | Decided July 9, 1997. |
Rehearing Overruled Oct. 30, 1997.

Grocery store customer who was arrested for allegedly leaving store with concealed pack of cigarettes brought malicious prosecution action against store owner following his acquittal on criminal charges. The 241st Judicial District Court, Smith County, Joe Tunnell, J., entered judgment in favor of customer, and owner appealed. The Court of Appeals, 899 S.W.2d 331, reversed and rendered, and application for writ of error was filed. The Supreme Court, Spector, J., held that owner had probable cause to initiate criminal proceedings against customer, barring customer's malicious prosecution action.

Affirmed.

Cornyn, J., filed dissenting opinion in which Gonzalez, Baker and Abbott, JJ., joined

West Headnotes (11)

**[1] Malicious Prosecution**
 Nature and elements of malicious prosecution in general

Plaintiff in malicious criminal prosecution claim must establish: commencement of criminal prosecution against plaintiff; causation (initiation or procurement) of action by defendant; termination of prosecution in plaintiff's favor; plaintiff's innocence; absence of probable cause for proceedings; malice in filing charge; and damage to plaintiff.

83 Cases that cite this headnote

**[2] Malicious Prosecution**
 Grounds in General

Probable cause, for purposes of malicious prosecution claim, is existence of such facts and circumstances as would excite belief in reasonable mind, acting on facts within knowledge of prosecutor or complainant, that person charged was guilty of crime for which he or she was prosecuted.

36 Cases that cite this headnote

**[3] Malicious Prosecution**
 Grounds in General

Probable cause determination in malicious prosecution case asks whether reasonable person would believe that crime had been committed given facts as complainant honestly and reasonably believed them to be before criminal proceedings were instituted.

34 Cases that cite this headnote

**[4] Malicious Prosecution**
 Presumptions and burden of proof

There is initial presumption in malicious prosecution actions that defendant acted reasonably and in good faith and had probable cause to initiate proceedings; that presumption disappears once plaintiff produces evidence that motives, grounds, beliefs and other evidence upon which defendant acted did not constitute probable cause, and burden then shifts to defendant to offer proof of probable cause.

40 Cases that cite this headnote

**[5] Malicious Prosecution**
 Probable cause

When facts underlying defendant's decision to prosecute are disputed in malicious prosecution action, trier of fact must weigh evidence and resolve conflicts to determine if probable cause exists, as mixed question of law and fact.

11 Cases that cite this headnote

**[6]** **Malicious Prosecution**

  🔑 Probable cause

Probable cause was question of law for court and not trier of fact in malicious prosecution action arising from arrest of grocery store customer, where facts and events leading up to customer's arrest were undisputed. Restatement (Second) of Torts § 673(1)(c).

3 Cases that cite this headnote

**[7]** **Malicious Prosecution**

  🔑 Acts and conduct of accused evidence of probable cause in general

Grocery store owner had probable cause to initiate criminal proceedings against customer, barring customer's malicious prosecution action, where store employees observed customer place pack of cigarettes in his pocket, retain cigarettes in his possession, and pass through checkout line without paying for them. V.T.C.A., Penal Code § 31.03.

4 Cases that cite this headnote

**[8]** **Malicious Prosecution**

  🔑 Preliminary investigations by prosecutor

In malicious prosecution case based on criminal complaint, complainant's failure to make further investigation into suspect's state of mind does not constitute lack of probable cause if all objective elements of crime reasonably appeared to have been completed.

12 Cases that cite this headnote

**[9]** **Malicious Prosecution**

  🔑 Preliminary investigations by prosecutor

Grocery store employees had no duty to inquire into customer's state of mind before causing customer's arrest for shoplifting, in determining whether prosecution was supported by probable cause in subsequent malicious prosecution action, where store manager observed customer

leave store without paying for item in his concealed possession.

Cases that cite this headnote

**[10]** **Malicious Prosecution**

  🔑 Advice of prosecuting officer or magistrate

Grocery store employees' failure to fully and fairly disclose all relevant facts to the police at time of customer's arrest for shoplifting was irrelevant to whether customer's prosecution was supported by probable cause in subsequent malicious prosecution action.

2 Cases that cite this headnote

**[11]** **Malicious Prosecution**

  🔑 Instigation of or participation in prosecution

**Malicious Prosecution**

  🔑 Advice of prosecuting officer or magistrate

**Malicious Prosecution**

  🔑 Acts and conduct evidence of malice

Failing to fully and fairly disclose all material information and knowingly providing false information to prosecutor are relevant to malice and causation elements of malicious prosecution claim but have no bearing on probable cause.

19 Cases that cite this headnote

**Attorneys and Law Firms**

**\*516** Gregory P. Grajczyk, William K. Gleason, Longview, for Petitioner.

Molly H. Hatchell, Mike A. Hatchell, Tyler, for Respondent.

**Opinion**

SPECTOR, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, HECHT, ENOCH and OWEN, Justices, join.

The issue in this malicious prosecution case is whether Brookshire Grocery Store lacked probable cause to initiate criminal proceedings against Kelley Richey. The jury found, along with the other elements of malicious prosecution,

that Brookshire lacked probable cause to file a criminal prosecution against Richey and awarded him damages. The court of appeals reversed, holding that there was no evidence to support the jury's finding on the probable cause issue. 899 S.W.2d 331. We agree with the court of appeals and therefore affirm.

## I.

On December 11, 1989, at approximately 2:30 a.m., Richey entered a Brookshire Super 1 Food Store. Brookshire night manager Russell Farris saw Kelley Richey enter the store and place a pack of cigarettes in his shopping cart. Farris then observed Richey "twiddle" the cigarettes in his hand and later put them in his coat pocket. As night manager, Farris was required to be alert to potential shoplifting, cigarettes topping the list of items commonly taken. As Richey **\*517** checked out, he wrote a check for $51.75 for some groceries and began to bag them. He did not pay for the cigarettes in his pocket. Before walking out of the store, Richey pulled a food carton from one of the bags and read the label. Then Richey proceeded toward the door, stopping near a bin in which customers could place items to be donated to charity. He got a sack, went back to the food aisles and filled the sack with baby food, and paid $8.89 in cash. He still did not pay for the cigarettes. Richey then placed the baby food in the charity bin and left the store.

In the parking lot, Farris and another employee asked Richey if he had forgotten to pay for anything. Richey said that he had not. When Farris mentioned the cigarettes in Richey's pocket, Richey stated that he had inadvertently put them there and offered to pay for them. Following company policy, Farris refused to accept payment for the cigarettes. When the police arrived, Richey asked the police officer to mention in his report that Richey had contributed to the charity bin. Richey was interrogated, given a citation, and released. On his way out of the store, Richey removed the baby food from the charity bin and took it to his car. Farris later signed a sworn complaint charging Richey with theft of the cigarettes.

At the criminal trial, the jury found Richey not guilty after deliberating only a few minutes. Richey then filed this suit for false imprisonment and malicious prosecution. The jury in the civil trial returned a verdict against Richey on his false imprisonment claim but found in his favor on the malicious prosecution claim, awarding him $18,400 in actual damages and $18,400 in exemplary damages. The court of appeals,

with one justice dissenting, reversed and rendered judgment in favor of Brookshire, holding that there was no evidence to support the jury's finding that Brookshire lacked probable cause to prosecute Richey. 899 S.W.2d at 335.

## II.

**[1]** A plaintiff in a malicious criminal prosecution claim must establish

(1) the commencement of a criminal prosecution against the plaintiff;

(2) causation (initiation or procurement) of the action by the defendant;

(3) termination of the prosecution in the plaintiff's favor;

(4) the plaintiff's innocence;

(5) the absence of probable cause for the proceedings;

(6) malice in filing the charge; and

(7) damage to the plaintiff.

*See Coniglio v. Snyder,* 756 S.W.2d 743, 744 (Tex.App.—Corpus Christi 1988, writ denied); *see also Ellis County State Bank v. Keever,* 888 S.W.2d 790, 793–94 (Tex.1994); *Browning–Ferris Indus., Inc. v. Lieck,* 881 S.W.2d 288, 292–93 (Tex.1994). At issue in this appeal is whether Brookshire had probable cause to initiate criminal proceedings against Richey.

**[2]** **[3]** We have long defined probable cause as "the existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor [complainant], that the person charged was guilty of the crime for which he was prosecuted." *Akin v. Dahl,* 661 S.W.2d 917, 921 (Tex.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984); *see Ramsey v. Arrott,* 64 Tex. 320, 323 (Tex.1885) (quoting *Wheeler v. Nesbitt,* 65 U.S. 544, 551–52, 24 How. 544, 16 L.Ed. 765 (1860)). The probable-cause determination asks whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted. *Akin,* 661 S.W.2d at 920–21; *Coniglio,* 756 S.W.2d at 744.

**[4]** Malicious prosecution actions involve a delicate balance between society's interest in the efficient enforcement of the criminal law and the individual's interest in freedom from unjustifiable and oppressive criminal prosecution. *Lieck,* 881 S.W.2d at 290–91. Accordingly, there is an initial presumption in malicious prosecution actions that the defendant acted reasonably and in good faith and had probable cause to initiate the proceedings. *Keever,* 888 S.W.2d at 794; **\*518** *Akin,* 661 S.W.2d at 920. That presumption disappears once a plaintiff produces evidence that the motives, grounds, beliefs, and other evidence upon which the defendant acted did not constitute probable cause. *Id.* The burden then shifts to the defendant to offer proof of probable cause. *Id.*

**[5]** **[6]** Whether probable cause is a question of law or a mixed question of law and fact depends on whether the parties dispute the underlying facts. When the facts underlying the defendant's decision to prosecute are disputed, the trier of fact must weigh evidence and resolve conflicts to determine if probable cause exists, as a mixed question of law and fact. *Akin,* 661 S.W.2d at 920. It has long been true, however, that "[w]hen the facts are not contested, and there is no conflict in the evidence directed to that issue, the question of probable cause is a question of law which is to be decided by the court." *Ramsey v. Arrott,* 64 Tex. 320, 323 (1885); *see also Landa v. Obert,* 45 Tex. 539, 543 (1876) ("[w]hat facts and circumstances amount to probable cause is a pure question of law"). Probable cause in this case, in which the facts and events leading up to Richey's arrest are undisputed, is therefore a question of law for the court and not the trier of fact. *See also, e.g., Daniels v. Finney,* 262 S.W.2d 431, 433 (Tex.Civ.App.—Galveston 1953, writ ref'd n.r.e.); *Montgomery Ward & Co. v. Kirkland,* 225 S.W.2d 906, 908 (Tex.Civ.App.—San Antonio 1949, writ ref'd n.r.e.); RESTATEMENT (SECOND) OF TORTSSSSS § 673(1)(c).

### III.

**[7]** Because lack of probable cause in this case is a question of law, the issue for the Court is whether the undisputed facts underlying the decision to prosecute support a reasonable belief that Richey was guilty of theft. Because Richey concealed merchandise, retained the merchandise in his possession, and passed through the check-out line without paying for the merchandise, the only probable-cause issue is the reasonableness of Brookshire's belief as to Richey's state

of mind at the time of the appropriation. *See* TEX. PENAL CODE § 31.03.

**[8]** **[9]** In a malicious prosecution case based on a criminal complaint, the complainant's failure to make a further investigation into the suspect's state of mind does not constitute lack of probable cause if all objective elements of a crime reasonably appear to have been completed. *See Thomas v. Cisneros,* 596 S.W.2d 313, 317–18 (Tex.Civ.App. —Austin 1980, writ ref'd n.r.e.); *Carswell v. Southwestern Bell Tel. Co.,* 449 S.W.2d 805, 817 (Tex.Civ.App.—Houston [1st Dist.] 1969, no writ). In this case, in which the store manager observed Richey leave the store without paying for an item in his concealed possession, the store employees had no duty to inquire into Richey's state of mind before prosecuting. *See Delchamps, Inc. v. Morgan,* 601 So.2d 442, 445 (Ala.1992) ("Because Morgan undisputedly had a visible pack of cigarettes in her pocket, [the store employee] could have entertained 'an honest and strong suspicion' that she had concealed store property. Therefore, the malicious prosecution count should not have been submitted to the jury."); *Melia v. Dillon Cos., Inc.,* 18 Kan.App.2d 5, 846 P.2d 257, 261 (1993) ("Here, it is uncontested that Melia concealed and failed to pay for merchandise belonging to the store. Consequently, the existence of probable cause in this case is not a jury question."). As one court of appeals has noted, "A private citizen has no duty to inquire of the suspect whether he has some alibi or explanation before filing charges." *Marathon Oil Co. v. Salazar,* 682 S.W.2d 624, 627 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.); *see also* 52 AM.JUR.2D *Malicious Prosecution* § 54 (1970).

Even if Richey's intent to shoplift could not be presumed under these circumstances, the undisputed facts of this case dictate that it was not unreasonable for Brookshire's employees to believe that Richey intended to steal the cigarettes. Richey admitted that he placed the cigarettes in his pocket and did not pay for them. At trial, he testified that his behavior could lead someone to believe that he was shoplifting:

Q I know you had no intent but yet from your actions it looks like somebody was actually shoplifting by picking up those cigarettes and concealing them, isn't that right?

**\*519** A That's right.

\* \* \* \* \* \*

Q And the reason why it was a mistake is because somebody could look at that and think you were in fact shoplifting based on what they observed about your conduct.

A That's right.

Richey thus admitted that it was reasonable to believe that he had committed theft. Neither Richey's charity contribution nor his offer to pay after passing through the checkout line with the cigarettes negates Farris's reasonable belief that Richey intended to deprive Brookshire of the cigarettes. It was therefore reasonable for Brookshire's employees to believe that Richey intended to steal the cigarettes. [1]

 **[10]** Richey argues that Brookshire's failure to fully and fairly disclose all relevant facts to the police constitutes a lack of probable cause. It has been stated that the malicious-prosecution defendant lacks probable cause if he or she makes a material misrepresentation or does not disclose all known material facts in good faith to law enforcement officials. *See, e.g., Ellis County State Bank v. Keever,* 888 S.W.2d at 794–95; *Compton v. Calabria,* 811 S.W.2d 945, 950 (Tex.App.—Dallas 1991, no writ); *Marathon Oil Co.,* 682 S.W.2d at 627; *Eans v. Grocer Supply Co., Inc.,* 580 S.W.2d 17, 21 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ). In *Browning–Ferris Industries, Inc. v. Lieck,* however, we held that knowingly providing false information to a public official satisfies the causation element, rather than the lack-of-probable-cause element, of a malicious prosecution claim. 881 S.W.2d at 293–94.

 **[11]** We similarly conclude today that failing to fully and fairly disclose all material information and knowingly providing false information to the prosecutor are relevant to the malice and causation elements of a malicious prosecution claim but have no bearing on probable cause. The notion that probable cause can be negated by the failure to make a full and fair disclosure seems to have been derived mistakenly from the court of civil appeals' opinion in *Sebastian v. Cheney,* 24 S.W. 970 (Tex.Civ.App.), *rev'd,* 86 Tex. 497, 25 S.W. 691 (1894). In that case, the court of appeals held that the fact that a complainant consults with counsel before making a full and fair disclosure to public officials does not always insulate the complainant from a later malicious prosecution suit. 24 S.W. at 972. Later courts have cited *Sebastian* wrongly, we think, for the proposition that a failure to make a full and fair disclosure in itself constitutes a lack of probable cause. *See, e.g., Eans,* 580 S.W.2d at 21; *Ada Oil Co. v. Dillaberry,* 440

S.W.2d 902, 910 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ dism'd).

The probable cause inquiry asks only whether the complainant reasonably believed that the elements of a crime had been committed based on the information available to the complainant before criminal proceedings began. When a complainant reasonably believes a crime has occurred, the reasonableness of that belief is not negated by the failure to fully disclose all relevant facts to the officer. Thus, the extent of the disclosure to the prosecutor is not probative of lack of probable cause, but rather indicates whether the complainant may have acted with malice or may have, by knowingly providing false information, caused the prosecution. *See Sebastian,* 25 S.W. at 693 (failure to make full disclosure to officer is probative of malice); *Lieck,* 881 S.W.2d at 293–94 (knowingly making false disclosure is probative of causation). Whether Brookshire's employee failed to fully disclose all relevant information to the officer is therefore immaterial to the probable-cause inquiry currently before us. *See Biering v. First Nat'l Bank of Galveston,* 69 Tex. 599, 7 S.W. 90, 92 (1888) ("want of probable cause can never be inferred from proof of malice"). As a matter **\*520** of law, then, we hold that Brookshire had probable cause to initiate criminal proceedings against Richey.

## IV.

Actions for malicious prosecution create a tension between the societal interest in punishing crimes and the individual interest in protection from unjustifiable criminal prosecution. *Lieck,* 881 S.W.2d at 290–91. We are not called upon today to pass on the wisdom of Brookshire's policy of prosecuting customers who reasonably appear to have taken merchandise from the store without paying—regardless of the value of the merchandise taken. In this case, Brookshire should not and cannot be punished for prosecuting Richey when Brookshire's employees saw Richey conceal merchandise, retain the merchandise in his possession, and pass through the check-out line without paying for the merchandise. Accordingly, we affirm the take-nothing judgment of the court of appeals.

CORNYN, Justice, joined by GONZALEZ, BAKER and ABBOTT, Justices, dissenting.

After he was acquitted of shoplifting by one jury, a second jury concluded from the evidence in this case that no reasonable person would have believed that Kelley Richey,

first, paid $51 for groceries, and then paid almost $9 more for groceries that he donated to charity, and then intentionally stole a $1.49 pack of cigarettes when he had the money in his pocket to pay for it. Both juries concluded from the evidence that Richey took the cigarettes by mistake, without any intention to steal them. Nevertheless, five members of this Court hold that the *only* conclusion that may reasonably be drawn from the evidence is that Kelley Richey is a thief. Like the two juries who heard all the evidence in this case, three other members of this Court, one justice on the court of appeals panel, and the trial judge, I disagree.

The practical effect of the Court's holding is breathtaking: *anytime* a person leaves a store without paying for merchandise by mistake, that is, with no intention to steal it, the store owner is always legally justified in pursuing criminal charges against the customer. No other circumstances matter. Even though the innocent customer may eventually be acquitted, as was Kelley Richey, under today's decision, the customer has no recourse for the public humiliation, the damage to one's reputation, and the potentially devastating financial consequences of having to defend oneself in the criminal justice system against false charges.

I object to the Court's actions on two grounds. My first objection is to the Court's transformation of probable cause in this case from a fact question to a legal question. Simply because the "facts and events leading up to Richey's arrest are undisputed," *supra,* 952 S.W.2d at 518, does not mean probable cause is a question of law for the court. While the underlying facts of what happened that night are undisputed, those facts give rise to conflicting inferences. This Court has long held that resolution of conflicting inferences, including those arising from undisputed facts, lies with the factfinder: "If reasonable minds can draw different inferences or conclusions from undisputed facts, a fact issue is presented." *Commercial Standard Ins. Co. v. Davis,* 134 Tex. 487, 137 S.W.2d 1, 2 (1940); *see also Ramo, Inc. v. English,* 500 S.W.2d 461, 467 (Tex.1973); *Mills v. Bartlett,* 377 S.W.2d 636, 638 (Tex.1964); *Cavanaugh v. Davis,* 149 Tex. 573, 235 S.W.2d 972, 977 (1951); *Le Master v. Fort Worth Transit Co.,* 138 Tex. 512, 160 S.W.2d 224, 226 (1942). That the court of appeals or this Court would have drawn a different conclusion from the facts does not authorize substitution of judicial factfinding for the jury's verdict. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634–35 (Tex.1986). Moreover, even if probable cause in this case is a question of law, the Court is still bound to consider all the facts and circumstances, including evidence relevant to Brookshire's

motives, grounds, and beliefs, before applying the law. *See Akin v. Dahl,* 661 S.W.2d 917, 921 (Tex.1983). But the Court's analysis unjustifiably excludes far more evidence than it includes.

Second, contrary to the Court's conclusion, under the proper no-evidence standard of review, Richey produced legally sufficient evidence to support the verdict. Probable cause is the existence of such facts and circumstances **\*521** as would cause the belief, in a reasonable mind, acting on the facts within the knowledge of the complainant, that the person charged was guilty of the crime for which he or she was prosecuted. *Akin,* 661 S.W.2d at 921. Material to this objective inquiry is evidence of the beliefs and motives of the complainant at the time criminal proceedings began; the ultimate guilt or innocence of the accused is immaterial. *Id.* at 920. Thus, to prevail, Richey needed to offer evidence and secure a jury finding that facts and circumstances did not exist at the time criminal proceedings were instituted to support a reasonable belief that he had committed a crime. This, he did.

When reviewing a no-evidence point of error, we consider only the evidence and reasonable inferences that support the verdict and disregard all evidence and inferences to the contrary. *Ellis County State Bank v. Keever,* 888 S.W.2d 790, 794 (Tex.1994). If any evidence supports the finding, the finding must be upheld. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

The basic facts, detailed in the Court's opinion, support the jury's inference and finding that a reasonable person in Brookshire's position would not have believed that Richey had *intended to* steal the cigarettes. While the jury was not required to believe Richey's story and could have rejected it, it was certainly within the jury's power to accept it. Richey paid $51.75 for groceries for his family, re-entered the store to purchase items for charity, paid an additional $8.89 in cash for those items, had cash on hand to pay $1.49 for the cigarettes, and offered to pay for them when he was reminded of his oversight. The jury, in essence, found that a reasonable person would not have believed that a customer who had just paid $51.00 for his own groceries and $9.00 for groceries for charity would intentionally steal cigarettes worth $1.49 when he had in his pocket the money to pay for them.

Jack Millican, Brookshire's Director of Safety and Loss Control, testified that company policy required managers to investigate each suspected shoplifting incident. But, he said, this policy was limited to determining whether the

customer left the store without paying for an item; company policy did not differentiate between criminal and noncriminal takings. Similarly, Kevin Santone, the District Manager, testified that rather than determining whether a taking may have been inadvertent, Brookshire's policy was simply to conclude that the taking was intentional from the taking itself. Once a customer is suspected of being a thief, he said, the customer will always be regarded as such, regardless of the circumstances of the case. Finally, in contrast to Brookshire's policy when dealing with customers, the jury heard that store employees who left without paying for goods would be forgiven for "honest errors." This evidence lends further support to the jury's apparent conclusion that while a reasonable person would have concluded that Richey inadvertently took the pack of cigarettes, Brookshire nevertheless pressed charges against Richey as a matter of course.

The jury could also have disregarded Brookshire's alleged grounds for probable cause because of inconsistencies in the testimony of Russell Farris, the night manager on duty during the incident. He testified that Brookshire stressed accuracy in the internal reports filed by managers, and he told the jury that he had filled out the Richey report while waiting for the police to arrive, so that the details would be "fresh" on his mind. But, neither the internal report nor the police report mention that Richey paid $5 1.00 for his groceries, re-entered the store and paid for more groceries for charity, or had cash on hand to pay for the cigarettes. And, neither report included a litany of other factors that Farris told the jury were important to his decision to press charges: Richey's "shifty looks," "stalling tactics," "nervous" demeanor, and the smell of alcohol on his breath. When, as here, conflicting evidence exists on an issue, the jury's verdict is generally conclusive on such matters as the weight given to the evidence and the credibility of witnesses. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796–97 (1951).

Moreover, Farris's inaccurate report to the police was sufficient by itself to support a finding that probable cause did not exist to prosecute Richey. "[Lack of probable cause] may be demonstrated by proof that the defendant **\*522** made material misrepresentations to the prosecuting officer." *Ellis County State Bank v. Keever,* 888 S.W.2d at 794–95. Texas law requires a complainant to make a "full and fair disclosure of the facts and circumstances known to him at the time.... [U]nless he acts in good faith in disclosing to the prosecuting attorney all material facts known to him, probable cause does not exist." *Marathon Oil Co. v. Salazar,*

682 S.W.2d 624, 627 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). It is only after "a person fairly discloses facts in his possession to the prosecuting officer [that] he has no duty to make further investigation...." *Id.* at 628; *see also Coniglio v. Snyder,* 756 S.W.2d 743, 744 (Tex.App.—Corpus Christi 1988, writ denied) ("Unless a person fairly discloses information to a prosecuting attorney, in good faith, probable cause does not exist."); *Diamond Shamrock Corp. v. Ortiz,* 753 S.W.2d 238, 242 (Tex.App.—Corpus Christi 1988, writ denied) ("[Complainants] generally have a duty to make a full and fair disclosure of all evidence to police and a failure to make material exculpatory information known to the police could be evidence of a hostile motive or insufficient grounds.").

Farris's internal report on the incident read as follows:

> Subject removed 1 pack cigarettes from rack at front of store and placed them in his buggy. Subject went down aisle # 8 (dog food) and placed cigs in pocket of coat. Subject shopped for approx. 15 mins. and left store. Subject was stopped in parking lot.

Farris failed to mention that Richey went through the check-out stand once, paid $51.00 dollars for groceries, saw the charity display, re-entered the store, paid almost $9.00 for more groceries for the charity bin, left the store again, and then offered to pay for the cigarettes outside the store. If one read only the internal report, one would believe that Richey walked down one aisle, put the cigarettes in his pocket, and then left the store without paying for *any food at all,* much less re-entering to pay for more food for charity.

Likewise, Farris's report to the police was incomplete and misleading. The relevant portions of the police report read as follows:

> Farris stated that Richey came into the store and got a shopping cart. Richey then got the above item [the cigarettes] and placed it in the shopping cart. Farris stated that Richey continued to shop for about 15 minutes. Farris advised that while Richey was shopping, Richey took the above listed item out of the shopping cart and placed it inside a coat pocket. Richey then went through the check-

out line and paid for some other items and left the store. Farris then detained Richey in the parking lot and escorted Richey back inside the store.

Obviously, there is no mention by Farris of Richey re-entering the store to purchase more groceries for charity and no mention of Richey's offer to pay cash for the cigarettes upon being reminded of his oversight. Farris omitted only evidence tending to show that the taking was accidental. This is precisely the type of material omission that this Court has held to be evidence that there was no probable cause to press criminal charges. *See Keever,* 888 S.W.2d at 794–95.

The importance of a complete police report cannot be overstated. Retailers wishing to notify the authorities of every case of suspected shoplifting and to avoid the role of amateur police officers may discharge their duty by providing a thorough report to the police and the prosecuting authorities. This allows the authorities to weigh all of the exonerating and incriminating evidence and to make an informed decision regarding the merits of a particular case. While the Court restricts this kind of evidence to the causation or malice elements of malicious prosecution, I view such evidence as relevant to a complaining party's motives and beliefs, and thus probative on the issue of probable cause.

Finally, while Richey did admit that Farris had probable cause to stop him and ask about the cigarettes, he never admitted that a reasonable person would have inferred from the taking itself that the taking was intentional. He never said that Farris should have ignored the groceries that he bought for himself, his re-entry to buy more **\*523** groceries for charity, and his offer to pay cash for the cigarettes. He characterized his taking the cigarettes as a "mistake" and answered affirmatively to a question that assumed that he had no intent to steal. The Court thus confuses the probable cause relevant to a

false imprisonment claim—probable cause to stop—with the probable cause relevant to a malicious prosecution claim—probable cause to believe that the taking was intentional. If Brookshire had to show only that it had probable cause to *detain* Richey to avoid liability for malicious prosecution, then Richey's testimony would dispose of the issue. However, the question is whether probable cause existed, not to stop Richey, but to file a complaint. Instead of evaluating all of the evidence supporting the finding of no probable cause, the Court focuses on the one event that would suggest Richey took the pack intentionally. This fixation on one piece of evidence with regard to one event, to the exclusion of nearly all other evidence, violates the proper standard of review.

"Once these opposing parties have entered into a factual contest on the issue of probable cause, a fact issue is created for resolution by the trier of fact. This is a cornerstone of our judicial system." *Akin,* 661 S.W.2d at 920. Applying this principle, I conclude that Richey produced legally sufficient evidence to support the jury finding that Brookshire pursued criminal charges against him without probable cause. The Court, unfortunately, while acknowledging the need for balance between vigilant law enforcement and the liberty interest of those unjustly accused, creates what is in effect a rule of strict nonliability for store owners—if a customer takes something out of a store without paying for it, regardless of the circumstances, the customer is a thief and the store owner cannot be held liable for malicious prosecution. By turning disputed facts into a question of law in this case, the Court has simply substituted its opinion for that of the jury. I cannot be part of such an illegitimate exercise of power. Accordingly, I dissent.

**All Citations**

952 S.W.2d 515, 40 Tex. Sup. Ct. J. 839

---

Footnotes

1    Contrary to the dissent's rhetoric, we do not conclude that Kelly Richey is a "thief." As the court of appeals noted, "It appears from the record that Richey was acquitted by the municipal court jury because he did not *intend* to shoplift, not because there was a lack of probable cause." 899 S.W.2d at 337. Our holding that Brookshire had probable cause *to believe* that Richey had committed theft is unrelated to Richey's actual innocence or guilt. *See McManus v. Wallis,* 52 Tex. 534 (1880); *Haldeman v. Chambers,* 19 Tex. 1 (1857).



KeyCite Yellow Flag - Negative Treatment

Distinguished by    Hafi v. Baker,    Tex.,    May 13, 2005

962 S.W.2d 28
Supreme Court of Texas.

Richard L. SHEPHERD, M.D., and
Allan Graham, M.D., Petitioners,

v.

Lahoma LEDFORD, Respondent.
TRANSAMERICAN NATURAL GAS
CORPORATION, Southwest Texas Services,
Inc., L.T.V. Energy Products d/b/a Wilson
Manufacturing, Continental Emsco Company d/b/
a Wilson Manufacturing, Wilson–Wichita, Inc. d/
b/a Wilson Manufacturing, and Dana Corporation
d/b/a Wilson Manufacturing, Petitioners,

v.

Nancy Rodriguez FUENTES, Respondent.

Nos. 96–0994, 96–1243.    |    Argued
April 23, 1997.    |    Decided Jan. 29, 1998.
|    Rehearing Overruled March 13, 1998.

Plaintiff claiming to be patient's common-law wife brought wrongful death action based on medical malpractice. The 96th District Court, Tarrant County, entered judgment on jury verdict adverse to physicians. Physicians appealed. The Court of Appeals, Dixon W. Holman, J., 926 S.W.2d 405, reversed and remanded for new trial. In a separate action, alleged common-law spouse of decedent killed in drilling accident brought wrongful death claim against several defendants. The 49th District Court, Zapata County, Manuel R. Flores, J., granted summary judgment to defendants on limitations grounds, and plaintiff appealed. The Court of Appeals, Phil Hardberger, J., 933 S.W.2d 624, reversed and remanded. Applications for writs of error were filed and cases consolidated. The Supreme Court, Baker, J., held that: (1) former family Code provision requiring elements of informal marriage to be proven within one year from end of relationship does not conflict with, and is not supplanted by, two-year limitations period under Medical Liability and Insurance Improvement Act (MLIIA) for medical malpractice or Wrongful Death Act; (2) stipulation that purported spouses had valid common-law marriage relieved wife of burden to prove marriage in order to establish standing to bring wrongful death action for medical malpractice; (3) no formal administration of estate was required under circumstances,

and wife thus had standing to bring medical malpractice suit on behalf of husband's estate; (4) trial court erred in refusing to strike for cause prospective juror who had expressed his bias against defendants in medical malpractice action; and (5) purported wife's failure to initiate proceeding to prove common-law marriage within one year of purported husband's death barred her from subsequently offering any proof of that relationship to establish standing as surviving spouse to bring suit under Wrongful Death Act.

Judgments of Court of Appeals affirmed and remanded in part and reversed and rendered in part.

Hecht, J., filed an opinion concurring in part and dissenting in part in which Phillips, C.J., and Owen, J., joined.

West Headnotes (12)

**[1]    Health**

Limitations;  time requirements

Provision of Medical Liability and Insurance Improvement Act (MLIIA) barring any health care liability claim unless filed within two years from occurrence, notwithstanding any other law, is exclusive statute of limitations for medical malpractice claims. Vernon's Ann.Texas Civ.St. art. 4590i, § 10.01.

1 Cases that cite this headnote

**[2]    Death**

Persons Entitled to Sue

To bring suit under Wrongful Death Act, party is required to prove that he or she was deceased's spouse, child, or parent. V.T.C.A., Civil Practice & Remedies Code § 71.004(a).

4 Cases that cite this headnote

**[3]    Death**

Heirs and next of kin

Heirs at law can maintain survival suit during four-year period allowed for instituting administration proceedings if they allege and prove that there is no administration pending

and none necessary. V.T.C.A., Civil Practice & Remedies Code § 71.021(b).

31 Cases that cite this headnote

**[4]** **Death**

    Special limitations

Former Family Code provision requiring elements of informal marriage to be proven within one year from time of relationship's end did not conflict with, and was not supplanted by, Medical Liability and Insurance Improvement Act's (MLIIA) two-year statute of limitations governing wrongful death action based on medical malpractice; purported wife could have filed proceeding to declare heirship in order to establish existence of her common-law marriage within one year of purported husband's death and then later filed medical malpractice action within its 2-year limitations period. V.T.C.A., Family Code § 1.91(b) (Repealed); Vernon's Ann.Texas Civ.St. art. 4590i, § 10.01.

9 Cases that cite this headnote

**[5]** **Stipulations**

    Nature and essentials in general

"Stipulation" is agreement, admission, or concession made in judicial proceeding by parties or their attorneys respecting some matter incident thereto.

31 Cases that cite this headnote

**[6]** **Stipulations**

    Agreed statement of facts

Stipulation that purported spouses had valid common-law marriage at time of husband's death was signed by counsel for both parties and was accepted by trial court and, thus, became conclusive on existence of marriage and thereby relieved wife of burden to prove common-law marriage in order to establish standing to bring wrongful death action based on medical malpractice, even though wife otherwise would have been barred from establishing common-law marriage by former provision of family code requiring informal marriage to be proven within

one year from end of relationship. V.T.C.A., Family Code § 1.91(b) (Repealed); Vernon's Ann.Texas Civ.St. art. 4590i, § 10.01.

16 Cases that cite this headnote

**[7]** **Executors and Administrators**

    Estate of husband or wife

No formal administration of estate was required, and wife thus had standing to bring medical malpractice suit on behalf of husband's estate, under circumstances that husband owned only personal property at time he died intestate, that property vested immediately in wife, and that family had resolved estate's disposition and paid all debts. V.A.T.S. Probate Code, § 38(b), par. 2.

30 Cases that cite this headnote

**[8]** **Appeal and Error**

    Qualifications and selection, impaneling and oath of jurors

When trial court refuses to disqualify juror for bias or prejudice, complaining party must show that error was harmful by advising trial court, before exercising its peremptory challenges, that court's denial of challenges for cause would force party to exhaust its peremptory challenges and, that, after exercising its peremptory challenges, specific objectionable jurors would still remain on panel. V.T.C.A., Government Code § 62.105(4).

17 Cases that cite this headnote

**[9]** **Jury**

    Subject-Matter of Cause

Prospective juror who had expressed his bias against defendants in medical malpractice action was disqualified as matter of law, and thus, trial court erred in refusing to strike prospective juror for cause when defendants made showing that they would be forced to use peremptory strike on him that they would otherwise have used on another specific objectionable juror.

16 Cases that cite this headnote

**[10] Death**

👉 Special limitations

Former Family Code provision requiring elements of informal marriage to be proven within one year from time of relationship's end does not conflict with or supplant two-year statute of limitations governing wrongful death actions; purported spouse could file other proceeding to establish existence of common-law marriage within one year of purported spouse's death and then later file wrongful death action within 2-year limitations period. V.T.C.A., Family Code § 1.91(b) (Repealed); V.T.C.A., Civil Practice & Remedies Code §§ 16.003(b), 71.004(a).

6 Cases that cite this headnote

**[11] Marriage**

👉 Annulment

Purported wife's failure to initiate proceeding to prove common-law marriage within one year of relationship's end at time of purported husband's death, as required by former provision of Family Code, barred her from subsequently offering any proof of that relationship to establish standing as surviving spouse to bring suit under Wrongful Death Act. V.T.C.A., Family Code § 1.91(b) (Repealed); V.T.C.A., Civil Practice & Remedies Code §§ 16.003(b), 71.004(a).

9 Cases that cite this headnote

**[12] Death**

👉 Nature and form of remedy

Purpose of Wrongful Death Act is to provide means whereby surviving spouses, children, and parents can recover for loss of their family member. V.T.C.A., Civil Practice & Remedies Code § 71.004(a).

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*30** Anthony M. Kuehler, Jennifer M. Andrews, Joseph M. Gallagher, Fort Worth, for Petitioners in No. 96–0994.

David G. McCracken, Allister M. Waldrop, Dallas, Macey Reasoner Stokes, Houston, Michael V. Powell, Dallas, Allan R. King, Corpus Christi, Robert H. Etnyre, Houston, for Petitioners in No. 96–1243.

Margaret I. Henning, Janis M. Calos, William A. Newman, Bruce A. Pauley, Dallas, for Respondent in No. 96–0994.

James K. Jones, Jr., Laredo, Alicia C. Finley–Richter, San Antonio, Arnulfo Gonzalez, Jr., Laredo, for Respondent in No. 96–1243.

**Opinion**

BAKER, Justice, delivered the opinion of the Court, in which GONZALEZ, ENOCH, SPECTOR and ABBOTT, Justices, join.

In these two cases we consider whether former Family Code section 1.91(b) [1] conflicts with Medical Liability and Insurance Improvement Act ("MLIIA") section 10.01 or Texas Civil Practice and Remedies Code section 16.003. We hold that section 1.91(b), as it existed before the 1995 amendment, does not conflict with either section 10.01 of the MLIIA or section 16.003 of the Texas Civil Practice and Remedies Code. Accordingly, we affirm the court of appeals' judgment in *Shepherd v. Ledford,* [2] and reverse the court of appeals' judgment in *Transamerican v. Fuentes.*

## I. BACKGROUND

### A. *Shepherd v. Ledford*

*Shepherd v. Ledford* involves a wrongful death and survival claim for medical malpractice. Lahoma Ledford sued Drs. Richard Shepherd and Allan Graham for the wrongful death of her alleged common-law husband, John Ledford. The medical malpractice action resulted from the doctors' treatment of Mr. Ledford for a heart condition. The jury found for Mrs. Ledford on both causes of action. The trial court rendered judgment on the verdict on the wrongful death claim. However, the trial court partially granted the

defendants' motion for judgment notwithstanding the verdict on the survival claim.

Affirming the trial court in part, the court of appeals held that section 1.91(b) did not bar Mrs. Ledford's cause of action. The court reasoned that section 1.91(b) conflicted with the medical malpractice two-year statute of limitations for wrongful death in section 10.01 of the MLIIA. The court then determined that section 10.01 supplanted section 1.91(b) of the Family Code and held that Mrs. Ledford had two years to bring a wrongful death action as the decedent's wife. Additionally, the court of appeals reversed the trial court's judgment notwithstanding the verdict on the survival claim. The court of appeals determined that Mrs. Ledford did have standing to assert the survival action on behalf of Mr. Ledford's estate. However, the court of appeals reversed and remanded the case for a new trial because the district judge did not disqualify a biased juror. 926 S.W.2d 405.

### B. *Transamerican v. Fuentes*

*Transamerican v. Fuentes* involves a wrongful death claim for ordinary negligence. On October 15, 1993, Nancy Rodriguez Fuentes filed this wrongful death action as Julio Fuentes's alleged common-law spouse. Mr. Fuentes was killed in a drilling rig accident on October 16, 1991. The trial court granted the defendants' motion for summary judgment, and Mrs. Fuentes appealed. The court of appeals reversed the summary judgment **\*31** and remanded the case for trial, holding that Mrs. Fuentes had two years to bring a wrongful death action as Mr. Fuentes's common-law wife. 933 S.W.2d 624.

### II. APPLICABLE LAW

### A. Family Code Section 1.91

When Mrs. Ledford and Mrs. Fuentes filed suit, section 1.91 provided that:

(a) In any judicial, administrative, or other proceeding, the marriage of a man and woman may be proved by evidence that:

(1) a declaration of their marriage has been executed under Section 1.92 of this code; or

(2) they agreed to be married, and after the agreement they lived together in this state as husband and wife, and they represented to others that they were married.

(b) A proceeding in which a marriage is to be proved under this section must be commenced not later than one year after the date on which the relationship ended or not later than one year after September 1, 1989, whichever is later.

TEX. FAM.CODE § 1.91(b).

Legislative history shows that section 1.91(b)'s one year time limit was a compromise alternative to completely abrogating common-law marriages in Texas. *See Russell v. Russell,* 865 S.W.2d 929, 932 (Tex.1993). The Texas Legislature has had a long history of "grudging" tolerance of common-law marriages. *See Russell,* 865 S.W.2d at 931. Thus, the Legislature intended for section 1.91(b) to strictly limit parties' ability to prove a common law marriage. *See Riley v. State,* 849 S.W.2d 901, 903 (Tex. App—Austin 1993, pet. ref'd).

### B. MLIIA Section 10.01

**[1]** The MLIIA provides: "Notwithstanding any other law, no health care liability claim may be commenced unless the action is filed within two years from the occurrence...." TEX.REV.CIV. STAT. art. 4590i, § 10.01. Section 10.01 is the exclusive statute of limitations for medical malpractice claims. *See Bala v. Maxwell,* 909 S.W.2d 889, 892–93 (Tex.1995). In *Bala,* the Court concluded that the phrase "notwithstanding any other law" clearly evinced the Legislature's unequivocal intent that section 10.01 govern when its time limitations conflicts with another law. *See Bala,* 909 S.W.2d at 892–93.

### C. Wrongful Death Act

**[2]** An action to recover damages for wrongful death is for the exclusive benefit of the deceased's surviving spouse, children, and parents. *See* TEX. CIV. PRAC. & REM.CODE § 71.004(a); *see also Rose v. Doctors Hosp.,* 801 S.W.2d 841, 846 (Tex.1990); *Garza v. Maverick Mkt., Inc.,* 768 S.W.2d 273, 276 (Tex.1989); *Brown v. Edwards Transfer Co.,* 764 S.W.2d 220, 222 (Tex.1988). Furthermore, to bring suit under the Wrongful Death Act, a party is required to prove that he or she was the deceased's spouse, child, or parent. *See* TEX.

CIV. PRAC. & REM.CODE § 71.004(a); *See also Garza,* 768 S.W.2d at 275–76; *Brown,* 764 S.W.2d at 220.

### D. Survival Statute

The Survival Statute provides that only a personal representative, administrator, or heir may sue on behalf of an estate. *See* TEX. CIV. PRAC. & REM.CODE § 71.021(b). A person who dies intestate with no children leaves all of his or her estate to his or her spouse as sole heir. *See* Tex. PROB.CODE §§ 37, 38(b)(2). The Wrongful Death Act expressly authorizes the surviving spouse to bring suit on behalf of all wrongful death beneficiaries. However, the Survival Statute is silent about whether and when a spouse may bring a survival claim. *Compare* TEX. CIV. PRAC. & REM.CODE § 71.004(b) *with* TEX. CIV. PRAC. & REM.CODE § 71.021(b).

 **[3]** This Court has determined that generally, personal representatives of the decedent's estate are the only people entitled to sue to recover estate property. *See Frazier v. Wynn,* 472 S.W.2d 750, 752 (Tex.1971). However, circumstances can exist when an heir may have standing to bring suit on behalf of the decedent's estate. Heirs at law can maintain a survival suit during the four-year period the law allows for instituting administration proceedings if they allege and prove that there is no administration pending **\*32** and none necessary. *See Frazier,* 472 S.W.2d at 752.

A family settlement agreement is an alternative method of administration in Texas that is a favorite of the law. *See In re Estate of Hodges,* 725 S.W.2d 265, 267 (Tex.App.—Amarillo 1986, writ ref'd n.r.e.); *Estate of Morris,* 577 S.W.2d 748, 755–56 (Tex.Civ.App.—Amarillo 1979, writ ref'd n.r.e.) Under section 37 of the Probate Code, when a person dies leaving a will, all of the estate devised or bequeathed by the will immediately vests in the devisees or legatees, subject to payment of the decedent's debts. The beneficiaries of an estate are free to arrange among themselves for the distribution of the estate and for the payment of expenses from that estate. *See Tex. Prob.Code § 37; see also Pitner v. United States,* 388 F.2d 651, 656 (5th Cir.1967); *Estate of Hodges,* 725 S.W.2d at 267.

Section 37 also provides that when a person dies intestate, all of his estate shall vest immediately in his heirs at law, subject to payment of the debts of the estate. *See* TEX. PROB.CODE § 37. If the deceased has no children or their descendants, the surviving spouse is entitled to all of the personal estate. *See* TEX. PROB.CODE § 38(b)(2).

### III. ANALYSIS

#### A. *Shepherd v. Ledford*

#### 1. Limitations Period

Because Mrs. Ledford alleged a common-law marriage, as opposed to a formal marriage, she was required to prove the elements of an informal marriage within one year from the time the relationship ended. *See* TEX. FAM.CODE § 1.91(b). The apparent conflict arises, however, because the statute of limitations for medical negligence is two years. *See* TEX.REV.CIV. STAT. art. 4590i, § 10.01; *Bala,* 909 S.W.2d at 893.

Affirming the trial court's judgment, the court of appeals held that section 1.91(b) impermissibly reduced the time Mrs. Ledford had to file her wrongful death suit. The court reasoned that because section 1.91(b) required her to file the wrongful death lawsuit within one year of Mr. Ledford's death and the limitations for a medical malpractice wrongful death claim is two years under section 10.01, section 1.91(b) necessarily conflicted with section 10.01. We disagree.

 **[4]** We hold that section 1.91(b) of the Family Code does not conflict with section 10.01 of the MLIIA. When the one-year time period in section 1.91(b) expires, the party asserting an informal marriage is barred only from proving the marriage's existence. *See Mossler v. Shields,* 818 S.W.2d 752, 754 (Tex.1991).

Mrs. Ledford did not have to file her medical liability claim within one year of Mr. Ledford's death. Rather, she only had to initiate a proceeding to prove the requisite elements of an informal marriage within one year of his death. *See* TEX. FAM.CODE § 1.91(a) & (b). There are legal procedures available for common-law spouses in Mrs. Ledford's situation. For example, Mrs. Ledford could have filed a Proceeding to Declare Heirship to establish the existence of her common-law marriage. *See* TEX. PROB.CODE § 48(a). Or she could have filed the wrongful death claim within one year of Mr. Ledford's death and established the existence of the common-law marriage at trial. The choice was hers, as long as she initiated a proceeding to

prove her informal marriage within the one-year time limit. *See* TEX. FAM.CODE § 1.91(b); *Mossler,* 818 S.W.2d at 754.

Accordingly, we reject the court of appeals' conclusion that section 1.91(b) provided an independent limitations mechanism that directly conflicted with section 10.01. Rather, we hold that section 1.91(b) simply estops a person from claiming that he or she is informally married unless he or she starts a proceeding to establish an informal marriage within section 1.91(b)'s one year time limit. Consequently, the person would be unable to assert standing to sue under the Wrongful Death Act.

This holding is compatible with *Mossler.* In *Mossler,* the petitioner filed a second divorce action after the trial court dismissed with prejudice the initial divorce proceeding. *See Mossler,* 818 S.W.2d at 754. We held that the dismissal with prejudice of Mrs. **\*33** Mossler's first suit estopped her from bringing a second suit for divorce. We then held that section 1.91 prevented Mrs. Mossler from claiming that a common-law marriage existed in the second proceeding, achieving the same result as estoppel based upon a dismissal with prejudice. *See Mossler,* 818 S.W.2d at 754. We specifically noted that public policy supported our decision because the Legislature approved barring stale claims of an informal marriage by enacting the one-year time limit in section 1.91(b) of the Family Code. *See Mossler,* 818 S.W.2d at 754. Therefore, under the law, Mrs. Ledford was required to begin a proceeding to prove an informal marriage within one year from the time the marriage ended.

### 2. The Stipulation

We have held that section 1.91(b) required Mrs. Ledford to begin a proceeding to prove her common-law marriage within one year limit of Mr. Ledford's death, or forfeit the opportunity to establish her standing to bring suit under the Wrongful Death Act. However, under the specific facts of this case, her failure to comply with section 1.91(b) does not bar her wrongful death claim.

Mrs. Ledford sued on November 15, 1991. Despite the fact that she had not complied with section 1.91(b), the court entered an order, which reflected the parties agreement, stating that the parties "stipulated and agreed ... that Lahoma Ledford and John Ledford had a valid common-law marriage, prior to and at the time of John Ledford's death."

 **[5]** **[6]** A stipulation is "an agreement, admission, or concession made in a judicial proceeding by the parties or their attorneys respecting some matter incident thereto." *Ortega–Carter v. American Int'l Adjustment,* 834 S.W.2d 439, 441–42 (Tex.App.—Dallas 1992, writ denied). Counsel for both parties signed the stipulation and thereby judicially admitted that Mr. and Mrs. Ledford were common-law spouses. The trial court accepted the stipulation and thus it became conclusive on the existence of the Ledfords' common-law marriage. *See Herschbach v. City of Corpus Christi,* 883 S.W.2d 720, 733 (Tex.App.—Corpus Christi 1994, writ denied) (citing *Hennigan v. I.P. Petroleum Co., Inc.,* 858 S.W.2d 371, 372 (Tex.1993)) (stating that a "true judicial admission is a formal waiver of proof usually found in ... the stipulations of the parties."). Therefore, because the defendants judicially admitted facts that establish Mrs. Ledford's standing to bring a wrongful death action as Mr. Ledford's surviving spouse, they are estopped from now claiming to the contrary. *See Herschbach,* 883 S.W.2d at 733.

Consequently, the stipulation relieved Mrs. Ledford of her burden to prove her common law marriage, something she would not have been able to prove otherwise, and she had standing to bring the wrongful death action. Accordingly, section 1.91(b) does not apply in this case.

### 3. Survival Suit

Defendants' final contention is that the court of appeals erred in holding that Mrs. Ledford had standing to bring the survival claim on behalf of Mr. Ledford's estate. They assert that Mrs. Ledford lacks standing to sue as Mr. Ledford's heir because she did not plead and prove that no administration was pending or necessary. Defendants contend that when Mr. Ledford died he owed more than the minimum two debts to qualify for an informal estate administration. *See* TEX. PROB.CODE § 178(b).

Mrs. Ledford's evidence showed that Mr. Ledford owned no real property and had no children. Therefore, his personal estate vested immediately in Mrs. Ledford, his surviving spouse. *See* TEX. PROB.CODE § 38(b)(2). Mrs. Ledford testified that by the time of trial all Mr. Ledford's debts had been paid. She also testified that she made an agreement with other family members permitting her to take the minimal assets of Mr. Ledford's estate as his only heir. Defendants did not controvert this evidence.

**[7]** The evidence shows that the family had resolved the estate's disposition and that all debts were paid. Accordingly, no administration was necessary for it would have served no purpose. We see no reason why the *Pitner* rationale approving no administration **\*34** when the devisees under a will make an agreement to distribute the estate and pay the bills does not apply with equal force in the situation where the heirs of an intestate decedent make an agreement to distribute the estate and pay the bills. *See Pitner,* 388 F.2d at 656. Thus, the *Pitner* rationale applies here, where the decedent owned only personal property, and that property vested immediately in Mrs. Ledford. Accordingly, we hold that under the facts and because of the family agreement, no formal administration was necessary. *See In re Estate of Hodges,* 725 S.W.2d at 267; *Estate of Morris,* 577 S.W.2d at 755–56. We conclude the court of appeals correctly determined that Mrs. Ledford had standing to sue on behalf of Mr. Ledford's estate.

### 4. Juror Disqualification

We now turn to Mrs. Ledford's complaint that the court of appeals erred in remanding the case for trial because the trial court did not disqualify an allegedly biased prospective juror. Drs. Shepherd and Graham contend that the trial court abused its discretion in refusing to strike the prospective juror for cause.

**[8]** A prospective juror who admits bias or prejudice is disqualified to serve as a juror. *See* TEX. GOV'T CODE § 62.105(4); *Compton v. Henrie,* 364 S.W.2d 179, 182 (Tex.1963). When a trial court refuses to disqualify a juror for bias or prejudice, the complaining party must show that the error was harmful. To do this, the party, before exercising its peremptory challenges, must advise the trial court that "the court's denial of the challenges for cause would force the party to exhaust its peremptory challenges and, that after exercising its peremptory challenges, specific objectionable jurors would still remain on the panel." *Goode v. Shoukfeh,* 943 S.W.2d 441, 452 (Tex.1997); *Hallett v. Houston N.W. Med. Ctr.,* 689 S.W.2d 888, 890 (Tex.1985).

During voir dire, defendants' counsel elicited statements from three consecutive prospective jurors that none of them could be fair to the defendants because of the results of medical treatment experienced by family members. Defense counsel asked prospective juror Caudill if she could consider the facts objectively and in a neutral way. She replied, "I don't think

so." Next, counsel asked prospective juror Somerville: "You feel that based upon your past experience, you could not be fair and objective in looking at the medical facts as they have been testified to so that both sides start out evenly in this case; is that correct ma'am?" In response, Somerville responded, "That is true." Immediately following this exchange, counsel began to ask the following question of the jury panel, and venireperson Guerra responded:

> COUNSEL: Is there anybody else, after we've listened to this-
>
> GUERRA: *I feel the same way. ...* My dad died of a heart attack also. I just don't like to talk about it because it brings back bad memories. But yeah, I think it would have a—I would have a problem with that.
>
> COUNSEL: [A]s a result of that, you feel that Mrs. Ledford would be—you would feel for her and put her—sort of put her ahead of the defense in this case ... ?
>
> GUERRA: I think so. Like I said, my dad was—after that, for a long, he was in a coma, so I seen [sic] him suffer a lot, and I know what it did to me.

The trial court granted Shepherd's motion to strike Caudill and Somerville for cause. However, despite defendants' showing that Guerra was biased and that they would be forced to use a peremptory strike on Guerra that they would otherwise have used on another specific objectionable juror, the trial court refused to strike Guerra for cause.

**[9]** The court of appeals correctly held that Guerra was disqualified as a matter of law. Guerra expressed his bias, and the trial court should have granted the defendants' motion to strike Guerra for cause. Accordingly, we affirm the court of appeals' judgment and remand this case to the trial court.

### B. *Transamerican v. Fuentes*

#### 1. Limitations—Wrongful Death

**[10]** "A person must bring suit not later than two years after the day the cause of **\*35** action accrues in an action for injury resulting in death." TEX. CIV. PRAC. & REM.CODE § 16.003(b). As we have explained, section 1.91(b) sets the time limit in which a proceeding to prove an informal marriage must be brought. Thus, for the same reasons discussed above,

section 1.91(b) does not supplant or conflict with the two-year statute in section 16.003(b).

It is undisputed that Mrs. Fuentes and Mr. Fuentes were never formally married and never filed a declaration of informal marriage. Thus, the only way Mrs. Fuentes could assert standing to bring this suit under the Wrongful Death Act is if she proved she was Mr. Fuentes's common-law surviving spouse. *See* TEX. CIV. PRAC. & REM.CODE § 71.004(a).

**[11]** Mrs. Fuentes had to initiate a proceeding to prove that she was Mr. Fuentes's common-law surviving spouse within one year of his death. *See* TEX. FAM.CODE § 1.91. However, Mrs. Fuentes did not initiate a proceeding to prove her common-law marriage within section 1.91(b)'s one-year requirement; therefore, she is barred from offering any proof of that relationship.

**[12]** The purpose of the Wrongful Death Act is "to provide a means whereby surviving spouses, children, and parents can recover" for the loss of their family member. *Garza,* 768 S.W.2d at 275. Because section 1.91(b)bars Mrs. Fuentes from proving her standing as Mr. Fuentes's surviving spouse, she cannot maintain her wrongful death action against Transamerican.

### IV. CONCLUSION

#### A. *Shepherd v. Ledford*

While we affirm the court of appeals' judgment in this case, we disapprove of the court of appeals' determination that Family Code section 1.91(b) conflicts with MLIIA section 10.01. Section 1.91(b) is a time limit for bringing a proceeding to prove the requisite elements of a common-law marriage. However, because the parties stipulated to the Ledfords' common-law marriage, Mrs. Ledford had standing to bring a wrongful death claim without meeting section 1.91(b)'s requirements. Furthermore, Mrs. Ledford, as Mr. Ledford's sole heir, also has standing to assert his survival action.

Because the trial court erroneously refused to disqualify venireperson Guerra, despite his apparent bias, we remand this case to the trial court for proceedings consistent with this opinion.

#### B. *Transamerican v. Fuentes*

Mrs. Fuentes had no standing to file a wrongful death claim because she did not file a proceeding to prove the existence of a common-law marriage within section 1.91(b)'s time limit. Therefore, she is barred from maintaining her wrongful death claim against Transamerican. Accordingly, we reverse the court of appeals' judgment and render judgment that Mrs. Fuentes take nothing.

HECHT, J., joined by PHILLIPS, C.J., and OWEN, J., concurs and dissents in part.

HANKINSON, J., not sitting.

HECHT, Justice, joined by PHILLIPS, Chief Justice, and OWEN, Justice, concurring and dissenting in part.

I agree with the Court that Section 1.91(b) of the Family Code bars plaintiffs' recoveries in these two cases. I do not agree, however, that Dr. Shepherd and Dr. Graham's attorney waived applicability of that statute by stipulating that Lahoma and John Ledford had a valid common law marriage. The purpose and effect of the stipulation was merely to obviate the necessity of proof of the marriage at trial; it was not intended to waive defendants' consistent contention that even if a marriage existed, Section 1.91(b) precluded Ledford from asserting it in this action. The Court's contrary conclusion is not supported by the text of the stipulation and is contrary to defendants' intent apparent in the context in which the stipulation was made. I would hold that the stipulation does not preclude the application of Section 1.91(b), and that judgment should be rendered for Drs. Shepherd and Graham, just as the Court renders judgment for TransAmerican Natural Gas Corporation and the other defendants in the companion case. From the affirmance of the **\*36** judgment against Drs. Shepherd and Graham I respectfully dissent.

Ms. Ledford could not sue for John Ledford's death without proving that she had been his wife. *See* TEX. CIV. PRAC. & REM.CODE § 71.004. Ms. Ledford claimed a common-law marriage to John Ledford. Section 1.91(b) requires that a proceeding in which a common-law marriage is to be proved must be brought within one year of the relationship's end. Ms. Ledford did not initiate such a proceeding within the prescribed time period. Thus, as the Court holds, she cannot

recover in this action unless defendants waived applicability of Section 1.91(b).

Before trial Dr. Shepherd and Dr. Graham asserted that Section 1.91(b) prevented Ms. Ledford from recovering for John Ledford's death because this action was undisputedly not brought within one year of the termination of their relationship. Defendants took this position in a motion for summary judgment, a supplemental motion for summary judgment, and a plea in abatement. The district court consistently rejected defendants' argument.

On the first day of trial, counsel for all parties approved a written stipulation "that Lahoma Ledford and John Ledford had a valid common-law marriage prior to and at the time of John Ledford's death." The stipulation was made in the form of an order signed by the district court and approved by counsel. At the close of plaintiff's evidence, defendants moved for a directed verdict on the ground that Section 1.91(b) precluded plaintiff from proving a common-law marriage. Without allowing plaintiff's counsel to respond, the district court denied the motion, stating: "I take this as [defendants' counsel's] preserving her record for purposes of appeal. Since we've addressed this question ... in motions for summary judgment and on other occasions, my ruling will be consistent." Thus, at this point in the trial, several days after the stipulation had been made, the district court, who signed the stipulation, was apparently of the view that defendants had not waived their Section 1.91(b) defense. Had the court thought that the stipulation waived the defense, there would have been no reason to refer to defendants' motion for directed verdict as being made to preserve their complaint for appeal. The district court's statement indicated that defendants had not by their stipulation waived their contention that Section 1.91(b) precluded plaintiff's recovery.

At the close of the evidence, Drs. Shepherd and Graham again moved for a directed verdict based on Section 1.91(b). Again the district court denied their motion without permitting plaintiff to respond. After a verdict against Drs. Shepherd and Graham, they moved for judgment non obstante veredicto, still asserting Section 1.91(b). For the first time, Ms. Ledford argued that defendants waived their contention by their pretrial stipulation. The court denied defendants' motion and rendered judgment against Drs. Shepherd and Graham for $150,000, plus interest.

Unquestionably, Drs. Shepherd and Graham *could* have stipulated that Ms. Ledford would succeed in proving that

she was married to John Ledford if only Section 1.91(b) permitted her to do so, without waiving their argument that Section 1.91(b) precluded her from making such proof. A defendant can stipulate that available evidence would prove a fact without waiving the contention that recovery based on the fact is barred for some other reason. To take another example, a defendant can stipulate that his negligence caused plaintiff's injuries without waiving his contention that plaintiff's claim is barred by limitations. The Court does not, and cannot, argue to the contrary. The question is not *could* defendants make such a limited stipulation, but *did* they.

"Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Sun Exploration & Prod. Co. v. Benton,* 728 S.W.2d 35, 37 (Tex.1987). More than a century ago we said that waiver is " 'largely a matter of intention' ". *Pope v. A.T. Graham & Co.,* 44 Tex. 196, 199 (1875). More recently, we stated: "[W]aiver must be clearly established by facts or circumstances showing an intention by one party to waive and an understanding to that effect by the other." **\*37** *Garner v. Texas State Bd. of Pharmacy,* 304 S.W.2d 530, 534 (Tex.Civ.App.—Eastland 1957, writ ref'd). Neither the intention by Drs. Shepherd and Graham to forego their Section 1.91(b) defense, nor the contemporaneous understanding by Ledford that they had done so, both requisite for waiver under our holding in *Garner,* is present.

I agree with the court of appeals in *United States Fire Insurance Co. v. Carter,* 468 S.W.2d 151, 154 (Tex.Civ.App.—Dallas), *writ ref'd n.r.e.,* 473 S.W.2d 2 (Tex.1971) (per curiam), when it wrote:

> A stipulation is an agreement or contract between the parties made in a judicial proceeding in respect to some matter incident thereto and for the purpose, ordinarily, of avoiding delay, trouble and expense.... Being a contract the stipulation must truly express the intentions of the parties making same. A court will not construe a stipulation so as to effect an admission of something intended to be controverted or so as to waive a right not plainly agreed to be relinquished.

*Accord: Jackson v. Lewis,* 554 S.W.2d 21, 24 (Tex.Civ.App.—Amarillo 1977, no writ) (stating also that a stipulation "will be given no more force than the parties intended it to have");

*see also Discovery Operating, Inc. v. Baskin,* 855 S.W.2d 884, 886 (Tex.App.—El Paso 1993, no writ); *Ortega–Carter v. American Int'l Adjustment Co.,* 834 S.W.2d 439, 441–442 (Tex.App.—Dallas 1992, writ denied); *National Union Fire Ins. Co. v. Martinez,* 800 S.W.2d 331, 334 (Tex.App.—El Paso 1990, no writ). I also agree with the court of appeals in *Mann v. Fender,* 587 S.W.2d 188, 202 (Tex.Civ.App.—Waco 1979, writ ref'd n.r.e.) (quoting *Texas Indem. Ins. Co. v. Dunn,* 221 S.W.2d 922, 924 (Tex.Civ.App.—Waco 1949, no writ)), that "[t]he intention of the parties in a trial stipulation is for the determination of the court from the language used in the entire agreement 'in the light of the surrounding circumstances, including the state of the pleadings, the allegations therein, and the attitude of the parties in respect of the issues.' "

The stipulation does not itself reflect an intention to waive applicability of Section 1.91(b), and there is no other evidence in our record from which that intention can be discerned. To the contrary, Drs. Shepherd and Graham have consistently maintained before trial, during trial, after trial, and on appeal, that Ms. Ledford's recovery is barred by Section 1.91(b). Defendants explained that they agreed to the stipulation as a mechanism for shortening the trial of the case by obviating the need for plaintiff to adduce evidence of her common-law marriage which defendants acknowledged existed but argued was to no avail because of the statute. The district court, who signed the stipulation, was apparently of the view mid-trial that defendants had not waived their position. Ms. Ledford did not assert that defendants had waived their Section 1.91(b) defense until she filed her response to defendants' motion for judgment non obstante veredicto. While it now appears that defendants' counsel would have been prudent to expressly reserve defendants' Section 1.91(b) contention in the stipulation, she was not required to do so. Waiver is the intentional relinquishment of a known right, not the unintentional failure to reserve a known right.

The Court offers no explanation for its holding that Drs. Shepherd and Graham intended to waive a defense they had consistently asserted prior to trial and continued to assert afterward. Absent a clear statement of waiver in the stipulation, any evidence of an intent to waive defenses in defendants' conduct, any evidence that plaintiff understood the stipulation to be a waiver at the time it was made, and any suggestion of a reason why defendants might have intended to waive a position they were continuing to assert, I would hold that Drs. Shepherd and Graham did not waive their defense under Section 1.91(b). The $150,000 judgment against them is simply not their lawyer's fault. Because the Court says it is, I respectfully dissent.

**All Citations**

962 S.W.2d 28, 41 Tex. Sup. Ct. J. 333

Footnotes

1     All references to section 1.91(b) of the Family Code are to section 1.91(b) as it existed before the 1995 amendments and the 1997 recodification. Although we acknowledge that the issues presented in these two cases are unlikely to reoccur because of the amendment, the apparent conflict between the statutes as it affects these parties and others similarly situated is important to the jurisprudence of the state.

2     While the court in *Shepherd* misapplied section 1.91(b), we affirm its judgment on other grounds.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.



KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by**    Rucker v. Killian,    Tex.App.-El Paso,    October 11, 2001

826 S.W.2d 933
Supreme Court of Texas.

Janet SHOEMAKE, Individually
and as Administratrix of the Estate
of Miranda Gilley, Petitioner,

v.

FOGEL, LTD., A.T., Federal Group
I, and International Property
Management, Inc., Respondents.

No. D–0526.    |    Feb. 26, 1992.    |
Rehearing Overruled April 29, 1992.

Apartment complex owners and manager sought contribution for mother's negligent supervision of child in survival action and wrongful death action following near drowning accident in swimming pool. The 153rd District Court, Tarrant County, Sidney Farrar, J., reduced jury's award in wrongful death action but rendered judgment for estate in full amount in survival suit. Defendants appealed. The Fort Worth Court of Appeals, Second Judicial District, Sam Day, J., 795 S.W.2d 903, reversed in part. On application for writ of error, the Supreme Court, Mauzy, J., held that doctrine of parental immunity barred contribution where mother's negligence involved only negligent supervision of child.

Court of Appeals reversed and district court affirmed.

Hecht, J., dissented and filed opinion in which Phillips, C.J., Gonzalez and Doggett, JJ., joined.

West Headnotes (11)

**[1]    Contribution**
 Nature and grounds of obligation

Contribution claim is derivative of plaintiff's right to recover from joint defendant against whom contribution is sought.

25 Cases that cite this headnote

**[2]    Parent and Child**
 Right of action by child or child's representatives against parent

Doctrine of parental immunity restricts right of unemancipated minor to bring tort action against his or her parent.

5 Cases that cite this headnote

**[3]    Parent and Child**
 Right of action by child or child's representatives against parent

Parental immunity does not extend to suits arising in course of parent's business activities or to automobile tort actions.

Cases that cite this headnote

**[4]    Contribution**
 Persons not in pari delicto;  active and passive wrongdoers

**Contribution**
 Particular Torts or Wrongdoers

Parental immunity barred contribution claim by apartment complex owners and apartment complex manager against victim's mother in survival action arising from death of child following near-drowning in apartment's swimming pool based on mother's alleged negligence in management, supervision, and control of child.

4 Cases that cite this headnote

**[5]    Parent and Child**
 Right of action by child or child's representatives against parent

Objective of parental immunity is to avoid undue judicial interference with parental discretion.

2 Cases that cite this headnote

**[6]    Parent and Child**
 Right of action by child or child's representatives against parent

Child's death does not, by itself, extinguish parent's immunity from liability for negligent supervision.

2 Cases that cite this headnote

**[7]** **Pleading**
   Necessity for defense

Affirmative defense is generally waived if not pleaded. Vernon's Ann.Texas Rules Civ.Proc., Rule 94.

16 Cases that cite this headnote

**[8]** **Pleading**
   Necessity for defense

Immunity is affirmative defense that ordinarily must be pleaded to avoid waiver. Vernon's Ann.Texas Rules Civ.Proc., Rule 94.

9 Cases that cite this headnote

**[9]** **Contribution**
   Pleading

Mother did not waive immunity, to contribution claim by apartment complex owners and manager in survival action arising from death of child, by failing to specifically plead defense of parental immunity; allegations that defendants were not entitled to indemnity or contribution from mother were sufficient given that defendants failed to file special exceptions to clarify claim and contribution claims alleged that mother had been negligent in supervision of child. Vernon's Ann.Texas Rules Civ.Proc., Rules 90, 91, 94.

10 Cases that cite this headnote

**[10]** **Pleading**
   Necessity for defense

Defense of parental immunity is not waived by failure to specifically plead immunity if defense is apparent on face of petition and established as matter of law. Vernon's Ann.Texas Rules Civ.Proc., Rules 90, 91, 94.

14 Cases that cite this headnote

**[11]** **Death**
   Contributory negligence of plaintiff or beneficiary

Mother's negligence in failing to supervise child affected her recovery following near-fatal drowning under wrongful death statute but did not affect recovery of child's estate under survival statute, despite fact that parental immunity barred contribution claim against mother. V.T.C.A., Civil Practice & Remedies Code §§ 33.001 et seq., 71.021.

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*934** Ken M. Link, Fort Worth, C. Denise Smith, Houston, for petitioner.

**\*935** R. Brent Cooper, Dallas, for respondents.

**OPINION**

MAUZY, Justice.

In this cause, we consider whether a defendant in a survival action arising from the death of a child may seek contribution from a negligent parent of the deceased child. We hold that the doctrine of parental immunity bars such contribution when the parent's negligence involves only negligent supervision of the child.

One month before her second birthday, Miranda Gilley nearly drowned in the swimming pool at her apartment complex. The child was rescued and temporarily revived, but four months later died from the injuries she had suffered. Her mother, Janet Shoemake, then brought this suit against the apartment complex owners, Fogel, Ltd. A.T. and Federal Group I, and the apartment complex manager, International Property Management, Inc. (collectively "Fogel"). [1] In addition to seeking damages in her own capacity for wrongful death, Shoemake brought a survival action in her capacity as representative of the child's estate. *See* Tex.Civ.Prac. & Rem.Code §§ 71.001–.011 (wrongful death), 71.021

(survival). The jury awarded $285,492.28 to Shoemake on her wrongful death claim, and $50,969 to the child's estate in the survival action. Considering the negligence that caused the near-drowning, the jury attributed a total of fifty-five percent to the Fogel defendants, and the remaining forty-five percent to Janet Shoemake.

As to the wrongful death action, the trial court reduced Shoemake's recovery by forty-five percent, in accordance with the findings on comparative negligence. *See* Tex.Civ.Prac. & Rem.Code ch. 33. That aspect of the judgment was not appealed.

In connection with the survival action, Fogel argued that a similar result should obtain; *i.e.,* that it was entitled to a forty-five percent contribution from Shoemake, to be credited against the amount owed her on the wrongful death claim. The trial court rejected that argument and rendered judgment for the estate in the full amount of the jury verdict, along with pre-judgment interest. The court of appeals reversed, holding that the requested contribution was available under sections 33.012 and 33.016 of the Texas Civil Practice and Remedies Code. 795 S.W.2d 903.

Shoemake now argues that Fogel is barred from contribution against Shoemake, because the doctrine of parental immunity bars Miranda Gilley's estate from recovering damages against Shoemake. We agree.

**[1]** A defendant's claim of contribution is derivative of the plaintiff's right to recover from the joint defendant against whom contribution is sought. *Varela v. American Petrofina Co. of Texas,* 658 S.W.2d 561, 562 (Tex.1983). Thus, Fogel's claim of contribution depends upon whether Miranda Gilley's estate has the right to recover damages from Shoemake.

**[2]** The right of an unemancipated minor to bring a tort action against his or her parent is restricted by the doctrine of parental immunity. *See Felderhoff v. Felderhoff,* 473 S.W.2d 928 (Tex.1971). The purpose of the doctrine is "to prevent the judicial system from being used to disrupt the wide sphere of reasonable discretion which is necessary in order for parents to properly exercise their responsibility to provide nurture, care, and discipline for their children." *Id.* at 933.

**[3]** In *Felderhoff,* this court held that parental immunity does not extend to suits arising in the course of the parent's business activities. *Id.* More recently, this court held that the doctrine is inapplicable to automobile tort actions. *Jilani v.*

*Jilani,* 767 S.W.2d 671 (Tex.1988). In both cases, though, we adhered to the view that **\*936** a parent retains immunity as to "alleged acts of ordinary negligence which involve a reasonable exercise of parental authority or the exercise of ordinary parental discretion with respect to provisions for the care and necessities of the child." *Felderhoff,* 473 S.W.2d at 933; *Jilani,* 767 S.W.2d at 672.

**[4]** In the present case, Fogel alleged that Shoemake was negligent in the "management, supervision and control" of Miranda Gilley, and that this negligence proximately caused Miranda's death.[2] Because Fogel chose not to bring forward a statement of facts, *see* Tex.R.App.P. 53(d), we cannot determine the exact circumstances of the child's injuries. We assume, however, that there was no evidence that Shoemake was negligent in any manner other than that suggested by the pleadings. *See Christiansen v. Prezelski,* 782 S.W.2d 842, 843 (Tex.1990) (explaining Rule 53(d)); *see also Vance v. Wilson,* 382 S.W.2d 107, 108 (Tex.1964) (judgment disposes of all issues presented by the pleadings). Thus, we assume the evidence indicated that Shoemake was negligent in the management, supervision and control of her child. Those responsibilities entail exactly the sort of parental authority that remains protected under *Felderhoff* and *Jilani.* If Shoemake's negligence entailed some other sort of authority, such as business authority or driving responsibilities, Fogel has failed to sustain its burden of presenting a sufficient record to show the trial court's error. *See* Tex.R.App.P. 50(d); *Christiansen,* 782 S.W.2d at 843.

The court of appeals considered the policy concerns underlying parental immunity, but concluded that they were not implicated by the present facts. The usual rationale for retaining parental immunity, the court determined, is that "parental immunity is necessary for the protection of family peace and tranquility and any change in the rule would unduly interfere with the rights of parents to discipline, control, and care for their children." 795 S.W.2d at 907–08. Applying the first half of that rationale to the present case, the court decided that "the public policy consideration of family peace and tranquility disappeared upon Miranda's death and at the time that Shoemake's action accrued." *Id.* at 908. The court therefore held that parental immunity did not bar Fogel from seeking contribution against Shoemake. *Id.*

In *Felderhoff,* this court did consider the issue of family harmony. We expressly recognized, however, that the aim of domestic tranquility did not provide a realistic justification for parental immunity:

> We recognize that peace, tranquility and discipline in the home are endowed and inspired by higher authority than statutory enactments and court decisions. Harmonious family relationships depend on filial and parental love and respect which can neither be created nor preserved by legislatures or courts.

473 S.W.2d at 933. *See also Price v. Price,* 732 S.W.2d 316, 318 (Tex.1987) (rejecting view that interspousal immunity promotes domestic tranquility).

 **[5]**　The real objective of parental immunity, as stated in *Felderhoff,* is not to promote family harmony; rather, it is simply to avoid undue judicial interference with parental discretion. The discharge of parental responsibilities, such as the provision of a home, food and schooling, entails countless matters of personal, private choice. In the absence of culpability beyond ordinary negligence, those choices are not subject to review in court.

 **[6]**　As the court of appeals observed, family harmony may not be a practical **\*937** concern in cases like the present one, where the family unit no longer exists. Concerns about judicial interference with parental authority, though, do survive the death of a child. Though hindsight may be clear, a court should still be reluctant to "second-guess a parent's management of family affairs" beyond basic, statutory protections. *Paige v. Bing Construction Co.,* 61 Mich.App. 480, 233 N.W.2d 46, 49 (1975). We hold, therefore, that a child's death does not, by itself, extinguish the parent's immunity from liability for negligent supervision.[3] *See, e.g., Lewis v. Farm Bureau Mut. Auto Ins. Co.,* 243 N.C. 55, 89 S.E.2d 788 (1955).

 **[7]**　 **[8]**　Fogel claims, however, that Shoemake has waived any claim of parental immunity by failing to plead such immunity specifically. Generally, an affirmative defense is waived if it is not pleaded. Tex.R.Civ.P. 94. Though not specifically mentioned in Rule 94, immunity is an affirmative defense that ordinarily must be pleaded to avoid waiver. *See, e.g., Davis v. City of San Antonio,* 752 S.W.2d 518, 519–20 (Tex.1988) (governmental immunity).

 **[9]**　Shoemake did not specifically plead the defense of parental immunity. However, she did plead, as an affirmative defense against each of Fogel's counterclaims, that Fogel was "not entitled to indemnity or contribution from Counter-defendant ... as a matter of law." Fogel filed no special exceptions to clarify this claim. Thus, Fogel cannot now complain that Shoemake's pleading was insufficiently specific. Tex.R.Civ.P. 90, 91; *see, e.g., Roark v. Allen,* 633 S.W.2d 804, 810 (Tex.1982); *Manufactured Housing Management Corp. v. Tubb,* 643 S.W.2d 483, 487 (Tex.App.—Waco 1982, writ ref'd n.r.e.).

 **[10]**　Moreover, Rule 94's requirement of pleading is not absolute. Recently, in *Phillips v. Phillips,* 820 S.W.2d 785 (Tex.1991), this court considered the circumstances in which the failure to plead an affirmative defense does not result in waiver. We noted that the defense of illegality need not be pleaded, even though it is specifically listed in Rule 94, because "[p]leading an agreement illegal on its face in effect anticipates the defense," and because "[e]nforcement of an illegal agreement violates public policy." 820 S.W.2d at 789–90. For those same reasons, we held that "the defense of penalty is not waived by the failure to plead it if it is apparent on the face of the petition and established as a matter of law." *Id.*

The same considerations also apply to the defense of parental immunity. If a child sued a parent for the negligent performance of parental duties, the pleading would effectively anticipate the defense of parental immunity. Moreover, in view of the concerns discussed above, allowing the action would violate public policy; the policy concerns behind parental immunity are at least as great as those underlying the penalty defense. For these reasons, we conclude that the defense of immunity, like the defense of penalty, is not waived by the failure to specifically plead it if it is apparent on the face of the petition and established as a matter of law.

In the present case, the pleadings of two of the respondents alleged that Shoemake had been negligent in the "management, supervision and control," of Miranda Gilley, while the other respondent alleged that Shoemake "negligently or intentionally failed to maintain proper supervision" of Miranda Gilley.[4] The respondents rely on their pleadings, and not on any factual matters, to support their contribution claim: in designating the record on appeal, the respondents stated that "[t]he issues in this case are ones solely of law," and for that reason chose not to bring forward a statement of facts. Because the defense of **\*938** parental immunity was apparent on the face of the pleadings, and its application was purely a matter of law, there was no need for

a separate jury finding on immunity. We hold, then, that the defense of parental immunity was not waived by Shoemake's failure to specifically plead it.

[11] Because the child's estate has no viable negligence claim against Shoemake, Fogel has no viable contribution claim against Shoemake. *Varela,* 658 S.W.2d at 562; *see also Johnson v. Holly Farms of Texas,* 731 S.W.2d 641, 645 (Tex.App.—Amarillo 1987, no writ) (parent's negligence cannot be imputed to child's cause of action). Shoemake's negligence does affect her recovery under the wrongful death statute; but it does not affect the recovery of her child's estate under the survival statute. *See Mitchell v. Akers,* 401 S.W.2d 907 (Tex.Civ.App.—Dallas 1966, writ ref'd n.r.e.).

We conclude that the court of appeals erred in reforming the trial court's judgment to reflect a $29,851.52 credit in favor of Fogel. We reverse the judgment of the court of appeals and affirm the trial court's judgment in favor of the estate of Miranda Gilley.

Dissenting opinion by HECHT, J., joined by PHILLIPS, C.J., and GONZALEZ and DOGGETT, JJ.

HECHT, Justice, dissenting.

The central issue in this case is whether a parent who negligently injures his or her child is liable for contribution to another whose negligence also caused the injury. The Court holds that if the parent is negligent only in the management, supervision and control of the child, a claim for contribution against the parent by the joint tortfeasor is barred by parental immunity. While I do not disagree with this holding as an abstract legal proposition, I do disagree that it can be applied in this case when parental immunity was never pleaded or raised in any way in the trial court. I therefore dissent.

Defendants in this case pleaded that plaintiff Janet Shoemake was negligent, not only in the management, supervision and control of her daughter, but generally in her failure to exercise ordinary care. [1] Defendants sued for contribution from Shoemake. The jury found that Shoemake was 45% responsible for her daughter's accident.

Shoemake never pleaded parental immunity. Although the defense is not among the affirmative defenses listed in TEX.R.CIV.P. 94, I agree with the Court that it is, in the language of the rule, "a matter constituting an avoidance or affirmative defense." *See also Davis v. City of San Antonio,* 752 S.W.2d 518, 519–520 (Tex.1988) (governmental immunity is an affirmative defense). As such, it must be pleaded or it is waived. TEX.R.CIV.P. 94; *see also Davis,* 752 S.W.2d at 520 (governmental immunity and charitable immunity must be pleaded as affirmative defenses or they are waived).

Nevertheless, the Court excuses the failure to plead parental immunity in this case because the defense "is apparent on the face of the pleadings, and is established as a matter of law." *Ante,* at 937. Although one might well argue, with respect to the first phrase quoted, that it is apparent in this case from defendants' pleadings that Shoemake *should* have pleaded parental immunity, it can hardly be said that she did. And it cannot be said, with respect to the second quoted phrase, that the defense is established as a matter of law. To the **\*939** contrary, whether the defense is applicable depends upon whether Shoemake was negligent and in what particulars. Shoemake's negligence was a matter properly decided by the jury upon the evidence submitted. It cannot be determined from the pleadings alone whether Shoemake was protected by parental immunity. According to the Court, if defendants here could demonstrate that Shoemake was negligent other than in the management, supervision and control of her daughter, parental immunity would not insulate her from liability. Thus, whether the defense of parental immunity is available to Shoemake is very much a question of fact.

The Court also excuses Shoemake's failure to plead parental immunity on the ground that it would be against public policy to hold her liable for contribution for her daughter's injuries. In so doing, the Court contradicts its own authorities. Surely it is no more against public policy to hold a parent liable when he or she might have claimed immunity than it is to hold the government or a charity liable when they might have claimed immunity. As the Court notes, citing *Davis,* 752 S.W.2d at 520, we have held that governmental immunity and charitable immunity can be waived by the failure to assert them as affirmative defenses. If immunity can be waived by governments and charities, then it seems to me it can be waived by parents. The converse is also true: if a parent may assert immunity without pleading it, there is no logical basis for denying the same right to others, like governments and charities. That conclusion, however, would contradict *Davis.* Thus, the Court has either overruled *Davis* without saying so, or cited it without following it, or carved out a special exception for this case.

As its sole authority for excusing the pleading of parental immunity in this case, the Court cites its recent opinion in *Phillips v. Phillips,* 820 S.W.2d 785, 789 (Tex.1991), in which we held that "the defense of penalty is not waived by the failure to plead it if it is apparent on the face of the petition and established as a matter of law." In *Phillips,* the plaintiff pleaded that she was entitled to recover ten times her actual damages according to a provision in a contract she had with her husband. Assuming she was correct, her own pleadings conclusively demonstrated that she sought to enforce a penalty. We held that a provision authorizing recovery of decuple damages was an unenforceable penalty on its face. No evidence could demonstrate that such a provision was any less a penalty than it appeared on the face of plaintiff's pleadings. Furthermore, we observed that a penalty provision was similar to an illegal contract, and that "the courts will not enforce a plainly illegal contract even if the parties do not object." *Id.* at 789; *Texas & P. Coal Co. v. Lawson,* 89 Tex. 394, 34 S.W. 919, 921 (1896). Penalty, like illegality, but unlike immunity, cannot be waived.

*Phillips* is simply inapposite in this case. Here, assuming defendants are correct in their allegations that Shoemake was negligent, her liability might or might not be barred by immunity, according to the Court. Both Shoemake's liability and her immunity from liability are factual issues to be resolved on the evidence. Although the Court refers to Shoemake's immunity as being both apparent on the face of her pleadings and established as a matter of law, it is simply neither. Even if Shoemake's immunity could be established by defendants' pleadings, she could waive that immunity, and the law would not protect her without a timely assertion of the defense. In this respect immunity is different from penalty and illegality. By extending the holding of *Phillips* from the defense of penalty to the defense of immunity, the Court necessarily holds that the requirement that affirmative defenses be pleaded will be relaxed whenever it appears from the claimant's pleadings that an affirmative defense could be pleaded. While I do not agree with this change in our pleading rules, the Court will lack justification for not adhering to it when it is not so intent upon a result as it is in this case.

**\*940**  The Court also states that Shoemake's pleadings raise *some* affirmative defense, even if its exact nature cannot be ascertained. The language to which the Court points states:

> "Counter–Defendant would further show that as a matter of an affirmative defense, Counter–Plaintiff herein is not entitled to indemnity nor contribution from Janet Shoemake, as a matter of law."

Shoemake included an essentially identical paragraph in all her pleadings in response to defendants' counterclaims. The Court states that because defendants did not specially except to this pleading, they cannot complain that it lacks specificity. There are two problems with the Court's position. The first is that Shoemake never argued that the quoted language was sufficient to raise immunity as an affirmative defense until her rebuttal during oral argument in this Court. Having failed to raise this argument in the court of appeals, Shoemake ought not to be heard to make it now. The second flaw in the Court's position is that it violates the rule that pleadings must give fair notice of what is alleged. TEX.R.CIV.P. 45(b). Pleading "as an affirmative defense, I am not liable", gives no notice at all, much less fair notice, of the allegation made. The Court must conclude that defendants should have known from this pleading that Shoemake was asserting immunity. Again, although I do not agree with this conclusion, the Court offers no reason for not applying the same rule in other cases.

I would hold that Shoemake could be protected by parental immunity only if she affirmatively pleaded it in the trial court, and would therefore affirm the judgment of the court of appeals. Accordingly, I dissent.

PHILLIPS, C.J., and GONZALEZ and DOGGETT, JJ., join in this dissenting opinion.

**All Citations**

826 S.W.2d 933, 60 USLW 2572

---

Footnotes

1    Shoemake's original petition also named as defendants two individual owners of the apartment complex, Danny Fogel and William Hummel.

2    Fogel Ltd., A.T. and Danny Fogel both alleged that Shoemake was negligent in the "management, supervision and control" of Miranda Gilley. Federal Group I alleged that Shoemake "negligently or intentionally failed to maintain proper supervision" of Miranda Gilley. International Property Management alleged that Shoemake was "negligent on the occasion

in question, including in her management, supervision and control" of Miranda Gilley. William Hummel alleged that Shoemake "negligently failed to maintain proper supervision" of Miranda Gilley.

3    We expressly disapprove the dicta in *Sneed v. Sneed,* 705 S.W.2d 392, 397 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.), to the extent that it conflicts with this opinion.

4    See note 2, *supra.*

1    Defendants Fogel, Ltd. and Danny Fogel pleaded that "Janet Shoemake was negligent in the management, supervision and control of Miranda Gilley". Defendants Federal Group I and William Hummel pleaded that "Janet Shoemake failed to exercise ordinary care for the safety of her daughter" and "negligently ... failed to maintain proper supervision of her daughter". Defendant International Property Management, Inc. pleaded that "Janet Shoemake was negligent on the occasion in question, including, in her management, supervision and control of Miranda Gilley".

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.



KeyCite Yellow Flag - Negative Treatment
**Distinguished by** In re SMIC, Ltd., Bankr.N.D.Tex., August 13, 2013

395 S.W.3d 178
Court of Appeals of Texas,
Houston (1st Dist.).

Robert B. TAYLOR, Appellant

v.

ALONSO, CERSONSKY & GARCIA,
P.C., James A. Cersonsky, John Causey,
and Hope and Causey, P.C., Appellees.

No. 01–11–00078–CV. | Aug. 30, 2012.

**Synopsis**
**Background:** Client brought action against first and second law firms for legal malpractice, gross negligence, and breach of fiduciary duty after he paid personal funds over his insurance policy limit to settle underlying car accident suit. Law firms filed motions for summary judgment, and the 190th District Court, Harris County, Patricia J. Kerrigan, J., granted the motions and rendered a take-nothing judgment. Client appealed.

**Holdings:** The Court of Appeals, Rebeca Huddle, J., held that:

[1] first law firm's representation of client did not cause alleged damages, and

[2] summary judgment affidavit failed to show that the results of a trial in underlying action probably would have been better for client.

Affirmed.

See also 356 S.W.3d 92.

West Headnotes (17)

**[1]** **Attorney and Client**
 Elements of malpractice or negligence action in general

A legal malpractice action is based on negligence.

1 Cases that cite this headnote

**[2]** **Attorney and Client**
 Elements of malpractice or negligence action in general

A plaintiff bringing a legal malpractice claim must show that: (1) the attorney owed the plaintiff a duty, (2) the attorney breached that duty, (3) the breach proximately caused the plaintiff's injuries, and (4) damages occurred.

1 Cases that cite this headnote

**[3]** **Attorney and Client**
 Conduct of litigation

If a legal malpractice claim is based on the attorney's acts during prior litigation, a plaintiff must prove that, but for the attorney's breach of duty, the plaintiff would have been successful in the prior case.

1 Cases that cite this headnote

**[4]** **Attorney and Client**
 Conduct of litigation

The "suit within a suit" causation requirement for a claim based on prior litigation applies both to claims for legal malpractice and claims for a former attorney's alleged breach of fiduciary duty when the damages sought are based on the attorney's wrongful conduct in prior litigation.

2 Cases that cite this headnote

**[5]** **Attorney and Client**
 Pleading and evidence

Generally, expert testimony is required to prove causation in a legal malpractice suit.

2 Cases that cite this headnote

**[6]** **Negligence**
 Necessity of causation
**Negligence**

- Foreseeability

**Negligence**
- In general;  degrees of proof

Proximate cause has two elements, cause in fact and foreseeability; these elements cannot be established by mere conjecture, guess, or speculation.

Cases that cite this headnote

**[7]** **Negligence**
- "But-for" causation;  act without which event would not have occurred

**Negligence**
- Substantial factor

The test for cause in fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred.

Cases that cite this headnote

**[8]** **Attorney and Client**
- Conduct of litigation

First law firm's representation of client in personal injury action arising out of motor vehicle accident did not cause alleged damages to client, who paid personal funds over his insurance policy limit to settle the underlying action; first law firm only represented client for five months before withdrawing, no trial date had been set and no scheduling order had been entered at that time, second law firm took over representation approximately 18 months before eventual mediation and trial date, and first law firm did not do anything in that five-month period which hampered or interfered with second law firm's later representation.

Cases that cite this headnote

**[9]** **Attorney and Client**
- Elements of malpractice or negligence action in general

When an attorney withdraws from representing a client, and another attorney agrees to represent the client, the first attorney does not cause the harm suffered by the client if nothing the first attorney did or failed to do hampered the second attorney's representation.

Cases that cite this headnote

**[10]** **Evidence**
- Cause and effect

An expert may not simply opine that the defendant's negligence caused the plaintiff's injury, but must also explain how and why the negligence caused the injury; in other words, an expert must sufficiently link his conclusions to the facts.

Cases that cite this headnote

**[11]** **Evidence**
- Disclosure, necessity and right

The factfinder must have access to the facts and data underlying an expert's testimony in order to accurately assess the testimony's worth.

1 Cases that cite this headnote

**[12]** **Judgment**
- Weight and sufficiency

**Judgment**
- Matters of fact or conclusions

An expert opinion on causation stated without the underlying facts is conclusory, and a conclusory opinion is not probative and will neither support nor defeat a summary judgment.

1 Cases that cite this headnote

**[13]** **Evidence**
- Necessity and sufficiency

An expert cannot simply say "Take my word for it; I know."

Cases that cite this headnote

**[14]** **Judgment**
- Attorneys

Expert's summary judgment affidavit failed to show that the results of a trial in underlying

personal injury action probably would have been better for client, who paid $3,000,000 in personal funds over his $250,000 automobile insurance policy limit to settle the underlying action, and thus failed to establish that law firm's alleged legal malpractice in failing to proceed to trial caused client damages; expert merely assumed that injured victim's failure to wear a seat belt would have been admissible at trial and that the trial judge would have reduced client's liability by the percentage of the injury that would have been avoided had the victim worn a seat belt, although Texas law was unsettled on the issue, and expert failed to explain his reasoning or supply any authority to suggest that a trial would have unfolded in such a manner. V.T.C.A., Transportation Code § 545.413(g).

Cases that cite this headnote

[15]     **Negligence**
　　 💬 Gross negligence

In order to prevail on a claim for gross negligence, a plaintiff must first show ordinary negligence.

Cases that cite this headnote

[16]     **Attorney and Client**
　　 💬 Conduct of litigation

Suit-within-a-suit causation is an element of a legal malpractice claim and a breach of fiduciary duty claim for damages based on representation in underlying litigation.

2 Cases that cite this headnote

[17]     **Attorney and Client**
　　 💬 Deductions and forfeitures

In breach of fiduciary duty cases in which the former client seeks disgorgement of fees paid to the attorney, the former client need not prove actual damages.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*179**  Jeffery W. Steidley, The Steidley Law Firm, Houston, TX, for Appellant.

Allison Standish Miller, William A. Scheel, Billy Shepherd, Shepherd, Scott, Clawater & Houston, L.L.P., Alan N. Magenheim, Magenheim & Associates, William Book, Tekell, Book, Allen & Morris LLP, Houston, TX, for Appellees.

**\*180**  Panel consists of Chief Justice RADACK and Justices BLAND and HUDDLE.

### OPINION

REBECA HUDDLE, Justice.

In this legal malpractice case, Robert B. Taylor appeals the trial court's rendition of summary judgment in favor of his former attorneys. Taylor was sued in the underlying case for allegedly causing a car accident that left the passenger in the other car in a permanent vegetative state. In the car accident case, Taylor initially was represented by James A. Cersonsky and Alonso, Cersonsky & Garcia, P.C. (Cersonsky). After Cersonsky withdrew from the representation, John Causey and Hope and Causey, P.C. (Causey) took over Taylor's representation.

Taylor ultimately paid $3 million in personal funds over his $250,000 policy limit to settle the car accident suit. He then brought this suit against Cersonsky and Causey, asserting claims for legal malpractice, gross negligence, and breach of fiduciary duty. Cersonsky and Causey each moved for summary judgment. The trial court granted the motions and rendered a take-nothing judgment. Taylor appeals, arguing that the trial court erred in granting summary judgment because he raised fact issues as to each of the essential elements of his claims. We conclude that the trial court correctly granted summary judgment and, accordingly, we affirm.

### Background

**The accident**
In July 2005, Taylor, then seventy-eight years old, was involved in a head-on collision on a two-lane road in Chambers County. Russell Fullen, a passenger in the other

car, suffered a severe brain injury and, as a result, fell into a permanent vegetative state. Fullen, who was twenty-one years old at the time of the accident, will require round-the-clock medical care for the rest of his life. It is estimated that the cost of his medical care will approach $20 million.

The accident report completed by the Chambers County Sheriff's Office indicated that Taylor and Leach, the driver of the car in which Fullen rode, were driving in opposite directions. Taylor attempted to turn left in front of Leach, who swerved to his left to avoid Taylor. Taylor then swerved back into his lane of traffic, striking Leach. The report concluded: "[Taylor] drove on the wrong side-not passing, and [Leach] may have taken a faulty evasive action." Taylor ultimately was charged with a moving violation in connection with the accident.

Taylor's insurer, Allstate Insurance Company, retained The ProNet Group to investigate the accident. ProNet's January 2006 accident reconstruction report noted that Taylor claimed Leach caused the accident by driving erratically and swerving into Taylor's lane of traffic. Nevertheless, the report concluded that the evidence, some of which was not conclusive, suggested that the accident did not occur as Taylor had described. Rather, ProNet concluded that it was more likely that the accident occurred as described in the police report. In February 2006, Allstate informed Taylor that his potential liability exceeded his policy limits.

**Fullen's suit against Taylor**

In February 2006, Fullen, through his family, sued Taylor. Allstate retained Cersonsky to defend Taylor in the suit. Cersonsky communicated with Taylor and Richard Baker, Taylor's personal attorney, during Cersonsky's representation of Taylor. One of Taylor's main objectives in the litigation was to prevent disclosure of his **\*181** personal financial information. To that end, Taylor, Baker, and Cersonsky decided to file a special exception and motion for protection to prevent disclosure of that information, which the Fullen family had requested in discovery. The trial court ruled against Taylor on the motion for protection and ordered the financial information produced. Taylor decided to appeal the decision. Cersonsky, who does not handle appeals, told Allstate to transfer the matter to another attorney. Cersonsky wrote Taylor and informed him that Allstate was assigning the case to Causey, and Cersonsky withdrew. During Cersonsky's five-month representation of Taylor, no scheduling order or trial setting was in place, and no settlement offers or demands were exchanged.

Following Cersonsky's withdrawal in July 2006, Allstate hired Causey to continue the representation of Taylor. While the case ultimately settled eighteen months later, the settlement came after several developments—each unfavorable to Taylor—came to pass:

- First, Fullen amended his petition to assert a fraudulent transfer claim against Taylor, Taylor's family members, Taylor's family trust, and others, after discovering that Taylor, after the accident, had transferred certain significant assets in an apparent effort to avoid exposing his substantial net worth to a potential judgment in Fullen's favor. Fullen also obtained a temporary restraining order and temporary injunction prohibiting the transfer of certain assets until the case was resolved. [1]

- Second, the trial court denied Taylor's motion for summary judgment on Fullen's gross negligence claim, leaving Taylor open to jury consideration of exemplary damages.

   - Third, more unfavorable evidence regarding fault came to light. An accident reconstruction expert retained by Causey concluded that Taylor was a cause of the accident. And an eyewitness to the accident testified that the accident was Taylor's fault because he crossed over into the lane of oncoming traffic while attempting to turn left.

It was against this backdrop that the parties mediated the case, nine days before the scheduled trial date in October 2007. [2] At the mediation, Allstate tendered policy limits of $250,000, and Taylor, who was accompanied by Causey and two personal lawyers not retained by Allstate, agreed to pay $3 million to settle all of the claims against Taylor, his family members, and related entities. Taylor signed the written settlement agreement, as did Causey and Taylor's personal attorney, Baker.

**Taylor's suit against Cersonsky and Causey**

In February 2008, Taylor sued Cersonsky, Causey, and Allstate. Taylor alleged that Cersonsky and Causey committed legal malpractice by failing to properly investigate and develop viable defenses to Fullen's suit that could have resulted in a verdict in Taylor's favor or significantly reduced the value of Fullen's claims. Although Taylor alleged various acts of malpractice, his primary complaint was that his

lawyers, who he claims were beholden to Allstate, failed to investigate and pursue a defense based on the fact that Fullen failed to wear a seat belt on the day of the accident. While Causey pleaded an affirmative **\*182** defense based on Fullen's failure to wear a seat belt and later designated (after the expert deadline) an expert to opine on whether Fullen would have avoided serious injury had he worn a seat belt, Taylor complains that it was too little, too late.

With respect to the alleged breach of fiduciary duty, Taylor contended that Cersonsky and Causey defended his case so as to further their own interests, and Allstate's interests, rather than Taylor's. [3] He contends that Cersonsky and Causey, each of whom took the case for a flat fee, were motivated to save Allstate from having to pay for an expensive defense, and did not act in Taylor's best interest. For example, he contends that a lawyer truly representing Taylor would have immediately interviewed witnesses and that Cersonsky and Causey did not work up the case soon enough because of the nature of their fee arrangement. Randy Donato, Taylor's legal expert, also asserts that Cersonsky and Causey improperly failed to disclose to Taylor the nature of their fee arrangements with Allstate.

Cersonsky and Causey each filed traditional and no-evidence motions for summary judgment on all of Taylor's claims against them. Both argued that Taylor had no evidence of causation or, in other words, that Taylor could not raise a fact issue on the "suit within a suit" element of his legal malpractice claim. Cersonsky additionally argued that his early withdrawal from the case broke the chain of causation. In response, Taylor offered the affidavits of three experts: a biomechanical engineering expert, John Lenox, who averred that Fullen would not have sustained serious injury if he had been wearing his seat belt on the day of the accident; an accident reconstruction expert, William Greenlees, who performed an accident reconstruction analysis; and Donato, who opined that Cersonsky's and Causey's breaches of the standard of care in their representation of Taylor caused Taylor to suffer damages. Donato concluded: "Both Cersonsky and Causey failed to adequately investigate and prepare the underlying defenses available to them rising out of the accident facts. Had that work been performed properly, in my opinion, the value of the case should have been reduced to within, Allstate's policy limits." In other words, "had either of these lawyers, retained by Allstate Insurance Company complied with the standard of care in timely locating and retaining experts ... it is more probable than not that a trial would have resulted in a defense verdict and a pretrial

settlement would have been accomplished for the available policy limits or less." The trial court granted the summary judgment motions, and Taylor appealed, contending that it erred in doing so.

## Standard of Review

We review a trial court's summary judgment de novo. *Travelers Ins. Co. v. Joachim,* 315 S.W.3d 860, 862 (Tex.2010). If a trial court grants summary judgment without specifying the grounds for granting the motion, we must uphold the trial court's judgment if any one of the grounds is meritorious. *Beverick v. Koch Power, Inc.,* 186 S.W.3d 145, 148 (Tex.App.-Houston [1st Dist.] 2005, pet. denied). The **\*183** motion must state the specific grounds relied upon for summary judgment. *See* TEX. R. CIV. P. 166a(c), (i); *Timpte Indus., Inc. v. Gish,* 286 S.W.3d 306, 310 (Tex.2009). When reviewing a summary judgment motion, we must (1) take as true all evidence favorable to the nonmovant and (2) indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005) (citing *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003)).

A party seeking summary judgment may combine in a single motion a request for summary judgment under the no-evidence standard with a request under the traditional summary judgment standard. *Binur v. Jacobo,* 135 S.W.3d 646, 650–51 (Tex.2004). In a no-evidence motion for summary judgment, the movant asserts that there is no evidence to support an essential element of the nonmovant's claim on which the nonmovant would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Hahn v. Love,* 321 S.W.3d 517, 523–24 (Tex.App.-Houston [1st Dist.] 2009, pet. denied). The burden then shifts to the nonmovant to present evidence raising a genuine issue of material fact as to each of the elements specified in the motion. *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex.2006); *Hahn,* 321 S.W.3d at 524.

In a traditional summary judgment motion, the movant has the burden to show that no genuine issue of material fact exists and that the trial court should grant judgment as a matter of law. TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999). A defendant moving for traditional summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action

or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997).

**Discussion**

**A. Legal malpractice claims**

 **[1]**　**[2]**　**[3]**　**[4]**　A legal malpractice action is based on negligence. *Cunningham v. Hughes & Luce, L.L.P.,* 312 S.W.3d 62, 67 (Tex.App.-El Paso 2010, no pet.) (citing *Cosgrove v. Grimes,* 774 S.W.2d 662, 664 (Tex.1989)). A plaintiff bringing a legal malpractice claim must show that "(1) the attorney owed the plaintiff a duty, (2) the attorney breached that duty, (3) the breach proximately caused the plaintiff's injuries, and (4) damages occurred." *Grider v. Mike O'Brien, P.C.,* 260 S.W.3d 49, 55 (Tex.App.-Houston [1st Dist.] 2008, pet. denied) (quoting *Alexander v. Turtur & Assocs., Inc.,* 146 S.W.3d 113, 117 (Tex.2004)). ==If the legal malpractice claim is based on the attorney's acts during prior litigation, a plaintiff must prove that, but for the attorney's breach of duty, the plaintiff would have been successful in the prior case.== *Id.* (citing *Greathouse v. McConnell,* 982 S.W.2d 165, 172 (Tex.App.-Houston [1st Dist.] 1998, pet. denied)); *see also Heath v. Herron,* 732 S.W.2d 748, 753 (Tex.App.-Houston [14th Dist.] 1987, writ denied) (stating that defendant in underlying case claiming malpractice must show a "meritorious defense," that is, a defense "that, if proved, would cause a different result upon retrial of the case"). ==This causation burden in this type of legal malpractice claim has been called the "suit-within-a-suit" requirement.== *See Greathouse,* 982 S.W.2d 165 at 173. The "suit within a suit" causation requirement applies both to claims for legal malpractice and claims for a former attorney's alleged breach of fiduciary duty when the damages sought are based on the attorney's wrongful conduct in prior litigation. *See Finger* **\*184** *v. Ray,* 326 S.W.3d 285, 292 (Tex.App.-Houston [1st Dist.] 2010, no pet.); *Greathouse,* 982 S.W.2d 165 at 173.

 **[5]**　**[6]**　**[7]**　Generally, expert testimony is required to prove causation in a legal malpractice suit. *See Alexander,* 146 S.W.3d at 119–20. Proximate cause has two elements: cause in fact and foreseeability. *W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 551 (Tex.2005). "These elements cannot be established by mere conjecture, guess, or speculation." *Id.* (quoting *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995)). The test for cause in fact is whether the act or omission was a substantial factor in causing

the injury without which the harm would not have occurred. *Id.*

**1. Taylor's claims against Cersonsky**

 **[8]**　Cersonsky moved for summary judgment on all Taylor's claims on the ground that Cersonsky's withdrawal, and Causey's substitution, broke the chain of causation. We agree that Taylor failed to raise a fact issue as to how Cersonsky's representation of Taylor caused Taylor's alleged damages.

 **[9]**　When an attorney withdraws from representing a client, and another attorney agrees to represent the client, the first attorney does not cause the harm suffered by the client if nothing the first attorney did or failed to do hampered the second attorney's representation. *See Blake v. Lewis,* 886 S.W.2d 404, 408 (Tex.App.-Houston [1st Dist.] 1994, no writ); *see also Medrano v. Reyes,* 902 S.W.2d 176, 178 (Tex.App.-Eastland 1995, no writ) (holding, in legal malpractice suit for failure to file action within limitations period, that firm should not be liable when it withdrew twenty-one months before limitations period expired giving former client sufficient time to employ other counsel). Here, Cersonsky represented Taylor for approximately five months before withdrawing. At the time of his withdrawal in July 2006, no trial date had been set and no scheduling order had been entered. Causey took over the representation approximately eighteen months before the eventual mediation and trial date. In his affidavit, Donato does not assert that anything Cersonsky did in that five-month period hampered or interfered with Causey's later representation. Rather, he opines generally that both Cersonsky and Causey should have begun their factual investigation of the case earlier than they did, but nowhere explains how Cersonsky's doing so would have yielded a better outcome for Taylor. We hold that Taylor failed to raise a fact issue concerning the element of causation on his malpractice claim against Cersonsky. *See Blake,* 886 S.W.2d at 408; *Medrano,* 902 S.W.2d at 178.

We overrule the portion of Taylor's point of error with respect to the summary judgment on Taylor's malpractice claims against Cersonsky. [4]

**2. Taylor's claims against Causey**

As part of his motion for summary judgment, Causey asserted that there was no evidence of the element of causation. Taylor

responded with summary judgment evidence, including an affidavit from a legal expert, Randy Donato. In his affidavit, Donato identifies a number of acts and omissions he contends amount to malpractice by Causey. The alleged breaches of the standard of care include: failing to interview the investigating officer and other witnesses early in the representation; **\*185** failing to raise and develop a defense based on Fullen's failure to wear a seat belt, specifically, failing to consult or retain appropriate experts necessary to prove a seat belt defense; and generally carrying out the representation in such a way to save Allstate money rather than pursuing Taylor's best interests. Donato avers that Causey "failed to defend in a reasonable manner the 'how this accident happened' issues."

Donato's affidavit addresses the suit within a suit requirement by positing how a hypothetical lawyer "uninfluenced by the fact he is being paid by an insurance company, would have defended the underlying lawsuit." He avers that, properly handled, the seat belt defense "would have significantly reduced Mr. Fullen's claims and likely eliminated them altogether." In other words, Donato opines that if a lawyer acting in Taylor's best interest had defended the case properly, and if Taylor had proceeded to trial, the seat belt defense would have been a viable defense and yielded an outcome in which Taylor's liability would have been less than the $3 million Taylor paid to settle the case. Donato accords the seat belt defense such importance that he concludes that, if it had been properly developed in this case, "the value of the case should have been reduced to within Allstate's policy limits." In short, according to Donato, satisfactory counsel would have saved Taylor from contributing a single dollar toward a settlement or judgment.

 **[10]  [11]  [12]  [13]**   An expert may not "simply ... opine that the defendant's negligence caused the plaintiff's injury." *Jelinek v. Casas,* 328 S.W.3d 526, 536 (Tex.2010). An expert must also "explain how and why the negligence caused the injury." *Id.* In other words, an expert must sufficiently link his conclusions to the facts. *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999). The factfinder must have access to the facts and data underlying an expert's testimony in order "to accurately assess the testimony's worth." *In re Christus Spohn Hosp. Kleberg,* 222 S.W.3d 434, 440 (Tex.2007). An opinion on causation stated without the underlying facts is conclusory. *See Jelinek,* 328 S.W.3d at 536; *Arkoma Basin Exploration Co., Inc. v. FMF Assocs. 1990–A, Ltd.,* 249 S.W.3d 380, 389 n. 32 (Tex.2008). A conclusory opinion is not probative and will neither support nor defeat a summary judgment. *See City of San Antonio v. Pollock,* 284 S.W.3d 809, 818 (Tex.2009);

*see also Burrow v. Arce,* 997 S.W.2d 229, 235 (Tex.1999) ("[I]t is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness."). An expert "cannot simply say, 'Take my word for it; I know....' " *Burrow,* 997 S.W.2d at 236.

In *Burrow,* the Supreme Court of Texas examined an affidavit in a legal malpractice case. *Burrow,* 997 S.W.2d at 235. Former clients sued their attorneys, asserting that the attorneys had improperly settled their suits and allocated damages among the clients. *Id.* at 232–33. The attorneys moved for and were granted summary judgment by the trial court. *Id.* at 233. In support of their motion for summary judgment, the attorneys included an affidavit from an expert who opined that the attorneys' actions did not cause the clients any damages. *Id.* at 235. The expert stated there were several important considerations in considering the reasonableness of the settlement amounts, he considered those factors, and he concluded that the clients were all reasonably compensated and, therefore, had not been harmed by the alleged malpractice. *Id.* The Supreme Court explained that because **\*186** the expert did not explain why the settlements were fair and reasonable for each client, the affidavit was conclusory. *Id.* at 236.

 **[14]**   We conclude that, like the deficient affidavit in *Burrow,* Donato's affidavit fails to sufficiently explain how Causey caused Taylor's damages. More specifically, it fails to explain the basis for Donato's opinion that a lawyer properly handling the case would have achieved the favorable outcome Donato posits. The main flaw in Donato's analysis is the causal leap it makes with respect to legal rulings the trial court would have made regarding the seat belt defense had Taylor proceeded to trial. The basis for these leaps is nowhere explained, but the assumptions themselves are embedded in a key passage of Donato's affidavit:

> The most glaring failure I have found in failing to do that which a lawyer exercising independent judgment would have done, is the failure of [Cersonsky and Causey] to investigate the non-use of seatbelt issues applicable specifically to Mr. Fullen. For years as a defense attorney, I was frustrated by the fact that Texas Law did not allow in front of juries the use or non-use of seatbelts. It is proven by the statistics countless injuries and specifically head injuries are avoided when occupants wear seatbelts.

In 2003, our Texas Legislature repealed sections 545.412d and 545.413 [g] of the Texas Transportation Code. In repealing these sections, the Legislature gave defense lawyers, a new and potentially case winning defense if a Plaintiff was not wearing a seatbelt and if his injury would have been prevented by the use of a seatbelt. The way seat belt use is submitted in Texas, gives defense counsel essentially two bites at the apple. A jury will be asked to assign fault on a proportionate basis as between parties for causing the accident. After the jury has answered that question, *a seat belt inquiry question is submitted which inquires essentially, as to how much of a, Plaintiffs injury would have been prevented had he been wearing a seatbelt.* Both fault and injury causation are used to establish if and how a defendant may owe.

.... Competent Plaintiff counsel throughout the state of Texas for years fought against the repeal of the provisions of the Transportation Code making the use or non-use of seatbelts inadmissible. They did so for a very good reason, and that is failing to wear seatbelts is and will continue to be a devastating defense against their clients.

.... Accordingly, had either of these defense lawyers, retained by Allstate Insurance Company complied with the standard of care in timely locating and retaining experts ... *it is more probable than not that a trial would have resulted in a defense verdict* and pretrial settlement would have been accomplished for the available insurance policy limits or less.

(Emphasis added.) Before its repeal in 2003, Texas Transportation Code section 545.413(g) provided, "Use or nonuse of a safety belt is not admissible evidence in a civil trial...." Act of Apr. 21, 1995, 74th Leg., R.S., ch. 165, § 1, sec. 545.413(g), 1995 Tex. Gen. Laws 1025, 1644, *repealed by* Act of June 1, 2003, 78th Leg., R.S., ch. 204, § 8.01 2003 Tex. Gen. Laws 847, 863. Donato assumes that, with the repeal of section 545.413(g), admissibility of an injured party's failure to wear a seat belt is a foregone conclusion. Donato likewise assumes that the trial judge would have reduced Taylor's liability by the percentage of the injury that would have been **\*187** avoided had Fullen worn a seat belt, as found by the jury.

But Donato nowhere explains the basis for either of these leaps. That likely is because Texas law on these points is unsettled. *See Trenado v. Cooper Tire & Rubber Co.,* No. 4:08–cv–249 (S.D.Tex. Jan. 26, 2010) (noting absence of

authorities discussing issue of seat belt usage since repeal of section 545.413(g)). Donato cited no authorities to support his view of how a trial court would rule on these questions. And our own research revealed no Texas Supreme Court or Texas appellate court cases discussing the significance or effect of the provision's repeal. Nor have we located Texas cases discussing whether or how an injured party's failure to wear a seat belt should be submitted to the jury. Indeed, the few federal court opinions addressing these issues reached conclusions that conflict with Donato's assumptions about how the hypothetical Chambers County trial court would have ruled.

One federal court concluded that the legislature's repeal in 2003 of section 545.413(g) "does not indicate that [evidence of a party's failure to wear a seat belt] is now per se admissible." *Idar v. Cooper Tire & Rubber Co.,* C.A. No. C–10–217, 2011 WL 2412613, at \*9 (S.D.Tex. June 6, 2011); *see also Trenado v. Cooper Tire & Rubber Co.,* C.A. No. 4:08–cv–249 (S.D.Tex. Jan. 26, 2010) (noting that the legislative intent was to change the admissibility of seat belt usage from a substantive to a procedural issue and concluding that, while Texas law does not preclude the admissibility of seat belt evidence, admissibility would be decided by trial court according to evidentiary rules). This casts doubt on Donato's assumption that the fact that Fullen failed to wear a seat belt would be the deciding factor in the jury's deliberations had Taylor proceeded to trial.

The same can be said of Donato's assumption that Taylor's liability would have been reduced due to Fullen's failure to wear a seat belt. *Trenado* and *Idar* each made two holdings that undercut Donato's assumption on this point: (1) the alleged failure of the injured person to wear a seat belt did not contribute to the accident, and, under current Texas law, it should not give rise to a contributory negligence defense, *Idar,* 2011 WL 2412613, at \*11; *Trenado,* at \*41–42, and (2) the injured person's failure to wear a seat belt did not constitute subsequent negligence and therefore does not give rise to a defense of failure to mitigate damages that would yield a reduction in recovery. *Idar,* 2011 WL 2412613, at \*11–12; *Trenado,* at 38–39.

Donato's analysis nowhere explains the specific legal basis for his opinion that earlier development of the seat belt defense by Causey probably would have yielded a more favorable result at trial. Instead, his analysis leaps from the fact of section 545.413(g)'s repeal to his conclusion that Taylor would have obtained a better outcome at trial had he been properly

represented, without ever addressing the unsettled legal issues that the trial court would have confronted, or how or why he believes that Taylor would have obtained favorable rulings on them—and convinced a jury of their outcome-determinative nature—had Taylor proceeded to trial. Donato's failure to explain this analytical gap—together with the absence of any authority to suggest that the trial would have unfolded in the manner Donato suggests—lead us to conclude that Donato's opinion is insufficient to raise a fact issue on causation. *Pollock,* 284 S.W.3d at 818 (conclusory opinion is not probative and will not defeat a summary judgment); *Burrow,* 997 S.W.2d at 235 (an expert's opinion is conclusory and will not support summary judgment if it does not contain the basis or reasoning for the opinion).

**\*188** In addition, Donato does not address other significant legal and factual hurdles Taylor faced in the underlying lawsuit. For example, Donato does not address the undisputedly severe and tragic nature of Fullen's injury or the substantial estimated cost of his medical care needs and how these facts may have influenced a jury. Additionally, Fullen had amended his petition to assert a fraudulent transfer claim based on Taylor's attempt to shield assets from a judgment in Fullen's favor. Taylor had also lost a summary judgment on Fullen's gross negligence claim, leaving the possibility of Taylor being liable for exemplary damages at trial. Finally, the police report and both accident reconstruction expert reports concluded that Taylor was a cause of the accident. Under the facts of this case, we conclude that Donato's affidavit is insufficient to raise a fact issue on whether the alleged malpractice caused injury to Taylor because it does not show that the results of a trial probably would have been better for Taylor. *See Pollock,* 284 S.W.3d at 818; *Burrow,* 997 S.W.2d at 235; *see also Cooper v. Harris,* 329 S.W.3d 898, 904 (Tex.App.-Houston [14th Dist.] 2010, pet. denied) (finding expert testimony insufficient to support jury's verdict on legal malpractice claim because expert who testified that malpractice plaintiff would have recovered a money judgment had his claims been prosecuted by a reasonably prudent attorney did not "address the complicated factual and legal issues" in the underlying case); *Kemp v. Jensen,* 329 S.W.3d 866, 871 (Tex.App.-Eastland 2010, pet. denied) (affirming summary judgment on legal malpractice claim where expert opined that malpractice plaintiff would have had a much better opportunity of obtaining a favorable jury verdict but for the alleged malpractice, but did not explain the basis of the statement).[5] Accordingly, we hold that the trial court correctly granted summary judgment on Taylor's legal malpractice claims.

### B. Gross negligence claims

**[15]** Taylor pleaded that his lawyers' acts and omissions rose to the level of gross negligence. Texas law is well-settled that, in order to prevail on a claim for gross negligence, a plaintiff must first show ordinary negligence. *Doe v. Messina,* 349 S.W.3d 797, 804 (Tex.App.-Houston [14th Dist.] 2011, pet. denied) (citing *Sonic Sys. Int'l, Inc. v. Croix,* 278 S.W.3d 377, 395 (Tex.App.-Houston [14th Dist.] 2008, pet. denied)). Here, we have concluded that the summary judgment on the negligence claims against Cersonsky and Causey was proper. Therefore, Taylor's gross negligence claims also fail. We hold that the trial court properly granted summary judgment on Taylor's gross negligence claims against Cersonsky and Causey.

### C. Breach of fiduciary duty claims

The parties dispute whether Taylor asserted only claims of legal malpractice or whether he also stated a breach of fiduciary duty claim. Taylor contends that his allegations about allegedly divided loyalties give rise to a breach of fiduciary duty claim. Specifically, he claims Cersonsky **\*189** and Causey breached their fiduciary duties to Taylor by failing to disclose certain facts (the nature of their fee arrangement with Allstate and the fact that Fullen's medical lien could be waived) and by acting in the interests of Allstate and themselves (by allegedly skimping on Taylor's defense in order to keep Allstate happy and thereby secure other work for themselves in the future). The former lawyers argue that Taylor's allegations are nothing more than complaints about the adequacy of their representation and therefore can only give rise to ordinary malpractice claims. *See Greathouse,* 982 S.W.2d at 172 (the test to determine whether a plaintiff asserts only malpractice claims, generally, is whether the "crux" of each separate claim is that the lawyer "did not provide adequate legal representation.").

**[16]** **[17]** Our resolution of this case is based on Taylor's failure to raise a fact issue with respect to the suit within a suit causation element of his claims. This causation is an element of a legal malpractice claim and a breach of fiduciary duty claim for damages based on representation in underlying litigation.[6] *See Finger,* 326 S.W.3d at 291–92 (former client asserting breach of fiduciary duty claim based on representation in prior suit must prove "suit within a suit" causation); *Smith v. Aldridge,* No. 14–11–00673–CV, 2012 WL 1071246, at \*6 (Tex.App.-Houston [14th Dist.] March 29, 2012, no pet.) (assuming malpractice plaintiff's

allegations supported an independent action for breach of fiduciary duty, plaintiff was required to prove "suit within a suit" to defeat summary judgment on that claim). Because Taylor had the burden—but failed—to raise a fact issue on causation, it is immaterial whether Taylor asserted only malpractice claims, on the one hand, or whether he asserted both malpractice and breach of fiduciary duty claims, on the other. Even if some of his allegations could form the basis for a breach of fiduciary duty claim, Taylor's failure to meet his burden with respect to causation vitiates both. We express no opinion as to whether Taylor asserted claims for breach of fiduciary duty as distinct from legal malpractice; rather, we conclude that, even if he had, his failure to raise a fact issue

on the element of causation would render summary judgment proper on any such claim. *See Finger,* 326 S.W.3d at 291–92; *Smith,* 2012 WL 1071246, at \*6.

### Conclusion

We affirm the judgment of the trial court.

### All Citations

395 S.W.3d 178

### Footnotes

1   Causey did not handle this aspect of the litigation; it was handled by Nelson Hensley, another personal attorney of Taylor.

2   Taylor had made a written $1 million settlement offer through his personal attorney, Hensley, the month before the mediation.

3   Taylor also sued Allstate. He alleged Allstate (1) tortiously interfered with Taylor's relationships with Cersonsky and Causey, (2) breached its contract with Taylor and (3) violated the DTPA and Insurance Code in handling his claim. After the trial court granted Allstate's motion for summary judgment, it severed the claims against Allstate, and Taylor appealed. This court affirmed in part but reversed and remanded Taylor's DTPA and Insurance Code claims against Allstate. *See Taylor v. Allstate Ins. Co.,* 356 S.W.3d 92, 103 (Tex.App.-Houston [1st Dist.] 2011, pet. denied).

4   In addition, the discussion below concerning the causation in the case against Causey applies equally to causation in the case against Cersonsky.

5   Donato's affidavit can also be read to conclude that proper handling of the case would have reduced the amount Taylor had to pay to settle the case, had he decided not to proceed to trial. That theory is also insufficient to survive summary judgment, because there is no evidence that Fullen's representatives would have accepted a settlement offer lower than $3 million. *See Tolpo v. Decordova,* 146 S.W.3d 678, 684 (Tex.App.-Beaumont 2004, no pet.) (affirming summary judgment based on lack of fact issue on causation where there was no evidence that other party in underlying suit would have entered into the contract had former counsel proposed special provision, the omission of which was the basis of former client's malpractice claim).

6   We note that Taylor sought only actual and exemplary damages in this case. In breach of fiduciary duty cases in which the former client seeks disgorgement of fees paid to the attorney, the former client need not prove actual damages. *Burrow v. Arce,* 997 S.W.2d 229, 240 (Tex.1999). Because he did not seek disgorgement of fees, Taylor was required to prove Causey and Cersonsky's breach of fiduciary duties caused his actual damages.

**End of Document**                                                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

YY

445 S.W.3d 698
Supreme Court of Texas.

TENET HOSPITALS LIMITED, A Texas Limited
Partnership d/b/a Providence Memorial Hospital,
and Michael D. Compton, M.D., Petitioners
v.
Elizabeth RIVERA, as Next
Friend for M.R., Respondent.

No. 13–0096.  |  Argued Feb. 4,
2014.  |  Decided Aug. 22, 2014.
|  Rehearing Denied Nov. 21, 2014.

**Synopsis**
**Background:** Mother, on behalf of minor child, brought action against hospital and physician for medical negligence, arising from emergency cesarean section allegedly resulting in minor's permanent neurological injury and disability. The 120th Judicial District Court, El Paso County, Maria Salas–Mendoza, J., granted summary judgment in favor of hospital and physician. Mother appealed. The Court of Appeals, Guadalupe Rivera, J., 392 S.W.3d 326, reversed and remanded. Hospital sought review.

**Holdings:** The Supreme Court, Guzman, J., held that:

[1] statute of repose for the Medical Liability Act did not violate open courts provision as applied to mother, and

[2] statute was not unconstitutionally retroactive as applied.

Reversed and rendered.

Lehrmann, J., dissented and filed opinion.

West Headnotes (17)

**[1]**     **Constitutional Law**
            Facial invalidity
            **Constitutional Law**
            Invalidity as applied

A "facial challenge" claims that a statute, by its terms, always operates unconstitutionally; by contrast, an "as-applied challenge" asserts that a statute, while generally constitutional, operates unconstitutionally as to the claimant because of her particular circumstances.

2 Cases that cite this headnote

**[2]**     **Constitutional Law**
            Conditions, Limitations, and Other Restrictions on Access and Remedies

Open courts provision of Constitution guarantees that a common law remedy will not be unreasonably abridged. Vernon's Ann.Texas Const. Art. 1, § 13.

Cases that cite this headnote

**[3]**     **Limitation of Actions**
            In general;  what constitutes discovery

Tolling provisions generally defer accrual of a claim until the plaintiff knew, or in the exercise of reasonable diligence should have known, the facts giving rise to the claim.

Cases that cite this headnote

**[4]**     **Constitutional Law**
            Time for proceedings

In contrast to tolling statutes, the open courts provision of the Constitution merely gives litigants a reasonable time to discover their injuries and file suit; courts must determine what constitutes a reasonable time frame. Vernon's Ann.Texas Const. Art. 1, § 13.

1 Cases that cite this headnote

**[5]**     **Constitutional Law**
            Time for proceedings;  limitation or suspension of remedy

An open courts challenge is a due process complaint and requires the party to use due diligence. U.S.C.A. Const.Amend. 14; Vernon's Ann.Texas Const. Art. 1, § 13.

1 Cases that cite this headnote

**[6]    Constitutional Law**

   Right of access to the courts and a remedy for injuries in general

The party raising the open courts challenge must raise a fact issue establishing that he did not have a reasonable opportunity to be heard. Vernon's Ann.Texas Const. Art. 1, § 13.

1 Cases that cite this headnote

**[7]    Constitutional Law**

   Delay in assertion of rights;  laches

A guardian's lack of diligence may operate to bar a legally incompetent person's open courts challenge. Vernon's Ann.Texas Const. Art. 1, § 13.

1 Cases that cite this headnote

**[8]    Constitutional Law**

   Delay in assertion of rights;  laches

A next friend's lack of due diligence may operate to bar a minor child's open courts challenge. Vernon's Ann.Texas Const. Art. 1, § 13.

1 Cases that cite this headnote

**[9]    Constitutional Law**

   Time for proceedings

**Limitation of Actions**

   Constitutionality of statute

Ten-year statute of repose for the Medical Liability Act did not violate open courts provision as applied to mother, who brought action as next friend of her child against hospital and physician for medical negligence, arising from emergency cesarean section allegedly resulting in child's permanent neurological injury and disability, where an attorney sent the hospital and physician the statutorily required notice of child's health care liability claim two years before the statute of repose barred it, but then waited over six-and-a-half years to file suit. Vernon's Ann.Texas Const. Art. 1, § 13;

V.T.C.A., Civil Practice & Remedies Code § 74.251(b).

1 Cases that cite this headnote

**[10]    Constitutional Law**

   Abrogation, modification, or recognition of remedies

Test for whether a law violates the open courts provision is if the law: (1) imposes substitute remedies, whether those remedies are reasonable, or (2) extinguishes remedies, whether such action is a reasonable exercise of the police power. Vernon's Ann.Texas Const. Art. 1, § 13.

Cases that cite this headnote

**[11]    Statutes**

   Nature and definition of retroactive statute

A "retroactive law" is one that extends to matters that occurred in the past.

1 Cases that cite this headnote

**[12]    Statutes**

   Power to enact;  validity

Not all retroactive statutes are unconstitutional.

Cases that cite this headnote

**[13]    Statutes**

   Power to enact;  validity

The test for examining whether retroactive laws are constitutional considers the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings, the nature of the prior right impaired by the statute, and the extent of the impairment.

Cases that cite this headnote

**[14]    Statutes**

   Power to enact;  validity

In retroactivity inquiry, Supreme Court must balance a compelling public interest against the

nature of the prior right and the extent to which the statute impairs that right.

Cases that cite this headnote

**[15]** **Limitation of Actions**
　　 Retroactive Operation
**Statutes**
　　 Statutes of limitations

Ten-year statute of repose for the Medical Liability Act was not unconstitutionally retroactive as applied in action by mother as next friend of child against hospital and physician for medical negligence, arising from emergency cesarean section allegedly resulting in child's permanent neurological injury and disability; Medical Liability Act demonstrated its compelling public purpose in lowering the cost of medical malpractice premiums and broadening access to health care, and mother had a three-year grace period to bring the claim. V.T.C.A., Civil Practice & Remedies Code § 74.251(b).

1 Cases that cite this headnote

**[16]** **Constitutional Law**
　　 Third-party standing in general

The more difficult plight of a different or hypothetical litigant will not save a litigant's as-applied challenge to the constitutionality of a statute.

1 Cases that cite this headnote

**[17]** **Constitutional Law**
　　 Judicial Authority and Duty in General

There is no need to strike a statute down because it might operate unconstitutionally in another case.

1 Cases that cite this headnote

**West Codenotes**

**Negative Treatment Vacated**

 **\*700** V.T.C.A., Civil Practice & Remedies Code § 74.251(b)

**Attorneys and Law Firms**

Michael S. Hull, Hull Hendricks L.L.P., Austin, TX, for Amicus Curiae Texas Alliance for Patient Access.

Jason Paul Hungerford, John Scott Mann, Ken Slavin, Kemp Smith, LLP, P. Michael Jung, Strasburger & Price LLP, Dallas, TX, for Petitioner Tenet Hospitals Limited.

H. Keith Myers, Steven L. Hughes, Mounce, Green, Myers, Safi, Paxson & Galatzan, P.C., El Paso, TX, for Petitioners Michael D. Compton, M.D.

Alfonso L. Melendez, Alfonso L. Melendez P.C., Enrique Moreno, Law Offices of Enrique Moreno, John P. Mobbs, Attorney-at-Law, El Paso, TX, for Respondent Elizabeth Rivera.

**Opinion**

Justice GUZMAN delivered the opinion of the Court in which Chief Justice HECHT, Justice GREEN, Justice JOHNSON, Justice WILLETT, Justice BOYD, Justice DEVINE, and Justice BROWN joined.

Our Constitution must strike a delicate balance between the pre-existing rights of individuals and the state's need to abridge those rights to achieve important public policy objectives. This appeal raises such questions of balance through a challenge to the statute of repose in the Medical Liability Act. In 2003, the Legislature enacted the Medical Liability Act to lower the escalating cost of medical malpractice insurance premiums and increase access to health care. The Act contains a statute of repose that operates to bar claims not brought within ten years of the date of the medical treatment.

Here, alleged negligence occurred during the birth of a child in 1996. Under the 2003 repose statute, a suit on this negligence claim must be filed by 2006. In 2004, an attorney for the mother notified the hospital of the minor's claim, but no suit was filed until 2011, five years after the repose statute's deadline. The hospital moved for summary judgment on the ground that the repose statute barred the claim, and the mother responded that the repose statute violates the open courts and retroactivity provisions of the Texas Constitution. We overrule both constitutional challenges.

The open courts challenge fails due to the mother's lack of diligence in filing suit. In this context, an open courts challenge contends that the claimant had an insufficient opportunity to bring suit. It is well-established in our jurisprudence that such open-courts challengers must themselves be diligent in bringing suit. The mother cannot meet this requirement because she was aware of the claim one year into her three-year period to bring the claim but waited over six additional years to file suit. The mother's retroactivity challenge also fails because a compelling public purpose justified the legislation and granted her a three-year grace period to file suit. Because the court of appeals found in the mother's favor on her open courts challenge, we reverse the court of appeals' judgment and render judgment that the plaintiff take nothing.

## I. Background

In 1996, Elizabeth Rivera was nine months pregnant with her daughter, M.R., when she visited the emergency room of **\*701** Providence Hospital[1] with a cough and fever. Dr. Michael Compton assessed Rivera and discharged her. The following day, Rivera noticed decreased fetal movement and returned to the hospital, where M.R. was delivered via emergency C-section. M.R. lacked oxygen and has permanent neurological disabilities. Rivera claims this injury resulted from the hospital and Dr. Compton's failure to properly assess and monitor her and notify her OB/GYN.

Seven years after the medical treatment at issue (in 2003), the Legislature enacted a ten-year statute of repose for the Medical Liability Act, which provides:

> A claimant must bring a health care liability claim not later than 10 years after the date of the act or omission that gives rise to the claim. This subsection is intended as a statute of repose so that all claims must be brought within 10 years or they are time barred.

Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 872 (current version at TEX. CIV. PRAC. & REM.CODE § 74.251(b)). Thus, when the repose statute became law, M.R.'s claim needed to be brought within three years to avoid the claim being barred by the statute of repose.[2]

In August 2004, Rivera's lawyer sent the hospital the statutorily required notice of a health care liability claim,[3] but only filed suit (on M.R.'s behalf) in March 2011—five years after the repose statute barred the claim and six-and-a-half years after Rivera sent pre-suit notice of the claim. The hospital and Dr. Compton moved for summary judgment based on the statute of repose and the trial court granted the motion. The court of appeals reversed, holding that the statute of repose violated the open courts provision as applied to M.R. 392 S.W.3d 326, 333 (Tex.App.–El Paso 2012). We granted the hospital and Dr. Compton's petitions for review.[4]

## II. Discussion

Rivera poses open courts and retroactivity challenges to the repose statute as independent bases for affirming the court of appeals. Regarding the open courts challenge, Rivera claims the repose statute is similar to previous statutes of limitations we held to be unconstitutional as applied to minors. Regarding the retroactivity challenge, Rivera contends the repose statute is unconstitutionally retroactive because it extinguished M.R.'s claim before she could reach the age of majority. We address each constitutional challenge in turn. In doing so, we are mindful that we begin assessing a constitutional challenge with a presumption that the statute is valid[5] and **\*702** do not defer to lower court constructions of statutes.[6]

 **[1]** The distinction between facial and as-applied challenges also bears mentioning because we consider bother Rivera's challenges to be as-applied challenges. A facial challenge claims that a statute, by its terms, always operates unconstitutionally. *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *Tex. Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 518 (Tex.1995). By contrast, an as-applied challenge asserts that a statute, while generally constitutional, operates unconstitutionally as to the claimant because of her particular circumstances.[7] *City of Corpus Christi v. Pub. Util. Comm'n of Tex.,* 51 S.W.3d 231, 240 (Tex.2001); *Garcia,* 893 S.W.2d at 518 n. 16.

Both of Rivera's constitutional challenges here (open courts and retroactivity) are as-applied challenges. Her open courts challenge does not claim the repose statute operates unconstitutionally as to all persons, and we have previously held open courts applied constitutionally to an adult who could not discover her claim before the repose statute

barred it.[8] *Methodist Healthcare Sys., Ltd., L.L.P. v. Rankin,* 307 S.W.3d 283, 292 (Tex.2010); *see Yancy v. United Surgical Partners Int'l, Inc.,* 236 S.W.3d 778, 786 (Tex.2007) (treating an open courts challenge as an as-applied challenge). Likewise, Rivera's retroactivity challenge is an as-applied challenge because it contends the repose statute is unconstitutionally retroactive as to M.R.'s claim based upon the particular circumstances of her situation. *See Robinson v. Crown Cork & Seal Co.,* 335 S.W.3d 126, 147 (Tex.2010) (treating a retroactivity challenge as an as-applied challenge). With this background in mind, we turn to the substance of Rivera's constitutional challenges.

### A. Open Courts

In *Weiner v. Wasson*[9] and *Sax v. Votteler*[10], we held statutes of limitations requiring minors to bring medical malpractice suits by a certain age violated the open courts provision. Rivera argues these decisions compel the conclusion that this repose statute is unconstitutional as applied to M.R., who is also a minor. The hospital primarily counters that, because we upheld this repose statute against an open courts challenge in *Rankin,* we likewise must do so here.[11] We agree with the hospital's conclusion that the repose statute does not violate the open courts provision as applied to M.R., but rely on different reasons.

**\*703** **[2]** **[3]** **[4]** **[5]** **[6]** The open courts provision of the Texas Constitution provides: "All courts shall be open and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." TEX. CONST. art. I, § 13. This requirement "guarantees that a common law remedy will not be unreasonably abridged." *Garcia,* 893 S.W.2d at 521. This guarantee operates quite differently from a tolling provision. *Yancy,* 236 S.W.3d at 784. Tolling provisions generally defer accrual of a claim until the plaintiff knew, or in the exercise of reasonable diligence should have known, the facts giving rise to the claim. *Id.* (citing *HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 886 (Tex.1998)). By contrast, "the open courts provision merely gives litigants a reasonable time to discover their injuries and file suit," and courts must determine what constitutes a reasonable time frame. *See id.* In short, an open courts challenge is a due process complaint and requires the party to use due diligence. *Id.* at 785. Procedurally, the party raising the open courts challenge "must raise 'a fact issue establishing that he did not have a reasonable opportunity'

to be heard." *Stockton v. Offenbach,* 336 S.W.3d 610, 618 (Tex.2011) (quoting *Yancy,* 236 S.W.3d at 785).

We have interpreted this due diligence requirement three times in the past two decades, and these precedents guide our analysis here. First, in *Shah v. Moss,* Moss sued Shah for negligence in performing eye surgery and neglecting to provide adequate post-surgical treatment. 67 S.W.3d 836, 839 (Tex.2001). When Shah moved for summary judgment on limitations, Moss asserted that the limitations statute violated the open courts provision. *Id.* at 840–41. Moss knew about the alleged injury at least seventeen months before he filed suit but offered no explanation for his delay. *Id.* at 847. Thus, we concluded that, as a matter of law, Moss failed to file suit within a reasonable time after discovering his injury. *Id.*

Six years after we decided *Shah,* we addressed a case with facts more closely aligned with those presented here. In *Yancy,* Yates suffered cardiac arrest when undergoing a procedure to remove kidney stones. 236 S.W.3d at 780. She was resuscitated but remained comatose after the procedure. *Id.* Some nineteen months later, Yates's guardian sued two defendants and waited another twenty-two months to sue two additional defendants. *Id.* The additional defendants moved for summary judgment on limitations, to which the guardian raised an open courts challenge. *Id.* Relying on *Shah,* we overruled the open courts challenge because the guardian offered no explanation for waiting twenty-two months after filing her petition to sue the additional defendants. *Id.* at 785. Specifically, we observed that the guardian

> knew of [Yates's] condition and retained a lawyer well within the limitations period. On this record, there is no fact issue establishing that [the guardian] ... sued within a reasonable time after discovering the alleged wrong. Thus, the open courts provision does not save Yates's time-barred negligence claims.

*Id.* We acknowledged precedent indicating that a statute requiring an incapacitated plaintiff to give pre-suit notice would "require an impossible thing." *Id.* at 786 (citing *Tinkle v. Henderson,* 730 S.W.2d 163, 167 (Tex.App.-Tyler 1987, writ ref'd)). But we concluded the limitations statute there did not require an impossible thing of Yates, who had a guardian, retained a lawyer, and filed suit within the limitations period. *Id.* We opined that, because the limitations statute was constitutional as applied to Yates, "there is no need to strike it

down because it might operate unconstitutionally in another case." *Id.*

**\*704** Most recently, in *Stockton,* a mother of a minor with a health care liability claim raised an open courts challenge to the Medical Liability Act's 120–day deadline to serve an expert report. 336 S.W.3d at 617–18. There, *Stockton* was unable to serve the report on a defendant and filed a motion forty days after filing suit to request substituted service for the report. *Id.* at 618. However, Stockton did not alert the trial court to the impending expert report deadline, and the court granted the motion four months later after requesting additional information. *Id.* at 617. We held that Stockton did not raise a fact issue concerning her due diligence and overruled her open courts challenge. *Id.* at 617–18. Notably, the fact that she was a next friend of her minor child did not prevent this Court from imputing her lack of diligence to her child. *Id.*

**[7]** **[8]** In sum, we have found delays of four months, [12] seventeen months, [13] and twenty-two months [14] to constitute a lack of due diligence as a matter of law—such that an open courts challenge must fail at summary judgment. Additionally, a guardian's lack of diligence may operate to bar a legally incompetent person's open courts challenge. *Yancy,* 236 S.W.3d at 785. And a next friend's lack of due diligence may operate to bar a minor child's open courts challenge. *Stockton,* 336 S.W.3d at 617–18.

**[9]** Here, Rivera acted as the M.R.'s next friend. In 2004, a lawyer for Rivera sent the hospital the statutorily required notice of M.R.'s health care liability claim, but Rivera waited over six-and-a-half years to file suit (represented by the same lawyer). This period of time is fifteen times the four months we found constituted a lack of diligence in *Stockton,* [15] over five times the seventeen months in *Shah,* [16] and almost three times the twenty-two months in *Yancy.* [17] And as in *Stockton, Yancy*, and *Shah,* the plaintiff has offered no explanation for her delay in filing suit. Moreover, similar to Yancy, the repose statute did not deprive M.R. of her opportunity to be heard because she gave statutory pre-suit notice of her claim two years before the repose statute barred it. [18] *See Yancy,* 236 S.W.3d at 785–86 (concluding that a statute did not deprive a legally incompetent person of her opportunity to be heard because she had a guardian, retained a lawyer, and filed suit against some defendants within the limitations period). Accordingly, on this record, there is no fact issue establishing that Rivera (on M.R.'s behalf) "did not have a

reasonable opportunity to discover the alleged wrong and bring suit before the repose statute barred her claim or that she sued within a reasonable time after discovering the alleged wrong." *Id.* at 785. Accordingly, the open courts provision cannot revive M.R.'s time-barred claim. *See id.*

Rivera argues we should not impute any lack of diligence on her part to M.R. But our precedents have required due diligence of a next friend raising an open courts challenge on behalf of a minor in *Stockton,* 336 S.W.3d at 617–18, as well as of the guardian of a legally incompetent person raising an open courts challenge in **\*705** *Yancy,* 236 S.W.3d at 785–86. Rivera offers us no compelling reason to overturn either decision. And the consistency of these decisions is well-founded. The law, our precedent, and our rules of procedure all treat minors and legally incompetent persons alike as lacking the legal capacity to sue, such that they must appear in court through a legal guardian, a next friend, or a guardian ad litem. *See* TEX. CIV. PRAC. & REM.CODE § 16.001 (classifying persons under 18 years of age and persons of unsound mind as being under a legal disability); TEX.R. CIV. P. 44, 173; *Austin Nursing Center v. Lovato,* 171 S.W.3d 845, 849 (Tex.2005). [19] Indeed, our precedent reveals only one instance discussing minors and incompetent persons differently, and it poignantly observed that minors and legally incompetent persons are treated comparably, but that incompetent persons are deserving of perhaps even greater protections. *Tinkle,* 730 S.W.2d at 166. [20]

We must note the fact that the similar treatment of minors and legally incompetent persons does not necessarily mean next friends or parents and guardians are treated similarly. There are specific procedures for guardians that do not apply to next friends. For example, guardians: are court-appointed, [21] act as fiduciaries on behalf of the legally incompetent person, [22] need not post security for costs in suits brought on behalf of the legally incompetent person, [23] generally must post a bond, [24] and must annually report on the guardianship to the court that appointed them. [25] But if anything, these technical requirements simply bring guardians in line with the powers and duties that parents possess. Unlike a guardian, a parent as next friend need not post a bond until possessing **\*706** money from a judgment on behalf of a minor. [26] But such disparate treatment is largely attributable to the presumption that fit parents act in the best interest of their children. *See In re Derzapf,* 219 S.W.3d 327, 333 (Tex.2007). As a whole, our statutes, rules, and precedent treat guardians and next

friends similarly. *See, e.g.,* TEX.R. CIV. P. 44 (granting next friends the same rights as guardians except that they must give security for costs). We see no reason today to depart from our requirement that guardians and next friends use due diligence in bringing suit to sustain an open courts challenge. [27]

 **[10]** Rivera and the hospital both contend that different precedents regarding the reasonableness of statutory limits to common-law recovery should govern our analysis of the open courts challenge. Substantively, our longstanding test for whether a law violates the open courts provision is (1) if the law imposes substitute remedies, whether those remedies are reasonable, or (2) if the law extinguishes remedies, whether such action is a reasonable exercise of the police power. *Lebohm v. City of Galveston,* 154 Tex. 192, 275 S.W.2d 951, 955 (1955). Rivera contends that under *Weiner* and *Sax,* requiring a minor to sue through a next friend is unreasonable. The hospital asserts that under *Rankin,* extinguishing the claim altogether if not filed within ten years is a reasonable exercise of the police power. Rivera's assertion that *Sax* and *Weiner* control fails for two reasons. First, we need not assess whether the law was reasonable if the party challenging the law was not diligent. We never reached the question of whether the statute was reasonable as applied to the claimants in *Stockton, Yancy*, and *Shah* because the claimants in those cases demonstrated a lack of due diligence. *Stockton,* 336 S.W.3d at 617–18; *Yancy,* 236 S.W.3d at 785; *Shah,* 67 S.W.3d at 847. Second, *Sax* and *Weiner* involved statutes of limitations that expressly applied to minors (that minors must bring health care claims by age twelve in *Sax* and age fourteen in *Weiner* ). We held that those statutes were facially unconstitutional. *See Weiner,* 900 S.W.2d at 320 (expressly declining to invalidate statute of limitations for minors on an as-applied basis). By contrast, this statute does not only affect minors, and Rivera's constitutional challenge is necessarily an as-applied attack. Thus, we must consider the circumstances of Rivera's representation of M.R., including the fact that she hired a lawyer to send pre-suit notice of the claim two years before the repose statute barred it.

We likewise disagree with the hospital that *Rankin* controls this case. Had Rivera exercised due diligence and the repose statute still barred her claim, we would then be required to assess the reasonableness of the law. *See Rankin,* 307 S.W.3d at 285 (assessing the reasonableness of the repose statute when the plaintiff's diligence in bringing suit was not at issue). The absence of due diligence means we need not reach this issue.

## B. Retroactivity

Rivera also challenges the repose statute as unconstitutionally retroactive because it required M.R. to bring her previously accrued claim before she reached the age of majority. The hospital counters **\*707** that the repose statute is not unconstitutionally retroactive because it allowed M.R. three years after the statute took effect to bring her claim through her next friend. We agree with the hospital.

 **[11]** A retroactive law is one that extends to matters that occurred in the past. *Robinson,* 335 S.W.3d at 138 ("A retrospective law literally means a law which looks backwards, or on things that are past; or if it be taken to be the same as retroactive, it means to act on things that are past." (quoting *DeCordova v. City of Galveston,* 4 Tex. 470, 475–76 (1849))); *Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 219 (Tex.2002); *see also Landgraf v. USI Film Prods.,* 511 U.S. 244, 270, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (determining for purposes of retroactivity "whether the new provision attaches new legal consequences to events completed before its enactment."). Here, the parties concede the statute is retroactive as applied to M.R. because it established a date to bar her already-accrued claim.

 **[12]** **[13]** But not all retroactive statutes are unconstitutional. *Robinson,* 335 S.W.3d at 138. In *Robinson,* we established a three-part test for examining whether retroactive laws are constitutional: "the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings; the nature of the prior right impaired by the statute; and the extent of the impairment." *Id.* at 145. This test acknowledges the heavy presumption against retroactive laws by requiring a compelling public interest to overcome the presumption. *Id.* at 146. But it also appropriately encompasses the notion that "statutes are not to be set aside lightly." *Id.* We examine each of the three factors in turn with respect to the repose statute.

Regarding the public interest, the statute at issue in *Robinson* was enacted solely to benefit a single company by reducing its liability in asbestos litigation, which we determined constituted only a slight public interest. *Id.* at 146, 150. By contrast, the repose statute here was part of the 2003 Medical Liability Act, which was a comprehensive overhaul of Texas medical malpractice law to "make affordable medical and health care more accessible and available to the citizens of

Texas," [28] and to "do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis." [29] The Legislature conducted hearings and gathered evidence of the increasing costs of malpractice insurance resulting from claims that endured indeterminately. As a result, the Legislature expressly found that a spike in healthcare liability claims was causing a malpractice insurance crisis that adversely affected the provision of healthcare services in Texas. [30] Unlike the statute in *Robinson,* there is no indication the statute here was to benefit only a particular entity; rather, it was aimed at broadening access to health care by lowering malpractice insurance premiums. We previously concluded this public interest was sufficient to overcome a different constitutional challenge to this statute. *Rankin,* 307 S.W.3d at 288 (holding that public interest in lowering malpractice insurance premiums and increasing access to health care by implementing this repose statute was a valid exercise of the police power sufficient to overcome an open courts challenge). It is likewise a compelling public **\*708** interest with respect to Rivera's retroactivity challenge.

 **[14]** But a compelling public interest does not end the retroactivity inquiry. We must balance that purpose against the nature of the prior right and the extent to which the statute impairs that right. Regarding the nature of the prior right, we held in *Robinson* that the personal injury claim at issue (for mesothelioma) was a mature tort that had a substantial basis in fact due to the discovery in the case. 335 S.W.3d at 148. Here, M.R.'s claim is mature because claims for medical negligence in utero are established causes of action in Texas, *Brown v. Shwarts,* 968 S.W.2d 331, 334 (Tex.1998), and M.R.'s injury has allegedly come to fruition. But unlike in *Robinson,* the sparse record before us fails to provide any indication of the strength of M.R.'s claim. Thus, though the type of claim M.R. has is clearly established, the strength of her individual claim is unclear.

Finally, we assess the extent to which the repose statute impaired M.R.'s claim. Before 1996, when the injury allegedly occurred, there was no statute of repose for medical negligence claims and a minor had until age twenty to sue before limitations would run (the age of majority plus two years for limitations). *Weiner,* 900 S.W.2d at 318–19. Thus, M.R. reasonably had settled expectations in 1996 that she would have until age twenty to file suit, and the repose statute impaired these settled expectations. But we have long recognized that the impairment of such a right may be lessened when a statute affords a plaintiff a grace period to

bring her claim, and we observed in *Robinson* that "a change in the law need not provide a grace period to prevent an impairment of vested rights." 335 S.W.3d at 141. We noted that grace periods of two months to sue, [31] four years to sue, [32] and seven years to resume pumping water [33] had all previously been upheld over retroactivity challenges. *Id.*

We have only upheld constitutional retroactivity challenges four times. In two of those cases, we upheld retroactivity challenges because amendments to statutes of limitations revived claims the previous statutes barred. [34] And in one case, the Legislature extinguished a taxpayer's valid limitations defense to a governmental property tax claim by enacting legislation that prevented taxpayers from raising limitations defenses. *Mellinger v. City of Houston,* 68 Tex. 37, 3 S.W. 249, 254–55 (1887). Finally, in *Robinson,* the statute operated to extinguish Robinson's mature tort claim against a particular defendant, despite discovery showing a substantial basis in fact for the claim. 335 S.W.3d at 148. When balanced against a statute that contained no findings and affected only one defendant, we concluded the "slight" public interest did not justify the impairment to the claims at issue. *Id.* at 149.

 **[15]** Here, M.R. possessed a three-year grace period from the time the repose statute took effect until it extinguished her claim. We have upheld statutes with shorter grace periods, and we cannot say the three-year grace period M.R. possessed rendered the statute unconstitutional as applied in light of its compelling public interest.

 **\*709** Rivera counters that this grace period is meaningless because M.R. could not sue during the time she was under a legal disability and would have to sue through her next friend. But we cannot ignore that Rivera brings an as-applied challenge. Thus, the inquiry must be Rivera representing M.R.—not parents representing children generally. Two facts in this case compel us to reject Rivera's retroactivity challenge. First, Rivera knew of M.R.'s claim one year into the three-year grace period. She demonstrated that knowledge by sending the statutorily-required notice of M.R.'s claim to the hospital through her lawyer. Thus, Rivera cannot rightfully contend that a three-year grace period unconstitutionally deprived her of the ability to bring M.R.'s claim when she knew of the claim long before the period expired. Second, Rivera actually brought M.R.'s claim, albeit after the repose statute barred it. She brought the claim on M.R.'s behalf while M.R. was still a minor. While one may conceive of a scenario where a parent fails to bring her child's claim due to legal incompetence or a conflict of interest with the child,

Rivera's as-applied challenge requires us to consider only her circumstances. *See Weiner,* 900 S.W.2d at 327 (Owen, J., dissenting). There is no indication in the record that Rivera is legally incompetent or possesses a conflict of interest with M.R. And sending pre-suit notice of M.R.'s claim and filing suit on her behalf demonstrates Rivera's capability of representing M.R.

In short, the Legislature's findings in enacting the Medical Liability Act demonstrate its compelling public purpose in lowering the cost of medical malpractice premiums and broadening access to health care. And although the record gives no indication of the strength of M.R.'s claim, the repose statute gave M.R. a three-year grace period to bring her claim. In light of the compelling public purpose and the three-year grace period, we overrule Rivera's challenge that the statute is unconstitutionally retroactive as applied.

### C. Response to the Dissent

The dissent would hold that the repose statute violates the open courts provision and is unconstitutionally retroactive. Regarding the open courts challenge, the dissent correctly observes that the open courts provision requires a "reasonable opportunity" to sue and may not make a remedy contingent on "an impossible condition." 445 S.W.3d 698, 711 (Lehrmann, J., dissenting) (quoting *Stockton,* 336 S.W.3d at 617–18, and *Shah,* 67 S.W.3d at 842). But here, M.R. had three years to sue through Rivera, who hired a lawyer and sent pre-suit notice of the claim two years before the repose statute barred it. The statute afforded M.R. a reasonable opportunity to sue through her parent and did not impose an impossible condition. Thus, we disagree with the dissent that the as-applied challenge prevails.

The dissent also raises two additional arguments regarding the open courts challenge, neither of which is persuasive. First, the dissent contends we have never imputed a parent's due diligence to the minor child she represents. But we did precisely that three years ago in *Stockton.*[35] The dissent claims *Stockton* was different in that the parent there argued the statute was unconstitutional as applied "*to her*" because it was impossible for her to comply with the statutory deadline at issue. 445 S.W.3d at 713 (Lehrmann, J., dissenting) (quoting *Stockton,* 336 S.W.3d at 612). But in *Stockton,* the parent's failure to use due diligence to comply with the statutory procedure barred her minor **\*710** child's claim. 336 S.W.3d at 612. Here, the parent's failure to use due diligence

to comply with the statute's procedure barred her minor child's claim. There is no legal difference between *Stockton* and this case.

Second, the dissent believes that imputing a guardian's lack of diligence to a ward in *Yancy* is materially different from imputing a parent's lack of diligence to a minor child and warrants a different result. But the dissent cites no authority for that proposition, and for a good reason. We have previously observed that "[t]raditionally the interests of minors, incompetents, and other helpless persons are viewed in law as substantially similar, and both the substantive law and the rules of procedure accord them comparable treatment." *Tinkle,* 730 S.W.2d at 166. We see no reason to treat parents of minor children differently than guardians of wards in this circumstance.

 **[16]** **[17]** Finally, the dissent concludes that the repose statute is unconstitutionally retroactive as applied to M.R. This conclusion stems from its interpretation of *Weiner* that inquiring into whether a particular parent was incompetent or possessed a conflict of interest is an unworkable standard. *Weiner* did not involve a retroactivity challenge, and retroactivity challenges are, by definition, as-applied constitutional challenges. They examine only the position of the party raising the challenge. The more difficult plight of a different or hypothetical litigant will not save a litigant's as-applied challenge. Or as we observed in *Yancy,* "there is no need to strike [a statute] down because it might operate unconstitutionally in another case." 236 S.W.3d at 786. Our courts have had little difficulty examining the particular circumstances of those raising retroactivity challenges, and we are confident in their ability to continue to do so.

### III. Conclusion

In sum, we uphold the Medical Liability Act's ten-year statute of repose against Rivera's as-applied constitutional challenges on open courts and retroactivity grounds. Rivera fails to meet this requirement because she was aware of M.R.'s claim one year into her three-year period to bring the claim but waited over six-and-a-half additional years to file suit. Rivera's retroactivity challenge also fails because a compelling public purpose justified the legislation and granted Rivera a three-year grace period to file suit. Because the court of appeals found in favor of Rivera on her open courts challenge, we reverse the court of appeals' judgment and render judgment that Rivera take nothing.

Justice LEHRMANN filed a dissenting opinion.

Justice LEHRMANN, dissenting.
Statutes of repose present harsh barriers to the administration of justice. Today the Court extends this obstacle to situations involving the most vulnerable amongst us—our children. And it does so under the false notion that all parents can and do adequately protect their children. However, the sad reality is that the needs of too many children—our most valuable resource—are not satisfactorily addressed by their parents. While the Texas Medical Liability Act's repose statute requires a health care liability claim to be brought within ten years of the date medical treatment is provided, we have never held that this statute may properly apply to bar the claims of innocent children. To the contrary, we have consistently held that statutes of limitations that similarly purport to bar a child's claim violate the Texas Constitution.

In the underlying suit, M.R. was injured during childbirth, allegedly as a result of **\*711** the negligence of the treating physician and hospital. M.R.'s mother, Elizabeth Rivera, filed suit on M.R.'s behalf more than ten years later. M.R. was seven years old when the repose statute took effect. The Court holds today that, as applied to M.R., the statute violates neither the Texas Constitution's open courts provision nor its prohibition against retroactive laws. In so holding, the Court attributes Rivera's apparent lack of diligence to her daughter and concludes that M.R. had a reasonable opportunity to sue through Rivera before the statute took effect. Because this holding contradicts well-settled precedent in which we refused to bar a minor's claim because of the action (or, more accurately, inaction) of a parent, I am compelled to respectfully express my dissent.

### I. Open Courts

The Texas Constitution's open courts provision [1] "protects a person from legislative acts that cut off a person's right to sue before there is a reasonable opportunity to discover the wrong and bring suit." *Shah v. Moss,* 67 S.W.3d 836, 842 (Tex.2001). Stated another way, the Legislature may not "mak[e] a remedy by due course of law contingent upon an impossible condition." *Stockton v. Offenbach,* 336 S.W.3d 610, 617–18 (Tex.2011) (citation and internal quotation marks omitted). A statute violates the open courts provision

when a litigant shows (1) he "has a cognizable common law cause of action that is being restricted," and (2) "the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute." *Trinity River Auth. v. URS Consultants, Inc.,* 889 S.W.2d 259, 262 (Tex.1994) (citation and internal quotation marks omitted). We have also noted that a plaintiff is not entitled to relief under the open courts provision "if he does not use due diligence and sue within a reasonable time after learning about the alleged wrong." *Shah,* 67 S.W.3d at 847.

The Court holds that Rivera failed to use due diligence in filing the underlying suit on M.R.'s behalf, thereby foreclosing her open courts challenge to the statute of repose. [2] In my view, attributing Rivera's lack of due diligence to her daughter is both fundamentally unfair and contrary to our decisions in *Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983), and *Weiner v. Wasson,* 900 S.W.2d 316 (Tex.1995).

In *Sax,* we evaluated the two-year statute of limitations on medical malpractice claims contained in a prior version of the Medical Liability Act. [3] 648 S.W.2d at 663. Before that statute was enacted, the limitations period on all tort actions by minors was tolled until two years after they reached the age of majority. *Id.* The challenged statute removed that tolling provision in medical malpractice cases, with the exception that minors under the age of six had until their eighth birthday to file such claims. *Id.* The plaintiffs in *Sax* sued a doctor for malpractice on behalf of their minor daughter more than two years after she was treated, and the defendant argued that the statute of limitations barred their **\*712** claim. *Id.* We held that the admittedly legitimate purpose of the statute of limitations—generally, to increase the availability of medical practice insurance and, more specifically, to limit the length of time insureds are exposed to potential liability—did not justify "the effective abrogation of a child's right to redress." *Id.* at 666–67.

In holding that the statute violated the open courts provision, we expressly considered, and rejected, a parent's ability to sue on behalf of his child as adequately protecting the child's rights. We held:

> If the parents, guardians, or next friends of the child negligently fail to take action in the child's behalf within the time provided by article 5.82, the child is precluded from asserting his

cause of action under that statute. Furthermore, the child is precluded from suing his parents on account of their negligence, due to the doctrine of parent-child immunity. The child, therefore, is effectively barred from any remedy if his parents fail to timely file suit. Respondents argue that parents will adequately protect the rights of their children. *This Court, however, cannot assume that parents will act in such a manner. It is neither reasonable nor realistic to rely upon parents, who may themselves be minors, or who may be ignorant, lethargic, or lack concern, to bring a malpractice lawsuit action within the time provided by article 5.82.*

*Id.* at 667 (emphasis added) (internal citation omitted). We concluded that "[u]nder the facts in [that] case, [the child was] forever precluded from having her day in court to complain of an act of medical malpractice," that "the [L]egislature [had] failed to provide her any adequate substitute to obtain redress," and that former article 5.82 was therefore "unconstitutional as it applie[d] to a minor's cause of action." *Id.*

Twelve years after deciding *Sax,* we reaffirmed the opinion and applied its reasoning in *Weiner.* In that case, we considered an open courts challenge to the statute that replaced article 5.82. 900 S.W.2d at 317–18. Section 10.01 of the Medical Liability and Insurance Improvement Act maintained the two-year statute of limitations for medical malpractice claims contained in article 5.82, but broadened the exception for minors to allow those under the age of twelve until their fourteenth birthday to file suit. Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 10.01, 1977 Tex. Gen. Laws 2039, 2052 (former TEX.REV.CIV. STAT. art. 4590i, § 10.01), *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 884. Notwithstanding this "inconsequential" change, we held that "section 10.01, like its predecessor article 5.82, is unconstitutional as applied to minors because it purports to cut off [the minor plaintiff's] cause of action before he reaches majority, an age at which he may lawfully sue on his own behalf." *Weiner,* 900 S.W.2d at 318. In so holding, we confirmed that "*Sax* has become firmly ensconced in Texas jurisprudence." *Id.* at 320.

Our analysis in *Sax* and *Weiner* confirms that a parent's failure to use due diligence in pursuing his minor child's health care liability claim should not and does not foreclose pursuit of that claim. However, the Court concludes that these cases do not control for two reasons, neither of which is persuasive. First, the Court notes that in *Sax* and *Weiner* we evaluated the reasonableness of the statute in question, while the issue here is the diligence of the party challenging the law. 445 S.W.3d at 706. But the basis of our holding that the statutes of limitations in **\*713** *Sax* and *Weiner* were unreasonable—and in turn unconstitutional—was that it was "neither reasonable nor realistic to rely upon parents, who may themselves be minors, or who may be ignorant, lethargic, or lack concern, to bring a malpractice lawsuit action" within the limitations period. *Sax,* 648 S.W.2d at 667; *see also Weiner,* 900 S.W.2d at 320 ("We fail to see any benefit in requiring a minor to show that his or her parent was incompetent or failed to act in the minor's best interests by not pursuing a medical malpractice claim, especially when the very failure of the parent to do so leaves the minor without any legal recourse."). For the same reason, we may not rely on parents to pursue their child's health care liability claim with due diligence. As in *Sax* and *Weiner,* their failure to do so leaves the minor with no legal recourse.

Second, the Court distinguishes *Sax* and *Weiner* on the grounds that they presented facial open courts challenges to the statutes at issue, while the underlying case presents an as-applied challenge that must take into account "the circumstances of Rivera's representation of M.R." 445 S.W.3d at 706. I disagree. In *Sax* and *Weiner,* the plaintiffs contended, and we held, that the statutes at issue were unconstitutional as applied to minors whose claims were cut off before they reached the age of majority and had the legal capacity to sue. *See Sax,* 648 S.W.2d at 667 (holding article 5.82 unconstitutional "as it applies to a minor's cause of action"); *Weiner,* 900 S.W.2d at 318 (holding section 10.01 "unconstitutional as applied to minors"). Similarly, in this case Rivera challenges the constitutionality of the Medical Liability Act's statute of repose as applied to minor plaintiffs whose claims are cut off before they reach the age of majority. *See Adams v. Gottwald,* 179 S.W.3d 101, 102 (Tex.App.-San Antonio 2005, pet. denied) (noting that the plaintiffs challenged the constitutionality of the Medical Liability Act's statute of limitations "on its face as applied to all minors," not "as applied to [the minor at issue] and her circumstances").

The Court also relies on three distinguishable cases in which we rejected open courts challenges based on a lack of due

diligence. *Shah* provides no guidance because it involved a plaintiff who failed to use due diligence in asserting his own claim. 67 S.W.3d at 846–47. The Court also relies on *Stockton,* in which a parent sued on behalf of her minor child and challenged the Medical Liability Act's expert-report requirement, with which she had failed to comply. 336 S.W.3d at 612. The parent argued that the statute was "unconstitutional as applied *to her* because it was impossible for her to comply with its deadline." *Id.* (emphasis added). The parent did not argue that her failures should not extinguish her child's claim, and we did not address the issue.

Finally, the Court relies on *Yancy v. United Surgical Partners International, Inc.,* in which the guardian of an incapacitated adult filed health care liability claims on behalf of her ward against some defendants within the limitations period, but against others after the limitations period had expired. 236 S.W.3d 778, 780 (Tex.2007). We held that the guardian's lack of diligence in pursuing claims against the latter defendants precluded the open courts provision from saving the ward's time-barred claims. *Id.* at 785. The Court applies this reasoning to a parent's lack of diligence in pursuing a minor child's claims; I would not. The Court recognizes the strict legal procedures applicable to guardians, such as the fact that they are court-appointed, act as fiduciaries on behalf of their wards, must post a bond, and must report annually to the court. 445 S.W.3d at 705. These statutory requirements **\*714** are significant and do more than simply "bring guardians in line with the powers and duties that parents possess." *Id.* at 705. They also help minimize the possibility that guardians "may be ignorant, lethargic, or lack concern," the very concern that led us in *Sax* to reject the presumption that parents will act diligently in pursuing claims on their child's behalf. 648 S.W.2d at 667.

For these reasons, I would not extend *Yancy's* reasoning to the underlying case. Confining *Yancy* to the situation in which a court-appointed guardian fails to act with due diligence reconciles that case with *Sax* and *Weiner,* and properly recognizes the significant differences between such guardians and parents acting as next friends. I would hold that, under *Sax* and *Weiner,* an open courts challenge to the Medical Liability Act's statute of repose brought by or on behalf of a minor may not be foreclosed by a parent's lack of diligence in bringing the suit.

I would further hold that *Sax* and *Weiner* compel a holding that the Medical Liability Act's ten-year statute of repose violates the open courts provision as applied to minors like

M.R. because (1) she has a cognizable common law cause of action that is being restricted, and (2) the restriction is unreasonable when balanced against the statute's purpose. *See id.* at 666. As noted above, in those cases we held that the Act's statute of limitations was unconstitutional as applied to a minor's cause of action that the statute "purports to cut off ... before [the minor] reaches majority." *Weiner,* 900 S.W.2d at 318; *see also Sax,* 648 S.W.2d at 667. To the extent the Act's statute of repose leads to the same result, it too violates the open courts provision.

The hospital in this case contends that our opinion in *Methodist Healthcare System of San Antonio, Ltd. v. Rankin,* 307 S.W.3d 283 (Tex.2010), which also involved an open courts challenge to the Act's statute of repose, forecloses Rivera's claim. In *Rankin,* the plaintiff presented evidence that she did not know and could not have reasonably discovered prior to the repose period's expiration that a surgical sponge had been left inside her during surgery. *Id.* at 285. Rejecting the plaintiff's open courts challenge, we held that the statute of repose was a reasonable exercise of the Legislature's police power, noting that "the key purpose of a repose statute is to eliminate uncertainties under the related statute of limitations and to create a final deadline for filing suit that is not subject to any exceptions." *Id.* at 286, 290.

Although *Rankin* involved the Medical Liability Act's statute of repose, while *Sax* and *Weiner* involved the Act's statute of limitations, I would hold that *Sax* and *Weiner,* rather than *Rankin,* control the outcome of this case. First, the statutes of limitations we considered in *Sax* and *Weiner,* as applied to minors, had the effect of a repose statute in that they removed the tolling provision otherwise applicable to minors, at least once the minors reached a certain age (six in *Sax;* twelve in *Weiner* ). As to such plaintiffs, the statutes served as a "definitive cut-off" just as statutes of repose do. *Id.* at 288. And the purpose underlying the Medical Liability Act that was passed in 2003 as part of House Bill 4, which contains the applicable statute of repose, is the same as that underlying the statutes that were at issue in *Sax* and *Weiner:* to limit the length of time malpractice insureds are exposed to potential liability in order to increase the availability of medical practice insurance and affordable health care. *See id.* at 287; *Sax,* 648 S.W.2d at 666. While this purpose remains legitimate, it does not alter the analyses or the conclusions reached in *Sax* and *Weiner.*

**\*715** Finally, in *Rankin* we found it significant that allowing a constitutional exception to the statute of repose

for undiscoverable injuries "means never-ending exposure to liability, which in turn injects actuarial uncertainty into the insurance market [that] wholly undermines the purpose of House Bill 4 and of statutes of repose generally: to declare a no-exceptions cut-off point and grant a substantive right to be free of liability." 307 S.W.3d at 291. This concern is unfounded when the basis of the open courts violation is that minors' claims will be foreclosed before they reach the age of majority. A malpractice insured's exposure is not "never-ending" in this context; a definite "cutoff point" exists at which the insured will "be free of liability." *Id.*

"Under the facts in this case, [M.R.] is forever precluded from having her day in court to complain of an act of medical malpractice." *Sax,* 648 S.W.2d at 667. Because I cannot conclude that this results from a reasonable use of the police power, I depart from the Court and would hold that the Medical Liability Act's ten-year statute of repose violates Article I, Section 13 of the Texas Constitution as applied to minors.

### II. Retroactivity

As the Court notes, M.R.'s malpractice claim accrued in 1996, and the ten-year statute of repose went into effect in 2003. Prior to the repose statute's enactment, a minor had until the age of twenty to assert a health care liability claim. *Weiner,* 900 S.W.2d at 321. After its enactment, a minor had no more than ten years from the date of medical treatment. In a case like M.R.'s, the statute's effect is to cut off a minor's previously accrued claim before she has the legal capacity to sue. The Court concludes that the repose statute, while retroactive as applied to M.R., is not unconstitutionally so. I disagree.

A retroactive law is presumed unconstitutional,[4] requiring "a compelling public interest to overcome" that presumption. *Robinson v. Crown Cork & Seal Co.,* 335 S.W.3d 126, 146 (Tex.2010). In *Robinson,* we developed a three-factor test to utilize in evaluating a retroactive law. *Id.* at 145. Under that test, we consider: "the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings; the nature of the prior right impaired by the statute; and the extent of the impairment." *Id.*

I do not disagree with the Court's analysis of the first factor. We have already recognized that the Legislature's purpose in limiting the length of exposure to medical malpractice cases is a legitimate one. *Rankin,* 307 S.W.3d at 287–88; *Sax,* 648 S.W.2d at 667. As to the second factor, the Court recognizes that M.R.'s claim for medical negligence in utero is an "established cause[ ] of action in Texas." 445 S.W.3d at 708. Because these factors weigh in opposing directions, the third factor is the crux of the Court's conclusion. As to that factor, the Court holds that the extent of the impairment to M.R.'s rights is significantly lessened by the fact that she had a three-year grace period following the statute's enactment to pursue her claim before the repose period expired, despite the fact that she could not do so on her own behalf. *Id.* at 709. Because there is evidence that Rivera knew of the claim but failed to timely assert it, and finding "no indication in the record that Rivera is legally incompetent or possesses a conflict of interest with [M.R.]," the **\*716** Court finds this grace period persuasive. *Id.* at 709.

This conclusion is at odds with our recognition in *Weiner* that a parent's failure to sue on behalf of a minor affects neither the tolling of the limitations period nor the constitutionality of the Medical Liability Act's statute of limitations under the open courts provision. 900 S.W.2d at 318–19. We criticized as "unworkable" a standard that "would inquire whether the minor's parent was 'incompetent' or had a 'conflict of interest' that prevented the parent from acting in the minor's best interests." *Id.* at 320. For the same reason a parent's right to take action on his child's behalf is irrelevant to an open courts challenge, it has no bearing on the extent of a retroactive statute's impairment of a minor's rights. In other words, while Rivera had a three-year grace period to assert M.R.'s claims, M.R. herself had no grace period at all because the statute of repose absolutely extinguished her negligence claim before she was legally capable of asserting it. I would therefore hold that the presumption against the statute's constitutionality was not overcome.

### III. Conclusion

However legitimate a statute's purpose, the Legislature may not abrogate a child's established common law cause of action before that child reaches the age of majority. The Medical Liability Act's statute of repose does exactly that in this case, violating the Texas Constitution's open courts guarantee as well as its prohibition against retroactive laws. Because the Court holds otherwise, I respectfully dissent.

**All Citations**

445 S.W.3d 698, 57 Tex. Sup. Ct. J. 1238

Footnotes

1   Providence Hospital is the d/b/a for Tenet Hospitals Limited, LP. The hospital and Dr. Michael Compton are collectively referred to in this opinion as "the hospital."

2   Neither party discusses the effect of limitations on M.R.'s claim, and we therefore express no opinion on that issue.

3   Under the Medical Liability Act, anyone asserting a health care liability claim must give written notice to the physician or health care provider at least sixty days before filing suit. TEX. CIV. PRAC. & REM.CODE § 74.051(a).

4   At the petition stage, the Texas Alliance for Patient Access, the Texas Medical Association, the Texas Hospital Association, the American Congress of Obstetricians and Gynecologists, the Texas Children's Hospital, and the Texas Osteopathic Medical Association jointly submitted an amicus brief supporting the hospital.

5   *See Robinson v. Crown Cork & Seal Co.,* 335 S.W.3d 126, 146 (Tex.2010) ("To be sure, courts must be mindful that statutes are not to be set aside lightly."); *Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.1983) ( "We recognize that '[i]n passing upon the constitutionality of a statute, we begin with a presumption of validity.' " (quoting *Smith v. Davis,* 426 S.W.2d 827, 831 (Tex.1968)) (alteration in original)).

6   *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 25 (Tex.2003).

7   As we have observed previously, "the line between facial and as-applied challenges is not so well defined that it has some automatic effect." *In re Nestle USA, Inc.,* 387 S.W.3d 610, 617 (Tex.2012) (quotation marks omitted); *see also id.* at 617 n. 76 (observing that " 'courts remain hopelessly befuddled in this area' " (quoting Scott A. Keller & Misha Tseytlin, *Applying Constitutional Decision Rules Versus Invalidating Statutes in Toto,* 98 VA. L.REV. 301, 312 (2012))).

8   Rivera asserts that the repose statute is unconstitutional "as applied to children injured by medical negligence before their eighth birthday." This framing unnecessarily blurs the line between facial and as-applied challenges. Because Rivera contends in neither constitutional challenge that the repose statute always operates unconstitutionally, her challenges are as-applied to her circumstances only.

9   900 S.W.2d 316 (Tex.1995).

10  648 S.W.2d 661 (Tex.1983).

11  307 S.W.3d 283 (Tex.2010).

12  *Stockton,* 336 S.W.3d at 617–18.

13  *Shah,* 67 S.W.3d at 847.

14  *Yancy,* 236 S.W.3d at 785.

15  336 S.W.3d at 617–18.

16  67 S.W.3d at 847.

17  336 S.W.3d at 785.

18  Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 872 (current version at TEX. CIV. PRAC. & REM.CODE § 74.251(b)).

19  *See also* TEX. HEALTH & SAFETY CODE § 611.004(a)(4) (treating minor's and legally incompetent persons similarly for purposes of disclosing certain confidential information); TEX. LAB.CODE § 403.007 (treating workers' compensation death benefits payable to minors and legally incompetent persons similarly).

20  *Tinkle,* 730 S.W.2d at 166 ("It is impossible to avoid the analogy between the situation of the child plaintiff in *Sax* and the arguably incompetent plaintiff in this case. Traditionally the interests of minors, incompetents, and other helpless persons are viewed in law as substantially similar, and both the substantive law and the rules of procedure accord them comparable treatment. In many respects, mentally incompetent persons present a more compelling case for legal protection. They are frequently less communicative, more vulnerable and dependent than children.... The mentally incompetent are less likely than children to have someone intimately interested in their welfare and inclined to act in their behalf."). We note that the record here describes M.R.'s condition as such that she might need a guardian when she reaches the age of majority. Because the law treats minors and legally incompetent persons similarly, such a change in legal status would not affect our holding.

21  TEX. EST.CODE § 1001.001 (formerly TEX. PROB.CODE § 602) ("A court may appoint a guardian with full authority over an incapacitated person....").

22    *Id.* §§ 1053.052 (formerly TEX. PROB.CODE § 622) (discussing guardian's fiduciary capacity), 1105.051 (formerly TEX. PROB.CODE § 700) (establishing oath to faithfully discharge duties to a legally incompetent person).

23    *Id.* § 1053.052 (formerly TEX. PROB.CODE § 622) ("No security for costs shall be required of a guardian ... in any suit brought by the guardian ... in [her] respective fiduciary capacit[y].") Rule of Civil Procedure 44 grants next friends "the same rights concerning such suits as guardians have, but shall give security for costs, or affidavits in lieu thereof, when required."

24    *Id.* §§ 1105.101 (formerly TEX. PROB.CODE § 702), 1105.102 (formerly TEX. PROB.CODE § 702A).

25    *Id.* § 1163.101 (formerly TEX. PROB.CODE § 743).

26    TEX. PROP.CODE § 142.002 (formerly TEX. PROB.CODE § 142.002(a)) (providing for next friend to take possession of money recovered from a judgment for the minor only after posting a bond).

27    For these reasons, we disagree with the court of appeals that any lack of diligence on Rivera's part could not be imputed to M.R. 392 S.W.3d at 334.

28    Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11(b)(5), 2003 Tex. Gen. Laws 847, 884–85.

29    *Id.* § 10.11(b)(3).

30    *Id.* § 10.11(a).

31    *City of Tyler v. Likes,* 962 S.W.2d 489, 502 (Tex.1997).

32    *DeCordova,* 4 Tex. at 470–71.

33    *Tex. Water Rights Comm'n v. Wright,* 464 S.W.2d 642, 644 (Tex.1971).

34    *Baker Hughes, Inc. v. Keco R. & D., Inc.,* 12 S.W.3d 1, 4 (Tex.1999); *Wilson v. Work,* 122 Tex. 545, 62 S.W.2d 490, 490–91 (1933) (per curiam) (original proceeding).

35    336 S.W.3d at 612.

1    "All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." TEX. CONST. art. I, § 13.

2    The statute of repose at issue provides that "[a] claimant must bring a health care liability claim not later than 10 years after the date of the act or omission that gives rise to the claim." TEX. CIV. PRAC. & REM.CODE § 74.251(b).

3    *See* Act of May 29, 1975, 64th Leg., R.S., ch. 330, § 4, 1975 Tex. Gen. Laws 864, 865 (former TEX.REV.CIV. STAT. art. 582), *repealed by* Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 41.03, 1977 Tex. Gen. Laws 2064.

4    "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." TEX. CONST. art. I, § 16.

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

ZZ

145 Tex. 534
Supreme Court of Texas.

TEXAS & P. RY. CO.

v.

WOOD et al.

No. A-1053.　|　Feb. 12, 1947.　|
Rehearing Denied March 12, 1947.

Certified Questions from Court of Civil Appeals of Eighth
Supreme Judicial District.

Action by Mrs. O. M. Wood and others against the Texas
& Pacific Railway Company for wrongful death of O. M.
Wood, named plaintiff's husband. From an order granting
plaintiffs' motion overruling defendant's plea of privilege,
defendant appealed, to the Court of Civil Appeals which
certified questions.

Questions answered in accordance with the opinion.

West Headnotes (11)

**[1]　Death**
　Persons Entitled to Sue

　**Death**
　Joinder

　**Death**
　Apportionment and Distribution of Amount
Recovered

The death statute gives the right of action
for death to all the persons within the classes
named but there can be but one action and
sum recovered must be apportioned among
those persons according to their several rights.
Vernon's Ann.Civ.St. art. 4675.

5 Cases that cite this headnote

**[2]　Railroads**
　Actions for Injuries to Person or Property

In action by wife against railroad for wrongful
death of husband, although husband's parents
were nominally parties defendants, they were to

be arranged as parties plaintiff in considering
question of venue. Rev.St.1925, art. 1995, subd.
25; Vernon's Ann.Civ.St. art. 4675.

Cases that cite this headnote

**[3]　Evidence**
　Conclusiveness and Effect

　**Evidence**
　Testimony

The testimony of a party to a suit and admissions
made by him must be construed as binding upon
him, and not merely as raising issues of fact.

7 Cases that cite this headnote

**[4]　Evidence**
　Testimony

In wife's action for wrongful death of husband
against railroad, testimony of husband's parents
who were joined as parties defendant, that
they did not assert any cause of action against
railroad was binding upon the parents. Vernon's
Ann.Civ.St. art. 4675.

3 Cases that cite this headnote

**[5]　Death**
　Joinder

Where petition for damages for death by
wrongful acts alleges and proof shows that
parents of deceased have no interest in the suit,
no useful purpose can be subserved by making
them parties. Vernon's Ann.Civ.St. art. 4675.

1 Cases that cite this headnote

**[6]　Railroads**
　Actions for Injuries to Person or Property

Action for wrongful death of husband against
railroad by wife who was a nonresident could
be maintained under exception 25 of the venue
statute in Crane County in which railroad
operated and was not required to be brought in
Dallas County in which railroad's principal office
was located, notwithstanding husband's parents,
joined as parties defendant, were residents of

Texas, where plaintiff established her allegation that parents had no cause of action and they asserted none against railroad. Rev.St.1925, art. 1995, subd. 25; Vernon's Ann.Civ.St. art. 4675.

Cases that cite this headnote

**[7]  Evidence**
 Location of Railroads

Court could take judicial notice that defendant railroad operated its railroad through Crane County.

Cases that cite this headnote

**[8]  Venue**
 Estoppel and Waiver

A defendant can waive his privilege to be sued in his own domicile.

4 Cases that cite this headnote

**[9]  Estoppel**
 Nature and Elements of Waiver

"Waiver" is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming it.

20 Cases that cite this headnote

**[10]  Railroads**
 Actions for Injuries to Person or Property

In action for wrongful death against railroad, the fact that railroad agreed that plea of privilege and the cause on its merits might be tried together did not constitute a waiver of its plea of privilege to be sued in county where its principal office was located. Rev.St.1925, art. 1995, subd. 25; Vernon's Ann.Civ.St. art. 4675.

Cases that cite this headnote

**[11]  Railroads**
 Actions for Injuries to Person or Property

In action for wrongful death against railroad brought in Crane County, railroad did not waive its plea of privilege to be sued in Dallas County,

the county of its principal office, on ground that it did not request submission to the jury of issue of plaintiff's nonresidence, raised by the plea, since burden of proving nonresidence so as to bring plaintiff within exception clause of venue statute, was upon plaintiff. Rev.St.1925, art. 1995, subd. 25; Vernon's Ann.Civ.St. art. 4675.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*535  \*\*653** J. T. Suggs, D. L. Case, and Robert G. Payne, all of Dallas, Hill D. Hudson, of Pecos, and Black & Stayton and Charles L. Black, all of Austin, for appellant.

John J. Watts, of Odessa, Richard Critz, and Critz, Kuykendall, Bauknight, Mann & Stevenson, all of Austin, for appellees.

**Opinion**

SIMPSON, Justice.

Mrs. Ollie M. Wood, surviving wife of Ollie M. Wood, deceased, for herself, as administratrix of the estate of her deceased husband, and as next friend for her minor son, as plaintiff sued the Texas & Pacific Railway Company in the district court of Crane County, Texas, for damages for the alleged wrongful death of her husband. ,She made his surviving parents, **\*536** who were residents of Martin County, Texas, parties defendant, alleging that her husband had not contributed to their support and hence his parents had no cause of action as plaintiffs; and further that all statutory beneficiaries had been made parties to the suit. The railway company by a timely plea asserted its privilege to be sued in Dallas County, Texas, where its principal office was located. This plea was controverted by Mrs. Ollie M. Wood, who alleged that she was a nonresident of Texas and that venue was properly laid in Crane County under Section 25, Art. 1995, R.S., which among other things provides, as an exception to the general statute giving defendants the privilege of being sued in the county of their domicile, that: 'If the plaintiff is a non-resident of this State, then such suit may be brought in any county in which the defendant corporation may run or operate its railroad, or have an agent.'

A jury was demanded on the venue issues, which the parties agreed might be tried along with the suit upon its merits.

The cause came on to be heard in November, 1945, and was submitted upon special issues to a jury, which was unable to agree. No issues were submitted as to the venue facts, but Mrs. Ollie M. Wood requested the submission of the issue of her nonresidence, which the court refused.

Upon trial of the plea of privilege (tried, as has been indicated, along with the cause upon the merits), the father of the deceased husband stated in his testimony that he did not then nor afterwards intend to assert any claim against the railway company for the death of his son, and Ollie M. Wood's mother testified that she did not make any claim for damages on account of her son's death.

**\*\*654** In this state of the record, on February 19, 1946, the district court granted plaintiff's motion to overrule the plea of privilege, from which order the railway company appealed to the Honorable Court of Civil Appeals at El Paso, which in a tentative opinion concluded that the plea of privilege was properly overruled but has certified the following questions: '1. Did the fact that the surviving parents of the deceased Wood were made parties defendant by plaintiff and were each residents of the State of Texas on the date plaintiff filed her suit entitle defendant railway company as a matter of law to a change of venue to the county of its residence?

'2. Were we correct in holding that judicial notice could be **\*537** taken of the fact that at the relevant time part of defendant's railroad was operated through Crane County?

'3. Did defendant waive its plea of privilege by proceeding with the trial on the merits without objection to the failure to submit an issue as to nonresidence of plaintiff on the date of filing her suit?

'3(a). If Question No. 1 be answered in the affirmative, then did defendant waive its plea of privilege by proceeding to trial on the merits without objection?'

We conclude the answers to Questions Nos. 1, 3, and 3(a) should be 'No,' and to Question No. 2 'Yes.'

Question No. 1 inferentially assumes that the plaintiff was a nonresident of Texas, and this discussion proceeds upon that assumption.

Our present-day version of Lord Campbell's Act, also frequently called the 'Death Statute,' (originally passed in England in 1846 and first enacted in Texas in 1860) provides in part that: 'Actions for damage arising from death shall be

for the sole and exclusive benefit of and may be brought by the surviving husband, wife, children, and parents of the person whose death has been caused or by either of them for the benefit of all.' Art. 4675, R.S.1925, as amended, Vernon's Ann.Civ.St. art. 4675.

**[1] [2]** The statute gives the right of action to all the persons within the classes named to recover one sum. That sum must be apportioned among those persons according to their several rights, but under the statute there can be but one action. San Antonio & A. P. Ry. Co. v. Mertink, 101 Tex. 165, 105 S.W. 485. Necessarily the mother and father of Ollie M. Wood potentially occupied the same position and bore the same relation toward the railway company as his surviving wife and son, all being within those classes to whom the statute gives a right of action for Ollie M. Wood's death if wrongful. And we have no difficulty in concluding that the mother and father of the deceased, although nominally defendants, should be arranged as parties plaintiff and the venue question considered with the parties so aligned.

**[3] [4]** But it does not follow that venue should be controlled by the presence before the court of parties if they have no interest in **\*538** the suit. To the contrary, if the pleadings and proof demonstrate that the mother and father of the deceased had no cause of action against the railway company, their presence should not be given controlling effect upon the question of venue. As has been pointed out, the plaintiff averred that neither her mother-in-law nor her father-in-law had a cause of action against the railway company. While the pleading mistakenly ascribes an evidentiary and not a controlling circumstance as the reason for the assertion that the parents had no cause of action, namely, the circumstance that the plaintiff's husband had not contributed to his parents' support, still the petition did fairly give notice to the railway company that it was the plaintiff's position that the mother and father had no cause of action. Upon the hearing of the plea of privilege, the mother and father testified unequivocally that they did not assert any cause of action against the railway company. While it is true that there was substantial evidence in the record which, in the absence of these admissions, would have supported an award of damages to the mother and father, still these admissions by the parents of the deceased would have effectively precluded them from recovering anything. As was said in Southern Surety Co. v. Inabnit, Tex.Civ.App., 1 S.W.2d 412, 415: 'The testimony of a **\*\*655** party to a suit and admissions made by him must be construed as binding upon him, and not merely as raising issues of fact. His testimony is governed by different rules to those governing witnesses who are not parties.' See also note, 80 A.L.R. 624.

The mother and father of the deceased filed no pleadings. Their admissions from the witness stand have been noted. Under all the circumstances, it must be concluded that the plaintiff pleaded and established that the mother and father of the deceased had no interest in the suit.

[5]    The rules as to necessary parties in actions under the 'Death Statute' which are regarded as pertinent here are thus stated in Cobb Brick Co. v. Lindsay, Tex.Civ.App., 277 S.W. 1107, 1112-language which was expressly approved in Greathouse v. Fort Worth & D. C. Ry. Co., Tex.Com.App., 65 S.W.2d 762: 'The Supreme Court and the several Courts of Civil Appeals have by numerous decisions held that a parent is a beneficiary of the damages claimed under the provisions of the death statute, **\*539** and a necessary party to a suit to recover them, and that, where it appears from the record that a parent is not made a party, the judgment cannot stand; the error going to the very foundation of the action. (Citing cases.) An equally well established rule to the one requiring that a father, having a statutory interest by reason of the wrongful act, be made a party to the suit for damages, is one holding that where the petition for such damages alleges, and the proof shows, that he has no interest in the suit, no useful purpose can be subserved by making him a party. (Citing cases.)' (Emphasis supplied.) See also Dallas & W. R. Co. v. Spiker, 59 Tex. 435.

[6]    Upon an application of these principles to the circumstances before us, we conclude that the presence of the mother and father of deceased, residents of Martin County, Texas, even be they aligned as parties plaintiff, did not as a matter of law entitle the railway company to have its plea of privilege sustained.

The railway company points out the rule stated in Ogburn-Dalchau Lumber Co. v. Taylor, 59 Tex.Civ.App. 442, 126 S.W. 48, 50, that: 'If at the time this suit was instituted the appellee held the lien which he here asserts, then the jurisdiction of the court properly attached and would not be devested by the subsequent loss or abandonment of the lien in changing the form of the action.' It also calls attention to the great value of the right to be sued in one's own domicile and points out that this right must not be defeated by any evasion or artifice contrived for that purpose. Pool v. Pickett, 8 Tex. 122. No violence is done these principles by the conclusions we have reached. The plaintiff had alleged in her petition, as we have taken pains to show, that her husband's mother and father had no cause of action against the defendant company.

By reference she made the petition a part of her affidavit controverting the defendant's plea of privilege. She pursued the allegations she had originally tendered and established them. There was no shifting of position by the plaintiff in an effort to defeat the plea of privilege after it had been filed. No improper evasion or avoidance on her part to hold venue in Crane County was shown as a matter of law.

[7]    As to the second question, we conclude the Court of Civil Appeals was correct in holding that judicial notice can be taken **\*540** of the fact that the defendant railway company at the relevant time operated its railroad through Crane County. The rule, thus stated in Miller & Co. v. Texas & N. O. Ry. Co., 83 Tex. 518, 520, 18 S.W. 954, is well settled: 'There are certain facts, however, which may be judicially noticed by the courts, because of their public notoriety and indisputable existence. Railways are public highways, and it is a matter of history that important lines of railways, once established, have remained as fixed and permanent in their course as the rivers themselves. Their locality becomes so notorious and indisputable that the courts will take notice thereof.' See also McCormick & Ray, Texas Law of Evidence, s 100.

Accordingly, Question No. 2 has been answered 'Yes.'

Questions Nos. 3 and 3(a) will be considered together. We conclude that the **\*\*656** railway company did not waive its plea of privilege by proceeding to trial on the merits without objection, nor was there any waiver because the company did not object to the court's failure to submit an issue as to the nonresidence of the plaintiff.

The record shows that the parties agreed that the plea of privilege and the cause on its merits might be tried together. Conceivably this arrangement might greatly expedite the proceedings and so benefit all parties by settling the interlocutory venue question and the case on its merits in one trial and on one appeal instead of having separate trials and appeals of the two matters. If the parties wished to try to expedite the proceedings in this way, we would not feel at all warranted in penalizing either by imposing a waiver upon him for having made the arrangement.

[8]    [9]    [10]    It is admittedly true that a defendant can waive his privilege to be sued in his own domicile, as, for example, when he has prevailed upon the trial court to enter an order sustaining that right but later disregards the order and litigates the case to final judgment in the foreign forum. Frosh v. Holmes, 8 Tex. 29. A somewhat similar waiver is considered in Hosmer v. New York Buyers' Ass'n, Tex.Civ.App., 258 S.W. 853, error refused. But no such a

situation obtains here. The defendant company disregarded no order in its favor on the issue of venue. A waiver has been frequently defined as an intentional relinquishment of a known right or intentional conduct inconsistent with claiming it. 67 C.J. 288. We are unable to discern how it **\*541** would be fairly said that the defendant company intended to surrender its right to be sued in its own domicile or conducted itself inconsistently with the continued assertion of that right (assuming it otherwise existed) by simply agreeing to proceed with the trial of the venue issues and the cause on its merits together.

[11] As to the waiver sought to be imposed upon the railway company for failing to request submission to the jury of the controverted matter of the plaintiff's nonresidence, this issue was duly requested by the plaintiff and its submission improperly refused. The burden of proof upon the trial of the issues joined by the plea of privilege and the controverting affidavit was upon the plaintiff. Newlin v. Smith, 136 Tex. 260, 150 S.W.2d 233. Her nonresidence was her own issue. No duty devloved upon the defendant company to request its submission. Nor was the company bound to except to the court's refusal to submit it. So to require would in effect cast upon the defendant company the duty of assisting the plaintiff in establishing her venue facts, one of the chief of which was that of her nonresidence. This would obviously be intolerable. We conclude the railway company waived nothing by not objecting to the failure of the court to submit this issue.

Accordingly, Questions Nos. 3 and 3(a) have been answered 'No.'

**All Citations**

145 Tex. 534, 199 S.W.2d 652

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

AAA

146 S.W.3d 637
Supreme Court of Texas.

TEXAS DEPARTMENT OF TRANSPORTATION,
Michael W. Behrens, Robert L. Nichols, John
W. Johnson, and Ric Williamson, Petitioners,
v.
CITY OF SUNSET VALLEY, Terrance R.
Cowan, and Donald Hurwitz, Respondents.

No. 03–0041.  |  Argued Feb. 4,
2004.  |  Decided Sept. 24, 2004.

**Synopsis**

**Background:** City filed inverse condemnation action against
Texas Department of Transportation (TxDOT) concerning
highway expansion, and mayor and city council member
intervened as additional plaintiffs. The District Court, Travis
County, 353rd Judicial District, Peter M. Lowry, J., overruled
TxDOT's plea to the jurisdiction and rendered partial
summary judgment for city. TxDOT appealed. The Court
of Appeals, 8 S.W.3d 727, affirmed. On remand, the 353rd
Judicial District Court, Travis County, Suzanne Covington,
J., entered judgment on jury verdict, which awarded city
$836,192.80 for cost of substitute road and $810,978.60
in prejudgment interest, declared that TxDOT violated
administrative regulations regarding noise and lighting,
enjoined private nuisance, awarded city $34,075 in attorney
fees, awarded mayor and council member $3,648 in damages,
enjoined equal protection violations arising from use of flood
lights and failure to erect city limit signs, and awarded
mayor and council member $7,000 in attorney fees. TxDOT
appealed. The Court of Appeals, 92 S.W.3d 540, affirmed in
part and reversed in part. TxDOT appealed.

**Holdings:** The Supreme Court, O'Neill, J., held that:

[1] Transportation Code section mandating compensation for
the acquisition of a state agency's property by TxDOT did not
create a private right of action for city;

[2] TxDOT had immunity from city's claim that road closure
constituted a common-law nuisance claim;

[3] city did not have superior ownership interest in road so as
to support its right to compensation under takings theory;

[4] TxDOT's alleged failure to erect adequate signage and
decision to install high-mast floodlights did not give city
council member and mayor standing to bring equal protection
claim based on geographic disparate treatment;

[5] TxDOT did not intentionally single out city council
member and mayor for treatment different than other city
residents; and

[6] nuisance created by floodlights did not amount to
unconstitutional taking of mayor's property.

Reversed and rendered.

West Headnotes (26)

**[1]**   **States**
  ↪ Necessity of Consent

State agencies like Texas Department of
Transportation (TxDOT) are immune from
liability in Texas unless the Legislature waives
that immunity.

2 Cases that cite this headnote

**[2]**   **States**
  ↪ Mode and Sufficiency of Consent

Sovereign immunity is waived only when
the Legislature has clearly and unambiguously
expressed that intent. V.T.C.A., Government
Code § 311.034.

5 Cases that cite this headnote

**[3]**   **Eminent Domain**
  ↪ Appeal and error

Texas Department of Transportation (TxDOT)
did not waive right in inverse condemnation
action to challenge whether city was a "state
agency," although it couched its argument in
terms of whether it had sovereign immunity, as
TxDOT raised the issue in its brief by arguing
that the Transportation Code expressly excludes
cities from compensation and adequately
challenged city's right to recover under the

Transportation Code. V.T.C.A., Transportation Code § 203.058(a); Rules App.Proc., Rule 1.1.

8 Cases that cite this headnote

**[4]** **Statutes**

   Intent

The primary objective when construing a statute is to ascertain and give effect to the Legislature's intent.

39 Cases that cite this headnote

**[5]** **Statutes**

   Plain Language;  Plain, Ordinary, or Common Meaning

In discerning the Legislature's intent in a statute, the court begins with the plain and common meaning of the statute's words.

48 Cases that cite this headnote

**[6]** **Statutes**

   Statute as a Whole;  Relation of Parts to Whole and to One Another

The court must read a statute as a whole and not just isolated portions.

35 Cases that cite this headnote

**[7]** **Statutes**

   Giving effect to statute or language;  construction as written

**Statutes**

   Statute as a Whole;  Relation of Parts to Whole and to One Another

If statutory language is unambiguous, the court must interpret it according to its terms, giving meaning to the language consistent with other provisions in the statute.

37 Cases that cite this headnote

**[8]** **Statutes**

   Construction in View of Effects, Consequences, or Results

**Statutes**

   Purpose

When interpreting a statute, the court considers the objective the law seeks to obtain and the consequences of a particular construction.

14 Cases that cite this headnote

**[9]** **States**

   Eminent domain

Transportation Code section mandating compensation for acquisition of a state agency's property by Texas Department of Transportation (TxDOT) did not create private right of action for city, which brought inverse condemnation action after TxDOT closed road, so as to amount to waiver of TxDOT's sovereign immunity; statute provided a mechanism by which state agencies could ensure budgetary protection when property is transferred between them, and city was not a "state agency" within the meaning of the statute, although it exercised governmental powers as an agent of the state for certain purposes. V.T.C.A., Transportation Code §§ 203.001(4), 203.058(a).

8 Cases that cite this headnote

**[10]** **States**

   Nature of Act or Claim

Texas Department of Transportation (TxDOT) had immunity from city's claim that TxDOT's act in closing road as part of highway expansion constituted a common-law nuisance claim; TxDOT's expansion of the state's highways was a governmental function for which it had sovereign immunity, and there was no statute which waived TxDOT's immunity for performing that function.

4 Cases that cite this headnote

**[11]** **States**

   Highway matters

Texas Department of Transportation (TxDOT) is immune from liability for its governmental actions unless that immunity is waived.

2 Cases that cite this headnote

**[12]** **Eminent Domain**

Property and Rights Subject of Compensation

City did not have superior ownership interest in road so as to support its right to compensation under takings theory after Texas Department of Transportation (TxDOT) closed road as part of highway expansion; state held title to road and had right to control road, which included right to close road. Vernon's Ann.Texas Const. Art. 1, § 17.

2 Cases that cite this headnote

**[13]** **Eminent Domain**

Questions for jury

Whether there has been a taking is a question of law for the court to decide. Vernon's Ann.Texas Const. Art. 1, § 17.

3 Cases that cite this headnote

**[14]** **Eminent Domain**

Property and Rights Subject of Compensation

To recover under the constitutional takings clause, one must first demonstrate an ownership interest in the property taken. Vernon's Ann.Texas Const. Art. 1, § 17.

11 Cases that cite this headnote

**[15]** **Highways**

Power to vacate

The State's right to control its roads includes the right to close them.

1 Cases that cite this headnote

**[16]** **Municipal Corporations**

Powers and functions of local government in general

General-law municipalities are political subdivisions created by the State and, as such, possess those powers and privileges that the State expressly confers upon them.

4 Cases that cite this headnote

**[17]** **Municipal Corporations**

Title and rights of municipality in general

As the State's agent or trustee, a municipality possesses a superior interest in its public roads vis-a-vis private citizens.

Cases that cite this headnote

**[18]** **Action**

Persons entitled to sue

Standing is a constitutional prerequisite to maintaining suit.

10 Cases that cite this headnote

**[19]** **Constitutional Law**

Equal Protection

Standing to raise an equal-protection challenge requires the claimant to demonstrate an interest distinct from that of the general public such that the actions complained of have caused a particular injury. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

**[20]** **Constitutional Law**

Conditions, Limitations, and Other Restrictions on Access and Remedies

**Constitutional Law**

Standing

The separation of powers doctrine and the open courts provision require an actual grievance, not one that is merely hypothetical or generalized, in order for a claimant to have standing to bring an equal protection claim. U.S.C.A. Const.Amend. 14; Vernon's Ann.Texas Const. Art. 1, § 13, Art. 2, § 1.

2 Cases that cite this headnote

**[21]** **Appeal and Error**

Cases Triable in Appellate Court

As a component of subject matter jurisdiction, the Supreme Court reviews a claimant's standing de novo.

60 Cases that cite this headnote

**[22]** **Constitutional Law**

🔑 Equal Protection

Alleged failure of Texas Department of Transportation (TxDOT) to erect adequate signage and the installation of high-mast floodlights in connection with highway expansion did not give city council member and mayor standing to bring equal protection claim against TxDOT based on geographic disparate treatment, even if other municipalities had received more signage and had not been subject to high-mast floodlights; TxDOT necessarily had to draw distinctions between geographic areas when building highways. U.S.C.A. Const.Amend. 14; Vernon's Ann.Texas Const. Art. 1, § 3.

3 Cases that cite this headnote

**[23]** **Constitutional Law**

🔑 Territorial uniformity; application to places, areas, or regions

State and federal equal-protection guarantees relate to equality between persons as such, rather than between areas, and territorial uniformity is not a constitutional prerequisite. U.S.C.A. Const.Amend. 14; Vernon's Ann.Texas Const. Art. 1, § 3.

1 Cases that cite this headnote

**[24]** **Constitutional Law**

🔑 Equal Protection

Texas Department of Transportation (TxDOT) did not intentionally single out city council member and mayor for treatment differently from others similarly situated in connection with highway expansion project, and thus council member and mayor lacked standing as individuals to bring equal protection claim against TxDOT based on alleged lack of same signage which other cities had received and

based on highway floodlights which other cities had not received; all city residents suffered from same alleged injury of inadequate signage and light pollution. U.S.C.A. Const.Amend. 14; Vernon's Ann.Texas Const. Art. 1, § 3.

4 Cases that cite this headnote

**[25]** **Eminent Domain**

🔑 Nuisance and demolition

Nuisance created by high-mast floodlights did not amount to unconstitutional taking of city mayor's property by Texas Department of Transportation (TxDOT) which installed lights as part of highway expansion, as lights similarly affected others in the community. Vernon's Ann.Texas Const. Art. 1, § 17.

1 Cases that cite this headnote

**[26]** **Eminent Domain**

🔑 What Constitutes a Taking; Police and Other Powers Distinguished

**Eminent Domain**

🔑 Particular acts and regulations

Not every deleterious impact on private property amounts to a compensable taking; instead, property impacts resulting from the construction of public works are compensable only to the extent they are not common to the community at large. Vernon's Ann.Texas Const. Art. 1, § 17.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*640** Edward D. Burbach, Barry Ross McBee, Ronda Leigh Neff, Kristina Weber Silcocks, Rafael Edward Cruz, Rance L. Craft, Office of Attorney General, Philip A. Lionberger, Brown McCarroll, L.L.P., Jeffrey S. Boyd, Thompson & Knight, Greg Abbott, Attorney General of TX, Austin, Rick Thompson, Law Office of Deborah Hankinson PC, Dallas, John Stephen Toland, Watson Bishop London Galow, P.C., Austin, Idolina Garcia, Hermes Sargent Bates, LLP, Dallas, for Petitioners.

W. Thomas Buckle, Brad Rockwell and Jessica Scott, Douglas C. Young, Scanlan Buckle & Young, P.C., Sheri Joy Nasya Tolliver, Texas Civil Rights Project, Austin, for Respondent.

James C. Harrington, Austin, for Amicus Curiae Texas Civil Rights Project.

**Opinion**

Justice O'NEILL delivered the opinion of the Court.

The Texas Department of Transportation (TxDOT) destroyed a portion of Jones Road in the City of Sunset Valley when it expanded State Highway 290. To regain the vital transportation link lost in the expansion, the City constructed a substitute street. We must decide whether the City can recover the cost of that construction from TxDOT under section 203.058(a) of the Texas Transportation Code, the common law of nuisance, or Article I, section 17 of the Texas Constitution. We hold that it cannot because (1) section 203.058(a) does not waive TxDOT's immunity from suit, nor is the City a state agency within the statute's purview; (2) absent an applicable waiver, TxDOT retained immunity from the City's common-law nuisance claim; and (3) TxDOT cannot be liable for an unconstitutional taking because the State owns the property that was appropriated for highway expansion. We also hold that the City's mayor and a council member lack standing to assert equal-protection claims on their own behalf or on behalf of the City's residents. Finally, we hold that the mayor's individual nuisance claim does not rise to the level of a constitutional taking and is thus barred by sovereign immunity. Accordingly, we reverse the court of appeals' judgment and render judgment for TxDOT.

## I. Background

In 1991, TxDOT expanded State Highway 290 to create a controlled-access highway. The expansion extended to parts of the City of Sunset Valley, a general-law municipality approximately one square mile in size located in southwest Travis County. To complete the project, TxDOT closed Jones Road at its western intersection with Brodie Lane. Jones Road was a main thoroughfare that connected the City's center to the northern, western, and southwestern portions of the City. According to the City, the road's closure increased threefold the travel time across the City, significantly impacting the City's ability to combat crime and respond to police and other

emergencies. To remedy the problem, the City constructed a substitute road at its own expense.

In May 1998, the City sued TxDOT to recover its costs in constructing the substitute road. The City asserted several liability theories, including a right of reimbursement under **\*641** section 203.058(a) of the Texas Transportation Code, an unconstitutional taking under Article I, section 17 of the Texas Constitution, and common-law nuisance and trespass. TxDOT filed a plea to the jurisdiction asserting sovereign immunity and challenging the plaintiffs' standing, which the trial court denied. On interlocutory appeal, the court of appeals affirmed. 8 S.W.3d 727. On remand, the City's mayor, Terrance Cowan, and one of its council members, Donald Hurwitz, intervened in the suit on behalf of Sunset Valley's citizens claiming TxDOT had violated their equal-protection rights by failing to post adequate highway signs like those present in other similar municipalities and by installing high-mast floodlights not used on other controlled-access highways. Mayor Cowan also asserted individual nuisance claims for injuries that he alleged were particular to his property. The trial court held TxDOT liable to the City for the $836,192.80 cost of constructing reasonably necessary substitute facilities, and awarded the City approximately $857,000 in pre-judgment interest and attorneys' fees. The trial court also granted injunctive relief on the intervenors' equal-protection claims, abating the high-mast floodlights and ordering TxDOT to post adequate signs. It also awarded Cowan and Hurwitz $9,450 in attorneys' fees. Finally, the trial court awarded Cowan $3,648 in damages, as well as injunctive relief, based on his individual nuisance claim.

The court of appeals affirmed the trial court's judgment in part and reversed in part. 92 S.W.3d 540. It held that section 203.058(a) of the Texas Transportation Code supported the City's right to recover, but concluded that the statutory scheme required the Texas General Land Office to determine the amount of compensation that should be awarded and remanded the case accordingly. *Id.* at 547. Because it upheld the judgment based on the statutory claim, the court of appeals did not address the City's alternative constitutional or common-law claims. *Id.* In all other respects, the court of appeals affirmed the trial court's judgment. *Id.* We granted review to consider the plaintiffs' respective claims arising out of TxDOT's highway expansion and the closure of Jones Road.

## II. Texas Transportation Code

 **[1]** **[2]** State agencies like TxDOT are immune from liability in Texas unless the Legislature waives that immunity. *See Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 405 (Tex.1997); *Duhart v. State,* 610 S.W.2d 740, 741 (Tex.1980). We have long recognized the Legislature's exclusive power to create a cause of action that waives the State's immunity. *See Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638 (Tex.1999). But sovereign immunity is waived only when the Legislature has clearly and unambiguously expressed that intent. *See Kerrville State Hosp. v. Fernandez,* 28 S.W.3d 1, 3 (Tex.2000); *see also* TEX. GOV'T CODE § 311.034 (codifying common-law standard for immunity waiver: "[A] statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language.").

The City claims that the Legislature waived TxDOT's sovereign immunity in section 203.058(a) of the Texas Transportation Code, which provides:

> If the acquisition of real property, property rights, or material by the department from a state agency under this subchapter will deprive the agency of a thing of value to the agency in the exercise of its functions, adequate compensation for the real property, property rights, or material shall be made.

TEX. TRANSP. CODEE § 203.058(a). The City contends this provision clearly and unambiguously **\*642** provides a judicial right of recovery against TxDOT for property that it appropriated in closing Jones Road. The court of appeals agreed, holding that the City is a "state agency" entitled to compensation under the statute. 92 S.W.3d at 546–47.

 **[3]** TxDOT claims that in enacting section 203.058(a) the Legislature did not intend to create a statutory cause of action for which the State may be sued, but merely intended to establish a mechanism by which state agencies may be compensated if TxDOT uses their property in exercising powers conferred under chapter 203. TxDOT further argues that, even if section 203.058(a) does create a right of action, the City is not a "state agency" as defined in the statute. *See* TEX. TRANSP. CODEE § 203.001(4) (defining "state

agency" as "a department or agency of this state"). We agree with TxDOT on both points. [1]

 **[4]** **[5]** **[6]** **[7]** **[8]** Our primary objective when construing a statute is to ascertain and give effect to the Legislature's intent. *See McIntyre v. Ramirez,* 109 S.W.3d 741, 745 (Tex.2003) (citing *Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 318 (Tex.2002)). In discerning that intent, we begin with the " 'plain and common meaning of the statute's words.' " *Id.* (quoting *State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez,* 82 S.W.3d 322, 327 (Tex.2002) (quoting *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 865 (Tex.1999))). We must read the statute as a whole and not just isolated portions. *See City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 25 (Tex.2003) (citing *Gonzalez,* 82 S.W.3d at 327). If the statutory language is unambiguous, we must interpret it according to its terms, giving meaning to the language consistent with other provisions in the statute. *See McIntyre,* 109 S.W.3d at 745. We also consider the objective the law seeks to obtain and the consequences of a particular construction. TEX. GOV'T CODE § 311.023(1), (5); *see also McIntyre,* 109 S.W.3d at 745.

 **[9]** Nothing in the plain language of section 203.058 indicates the Legislature intended to waive immunity in situations like the one presented. The statute provides that when the State acquires property from a state agency pursuant to its chapter 203 powers, it must make "adequate compensation." TEX. TRANSP. CODEE § 203.058(a). The statute then outlines the actual accounting procedures by which compensation is to be accomplished. *See id.* § 203.058(b)-(e). For example, subsection (b) states that compensation will be paid on vouchers, and subsection (c) indicates to which budget item compensation shall be credited. Subsection (d) concerns situations in which it is unclear which appropriation item or agency account is to be credited. Finally, subsection (e) provides that the General Land Office will determine appropriate compensation if the agency and TxDOT cannot agree on an amount. Nowhere does the statute expressly waive TxDOT's immunity. That the statute imposes a financial obligation on the State does not in itself mean that the Legislature intended to create a private right of action, as evidenced by the fact that the statute expressly vests the **\*643** power to determine adequate compensation in the General Land Office. *Id.* § 203.058(e). In deciding whether the Legislature intended to waive TxDOT's immunity, "we must look at whether [the] statute makes any sense if immunity is not waived." *Kerrville State Hosp.,* 28

S.W.3d at 6. Clearly section 203.058 does, in that it provides a mechanism by which state agencies may ensure budgetary protection when property is transferred between them.

Moreover, the City is not a "state agency" within section 203.058(a)'s purview. The court of appeals determined that it was, relying on our decision in *Proctor v. Andrews,* 972 S.W.2d 729, 734 (Tex.1998). But that reliance is misplaced. In *Proctor,* we addressed whether a provision of the Civil Service Act that allowed police officers and fire fighters who had been suspended, passed over for promotion, or recommended for demotion to appeal to an independent third-party hearing examiner was an unconstitutional delegation of legislative authority or impermissibly infringed on a home-rule city's governmental authority to direct, control, and discipline its civil servants. *Id.* at 732. Presuming that the delegation did in fact infringe upon the City's police powers, we held that the infringement was permissible if the Legislature by general law clearly intended it. *Id.* at 733. Concluding that the Legislature did so intend, we made the following statement that the court of appeals in this case relied on: " 'Municipal corporations [including home rule cities] are created for the exercise of certain functions of government.... [I]n so far as their character is governmental, they are agencies of the state, and subject to state control.' " *Id.* at 734 (alteration in original) (quoting *Yett v. Cook,* 115 Tex. 205, 281 S.W. 837, 842 (1926)). Thus, we described the principal-agent relationship that exists between the State and a political subdivision in exercising certain governmental powers. *Id.; see also Payne v. Massey,* 145 Tex. 237, 196 S.W.2d 493, 495 (1946) ("Municipalities are creatures of our law and are created as political subdivisions of the state as a convenient agency for the exercise of such powers as are conferred upon them by the state."); *Tex. Nat'l Guard Armory Bd. v. McGraw,* 132 Tex. 613, 126 S.W.2d 627, 638 (1939) ("In its governmental capacity a city is a political subdivision of the State, and in many instances is considered as an agent of the State; and the State may use such agent in the discharge of its duties.").

That a municipality may exercise governmental powers as an agent of the State for certain purposes does not mean that it is a "state agency" within section 203.058(a)'s meaning. When used in this context, we have long recognized a distinction between agencies of the State, which generally exercise statewide jurisdiction, and political subdivisions like municipalities, which have limited geographic jurisdiction. *See Monsanto Co. v. Cornerstones Mun. Util. Dist.,* 865 S.W.2d 937, 939–40 (Tex.1993) ("[A] political subdivision

differs from a[n] ... agency of the State. A political subdivision has jurisdiction over a portion of the State; a[n] ... agency of the State exercises its jurisdiction throughout the State.... [T]he legislature has consistently recognized these distinctions between ... agencies on the one hand and political subdivisions on the other."). Chapter 203 itself reflects that the Legislature recognized a distinction between a state agency, a political subdivision, and a municipality. Section 203.032 provides that a commission order under section 203.031 "supersedes a conflicting rule or ordinance of a state agency or subdivision of this state or any county or municipality." TEX. TRANSP. CODEE § 203.032. Yet the Legislature did not include a "political subdivision," "county," or **\*644** "municipality" in the definition of a "state agency." *Id.* § 203.001(4). We see nothing in the statutory language that would support the broad meaning that the City ascribes to the term "state agency" in section 203.058(a).

Because nothing in the statutory language indicates that the Legislature intended to waive immunity by creating a private right of action for entities like the City, we hold that it cannot seek compensation thereunder for TxDOT's closure of Jones Road.

### III. Common–Law Nuisance

[10] [11] The City's common-law nuisance claim is similarly foreclosed. *See City of Dallas v. Jennings,* 142 S.W.3d 310 (Tex.2004). TxDOT is immune from liability for its governmental actions unless that immunity is waived. *Id.* at 315. TxDOT's expansion of the State's highways is a governmental function. TEX. CIV. PRAC. & REM.CODE § 101.0215(a). Therefore, TxDOT cannot be liable for damage resulting from its expansion of State Highway 290 without a clear waiver of immunity. As we have said, the City's reliance on section 203.058(a) of the Texas Transportation Code to establish that waiver is misplaced, and the City has asserted no other basis to support a waiver. Accordingly, TxDOT retained immunity from the City's common-law nuisance claim. The only claim the City could potentially assert against TxDOT, then, is for an unconstitutional taking under Article I, section 17 of the Texas Constitution, to which we now turn.

### IV. Unconstitutional Taking

[12] [13] Article I, section 17 of the Texas Constitution provides: "No person's property shall be taken, damaged

or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person...." TEX. CONST. art. I, § 17. The City claims that it is entitled to recover its cost of constructing a substitute road under this constitutional provision. TxDOT argues that, as against the State, the City has no proprietary title or vested property right in Jones Road sufficient to confer a right to compensation. Because the court of appeals affirmed the trial court's judgment based on the statutory claim, it did not address the City's constitutional claim. 92 S.W.3d at 546. Whether there has been a taking is a question of law for the court to decide. *See Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, ——, 2004 WL 1439646 (Tex.2004).

 **[14]** It is fundamental that, to recover under the constitutional takings clause, one must first demonstrate an ownership interest in the property taken. TEX. CONST. art. I, § 17 ("No person's property shall be taken...."). The City relies upon its fee simple title to Jones Road to support its right to compensation under the takings clause. TxDOT, on the other hand, contends the City merely holds the road in trust with legal title belonging to the State. As a result, TxDOT claims, the City's takings claim fails as a matter of law. We agree.

This Court has consistently recognized that the State has a superior ownership interest in its public roads. *See State v. Hale,* 136 Tex. 29, 146 S.W.2d 731, 736 (1941); *Robbins v. Limestone County,* 114 Tex. 345, 268 S.W. 915, 918 (1925); *Travis County v. Trogden,* 88 Tex. 302, 31 S.W. 358, 359–60 (1895). We have also recognized that the State's ownership interest in its roads is superior to that of its political subdivisions. *See Robbins,* 268 S.W. at 918. In *Robbins,* the county argued that a recently enacted statute allowing the State to place public roads under the State Highway Department's direct control resulted **\*645** in an unconstitutional taking because the roads were built with funds raised by local taxation. *Id.* In response to questions certified by the court of civil appeals, we held that there could be no taking because the Legislature has sole and exclusive power pertaining to public roads and highways which may only be modified by another constitutional provision. *Id.* The county argued, as does the City here, that it was entitled to compensation under the Constitution because it held legal title to the roads taken. *Id.* We disagreed, stating that, even though legal title was taken in the county's name, title was held for the benefit of the State and the general public. *Id.* We specifically said: "Public roads are state property over which the state has full control and authority." *Id.; see also City of Mission v. Popplewell,* 156 Tex. 269, 294 S.W.2d 712, 715 (1956) ("The

city controls the streets as trustee for the public. It has no proprietary title nor right to exclusive possession.").

 **[15]** The City attempts to distinguish *Robbins* and the cases upon which it relies, claiming that they involved control over road maintenance rather than outright destruction or closure as presented here. Once Jones Road was closed and ceased operating as a public road, the City argues, it was no longer held for the benefit of the public, thus entitling the City to compensation. We are not persuaded. The State's right to control its roads includes the right to close them, and we see nothing in the cases the City cites that would support the distinction it seeks to draw. [2] Neither do factual differences among those cases undermine their fundamental premise— that the State has a superior ownership interest in its roads.

 **[16]** **[17]** This does not mean, however, that municipalities have no possessory interest in their roads. General-law municipalities like the City of Sunset Valley are political subdivisions created by the State and, as such, possess those powers and privileges that the State expressly confers upon them. *See Payne,* 196 S.W.2d at 495. As the State's agent or trustee, a municipality does possess a superior interest in its public roads vis-a-vis private citizens. *See Popplewell,* 294 S.W.2d at 715. Thus, we have said that the Legislature may grant cities and towns "exclusive dominion" over the public ways within their corporate or municipal boundaries. *See City of San Antonio,* 111 S.W.3d at 28 (recognizing in dispute between two cities that the Legislature granted general control to commissioners courts); *City of Fort Worth v. Taylor,* 162 Tex. 341, 346 S.W.2d 792, 793 (1961) (noting that a home rule city, by statutory grant, may regulate and control obstructions from streets and alley ways); *West v. City of Waco,* 116 Tex. 472, 294 S.W. 832, 834 (1927) (holding State can and did delegate authority to a city to regulate parking on a public square). We have also recognized the unique nature of school lands and that school districts, as political **\*646** subdivisions of the State, have an ownership interest in their property. *See Love v. City of Dallas,* 120 Tex. 351, 40 S.W.2d 20, 29 (1931); *Milam County v. Bateman,* 54 Tex. 153, 165 (1880). But none of these cases support the proposition that municipalities possess a superior ownership interest in public roads vis-a-vis the State that would support a right to compensation under the Constitution's takings clause when they are applied to another public use. Accordingly, the City's takings claim fails as a matter of law.

## V. Intervenors' Claims

Terrance Cowan, the City's mayor, and Donald Hurwitz, a City council member, intervened in this suit on behalf of the citizens of Sunset Valley. They alleged TxDOT violated their equal-protection rights by treating the citizens of Sunset Valley disparately from residents of other Texas communities. Cowan also asserted an individual private-nuisance claim, for which the trial court awarded him damages. TxDOT challenges the intervenors' standing to assert equal-protection claims and contends sovereign immunity protects it from Cowan's private-nuisance claim. We address each argument in turn.

### A. Equal Protection

[18] [19] [20] [21] Standing is a constitutional prerequisite to maintaining suit. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993); *Hunt v. Bass,* 664 S.W.2d 323, 324 (Tex.1984). Standing to raise an equal-protection challenge requires the claimant to demonstrate an interest distinct from that of the general public such that the actions complained of have caused a particular injury. *See Williams v. Lara,* 52 S.W.3d 171, 178–79 (Tex.2001); *see also Hunt,* 664 S.W.2d at 324 ("Standing consists of some interest peculiar to persons individually and not as members of the general public."). The "particularized injury" requirement "inheres in the nature of standing[, which] 'stems from two limitations on subject matter jurisdiction: the separation of powers doctrine and, in Texas, the open courts provision.' " *Brown v. Todd,* 53 S.W.3d 297, 302 (Tex.2001) (quoting *Tex. Ass'n of Bus.,* 852 S.W.2d at 443). These provisions require an actual grievance, not one that is merely hypothetical or generalized. *Id.* As a component of subject matter jurisdiction, we review a claimant's standing de novo. *See Tex. Ass'n of Bus.,* 852 S.W.2d at 445.

[22] Cowan and Hurwitz allege standing as members of a class, namely the residents of Sunset Valley, which they claim TxDOT targeted for disparate treatment. Specifically, they allege disparate treatment based on TxDOT's (1) failure to erect highway signs indicating Sunset Valley's exit and city limits, when similar municipalities in Texas have properly marked signs, and (2) installation of high-mast floodlights, when no other similar highway area in Texas uses them. The intervenors claim that Sunset Valley residents, as a group,

were treated unequally with respect to these features and have, as a community, suffered particularized injury distinct from that of similar municipalities. The court of appeals agreed, concluding that the injuries alleged were unique to residents of Sunset Valley as compared to other regions, and that as residents Cowan and Hurwitz had standing to assert them. 92 S.W.3d at 551–53.

[23] TxDOT contends that, to the extent the intervenors' claims are based on geographic disparate treatment, an equal-protection claim will not lie. *See Richards v. League of United Latin Am. Citizens,* 868 S.W.2d 306, 311–12 (Tex.1993) ("*LULAC* "). We agree. State and federal equal-protection guarantees relate to **\*647** " 'equality between persons as such, rather than between areas, and ... territorial uniformity is not a constitutional prerequisite.' " *Id.* at 311 (quoting *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)); *see also Mouton v. State,* 627 S.W.2d 765, 767 (Tex.App.-Houston [1st Dist.] 1981, no pet.). In *LULAC,* we held that, although the plaintiffs could challenge the State's higher-education system based on their racial identity, they could not challenge it as residents of a geographic region of the State. *Id.* at 311–12, 314. This, of course, makes sense. When the State exercises governmental powers, such as building highways, it necessarily draws distinctions between different geographic areas. Entitling every citizen to equal benefits whenever government money is spent "would make almost all government programs unconstitutional." *Weber v. City of Sachse,* 591 S.W.2d 563, 567 (Tex.Civ.App.-Dallas 1979, writ dism'd). Insofar as the intervenors' equal-protection claims are brought on behalf of area residents for TxDOT's failure to provide signage or lighting equal to that provided in other geographic areas, it fails as a matter of law.

[24] To bring an individual equal-protection claim, Cowan and Hurwitz must demonstrate that they were intentionally singled out and treated differently from others similarly situated. *County of Bexar v. Santikos,* 144 S.W.3d 455, 463, 2004 WL 1908328 (Tex.2004). According to Cowan and Hurwitz's pleadings and the evidence presented, though, all Sunset Valley residents suffered the same injury—inadequate signage and light pollution. There is simply no evidence that Cowan or Hurwitz were singled out or treated disparately with regard to these alleged highway effects. As we stated in *Brown v. Todd,* in which an individual voter asserted standing to challenge a city ordinance he had voted against in a previous election, "the injury that [the voter] identifies is not unique to him. Indeed, it is shared by all living Houstonians

who were among the ... electors who actually voted against the proposed ordinance." 53 S.W.3d at 302. Although the voter in that case did not assert an equal-protection violation, the generalized grievance bar to standing that we upheld also applies to equal-protection claims like those asserted here. *See United States v. Hays,* 515 U.S. 737, 743, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). Because Cowan and Hurwitz could not assert equal-protection claims on their own behalf or that of Sunset Valley's residents, these claims fail as a matter of law.

### B. Private Nuisance

 [25]    Cowan also asserted a private-nuisance claim based on light pollution, which TxDOT argues is barred by sovereign immunity. Because Cowan has asserted no statutory or other basis for a waiver of TxDOT's sovereign immunity, TxDOT can only be liable if the nuisance rises to the level of an unconstitutional taking under Article I, section 17 of the Texas Constitution. *See Jennings,* 142 S.W.3d at 312.

 [26]    Cowan presented evidence that the high-mast floodlights shone extremely brightly on his property, destroying its rural character and creating a "spot light effect." But not every deleterious impact on private property amounts to a compensable taking. *Santikos,* 144 S.W.3d at 459.

Instead, property impacts resulting from the construction of public works are compensable only to the extent they are not common to the community at large. *Id.* at 463; *Felts v. Harris County,* 915 S.W.2d 482, 485 (Tex.1996). Here, Cowan testified that the lights shine "into [his] neighborhood and [his] neighbors' property," and his pleadings also suggest that the lights similarly affect others in the community. **\*648**  While the proximity of Cowan's property to Highway 290 may increase the degree of the lights' impact on his property in comparison to its impact on other properties in the area, that fact alone does not suffice to render his injuries constitutionally compensable. *See Felts,* 915 S.W.2d at 485. Because Cowan failed to demonstrate that the nuisance he alleged amounted to an unconstitutional taking, sovereign immunity protects TxDOT from Cowan's private-nuisance claim.

### VI.

For the foregoing reasons, we reverse the court of appeals' judgment and render judgment for TxDOT.

### All Citations

146 S.W.3d 637, 47 Tex. Sup. Ct. J. 1252

## Footnotes

1    As a preliminary matter, the City claims TxDOT waived its right to challenge the judgment on the second ground by failing to properly raise it. It is true that TxDOT couched its argument to the court of appeals in terms of sovereign immunity. But as the court of appeals noted, TxDOT raised the issue in its brief by arguing that the Transportation Code expressly excludes cities from compensation. 92 S.W.3d at 546 n. 2. Because TxDOT adequately challenged the City's right to recover under the Transportation Code, it did not waive the issue on appeal. *See* TEX.R.APP. P. 38.1(e).

2    The City cites several cases from other states that it contends support a municipality's constitutional right to compensation from the state. *See City of Chester v. Commonwealth Dep't of Transp.,* 495 Pa. 382, 434 A.2d 695 (1981); *State ex. rel. Ala. State Docks Dep't v. Atkins,* 439 So.2d 128 (Ala.1983); *State ex rel. State Highway Comm'r v. Cooper*, 24 N.J. 261, 131 A.2d 756 (1957). Those cases, however, are either distinguishable in that they involved statutorily created eminent-domain rights, or inapposite in their reliance on federal authority. The relationship between a city and state, which are not separate sovereigns, is not analogous to that between the federal government and a state. *See United States v. Carmack,* 329 U.S. 230, 242 n. 12, 67 S.Ct. 252, 91 L.Ed. 209 (1946) ("When ... a sovereign state transfers its own public property from one governmental use to another ... a like obligation does not arise to pay just compensation for it.").

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# BBB

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** Gonzalez v. Grimm, Tex.App.-El Paso, July 8, 2015

974 S.W.2d 70
Court of Appeals of Texas,
San Antonio.

Terry THRIFT, Jr., Appellant,
v.
Sandra HUBBARD k/n/a Sandra
Hubbard Venable, Appellee.

No. 04–96–01013–CV. | Feb. 25, 1998.
| Opinion Dissenting from Denial of Rehearing
May 6, 1998. | Review Denied Oct. 15, 1998.

Accused brought action for malicious prosecution against business associate after charges of misapplication of funds, fraud, and theft were dismissed. The 224th Judicial District, Bexar County, David Peeples, J., entered judgment on jury verdict awarding accused $524,760, and business associate appealed. The Court of Appeals, Angelini, J., held that: (1) evidence supported finding of liability, and (2) evidence supported damage award.

Affirmed.

Green, J., filed dissenting opinion on motion for rehearing.

West Headnotes (18)

**[1]** **Malicious Prosecution**

🔑 Weight and Sufficiency of Evidence

In cases of malicious prosecution, delicate balance must be struck between interest of society in good faith reporting of suspect criminal conduct and interest of individual in freedom from unjustifiable and oppressive litigation of criminal charges, and in order to protect this delicate balance, courts must require strict proof of each element of cause of action; however, as with any other cause of action, if elements are proved, liability is established.

1 Cases that cite this headnote

**[2]** **Malicious Prosecution**

🔑 Instigation of or Participation in Prosecution

Finding that business associate initiated or procured commencement of fraud and theft prosecution against accused, as element of malicious prosecution, was supported by evidence that business associate filed complaint with district attorney's office which falsely represented substance of various transactions.

1 Cases that cite this headnote

**[3]** **Malicious Prosecution**

🔑 Instigation of or Participation in Prosecution

Person initiates criminal prosecution, as element of malicious prosecution, if he makes formal charge to law enforcement authorities.

1 Cases that cite this headnote

**[4]** **Malicious Prosecution**

🔑 Instigation of or Participation in Prosecution

Person procures criminal prosecution, as element of malicious prosecution, if his actions are enough to cause prosecution, and but for his actions, prosecution would not have occurred.

Cases that cite this headnote

**[5]** **Malicious Prosecution**

🔑 Instigation of or Participation in Prosecution

Person does not procure criminal prosecution, as element of malicious prosecution, when decision whether to prosecute is left to discretion of another, including law enforcement official or grand jury, unless person provides information which he knows is false.

4 Cases that cite this headnote

**[6]** **Malicious Prosecution**

🔑 Mode of Termination

Acquittal and resolution of factual elements of case were not required for criminal prosecution to be resolved in accused's favor, as element of malicious prosecution.

1 Cases that cite this headnote

**[7]** **Malicious Prosecution**

Mode of Termination

Finding that criminal prosecution was resolved in accused's favor, as element of malicious prosecution, was supported by prosecutor's testimony that he dismissed case after conducting prosecution for eight to ten months and concluding that it was no longer a good case, because there was not enough evidence to obtain conviction.

2 Cases that cite this headnote

**[8]** **Malicious Prosecution**

Grounds in General

Finding that business associate lacked probable cause to initiate fraud and theft prosecution against accused, as element of malicious prosecution, was supported by evidence that list of accounts receivable given as security clearly showed age of each account and did not misrepresent their value, that check was issued as part of new loan transaction and was not intended to be honored immediately, and that allegedly misappropriated funds were used for legitimate business purpose.

Cases that cite this headnote

**[9]** **Malicious Prosecution**

Belief in Guilt of Accused

Probable cause for initiation of criminal prosecution, precluding claim of malicious prosecution, exists when relevant facts and circumstances would excite belief in mind of reasonable person that individual accused is guilty of crime for which he is prosecuted.

1 Cases that cite this headnote

**[10]** **Malicious Prosecution**

Belief in Guilt of Accused

In determining whether probable cause exists in malicious prosecution case, trier of fact must determine whether complainant reasonably believed that elements of crime had been committed based on information available before criminal proceedings began; it is, therefore, important that probable cause inquiry focus only on actions of complainant, based upon his perspective of facts at time report was made, and not on subsequent actions of third-parties or information discovered after the fact.

4 Cases that cite this headnote

**[11]** **Malicious Prosecution**

Presumptions and Burden of Proof

Defendant in malicious prosecution case is afforded initial presumption that he acted reasonably and in good faith in initiating criminal proceeding against plaintiff, but presumption is rebutted when plaintiff produces evidence that motives, grounds, beliefs, and other evidence upon which defendant acted did not constitute probable cause to commence proceeding, in which case burden shifts to defendant to prove he acted with probable cause.

10 Cases that cite this headnote

**[12]** **Malicious Prosecution**

Probable Cause

When facts surrounding impetus of decision to instigate criminal prosecution are in dispute in malicious prosecution case, issue of probable cause becomes mixed question of law and fact to be resolved by jury.

3 Cases that cite this headnote

**[13]** **Malicious Prosecution**

Probable Cause and Malice

Finding that business associate acted with malice in filing criminal complaint against accused was supported by evidence that business associate was aware of exculpatory facts that he did not disclose to district attorney, and that he

threatened accused and her spouse with criminal charges and vowed to "get even" with them.

9 Cases that cite this headnote

**[14]** **Malicious Prosecution**
  Inference from Want of Probable Cause

**Malicious Prosecution**
  Probable Cause and Malice

Malice element of malicious prosecution may be established by either direct or circumstantial evidence and may be inferred from lack of probable cause.

5 Cases that cite this headnote

**[15]** **Malicious Prosecution**
  Amount Awarded

Award of $275,000 in malicious prosecution case for damage to reputation was supported by evidence that accused avoided business dealings and restricted church activities so she would not have to disclose indictment, and testimony that no one would want to work with her because of indictment.

1 Cases that cite this headnote

**[16]** **Malicious Prosecution**
  Amount Awarded

Award of $150,000 in malicious prosecution case for emotional distress was supported by evidence of accused's fear and anxiety related to charges pending against her, and emotional strain surrounding her preparation for and attendance at over 15 court proceedings as criminal defendant; additional evidence that she could not sleep or eat, required medication or psychiatric care, experienced depression, or fell into substance abuse as result of the charges against her was not required.

1 Cases that cite this headnote

**[17]** **Malicious Prosecution**
  Amount Awarded

Award of $9,800 in malicious prosecution case for past lost wages was supported by accused's estimation that she spent approximately 98 hours preparing for, traveling to, and making seven four-hour court appearances and seven ten-hour court appearances while indictment was pending, that if she had not been traveling and making court appearances, she would have been working, and that her standard billing rate for programming was $100 an hour.

1 Cases that cite this headnote

**[18]** **Appeal and Error**
  Particular Cases

Any error in including alternative definition of "malice" in jury charge was not prejudicial in malicious prosecution case, where there was more than enough evidence to support finding of malice under standard definition.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*71** W. Wendell Hall, Fulbright & Jaworski, L.L.P., San Antonio, for appellant.

**\*72** Darby Riley, Law Office of Darby Riley, Thomas B. Black, San Antonio, for appellee.

Before STONE, GREEN and ANGELINI, JJ.

**OPINION**

ANGELINI, Justice.

This is an appeal from a jury verdict in favor of Sandra Hubbard in her suit against Terry Thrift for malicious prosecution. In four points of error, Thrift contends that the evidence is both legally and factually insufficient to support the jury's findings of malicious prosecution, damaged reputation, emotional distress, and lost earning capacity. In an additional point of error, Thrift contends that the jury charge contained an erroneous theory of law. We affirm the judgment of the trial court.

**Factual and Procedural Background**

This complex set of facts began in 1985 when Victor [1] and Sandra Hubbard were seeking investors for a new software company they were starting. The Hubbards had been employees in the software division of Peerless Equipment Company ("PECO") when they developed a software program that attracted a tremendous amount of attention. PECO and the Hubbards agreed that the Hubbards would spin PECO's software division into an independent company, Peerless Technologies Corporation ("Peerless"), in order to develop and market the new program ("EMIS"). PECO retained the rights to inventory, equipment, and the software at its current level. The Hubbards were majority stock holders, officers, and employees of Peerless.

When Peerless spun off from PECO, the Hubbards needed capital to get the company off the ground. The Hubbards were introduced to Terry Thrift, who agreed to invest in Peerless after receiving assurances that the Hubbards's stock was not pledged and that the Hubbards's salaries were capped. He continued to invest in the company over the course of several months. In February of 1986, Thrift issued to Peerless a $100,000 line of credit. The loan was secured by (1) Peerless's accounts receivable less than 75 days old, unless otherwise approved by Thrift, and (2) all of Peerless's other assets. There was also a stock pledge agreement effective February 19, 1986, whereby the Hubbards pledged half of their stock to Thrift in further satisfaction of the loan.

In October of 1986, Thrift notified the Hubbards in writing that Peerless was insolvent because of unpaid debts, back employment taxes, and failure to pay interest on the line of credit. Thrift demanded payment in full on the line of credit and laid claim to all of Peerless's assets pursuant to the security agreement. He instructed the Hubbards that they could not sell or buy any permanent asset of the company, nor could they pay corporate officers without his consent. He demanded accurate and up to date operating statements, financial statements, and an estimate of sales and cash needs.

Sandra Hubbard testified that Thrift also demanded that half of the Hubbards's stock be transferred to his name on the company books pursuant to the stock pledge agreement. Peerless's stock transfer records indicate that 600,000 shares of Peerless stock were transferred from the Hubbards to Thrift on January 16, 1987, making him the majority shareholder of Peerless. Thrift testified that he requested possession of the pledged stock, which he received, but that the Hubbards transferred the stock to him in the company books on their own volition.

Sandra testified that Peerless was in dire financial straits, but that it had promising prospects. Peerless was behind in payment of rent, employment taxes, and employee wages. Sandra testified that, from the point of the stock transfer, she and her husband considered Thrift to be the majority shareholder in Peerless. Therefore, she claims that Peerless's financial condition was fully disclosed to Thrift. She claims that, per Thrift's request, she prepared status reports of Peerless's progress almost weekly for Thrift's review. Thrift acknowledges requesting but denies receiving these status **\*73** reports. He testified that he requested them so that he could determine whether he wanted to extend the line of credit he had given Peerless.

In December of 1986, Sandra Hubbard testified that Thrift and Peerless engaged in a "check swap" loan, whereby Thrift gave a $13,000 check to Peerless for use in a hardware purchase and Peerless gave Thrift a post-dated $13,000 check in repayment. There was not enough money in the account to cover Peerless's check, but, because Peerless had overdraft coverage protection, the bank paid the check anyway.

Also in December of 1986, it became necessary for Peerless to obtain the rights to the EMIS software that PECO had retained when Peerless was formed. The evidence is disputed regarding the impetus of this transaction. Thrift contends that Victor Hubbard beseeched him to purchase PECO's interest in the EMIS software because Peerless could not afford the lease payments. Conversely, Sandra Hubbard testified that Thrift approached the Hubbards about him personally obtaining rights to the software through Peerless so that he would not be identifiable as the purchaser. Sandra Hubbard further testified that the company attorney advised Thrift to purchase the software rights on his own, but that Thrift insisted on doing it through Peerless.

In any event, Thrift gave Peerless the $100,000 asking price to purchase the EMIS software rights from PECO. However, there was an $87,122.85 IRS levy on Peerless's account when Thrift's check was deposited, so $87,122.55 of the $100,000 intended to be used to purchase the EMIS rights was taken by the IRS as soon as the check was deposited. Sandra Hubbard testified that she was not aware of the IRS levy when the check was deposited. The evidence reflects that, in order to repay Thrift his $100,000, Peerless issued Thrift a note in the

amount of $87,122.55 and paid him the $12,877.15 difference by check. Thrift eventually purchased the EMIS rights on his own for $75,000.

As the result of a sale to Wrigley Company, Peerless was due to collect $49,484 in the spring of 1987. Sandra Hubbard testified that in January of 1987, Peerless's landlord was threatening to lock the doors because of unpaid rent. She claims that, in a meeting with Thrift, he instructed the Hubbards to reduce office space. The Hubbards, knowing Peerless needed to be current on its lease before it could move its offices, agreed to assign $21,227.64 of the Wrigley account receivable to the landlord in satisfaction of Peerless's obligations under the lease. This assignment was made in January of 1987. Sandra Hubbard testified that Thrift was aware of this assignment.

On February 19, 1987, Thrift and Peerless executed another line of credit in the amount of $109,776.10. This line of credit extended the original 1986 line of credit and included unpaid interest on the 1986 note. The second note was collateralized with Peerless's accounts receivable. However, neither party disputes that no credit was made for assets already appropriated and stock already taken when Thrift foreclosed on the 1986 note.

Thrift contends that the Hubbards listed the value of the accounts receivable at $140,000 in order to induce Thrift to extend the loan. It is undisputed that, except for the Wrigley account and another $10,000 of the accounts receivable, the remaining accounts listed were older than 75 days at the time the security agreement was signed. The security agreement on the second note indicates that the collateral does not include accounts receivable older than 75 days absent Thrift's consent. Sandra Hubbard testified that she gave Thrift a list of the accounts receivable on a regular basis. Thrift acknowledges receiving at least one of these lists showing accounts receivable up to January 22, 1987. This list included the age of each account. According to Sandra Hubbard, by agreeing to use the accounts receivable as collateral for the note, Thrift either did not intend to collateralize the old receivables or he consented to use them as collateral pursuant to the terms of the security agreement. Sandra Hubbard was under the impression that only the receivables less than 75 days old were collateralized.

Thrift also contends that several of the accounts receivable listed by the Hubbards were fictitious, particularly a $101,704 receivable **\*74** from NACO. Thrift testified that he

discovered that no money was due from NACO when he later took over the company. Sandra Hubbard testified that the receivable was listed accurately at the time the list was made, but that the deal later fell through.

Also in February of 1987, Thrift made Peerless another loan. Peerless needed money to purchase hardware in order to complete the Wrigley contract. Thrift wrote Peerless a check for $17,981, indicating that it was a 14 day loan. On the same date, Peerless wrote Thrift a check for $17,981, post-dating it 11 days. Sandra Hubbard testified that this transaction was another "check swap" loan. She stated that she post-dated the check 11 days because she was expecting some receivables and she felt sure there would be money to cover the check in the Peerless account within that time. Thrift testified that this transaction was not a "check swap" loan. He contends that he made the loan on assurances that he would be paid back out of the Wrigley account. Sandra Hubbard testified that she never stated Peerless would pay the $17,981 back from the Wrigley account. The money loaned was to buy hardware to complete the Wrigley contract. She stated that there is no way Peerless could have purchased the hardware, completed the contract, invoiced the Wrigley Company, and been paid in 11 days.

In March of 1987, Thrift had still not deposited the $17,981 check, apparently on the advice of the Hubbards. In a March 9, 1987, status report, Sandra Hubbard notified Thrift that Peerless was still waiting on money "from several large accounts (e.g.Wrigley's)—so I'll let you know as soon as your check can go through!" In another status report dated May 18, 1997, Sandra Hubbard notified Thrift that the Wrigley receivable had come in. The letter stated that the money was used to pay the landlord pursuant to the assignment, back wages (including those due the Hubbards), and critical operating bills. In explanation, the letter continued:

> Peerless does not have the money to pay you right now the $17,981 it owes you. The Wrigley money and the Bank One money was just barely enough to keep the company afloat. I made a judgment call with these funds—one necessary to the survival of Peerless (and therefore to protect all of us). You may not have agreed with it, but it seemed to be the right thing to do at the time.

\* \* \* \*

I thought about calling you at the time but reasoned to myself that it would make no difference, considering how

badly things had deteriorated—and the very best thing that I could do for you was to protect your total investment by trying to keep Peerless alive long enough to reduce the overheads. With a reduced overhead, if it could not make it on its own cash, then it could at least tread water long enough to be sold and leave you (and everyone else) whole. Also in this letter, Sandra Hubbard notified Thrift that she and Victor Hubbard had become self-employed agents for one of Peerless's major account resellers. She stated they had done this in order to take a large part of their salaries out of Peerless's overhead. Following Thrift's receipt of this letter in the latter part of May, 1987, Thrift and the Hubbards had several meetings regarding Peerless. Thrift asked the Hubbards to sign several documents which would enable him to recover what he could of his investment. Thrift presented letters to himself and others that he had drafted on Victor Hubbard's behalf. Thrift asked Victor Hubbard to sign the letters, all of which were introduced into evidence. The first letter authorized Thrift to receive and cash any checks that came into Peerless. The second letter notified all Peerless customers to make payments directly to Thrift. Victor Hubbard signed both of these letters.

A third letter operated to effectually give all Peerless assets and equipment to Thrift free and clear of all other creditors. It stated that Peerless could not continue operation "because of severe insolvency," and it gave Thrift access to all of Peerless's equipment and records. The letter also stated that the company furniture and equipment was not where it was supposed to be. Finally, the letter asked Thrift to allow the Hubbards to **\*75** continue working with him as agents or software writers. Thrift testified that he felt the letter would be a simple way to disentangle himself from Peerless without being too hard on the Hubbards. Sandra Hubbard testified that she and Victor refused to sign the third letter because they felt it contained untrue statements and was unethical.

Thrift acknowledges that he threatened to file fraud charges against the Hubbards because they refused to comply with his wishes. Sandra Hubbard testified that Thrift said, "I have friends, and I can do it" when making the threat. Thrift claims that the threat was idle and used merely as a negotiation tool.

In a letter dated May 22, 1987, the Hubbards resigned from the company. The letter acknowledged Thrift's majority interest in the company and his desire to transfer company assets. It continued by stating that the Hubbards did not want to be a part of such activity because they felt Peerless had a

good chance of paying its other creditors if it continued to operate.

Also on May 22, 1987, Thrift turned over all of his Peerless stock to the company attorney. He contends he did this before he received the Hubbards's letter of resignation. Sandra Hubbard contends that he turned in the stock after he received their letter. Sandra Hubbard testified that she believes Thrift turned in his stock because he did not want to be totally responsible for the company's liabilities after the Hubbards resigned. Thrift claims he returned the stock because it was worthless and because the Hubbards were abdicating responsibility for Peerless by claiming that Thrift was the majority stockholder.

Shortly thereafter, Thrift took over the Peerless office. Bill Shaefer, Peerless's chief operating officer testified that Thrift entered the office on a Friday morning and introduced himself as the majority stockholder. He offered the employees their jobs and agreed to pay them back wages if they would continue to work for him. However, Thrift later explained to the employees that he could not pay the back wages because it would cause him to be liable for other Peerless debts. Thrift instructed Schaefer to fire the Hubbards's son, who was working for the company, because he did not want a Hubbard working at his company. Schaefer testified that Thrift seemed surprised to learn that the Hubbards were working somewhere else marketing EMIS. Thrift told Shaefer that "[The Hubbards] don't know who they're messing with. I'll get even with them no matter how long it takes." Thrift continued the company as EMIS Software, Inc. for several years and eventually sold it.

On May 26, 1987, Thrift and the Hubbards entered into a separation agreement regarding Peerless. Among other things, the agreement provided that Thrift would regain possession of company equipment, receive title to all accounts receivable, and obtain possession of the company offices. The agreement further provided that Thrift would assume responsibility for employee wages and rent obligations. The Hubbards retained the right to sell EMIS as a "major account reseller" and to use the fixed assets already in their possession in doing so. Finally, the agreement provided that Thrift would not pursue fraud charges against the Hubbards and that the Hubbards would not represent to anyone that Thrift assumed any liability of Peerless or that he was a shareholder, officer, director or employee of Peerless. Thrift testified that he included this last provision in the agreement because the Hubbards were referring creditors

and unhappy customers to him, claiming that he owned the company software and was "in charge."

The agreement provided that "It is apparent that there are no funds immediately available that would be adequate enough to satisfy [Thrift's] demands...." Nevertheless, on June 4, 1987, Thrift deposited the $17,981 check. Predictably, the bank would not honor the check. Thrift testified that he deposited the check in spite of his knowledge of Peerless's insolvency because he was "hoping there might be [some money in the account]." On the other hand, Sandra Hubbard contends that Thrift deposited the check knowing there was no money in the account in order to obtain a check with a NSF stamp and set the Hubbards up for fraud charges.

 **\*76** On July 9, 1997, Thrift sent the Hubbards a letter declaring the separation agreement null and void. He claimed that the Hubbards deceived him regarding the collectability and existence of accounts receivable, refused to return company equipment, and failed to otherwise abide by the agreement. Sandra Hubbard testified that, on July 13, 1987, she and Victor Hubbard sent Thrift a letter rebutting the allegations in his July 9, 1987, letter and informing Thrift that, if the separation agreement was void, they would compete with him in the market place.

On July 20, 1997, Thrift filed a complaint with the Bexar County District Attorney's Office against the Hubbards, alleging theft of accounts receivable. Thrift testified that he filed the complaint pursuant to the directions of Assistant District Attorney Ben Sifuentes. He does not remember what documents he attached to the complaint, but he repeatedly testified that he "stand[s] by [his] complaint." The jury was not provided with the complaint actually filed as Thrift had thrown his copy away and the D.A.'s office could not locate its file. A copy of the complaint obtained from Thrift's attorney in a related civil suit was admitted at trial. The jury was instructed regarding the situation and allowed to make its own decision regarding the veracity of the complaint actually admitted.

In the complaint, Thrift alleged that (1) he gave the Hubbards a note against Peerless's accounts receivable in the amount of $109,776 in an effort to refinance a previous note scheduled to come due; (2) a list of receivables in the amount of $140,392.75 was pledged by the Hubbards in exchange for this note; (3) a check for $17,981 was added to the principle amount of the note; (4) the Hubbards never reported Peerless's progress as he had requested; (5) he went to their office and

found that they were gone and had started a new business as an agent of Peerless so they could siphon profits from Peerless; (6) the Hubbards purposefully and unlawfully reduced the receivables to $7,887.25; and (7) the Hubbards had included a fictitious account receivable (NACO) in the original list of pledged receivables.

Assistant District Attorney Ben Sifuentes was assigned to the case. He reviewed the complaint and conducted an independent evaluation. Sifuentes testified that, during his investigation, he was operating under an assumption, created by Thrift, that Thrift was attempting to purchase Peerless when the alleged acts took place. The case was eventually transferred to Assistant District Attorney Jane Davis who also conducted an investigation. Davis testified that she thought that the case against the Hubbards was very good. Three years later, in March of 1990, a grand jury indicted Victor Hubbard. In December of 1990, Sandra Hubbard was also indicted on two counts of misapplication of funds, one count of fraud, and one count of theft. The case was reset a number of times over the next three years. During that time, Victor Hubbard passed away.

During the course of the prosecution, the case was again reassigned, this time to Assistant District Attorney Dwight Chumbley. Chumbley testified that the case was old by the time he got it, but that Thrift stayed involved, offering to provide him meticulously kept documents. He testified that he believed there was enough evidence against Sandra Hubbard to support an indictment. However, he also testified, via affidavit, that there was insufficient evidence to convict or otherwise prove the allegations beyond a reasonable doubt. On December 6, 1993, Chumbley filed a motion to dismiss the case. The motion to dismiss reflects that Chumbley's explanation for dismissing the case was: "[co-defendant] deceased. In the interest of justice."

On August 26, 1994, Sandra Hubbard sued Terry Thrift for malicious prosecution. The case was tried to a jury. The jury returned a verdict in favor of Sandra Hubbard, finding that she had been damaged in the amount of $524,760. Thrift filed a motion for new trial, a motion to disregard the jury findings, and a motion for judgment notwithstanding the verdict, all of which were denied by the trial court. A judgment reflecting the jury's verdict was entered and this appeal ensues.

**ARGUMENT AND AUTHORITY**

In his first four points of error, Thrift challenges the legal and factual sufficiency of **\*77** the jury's verdict as it pertains to both liability and damages. In considering a legal insufficiency point, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988). If there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987). In considering a factual sufficiency point, we must assess all the evidence and reverse for a new trial only if the challenged finding shocks the conscience, clearly demonstrates bias, or is so against the great weight and preponderance of the evidence that it is manifestly unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). Under this analysis, we are not fact finders, we do not pass upon the credibility of witnesses, nor do we substitute our judgment for that of the trier of fact, even if there is conflicting evidence upon which a different conclusion could be supported. *Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

## I. MALICIOUS PROSECUTION

 [1]   In his first point of error, Thrift contends that the evidence is both legally and factually insufficient to support the jury's finding of malicious prosecution. This court has recently noted that in order to prevail in a malicious prosecution case, the following elements must be established: (1) a criminal prosecution was commenced against the plaintiff; (2) the prosecution was initiated or procured by the defendant; (3) the prosecution terminated in favor of the plaintiff; (4) the plaintiff was innocent; (5) the defendant lacked probable cause to instigate the prosecution; (6) the defendant acted with malice in bringing about the prosecution; and (7) the plaintiff suffered damages as a result of the prosecution. *Zess v. Funke,* 956 S.W.2d 92, 93 (Tex.App.—San Antonio 1997, n.w.h.); *see Browning–Ferris Indus., Inc. v. Lieck,* 881 S.W.2d 288, 292–93 (Tex.1994). In cases of malicious prosecution, a delicate balance must be struck between the interest of society in the good faith reporting of suspect criminal conduct and the interest of the individual in freedom from unjustifiable and oppressive litigation of criminal charges. *Lieck,* 881 S.W.2d at 290. In order to protect this delicate balance, courts must require strict proof of each element of the cause of action. *Id.* at 291. However, as with any other cause of action, if the elements are proved, liability is established. *Id.; see Ellis County State Bank v. Keever,* 888 S.W.2d 790, 793 (Tex.1994).

### A. Commencement and Causation

 [2]   [3]   [4]   [5]   There is no dispute that a criminal prosecution was commenced against Hubbard, thereby establishing the first element of a malicious prosecution cause of action. However, Thrift contends that Hubbard failed to prove that Thrift initiated or procured the commencement of the prosecution. A person initiates a criminal prosecution if he makes a formal charge to law enforcement authorities. *Lieck,* 881 S.W.2d at 292. A person procures a criminal prosecution if his actions are enough to cause the prosecution, and but for his actions, the prosecution would not have occurred. *Id.* A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides information which he knows is false. *Id.* Thrift argues that because he did not direct Hubbard's arrest and because the District Attorney's Office and the grand jury exercised sole discretion in deciding to prosecute Hubbard, he could have neither initiated nor procured the prosecution.

In the present case, Thrift filed a sworn, notarized complaint form with the District Attorney's office. The complaint itself states that it is made for the sole purpose of instituting criminal prosecution where the investigation indicates criminal activity. The complaint lists Sandra Hubbard as a co-defendant and repeatedly accuses her of numerous illegal acts. While Thrift argues that the mere filing of a complaint does not constitute the initiation of a criminal prosecution, we find it unnecessary to address this contention because, even though the decision to prosecute Hubbard was ultimately made **\*78** by the District Attorney's office, the jury had sufficient evidence to believe that Thrift intentionally included false and misleading information in his complaint. Thus, the evidence is sufficient to support a finding that Thrift procured the prosecution of Sandra Hubbard.

Specifically, Thrift indicated in his complaint to the District Attorney that the $17,981 check was a part of the second line of credit he extended to Peerless. However, the trial evidence indicates that the $17,981 was a separate and independent loan. Thrift also told the District Attorney that the Hubbard's pledged to him accounts receivable in the amount of $140,392.75, when there is evidence that he knew this to be untrue. He further claimed that he was not kept up to date on the operations of Peerless. However, Sandra Hubbard testified that reports were given to Thrift almost weekly. In fact, several of those reports were admitted into evidence.

Further, Thrift implied in his complaint that, on May 19, 1987, he was surprised to learn that the Thrift's had "started another business" in order to siphon Peerless profits. Conversely, the evidence reveals that Thrift knew the Hubbards were acting as major account resellers for Peerless and that he agreed to them acting as such. Finally, Assistant District Attorney Ben Sifuentes testified that he conducted his investigation of the Hubbards and Peerless based upon information given to him by Thrift that was untrue, that is that Thrift was attempting to purchase Peerless when the alleged theft took place. Accordingly, the evidence is sufficient to establish that the criminal prosecution of Sandra Hubbard would not have occurred but for the complaint filed by Terry Thrift.

## B. Resolution in Hubbard's Favor

 **[6]** **[7]** Thrift further contends that the evidence is insufficient to support a finding that the prosecution in this case ended in Sandra Hubbard's favor. Particularly, Thrift argues that an action terminates in favor of the accused only where there has been an acquittal and a resolution of some or all of the factual elements of the case. In the present case, Thrift claims that because there was no resolution or adjudication of the facts underlying the criminal charges against Hubbard, the jury should not have concluded that the prosecution ended in her favor.

However, in addressing the same issue, several Texas courts, including our supreme court, have held otherwise. *See Davis,* 752 S.W.2d at 523; *Leal v. American Nat. Ins. Co.,* 928 S.W.2d 592, 597 (Tex.App.—Corpus Christi 1996, writ denied); *Closs v. Goose Creek Consol. Ind. School Dist.,* 874 S.W.2d 859, 878 (Tex.App.—Texarkana 1994, no writ); *see also Lang v. City of Nacogdoches,* 942 S.W.2d 752, 758 (Tex.App.—Tyler 1997, writ denied) (implying favorable dismissal where criminal charges were dismissed). In *Davis,* the supreme court specifically rejected an argument similar to Thrift's, holding that termination on the merits is not a necessary requirement of a malicious prosecution cause of action. *Davis,* 752 S.W.2d at 523. The court held that "even when the termination is indecisive as to the accused's guilt, it is nevertheless favorable if the prosecution cannot be revived." *Id.* Likewise, in *Leal,* the court held that dismissal of the criminal charges against the accused constituted termination on the merits where the prosecutor testified that he concluded that the criminal prosecution might not be successful. *Leal,* 928 S.W.2d at 597; *see also Closs,* 874 S.W.2d at 878.

In the present case, Assistant District Attorney Dwight Chumbley testified that he dismissed the case after conducting the prosecution for eight to ten months and concluding that it was no longer a good case. He acknowledged that there was probable cause to support the original indictment, but that there was not enough evidence to obtain a conviction. This evidence is clearly sufficient to support a finding that the prosecution in this case terminated in Sandra Hubbard's favor.

## C. Probable Cause

 **[8]** **[9]** Finally, Thrift contends that the evidence is insufficient, in all respects, to support a finding that Thrift lacked probable cause to initiate a criminal prosecution against Sandra Hubbard. Probable cause for the initiation of a criminal prosecution exists when the relevant facts and circumstances **\*79** would excite belief in the mind of a reasonable person that the individual accused is guilty of the crime for which he is prosecuted. *Akin v. Dahl,* 661 S.W.2d 917, 921 (Tex.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984).

 **[10]** In determining whether probable cause exists in a malicious prosecution case, the trier of fact must determine "whether the complainant reasonably believed that the elements of a crime had been committed based on the information available before the criminal proceedings began." *Richey v. Brookshire Grocery Co.,* 952 S.W.2d 515, 519 (Tex.1997). It is, therefore, important that the probable cause inquiry focus only on the actions of the complainant, based upon his perspective of the facts at the time the report was made, and not on the subsequent actions of third-parties or information discovered after the fact. *Akin,* 661 S.W.2d at 921; *Digby v. Texas Bank,* 943 S.W.2d 914, 920 (Tex.App.—El Paso 1997, writ denied).

 **[11]** **[12]** The defendant in a malicious prosecution case is afforded the initial presumption that he acted reasonably and in good faith in initiating a criminal proceeding against the plaintiff. *Richey,* 952 S.W.2d at 517; *Keever,* 888 S.W.2d at 794; *Akin,* 661 S.W.2d at 920. However, this presumption is rebutted when the plaintiff produces evidence that the motives, grounds, beliefs, and other evidence upon which the defendant acted did not constitute probable cause to commence the proceeding. *Id.* The burden then shifts to the defendant to prove he acted with probable cause. *Id.* When the facts surrounding the impetus of the defendant's decision to instigate a criminal prosecution are in dispute, the issue of probable cause becomes a mixed question of law and fact to

be resolved by the jury. *Richey,* 952 S.W.2d at 518; *Akin,* 661 S.W.2d at 920.

While we may not agree with the jury's finding of lack of probable cause in this case, there is certainly sufficient evidence to support such a finding. Thrift accused Sandra Hubbard of theft of accounts receivable. Specifically, he accused her of misrepresenting the value of Peerless's accounts receivable, giving him a "bad check" in repayment of a loan he made to Peerless, and misappropriating the money received from the Wrigley account. The list of accounts receivable Thrift alleges was misrepresented to him clearly shows the age of each account. The security agreement relevant to the line of credit he issued specifically provides that he did not have to accept as collateral any receivable older than 75 days. The jury could have reasonably concluded that the receivables were honestly represented to Thrift and that he made the conscious decision to issue the line of credit in spite of the large percentage of old receivables contained on the list. The evidence certainly supports the fact that Thrift could not have believed that Sandra Hubbard personally pledged the old receivables because their own security agreement prevented her from doing so without Thrift's approval.

Thrift himself testified that the $17,981 note was not part of the line of credit as he claimed in his complaint to the District Attorney. He further testified that he deposited Peerless's $17,981 check when he knew the Peerless account was insolvent and he knew why. There is evidence that Thrift was aware that a large portion of the Wrigley receivable had already been pledged to Peerless's landlord before he claimed that his $17,981 loan was collateralized by the Wrigley account. The evidence also supports a finding that Thrift was aware that his $17,981 loan might not be paid out of the Wrigley receivable as he stated in his complaint. Letters from Sandra Hubbard to Thrift also support a finding that Thrift was aware that the Peerless receivables he claimed the Hubbards stole were used for legitimate business purposes.

Thrift's testimony concerning his good faith belief that the Hubbards had stolen his investment is compelling. However, the evidence also supports a finding that Thrift was a disappointed investor who gambled and lost on a fledgling company that could not keep its head above water. Where the evidence supports differing conclusions, we must defer to the jury's verdict. It is reasonable to interpret the evidence in this case as proving that Thrift filed his criminal complaint against the Hubbards, knowing it was specious, in an attempt to avenge his lost investment **\*80** or to gain an advantage

in the civil litigation stemming from these same facts. In fact, Thrift testified that his own attorney advised him against filing charges against the Hubbards when he threatened to do so. When viewed in this manner, the evidence is sufficient to support a finding that Thrift did not reasonably believe the Hubbards had stolen money from him, and, therefore, lacked probable cause to instigate criminal proceedings against Sandra Hubbard.

### D. Malice

[13] [14] With respect to the element of malice, Thrift argues that the evidence is insufficient to support a finding that he acted with malice in reporting Hubbard's conduct to the District Attorney's Office. Malice may be established by either direct or circumstantial evidence and may be inferred from lack of probable cause. *Digby,* 943 S.W.2d at 922; *Fisher v. Beach,* 671 S.W.2d 63, 67 (Tex.App.—Dallas 1984, no writ). Malice is generally defined as ill will, evil motive, gross indifference, or reckless disregard of the rights of others. *Digby,* 943 S.W.2d at 922; *Closs,* 874 S.W.2d at 878.

In the present case, there is sufficient evidence to demonstrate that Thrift acted with malice in filing the complaint accusing Sandra Hubbard of theft. There is evidence that Thrift was aware of exculpatory facts that he did not disclose to the District Attorney, specifically in regard to his exercise of control over Peerless operations, the circumstances surrounding the $17,981 loan, his prior knowledge of the collectability of the accounts receivable, and his beliefs regarding the Wrigley account. Moreover, there is evidence that he threatened the Hubbards with criminal charges and vowed to "get even" with the Hubbards.

We conclude, based upon a thorough review of the record, that the evidence in this case is sufficient to support the jury's affirmative finding regarding each element of malicious prosecution. Thrift's first point of error is overruled.

### II. DAMAGES

In his second through fourth points of error, Thrift disputes the sufficiency of the evidence supporting the jury's findings of damages. The jury awarded Hubbard $437,300 in damages: $2,500 in attorney's fees, $275,000 for injury to reputation; $150,000 for emotional distress; and $9,800 for lost wages.

### A. Injury to Reputation

**[15]** In his second point of error, Thrift contends that the evidence does not support the jury's award of damages for injury to Hubbard's reputation. He argues that there is no evidence that Hubbard possessed a certain amount of respect in the community that she lost as a result of the criminal charges against her. He further claims that the evidence is insufficient because there was no evidence that Hubbard's indictment was ever publicized.

At trial, Hubbard testified that she was extremely involved in the computer software business prior to her indictment. She had been and continued to work with large corporations and government agencies designing computer software. In her opinion, she had "quite a very good reputation" in the technology industry. Hubbard also testified that she was heavily involved in church activities and that she taught fifth grade Sunday school.

After the indictment was returned against her, Hubbard testified that she chose not to continue seeking promising employment opportunities with government agencies because she would have had to disclose that there was an indictment pending against her. She also chose not to attempt to sell technology she had developed because industry-wide due diligence requirements mandated that she disclose the indictment. Because the indictment is still on her record, she continues to be required to disclose its existence in her business dealings. Likewise, she will always have to disclose the indictment on official forms and applications asking for such information. According to Hubbard, "it is a poison pill" and "it killed [her] reputation." Her stepdaughter stated, and the jury apparently agreed, that "nobody is going to want to work with somebody ... with that kind of reputation."

**\*81** As for her church activities, Jerry Horn, one of Hubbard's friends from church testified that Sandra relinquished her responsibilities and decreased her involvement in church activities. He testified that, if information regarding her indictment had been widely known, it would have discredited her ministry.

Thrift did not counter any of this evidence. Under these circumstances, the jury reasonably concluded that Hubbard had suffered damage to her reputation in the amount of $275,000. Such a finding is reasonable in light of the gross social stigma attached to criminal charges that Hubbard will be burdened with both professionally and socially as long as the indictment remains on her record. Thrift's second point of error is overruled.

**B. Emotional Distress**

**[16]** In his third point of error, Thrift contends that the evidence is insufficient to support the jury's award of damages for emotional distress because the award necessitates an inference of humiliation. We disagree. The evidence reflects that Hubbard was indicted by a grand jury of four counts of criminal activity reflecting negatively on her character, and that she remained under indictment for over three years. Hubbard testified that she had to sit with other criminal defendants who were chained and attended by guards during her fifteen court appearances. She further testified that, during these hearings, she endured "glossy eyed" on-lookers "pawing" at her and asking why she was there. She spent over three years assisting in her defense and fearing a conviction of unfounded charges. She testified that it was "terrible."

Hubbard testified that she discontinued her church activities because she feared misleading people about her faith if they discovered that she was under indictment. She also worried about her business dealings and feared applying for certain projects because she would be compelled to disclose the indictment. Hubbard's criminal attorney testified that she was many times, "crying, a nervous wreck." Hubbard's stepdaughter testified that the Hubbards's criminal defense took up "pretty much all of their time and all of their thoughts and everything ... I mean they worked hard to get where they were, and it was all gone, taken away."

Thrift's contention that the award of damages for emotional distress required evidence that Hubbard could not sleep or eat, required medication or psychiatric care, experienced depression, or fell into substance abuse as a result of the charges against her is unfounded. The evidence in this case supports a finding that Hubbard's daily routine was substantially disrupted by fear and anxiety related to the charges pending against her, not to mention by the emotional strain surrounding her preparation for and attendance at over 15 court proceedings as a criminal defendant. The jury's award of $150,000 for mental anguish was, therefore, appropriate. Thrift's third point of error is overruled.

**C. Lost Wages**

**[17]** In her fourth point of error, Thrift contends that the evidence is insufficient to support the jury's award of damages for past lost wages. The evidence introduced at trial in support of Hubbard's claim for lost wage damages consists of Hubbard's estimation that she spent approximately 98 hours

preparing for, traveling to, and making seven four-hour court appearances and seven ten-hour court appearances while the indictment was pending. She testified that if she had not been traveling and making court appearances, she would have been working. She further testified that her standard billing rate for programming was $100 an hour.

Thrift argues that the evidence is insufficient to support the award of lost wages because Hubbard's testimony constituted speculation. However, Thrift did not object to this allegedly speculatory testimony at trial nor did he offer any controverting evidence. Hubbard's testimony was clear, definitive, and within her personal knowledge—it was not speculative. Accordingly, the evidence is sufficient to support the jury's award of lost wage damages in the amount of $9,800. Thrift's fourth point of error is overruled.

## *82 III. THE JURY CHARGE

[18] In his final point of error, Thrift complains that the trial court erred in overruling his objection to the jury instruction regarding malice. The jury instruction actually given allowed the jury to make an affirmative finding regarding the malice element of malicious prosecution if it determined:

> that Terry Thrift, Jr. acted with malice in initiating or procuring the criminal prosecution, or that he initiated or procured it primarily for a purpose other than to bring an offender to justice;
>
> > "Malice" is ill will or evil motive or such gross indifference or reckless disregard for the rights of others as to amount to wanton and willful action, knowingly and unreasonably done.

As discussed above, a finding of malice is necessary to a successful malicious prosecution case. Malice has been consistently defined by Texas courts as it was defined by the court's charge in this case: ill will, evil motive, gross indifference, or reckless disregard. *See Fisher,* 671 S.W.2d at 67; *Dahl v. Akin,* 645 S.W.2d 506, 515 (Tex.App.—Amarillo 1982), *aff'd,* 661 S.W.2d 917 (Tex.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984). However, the court's charge in this case goes beyond the common law definition of malice and allows an affirmative finding of the malice element upon proof that the prosecution was sought "primarily for a purpose other than to bring an offender to justice." Thrift argues that the instruction given in this case is erroneous because it enabled the jury to find malice on alternative grounds: either by finding malice as it is generally

defined or by finding that Thrift filed his complaint for some other reason than to obtain justice.

While the charge in this case allowed the jury to find malice based upon a legal theory not generally recognized in Texas case law, the instruction given is consistent with the theory of malice established in the Restatement Second of Torts. The Restatement provides that:

> [t]o subject a person to liability for malicious prosecution, the proceedings must have been initiated primarily for a purpose other than that of bringing an offender to justice.

RESTATEMENT (SECOND) OF TORTS § 668 (1997); *see* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 119 at 883 & n. 65 (5th ed.1984) (citing *Nesmith v. Alford,* 318 F.2d 110 (5th Cir.1963), *cert. denied,* 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420 (1964) for proposition that malice is established where the defendant's primary purpose was something other than the bringing an offender to justice).

It is Thrift's burden to establish that he was harmed by the trial court's submission of the allegedly erroneous malice issue to such a degree that the error probably caused the rendition of an improper judgment. TEX.R.APP. P. 44.1(a) (formerly TEX.R.APP. P. 81(b)(1)). Contrary to Thrift's contention, the fact that the jury may have relied upon a legal theory submitted in error does not necessarily require reversal because it does not affirmatively demonstrate that the error probably caused rendition of an improper judgment. *Provident American Ins. Co. v. Castaneda,* 914 S.W.2d 273, 277 (Tex.App.—El Paso 1996, writ granted).

In order to make a sufficient showing of harm, Thrift must show that there is no or insufficient evidence to support a finding based upon the correct portion of the malice issue submitted to the jury. *Ford Motor Co. v. Pool,* 688 S.W.2d 879, 882 (Tex.App.—Texarkana 1985), *aff 'd in part and rev 'd in part,* 715 S.W.2d 629 (1986) (affirming holding of appellate court in regard to proposition at issue); *Bernstein v. Portland Sav. & Loan Assoc.,* 850 S.W.2d 694, 702 (Tex.App.—Corpus Christi 1993, writ denied). In other words, if the evidence is not sufficient to demonstrate that Thrift acted with ill will, evil motive, gross indifference, or reckless disregard in filing his complaint against the Hubbards, then it is more likely than not that the jury found malice based upon the Restatement definition. However, as discussed above, the

evidence in this case is more than sufficient to demonstrate that Thrift's complaint was filed with ill will, evil motive, gross indifference, or reckless disregard. Accordingly, we find that, if the jury **\*83** charge in this case was in fact erroneous, the error is harmless.

Because we find that Thrift suffered no harm as a result of the inclusion of the Restatement definition of malice in the jury charge, we will not pass on the actual propriety of the charge. Thrift's fifth point of error is overruled.

The judgment of the trial court is affirmed.

GREEN, Justice, dissenting on motion for rehearing.
Appellant's motion for rehearing should be granted on the damages issues. Because the panel majority has voted to deny the motion, I respectfully dissent.

**All Citations**

974 S.W.2d 70

Footnotes

1    While Victor Hubbard is essential to the factual development of this case, he has since passed away. Neither he nor his estate have been involved in the malicious prosecution case.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

CCC

KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by** Kuzmin v. Schiller, Tex.App.-Dallas, January 8, 2015

171 S.W.3d 857
Supreme Court of Texas.

Evelyn TITTIZER, Individually and as Independent Executrix of the Estate of Louis Tittizer, Petitioner,
v.
UNION GAS CORPORATION, Respondent.

No. 04–0100. | Aug. 26, 2005.

**Synopsis**
**Background:** Oil and gas lessors brought action against lessee seeking payment of royalties in accordance with pooling agreement. Lessee joined non-drillsite lessors as third-party defendants and sought declaration to establish rights of the parties concerning the royalty payments and the effective date of the pooled unit as the date of first production for all royalty owners. Non-drillsite lessor brought counterclaim seeking declaration that the effective date of the pooled unit under her lease was the date of first production, and seeking to recover her pro rata share of royalties accruing from the date of first production to the date of judgment. The 267th District Court, Victoria County, granted lessors' and non-drillsite lessors' motions for summary judgment, awarded attorney's fees, and granted motions to sever. Lessee appealed. The Court of Appeals, Thirteenth District, affirmed in part and reversed in part. Lessee and non-drillsite lessor petitioned for review.

**Holdings:** The Supreme Court held that:

[1] effective date of the pooled unit under lease was the date of recordation of the designation;

[2] lessee was not estopped under the invited error doctrine from arguing on appeal that effective date of pooled unit was date of recordation;

[3] lessee did not unequivocally take a position in the trial court that was clearly adverse to its position on appeal such that lessee was estopped from making such an argument on appeal; and

[4] lessee had appealed award of $150,000 in attorneys' fees to non-drillsite lessors, such that Court of Appeals should have considered issue on appeal.

Affirmed in part, reversed in part, and remanded.

West Headnotes (15)

**[1]** **Appeal and Error**
⬤ Cases Triable in Appellate Court

The Supreme Court reviews the trial court's summary judgment de novo.

19 Cases that cite this headnote

**[2]** **Mines and Minerals**
⬤ In General; General Rules of Construction

An oil and gas lease is a contract, and its terms are interpreted as such.

24 Cases that cite this headnote

**[3]** **Mines and Minerals**
⬤ In General; General Rules of Construction

In construing an unambiguous oil and gas lease, the court seeks to enforce the intention of the parties as it is expressed in the lease.

18 Cases that cite this headnote

**[4]** **Contracts**
⬤ Application to Contracts in General

The court enforces an unambiguous document as written.

1 Cases that cite this headnote

**[5]** **Mines and Minerals**
⬤ Place or Portion Developed; Pooled or Unitized Tracts

Oil and gas lease, which provided that lessee "shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record," did not authorize lessee to execute a pooling designation

with a retroactive effect, but rather provided that unitization could be effective only upon recordation, and thus effective date of the pooled unit was the date of recordation of the designation and non-drillsite lessor was entitled only to her pro rata share of the royalties earned after that date.

4 Cases that cite this headnote

**[6]** **Mines and Minerals**

    Place or Portion Developed; Pooled or Unitized Tracts

An oil and gas lessee has no power to pool without the lessor's express authorization, usually contained in the lease's pooling clause.

5 Cases that cite this headnote

**[7]** **Mines and Minerals**

    Place or Portion Developed; Pooled or Unitized Tracts

For pooling to be valid, it must be done in accordance with the method and purposes specified in the oil and gas lease.

5 Cases that cite this headnote

**[8]** **Appeal and Error**

    Nature and Theory of Cause, and Grounds of Action or Defense

**Declaratory Judgment**

    Scope and Extent of Review in General

Oil and gas lessee was not estopped under the invited error doctrine from arguing on appeal that effective date of pooled unit was date of recordation, despite lessee's third-party claim seeking declaration that the pooled unit was retroactively effective as of the date of first production; lessee filed third-party claim to avoid potential double liability by obtaining a judicial determination of its obligations under leases and by joining all stakeholders as parties, lessee's argument that it had the power to make the unit retroactive was contingent on the retroactive application being uniformly applied to all parties, but trial court declined to apply that application to non-drillsite lessor.

3 Cases that cite this headnote

**[9]** **Appeal and Error**

    Error Committed or Invited by Party Complaining

As a general rule, the doctrine of estoppel precludes a litigant from requesting a ruling from a court and then complaining that the court committed error in giving it to him.

9 Cases that cite this headnote

**[10]** **Appeal and Error**

    Error Committed or Invited by Party Complaining

A party cannot complain on appeal that the trial court took a specific action that the complaining party requested, a doctrine commonly referred to as "the invited error doctrine."

44 Cases that cite this headnote

**[11]** **Appeal and Error**

    Nature and Theory of Cause, and Grounds of Action or Defense

**Declaratory Judgment**

    Scope and Extent of Review in General

Oil and gas lessee did not unequivocally take a position in the trial court, where lessee argued for declaration that pooled unit was retroactively effective as of the date of first production, that was clearly adverse to its position on appeal, which was that effective date of pooled unit was date of recordation, such that lessee was estopped from making such an argument on appeal; lessee stated in trial court that a "bona fide dispute exists" concerning lessors' entitlement under their respective leases and under unit designation, which was an acknowledgment that both positions concerning the effective date of pooling might have validity and were asserted in good faith.

5 Cases that cite this headnote

**[12]** **Appeal and Error**

 Points and Arguments

Oil and gas lessee had appealed award of $150,000 in attorneys' fees to non-drillsite lessors, such that Court of Appeals should have considered issue on appeal; although lessee stated in point of error that court erred in granting fees to other lessors, body of argument supporting the point of error twice referred to challenges to the attorneys' fees awarded to non-drillsite lessors, and argument concluded that attorney's fee award to non-drillsite lessors was "unreasonable as a matter of law."

4 Cases that cite this headnote

[13]    **Appeal and Error**
 Points and Arguments

Points of error should be liberally construed to fairly and equitably adjudicate the rights of litigants. Rules App.Proc., Rule 38.9.

5 Cases that cite this headnote

[14]    **Appeal and Error**
 Points and Arguments

An appellate court should consider the parties' arguments supporting each point of error and not merely the wording of the points. Rules App.Proc., Rule 38.9.

Cases that cite this headnote

[15]    **Appeal and Error**
 Defects, Objections, and Amendments

Adhering to tenets of preservation of error is important; however, appellate courts should avoid being overly technical in their application.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*859** Paul S. Francis, Kenneth Sup Soh, Baker & Hostetler, LLP, Joe G. Roady, Hirsch & Westheimer, Houston, for respondent.

Emmett Cole Jr., William L. Sciba, III, Cole, Cole & Easley, P.C., Victoria, for petitioner.

**Opinion**

PER CURIAM.

The parties dispute the amount of royalties that an oil and gas lessee owes landowners under the pooling provisions of multiple oil and gas leases. The landowner argues that her lease's pooling provisions entitle her to royalties on the pooled unit from the date of first production. The lessee argues that royalties are due from the later date of recordation of the Designation of Pooled Unit. We agree with the lessee and affirm in part the judgment of the court of appeals and remand the case to the court of appeals to consider the reasonableness of attorneys' fees.

In 1999, Union Gas Corporation entered into multiple oil and gas leases with Jimmie Gisler, Jenell Gisler, Ralph Gisler, and Doris Gisler (the Gislers) and various adjoining landowners. The leases contained pooling clauses, allowing lessee Union Gas to pool acreage owned by the various lessors for production of natural gas. Under the leases, each lessor in the "pooled unit" was entitled to receive a pro rata share of royalty fees from production anywhere in the unit. Completed in March 2000, the Watts–Gisler No. 1 Well was part of a pooled unit. The well began production on March 27, 2000. However, Union Gas did not file a Designation of Pooled Unit (the Designation) until August 7, 2000. The county recorded the Designation on the same day. The Designation included language that purported to make the pooled unit effective retroactively, from the date of first production on March 27, 2000.

The Gislers filed a breach of contract claim against Union Gas, seeking to defeat the retroactive effect of the Designation. They sought 100% of their royalties from the March 27, 2000 production date until the August 7, 2000 recordation of the Designation. The suit also alleged bad-faith pooling, damages for drainage, breach of implied covenants, fraud, negligence, and conversion. Union Gas joined, as third-party defendants, the adjoining landowners (the non-drillsite lessors), alleging that these parties' royalty rights under the pooling clauses of the leases could be affected by the Gislers' claim to 100% of the royalties from March 27, 2000 to August 7, 2000. Union Gas sought a declaration to establish the rights of the parties concerning the royalty payments and the

effective date of the pooled unit as the date of first production for all royalty owners.

Evelyn Tittizer was one of the non-drillsite lessors joined by Union Gas's third-party action. Tittizer counterclaimed against Union Gas seeking a declaration that the effective date of the pooled unit under her lease was the date of first production, and seeking to recover her pro rata share of royalties accruing from the date of first production to the date of judgment.

Union Gas later amended its third-party action to add a claim for interpleader, alleging that competing claims for royalties placed them "in the position of potential double liability." Union Gas tendered over $1.3 million into the registry of the court, representing this amount as the royalties accruing from March 27, 2000 (the date of first production) to August 7, 2000 (the recordation date of the Designation).

The Gislers filed a motion for partial summary judgment seeking 100% of their royalties from March 27, 2000 to August 7, 2000. All of the non-drillsite lessors, including **\*860** Tittizer, also filed motions for partial summary judgment, seeking declarations that the pooling clauses of the leases were effective from the date of first production and that all of the owners of the pooled unit were entitled to pro rata shares of the $1.3 million in royalties from production during the March 27, 2000 to August 7, 2000 period.

The trial court granted the Gislers' and all non-drillsite lessors' motions for partial summary judgment against Union Gas. The trial court also granted motions to sever the Gislers' breach of contract claims and the non-drillsite lessors' counterclaims against Union Gas, creating eleven different cases. The trial court entered final judgment for the Gislers on their severed contract claims for over $1.3 million in royalties, plus attorneys' fees. The trial court also entered judgment for each of the non-drillsite lessors. Specifically, the trial court awarded Tittizer her pro rata share of royalties from March 27, 2000, the date of first production, through April 30, 2001, the date of judgment in her favor, plus attorneys' fees. By doing so, the trial court implicitly rejected Union Gas's interpleader claim.

**[1]** On appeal, Union Gas complained that it had been wrongfully ordered to pay double royalties for production between March 27, 2000 and August 7, 2000. The court of appeals reversed in part the trial court's judgments in favor of the non-drillsite lessors and ordered that the Gislers alone

were entitled to royalties from production between March 27, 2000 and August 7, 2000. 171 S.W.3d 209, ——, 2003 WL 22479980. The court of appeals affirmed the trial court's judgment in all other respects. *Id.* at ——. The court of appeals also held that Union Gas failed to attack the award of Tittizer's attorneys' fees and thus did not consider the reasonableness of the $150,000 award. Tittizer and Union Gas petitioned this Court for review. We review the trial court's summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003).

**[2]** **[3]** **[4]** An oil and gas lease is a contract, and its terms are interpreted as such. *See Anadarko Petroleum Corp. v. Thompson,* 94 S.W.3d 550, 554 (Tex.2002); *Skelly Oil Co. v. Archer,* 163 Tex. 336, 356 S.W.2d 774, 778 (1961). In construing an unambiguous oil and gas lease, such as the one at issue here, we seek to enforce the intention of the parties as it is expressed in the lease. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996); *McMahon v. Christmann,* 157 Tex. 403, 303 S.W.2d 341, 344 (1957). We enforce an unambiguous document as written. *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 728 (Tex.1981).

**[5]** **[6]** **[7]** A lessee has no power to pool without the lessor's express authorization, usually contained in the lease's pooling clause. *Southeastern Pipe Line Co. v. Tichacek,* 997 S.W.2d 166, 170 (Tex.1999); *Jones v. Killingsworth,* 403 S.W.2d 325, 327–28 (Tex.1965) ("The lessors' land may be pooled only to the extent stipulated in the lease."). For pooling to be valid, it must be done in accordance with the method and purposes specified in the lease. *Tichacek,* 997 S.W.2d at 170.

Union Gas's lease with Tittizer reads:

> Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of said options may be exercised by lessee at any time and from time to time while this lease is in force, and whether before or after production has been established either on said land, or on the portion of **\*861** said land included in the unit, or on other land unitized therewith.

Tittizer argues that the language in her lease allows Union Gas to make the effective date of the pooled unit retroactive

by language in the Designation. On the contrary, under the terms of the lease, pooling can only be effectuated upon recordation of an instrument identifying the pooled unit. While the lease allows Union Gas to pool by recording at any time, it does not allow Union Gas to pool on a date other than that of recordation of the Designation. Therefore, the attempt by Union Gas to effect pooling on a date prior to the date of recordation, by assigning a different effective date in the Designation, is contrary to the unambiguous terms of the lease. Our courts of appeals have also reached the same conclusion on similar lease language. *See, e.g., Sauder v. Frye,* 613 S.W.2d 63, 64 (Tex.Civ.App.Fort Worth 1981, no writ) (holding, in interpreting a pooling clause providing that the lessee "shall execute in writing and record" an instrument identifying the units, that the intent of the parties was for unitization to be effective only upon recording of the designation); *Yelderman v. McCarthy,* 474 S.W.2d 781, 782, 784 (Tex.Civ.App., Houston [1st Dist.] 1971, writ ref'd n.r.e.) (holding that ratification of a lease clause providing that "upon such recordation the unit shall be effective as to all parties hereto" made pooling conditioned upon recordation); *cf. Tiller v. Fields,* 301 S.W.2d 185, 191 (Tex.Civ.App.Texarkana 1957, no writ) (holding that effective date of pooling was the date of execution of the designation where the lease did not require that the unit designation be recorded); *see also* Howard R. Williams & Charles J. Meyers, Oil and Gas Law §§ 669.11, 921.16 (2004); 1 Ernest E. Smith & Jacqueline Lang Weaver, Texas Law of Oil and Gas § 4.8[B][2] (2d ed.2005).

We hold that this lease does not authorize the lessee to execute a pooling designation with a retroactive effect. The lease provides that unitization can be effective only upon recordation. We affirm the court of appeals' conclusion that the effective date of the pooled unit was the date of recordation of the Designation, and that Tittizer is only entitled to her pro rata share of the royalties earned after that date.

 **[8]**  **[9]**  Tittizer next argues that Union Gas is estopped from arguing that the effective date of the pooled unit is the date of recordation because Union Gas filed a third-party claim seeking a declaration that the pooled unit was effective as of the date of first production, on March 27, 2000. As a general rule, the doctrine of estoppel precludes a litigant from requesting a ruling from a court and then complaining that the court committed error in giving it to him. *Northeast Tex. Motor Lines v. Hodges,* 138 Tex. 280, 158 S.W.2d 487, 488 (1942); *Ramirez v. State,* 973 S.W.2d 388,

392 (Tex.App.El Paso 1998, no pet.); *Austin Transp. Study Policy Advisory Comm. v. Sierra Club,* 843 S.W.2d 683, 689–90 (Tex.App.Austin 1992, writ denied). The rule is grounded in justice and dictated by common sense. *Hodges,* 158 S.W.2d at 488. Union Gas responds that it is not raising a point of error inconsistent with its position at the trial court. We agree.

Union Gas filed its third-party claim to avoid potential double liability by obtaining a judicial determination of its obligations under the leases, and also by joining all the stakeholders as parties to ensure that it obtained a binding determination of their contractual rights and obligations in the oil and gas properties. While Union Gas did seek a declaration that the effective date of the pooled unit for royalty purposes was the date of first production, **\*862** it also stated that "the possibility of double liability makes it essential that Union Gas obtain a declaration of the rights of the parties." Union Gas's argument that it had the power to make the unit retroactive was contingent on the retroactive application being uniformly applied to all parties, such that it owed no more than the amount it sought to interplead into the court's registry.

 **[10]**  As we explained in *Hodges,* a party cannot complain on appeal that the trial court took a specific action that the complaining party requested, a doctrine commonly referred to as "the invited error" doctrine. 158 S.W.2d at 488; *see, e.g., Naguib v. Naguib,* 137 S.W.3d 367, 375 (Tex.App., Dallas 2004, pet. denied); *Neasbitt v. Warren,* 22 S.W.3d 107, 112 (Tex.App.Fort Worth 2000, no pet.); *Ramirez,* 973 S.W.2d at 392. Union Gas sought a uniform determination from the trial court, applicable to all royalty owners, that the effective date of pooling was the date of first production. Granting Tittizer's motion for summary judgment, the trial court declared that the effective date of the pooled unit as to the Tittizer lease was the date of first production. However, the court did not apply the same effective date to the Gisler lease. Instead, contrary to Union Gas's position, the court entered judgment in favor of the Gislers in an amount based on an effective date of pooling from the date of recordation of the Designation. By establishing different effective dates for the Gislers and Tittizer, the trial court did not grant Union Gas's requested uniform relief. Therefore, the invited error doctrine is inapplicable to this case because Union Gas did not request that the trial court rule in the manner in which it did and thus did not "invite" the error.

 **[11]**  <mark>In addition, to be estopped from asserting that recordation is the effective date of pooling, Union Gas must</mark>

have unequivocally taken a position in the trial court that is clearly adverse to its position on appeal. *See Am. Sav. & Loan Ass'n v. Musick,* 531 S.W.2d 581, 589 (Tex.1975) ("One of the requirements for application of the doctrine of judicial estoppel is that the statement must be deliberate, clear, and unequivocal."). Union Gas's position at the trial court was neither unequivocal nor clearly adverse to its position on appeal. Union Gas stated in its third-party claim that a "bona fide dispute exists" concerning the entitlement of Tittizer and the non-drillsite lessors "under their respective leases and under the Unit Designation." This statement is an acknowledgment that both positions concerning the effective date of pooling may have validity and are asserted in good faith. Union Gas's position that the effective date of pooling was the date of first production was not unequivocal. For similar reasons, Union Gas's third-party claim is not clearly adverse to its position on appeal. At the trial court, Union Gas sought to obtain a uniform determination applicable to all royalty owners to avoid double liability, and its position on appeal is the same.

 **[12]**    Finally, Union Gas complains that the court of appeals erred in holding that Union Gas did not appeal the award of $150,000 in attorneys' fees to Tittizer. We agree. In its brief to the court of appeals, Union Gas included the following point of error: "The trial court erred in granting final judgments which awarded attorneys fees to the *Gislers* [*Union Gas Corp. v. Gisler,* 129 S.W.3d 145 (Tex.App.—Corpus Chrisit)] because the amounts awarded were excessive and were not reasonable, necessary, equitable, or just." (emphasis added). The court of appeals held simply that "Union did not appeal the award of attorneys fees in this case." 171 S.W.3d at 211 [(Tex.App.—Corpus Christi—2003)].

 **\*863**   **[13]**    **[14]**    Read in isolation, Union Gas's point of error in the court of appeals complains that the trial court awarded excessive fees to the *Gislers* and includes no challenges to the trial court's attorneys' fees award to *Tittizer.* Under this view Union Gas failed to preserve error as to Tittizer's attorneys' fees award. However, points of error should be liberally construed to fairly and equitably adjudicate the rights of litigants. Tex.R.App. P. 38.9; *Williams v. Khalaf,* 802 S.W.2d 651, 658 (Tex.1990). Furthermore, an appellate court should consider the parties' arguments supporting each point of error and not merely the wording of the points. *Anderson v. Gilbert,* 897 S.W.2d

783, 784 (Tex.1995); *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982). After severing all the non-drillsite lessors' counterclaims, the trial court awarded attorneys' fees to both Tittizer and the Gislers. The body of the argument supporting the point of error twice refers to challenges to the attorneys' fees awarded to Tittizer. The text of Union Gas's argument concludes that "the attorneys fee award provided to the Tittizer appellees is thus unreasonable as a matter of law."

 **[15]**    The context of the litigation, as well as the text of the argument in its brief to the court of appeals, indicates that the intent of Union Gas was to appeal the award of attorneys' fees to Tittizer, even though its point of error erroneously mentioned "the Gislers." Adhering to tenets of preservation is important; however, appellate courts should avoid being overly technical in their application. *See In re B.L.D. & B.R.D.,* 113 S.W.3d 340, 350 (Tex.2003) (describing the underpinnings of preservation rules as fairness to the parties and judicial economy and accuracy); *Motor Vehicle Bd. of the Tex. Dep't of Transp. v. El Paso Indep. Auto. Dealers Ass'n,* 1 S.W.3d 108, 111 (Tex.1999) (stating the Court's preference to decide cases on substance rather than procedural technicalities). The court of appeals erred in holding that this point of error was not raised. We remand this issue to the court of appeals. Tex.R.App. P. 61.4.

We hold that the court of appeals is correct in concluding that Tittizer is not entitled to royalties for production between March 27, 2000 and August 7, 2000 because the lease unambiguously provides for pooling to commence on the date of the Designation's recordation. We further hold that the court of appeals erred in concluding that Union Gas failed to appeal the trial court's award of attorneys' fees. We affirm in part and reverse in part the court of appeals' judgment and remand the case to the court of appeals to consider Union Gas's challenge to the reasonableness of the attorneys' fees awarded to Tittizer.

Justice Willett did not participate in the decision.

**All Citations**

171 S.W.3d 857, 164 Oil & Gas Rep. 172, 48 Tex. Sup. Ct. J. 1023

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# DDD

KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by** United Parcel Service, Inc. v. Tasdemiroglu, Tex.App.-Hous. (14 Dist.), August 10, 2000

159 Tex. 58
Supreme Court of Texas.

Daniel TOBIN, Jr., et al.

v.

Amando GARCIA, Jr., and George B. Parr.

No. A-6632. | April 30, 1958.
| Rehearing Denied Oct. 1, 1958.
| Concurring Opinion Oct. 16, 1958.

Consolidated mandamus proceedings to require county commissioners to issue certificate showing plaintiffs' election to office of county clerk, and office of sheriff, respectively. The District Court, Duvall County, C. W. Laughlin, J., granted defendants' motions for summary judgment and plaintiffs appealed. The San Antonio Court of Civil Appeals, 307 S.W.2d 836, reversed and remanded with instructions, and plaintiffs and defendants brought error. The Supreme Court, Hickman, C. J., held that exhibits, pleadings and affidavits submitted for and in opposition to motions for summary judgment presented an issue of fact as to whether plaintiffs were ineligible to hold offices of county clerk and sheriff, respectively, under constitutional provision that no person entrusted with public money shall be eligible to office until he shall have obtained a discharge, precluding summary judgment.

Judgment of Court of Civil Appeals affirmed with directions.

West Headnotes (5)

**[1]** **Officers and Public Employees**
 Special requirements

In constitutional provision that no person with whom public money has been entrusted shall be eligible to office until he shall have obtained a discharge for such money, "entrusted" means to confer a trust upon, or to deliver to another something in trust or to commit something to another with a certain confidence regarding

his care, use or disposal of it. Vernon's Ann.St.Const. art. 3, § 20.

3 Cases that cite this headnote

**[2]** **Judgment**
 Evidence and Affidavits in Particular Cases

In consolidated mandamus proceedings to require county commissioners to issue certificate showing plaintiffs' election to office of county clerk, and office of sheriff, respectively, exhibits, pleadings and affidavits submitted for and in opposition to motions for summary judgment presented in issue of fact as to whether plaintiffs were ineligible to hold offices of county clerk and sheriff, respectively, under constitutional provision that no person entrusted with public money shall be eligible to office until he shall have obtained a discharge, precluding summary judgment. Vernon's Ann.St.Const. art. 3, § 20; Rules of Civil Procedure, rule 166–A.

68 Cases that cite this headnote

**[3]** **Judgment**
 Nature of summary judgment

The right to summary judgment was unknown to common law and exists only by virtue of rule providing therefor, and in order to be entitled to benefits of such rule, all of its terms must be complied with. Rules of Civil Procedure, rule 166–A.

21 Cases that cite this headnote

**[4]** **Appeal and Error**
 Nature and Scope of Decision

**Appeal and Error**
 Rendering Final Judgment

If the only order in a trial court is one overruling a motion for summary judgment, then that order is interlocutory and no appeal will lie therefrom, but when both parties file motions for summary judgment and one such motion is granted, then the trial court's judgment becomes final and appealable, and on appeal the Court of Civil Appeals should determine all questions presented, and if reversible error is found, it

should render such judgment as the trial court should have rendered, and if the case is brought to the Supreme Court and the judgment of the Court of Civil Appeals is reversed, Supreme Court should render such judgment as Court of Civil Appeals should have rendered. Rules of Civil Procedure, rules 434, 501, 505.

240 Cases that cite this headnote

**[5]    Courts**

👉 Review by or certificate to Supreme Court by Court of Civil Appeals of questions where its decision conflicts with or overrules that of another Court of Civil Appeals or that of the Supreme Court

Where application for writ of error to review decision of Court of Civil Appeals, failed to comply with applicable rule of civil procedure it was wholly insufficient to present any question for review. Rules of Civil Procedure, rule 469.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*59    \*\*397**  Gerald Weatherly, Laredo, Werner A. Gohmert, Alice, for petitioners.

Sidney P. Chandler, Corpus Christi, Sam H. Burris, Alice, Walter Purcell, San Diego, for respondents.

**Opinion**

HICKMAN, Chief Justice.

Our statement of this case will be substantially in the language of the opinion of the Court of Civil Appeals.

**\*\*398**  This is a consolidated case. Originally Amando Garcia, Jr., brought a suit against Daniel Tobin, Jr., County Judge of Duval County, and the then four County Commissioners of that County, seeking, among other things, a writ of mandamus requiring the defendants to issue to him a certificate showing that he was elected to the office of County Clerk of Duval County at the General Election in November, 1956, at which election he received practically all the votes. On January 1, 1957, Rafael Garcia qualified as County Clerk of Duval County, under an appointment by

the Commissioners' Court of that County, which had declared the office vacant, and thereafter this became a suit between Amando Garcia, Jr., and Rafael Garcia for the office of County Clerk of Duval County.

Likewise, George B. Parr originally brought a suit against Daniel Tobin, Jr., and the County Commissioners, seeking, among other things, a writ of mandamus requiring the defendants to issue to him a certificate showing that he was elected to the office of Sheriff of Duval County at the General Election in November, 1956, at which he received a substantial majority of the votes. On January 1, 1957, J. P. Stockwell qualified as  **\*60**  Sheriff of Duval County under an appointment by the Commissioners' Court of Duval County, which had declared the office vacant, and thereafter that cause became a suit between George B. Parr and J. P. Stockwell for the office of Sheriff of Duval County. These two cases were consolidated by the trial court with a third suit filed by Felipe Valerio, Jr., against Daniel Tobin, Jr., and others. The Valerio case (Tobin v. Valerio, Tex.Civ.App., 309 S.W.2d 479) is not involved in this appeal and need not be further mentioned.

Ultimately, Amando Garcia, Jr., and George B. Parr filed motions for summary judgment, and the defendants also filed a motion for summary judgment. The trial court denied the motions of Amando Garcia, Jr., and George B. Parr, but granted the motion of defendants, and rendered judgment that George B. Parr and Amando Garcia, Jr., take nothing, from which judgment they prosecuted an appeal.

The Court of Civil Appeals reversed the judgment of the trial court, and remanded the case thereto. 307 S.W.2d 836. The parties will be sometimes referred to herein as they were designated in the trial court, wherein Amando Garcia, Jr., and George B. Parr were designated as plaintiffs and the other parties as defendants.

Both the plaintiffs and defendants filed applications for writs of error. We consider first the application of the defendants. The ground upon which they were awarded a summary judgment in the trial court is that Amando Garcia, Jr., and George B. Parr were ineligible to hold the offices of County Clerk and Sheriff, respectively, under the provisions of Article III, Section 20, of our State Constitution, Vernon's Ann.St. That section reads as follows:

> 'No person who at any time may have been a collector of taxes, or who may have been otherwise entrusted with public money, shall be eligible to the Legislature, or to any office of profit or

trust under the State government, until he shall have obtained a discharge for the amount of such collections, or for all public moneys with which he may have been entrusted.'

 **[1]** The Court of Civil Appeals reversed the trial court's judgment on the ground that the constitutional provision presupposes that there has been a prior judicial determination or admission of the entrustment of public money and a failure to obtain a discharge therefor. Assuming that the Commissioners' Court exceeded its authority in refusing to issue certificates of **\*61** election to the plaintiffs, that is not determinative of this case. As the case developed, it was a suit by Amando Garcia, Jr., and George B. Parr against Rafael Garcia and J. P. Stockwell for the title to the offices of County Clerk and Sheriff, respectively, and in order to prevail in that **\*\*399** suit it was incumbent upon them to show themselves to be duly elected, qualified and eligible to hold the offices which they sought. If it is shown on the trial that they have failed to be discharged of money entrusted to them, they will not have shown themselves eligible and entitled to the offices. We do not agree with the ground upon which the Court of Civil Appeals based its decision.

Before considering the motion upon which the trial court rendered a summary judgment for defendants, we turn to a construction of the constitutional provision above quoted. The provision is narrow in its application. It deals only with persons with whom public money has been entrusted. One who, for example, steals public money would be morally unfit for public office, but the provision has no application in that case. Its meaning is to be determined by the definition of 'entrusted.' That term has a well-defined meaning. It is defined in Black's Law Dictionary as:

> 'To confer a trust upon; to deliver to another something in trust or to commit something to another with a certain confidence regarding his care, use or disposal of it.'

Ballentine's Law Dictionary defines it as follows:

> 'To transfer or deliver property to another to hold as trustee.'

In effect, the same definition is given in 48 C.J.S. p. 754, and Webster's New International Dictionary. In order to render judgment against the plaintiffs it must be determined that public money was entrusted with them in the meaning of the above definition, and they have failed to obtain a discharge therefor.

 **[2]** The motion for summary judgment was not verified. It referred for identification to a number of exhibits attached to the motion, explained a portion of the exhibits, and incorporated all of the movant's pleadings.

With respect to Amando Garcia, Jr., the charge is that he collected certain fees of office which were not paid into the treasury of the county as required by law. In support of the **\*62** charge, movants attached purported copies of summary accounts of total fees collected and purported copies of schedules of fees of office paid into the treasury for the same years, plus photostatic copies of 194 checks payable to cash or to Garcia and signed by him. The only proof of these documents is this statement in the affidavit of the attorney for defendants: 'All of the copies of the instruments described in the defendants' motion for summary judgment, Exhibits A to T, inclusive, are true copies of said instruments or the records from which they were taken.' The summary judgment rule, Rule 166-A, Texas Rules of Civil Procedure, provides that affidavits must be made by competent affiants with personal knowledge of the statements in them, which statements must be so worded that if given on the witness stand they would be admissible as evidence. Obviously, the statement of the attorney, if given on the witness stand, would not be competent to identify public documents, nor would it establish that Garcia himself had signed the checks or for what purpose they were executed. The trial court erred in rendering summary judgment against Garcia.

With reference to George B. Parr, the motion for summary judgment was based upon several grounds. One ground was that the Texas State Bank of Alice was the depository of the funds of Duval County and the Benevides Independent School District; that Parr was a stockholder, director and officer of the bank; that he took money from the bank, charged it to the county and the school district, and applied same in a manner not authorized by the county or the school district, and not permitted by law. As noted above, the motion is not verified, and what has been held regarding the checks of Garcia is applicable to the deposit slips and checks attached in support of this allegation. Even if the checks were identified, that would **\*\*400** not establish that Parr was in default with

money entrusted to him by the county and the school district. When the moneys were deposited in the bank, a relationship was created between the bank and the depositors, and no relationship of trust was created between the depositors and Parr. The summary judgment cannot be sustained on the ground of Parr's dealings with the bank, however wrongful they may have been.

Another ground of the motion was that Parr had borrowed money from the county and had not repaid it. Parr admitted at the hearing on the motion that he owed money to Duval County, but he did not admit that it was money entrusted to him. So far as the record discloses, it may have been owing for taxes. In support of the allegation that Parr borrowed money from **\*63** Duval County which had not been repaid, the defendants in one of their verified pleadings quote from an alleged deposition of Parr and alleged pleading of Parr in other cases, but no copy of the alleged deposition or pleading was attached as required by Rule 166-A. The state of the proof on this charge would not warrant the rendition of a summary judgment.

Another ground in the motion was that if Parr's present suit were in good faith 'he would repay to Duval County all funds that while County Judge of Duval County he illegally took, received, concealed, converted, and paid to persons such as Dan U. Garcia, whom Parr paid $20,000.00 on or about April 1, 1952, of Duval County funds to induce said Dan U. Garcia to resign as Sheriff of Duval County so said Parr could be appointed to said office upon his resigning as County Judge of said Duval County,' and for which no discharge has been received. The only support for that charge is an answer of defendants to the original petition, which is verified by the attorney who drew the answer. Even if we assume that the certification complies with Rule 166-A, the allegation concerning the transaction with Dan U. Garcia is the only specific one involving the time when Parr was County Judge. We find in the record an affidavit of Charles T. Stansell, Jr., who was County Auditor of Duval County at the time of the alleged transaction. The affidavit states that at no time between 1935 and 1954 was George Parr entrusted with public money without having since obtained a discharge therefor. Thus a fact issue is raised requiring adjudication upon trial.

[3] It must be kept in mind that this case has never been tried on its merits, but only on motions for summary judgment under Rule 166-A. The right to summary judgment was unknown to common law and exists in this State only by virtue of that rule. In order to be entitled to the benefits of the rule all of its terms must be complied with. This the defendants have failed to do.

As noted above, plaintiffs filed a motion for summary judgment in the trial court which was overruled. In Rogers v. Royalty Pooling Co., Tex., 302 S.W.2d 938, where both parties filed motions for summary judgment, and the trial court granted one motion and overruled the other, this court held that in an appeal from the order granting a summary judgment, the Court of Civil Appeals could not review the order of the trial court overruling the other motion. [4] After a careful consideration of the matter we have come **\*64** to the conclusion that that case should be overruled. If the only order in the trial court is one overruling a motion for summary judgment, then that order is interlocutory and no appeal will lie therefrom. But when, as in this case, both parties file motions for summary judgment and one such motion is granted, then the trial court's judgment becomes final and appealable, and on appeal the Court of Civil Appeals should determine all questions presented. If reversible error is found, the court should render such judgment as the trial court should have rendered, Rule 434, and if the case is brought to this court and the **\*\*401** judgment of the Court of Civil Appeals is reversed, we should render such judgment as that court should have rendered. Rules 501 and 505. Rogers v. Royalty Pooling Co. is overruled.

[5] Concerning the application of the plaintiffs Garcia and Parr but little need be written. They join in a single application for writ of error, which is wholly insufficient to present any questions for review under Rule 469, T.R.C.P. We here copy the entire application following the statement of jurisdiction:

**'Points of Error.**

'1. The Court of Civil Appeals reversibly erred in not rendering judgment in favor of petitioner Garcia, that he forthwith recover the office he sues for. (Germane to assignment of error No. 1 in Appellants' Motion for Rehearing in the Court of Civil Appeals.)

'2. The Court of Civil Appeals reversibly erred in not rendering judgment in favor of petitioner Parr, that he forthwith recover the office he sues for. (Germane to assignment of error No. 2 in Appellants' Motion for Rehearing in the Court of Civil Appeals.)

'3. Because there is no evidence supporting its below-quoted holding, and this holding is inconsistent with its other holding which are correct, the Court of Civil Appeals reversibly erred in its holding (Opinion, p. 6) that: 'However, as to appellant George B. Parr the answer is sufficient to raise an issue of fact as to whether Parr has been entrusted with public moneys and has not paid it back or properly accounted therefor and that he has freely admitted such defalcation.' (Germane to assignment of error No. 3 in Appellants' Motion for Rehearing in the Court of Civil Appeals.)

**\*65** 'Brief of the Argument, with Prayer. (All points are grouped together.)

'Petitioners respectfully submit that it necessarily and inevitably follows, from the correct holdings and authorities in the Court of Civil Appeals opinion, that the Trial Court's judgment should be reversed and rendered, adjudging that appellants forthwith recover the offices sued for, to which they were unquestionably duly elected. And petitioners respectfully submit that this Court should so render judgment.'

The judgment of the Court of Civil Appeals is affirmed, but upon a trial on the merits the court will be guided by this opinion.

SMITH, Justice (concurring).

The opinion reaches a correct result, but I respectfully decline to join in overruling the holding in Rogers v. Royalty Pooling Co., Tex., 302 S.W.2d 938. In that case we held that where both parties filed motions for summary judgment, and the trial court granted one motion and overruled the other, the Court of Civil Appeals could not review the order of the trial court overruling the motion for summary judgment. It is true that the Rogers decision was announced in a Per Curiam opinion. The application for writ of error was not granted, thereby depriving the parties of an opportunity to present oral argument on the question. Although this method of procedure has never met with my approval, yet it must be said that the holding that an order overruling a motion for summary judgment was interlocutory in nature, and, therefore, not appealable, was supported by the case of Wright v. Wright, 154 Tex. 138, 274 S.W.2d 670, decided by this Court on January 5, 1955. I am unable to draw a distinction between the

holding on the question in the Rogers and Wright cases. The majority in the present case makes no effort to do so. There is no distinction. **\*\*402** This Court must have so thought, otherwise it would not have cited the Wright case, supra, in support of its decision in the Rogers case.

The parties to the present suit were not concerned enough with this question to mention the overruling of the Rogers case in their motion for rehearing, this for the obvious reason that **\*66** the cause was reversed and remanded for trial. The overruling of the Rogers case was unnecessary to a decision in the present case. Since the decision in the Wright and Rogers cases, supra, litigants have accepted the law announced in such cases, and without doubt attorneys representing their clients in many cases have made no effort to appeal from an order overruling a motion for summary judgment. Likewise, the opposite party will make no effort to point out issues of fact in the event error should be assigned to the action of the trial court in overruling a motion for summary judgment. As a matter of fact, we have such a case pending in this Court. The case is styled and numbered: A-6759, Gulf, Colorado and Santa Fe Railway Company v. G. C. McBride, DBA G. C. McBride Company, and Central Surety and Insurance Corporation. In that case, the respondent very briefly replied to the point urging that the court erred in overruling petitioner's motion for summary judgment. The respondent apparently felt secure in the belief that appeals cannot lie where orders are interlocutory in nature, and that appeals cannot lie from those portions of orders which are interlocutory until a final judgment has been reached in the case. The respondent in the McBride case thought it sufficient to say: 'In view of the very recent Supreme Court opinions in the cases of Wright v. Wright (154 Tex. 138), 274 S.W.2d 670, and Rogers v. Royalty Pooling Co. (Tex.), 302 S.W.2d 938, we will not unnecessarily lengthen this writing. One comment in connection with this point, however, seems indicated. Contrary to the position that petitioner has taken in its application, the rule as announced by this Honorable Court in the above cases is not 'downright unjust and unfair ". (See 322 S.W.2d 492.) As pointed out by this Court, speaking through the Honorable Justice Garwood in the Wright case, supra (154 Tex. 138, 274 S.W.2d 674), the benefits of such a rule as petitioner urges would 'well be outweighed by the resultant confusion.'

**All Citations**

159 Tex. 58, 316 S.W.2d 396

# EEE

850 S.W.2d 210
Court of Appeals of Texas,
Texarkana.

Dana L. TURNER and aaNKILL 44, Inc., Appellants,

v.

The STATE of Texas and Rick Perry, Commissioner
of the Texas Department of Agriculture, Appellees.

No. 6–92–105–CV.   |   Feb. 23, 1993.
|   Rehearing Denied March 29, 1993.

State and Commissioner of Department of Agriculture brought action against developer of products to get rid of fire ants seeking civil penalties and injunctive relief for alleged violations of pesticide registration requirements of Agriculture Code. The 188th Judicial District Court, Gregg County, Marcus Vascocu, J., entered judgment for state. Developer appealed. The Court of Appeals, Grant, J., held that: (1) products were "pesticides" under Code as a matter of law, and (2) permanent injunction was too expansive and would be modified so that meaning of "pesticide" and "distribute" would be meaning given those terms in Code.

Affirmed in part and reformed in part.

West Headnotes (5)

**[1]**    **Appeal and Error**
    Extent of Review Dependent on Nature of Decision Appealed from

When trial court grants motion to disregard jury answers and answers are on issues upon which appellant has burden of proof, Court of Appeals reviews trial court's action to determine if appellant has established all vital facts in support of issue as a matter of law.

2 Cases that cite this headnote

**[2]**    **Environmental Law**
    Registration and labelling

Two products, which were developed by defendant and which defendant admitted were intended to prevent fire ants from eating,

thus causing their death, were "pesticides" subject to pesticide registration requirements of Agriculture Code as a matter of law. V.T.C.A., Agriculture Code §§ 76.001 et seq., 76.001(18).

1 Cases that cite this headnote

**[3]**    **Evidence**
    Conclusiveness and Effect

When litigant admits positive facts which defeat his right to recover, and such admissions are not subsequently modified by litigant, then he or she is conclusively bound by such admissions.

1 Cases that cite this headnote

**[4]**    **Injunction**
    Scope of Relief in General

Permanent injunction should not be more comprehensive or restrictive than justified by pleadings, evidence and usages of equity.

1 Cases that cite this headnote

**[5]**    **Injunction**
    Other particular businesses or occupations

Permanent injunction preventing developer of fire ant pesticides from distributing those pesticides, as well as any other pesticide, unless it was registered with Department of Agriculture was too expansive and would be modified to limit meaning of "distribute" to meaning given term in Agriculture Code to offer for sale, hold for sale, sell, barter or supply and to limit meaning of "pesticide" to meaning given in Agriculture Code. V.T.C.A., Agriculture Code § 76.001(7, 18).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*211** Gregory Neeley, Akin, Steele, Bush & Neeley, Longview, for appellants.

Grant Gurley, Asst. Atty. Gen., Environmental Protection Div., Austin, for appellees.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

**OPINION**

GRANT, Justice.

The State of Texas and Rick Perry, Commissioner of the Texas Department of Agriculture, filed suit against Dana L. Turner and aaNKILL 44, Inc. seeking civil penalties and injunctive relief for alleged violations of the pesticide registration requirements of Chapter 76 of the Texas Agriculture Code. Turner appeals from a judgment favoring the State.

Turner contends that the trial court erred in disregarding the jury's findings and entering a judgment concluding that the products in question are pesticides as a matter of law. He further contends that the trial court erred in drafting the permanent injunction because it exceeds the scope of the pleadings and the evidence. The State raises three cross points in which it alleges that the trial court erred in admitting irrelevant evidence and that the jury's answers to certain questions in the charge were against the great weight and preponderance of the evidence.

In 1990, Turner developed a product designed to have a detrimental effect on fire ants. In September or October of that year, he formed a corporation, aaNKILL 44, Inc., and began to market the product. On November 28, 1990, David Inman, an inspector for the Texas Agriculture Department, served Turner with an administrative stop sale order. The stop sale order put Turner on notice that the Agriculture Department considered aaNKILL 44 to be an unregistered pesticide, and Turner ceased selling the product under that name.

In August 1991, Turner began selling a product he called Plus Water Activator ("Plus") which contained essentially the same formula that comprised aaNKILL 44. On October 10, 1991, the trial court issued a temporary restraining order which barred Turner and his corporation from selling either aaNKILL 44 or Plus. Turner then began marketing a product which he labelled "DLT Mound Leveler" and which contains essentially the same ingredients as aaNKILL 44 and Plus.

**\*212** In its petition, the State alleged 579 acts of unlawful distribution of the three products discussed above. The State stipulated that it sought damages only in the amount of the minimum statutory fine of $50 per violation. The State also requested a permanent injunction preventing Turner or his corporation from distributing any of the products.

The jury returned answers to the charge indicating that aaNKILL 44 is a pesticide and that Turner committed three acts of illegal distribution in regard to that product. The jury found that neither Plus nor DLT Mound Leveler is a pesticide. The trial court granted the State's motion to disregard the jury's findings and held that Plus and DLT Mound Leveler are pesticides as a matter of law. The court entered judgment favoring the State in regard to all three products. The trial court did not find any additional instances of illegal distribution beyond the three instances found by the jury.

Turner contends that the trial court erred in disregarding the jury's findings as to Plus and DLT Mound Leveler and in entering judgment favoring the State. He does not contest the judgment as to aaNKILL 44.

 **[1]**  We have been asked to review the trial court's granting of a motion to disregard two of the jury's answers. These answers were on issues upon which the State had the burden of proof. Thus, we review the trial court's action to determine if the State established all vital facts in support of the issue as a matter of law. *See Ritchey v. Crawford,* 734 S.W.2d 85, 86 (Tex.App.—Houston [1st Dist.] 1987, no writ); *Meyerland Community Improvement Ass'n v. Temple,* 700 S.W.2d 263, 267 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). [1] The undisputed evidence shows that Turner sold the product and that the product was not registered. The only vital fact issue that Turner contests is whether the State established that Plus and DLT Mound Leveler are pesticides as a matter of law.

 **[2]**  Section 76.001(18) of the Texas Agriculture Code defines a pesticide as "a substance or mixture of substances *intended to prevent, destroy, repel, or mitigate* any pest, or any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant." TEX.AGRIC.CODE ANN. § 76.001(18) (Vernon 1982) (emphasis added).

Since the Code itself does not define the word "intended," a key term in understanding this section, we look to the Code Construction Act which states that the ordinary meaning of the word should be deemed as having been intended by the Legislature. TEX.GOV'T CODE ANN. § 311.011 (Vernon 1988). The trial court correctly did not attempt to define the word "intended" in its charge to the jury, but it did charge that

words not specifically defined **\*213** by the court should be construed according to common usage. [2]

Turner asserts that the testimony that he gave at trial supports the jury's findings indicating that Plus and DLT Mound Leveler are not pesticides. Turner testified that although he originally believed that his formula killed fire ants, later experiments revealed that, in fact, it did not kill them. He said that most pesticides work by either breaking down the outer shell of the ants or by attacking their nervous systems, but that his product did neither. Instead, according to Turner, aaNKILL 44 and its progeny immobilize the ants for a while so that they cannot eat.

Turner further described the effect of his formula on the ants by saying that it "switches off [their] power," that it "stops power from getting to them," and that the ants switch off "like an electric light" and they "don't ever turn on again," unless placed in direct sunlight within four hours of having been "deactivated."

Turner further testified that he sold the formula as Plus and DLT Mound Leveler after he arrived at the conclusion that it did not actually kill the ants and was thus not a pesticide. Turner stated that the purpose of the DLT Mound Leveler was, in fact, to level mounds. He admitted, however, that this explanation "raised eyebrows" among his customers, and when customers pressed him about the formula's effect on the ants, he told them "I suppose they die." Furthermore, Turner has at no point suggested that his product may have alternative uses. [3]

We agree with the trial court that Turner's testimony, rather than supporting the jury's findings, demonstrates conclusively that Turner's formula was intended to be used to "prevent, repel, or mitigate" fire ants. The formula kills the fire ants by preventing them from eating and this reaches the same end result as any other pesticide. Turner's statements regarding his formula are mere euphemisms for the fact that it is a pesticide.

**[3]** This Court is bound by the principle that when a litigant admits positive facts which defeat his right to recover, and such admissions are not subsequently modified by the litigant, then he or she is conclusively bound by such admissions. *Jones v. Underwood & Weld Co.,* 406 S.W.2d 491, 493 (Tex.Civ.App.—Beaumont 1966, no writ); *see also, Texas & P. Ry. Co. v. Wood,* 145 Tex. 534, 199 S.W.2d 652 (1947) ("The testimony of a party to a suit and admissions made by him must be construed as binding upon him, and not merely as raising issues of fact.")

Here, Turner admits that his product is intended to prevent ants from eating, thus causing their death. The evidence conclusively shows that Plus and DLT Mound Leveler were sold as pesticides. Based upon Turner's judicial admissions, the trial court correctly found these products to be pesticides as a matter of law. We overrule this point of error.

In his second point of error, Turner contends that the trial court erred in drafting the injunctive order in that it exceeded the scope of the pleadings and the evidence produced at trial. Specifically, Turner complains that the language in the injunction unnecessarily enlarged the statutory definition of "distribute" and improperly defined "pesticide."

**[4]** A permanent injunction should not be more comprehensive or restrictive than justified by the pleadings, evidence, and usages of equity. **\*214** *Gonzales v. Zamora,* 791 S.W.2d 258 (Tex.App.—Corpus Christi 1990, no writ).

**[5]** In its petition, the State requested injunctive relief in order to prevent Turner from distributing aaNKILL 44, Plus, or DLT Mound Leveler, as well as any other pesticide unless it is registered with the Department of Agriculture. The only definition of "distribute" or "pesticide" in the petition is by reference to Section 76.001 of the Agriculture Code. TEX.AGRIC.CODE ANN. § 76.001 (Vernon 1982).

Section 76.001(7) defines "distribute" as "offer for sale, hold for sale, sell, barter, or supply." Section 76.001(18) defines "pesticide" as "a substance or mixture of substances intended to prevent, destroy, repel, or mitigate any pest." The trial court's order, however, states that:

### III.

. . . . .

B. In this injunction, "distribute" shall have the meaning given in Chapter 76 of the Texas Agriculture Code, namely "offer for sale, hold for sale, sell, barter, or supply", and shall include, without implying the exclusion of other conduct, the following conduct:

1) sell;

2) deliver;

3) give away;

4) give to;

5) allow to take;

6) turn over to;

7) make available to;

8) exchange for goods, services, or a promise to provide goods or services;

9) advertise;

10) market;

11) promote;

12) provide;

13) provide a sample of;

14) give permission or authorization to any other person or entity to commit any of these enumerated acts; or

15) offer to commit any of these enumerated acts, either conditionally or unconditionally.

C. In this injunction "pesticide" shall have the meaning given in Chapter 76 of the Texas Agriculture Code, namely, "any substance or mixture of substances intended to prevent, destroy, repel or mitigate any pest...." In determining the intended purpose of a substance or mixture of substances, the intent that shall be examined is not the subjective intent of the actor, but rather that person's objective intent, taking into account any and all circumstances.

The State contends that the trial court correctly detailed the prohibited conduct in light of Turner's persistent attempts to find a loophole in the law. The State argues that Turner should not be allowed to complain that he was given too much notice.

The record, however, reveals no support for the expanded definition of "distribute" nor have we found any in statutory or case law. We therefore reform paragraph III.B of the injunction so that it now reads: "In this injunction, 'distribute' shall have the meaning given in Chapter 76 of the Texas Agriculture Code, namely 'offer for sale, hold for sale, sell, barter, or supply.' "

Furthermore, we see no reason for expanding the definition of "pesticide" beyond the statutory definition. [4] Paragraph III.C of the injunction is therefore reformed so that it now reads:

> In this injunction 'pesticide' shall have the meaning given in Chapter 76 of the Texas Agriculture Code, namely, 'any substance or mixture of substances intended to prevent, destroy, repel or mitigate any pest.'

Because of the foregoing holdings, which are dispositive of all issues in the case, we do not reach the cross-points filed by the State.

**\*215** The judgment of the trial court is affirmed in part and reformed in part.

**All Citations**

850 S.W.2d 210

Footnotes

1    This is sometimes erroneously addressed as a no evidence point. However, Turner did not have the burden of proof on this issue and even if there was no evidence introduced to support his position, the State would still not be entitled to have a motion granted to disregard a jury finding unless it had established all vital facts in support of that issue as a matter of law.

     Calling matter-of-law points no evidence points is a misnomer. *See* R.W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX.L.REV. 361, 363 (1960). These points of error should be referred to as conclusive evidence points. *See* W. Powers, Jr. & J. Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX.L.REV. 515, 518 (1991). We recognize that Rule 301 of the Texas Rules of Civil Procedure refers to disregarding the jury finding on a question "that has no support in evidence." This term has been applied broadly to matter-of-law challenges. *See* Roger Townsend, W. Wendell Hall, & Madelyn Dewoody, *Standards of Review and Reversible Error, in*STATE BAR OF TEXAS PROF. DEV. PROGRAM, 1 ADVANCED APPELLATE PRACTICE COURSE F (1990).

     This same principle has been recognized in judgment non obstante veredicto cases in which the party moving for judgment n.o.v. had the burden of proof. *See Southwestern Bell Telephone Co. v. Hertz Equipment Rental Co.,* 533

S.W.2d 853 (Tex.Civ.App.—Fort Worth 1976, writ ref'd n.r.e.); *Morris v. Brown,* 337 S.W.2d 759 (Tex.Civ.App.—Eastland 1960, no writ).

This legal insufficiency contention raises a matter of law point that the converse of the finding was established conclusively as a matter of law. *See* W.J. Cornelius, *Appellate Review of Sufficiency Of the Evidence Challenges In Civil and Criminal Cases,* 46 TEX.B.J. 439, 440 (1983).

2      RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 991 (2nd ed. 1987) defines *intend* as: "1. to have in mind as something to be done or brought about ... 2. to design or mean for a particular purpose, use ... 3. to design to express or indicate, as by one's words; refer to...."

It defines *intended* as: "1. purposed; designed; intentional ... 2. prospective...."

3      At trial, Turner also presented the labels placed on his products. The Plus label features statements such as "Don't Kill Fire Ants Stop Power From Getting To Them," "WATER IS THE ACTIVE INGREDIENT!" and "Plus produces no pesticidal effects when used as directed."

The label for DLT Mound Leveler is much simpler and suggests that you should "Rid Your Property of Unsightly and Hazardous Mounds with DLT MOUND LEVELER."

4      The State urges this Court to adopt the federal standard used in defining "intended" in a similar federal pesticide statute. *See N. Jonas & Co., Inc. v. U.S. Environmental Protection Agency,* 666 F.2d 829, 833 (3d Cir.1981); 7 U.S.C.A. § 136(u) (West Supp.1992). Since deciding this case does not require a definition other than the ordinary usage of the term, we do not grant the State's request.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

# FFF

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** Challenger Gaming Solutions, Inc. v. Earp, Tex.App.-Dallas, May 15, 2013

315 S.W.3d 109
Court of Appeals of Texas,
Houston (1st Dist.).

Olga (Chapa) VILLARREAL
and Isreal Chapa, Appellants,
v.
WELLS FARGO BROKERAGE SERVICES,
LLC, Wells Fargo Investments, LLC,
and Charles J. Lewis, Jr., Appellees.

No. 01–08–00258–CV. | March 11, 2010.

**Synopsis**
**Background:** Beneficiaries of trust brought breach of fiduciary duty, breach of the duty of good faith and fair dealing, negligent misrepresentation, negligence, fraud, and statutory violations action against investment broker and brokerage service, after beneficiaries learned that trust had lost a substantial amount of money when investing in high risk investments. The 55th District Court, Harris County, Jeffrey Brown, J., granted broker and brokerage service summary judgment, and beneficiaries appealed.

**Holdings:** The Court of Appeals, Laura Carter Higley, J., held that:

[1] claims that beneficiaries brought against broker and brokerage service on behalf of trustee accrued, and statutes of limitations began to run, when trustee in writing directed that the funds exit from high risk investments;

[2] otherwise time-barred claims for breach of fiduciary duty, fraud and violations of securities statute that trust beneficiaries asserted against broker were revived when trustee designated broker as a responsible third party;

[3] time-barred claims which were subject to two-year statutes of limitations were not revived when trustee designated broker as a responsible third party, as limitations had already expired on such claims when apportionment of liability statute was enacted;

[4] apportionment of liability statute did not revive time-barred claims against brokerage service that were based on respondeat superior; and

[5] beneficiaries were not required to establish that broker or brokerage service owed them a fiduciary duty in order to maintain that broker and service knowingly assisted trustee in breaching his fiduciary duties to beneficiaries.

Affirmed in part, reversed in part, and remanded.

West Headnotes (26)

**[1]** **Judgment**
🔑 Particular defenses

A defendant moving for summary judgment on the affirmative defense of limitations must conclusively establish the date on which the limitations commenced; that is, the date on which the cause of action accrued.

3 Cases that cite this headnote

**[2]** **Limitation of Actions**
🔑 Questions for Jury

He determination of the date on which a cause of action accrued for purposes of limitations is typically a question of law.

Cases that cite this headnote

**[3]** **Limitation of Actions**
🔑 Causes of action in general

As a general rule, a cause of action accrues, and the statute of limitations begins to run, when facts come into existence that authorize a party to seek a judicial remedy.

1 Cases that cite this headnote

**[4]** **Limitation of Actions**
🔑 Causes of action in general

**Limitation of Actions**
🔑 In general; what constitutes discovery

**Limitation of Actions**

Knowledge as to extent of harm or damage

In most cases, claims accrue for limitations purposes when a wrongful act causes some legal injury, and this is true even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred.

Cases that cite this headnote

**[5]　Limitation of Actions**

In general; what constitutes discovery

The discovery rule defers the accrual of a cause of action for limitations purposes until the plaintiff knows, or by exercising reasonable diligence, should know of the facts giving rise to the claim.

Cases that cite this headnote

**[6]　Limitation of Actions**

In general; what constitutes discovery

For the discovery rule to apply and defer the accrual of a cause of action, the injury must be inherently undiscoverable and objectively verifiable.

Cases that cite this headnote

**[7]　Judgment**

Particular defenses

If a plaintiff pleads the discovery rule as an exception to limitations, a defendant moving for summary judgment on limitations then has the dual burden of proving the date of accrual and of negating the discovery-rule exception.

1 Cases that cite this headnote

**[8]　Judgment**

Particular defenses

A defendant moving for summary judgment on limitations may negate the discovery-rule exception by proving, as a matter of law, that no genuine issue of material fact exists regarding when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the wrongful act and resulting injury.

2 Cases that cite this headnote

**[9]　Judgment**

Particular defenses

If a movant for summary judgment establishes that limitations bars the action, the nonmovant must then adduce summary judgment proof raising a fact issue to avoid limitations.

1 Cases that cite this headnote

**[10]　Limitation of Actions**

Fraud of person acting in official or fiduciary capacity

When analyzing the applicability of the discovery rule for limitations purposes in cases in which the alleged injuries arise from a breach of fiduciary duty, the claims are generally considered inherently undiscoverable; nonetheless, once the fiduciary's misconduct becomes apparent, the claimant cannot ignore it, regardless of the fiduciary nature of the relationship.

1 Cases that cite this headnote

**[11]　Limitation of Actions**

Fraud of person acting in official or fiduciary capacity

Claims in which the alleged injuries arise from a breach of fiduciary duty accrue for limitations purposes when the claimant knows or in the exercise of ordinary diligence should know of the wrongful act and resulting injury.

1 Cases that cite this headnote

**[12]　Limitation of Actions**

Fraud and concealment of cause of action

The date that a claimant knew or should have known of an injury arising out of a breach of fiduciary duty, for limitations purposes, is generally a fact question; however, if reasonable minds could not differ about the conclusion to be drawn from the facts in the record, the start of the limitations period may be determined as a matter of law.

2 Cases that cite this headnote

**[13]** **Limitation of Actions**
 Securities; corporations

**Limitation of Actions**
 What constitutes discovery of fraud

Claims for breach of fiduciary duty, breach of the duty of good faith and fair dealing, negligent misrepresentation, negligence, fraud and statutory violations that beneficiaries of trust brought on behalf of trustee against investment broker and brokerage service, arising out of advice from broker and service that trustee engage in margin trading and invest in high-risk technology mutual funds, accrued, and two and four year statutes of limitations on such claims began to run, when, following month in which trust lost $152,886.26, trustee signed investment replacement authorization form directing that brokerage account's funds exit from technology mutual funds due to such funds' volatility, as when trustee signed such authorization he knew or should have known of the unsuitable nature of the investments recommended by broker.

Cases that cite this headnote

**[14]** **Limitation of Actions**
 Intervention or bringing in new parties

Otherwise time-barred claims of breach of fiduciary duty, fraud, and violations of securities statute that trust beneficiaries asserted against investment broker, arising out of broker's advice that trustee engage in margin trading and high risk investments, were revived pursuant to apportionment of liability statute when trustee in beneficiaries' action designated broker as a responsible third party and beneficiaries sought to join broker within 60 days of designation, though broker alleged beneficiaries and trustee colluded to join broker after beneficiaries realized claims against broker were time-barred, as statute expressly allowed revival of previously time-barred claims, statute did not preclude responsible third party designations based on intent of designators, such claims against broker were not time-barred when statute was enacted,

and claims that beneficiaries asserted against trustee were timely. V.T.C.A., Civil Practice & Remedies Code §§ 33.004(e), 33.011(6).

2 Cases that cite this headnote

**[15]** **Statutes**
 Plain Language; Plain, Ordinary, or Common Meaning

**Statutes**
 Absent terms; silence; omissions

Courts must construe a statute according to its plain language, and may not add language that is not implicitly contained in the language of the statute.

2 Cases that cite this headnote

**[16]** **Statutes**
 Construction as written

**Statutes**
 Context

**Statutes**
 Unintended or unreasonable results; absurdity

Courts are to apply a statute as written, unless the context or an absurd result requires a different construction.

Cases that cite this headnote

**[17]** **Limitation of Actions**
 Intervention or bringing in new parties

Time-barred claims for breach of the duty of good faith and fair dealing, negligent misrepresentation, negligence, and deceptive trade act violations that trust beneficiaries asserted against investment broker, arising out of broker's advice that trustee engage in margin trading and high risk investments, were not revived pursuant to apportionment of liability statute when trustee in beneficiaries' action designated broker as a responsible third party and beneficiaries sought to join broker within 60 days of the designation, as such claims, which were subject to two-year statutes of limitations, were time-barred when apportionment statute

was enacted, and broker had a vested right to rely on statutes of limitations barring such claims. V.T.C.A., Civil Practice & Remedies Code §§ 33.004(e), 33.011(6); Vernon's Ann.Texas Const. Art. 1, § 16.

Cases that cite this headnote

**[18]** **Appeal and Error**
  Judgment

Court of Appeals would not address argument by investment broker and brokerage service that apportionment of liability statute, which allowed revival of otherwise time-barred claims if a defendant made a responsible third party designation, did not apply to fraud claims, in appeal of summary judgment for broker and brokerage service in action by trust beneficiaries asserting breach of fiduciary duty, fraud and other claims against trustee, broker and brokerage service, where broker and brokerage service did not raise such argument in the trial court to support summary judgment. V.T.C.A., Civil Practice & Remedies Code §§ 33.002(a), 33.004(e).

Cases that cite this headnote

**[19]** **Appeal and Error**
  Grounds for Sustaining Decision Not Considered

The Court of Appeals may not affirm a summary judgment on grounds not expressly set out in the motion or response.

Cases that cite this headnote

**[20]** **Limitation of Actions**
  Intervention or bringing in new parties

Apportionment of liability statute, which allowed revival of otherwise time-barred claims if a defendant made a responsible third party designation, applied to violations of securities act and trust act claims that trust beneficiaries asserted against investment broker, arising out of broker's advice that trustee engage in margin trading and high risk investments, when trustee designated broker as a responsible third party

in beneficiaries' action, as such statutory claims were based in tort, and the subject statutes did not contain a separate and conflicting legislative fault allocation scheme. V.T.C.A., Civil Practice & Remedies Code §§ 33.002(a), 33.004(e).

2 Cases that cite this headnote

**[21]** **Limitation of Actions**
  Intervention or bringing in new parties

Time-barred claims for breach of fiduciary duty, fraud, and violations of securities act that trust beneficiaries asserted against brokerage service based on respondeat superior, arising out of advice by broker employed by service that trustee engage in margin trading and high risk investments, were not revived pursuant to apportionment of liability statute when trustee in beneficiaries' action designated broker and brokerage service as responsible third parties, though statute revived such claims against broker, as statute's intent was to apportion responsibility based on a person's harm-causing conduct, and allowing revival of claims based on respondeat superior, under which an employer was vicariously liable regardless of fault, was incongruent with statute's purpose. V.T.C.A., Civil Practice & Remedies Code § 33.004(e).

Cases that cite this headnote

**[22]** **Labor and Employment**
  Nature of liability in general

Pursuant to the doctrine of respondeat superior, an employer will be held vicariously liable for the negligence of its employee regardless of any allegation of fault on the part of the employer.

Cases that cite this headnote

**[23]** **Judgment**
  Motion or Other Application
**Judgment**
  Particular defenses

Summary judgment could not be granted on limitations grounds to investment brokerage and brokerage service, who advised trustee to engage in margin trading and invest in high risk

mutual funds, on claim by trust beneficiaries that broker and service knowingly assisted trustee in breaching his fiduciary duties to beneficiaries, when such claim was not brought by beneficiaries on trustee's behalf, and there was no evidence or argument offered to establish the accrual date for the assisting-in-breach-of-fiduciary-duty claim.

Cases that cite this headnote

**[24]     Appeal and Error**

👉 Grounds for Sustaining Decision Not Considered

In an appeal of a summary judgment, the Court of Appeals may consider, in the interest of justice, grounds that the movant preserved for review and on which the trial court did not rule.

Cases that cite this headnote

**[25]     Fraud**

👉 Persons liable

When a third party knowingly participates in the breach of a fiduciary duty, the third party becomes a joint tortfeasor and is liable as such.

Cases that cite this headnote

**[26]     Brokers**

👉 Nature of broker's obligation

**Brokers**

👉 Purchases and Sales on Margin

Trust beneficiaries were not required to establish that investment broker and brokerage service owed them a fiduciary duty or that broker and service breached such duty, in order to assert a claim against broker and service, who advised trustee to engage in margin trading and invest in high risk mutual funds, that broker and service knowingly assisted trustee in breaching his fiduciary duties to beneficiaries.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*112**  Leonard J. Meyer, Leslie K. Hillendahl, Zimmerman, Axelrad, Meyer, Stern & Wise, P.C., Houston, TX, for Appellants.

Lindsey Eubank Simmons, Joyce McFarland & McFarland LLP, Yasmin Islam Atasi, Winstead PC, Houston, TX, Michael L. Scanes, Scanes, Routh & James, LLP, Waco, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices ALCALA and HIGLEY.

## \*113  OPINION

LAURA CARTER HIGLEY, Justice.

In this appeal, plaintiffs/appellants, Olga (Chapa) Villarreal and Israel Chapa, present three issues challenging the trial court's order granting summary judgment in favor of defendants/appellees, Wells Fargo Brokerage Services, LLC, Wells Fargo Investments, LLC (collectively, "Wells Fargo"), and Charles J. Lewis, Jr.

We affirm in part and reverse in part.

### Factual & Procedural Background

Pete David Chapa ("Mr. Chapa") developed silicosis after working at a glass plant for 20 years. Mr. Chapa filed suit based on his silicosis injuries and obtained a settlement for $650,000. The settlement funded shortly after his death in February 1997. As directed by Mr. Chapa, the settlement funds were placed in a testamentary trust for the benefit of his two adult children, Olga (Chapa) Villarreal and Israel Chapa (collectively, "the Chapas"). Mr. Chapa named a family friend, Ramiro Pena, Jr. ("Pena"), to act as trustee.

Pena opened a non-discretionary brokerage account with investment broker Charles J. Lewis, Jr. ("Lewis") at Wells Fargo. Pena deposited $634,000 into the account on May 19, 1997. In August 1997, Pena began margin trading with the account's funds. Pena signed a margin trading agreement with Wells Fargo. The agreement explained that margin trading allowed Pena to borrow money from Wells Fargo and that such loans were secured by the brokerage account's assets.

In late 1999 and early 2000, Pena authorized Wells Fargo to invest the account's funds in technology mutual funds. From December 31, 1999 to January 31, 2001, the value of the brokerage account went from $653,214.87 to $361,538.98.

Pena closed the brokerage account with Wells Fargo on November 1, 2001. Pena then invested the funds with Jubilee Investments.

On June 21, 2005, Israel Chapa's attorney sent a letter to Pena regarding the trust's assets. The letter indicated that the beneficiaries had never received an accounting of the trust's funds, but had received only "a few general comments about some money being lost in investments." The letter also stated that Israel had stopped receiving monthly payments from the trust and had been told by Pena that the money was "tied up" in Jubilee Investments. Israel's counsel demanded that Pena provide an accounting of the trust's assets since its creation. Pena provided information to the beneficiaries, but not until six months after receiving Israel's request.

The Chapas filed suit against Pena, Wells Fargo, and the principals of Jubilee Investments on August 17, 2006. The Chapas alleged that Pena breached his fiduciary duty as trustee by failing to properly invest, manage, and preserve the trust's assets. The Chapas also alleged that Pena breached his fiduciary duty by failing to "institute[ ] legal action" against Wells Fargo and by failing to fully disclose "material facts" to the Chapas regarding the losses sustained by the trust.

The Chapas also alleged that Wells Fargo owed a fiduciary duty to Pena in his capacity as trustee of the testamentary trust and, by extension, to them as beneficiaries of the trust. The Chapas asserted that Wells Fargo, through the acts of its employee, investment broker Charles Lewis, had breached that duty by advising Pena to make "unsuitable" high-risk investments with the trust's funds, despite Pena's request that the funds be placed in low-risk investments. Specifically, the Chapas identified the technology mutual **\*114** funds and the margin trading as "unsuitable" investments for the trust's assets. The Chapas claimed that, when Pena had questioned Lewis about the suitability of these investments, Lewis had continually assured him that they were suitable investments for the trust's funds.

Besides breach of fiduciary duty, the Chapas also sued Wells Fargo for breach of the duty of good faith and fair dealing, negligent misrepresentation, negligence, and violations of the Deceptive Trade Practices Act and the Texas Securities Act.

In addition, the Chapas set forth a cause of action against Wells Fargo for assisting Pena in breaching his fiduciary duty to the Chapas.

In their petition, the Chapas further asserted that Wells Fargo was vicariously liable for Lewis's acts based on respondeat superior and based on a "negligent failure to supervise." The Chapas also alleged that the discovery rule and "fraudulent concealment" had served to toll the statute of limitations on their claims.

After the Chapas filed their third amended petition, Pena filed a motion to designate Lewis as a "responsible third party" pursuant to Civil Practices and Remedies Code section 33.004. The Chapas also filed a motion to join Lewis as a defendant based on section 33.004(e). After the trial court granted the motion to join, the Chapas filed their fourth amended petition, adding Lewis as a defendant. The Chapas asserted the same causes action against Lewis as they had previously asserted against Wells Fargo. The Chapas also added a cause of action for fraud against Wells Fargo and Lewis.

Wells Fargo and Lewis filed a "traditional" rule 166a(c) motion for summary judgment against the Chapas. The summary judgment movants asserted, "as a threshold matter," that they did not owe an independent fiduciary duty to the Chapas because Pena was the account holder, not the Chapas.

Wells Fargo and Lewis asserted the affirmative defense of limitations as the primary basis for summary judgment. They argued that the applicable statutes of limitation had expired on all of the Chapas' causes of action. Wells Fargo and Lewis contended that the discovery rule and fraudulent concealment did not operate to toll the various limitations periods.

The summary judgment movants asserted that, because the Chapas' alleged injuries were not "inherently undiscoverable," the discovery rule did not apply to toll the statutes of limitation. Wells Fargo and Lewis acknowledged Pena's deposition testimony in which he testified that he was unaware that investing in technology mutual funds or margin trading were not "suitable" investments for the trust's assets until he consulted an attorney in 2005 after receiving the Chapas' demand letter requesting an accounting for the trust. Wells Fargo and Lewis averred that Pena's claim was "misplaced." The movants asserted, "[A]ny injury or wrongdoing caused by Wells Fargo or Lewis was clearly evident on the face of the bank statements, which showed all

activity in the margin account, the funds in which the account was invested, and gains and losses to the account."

To support this assertion, Wells Fargo and Lewis offered, as evidence, monthly and quarterly account statements received by Pena from December 1999 through January 2001. The statements show a noticeable decline in the brokerage account's funds. They also offered a document signed by Pena on December 4, 2000, which directed Wells Fargo to transfer funds from Internet and technology mutual funds into a "unit investment trust" that had "greater diversification and less overall **\*115** volatility." The movants pointed to the monthly account statement following this transaction, which reflected that proceeds from this sale had been used to pay monies owed on the margin account balance.

With regard to fraudulent concealment, Wells Fargo and Lewis argued that nothing had been concealed from Pena. They again pointed to the monthly and quarterly statements received by Pena, which showed the decline in the brokerage account's value.

Wells Fargo and Lewis argued that "any claims Pena may have had against Wells Fargo or Lewis accrued in 2000 when Pena received the monthly statements and quarterly reports reflecting the losses in technology funds, and certainly no later than December 4, 2000, when Pena decided to move the brokerage account investments out of the technology funds into more conservative investments, as a result of the losses." Wells Fargo and Lewis concluded that the Chapas' claims first asserted in their August 17, 2006 lawsuit were "barred by the statutes of limitations, as the longest period for any cause of action they allege is four years."

The Chapas responded to the motion for summary judgment by first clarifying that they, as the trust's beneficiaries, had the legal right to pursue claims on behalf of the trust which the trustee, Pena, had not pursued. The Chapas also reminded Wells Fargo and Lewis that they had asserted a claim against both defendants for assisting Pena in breaching his fiduciary duty as trustee to the Chapas.

The Chapas reasserted their claim that the discovery rule tolled the running of limitations. They argued that "a fiduciary's misconduct is inherently undiscoverable." The Chapas again pointed out that Pena, as trustee, owed them a fiduciary duty. They asserted, "Pena actively concealed from them the fact and extent of the injury they suffered through the misfeasance of Lewis." They continued, "Plaintiffs have established that they did not learn of their injury until December 2005 when [Pena] finally provided an accounting to the Plaintiffs."

In their summary judgment response, the Chapas also reasserted their claim that "the various statutes of limitations are tolled due to fraudulent concealment." They asserted that they had "produced evidence of a breach of trust/breach of fiduciary duty by Lewis, Wells Fargo, and [Pena] in picking out investments for the trust that were prima facie unsuitable." The Chapas argued that the defendants "knew of the tort, but used deception to conceal the tort." They further asserted that "a fiduciary has an affirmative duty to disclose material facts to the beneficiaries and a breach of the duty to disclose is tantamount to concealment." The Chapas averred that Pena had "failed to provide periodic statements regarding the trusts to Plaintiffs and did not disclose the losses occasioned by Lewis's negligence until long after they occurred." They asserted that they had "relied on Lewis's and Pena's deception to their detriment." For these reasons, the Chapas concluded, "[T]he applicable statute of limitations for the various causes of action were tolled during the time that the losses were fraudulently concealed."

In their motion for summary judgment, Wells Fargo and Lewis also argued that Lewis could not properly be joined pursuant to Civil Practice and Remedies Code section 33.004. The movants acknowledged that section 33.004 provides that a claimant (plaintiff) is not barred by limitations from seeking to join a responsible third party within 60 days after that person is designated as a responsible third party.

**\*116** Wells Fargo and Lewis argued that the Chapas should not be permitted to join Lewis because such joinder was a "fraudulent" attempt to avoid limitations. They alleged that the Chapas and Pena had conspired to circumvent limitations.

Wells Fargo and Lewis also argued that allowing joinder of a defendant against whom limitations had run before the lawsuit was initially filed would be an "absurd result" and a "nonsensical" interpretation of the statute.

The movants also asserted that section 33.004 did not apply to those causes of action asserted by the Chapas for which limitations had expired prior to the section's effective date. Wells Fargo and Lewis further asserted that section 33.004 did not apply to certain statutory claims asserted by the Chapas.

The Chapas responded that the plain language of section 33.004(e) permitted their joinder of Lewis and appeared to "contemplate[ ] the very issue of bringing in a person who limitations may have run against." The Chapas further asserted that Wells Fargo was "liable under the doctrine of respondeat superior to the extent that [Lewis] is found liable."

Wells Fargo and Lewis filed a reply to the Chapas' summary judgment response. In addition to reasserting their initial summary judgment arguments, the summary judgment movants pointed out that, in their response, the Chapas "do not dispute that they stand in the shoes of Pena, the trustee, for purposes of their claims." Wells Fargo and Lewis agreed that the Chapas could assert claims based on their status as beneficiaries of the testamentary trust. But, they disagreed that the Chapas had "individual claims against Wells Fargo and Lewis." They asserted, "Plaintiff's stand in the trustee's shoes, and Plaintiffs' limitations period is computed from the time the trustee acquired his right to sue."

In their reply, Wells Fargo and Lewis also asserted, "[s]ection 33.004 was clearly not intended to allow for the collusive joinder of an employee of a previously-named defendant where, as here, the claims against the employee and employer are one and the same, and the employee was known to the parties all along, and Plaintiffs made a conscious decision not to sue the employee at the outset." They further alleged that, even assuming that Lewis was properly joined, section 33.004 does not operate to "revive" time-barred claims against Wells Fargo "by virtue of respondeat superior."

In addition to their traditional motion for summary judgment, Wells Fargo and Lewis also asserted a no-evidence motion for summary judgment with respect to one of the Chapas' causes of action: the Chapas' claim that Wells Fargo and Lewis had participated or assisted in Pena's breach of his fiduciary duty as trustee to the Chapas. Specifically, Wells Fargo and Lewis asserted that the Chapas could produce no evidence that Wells Fargo's and Lewis's conduct breached a duty to the Chapas.

The trial court granted Wells Fargo's and Lewis's motion for summary judgment. In its order, the trial court specified that "all claims asserted by Plaintiffs [the Chapas] against Wells Fargo and Lewis are barred by the statutes of limitations." The trial court ordered that all of the Chapas' claims against Wells Fargo and Lewis "are hereby dismissed with prejudice, and Plaintiffs shall take nothing by reason of those claims." The trial court then granted the movants' motion to sever, making the summary judgment order final for purposes of appeal.

The Chapas appealed. They present three issues challenging the summary judgment order. In their first two issues, **\*117** the Chapas contend that summary judgment was not proper based on limitations. In their third issue, the Chapas assert that summary judgment could not be based on the ground that there was no evidence to support their claim that Wells Fargo and Lewis participated or assisted Pena in breaching his fiduciary duty.

### Summary Judgment Based on Limitations

In their first and second issues, the Chapas contend that the trial court erred by granting summary judgment because Wells Fargo and Lewis failed to prove, as a matter of law, that limitations bar the Chapas' claims, which they assert as trust beneficiaries on behalf of the trustee. On appeal, the Chapas contend that a genuine issue of material fact exists regarding whether the discovery rule deferred the accrual of these causes of action. [1]

### A. Legal Principles: Traditional Summary Judgment and Limitations

Because summary judgment is a question of law, a trial court's summary judgment decision is reviewed de novo. *See Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). In our review, we take the nonmovant's competent evidence as true, indulge every reasonable inference in favor of the nonmovant, and resolve all doubts in favor of the nonmovant. *Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 846 (Tex.2005). To prevail on a "traditional" summary-judgment motion asserted under Rule 166a(c), a movant must prove that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *See* TEX.R. CIV. P. 166a(c); *Little v. Texas Dep't of Criminal Justice,* 148 S.W.3d 374, 381 (Tex.2004).

**[1]** **[2]** A defendant moving for summary judgment on the affirmative defense of limitations must conclusively establish the date on which the limitations commenced; that is, the date on which the cause of action accrued. *See Pustejovsky v. Rapid–American Corp.,* 35 S.W.3d 643, 646 (Tex.2000); *Zale Corp. v. Rosenbaum,* 520 S.W.2d 889, 891 (Tex.1975). The determination of this date is typically a question of law. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 221 (Tex.2003).

**[3]** **[4]** As a general rule, a cause of action accrues, and the statute of limitations begins to run, when facts come into existence that authorize a party to seek a judicial remedy. *Id.* (citing *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 514 (Tex.1998)). In most cases, claims accrue "when a wrongful act causes some legal injury." *Via Net v. TIG Ins. Co.,* 211 S.W.3d 310, 313 (Tex.2006). This is true even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred. *Knott,* 128 S.W.3d at 221 (citing *S.V. v. R.V.,* 933 S.W.2d 1, 4 (Tex.1996)).

**[5]** **[6]** The discovery rule defers the accrual of a cause of action until the plaintiff knows, or by exercising reasonable diligence, should know of the facts giving rise to the claim. *Barker v. Eckman,* 213 S.W.3d 306, 311–12 (Tex.2006). For the discovery rule to apply, the injury must be inherently undiscoverable and objectively verifiable. *Id.* at 312; *Via Net,* 211 S.W.3d at 313.

**\*118** **[7]** **[8]** **[9]** If the plaintiff pleads the discovery rule as an exception to limitations, the moving defendant then has the dual burden of proving the date of accrual and of negating the discovery-rule exception. *See Envtl. Procedures, Inc. v. Guidry,* 282 S.W.3d 602, 622 (Tex.App.-Houston [14th Dist.] 2009, pet. denied). The defendant may negate the exception by proving, as a matter of law, that no genuine issue of material fact exists regarding when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the wrongful act and resulting injury. *See KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999); *see also Childs v. Haussecker,* 974 S.W.2d 31, 37 (Tex.1998). If the movant establishes that limitations bars the action, the nonmovant must then adduce summary judgment proof raising a fact issue to avoid limitations. *KPMG Peat Marwick,* 988 S.W.2d at 748.

**B. Analysis of Whether Limitations had Expired**

In *Interfirst Bank–Houston, N.A. v. Quintana Petroleum Corporation,* we explained,

> It is only when the trustee cannot or will not enforce the cause of action that he has against the third person that the beneficiary is allowed to enforce it. In such a case, the beneficiary is not acting on a cause of action vested in him, but is acting for the trustee, and

the period of the statute of limitations should be computed from the time the trustee acquired his right to sue.

699 S.W.2d 864, 874 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.).

In this case, the Chapas asserted their claims against Wells Fargo and Lewis for breach of fiduciary duty, breach of the duty of good faith and fair dealing, negligent misrepresentation, negligence, fraud, and for statutory violations, as trust beneficiaries on behalf of the trustee. *See id.* The parties agree that the limitations periods for these claims began to run when Pena, as trustee, acquired his right to sue. *See id.* As a result, Wells Fargo and Lewis had to show that no genuine issue of material fact exists regarding when Pena, not the Chapas, discovered, or in the exercise of reasonable diligence should have discovered, the wrongful act and resulting injury. [2] *See id.* Indeed, all of the arguments and evidence offered by Wells Fargo and Lewis related to Pena's knowledge, not the Chapas' knowledge.

The Chapas allege that Lewis owed a fiduciary duty to Pena to correctly advise him regarding suitable investments for the testamentary trust funds. The Chapas allege that Lewis breached this duty when he directed Pena to engage in margin trading and invest in high-risk technology mutual funds.

**\*119** **[10]** **[11]** **[12]** The Chapas correctly point out that when analyzing the applicability of the discovery rule in cases in which the alleged injuries arise from a breach of fiduciary duty, the claims are generally considered inherently undiscoverable. *See S.V.,* 933 S.W.2d at 8; *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 456 (Tex.1996). Nonetheless, once the fiduciary's misconduct becomes apparent, the claimant cannot ignore it, regardless of the fiduciary nature of the relationship. *See S.V.,* 933 S.W.2d at 8; *see also Computer Assocs.,* 918 S.W.2d at 456. In other words, such claims accrue when the claimant knows or in the exercise of ordinary diligence should know of the wrongful act and resulting injury. [3] *See Murphy v. Campbell,* 964 S.W.2d 265, 271 (Tex.1997). The date that a claimant knew or should have known of an injury is generally a fact question. *See Childs,* 974 S.W.2d at 44. However, if reasonable minds could not differ about the conclusion to be drawn from the facts in the record, the start of the limitations period may be determined as a matter of law. *See id.*

**[13]** Here, Wells Fargo and Lewis offered evidence to show that, on December 4, 2000, Pena knew, or should have known, the risky and "unsuitable" nature of the subject investments and of the injury to the trust. To support summary judgment, the movants offered the monthly and quarterly statements received by Pena from December 1999 through January 2001. The statements show that from December 31, 1999 to November 30, 2000 the value of the brokerage account declined from $653,214.87 to $433,202.86. In the month of November 2000, the account lost $152,886.26. The statement dated December 29, 2000 indicates that account funds were used to pay for losses sustained due to margin trading.

The movants offered Pena's deposition testimony in which Pena admitted that he was aware that the losses to the brokerage account resulted from the investments in the technology mutual funds. Pena acknowledged that he decided to take the brokerage account's funds out of the technology sector investments in December 2000 because he knew that the account had sustained losses from the technology investments.

The movants also offered the "Client Investment Replacement Authorization" form signed by Pena on December 4, 2000. In the form, Pena directed that the brokerage account's funds "exit" from the technology mutual funds and be invested in a "unit investment trust." The hand-written notation on the form indicates that the "reason for [the] change" was as follows: "Diversify from internet sector/technology funds into UIT with greater diversification and less overall volatility."

By the hand-written notation, the Client Investment Replacement Authorization form indicates that Pena was aware that the technology investments were, as the Chapas allege, not "suitable" investments for the trust fund's assets because of their volatility. Pena was also aware that the trust's corpus had sustained substantial losses caused by investment in the technology mutual funds. And he was aware that margin trading was also depleting the trust fund's assets.

Pena's awareness of these facts, at a minimum, would have caused a reasonably prudent trustee to further inquire into Lewis's conduct. Even assuming a fiduciary relationship between Pena and Lewis, **\*120** Pena could not simply sit back and ignore the very facts that the Chapas now, acting on his behalf, claim afford them a judicial remedy.

Based on the summary judgment proof offered, Wells Fargo and Lewis conclusively established that Pena knew, or should have known of Lewis's alleged wrongdoing, and of the resulting injury, on December 4, 2000. *See Murphy,* 964 S.W.2d at 271; *S.V.,* 933 S.W.2d at 8; *Computer Assocs.,* 918 S.W.2d at 456; *see also Freuden v. Hibernia Nat. Bank,* No. 09–08–00398–CV, 2009 WL 2045158, at \*3 (Tex.App.-Beaumont July 16, 2009, pet. denied) (mem.op.). This is true even when the evidence is viewed in favor of the Chapas. Thus, Wells Fargo and Lewis conclusively proved that the Chapas' causes of action brought on behalf of Pena accrued on December 4, 2000.

On appeal, the Chapas point to record evidence to show that, when viewed in the light most favorable to them, a genuine issue of material fact exists regarding when their causes of action accrued. The Chapas rely on Pena's testimony that he did not realize that the trust's funds had not been suitably invested until December 2005, when Pena consulted an attorney to respond to the Chapas' demand for an accounting of the trust.

The Chapas also point to evidence that Pena was inexperienced as a trustee and as an investor. Pena testified that he told Lewis that he did not want to place the trust's funds in any risky investments. He stated that Lewis had assured him that the funds would be not be put at risk. Pena testified that, when he questioned Lewis regarding the losses in the account, Lewis reassured him that the investments were suitable. In their brief, the Chapas point to testimony that Lewis had "crafted the investment strategy specific for the Trust to achieve 'preservation' of the principal for the benefit of the Chapas as beneficiaries, all the while knowing that Pena was relying on his expert advice as a 'certified financial planner.' " The Chapas also cite testimony that, on one occasion, "Lewis made the decision to sell stock out of the Trust account to reduce the amount of margin without seeking the approval of Pena or even notifying him of such sale until after the fact."

Here, the monthly account statements, coupled with the Client Investment Replacement Authorization, shows that, on December 4, 2000, Pena had an affirmative awareness of the losses sustained by the trust's assets and of the cause of that loss. When viewed in their favor, the evidence cited by the Chapas may raise a fact issue regarding whether Pena knew, or should have known, of the alleged unsuitable nature of the investments *before* December 4, 2000, given the claimed fiduciary relationship between Lewis and Pena. The evidence

cited by the Chapas may also be relevant to the underlying merits of their claims. But, such evidence does not raise a genuine issue of material fact regarding whether Pena knew, or should have known, of Lewis's alleged wrongdoing and of the resulting injury on December 4, 2000.

Viewing the evidence in the light most favorable to the Chapas, Wells Fargo and Lewis established that Pena knew, or should have known, of Lewis's alleged wrongdoing and of the resulting injury on December 4, 2000. *See Murphy,* 964 S.W.2d at 271; *S.V.,* 933 S.W.2d at 8; *Computer Assocs.,* 918 S.W.2d at 456. Accordingly, Wells Fargo and Lewis conclusively proved that the Chapas' causes of action brought on behalf of Pena accrued on December 4, 2000.

It is undisputed that the Chapas' causes of action have statutes of limitations ranging from two years to four years. The **\*121** Chapas did not file suit until August 17, 2006. Therefore, we conclude that the Chapas' claims against Wells Fargo and Lewis, asserted by them on behalf of Pena, for breach of fiduciary duty, breach of the duty of good faith and fair dealing, negligent misrepresentation, negligence, fraud, and violating the Deceptive Trade Practices Act and the Texas Securities Act were barred by limitations when the suit was filed.

### C. Civil Practices and Remedies Code Section 33.004

 **[14]**   In support of their first two issues challenging summary judgment, the Chapas also contend that Civil Practices and Remedies Code section 33.004 permits them to pursue their claims against Lewis and Wells Fargo, regardless of whether those claims were time-barred at the time suit was initially filed. Section 33.004 is part of Chapter 33, the statutory scheme for the apportionment of responsibility in tort and deceptive trade practices actions. *See* TEX. CIV. PRAC. REM.CODE ANN. §§ 33.001–.017 (Vernon 2008).

Section 33.004 provides, in relevant part,

> (a) A defendant may seek to designate a person as a responsible third party by filing a motion for leave to designate that person as a responsible third party. The motion must be filed on or before the 60th day before the trial date unless the court finds good cause to allow the motion to be filed at a later date.
>
> ....

> (e) If a person is designated under this section as a responsible third party, a claimant is not barred by limitations from seeking to join that person, even though such joinder would otherwise be barred by limitations, if the claimant seeks to join that person not later than 60 days after that person is designated as a responsible third party.

TEX. CIV. PRAC. REM.CODE ANN. § 33.004(a),(e) (Vernon 2008).

It is undisputed that, pursuant to section 33.004(e), the Chapas joined Lewis within 60 days after he had been designated as a responsible third party by Pena. In their motion for summary judgment, Wells Fargo and Lewis raised several grounds to support their assertion that section 33.004(e) did not permit Lewis's joinder.

### 1. Public Policy

The movants first characterize Lewis's joinder as "fraudulent." They alleged that the Chapas and Pena colluded to join Lewis after the Chapas realized that their claims against Wells Fargo were time-barred. The movants argued that section 33.004(e)'s joinder provision should not apply when, as here, a plaintiff's claims were time-barred *before* suit was filed. Specifically, the movants asserted,

> [I]nterpreted logically, the apparent limitations savings clause [of section 33.004(e) ] should only operate to revive claims against later joined responsible third parties in cases where the initial lawsuit was timely filed. Any suggestion to the contrary, namely that limitations may be revived as to claims which were barred on the date the lawsuit was first filed, would essentially strip all defendants who are joined as responsible third parties from any limitations defense, regardless of how far back the conduct in question occurred. Taken to its end, this argument would lead to absurd results and potential for collusion that the legislature could not have possibly intended when they drafted § 33.004(e).

The movants acknowledged that no case law supports their policy argument and that "the legislative history does not shed any light on the limitations issue."

**\*122** Although the movants' policy argument has certain common sense appeal, it cannot serve to defeat the plain language of the statute, which permitted the joinder of Lewis in this case. Last year, the San Antonio Court of Appeals rejected a similar public policy argument in *Flack v. Hanke,* ——S.W.3d ——, —— (Tex.App.-San Antonio 2009, no pet.). There, the designating defendant had agreed to designate the appellees as responsible third parties in exchange for being dismissed from the suit as part of a settlement agreement with the plaintiff. *See id.* at ——. The appellees argued that their designation as responsible third parties should be disallowed because such designation was an "attempt to manipulate the process" and to circumvent their statutory limitations defense. *Id.* at ——. The court of appeals acknowledged that the appellees were likely designated as responsible third parties solely to "wash out" the appellees' limitations defense. [4] *Id.* at ——. Nonetheless, the San Antonio court of appeals rejected the appellees' policy argument, explaining, "[T]he statute does not specifically preclude such designations based on the intent of the designor." *Id.*

 **[15]** We must construe section 33.004(e) according to its plain language and may not add language that is not implicitly contained in the language of the statute. *See Lee v. City of Houston,* 807 S.W.2d 290, 295 (Tex.1991). Here, we can ascertain no legislative intent from the statutory scheme that the legislature meant to preclude the joinder of a responsible third party, which had a valid limitations defense when the suit was filed. *See* TEX. CIV. PRAC. REM.CODE ANN. § 33.004(e); *see also* TEX. CIV. PRAC. REM.CODE ANN. § 33.002 (defining applicability of Chapter 33, including listing types of claims to which chapter does not apply). Rather, the provision's plain language expressly allows, for a limited period, the revival of claims that were previously time-barred. *See* TEX. CIV. PRAC. REM.CODE ANN. § 33.004(e).

 **[16]** We further note that our function is not to question the wisdom of the statute or measure it for logic; we are to apply the statute as written, unless the context or an absurd result requires a different construction. *See City of Rockwall v. Hughes,* 246 S.W.3d 621, 629 (Tex.2008); *Lee,* 807 S.W.2d at 293. Wells Fargo and Lewis argued in their summary judgment motion that allowing Lewis's joinder leads to such

an absurd result. To illustrate their point, they offered the following example and argument:

> Plaintiff (P) files suit in January 2008 against D1, an individual driving alone, and D2, a moving company, for negligence stemming from a May 1997 three-car automobile accident. P's claims against D1 and D2 are clearly barred by the two-year negligence statute of limitations. D1, the individual, files a motion to designate T, the employee driver of D2's moving company vehicle, as a responsible third party. P then joins T as a defendant pursuant to 33.004(e), even though over 10 years have passed since the accident, and any claims against T are clearly time-barred. By the Chapa Plaintiffs' logic, the claims against T should survive pursuant to the savings clause of 33.004(e), even though the initial suit by P was not timely filed. Thus, P would be able to revive a completely dead case and pursue his 10–year–old claims against T. Clearly this **\*123** was not the intent of the legislature in drafting 33.004.

Again, Wells Fargo and Lewis provide a compelling argument. Nonetheless, the underlying facts of this case are unlike those in the movants' example. Here, no allegation or proof has been offered to show that the Chapas' claims against Pena, the defendant who designated Lewis as a responsible third party, were time-barred when suit was initially filed. To the contrary, it appears accepted by the parties that the Chapas' claims against Pena were timely. In contrast, the defendant, D1, in the movants' example, who designated T as a responsible third party, had a valid limitations defense when suit was filed.

The distinction does have significance. Here, the case is not "completely dead," as the movants characterized the claims in their example. The Chapas had a "live" claim against Pena when they filed suit. Under the statutory scheme of Chapter 33, Pena had the right to designate Lewis as a responsible third party to apportion responsibility. *See* TEX. CIV. PRAC. REM.CODE ANN. § 33.004(a).

The legislature has chosen to permit a defendant to designate a responsible third party, regardless of whether that party has a valid limitations defense. *See* TEX. CIV. PRAC. REM.CODE ANN. § 33.011(6) (Vernon 2008) (broadly defining "responsible third party"). In turn, the legislature balanced out the rights of a claimant, such as the Chapas, by giving the claimant a 60–day window to join a responsible third party, regardless of whether that party has a valid limitations defense. *See* TEX. CIV. PRAC. REM.CODE ANN. § 33.004(e); *see also Kimbrell v. Molinet,* 288 S.W.3d 464, 470 (Tex.App.-San Antonio 2009, pet. filed) (Simmons, J., concurring) (discussing legislative history of Chapter 33 and balancing of parties' rights under statutory scheme). In short, we conclude the movants' policy argument is without merit and did not prevent Lewis's joinder by the Chapas.

**2. Claims with Two–Year Limitations Period**

In their motion for summary judgment, Wells Fargo and Lewis also asserted that section 33.004(e) did not apply to the Chapas' claims governed by two-year statutes of limitations. The movants pointed out, "The amendments to Chapter 33, including § 33.004(e), became effective September 1, 2003." *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 23.02, 2003 Tex. Gen. Laws 847, 898–99. The 2003 version governs all cases filed on or after July 1, 2003. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 23.02(c), 2003 Tex. Gen. Laws 847, 899.

Wells Fargo and Lewis further asserted, "It is well-settled that a new limitations statutory scheme cannot revive claims on which limitations had expired prior to enactment of the new statute." They averred, "In the instant case, the [Chapas'] claims with a two-year statute of limitations had already expired by September 1, 2003."

 **[17]** It is undisputed that the following claims asserted by the Chapas against Lewis had a two-year statute of limitations: breach of the duty of good faith and fair dealing, negligent misrepresentation, negligence, and DTPA violations. [5] <mark>The movants asserted that, because these claims were time-barred when the 2003 amendments to Chapter 33 were enacted,</mark> the Chapas could not assert these causes of action against Lewis when they joined him pursuant to section 33.004(e). <mark>We agree.</mark>

 **\*124** In *Baker Hughes, Inc. v. Keco R. & D., Inc.,* the Texas supreme court reaffirmed "settled law" that, "after a cause

has become barred by the statute of limitation, the defendant has a vested right to rely on such statute as a defense." 12 S.W.3d 1, 4 (Tex.1999) (citing *Wilson v. Work,* 122 Tex. 545, 62 S.W.2d 490, 490 (1933); *Cathey v. Weaver,* 111 Tex. 515, 242 S.W. 447, 453 (1922); *Mellinger v. City of Houston,* 68 Tex. 37, 3 S.W. 249, 255 (1887)). The court continued, "To permit barred claims to be revived years later would undermine society's interest in repose, which is one of the principal justifications for statutes of limitations." *Id.* The court explained, "[W]e have written that a statute extending the limitations period of a claim already barred by limitations violates the Texas Constitution's prohibition against retroactive laws, which is article I, section 16." *Id.*

Here, the Chapas' claims against Lewis for breach of the duty of good faith and fair dealing, negligent misrepresentation, negligence, and DTPA violations accrued, as discussed above, on December 4, 2000. When the legislature enacted the 2003 amendments to Chapter 33, including section 33.004(e), these claims were already time-barred. At the time of 33.004(e)'s enactment, Lewis had a vested right to rely on the statutes of limitation barring these claims. *See id.* Reading section 33.004(e) to divest Lewis of that right violates article I, section 16 of the Texas Constitution. *See id.* Accordingly, the Chapas' time-barred claims for breach of the duty of good faith and fair dealing, negligent misrepresentation, negligence, and DTPA violations may not, as a matter of law, be revived against Lewis pursuant to section 33.004(e). *See id.; see also Mann v. Jack Roach Bissonnet, Inc.,* 623 S.W.2d 716, 718–19 (Tex.Civ.App.-Houston [1st Dist.] 1981, no writ) (holding that legislature cannot extend limitations period for claims that are already time-barred).

**3. Statutory Claims**

 **[18]  [19]  [20]**  Civil Practice and Remedies Code section 33.002(a) provides that Chapter 33 applies to

 (1) any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought; or

 (2) any action brought under the Deceptive Trade Practices–Consumer Protection Act (Subchapter E, Chapter 17, Business & Commerce Code) in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought.

TEX. CIV. PRAC. REM.CODE ANN. § 33.002(a) (Vernon 2008). The movants argued that Chapter 33 does not apply to the Chapas' statutory claims asserted under the Texas Securities Act and the Texas Trust Act.[6] The movants' assertions are not supported by the weight of authority.

Article 33.002(a) provides that Chapter 33 applies to "any action based in tort." TEX. CIV. PRAC. REM.CODE ANN. § 33.002(a) (emphasis added). The Texas supreme court has applied Chapter 33 to statutory tort claims that do not include a separate **\*125** and conflicting legislative fault allocation scheme.[7] *Compare JCW Elecs., Inc. v. Garza,* 257 S.W.3d 701, 705–06 (Tex.2008) (holding that Chapter 33 applied to UCC article 2 claims) *with Sw. Bank v. Info. Support Concepts, Inc.,* 149 S.W.3d 104, 111 (Tex.2004) (declining to apply Chapter 33 to UCC article 3 conversion claims because article 3 contains "its own loss allocation scheme uniquely applicable to conversion claims involving negotiable instruments"); *see also Werner v. KPMG, L.L.P.,* 415 F.Supp.2d 688, 703 (S.D.Tex.2006).

Here, the movants made no assertion in their motion for summary judgment that the Chapas' statutory claims are not "based in tort." Nor is there any argument that the subject statutes contained a separate and conflicting legislative fault allocation scheme. Accordingly, we conclude that section 33.004(e) applied to the Chapas' statutory claims asserted against Lewis. *See JCW Elecs.,* 257 S.W.3d at 705–06.

## 4. Respondeat Superior

 **[21]**    In the trial court and on appeal, the Chapas contend that, to the extent that section 33.004(e) applies to Lewis, it also applies to Wells Fargo, based on respondeat superior.[8] As a result, the Chapas contend that Wells Fargo remains a defendant in the lawsuit, regardless of whether it has a valid limitations defense.

In their opening brief, the Chapas contend that "the doctrine of respondeat superior clearly and most logically applies to the context of Section 33.004(e)." They argue, "Permitting a claim against an employer based on vicarious liability should be revived if the claim against the employee is revived as well." The Chapas do not cite, nor can we locate, any authority determining this issue. Nor does Chapter 33 generally, or section 33.004(e) specifically, address the interplay between the proportionate liability scheme and claims based on theories of vicarious liability. *See generally*

*Fid. & Guar. Ins. Underwriters Inc. v. Wells Fargo Bank,* No. H–04–2833, 2006 WL 870683, at \*5 (S.D.Tex. Mar. 31, 2006) (noting that "courts and commentators alike have recognized the difficulty in reconciling the language of the Proportionate Responsibility Statute with certain causes of actions, including vicarious and/or derivative liability actions"); D. Underwood & Michael D. Morrison, *Apportioning Responsibility in Cases Involving Claims of Vicarious Derivative, or Statutory Liability for Harm Directly Caused by the Conduct of Another,* 55 BAYLOR L.REV. 617, 647–48 (2003) (writing that the legislature, in enacting the original and present versions of section 33.003, did not consider derivative or vicarious liability cases).

 **[22]**    As noted by the El Paso Court of Appeals, "The purpose of Chapter 33 ... is to apportion the damages for which joint tortfeasors are liable, according to the percentage **\*126** of fault." *Gilcrease v. Garlock, Inc.,* 211 S.W.3d 448, 457 (Tex.App.-El Paso 2006, no pet.); *see also* TEX. CIV. PRAC. REM.CODE ANN. § 33.003 (directing that jury apportions responsibility among only those persons whose conduct caused or contributed to cause harm on which damages sought). Pursuant to the doctrine of respondeat superior, an employer will be held vicariously liable for the negligence of its employee regardless of any allegation of fault on the part of the employer. *See Bedford v. Moore,* 166 S.W.3d 454, 461 (Tex.App.-Fort Worth 2005, no pet.). Allowing a plaintiff to use section 33.004(e) to revive a time-barred claim against a party, not for its tortious conduct, but merely based on its relationship with a tortfeasor, is incongruent with Chapter 33's statutory scheme to apportion responsibility based on the person's harm-causing conduct. *Cf. Rosell v. Cent. W. Motor Stages, Inc.,* 89 S.W.3d 643, 656–57 (Tex.App.-Dallas 2002, pet. denied) (explaining that, "while the statute on its face requires all defendants to be included in the apportionment question, it would not be proper for an employer to be included along with the driver if its only responsibility was that of respondeat superior").

Moreover, section 33.004(e) permits a claimant to join a designated "responsible third party." Under § 33.011(6), a "responsible third party"

> means [in pertinent part] any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by

other conduct or activity that violates an applicable legal standard, or by any combination of these.

TEX. CIV. PRAC. REM.CODE ANN. § 33.011(6). A party that is liable based purely on respondeat superior does not fit this definition. The definition further underscores that section 33.004(e) should not be used to hold a party liable when no allegations have been made that the party caused or contributed to the claimant's damages. Accordingly, we conclude that the Chapas' time-barred claims against Wells Fargo based on respondeat superior are not revived by section 33.004(e).

### No Evidence Motion for Summary Judgment

 **[23]**  **[24]**  In their third issue, the Chapas contend that summary judgment cannot be based on Lewis's and Wells Fargo's no-evidence motion for summary judgment. The movants filed a no-evidence motion for summary judgment with respect to the Chapas' claim that Lewis and Wells Fargo assisted Pena in his breaching his fiduciary duty to the Chapas.[9]

 **[25]**  **[26]**  "When a third party knowingly participates in the breach of a fiduciary duty, the third party becomes a joint tortfeasor and is liable as such." *Kastner v. Jenkens & Gilchrist, P.C.,* 231 S.W.3d 571, 580 (Tex.App.-Dallas 2007, no pet.). In their fourth amended petition, the Chapas **\*127** asserted a breach of fiduciary duty claim against Pena, individually, and against Wells Fargo and Lewis as joint tortfeasors. The Chapas claimed that Wells Fargo and Lewis, as third parties, knew that Pena was committing a breach of his fiduciary duty. They alleged that Wells Fargo and Lewis knowingly participated in Pena's breach. The Chapas further alleged that Wells Fargo and Lewis became joint tortfeasors with Pena. They asserted that, as a result, Wells Fargo and Lewis are liable for participating in Pena's breach of trust. *See Kinzbach Tool Co. v. Corbett–Wallace Corp.,* 138 Tex. 565, 160 S.W.2d 509, 514 (1942); *Denson v. Dallas County Credit Union,* 262 S.W.3d 846, 851 (Tex.App.-Dallas 2008, no pet.).

In their no-evidence summary judgment motion, Wells Fargo and Lewis alleged that there is no evidence that their conduct, separate from Pena's conduct, breached a duty to the Chapas. In so doing, the movants misinterpreted the Chapas' cause of action. With regard to their assisting-in-breach-of-fiduciary-duty claim, the Chapas do not allege that Wells Fargo and Lewis breached a duty that they owed to the Chapas. Rather, they allege that Wells Fargo and Lewis knowingly assisted Pena in breaching his fiduciary duty to the Chapas. Indeed, to succeed on their assisting-in-breach-of-fiduciary-duty claim, the Chapas need not show that Wells Fargo and Lewis owed them a fiduciary duty or that Wells Fargo's and Lewis's conduct breached such a duty. *See Denson,* 262 S.W.3d at 851.

In a no-evidence motion for summary judgment, the movant must state the elements as to which there is no evidence for a claim. TEX.R. CIV. P. 166a(i); *Roventini v. Ocular Sciences, Inc.,* 111 S.W.3d 719, 722 (Tex.App.-Houston [1st Dist.] 2003, no pet.) (noting that "motion must specify which essential elements of the opponent's claim or defense lack supporting evidence"). Here, the only element identified by the movants as entitling them to summary judgment is not an element of the Chapas' assisting-in-breach-of-fiduciary-duty claim, as pleaded.[10] Accordingly, summary judgment cannot be properly granted on the movants' no-evidence summary judgment motion. *See Denson,* 262 S.W.3d at 851 (concluding that no-evidence summary judgment erroneously granted on assisting-in-breach-of-fiduciary-duty claim because movant mischaracterized duty element of claim).

### Conclusion

Based on the record and the foregoing analysis, we summarize our conclusions as follows:

- The Chapas' claims against Wells Fargo and Lewis, asserted on behalf of Pena, accrued on December 4, 2000.

- The Chapas' claims against Wells Fargo and Lewis, asserted on behalf of Pena, were time-barred when suit was filed.

- The Chapas' claims against Lewis for breach of fiduciary duty, fraud, and violating the Texas Securities Act were revived by Civil Practices and Remedies Code section 33.004(e).

- Because they were time-barred when the statute was enacted, the Chapas' claims against Lewis for breach of the duty of good faith and fair dealing, **\*128** negligent misrepresentation, negligence, and DTPA violations,

which have two-year statutes of limitations, are not revived by section 33.004(e).

• The Chapas' claims against Wells Fargo, based on respondeat superior, are not revived by section 33.004(e).

• The Chapas' claims against Wells Fargo and Lewis for assisting Pena in breaching his fiduciary duty are not time-barred, and the no-evidence motion for summary judgment on this claim should not have been granted.

• The trial court properly granted summary judgment based on limitations with regard to the Chapas' claims against Wells Fargo for breach of fiduciary duty, fraud, breach of the duty of good faith and fair dealing, negligent misrepresentation, negligence, and violating the DTPA and the Texas Securities Act.

• The trial court did not properly grant summary judgment with regard to the Chapas' claim against Wells Fargo for assisting Pena in the breach of his fiduciary duty.

• The trial court properly granted summary judgment based on limitations with regard to the Chapas' claims against Lewis for breach of the duty of good faith and fair dealing, negligent misrepresentation, negligence, and DTPA violations.

• The trial court did not properly grant summary judgment with regard to the Chapas' claims against Lewis for

breach of fiduciary duty, fraud, violating the Texas Securities Act, and assisting Pena in the breach of his fiduciary duty.

Accordingly, we affirm the judgment of the trial court to the extent that it grants summary judgment on the Chapas' claims against Wells Fargo for breach of fiduciary duty, fraud, breach of the duty of good faith and fair dealing, negligent misrepresentation, negligence, and violating the DTPA and the Texas Securities Act. We also affirm the judgment of the trial court to the extent that it grants summary judgment on the Chapas' claims against Lewis for breach of the duty of good faith and fair dealing, negligent misrepresentation, negligence, and DTPA violations.

We reverse the judgment of the trial court to the extent that it grants summary judgment on the Chapas' claims against Wells Fargo for assisting Pena in breaching his fiduciary duty. We also reverse the judgment of the trial court to the extent that it grants summary judgment on the Chapas' claims against Lewis for breach of fiduciary duty, fraud, violating the Texas Securities Act, and assisting Pena in breaching his fiduciary. We remand the case for further proceedings.

**All Citations**

315 S.W.3d 109

---

Footnotes

1   In the trial court, the Chapas asserted that fraudulent concealment also served to toll the running of limitations. On appeal, the Chapas do not separately brief fraudulent concealment, but incorporate certain aspects of it into their discovery-rule argument.

2   In contrast, the Chapas prosecute the claim against Wells Fargo and Lewis for assisting or participating in Pena's breach of his fiduciary duty in individual capacities, not on behalf of the trustee. We agree with the Chapas that the limitations period for this claim began when *the Chapas* knew or should have known of facts that, in the exercise of reasonable diligence, would have led to the discovery of Pena's alleged breach of his fiduciary duty. *See Little v. Smith,* 943 S.W.2d 414, 420 (Tex.1997); *Slay v. Burnett Trust,* 143 Tex. 621, 187 S.W.2d 377, 394 (1945). Wells Fargo and Lewis offered no summary judgment argument or proof to show when *the Chapas* knew or should have known of facts that, in the exercise of reasonable diligence, would have led to discovery of Pena's alleged breach of his fiduciary to them. Thus, summary judgment was not proper on this claim based on limitations. As mentioned, Wells Fargo and Lewis asserted a no-evidence motion for summary judgment regarding this cause of action. We discuss the propriety of the no-evidence motion for summary judgment with respect to this claim *infra.*

3   The same rule applies by statute in DTPA claims. *See* TEX. BUS. & COM.CODE ANN. § 17.565 (Vernon 2002).

4   We note that, unlike in *Flack,* there is no evidence in this case that Pena and the Chapas had any express agreement whereby Lewis would be designated by Pena as a responsible third party.

5   The parties also agree that the other causes of action asserted by the Chapas against Lewis and Wells Fargo are subject to three- or four-year limitation periods.

6   Wells Fargo and Lewis also assert on appeal that Chapter 33 does not apply to fraud claims. The movants did not raise this ground in the trial court to support summary judgment. As a result, we cannot reach this ground. The law is clear: we may not affirm a summary judgment on grounds "not expressly set out in the motion or response." *Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 26 (Tex.1993). In any event, the Chapter 33 has been held to apply to fraud claims. *See Isaacs v. Bishop,* 249 S.W.3d 100, 116 (Tex.App.-Texarkana 2008, pet. denied).

7   Wells Fargo and Lewis cite *Davis v. Estridge,* 85 S.W.3d 308, 311 (Tex.App.-Tyler 2001, pet. denied), for its conclusion that Chapter 33 does not apply to a statutory fraud claim because the DTPA was the only statute expressly mentioned in section 33.002(a). We do not find *Davis* persuasive. Since *Davis,* the Texas supreme court has held that Chapter 33 applied to a statutory tort claim in *JCW Electronics, Inc. v. Garza,* 257 S.W.3d 701, 705–06 (Tex.2008). Moreover, the express language of section 33.002(a) provides that Chapter 33 applies "to *any* action based in tort." TEX. CIV. PRAC. REM.CODE ANN. § 33.002(a) (Vernon 2008) (emphasis added).

8   In the trial court, the Chapas also asserted that Wells Fargo was liable for Lewis's conduct based on Wells Fargo's alleged negligent failure to supervise Lewis. The Chapas do not argue or brief this theory of vicarious liability on appeal.

9   As mentioned, unlike all their other claims against Wells Fargo and Lewis, the Chapas' claim for assisting Pena in the breach of his fiduciary duty was not brought by the Chapas on behalf of Pena. Accordingly, the accrual date for this claim would be different from the accrual date of Chapas' other claims. No argument or evidence has been offered to show the accrual date for the Chapas' assisting-in-breach-of fiduciary-duty claim. Therefore, summary judgment based on limitations was not proper on this claim. Although the trial court's order identified limitations as the only basis for summary judgment, we may consider, in the interest of justice, grounds that the movant preserved for review and on which the trial court did not rule. *See Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 626 (Tex.1996).

10  In the trial court, Wells Fargo's and Lewis's no-evidence motion for summary judgment also identified other elements on which there was no evidence. On appeal, the parties now disagree only regarding the propriety of the movants' assertion that there is no evidence that the conduct of Wells Fargo and Lewis breached a duty that they owed to the Chapas. In their brief, Wells Fargo and Lewis argue that they owed no fiduciary duty directly to the Chapas. They contend that, if they owed any duty, it was owed only to Pena.

---

                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

GGG

# CIVIL PRACTICE & REMEDIES CODE

# CHAPTER 33. PROPORTIONATE RESPONSIBILITY

# SUBCHAPTER A. PROPORTIONATE RESPONSIBILITY

## § 33.001. PROPORTIONATE RESPONSIBILITY.

In an action to which this chapter applies, a claimant may not recover damages if his percentage of responsibility is greater than 50 percent.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.  Amended by Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.04, eff. Sept. 2, 1987;  Acts 1995, 74th Leg., ch. 136, § 1, eff. Sept. 1, 1995.

## § 33.002. APPLICABILITY.

(a) This chapter applies to:

(1)  any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought;  or

(2)  any action brought under the Deceptive Trade Practices-Consumer Protection Act (Subchapter E, Chapter 17, Business & Commerce Code)  in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought.

(b)  Repealed by Acts 2003, 78th Leg., ch. 204, § 4.10(1).

(c)  This chapter does not apply to:

(1)  an action to collect workers' compensation benefits under the workers' compensation laws of this state  (Subtitle A, Title 5, Labor Code)  or actions against an employer for exemplary damages arising out of the death of an employee;

(2)  a claim for exemplary damages included in an action to which this chapter otherwise applies;  or

(3)  a cause of action for damages arising from the manufacture of methamphetamine as described by Chapter 99.

(d)  to (h) Repealed by Acts 2003, 78th Leg., ch. 204, § 4.10(1).

Added by Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.05, eff. Sept. 2, 1987. Amended by Acts 1989, 71st Leg., ch. 380, § 4, eff. Sept. 1, 1989;  Acts 1995, 74th Leg., ch. 136, § 1, eff. Sept. 1, 1995;  Acts 1995, 74th Leg., ch. 414, § 17, eff. Sept. 1, 1995;  Acts 2001, 77th Leg., ch. 643, § 2, eff. Sept. 1, 2001;  Acts 2003, 78th Leg., ch. 204, § 4.01, 4.10(1), eff. Sept. 1, 2003.

## § 33.003. DETERMINATION OF PERCENTAGE OF RESPONSIBILITY.

  (a) The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, for the following persons with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these:
      (1)  each claimant;
      (2)  each defendant;
      (3)  each settling person;  and
      (4)  each responsible third party who has been
designated under Section 33.004.
  (b)  This section does not allow a submission to the jury of a question regarding conduct by any person without sufficient  evidence to support the submission.

Added by Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.06, eff. Sept. 2, 1987. Amended by Acts 1995, 74th Leg., ch. 136, § 1,eff. Sept. 1, 1995;  Acts 2003, 78th Leg., ch. 204, § 4.02, eff. Sept. 1, 2003.

## § 33.004. DESIGNATION OF RESPONSIBLE THIRD PARTY.

  (a) A defendant may seek to designate a person as a responsible third party by filing a motion for leave to designate that person as a responsible third party. The motion must be filed on or before the 60th day before the trial date unless the court finds good cause to allow the motion to be filed at a later date.
  (b)  Nothing in this section affects the third-party practice as previously recognized in the rules and statutes of this state with regard to the assertion by a defendant of rights to contribution or indemnity.  Nothing in this section affects the filing of cross-claims or counterclaims.
  (c), (d) Repealed by Acts 2003, 78th Leg., ch. 204, § 4.10(2).
  (e)  If a person is designated under this section as a responsible third party, a claimant is not barred by limitations from seeking to join that person, even though such joinder would otherwise be barred by limitations, if the claimant seeks to join that person not later than 60 days after that person is designatedas a responsible third party.
  (f)  A court shall grant leave to designate the named person as a responsible third party unless another party files an objection to the motion for leave on or before the 15th day after the date the motion is served.
  (g)  If an objection to the motion for leave is timely filed, the court shall grant leave to designate the person as a responsible third party unless the objecting party establishes:

(1)  the defendant did not plead sufficient facts concerning the alleged responsibility of the person to satisfy the pleading requirement of the Texas Rules of Civil Procedure;  and

(2)  after having been granted leave to replead, the defendant failed to plead sufficient facts concerning the alleged responsibility of the person to satisfy the pleading requirements of the Texas Rules of Civil Procedure.

(h)  By granting a motion for leave to designate a person as a responsible third party, the person named in the motion is designated as a responsible third party for purposes of this chapter without further action by the court or any party.

(i)  The filing or granting of a motion for leave to designate a person as a responsible third party or a finding of fault against the person:

(1)  does not by itself impose liability on the person; and

(2)  may not be used in any other proceeding, on the basis of res judicata, collateral estoppel, or any other legal theory, to impose liability on the person.

(j)  Notwithstanding any other provision of this section, if, not later than 60 days after the filing of the defendant's original answer, the defendant alleges in an answer filed with the court that an unknown person committed a criminal act that was a cause of the loss or injury that is the subject of the lawsuit, the court shall grant a motion for leave to designate the unknown person as a responsible third party if:

(1)  the court determines that the defendant has pleaded facts sufficient for the court to determine that there is a reasonable probability that the act of the unknown person was criminal;

(2)  the defendant has stated in the answer all identifying characteristics of the unknown person, known at the time of the answer;  and

(3)  the allegation satisfies the pleading requirements of the Texas Rules of Civil Procedure.

(k)  An unknown person designated as a responsible thirdparty under Subsection (j) is denominated as "Jane Doe" or "John Doe" until the person's identity is known.

(l)  After adequate time for discovery, a party may move to strike the designation of a responsible third party on the ground that there is no evidence that the designated person is responsible for any portion of the claimant's alleged injury or damage.  The court shall grant the motion to strike unless a defendant produces sufficient evidence to raise a genuine issue of fact regarding the designated person's responsibility for the claimant's injury or damage.

Added by Acts 1995, 74th Leg., ch. 136, § 1, eff. Sept. 1, 1995.
Amended by Acts 2003, 78th Leg., ch. 204, § 4.03, 4.04, 4.10(2), eff. Sept. 1, 2003.

## SUBCHAPTER B. CONTRIBUTION

### § 33.011. DEFINITIONS.

In this chapter:

(1) "Claimant" means a person seeking recovery of damages, including a plaintiff, counterclaimant, cross-claimant, or third-party plaintiff. In an action in which a party seeks recovery of damages for injury to another person, damage to the property of another person, death of another person, or other harm to another person, "claimant" includes:

(A) the person who was injured, was harmed, or died or whose property was damaged; and

(B) any person who is seeking, has sought, or could seek recovery of damages for the injury, harm, or death of that person or for the damage to the property of that person.

(2) "Defendant" includes any person from whom, at the time of the submission of the case to the trier of fact, a claimant seeks recovery of damages.

(3) "Liable defendant" means a defendant against whom a judgment can be entered for at least a portion of the damages awarded to the claimant.

(4) "Percentage of responsibility" means that percentage, stated in whole numbers, attributed by the trier of fact to each claimant, each defendant, each settling person, or each responsible third party with respect to causing or contributing to cause in any way, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity violative of the applicable legal standard, or by any combination of the foregoing, the personal injury, property damage, death, or other harm for which recovery of damages is sought.

(5) "Settling person" means a person who has, at any time, paid or promised to pay money or anything of monetary value to a claimant in consideration of potential liability with respect to the personal injury, property damage, death, or other harm for which recovery of damages is sought.

(6) "Responsible third party" means any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these. The term "responsible third party" does not include a seller eligible for indemnity under Section 82.002.

(7) Repealed by Acts 2003, 78th Leg., ch. 204, § 4.10(3).

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985. Amended by Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.07, eff. Sept. 2, 1987; Acts 1995, 74th Leg., ch. 136, § 1, eff. Sept. 1, 1995; Acts 2003, 78th Leg., ch. 204, § 4.05, 4.10(3), eff. Sept. 1, 2003.

## § 33.012. AMOUNT OF RECOVERY.

  (a) If the claimant is not barred from recovery under Section 33.001, the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility.
  (b)  If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by the sum of the dollar amounts of all settlements.
  (c)  Notwithstanding Subsection (b), if the claimant in a health care liability claim filed under Chapter 74 has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by an amount equal to one of the following, as elected by the defendant:
        (1)  the sum of the dollar amounts of all settlements;  or
        (2)  a percentage equal to each settling person's percentage of responsibility as found by the trier of fact.
  (d)  An election made under Subsection (c) shall be made by any defendant filing a written election before the issues of the action are submitted to the trier of fact and when made, shall be binding on all defendants.  If no defendant makes this election or if conflicting elections are made, all defendants are considered to have elected Subsection (c)(1).
  (e)  This section shall not apply to benefits paid by or on behalf of an employer to an employee pursuant to workers' compensation insurance coverage, as defined in Section 401.011(44), Labor Code, in effect at the time of the act, event, or occurrence made the basis of claimant's suit.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.  Amended by Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.08, eff. Sept. 2, 1987;  Acts 1995, 74th Leg., ch. 136, § 1, eff. Sept. 1, 1995;  Acts 2003, 78th Leg., ch. 204, § 4.06, 4.10(4), eff. Sept. 1, 2003;  Acts 2005, 79th Leg., ch. 277, § 1, eff. June 9, 2005;  Acts 2005, 79th Leg., ch. 728, § 23.001(6), eff. Sept. 1, 2005.

## § 33.013. AMOUNT OF LIABILITY.

  (a) Except as provided in Subsection (b), a liable defendant is liable to a claimant only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury, property damage, death, or other harm for which the damages are allowed.
  (b)  Notwithstanding Subsection (a), each liable defendant is, in addition to his liability under Subsection (a), jointly and severally liable for the damages recoverable by the claimant under Section 33.012 with respect to a cause of action

if:

    (1)  the percentage of responsibility attributed to the defendant with respect to a cause of action is greater than 50 percent;  or

    (2)  the defendant, with the specific intent to do harm to others, acted in concert with another person to engage in the conduct described in the following provisions of the Penal Code and in so doing proximately caused the damages legally recoverable by the claimant:

        (A)  Section 19.02 (murder);

        (B)  Section 19.03 (capital murder);

        (C)  Section 20.04 (aggravated kidnapping);

        (D)  Section 22.02 (aggravated assault);

        (E)  Section 22.011 (sexual assault);

        (F)  Section 22.021 (aggravated sexual assault);

        (G)  Section 22.04 (injury to a child, elderly individual, or disabled individual);

        (H)  Section 32.21 (forgery);

        (I)  Section 32.43 (commercial bribery);

        (J)  Section 32.45 (misapplication of fiduciary property or property of financial institution);

        (K)  Section 32.46 (securing execution of document by deception);

        (L)  Section 32.47 (fraudulent destruction, removal, or concealment of writing);  or

        (M)  conduct described in Chapter 31 the punishment level for which is a felony of the third degree or higher.

 (c)  Repealed by Acts 2003, 78th Leg., ch. 204, § 4.10(5).

 (d)  This section does not create a cause of action.

 (e)  Notwithstanding anything to the contrary stated in the provisions of the Penal Code listed in Subsection (b)(2), that subsection applies only if the claimant proves the defendant acted or failed to act with specific intent to do harm.  A defendant acts with specific intent to do harm with respect to the nature of the defendant's conduct and the result of the person's conduct when it is the person's conscious effort or desire to engage in the conduct for the purpose of doing substantial harm to others.

 (f)  The jury may not be made aware through voir dire, introduction into evidence, instruction, or any other means that the conduct to which Subsection (b)(2) refers is defined by the Penal Code.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.  Amended by Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.09, eff. Sept. 2, 1987;  Acts 1995, 74th Leg., ch. 136, § 1, eff. Sept. 1, 1995;  Acts 2003, 78th Leg., ch. 204, § 4.07, 4.10(5), eff. Sept. 1, 2003.

## § 33.015. CONTRIBUTION.

(a) If a defendant who is jointly and severally liable under Section 33.013 pays a percentage of the damages for which the defendant is jointly and severally liable greater than his percentage of responsibility, that defendant has a right of contribution for the overpayment against each other liable defendant to the extent that the other liable defendant has not paid the percentage of the damages found by the trier of fact equal to that other defendant's percentage of responsibility.

(b) As among themselves, each of the defendants who is jointly and severally liable under Section 33.013 is liable for the damages recoverable by the claimant under Section 33.012 in proportion to his respective percentage of responsibility. If a defendant who is jointly and severally liable pays a larger proportion of those damages than is required by his percentage of responsibility, that defendant has a right of contribution for the overpayment against each other defendant with whom he is jointly and severally liable under Section 33.013 to the extent that the other defendant has not paid the proportion of those damages required by that other defendant's percentage of responsibility.

(c) If for any reason a liable defendant does not pay or contribute the portion of the damages required by his percentage of responsibility, the amount of the damages not paid or contributed by that defendant shall be paid or contributed by the remaining defendants who are jointly and severally liable for those damages. The additional amount to be paid or contributed by each of the defendants who is jointly and severally liable for those damages shall be in proportion to his respective percentage of responsibility.

(d) No defendant has a right of contribution against any settling person.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985. Amended by Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.11, eff. Sept. 2, 1987; Acts 1995, 74th Leg., ch. 136, § 1, eff. Sept. 1, 1995.

## § 33.016. CLAIM AGAINST CONTRIBUTION DEFENDANT.

(a) In this section, "contribution defendant" means any defendant, counterdefendant, or third-party defendant from whom any party seeks contribution with respect to any portion of damages for which that party may be liable, but from whom the claimant seeks no relief at the time of submission.

(b) Each liable defendant is entitled to contribution from each person who is not a settling person and who is liable to the claimant for a percentage of responsibility but from whom the claimant seeks no relief at the time of submission. A party may assert this contribution right against any such person as a contribution defendant in the claimant's action.

(c) The trier of fact shall determine as a separate issue or finding of fact the

percentage of responsibility with respect to each contribution defendant and these findings shall be solely for purposes of this section and Section 33.015 and not as a part of the percentages of responsibility determined under Section 33.003. Only the percentage of responsibility of each defendant and contribution defendant shall be included in this determination.

 (d)  As among liable defendants, including each defendant who is jointly and severally liable under Section 33.013, each contribution defendant's percentage of responsibility is to be included for all purposes of Section 33.015. The amount to be contributed by each contribution defendant pursuant to Section 33.015 shall be in proportion to his respective percentage of responsibility relative to the sum of percentages of responsibility of all liable defendants and liable contribution defendants.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.  Amended by Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.11A, eff. Sept. 2, 1987;  Acts 1995, 74th Leg., ch. 136, § 1, eff. Sept. 1, 1995.

## § 33.017. PRESERVATION OF EXISTING RIGHTS OF INDEMNITY.

Nothing in this chapter shall be construed to affect any rights of indemnity granted by any statute, by contract, or by common law.  To the extent of any conflict between this chapter and any right to indemnification granted by statute, contract, or common law, those rights of indemnification shall prevail over the provisions of this chapter.

Added by Acts 1995, 74th Leg., ch. 136, § 1, eff. Sept. 1, 1995. Amended by Acts 2003, 78th Leg., ch. 204, § 4.08, eff. Sept. 1, 2003.

HHH

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 3. Legislative Branch (Refs & Annos)
      Subtitle B. Legislation
        Chapter 311. Code Construction Act (Refs & Annos)
          Subchapter B. Construction of Words and Phrases (Refs & Annos)

V.T.C.A., Government Code § 311.011

§ 311.011. Common and Technical Usage of Words

Currentness

(a) Words and phrases shall be read in context and construed according to the rules of grammar and common usage.

(b) Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.

**Credits**
Acts 1985, 69th Leg., ch. 479, § 1, eff. Sept. 1, 1985.

Notes of Decisions (49)

V. T. C. A., Government Code § 311.011, TX GOVT § 311.011
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.



---

Vernon's Texas Rules Annotated
  Texas Rules of Civil Procedure
    Part II. Rules of Practice in District and County Courts
      Section 3. Parties to Suits

TX Rules of Civil Procedure, Rule 38

Rule 38. Third-Party Practice

Currentness

**(a) When defendant may bring in third party.** At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a citation and petition to be served upon a person not a party to the action who is or may be liable to him or to the plaintiff for all or part of the plaintiff's claim against him. The third-party plaintiff need not obtain leave to make the service if he files the third-party petition not later than thirty (30) days after he serves his original answer. Otherwise, he must obtain leave on motion upon notice to all parties to the action. The person served, hereinafter called the third-party defendant, shall make his defenses to the third-party plaintiff's claim under the rules applicable to the defendant, and his counterclaims against the third-party plaintiff and cross-claims against other third-party defendants as provided in Rule 97. The third-party defendant may assert against the plaintiff any defenses which the third-party plaintiff has to the plaintiff's claim. The third-party defendant may also assert any claim against the plaintiff arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff. The plaintiff may assert any claim against the third-party defendant arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff, and the third-party defendant thereupon shall assert his defenses and his counterclaims and cross-claims. Any party may move to strike the third-party claim, or for its severance or separate trial. A third-party defendant may proceed under this rule against any person not a party to the action who is or who may be liable to him or to the third-party plaintiff for all or part of the claim made in the action against the third-party defendant.

**(b) When plaintiff may bring in third party.** When a counterclaim is asserted against a plaintiff, he may cause a third party to be brought in under circumstances which under this rule would entitle a defendant to do so.

**(c)** This rule shall not be applied, in tort cases, so as to permit the joinder of a liability or indemnity insurance company, unless such company is by statute or contract liable to the person injured or damaged.

**(d)** This rule shall not be applied so as to violate any venue statute, as venue would exist absent this rule.

**Credits**
Oct. 29, 1940, eff. Sept. 1, 1941. Amended by orders of March 31, 1941, eff. Sept. 1, 1941; Dec. 5, 1983, eff. April 1, 1984.

Notes of Decisions (94)

Vernon's Ann. Texas Rules Civ. Proc., Rule 38, TX R RCP Rule 38
Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through September 1, 2015. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration

---

are current with amendments received through September 1, 2015. Other state court rules and selected county rules are current with rules verified through June 1, 2015.

---

**End of Document**                                               © 2015 Thomson Reuters. No claim to original U.S. Government Works.